# EXHIBIT 1



NORTH PENN SCHOOL DISTRICT
Student Registration Form

Date of Registration   3/3/08
Page 1 of 1

Student ID:   135990
Jane Doe

Current Building:   PRE-REGISTRATION
Next Building:   GWYNEDD SQUARE ELEMENTARY   Next Grade:   KG
Entry Date:   6/27/08
Birthdate:                    5      Gender: F    Ethnicity: WHITE
Name other than legal:

Grade:   PK

Family number:   807144

Primary Language in home:   ENGLISH
Resident Code:   RESIDENT
Evidence to become resident

IEP required?  N
Last School Attended:

Place of birth:
Placement Agency:
Attendance Code:   E1

Birth certificate #
Affidavit:

Proof of immunization?
Grade:

Imm Dt:
Previously at NP?

Hepatitis B:
Bldg:
Gr:

Student lives with:   PARENT(S)
Guardian 1:                    MRS   MOTHER

Guardian 2:                    MR   FATHER

Emp.

Emp.

Other adults living in household:

Siblings:

| Studentid | Fname | Mname | Lname | Birthdate | Grad year | Grade | Building | Sex |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

I certify that the above information is complete and accurate to the best of my knowledge.
Parent/Guardian Signature:                                                    Date:   3-3-08

# EXHIBIT 2

NAME: **Jane Doe**
TEACHER: Dirver, Ruth
STUDENT ID:

Gwynedd Square Elementary
William Bowen, Principal

YEAR: 2014 - 2015
GRADE: 06

### CHARACTERISTICS OF A SUCCESSFUL LEARNER

| | Marking Period 1 | 2 | 3 |
|---|---|---|---|
| **Self-Directed Learner** | | | |
| Follows directions | - | ✓ | ✓ |
| Seeks help when needed | ✓ | + | ✓ |
| Works independently to complete tasks | - | ✓ | ✓ |
| Stays focused during instruction | - | - | - |
| **Quality Producer** | | | |
| Keeps desk area and materials organized | - | - | ✓ |
| Writes legibly | ✓ | ✓ | ✓ |
| **Collaborative Worker** | | | |
| Accepts constructive suggestions | ✓ | ✓ | ✓ |
| Works cooperatively in groups of various sizes | ✓ | ✓ | ✓ |
| **Respectful Citizen** | | | |
| Follows school and class rules | ✓ | ✓ | ✓ |
| Demonstrates respect for property, self, and others | ✓ | ✓ | ✓ |
| Demonstrates self-control | - | - | - |

### READING (Performance Level)

| | Program Modified 1 | 2 | 3 |
|---|---|---|---|
| Demonstrates initiative and effort | N | ✓ | N |
| Completes and returns quality assignments on time | - | ✓ | ✓ |
| **Learns To Read Independently** | | | |
| Applies comprehension skills and strategies to gain meaning from text | - | - | - |
| Reads fluently | ✓ | ✓ | ✓ |
| Applies reading vocabulary | ✓ | ✓ | ✓ |
| Uses word recognition strategies | ✓ | ✓ | ✓ |
| **Reads Critically In All Content Areas** | | | |
| Reads and communicates understanding of informational text | - | - | - |
| **Speaking And Listening In All Content Areas** | | | |
| Listens and contributes relevant ideas to discussions | ✓ | ✓ | ✓ |
| Expresses ideas clearly | | | - |
| **Reads, Analyzes, And Interprets Literature** | | | |
| Identifies and uses story elements | | | |
| Identifies and uses literary devices | | | |
| Communicates understanding of a variety of texts | ✓ | ✓ | ✓ |
| **Research** | | | |
| Selects, organizes, and presents information | NA | ✓ | ✓ |

### WRITING (Performance Level)

| | Program Modified 1 | 2 | 3 |
|---|---|---|---|
| Demonstrates initiative and effort | N | ✓ | ✓ |
| Completes and returns quality assignments on time | N | + | ✓ |
| **Types Of Writing** | | | |
| Writes in an appropriate form: narrative, informational, and/or persuasive | ✓ | ✓ | ✓ |
| **Quality Of Writing** | | | |
| Maintains a focus on topic | ✓ | ✓ | ✓ |
| Includes content with supporting details | - | ✓ | ✓ |
| Uses appropriate organization | ✓ | ✓ | ✓ |
| Uses style in writing (varies word choice, sentence structure, figurative language) | - | ✓ | ✓ |
| Uses conventions of writing (grammar, capitalization, punctuation, & spelling) | - | - | ✓ |
| Edits and revises | - | - | - |

### SCIENCE (Grade)   DElia, Rossana

| | Program Modified N | N | N |
|---|---|---|---|
| Demonstrates initiative and effort | ✓ | ✓ | ✓ |
| Completes and returns quality assignments on time | - | ✓ | ✓ |
| Uses scientific process skills in investigations (generates questions; designs, performs investigations, analyzes data & draws conclusions) | ✓ | ✓ | ✓ |
| Understands and applies vocabulary and concepts | ✓ | ✓ | ✓ |

### SOCIAL STUDIES (Grade)   DElia, Rossana

| | Program Modified C | B | C |
|---|---|---|---|
| Demonstrates initiative and effort | N | N | N |
| Completes and returns quality assignments on time | ✓ | + | ✓ |
| Understands and applies vocabulary and concepts | ✓ | + | ✓ |
| Applies information to draw conclusions | - | - | ✓ |

### HEALTH (Performance Level)   DElia, Rossana

| | Program Modified NA | NA | 3 |
|---|---|---|---|
| Demonstrates initiative and effort | N | N | N |
| Completes and returns quality assignments on time | ✓ | NA | ✓ |
| Understands and applies information, vocabulary and concepts | ✓ | NA | ✓ |

### MATHEMATICS (Grade)   Asman, Kelli

| | Program Modified 1 | 2 | 3 |
|---|---|---|---|
| | D | C | B |
| Demonstrates initiative and effort | N | N | N |
| Completes and returns quality assignments on time | ✓ | ✓ | ✓ |
| Knows basic facts (add, subtract, multiply, divide) | ✓ | ✓ | ✓ |
| Applies and explains problem solving strategies using appropriate mathematical terminology | ✓ | ✓ | ✓ |
| **Numbers And Operations** | | | |
| Solves fraction problems using all operations | ✓ | ✓ | ✓ |
| Identifies processes to compute with multi-digit numbers | - | ✓ | ✓ |
| Applies number theory concepts to find factors and multiples | ✓ | ✓ | ✓ |
| Applies/extends understanding of rational numbers | | | |
| **Ratios and Proportional Relationships** | | | |
| Understands ratio concepts and ratio reasoning to solve problems | NA | ✓ | NA |
| **Algebraic Concepts** | | | |
| Applies/extends understanding of algebraic expressions | | | |
| Demonstrates understanding of equations and inequalities | NA | NA | NA |
| **Geometry** | | | |
| Solves area, surface area, and volume problems | NA | NA | ✓ |
| **Measurement, Data and Probability** | | | |
| Displays, analyzes, and summarizes data | NA | NA | ✓ |

### GRADING SYSTEM KEY

**Grade**
A (Outstanding)    B (Very Good)    C (Satisfactory)
D (Less than Satisfactory)    F (Minimum requirements not met)

**Progress Level as of reporting date**
+ Strongly in Place
√ Meets Expectations
- Needs Improvement

**Performance Level**
4 = Advanced    3 = Proficient    2 = Basic    1 = Below Basic

**Support Services**
ESL    √ IEP    Title 1    Reading Support
Speech    Chapter 15/504    GIEP    Other

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
NO. 2:20-CV-05142


JANE DOE,                    )    DEPOSITION UPON
                             )
        Plaintiff,           )    ORAL EXAMINATION
                             )
   - vs -                    )         OF
                             )
NORTH PENN SCHOOL            )    Jane Doe
DISTRICT,                    )
                             )
        Defendant.           )
- - - - - - - - - - -   )


TRANSCRIPT OF DEPOSITION,
taken by and before JAMES J. GALLAGHER, JR.,
Professional Reporter and Notary Public, at
FREIWALD LAW, 1500 Walnut Street, 18th Floor,
Philadelphia, Pennsylvania, on Tuesday,
November 2, 2021, commencing at 10:05 a.m.


ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA 19103
(215) 564-1233

Jane Doe

---

**30**

1    I'm just kind of -- if that makes any --
2    I'm not trying to say she was a bad person.
3    BY MS. JORDAN:
4    Q.    From what you've told me, would I be
5    correct that you didn't feel as though your
6    interactions with Ms. Andrews were positive in
7    helping you improve your academics at elementary
8    school?
9    A.    She had another teacher around with her.  I
10   don't remember her name, but she was small -- and
11   I'm not saying this in any bad way, but she had dark
12   skin and she was small and -- I don't remember --
13   but she would kind of always come around and like --
14   I don't -- it would be like a bull in a China shop.
15   She would come and like take you over and your work
16   and stuff like that and Ms. Holly wouldn't exactly
17   interact with you as much as she would, but I don't
18   remember her name.
19   Q.    Do you know if the person you just
20   described was a student teacher?
21   A.    I don't know.  She was maybe one of the
22   assistant teachers.  I'm not too sure.
23   Q.    Now, when she would interact with you, was
24   that a positive experience?

---

**31**

1    A.    No.
2    Q.    Now, you previously identified that Ms.
3    Divers was one of your teachers, correct?
4    A.    Yes.
5    Q.    And she was your English or language arts
6    teacher, correct?
7    A.    Yes.
8    Q.    And that's one of the classes that you do
9    recall that M P was in your class, correct?
10   A.    Yes.
11   Q.    And in the classroom, in Ms. Divers' class
12   in sixth grade, where did you sit in relationship to
13   M P , if you remember?
14   A.    Across the room.  I think he would sit at
15   the top corner or something like that and I would
16   sit at the bottom, but I'm not 100 percent sure
17   though.
18   Q.    So would I be correct that you did not sit
19   next to each other on a daily basis?
20   A.    No.
21   Q.    Okay.  Now, in regard to your lawsuit,
22   there is an incident that occurred in Ms. Divers'
23   class, correct?
24   A.    Yes.

---

**32**

1    Q.    And that involved M P , correct?
2    A.    Yes.
3    Q.    And am I correct that on that particular
4    day you and M.P. were partners on a project
5    of some kind?
6    A.    Yes.
7    Q.    How is it that you and M P became
8    partners?
9    A.    I think it was either he kind of like told
10   me to go over there or one of the teachers assigned
11   us.  I don't remember exactly how it happened, but
12   all I remember is that we were kind of sitting at
13   the table together and we were next to each other
14   and we were just kind of working on a project, but
15   I'm not 100 percent sure what it was or --
16   Q.    Okay.  So if I understand your testimony,
17   you were M P 's partner that day in a
18   project, but you don't recall how you came to be
19   partners or what you were working on?
20   A.    It was either he called me over there and
21   like told me to go over there or Ms. Divers assigned
22   us over there and -- yeah, I'm not 100 percent sure
23   on that.
24   Q.    And when you say that he told me to go over

---

**33**

1    there, you're referring to M P , correct?
2    A.    Yeah.
3    Q.    Had you ever been partners with M P.
4    M P in any class on a project before?
5    A.    I think the only one else would be
6    D'Elia's, but I'm not too sure if that's -- that's
7    sixth grade, so, yeah, I believe, and that was --
8    yeah.  It was in science class and we would do a few
9    projects together or he would like tell me to do a
10   few projects together with him or she would put us
11   together and then we would do projects together.
12   Q.    Now, it was during this period of time that
13   you were in language arts class where M P
14   touched you inappropriately, correct?
15   A.    Uh-huh.
16        MS. LAUGHLIN:  Is that yes?
17        THE WITNESS:  Yes.  Sorry.
18        MS. LAUGHLIN:  That's okay.
19   BY MS. JORDAN:
20   Q.    Can you describe for me what occurred in
21   that language arts class?
22   A.    So we were working on a project and I was
23   trying to -- I was trying to do whatever we were
24   doing and the next thing you know -- like he would

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

**34**

1  always like try to turn a little bit to the side so
2  he didn't look like suspicious and then try to take
3  his hand and graze my back or my back under my shirt
4  or he would try to like graze my chest or like my
5  chest area and then anytime the teacher was looking
6  he would like take it away really quickly and --
7  Q.    When he attempted to touch your chest area
8  or graze your chest area, was that over your
9  clothes?
10  A.    No.  It was under.
11  Q.    And was that the first time that M.P.
12  touched you inappropriately?
13  A.    I want to say yes.
14  Q.    And when he first began to touch you,
15  either under your shirt in the back or the front,
16  what if anything did you do?
17  A.    I would try to shove him off or close my
18  arm off so he couldn't get under.  Because he would
19  try to go under his arm so it didn't like look
20  suspicious or anything like that.  So I would try to
21  like shake him off or tell him no or push him off
22  and he wouldn't exactly stop.
23  Q.    And am I correct that Ms. Andrews saw what
24  M.P. was doing?

**35**

1  A.    Yes.
2  Q.    And did you see yourself looking at the
3  front of the classroom that Ms. Andrews saw what
4  M.P was doing?
5  A.    Uh-huh.
6  Q.    And is that because you made eye contact
7  with her --
8  A.    Yes.
9  Q.    -- at the time?
10  A.    Uh-huh.
11  Q.    And when you were aware that Ms. Andrews
12  could see what M.P was doing then what happened?
13  A.    She kind of pointed to us and said Jane Doe,
14  M.P , out in the hall and then we went out into
15  the hall to talk with her.
16  Q.    And do you recall what she asked you?
17  A.    She was asking us -- or she was like I saw
18  -- she was just like I saw your hand -- pointing
19  over to M.P , like your hand up her shirt; am I
20  correct?  And like looked at both of us.  I kind of
21  looked at her like yeah.  And he looked at her and
22  goes like no.  She was like all right.  Well, if I
23  do not see this again I will not tell the principal
24  or your parents.  Go into the room, go sit at your

**36**

1  desks and move.  Don't do it again kind of thing.
2  Then she sent us on our way.
3  Q.    When she asked you that question and you
4  said yes, did you say anything to her that you
5  didn't want him to do that?
6  A.    No.
7  Q.    How did you feel when she called you out of
8  the room?
9  A.    I felt happy that finally someone caught
10  it, because I didn't want to be the one to -- I
11  didn't know how to be the one to tell someone that
12  it was happening to me and yet I felt terrified
13  because I didn't know what else was going to be next
14  after it.
15  Q.    When you say that you were happy because
16  someone else knew about it and you didn't want it to
17  happen, does that refresh your recollection that it
18  had happened before or was it just from that time
19  you were happy because you didn't want it to
20  continue?
21  A.    I think there were a few times that it did
22  happen before and then -- because I know it happened
23  more times than that one incident.  I know there
24  were a few times before and a few times afterwards

**37**

1  and that I was kind of just sick of it at that
2  point, but --
3  Q.    Now, when it happened before, do you have a
4  recollection as to the first time it happened in
5  regard to a timeframe?
6  A.    Probably it started in the back of the line
7  when we would be going to like different classes or
8  something.
9  Q.    And was it when you were in sixth grade?
10  A.    Yeah.
11  Q.    And when it first happened, what is your
12  recollection of what M.P. did?
13  A.    He would try to walk up behind me really
14  closely so that like no one could see his arm and
15  then he would try to put it under my shirt and try
16  to go under my pants or like under my shirt, so --
17  Q.    And when he did it the first time, did you
18  say anything to M.P. regarding to stop it?
19  A.    I mean I shrugged him off and I looked at
20  him like, dude, stop.  What are you doing?  But then
21  it was just -- I kind of froze and I didn't know
22  what to do.
23  Q.    When M.P. touched you inappropriately the
24  first time in line did you say anything to any of

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

**38**

1  your teachers?
2  A.  No, because I didn't know what it was.
3  Q.  Did you mention it to either of your
4  parents?
5  A.  No.
6  Q.  Did you mention it to either of your
7  siblings?
8  A.  No.
9  Q.  When you were called out in the hall by Ms.
10  Andrews and she indicated that if it didn't happen
11  again she wouldn't call your parents, did you say
12  anything to her after that?
13  A.  No.
14  Q.  Did you say anything to any of your friends
15  at school?
16  A.  Uh-uh.
17          MS. LAUGHLIN:  You have to say
18      yes or no.
19          THE WITNESS:  No.  Sorry.
20          MS. LAUGHLIN:  That's okay.
21  BY MS. JORDAN:
22  Q.  When you went home, did you tell your
23  parents at any time?
24  A.  After the Andrews thing that came -- or

**39**

1  when it actually came to light, yes.
2  Q.  So you talked to your parents about it in
3  April of that same school year; would that be
4  correct?
5  A.  Yeah.  After it came out and after they had
6  actually like figured out what was going on.
7  Q.  Okay.  How about your siblings, did you
8  tell either of your siblings before it came out
9  after it occurred?
10  A.  No.
11  Q.  So from your answers, would I be correct
12  this is something you kept inside yourself?
13  A.  Yes.
14  Q.  Now, after M.P. touched you
15  inappropriately and Ms. Andrews called you outside,
16  did M P continue to touch you inappropriately
17  until April of the same school year when it came out
18  to other people in the school other than Ms. Andrews
19  and your parents?
20  A.  Yeah, a few times afterwards.  Then not
21  really after -- or not really that much after,
22  because then I guess he was on to the next girl,
23  because that's when the other one confessed what was
24  going on.

**40**

1  Q.  So in regard to him touching you
2  inappropriately after Ms. Andrews called you out in
3  the hall, do you have a recollection as to when the
4  next time was that it occurred?
5  A.  Maybe like a week or two afterwards.
6  Q.  Do you have a recollection as to where it
7  occurred?
8  A.  Probably in the hallway honestly.  It was
9  one time when we were like genuinely alone and we
10  just kind of ran into each other and he just like
11  came up and he was trying to like -- you know, be
12  himself and --
13  Q.  When you say be himself, was M P always
14  touchy with you?
15  A.  I mean he would -- if he could get me in a
16  spot where he knew that no one could see us, yeah.
17  Q.  And when he would touch you inappropriately
18  when he got a chance in a spot where no one could
19  see what, if anything, did you say to him?
20  A.  I would tell him to stop.  I would tell him
21  don't.  I'm like not right now.  Like leave me
22  alone.
23  Q.  And what, if anything, would he do in
24  response?

**41**

1  A.  He didn't care.
2  Q.  Were you afraid of M P ?
3  A.  Yeah.
4  Q.  And why were you afraid of him?
5  A.  Because I didn't know what to do.  I was
6  watching like -- I watched Ms. Andrews see something
7  that even after that I watched her see something
8  that's not supposed to even be happening, but
9  brushed it off like it was nothing.  And I was going
10  through my own things.  Because then that also
11  triggered me remembering my five-year-old experience
12  and that's -- and then I was going through all of
13  that by myself and it was all bottling up and I
14  just --
15  Q.  It's my understanding that when you were
16  five a neighbor molested you; is that correct?
17  A.  Yes.
18  Q.  And for how long a period of time did that
19  occur, if you remember?
20  A.  It only happened once.
21  ██ █████████████████████████████████
22  ██ ███████████████████████████████
23  ██ ██████████████████████
24  A.  I mean I didn't find that out just until

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

**46**

1  Q.    And did you discuss that with anyone at the
2  time?
3  A.    No, not after the [M.P.] incident.
4  Q.    Now, can you approximate for me how many
5  times you believe [M.P.] inappropriately touched you
6  prior to April when it all came out to light that he
7  had touched you inappropriately?
8  A.    I was like once or twice a week, three
9  times max maybe.  That was about it though.
10  Q.    Can you give me a number of times?
11          MS. LAUGHLIN:  If you can
12      estimate.
13          THE WITNESS:  Over 20.
14  BY MS. JORDAN:
15  Q.    Now, in April of 2015, which is still sixth
16  grade, how did you learn that [M.P.] had touched
17  someone else inappropriately?
18  A.    Because basically the school -- or my mom
19  had told me that it had come out that some other
20  girl reported him touching them inappropriately and
21  then a few other girls came out.  And my mom was
22  like, are you one of these girls?  I was like yeah.
23  Because during that time I was also then -- with the
24  remembering the five-years-old incident and going

**47**

1  through that incident I was dealing with some anger
2  issues and some anxiety and all that stuff and that
3  triggered the beginning of that and then I was
4  acting out.  And she was like is that's what's going
5  on here?  And I'm like yes, so --
6  Q.    And in regard to the anger issues, can you
7  describe for me what you mean by that?
8  A.    One time I ended up punching a fourth
9  grader in the stomach for annoying -- I mean for
10  picking me on me, but then because of like
11  everything else -- and I know I would never actually
12  do that, but in that situation I ended up doing
13  that, so --
14  Q.    So if I understand you, you acted out in
15  response to this fourth grader not being nice to you
16  in a way that was bigger than you would have
17  otherwise, but because of the anxiety that you had
18  from the touching incidents?
19  A.    Yes.  From the [M.P.] -- like if a girl
20  picked on me, normally I would be like, all right,
21  cool, let's laugh about it together, like let's go
22  along with it, but like just having that girl pick
23  on me on top of [M.P.] touching me and then having
24  to bottle that up for like six months by myself,

**48**

1  it's just -- like I kind of snapped at that moment.
2  Q.    Okay.  So when it came out that he had
3  touched other female students at the school
4  inappropriately and your mom came and asked you
5  about it and you admitted it happened, did you then
6  tell her about all the times he touched you
7  appropriately?
8  A.    Yes.
9  Q.    Did you speak to anyone at the school -- at
10  Gwynedd Square Elementary School about what [M.P.]
11  had done?
12  A.    I think Ms. Vaszily.
13  Q.    And who was Ms. Vaszily at the time, if you
14  know?
15  A.    The counselor.
16  Q.    Prior to the April incident involving
17  [M.P.] with these other girls, had you ever spoken
18  to Ms. Vaszily before?
19  A.    Yes.
20  Q.    And was she someone that was available for
21  you to speak to about anything?
22  A.    Yes.
23  Q.    Would I be correct that prior to the April
24  incident with [M.P.] and these other girls coming to

**49**

1  light you had never confided in Ms. Vaszily what was
2  going on with [M.P.] touching you inappropriately?
3  A.    Yes.
4  Q.    And when you spoke to Ms. Vaszily after it
5  all came to light did you tell her that [M.P.] had
6  touched you inappropriately 20 times?
7  A.    Yes.
8  Q.    What, if anything, did Ms. Vaszily say to
9  you?
10  A.    Wait.  Hold on.  Can you repeat the last
11  question?  I'm sorry.
12  Q.    Yeah.  I asked you if you had conveyed to
13  Ms. Vaszily when you spoke to her after the
14  April 2015 incident involving [M.P.] came to light
15  and then your incident of November of 2014 came out,
16  whether when you talked to her you told her about
17  the approximate 20 times that he had touched you
18  inappropriately?
19  A.    Yes.  Probably after the [M.P.] incident,
20  yeah, I talked to her, because before that she was
21  the one who was trying to help me not trigger my
22  memories of my five-year-old incident, because if I
23  had any like alarms -- or if there were any fire
24  drills or any like announcements that could have

Jane Doe

50

1  triggered we would try to like avoid them.  So she
2  would come and pull me out of class and be like
3  let's go play games or something like that, you
4  know, to keep your mind off of that, because we were
5  working so hard towards that that she even got
6  completely blind sided when this all happened and
7  she was the only one that I could talk to kind of
8  after that, so --
9  Q.     So would I be correct from what you just
10  said that Ms. Vaszily did know about your
11  five-year-old experience involving ████████ and
12  she was your go to person at the school to try and
13  help you contain any trigger events from occurring?
14  A.     Yes.
15  Q.     Okay.  And for how long was Ms. Vaszily
16  your go to person at the school, if you can
17  remember?
18  A.     Since basically whenever it happened and
19  whenever I went to the school.  So if I went there
20  when I was like five, it was ever since it happened
21  like --
22  Q.     Okay.  So Ms. Vaszily was always available
23  for you to talk to about trigger events to try and
24  contain your feelings about that incident, those,

51

1  you know, not good feelings from coming out?
2  A.     Yeah, like that or like my emotions or if I
3  just -- like if I was having a bad week or
4  something, she was kind of my go to person overall.
5  Q.     And did you appreciate your relationship
6  with Ms. Vaszily?
7  A.     Yes.
8  Q.     And did you believe that you could confide
9  in her and she would try to help you?
10  A.     Yes.
11  Q.     Okay.  Was there a reason you didn't tell
12  Ms. Vaszily about what M.P. was doing before it
13  came out in April?
14  A.     Because I knew if I told her then
15  everything between like my friends and just home
16  life and school life, everything would change.  Plus
17  I didn't know whether she was going to believe me,
18  because a sixth grader coming up to you and telling
19  you that before the other girl came out that -- you
20  don't think anyone is going to believe you.
21  Q.     So if I understand, you were afraid that
22  Ms. Vaszily wouldn't believe you that M.P. was
23  abusing you; is that correct?
24  A.     Yes.

52

1  Q.     And also you were concerned that if you
2  told her it would change your relationship at school
3  with friends as well as with your parents?
4  A.     Like it was just -- it was going to change
5  everything.  How could that not?  That's like -- and
6  also at the time, even at the beginning, I didn't
7  realize how wrong it was until the one girl really
8  came out.  Like I never realized the extent of how
9  wrong it was.
10  Q.     And who was the girl, if you remember her
11  name?
12  A.     Sara ████.
13  Q.     Were you friends with Sara ████?
14  A.     Yes.
15  Q.     And after Sara told the teacher that
16  M.P. was touching her inappropriately, did you
17  talk to Sara about your incident?
18  A.     I just -- when she was putting some stuff
19  on her food I just kind of walked up, gave her a hug
20  and said thank you and walked off.
21  Q.     Did she ever ask you why you hugged her and
22  why you were thanking her?
23  A.     No.  Because she looked at me and said
24  you're welcome.

53

1  Q.     Do you believe that she knew that that
2  meant that M.P. had also inappropriately touched
3  you?
4  A.     Yes.
5  Q.     Okay.  And do you know any of the other
6  girls who came forward?
7  A.     Not really.  Maybe like ████████ -- I'm
8  not 100 percent sure.
9  Q.     But you think ████ another girl --
10  A.     ████ but I have no clue.  I wouldn't
11  trust that, but --
12  Q.     So would I be correct that you only had the
13  intersection with Sara ████ that you just
14  described and not any of the other girls?
15  A.     Yes.
16  Q.     And as you sit here today, you're not sure
17  who the other girls are?
18  A.     Yes.
19  Q.     Now, your mom -- to your knowledge, was
20  your mom contacted at the school and that's how she
21  knew about the October 2014 incident?
22  A.     I think the school called her and told her
23  what was going on.  I don't exactly remember how
24  that whole thing went down and how we found out.

14  (Pages 50 to 53)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Jane Doe

**54**

1    Q.    Okay.  But your mom did come to you and ask
2    you about M.P. touching you inappropriately,
3    correct?
4    A.    Yes.
5    Q.    And you did confide in her that it had
6    happened?
7    A.    Yes.
8    Q.    Did you tell her that he had did it more
9    than once?
10   A.    Yes.
11   Q.    And did you have any intersection with the
12   police department at that time?
13   A.    There was -- I have this one police
14   officer, his name is Ted, and he was the -- he's
15   what my mom calls my guardian angle after -- because
16   he was there for my five-year-old incident and he
17   helped me try to -- or helped my parents try to
18   limit the amount of trauma from the whole experience
19   and just helping me to -- or him being the one to
20   just, you know, take me and do the whole system
21   since we kind of already did it once before.
22   Q.    Okay.  So Ted was the police officer that
23   you interacted with in relaying what _____ did
24   to you, if I understand what you're saying, correct?

**55**

1    A.    Yes.
2    Q.    And then after that the incident with ____
3    _____ am I understanding correctly that you had
4    interaction with Ted, the policeman, after that to
5    help you with your feelings about the _____
6    incident before it came out about M.P
7    inappropriately touching you?
8    A.    No.  It was -- he was the one for like --
9    so basically they want the policeman to come there
10   and like actually handle the situation, do the
11   investigation, but he was the one to handle all of
12   that, because he already knew our family and he
13   already knew how to do that and he ended up being
14   the policeman to kind of take over the case -- not
15   take over the case, but like be there, like the
16   policeman that's supposed to be there kind of.
17   Q.    Okay.  So if I understand you, because he
18   dealt with the five-year-old incident with you, when
19   it came to light that M.P. had inappropriately
20   touched you he was also called in to assist in
21   regard to finding out what had occurred?
22   A.    Yes.
23   Q.    Okay.  So would I be correct that you spoke
24   to Ted, the police officer, about what M P did?

**56**

1    A.    I never spoke to Ted about what happened,
2    but my mom was the one to speak to him about that
3    stuff.  Like my mom tried to keep me out of most of
4    that stuff to keep it like the least trauma -- like
5    least impacting as possible.  So when it comes to
6    like the talking to the policeman and all that
7    stuff I wasn't the one to ever do that really.
8    Q.    Okay.  And do you have any knowledge as to
9    what, if anything, the police did in relation to the
10   reports of M.P. touching not only you, but other
11   girls at Gwynedd Square Elementary School?
12   A.    I don't think he really got any -- I don't
13   think he got like anything afterwards.  I think they
14   did an investigation on him, but that was about it.
15   I don't think there was any like repercussions for
16   it.
17   Q.    Do you know if the school did anything to
18   M.P ?
19   A.    They didn't do anything.
20   Q.    Are you aware of him being suspended for
21   any period of time?
22   A.    No.
23   Q.    Did you have any conversations with your
24   parents about criminal charges against M.P. at

**57**

1    that time that you recall?
2    A.    Yeah, but we didn't -- it wasn't -- it
3    wasn't the time to do any like charges or anything
4    because I was already starting to spiral from how
5    traumatizing that was.  It wasn't good to put that
6    much on top of me.
7    Q.    And did you discuss that with your parents
8    to your recollection?
9    A.    Yes.
10   Q.    Now, after Sara told the school about what
11   M.P. was doing and it came to light that the same
12   thing had occurred to you in October -- I'm sorry --
13   November at the beginning of sixth grade, am I
14   correct that you were separated from M P at
15   school and that he was taken out of any class that
16   you were in?
17   A.    After the incident, like when Sara said --
18   Q.    Yes.
19   A.    Yes.
20   Q.    And Sara and the other girls who had
21   reported that he touched them inappropriately also
22   were separated from M.P. in class, correct?
23   A.    Yes.
24   Q.    Now, would I be correct that you still

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Jane Doe

**70**

```
 1   any kind with ███████?
 2   A.   Not in Pennbrook.
 3   Q.   Anywhere?
 4   A.   Like after the 6th grade?
 5   Q.   Yes.  In seventh grade --
 6   A.   No.
 7   Q.   -- when you were in seventh grade, did you
 8   have any intersection of any kind with ███████?
 9   A.   No.  Seventh and eighth I was clear of
10   seeing him for the year.
11   Q.   Okay.  So in seventh and eighth grade no
12   interaction with ███████, you didn't see him,
13   you didn't talk to him, you didn't have to be in the
14   same room with him?
15   A.   Uh-huh.
16        MS. LAUGHLIN:  Correct?
17        THE WITNESS:  Correct.  Sorry.
18        MS. LAUGHLIN:  That's okay.
19   BY MS. JORDAN:
20   Q.   Now, in ninth grade you were at Pennbrook,
21   but you were also going to attend classes North
22   Montco Technical Career Center, correct?
23   A.   Yes.
24   Q.   And that is something that you had to apply
```

**71**

```
 1   to for to attend, correct?
 2   A.   Yes.
 3   Q.   So you had to fill out paperwork?
 4   A.   Yes.
 5   Q.   And why did you want to go there?
 6   A.   Because to be honest, I wanted to kind of
 7   follow like my dad and my brother and stuff and do
 8   like automotive and just kind of learn like some new
 9   stuff instead of just going out into like the real
10   world and trying to get an automotive job, which is
11   kind of like hard for a girl and -- which I'm not
12   even trying to be sexist.  It's just not -- like you
13   look at me and you say you want to be in automotive?
14   Like the moment I walked into North Montco the girl
15   said, oh, you know cosmetology is the other way,
16   right?  And I looked at her and I'm like great, I'm
17   going this way, so --
18   Q.   So your brother █████, is he an auto
19   mechanic?
20   A.   He used to race quarter midgets.
21   Q.   Is that some kind of race car?
22   A.   It's a really, really small race car.
23   Q.   It sounds it.
24   A.   Yeah.  It's really fun.  Little kids like
```

**72**

```
 1   to go fast on them and it's really fun.
 2   Q.   And you said your dad also used to do
 3   automotive?
 4   A.   Yeah.  He used to detail cars and just --
 5   also, he didn't -- he didn't want me to go into
 6   construction and carpentry even though I wanted to,
 7   because he didn't want me to kind of break my back
 8   and stuff the way that he does every single day,
 9   because he has seen the ugly side of it and wants me
10   to be -- you know, keep your body for a few more
11   years, you know.  It's not time to break it yet.  So
12   I'm like, you know what, let's go into automotive.
13   Also he detailed cars.  It was cool.
14   Q.   And when he detailed cars, would he detail
15   them like at your home and you could watch him?
16   A.   I mean he would -- it was cool, because he
17   would be able to look at a bend in a car of the hood
18   and tell you exactly what car it was, what year and
19   what make and model.  It was just really cool.
20   You'd give him a part and he's like I know what this
21   is.  It's just learning all that stuff and just
22   learning how to be able to do your own stuff.  Like
23   my mom says, oh, I need my oil changed.  He's like
24   let's go do that.  It seemed just really cool.
```

**73**

```
 1   Q.   So prior to you attending North Montco,
 2   would you ever help your dad do car automotive?
 3   A.   Yes.  And I have my sister's boyfriend,
 4   yeah.
 5   Q.   So you filled out the paperwork and you
 6   indicated that you wanted take automotive classes,
 7   correct?
 8   A.   Yes.
 9   Q.   And you were accepted?
10   A.   Yes.
11   Q.   Now, do you remember when you were in ninth
12   grade when school started what the breakdown was of
13   how often you would go to North Montco versus stay
14   at Pennbrook?
15   A.   So when it came to North Montco, I think --
16   wasn't that -- wasn't there a year that I
17   transferred -- I transferred into North Montco as a
18   full-time ninth grader.  So I think there was maybe
19   a few times where we would go like before school --
20   or not before school, but in the middle of school,
21   but I'm not too sure, because pretty much right
22   after I went there part time I ended up transferring
23   there to full time.
24   Q.   Okay.  So you don't remember in the
```

**19 (Pages 70 to 73)**

Jane Doe

**74**

1   beginning how it worked between Pennbrook and North
2   Montco?
3   A.      No.  There was a time where I transferred
4   from Pennbrook to North Montco and they were telling
5   me about it.  And I'm like, you know what, okay.  It
6   kind of sounds okay.  Let's just -- I'm going to be
7   their like first ninth grader.  That sounds really,
8   really cool.  So then I ended up transferring there
9   a year -- early after.  They set up a few things and
10  I went from ninth to tenth to 11th.
11  Q.      Okay.  So when you started ninth grade and
12  you went to North Montco for automotive, am I
13  correct that you did see M.P.           at North
14  Montco?
15  A.      Yes.
16  Q.      Okay.  Do you have a recollection as to
17  when you first saw him in the school?
18  A.      The first day when they were bringing us
19  in.
20  Q.      Okay.  So on that first day -- where is
21  North Montco in relationship to Pennbrook Middle
22  School?
23  A.      It's not that far.  I'm not too sure.  It's
24  kind of far, but not really far.

**75**

1   Q.      So you did have to get on a bus, correct?
2   A.      Yeah.
3   Q.      So the first day you went to North Montco
4   in ninth grade you got on the bus, they brought you
5   to North Montco, you went into North Montco and you
6   saw M P        ?
7   A.      Uh-huh.
8   Q.      Is that right?
9   A.      Yeah.  They would have you like in the
10  cafeteria where they had all the schools and stuff
11  in there and they -- or I kind of ran into him when
12  I was passing one of the cafeteria tables and saw
13  him.
14  Q.      And when you saw him, what occurred, if
15  anything?
16  A.      It was -- I walked past him and it was kind
17  of a shock to me to see him there.  Like I knew the
18  possibility of him coming there -- it was like a
19  possibility, but I didn't know that it was -- he was
20  actually there.  It was different from when I
21  actually saw him.
22  Q.      When you say that you knew it was possible
23  you would see him, why did you think that when you
24  were going to North Montco before you got there?

**76**

1   A.      Say that again.
2   Q.      You told me that when you were going to
3   start North Montco you knew it was a possibility
4   that you were going to see M P       , correct?
5   A.      Yes.
6   Q.      Why did you think that before you got
7   there?
8   A.      Because he was in the school district and I
9   didn't know where he went, so it was a possibility
10  of him popping up anywhere.  It was whether he's
11  going to -- like there was a good chance he wasn't,
12  there was a chance that he was.  It was just kind of
13  like flip the quarter and see what side it lands on.
14  Q.      Prior to going to North Montco when you
15  realized there was a possibility that M P
16  could go there too, did you have a conversation with
17  anyone about that possibility?
18  A.      No.
19  Q.      So would I be correct you didn't bring it
20  up with your mom?
21  A.      I mean it wasn't like a crazy thing.  Like
22  we didn't think he was going to be there, because
23  like there was also the fact that if you had a few
24  issues with your report card they weren't going to

**77**

1   accept you or like if you had issues they -- yeah,
2   they weren't going to accept you, but then they kind
3   of accepted him.  And it was like, oh, okay.
4   Q.      And then am I correct that before you
5   transitioned and were going to spend half the time
6   at Pennbrook and half the time at Montco you would
7   have had an IEP meeting about that, correct?
8   A.      Yes.
9   Q.      Did you discuss with anyone in the IEP
10  meeting any concerns about M.P     potentially being
11  in class?
12  A.      No.  We didn't really -- I don't think we
13  brought it up.  My mom really handled the IEP --
14  like most of those meetings and I was kind of there
15  for them.
16  Q.      Okay.  You were there, but your mom was in
17  control of it?
18  A.      Yes.
19  Q.      I understand what you're saying.
20  A.      Yes.
21  Q.      After you saw M P       in the school,
22  did you do anything in school when you were at North
23  Montco?
24  A.      I told my mom that I saw him, but I don't

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

94

1  trying -- on trusting people, because between the
2  whole M.P. thing and then the belittling me it
3  started making me give up on like authority and
4  making it -- or it almost felt like authority didn't
5  care or anything like that.  They were almost like
6  out to kind of get me sort of -- not like get me,
7  but -- I don't know.  They just kind of took their
8  anger out on me kind of thing or something like that
9  is what it felt like.  So then I just kind of said,
10  all right, well, I'm going to the school.  I don't
11  have a choice.  I can't change it.  I kind of gave
12  in and just said, okay, then fine.
13  Q.      Would you have preferred to stay full time
14  at North Montco?
15  A.      Dealing with the problems that I was having
16  there -- yeah.  It would have been easier, because I
17  knew the moment I was in North Penn they weren't
18  going to care about me.  Like I know they care about
19  their students and stuff like that, but at the end
20  of the day look where we are now.
21  Q.      Prior to tenth grade starting, was it still
22  your intention of continuing with automotive?
23  A.      Yes.
24  Q.      And who was your case manager in ninth

95

1  grade, if you remember?
2  A.      It might have been O'Brien.  I am not too
3  sure.  It might have been -- I don't know.
4  Q.      Do you know who Megan Schoppe was?
5  A.      No.
6  Q.      She wasn't your case manager?
7  A.      No.  I didn't interact with many case
8  managers after this -- after this, because then
9  this was where I kind of -- like authority figures
10  started dwindling down where I started going to like
11  home school and stuff.
12  Q.      Okay.  So you had an IEP meeting at the end
13  of ninth grade where you learned that you were going
14  to go half to the high school and half to Montco,
15  correct?
16  A.      Yes.
17  Q.      So for the summer were you doing your
18  horsing?
19  A.      Yes.
20  Q.      And then prior to starting tenth grade you
21  have another IEP meeting, correct?
22  A.      Uh-huh.
23          MS. LAUGHLIN:  Yes?
24          THE WITNESS:  Yes.

96

1  BY MS. JORDAN:
2  Q.      So that would have been from people from
3  the high school --
4  A.      Yes.
5  Q.      -- as well as Montco?
6  A.      Yes.
7  Q.      -- or are they separate meetings?
8  A.      I think the one with North Penn was just
9  the one with the North Penn people, because I
10  remember that we were talking about -- we were
11  talking about the whole M P situation and said
12  how we weren't going to be near him and how we were
13  going to be assigned separate classes and all that
14  stuff.
15  Q.      And for the Montco meeting you already had
16  a safety plan in place, correct?
17  A.      Yes.  The Montco one at the year of tenth
18  grade?
19  Q.      Before tenth grade started.
20  A.      Yes.  We had the safety plan for tenth
21  grade too, yes.
22  Q.      So that was going to continue?
23  A.      Yeah.  I think unless I was able to talk
24  them down.  I don't remember.  Because the safety

97

1  plan was a very iffy thing, because I kind of wasn't
2  listening to it at that point, because I was tired
3  of getting called out by my friends and stuff, so --
4  Q.      Okay.  So you weren't interested in the
5  safety plan?
6  A.      It's not because I wasn't interested.  I
7  was just tired of having all the attention drawn to
8  me.
9  Q.      Okay.  But you do remember at the IEP
10  meeting with the North Penn High School people that
11  your mom did discuss that you needed to be kept away
12  from M P , correct?
13  A.      Yeah.
14  Q.      And what's your recollection of what any of
15  the North Penn school people said in response?
16  A.      They said they would definitely keep us out
17  of the same classes and they kept reassuring and
18  said that we wouldn't be together and that we would
19  stay separated and kind of said that they would look
20  into it and make sure that I would have a security
21  guard to and from North Montco.  I would have this,
22  that and the other thing.  Then they kind of --
23  wait.  What else did they say?  I don't know what
24  else they -- I don't remember what else they said,

25 (Pages 94 to 97)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

**118**

1  that he forced me to go on the Zipper; is that a
2  ride of some kind?
3  A.     Yes.
4  Q.     And how did he force you to go?
5  A.     He was like, oh, we should go on this ride,
6  you know, we should go on this ride and kind of
7  nudging me over towards it. ▓▓▓ was like go ahead.
8  So I don't think he actually figured out what it was
9  at the time, but then -- yeah.  So then, yeah, he
10  said, all right, let's go on this roller coaster.
11  I'm like, no, I'm good.  No, I'm good.  And then
12  like, all right, fine, if you're going to keep
13  pushing.  Then he just kind of like nudged me over
14  to the Zipper and then we ended up getting onto the
15  Zipper.
16  Q.     Prior to going on the Zipper, was there any
17  reason why you didn't say, hey, ▓▓▓ I want out of
18  here, let's leave?
19  A.     I kind of froze and I just looked at ▓▓▓
20  like -- because in that time it's like you think of
21  a thousand things, but you can't like -- you
22  wouldn't expect to be turning around and you see him
23  like -- I don't know.  It's just -- I kind of just
24  froze in that situation.

**119**

1  Q.     And would that be why you yourself didn't
2  leave the area when he wanted to go on the Zipper
3  with you?
4  A.     I mean I did want to leave, but that's
5  probably -- yeah, honestly.  And also in tenth grade
6  he's a lot -- or in tenth grade especially he was a
7  lot bigger than me and he was friends with all my
8  friends and he was like -- like he was intimidating
9  and like he -- like the moment I -- I didn't know if
10  I ruined it with him.  Did I ruin it with all my
11  friends.  Like am I going to ruin everything by
12  saying the truth like -- or even at that moment the
13  that scene that I would have caused at that
14  carnival, what's going to spiral down because of it.
15  Q.     So when he approached you at the carnival
16  did you believe that he was physically intimidating?
17  A.     I mean yeah and like just him being there
18  and just remembering everything and it was like I
19  need to -- I didn't know what to do.
20  Q.     Okay.  And if I understand your testimony,
21  because he was friends with your friends, you were
22  concerned that if you made a big deal about it that
23  it would impact your friendships with these other
24  people; is that what you're saying?

**120**

1  A.     A little bit, because this -- or North Penn
2  -- as much as the ▓M.P▓ thing sucked, it was the
3  first time I ever had friends.  It was the first
4  time I had ever had the classes I enjoyed and doing
5  the work that I loved.  Like getting to go down to
6  the automotive shop and doing that stuff and then
7  coming back to do my academics, it was like the one
8  thing in education I really wanted except for the
9  ▓M.P▓ thing and like it was just -- I don't know --
10  other than friendships -- I just didn't want
11  everything to get messed up.
12  Q.     So you did confide in Ms. O'Brien at the
13  point where you believed that something needed to be
14  changed?
15  A.     Yeah.
16  Q.     And am I correct that Ms. O'Brien advised
17  you that the police had to be called?
18  A.     Yes.
19  Q.     And she advised you that she had to tell
20  your parents?
21  A.     Yes.
22  Q.     And those things occurred, correct?
23  A.     Yep.
24  Q.     And did your parents come to the school

**121**

1  first or did you go home and talk to your parents,
2  if you remember?
3  A.     I went home -- or no.  My mom came over to
4  the school, I think, and then picked me up and then
5  we went to go talk at home or something and like we
6  started going to Mission Kids or something.  I'm not
7  100 percent sure.
8  Q.     Do you recall speaking to the Towamencin --
9  and I could be saying that wrong --
10  A.     The Towamencin Police Department?
11  Q.     Yes.
12  A.     Yes.
13  Q.     Was that the same officer who had helped
14  you on the prior occasion that was there?
15  A.     I don't think that was one, because that
16  was the Towamencin area.
17  Q.     So this is a different police officer that
18  you didn't have a relationship with; would that be
19  fair?
20  A.     Yes.
21  Q.     Okay.  And with your mom in the room the
22  police officer and some other people associated with
23  the police department, you were asked questions and
24  you gave responses, correct?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

Jane Doe

122

1    A.    Yes.
2    Q.    When you were at the carnival and got on
3    the Zipper with M.P. , did he inappropriately touch
4    you on the Zipper?
5    A.    He grabbed my hand and then -- even though
6    I was trying to fight him, he still forced me to put
7    my hands down his pants and -- yeah.
8    Q.    He forced you to touch him?
9    A.    Uh-huh.  Because he had his own hand -- or
10   my hand in his arm and not matter how much I was
11   trying to yank it back, this man who plays football
12   can definitely control my arm a lot better than I
13   can and I was trying to not to.  I was like, dude,
14   stop.  Come on.  This is a roller coaster, like
15   let's not start this.  It's literally a kid ride.
16   He was like no, I think we should and then he
17   started doing stuff.
18   Q.    So when he forced you to put your hand in
19   his pants, did you do anything with your hand in his
20   pants?
21   A.    No.
22   Q.    What did he do to you, if anything, on the
23   Zipper?
24   A.    He was trying to like grab -- or he like

123

1    tried to touch me a little bit, but I kind of
2    defended myself a little bit.  He was more worried
3    about where my hand was going to go and -- yeah.  He
4    like -- I don't know.  He tried more -- he was more
5    worried about me trying to do things with him than
6    he was about doing things with me.
7    Q.    And when say that he was more worried about
8    you doing things to him, he was trying to initiate
9    you to touch him in a sexual way?
10   A.    Yes.
11   Q.    And you did not?
12   A.    No.  I didn't like -- like I kept my fist
13   closed.  I'm like, dude, come on.  This is a kid
14   ride.  I don't want to be doing -- no.  There is a
15   screen in front of us where an entire amusement park
16   can see us.  I'm good.  Like even if that wasn't
17   there, I'm still good.
18   Q.    So other than him trying to get you to
19   touch him in a sexual way, did anything happen on
20   the Zipper?
21   A.    No.
22   Q.    After you rode the Zipper then what
23   happened?
24   A.    I kind of just told -- or I called my mom

124

1    up and I told her that she needed to come pick us up
2    and then I grabbed [    ] and I'm like, dude, we're
3    going home.  He's like, are you all right?  I'm
4    like, yep.  We're going home.  He was like okay.
5    Q.    From your testimony, would I be correct
6    that at the carnival M P did not digitally
7    penetrate your vagina?
8    A.    Yes.
9    Q.    Did M P at any time digitally penetrate
10   your vagina?
11   A.    There were a few times where he would like
12   to finger -- or like -- yes.  Like in class and
13   stuff like that.  I think in sixth grade he did
14   once.  In tenth grade he did a few times.  That was
15   about it.
16   Q.    How many times total -- once in sixth grade
17   and then you said a few times in tenth grade; what
18   does a few mean?
19   A.    Three to seven maybe.  Maybe more.  I don't
20   know.
21   Q.    And did that all occur in the classroom?
22   A.    Yeah.
23   Q.    And how did that occur while class was
24   going on?

125

1    A.    Because he would like to -- he would
2    basically sit there hunched over in his desk and
3    then take his arm and like put it underneath the
4    chair of like both of our arms, but he would have
5    his desk pushed up so far that he would be pinning
6    himself inside his desk.  So literally if he did
7    that he could grab anything that he wants on my
8    side.  And I'm like, dude, knock it off and he never
9    did, so --
10   Q.    But to be able to do that wouldn't he have
11   to put his hands down your pants or skirt and your
12   underwear?
13   A.    No, not when you're literally doing it like
14   this and you have your arm out like that
15   (indicating).
16          MS. LAUGHLIN:  And just for the
17   record, you're leaning over yourself and
18   your right arm is reaching across your
19   body.
20          THE WITNESS:  Yeah.  Like under
21   your arm you have that -- he has anything
22   -- the small arm desk chairs are literally
23   like -- he's pushed all the way over here
24   and trying to go there.  The man is a

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

# EXHIBIT 4

1           UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3   JANE DOE,                      :

                                   :

4              Plaintiff,      : CIVIL ACTION NO.

                               : 2:20-CV-05142

5              vs.             :

                               :

6   NORTH PENN SCHOOL DISTRICT,  :

                                 :

7              Defendant.      :

8                   -   -   -

9                July 28, 2021

10                  -   -   -

11

12      Remote via Zoom Oral Deposition of HOLLY

13   LYNNE GARRETT, conducted at the location of the

14   witness in Lansdale, Pennsylvania, before DONNA

15   ROSNER, a Certified Court Reporter and Notary

16   Public of the Commonwealth of Pennsylvania,

17   commencing at 10:05 a.m.

18

19

20

21

22

23

24        GOLKOW LITIGATION SERVICES, INC.

        877.370.3377 ph| 917.591.5672 fax

25             deps@golkow.com

Holly Lynne Garrett

```
1        A.       I mean, I'm sure that happened, if

2   someone had to use the restroom or if they got a

3   phone call or something and had to step out.

4        Q.       I just started asking what

5   independent memories you had of the incident or

6   surrounding the incident in November of 2014.

7   That's when the incident was.  Do you recall

8   that?

9        A.       Yes.

10        Q.       You started out by saying it was

11   your first year in full inclusion; you no longer

12   had your own separate classroom; you're doing

13   everything in the room with all of the students

14   now.  Tell me the next thing that you remember.

15        A.       About the day that I wrote up the

16   behavioral slip?

17        Q.       Sure.  Yes.

18        A.       It was in a language arts class in

19   Mrs. Divver's room.  And I remember the students

20   were working in small groups.  So there were

21   groups of students all around the classroom.  And

22   I remember where the two students were seated, in

23   the back of the room.  And I was working on the

24   front rug with another group of students,

25   continuously scanning the room, looking around,
```

Holly Lynne Garrett

1    when I noticed that both of the students in the

2    back of the room had their hands under the table,

3    and M.P. was starting to put his hand up

4    Jane Doe's sweatshirt.  So I pointed at the

5    students.  They both made eye contact with me.

6              I called them out into the hallway.

7    And I think I was just shocked at the time.  I

8    asked them what were they doing.  Reading my

9    write-up that I did, "M.P. did not say a word.

10   Jane Doe denied that anything had happened."

11             And we did go back into the

12   classroom after that.  And I remember I wrote up

13   a behavior slip, office slip -- whatever we're

14   calling it -- I wrote one up for M.P. and for

15   Jane Doe.

16        Q.        So two different slips?

17        A.        Two different slips, correct.

18        Q.        Prior to this day, I assume you had

19   known Jane Doe before?

20        A.        I also had Jane Doe in fifth grade.  I

21   was her case manager in fifth grade when I had my

22   self-contained classroom.

23        Q.        And fifth grade, was that the first

24   time you had interactions with Jane Doe or she had

25   been on your caseload?

Holly Lynne Garrett

1      Q.      Were they sitting next to each

2  other; across from each other?

3      A.      They were sitting next to each

4  other.

5      Q.      From your vantage point, were you

6  able to see the front of their bodies or the

7  side?

8      A.      The front.

9      Q.      So you're, like, looking directly at

10  both of them that are facing you?

11      A.      Correct.

12      Q.      So you see all four hands underneath

13  the table?

14      A.      Correct.

15      Q.      Where were the hands?  What were the

16  hands doing that you could see?

17      A.      Touching each other's hands.

18      Q.      Like, holding each other's hands?

19      A.      Yeah.  Yes.

20      Q.      And then you saw from that M.P.      's

21  hand start to go up Jane Doe's shirt?

22      A.      Correct.

23      Q.      Was it the front of her shirt?

24      A.      Yes.

25      Q.      And then you said at that point, you

1    office.

2         Q.      Do you remember having any questions

3    about the form and his explanation?

4         A.      No.

5         Q.      Did he explain at all what

6    "Inappropriate Language" meant?

7         A.      I don't recall him going through

8    each behavior and explaining it; no.

9         Q.      So "Physical Contact," he didn't

10   explain to you what would qualify as physical

11   contact?

12        A.      Correct.

13        Q.      Is that something just you, as a

14   teacher, what you thought physical contact was,

15   you could fill out the form based on what your

16   thought was?

17        A.      Yes.  I guess.

18        Q.      When you talked to Mrs. Divver about

19   completing these forms, did you show her the

20   forms that you had completed back in November?

21        A.      I did show her the forms when I

22   completed them, because she filed them.  She kept

23   them in her classroom.

24        Q.      Do you know where in the classroom

25   they were kept?

# EXHIBIT 5



**NORTH PENN**
**School District**

**Department of Human Resources Memorandum**

TO:     **Holly Andrew**

FR:     **Cheryl A. R. McCue, Director of Human Resources**

RE:     **Performance Meeting**

DA:     **June 3, 2015**

Holly,

Mr. William Bowen, Dr. Elizabeth Santoro, Dr. Frances Garner and I met with you and Mr. Alan Malachowski, NPEA President on May 27, 2015 to continue our discussion from the meeting of April 16, 2015 regarding the reported student incidents. During the meeting, we reviewed the situation involving the students in November and April as discussed in our April meeting. The following are points in summary:

1) In November and while in your supervision, a male student was observed putting his hands up the shirt of a female student. You called both students out to the hallway to question the behavior. Upon denial from both students and feeling that it was mutual, you told them, "If they promise not to do it again, they would not go to Mr. Bowen." An 'Office Referral Form' for both students was completed but never shared with the office at that time, nor were parents notified of the behavior. This information was confirmed in your written statement and verbal discussion during our April meeting.

2) In April, a second incident of inappropriate touching involving the male student and second female student in another teacher's classroom occurred and was reported to the guidance counselor, which caused the knowledge and information from the first incident to reach the office for investigation. Both situations were investigated with parents, Child Line, and the appropriate authorities being notified.

3) During our April meeting, concern for your judgment in dealing with the situation was shared as well as the need for continued investigation. School Board Policy #5150 with regard to Harassment and your responsibility as an employee to maintain an educational environment free from all forms of unlawful harassment was shared with you. At that time and with the ongoing involvement of the police and Mission Kids, the disposition of the situation was deferred until the investigation could be completed.

4) During our May 27, 2015 meeting, a brief summary of the the above information was acknowledged and agreed by you as not being necessary to review in detail. Information from the Mission Kids reports indicating that both female students were subject to multiple incidences of inappropriate touching from the male student throughout the school year was shared. It was at this time that we reiterated concern for your poor judgment in the following:

    a. You failed to report harassment of a sexual nature to someone in authority;

    b. You questioned the male and female student together, which is not proper procedure when investigating possible harassment;

    c. You assumed mutual or consensual behavior, which is not accurate or appropriate since the students are not of age and the reported behavior is not appropriate school behavior; and finally,

    d. You told the students that it would not be reported to Mr. Bowen if they promised not to do it again.

**DEF NPSD 001005**



**NORTH PENN**
School District

**Department of Human Resources Memorandum**

H. Andrew June 3, 2015 memo, p. 2


As a result of these concerns, you were suspended without pay for 2 days identified as May 28 and 29, 2015.
In addition and during our May 27, 2015 meeting, concern for your professional judgment was also shared in regard to an IEP issue and shredding of the document as explained by Dr. Garner.  The case is still being reviewed and is in settlement stages at the central office level.

At the conclusion of the meeting, we emphasized the need for you as the professional to create a classroom atmosphere conducive to learning. Both issues as discussed represent significant concern for your professional judgment and could result in unsatisfactory ratings in the areas of professionalism and classroom environment as found and evaluated in Domains 2 and 4 of the Educator Effectiveness Framework and Evaluation System.

Finally, any and all future concerns reflecting your failure to act in a professional manner and within the policies set forth in the school district will result in further disciplinary action up to and including a recommendation for termination.  Should you have any questions regarding the meeting or this communication, please don't hesitate to contact me.


c:  File
    Dr. Elizabeth Santoro
    Dr. Frances Garner
    Mr. William Bowen
    Mr. Alan Malachowski

DEF NPSD 001006

# EXHIBIT 6

 

# Gwynedd Square Elementary School
## Office Referral Form

**Name:** M.P.

**Date:** 11.17.14    **Time:** 2:40

**Teacher:** MS Andrew

**Grade:** K  1  2  3  4  5  (6)

**Referring Staff:** Ms. Andrew

### Location
◊ Playground    ◊ Special
◊ Cafeteria    ◊ Bathroom
◊ Hallway    ◊ Arrival/Dismissal
☒ Classroom    ◊ Other _____

---

☐ I need to talk to the student's teacher   ☐ I need to talk to the administrator

| Minor Problem Behavior | Major Problem Behavior | Possible Motivation |
|---|---|---|
| ◊ Inappropriate language | ◊ Abusive language | ◊ Obtain peer attention |
| ☒ Physical contact | ◊ Fighting/ Physical aggression | ◊ Obtain adult attention |
| ◊ Defiance/Disrespect | ◊ Overt Defiance/Disrespect | ◊ Obtain items/activities |
| ◊ Disruption | ◊ Harassment/Bullying | ◊ Avoid Peer(s) |
| ◊ Electronic Violation | ◊ Stealing | ◊ Avoid Adult |
| ◊ Property Misuse | ◊ Disruption | ◊ Avoid task or activity |
| ◊ Other _____ | ◊ Electronic Violation | ◊ Don't know |
|  | ◊ Lying/ Cheating | ◊ Other _____ |
|  | ◊ Other _____ |  |

### Action taken by teacher prior to this notice:

| | |
|---|---|
| ◊ Reviewed Expectations | ◊ Telephoned parent |
| ☒ Conference with student | ◊ Parent conference |
| ☒ Verbal reprimand | ◊ Changed seat |
| ◊ Consulted counselor | ◊ Other: |

### Administrative Decision

| | |
|---|---|
| ◊ Loss of privilege | ◊ Individualized instruction |
| ◊ Time in office | ◊ In-school suspension (____ hours/ days) |
| ◊ Conference with student | ◊ Out of school suspension (____ days) |
| ◊ Parent Contact | ◊ Other _____ |
| ◊ Bus suspension | |

**Others involved in incident:** ◊ None ◊ Peers ◊ Staff ◊ Teacher ◊ Substitute ◊ Unknown ◊ Other

**Other comments:**

**Parent Signature:** _____    **Date:** _____

All minors are filed with classroom teacher.  Three minors equal a major.

Recieved from Kristin V_____

DEF NPSD 001023

# EXHIBIT 7

*Rec'd 4·15·2015 from Bill Bowen, GS principal*

On the afternoon of Friday, April 10, 2015 I was at the ESC to conduct interviews for teaching positions. At 1:31 p.m., I received a text message from Kristen Vaszily, Gwynedd Square guidance counselor, asking me to call her for an urgent reason. I called her and she stated she was contacted by a 6th grade teacher, Mrs. Rossana D'Elia, to address a situation with a female student, identified as     "Sara"   Mrs. Vaszily, went to the room and met with the teacher.   Mrs. D'Elia relayed what the female student said to her. Mrs. Ruth Divver was present at the time and stated there might *have* been a similar incident involving the male student that occurred earlier in the year. Mrs. Vaszily escorted the female student to her office and spoke with her. She reported that on Wednesday, April 1st, 2015 during a *movie* in social studies class a male student, identified as M.P.        placed his hand on her neck and lower back. On Thursday, April 9, 2015 the male student again touched the female on the knee, hand and under her shirt. Mrs. Vaszily returned the student to the room and spoke to Mrs. Divver and Ms. Holly Andrew was also present due to the co-teaching classroom.   Mrs. Divver *provided* Mrs. Vaszily with an office referral form from an earlier incident.  Ms. Andrew provided further information about the November 2014 incident, she witnessed M.P.        and Jane Doe        sitting together and at one point she saw M.P. s hand under Jane Doe's shirt.  She addressed both students in the hallway.  The incident did not get reported to the parents or administration but an office referral form was completed and filed with Mrs. Divver. I asked Mrs. Vaszily to set up a meeting with the parents of the male student for Monday morning and after that meeting we would further discuss the course of action.  I also asked Mrs. Vaszily to have Ms. Andrew provide a written statement of the November incident.

On Monday, April 13, 2015, Mrs. Vaszily provided me with the office referral form and Ms. Andrew's statement.. At 8:05 a.m. we met with M.P. 's mother and M.P.        . We discussed the incident and M.P. admitted that both did occur. I informed M.P. 's mother we would need to investigate further and consequences would be determined after that. During the course of Monday, we contacted the parents of Jane Doe        , who was identified as the girl from the November 2014 incident.  I called Dr. Santoro; Director of Elementary Education to make her aware of the situation, and that Jane Doe's parents informed me they would be coming to school to further discuss the incident. At 12:30 p.m. the Does        arrived and Mrs. Vaszily and I met with them until 1:30 p.m.  I contacted

Dr. Santoro to inform her about our meeting. We then contacted the parents of
to inform them of our findings. Dr. Santoro called me at about 2:30 p.m. to inform
me she met with the **Does**   At about 3:00 p.m., I met with 6th Grade teachers to
develop a new schedule for **M.P.**   In addition, I asked Mrs. Diwer to provide a written
statement about the November 2014 incident. At about 3:25 p.m., I contacted **M.P. 's mother**
to inform her that her son would receive an out of school suspension. At about 3:50 p.m.,
**M.P. 's father** contacted me that he and his wife did not feel the offense warranted this level of
discipline and requested to speak to Dr. Santoro. Dr. Santoro called me back at about 5:15
p.m. after she spoke with **M.P. 's parents** and informed me there would be a meeting at 8:30
a.m. on Tuesday, April 4, 2015, to further discuss the consequences.

On Tuesday, April 4, 2015, at 8:00 a.m., Detective Sergeant, Ted Cialoa, of the Upper
Gwynedd Police Department came to the school to meet with us because the **Does**
made a report to the police. Mrs. Vaszily, Dr. Santoro and I discussed the incident with the
officer. At 8:30 a.m., Dr. Santoro and I met with **M.P. 's mother**. She also requested that Mr.
Leo McNeil, a social worker form Turning Points be allowed to listen in via her speaker
phone. We discussed the situation and decision making process for the suspension. It was
ultimately determined **M.P.** would have an out of school suspension for Tuesday, April
14, 2015 and an fo school suspension for Wednesday, April 15, 2015 due to an Obscene
Gesture. In addition, **M.P.** would have his schedule altered so he would not be in class
with either girl. Around 10:00 a.m., **M.P. 's father** contacted me to discuss the outcome of our
meeting with his wife and requested **M.P.** to be moved away from the girls. At about
11:00 a.m., Dr. Santoro contacted me to discuss setting up meetings with both teachers to
get further information about the November 2014 incident. At about 1:30 p.m., Mrs.
Vaszily and I also made a referral to Child Line for the April incident. At about 3:30 p.m. we
also contacted both sets of parents to request permission to notify Mission Kid's and both
parents declined our assistance. Finally, at about 3:50 p.m., I was contacted by Dr. Santoro
to discuss details about the Thursday meetings for both teachers to discuss the incident. I
sent Outlook invitations to the teachers, Mrs. Cheryl McCue, NP Director of Human
Resources, Dr. Santoro, and Alan Malachowski, the President of the teacher's union.

On Wednesday, April 15, 2015 at about 9:10 a.m., Mrs. Vaszily contacted me to come
to her office. **Jane Doe** was present and informed her that she and her parents

discussed the incident on Tuesday evening. She was visibly upset so we elected to keep her in Mrs. Vaszily's office to allow her time to compose herself. Officer Ted Cioloa contacted me at about 9:30 a.m. to inform me that there were potentially other girls involved and requested us to interview the girls. Next, I spoke with Dr. Santoro and Dr. Holben, Assistant Superintendent and informed them of the new information. They wanted to seek further information for the district solicitor and contacted me about 30 minutes later and advised me to have Mrs. Vaszily interview both girls. I contacted the parents of the girls to inform them that Mrs. Vaszily would be meeting with them. Mrs. Vaszily met with both of the girls and a third 6th Grade girl, identified as "Casey"        She reported to Mrs. Vaszily that M.P. touched her in the front and back of the bottom portion of her body. At 3:30, we made calls to Child Line for both Jane Doe and

# EXHIBIT 8

**Gwynedd Square Incident**

**Notes from Betty Santoro**

<u>Monday, April 13, 2015</u>

- Around noon, Bill Bowen informed me of an incident of inappropriate touching of a sixth grade boy (M.P.          ) with a sixth grade girl  "Sara"        that was shared with the guidance counselor (Kristin Vaszily) on Friday, April 10, 2015. Please refer to the statement provided by the counselor. The incident occurred before spring break but the student reported it to KV on 4/10/15.

- Bill Bowen called the parent of ( "Sara"  on Monday morning to inform them of the incident shared by female student. The parent was informed that the incident would be addressed and the necessary steps would be taken for disciplinary action with the male student. The parent did inform Bill that they would not be pursing police action and were confident the school would handle this matter.

- As indicated by the counselor's statement, it was revealed on Friday from Mrs. Diver that a similar incident occurred with the same male student and another 6th grade girl (           Jane Doe    ) in November 2014. Bill Bowen met with the parents of Jane Doe on Monday morning to explain what he and the counselor had learned that involved their daughter. He stressed that this personnel matter would be handled. Supports and counseling would be put in place for both female students. At that time, the parents did not want the school to discuss this matter with their daughter. The Does         were leaving the principal's office to file a report with the Upper Gwynedd Police Dept.

- Mr. Bowen met with M.P. parents       to discuss both incidents of inappropriate touching with their son and two fellow female 6th grade students. M.P.    admitted to the most recent one of April ("put his hands up "Sara's"    shirt"). Mr. Bowen did not address the November incident with M.P.    at this point since he was still waiting for the teachers' statements. Mr. Bowen indicated to the M.P. parents that he would be moving M.P.    's section and that other discipline would occur after he had time to gather more information. He indicated he would call the M.P. parents back at the end of the day.

- HR was briefed on the incident as well as the superintendent/assistant superintendent

- Does                 came to the ESC to meet with the superintendent at approximately 2:30 pm. I met with the parents in my office to address their concerns and gather any additional information. The parents expressed the following concerns:

  1. Jane Doe is a victim of child abuse that occurred when she was 5 yrs. old. This occurred in the neighborhood. The school counselor and Ms. Andrews were aware of the child abuse and had worked with the parents on supports throughout the years. The student has a current IEP.

  2. Both parents were gravely concerned that Ms. Andrews and Mrs. Diver were both aware of the November incident but never reported it to the parents or the principal.

DEF NPSD 001019

They are concerned with the moral and ethical attitudes of these teachers to disregard addressing this issue.

3. They ask that no one speak to Jane Doe about this incident w/o their permission.
4. They wanted their daughter separated from M.P. in school.

I shared with the Does that this matter is still under investigation and that I would be in touch with them as we gathered more information.

- Around 3:30pm, I spoke with Bill Bowen again to share my conversation with the Does. We discussed the level of discipline for M.P. based on the information we had at the time. Based on the fact that M.P. admitted to "putting his hand up            hirt", a three day out of school suspension was given. Bill indicated he would call the M.P. parents to let them know about the discipline.
- Around 4:15 pm, M.P. mother called and left me a message that she wanted to speak to me about the 3 day suspension. I returned her call at 5 pm. I explained to her that this was a Level III discipline matter and that the discipline warranted out of school. She felt she was misinformed that morning in the principal's office and was under the impression that no other discipline would occur. I asked if she could meet with Mr. Bowen and me on Tuesday morning to review the matter again for clarity.

**Tuesday, April 14, 2015**

- Bill Bowen and I met with M.P. mother for about an hour and reviewed the conversation from the previous day. M.P. mother felt her son's behavior deserved consequences but that this type of behavior was normal for 12 year old boys. She expressed the following:
    1. Concerns with it being a Level III offense
    2. Felt our discipline code was subjective
    3. Wanted to appeal this to the Board
    4. Wanted to know the punishment of the girl since she willingly allowed this to happen and invited her son to sit next to her
    5. Felt the girl should be punished because it was consensual
    6. Was extremely concerned that the incident in November was never reported to her by the teacher or the school. Wanted to know why that was allowed to happen

We finished our meeting with agreeing to disagree and I reiterated the seriousness of the incident.

- Spoke with Bill Bowen and Kristin Vaszily about the timeline of events from the beginning...starting with the report made to Kristin on Friday, April 10, 2015:
    1. "Sara"        went to Mrs. D'Elia during class on Friday afternoon to share she needed to speak to the counselor.
    2. Mrs. D'Elia called the counselor and said "Sara" needed to see her. "Sara" was crying, afraid and very upset as she reported that during a movie on April 1st in Mrs. Diver's class, M.P. touched her on the back-upper back. "Sara" didn't tell him to stop. On Thurs. April 9th, while watching a movie again in Mrs. Diver's class, M.P. sat next to

DEF NPSD 001020

her, put his hand on her leg, then had his hand on her hand, then put his hand up her shirt. The counselor reported that the student was shocked, confused, and didn't know what to do. "Sara" didn't tell M.P. to stop. "Sara" didn't tell her parents. "Sara" claims this was the first time this happened to her. Kristin indicated that "Sara" reached out to some friends via social media and they told her to tell someone. "Sara" was afraid to tell her parents for fear of getting in trouble. She felt comfortable telling the counselor.

3. Kristin indicated that upon learning this on Friday afternoon she called Bill at the ESC to report this. As a result, she called the Browns on Friday and asked that they meet with her and Bill on Monday.

- Officer Ted Ciola took the written statements on Tuesday from the two teachers and the counselor. Ted spoke to Bill and Kristin but did not speak directly to the teachers. He just took copies of their statements. He also spoke to M.P. mother at GS since she was already there to meet with Bill and me to let her know that a report had been filed.

- Ted Ciloa informed us that he would be meeting with M.P. and his parents at 1:00 pm on 4.14.15 to obtain M.P.'s statement. Detective Ciola informed Bill Bowen late Tuesday that the parents called to reschedule their appt. since they are seeking an attorney.

- Bill, Kristen and I did a conference call with Kyle Somers, district's attorney, to brief him in on the situation. He confirmed that all the necessary steps have been taken at this point.

- I received an email from Doe's mother on Tuesday indicating her gratitude for meeting with her on the spot on Monday. She commended the principal and counselor for their attention and care in this matter. Doe's mother is requesting a TOA for 7th grade from PD to PB.

- I responded to Doe's mother 's email and asked her to call me so we could discuss the TOA.

**Wednesday, April 15, 2015**

- Doe's mother called me at 9:00 am this morning to share that she and her husband spoke to Jane Doe about the incident from November. The following highlights the points:
    1. Jane Doe admitted that in November M.P. touched her under clothes (up her shirt) and (down her pants)
    2. Jane Doe indicated that girls expect this from M.P. and that this touching has been going on since 4th grade
    3. Jane Doe witnessed another girl being touched ████████████ and █████
    4. Jane Doe r indicated to her mother that M.P. never threatened her or bullied her
    5. Jane Doe never told because she was afraid M.P. would freak out

6. ▓Jane Doe▓ told her mother that back in November Mrs. Andrews saw ▓M.P.▓ with his hand up her shirt in class. Mrs. Andrews pulled them both outside in the hall and said "Promise not to do this again and I won't tell your parent?"

7. I shared with ▓Doe's mother▓ that she needed to report this updated information to Detective Ciola so he could then inform Mission Kids.

- I reported the new events to Dr. Holben. We did a conference call to Bill Bowen. He indicated that after ▓Doe's mother▓ contacted me, she called him and Kristin as well as Ted Ciola to report all the information shared from ▓Jane Doe▓ last evening.

- Dr. Holben and I called Kyle Somers for next steps with the new information. We then called Bill Bowen and asked him to call the parents of both girls that have been newly identified and let them know their names came up in an investigation and that the counselor would be asking them general questions about inappropriate touching.

- At 3 pm, Bill Bowen informed me that one of the students ( "Casey"   did admit to being touched (top and bottom) by ▓M.P.▓ in 5ᵗʰ grade. Bill is following up with the parent of the student and Ted Ciola.  *front & back*

- All of this has been reported to Child Line.

Betty Santoro

Director of Elementary Education

# EXHIBIT 9

April 14, 2015                              on 4/10/15

I received a voicemail from Mrs. D'Elia to see her as soon as I can that day. She mentioned on the phone that there was a situation with ____ that needed to be addressed today. I went up to her room and she told me that **"Sara"** came to her and said that █M.P.█ touched her inappropriately. At that time, Mrs. Divver was also present and she mentioned that there was an incident prior with █M.P.█ touching █Jane Doe█ It was a situation that Ms. Andrew observed and addressed. I then touched base with Mrs. Asman **"Sara"** was in her room for math at the time). **"Sara"** came down to my room. She shared with me what had happened. She reported the following: Wednesday (April 1st), they were watching a movie in social studies and █M.P.█ was sitting next to her. He placed his hand on her upper back and then on her lower back. On Thursday (April 9), they were watching a movie and █M.P.█ put his hand on her leg, held her hand and also placed his hand under her shirt on her chest. During this time, she was very upset. After I walked her back to class, Mrs. Divver handed me the behavior referral form for █M.P.█. Ms. Andrew was there and mentioned what had happened in the fall. Next, I contacted Mr. Bowen by text to contact me. He called me and I explained the situation to him. He asked me to call **"Sara's"** parents and call █M.P.█'s parents to have them meet first thing Monday morning. At that time, I also let him know that there was a previous situation regarding █M.P.█ and █Jane Doe█. He asked me to ask Ms. Andrew to write the incident up for him. I did speak with both of **"Sara's"** parents on Friday and also █M.P.█'s father.

Kristin Vaszily
School Counselor

# EXHIBIT 10

1        IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                      -   -   -
4

     JANE DOE,                  :
5         Plaintiff,            :
                                :   CIVIL ACTION
6         v.                    :   NO. 2:20-CV-
                                :   05142
7    NORTH PENN SCHOOL          :
     DISTRICT,                  :
8         Defendant.            :
9                      -   -   -
10                 August 26, 2021
11                     -   -   -
12
13             Remote videotaped deposition
     of TODD BAUER, taken pursuant to notice,
14   was conducted at the location of the
     witness, beginning at 10:01 a.m., on the
15   above date, before Ben Pieczynski, Jr., a
     Professional Reporter and Notary Public
16   for the Commonwealth of Pennsylvania.
17
18
19

                       -   -   -
20
21        GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.951.5672
22          deps@golkow.com
23
24

Todd Bauer

1 an understanding of what these roles mean

2 and, you know, what their

3 responsibilities are, generally, within

4 the district.

5                For assistant

6 superintendent, because that's where

7 we're all -- let's start there, what is

8 the assistant superintendent in the North

9 Penn School District?

10       A.    I guess it would be easiest

11 for me to answer that question by

12 defining what I think my role is.

13                I am the conduit to our

14 administrators and employees, in my

15 cases.  I oversee and supervise many

16 cabinet level administrators, which would

17 include your director of facilities and

18 operations, your business manager, I

19 oversee our coordinator of safe, safe

20 schools and emergency management,

21 technology -- our director of technology,

22 all of our secondary schools.  Our other

23 assistant superintendent oversees our

24 director of elementary school and the

Todd Bauer

1  elementary schools and handle discipline

2  in situations when they rise above the

3  building level.  For example, expulsion,

4  I handle those.  I believe I handle them

5  across the board, just because I'm most

6  familiar.  I'm involved in policies, I'm

7  involved in -- I oversee many of our

8  school board committees.  Our committee

9  structure here at North Penn includes our

10  ECI committee, which is education,

11  curriculum, instruction, we have a

12  facility and operations, a safe school

13  committee, a policy committee.  I

14  oversee -- I'm -- I sit on all of those

15  committees that I just mentioned and help

16  set the agendas for those meetings and

17  work with the board through agenda items

18  or anything that may come up at the

19  meetings.

20          So, I really am a go

21  between -- in between the administrators

22  and, of course, Dr. Dietrich.  It's hard

23  to describe.  It is far easier to explain

24  the superintendent role and the principal

Todd Bauer

1   adopted on November 19th, 2020, last

2   revised in April of 2021.

3          Q.    Okay.  And so, just so I'm

4   making sure I understand, where is Policy

5   103, it's on the district's website?

6          A.    Yes.

7          Q.    Okay.  And what is the title

8   of that policy?

9          A.    Discrimination/Title IX

10  sexual harassment affecting students.

11         Q.    Okay.  And are you saying --

12  just to make sure I'm understanding what

13  you're describing -- prior to November

14  2020, because that's when 103 came into

15  play?

16         A.    (Nodding.)

17         Q.    Yes?

18         A.    Mm-hmm.  Sorry, I thought

19  there was more to the question.

20         Q.    No.  That was my question.

21         A.    Yes.

22         Q.    The -- was the -- what's now

23  103, was that 5150 prior to that time?

24         A.    So, yes, 5150A.

Todd Bauer

1  Q.    Okay.

2  A.    I believe.  So, through the

3  policy review process, our current board

4  began -- I'm going to say we're

5  approaching, embarrassingly, three years

6  ago, it takes an awful long time to get

7  through so many policies, but we switched

8  to PSBA, which is Pennsylvania School

9  Board Association, and they do -- they

10 provide advisement on policies, and they,

11 I'd say, triangulate our policies and

12 practices from handbooks and existing

13 policies and kind of combine them.  So

14 it's hard to say that this policy was

15 exchanged for that policy, because many

16 times it's pulling from multiple to

17 consolidate.  But Policy 5150A, is it my

18 belief, that it most closely aligns with

19 the current Policy 103.

20 Q.    Is -- was 5150A, was that,

21 like, repealed, or is that still

22 currently a district policy that's in

23 effect?

24 A.    I believe it was repealed.

1        Q.    Okay.

2        A.    I can look, but I believe it

3    was repealed.

4        Q.    Is there --

5        A.    Sometimes --

6        Q.    Sorry, go ahead.

7        A.    -- there are little

8    components of policies that need to

9    remain because they're not covered in a

10   newly adopted -- like, we haven't adopted

11   the next policy yet.  So we need to leave

12   it because of this little paragraph out

13   of seven pages.  So -- but I do believe

14   that that policy has been repealed,

15   5150A.

16       Q.    Is -- the rest of the 5150,

17   I think there's, like, a B and C, do you

18   know whether they were repealed as well

19   in this -- do you know if they were

20   repealed as well?

21       A.    I'd have to look.

22       Q.    Where could you -- sorry, go

23   ahead.

24       A.    So, through the policy

Todd Bauer

1  review process, I have charts of which

2  policies were adopted, which policies

3  were repealed.  They're also reflected in

4  the minutes from our school board

5  meetings.  So it's an action item each

6  month, which policies we're adopting and

7  which ones we're repealing.

8         Q.    Is that readily accessible

9  to you, to find out if that was -- those

10  policies were repealed and, I guess, in a

11  sense, 103 is the relevant policy?

12        A.    Give me a moment to try to

13  answer that.

14              So, I can tell you that when

15  drafting Policy 103, the notes that I

16  have from PSBA, the policies that they

17  referenced in writing Policy 103 was

18  1251, 4316 and 5150.

19        Q.    Okay.

20        A.    Specifically what was

21  repealed, I could -- whether or not that

22  policy was repealed, I can probably get

23  that in a moment or two, if you would

24  like me to try.

Todd Bauer

1    Q.    Yeah.  I mean, I -- if

2    you're able to.  If it's easily

3    accessible and it will only take a moment

4    or two, I think that would be good to

5    find out.

6    A.    I don't think I'll be much

7    longer, hold on.

8    Q.    Okay.

9    A.    The website --

10    Q.    Take your time.

11    A.    The website does not appear

12    to be cooperating.

13    Q.    Is it the district's website

14    that you're on?

15    A.    Yeah.

16    Oh, you know what, I might

17    know.

18    Okay.  It does appear that

19    5150 is repealed.

20    Q.    What about the other two

21    policies that you had referenced, I think

22    one was 4316, which is administrative

23    regulation, and one more, were they

24    replaced by 103 as well?

Todd Bauer

1    A.    You -- I'm sorry, you said

2  41 -- I have to --

3    Q.    I thought it was 4316.  The

4  other -- when you had went over 103, you

5  referenced three different policies.

6    A.    Yes.  It doesn't appear that

7  that policy is still in existence.

8              And what was the other?

9    Q.    I forget what the third --

10  I'm not ever sure what it -- what the

11  policy was for, but you referenced three

12  different numbers.

13    A.    I can look.

14              1251.

15    Q.    Do you have 1251 is for,

16  what policy that is (sic)?

17    A.    Nondiscrimination on the

18  basis of disability.

19    Q.    Okay.

20    A.    That one does still exist.

21    Q.    Okay.

22    A.    But again, these were

23  policies that were referenced in drafting

24  Policy 103.

Todd Bauer

1    Q.    Okay.  And then 103 replaced

2  those three -- well, two of the three

3  policies?

4    A.    Maybe not in their entirety.

5  They -- it has since been repealed, I

6  know that.

7    Q.    Okay.

8    A.    I don't know that it was at

9  the same moment, though.

10    Q.    Do you know when 5150 was

11  repealed?

12    A.    I don't.  Again, I could

13  find it, but it wouldn't be quick.

14    Q.    Okay.

15    A.    I'd have to go back through

16  board minutes and look.

17    Q.    Are the -- the board

18  minutes, where are those kept?

19    A.    On the website.

20    Q.    They're all public?

21    A.    Yes.

22    Q.    What about the discussions

23  in terms of, like, why they're repealing

24  5150 and implementing Section 103, would

Todd Bauer

1  that be contained in the board minutes as

2  well?

3          A.    Notes, minutes are taken.

4  So if you go to the following month, you

5  can look at the minutes that were

6  approved.  But perhaps, simply, would be

7  all of our meetings are recorded and on

8  the website.  So, you could find our

9  YouTube channel and watch meetings.

10         Q.    Do you know -- happen to

11  know what meetings where 103 or 5150 were

12  discussed?

13         A.    If there was discussion --

14  so, at a typical policy committee

15  meeting, we could have ten policies that

16  go before the committee, and then the

17  committee -- the way the committee

18  structure works is the committee makes a

19  recommendation to the full board.  So, if

20  we discussed it in a policy committee

21  meeting, it would have been two months --

22  at least two months, maybe three, prior

23  to when it was adopted.

24         Q.    Okay.

Todd Bauer

1    A.    So if it was adopted in

2  November 2020, I would expect that we

3  discussed it in August of 2020.

4    Q.    Would you have been at those

5  meetings?

6    A.    Most likely.

7    Q.    Do you recall any discussion

8  about the 5150 or the 4316 being repealed

9  and 103 being implemented or drafted?

10    A.    I am certain that we

11  discussed with counsel.  We review every

12  policy with Mr. Somers and with the chair

13  of that committee behind closed doors.

14  Whether or not we discussed it publicly,

15  I've been to hundreds of school board

16  meetings, I don't recall.

17    Q.    Do you know whether in the

18  discussions about those particular

19  policies, whether any discussion about

20  this case was entered into?

21    A.    I don't.  I don't recall.

22    Q.    Do you know whether those

23  policies and the changing of policies,

24  repealing policies, do you know whether

Todd Bauer

1 Just, when we receive professional

2 development about these policies in a

3 legal update, we had a workshop provided

4 by Mr. Somers, and at the time I believe

5 it was Dr. Diegue, specific about the

6 process pertaining to Policy 103, among

7 other policies that they were reviewing

8 that day.

9      Q.    Are there other -- other

10 than 103, are there other professional

11 development things that you're saying the

12 district has learned?

13      A.    Professional development

14 things?  I guess --

15      Q.    I think that was your term

16 that you had used.

17      A.    I guess my answer to that

18 would be no.  Nothing comes to mind.

19      Q.    What about in terms of --

20 I'm going back to the defining roles of

21 different people in the district -- for

22 principal, what is their role and

23 responsibility?

24      A.    I would say that the

Todd Bauer

1   principal's responsibility is to provide

2   a safe educational environment for all

3   students and staff, and the two most

4   important things we always say is taking

5   care of kids and educating them.  So,

6   that's a, a one-liner for the

7   responsibilities of a principal.  They

8   have everything from scheduling, to

9   emergency procedures, to supervising

10  personnel, dealing with parents,

11  community events.  You know, I think

12  every -- one of the things that's unique

13  to the filed of education is that

14  everyone has experience, everyone.  So,

15  all the things that most people know

16  happen in a school, they're responsible

17  for all of those things and more.

18       Q.   In terms of sexual

19  misconduct of a student, what role does

20  the principal have in that, if any?

21       A.   I, I think that was pretty

22  ambiguous, in terms of the role of sexual

23  misconduct.  If, if the question was when

24  something's reported to them, then I

Todd Bauer

1 would say that they would contact,

2 assuming that it falls under the

3 definition that outlined in the policy,

4 that they would contact the Title IX

5 coordinator.

6         Q.    You say assuming -- because

7 the new policy just started.  So, is

8 there a definition in 5150, you're

9 saying, assuming back then, meaning,

10 like, from 2014 to 2020, if it was a

11 definition in 5150, that it would be

12 reported?

13        A.    I think it's reasonable to

14 expect that if an administrator is aware

15 of misconduct of that nature, that they

16 should report it to the Title IX

17 coordinator or to their immediate

18 supervisor, if they are not sure.  So, I

19 think it is reasonable to expect

20 administrators to report that, if they're

21 aware, yes.

22        Q.    Do principals have any

23 responsibility for investigating Title IX

24 issues?  And when I say Title IX issues,

Todd Bauer

1     Q.     Do they have any

2  responsibilities, assistant principals,

3  for when sexual misconduct is reported,

4  in terms of documenting, investigating,

5  reporting to someone else?

6     A.     The only difference aside

7  from those aforementioned

8  responsibilities of a principal would be,

9  I would expect that the assistant

10  principal went to the principal first.  I

11  think that they would contact the

12  principal, and they would collectively

13  call the coordinator.

14     Q.     Okay.  I want to jump back

15  to principals for a second.

16     A.     Sure.

17     Q.     When there's sexual

18  misconduct reported at their school, I

19  know you said that should be reported to

20  the Title IX coordinator, but upon a

21  finding that sexual misconduct did occur

22  with a student perpetrating on another

23  student, do they have any other

24  responsibilities other than notifying

Todd  Bauer

1          A.     The think the more

2    information you have about students, the

3    better you can support them, and that's

4    for all kids.  So, I would want to know,

5    as the building principal, anything that

6    I could to help provide a better

7    environment for all of my students.

8          Q.     Would that include keeping

9    them safe?

10          A.     Of course.  I want to keep

11    all kids safe.

12          Q.     What about the

13    superintendent, what's the

14    superintendent's role?

15          A.     The superintendent's role

16    in, what, in particular?

17          Q.     Just, overall, do you have

18    an understanding of -- or are you saying

19    that there's so many things that -- job

20    responsibilities?

21          A.     Yeah.  I mean, so it's the

22    CEO of the organization, right?  So I'm

23    responsible for the budget, for

24    communicating with the school board, for

Todd Bauer

1  setting agendas for meetings, setting

2  expectations of employees, and that's --

3       Q.    What about in terms of

4  student misconduct, just to cut down to?

5       A.    Most student misconduct

6  infractions are handled at the building

7  level, an overwhelmingly majority of

8  them.  Something that would make its way

9  to my level is usually handled at that

10  point, and if it is egregious, the

11  superintendent would be involved.

12       Q.    Is the superintendent, are

13  they involved at all in, in Title IX

14  student sexual misconduct, sexual

15  harassment?

16       A.    So, such incidents are

17  pretty confidential.  So I don't know

18  about conversations between the

19  superintendent and the Title IX

20  coordinator.  So I can't describe what he

21  knows.  But I can tell you, in, in North

22  Penn, Dr. Dietrich is very involved in

23  many, many things.  So, yeah, I can't, I

24  can't speak to the specificity of the

Todd Bauer

1  conversation between the Title IX

2  coordinators and -- coordinator and the

3  superintendent.  But I assume he is, he

4  is aware that an investigation is

5  occurring, yes.

6          Q.    Do you know whether the

7  superintendent, just, does he have the

8  authority or the ability to talk to just,

9  say, principals and things and implement

10  things at the, the building level?

11          A.    Sure.

12          Q.    Like, he has the authority

13  to do so?

14          A.    Implement things, yes,

15  certainly.

16          Q.    Well that's pretty broad.

17  So let me be more specific as well, so

18  we're clear.

19              In terms of, like, asking

20  for a safety plan to be put in place, is

21  that something that he would have the

22  authority to do, to go to the building

23  administrator and say, hey, can you put a

24  safety plan in place for this student?

Todd Bauer

1    you to implement a safety plan.

2    That's something that occurs at the

3    building level, not at the

4    superintendent level.

5  BY MS. LAUGHLIN:

6        Q.    But if the superintendent is

7  the one who knows, just say, for example,

8  and the high school principal maybe

9  doesn't, I mean, does the superintendent

10 have the ability or authority to make

11 sure that that message, if that's needed,

12 gets down to where it can be implemented

13 at the school level?

14            MS. JORDAN:  Note my

15    objection to the form of the question.

16            You can answer.

17            THE WITNESS:  So the -- it

18    is my belief, wholeheartedly, that if

19    Dr. Dietrich, or the superintendent,

20    knew that a safety plan was to be

21    implemented for a student and one was

22    not implemented, I wholeheartedly

23    belief that he would set that

24    expectation and direct it to be done.

Todd Bauer

1       But I don't think it is within a

2       normal scope of his job, for -- to

3       direct building teams to setup

4       individualized safety plans for kids.

5  BY MS. LAUGHLIN:

6           Q.    I want to ask you about

7  the -- it's my understanding there's a

8  director of elementary education,

9  director of secondary education and a

10 director of special education.  Are they

11 all on the same level in terms of

12 hierarchy?

13          A.    Yeah.  So there is not a

14 director of secondary.

15          Q.    Okay.

16          A.    There's a director of

17 elementary.  If you recall, we described,

18 back in 2018, that was when we had two

19 assistant superintendents.  There was a

20 consolidation at that point.  So, the

21 director of secondary job no longer

22 existed.  I took on that role.  So there

23 are two assistant superintendents, a

24 director of elementary and a director of

Todd Bauer

1  special ed, district of curriculum,

2  director of technology, all of those

3  positions.  Would I say they are all on

4  the same level?  I think, in any

5  organization, there's a hierarchy of

6  sorts, but in general, they're all

7  cabinet level administrators, and I, I

8  would say there's a clear delineation.

9  In the group that I previously

10  referenced, it's the operations team,

11  which would be the superintendent, two

12  assistant superintendents, director of HR

13  and CFO.  They -- excuse me -- they are

14  at the top of the ladder, if you will, in

15  this organization, and then you have the

16  directors, who are all on a parallel

17  plane.

18       Q.    What's the role of the

19  director of elementary education?  And

20  when I'm asking these questions, I'm

21  asking from just, say, 2014 up through

22  the present.  I don't know if it's

23  changed at all, but let me know that,

24  please, if it has.

Todd Bauer

1        A.     I would say that, to
2   supervise all of the happenings in our
3   elementary schools, collaborating with
4   the curriculum department and special ed
5   department, as it pertains to elementary
6   school, and then the director of
7   elementary, in this district, has other
8   responsibilities as well.  Sometimes
9   those responsibilities can rotate, but
10  here, right now, director of education
11  oversees home school, McKinney-Vento
12  Homelessness, boundary alignment, at
13  times, they have their hands in, if we
14  need to make some shifts because some
15  schools are overpopulated.  So, those are
16  just some examples.  But the workings of
17  our elementary -- 13 elementary school
18  buildings.
19        Q.     Okay.  And there's one
20  director of elementary ed for those 13
21  buildings?
22        A.     Yeah.
23        Q.     And was that Betty -- Dr.
24  Betty Santoro, was that her role?

Todd Bauer

1    A.    Yes.  Just recently retired.

2    Q.    Does the director of

3  elementary education have the authority

4  to implement things or communicate to

5  people so they could implement things, in

6  terms of student safety and student

7  discipline at the school level?

8    A.    Yes.

9    Q.    What is the difference with

10  the director of special education?

11    A.    The director of special ed,

12  I mean, I think that the answer is in the

13  name.  The director of special education

14  oversees all things related to special

15  education.  So, all students and services

16  with identified disabilities.

17    Q.    So a student that's

18  receiving special education services

19  would also -- kind of like the overlap

20  we talked about earlier in your

21  deposition -- the elementary education

22  director and the special education

23  director would overlap for special

24  education students in elementary?

Todd Bauer

1    A.    Yeah.   There would be some

2  overlap, yes.

3    Q.    Does the director of special

4  education also have the authority to

5  implement safety-type things at the

6  building level for a student?

7    A.    I wouldn't say at-large, but

8  for students with disabilities, yes.   As

9  it pertains to students with

10 disabilities, yes.

11   Q.    Okay.   And the supervisor of

12 special education, what's the difference

13 between that and the director of special

14 education?

15   A.    I think you could draw

16 parallels with the director of elementary

17 and the principals.   It's very similar

18 with the director of special education

19 and the special ed supervisors.   They're

20 also administrators, and they're direct

21 report, it's not the principal of their

22 building, it's the director of special

23 ed.

24   Q.    Okay.   So in terms of

Todd Bauer

1    A.    I am.

2    Q.    Is it large enough for you?

3    A.    It is.

4    Q.    Okay.  I'm referring to

5  bates No. 1 of the North Penn School

6  District production.

7          Whose, whose notes are

8  these, this typed up document?

9    A.    I believe that was Dr.

10  Ann-Marie Lucas, wrote those.

11          What page are you on, I'm

12  sorry?

13    Q.    10001.

14    A.    Okay.

15    Q.    You have it in front of you

16  as well?

17    A.    I don't, but I'll find it.

18    Q.    I mean, can you see it on

19  the screen?

20    A.    I can, yeah.

21    Q.    Okay.  And I'm just gonna be

22  going through it with you now.

23    A.    Yup.

24    Q.    And who is, who is Ann-Marie

1   Lucas?

2         A.    At the time of those notes,

3   she was the director of special

4   education.

5         Q.    Okay.  How -- do you know

6   when she took on that role of director of

7   special education?

8         A.    Yes.  She followed when Dr.

9   Rufo got promoted.  So it would have been

10  2018.

11        Q.    How did this, this meeting

12  come about between Mrs. ██Doe████████ ,

13  yourself -- is it Dr. Lucas?

14        A.    It is now; it wasn't then.

15  I honestly believe that it was a phone

16  call from me saying I would like to sit

17  down and talk to her.  I was neutral in

18  my position at the time, and the

19  situation was brought to my attention, I

20  supervise the high school, and I reached

21  out to her and said, can I sit down with

22  you.  And I think there was some

23  apprehension initially, and then she

24  called back and said, I'd be willing to

Todd Bauer

1   then we met.

2        Q.    Why were you upset about it?

3        A.    Because I was disappointed

4   that a student ended up in the same class

5   when they should not have been in the

6   same class, and obviously the behaviors

7   that were alleged, and there was no

8   specificity as to what happened, none.  I

9   believe the term was sexually assaulted.

10  And I wanted to meet with the parent.

11       Q.    When you say there was no

12  specificity as to what happened other

13  than using the phrase sexually assaulted,

14  was that the term that Principal

15  Nicholson had used to you in that

16  conversation?

17       A.    Great question.  I'm not --

18  I can't say with confidence if he said

19  that.  My recollection of what he said to

20  me back then was that, look, here's a

21  situation, apparently there was some

22  misconduct in elementary school, two

23  students were to be separated, they went

24  to different middle schools, and when she

Todd Bauer

1  came to the high school, mom let us know

2  that she should not be in the same

3  classes with this student, and at the IEP

4  meeting, the case manager checked their

5  schedules, they were not in the same

6  class, somehow, I'm not sure how, they

7  ended up in the same social studies

8  class, and mom says that it happened

9  again.

10          That's how it was outlined

11  to me; with no detail.  So that's when I

12  reached out to mom.

13     Q.    When you said that Principal

14  Nicholson said that, mom let us know

15  before Jane Doe had entered the high

16  school, meaning, like, let Principal

17  Nicholson know of the past conduct that

18  had happened in elementary and then the

19  fact that they were separated?

20     A.    When he was using the term

21  "us", I don't believe it was him.  I

22  don't believe he was initially involved

23  in the first meeting.  So it would have

24  been the case manager, specifically, and

Todd Bauer

1  students need to be separated because
2  they were not both in either school.  So
3  I would assume that the counselor at
4  Pennbrook and the counselor at Penndale
5  did not say anything to the counselors.
6  However, mom did, at the IEP meeting.
7  And it's my belief that the schedules
8  were checked.  I know the individuals
9  involved, and I can't say enough about
10  Kate or Megan, two of our finest, and I
11  believe they did check their schedules,
12  and I also have reason to believe that
13  they were correct, that they -- the two
14  students were not in the same class,
15  because I was able to go back and check
16  their schedules the day of the IEP
17  meeting, and they were not.  So, I think
18  they did as they said.
19       Q.    What's the process that is
20  in place, though, when you're -- or, what
21  are the available processes in place to
22  separate two students at the high school?
23  I know you did talk about schedule
24  checking as one.  But are there other --

Todd Bauer

1  think there are three dates noted where

2  she met with her, but I don't know that

3  there is written confirmation that she

4  gave her a pass or that they discussed

5  it.  I don't know the details of those

6  conversations from -- in 2018.

7       Q.    Okay.  And why did --

8  Principal Nicholson, why was he calling

9  you to bring it to your attention about

10  what had happened?

11       A.     I think Mr. Nicholson has a

12  really high moral compass, and the events

13  as I just described are disappointing.

14  So he called me and said, hey, this

15  happened, and I don't know how it

16  happened, and I'm sorry, but I wanted to

17  let you know.  And that's when I reached

18  out to the mom.

19       Q.    Have you ever had any prior

20  contact with Mrs. Doe          , Jane

21  Doe         before this point?

22       A.    No.  My path did not overlap

23  with Jane Doe 's at all.  So I was a high

24  school principal while she was in middle

Todd Bauer

1  the meeting mom describing what had

2  happened -- high school meeting?

3          A.    Yeah.  I remember that mom

4  said, look, there are -- there's a boy

5  that she's not allowed to be around, I

6  don't want too many people to know about

7  this, it's time for us to move on, but

8  they are to be separated, under no

9  circumstances can they be in the same

10 class, I believe that they can see each

11 other in the hallways or walk past each

12 other, but they cannot be in the same

13 class or the same lunch.  I told her that

14 they were gonna check her schedules --

15 their schedules to make sure that they

16 weren't and -- yeah, that's my

17 understanding of the initial meeting.

18         Q.    Is this from mom, mom

19 telling you this in this meeting?

20         A.    Yes, that's my recollection.

21         Q.    And Kate Small and Megan

22 Schoppe, do they have, like, the ability

23 and the authority to be implementing

24 these separation measures?

1  you remember in this discussion?

2      A.   Yeah.  So, that was the

3  first that I had heard that something

4  happened at the middle school level, and

5  mind you, Jane Doe and M.P.   did not go to

6  the same middle school.  But mom said in

7  ths meeting, "yeah, he did this to two

8  other girls at the middle school".  At

9  that time, I did not know that.  I have,

10  since, looked into it, I have spoken to

11  the assistant principal at Penndale

12  Middle School, the assistant principal at

13  the time, and he said that his

14  recollection is that he touched two

15  girls' thighs in the cafeteria.

16      Q.   Who was that assistant

17  principal you spoke to?

18      A.   His last name is spelled

19  B -- as in 'bravo' -- A-S-H-A-W, Bashaw;

20  first name is Jason.

21      Q.   When you had found that

22  information out, was M.P.   still a

23  student at the high school?

24      A.   No.

Todd Bauer

1   education, she was aware of the

2   allegation that students had been touched

3   in fourth grade by M.P. ?

4        A.    I would be willing to state

5   that Jane Doe's mom said that M.P. did

6   that in fourth grade, I'd be willing to

7   say that.

8        Q.    To Dr. Santoro?

9        A.    That Jane Doe's mom said that

10   to Dr. Santoro, yes.

11       Q.    Okay.

12       A.    It was reported not that the

13   principal knew, yes.

14       Q.    In your compiling of

15   information and investigation -- or,

16   documents on behalf of the district, was

17   there any indication to you that a

18   investigation into what happened or the

19   allegation of M.P. touching girls in

20   fourth grade was investigated?

21       A.    I did not come across that,

22   no --

23       Q.    What about --

24       A.    -- that I recall.

Todd Bauer

1   said two incidents.  I'm aware of one

2   that referenced two students.

3        Q.    Okay.

4        A.    But nothing other than what

5   we've already talked about,

6   conversations, and in this case, it's

7   pretty clear that the administration at

8   the high school knew about this, right?

9   So it was communicated.  That's not the

10  issue, whether or not it was

11  communicated.

12       Q.    I guess the way you just

13  answered the question, I wanted to ask a

14  follow-up question, then.

15            When you say you have one

16  incident involving two students --

17       A.    Mm-hmm.

18       Q.    -- in terms of the district

19  classifying incidents, the one with the

20  two separate students that M.P. had

21  touched individually in middle school, is

22  that considered one incident, on behalf

23  of the district?

24       A.    I guess it depends whether

# EXHIBIT 11

William Bowen

```
 1                UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3               CIVIL ACTION NO. 2:20-CV06142

 4

 5

 6    - - - - - - - - - - - - - - - -

 7    JANE DOE,                       )

 8                    Plaintiff,     )

 9        -vs-                        )

10                                    )

11    NORTH PENN SCHOOL DISTRICT,    )

12                    Defendant.     )

13    - - - - - - - - - - - - - - - -

14

15                       - - -

                    July 26, 2021

16                       - - -

17

              Remote Deposition via Zoom of WILLIAM

18    BOWEN, conducted at the location of the witness,

      taken before Stephanie LaForte, a Professional Court

19    Reporter and Notary Public, on the above date,

      commencing at 10:02 a.m., there being present:

20

21                       - - -

22

23                GOLKOW LITIGATION SERVICES

              877.370.3377 ph/917.591.5672 fax

24                    deps@golkow.com
```

William Bowen

1  you distinguish it from being consensual versus not

2  consensual?

3       A.    No.  Just that I recall the teachers

4  telling me, kind of, the reason they didn't report

5  it was that they felt that it was more consensual

6  and that is why they told them they wouldn't tell

7  their parents.

8       Q.    Okay.  Them telling them that they

9  wouldn't tell their parents, what was your reaction

10 to that at the time?

11      A.    That they should have told the parents

12 right away.  I mean, what they did was not the

13 correct course of action.

14      Q.    So, I am gonna pull up a document.

15           MR. SOMERS:  These are all documents

16      you have already seen?

17           MS. JORDAN: Yes.

18 BY MS. LAUGHLIN:

19      Q.    Are you able to see that on your

20 screen?

21      A.    Yes.

22      Q.    Is this one of the documents that you

23 reviewed in preparation for today?

24      A.    Yes.

William Bowen

```
 1        A.    Yes.  Yeah, it is chronological.  It is

 2   chronological.

 3        Q.    So, you call Dr. Santoro to make her

 4   aware of the situation.  Why were you doing that?

 5        A.    Because she is my immediate supervisor.

 6        Q.    Is this something -- I think before you

 7   had said that major incidents are the ones that you

 8   would report to the immediate supervisor; is that

 9   right?

10        A.    Correct.

11        Q.    What about this was a major incident?

12        A.    I think, uh, sexual in nature.

13        Q.    Are you talking about both Jane's

14   incident and the other girl's incident?

15        A.    I am talking about it all.

16        Q.    Okay.

17        A.    Because as you can see, I would need to

18   investigate further.  It is the start of an

19   investigation, so I don't think I have all the

20   facts, and part of that is meeting with the parents.

21        Q.    At this point, since you are starting

22   the investigation, do you know whether this is

23   something that, like, kind of triggers Title IX at

24   this point?
```

William Bowen

1  consensual with the girls than what -- you know,

2  than the girls felt it was, and you know, that

3  probably at the time I felt it was.

4       Q.    At the time you said the way that you

5  felt it was.  What did you feel at the time?

6       A.    I think -- I think it was -- I -- I

7  can't give you -- I can't give you a lot of detail

8  about that, other than I felt what he did was wrong

9  or else I wouldn't have suspended him.

10       Q.    When you said that -- You also said

11  that from what the girls said, do you recall

12  something that M.P.    had -- I'm sorry, that Jane Doe

13  had said to you regarding whether it was consensual

14  or she wanted it to happen or anything like that?

15            Do you remember anything?

16       A.    No.  Not necessarily, no.

17       Q.    Okay.  But just your general sense of

18  what you got from them was that it was unwanted?

19       A.    I think -- yes.  I think that whether

20  the first incident was consensual or not, I don't

21  know, but I think that he should not have touched

22  students and he did.  And that is why it warranted

23  that level of discipline.

24       Q.    Do you know whether you or Ms. Vaszily

1    it's been seven years almost.

2         Q.    Okay.  Then it says, at 3:00 p.m.  Bill

3    Bowen informed me, meaning Dr. Santoro, that one of

4    the students, blank, did admit to being touched.  It

5    says top, and it's crossed out, front and back and

6    bottom by M.P.    in fifth grade.  Then it says --

7              So, she is saying that you are the one

8    that informed her about M.P.   touching somebody in

9    fifth grade?

10        A.    I don't recall that.

11        Q.    I know you don't recall, but do you

12   disagree that that happened or you just can't

13   remember?

14        A.    I can't remember.

15        Q.    Then it says you are following up with

16   the parent of the student and Ted Ciaola.  It says

17   all of this has been reported to Child Line.

18             Do you recall whether you were the one

19   to -- When it says all of this has been reported to

20   Child Line, were you the one who made the calls or

21   did other people; if you know?

22        A.    I believe Kristin Vaszily and I called

23   together.

24        Q.    Do you recall how many phone calls you

# EXHIBIT 12

## AGREEMENT REGARDING
## HOLLY ANDREW-GARRETT

**THIS AGREEMENT** is entered into by and between NORTH PENN SCHOOL DISTRICT (herein "District"), NORTH PENN EDUCATION ASSOCIATION, the employee representative for collective bargaining purposes (herein "Association"), and HOLLY ANDREW-GARRETT, a District employee and member of the Association.

WHEREAS, District and Association are parties to a Collective Bargaining Agreement;

WHEREAS, Holly Andrew-Garrett ("Andrew-Garrett"), who is employed by the District as a professional employee, is a member of the Association.

WHEREAS, in May of 2015, Andrew-Garrett was suspended without pay for two days as a result of her handling of a student issue in her classroom;

WHEREAS, as a result of the suspension, Andrew-Garrett and the Association filed a grievance on May 29, 2015;

WHEREAS, in February of 2016, Andrew-Garrett was placed on a Performance Improvement Plan ("PIP") due, in part, to her handling of the student issue that led to the above-referenced suspension;

WHEREAS, it is the intention of the District, the Association and Andrew-Garrett to resolve the disciplinary matter involving Andrew-Garrett's handling of a student issue in her classroom so as to avoid the need for an arbitration hearing or any other complaint or claim by the Association or Andrew-Garrett.

NOW, THEREFORE, the District, the Association and Andrew-Garrett agree as follows:

1.      Andrew-Garrett's two-day suspension is reduced to a one-day unpaid suspension;

2.      Andrew-Garrett shall receive payment for the one day of back pay in the first paycheck following the execution of this Agreement by all Parties;

1

**DEF NPSD 001001**

3.      The District agrees to remove the PIP that was issued to Andrew-Garrett in February of 2016 from her personnel file;

4.      The Association agrees that it will withdraw the grievance that was filed on May 29, 2015 and will not file or otherwise commence an unfair labor practice or any other action relating to the discipline that was imposed against Andrew-Garrett;

5.      Andrew-Garrett accepts the above-listed disciplinary consequences and agrees that the grievance filed on May 29, 2016 will be withdrawn and that she will not file or otherwise commence an unfair labor practice or any other legal action of any kind relating to these consequences.

**IN WITNESS WHEREOF**, the District, the Association and Andrew-Garrett have approved this Agreement.

NORTH PENN SCHOOL DISTRICT

Date: 5/6/16

By: _____
Curtis R. Dietrich, Ed.D.
Superintendent of Schools

NORTH PENN EDUCATION ASSOCIATION

Date: 5/6/16

By: _____
Sean J. Devlin
Association President

HOLLY ANDREW-GARRETT

Date: 4.22.16

By: _____
Employee

2

**DEF NPSD 001002**

# EXHIBIT 13



**NORTH PENN**
School District

June 10, 2015

Mr. Alan Malachowski, President
Ms. Holly Andrew

RE: NPEA Grievance Dated May 29, 2015

This letter is the Step III response to the above referenced grievance filed by NPEA on May 29, 2015 alleging that the North Penn School District violated the Collective Bargaining Agreement by issuing a two day suspension of Ms. Andrew without cause.

After meeting with you and Ms. Andrew, and carefully considering the facts of the case, I conclude that a two day suspension is appropriate. I am very concerned that Ms. Andrew did not report to her building principal the student behavior she observed. The behavior of a male student reaching his hand underneath a female student's shirt in the area of her chest during the course of a sixth grade class lesson should be very significant cause for concern by the teacher, and should have been handled in a much different manner than the manner in which Ms. Andrew handled it. For example, I am very concerned that Ms. Andrew interviewed both students together and at the same time. This was a clear and significant violation of protocol. Furthermore, I am very concerned about Ms. Andrew's explanation of how and why she arrived at her conclusion that the behavior was consensual and therefore warranted only a discussion with the students with a promise that if it did not happen again the parents and the school principal would never learn of it. As we know, when student behavior such as the behavior in this case is not appropriately addressed, the behavior is very likely to be repeated with victims continuing to suffer.

On the basis described above, the grievance is denied.

Sincerely,

*Curtis R Dietrich*

Curtis R. Dietrich, Ed.D.
Superintendent

CRD/srk

cc: Cheryl McCue, Director Human Resources

# EXHIBIT 14

NORTH PENN SCHOOL DISTRICT

Educational Service Center

401 E. Hancock Street Lansdale, PA. 19446

215-853-1056   FAX: 215-853-1749

## APPLICATION FOR TRANSFER OF SCHOOL ATTENDANCE - E L E M E N T A R Y

School Year 20 15 - 20 18

SECTION I: (To be completed by parent/ legal guardian; District to supply student number)

PARENT/LEGAL GUARDIAN MAKING THIS REQUEST:

HOME ADDRESS (Street, City, ZipCode):

Home Phone # _____    Work Phone # _____    E-mail _____

1. CHILD'S NAME: Jane Doe    GRADE 6    STUDENT NO.: _____

2. CHILD'S NAME: _____    GRADE ____    STUDENT NO.: _____

3. CHILD'S NAME: _____    GRADE ____    STUDENT NO.: _____

HOME SCHOOL: Penndale    REQUESTED SCHOOL: Pennbrook Middle School

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

SECTION II: (To be completed by parent/ legal guardian)

This transfer request is necessary due to (please check one and provide requested information):

____ Daycare needs: Provider's Name: _____

Address: _____    Daytime Phone #: (___) _____

*A letter from attending Day Care provider is required to verify enrollment.*

X Other Compelling Reason: Please explain – (attach additional sheet if necessary) _____

_____

Does student have an IEP? X Yes ____ No

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

SECTION III: (To be notarized)

Transfers of attendance are considered a privilege and may be rescinded by the school district if need be. I understand that if the transfer is approved it is for ONE YEAR ONLY and MUST BE RESUBMITTED and approved annually. Approval of transfers of attendance is based on enrollment figures and availability of space in the requested school. Extended School Care may NOT be available at the requested school.

*I understand that transportation for my child to the requested school is my responsibility.*

Please have this completed application form notarized prior to returning it to the Educational Service Center for consideration.

_____    2-24-15
Signature of Parent/Legal Guardian          Date

*Please attach current custodial agreement and provide signature of shared custodial parent/guardian when applicable.*

_____    approved   6/10/15
Signature of shared Parent/Legal Guardian    Will McKay 6/11/15

Subscribed and sworn to before me this ____ day of _____ 20___.    Isabelle 6/10/15

_____
Notary Public                        Seal of Notary Public

**DEF NPSD 000689**

# EXHIBIT 15

**Garrahan, Tonja D**

| | |
|---|---|
| **From:** | McKay, Deborah B |
| **Sent:** | Tuesday, May 05, 2015 12:25 PM |
| **To:** | Garrahan, Tonja D |
| **Subject:** | FW: Pennbrook |
| **Attachments:** | TOA for Pennbrook.PDF |

Tonja:  For our TOA file.  Please print this e-mail for my TOA conversation in June with principals.  Thanks.

**Deborah B. McKay, Ed.D.**
Director of Secondary Education/
Professional Development

**North Penn School District**
401 E. Hancock Street
Lansdale, PA 19446
215-853-1090

---

**From:** Santoro, Elizabeth
**Sent:** Tuesday, May 05, 2015 9:34 AM
**To:** McKay, Deborah B
**Cc:** Holben, Diane M
**Subject:** FW: Pennbrook

Hi Deb,

I have a request for a TOA for 7th grade to Pennbrook.  This is a delicate matter that I can fill you in later.  I strongly suggest we grant this since the student will need to be separated from some students that will be attending PD.

Thanks.

**Elizabeth A. Santoro, Ed.D.**
**Director of Elementary Education**
**North Penn School District**
**(215) 853-1045**

1

**DEF NPSD 000690**

# EXHIBIT 16



**NORTH PENN**
School District

January 6, 2016

Mr. & Mrs. M.P.

Re: M.P.

Dear Parent/Guardian of M.P.

This letter is to inform you that M.P. has been assigned a 3 <u>day Out-of-School Suspension</u> for the reason (s) stated below:

Cause of Suspension:  Sexual harassment of female students by way of inappropriate physical contact.

Effective date(s) of suspension:  January 7, 2015 through January 11, 2016.

During the suspension, I would hope that you would reinforce our view of the seriousness of this problem.  One way you can assist is by restricting M.P. to your home during school hours.  Please recognize that the student is not allowed to participate in school activities or enter the school building / grounds during this suspension.

Students found on school property during school hours, evenings or weekends while on suspension, may be issued a citation for trespassing and may be fined accordingly by the local police department.

Your cooperation is appreciated.

Sincerely,

Jason M. Bashaw
Assistant Principal

# EXHIBIT 17

1          UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                  -   -   -
3  JANE DOE              : CIVIL ACTION NO.
                         : 2:20-CV-05142
4        v.              :
                         :
5  NORTH PENN SCHOOL     :
    DISTRICT             :
6
                   -   -   -
7
              AUGUST 24, 2021
8
                   -   -   -
9
10          REMOTE ZOOM deposition of
11  DAWN LeBLANC, taken pursuant to notice,
12  commencing at 10:00 a.m., on the above
13  date, before LISA MARIE CAPALDO, RPR, a
14  Registered Professional Reporter and
15  Notary Public in and for the Commonwealth
16  of Pennsylvania.
17
18
19
20
21
22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph| 917.591.5672 fax
23            deps@golkow.com
24

1   and get a principal certification or

2   something like that to become principal?

3        A.    Yes, I did.  I did my

4   educational leadership.  Actually, I got

5   my certification and then my doctorate in

6   educational leadership and also my

7   vocational director certification at the

8   same time.

9        Q.    And I know we're here today

10  to talk about ███████████ and some

11  of the things that occurred back in the

12  2017 to 2019 time frame.

13            Do you remember ██████

14  ████████?

15       A.    Yes, I do.

16       Q.    How did you first meet her

17  or come in contact with her?

18       A.    She came to the office very

19  upset.  She said that she had passed a

20  student in the hallway that she wasn't

21  supposed to be around.  And just seeing

22  him upset her.

23            She was in a different part

24  of the building, but passed him coming to

Dawn LeBlanc

1   the office.  And that's kind of where we

2   got involved.

3                We weren't familiar with

4   anything between her and another student.

5   She was in automotive.  He was in

6   drafting.

7                So at that point in time, we

8   kind of came up with a game plan of how

9   we could keep her feeling safe in our

10  building with this other student that was

11  there.

12       Q.    When you say this other

13  student, are you referring to ████

14  M.P.   ?

15       A.    Yes, I am.

16       Q.    When you say that she came

17  to the office very upset because she had

18  seen this student or passed him in the

19  hallway, do you recall that conversation

20  when Jane Doe came in?

21       A.    Well, she came in upset.  We

22  didn't know anything about it.  So it was

23  more asking questions, how do you know

24  this student?  Why did he upset you?

Dawn LeBlanc

1          She told us she had been --
2    it was in middle school.  So she was not
3    in the same middle school with this
4    student.
5          And then apparently, the
6    middle school sent him to North Montco,
7    that communication of them being
8    separated was never -- for some reason,
9    it was never given to us.
10          Maybe one middle school
11    didn't know the other one was sending
12    him.  There's a lot of different people
13    or groups in sending a kid to the tech
14    school.  So it probably wasn't done
15    purposely, but it was just done -- it
16    just happened that way.
17          Q.    Meaning that somebody from
18    the district didn't communicate to North
19    Montco that these two kids were now going
20    to be at the same school?
21          A.    Yes.
22          Q.    Did Jane Doe explain to you --
23    I know you just told us about her
24    transferring middle school to avoid

Dawn LeBlanc

1                   Is that what you are

2    referring to?

3            A.    Yeah.  Yeah.

4            Q.    And just to clarify, for

5    North Montco, is it only North Penn

6    District students that are coming to the

7    tech school?

8            A.    No.  It's five school

9    districts and several private schools.

10   Do you want me to name them?

11           Q.    That's okay.  Are they all

12   kind of surrounding North Penn?

13           A.    Yes, the Northern Montgomery

14   County area.  That's the area that North

15   Montco serves.

16           Q.    About how many students are

17   in -- you said the class is ninth grade,

18   tenth grade, 11th grade, 12th grade.

19           A.    That varies.  I'm not sure

20   where it is now.  When I retired, we had

21   approximately 1,200 students over four

22   grades.  Divide that by four.  Probably

23   less ninth graders.  Some districts don't

24   send ninth grade.

Dawn LeBlanc

1  School District.  Was it the

2  administration office?

3          A.    Yes.

4          Q.    Do you remember who you

5  spoke to?

6          A.    There was a couple of times

7  I did speak to Dr. Dietrich, but I can't

8  quite remember was it this situation or

9  the second situation that I talked to

10  him.

11          It was always a nice

12  conversation.  I brought it to his

13  attention.  I think he was aware of the

14  previous situation, but he was not aware

15  that both kids were in the middle school

16  at the same time.

17          So I talked to him about

18  having a plan of safety for her.  He was

19  very appreciative and was going to look

20  into what happened so that something like

21  this couldn't happen again.

22          I recommended that maybe

23  Jane Doe changed her school time so that we

24  could really keep an eye on her in that

Dawn LeBlanc

1    time, yes.

2         Q.    You said that Dr. Dietrich

3    was aware of the prior situation.

4              Can you be more specific?

5         A.    I think the assault

6    situation that happened with Jane Doe and

7    M.P.    in elementary school.

8         Q.    And how do you know that he

9    was aware of that when you talked to him?

10        A.    I don't know.  Just through

11   conversation, it just led me to believe

12   that he knew of that situation but that

13   it had been several years earlier.

14             So now that they are in

15   middle school -- at two separate middle

16   schools, it probably didn't cross a lot

17   of people's mind that they would go to

18   the tech school.

19        Q.    Did Dr. Dietrich tell you or

20   did you get the impression that he was

21   aware of the assault in elementary

22   school?

23             Did he tell you, oh, I know

24   what you're talking about?  How did you

Dawn LeBlanc

1    get that impression from him?

2         A.    Just through conversation.

3    I spoke with a lot of administrators

4    about a lot of different things.  It just

5    seemed like he was aware of the

6    situation.

7              And maybe it got to the

8    middle, and then kind of lost touch with

9    the situation.  And it never crossed

10   anybody's mind that they may end up at

11   the tech school together.

12        Q.    Was Dr. Dietrich glad that

13   you had brought it to his attention?

14        A.    I don't know if he was glad.

15   He seemed very appreciative that we were

16   on top of it and we were going to come up

17   with a safety plan for Jane Doe and make

18   some changes to her schedule so that she

19   was in a safe environment and we were

20   looking out for her.

21        Q.    Did you believe Jane Doe when

22   she was telling you this and that she

23   didn't want to be around M.P. and the

24   reasons why?

# EXHIBIT 18

# Safety Plan for ▮Jane Doe▮

- Bus drop off at 8:00 am. ▮Jane Doe▮ reports directly in the building and then directly to Automotive
- 8:10-10:20 – Auto Mr. Fluck – If ▮Jane Doe▮ needs to leave the lab for any reason, Mr. Fluck or Mr. Becker will call Rhonda to see if that person is available.
- Once a week, Lakeside Counselor Rebecca will meet ▮ (Wednesday am @ 8:30)
- ▮Jane Doe▮ must remain in lab until 10:20 so that she attends Gym class after ▮M.P.▮ returns to NPHS.
- Gym teachers need to be made aware
- The remainder of the day ▮ will follow normal schedule
- Bus will pick ▮Jane Doe▮ up for 2:10 dismissal

Other contingency plans –

- School Assemblies and other school activities– Felicia from security will be assigned to monitor ▮ from a distance. ▮ will be informed if there are any issues, go directly to Felicia. If Felicia is not here, a backup will be assigned.
- If NMTCC determines that they need additional assistance for school assemblies / other school activities, they will share the dates of these events with NPHS (at least 2 days in advance), and an assistant will be sent to NMTCC to support.
- ▮ will be provides a laminated pass to go to guidance if needed

# EXHIBIT 19

1          UNITED STATES DISTRICT COURT
   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

                    -   -   -
3  JANE DOE                    :NO. 2:20 CV
                               :05142
4          v.                  :
                               :
5  NORTH PENN SCHOOL           :
   DISTRICT                    :
6

7                   -   -   -
8              November 5, 2021
9                   -   -   -
10             Remote Zoom deposition of
11 PETER NICHOLSON, taken pursuant to
12 notice, was held at the location of the
13 witness, commencing at 10:02 a.m., on the
14 above date, before Emily Andreasen, a
15 Court Reporter and Notary Public for the
16 Commonwealth of Pennsylvania.
17

18

19

20

21

22                  -   -   -

       GOLKOW LITIGATION SERVICES
23   877.370.3377 ph| 917.591.5672 fax
            deps@golkow.com
24

Peter Nicholson

1          Q.    Right.  Thank you for that.

2  I forgot.  When I went to high school, it

3  was 9 through 12 was high school.

4                I understand North Penn

5  School District, the high school starts

6  at 10th grade.

7                Correct?

8          A.    Correct.  9th grade is on

9  the high school transcript, but it's

10  contained in the middle schools.

11          Q.    I understand.

12                Prior to taking on the role

13  of principal at North Penn High School,

14  had you ever been trained on Title IX?

15          A.    Yes.

16          Q.    Can you describe for me that

17  training, when, where, that kind of

18  stuff?

19          A.    I don't recollect specific

20  times.  I do know that our school

21  solicitor regularly gave training

22  opportunities and updates to our

23  administrative team, as I said before,

24  during district administrative trainings,

Peter Nicholson

1   I recall, is that the report was made to

2   North Montco.  It was reported to me via

3   the Towamencin Police Department, and we

4   were told not to do any kind of

5   investigation; however, I did share the

6   fact that the investigation was happening

7   with members of the administrative team

8   here at North Penn by including

9   Dr. McCue.

10          Q.    And you included Dr. McCue?

11          A.    I knew she was involved in

12  it, yes.

13          Q.    When you say you know she

14  was involved in it, what do you mean?

15          A.    I know that she -- I know

16  that she was made aware of the pending

17  police investigation and the report that

18  was made at the tech school.

19          Q.    How do you know that she was

20  made aware of those things?

21          A.    Through conversations with

22  other members of the district

23  administrative team that I'd had, after

24  being notified by Towamencin police.

# EXHIBIT 20

Attending--Mrs. **Doe** , Dr. Bauer, Ann Marie Lucas
Time 3:01

- Mom provided the below background and perspective resulting in current concerns with **Jane** s education provided to date --
  - 3 events have occurred over the years to **Jane** . One event happened when she was 5 and then again in 6th grade. April of her 6th grade year in October it was alleged that sexual assault occurred to **Jane** by a student in her class.Teachers did not report it. **M.P.** was alleged student.
  - During her early elementary years teams did a good job of alerting mom to **Jane** 's anxiety and triggers that might happen in the classroom. She was happy with the way the teachers and counselors supported her prior to her 6th grade year around the earlier assaults when she was 5.
  - Schools did not offer additional supports. No info on disciplinary actions on teachers. Mom pushed to get her moved to Pennbrook.Everything has been a fight for mom.
  - In her 9th grade year **Jane** was going to go to the tech school and **M.P.** is at the tech school. Mom called superintendent about the other student being there. How not put safeguards in place to keep them apart? Super asked to have memory refreshed about incident. Mom is upset there was no knowledge of her student and the concerns from the 6th grade year.
  - Tech school stepped in the 9th grade year. Put safety team in place so they would not cross each other. Tech school had not been notified by the North Penn team. **Jane** was also the first 9th grader to go through the tech school. They don't have the academic supports there. She was going to be around older kids. Tech school teachers don't like problem kids. PIAT team made decision she could not continue after 9th grade. Found out needed to go to HS this year though given she could not continue full time at tech with her academic functioning needs. August 22 mom met with Kate Small and Meghan Schoppe and went into great detail about keeping the 2 students a part when at the high school. Yet the first day of school they end up being in the same class together.
  - On October 29 mom gets a phone call from **Jane** that she was being assaulted again by the same student. Mom contacts the police and the detective felt there was a case. Was going to go to the assistant district attorney.
  - Tech school brought her in full time to support her now that there was a lack of trust in the high school and continuing there partially. HS shares apologies with mom in the meetings.
  - Mom shared that **Jane** has right to be a kid and don't treat her like the offender when part of the plan was to have her enter through back door to keep them apart.
  - Mom shared the three common elements in all 3 situations--**M.P.** **Jane** and superintendent are the 3 who knew all along what has been going on. She shared she is angry that when she calls Superintendent he asks for mom to refresh his memory on what has transpired.

- ○ Mom shared she talked to legal counsel around Title IX--fully aware of the provisions they should have made available. In 6th grade should have been put in place the safeguards to keep the kids a part as requested all along.
  - ○ Shared she went through documentation which was educational records. Why don't we have records about the incidents, phone calls, emails and transfer of assignments that have occurred. Only saw on file details from latest issue handled by Kate Small.

- Todd explained that we don't hold onto every phone call we make or all emails and what was in her educational records and files was shared. Logs of phone calls are not necessarily picked up or shared. TOA was not in her educational file so we had to seek them out separately which we did after and shared with mom via email.
- In regards to Title IX compliance Todd shared--what happened this year was not reported to the HS staff but rather went right to the police via ▮Jane▮ and the family.  We could not investigate b/c the police asked us not to investigate.
- Mom shared that we can run our investigation concurrently according to Title IX. Mom shared her lawyer shared we could have been doing our investigation concurrently. Todd shared if police tell us not to investigate we will comply. Our attorney, Mission Kids, and police have always told us not to so we followed their directions.
- Todd shared the official bullying/harassment form with mom in the meeting so that she can officially request our team to investigate if she and ▮Jane▮ still want that to happen as the police investigation has ended. Mom took the form with her and will follow up with us by completing it if she wants that to occur.  Clarified that the HS team did not Investigate given advisement from our attorney and also given the form needs to be completed. It was before Thanksgiving police said we could now start up the investigation and having this meeting was part of the reason we did not further engage as well.
- Todd explained his understanding of how the students might have ended up in the same class after safeguards and measures to check the schedule to keep the a part were put into place. Given internet forensic evidence we completed on 8/9 had 0 concurrent classes displaying in our systems online. This would validate that Kate Small did check and they were kept apart when original scheduling occurred. Then on 8/24 the schedules did coincide during a drop/add period. Students must have requested changes that the scheduler at the time did not know were not to happen.
- The schedule button is now in place and note in file was placed after the incident.
- Todd shared there is a process in place but it failed ▮Jane▮. Mom agreed with this statement.
- Mom shared she was upset that superintendent did not provide more oversight or communication to keep kids apart.  Todd shared  it should not be superintendents job to look at schedules and keep kids a part. Mom shared she agrees he does not need to be the one to do the schedule checks but he should have shared the information with others about the incidents and keeping them a part.
- Todd shared the IEP can be vehicle for us to not graduate her on time.

Mom shared further---

-angry that the system failed.

-The student who touched [Jane] did it twice at Penndale and there are other allegations according to mom. Todd and I let mom know we were not aware of other allegations or the students case in general.

-Mom shared she feels the system has failed her and robbed her daughter of time she won't get back and towards her final outcomes outside of high school.

-What Todd and I discussed with mom---More therapeutic environment might be something we can consider for her without involving attorneys.  Can do educational and therapeutic then senior year full time tech student at some tech school. Middle bucks institute of technology or other vocational placement in a year or two after the therapeutic option?  Also threw out names of other schools such as Vanguard, Pathway, Lifeworks etc. but that we could more formally offer up these schools for her to visit and learn more when she talks to [Jane] and thinks more about our conversation.

-Also talked about what type of counseling she might need help or support with. Mom did share they have counseling now financed through insurance. Todd asked what type of counseling as a family they might need and how we could potentially support with that.

- In regards to the investigation and charges against the student occurring mom shared that [Jane] was afraid of retaliation from the student accused and the football team so she omitted things during her Mission Kids interview follow-up and therefore they could not prosecute him. Mom did not push her further on this as this is what [Jane] wanted.

-We discussed the important of involving [Jane] in the conversation.

-Kate Small no longer in the role of supervisor as she wanted to return to the classroom and it was an interim position she was filling. Now Neil Broxterman is in the role. Kate did look at the schedules but then a change occurred in the system after. Someone not case manager or principal made the change. Not an excuse but understand it happened in error. Kate made changes on paper only and communicated to certain team members including principal. Honest mistake.

- Mom shared the tech school is supposed to send updates weekly. They don't always share things

-Mom shared some concerns over tech school communications and ways they support her. She has a stack of emails around those concerns from the files the tech school shared.

-Mom shared she just started a foundation called my silence is not golden. It is something she developed after work and partnership with the Hope program out of the Eagles foundation.

-Todd encouraged mom to  sit down with [Jane] and let her know we met to see what she is thinking she wants moving forward to support her educational and emotional/mental health needs. Options on table but what does she want. What type of school environment? See what she says and share back with us.

-Mom shared she was happy we both met with her and it was the most honest and open conversation she has had and has wanted to have occur.

-Todd also shared he believes some of the issue in the breakdown of keeping the kids a part has to do with Privacy concerns of team members in oversharing the information with those that did not need to know. Todd shared he always believe others are coming at it from a place of

trying to do good. Mom shared she does not feel that way. Mom feels that the HS team just wanted to see her be put somewhere else and be the tech schools problem not the HS teams.
- Mom shared there is Emotional scarring for ▮Jane▮ given all of this.

-Todd shared that the police would not tell us anything about the investigation when mom asked if we had details.

Next steps--Ann Marie will follow-up with Mrs. ▮Doe▮ after break  following our meeting given she needs time to talk to ▮Jane▮ about options for her education.  She can also let us know if she wants us to start the investigation by filling out that form.

# EXHIBIT 21

Kira O'Brien

```
 1            IN THE UNITED STATES DISTRICT COURT
 2
 3        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 4
 5   JANE DOE,                    :   CIVIL ACTION
            Plaintiff,           :
 6                                :   NO. 2:20-CV-05142
        vs.                       :
 7                                :
     NORTH PENN SCHOOL DISTRICT,   :
 8          Defendant.            :
 9                    -   -   -
10                 August 23, 2021
11                    -   -   -
12
         Remote via Zoom Oral deposition of KIRA
13
     O'BRIEN, conducted at the location of the witness
14
     in Sanatoga, Pennsylvania, before Nancy J.
15
     Taguinot, RPR, CCR(NJ), Registered Professional
16
     Reporter and Notary Public in and for the
17
     Commonwealth of Pennsylvania, commencing at 2:05
18
     p.m.
19
                       -   -   -
20
21
22         GOLKOW LITIGATION SERVICES, INC.
23        887.370.3377 ph/ 917.591.5672 fax
24             deps@golkow.com
```

Kira O Brien

1    like that?

2         A.      I know that at the end of 9th grade

3    year she was not accepted back into the full-time

4    program for the upcoming year.  So she was upset by

5    that and Mrs. ███████ was upset by that.  She

6    felt like 9th grade year was -- at North Montco was

7    actually a really good year.  I remember her saying

8    that.  And going to Mr. Fleck [ph], her auto

9    teacher and bringing him doughnuts and thanking him

10   for having it be a really great school year.

11            So overall she was feel happy to be at

12   North Montco, but her grades were definitely not

13   where they needed to be.  So that's why they said

14   that she wasn't -- not just with the grades, but

15   also she had been written up quite a few times for

16   discipline referrals also.

17            So they let her know that she could not

18   return to the full-time program.  She could return

19   as a part-time student for auto for 10th grade

20   year.

21        Q.      And did you work through processing

22   that with ████ that she was upset about it?  Was

23   that one of the things you were discussing when she

24   would come to see you?

Kira O'Brien

```
 1    that with me hoping that I would not have to share
 2    it with anybody else, that I could just keep that
 3    to I myself.
 4              Because she said, "You know what, like,
 5    this has been a school year and everything's going
 6    okay and I really -- I don't want this to cause any
 7    problems.  I don't want there to be any issues.  If
 8    we could just have this be between you and me and
 9    not report it, that would be -- that would be
10    ideal."
11              She really just wanted to get through
12    the school year without any -- without any
13    disruptions.  Like, she felt like, "Okay.  If you
14    come forward with what I just told you, then this
15    is really going to throw things off for me."  And
16    she'd rather just ignore it and just, you know,
17    move on with her school year.
18       Q.    When you say ignore it, what -- what
19    was she trying to ignore?  What was going on?
20       A.    So when she came to me and let me know
21    that she was in class with M.P.   and there was
22    inappropriate things going on quite frequently, one
23    of the things, you know, I asked her was why
24    didn't -- you know, why didn't you say something
```

Kira O'Brien

1    sooner?  And one of the reasons was because she

2    really -- she felt like the year was calm and she

3    felt like things were calm and she had, like -- and

4    it wasn't just academics.  Like, she was always

5    worried about the social piece of things also.

6              Like, she felt like her friend group

7    was good at that point and she felt like some of

8    her friends were friends or acquaintances with

9    M.P. , and so she really just didn't want any --

10   any attention to be put on her.  She kind of just

11   wanted to just go through 10th grade without there

12   being any issues.

13             And, unfortunately, I told her, you

14   know, this is something that I can't just keep to

15   myself, it has to be reported.  And she, you know,

16   was upset by that because she was hoping that we

17   could just somehow not report it.

18        Q.    When you said inappropriate things

19   going on, what do you mean?

20        A.    So that's when she told me that M.P.

21   was touching her inappropriately sexually during

22   class.

23        Q.    I'm sorry.  I apologize.  So touching

24   her sexually inappropriately during class.  Are

Kira O'Brien

1   those the words that she used?

2        A.     I can't say for sure that she said it

3   exactly that way, but she -- she went into detail

4   about what sort of thing was happening and I

5   explained to her that we needed to call the police.

6        Q.     Now, I know it's uncomfortable and, you

7   know, kind of difficult to talk about, but it's

8   important to understand, you know, what exactly she

9   was saying or, you know, why you thought it was

10   important to call the police.

11             So can you just, as difficult as it may

12   be, you know, say specifically what she was telling

13   you and kind of be more descriptive if you can?

14        A.     She was saying that ███ purposely

15   had her -- had his desk right next to her desk, and

16   was -- he was going underneath her shorts or her

17   pants and her underwear and using his fingers on

18   her inappropriately.

19        Q.     I apologize for the level of detail,

20   but, like, do you mean in her vagina?

21        A.     Correct.

22        Q.     Or in her -- in her rectum?  Or was it

23   both or just one or the other?

24        A.     I believe it was just her vagina.

Kira O'Brien

```
 1        Q.       And you said this was in the back of
 2    the classroom?
 3        A.       I'm not sure if it was in the back of
 4    the classroom, but I believe when she told me about
 5    it, I pictured it towards the back over to the
 6    side.  I'm kind of surprised that she was able to
 7    have her desk so close to M.P.    's and that it
 8    wasn't that -- no attention was brought to it.  But
 9    I didn't actually see the layout, so I'm not sure
10    exactly how it was set up.
11        Q.       When you say her desk so close to
12    M.P.   's, did she describe for you, like, how close
13    the desks were?
14        A.       She had told me that M.P.    pulled up
15    his desk so that -- like, M.P.    wanted their desks
16    right next door to each other.
17        Q.       Like where their desks were touching do
18    you mean?
19        A.       Yes.
20        Q.       When you say that M.P.    had
21    purposely -- or I think was putting his fingers
22    under her shirts -- or her shorts and her underwear
23    and into her vagina, that you said -- did this
24    happen -- do you know about how many times that had
```

Kira O'Brien

1  happened in the classroom?

2      A.      I know that it definitely happened more

3  than once and it seemed that it had been going on

4  for quite a while, since, like, the beginning of

5  the school year.

6      Q.      And do you know about when it was that

7  Jane  brought this information to you?

8      A.      I believe -- I don't have it in front

9  of me, but I remember -- I believe it was October.

10  Whatever day it was, we called the Towamencin

11  police and they came in on that day to discuss all

12  the details.

13      Q.      Why did you -- I think you said you had

14  to call the police or you wanted to call the

15  police, or something like that.  Why was that?

16      A.      Just the fact that she had told me that

17  somebody touched her sexually inappropriately.

18  That would -- that's the way our school handles a

19  situation like that.  If -- if abuse is reported,

20  then we have to report it.

21      Q.      When you say -- I mean, you just used

22  the term "abuse," when abuse is reported.  How --

23  was there an impression that you got or something

24  that Jane  told you perhaps that made you

1      A.      I believe she might have said that he

2   would -- he touched her in other ways too, but I'm

3   not -- I don't recall.  I don't remember for sure.

4      Q.      Do you recall what other ways you're

5   referring to or what she was referring to?

6      A.      All I know is that it happened more

7   than just once and I forget if -- you know, what

8   was happening when.  You know.  All I know is that

9   this -- there was inappropriate touching going on

10  that she did not want, but I don't remember the

11  details.

12            And to be honest with you, like, she --

13  I didn't want to ask too many details because of

14  the sensitivity of the situation, but she did let

15  me know that fingers -- that ▇M.P.▇ did use his

16  fingers underneath her underwear during class.  But

17  I don't know if -- how often that happened, but I

18  know at least one time that happened.

19      Q.      When you say that ▇Jane▇ was upset and,

20  like, very anxious as she's telling you this,

21  what -- was she crying or what was it that gave you

22  the impression that she was upset and very anxious?

23      A.      I'm not sure if she was crying that

24  time, but she would cry.  She would definitely show

1   all the signs of somebody with anxiety, asking lots

2   of questions.  Like I said, she -- she really was,

3   like -- "I don't know if I want to tell you this,

4   because you might have to tell somebody."

5              And I'm like, "Well, these are the

6   reasons why I would have to tell somebody.  And

7   whatever it is, I'd like for you to tell me,

8   obviously."

9              So she definitely showed all the signs

10  of being anxious about -- about letting me know and

11  what was going to happen next.  I can't say for --

12  you know, for sure at this point whether she was

13  crying.  I wouldn't -- I wouldn't doubt it, because

14  she was tearful with me in my office.  She felt

15  comfortable crying in my office if she -- if that

16  was what was going on.  But I just know that she

17  was very worried about how things were going to

18  play out.

19             I remember calling Mom and she was in

20  Philadelphia working and I was very nervous about

21  Mom driving after hearing the news.  So I wanted

22  her to, you know, take it easy and go slow because

23  I knew all of this wasn't going to go over well.

24             So -- so Jane     was very anxious with

# EXHIBIT 22

Kate Small notes - 8/22/1

████ Jane Doe ████ IEP Meeting

Mrs. Matje shared recommendations for the schedule -

1) Group Dynamics
2) Tech - Automotive
3) DI V classes - science (7th period) and English (8th period) - small group classes
4) Health / PE / Support → Maybe looking at doing biology this period
5) Co-taught math class (Geometry - preparation for Keystones which will

Cannot be in classes with **M.P.** ████ - there can be no contact between these two students

Parents have concerns about moving about the building with the other student present. Mrs. Schoppe shared that she would develop a plan with **Jane** for navigating the building. She shared that there will be point people and known rooms where **Jane** can go in case she sees this student, or needs to report an interaction between the who of them.

Tech school - Mrs. Ahart - consulting with the team at NMTCC to implement Tier ! supports - possibly move forward to an FBA

Kate - reach out to Dr. Hammer to add rating scales to **Jane**'s evaluation. Also looking at executive functioning, and planning supports for **Jane** to be aware of projects and assignments that are coming in the future.

Lots of social anxiety, and trust issues with teachers.

IEP meeting will happen within the first 30 days of school - plan for end of September and include tech school representation.

Interests = riding. Discussed Knight Riders as a possible

# EXHIBIT 23

Megan Schoppe notes - 8/22/18

**Jane** will continue at

Group Dynamics period 1, going to NMTCC for automotive, lunch, DI-V classes for period 7 science, period 8 english. Co taught math geometry, social studies

**M.P.**     is not in class or in halls near her. She is the victim in the situation according to mom. Walk over to NMTCC I raised concern.

**Jane** needs to have the power back in school setting when near him.

NMTCC- Ahart will go over to work with the team to support and complete an FBA if needed. Mom felt level 1 supports for her- PBSP needed
- Uniform
  Work completion
  Rating scales with Dr. Hammer -
  Executive functioning is a need - time to figure things out
  Structure is good for her -
  Social anxiety to speak in class or be put on the spot for answers in class

IEP meeting beginning of October.....

Try not to have Liz Shine attend meetings.Dawn and Kira are go to for her.

Meet with in the week to check in and introduce to teacher.

**DEF NPSD 000536**

# EXHIBIT 24

**North Penn School District**
Department of Student Services
401 East Hancock Street
Lansdale, PA 19446
Phone: 215-368-0400   ~   Fax: 215-855-6926
Web Address: www.npenn.org

## INDIVIDUALIZED EDUCATION PROGRAM (IEP)                     School Age

**Student's Name:** Jane Doe █████████████████
**IEP Team Meeting Date:** 04/13/2018
**IEP Implementation Date (Projected Date when Services and Programs Will Begin):** 04/14/2018
**Anticipated Duration of Services and Programs:** 04/12/2019
**Date Of Birth:** ██████████

**Age:** ███████████████████
**Grade:** 09

**Anticipated Year of Graduation:** 2021

**Local Education Agency:** North Penn School District

| **School District** | **Home/Neighborhood School** | **School Building** |
|---|---|---|
| North Penn School District | NPVA/NMTCC (10/27/2017-06/15/2018) | Pennbrook Middle School (4/14/2018-6/16/2018) |
| North Penn School District | North Penn High School/NMTCC (08/25/2018-) | North Penn High School (10/22/2018-4/12/2019) |

**County of Residence:** Montgomery County

**Name and Address of Parent/Guardian/Surrogate:**
Mother: ████████████████████████  ███████████ 
Father: ███████████████████  ███████████

Cell: ███████████
Email Address: ████████████████████
Home: █████████████
Mobile: █████████
Work: █████████████
Work: ███████████████████

**Other Information:**
   N/A

**The LEA and parent have agreed to make the following changes to the IEP without convening an IEP meeting, as documented by:**

*April 2014*

**DEF NPSD 000013**

Annual grad 9/10 IEP - 4/13/2018                          Student's Name: ████████ Jane Doe ████████

5/17/2018: A meeting was held with Mrs. ██ Doe ███, Mrs. O'Brien, and Mrs. Reffner to discuss Jane 's progress and what needs to be done for her to pass all of her classes.  The Present Ed Levels have been updated.

8/22/2018: a meeting was held with Mrs. Schoppe Mrs. Small, Mrs. ██ Doe ███ and Jane to review her schedule and to ensure that the team was prepared for a smooth transition to NPHS.

10/19/2018: An IEP meeting was held for Jane ███ at NMTCC with her IEP team to discuss her transition to full-time NMTCC and how her IEP will be implemented within the full-time tech school setting.

11/12/2018:  An IEP revision was made on 11/12/2018 after a Manifestation Determination. A review of Jane 's specially designed instruction indicated that no additional SDI's needed to be added, however, the team agreed that a re-evaluation including behavior rating scales and a Functional Behavioral Assessment should be conducted.

| Date of Revision(s) | Participants/Roles | IEP Section(s) Amended |
|---|---|---|
| 11/12/2018 | Kate Small - Local Ed. Agency Rep., Kyle Hassler - Associate Principal - NPHS, Dawn LeBlanc - Principal - NMTCC, █████ - Parent, Jane Doe █████ - Student | Present Ed. Levels, |
| 10/19/2018 | Kyle Hassler- Local Ed. Agency Rep., ████- Guardian, ████████ - Guardian, Randi McGinley- Regular Education Teacher, Pete Nicholson-Principal, Lindsey Riggin- Special Education Teacher, Kathryn Small-Supervisor of Special Education, Brandon Turner- Guidance Counselor, Gina Pardovich-CTE Administration, Dawn LeBlanc-NMTCC Principal, Rebecca Schmidt-Lakeside Counselor | Present Ed. Levels, Program Modifications and Specially Designed Instruction, Related Services, Educational Placement |
| 5/17/2018 | ████████ parent, Mrs. Reffner-casemanager, Mrs. O'Brien- Guidance Counselor | Present Ed Levels |
| 08/22/2018 | Michele Beach- Regular Education Teacher, ████- Guardian, ████████ Guardian, Jane Doe █████- Student, Juliet Matje-Supervisor of Special Education, Megan Schoppe- Special Education Teacher, Kate Small- Local Ed. Agency Rep. | Present Ed Levels |

*April 2014*

**DEF NPSD 000014**

Annual grad 9/10 IEP - 4/13/2018        Student's Name: ▉Jane Doe▉    ▉▉▉▉▉

## 04/13/2018 IEP TEAM/SIGNATURES

The Individualized Education Program Team makes the decisions about the student's program and placement.  The student's parent(s), the student's special education teacher, and a representative from the Local Education Agency are required members of this team.  Signature on this IEP documents attendance, not agreement.

| Role | Printed Name | Signature |
|---|---|---|
| Parent/Guardian/Surrogate | ▉▉▉▉▉▉▉▉ | |
| Parent/Guardian/Surrogate | ▉▉▉▉▉▉▉▉ | |
| Student* | Jane Doe | |
| Regular Education Teacher** | | |
| Special Education Teacher** | Christina Reffner | |
| Local Ed. Agency Rep. | John Wilson | |
| Career/Tech Ed Rep*** | | |
| Community Agency Rep | | |
| Teacher of the Gifted**** | | |

## 10/19/2018 IEP TEAM/SIGNATURES

The Individualized Education Program Team makes the decisions about the student's program and placement.  The student's parent(s), the student's special education teacher, and a representative from the Local Education Agency are required members of this team.  Signature on this IEP documents attendance, not agreement.

| Role | Printed Name | Signature |
|---|---|---|
| Parent/Guardian/Surrogate | ▉▉▉▉▉▉▉▉ | |
| Parent/Guardian/Surrogate | ▉▉▉▉▉▉▉▉ | |
| Regular Education Teacher** | Randi McGinley | |
| Special Education Teacher** | Lindsey Riggin | |
| Local Ed. Agency Rep. | Kyle Hassler | |
| Guidance Counselor | Brandon Turner | |
| Principal | Pete Nicholson | |
| Supervisor of Special Education | Kathryn Small | |
| Student* | | |
| Career/Tech Ed Rep*** | | |
| Community Agency Rep | | |
| Teacher of the Gifted**** | | |

*April 2014*

**DEF NPSD 000015**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** Jane Doe

*    The IEP team must invite the student if transition services are being planned or if the parents choose to have the student participate.

**   If the student is, or may be, participating in the regular education environment
***  As determined by the LEA as needed for transition services and other community services
**** A teacher of the gifted is required when writing an *IEP* for a student with a disability who also is gifted.

One individual listed above must be able to interpret the instructional implications of any evaluation results.

Written input received from the following members:
   N/A

**Transfer of Rights at Age of Majority**

For purposes of education, the age of majority is reached in Pennsylvania when the individual reaches 21 years of age. Likewise, for purposes of the Individuals with Disabilities Education Act, the age of majority is reached for students with disabilities when they reach 21 years of age.

*April 2014*

**DEF NPSD 000016**

Annual grad 9/10 IEP – 4/13/2018                         **Student's Name:** Jane Doe ▮

## PROCEDURAL SAFEGUARDS NOTICE

I have received a copy of the *Procedural Safeguards Notice* during this school year.  The *Procedural Safeguards Notice* provides information about my rights, including the process for disagreeing with the IEP. The school has informed me whom I may contact if I need more information.

Signature of Parent/Guardian/Surrogate: _____     Date: _____

## IEP MEETING WAIVER

DATE:     04/13/2018

The Pennsylvania Special Education Regulations and Standards (22 PA Code §14.124(d)) state that parents are to be provided with a copy of the multidisciplinary evaluation at least 10 days prior to the meeting of the IEP Team so that they may have time to review the report. Parents may choose to waive this time period and proceed to the IEP meeting to discuss the determination of exceptionality and IEP development.

As parents of Jane Doe ▮, I/we request that this time period be waived.

Signature of Parent/Guardian/Surrogate: _____     Date: _____

Signature of Parent/Guardian/Surrogate: _____     Date: _____

*April 2014*

**DEF NPSD 000017**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

## MEDICAL ASSISTANCE PROGRAM BILLING NOTICE
## (Applicable only to parents who have consented to the release of billing information to Medical Assistance programs)

I understand that the school may charge the School-Based Access Program ("SBAP")-or any program that replaces or supplements the SBAP-the cost of certain special education and related services described in my child's IEP.  To make these charges to the SBAP, the school will release to the administrator of that program the name, age, and address of my child, verification of Medicaid eligibility for my child, a copy of my child's IEP, a description of the services provided and the times and dates during which such services were provided to my child, and the identity of the provider of such services.  *I understand that such information will not be disclosed, and such charges will not be made, unless I consent to the disclosure*. I acknowledge that I have provided written consent to disclose such information.

I understand that my consent is ongoing from year-to-year unless and until I withdraw it. I can withdraw my consent in writing, or orally if I am unable to write, at any time.  My refusal to consent or my withdrawal of consent will not relieve the school of the obligation to provide, at no cost to me or my family, any service or program to which my child is entitled under the Individuals with Disabilities Education Act ("IDEA") or that is necessary to enable my child to receive a free appropriate public education as described in my child's IEP.

I understand that the school cannot-

Require me or my family to sign up for or enroll in any public benefits or insurance program, such as Medicaid, as a condition of receiving a free appropriate public education for my child;

Require me or my family to incur any expense for the provision of a free appropriate public education to my child, including co-payments and deductibles, unless it agrees to pay such expenses on my or my family's behalf;

Cause a decrease in available lifetime coverage or any other insured benefit;

Cause me or my family to pay for services that would otherwise be covered by a public benefits or insurance program and that are required for my child outside the time that he or she is in school;

Risk the loss of eligibility for home and community-based waivers, based on aggregate health-related expenditures.

*April 2014*

DEF NPSD 000018

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** Jane Doe

**I.   SPECIAL CONSIDERATIONS THE IEP TEAM MUST CONSIDER BEFORE DEVELOPING THE IEP.   ANY FACTORS CHECKED AS "YES" MUST BE ADDRESSED IN THE IEP.**

**Is the student blind or visually impaired?**
- ☐ Yes  The IEP must include a description of the instruction in Braille and the use of Braille unless the IEP team determines, after an evaluation of the student's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the student's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the student.

- ☑ No

**Is the student deaf or hard of hearing?**
- ☐ Yes  The IEP must include a communication plan to address the following: language and communication needs; opportunities for direct communications with peers and professional personnel in the student's language and communication mode; academic level; full range of needs, including opportunities for direct instruction in the student's language and communication mode; and assistive technology devices and services.  Indicate in which section of the IEP these considerations are addressed.  The Communication Plan must be completed and is available at www.pattan.net

- ☑ No

**Does the student have communication needs?**
- ☐ Yes  Student needs must be addressed in the IEP (i.e., present levels, specially designed instruction (SDI), annual goals, etc.)

- ☑ No

**Does the student need assistive technology devices and/or services?**
- ☐ Yes  Student needs must be addressed in the IEP (i.e., present levels, specially designed instruction (SDI), annual goals, etc.)
- ☑ No

**Does the student have limited English proficiency?**
- ☐ Yes  The IEP team must address the student's language needs and how those needs relate to the IEP.
- ☑ No

*April 2014*

**DEF NPSD 000019**

Annual grad 9/10 IEP - 4/13/2018                         Student's Name: Jane Doe

**Does the student exhibit behaviors that impede his/her learning or that of others?**

☐ Yes   The IEP team must develop a Positive Behavior Support Plan that is based on a functional assessment of behavior and that utilizes positive behavior techniques. Results of the functional assessment of behavior may be listed in the Present Levels section of the IEP with a clear measurable plan to address the behavior in the Goals and Specially Designed Instruction sections of the IEP or in the Positive Behavior Support Plan if this is a separate document that is attached to the IEP. A Positive Behavior Support Plan and a Functional Behavioral Assessment form are available at www.pattan.net

☑ No

**Other (specify):**
Other Health Impaired (ADHD only)

## II.  PRESENT LEVELS OF ACADEMIC ACHIEVEMENT AND FUNCTIONAL PERFORMANCE

**Include the following information related to the student:**

- **PRESENT LEVELS OF ACADEMIC ACHIEVEMENT:**
  (e.g., most recent evaluation of the student, results of formative assessments, curriculum-based assessments, transition assessments, progress toward current goals)
  **REVISION MEETING 11/12/2018**
  An IEP revision was made on 11/12/2018 after a Manifestation Determination. A review of Jane 's specially designed instruction indicated that no additional SDI's needed to be added, however, the team agreed that a re-evaluation including behavior rating scales and a Functional Behavioral Assessment should be conducted.

  **REVISION MEETING 10/19/2018**
  AN IEP revision meeting was held on Friday, 10/19/18 at NMTCC to discuss Jane 's recently changed schedule to full-time NMTCC. Changes will be made to Jane 's current IEP in order to best meet her needs at NMTCC. It was noted at the revision meeting that it is crucial that communication between NMTCC and North Penn School District is made clear and done frequently between designated members of the IEP team. A Safety Contingency Plan was created for the entirety of Jane 's school day including transportation, point people to reach out to in case a situation arises, a created plan for arrival and dismissal, and for future assemblies and/or events that may occur throughout the school year. Please refer to the Present Levels of Functional Performance regarding specifics of the Safety Contingency Plan.

  Jane 's IEP goals were reviewed and updated. A self-advocacy goal was added to support Jane in learning how to ask for help when needed. Additionally, Jane 's Specially Designed Instruction was reviewed, updated and added to.

  Due to Jane 's school-based anxiety, the team discussed supports that would be available to Jane . She is welcome to attend Group Dynamic for first period each day at North Penn High School. The team discussed this, but determined that in order to ensure that Jane feels safe at school, counseling services should be delivered at North Montco Technical Career Center. The team determined that Jane will receive individual counseling one time per week for 30 minutes per session. The team discussed adding more counseling services, however, all members were in agreement that we will begin with one time per week for 30 minutes per session. If at any time Jane expresses an interest in talking to her school-based counselor more than one time per week for 30 minutes per session, the team will reconvene and consider adding additional counseling sessions.

*April 2014*

DEF NPSD 000020

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: ███ Jane Doe ██████    ████

```
****************************************************************************************************
*
```

Revision Meeting 8/22/18

███Jane███ will continue at North Penn High School. The team reviewed a schedule that included supports within the school day. ██Jane██ will participate in Group Dynamics, Emotional Support Science and Language Arts, NMTCC during the school day. ██Jane██ is receiving counseling services outside of school and will see a counselor 1 time per cycle in school individually. Many concerns were discussed about supporting her within the school day. ██Jane██ will have access to the support classroom whenever needed in order to work through a situation or be able to report any problems she encounters with others. These situations will be taken directly to her assistant principal.

```
*******************************************************************
```
Revision 5/17/2018
NPVA- Science is 70% complete with a grade of 69.9% she needs to complete 5% of the course to pass. Her
    first marking period grade was an 87%.
    - ELA is 60% complete with a grade of 62.3%  she needs to complete 15% of this course to pass.  Her
    first marking period grade was a 79%

███Jane███s grades  at NMTCC

|         | 1st | 2nd | 3rd | 4th (current) |
|---------|-----|-----|-----|---------------|
| Auto    | 88  | 78  | 68  | 55            |
| History | 74  | 76  | 47  | 45            |
| Algebra | 73  | 78  | 67  | 78            |

███Jane███ is currently at risk of failing History with an average of 60% for the year.

The team will communicate weekly for the rest of the 2018 school year to ensure the IEP is being followed.

Teachers at NMTCC have reported that ██Jane██ is off task during independent work time and as a result she is not completed the required work and her grades are below satisfactory.  If ██Jane██ is told to get back on task and does not complete her assignment or is off task again she will be told to go to the office or to the Academic Support room and sit next to a teacher/counselor to ensure she is on task and Mrs. ██Doe██ will be contacted ASAP.

███Jane███ would like to attend NMTCC in 10th grade full time.  She would like to continue in the Automotive section however, her teacher is concerned about her interest and motivation over the past 2 marking periods.

----------------------------------------------------------------------------------------------------
███Jane███ is a 9th grade student whom attends NMTCC full time. She is in the Automotive cluster. She attends History at NMTCC and completes computer online courses for English, science, and Algebra.  She has time periods in her day at NMTCC where she is to be progressing through the online portions of those classes this is supervised by the Special Education teacher at the high school. She did attend the first MP at Pennbrook Middle School.

*April 2014*

**DEF NPSD 000021**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** ▮Jane Doe▮                    ▮▮▮

A re-evaluation was done by a certified school psychologist on 9/2/15. She found that when compared to predicted achievement levels based upon ▮Jane▮ 's Full Scale IQ, ▮Jane▮ does not demonstrate a severe and unusual discrepancy between achievement and ability in the areas assessed on norm-referenced tests and when compared to age/grade based standards.

▮Jane▮ continues to qualify under Other Health Impairment (ADHD) only.

**English/Language Arts:**
All lexile scores in 8th grade put her above proficiency for 8th grade. Therefore reading was not determined as a need for her in 9th grade.
She is completing the Common Core ELA through NPVA this is 37% complete she still has 43% f the course to complete.  Her current grade for the completed section is a 52.8%.   Her first marking period grade of 79% will be factored in from Pennbrook. ▮Jane▮ scored 100% on 2 writing samples and a 60% on a short write about the Odyssey. ▮Jane▮ will be given an additional re-test when her unit test score is below 70%. Her Unit test score was a 20% with 2 attempts.  She will have one more try to score higher.

**PSSA**
The Pennsylvania System of School Assessments or "PSSA"is a series of tests given to students in grades three through eight and grade 11. The assessments are in math, reading, writing, and science. The PSSA assessments are designed to determine what students know and are able to do compared to the grade-level standards. The tests are standardized and criterion referenced with the criteria set at the "proficient" level of the performance standards. In other words, the tests are supposed to find out whether a child is at,above,or below the proficient standard for that grade level.

4/15/2017 PSSA - ELA - Grade 7 - 909(Basic)
4/15/2017 PSSA - Math - Grade 7 - 777 (Below Basic)


**History:**Her 3rd marking period grade is a 47%. This is much lower than the past 2 marking periods. Assignments are often late or not submitted. She enjoys leading.  She gets angry easily and becomes defiant.

**Science**:  This course is also through NPVA and is Common Core Science.  She is 63 % complete with the course which leaves her with 12 to complete however her grade on the completed parts is a 49.5%. Unit test scores are 76%, 52%, 0% (with 2 attempts) ▮Jane▮ will have the opportunity to retest the unit test under 70% 1 more time. She neeeds to score a 65% grade in the course to get a C for the year. Her first marking period grade of 87% will be factored in from Pennbrook.

**Algebra:**▮Jane▮'s grade for the 3rd MP is a 75%. He teacher Mr. Feliz stated that once she gets the concept she can retain the steps. She prefers being taught one on one than whole group. The group is small enough that she gets a lot of one on one re-teaching/assistance. She does best focusing at the front of the classroom. Her teacher is concerned about the missed instruction due to attending guidance often and would like to see her wait until the end of the day to visit with the counselor.  However, he did recognize her outburst becoming less frequent with her improved self advocacy skills.
CDT test score: 936

**Automotive:**Her grade for the 3rd MP is a 68%.  This is lower than in the first 2 marking periods. ▮Jane▮ seems to be lacking the interest in the course.  Her teacher suggest possibly looking into other courses at

**DEF NPSD 000022**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: [Jane Doe] ▇▇▇

NMTCC.  She enjoys setting up lab.  She is not completing the computer assignments regularly. She need improvement in demonstrating respect for her peers and adults.  She has been identifying when she is stressed or anxious and I permit her to go to the counselor.

[Jane] ▇▇ said she is still interested in the Automotive section at NMTCC and would like to continue.  She knows that her work completion needs to increase in order to stay at NMTCC and to be eligible to return next year. She will need to improve he written expression for post secondary education. She understands she will have to complete post secondary training/education to become a mechanic after attending NMTCC.

- **PRESENT LEVELS OF FUNCTIONAL PERFORMANCE:**
  (e.g., results from a functional performance behavioral assessment, results of ecological assessments, progress toward current goals)
  ### REVISION MEETING – 10/19/2018:
  At the revision meeting on 10/19/2018, it was discussed that [Jane] ▇▇ presented some behaviors at the tech school during her 9th grade year. It is believed that this was due to her unstructured schedule. This year, [Jane] ▇▇'s schedule is more structured. If the team at NMTCC feels that [Jane] ▇▇'s behavior is impeding her ability to learn and make progress towards her IEP goals, this will be communicated to her case manager at NPHS and a Functional Behavioral Assessment (FBA) will be completed.

  ### Safety Contingency Plan:
  [Jane] ▇▇ is not to be in contact with student, [M.P.] ▇▇▇▇. To outline measures that would prevent this from happening, a safety contingency plan was developed to be implemented at NMTCC. The plan is as follows:

  Daily –
  · Bus drop off at 8:00 am. [Jane] ▇▇ reports directly in the building and then directly to Automotive
  · 8:10-10:20 – Auto Mr. Fluck – If [Jane] ▇▇ needs to leave the lab for any reason, Mr. Fluck or Mr. Becker will call Rhonda to see if that person is available.
  · Once a week, Lakeside Counselor Rebecca will meet ▇▇. (Wednesday am @ 8:30)
  · [Jane] ▇▇ must remain in lab until 10:20 so that she attends Gym class after [M.P.] ▇▇ returns to NPHS.
  · Gym teachers need to be made aware
  · The remainder of the day ▇▇ will follow normal schedule
  · Bus will pick [Jane] ▇▇ up for 2:10 dismissal

  Other contingency plans –
  · School Assemblies and other school activities– Felicia from security will be assigned to monitor ▇▇ from a distance. ▇▇ will be informed if there are any issues, go directly to Felicia. If Felicia is not here, a backup will be assigned.
  · If NMTCC determines that they need additional assistance for school assemblies / other school activities, they will share the dates of these events with NPHS (at least 2 days in advance), and an assistant will be sent to NMTCC to monitor that [Jane] ▇▇ does not come in contact with [M.P.] ▇▇.
  · ▇▇ will be provides a laminated pass to go to guidance if needed.

  --

  ### Study Skills:

  [Jane] ▇▇ struggles to stay on task and complete the task expectation at the time she is required to do them. She leaves class often and does not comply with directives to complete the online work during her academic

**DEF NPSD 000023**

Annual grad 9/10 IEP - 4/13/2018          **Student's Name:** ▮Jane Doe▮

time period at NMTCC. She is behind on the pacing of both NPVA cources (ELA an d Science) therefore demonstrating a need for study skills, time on task, time management, assignments completion. She currently is at a pace of 18% complete per marking period when she should be completing at a pace of 25%. Her Teachers History, Algebra, and Automotive also indicate she is in the developing stages per the NP study skills rubic(2/4).

- **PRESENT LEVELS RELATED TO CURRENT POSTSECONDARY TRANSITION GOALS:**
  if the student's age is 14 or younger if determined appropriate by the IEP team
  (e.g., results of formative assessments, curriculum-based assessments, progress toward current goals)
  ▮Jane▮ has a desire to be involved in the automotive feild. She is currently enrolled in the Automotive Cluster at NMTCC. ▮Jane▮ will continue to work on her study skills and writing goals in order for her to achieve her post secondary transition goals. ▮Jane▮ is enrolled in appropriate academic classes

  Results of Transition Survey:

  Post-Secondary Education:
  In order to reach her goal of attending post-secondary education, ▮Jane▮ will continue to need support in study skills and writing goals. She is enrolled in the proper courses to achieve this goal and also receives additional support with these goals within the Academic Support work period at the Tech School. In which she works with her NMTCC case manager. ▮Jane▮ is aware that she may need to go to post secondary trade school in order to achieve her goal.

  Post- Secondary Employment:
  In order to reach her goal of being independently employed, ▮Jane▮ will need to continue to receive support in study skills and writing skills

  Independent Living:
  The IEP Team has documented that a goal and services for ▮Jane▮ in the area of Independent Living is not needed at this time.

- **PARENTAL CONCERNS FOR ENHANCING THE EDUCATION OF THE STUDENT:**
  **<u>REVISION MEETING - 10/19/18:</u>**
  Mrs. ▮Doe▮ shared significant concerns regarding ▮Jane▮'s safety. She asked that a safety plan be developed and implemented. Mrs. ▮Doe▮ wants ▮Jane▮ to attend NMTCC full time, and asks that there be consistent communication between the tech school and North Penn High School so that ▮Jane▮ receives all of the supports necessary to be successful. While reviewing each of ▮Jane▮'s SDI's, Mrs. ▮Doe▮ made it clear that she does not want ▮Jane▮ to view these accommodations as ways of getting out of work, and wants to ensure that ▮Jane▮ is requesting these supports appropriately.
  --

  8/22/2018
  Mrs. ▮Doe▮ noted concerns over supports for ▮Jane▮. She gave some background on a previous situation and them team reviewed supports ▮Jane▮ cold have at the HS to address this situation.

  *****************************************************************************************************************
  *
  ▮Jane▮'s mother is concerned about her progress on the NPVA programs and the other classes at NMTCC and managing her time to complete the required work load.

**DEF NPSD 000024**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** <span style="background:black;color:white">Jane Doe</span>     ▮

- **HOW THE STUDENT'S DISABILITY AFFECTS INVOLVEMENT AND PROGRESS IN GENERAL EDUCATION CURRICULUM:**
  <span style="background:black;color:white">Jane</span> will participate in all activities in the regular education class. The IEP team has considered various supplemental aids and services through the Specially Designed Instruction of the IEP and has included those considered to be beneficial and appropriate for <span style="background:black;color:white">Jane</span>.

- **STRENGTHS:**
  Improved Reading Fluency and comprehension
  Class Participation
  Focus in writing
  Basic Math Skills

- **ACADEMIC, DEVELOPMENTAL, AND FUNCTIONAL NEEDS RELATED TO STUDENT'S DISABILITY:**
  <u>REVISION MEETING - 10/19/18:</u>
  Self-advocacy
  School-based anxiety
  --
  Writing skills
  Study skills

*April 2014*

**DEF NPSD 000025**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

## III.  TRANSITION SERVICES

**This is required for students age 14 or younger if determined appropriate by the IEP team.** If the student does not attend the IEP meeting, the school must take other steps to ensure that the student's preferences and interests are considered. Transition services are a coordinated set of activities for a student with a disability that is designed to be within a results oriented process, that is focused on improving the academic and functional achievement of the student with a disability to facilitate the student's movement from school to post school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation that is based on the individual student's needs taking into account the student's strengths, preferences, and interests.

**POST-SCHOOL GOALS -** Based on age appropriate assessment, define and project the appropriate measurable postsecondary goals that address education and training, employment, and as needed, independent living. Under each area, list the services/activities and courses of study that support that goal. Include for each service/activity the location, frequency, projected beginning date, anticipated duration, and person/agency responsible.

**For students in Career and Technology Centers, CIP Code:**

| Postsecondary Education and Training Goal:<br>Jane has a goal of obtaining a degree or certification from a technical school in the area of Automotive. | Measurable Annual Goal<br>Yes/No<br>(Document in Section V) |
|---|---|
| | Yes |

**Courses of Study:**     4/14/2018 - 4/12/2019
2017-2018- Common Core ELA, Common Core Science, Algebra 1, European History, Automotive
2018-2019- English 10, Biology, Geometry, European History, Automotive

| Service/Activity | Location | Frequency | Projected Beginning Date | Anticipated Duration | Person(s)/Agency Responsible |
|---|---|---|---|---|---|
| Jane will enroll in academic classes that will prepare her for the educational challenges of postsecondary education. | Guidance Office | once/annually | 04/14/2018 | 04/12/2019 | LEA |
| Jane will meet with guidance counselor/special education teacher to discuss academic requirements of pursuing a college degree. | Guidance Office | once/annually | 04/14/2018 | 04/12/2019 | LEA |
| Jane will practice note-taking, test preparation, organization and study skills across all environments. | General Education classroom | 6 times per cycle 45 minute sessions | 04/14/2018 | 04/12/2019 | LEA |

*April 2014*

**DEF NPSD 000026**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe ████████

| Employment Goal: | Measurable Annual Goal |
|---|---|
| Jane ██ has a goal of completing college degree or technical certification for employment. | Yes/No (Document in Section V) |
| | **Yes** |

**Courses of Study:**     4/14/2018 - 4/12/2019

2017-2018- Common Core ELA, Common Core Science, Algebra 1, European History, Automotive 2018-2019- English 10, Biology, Geometry, European History, Automotive

| Service/Activity | Location | Frequency | Projected Beginning Date | Anticipated Duration | Person(s)/Agency Responsible |
|---|---|---|---|---|---|
| Jane will complete an informal vocational assessment. | Career Studies classroom | once/annually | 04/14/2018 | 04/12/2019 | LEA |
| Jane will practice note-taking, test preparation, organizational, and study skills across all environments. | General Education classroom | 6 days/cycle | 04/14/2018 | 04/12/2019 | LEA |
| Jane will describe interests and abilities related to potential career and job opportunities. | Career Studies classroom | once/annually | 04/14/2018 | 04/12/2019 | LEA |

| Independent Living Goal, if appropriate: | Measurable Annual Goal |
|---|---|
| Based on Jane 's grades falling within the passing range, the IEP Team has documented that a goal and services for Jane in the area of Independent Living is not needed at this time. | Yes/No (Document in Section V) |
| | **NO** |

**Courses of Study:**

| Service/Activity | Location | Frequency | Projected Beginning Date | Anticipated Duration | Person(s)/Agency Responsible |
|---|---|---|---|---|---|
| | | | | | |

*April 2014*

**DEF NPSD 000027**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

## IV.  PARTICIPATION IN STATE AND LOCAL ASSESSMENTS

**Instructions for IEP Teams:**
Please select the appropriate assessment option.  Information on available testing accommodations may be found in the Accommodations Guidelines available on www.education.state.pa.us.

**State Assessments**

**Not Assessed**

| | |
|---|---|
| ☐ | No statewide assessment is administered at this student's grade level. |
| ☑ | No English proficiency assessment administered because the student is not an English Language Learner. |

**PSSA** (Math administered in grades 3-8; Science administered in grades 4 and 8; Reading administered in grades 3-8; Writing administered in grades 5 and 8; and ELA*)

| Tested Subject | Without Accommodations | With Accommodations | Accommodations to be Provided |
|---|---|---|---|
| Math | ☑ | ☐ | |
| Science | ☑ | ☐ | |
| Reading | ☑ | ☐ | |
| Writing | ☑ | ☐ | |
| ELA* | ☑ | ☐ | |

*ELA will replace the Reading and Writing PSSAs in 2014-2015 for grades 3-8.

**Keystone Exam** (Replaces the 11th grade PSSA in high school; Student must participate by 11th grade)

| Tested Subject | Without Accommodations | With Accommodations | Accommodations to be Provided |
|---|---|---|---|
| Algebra 1 | ☐ | ☑ | Read directions to the student (re-read as necessary). Prompt the student to remain on task. Read test items (Mathematics or Writing prompts only; do not read the Reading test). |

**DEF NPSD 000028**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:**  Jane Doe

| | Without Accommodations | With Accommodations | |
|---|---|---|---|
| | | | Check periodically to make sure the student is marking correct spaces.<br>Permit additional breaks or extended rest breaks during testing.<br>Test in separate room or small group to reduce distractions. |
| Literature | ☐ | ☑ | Read directions to the student (re-read as necessary).<br>Prompt the student to remain on task.<br>Read test items (Mathematics or Writing prompts only; do not read the Reading test).<br>Check periodically to make sure the student is marking correct spaces.<br>Permit additional breaks or extended rest breaks during testing.<br>Test in separate room or small group to reduce distractions. |
| Biology | ☐ | ☑ | Read directions to the student (re-read as necessary).<br>Quietly repeat directions to the student.<br>Prompt the student to remain on task.<br>Read test items (Mathematics or Writing prompts only; do not read the Reading test).<br>Permit additional breaks or extended rest breaks during testing.<br>Test in separate room or small group to reduce distractions. |

**Keystone Project Based Assessment** (Available when student is unable to demonstrate proficiency on a Keystone Exam or Keystone Exam module)

| Tested Subject | Without Accommodations | With Accommodations | Accommodations to be Provided |
|---|---|---|---|
| Algebra 1 | ☐ | ☐ | |
| Literature | ☐ | ☐ | |
| Biology | ☐ | ☐ | |

*April 2014*

**DEF NPSD 000029**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** Jane Doe

**Validated Local Assessment** (Available when selected as option by LEA)

| Tested Subject | Without Accommodations | With Accommodations | Accommodations to be Provided |
|---|---|---|---|
| Algebra 1 | ☐ | ☐ | |
| Literature | ☐ | ☐ | |
| Biology | ☐ | ☐ | |

**PASA** (Administered in grades 3-8, 11 for Reading and Math; Grades 4, 8, 11 for Science)

| ☐ | Student will participate in the PASA |
|---|---|

Explain why the student cannot participate in the PSSA or the Keystone Exam for Reading/Literature, Math/Algebra 1, Science/Biology, and Composition (The Composition exam will be available for the 2016-17 school year):

Explain why the PASA is appropriate:

Choose how the student's performance on the PASA will be documented:

☐ Videotape (preferred method)

☐ Written narrative notes (requires prior approval in accordance with PDE guidance)

**ACCESS for ELLs** (Administered in grades K-12)

| Domains | Without Accommodations | With Accommodations | Unable to Participate | Accommodations to be Provided or Rationale for Inability to Participate in Selected Domains |
|---|---|---|---|---|
| Listening | ☐ | ☐ | ☐ | |
| Reading | ☐ | ☐ | ☐ | |

18                                                                    *April 2014*

**DEF NPSD 000030**

Annual grad 9/10 IEP – 4/13/2018                    **Student's Name:** Jane Doe

| | | | | |
|---|---|---|---|---|
| Writing | ☐ | ☐ | ☐ | |
| Speaking | ☐ | ☐ | ☐ | |

**Alternate ACCESS for ELLs** (Administered in grades 1-12)

| | |
|---|---|
| ☐ | Student will participate in the Alternate ACCESS for ELLs |

Explain why the student cannot participate in the ACCESS for ELLs:


Explain why the Alternate ACCESS for ELLs is appropriate:


| Domains | Without Accommodations | With Accommodations | Unable to Participate | Accommodations to be Provided or Rationale for Inability to Participate in Selected Domains |
|---|---|---|---|---|
| Listening | ☐ | ☐ | ☐ | |
| Reading | ☐ | ☐ | ☐ | |
| Writing | ☐ | ☐ | ☐ | |
| Speaking | ☐ | ☐ | ☐ | |


**Local Assessments**

☐ Local assessment is not administered at this student's grade level; **OR**

☐ Student will participate in local assessments without accommodations; **OR**

☑ Student will participate in local assessments with the following accommodations; **OR**

  • Read directions to the student (re-read as necessary).
  • Prompt the student to remain on task.
  • Read test items (Mathematics or Writing prompts only; do not read the Reading test).
  • Check periodically to make sure the student is marking correct spaces.

**DEF NPSD 000031**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:**  Jane Doe

- Highlight key words or phrases in directions.
- Permit additional breaks or extended rest breaks during testing.
- Test in separate room or small group to reduce distractions.

☐ The student will take a local alternate assessment.
     Explain why the child cannot participate in the local regular assessment:


     Explain why the alternate assessment is appropriate:

20

*April 2014*

**DEF NPSD 000032**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

**V.  GOALS AND OBJECTIVES** - Include, as appropriate, academic and functional goals. Use as many copies of this page as needed to plan appropriately.  Specially designed instruction may be listed with each goal/objective or listed in Section VI.

Short term learning outcomes are required for students who are gifted. The short term learning outcomes related to the student's gifted program may be listed under Goals or Short Term Objectives.

| MEASURABLE ANNUAL GOAL Include: Condition, Name, Behavior, and Criteria (Refer to Annotated IEP for description of these components) | Describe HOW the student's progress toward meeting this goal will be measured | Describe WHEN periodic reports on progress will be provided to parents | Report of Progress |
|---|---|---|---|
| When provided with a writing assignment, Jane will create a well-developed multi-paragraph essay including an introductory paragraph, a minimum of two body paragraphs, and a concluding paragraph as evidenced by a "Proficient" score of 3/4 (75%) on the writing rubric on a minimum of one writing piece per marking period. Baseline - Currently at 72. 5 % on the rubric | Work Samples; Rubrics; Curriculum Based Assessment and/or Teacher Created Assessments | IEP Progress Reports; Report Cards (end of marking period); Annual IEP Review | |

**SHORT TERM OBJECTIVES** - Required for students with disabilities who take alternate assessments aligned to alternate achievement standards (PASA).

| Short term objectives/benchmarks |
|---|
| |

21

*April 2014*

Annual grad 9/10 IEP – 4/13/2018                    Student's Name: Jane Doe

| MEASURABLE ANNUAL GOAL Include: Condition, Name, Behavior, and Criteria (Refer to Annotated IEP for description of these components) | Describe HOW the student's progress toward meeting this goal will be measured | Describe WHEN periodic reports on progress will be provided to parents | Report of Progress |
|---|---|---|---|
| Jane will demonstrate appropriate self-advocacy skills by communicating her wants and needs in a clear, socially appropriate manner (communicating with case manager at NMTCC/NPHS along with school counselor, level of academic challenge, offering ideas for her education, understanding/expressing knowledge regarding disability and IEP accommodations, and assertion). | Documentation Log; Rubrics; Data Sheets | IEP Progress Reports; Annual IEP Review | |

**SHORT TERM OBJECTIVES – Required for students with disabilities who take alternate assessments aligned to alternate achievement standards (PASA).**

| Short term objectives/benchmarks |
|---|
| |

22

*April 2014*

**DEF NPSD 000034**

Annual grad 9/10 IEP – 4/13/2018                    Student's Name: ▐Jane Doe▐        ▐▐▐▐▐

| MEASURABLE ANNUAL GOAL Include: Condition, Name, Behavior, and Criteria (Refer to Annotated IEP for description of these components) | Describe HOW the student's progress toward meeting this goal will be measured | Describe WHEN periodic reports on progress will be provided to parents | Report of Progress |
|---|---|---|---|
| Across all academic subjects, ▐Jane▐ will improve study skills in the areas of materials, organization, promptness, assignment completion, note-taking, homework completion, flexibility, work habits and time management as measured by an improved score on the North Penn Study Skills Rubric measured by classroom teachers on a quarterly basis (baseline will be determined after the first marking period). | Rubrics | Quarterly progress report | |

**SHORT TERM OBJECTIVES – Required for students with disabilities who take alternate assessments aligned to alternate achievement standards (PASA).**

| Short term objectives/benchmarks |
|---|
| |

23                                                                            *April 2014*

**DEF NPSD 000035**

Annual grad 9/10 IEP - 4/13/2018                      Student's Name: **Jane Doe**  ▮▮▮▮

**VI.   SPECIAL EDUCATION / RELATED SERVICES / SUPPLEMENTARY AIDS AND SERVICES / PROGRAM MODIFICATIONS –**
**Include, as appropriate, for nonacademic and extracurricular services and activities.**

**A.   PROGRAM MODIFICATIONS AND SPECIALLY DESIGNED INSTRUCTION (SDI):**
- SDI may be listed with each goal or as part of the table below.
- Include supplementary aids and services as appropriate.
- For a student who has a disability and is gifted, SDI also should include adaptations, accommodations, or modifications to the general education curriculum, as appropriate for a student with a disability.

| Modifications and SDI | Location | Frequency | Projected Beginning Date | Anticipated Duration |
|---|---|---|---|---|
| Study guides and/or review packets will be given to Jane prior to an assessment or upcoming project. Parent access to study guides should also be made available. | All Major Subjects | on-going | 4/14/18 | 4/12/19 |
| During assessments, assignments, and projects, Jane will be allotted 50% extended time when she is utilizing her time appropriately (not avoiding task such as technology use, leaving room, working on another assignment etc.) | All Major Subjects | during a test | 4/14/18 | 4/12/19 |
| Frequent parent contact should be made when Jane 's grades drop below a 70% and/or there are any classroom concerns. | All Major Subjects & Minor Subject | on-going | 4/14/18 | 4/12/19 |
| Preferential seating will be provided to Jane . For Jane , this looks like: in the front row of the classroom, or the back row of the classroom. | All Major Subjects & Minor Subject | daily | 10/19/18 | 4/12/19 |
| Hi tory, Algebra, and Automotive - Jane will be permitted to hand assignments in put to 5 days late and receive partial credit for the past due assignments. After 5 | All Major Subject & Minor Subject | | 10/19/18 | 4/12/19 |

*April 2014*

**DEF NPSD 000036**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

| | | | | |
|---|---|---|---|---|
| days they should not be permitted for credit.<br><br>* Jane will communicate to her teachers when she is struggling and this accommodation needs to be used. * | | | | |
| Jane is able to access to a water bottle at all times. | Across all environments | as needed | 10/19/18 | 4/12/19 |
| Jane will be permitted to retest within two days when she scores below a 70%. The retest and original test grades will be averaged for the new determined score. | All Major Subjects & Minor Subject | as needed | 10/19/18 | 4/12/19 |
| Teacher directed cueing and/or proximity control will be used to help Jane remain on-task. | All Major Subjects & Minor Subject | on-going | 4/14/18 | 4/12/19 |
| Chunking of assignments will be provided across all subjects, specifically when writing is involved. | All Major Subjects & Minor Subject | on-going | 4/14/18 | 4/12/19 |
| A safety plan has been developed and will be implemented at NMTCC. Please ee Pre ent Level of Functional Performance for specific details. | Across all settings | daily | 10/19/18 | 4/12/19 |
| Weekly communication will be had between a point person at NMTCC and North Penn School District. | Behavior, home and school | 1 time a week | 10/19/18 | 4/12/19 |
| When feeling stressed, overwhelmed, upset etc. Jane will have access to her guidance counselor at NMTCC (will have a counselor laminated pass). | Across all settings | on-going | 10/19/18 | 4/12/19 |

*April 2014*

**DEF NPSD 000037**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** <span style="background:black;color:white">Jane Doe</span>

**B.   RELATED SERVICES -** List the services that the student needs in order to benefit from his/her special education program:

| Service | Location | Frequency | Projected Beginning Date | Anticipated Duration |
|---|---|---|---|---|
| Counseling Services<br><br>Class Size Ratio:<br>  Individual | North Penn High School | 1 times per week<br>30 minutes per session | 8/25/18 | 4/12/19 |
| When <span style="background:black;color:white">Jane</span> meets with her counselor, there will be an opportunity to move throughout their session, i.e.; walking, accessing the weight room, accessing the gym, etc. ||||| 
| Transportation<br><br>Class Size Ratio:<br>  Group | North Penn High School | 5 times per week | 8/25/18 | 4/12/19 |
| Transportation will take <span style="background:black;color:white">Jane Doe</span> directly to NMTCC in the morning, and pick her up from NMTCC in the afternoon. ||||| 

*April 2014*

**DEF NPSD 000038**



Annual grad 9/10 IEP – 4/13/2018                    **Student's Name:** Jane Doe

**C.  SUPPORTS FOR SCHOOL PERSONNEL** – List the staff to receive the supports and the supports needed to implement the student's IEP

| School Personnel to Receive Support | Support | Location | Frequency | Projected Beginning Date | Anticipated Duration |
|---|---|---|---|---|---|
| Regular Education Teacher | The Special Education Teacher will consult with IEP team regarding Jane 's progress across all academic settings | Regular Classroom | weekly | 4/14/18 | 4/12/19 |
| Special Education Teacher | The Special Education Teacher/ Case Manager from NPHS will consult with the Special Education Teacher / Case Manager from NMTCC weekly. | Special Education Classroom | 1 time a week 15 minutes per session | 10/19/18 | 4/12/19 |
| Special Education Teacher | The Regular Education Teacher will provide test dates, project due dates, schedule changes, etc. to the special education teacher | Special Education Classroom | weekly | 4/14/18 | 4/12/19 |

**D.  GIFTED SUPPORT SERVICES FOR A STUDENT IDENTIFIED AS GIFTED WHO ALSO IS IDENTIFIED AS A STUDENT WITH A DISABILITY** – Support services are required to assist a gifted student to benefit from gifted education (e.g., psychological services, parent counseling and education, counseling services, transportation to and from gifted programs to classrooms in buildings operated by the school district).

| Support Service | |
|---|---|

**E.  EXTENDED SCHOOL YEAR (ESY)** – The IEP Team has considered and discussed ESY services, and determined that:

☐   Student IS eligible for ESY based on the following information or data reviewed by the IEP team:

**OR**

☑   As of the date of the IEP, student is NOT eligible for ESY based on the following information or data reviewed by the IEP team:

**DEF NPSD 000039**

Annual grad 9/10 IEP – 4/13/2018                    Student's Name: ███Jane Doe██████████████ ████████

Current data collected and IEP team input indicate that:██Jane███ does not revert to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occurs as a result of an interruption in educational programming; ██Jane███ has the capacity to recover the skills or behavior patterns in which regression occurred to a level demonstrated prior to the interruption of educational programming; ██Jane██ is able to maintain the skills and behaviors relevant to IEP goals and objectives within a reasonable recoupment period; and an interruption in programming will not affect ██Jane███ 's ability to maintain mastery of an important skill, lead to dependence on caretakers or lead to a withdrawal from the learning process.

**The Annual Goals and, when appropriate, Short Term Objectives from this IEP that are to be addressed in the student's ESY Program are:**


**If the IEP Team has determined ESY is appropriate, complete the following:**


## VII.   EDUCATIONAL PLACEMENT

**A. QUESTIONS FOR IEP TEAM –** The following questions must be reviewed and discussed by the IEP team prior to providing the explanations regarding participation with students without disabilities.

It is the responsibility of each public agency to ensure that, to the maximum extent appropriate, students with disabilities, including those in public or private institutions or other care facilities, are educated with students who are not disabled. Special classes, separate schooling or other removal of students with disabilities from the general educational environment occurs only when the nature or severity of the disability is such that education in general education classes, EVEN WITH the use of supplementary aids and services, cannot be achieved satisfactorily.

- What supplementary aids and services were considered? What supplementary aids and services were rejected? Explain why the supplementary aids and services will or will not enable the student to make progress on the goals and objectives (if applicable) in this IEP in the general education class.

- What benefits are provided in the general education class with supplementary aids and services versus the benefits provided in the special education class?

- What potentially beneficial effects and/or harmful effects might be expected on the student with disabilities or the other students in the class, even with supplementary aids and services?

- To what extent, if any, will the student participate with nondisabled peers in extracurricular activities or other nonacademic activities?

Explanation of the extent, if any, to which the student **will not participate** with students without disabilities in the regular education class:

28                                                            *April 2014*

**DEF NPSD 000040**

Annual grad 9/10 IEP - 4/13/2018                    **Student's Name:** ▮Jane Doe▮▮▮▮▮▮▮▮▮   ▮▮▮▮

▮Jane▮ will participate in all activities in the regular education class. She will receive Language Arts (reading, writing, grammar) and Math in the Regular Education classroom with support from the learning support staff. The IEP team has considered various supplemental aids and services through the Specially Designed Instruction of the IEP . She will attend Academic Support with her NMTCC case manager to complete work.

Explanation of the extent, if any, to which the student **will not participate** with students without disabilities in the general education curriculum:

▮Jane▮ will participate in all activities in the regular education class. The IEP team has considered various supplemental aids and services through the Specially Designed Instruction of the IEP and has included those considered to be beneficial and appropriate for ▮Jane▮. She will attend Academic Support with her NMTCC case manager to complete work.

**Recommended** (04/14/2018 - 06/16/2018)
  **B. Type of Support:**
   **1. Amount of special education supports**
      ☒ Itinerant: Special education supports and services provided by special education personnel for 20% or less of the school day
      ☐ Supplemental: Special education supports and services provided by special education personnel for more than 20% of the school day but less than 80% of the school day
      ☐ Full-Time: Special education supports and services provided by special education personnel for 80% or more of the school day

   **2. Type of special education support:**
      ☐ Autistic Support
      ☐ Blind-Visually Impaired Support
      ☐ Deaf and Hard of Hearing Support
      ☐ Emotional Support
      ☒ Learning Support
      ☐ Life Skills Support
      ☐ Multiple Disabilities Support
      ☐ Physical Support
      ☐ Speech & Language Support

  **C. Location of student's program:**

Name of School District where the IEP will be implemented: <u>North Penn School District</u>

Name of School Building where the IEP will be implemented: <u>Pennbrook Middle School</u>

   Is this school the student's neighborhood school (i.e. the school the student would attend if he/she did not have an IEP)?
      ☐ Yes
      ☒ No.  If answer is "no", select the reason why not:
         ☐ Special education supports and services required in the student's IEP cannot be provided in the neighborhood school.

**DEF NPSD 000041**

Annual grad 9/10 IEP - 4/13/2018                **Student's Name:** Jane Doe ▮▮▮▮▮▮

☐ Other.  Please explain:

**Next Recommended** (08/25/2018 - 10/21/2018)

**B. Type of Support:**

    **1. Amount of special education supports**

        ☑ Itinerant: Special education supports and services provided by special education personnel for 20% or less of the school day

        ☐ Supplemental: Special education supports and services provided by special education personnel for more than 20% of the school day but less than 80% of the school day

        ☐ Full-Time: Special education supports and services provided by special education personnel for 80% or more of the school day

    **2. Type of special education support:**

        ☐ Autistic Support

        ☐ Blind-Visually Impaired Support

        ☐ Deaf and Hard of Hearing Support

        ☐ Emotional Support

        ☑ Learning Support

        ☐ Life Skills Support

        ☐ Multiple Disabilities Support

        ☐ Physical Support

        ☐ Speech & Language Support

**C. Location of student's program:**

Name of School District where the IEP will be implemented: <u>North Penn School District</u>

Name of School Building where the IEP will be implemented: <u>North Penn High School</u>

Is this school the student's neighborhood school (i.e. the school the student would attend if he/she did not have an IEP)?

    ☐ Yes

    ☑ No.  If answer is "no", select the reason why not:

        ☐ Special education supports and services required in the student's IEP cannot be provided in the neighborhood school.

        ☐ Other.  Please explain:

**Next Recommended** (10/22/2018 - 04/12/2019)

**B. Type of Support:**

    **1. Amount of special education supports**

        ☑ Itinerant: Special education supports and services provided by special education personnel for 20% or less of the school day

        ☐ Supplemental: Special education supports and services provided by special education personnel for more than 20% of the school day but less than 80% of the school day

        ☐ Full-Time: Special education supports and services provided by special education personnel for 80% or more of the school day

*April 2014*

**DEF NPSD 000042**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

    **2. Type of special education support:**
- ☐ Autistic Support
- ☐ Blind-Visually Impaired Support
- ☐ Deaf and Hard of Hearing Support
- ☐ Emotional Support
- ☑ Learning Support
- ☐ Life Skills Support
- ☐ Multiple Disabilities Support
- ☐ Physical Support
- ☐ Speech & Language Support

**C. Location of student's program:**

Name of School District where the IEP will be implemented: <u>North Penn School District</u>

Name of School Building where the IEP will be implemented: <u>North Penn High School</u>

Is this school the student's neighborhood school (i.e. the school the student would attend if he/she did not have an IEP)?
- ☐ Yes
- ☑ No.  If answer is "no", select the reason why not:
  - ☐ Special education supports and services required in the student's IEP cannot be provided in the neighborhood school.
  - ☐ Other.  Please explain:

**VIII.  PENN DATA REPORTING: Educational Environment (Complete either Section A or B; Select only one Educational Environment)**

To calculate the percentage of time inside the regular classroom, divide the number of hours the student spends inside the regular classroom by the total of hours in the school day (including lunch, recess, study periods). The result is then multiplied by 100.

**Recommended**  (04/14/2018 - 06/16/2018)

| SECTION A. For Students Educated in Regular School Buildings with Nondisabled Peers - Indicate the percentage of time INSIDE the regular classroom for this student: |
|---|

Time spent outside the regular classroom receiving services unrelated to the student's disability (e.g., time receiving ESL services) should be considered time inside the regular classroom. Educational time spent in age-appropriate community-based settings that include individuals with and without disabilities, such as college campuses or vocational sites, should be counted as time spent inside the regular classroom.

**Calculations for this Student          Name of School Building:** Pennbrook Middle School

| Column 1 | Column 2 | Calculation | Indicate Percentage | Percentage Category |
|---|---|---|---|---|

*April 2014*

**DEF NPSD 000043**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

| Total hours the student spends in the regular classroom per day | Total hours in a typical school day (including lunch, recess & study periods) | Hours inside regular classroom ÷ hours in school day x 100 = % (Column 1 ÷ Column 2) x 100 = % | Section A: The percentage of time student spends inside the regular classroom: | Using the calculation result – select the appropriate percentage category |
|---|---|---|---|---|
| 5.75 | 6.80 | (5.75 ÷ 6.80) x 100 | 85% of the day | ☑ INSIDE the Regular Classroom 80% or More of the Day<br>☐ INSIDE the Regular Classroom 79-40% of the Day<br>☐ INSIDE the Regular Classroom Less Than 40% of the Day |

**SECTION B. This section required only for Students Educated OUTSIDE Regular School Buildings for more than 50% of the day – select and indicate the Name of School or Facility on the line corresponding with the appropriate selection: (If the student spends less than 50% of the day in one of these locations, the IEP team must do the calculation in Section A)**

| | | |
|---|---|---|
| ☐ | Approved Private School (Non-Residential) | |
| ☐ | Approved Private School (Residential) | |
| ☐ | Other Private Facility (Non Residential) | |
| ☐ | Other Private Facility (Residential) | |
| ☐ | Other Public Facility (Residential) | |
| ☐ | Other Public Facility (Non-Residential) | |
| ☐ | Hospital/Homebound | |
| ☐ | Correctional Facility | |
| ☐ | Out of State Facility | |
| ☐ | Instruction Conducted in the Home | |

**Next Recommended**  (08/25/2018 - 10/21/2018)

**SECTION A. For Students Educated in Regular School Buildings with Nondisabled Peers – Indicate the percentage of time INSIDE the regular classroom for this student:**

Time spent outside the regular classroom receiving services unrelated to the student's disability (e.g., time receiving ESL services) should be considered time inside the regular classroom. Educational time spent in age-appropriate community-based settings that include individuals with and without disabilities, such as college campuses or vocational sites, should be counted as time spent inside the regular classroom.

Calculations for this Student          Name of School Building:  North Penn High School

| Column 1 | Column 2 | Calculation | Indicate Percentage | Percentage Category |
|---|---|---|---|---|

*April 2014*

**DEF NPSD 000044**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

| Total hours the student spends in the regular classroom per day | Total hours in a typical school day (including lunch, recess & study periods) | Hours inside regular classroom ÷ hours in school day x 100 = % (Column 1 ÷ Column 2) x 100 = % | Section A: The percentage of time student spends inside the regular classroom: | Using the calculation result – select the appropriate percentage category |
|---|---|---|---|---|
| 5.77 | 6.80 | (5.77 ÷ 6.80) x 100 | 85% of the day | ☑ INSIDE the Regular Classroom 80% or More of the Day<br>☐ INSIDE the Regular Classroom 79-40% of the Day<br>☐ INSIDE the Regular Classroom Less Than 40% of the Day |

**SECTION B. This section required only for Students Educated OUTSIDE Regular School Buildings for more than 50% of the day – select and indicate the Name of School or Facility on the line corresponding with the appropriate selection: (If the student spends less than 50% of the day in one of these locations, the IEP team must do the calculation in Section A)**

| | | |
|---|---|---|
| ☐ | Approved Private School (Non-Residential) | |
| ☐ | Approved Private School (Residential) | |
| ☐ | Other Private Facility (Non Residential) | |
| ☐ | Other Private Facility (Residential) | |
| ☐ | Other Public Facility (Residential) | |
| ☐ | Other Public Facility (Non-Residential) | |
| ☐ | Hospital/Homebound | |
| ☐ | Correctional Facility | |
| ☐ | Out of State Facility | |
| ☐ | Instruction Conducted in the Home | |

**Next Recommended** (10/22/2018 - 04/12/2019)

**SECTION A. For Students Educated in Regular School Buildings with Nondisabled Peers - Indicate the percentage of time INSIDE the regular classroom for this student:**

Time spent outside the regular classroom receiving services unrelated to the student's disability (e.g., time receiving ESL services) should be considered time inside the regular classroom. Educational time spent in age-appropriate community-based settings that include individuals with and without disabilities, such as college campuses or vocational sites, should be counted as time spent inside the regular classroom.

Calculations for this Student          Name of School Building:  North Penn High School

| Column 1 | Column 2 | Calculation | Indicate Percentage | Percentage Category |
|---|---|---|---|---|

*April 2014*

**DEF NPSD 000045**

Annual grad 9/10 IEP - 4/13/2018                    Student's Name: Jane Doe

| Total hours the student spends in the regular classroom per day | Total hours in a typical school day (including lunch, recess & study periods) | Hours inside regular classroom ÷ hours in school day x 100 = % (Column 1 ÷ Column 2) x 100 = % | Section A: The percentage of time student spends inside the regular classroom: | Using the calculation result – select the appropriate percentage category |
|---|---|---|---|---|
| 5.90 | 6.95 | (5.90 ÷ 6.95) x 100 | 85% of the day | ☑ INSIDE the Regular Classroom 80% or More of the Day<br>☐ INSIDE the Regular Classroom 79-40% of the Day<br>☐ INSIDE the Regular Classroom Less Than 40% of the Day |

**SECTION B. This section required only for Students Educated OUTSIDE Regular School Buildings for more than 50% of the day – select and indicate the Name of School or Facility on the line corresponding with the appropriate selection:** (If the student spends less than 50% of the day in one of these locations, the IEP team must do the calculation in Section A)

| | | |
|---|---|---|
| ☐ | Approved Private School (Non-Residential) | |
| ☐ | Approved Private School (Residential) | |
| ☐ | Other Private Facility (Non Residential) | |
| ☐ | Other Private Facility (Residential) | |
| ☐ | Other Public Facility (Residential) | |
| ☐ | Other Public Facility (Non-Residential) | |
| ☐ | Hospital/Homebound | |
| ☐ | Correctional Facility | |
| ☐ | Out of State Facility | |
| ☐ | Instruction Conducted in the Home | |

*April 2014*

**DEF NPSD 000046**

EXAMPLES for Section A: How to Calculate PennData – Educational Environment Percentages

|  | Column 1 | Column 2 | Calculation | Indicate Percentage |
|---|---|---|---|---|
|  | Total hours the student spends in the regular education classroom per day | Total hours in a typical school day (including lunch, recess & study periods) | (Hours inside regular classroom ÷ hours in school day) x 100 = % (Column 1 ÷ Column 2) x 100 = % | Section A: The percentage of time student spends inside the regular classroom: |
| Example 1: | 5.5 | 6.5 | (5.5 ÷ 6.5) x 100 = 85% | 85% of the day (Inside 80% or More of Day) |
| Example 2: | 3 | 5 | (3 ÷ 5) x 100 = 60% | 60% of the day (Inside 79%–40% of Day) |
| Example 3: | 1 | 5 | (1 ÷ 5) x 100 = 20% | 20% of the day (Inside less than 40% of Day) |

For help in understanding this form, an annotated *IEP* is available on the PaTTAN website at www.pattan.net Type "Annotated Forms" in the Search feature on the website. If you do not have access to the Internet, you can request the annotated form by calling PaTTAN at 800-441-3215.

*April 2014*

**DEF NPSD 000047**

# EXHIBIT 25

 North Penn High School: A *COMMUNITY* where *GROWTH* and *CHARACTER* meet!

October 15th, 2018

ATTENTION:

Jane Doe may not be in contact with M.P. An alert has been added in eSchool to ensure that anyone viewing her profile may see that a schedule change cannot be made without informing the building principal, home office assistant principal or supervisor of special education.

On October 9th 2018, Jane reported that she had been assaulted by M.P. It was then discovered that they had been scheduled into the same history class, and assigned seats next to one another. Mrs. Doe has made it clear that Jane will not return to North Penn High School. Effective Monday, October 15th, Jane will attend North Montco Technical Career Center (NMTCC) full time.

Should there be a time that it is determined most appropriate for Jane to return to North Penn High School, action must be taken to ensure that she does not come in contact with M.P. Schedules will be checked (the alert in eSchool should prevent any changes), security will be notified, and hallway routes will be determined to prevent interaction.

Thank you,

*Kathryn M. Small*

Kathryn M. Small
Supervisor or Special Education

# EXHIBIT 26

1          UNITED STATES DISTRICT COURT
2   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3
4   JANE DOE,              : CIVIL ACTION NO.
         Plaintiff,        : 2:20-CV-05142
5                          :
      vs.                  :
6                          :
    NORTH PENN SCHOOL      :
7   DISTRICT,              :
         Defendant.        :
8
9
                    - - -
10
             August 10, 2021
11
                    - - -
12
13      Remote videotaped deposition of KATHRYN
14   SMALL, taken pursuant to notice, at the
15   location of the witness, Lansdale,
16   Pennsylvania, commencing on the above date
17   at or about 10:16 a.m., before Eileen P.
18   Barth, C.S.R., N.P.
19
20                  - - -
21
22
23        GOLKOW LITIGATION SERVICES
      Phone 877.370.3377  |  Fax 917.591.5672
24            deps@golkow.com

Kathryn Small

1        A.    Yes.

2        Q.    Did you discuss, like, that

3  Jane was going to have a specific case

4  manager in special education and whether

5  that person should know about this?

6        A.    We did discuss her having a

7  case manager.  I don't remember that we

8  talked about whether the case manager

9  should know this information.

10       Q.    At what point did you become

11  aware that Jane had been sexually

12  assaulted by M.P. in 10th grade?

13       A.    I don't remember the date

14  exactly, but I remember it being a

15  Friday.  And Pete Nicholson called me.

16  It was a day that I was at Northbridge.

17            And he called me and asked

18  if I remembered meeting with a student,

19  Jane Doe , and her mom, and I

20  shared that I did.  And he asked me to

21  kind of refresh his memory on what the

22  outcome of that meeting was, and I shared

23  with him about checking the schedules.

24            And he then communicated to

Kathryn Small

1    me that Jane had come forward at the

2    tech school, I believe the previous day,

3    and shared that she was sexually

4    assaulted by M.P. and that this had

5    happened in their social studies class,

6    that they were scheduled -- that they

7    were in class together.

8         Q.    And what was your reaction?

9    What did you think when Mr. Nicholson had

10   communicated that to you?

11            MS. JORDAN:  Note my

12        objection to the form of the

13        question.

14            You can answer.

15            THE WITNESS:  Of course

16        immediately I was, you know, very

17        upset to think that this could

18        have happened to a student and

19        that it could have been a result

20        of the schedule changing when I

21        knew that I had checked the

22        schedule.

23            And after ending my

24        conversation with Mr. Nicholson, I

# EXHIBIT 27

# NORTH PENN SCHOOL DISTRICT
## School Board Policy

**5150(a)**

**STUDENTS**                    Reference:  Administrative Regulation #5150

**Elementary and Secondary**

**Harassment**

It is the policy of the North Penn School District to maintain an environment in which harassment of employees, students, or other persons in any form will not be tolerated.  All persons are entitled to enjoy a working or learning environment free from all forms of discrimination or harassment. Harassment lowers morale and is damaging to the working and learning environment, and is also illegal.

The school board prohibits all forms of unlawful harassment, intimidation, and bullying of students by district employees, other students, and/or visitors in the schools.  The school board also prohibits all forms of unlawful harassment of employees, other students, or visitors by students.

Just as it is the school board's intent to provide a working environment free of harassment, it is also the school board's intent to provide a learning environment free of harassment for its students. Accordingly, unlawful harassment of students will not be condoned or tolerated.

To ensure that students are free from unlawful harassment, the district has established complaint procedures (administrative regulation #5150) to provide a mechanism for addressing and resolving complaints of unlawful harassment promptly, and corrective action be taken when allegations are substantiated.  The school board designates the manager of human resources as the district's compliance officer.

<u>Definitions</u>

A.  For the purpose of this policy, harassment shall consist of verbal, written, graphic or physical conduct relating to an individual's race, color, religion, ancestry, sex, national origin/ethnicity, age, and/or disability when such conduct:

1.  Is sufficiently severe, persistent, or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening, or abusive educational environment.
2.  Has the purpose or effect of substantially or unreasonably interfering with an individual's academic performance.
3.  Otherwise adversely affects an individual's learning opportunities.

B.  Racial and ethnic harassment includes the use of any derogatory word, phrase or action characterizing a given racial or ethnic group that creates an offensive learning environment.

C.  For the purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal, visual, written, graphic or physical conduct of sexual nature when:

1.  Submission to the conduct is explicitly or implicitly made a term or condition of an individual's academic status, good standing, or progress.

BOARD POLICY 5150
3/25/09 srk

**DEF NPSD 001041**

5150(b)

CONTINUED

2. Submission to, or rejection of the conduct by the individual is used as the basis of academic decisions affecting the individual, or for any decision affecting the individual regarding the benefits, services, treatments, educational aid, honors, programs, or activities available at or through the district.

3. The conduct is sufficiently severe, persistent, or pervasive that it has the purpose or effect of substantially interfering with the individual's academic performance, or of creating an intimidating, hostile, or offensive educational environment.

Sexual harassment can take a variety of forms ranging from subtle pressure to physical assault. Examples of sexual harassment include but are not limited to:

- Remarks, comments, slurs, jokes, threats, or epithets of a sexual or vulgar nature;

- Sexual innuendoes;

- Sexual flirtations, advances, or propositions;

- Continued expressions of sexual interest after being informed that the interest is unwelcomed;

- Verbal abuse of a sexual nature;

- Using sexually degrading words to describe an individual;

- Making graphic or suggestive comments about an individual's dress or body;

- Making references to sexual activities;

- Offering favors or benefits, such as favorable grades, assignments, or duties in exchange for sexual favors;

- Leering;

- Making sexual or obscene physical gestures;

- Suggestive or obscene letters, notes, or invitations;

- Displaying sexually suggestive objects, calendars, photographs, pictures, or cartoons;

- Graffiti of a sexual or vulgar nature;

- Overt sexual conduct;

- Assault, unwanted touching or sexual contact, impeding or blocking movement, or threats thereof;

- Coercive sexual behavior used to control, influence, or affect the educational opportunities, grades, and/or learning environment of a student, including promises or threats regarding grades, course admission, performance evaluations, or recommendations; enhancement or limitation of student benefits or services.  (e.g. scholarships, financial aid, work study job.)

- Creating an atmosphere of sexual harassment or intimidation, or a hostile or offensive educational environment based on sexual harassment.

- Making another feel uncomfortable or isolated for not participating in or responding to sexual jokes, cartoons, comments, or overtures.

DEF NPSD 001042

5150(c)

CONTINUED

Procedure

Any student who feels he/she has been a victim of harassment should immediately report the alleged harassment to a teacher, nurse, counselor, administrator, or the district's compliance officer, in order to commence a complaint in accordance with administrative regulation #5150. Each complaint will be carefully investigated by the compliance officer or designee, and all findings documented in writing. All information obtained will be held in the strictest confidence and will be discussed only on a need-to-know basis to investigate the matter.

Any action taken as a result of the investigation will depend upon the facts of each case. Disciplinary actions, if applicable, may range from a warning to expulsion for students, and from a warning to termination for employees.

Retaliation Prohibited

It is the district's policy not to discourage persons from filling harassment complaints. Retaliation against any student or other person for exercising the right to file a harassment complaint, or to cooperate in the investigation of a harassment complaint, is strictly prohibited and will result in discipline.

No student will be subject to any form of discipline for pursuing a harassment complaint, or cooperating in the investigation of a harassment complaint, unless it is found that such student or employee or knowingly provided false information related to the investigation of a harassment complaint.

Each employee and staff member shall be responsible to maintain an educational environment free from all forms of unlawful harassment. Each student shall be responsible to respect the rights of their fellow students and district employees and to ensure an atmosphere free from all forms of unlawful harassment.

If a student has any questions concerning this policy, he/she should contact the manager of human resources.

Policy:
Adopted:     October 21, 1993
Amended:    September 17, 1998
Amended:    June 22, 2006
Amended:    March 25, 2009

DEF NPSD 001043

## NORTH PENN SCHOOL DISTRICT
Administrative Regulations

**5150(a)**

**STUDENTS**                                    Reference:  Board Policy #5150

**Elementary and Secondary**

**Welfare**

**Harassment**

### Procedures for Reporting Harassment

A student who feels he/she has been a target of unlawful harassment by district students, employees, or visitors to the schools or other district locations should report the alleged harassment to a teacher, counselor, nurse, administrator, or the district compliance officer (manager of human resources) as soon as possible after the occurrence.

Student complaints should be resolved at the building level when student to student harassment is involved.  When the complaint alleges that the accused harasser is a district employee or a visitor to the school or other district location, then the building administrator or department supervisor should report the harassment to the district compliance officer. The district compliance officer will follow the procedures outlined in this administrative regulation #4316 to investigate and resolve the complaint.

Student complaints should be made in writing using the harassment complaint form designed for this purpose, attached to this regulation, and available in the main office of every school. The student should then submit the complaint form to the building administrator.  If the building administrator is named as the alleged harasser, the student should send the complaint form to the district compliance officer.

All student harassment complaints must be investigated, resolved, and reported to the superintendent.

### Procedures for Investigating Harassment Complaints

Each complaint filed will be promptly and carefully investigated and all findings documented in writing.

Upon receipt of a student to student complaint, the building principal or designee and another staff member, (assistant principal, guidance counselor, nurse, etc.) will conduct an investigation by interviewing both students and any witnesses and directing them to provide a written statement of the event.  If the accused student admits to the harassing behavior, the investigation should stop; parents should be notified; and disciplinary action should occur when appropriate.

If the accused student does not admit to the harassing behavior, the investigation should be broadened to include interviews of other students and staff who may have witnessed or have personal knowledge of the alleged harassment.

All interviews shall be documented in writing and signed by witnesses in the presence of the administrators conducting the interviews.

Because of increased public awareness of harassment and the potential for legal liability, administrators who are dealing with serious misconduct among students should promptly inform the superintendent and together determine whether the incident is serious enough to involve legal counsel.

CONTINUED

ADM. REG. 5150
5/14/09 srk

**DEF NPSD 001044**

5150(b)

**Procedures for Interviewing Involved Parties**

Interviewing the Complainant

The complainant should be encouraged to tell his/her story in a private setting.  Depending on the circumstances, it may be necessary and appropriate for that student to be accompanied by a parent or guardian.  Two investigators (building principal or designee, assistant principal, guidance counselor, nurse, etc.) shall be present.  The investigators should attempt to elicit specific facts from the complainant, including the following:

- Identity of the alleged harasser
- Time and place of incident(s)
- Specific details of what the harasser did and/or said
- Names of witnesses or other harassment victims
- Specific context in which conduct occurred
- Effect of conduct on complainant (Was it perceived as a joke? Did it frighten, embarrass, or humiliate complainant?)
- Desired consequence

The building principal shall use discretion during the investigation in determining whether to disclose the witnesses' identity to the accused, considering the student's age, maturity, emotional condition, and vulnerability to intimidation or retaliation.  However, before disciplinary action is taken, the accused harasser has a right to learn the identity of the accuser.

Interviewing the Accused Harasser(s)

The accused harasser shall be informed of the specific charges and allowed to fully explain his/her version of the incident.  The building principal and designee shall also gather specific facts from the accused harasser, including the following:

- Time and place of incident(s)
- Specific details of what accused did and/or said
- Names of witnesses
- Specific context in which conduct occurred
- Relationship of accused to complainant, i.e., classmate, etc.
- Any prior relationship between accused and complainant, i.e., friend, etc.
- Any prior incidents between the accused and complainant or the accuser's friends and complainant, or the accused and friends of the complainant.

Interviewing Witnesses

The building principal or designee shall also interview any other witnesses with actual knowledge of the incidents in the complaint or other individuals who may have been subject to harassment by the accused.

All students and staff interviewed shall be instructed to maintain confidentiality by refraining from discussing the investigation with others.

Principals and other staff members conducting the investigation shall refrain from sharing details of the complaint or the investigation with witnesses.

The superintendent shall be informed of all complaints, investigations, and results of each case.

**Important Considerations**

The building principal must inform parents of the complaining and harassing person, using discretion as to the appropriate time.

The State Board of Education Regulations allow educators to disclose confidential information to students' parents if it is believed that the health, safety, or welfare of the student or others so

CONTINUED

**DEF NPSD 001045**

5150(c)

requires.  The building principal shall consult with the superintendent before deciding whether and/or when to inform parents.  The superintendent shall determine whether the legal counsel is to be present at any such consultation.

**Note:**  When the accused is a student, the student's parents must be informed if the student is to be suspended or expelled.  In other situations, the building principal must exercise judgment whether to inform parents.

### Disposition of Complaint

At the conclusion of the investigation, the results will be reported in writing to the superintendent. The report shall include a summary of facts, conclusion, and the recommendation for any necessary remediation or discipline, if appropriate.  The complainant, the accused, and, if either are students, their parents, will be informed generally of the results of the investigation.

If harassment has occurred, the building principal or designee shall determine appropriate disciplinary action, subject to the discipline code and/or other applicable law.

If no unlawful harassment has occurred, the parties and the superintendent shall be so notified. Under no circumstances shall a record of complaint which is found to be without basis be released to any person other than the complainant, the accused, the superintendent, and where appropriate, the board and/or legal counsel, without consent of the accused, except by order of the court.

If the investigation is inconclusive, the building principal shall so state in a written report.  Under no circumstances shall the accused or complainant be disciplined based upon an inconclusive investigation.

If harassment has not occurred, and the complaint was made in bad faith, then the building principal may take appropriate disciplinary action against the complainant.

If the accused retaliates against the complainant in any way because of the complaint, the building principal may take appropriate disciplinary action.

### Review Procedure

If the complainant or accused is not satisfied with the building principal's decision, a written request stating specific reasons to review the decision may be filed with the superintendent.

The superintendent or designee shall review the initial investigation and report and may also make additional inquiries or investigations.  The superintendent shall then prepare a written response to the request for review.

Copies of the superintendent's response shall be given to the complainant, the accused, the building principal, and others directly involved as appropriate.

### Policy Communication

Building principals shall review the harassment policy with all students in an appropriate manner at least once each school year.

ATTACHMENT

Reviewed:  March 1999
Revised: May 2009

DEF NPSD 001046

**5150(d)**

### NORTH PENN SCHOOL DISTRICT
## Student Harassment Report Form

DIRECTIONS:  Complete the form by answering all questions.  Do not be afraid to state names and events, actual language and/or physical acts that occurred.
**Remember:  You have a right to be safe and protected and feel secure at school.**

**Name of Complainant:** _____ **Date** _____
(Person making complaint)

**Grade/Homeroom:** _____**Building** _____

**Name of person(s) who harassed you:**_____

**Date(s) of alleged incident(s):**_____

**Time(s) when behavior(s) occurred:** _____

_____

**Place(s) where behavior(s) occurred:** _____

_____

**Names of witnesses (if any):**_____

_____

_____

**Describe the behavior(s) as clearly as possible.  Include the following information:  who was involved, language used (threats, slurs, demands, requests, insults, etc.), physical contact (touching, etc.), and any other relevant information.**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

CONTINUED

**5150(e)**

**Describe how you felt, thought, and/or reacted to the behavior or conduct.**

_____

_____

_____

_____

_____

_____

**How has the behavior affected your school work?**

_____

_____

_____

_____

_____

_____

**How often has the behavior occurred?**

_____

_____

_____

_____

**What is your requested remedy or desired consequence?**

_____

_____

_____

_____

_____

_____

**I hereby certify that the information I have provided in this complaint is true, correct and complete to the best of my knowledge and belief.**

_____     _____
Complainant Signature                                         Date

_____     _____
Building Principal                                                 Date

_____     _____
                                                                       Date

_Please submit this complaint form to the building administrator._
_If the building administrator is named as the alleged harasser, the student should send_
_the complaint form to the district compliance officer (manager of human resources) @_
_401 E. Hancock Street_
_Lansdale, PA  19446._

**DEF NPSD 001048**

## NORTH PENN SCHOOL DISTRICT
School Board Policy

**5150(a)**

**STUDENTS**                                    Reference:  Administrative Regulation #5150

**Elementary and Secondary**

**Harassment**

It is the policy of the North Penn School District to maintain an environment in which harassment of employees, students, or other persons in any form will not be tolerated.  All persons are entitled to enjoy a working or learning environment free from all forms of discrimination or harassment. Harassment lowers morale and is damaging to the working and learning environment, and is also illegal.

The school board prohibits all forms of unlawful harassment, intimidation, and bullying of students by district employees, other students, and/or visitors in the schools.  The school board also prohibits all forms of unlawful harassment of employees, other students, or visitors by students.

Just as it is the school board's intent to provide a working environment free of harassment, it is also the school board's intent to provide a learning environment free of harassment for its students. Accordingly, unlawful harassment of students will not be condoned or tolerated.

To ensure that students are free from unlawful harassment, the district has established complaint procedures (administrative regulation #5150) to provide a mechanism for addressing and resolving complaints of unlawful harassment promptly, and corrective action be taken when allegations are substantiated.  The school board designates the manager of human resources as the district's compliance officer.

Definitions

A.  For the purpose of this policy, harassment shall consist of verbal, written, graphic or physical conduct relating to an individual's race, color, religion, ancestry, sex, national origin/ethnicity, age, and/or disability when such conduct:

 1.  Is sufficiently severe, persistent, or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening, or abusive educational environment.
 2.  Has the purpose or effect of substantially or unreasonably interfering with an individual's academic performance.
 3.  Otherwise adversely affects an individual's learning opportunities.

B.  Racial and ethnic harassment includes the use of any derogatory word, phrase or action characterizing a given racial or ethnic group that creates an offensive learning environment.

C.  For the purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual  favors, and other inappropriate verbal, visual, written, graphic  or physical conduct of sexual nature when:

 1.  Submission to the conduct is explicitly or implicitly made a term or condition of an individual's academic status, good standing, or progress.

**DEF NPSD 001049**

5150(b)

CONTINUED

2. Submission to, or rejection of the conduct by the individual is used as the basis of academic decisions affecting the individual, or for any decision affecting the individual regarding the benefits, services, treatments, educational aid, honors, programs, or activities available at or through the district.

3. The conduct is sufficiently severe, persistent, or pervasive that it has the purpose or effect of substantially interfering with the individual's academic performance, or of creating an intimidating, hostile, or offensive educational environment.

Sexual harassment can take a variety of forms ranging from subtle pressure to physical assault. Examples of sexual harassment include but are not limited to:

- Remarks, comments, slurs, jokes, threats, or epithets of a sexual or vulgar nature;

- Sexual innuendoes;

- Sexual flirtations, advances, or propositions;

- Continued expressions of sexual interest after being informed that the interest is unwelcomed;

- Verbal abuse of a sexual nature;

- Using sexually degrading words to describe an individual;

- Making graphic or suggestive comments about an individual's dress or body;

- Making references to sexual activities;

- Offering favors or benefits, such as favorable grades, assignments, or duties in exchange for sexual favors;

- Leering;

- Making sexual or obscene physical gestures;

- Suggestive or obscene letters, notes, or invitations;

- Displaying sexually suggestive objects, calendars, photographs, pictures, or cartoons;

- Graffiti of a sexual or vulgar nature;

- Overt sexual conduct;

- Assault, unwanted touching or sexual contact, impeding or blocking movement, or threats thereof;

- Coercive sexual behavior used to control, influence, or affect the educational opportunities, grades, and/or learning environment of a student, including promises or threats regarding grades, course admission, performance evaluations, or recommendations; enhancement or limitation of student benefits or services.  (e.g. scholarships, financial aid, work study job.)

- Creating an atmosphere of sexual harassment or intimidation, or a hostile or offensive educational environment based on sexual harassment.

- Making another feel uncomfortable or isolated for not participating in or responding to sexual jokes, cartoons, comments, or overtures.

DEF NPSD 001050

**5150(c)**

CONTINUED

<u>Procedure</u>

Any student who feels he/she has been a victim of harassment should immediately report the alleged harassment to a teacher, nurse, counselor, administrator, or the district's compliance officer, in order to commence a complaint in accordance with administrative regulation #5150. Each complaint will be carefully investigated by the compliance officer or designee, and all findings documented in writing.  All information obtained will be held in the strictest confidence and will be discussed only on a need-to-know basis to investigate the matter.

Any action taken as a result of the investigation will depend upon the facts of each case. Disciplinary actions, if applicable, may range from a warning to expulsion for students, and from a warning to termination for employees.

<u>Retaliation Prohibited</u>

It is the district's policy not to discourage persons from filling harassment complaints.  Retaliation against any student or other person for exercising the right to file a harassment complaint, or to cooperate in the investigation of a harassment complaint, is strictly prohibited and will result in discipline.

No student will be subject to any form of discipline for pursuing a harassment complaint, or cooperating in the investigation of a harassment complaint, unless it is found that such student or employee or knowingly provided false information related to the investigation of a harassment complaint.

Each employee and staff member shall be responsible to maintain an educational environment free from all forms of unlawful harassment.  Each student shall be responsible to respect the rights of their fellow students and district employees and to ensure an atmosphere free from all forms of unlawful harassment.

If a student has any questions concerning this policy, he/she should contact the manager of human resources.

Policy:
Adopted:      October 21, 1993
Amended:     September 17, 1998
Amended:     June 22, 2006
Amended:     March 25, 2009

**DEF NPSD 001051**