IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, | ) | Case No.: 2:20-cv-05142 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTH PENN SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON BEHALF OF DEFENDANT NORTH PENN SCHOOL DISTRICT**

COMES NOW Defendant NORTH PENN SCHOOL DISTRICT (the "District"), by and through the undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment in its favor.  In support of its Motion, the District states as follows:

## I.     INTRODUCTION

### A.     Nature of the Case

This case involves allegations of student-on-student sexual harassment.  (*See generally* Pl.'s Compl., attached as **Exhibit A** to the Statement of Undisputed Facts). Specifically, Jane Doe (referred to here as "JD") asserts that at various points throughout her education within the District, she was sexually harassed and assaulted by a male student ("MP").  (*Id.*)

JD's older sister – Julie Roe– initially brought the present lawsuit on JD's behalf as a result of the alleged hostile educational environment created by MP's misconduct.  (*Id.*)  JD is now past the age of majority and proceeds as Plaintiff on her own behalf.  She seeks to hold the District liable for damages she suffered a result of her encounters with MP.  (*Id.*)

## B.      The Elementary School Incident and the District's Response

In the 2014-2015 school year, JD and MP were both attending Gwynedd Square Elementary School as members of the sixth-grade class.  (JD Dep. 20:14-20, 23:6-8, 27:24-28:2, Nov. 2, 2021, attached as **Exhibit B** to the Statement of Undisputed Facts; Plaintiff's Mother Dep. 11:21-23, Nov. 2, 2021, attached as **Exhibit C** to the Statement of Undisputed Facts.)  One day in November 2014, the class was engaged in a group activity in which JD and MP were paired together.  (Exhibit A ¶ 2; Exhibit B 31:21-32:6; Garrett Dep. 36:4-37:15, July 28, 2021, attached as **Exhibit D** to the Statement of Undisputed Facts).  During that day, the special education aid for that class and JD's case manager – Holly Garrett ("Garrett")[1] – saw JD and MP touching hands underneath their desks, and she saw MP's hand going into JD's shirt.  (Exhibit B 27:3-10, 33:12-34:13, 34:23-35:10; Exhibit D 8:10-18, 36:4-37:17, 155:7-9.)

Upon witnessing that occurrence, Garrett made eye contact with both JD and MP and instructed them to go out into the hall.  (Exhibit B 35:11-36:2; Exhibit D 36:4-37:17, 41:9-42:2, 138:14-139:7.)  Garrett completed office referral slips for both, questioned them about their behavior, and warned them about the inappropriateness of their actions.  (Exhibit D 43:1-4, 46:3-8, 131:19-132:14.)  At the time, Garrett believed that their interaction was consensual and not unwanted, so she told them that no further action would be taken if that conduct stopped.  (*Id.* 46:17-47:5, 49:8-13, 131:19-132:14.)  JD denied that anything had happened, and MP said nothing.  (Exhibit D 44:19-21, 45:18-22.)  After returning to the classroom, Garrett provided a summary of the incident to the primary teacher for that room, Ruth Divver ("Divver").  (Exhibit B 31:2-10; Exhibit D 43:15-21.)  No further action was taken.  (*See* Exhibit B 38:9-19.)

---

[1] Holly Andrews is now known as Holly Garrett.

In April 2015, other female students at Gwynedd Square Elementary School reported that they had been inappropriately touched by MP. Upon hearing this report, the school's principal and counselors were also made aware of the prior interaction between JD and MP, and of Garrett's failure to report it. (Exhibit B 46:15-47:5, 48:9-49:7; Exhibit C 13:5-11; Exhibit D 50:3-18, 70:25-71:19.) It was then reported that MP had inappropriately touched JD on multiple subsequent occasions. (Exhibit B 39:14-40:12, 46:4-13, 48:9-49:7; Julie Roe Dep. 10:7-11:12, Nov. 2, 2021, attached as **Exhibit E** to the Statement of Undisputed Facts[2].) Once the elementary school administration became aware of the situation, the students' parents were notified, and the matter was reported to the police. (Exhibit B 54:11-55:22, 56:23-57:6; Exhibit C 13:23-14:9, 21:8-18; Bowen Dep. 84:21-86:10, 87:13-19, 95:6-22, 104:17-105:5, July 26, 2021, attached as **Exhibit F** to the Statement of Undisputed Facts.[3]) The school's principal, William Bowen, also called his immediate supervisor to notify her about what had occurred. (Exhibit F 91:10-92:20.)

Additionally, when MP's conduct came to light, the elementary school administration had MP moved to another class so that he would not be able to interact with JD and the other female students. (Exhibit B 57:10-58:18; Exhibit C 25:6-19; Exhibit D 161:17-163:2; Exhibit F 97:17-99:16, 111:8-22.) JD even admits that after the administration was made aware of MP's conduct, they "kept him . . . really well hidden from" the female students. (Exhibit B 58:4-10.) Further, after discussing the matter with MP – who admitted to his conduct – and his parents, MP was given an in-school suspension. (Exhibit F 88:21-90:11, 101:9-103:23.) Teachers and staff who interacted with MP were also to keep a close eye on him during common periods of the day to monitor his behavior. (*See* Exhibit D 159:3-162:17 (noting that she and other teachers monitored

---

[2] Julie Roe is JD's older sister.
[3] William Bowen is the principal for Gwynedd Square Elementary School.

MP and JD during recess times and that there were instances where JD actually attempted to make contact with MP despite their separation); *see also* Exhibit F 204:7-206:1.)

Ultimately, neither MP's parents nor JD's parents wanted further involvement from child-protective services or police, so the matter was not pursued further with local authorities. (*See* Exhibit B 56:23-57:6; Exhibit F 113:19-115:7, 227:12-228:2.) Nonetheless, the District took the matter seriously. Both Garrett and Divver were called to discuss the situation with District administration. (*See* Exhibit F 128:22-129:13.) Garrett – who had been primarily responsible for the failure to report the interaction between JD and MP – was told in no uncertain terms that her handling of the situation was entirely inappropriate; she was told that any such occurrences should be immediately reported to the administration so that the authorities and parents could be notified. (Exhibit D 68:15-69:19, 116:3-117:18; Exhibit F 162:6-24, 168:4-16.) Further, Garrett was placed on unpaid suspension and she received failing marks on her teacher evaluation for that year. (Exhibit D 79:12-80:1, 107:22-110:8, 111:17-25, 153:17-154:3; Exhibit F 219:18-20, 221:10-222:20; McCue Dep. 319:4-320:12, 363:10-364:24, Aug. 25, 2021, attached as **Exhibit G** to the Statement of Undisputed Facts [4]; Dietrich Dep. 202:5-19, 203:13-18, Aug. 11, 2021, attached as **Exhibit H** to the Statement of Undisputed Facts.[5])

In other words, once being notified of the incident involving JD, the District's response was immediate and comprehensive to ensure minimal possible contact between JD and MP and to discipline those who failed to take proper steps to prevent inappropriate contact between the two students. That response was entirely reasonable under the circumstances and consistent with

---

[4] Cheryl McCue is the human resources director for the District and was, at all times relevant to this matter, also the Title IX coordinator for the District.
[5] Curtis Dietrich is the superintendent for the District.

general educational standards.  (*See* Betsy Smith Report at 17-19, attached as **Exhibit I** to the Statement of Undisputed Facts.[6])

### C.     The Intervening Period

At the end of that sixth-grade year, JD's mother decided that she wanted to ensure that JD and MP would not have to interact in middle school.  Consequently, rather than attending Penndale Middle School, which was the middle school that JD would have otherwise attended, JD's mother asked that JD be permitted to attend Pennbrook Middle School.  (Exhibit B 59:3-61:2; Exhibit C 24:19-25:5.)  The District granted that request, and JD and MP had no contact with each other for the entirety of their seventh- or eighth-grade year.  (Exhibit B 69:23-70:17; Exhibit C 28:21-29:2.)

Further, at the end of each school year, counselors and administrative personnel from the elementary schools meet with their counterparts in the middle schools to discuss notable student-related issues and any special circumstances that might be salient for the upcoming year.  (Exhibit F 60:20-64:20; Bauer Dep. 227:3-228:18, Aug. 26, 2021, attached as **Exhibit J** to the Statement of Undisputed Facts.[7])  Additionally, the students' cumulative files are also transferred to the new schools.  (Exhibit F 54:1-21, 59:18-60:15; Small Dep. 176:22-177:12, Aug. 10, 2021, attached as **Exhibit K** to the Statement of Undisputed Facts; Exhibit J 70:7-13.[8])  It is unclear whether information concerning JD and MP's interaction at Gwynedd Square Elementary School was given to Pennbrook, but because those two would not be attending the same school, the absence of such information would not have been relevant to JD's middle school education.  (*See* Exhibit F 67:4-68:18, 229:11-23.)

### D.     Ninth Grade and High School

---

[6] Betsy Smith is the District's liability expert.
[7] Todd Bauer is an assistant superintendent for the District.
[8] Kathryn Small was previously the supervisor for special education with the District.

When JD started her ninth-grade year, she attended both Pennbrook and North Montco Technical Career Center, which offers specialized vocational training to students, part time. (*See* Exhibit B 70:20-23.) Shortly after she was accepted into the technical school program, however, she switched to attending school there full time as part of a pilot program. (Exhibit B 73:11-23, 81:18-82:21.)

Right when the school year began, however, JD saw MP in the hallway and discovered that they would be attending the same technical school, although they would not be part of the same program. (Exhibit B 74:11-19, 75:3-13; LeBlanc Dep. 10:13-22, Aug. 24, 2021, attached as **Exhibit L** to the Statement of Undisputed Facts.[9]) After school the first day that JD saw MP, she went home and reported the sighting to her family. (Exhibit B 77:21-78:5; Exhibit C 34:23-35:13; Exhibit E 20:4-12.) JD's mother immediately contacted the technical school staff to ensure that JD and MP would not have to interact. (Exhibit C 35:18-37:11.) Although JD's mother wanted MP barred from the school and the program entirely, that was not a viable action. (*See* Exhibit B 79:12-80:17; Exhibit C 37:23-40:1; Exhibit H 51:13-52:15, 223:4-19, 257:8-12; O'Brien Dep. 17:1-18:13, Aug. 23, 2021, attached as **Exhibit M** to the Statement of Undisputed Facts.[10]) Nonetheless, upon learning of the situation, the staff at the technical school immediately put measures into place to ensure that JD and MP would not have to interact. (Exhibit B 81:10-13, 83:7-10; Exhibit L 10:13-11:11, 14:17-15:9, 23:23-25:16; Exhibit M 23:12-25:16.) A safety plan was created so that the two students would be in different classes, travel through different hallways, and leave through different exists. (Exhibit B 83:18-84:9; Exhibit C 42:3-21; Exhibit L 28:18-30:20; Exhibit M 23:12-25:16, 67:10-14; Exhibit H 220:18-221:22.) JD was also assigned a staff security member to ensure her safety. (Exhibit B 84:10-22; Exhibit C 43:5-44:3.) Further, a

[9] Dawn LeBlanc was the principal of the North Montco Technical Career Center.
[10] Kira O'Brien is an assistant program counselor at the North Montco Technical Career Center.

special counselor was made available to JD for her to speak with when needed.  (Exhibit M 10:8-12:17.)

The safety measures enacted at the technical school appeared to have been successful because there were no reported direct interactions between JD and MP at that location for the rest of the school year.  (*See* Exhibit B 83:11-17.)  JD's own studies, however, were less successful. At the end of her ninth-grade year, JD's teachers at the technical school reported that her grades and her behavior were far below acceptable levels.  (*See* Exhibit M 28:3-30:20.)  JD had attendance and behavioral issues.  (Exhibit L 32:5-34:16; Exhibit M 69:8-70:9.)  She would also fight against her safety plan.  (*See* Exhibit B 84:23-86:1.)  Consequently, the technical school did not believe that her returning full time the following year would be in her best interest.  (*See* Exhibit M 28:3-30:20.)  JD therefore started her tenth-grade year only half time at the technical school and half time at the neighboring North Penn High School.  (Exhibit B 95:12-16; Exhibit C 49:3-8.)

Between ninth and tenth grade, JD's mother discussed with North Penn High School's administration the importance of keeping JD and MP apart.  (Exhibit B 97:9-98:1; Exhibit C 49:17-50:10; Exhibit M 32:16-36:7; *see also* Exhibit K 209:1-19.)  In a meeting that included Kathryn Small ("Small"), who worked as an assistant director of special education for the District, JD's mother also made clear that while she wanted to ensure that JD and MP never interacted, only necessary personnel were to be told about the situation.  (*See* Exhibit K 45:1-13, 52:19-54:20, 57:2-19.)  She specifically indicated that none of JD's teachers needed to know about the issue. (*Id.* 58:9-60:8, 106:3-21.)  Consequently, following the meeting, and in accordance with the instructions provided by JD's mother, Small told only Peter Nicholson ("Nicholson") – the high school's principal – and the assistant principal about the issue.  (*Id.* 58:9-60:18, 76:5-78:1, 81:20-83:22, 210:7-17.)  Additionally, the safety plan implemented by the technical school was

continued, although JD continually attempted to avoid its protections and, eventually, she cancelled it entirely.  (Exhibit B 96:15-97:8, 108:21-109:15; *see also* Exhibit K 62:21-64:20.)

On August 23, 2018, Small pulled the course schedules for JD and MP and compared them to ensure that they had no overlapping classes.  (Exhibit K 86:7-87:9, 88:11-21, 90:5-20, 152:16-21, 209:20-24.)  None existed.  Small then went on a short vacation, and when she returned, she notified the principals that her prior check had revealed no overlap between the students' schedules.  (*Id.* 90:10-91:5.)  Classes began shortly afterward.

Unfortunately, in the days between when Small checked the schedules and when classes started, there was a shift in the students' schedules, which resulted in JD and MP being placed in the same social studies class.  (Exhibit B 100:12-102:3, 102:21-103:12; Exhibit C 59:24-60:8.)  That class apparently also had a seating chart that resulted in JD and MP being seated directly next to each other.  The teacher for that class, however, was not aware of the situation between JD and MP – because JD's mother had asked that JD's teachers not be told – so he was not aware of any problem resulting from that seating arrangement.

Critically, despite the fact that it was apparent immediately to JD that she and MP were in a class together, JD never reported that fact either to school officials or to her own mother.  (*See* Exhibit B 103:18-105:17; Exhibit C 50:15-21.)  In October 2018 – more than a month later – JD was failing her social studies class, so her teacher was going to initiate a transfer.  (*See* Exhibit J 298:18-300:21; Exhibit K 162:21-165:6.)  JD would be moved to a lower-level social studies class to allow her the opportunity to improve her grades.  It was only after the decision to transfer JD was made that she elected to notify anyone that she was in a class with MP.  (Exhibit B 111:3-9, 117:3-23; Exhibit C 50:22-51:11; Exhibit L 38:5-23, 45:11-23; Exhibit M 68:13-17; Exhibit J 243:16-245:13, 298:18-300:21; Nicholson Dep. 154:20-155:21, Nov. 5, 2021, attached as **Exhibit**

N to the Statement of Undisputed Facts.[11])  Further, JD indicated that during that period while the two were in the class together, MP had allegedly begun sexually harassing and assaulting her again. (Exhibit B 109:19-110:23, 111:15-113:5, 122:2-9; Exhibit L 45:11-23.)

As soon as school officials learned that JD and MP were in the same class and of MP's alleged misconduct, they acted to rectify the situation.  (*See* Exhibit L 54:20-55:12.)  JD was again permitted to return to the technical school full time.  (Exhibit B 128:18-129:1; Exhibit C 56:22-57:20, 58:8-11; Exhibit L 66:22-67:9.)  JD's parents and the police were notified about MP's reported misconduct.  (Exhibit B 120:12-121:20, 126:14-17; Exhibit C 51:20-52:18, 53:6-15; Exhibit M 41:6-20, 49:3-12; Exhibit N 69:20-71:16.)  Administration officials within the District interviewed teachers, students, and case managers.  (*See* Exhibit J 258:23-259:15, 260:1-263:2, 275:3-14.)  Notably, the police inquiry did not result in any charges being pressed against MP. (Exhibit B 128:9-17; Exhibit M 53:8-23; *see also* Exhibit C 60:17-23.[12])  Further, JD's mother did not complete the harassment form to provide additional information on the specifics of the allegations, which would allow administrators within the District to further investigate.  (*See* Exhibit J 277:1-282:13.)

As with the incident that occurred in 2014 and came to light in early 2015, the District responded to all situations that it was made aware of swiftly and to appropriate effect.  This response was again entirely reasonable and consistent with expected educational standards.  (*See* Exhibit I at 19-24.)

---

[11] JD does not recall ever being told that she would be transferred out of that class.  (Exhibit B 116:14-18.)
[12] JD went on to attend tenth grade at Northbridge High School, which transitioned to homeschooling as the year progressed due to COVID-19.  (Exhibit B 134:13-135:2, 135:12-139:23, 140:14-141:6; Exhibit C 77:4-8, 82:2-7.)  JD eventually graduated from high school.

### E. The District and Training of its Personnel

Handling harassment and misconduct in the school setting is not a foreign concept to the District. Administrators and faculty members receive periodic training on how to handle such situations and were otherwise aware of how to do so. (Exhibit D 23:17-22, 59:7-13, 59:20-60:17, 78:23-79:3, 101:10-102:2; Exhibit F 25:7-26:9, 28:18-29:16, 30:20-31:7, 34:9-19, 35:21-36:11, 38:10-39:3, 40:20-41:9, 48:19-23, 200:5-201:1; Exhibit G 21:20-26:9, 29:5-30:1, 63:9-64:2; Exhibit H 61:19-64:20, 67:13-67:2; Exhibit J 31:4-20, 35:1-36:11, 57:19-64:19, 81:12-85:9, 88:20-90:21, 93:22-24, 109:18-111:20, 145:11-146:16, 192:13-193:17, 194:19-195:10, 197:2-7, 210:9-21; Exhibit K 23:9-26:22, 27:9-14; Exhibit M 41:13-20; Exhibit N 15:16-17:3, 35:7-15; *see also* Exhibit I at 12-15 (discussing the breadth and depth of the training given to the District's personnel).) Further, administrators and faculty receive policy guidance at the beginning of each year that outlines the requirements for handling and reporting child-related misconduct, harassment, and abuse. (Exhibit F 29:23-30:13; Exhibit G 340:20-342:19; Exhibit J 31:4-20, 57:19-64:19, 109:18-111:20, 200:4-24.)

### F. The Present Lawsuit

JD has now brought this lawsuit as the result of MP's alleged repeated instances of sexual harassment and assault. (*See generally* Exhibit A.) She brings three causes of action against the District: (1) violation of Title IX, 20 U.S.C. § 1681 for failure to report sexual harassment resulting in a hostile educational environment; (2) violation of Title IX, 20 U.S.C. § 1681 regarding prior sexual harassment resulting in future harassment; and (3) violation of JD's constitutional rights under 42 U.S.C. § 1983 for failure to train. (*Id.*)

As explained below, however, none of those allegations is supported by evidence in the record. Indeed, the undisputed evidence reveals that the District acted in an entirely reasonable

and appropriate manner, responding to all reported incidents swiftly and decisively. The District's personnel were aware of how to handle reported incidents of sexual harassment, and no evidence on record suggests that the District was ever deliberately indifferent.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the pleadings, discovery responses, and any affidavits demonstrate that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(c).  A fact is material for purposes of summary judgment only if it could affect the outcome of the litigation. *Blizman v. Travelers Home & Marine Ins. Co.*, No. 3:19-CV-01539, 2021 U.S. Dist. LEXIS 163367, at *4 (M.D. Pa. Aug. 30, 2021).  Further, "[a] dispute of material fact is 'genuine'" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jordan v. Murin*, No. 1:18-cv-0228 (Erie), 2020 U.S. Dist. LEXIS 207325, at *6 (W.D. Pa. Nov. 4, 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of showing the absence of any genuine issue of material fact. *M.S. v. Susquehanna Twp. Sch. Dist.*, No. 1:13-cv-02718, 2017 U.S. Dist. LEXIS 47916, at *17 (M.D. Pa. 2017).  The movant may satisfy that burden either by pointing to specific materials on file that show the absence of a genuine issue of fact or, if moving on a claim for which the non-movant bears the burden of proof, may point out to the court that there is an absence of evidence to support that claim. *See United States ex rel. Reyes v. Sweeney*, No. 97-3922, 1999 U.S. Dist. LEXIS 12517, at *3-4 (E.D. Pa. Aug. 10, 1999); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

Once the movant meets this initial burden, the non-moving party must then produce evidence of specific facts showing that a genuine issue remains for trial. *Bird v. Borough of*

*Moosic*, No. 3:18-cv02289, 2021 U.S. Dist. LEXIS 182854, at *7 (M.D. Pa. Sept. 24, 2021). Moreover, although the court must view all evidence and reasonable inferences drawn from the evidence in favor of the non-moving party, the plaintiff must still present more than a scintilla of evidence to rebut the moving party's summary judgment showing. *Corrado v. Super Fresh Food Mkts., Inc.*, No. 08-1905, 2009 U.S. Dist. LEXIS 118922, at *7-8 (E.D. Pa. Dec. 17, 2009). Further, summary judgment cannot "be defeated by speculation and conjecture, or conclusory, self-serving affidavits. *Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72 (3d Cir. 2020) (internal citation omitted).

Additionally, the non-moving party may not merely rest on its pleadings. *Citibank, N.A. v. Hicks*, No. 03-2283, 2004 U.S. Dist. LEXIS 8442, at *6 (E.D. Pa. Apr. 29, 2004). And the non-movant must do more than raise "some metaphysical doubt" on the challenged issue. *Dolan v. Penn Millers Ins. Co.*, No. 3:09-2041, 2014 U.S. Dist. LEXIS 68266, at *18 (M.D. Pa. May 19, 2014) (quotation omitted). If the movant shows – and the non-moving party fails to refute – that there is no genuine issue of material fact or that the non-movant has no support for an essential element of her claim, then the court must enter summary judgment for the moving party. *See Sweeney*, 1999 U.S. Dist. LEXIS 12517, at *3-4.

### III. ARGUMENTS AND AUTHORITIES

#### A. No claim under Title IX is viable.

JD brings two causes of action against the District arising under Title IX, 20 U.S.C. § 1681, *et seq.* ("Title IX"). (*See generally* Exhibit A.) Specifically, she contends that the District exhibited deliberate indifference with regard to reporting incidents of sexual harassment and with responding to prior instances of sexual harassment such that JD was forced to endure a hostile

educational environment during her matriculation at the North Penn School District. (*See id.*) JD's Title IX claims against the District are unsupported by the evidence.

Generally, Title IX prohibits "discrimination at educational institutions on the basis of sex, and allows recovery by victims of physical sexual abuse." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017). Discrimination in this context includes sexual harassment that would create a hostile educational environment. *See E.N. v. Susquehanna Twp. Sch. Dist.*, No. 1:09-CV-1727, 2010 U.S. Dist. LEXIS 124193, at *42 (M.D. Pa. Nov. 23, 2010). And the prohibitions of Title IX extend both to harassment between faculty and students and that between students. *See Doe v. Bellefonte Area Sch. Dist.*, 106 F. App'x 798, 799-800 (3d Cir. 2004); *Douglas v. Brookville Area Sch. Dist.*, 836 F. Supp. 2d 329, 343-44 (W.D. Pa. 2011). But to hold a school district liable for discrimination under Title IX, the plaintiff must show, in addition to harassment, the following elements: (1) that there was an "appropriate person" at the school; (2) who had actual knowledge that there was a danger to, or harassment directed at, the student; and (3) that that appropriate person acted with deliberate indifference to the situation. *Se. Delco Sch. Dist.*, 272 F. Supp. 3d at 688. Here, JD cannot satisfy those elements.

First, an "appropriate person" means an individual who had "authority to address the alleged abuse and to institute corrective measures on the district's behalf." *Id.* A school's principal is an example of an appropriate person; a teacher without administrative control over the faculty is not. *See E.N.*, 2010 U.S. Dist. LEXIS 124193, at *47; *see also Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 362 (3d Cir. 2005); *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 171-72 (3d Cir. 2002).

Second, the actual notice that the appropriate person must have more than simply notice of some non-specific inappropriate conduct. *Se. Delco Sch. Dist.*, 272 F. Supp. 3d at 688-89. Rather,

that individual must have known "of acts sufficiently indicating a danger of future abuse." *Id.* That is, it must be notice of "more than a mere possibility of abuse." *Id.*

Third, even if an appropriate person had actual notice of some danger of abuse, liability only arises if the district – through knowledge obtained by the appropriate person – was deliberately indifferent to that danger. *See id.* at 688. Deliberate indifference is a high standard. *Id.* (indicating that deliberate indifference is an "exacting culpability requirement"). It requires a showing that "an official decision by" the defendant was made "not to remedy the violation." *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 369 (W.D. Pa. 2008) (quotation omitted); *see also E.N.*, 2010 U.S. Dist. LEXIS 124193, at *49.

Notably, when handling student-on-student harassment, school administration receives "substantial deference," and harassment victims do not have the right to any particular remedy or demanded relief. *Dawn*, 586 F. Supp. 2d at 369; *see also Bellefonte Area Sch. Dist.*, 106 F. App'x at 800 (holding that a school district is not "deliberately indifferent because it [does] not undertake the specific remedial action" requested by the plaintiff, and further noting that courts should "refrain from second-guessing the disciplinary decisions made" by school districts). Rather, the defendant's response is deliberately indifferent only if that response was "clearly unreasonable in light of the known circumstances." *Dawn*, 586 F. Supp. 2d at 369 (quotation omitted); *see also Bellefonte Area Sch. Dist.*, 106 F. App'x at 800; S.*K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 801 (W.D. Pa. 2016). Further, courts have noted that a reasonable response requires, at minimum, a prompt inquiry into the matter and remedial action. *Dawn*, 586 F. Supp. 2d at 369.

This Court's decision in *Ings-Ray v. School District of Philadelphia* offers useful guidance on how those principles are applied. No. 02-CV-3615, 2003 U.S. Dist. LEXIS 7683 (E.D. Pa. May 1, 2003). In that case, the plaintiff was a disabled young female who was subjected to two

incidents of sexual harassment by a male classmate.  *Id.* at *1-2.  After the first incident, the student told her mother, who then contacted the school's principal.  *Id.* at *2.  The principal began an investigation, which included questioning the male student, who admitted to making the unwanted physical contact with the plaintiff.  *Id.*  The male student was suspended for a short period and was transferred out of the class that he shared with the plaintiff.  *Id.*  The male student was supervised throughout the remainder of the year to ensure no other contact occurred.  *Id.* at *2-3.  No further incidents occurred involving the male student for the remainder of that year.  *Id.*

The following school year, the plaintiff and the male student were in the same school and were placed in the same class.  The two shared that class without incident through most of the year.  Toward the end of the term, however – about a year after their prior incident – the male student was again discovered to have touched the plaintiff inappropriately.  *Id.* at *3.  The school staff responded immediately to notify law enforcement and to remove the male student from the class with the plaintiff.  *Id.* at *4-6.  No formal charges were ever brought.  The plaintiff's mother removed the plaintiff from the school and the plaintiff refused to go to the school except for the graduation.  *Id.*  A claim against the school district followed.

During the trial below, the defendant moved for summary judgment.  In addressing the motion, the Court noted that it is appropriate to grant summary judgment in a case where the defendant's response could readily be deemed to be "not clearly unreasonable as a matter of law." *Id.* at *10-11 (quotation omitted).  The Court then found that the school's response was not clearly unreasonable and did not constitute deliberate indifference.  *Id.* at *11.  The Court noted that the school's response was exactly as it should have been – the school was notified of the incident, discussed the matter with the offending student and his parents, reported the matter to the police, instituted remedial actions against the student, and removed the offending student from the

plaintiff's class. *Id.* The plaintiff argued that the school's response was necessarily not reasonable because there was a second incident only a year later. *Id.* at 12. The Court, however, rejected that argument. *Id.* The Court recognized that while the defendant's remedy "was not foolproof and [that the] plaintiff and [the male student] were allowed to share classes and a homeroom again" in the later year, there was little else that the defendant could have practically done to prevent the second incident, and even after it occurred, the defendant again acted swiftly to take corrective measures. *Id.*

The court's decision in *M.J.G. v. School District of Philadelphia* offers additional guidance. There, the plaintiff was a disabled high school female who was involved in a March 2015 interaction with a male student. 774 F. App'x 736, 738-39 (3d Cir. 2019). The plaintiff told a teacher about the incident. The teacher did not believe the plaintiff's version of the incident, stating that she had seen the students' interaction and that it was the plaintiff who was attempting to initiate contact with the male student. *Id.* Nonetheless, the teacher reported the matter, which resulted in increased supervision of the students, a change to the students' seating, and notifying the other teachers to be on the lookout for similar interactions. *Id.* The following year, the plaintiff again reported that there had been inappropriate touching by that male student. *Id.* at 739. Although a subsequent investigation by the police and questioning of the students revealed that the activities might not have occurred as alleged, the school districts still prepared a safety plan for the student, assigned additional staff to watch during lunch periods, separated the pair physically while keeping them in the same classroom, assigned an individual to escort the plaintiff, and prepared an individualized education plan for the plaintiff. *Id.*

Notwithstanding the school district's response, the plaintiff and her mother still brought a lawsuit against the school district in the Eastern District of Pennsylvania asserting, inter alia,

claims arising under Title IX. *Id.* at 740. The school district moved for summary judgment, which the District Court granted. The plaintiff appealed.

On review, the *M.J.G.* court considered whether the lower court was correct to grant summary judgment on the plaintiff's Title IX claim. The court noted that the critical issue was whether the defendant was deliberately indifferent, which required that it both have known about the violation and failed to act despite its knowledge. *Id.* at 742-43. The appellate court ultimately held that "no reasonable jury could find that the School Defendants" were deliberately indifferent or "that their responses after each [incident] were" unreasonable. *Id.* Specifically, the court noted that, after the first incident, the students were separated and monitored. And nearly a year had passed since that incident and nothing had been reported. Although the school *could* have done more to help protect the plaintiff, the court held that the school's response "cannot be said to have been unreasonable in light of the allegations, as it included physically separating and monitoring the students while in class." *Id.* at 743. Further, after the second incident, the schools' response was similarly sufficient such that "no reasonable juror could conclude that the School Defendants were deliberately indifferent to the incidents . . . ." *Id.*

Courts in other cases have reached similar conclusions. For example, in *Vaird v. School District of Philadelphia*, the court found no deliberate indifference where, shortly after the underlying incident between elementary school students was made known to the principal, the principal moved the students to different classes, notified the police, suspended the offending student for a number of days, and granted the parent's request that her child transfer to another school. No. 99-2727, 2000 U.S. Dist. LEXIS 6492, at *12-14 (E.D. Pa. May 12, 2000).

The same conclusion reached in those cases should be reached here. Indeed, the District's response to the reported incidents was similar to – if not greater in extent than – those in the cases

discussed above. After the October 2014 incident was discovered in April 2015, the elementary school staff immediately reacted by notifying the parents of the children involved, speaking with MP to obtain his admission of having engaged in the prohibited conduct, contacting the police to begin an investigation, suspending MP, removing MP from JD's class, and encouraging increased monitoring of the pair by teachers at the school. The District even reprimanded Garrett for her failure to report the incident to the administration, and it approved the request for JD to attend a different middle school so that she would not have to encounter MP. While it is possible that the District might have engaged in even more aggressive measures toward JD's interests, in line with the decisions in *Ings-Ray*, *M.J.G.*, and *Vaird*, no reasonable jury could find that the District's handling of the 2014 incident was clearly unreasonable or evidenced deliberate indifference. It was not. The District's response was swift and effective.[13]

The same conclusion must arise as to the subsequent incident in October 2018. When it first became known that JD and MP were attending the same technical school in their ninth-grade year, measures were taken to limit their interaction. A safety plan was created and enforced to ensure that JD did not share classes, hallway time, or entrances or exits with MP. In fact, during the entirety of her ninth-grade year, JD had no further direct interactions with MP.

Moreover, before the tenth-grade year started, Small personally and physically checked JD's and MP's schedules to ensure that there was no overlap. There was none. And it was only by some happenstance that resulted from changes during the limited add-drop period in the days before the semester actually began that JD and MP somehow became placed in class together. But because JD's mother had requested that the teachers not be told about JD's situation, and because

---

[13] While JD's mother obviously wanted MP barred from attending any school that JD might attend, she is not entitled to any remedy she might want. Indeed, the District had an obligation to act reasonably, which it did. By contrast, it would be unreasonable to categorically refuse another student's education. *See* 22 Pa. Code § 12.8 ("Education is a statutory right, and students shall be afforded due process if they are to be excluded from school.").

JD elected not to report the scheduling error until more than a month after the year was underway, the District was not aware of the problem. As soon as it was made aware, however, the District again took immediate and comprehensive measures to ensure JD's protection.

It is admittedly true that an oversight occurred that resulted in JD and MP being placed in a class together when the intent was to keep them apart. But inadvertence is not deliberate indifference. And even if theoretically negligent, the mistake that resulted in the two sharing a class does not amount to a clearly unreasonable response.

The fact is that the District acted at all times in a manner commensurate with its obligation to JD. (*See* Exhibit I at 16-24.) It punished those who acted wrongly at all levels, it enacted swift and effective measures to work toward JD's safety and comfort, and it took diligent steps to ensure that no further harmful contact would occur. The fact that the District's efforts were not as effective as intended does not make those efforts unreasonable, and no consideration of the undisputed evidence here comes even remotely close to suggesting deliberate indifference.

**B.      JD cannot maintain a claim under § 1983.**

JD additionally brings a claim against the District under 42 U.S.C. § 1983. Specifically, she claims that the District violated her rights by failing to train its teachers and administrators on how to identify, investigate, report, or prevent harassment. (*See* Exhibit A at Count III.) That claim is also untenable.

"To state a claim under § 1983, a plaintiff must allege that the defendant, acting under color of state law, deprived [her] of a right secured by the United States Constitution or federal law." *A.B & C.B. v. Tredyffrin/Easttown Sch. Dist.*, No. 17-2581, 2018 U.S. Dist. LEXIS 97863, at *5-7 (E.D. Pa. June 8, 2018). Further, "[t]o establish municipal liability under § 1983, a plaintiff must demonstrate (1) a constitutional violation by a municipal actor (2) that was caused by a municipal

policy or custom." *Id.* The "failure to train, supervise, or discipline" employees can be considered a "'policy or custom' that is actionable under § 1983 . . . ." *Id.* at *8 (quotation omitted). Critically, however, failure to train becomes actionable only where the "failure amounts to deliberate indifference to the rights of persons with whom the employees come into contact." *Id.* (same).

Moreover, the plaintiff in a § 1983 case based on the failure to train "must identify a failure to provide specific training . . . that has a causal nexus with their injuries and must demonstrate that the absence" of that training "can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Id.* (same). "The Supreme Court has held that a claim for failure to train turns on the deficiency of the 'program' as a whole and its application over time to multiple employees." *Id.* (same). "Consequently, allegations that a particular employee may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the employee's shortcomings may have resulted from factors other than a faulty training program." *Id.* at *8-9 (same). In other words, the alleged failure to train must have cased "a pattern of violations." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000); *see also MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 583 (W.D. Pa. 2019). In this way, as with a Title IX claim, establishing liability for a failure to train under § 1983 "is difficult." *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).

Here, JD's claim based on failure to train is foreclosed for want of evidentiary support. As described above, administrators and faculty within the District received periodic training on issues relating to harassment and child safety. Further, the District's policies relating to such matters, as well as reporting incidents, were constantly available to them, and they were expected to review those policies. And to a large extent, all of the personnel involved in the situations at issue acted in accordance with the training and policies – parents and law enforcement were called, safety

plans were created, and efforts made to secure the best interests of the students were pursued. The only exception would be the response of Garrett to the 2014 incident. But even then, Garrett was not unaware of how to respond to situations involving sexual harassment or assault. *See Se. Delco Sch. Dist.*, 272 F. Supp. 3d at 676-77 (finding no violation when the individuals knew what they were supposed to do despite not having been trained by the district to do it and even though their conduct was less than ideal). She was simply mistaken in believing that that particular situation did not involve such conduct. And indeed, even Garrett herself later acknowledged that she handled the situation incorrectly. Moreover, JD has not presented any evidence of a pattern of violations to support her claim for failure to train.

Further, while JD might argue that the District can be held liable for failing to inform students and parents about their Title IX rights and about the Title IX coordinator for the District, such an argument would be misplaced. JD cannot point to any authority suggesting that a school district owes any obligation to train students or parents about such matters. (*See* Exhibit I at 22, § iii.)

Simply put, JD cannot show that there was any deficiency in the District's training as a whole or over an extended period and involving multiple individuals, and she cannot show that there was a pattern of constitutional violations caused by any such deficiency. Indeed, at most JD could show that a single teacher ignored her training and exercised poor judgment under the circumstances. But that is not actionable under a § 1983 claim. Consequently, JD's attempt to bring such a claim here fails a matter of law.

## IV.    CONCLUSION

JD's claim against the District is untenable. The undisputed evidence on record reveals not only that the District did not behave in a manner that could be considered deliberately

indifferent, but also that the District acted at all times in a reasonable and appropriate manner that was entirely consistent with standard educational practices. JD's claim to the contrary is supposed by neither the facts nor the law.

No genuine issues of material fact remain for trial. The District is entitled to judgment as a matter of law, and the District's Motion for Summary Judgment should be granted.

Respectfully submitted,

HENDRZAK AND LLOYD
MAUREEN A. JORDAN, ESQUIRE
Attorney ID #54629
*Attorney for Defendant*
*North Penn School District*
3701 Corporate Parkway, Suite 100
Center Valley, PA 18034
Tel.: (610) 709-8579
Fax.: (610) 709-8560
Email: maureen.jordan@zurichna.com

Dated: April 4, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE,<br>by and through her next friend Julie Roe,<br><br>Plaintiff,<br><br>NORTH PENN SCHOOL DISTRICT,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.: 2:20-cv-05142 |

## CERTIFICATE OF SERVICE

I, MAUREEN A. JORDAN, ESQUIRE, hereby certify that service of the foregoing was automatically accomplished on all counsel of record through CM/ECF Notice of Electronic Filing, in accordance with the Federal Rules of Civil Procedure on this 4th day of April, 2022.

**HENDRZAK & LLOYD**

MAUREEN A. JORDAN, ESQUIRE
Attorney ID # 54629
*Attorney for Defendant,*
*NORTH PENN SCHOOL DISTRICT*
3701 Corporate Parkway, Suite 100
Center Valley, PA 18034
Tel: (610) 709-8579
Fax: (610) 709-8560
Email: maureen.jordan@zurichna.com

Dated: April 4, 2022