IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, | Case No.: 2:20-cv-05142 |
| Plaintiff, | |
| v. | |
| NORTH PENN SCHOOL DISTRICT, | |
| Defendant. | |

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANT NORTH PENN SCHOOL DISTRICT

COMES NOW Defendant NORTH PENN SCHOOL DISTRICT (the "District"), by and through its undersigned counsel, Hendrzak & Lloyd and files this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment as follows:

1. This case involves allegations of student-on-student sexual harassment. (*See generally* Plaintiff's Complaint attached hereto as **Exhibit A**.) Specifically, Plaintiff Jane Doe (hereinafter "JD") asserts that at various points throughout her education within the District, she was sexually harassed and assaulted by a male student ("MP"). (*Id.*)

2. In the 2014-2015 school year, JD and MP were both attending Gwynedd Square Elementary School as members of the sixth-grade class. (See Deposition Transcript of JD, at pp 20:14-20, 23:6-8, 27:24-28:2, Nov. 2, 2021, attached hereto as **Exhibit B**; and Deposition Transcript of Plaintiff's Mother 11:21-23, Nov. 2, 2021, attached hereto as **Exhibit C**).

3. One day in November 2014, the class was engaged in a group activity in which JD and MP paired together. (Exhibit A ¶ 2; Exhibit B 31:21-32:6; Deposition Transcript of Holly Garrett at pp. 36:4-37:15, July 28, 2021, attached hereto as **Exhibit D**.)

1

4. During that day, the special education aid for that class and JD's case manager – Holly Garrett ("Garrett")[1] – saw JD and MP touching hands underneath their desks, and she saw MP's hand going into JD's shirt. (Exhibit B 27:3-10, 33:12-34:13, 34:23-35:10; Exhibit D 8:10-18, 36:4-37:17, 155:7-9.)

5. Upon witnessing that occurrence, Garrett made eye contact with JD and MP and instructed them to go out into the hall. (Exhibit B 35:11-36:2; Exhibit D 36:4-37:17, 41:9-42:2, 138:14-139:7.)

6. Garrett completed office referral slips for both students, questioned them about their behavior, and warned them about the inappropriateness of their actions. (Exhibit D 43:1-4, 46:3-8, 131:19-132:14.)

7. Garrett believed that the interaction between the two students was consensual and not unwanted, so she told them that no further action would be taken if that conduct stopped. (*Id.* 46:17-47:5, 49:8-13, 131:19-132:14.)

8. After returning to the classroom, Garrett provided a summary of the incident to the primary teacher for that room, Ruth Divver ("Divver"), but no further action was taken. (Exhibit B 31:2-10, 38:9-19; Exhibit D 43:15-21.)

9. In April 2015, other female students at Gwynedd Square Elementary School reported that they had been inappropriately touched by MP. Upon hearing this report, the school's principal and counselors were also made aware of the prior interaction between JD and MP, and of Garrett's failure to report it. (Exhibit B 46:15-47:5, 48:9-49:7; Exhibit C 13:5-11; Exhibit D 50:3-18, 70:25-71:19.)

---

[1] Holly Andrews is now known as Holly Garrett.

10. It was then reported that MP had inappropriately touched JD on multiple subsequent occasions. (Exhibit B 39:14-40:12, 46:4-13, 48:9-49:7; Deposition Transcript of Julie Roe pp. 10:7-11:12, Nov. 2, 2021, attached hereto as **Exhibit E.**

11. Once the elementary school administration became aware of the situation, the students' parents were notified, and the matter was reported to the police. (Exhibit B 54:11-55:22, 56:23-57:6; Exhibit C 13:23-14:9, 21:8-18; Deposition Transcript of William Bowen, pp. 84:21-86:10, 87:13-19, 95:6-22, 104:17-105:5, July 26, 2021, attached hereto as **Exhibit F**.[2])

12. The school's principal, William Bowen, also called his immediate supervisor to notify her about what had occurred. (Exhibit F 91:10-92:20.)

13. The elementary school administration had MP moved to another class so that he would not be able to interact with JD and the other female students. (Exhibit B 57:10-58:18; Exhibit C 25:6-19; Exhibit D 161:17-163:2; Exhibit F 97:17-99:16, 111:8-22.)

14. JD admits that the administration "kept him [MP] . . . really well hidden from" the female students. (Exhibit B 58:4-10.)

15. Further, after discussing the matter with MP – who admitted to his conduct – and his parents, MP was given an in-school suspension. (Exhibit F 88:21-90:11, 101:9-103:23.)

16. Teachers and staff who interacted with MP were to keep a close eye on him during common periods of the day to monitor his behavior. (*See* Exhibit D 159:3-162:17; *see also* Exhibit F 204:7-206:1.)

17. Ultimately, neither MP's parents nor JD's parents wanted further involvement from child-protective services or police, so the matter was not pursued further with local authorities. (*See* Exhibit B 56:23-57:6; Exhibit F 113:19-115:7, 227:12-228:2.)

---

[2] William Bowen is the principal for Gwynedd Square Elementary School.

3

18. Nonetheless, the District took the matter seriously, and both Garrett and Divver were called to discuss the situation with District administration. (*See* Exhibit F 128:22-129:13.)

19. Garrett – who had been primarily responsible for the failure to report the interaction between JD and MP – was told in no uncertain terms that her handling of the situation was entirely inappropriate; she was told that any such occurrences should be immediately reported to the administration so that the authorities and parents could be notified. (Exhibit D 68:15-69:19, 116:3-117:18; Exhibit F 162:6-24, 168:4-16.)

20. Further, Garrett was placed on unpaid suspension, and she received failing marks on her teacher evaluation for that year. (Exhibit D 79:12-80:1, 107:22-110:8, 111:17-25, 153:17-154:3; Exhibit F 219:18-20, 221:10-222:20; Deposition Transcript of Cheryl McCue, pp. 319:4-320:12, 363:10-364:24, Aug. 25, 2021, attached hereto as **Exhibit G**[3]; Deposition Transcript of Curtis Dietrich, pp 202:5-19, 203:13-18, Aug. 11, 2021, attached hereto as **Exhibit H**.[4])

21. The District's response was entirely reasonable under the circumstances and consistent with general educational standards. (*See* Betsy Smith Report at 17-19, attached here as **Exhibit I**.[5])

22. At the end of that sixth-grade year, JD's mother decided that she wanted to ensure that JD and MP would not have to interact in middle school, so JD's mother asked that JD be permitted to attend Pennbrook Middle School. (Exhibit B 59:3-61:2; Exhibit C 24:19-25:5.)

23. The District granted that request, and JD and MP had no contact with each other for the entirety of their seventh- or eighth-grade years. (Exhibit B 69:23-70:17; Exhibit C 28:21-29:2.)

---

[3] Cheryl McCue is the human resources director for the District and was, at all times relevant to this matter, also the Title IX coordinator for the District.
[4] Curtis Dietrich is the superintendent for the District.
[5] Betsy Smith is the District's liability expert.

24. At the end of each school year, counselors and administrative personnel from the elementary schools meet with their counterparts in the middle schools to discuss notable student-related issues and any special circumstances that might be salient for the upcoming year. (Exhibit F 60:20-64:20; Deposition Transcript of Todd Bauer, pp 227:3-228:18, Aug. 26, 2021, attached hereto as **Exhibit J**.[6])

25. The students' cumulative files are also transferred to the new schools. (Exhibit F 54:1-21, 59:18-60:15; Deposition Transcript of Kathryn Small, pp. 176:22-177:12, Aug. 10, 2021, attached hereto as **Exhibit K**; Exhibit J 70:7-13.[7])

26. It is unclear whether information concerning JD and MP's interaction at Gwynedd Square Elementary School was given to Pennbrook, but because those two would not be attending the same school, the absence of such information would not have been relevant to JD's middle school education. (*See* Exhibit F 67:4-68:18, 229:11-23.)

27. When JD started her ninth-grade year, she attended both Pennbrook and North Montco Technical Career Center, which offers specialization vocational training to students, part time. (*See* Exhibit B 70:20-23.)

28. Shortly after she was accepted into the technical school program, however, she switched to attending school there full time as part of a pilot program. (Exhibit B 73:11-23, 81:18-82:21.)

29. Right when the school year began, JD saw MP in the hallway and discovered that they would be attending the same technical school, although they would not be part of the same

---

[6] Todd Bauer is an assistant superintendent for the District.
[7] Kathryn Small was previously the supervisor for special education with the District.

program. (Exhibit B 74:11-19, 75:3-13; Deposition Transcript of Dawn LeBlanc Dep. 10:13-22, Aug. 24, 2021, attached hereto as **Exhibit L**.[8])

30. After school the first day that JD saw MP, she went home and reported the sighting to her family. (Exhibit B 77:21-78:5; Exhibit C 34:23-35:13; Exhibit E 20:4-12.)

31. JD's mother immediately contacted the technical school staff to ensure that JD and MP would not have to interact. (Exhibit C 35:18-37:11.)

32. Although JD's mother wanted MP barred from the school and the program entirely, that was not a viable action. (*See* Exhibit B 79:12-80:17; Exhibit C 37:23-40:1; Exhibit H 51:13-52:15, 223:4-19, 257:8-12; Deposition Transcript of Kira O'Brien, pp. 17:1-18:13, Aug. 23, 2021, attached hereto as **Exhibit M**.[9])

33. Nonetheless, upon learning of the situation, JD began attending the technical school full time, and the staff there immediately put measures into place to ensure that JD and MP would not have to interact. (Exhibit B 81:10-13, 83:7-10; Exhibit L 10:13-11:11, 14:17-15:9, 23:23-25:16; Exhibit M 23:12-25:16.)

34. A safety plan was created so that the two students would be in different classes, travel through different hallways, and leave through different exists. (Exhibit B 83:18-84:9; Exhibit C 42:3-21; Exhibit L 28:18-30:20; Exhibit M 23:12-25:16, 67:10-14; Exhibit H 220:18-221:22.)

35. JD was also assigned a staff security member to ensure her safety, and a counselor was made available to her. (Exhibit B 84:10-22; Exhibit C 43:5-44:3; Exhibit M 10:8-12:17.)

---

[8] Dawn LeBlanc was the principal of the North Montco Technical Career Center.
[9] Kira O'Brien is an assistant program counselor at the North Montco Technical Career Center.

36. The safety measures enacted at the technical school appeared to have been successful because there were no reported direct interactions between JD and MP at that location for the rest of the school year. (*See* Exhibit B 83:11-17.)

37. JD's studies, however, were less successful, and at the end of her ninth-grade year, JD's teachers at the technical school reported that her grades were far below acceptable levels and she had behavioral issues. (*See* Exhibit L 32:5-34:16; Exhibit M 28:3-30:20, 69:8-70:9.) She would also fight against her safety plan. (*See* Exhibit B 84:23-86:1.)

38. Consequently, the technical school did not believe that her returning full time the following year would be in her best interest. (*See* Exhibit M 28:3-30:20.)

39. JD therefore started her tenth-grade year only half time at the technical school and half time at the neighboring North Penn High School. (Exhibit B 95:12-16; Exhibit C 49:3-8.)

40. Between ninth and tenth grade, JD's mother discussed with North Penn High School's administration the importance of keeping JD and MP apart. (Exhibit B 97:9-98:1; Exhibit C 49:17-50:10; Exhibit M 32:16-36:7; *see also* Exhibit K 209:1-19.)

41. In a meeting that included Kathryn Small ("Small"), who worked as an assistant director of special education for the District, JD's mother also made clear that while she wanted to ensure that JD and MP never interacted, only necessary personnel were to be told about the situation. (*See* Exhibit K 45:1-13, 52:19-54:20, 57:2-19.)

42. JD's mother specifically indicated that none of JD's teachers needed to know about the issue. (*Id.* 58:9-60:8, 106:3-21.)

43. Consequently, following the meeting, and in accordance with the instructions provided by JD's mother, Small told only Peter Nicholson ("Nicholson") – the high school's

principal – and the assistant principal about the issue. (*Id.* 58:9-60:18, 76:5-78:1, 81:20-83:22, 210:7-17.)

44. On August 23, 2018, Small pulled the course schedules for JD and MP and compared them to ensure that they had no overlapping classes; she found none. (Exhibit K 86:7-87:9, 88:11-21, 90:5-20, 152:16-21, 209:20-24.)

45. In the days between when Small checked the schedules and when classes started, there was a shift in the students' schedules, which resulted in JD and MP being placed in the same social studies class. (Exhibit B 100:12-102:3, 102:21-103:12; Exhibit C 59:24-60:8.)

46. Despite the fact that it was apparent immediately to JD that she and MP were in a class together, JD never reported that fact either to school officials or to her own mother. (*See* Exhibit B 103:18-105:17; Exhibit C 50:15-21.)

47. In October 2018 – more than a month later – JD was failing her social studies class, so her teacher was going to instigate a transfer to a lower level class. (*See* Exhibit J 298:18-300:21; Exhibit K 162:21-165:6.)

48. It was only after the decision to transfer JD was made that she elected to notify anyone that she was in a class with MP. (Exhibit B 111:3-9, 117:3-23; Exhibit C 50:22-51:11; Exhibit L 38:5-23, 45:11-23; Exhibit M 68:13-17; Exhibit J 243:16-245:13, 298:18-300:21; Deposition Transcript of Peter Nicholson, pp.154:20-155:21, Nov. 5, 2021, attached here as **Exhibit N**.[10])

49. JD indicated that during that period while the two were in the class together, MP had allegedly begun sexually harassing and assaulting her again. (Exhibit B 109:19-110:23, 111:15-113:5, 122:2-9; Exhibit L 45:11-23.)

---

[10] JD does not recall ever being told that she would be transferred out of that class. (Exhibit B 116:14-18.)

50. As soon as school officials learned that JD and MP were in the same class and of MP's alleged misconduct, they acted to rectify the situation. (*See* Exhibit L 54:20-55:12.)

51. JD was again permitted to return to the technical school full time. (Exhibit B 128:18-129:1; Exhibit C 56:22-57:20, 58:8-11; Exhibit L 66:22-67:9.)

52. JD's parents and the police were notified about MP's reported misconduct. (Exhibit B 120:12-121:20, 126:14-17; Exhibit C 51:20-52:18, 53:6-15; Exhibit M 41:6-20, 49:3-12; Exhibit N 69:20-71:16.)

53. Administration officials within the District interviewed teachers, students, and case managers. (*See* Exhibit J 258:23-259:15, 260:1-263:2, 275:3-14.)

54. The police inquiry did not result in any charges being pressed against MP. (Exhibit B 128:9-17; Exhibit M 53:8-23; *see also* Exhibit C 60:17-23.[11])

55. JD's mother did not complete the harassment form to provide additional information on the specifics of the allegations, which would allow administrators within the District to further investigate. (*See* Exhibit J 277:1-282:13.)

56. The District's response to both the 2014 and 2018 incidents were handled consistent with expected educational standards. (*See* Exhibit I at 19-24.)

57. Administration and faculty members receive periodic training on how to handle situations like JD's and were otherwise aware of how to do so. (Exhibit D 23:17-22, 59:7-13, 59:20-60:17, 78:23-79:3, 101:10-102:2; Exhibit F 25:7-26:9, 28:18-29:16, 30:20-31:7, 34:9-19, 35:21-36:11, 38:10-39:3, 40:20-41:9, 48:19-23, 200:5-201:1; Exhibit G 21:20-26:9, 29:5-30:1, 63:9-64:2; Exhibit H 61:19-64:20, 67:13-67:2; Exhibit J 31:4-20, 35:1-36:11, 57:19-64:19, 81:12-

---

[11] JD went on to attend tenth grade at Northbridge High School, which transitioned to homeschooling as the year progressed due to COVID-19. (Exhibit B 134:13-135:2, 135:12-139:23, 140:14-141:6; Exhibit C 77:4-8, 82:2-7.) JD eventually graduated from high school.

85:9, 88:20-90:21, 93:22-24, 109:18-111:20, 145:11-146:16, 192:13-193:17, 194:19-195:10, 197:2-7, 210:9-21; Exhibit K 23:9-26:22, 27:9-14; Exhibit M 41:13-20; Exhibit N 15:16-17:3, 35:7-15; *see also* Exhibit I at 12-15 (discussing the breadth and depth of the training given to the District's personnel).)

58. Further, administration and faculty receive policy guidance at the beginning of each year that outlines the requirements for handling and reporting child-related misconduct, harassment, and abuse. (Exhibit F 29:23-30:13; Exhibit G 340:20-342:19; Exhibit J 31:4-20, 57:19-64:19, 109:18-111:20, 200:4-24.)

Respectfully submitted,

*[signature]*

HENDRZAK AND LLOYD
MAUREEN A. JORDAN, ESQUIRE
Attorney ID #54629
*Attorney for Defendant*
*North Penn School District*
3701 Corporate Parkway, Suite 100
Center Valley, PA 18034
Tel.: (610) 709-8579
Fax.: (610) 709-8560
Email: maureen.jordan@zurichna.com

Dated: April 4, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE, by and through her next friend Julie Roe, <br><br> Plaintiff, <br><br> NORTH PENN SCHOOL DISTRICT, <br><br> Defendant. | Case No.: 2:20-cv-05142 |

**CERTIFICATE OF SERVICE**

I, MAUREEN A. JORDAN, ESQUIRE, hereby certify that service of the foregoing was automatically accomplished on all counsel of record through CM/ECF Notice of Electronic Filing, in accordance with the Federal Rules of Civil Procedure on this 4th day of April.

                                       **HENDRZAK & LLOYD**

                                       MAUREEN A. JORDAN, ESQUIRE
                                       Attorney ID # 54629
                                       *Attorney for Defendant,*
                                       *NORTH PENN SCHOOL DISTRICT*
                                       3701 Corporate Parkway, Suite 100
                                       Center Valley, PA 18034
                                       Tel: (610) 709-8579
                                       Fax: (610) 709-8560
                                       Email: maureen.jordan@zurichna.com

Dated: April 4, 2022