# EXHIBIT "D"

CERTIFIED COPY

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANE DOE,                          :
                                   :
              Plaintiff,           :  CIVIL ACTION NO.
                                   :  2:20-CV-05142
         vs.                       :
                                   :
NORTH PENN SCHOOL DISTRICT,        :
                                   :
              Defendant.           :

                    -    -    -

                July 28, 2021

                    -    -    -


        Remote via Zoom Oral Deposition of HOLLY

LYNNE GARRETT, conducted at the location of the

witness in Lansdale, Pennsylvania, before DONNA

ROSNER, a Certified Court Reporter and Notary

Public of the Commonwealth of Pennsylvania,

commencing at 10:05 a.m.


GOLKOW LITIGATION SERVICES, INC.
877.370.3377 ph| 917.591.5672 fax
deps@golkow.com

```
 1              A P P E A R A N C E S:

 2

 3   FREIWALD LAW, P.C.

 4   BY:  LAURA E. LAUGHLIN, ESQ.

 5        1500 Walnut Street, 18th Floor

 6        Philadelphia, Pennsylvania 19102

 7        Tel: (215) 875-8000

 8        Email: Lel@freiwaldlaw.com

 9   Attorneys for the Plaintiff.

10

11   HENDRZAK & LLOYD

12   BY:  MAUREEN A. JORDAN, ESQ.

13        3701 Corporate Center Parkway

14        Center Valley, Pennsylvania 18034

15        Tel: (610) 709-8560

16        Email: Maureen.jordan@zurichna.com

17   Attorneys for the Defendant.

18

19   WISLER PEARSTINE, LLP

20   BY:  KYLE J. SOMERS, ESQ.

21        460 Norristown Road, Suite 110

22        Blue Bell, Pennsylvania 19422

23        Tel: (610) 825-8400

24        Email: Ksomers@wispearl.com

25   Attorneys for the Defendant.
```

```
 1                    I N D E X

 2

 3   WITNESS                                    PAGE

 4   HOLLY LYNNE GARRETT                          4

 5        Examination by Ms. Laughlin             4

 6        Examination by Ms. Jordan             155

 7        Further Examination by Ms. Laughlin   161

 8

 9

10               E X H I B I T S

11

12   ID                  DESCRIPTION            PAGE

13

14            (NO EXHIBITS MARKED.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        -   -   -
 2               THE COURT REPORTER:  All parties to
 3     this deposition are appearing remotely and have
 4     agreed to the witness being sworn in remotely.
 5     Due to the nature of remote reporting, please
 6     pause briefly before speaking to ensure all
 7     parties are heard completely.
 8               Counsel, please state your
 9     appearance.
10               MS. LAUGHLIN:  Laura Laughlin, for
11     the Plaintiff Jane Doe.
12               MS. JORDAN:  Maureen Jordan, for the
13     Defendant.
14               MR. SOMERS:  Kyle Somers, for the
15     Defendant.
16                        -   -   -
17               HOLLY LYNNE GARRETT, 112
18     Zieglerville Road, Schwenksville, Pennsylvania
19     19473, having been first duly remotely sworn, was
20     examined and testified as follows:
21     EXAMINATION BY MS. LAUGHLIN:
22        Q.      Good morning, Ms. Garrett.  My name
23     is Laura Laughlin.  I represent Jane Doe in this
24     action that's been brought against the school
25     district.
```

1      You've been identified as a witness in some

2  of the documents and, from what I understand, has

3  some knowledge about what happened.  So that's

4  why you've been asked to give a deposition today.

5      Have you ever given a deposition before?

6     A.    No, I have not.

7     Q.    So I'm going to go over a few ground

8  rules that will make things go a little bit

9  easier today.  As you can see, we are all in the

10  Zoom format.

11      In the last probably year-and-a-half you've

12  become familiar with doing things over Zoom.  Is

13  that right?

14     A.    Yes.

15     Q.    So similar to that, if something

16  goes out or you can't hear me or there was a

17  break in the connection, just let me know, so

18  that I can restate it and you've heard everything

19  that's been said.  Okay?

20     A.    Okay.

21     Q.    Because we have Ms. Rosner, the

22  court reporter, on the screen, she's taking down

23  everything that is said and is going to create a

24  transcript from what is said today.  So I'd ask

25  that all of your answers be verbal.  Okay?

```
 1        A.      Yes.

 2        Q.      It's normal conversation to nod the

 3   head or say "Uh-huh."  So if I follow up to try

 4   and get something clearer, that's what I'm doing.

 5   I'm not trying to be rude.  All right?

 6        A.      Okay.

 7        Q.      In normal conversation, you may

 8   think you know where I'm going with my question

 9   and want to start answering it.  But I'd just ask

10   because Ms. Rosner is taking a transcript that

11   you wait until I'm done asking my question before

12   you start your answer.  And I'll try to wait

13   until you're done your answer before asking my

14   question.  Okay?

15        A.      Okay.

16        Q.      If I start to ask my next question

17   and you weren't done answering, just let me know,

18   and I'll let you finish.

19        A.      Okay.

20        Q.      If for any reason you need to take a

21   break today, just let me know, and you can do so.

22   I would just ask if there's a question pending

23   that you answer the question before you take your

24   break.

25        A.      Okay.
```

1      Q.      If I ask a question and you're not

2  sure what I'm asking, just let me know, and I'll

3  try to rephrase it so you do understand.  But if

4  you answer it, we're all going to assume that you

5  understood it since I gave you that instruction.

6      A.      Okay.

7      Q.      We're going to be talking about some

8  things that happened several years ago, around

9  the 2014-2015 school year.  So if you don't

10  remember something, you just let me know that.  I

11  don't want you to guess at anything.  Okay?

12      A.      Okay.

13      Q.      The only caveat to that, I would

14  say, is you can estimate.  If you don't know the

15  exact date something happened or the exact time

16  or exactly what was said, to quote it, but you

17  want to kind of estimate that, you just let us

18  know that that's what you're doing.  Okay?

19      A.      Okay.

20      Q.      Now, I understand you identified

21  yourself as "Ms. Garrett."  But in some of the

22  records, it's "Ms. Andrew."  Did you get married

23  at some point or change your name?

24      A.      Yes.  I got married in 2015.

25      Q.      So when we see "Holly Andrew" in

1    some of the records, that's you, just your maiden

2    name?

3         A.       It was from my first marriage.  My

4    maiden name is Wilson.

5         Q.       I understand.

6         Where do you work presently?

7         A.       At Gwynedd Square Elementary.

8         Q.       And how long have you worked there?

9         A.       Since 2008.

10        Q.       And have you had the same role since

11   you started in 2008 to the present at Gwynedd

12   Square?

13        A.       I was considered a "special

14   education teacher" when I first started in 2008.

15   And three years ago, I took the role of inclusion

16   facilitator.

17        Q.       So around 2018?

18        A.       Yes.

19        Q.       Can you just describe for me what

20   your duties and responsibilities are as the

21   inclusion facilitator?

22        A.       I support the other special

23   education teachers and general education teachers

24   in the building with inclusion practices.  So if

25   a child is struggling in a classroom, I help

1    maybe accommodate or modify a curriculum or

2    different assignments throughout the building.

3         Q.      Is it a more office-type position

4    versus being in the classroom with the children?

5         A.      No.  I still have a small caseload

6    of students, so I am still in the classroom.  But

7    they give me time to visit with every grade level

8    and teacher in the building.

9         Q.      Time each day, do you mean?

10        A.      No.  Typically, if we breakdown my

11   five days, three days are supposed to be an

12   inclusion facilitator, like 60 percent, and then

13   two days, which is about 40 percent, I'm

14   considered a special education teacher.

15        Q.      Did you have to take any additional

16   training or classes to take on the role of

17   inclusion facilitator?

18        A.      No, I did not.

19        Q.      Was that a job you applied for?  How

20   did it come up that you were switching from

21   special-ed teacher and taking on this additional

22   role of inclusion facilitator?

23        A.      Our inclusion facilitator that was

24   working at Gwynedd Square was getting transferred

25   to another building.  So my supervisor at the

1    time asked me if I wanted to take on the role of

2    inclusion facilitator.

3         Q.        And going back to your role as a

4    special education teacher, can you describe for

5    me exactly what your job duties and

6    responsibilities were in that role?

7         A.        I was the case manager for a group

8    of students.  Some years I would only have one

9    grade level.  Some years I would have two.  Some

10   years I would even have three grade levels.  And

11   I was responsible for implementing their IEP, and

12   also completing all of the paperwork that goes

13   along with the IEP.

14        Q.        Do you remember in the 2014 to 2015

15   school year how many grades you were responsible

16   for?

17        A.        I had three grade levels that year:

18   Second, fourth, and sixth.

19        Q.        You said some years you've had one,

20   some years you've had two, some years you've had

21   three.  Was the 2014 to 2015 school year the only

22   year you had three grades?

23        A.        No.  I had had three grade levels

24   before in previous years.

25        Q.        Had you had them since that time?

1    A.        I've had two grade levels since that

2    time.

3    Q.        I'll give you another instruction.

4    I may ask you questions that you just don't know.

5    You're not part of those conversations.  You

6    really don't know.

7         The question I'm going to ask you now, if

8    you don't know, it's okay to say that you don't

9    know.  Do you know why certain years you'd have

10   three grades and certain years you'd have one?

11   Do you know how that decision was made?

12   A.        It really depends on the amount of

13   IEP students in a grade level.  There are some

14   years where we have a larger population of IEP

15   students in a grade level.  So then we try to

16   just have one teacher, if there's a larger

17   number.  But if there's smaller numbers, then

18   sometimes special education teachers will get

19   placed in two or three grade levels.

20   Q.        In the 2014-2015 timeframe, do you

21   know how many special education teachers Gwynedd

22   had?

23   A.        I couldn't say exactly.  I would say

24   around six or seven.

25   Q.        Was that typical for the years you

1    worked there, from 2008 to the present?

2        A.    Yes.

3        Q.    How is your day typically broken up

4    in the 2014 to 2015 school year?

5        A.    I had to get into all of the grade

6    levels.  So my schedule was, you know, going from

7    second grade to fourth grade to sixth grade,

8    upstairs, downstairs.

9        Q.    And what exactly would that look

10    like?  Do you speak with the teachers or are you

11    actually interacting with the students, just so I

12    can get a better understanding of what your

13    day-to-day looked like?

14        A.    I might have gone into second grade

15    maybe for about 40, 45 minutes, and supported

16    with a language arts lesson.  The teacher and I

17    would have planned in the morning, and I would

18    have worked directly with the students.  Then

19    maybe gone upstairs for 45 minutes of a fourth

20    grade class, and then gone to sixth grade, then

21    maybe back to fourth grade.

22            I would try to get to the language

23    arts classes and the math classes for the grade

24    levels that I worked with.

25        Q.    And why was that?

1        A.        The core subjects where the children

2    needed the most support in reading and math.

3        **Q.        Do you recall how many students with**

4    **IEPs you had in the sixth grade in the '14 to '15**

5    **school year?**

6        A.        I don't remember.

7        **Q.        Can you estimate that at all?**

8        A.        With the three grade levels, I can't

9    say how many I had.  I'm not sure.

10        **Q.        Would the students that needed your**

11    **assistance, would they typically all be in the**

12    **same sixth grade classroom or would you also have**

13    **to rotate between teachers in the sixth grade?**

14        A.        We tried to group them together so

15    that my time was more useful.  So if I went into

16    a language arts class, my students with IEPs were

17    in that classroom.

18        **Q.        Okay.**

19        A.        So I didn't have to go to multiple

20    sixth grade classrooms.

21        **Q.        I understand.**

22    **So when you're going into the actual**

23    **classrooms, are you only working with**

24    **students/kids that have IEPs?**

25        A.        Some years, yes.  It really depends

1    on the amount of time that I'm able to get in a

2    classroom.  If I'm able to be there for the

3    entire block, then I would typically try to work

4    with the entire class.  But if my schedule

5    constricted me, and I was only able to be in

6    there like 45 minutes, then I would really -- I

7    know in the past, I would just try to work with

8    my IEP students, to give them the support that

9    they needed.

10        Q.      Can you just explain for me when

11   you're giving these students support that they

12   need, what exactly are you doing?

13        A.      So it really depends on what the

14   lesson is.  If we're doing a spelling lesson,

15   they may have different words.  So their lesson

16   may look a little bit different.  If we're doing

17   a reading lesson, I may even be using a different

18   story with them or using the same story, but more

19   guided and more support.  So, like, instead of

20   them just having to answer comprehension

21   questions, their comprehension questions would be

22   done with me, and I would guide them to a

23   specific page number to find the information that

24   they needed.

25        Q.      If all the students are in the

1    classroom together, if there's 25, 30 students,

2    and you're coming into just, say, Ms. Divver's

3    classroom, just say for example, do you have an

4    estimate of how many kids were in her class in

5    2014-2015?

6         A.    I can't say.  I'm not sure.

7         Q.    Do you think it was around, like, 20

8    or does that sound like too many?

9         A.    That sounds kind of low.

10        Q.    Okay.

11        A.    Like, 25 is a typical average.

12        Q.    Okay.  So if there's 25 students in

13   Ms. Divver's classroom, and you're coming in.

14   You have certain students that need that support

15   because they have IEPs, and they're the students

16   on your case list.  Are you just walking into the

17   class of 25 and sitting near the students that

18   need the assistance?  How does that work?

19        A.    Sometimes.

20              Mrs. Divver and I would plan

21   together.  So I knew what we were going to be

22   doing in those 45 minutes that I came in.  So if

23   the students were working in small groups, they

24   were purposefully placed into groups so that I

25   could check on certain students.  If we were

1    doing a whole group lesson, I may have already

2    modified the assignment.  So I would just walk

3    around to make sure that the students that were

4    on my caseload understood what they were doing,

5    if they had any questions.

6         Q.     So Mrs. Divver would present the

7    lesson to the class, and then you would go to

8    your specific students that were on your caseload

9    and offer assistance, if they understood, and

10   things like that?

11        A.     Correct.

12        Q.     Today we're going to be talking

13   about ▮▮▮▮ Henderson specifically.

14        But do you know whether ▮▮▮▮ ▮▮▮▮ was

15   also a part of your caseload?

16        A.     He was not.

17        Q.     Do you know whether he had an IEP or

18   was part of the special education program?

19        A.     He did not have an IEP in sixth

20   grade.

21        Q.     When you say "in sixth grade," did

22   he have one before, if you know?

23        A.     Actually, I couldn't say.  I'm not

24   sure.

25        Q.     Before you worked at Gwynedd in

1    2008, what did you do?

2         A.      I was a teacher in Carlisle Area

3    School District.

4         Q.      And what kind of teacher were you?

5         A.      Special education teacher.

6         Q.      In elementary school or in what

7    capacity?

8         A.      Middle school.  It was sixth,

9    seventh and eighth grade.

10        Q.      How long did you do that for?

11        A.      About seven years.

12        Q.      So from about 2001 to 2008, you were

13   at that school?

14        A.      Correct.

15        Q.      And why did you end up leaving there

16   to go to Gwynedd?

17        A.      My husband and I, at the time,

18   wanted to move back to this area, because this is

19   where we grew up.  When I first graduated

20   college, I wasn't able to get a job around here.

21   So we had moved out to Carlisle, for me to get my

22   teaching job, and then we wanted to move back to

23   the area.

24        Q.      And where did you go to college?

25        A.      My undergrad was Kutztown

1    University.

2         Q.      And what did you study there?

3         A.      It was a dual major, special

4    education and general education.

5         Q.      Did you go to grad school, as well?

6         A.      I did.  I got my master's degree

7    through Wilkes University.

8         Q.      I'm smiling because that's where I

9    went for undergrad.

10        A.      I did it online.

11        Q.      Okay.  And what was your master's in

12   at Wilkes?

13        A.      Education.

14        Q.      Just a master in education?

15        A.      Correct.

16        Q.      Was the teaching position you

17   started in 2001 in Carlisle, was that your first

18   job out of school?

19        A.      I substituted for a few months, but

20   yes, that was my first full-time job out of

21   school.

22        Q.      Were you substituting as a special

23   education teacher or just general?

24        A.      Substituting was pretty much

25   everything.

1     Q.      And, do you remember, when did you

2  graduate from Wilkes with a master's degree?

3     A.      I want to say 2012.  It might have

4  been 2013.

5     Q.      When did you start that program?

6     A.      I'm not really sure.

7             It took me a long time.  So I would

8  say maybe six or seven years prior to that.

9     Q.      Is there a normal course of how long

10  it takes if you go full time?

11     A.      I'm not really sure.

12     Q.      You said you were taking it online.

13  Were you working full time, and then doing the

14  online courses at night?

15     A.      Yes, I was.

16     Q.      Is that the only reason that it took

17  you six to seven years to complete the program?

18     A.      Yes.  That and I also have three

19  children.

20     Q.      That's a handful sometimes.

21     A.      Yes.

22     Q.      There wasn't any issue in the Wilkes

23  program with not being able to pass courses or

24  anything like that; right?

25     A.      No.  My GPA was very good.

```
 1        Q.        When did you graduate from Kutztown?
 2        A.        2001.
 3        Q.        During your training at Kutztown or
 4   Wilkes, do you recall ever receiving any training
 5   on Title 9?
 6        A.        No, not that I can remember.
 7        Q.        Working at Gwynedd, is your actual
 8   employer the North Penn School District?
 9        A.        Yes.
10        Q.        When you started working at Gwynedd
11   through North Penn School District, do you recall
12   getting any kind of training to take on the role
13   of a special education teacher at Gwynedd?
14        A.        I went through the mentor program.
15        Q.        And what is that?
16        A.        It's for new teachers, like new
17   teachers into the district, and also new teachers
18   that are newly graduated.
19                  I didn't have to do the full mentor
20   program, because I had already been teaching for
21   several years.  But I do know we had classes,
22   like, once a month just on practices and, like,
23   things about the North Penn School District.
24        Q.        So it was one time a month you would
25   have this mentor program.
```

1        Who ran the mentor program?

2        A.        I don't remember.

3        Q.        Did you have a specific mentor that

4    you were assigned to?

5        A.        I know I did have one teacher that

6    would run the program, and she would come into my

7    room sometimes to do visits with me.

8        Q.        Do you remember who that was?

9        A.        Yes, I do remember her.

10              But I don't know who ran the

11    program.

12        Q.        What was the teacher's name that was

13    kind of popping into your room and working with

14    you?

15        A.        Ann Warren.

16        Q.        Was she another special education

17    teacher at Gwynedd?

18        A.        No.  She was like a teacher on

19    special assignment at the time.  So she was

20    helping with the mentor program.

21              She's now back in the classroom.

22        Q.        This one time a month, did it last

23    for the full first year that you were employed?

24        A.        Yes.

25        Q.        And can you describe for me what

1    these once-a-month sessions would be like?

2         A.       They would be a different --

3    typically it would be a different topic every

4    month.  So sometimes we would dive into, like,

5    the language arts curriculum or sometimes the

6    math curriculum.  They would do information on,

7    like, technology, different technology, things

8    that we could use within the classroom.

9    Sometimes we would just talk about struggles we

10   were having in the classroom and try to

11   brainstorm suggestions or different things to

12   help the newer teachers.

13        Q.       Was there any documents or materials

14   that were provided to you as part of these

15   once-a-month sessions?

16        A.       I mean, I'm sure that there was

17   paperwork that was provided.  Like, when we were

18   diving into the language arts program, I'm sure

19   they gave us the scope and sequence for language

20   arts.

21                 I don't really remember the

22   paperwork I received during that program.

23        Q.       Safe to say you don't have it

24   anymore, whatever paperwork you might have

25   received?

1      A.      Correct.

2      Q.      And do you recall whether any of the

3  once-a-month trainings were on Title 9?

4      A.      I don't know.

5      Q.      Do you know whether, prior to the

6  2014-2015 school year, whether you had ever

7  received any training from the district on Title

8  9?

9      A.      Not that I remember, no.

10      Q.      I know it's a little difficult, but

11  I'm asking you questions what you knew back then.

12  So if you just found out last month what things

13  were, I'm really focused on what your knowledge

14  was back in the 2014-2015 timeframe.

15      Did you know what Title 9 was back then?

16      A.      No.

17      Q.      As part of the training you received

18  from the district, do you recall ever receiving

19  training on sexual harassment?

20      A.      I know that we have to do trainings

21  for that, like, online where you watch a video

22  and then maybe answer some questions.

23      Q.      When did you have to do that, if you

24  recall?

25      A.      I think we have to do it every

1   couple of years.

2       Q.      Do you know when that was

3   implemented?  When that started?

4       A.      I don't know.

5       Q.      Do you know whether, prior to the

6   2014-2015 school year, you were watching those

7   videos and answering questions?

8       A.      I can't say exactly, but -- I'm not

9   sure.

10      Q.      The training that you received, can

11  you give me a general sense of what it covered?

12      A.      What training?

13      Q.      The sexual harassment where you said

14  you would watch a video and answer some

15  questions.

16      A.      Not really.

17              It would usually be lumped in with

18  several other trainings, like maybe child abuse.

19  I know -- sometimes I feel like we have to do a

20  lot of those types of videos.

21              I don't feel comfortable to speak to

22  a sexual harassment one.  I'm not sure.

23      Q.      You don't feel comfortable because

24  you're not sure whether you saw one or watched

25  one, you mean?

1    A.    Yeah.  Correct.

2    Q.    When you said that you watched one

3  on child abuse, you think, do you know around

4  when that was?

5    A.    I know I just did one this past

6  year.

7          I'm not sure what the requirements

8  are, like how often it has to be done.

9    Q.    In the child abuse, do you know

10  whether you had watched a video like that prior

11  to the 2014-2015 school year?

12   A.    I'm not sure.

13   Q.    The child abuse video that you

14  recently saw, does it also cover, like,

15  child-on-child-type incidents or is it more

16  focused on adult-to-child abuse and things to

17  look out for?

18   A.    More focused on things to look for,

19  like signs and symptoms to look for.

20   Q.    Like if a child is being abused at

21  home or something?

22   A.    Yes.

23   Q.    Do you know who makes the video or

24  is it, like, an outside company that you're

25  watching videos through?

1       A.      I'm not really sure.

2       Q.      **Where do you watch the videos?**

3       A.      Typically we're sent a link through

4  our district email when we have to do required

5  trainings.  And then everything we need to get --

6  if we need a password or anything to get onto a

7  training, everything is in the email from the

8  district.

9       Q.      **Do you recall prior to the 2014-2015**

10  **school year ever receiving training on reporting**

11  **within the Gwynedd School?**

12      A.      I mean, I don't exactly remember if

13  I had a specific training, but I'm sure we did.

14      Q.      **Do you recall what the reporting**

15  **requirements were or what you were trained on or**

16  **trained to do back then?**

17      A.      I know that it's changed, like,

18  recently.  As mandated reporters, we are the ones

19  that call Children and Youth.

20              Previously we would go to our

21  building administrator to make a claim or if

22  something was -- if we felt that a phone call

23  needed to be made.

24      Q.      **Who is the building administrator?**

25      A.      The school principal.

1    Q.       Mr. Bowen?

2    A.       At the time, yes.

3    Q.       A couple of years ago it changed to

4  somebody else; right?

5    A.       Yes.

6    Q.       Did you have training from the

7  district on what was reportable to the

8  administrator or what wasn't?

9    A.       Not that I can remember.

10    Q.       Prior to the 2014-2015 school year,

11  had you ever been trained on consent for

12  children, like children at the elementary school?

13    A.       Not that I can remember.

14    Q.       Prior to the 2014-2015 school year,

15  did you have any understanding from any other

16  source of consent for children?

17    A.       Not that I can remember.

18    Q.       Prior to the 2014-2015 school year,

19  had you ever seen any of the North Penn School

20  Board policies?

21    A.       I'm sure that they were sent to us,

22  again, through our district email.

23    Q.       Just sending all of the policies or

24  the policy manual or something, you mean?

25    A.       I can't really speak to that.  I'm

1    not sure.

2        Q.        Do you remember ever receiving

3    training on any of the policies where the policy

4    is shown; they go through it with you?

5        A.        The school board policy?  No.

6        Q.        Specifically there's one on

7    harassment.  Do you recall ever receiving any

8    training on the school board's harassment policy;

9    like what constitutes harassment; what to do if

10   there is harassment?

11       A.        I don't think so, no.

12       Q.        Other than the policy you think

13   maybe -- or policies being sent to you -- was it

14   sent to all of the employees of the school, you

15   think?

16       A.        Yes.

17       Q.        Other than that, just being sent all

18   of the policies, do you know whether the policies

19   were kept anywhere in the school or that you

20   could access them in some way?

21       A.        I'm sure on the district website,

22   I'm sure we could access them that way.

23                 I'm not really sure.

24       Q.        If you had a question about a school

25   policy or something like that, do you know who

1    you could go to about something like that?

2         A.        I would probably go to a building

3    administrator, meaning my building principal or

4    either my special education supervisor.

5         Q.        And who was the special education

6    supervisor?  Was that Dr. Santoro?

7         A.        She's considered the director of

8    elementary education.

9                   The building supervisors are for

10   special education.  So I think at the time it was

11   Tiffany D'Amore.

12        Q.        And did you ever go to -- whether it

13   was the principal or Ms. D'Amore at any time with

14   any questions about policies at the school?

15        A.        Not that I can remember, no.

16        Q.        So I'm going to be asking you

17   questions about conversations you may have had.

18   But just to clarify, I'm not asking you questions

19   you may have had with Ms. Jordan or Mr. Somers or

20   any other lawyer that you may have spoke to.

21   Okay?

22        A.        Okay.

23        Q.        In preparation for the deposition

24   today, did you review any documents?

25        A.        Just a few that were in my employee

 1    file, I guess.

 2         Q.      Did you review your entire employee

 3    file?

 4         A.      No, I did not.

 5         Q.      How do you know that the documents

 6    you reviewed were from your employee file?

 7         A.      When Maureen gave me the --

 8         Q.      I'm sorry.  Let me just pause for a

 9    second.  I don't want to ask anything about what

10    Maureen, your counsel, may have said to you or

11    given to you.  If that's the answer and you only

12    know because she told you, I don't want to know

13    that.

14         But if it's something like, "Oh, well, I've

15    seen my employee file, and these are the things

16    that were in it," or because of this incident

17    we're here to talk about today, those were in the

18    file.  If it's something outside of your

19    conversations with her, you can tell me about it.

20         But the conversations that you had with your

21    lawyer are protected.  So I can't ask you about

22    that.  I'm trying to avoid asking you about that.

23         A.      Okay.

24         Q.      Outside of your conversation with

25    Ms. Jordan, is there a reason that you believe

1    that they came from your employee file?

2        A.       Outside of my conversations with Ms.

3    Jordan, I have no idea.  I didn't review anything

4    from my employee file.

5        Q.       **You didn't review the employee file**

6    **itself?**

7        A.       Correct.

8        Q.       **Do you remember what the documents**

9    **were that you reviewed?**

10       A.       The behavioral write-up slip that I

11   did in the 2014-2015 school year, and then some

12   documentation on meetings that were held with me.

13       Q.       **Like notes from the meetings?**

14       A.       Yes.

15       Q.       **When you say "the behavioral**

16   **write-up slip," do you mean the office referral**

17   **form?**

18       A.       Yes.

19       Q.       **You used the phrase "behavioral**

20   **write-up slip."  Is that what you would normally**

21   **call it in school?**

22       A.       I don't know a specific term.  I

23   guess "office write-up, behavior slip."  There's

24   different terms for it.

25       Q.       **Do you have an independent**

 1    recollection -- before I ask you that, other than

 2    speaking with your counsel, did you speak with

 3    anybody else before your deposition today?

 4         A.    No, I did not.

 5         Q.    Do you have independent memories,

 6    before you ever even looked at the documents in

 7    preparation for your deposition, of the incident

 8    that happened with ████ and ████ in the

 9    2014-2015 school year?

10         A.    A little bit.  It was a long time

11    ago.

12         Q.    Can you tell me what you remember

13    from that time, your independent memory of that?

14         A.    Like I had said earlier, I knew that

15    I worked with three grade levels that year.  It

16    was our first year with full inclusion at Gwynedd

17    Square.  So I was pushing into all of the

18    classrooms.  I no longer had a self-contained

19    classroom.

20         Q.    What does it mean when you said it

21    was the "first year of full inclusion"?  What

22    does that mean?

23         A.    We used to have learning support

24    classrooms where students that qualified for

25    reading would come into my room.  They would

1    leave the regular education classroom and come

2    into my room for reading or leave the regular

3    education classroom and come into my room for

4    math.

5               So 2014-2015 school year was the

6    first year that we no longer had the learning

7    support classrooms.

8         Q.      So then you're actually -- like you

9    were talking about earlier -- going into a class

10   of 25 people and just trying to assist the people

11   that are on your caseload in that class?

12        A.      Correct.

13        Q.      When it became full inclusion, would

14   the students on your case list, would they all be

15   seated together or were they spread out

16   throughout the room and you're going throughout

17   the room to these students?

18        A.      They would typically be spread out

19   throughout the room.

20        Q.      And I apologize if I asked you this

21   before, but do you recall or can you estimate for

22   me about how many students you had in Ms.

23   Divver's class that year?

24        A.      I can't really say.  I don't

25   remember.

1    Q.       Would it have been, like, more than
2    three?
3    A.       Probably.
4    Q.       Did you have a typical amount of
5    students that would be in a particular class?
6    A.       Like I said, it really depended on
7    the year.  Some years had more IEP students in a
8    grade level and other years had less.  I mean,
9    there's been some years where I've had 17
10   students in one grade level.
11   Q.       Okay.  So it can range from 17 to
12   about what?
13   A.       I can't really say an average.  It
14   just depends on the year.
15   Q.       So when you're going into the full
16   inclusion classroom, did you get any kind of
17   training in order to kind of merge from what you
18   had done before with having a separate learning
19   support class and now being everything full
20   inclusion?
21   A.       At the beginning of that school
22   year, we did have -- one of our professional
23   developments was on moving to inclusion.
24   Q.       How was it moving to full inclusion
25   from having your own separate space that you

1    could take these kids to?

2       A.       The first year, it was tough.  It

3    was a big adjustment.

4       Q.       **Tough in what ways?**

5       A.       Especially for the students, because

6    they had been used to coming out and now they

7    were staying in the classroom.  So dealing with

8    some of those anxieties.

9                And then also just switching the way

10   that I taught.  I no longer had my own classroom.

11   I had to plan with multiple teachers.

12      Q.       **Was it overwhelming that year,**

13   **switching from what you had done to this new way**

14   **of doing things?**

15      A.       Yes.  I would say yes.

16      Q.       **You could tell by your laugh and**

17   **your reaction that it must have been a rough year**

18   **going from what you had done for all those years**

19   **to now everyone being in the same room.**

20      A.       Yes.

21               It's normal now.  It's our norm now.

22   But yes, the first year was tough.

23      Q.       **Were there times where, like, Mrs.**

24   **Divver would step out, and it would kind of just**

25   **be you in the classroom with all the students?**

```
 1        A.       I mean, I'm sure that happened, if
 2   someone had to use the restroom or if they got a
 3   phone call or something and had to step out.
 4        Q.       I just started asking what
 5   independent memories you had of the incident or
 6   surrounding the incident in November of 2014.
 7   That's when the incident was.  Do you recall
 8   that?
 9        A.       Yes.
10        Q.       You started out by saying it was
11   your first year in full inclusion; you no longer
12   had your own separate classroom; you're doing
13   everything in the room with all of the students
14   now.  Tell me the next thing that you remember.
15        A.       About the day that I wrote up the
16   behavioral slip?
17        Q.       Sure.  Yes.
18        A.       It was in a language arts class in
19   Mrs. Divver's room.  And I remember the students
20   were working in small groups.  So there were
21   groups of students all around the classroom.  And
22   I remember where the two students were seated, in
23   the back of the room.  And I was working on the
24   front rug with another group of students,
25   continuously scanning the room, looking around,
```

Holly Lynne Garrett

1   when I noticed that both of the students in the

2   back of the room had their hands under the table,

3   and ████ was starting to put his hand up

4   ████ sweatshirt.  So I pointed at the

5   students.  They both made eye contact with me.

6                   I called them out into the hallway.

7   And I think I was just shocked at the time.  I

8   asked them what were they doing.  Reading my

9   write-up that I did, "████ did not say a word.

10  ████ denied that anything had happened."

11                  And we did go back into the

12  classroom after that.  And I remember I wrote up

13  a behavior slip, office slip -- whatever we're

14  calling it -- I wrote one up for ████ and for

15  ████

16      Q.      So two different slips?

17      A.      Two different slips, correct.

18      Q.      Prior to this day, I assume you had

19  known ████ before?

20      A.      I also had ████ in fifth grade.  I

21  was her case manager in fifth grade when I had my

22  self-contained classroom.

23      Q.      And fifth grade, was that the first

24  time you had interactions with ████ or she had

25  been on your caseload?

```
 1        A.      Yes.  I didn't have her previous to
 2   fifth grade.
 3        Q.      At the time when this incident
 4   happened that you just recalled for me, were you
 5   the only teacher in the room?
 6        A.      I was.  Mrs. Divver had stepped out,
 7   I think, to use the bathroom.
 8        Q.      I don't have the benefit of seeing
 9   what the classroom looked like.  But can you kind
10   of describe for me how big it was, where is
11   everything, so I can get kind of a visual picture
12   of where you were, where          and          were?
13        A.      I'm not sure of room dimensions.
14                Where the classroom door is, when
15   you first walk in, there was a rug in the front
16   of the room by the whiteboard.  And then the
17   student desks were kind of grouped around.  And
18   there was a table, a smaller table, towards the
19   back of the room, near the sink.
20        Q.      Can you estimate for me how far it
21   was from the rug area to the back of the room?
22        A.      Fifteen feet.
23        Q.      And when you described you were on
24   the rug area with students, is that the front of
25   the room?
```

Holly Lynne Garrett

Page 39

```
 1      A.      Correct.
 2      Q.      And then the table that        and
 3         were at -- were they at a table?
 4      A.      Yes.
 5      Q.      And that was the table you described
 6   at the back of the room?
 7      A.      Yes.
 8      Q.      Were there other students at the
 9   table with them?
10      A.      No.
11      Q.      Do you know how they ended up at
12   that table?  Was that their assigned seat?
13      A.      I'm pretty sure they didn't have
14   assigned seats, because some students were
15   sitting on the floor; some students were sitting
16   on the rug; some students were at desks; some
17   students were at tables.
18      Q.      Were they, at this point in the day,
19   were they working together on some type of
20   assignment that was given?
21      A.      Yes.  I don't remember what the
22   assignment was, but they were working with
23   partners.  Everyone was partnered up in the
24   class.
25      Q.      Were the partners assigned by the
```

Golkow Litigation Services  |  877.370.DEPS

1    teacher or somebody or did the kids pick their

2    own partners?

3         A.    I don't remember.

4         Q.    Was there like a typical way of

5    doing things in Ms. Divver's class?

6         A.    Honestly, I don't remember.

7         Q.    Now, you said as you're kind of on

8    the floor with the students on the rug, working

9    with them, and you're scanning the room, you said

10   you noticed both students had their hands under

11   the table.  You're referring to ▮▮▮▮ and

12   ▮▮▮▮▮ right?

13        A.    Correct.

14        Q.    Surrounding this table, were there

15   other students close by or was the table kind of

16   a little bit on its own?

17        A.    No.  There were other students close

18   by.

19        Q.    And you said that you noticed both

20   the students had their hands under the table.

21   What exactly do you mean?  Where were their

22   hands?

23        A.    Just under the table.

24        Q.    Were they both sitting in chairs?

25        A.    Yes.

```
 1      Q.      Were they sitting next to each

 2   other; across from each other?

 3      A.      They were sitting next to each

 4   other.

 5      Q.      From your vantage point, were you

 6   able to see the front of their bodies or the

 7   side?

 8      A.      The front.

 9      Q.      So you're, like, looking directly at

10   both of them that are facing you?

11      A.      Correct.

12      Q.      So you see all four hands underneath

13   the table?

14      A.      Correct.

15      Q.      Where were the hands?  What were the

16   hands doing that you could see?

17      A.      Touching each other's hands.

18      Q.      Like, holding each other's hands?

19      A.      Yeah.  Yes.

20      Q.      And then you saw from that ▆▆▆▆▆

21   hand start to go up ▆▆▆▆▆ shirt?

22      A.      Correct.

23      Q.      Was it the front of her shirt?

24      A.      Yes.

25      Q.      And then you said at that point, you
```

1   pointed to them in the back of the room?

2        A.      I made eye contact with them.

3        Q.      As █████████ hand is going up

4   █████████ shirt, were you able to see the look on

5   █████████ face at all?

6        A.      I don't remember.

7        Q.      What about the look on ████████████

8   face?  Were you able to see what he looked like

9   at the time?

10       A.      I don't remember.

11               I feel like it happened so fast.

12       Q.      So you looked at them and pointed at

13   them.  And then did you say anything?  You said

14   you called them out into the hallway.

15       A.      Yes.

16       Q.      What did you say?

17       A.      I don't remember my exact words.

18       Q.      Had you ever been in a situation

19   similar to this prior to this occasion?

20       A.      No.  No.  Definitely not.

21       Q.      Do you recall ever receiving any

22   kind of training from the North Penn School

23   District on a situation where one student is

24   touching another student?

25       A.      Not that I can remember.

1    Q.    So you called them both out into the
2  hallway.  And I think you said you were "shocked"
3  by this scenario.
4    A.    Yes.
5    Q.    When you called them out to the
6  hallway, were the rest of the students in the
7  classroom or did you get anybody to cover for you
8  while you pulled them out?
9    A.    By this point Mrs. Divver was back
10 in the room.  She had only run to the bathroom.
11   Q.    So by the time you're pulling the
12 kids out, ▓▓▓ and ▓▓▓ Mrs. Divver was back
13 in the classroom?
14   A.    Correct.
15   Q.    Did you say anything to Mrs. Divver
16 at the time while you're pulling these two
17 particular kids out?
18   A.    Yes.  I know that we had had a
19 conversation, because I had given her the copies
20 of the office referral -- the behavior slips that
21 I wrote up.
22   Q.    But you didn't write up the behavior
23 slips at this point; right?
24   A.    After I spoke with the two students,
25 I wrote the slips up, and then I gave them to

```
 1   Mrs. Divver.
 2        Q.      When you're in the process of
 3   pulling the kids out, though, I'm asking did you
 4   have any conversation with Mrs. Divver at that
 5   point?
 6        A.      I don't know if I spoke to her
 7   before I pulled them out or after I pulled them
 8   out, but I know that I made her aware of the
 9   situation.
10        Q.      So why did you pull out both kids at
11   the same time?
12        A.      I don't know.
13        Q.      You said you pulled them out, and
14   you asked them what they were doing?
15        A.      Probably something like that.
16        Q.      Do you recall saying anything else
17   to them?
18        A.      Not really.
19        Q.      And you said when you asked what
20   were they doing,          didn't say a word; right?
21        A.      Correct.
22        Q.      What was the look on his face?  Was
23   he looking at anybody?
24        A.      It was so long ago, I don't want to
25   speak to his facial expressions.  I'm not really
```

Holly Lynne Garrett

Page 45

1    sure.

2        Q.      What about for ▆▆▆▆    Do you

3    remember anything about her, her body language?

4        A.      I'm not sure.

5        Q.      When you were speaking to them, were

6    their backs up against a wall or -- describe for

7    me where you were in comparison to where the two

8    of them were.

9        A.      We were just right outside the

10   classroom door, in the hallway.  They were not up

11   against a wall.  They were just standing in the

12   hallway.

13       Q.      When you said "What were you doing,"

14   did either of them say what was happening?

15       A.      Like I said, ▆▆▆▆ did not say a

16   word, and ▆▆▆▆ said what -- like, nothing had

17   happened.

18       Q.      ▆▆▆▆ said what?

19       A.      I'm not really sure.  I don't want

20   to say words, because it was so long ago.

21              But I know she said nothing had

22   happened.  She denied anything had happened.

23       Q.      Do you remember asking her

24   specifically if something happened?

25       A.      I'm not really sure.  I don't want

Golkow Litigation Services    |    877.370.DEPS

1    to speak to our conversation, because I don't

2    remember words that I used.

3        Q.      And then after this interaction,

4    what happened next?

5        A.      Well, I'm assuming we went back into

6    the classroom.  And then I know I wrote up the

7    two office referral slips.  And then I gave them

8    to Mrs. Divver.

9        Q.      Since you reviewed some of the notes

10   you saw, I would assume that there was also a

11   notation of you saying to these two kids that you

12   "won't tell their parents if it doesn't happen

13   again."  Do you remember that?

14       A.      I don't remember bringing the

15   parents in at all.  I don't remember saying

16   anything about the parents.

17       Q.      Do you remember telling them that if

18   this doesn't happen again, you won't go to the

19   principal?

20       A.      I may have said that.

21       Q.      When I asked you the question about

22   "not telling their parents," do you deny that you

23   said that or you just don't remember?

24       A.      I'm not sure.

25       Q.      Why would you have told these two

1    students that if it didn't happen again, you

2    wouldn't go to the principal?

3         A.        At the time I just felt like it was

4    two kids being silly; it was a mutual thing

5    between the two of them.

6         Q.        You thought that a boy putting his

7    hand up the girl's front of her shirt in sixth

8    grade was them "being silly"?

9         A.        No.  That doesn't sound right.

10             Honestly, I don't know.  I don't

11   know.

12        Q.        At the time when you were telling

13   these two kids that you wouldn't go to the

14   principal -- or whether it was the parents or the

15   principal, you wouldn't go to them if it didn't

16   happen again, what was your mental state at that

17   time?  Why would you tell them that?

18        A.        ████ and ████ were friends.

19   They were working together that day.  They

20   continued to be friends after this situation.

21   They would play together at recess.

22             I can't really speak to my mental

23   state.  I don't really remember.

24        Q.        When you say "they were friends,"

25   did ████ ever tell you that they were friends?

1       A.      I just remember different situations

2   in recess with ▇▇▇▇ wanting to play with

3   ▇▇▇▇ wanting to get his phone number.

4       Q.      **She told you these things or how do**

5   **you know this?**

6       A.      ▇▇▇▇    ▇▇▇▇ did that year, yes.

7       Q.      **Do you know when in the school year**

8   **that was?**

9       A.      In the spring, at recess time, I

10  remember there was some documentation about

11  ▇▇▇▇ on the playground with ▇▇▇▇

12      Q.      **Are you referring to Ruth Divver's**

13  **summary of when they were on the playground**

14  **together?  Is that what you're talking about?**

15      A.      Yes.

16      Q.      **Do you remember something**

17  **independent of that document?**

18      A.      Like a side conversation or

19  something?  No.

20      Q.      **I'm just asking if what you're**

21  **saying is because you just reviewed the paperwork**

22  **and one of the pieces of paper that you reviewed**

23  **was Ruth's statement about "In the spring, when**

24  **the kids were playing on the playground," or if**

25  **there's something independent you remember about**

Holly Lynne Garrett

normal

1    it?

2        A.        Nothing independent.

3                  And I don't have Mrs. Divver's

4    statement from the playground incident.

5                  But I do remember that year.  I just

6    remember ████ wanting to play with ████ on

7    the playground.

8        Q.        At the time when you saw this

9    interaction in the back of the classroom and you

10   pulled them out, was there any part of you that

11   was thinking that this might be some type of

12   sexual assault?

13       A.        At the time, no.

14       Q.        I'm not asking for what your

15   impression is now.

16       But in the months following the incident,

17   did you think at all that what you had seen,

18   thinking back on it, was sexual assault?

19                 MS. JORDAN:  In what timeframe?

20                 MS. LAUGHLIN:  In that school year.

21   I'm not asking for right now looking back.

22                 MS. JORDAN:  Prior to learning of

23   the April incident?

24                 MS. LAUGHLIN:  We can do prior to

25   the April incident.

```
 1                THE WITNESS:  Then no.
 2   BY MS. LAUGHLIN:
 3        Q.       What about following the April
 4   incident?
 5        By "April incident," I mean when ▇▇▇▇ had
 6   touched another girl inappropriately.
 7        A.       That's when I brought the
 8   information to my building principal and guidance
 9   counselor.
10        Q.       At some point during that, when you
11   had meetings and stuff, did you come to any
12   realization that what had happened in November
13   was sexual assault?
14                MS. JORDAN:  What timeframe?
15                MS. LAUGHLIN:  The April timeframe.
16                MS. JORDAN:  So after learning of
17   the other incident?
18                MS. LAUGHLIN:  Correct.  Yes.
19                THE WITNESS:  What was the question
20   again?
21   BY MS. LAUGHLIN:
22        Q.       The school year from 2014 to 2015,
23   by the end of that school year had you looked
24   back on the incident and realized it was sexual
25   assault?
```

1        MS. JORDAN:  Note my objection to

2  the form of the question.

3        You can answer.

4        THE WITNESS:  No.

5  BY MS. LAUGHLIN:

6     Q.     Did you think at all by the end of

7  the school year that what was happening in

8  November was sexual assault?

9        MS. JORDAN:  Note my objection to

10  the form of the question.

11        You can answer.

12        THE WITNESS:  No.

13  BY MS. LAUGHLIN:

14     Q.     By the end of the school year, did

15  you view the incident in November as something

16  other than "kids being silly"?

17     A.     I don't know.

18     Q.     You're not sure if you still

19  believed that it was them "being silly"?

20     A.     I don't know.

21     Q.     I'm using your words that you had

22  used to describe the November incident.

23        By the end of that school year, would you

24  still have used those same words to describe what

25  had been happening in November?

1    A.    No.  I don't think those words are
2  appropriate to say.
3    Q.    By the end of the school year, what
4  would you have called what was happening -- what
5  had happened in November?
6    A.    I don't know.
7          I don't think it was sexual assault.
8  Because I do feel that I caught it immediately,
9  and it didn't happen again.
10   Q.    From your training and experience,
11 do you know what sexual assault was back then?
12 Could you define it?
13         MS. JORDAN:  Note my objection to
14 the form of the question.
15         You can answer it, if able.
16         THE WITNESS:  I don't think I know a
17 specific definition.
18 BY MS. LAUGHLIN:
19   Q.    Do you know back then what
20 constituted sexual harassment?
21   A.    I don't know.
22   Q.    You said when you brought the kids,
23 ▇▇▇ and ▇▇▇ back into the classroom -- or
24 possibly before -- but at some point you had a
25 conversation with Mrs. Divver.  Can you describe

1    for me, from your memory, what that conversation

2    was; what it entailed?

3         A.        I don't remember the conversation.

4                   I probably stated to her what was on

5    the office referral slip.

6         Q.        Did you fill out the office referral

7    slip before you had any verbal conversation with

8    Mrs. Divver?

9         A.        I don't remember.

10                  It may have been at the same time.

11        Q.        Why did you have a conversation with

12   Mrs. Divver about it?

13        A.        She was technically considered the

14   "homeroom teacher."  Because, like I said, I

15   would leave and go to multiple grade levels and

16   multiple classrooms.  So I worked with a lot of

17   regular education teachers that year.

18        Q.        At this time, in November, were you

19   aware that          had a pre-history of being

20   sexually abused when she was younger?

21        A.        I did not know that.

22                  MS. LAUGHLIN:  I'm going to show you

23   a document quickly by sharing my screen.

24   BY MS. LAUGHLIN:

25        Q.        Can you see the document in front of

```
 1    you?
 2                    MS. JORDAN:  We can.
 3                    THE WITNESS:  Yes.
 4                    MS. LAUGHLIN:  This is Bates number
 5    1019 of North Penn's production, for the record.
 6    It's notes from Dr. Betty Santoro.
 7    BY MS. LAUGHLIN:
 8        Q.      And at the bottom of page number 2,
 9    it says, "Both parents were gravely concerned
10    that Ms. Andrew and Ms. Divver were both aware of
11    the November" -- I'm sorry, I didn't mean to read
12    that part.
13        Number 1, it says, "        is a victim of
14    child abuse that occurred when she was
15    five-years-old.  This occurred in the
16    neighborhood.  The school counselor and Ms.
17    Andrew were aware of the child abuse and had
18    worked with the parents on supports throughout
19    the years.  The student currently has an IEP."
20        Do you disagree with Dr. Santoro that you
21    were aware that        had been sexually abused?
22        A.      Yes, I disagree.
23                    I remember Mrs. Santoro asking me,
24    in a meeting, if I was aware of previous child
25    abuse.  And I made it very clear to her that I
```

 1    did not know that that had previously happened.

 2    It was not a part of her IEP.

 3        Q.      So you didn't work on supports with

 4    her through the fifth and sixth grade year

 5    involving that?

 6        A.      I supported her through her IEP for

 7    academics, but not to support her through help

 8    with previous child abuse.

 9        Q.      What about in terms of anxiety?  Do

10    you remember her ever -- you assisting her with

11    symptoms of anxiety?

12        A.      From what I remember, there was not

13    any behavioral or emotional aspects of her IEP.

14    It was just academic support.

15        Q.      Like the ADHD she had been diagnosed

16    with?

17        A.      Okay.  Yeah, I guess.

18        Q.      If you don't remember, that's okay.

19        A.      I don't remember her specific

20    diagnosis, but...

21        Q.      Had you known at the time -- and if

22    you can tell me -- had you known at the time that

23    you saw the November incident that ███████ had

24    been a victim of sexual abuse when she was

25    younger, would that have changed the way you

1   would have handled the situation at that time?

2              MS. JORDAN:  Note my objection to

3   the form of the question.  Calls for speculation.

4              You can answer.

5              THE WITNESS:  If I had to speculate,

6   I think it would definitely change the way I

7   dealt with the November situation.

8   BY MS. LAUGHLIN:

9       Q.      In what way?

10      A.      I would have informed my school

11  administrator and the guidance counselor at the

12  building level.

13      Q.      How come?

14      A.      Because it had happened to her

15  before or she had been a victim of child abuse

16  before, so just wanting to make sure that

17  everyone was aware of this situation.

18      Q.      I'm trying to understand what the

19  difference was and would have been in your mind

20  of knowing this information?  Why did you feel

21  that they needed to be aware of it, the guidance

22  counselor and the administrator, if you had known

23  that information?

24              MS. JORDAN:  Note my objection to

25  the form of the question.

1          You can answer.

2          THE WITNESS:  I don't know.

3          It just seems like if a child has a

4     history of a situation, then I would want to make

5     sure that everyone is aware of what was

6     happening.

7     BY MS. LAUGHLIN:

8          Q.     Would you have viewed the situation

9     between ▓▓▓▓ and ▓▓▓▓ differently if you had

10    known she had a history of sexual abuse?

11         MS. JORDAN:  Note my objection to

12    the form of the question.

13         You can answer.

14    BY MS. LAUGHLIN:

15         Q.     If you're able to say.

16         A.     I don't know.

17         Q.     Did you have any knowledge at the

18    point in November -- or prior to that -- whether

19    a victim of prior sexual abuse is more vulnerable

20    to being sexually abused again?

21         A.     I don't know.

22         Q.     How would you have told the school

23    administrator and the principal?

24         MS. JORDAN:  Note my objection to

25    the form of the question.

```
 1                THE WITNESS:  I probably would have
 2   shared the write-up, the behavioral slip.
 3   BY MS. LAUGHLIN:
 4        Q.      Like given it to them?
 5        A.      Yes.
 6        Q.      In this instance you told me you
 7   wrote up both █████  and █████  on separate
 8   forms.  Would you have done the same thing,
 9   written them both up?
10        A.      I don't know.
11        Q.      Why in the scenario if you had known
12   about █████  prior history, you would have told
13   the school administrator and the school guidance
14   counselor, why is that?
15                MS. JORDAN:  Note my objection.
16   Asked and answered.
17   BY MS. LAUGHLIN:
18        Q.      You can answer.
19        A.      I just feel like that would have
20   been the right thing to do.
21        Q.      Why is it the right thing to do,
22   though?
23                MS. JORDAN:  Note my objection.
24                THE WITNESS:  Because of a previous
25   history.
```

1   BY MS. LAUGHLIN:

2       Q.      What about the previous history

3   would change your course of action?

4                   MS. JORDAN:  Note my objection.

5                   THE WITNESS:  I don't know.

6   BY MS. LAUGHLIN:

7       Q.      Did you receive any training about

8   that from the district, about children who have

9   prior instances of sexual abuse?

10      A.      Like I said earlier, I mean, I know

11  that we do get continuous training.  I can't

12  remember specifically getting training offered

13  after this situation; no.

14                  MS. LAUGHLIN:  Do you mind if we

15  take a few minute break?

16                  MS. JORDAN:  That's fine.

17                  (Short recess held at 11:13 a.m.)

18                  (Back on the record at 11:19 a.m.)

19  BY MS. LAUGHLIN:

20      Q.      Ms. Garrett, I know that you

21  interviewed        and        together.  Did the

22  thought cross your mind about interviewing them

23  separately at the time?

24      A.      I realize I should have done it,

25  interviewed them separately.

```
 1        Q.        When did you realize that?

 2        A.        I don't remember.

 3        Q.        Can you give me like an estimate in

 4   terms of how long after the incident that you

 5   realized that?

 6        A.        I don't remember.

 7                  Sorry.

 8        Q.        That's okay.

 9        Was it before the second incident in April?

10        A.        I'm not sure.

11        Q.        What made you realize that you

12   should have done it separately?

13        A.        It's best practice dealing with any

14   behavioral situation or any situation.

15        Q.        How did you learn that?  Where does

16   that come from?

17        A.        Just being a teacher.

18        Q.        Is there a policy on it that North

19   Penn had -- the district had about interviewing

20   kids separately?

21        A.        Not that I'm aware of.

22        Q.        What would be the difference in your

23   view -- in your understanding of interviewing

24   kids separately or together?

25        A.        If there's another student there,
```

the other student may not feel comfortable to speak or talk.

**Q. Anything else?**

A. Not that I can think of.

**Q. When we had talked about when you said that had you known [redacted] prior abuse history, you would have gone to the school administrator or the guidance counselor, what do you think would have happened had you gone to them? Would something different have happened?**

MS. JORDAN: Note my objection to the form of the question. Again, it calls for speculation.

THE WITNESS: I don't know. I'm not really sure.

BY MS. LAUGHLIN:

**Q. Was there something more serious about what happened with knowing -- if you had known that there was a prior abuse history?**

MS. JORDAN: Note my objection to the form of the question. Speculation.

THE WITNESS: What was the question again?

MS. LAUGHLIN: Can you read it back, Ms. Rosner.

1          (Whereupon the following portion of
2    the record was read:  "Was there something more
3    serious about what happened with knowing -- if
4    you had known that there was a prior abuse
5    history?")
6               MS. JORDAN:  Same objection.
7               THE WITNESS:  I'm not really sure
8    how to answer that.
9               Would I have felt that this
10   situation I observed was more serious; is that
11   the question?
12        Q.   Yes.
13               MS. JORDAN:  Same objection.
14               THE WITNESS:  No.
15   BY MS. LAUGHLIN:
16        Q.   What is it about an abuse history
17   that would make you change what you did in this
18   situation?
19        A.   I guess, like I said before, just
20   the fact that there was that history.
21        Q.   I mean, what is it about the
22   history?  I'm not understanding.  Is it that you
23   know or have been trained that kids who have
24   abuse histories are less likely to speak up or to
25   say something is happening or something

1    different?

2                    MS. JORDAN:  Note my objection to

3    the form of the question.

4                    THE WITNESS:  I'm not really sure.

5    BY MS. LAUGHLIN:

6        Q.      **You just don't know why you would**

7    **have done it differently, but you would have?**

8                    MS. JORDAN:  Note my objection.

9                    THE WITNESS:  Like I said before, it

10   would have been the right thing to do because of

11   the history.

12   BY MS. LAUGHLIN:

13       Q.      **What makes it because of the history**

14   **different?**

15                   MS. JORDAN:  Note my objection.

16   Asked and answered.  Calls for speculation.

17                   THE WITNESS:  I'm not sure.

18   BY MS. LAUGHLIN:

19       Q.      **Did you ever get training from the**

20   **district about kids who had been previously**

21   **sexually abused?**

22                   MS. JORDAN:  Note my objection.

23   Asked and answered.

24                   THE WITNESS:  Like I said, I know

25   that we do have trainings.  I don't specifically

1   remember if we were trained on children who were

2   previously abused.

3   BY MS. LAUGHLIN:

4        Q.      What about outside district

5   training?  Up to this point, up to the 2014-2015

6   school year, did you have any understanding of

7   the impacts that prior sexual abuse can have on a

8   child?

9        A.      I'm not really sure.

10               MS. LAUGHLIN:  I'm going to share my

11  screen and pull up page Bates number 1015 --

12  1015.

13               MS. JORDAN:  Is it 10015 or 1015?

14               MS. LAUGHLIN:  1015.

15               MS. JORDAN:  Thank you.

16               MS. LAUGHLIN:  You're welcome.

17               Are you able to see the screen?

18               MS. JORDAN:  We are.

19               THE WITNESS:  Yes.

20  BY MS. LAUGHLIN:

21       Q.      And is this your handwriting?

22       A.      Yes.

23       Q.      And is this the write-up that you

24  were asked to do following the incident in April

25  -- sorry.

1    Was this the report you had written up in
2  April regarding the November incident?
3    A.    Yes.
4    Q.    Do you remember who asked you to
5  write up this statement or why you wrote it up?
6    A.    I don't remember who.
7    Q.    When you had stood up from where you
8  were at the front of the room and called ▮▮▮▮
9  and ▮▮▮▮ out of the room, do you remember what
10  their reaction was with any of the other kids
11  that were in the classroom?
12    A.    No.
13    Q.    What about when the kids came back
14  in?  When you brought ▮▮▮▮ and ▮▮▮▮ back in
15  the room, were all three of you coming in the
16  room together?
17    A.    I mean, I don't remember exactly
18  that whole situation.  But I'm assuming that when
19  ▮▮▮▮ and ▮▮▮▮ went back into the room, I
20  walked in with them.
21    Q.    Were all of the students still all
22  in the classroom at that point?
23    A.    Yes, they were.
24    Q.    Do you recall whether any of the
25  students in the sixth grade throughout the day or

```
 1    throughout the coming weeks whether anybody was
 2    saying anything about the two kids getting pulled
 3    out of the class?
 4         A.      Not that I know of.
 5         Q.      I'm going to direct your attention
 6    to the second paragraph of your statement.  And
 7    it says, "         did not say a word and just
 8    stood there."  And then you wrote, "I could tell
 9    he was upset."
10    Do you remember what you were referring to
11    when you said "I could tell he was upset"?
12         A.      I don't remember.
13         Q.      Do you remember if he was crying or
14    anything about him that made you write that he
15    was upset?
16         A.      I don't think he was crying.
17                 I don't really remember.
18         Q.      You wrote, "         denied anything
19    had happened."  And I know we already talked
20    about that.  You don't remember specifically the
21    questions that you asked them other than what you
22    already told us.
23    Then it says, "Even when I questioned her
24    about having her hands under the table, she said
25    she didn't."
```

1      Is that accurate, per your recollection,

2  what you wrote?

3      A.      Yes.

4      Q.      When she told you she didn't and you

5  knew that both her hands had been under the

6  table, what did you think at that point?

7      A.      I don't know.

8      Q.      The conversation that you had with

9  Mrs. Divver, did you ever discuss interviewing

10  the kids separately or at a different time?

11      A.      I don't remember.

12      Q.      Is there anything you remember about

13  the conversation with Mrs. Divver that you

14  haven't already told me?

15      A.      No.

16      Q.      At the end of this statement

17  initially it wasn't signed.  And then there was

18  documentation I saw in the records that later on

19  you had to sign a statement.

20      Did you not want to sign this statement at

21  some point?

22      A.      I don't remember that.

23      Q.      Do you remember why you didn't sign

24  this statement when you first wrote it up?

25      A.      I don't remember.

 1        Q.        I'm going to pull up another page.

 2        I'm showing you what's labeled at page 997.

 3   This is a June 10th letter addressed to you --

 4   sorry about that.

 5        This is a June 10th letter that's addressed

 6   to you on North Penn School District letterhead

 7   from Dr. Curt Dietrich, the superintendent.

 8        Prior to the April timeframe of 2015, had

 9   you ever had interactions with Dr. Dietrich?

10        A.        No, I did not.

11        Q.        Did you ever meet him before?

12        A.        Maybe in passing, if he would come

13   to visit the school, but not specifically in a

14   one-on-one meet; no.

15        Q.        I'm going to go over some of the

16   things he writes in this letter and see if you

17   recall any of the conversations that were

18   surrounding what he's saying.

19        Here where my marker is it says, "The

20   behavior of a male student reaching his hand

21   underneath a female student's shirt in the area

22   of her chest during the course of a sixth grade

23   class lesson should be a very significant cause

24   for concern by the teacher, and should have been

25   handled in a much different manner than the

1    manner in which Ms. Andrew handled it."

2         Do you recall discussions that this

3    situation should have been a very significant

4    cause for concern by you?

5         A.      I remember Curt Dietrich saying that

6    to me.

7         Q.      Did he give you any further

8    explanation as to why it should have been a cause

9    of concern?

10        A.      Not that I remember.

11        Q.      And then it says, "And it should

12   have been handled in a much different manner than

13   the manner Ms. Andrew handled it."

14        Did he explain to you what should have

15   happened?

16        A.      I don't specifically remember words

17   that he said to me.

18             I know that it was said that I

19   should have interviewed the students separately.

20        Q.      Did they explain to you why?

21        A.      I don't remember.

22        Q.      Do you know whether there was any

23   kind of policy at North Penn School District or

24   at Gwynedd that required the students -- that

25   said the students should be interviewed

1    separately?

2        A.    I'm not sure.

3        Q.    I want to start at this sentence

4    here that says "Furthermore." It says,

5    "Furthermore, I am very concerned about Ms.

6    Andrew's explanation of how and why she arrived

7    at her conclusion that the behavior was

8    consensual."

9        Do you remember the explanation that you

10   gave to them as to why you concluded that it was

11   consensual behavior between ▮▮▮▮▮ and ▮▮▮▮▮

12       A.    I don't remember.

13       Q.    The first meeting, I believe, that

14   was had was on May 27, 2015.

15       Before I get to this, do you recall a second

16   incident happening in April with ▮▮▮▮▮

17       A.    It was not in a classroom that I was

18   in, but I do remember -- yes, I remember it being

19   mentioned.

20       Q.    Who was it mentioned by or in what

21   context did you find out about it?

22       A.    I don't remember.

23       Q.    Do you remember what happened?

24       A.    I don't.

25       Q.    Is there anything that you remember

1  about the April incident?

2      A.      I think the class was watching a

3  movie when it happened.  I think it was in Ms.

4  D'Elia's classroom.  The students were sitting on

5  the rug.  That's pretty much all I remember.

6      Q.      When you say "when it happened,"

7  when you say "it," what are you referring to?

8      A.      ███████ touching another female

9  student.

10     Q.      Do you remember how he touched her

11 or where?

12     A.      I don't.

13     Q.      When you found out that information,

14 what did you do?

15     A.      I don't remember specifically.

16             I think Mrs. Divver brought out the

17 behavior slips from November.  And then,

18 obviously, that information was shared with our

19 building principal and guidance counselor.

20     Q.      The slips that you were talking

21 about, the office referral form or the behavioral

22 slips, what was the policy for those, if you can

23 remember?

24     A.      Three minors go to the office or one

25 major, I think it is, goes to the office.

1      Q.      And otherwise it would just be kept

2 in a folder in the teacher's room?

3      A.      With the homeroom teacher, yes.

4      Q.      Was there any written policy of

5 that, that the three minors then go to a major or

6 the major just goes to the principal?

7      A.      I don't know if it was written.  It

8 might even be on the behavioral slip.  I'm not

9 sure.

10      Q.      Do you recall ever receiving

11 training on that?

12      A.      No.

13      Q.      Let me go through some of these

14 notes with you, to see if it helps refresh your

15 recollection at all.  These are notes from, as I

16 understand it, Ms. Cheryl McHugh on May 27, 2015.

17      And do you know who Cheryl --

18              MS. JORDAN:  What's the Bates-stamp

19 number for the record, please?

20              MS. LAUGHLIN:  Oh, sure.  1008,

21 1-0-0-8.

22              MS. JORDAN:  Thank you.

23 BY MS. LAUGHLIN:

24      Q.      Do you know who Ms. McAndrew {sic}

25 is -- sorry -- Ms. Cheryl McHugh?

1      A.      She was our director of human
2  resources at the time.
3      Q.      **Is she something different now?**
4      A.      She doesn't work in North Penn.
5      Q.      **Do you know where she works?**
6      A.      I'm not sure.
7      Q.      **Do you know about when she left**
8  **North Penn?**
9      A.      I don't remember.
10     Q.      **Now, up at the top right-hand corner**
11 **where my marker is under the date, it lists the**
12 **attendees.  And you're one of the people that is**
13 **listed as attending.  It's you and then, I**
14 **believe, Alan, who was the union rep.**
15     A.      He was our union president at the
16 time.
17     Q.      **And then Mr. Bowen, the principal,**
18 **Betty Santoro, Ms. McHugh, and then Frances.**
19         **Do you remember Frances?**
20     A.      Frances Garner, she was, I want to
21 say, a supervisor of special education.
22     Q.      **Okay.  At the time?**
23     A.      I'm not sure what her title was at
24 the time.
25     Q.      **Do you remember this meeting, the**

 1   first meeting you would have had at the end of

 2   May about this incident?

 3        A.      I remember being, like, nervous

 4   about it.  I don't remember specific

 5   conversations.

 6                I've never seen this document.

 7        Q.      Why were you nervous about it?

 8        A.      Because it's just a nerve-racking

 9   situation.  You're getting called in with your

10   principal and administrators.

11        Q.      Did you know going into it what the

12   meeting was about?

13        A.      Yes.

14        Q.      What had they told you about this

15   meeting or why you were having a meeting?

16        A.      Just that it was about the situation

17   that had happened in November.

18        Q.      And did they explain to you why you

19   were being called in to this meeting?

20        A.      I don't know -- I don't remember

21   that happening before the meeting.

22        Q.      Okay.

23        A.      I'm not sure.

24        Q.      So I'm going to go through this a

25   little bit to see if it helps, like I said,

 1    refresh your recollection at all.  And first it's

 2    saying that there was a review of the situation,

 3    and then additional info from Mission Kids.

 4         Do you remember anything about Mission Kids

 5    being discussed?

 6         A.     I think I remember that ████ had

 7    gone there to do, like, an interview.  That's

 8    all.  I don't really remember information from

 9    Mission Kids.

10         Q.     Okay.  And then the next thing says,

11    "Concerns for poor judgment and not reporting

12    sexual in nature to authority."

13         Do you recall what they were discussing at

14    the meeting about this?

15         A.     I don't remember.

16         Q.     Do you know whether "not reporting

17    sexual in nature to authority," whether that was

18    the authorities like the police, or like a

19    hotline, or whether "authority" means the

20    building principal or somebody higher up?

21         A.     I'm not sure.

22         Q.     I'm going to jump two bullet points

23    down.  It says, "Not mutual or consensual because

24    not of age and not appropriate behavior for

25    school."

1      Do you remember a discussion about it not

2   being consensual because of their age?

3      A.      I mean, it was a long time ago.  I

4   don't really remember specific conversations.

5   I'm sure that that was brought up.

6      Q.      Do you remember anything generally

7   about that part of the conversation?

8      A.      Not really.

9      Q.      Do you recall whether there was any

10  discussion as to "Is there a particular age that

11  kids can consent?"  Do you remember anything like

12  that?

13     A.      I don't remember them telling me a

14  specific age; no.

15     Q.      This part where it says, "Supports

16  for        boy in November," do you know what

17  that was about?

18     A.      No.

19     Q.      Here it talks about, "Telling

20  students that it will go no further if they

21  stop/won't tell parents."  That was the

22  conversation we talked about earlier where I had

23  asked you if you told the kids that you wouldn't

24  tell their parents if it didn't happen again.  I

25  remember you said you couldn't recall telling

1    them that.

2        Does seeing this on paper help refresh you

3    at all as to whether or not you told them that?

4        A.    No.

5        Q.    What did you think at the time when

6    telling them that if it didn't happen again,

7    whether it was you wouldn't go to the parents or

8    you wouldn't tell the principal, what did you

9    think was going to happen?

10           MS. JORDAN:  Note my objection to

11    the form of the question.

12           You can answer.

13    BY MS. LAUGHLIN:

14        Q.    I'm just asking what your mind was

15    at that time.

16           MS. JORDAN:  Note my objection.

17           THE WITNESS:  That it just wouldn't

18    happen again.

19    BY MS. LAUGHLIN:

20        Q.    Why did you think it wouldn't happen

21    again?

22        A.    I don't know.

23        Q.    What did you think would stop?

24           MS. JORDAN:  Note my objection to

25    the form of the question.

1          You can answer.

2          THE WITNESS:  ███  and ███  were

3   friends before the incident.  They remained

4   friends after the incident.  So I guess just the

5   situation that I observed would stop, that

6   something like that wouldn't happen again.

7   BY MS. LAUGHLIN:

8      Q.     **Like him putting his hand up her**

9   **shirt, do you mean?**

10     A.     Right.  Correct.

11     Q.     **Why didn't you tell the parents back**

12  **then?**

13         MS. JORDAN:  Note my objection to

14  the form of the question.

15         You can answer.

16         THE WITNESS:  I don't know.

17  BY MS. LAUGHLIN:

18     Q.     **Did you think at the time that**

19  **parents -- if a sixth grader is putting their**

20  **hands up another sixth grader's shirt that**

21  **parents should know about that?**

22     A.     I don't know.

23     Q.     **Had you received any training about**

24  **when to notify parents of certain conducts of**

25  **kids?**

1    A.    I can't remember specific training.
2  But, like I said earlier, I know that we do get
3  trainings.
4    Q.    I know we talked about child abuse
5  generally being trained on watching videos and
6  answering some questions.  But what about
7  specific to informing parents about student
8  conduct?  Did you ever receive training on that,
9  that you can remember?
10    A.    I'm not sure.
11          Not that I remember.
12    Q.    Here it says, "Two day suspension
13  without pay, letter in file."
14    Do you recall at this meeting whether they
15  told you you were getting a two day suspension
16  without pay?
17    A.    I know I was told about the two day
18  suspension without pay.  I just don't exactly
19  remember when that was told to me.  I don't
20  recall if it was at this meeting.
21    Q.    Do you remember who told you that?
22    A.    I don't remember.
23    Q.    What was your reaction when they
24  told you you would be suspended for two days
25  without pay?

1        A.        I guess I was upset.

2        Q.        **What about it upset you?**

3        A.        Just the whole situation was

4   upsetting.

5        Q.        **What do you mean?**

6        A.        The meetings at the ESE with

7   administrators, just having these records in my

8   file, and getting suspended.  It's not anything

9   that a teacher would ever want to go through.

10        Q.        **Right below that it mentions an**

11   **issue regarding the shredding of an IEP document.**

12   **Do you see that?**

13        A.        Yes.

14        Q.        **Can you tell me more about that?**

15   **What was that issue?**

16                THE WITNESS:  I don't know if I'm

17   allowed -- am I allowed to speak to her about

18   that?

19   BY MS. LAUGHLIN:

20        Q.        **Sorry.  I can add the clarification**

21   **that I'm not asking -- if you had a different**

22   **lawyer in that particular situation, I'm not**

23   **asking about conversations you may have had with**

24   **them.  But generally what did it involve?**

25                MS. JORDAN:  I think she had concern

1  about the confidentiality of the other student's

2  IEP.  I think that's what she means.

3           THE WITNESS:  Correct.

4           MS. LAUGHLIN:  Thank you for

5  clarifying that, Ms. Jordan.

6  BY MS. LAUGHLIN:

7      Q.     You don't have to identify who the

8  student was.  I don't want to violate anybody's

9  FERPA rights or education rights to privacy.

10      So without telling me who the student was or

11  anything like that, can you tell me generally

12  what it was about?  I think you can talk about

13  that, as far as I'm understanding.

14      A.     At the end of the previous year, so

15  2013-2014 school year, we were moving to full

16  inclusion in the following year, which would have

17  been the 2014-2015 school year.  The parent did

18  not want full inclusion for her child.  And that

19  was the whole issue around her not wanting her

20  son in the regular education classroom.  And then

21  I guess it moved to settlement stages.

22      Q.     This references an IEP getting

23  shredded.  I understand what you just described

24  to me.  But is this the same incident?

25      A.     Yes.


 1                    (Multiple speakers.)

 2         Q.        **Go ahead.  I'm sorry.**

 3         A.        That's okay.

 4                    There was a NOREP that was issued, a

 5    Notice Of Recommended Educational Placement.  And

 6    the parent did not want to accept it or approve

 7    it.

 8                    And then from there, I'm not really

 9    sure what had happened.  I don't know if I issued

10    a new NOREP.  I don't really remember.

11                    I just remember that it was about

12    the parent not wanting her child in full

13    inclusion for the following year.

14         Q.        **Do you recall an IEP document being**

15    **shredded?**

16         A.        No.

17         Q.        **If the parent didn't want the child**

18    **to be included in the full inclusion, and you're**

19    **recommending that the student should be included**

20    **in the full inclusion -- is that what you were**

21    **doing?**

22         A.        Yes.

23         Q.        **So then what was the issue that then**

24    **was brought into the administration or talking**

25    **about settlement stages?  What's the issue?**

1    A.    I guess because what North Penn

2  School District was proposing, the parents did

3  not want.  So they were -- they were, I guess,

4  seeking legal advice for it.

5         You can't really shred an IEP,

6  because it's all electronic.  So I don't know

7  what the shredding -- I don't know.

8         Like I said, it was just the parents

9  did not want full inclusion, we were proposing

10  full inclusion, and that's, I guess, why it went

11  to settlement stages.

12    Q.    **Was there something about your**

13  **conduct that was being questioned, whether it was**

14  **by the principal, administration, involving that**

15  **situation with the other parent and student?**

16    A.    Maybe some email communications that

17  I had with the mom about scheduling a meeting or

18  discussing different options or placements.

19    Q.    **Like you were brought in as a fact**

20  **witness because you knew about it?**

21    A.    No.  I wasn't brought in at all for

22  it.

23         I'm not really sure.

24    Q.    **Were your actions or conduct at all**

25  **being questioned or criticized in some way**

1    involving a prior incident?

2        A.        This is the first I'm seeing this

3    statement.  So I don't know.

4                  I mean, I haven't seen my employee

5    file, so I don't know what's in there.

6                  It never went --

7                  (Multiple speakers.)

8                  Sorry.

9        Q.        Go ahead.

10       A.        It never went to any process.  I

11   didn't have to go to court.  That's pretty much

12   all I know.

13       Q.        As you sit here today, you don't

14   have any memory of what the prior incident may

15   have been that you would have been questioned

16   about or potentially criticized about; is that

17   correct?

18       A.        Like I said, we had issued the NOREP

19   from the North Penn School District, and the

20   parents disagreed with that, with the NOREP.

21       Q.        That was as far as the extent that

22   you understood you were involved in that?

23       A.        Correct.

24       Q.        Did that also involve Frances

25   Garner, that incident?

1        A.        I don't remember.

2        Q.        Was there a separate incident

3   involving Ms. Garner that you had been questioned

4   about as far as your conduct went prior to May of

5   2015?

6        A.        Not that I can remember.

7        Q.        Right below that it says, "Both

8   issues and lapse of judgment could result in" --

9   it looks like it says -- "unsats" --

10  unsatisfactory -- "in professionalism domain."

11       Do you see that?

12       A.        Yes.

13       Q.        Do you remember that being part of

14  the conversation at all in this meeting?

15       A.        I remember them telling me about

16  that for my eval, for my final eval; yes.

17       Q.        When they say "both issues and lapse

18  of judgment," when they talk about the November

19  2014 incident, do you recall any other incident

20  or issue that they were discussing with you

21  involving an issue in lapse of judgment?

22       A.        No.

23       Q.        Here it has your initials at the

24  very bottom of page 1008.  And it says, "Not

25  necessary to review entire situation."

1      Do you see that?

2      A.      Yes.

3      Q.      Do you recall telling the meeting

4  that it wasn't necessary to review the entire

5  situation?

6      A.      No.

7              MS. JORDAN:  Note my objection to

8  the form of the question.

9              THE WITNESS:  No.  I don't remember

10  that.

11  BY MS. LAUGHLIN:

12      Q.      Do you know what that could be

13  referring to or what the context of the

14  conversation may have been at the time?

15      A.      I can't remember.

16      Q.      I'm going to show you page 1011 of

17  the record.  And I'll scroll up to 1010, which is

18  the top of the document, just to put it into

19  context.  This is the April 16th meeting that you

20  were present for.

21      Do you remember having a separate meeting

22  where Ruth Divver was brought in, and then you

23  were brought in afterwards to the meeting?

24      A.      I remember her coming in.  Yes.  Her

25  meeting was first.  And then she was leaving, and

1    then I went in.  Yes.

2         Q.      Did you have any conversations with

3    Ruth prior to this meeting since you're both

4    coming to the meeting at separate times?

5         A.      Not that I remember.

6         Q.      I'm scrolling back down to page 1011

7    again.  And I want to direct your attention to

8    this section where my cursor is.  It says,

9    "Holly/April comments."  And it says, "Ruth and

10   Kristin in hallway when she found out about the

11   incident with Paige."

12        "Ruth," would that be Ruth Divver?

13        A.      Correct.

14        Q.      "Kristin," is that Vaszily, the

15   guidance counselor?

16        A.      Yes, Kristin Vaszily is our guidance

17   counselor.

18        Q.      And then it says, "Ruth said ████

19   did something similar in November.  Later that

20   day, she was asked to write it up."

21        Are these your comments that you were making

22   to the people in the meeting, if you can

23   remember?

24        A.      I don't remember.

25        Q.      Reading this little summary about

1    Ms. Divver and Ms. Vaszily being in the hallway

2    and finding out about a second incident, and who

3    the student was that ▮▮▮▮ had done something

4    to, does that refresh your memory at all into any

5    conversations you've had or how you found out

6    about the second incident?

7        A.        I don't remember the exact moment

8    that I found out about the second incident.

9        Q.        When you found out, what was your

10   reaction or what did you think?

11       A.        I don't remember.

12       Q.        Do you know whether hearing about

13   the second incident caused you to reflect back on

14   the initial incident in November?

15       A.        Well, yeah.  I mean, I guess it --

16   especially it says, "Ruth said ▮▮▮▮ did

17   something similar in November, so later that day

18   I was asked to write it up."  I remember getting

19   the behavior slips from Ruth Divver from the

20   November incident.

21       Q.        Is there anything in April that you

22   could recall like looking back and kind of

23   reprocessing what had occurred in November and

24   thinking anything differently about it now that

25   you know that there is a second incident that

Holly Lynne Garrett

```
 1   happened in April?
 2       A.      I guess just what I had put in my
 3   statement that you shared on the screen earlier
 4   was what I remembered from the situation.
 5       Q.      But I mean did you look at the
 6   situation in November any differently than you
 7   had now that you have this additional
 8   information?
 9               MS. JORDAN:  Note my objection to
10   the form of the question.  Asked and answered.
11   It's speculative.
12               THE WITNESS:  I don't know.
13   BY MS. LAUGHLIN:
14       Q.      Okay.  At any time during this
15   period of time, whether it was in the fourth
16   grade year for          or the -- at any time in
17   the '14 to '15 school year or the year prior that
18   you had known          were you aware of any
19   claims that          had touched other girls in
20   fourth grade and fifth grade?
21       A.      No, I was not.
22       Q.      At any time even following the
23   investigation or in the next several years, had
24   you learned that          -- there had been claims
25   that          had touched girls in the fourth grade
```

-1

1    and the fifth grade?

2        A.      No.  I was only aware of the

3    situation that had happened in April.  That was

4    the only one.  I didn't know of any others.

5        Q.      Let me just clarify then, because

6    that was going to be my next question.  There

7    were some documents showing that there were

8    claims in addition to the April incident from

9    several other girls in the sixth grade that

10       ████████   had touched them inappropriately.

11       Were you aware of any of those additional

12   claims?

13       A.      No, I was not.

14       Q.      Me telling you this, is that the

15   first time you're hearing about other sixth grade

16   incidents?

17       A.      Yeah.  Yes.

18       Q.      And the same question for the fourth

19   and fifth grade, is me telling you the first time

20   you're hearing about claims he had touched girls

21   in fourth grade and fifth grade, as well?

22       A.      Yes.

23       Q.      Was there any mechanism or procedure

24   in place at the school for the teachers or staff

25   at the school to come together and talk about

1    issues that were happening in their classrooms

2    with students?

3         A.     We have our Child Study days, MTSS

4    days, where we can bring students up to our team.

5    The team includes the building principal, the

6    guidance counselor, the reading specialist, the

7    classroom teacher would be there, and it's

8    usually our school psychologist.

9         Q.     You said "MTSS."  What does that

10   stand for?

11        A.     I knew you were going to ask me

12   that.

13               I'm not sure.

14        Q.     But you're saying those are times

15   where staff would bring a particular student up

16   to meet with the series of people that you just

17   mentioned?

18        A.     Yes.

19        Q.     What about in terms of just the

20   staff or teachers meeting together about

21   particular students?  Did that happen?

22        A.     I mean, the teachers have multiple

23   opportunities to plan together.  So I mean it

24   happens that, you know, students are discussed

25   during teacher prep times or the morning time

1    when we do planning.

2         Q.        If certain students are discussed,

3    is that anything that would be documented in any

4    way?

5         A.        No, not necessarily.

6         Q.        Is there any type of mechanism or

7    procedure in place to document?  Like if somebody

8    said something about a student, that they're

9    informing another teacher that the student may

10   have about something, is there even a way to

11   document that somewhere?

12        A.        There is a Google form that can be

13   filled out that would then go to Child Study.

14        Q.        Was the Google form in existence in

15   2014-2015?

16        A.        Yes.  I'm almost positive that it

17   would have been.

18                  Because that's how we get to that

19   next step.  To have a Child Study meeting,

20   initially a teacher would fill out a form.

21        Q.        So there is a way for teachers to

22   put on a Google form that a student -- is it like

23   recommended for one of these meetings?

24        A.        Recommended for what?

25        Q.        For the meetings that you're talking

 1    about, that they get evaluated or have the

 2    meeting you were just describing.

 3         A.      The Google form would kind of

 4    initiate then the meeting -- (multiple speakers)

 5    -- and we would bring the teacher down.

 6         Q.      What did you call the meeting again?

 7         A.      MTSS.

 8         Q.      I think you called it something

 9    else, too.  Is there another word?

10         A.      Child Study.

11         Q.      Child Study.

12         Is the Child Study just for kids who are in

13    the special education program?

14         A.      No.  It's for any student in the

15    building.

16         Q.      So what's the purpose of a Child

17    Study, if you know?

18         A.      It can really be for any concerns

19    that a staff member would have for a student:

20    Academic, if they think they may need a speech

21    therapist to evaluate them or an occupational

22    therapist or a physical therapist, if there's

23    behavioral concerns.  It's pretty much anything

24    for the child.

25         Q.      The Google document, is it like a

1    form where it has certain questions or certain

2    line items that you're completing?

3        A.    Yes.

4        Q.    Do you know where that's held?

5    Where is the form kept?

6        A.    It's shared with us, with staff

7    members at the beginning of the year, so it's in

8    our Google drive.

9        Q.    You, for example, as the special

10   education teacher, could you fill out the Google

11   drive form?

12       A.    Yes.

13       Q.    And could a teacher like Mrs.

14   Divver, is she able to fill out the form, too?

15       A.    Yes.

16       Q.    What happens once you fill out this

17   form on a student?  Where does it go?  What

18   happens next?

19       A.    The guidance counselor and building

20   principal get a notification that a form has been

21   filled out, and then they schedule the child --

22   the MTSS meetings.

23       Q.    Is that something that a parent -- a

24   student's parent would be involved in too if

25   there was an MTSS meeting?

1    A.    Once it gets to that point where the

2  team is coming together to discuss the child, the

3  parents are notified.

4    **Q.    Okay.  Do the parents typically**

5  **attend that meeting?**

6    A.    No.

7    **Q.    But is the child in the team meeting**

8  **with the psychologist and teacher and all the**

9  **people you mentioned?**

10   A.    The child is not there; no.

11   **Q.    Does anything happen before the team**

12 **that you mention meets about a particular**

13 **student?  Is the student being interviewed or**

14 **anything?**

15   A.    No.  I mean, I guess depending on

16 what the situation is, sometimes students are

17 observed in the classroom.

18   **Q.    If there is a Child Study or an MTSS**

19 **meeting, do you know whether that's documented**

20 **anywhere that an MTSS meeting occurred on a**

21 **particular child?**

22   A.    There's a form that we fill out once

23 it gets to that point where we're in MTSS.  And

24 it just documents participants, what was

25 discussed, what are our next steps, when is our

1    next time that we're going to plan to meet.

2        Q.        What is that form called, if you

3    know?

4        A.        I don't know.

5                  Again, only the team has access to

6    that, like the guidance counselor, the school

7    psychologist.  So it's not something that the

8    teacher fills out.  It's something that is filled

9    out at the meeting.

10       Q.        Okay.  Do you know if there is a

11   behavioral -- I'm sorry -- a Child Study meeting

12   on a student whether that gets put in the

13   student's educational file?

14       A.        I'm not sure.

15       Q.        Do you know whether it's documented

16   anywhere, like if a student has multiple meetings

17   or something like that, if there's any way in the

18   system to track or keep track of that?

19       A.        The form that we use documents the

20   dates of the meetings.  So if there's multiple

21   meetings, yes, they're documented.

22       Q.        So it's kind of updating the form?

23       A.        Yes.  Yes.

24       Q.        You said it's on a Google drive.

25   Who has access to the forms on a particular

1    student, if you know?

2         A.       The MTSS team in a building.  So,

3    like I said, it would be the building principal,

4    the guidance counselor, the school psychologist,

5    reading specialist.  And now that I'm an

6    inclusion facilitator, I'm also a part of that

7    team.  So for the last three years, I've been

8    working with that group to do MTSS meetings.

9         Q.       Do you know whether there's ever

10   been an MTSS meeting involving ▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮

12        A.       I don't know.

13        Q.       Since you were her special education

14   teacher in fifth grade and sixth grade, if there

15   was a meeting would you have been brought into

16   that meeting for her?

17        A.       Definitely.

18        Q.       Do you know whether there was any

19   MTSS meetings for ▮▮▮▮▮

20        A.       I don't know.

21        Q.       The MTSS meeting, do you know

22   whether that's something that's just done at the

23   elementary school level or if that's something

24   that is part of the district or whether it's

25   middle school or high school, they still

1    implement the same plan?

2       A.    I'm not sure.

3       Q.    Have you received training on the

4    MTSS meetings?

5       A.    We did several years ago, I think.

6       Q.    Do you remember who did that

7    training?

8       A.    No, I don't.

9       Q.    For example, do you know whether it

10   was just at Gwynedd Square or whether it was a

11   bigger district-wide training?

12      A.    I don't remember.

13      Q.    Where would those meetings be held?

14      A.    In our conference room.

15      Q.    At Gwynedd Square?

16      A.    The Gwynedd Square conference room,

17   yes.

18      Q.    Are they typically during the school

19   day or on a night or weekend?

20      A.    They're typically during the school

21   day.

22      Q.    And how do you know to attend one?

23   Do you get like a calendar invitation or how does

24   that work?

25      A.    Yes.  A teacher would get a calendar

1    invitation when the student was up for MTSS.

2        Q.    Did you request at all that an MTSS

3    meeting be held for ████ or ████ following

4    the November incident?

5        A.    No, I did not.

6        Q.    That's something you could have

7    done, though; right?

8        A.    Correct.

9        Q.    Why didn't you?

10       A.    I don't remember.

11       Q.    I'm going to show you page 1013.

12   And these are handwritten notes from the April

13   16, 2015 meeting.  And you're listed on the

14   right-hand side as being one of the attendees at

15   this meeting, along with the principal, and Dr.

16   Santoro, and Cheryl McHugh, as well as, I guess,

17   the president of the union.

18       Do you recall this second meeting, the April

19   16th meeting?

20       A.    I know I went in for two meetings.

21       Q.    On the left-hand side, there's

22   initials of different people.  And your initials

23   are listed under the second paragraph on this

24   form.  So I want to go over this part and ask you

25   some questions about it.

1       It says, "November summary with students at

2   table.  ▓▓▓▓▓▓  with hands up ▓▓▓▓▓▓  shirt.

3   Took students into hallway and spoke to them

4   together.  ▓▓▓▓▓  denied anything and ▓▓▓▓▓  said

5   nothing.  Mutual wrote referral and filed in

6   classroom."

7       Does that refresh anything that we haven't

8   already talked about from what you already told

9   us?

10      A.      No.  That's what I said earlier.

11      Q.      The next sentence -- and it has

12  quotation marks around it -- it says, "Now that I

13  think of it, should have gone to Bill."

14      Do you see that?

15      A.      Yes.

16      Q.      Do you recall saying that at the

17  meeting?

18      A.      I mean, I don't remember specific

19  words that I said.

20      Q.      Do you recall generally saying

21  something to that effect at the meeting?

22      A.      That I should have submitted the

23  forms to Mr. Bowen, yes.

24      Q.      Why did you say that at that

25  meeting?

1     A.     I don't remember.

2     Q.     **Do you recall there ever being**

3 **discussion or having a discussion about reporting**

4 **what you saw at the Child Line?**

5     A.     No.

6     Q.     **At the time, in the 2014-2015 school**

7 **year, had you ever received any training on when**

8 **to make a report to Child Line?**

9     A.     I don't know.

10    Q.     **Do you recall having any knowledge**

11 **back then as to what Child Line was?**

12    A.     I mean yes.  I knew what the Child

13 Line was.  I don't remember if we were given

14 specific training on calling the Child Line.

15    Q.     **To your understanding back then,**

16 **what was Child Line?**

17    A.     To make a report with Children and

18 Youth.

19    Q.     **Do you recall what types of things**

20 **should be called in to Child Line, what your**

21 **understanding was at the time?**

22    A.     I guess if we felt the child was in

23 danger.

24    Q.     **"In danger," what do you mean?**

25    A.     If something was happening at home

1    or anywhere, anything putting the child in

2    danger.

3         Q.      Do you know whether, at the time, if

4    you had an understanding about students touching

5    other students, whether that was something that

6    should be reported to Child Line?

7         A.      I don't know.

8         Q.      Did you know at the time whether it

9    could, whether that was something you could

10   report to Child Line, a student touching another

11   student?

12        A.      I don't know.

13        Q.      At this part right here, the

14   second-to-last paragraph on page 1013, it says

15   your initials, and it says, "Not my place to

16   notify parents."

17        Do you see that?

18        A.      Yes.

19        Q.      Do you recall that, discussing that

20   it wasn't your place to notify the parents?

21        A.      Not specifically saying that, no.

22        Q.      What about generally?  Do you

23   remember the general discussions surrounding

24   that?

25        A.      Not really, no.

```
 1        Q.      At the time do you know whether you
 2   believed that it wasn't your place to notify the
 3   parents of an incident like the one in November?
 4        A.      I don't know.
 5        Q.      Had you ever received training up to
 6   that point, meaning up to the 2014-2015 school
 7   year, on notifying the parents and whether it was
 8   you or the homeroom teacher or the principal?
 9   How that would be done?
10        A.      I don't remember.
11        Q.      I'm going to show you page 994.
12   This is dated June 9, 2015.  And you're again
13   listed as one of the attendees for this meeting.
14        It says that a grievance was filed.  Do you
15   recall filling a grievance in this situation?
16        A.      Yes.
17        Q.      Can you tell me what you remember
18   about that?
19        A.      I remember visiting the PSEA lawyer.
20   And then he pretty much handled everything from
21   there.
22        Q.      I'm trying not to ask you about
23   conversations you had with the PSEA lawyer.
24        I assume you're referring to somebody that's
25   different than Alan Malachowski.  Is that right?
```

1      A.      Correct.

2              Alan was our union president at the

3      time, and he referred me to the lawyer.

4      Q.      Did you file your grievance prior to

5      meeting with the lawyer?

6      A.      No.

7              I mean, I'm not a hundred percent

8      sure of the timeline, but I know that the lawyer

9      took care of all of the paperwork and everything

10     for that.

11             MS. JORDAN:   Laura, do you mind if

12     we take a five minute bathroom break?

13             MS. LAUGHLIN:   Sure.   That's fine.

14             (Short recess held at 12:18 p.m.)

15             (Back on the record at 12:23 p.m.)

16     BY MS. LAUGHLIN:

17     Q.      So I'm going to go back to the

18     document we just started to talk about or I just

19     showed you.   It's Bates 994 of the Bates-stamped

20     records.

21         And we were talking a little bit about the

22     filing of a grievance.   Now, like I said, I'm

23     trying to be careful and purposefully not ask you

24     about conversations that you had with any lawyer.

25     So if I ask you a question, I'm not trying to get

1    you to tell me that.  Don't answer in that way.

2    And if the only answer you can give is something

3    that you and a lawyer discussed, then let me know

4    that.

5         But you filing the grievance, was the

6    grievance in response to you getting the two days

7    of suspension without pay?

8         A.       I don't remember exact wording, but

9    I know that I got the unsatisfactory evaluation,

10   and then I also had the two day suspension.  And

11   I remember them saying it was almost like you

12   were punished twice.  So that might have been why

13   the grievance was filed.

14                 I don't remember the exact wording,

15   though.

16        Q.       So was your grievance that you had

17   both the two day suspension, and then the

18   addition of the unsatisfactory performance

19   review?

20        A.       Yes.  I'm pretty sure.  Yes.

21        Q.       What was it about those two things

22   that you thought were unfair that you filed a

23   grievance?

24        A.       I mean, I had already done the two

25   day suspension without pay.  And then later on in

1    the school year, I was given the unsatisfactory

2    evaluation.

3         Q.     So after you got the unsatisfactory,

4    that's when you decided to file the grievance?

5         A.     I don't remember the exact timing,

6    but I'm pretty sure that was when it was filed,

7    yes.

8         Q.     I'm asking at the time, your

9    impressions at the time.  Did you think that the

10   unsatisfactory review was unwarranted?

11        A.     I don't know.

12        Q.     I guess I'm just trying to

13   understand what about the situation caused you to

14   file a grievance.  What did you have the

15   grievance about?

16        A.     Again, like I said, it was

17   recommended for me to do that.

18        Q.     Again, if it's something a lawyer

19   told you, that's not what I'm trying to ask.  I'm

20   asking for you.

21        Did you disagree with that?  Did you have a

22   grievance since you're the one that's filing it?

23        A.     I don't know.

24        Q.     You're not sure whether you had a

25   grievance with the two day suspension and the

1    unsatisfactory report?

2         A.      With both of them, I guess I would
3    say that, yes.

4         Q.      **With both of them, you're unsure?**

5         A.      No.  I meant the reason for filing
6    the grievance was because of the fact that I was
7    already suspended without pay, and then I also
8    received the unsatisfactory evaluation at the end
9    of the year.

10        **Q.      So what part of that was what you**
11   **didn't agree with?**

12        A.      Like I said before, I had already
13   been -- it had already been dealt with, and I was
14   punished with the two day suspension without pay.
15   And then for it to be in my permanent evaluation
16   for the entire year, I guess that's the reason
17   why I filed the grievance.

18        **Q.      Was it your understanding that the**
19   **two day suspension was not something permanent**
20   **that would go in your record?**

21        A.      I don't know.

22        **Q.      This is at the time, did you**
23   **disagree that you should not have received the**
24   **unsatisfactory evaluation?**

25        A.      Yes.

1       Q.      What was the appropriate thing that

2   should have been done at the time?

3       A.      I don't know.  I can't really say

4   what would have been appropriate.

5               (Multiple speakers.)

6       Q.      Sorry.  Go ahead.

7       A.      I just felt that I didn't need both,

8   the suspension and a poor evaluation.

9       Q.      Was the evaluation done on a

10  consistent basis, like the end of the year or

11  something?  Was this your end of the year

12  evaluation?

13      A.      I get one every year at the end of

14  the year, yes.

15      Q.      So this was your evaluation for the

16  year following what had happened, the incident in

17  November; is that right?

18      A.      Correct.

19      Q.      I understand it didn't come to light

20  to the principal, for example, until April.  So

21  that would have been the end of that year.  Is

22  that correct?

23      A.      Yeah.  The school year, 2014-2015,

24  one school year, you get one evaluation for the

25  end of the year.

1    Q.    So by the end of the year, this is

2  taking into account then that earlier in the

3  school year, the November incident?

4    A.    Correct.

5    Q.    I'm just asking for your thoughts at

6  the time.  Did you think that the evaluation

7  should have been satisfactory for that year?

8    A.    I can't say what I thought, because

9  it was like seven years ago.  I just felt that it

10  wasn't fair that I had a negative evaluation for

11  the entire year.

12    Q.    What do you think it should have

13  been?

14    A.    I don't know.  I don't know.

15    Q.    I guess I'm just trying to

16  understand what you're saying.  Are you saying

17  that it should have been based on "Look at my

18  entire year of what I did and not just the

19  incident in November"?

20        MS. JORDAN:  Note my objection to

21  the form of the question.

22  BY MS. LAUGHLIN:

23    Q.    You can answer.

24    A.    I mean, our evaluations are supposed

25  to be the entire year, so yes.  I mean, looking

1    at the entire year, yes.

2        Q.      Looking at the entire year, you

3    didn't think that you deserved a poor evaluation?

4        A.      Correct.

5        Q.      And it should have been a

6    satisfactory evaluation in your view?

7        A.      A satisfactory or at least needs

8    improvement, not a failing.

9        Q.      Needs improvement, did that have any

10   type of consequences to a teacher like you, if

11   you got a "needs improvement"?

12       A.      I think it's if you have two

13   evaluations that are failing, you can be put on a

14   professional improvement plan.

15       Q.      How do you know that is the case,

16   that it's two failings?

17       A.      I think Mr. Bowen had shared that

18   with me when I got the evaluation at the end, in

19   June of 2015.

20       Q.      Had you ever been on a professional

21   improvement plan before?

22       A.      No.

23       Q.      Subsequent to this, not involving

24   this incident, had you ever been on a

25   professional improvement plan?

```
 1      A.      No.

 2      Q.      Prior to this evaluation, had you

 3  ever received a needs improvement evaluation?

 4      A.      No.

 5      Q.      Have you ever received a failing

 6  evaluation?

 7      A.      No.

 8      Q.      As a result of the grievance that

 9  was filed, I had seen in some of the records or

10  documents that were provided to me from the

11  district that your two day suspension was reduced

12  to a one day suspension.  Are you aware of that?

13      A.      Yeah, I remember something -- I

14  think I received the one day back with the pay.

15      Q.      So you were paid for that one day --

16      A.      Correct.

17      Q.      You said you had already served the

18  two day suspension?

19      A.      Correct.

20      Q.      Did you have to stay home on those

21  two days?

22      A.      Yes, I did.

23      Q.      So you had to stay home and you

24  didn't receive pay for those days?

25      A.      Correct.
```

1    Q.    You didn't have to work an extra

2  day; it was just a matter of you got your pay,

3  whatever it would have been for the one day?

4    A.    Yes.  Correct.

5    Q.    At this top part of page 994, it

6  says -- and this looks like it was a discussion

7  by Alan, the president of the union -- it says,

8  "Want to make sure punishment fit the crime,

9  across state concerns."

10      Do you know what he was talking about or

11  what the discussion was at that point in the

12  meeting?

13    A.    I'm not really sure.

14          Like I said, I remember the lawyer

15  saying to me --

16    Q.    I don't want to ask any questions

17  about what a lawyer said to you.

18    A.    No.

19    Q.    I'm just asking in this meeting, do

20  you recall what this was about, this note here?

21    A.    No, I don't.

22    Q.    Or making sure that the punishment

23  fit the crime.

24    A.    I'm not sure.

25    Q.    I know that there's handwritten

1    notes here.  Do you know whether these meetings

2    are recorded in any other way, whether they're

3    video or audio recorded?

4        A.    I do not think they were audio

5    recorded.  I think it was just the handwritten

6    notes.

7        Q.    Did you after these meetings or

8    during these meetings take any notes?

9        A.    I know Alan did.

10       Q.    Okay.

11       A.    I do not recall taking my own

12   specific notes, no.

13       Q.    At the time of these meetings that

14   were happening, do you recall having any

15   conversations with anybody other than lawyers

16   outside of these meetings?

17       A.    No.

18       Q.    For example, do you recall ever

19   discussing the meetings with Ruth Divver?

20       A.    I'm sure we did.  But the day that

21   -- I remember she had the meeting first, and then

22   she came out and I went in.  I don't remember our

23   specific conversations.  I'm sure we talked about

24   it, because we taught together that year.

25       Q.    But you don't recall what was said?

1    A.    No, I don't.

2    Q.    Later on, down on page 994, it has

3 your initials again.  It says, "REF" -- I guess

4 it's referred -- "to other issue."  And then it

5 says "SE" in parenthesis.  Do you know what "SE"

6 is?

7    A.    I would assume special education.

8    Q.    It says, "Brought up by Frances

9 Garner."  It says, "Have emails, et cetera,

10 everything with Bill Bowen, Principal."

11    Do you recall what was being discussed here?

12    A.    I'm assuming it was the issue we

13 talked about earlier with the student from the

14 previous year whose parent denied the NOREP.

15    Q.    When you say "have emails," is that

16 the emails you were talking about where you're

17 recommending that whatever was in the NOREP and

18 the parents were disagreeing?

19    A.    Correct.  The email communication

20 between myself and the parent, yes.

21    Q.    It says, "Lawyer letter," and then

22 there's an arrow, "Previous evals by North Penn

23 School District."

24    Do you recall what you were discussing at

25 this point -- not with the lawyer, but the

1    previous evals by the North Penn School District?

2         A.      I had really good evaluations

3    previous to this school year.

4         Q.      The next line says, "Building for a

5    few years."  Do you remember what that would have

6    been discussed from?

7         A.      Maybe -- I don't know.  I can

8    speculate.  Because I had been there since 2008.

9         Q.      I don't want you to guess.  If you

10   have an idea of what it might have been, even if

11   you don't know the exact words that were said,

12   you can talk about that.

13        A.      I don't know.

14        Q.      If you don't know, I don't want you

15   to guess.

16        The next line says, "Didn't cause the

17   issue."

18        Let me make it a little bigger.  It says,

19   "Concerns and parents' lawyer."  Do you remember

20   anything about that?

21        A.      No, I really don't.

22        Q.      At the end of the page, on 994, Curt

23   Dietrich's initials are here.  At the bottom two

24   lines it says, "Promise I'll think about it, but

25   I need (be remiss) to tell you really times

```
1    three" -- like really, really, really --
2    "egregious act."
3         Do you remember Mr. Dietrich saying to you
4    that it was a really, really, really egregious
5    act?
6              MS. JORDAN:  Note my objection to
7    the form of the question.
8              You can answer.
9              THE WITNESS:  I don't remember the
10   specific words that he said to me.
11   BY MS. LAUGHLIN:
12        Q.     Do you remember him like in that
13   context generally saying about it being a really
14   egregious act, what you did?
15             MS. JORDAN:  Note my objection to
16   the form of the question.
17             You can answer.
18             THE WITNESS:  I remember him being
19   upset at the end of the meeting and saying that
20   it was a negative -- yes, it was an inappropriate
21   act.
22   BY MS. LAUGHLIN:
23        Q.     What gave you the impression that he
24   was upset at the end of the meeting?
25        A.     Just his demeanor, his words.
```

1    Obviously, it's there in the meeting notes.

2        Q.       **What about his demeanor gave you the**

3    **impression of that?**

4        A.       Tone of voice.

5        Q.       **Was he raising his voice?**

6        A.       No.  It was more -- no.

7        Q.       **Was it more of like a stern tone; do**

8    **you mean?**

9        A.       Yes, I would say that.  Yes.

10       Q.       **Do you recall like what he was**

11   **saying to you when he was explaining this to you**

12   **that it was not appropriate?**

13       A.       I really don't remember specific

14   words that he said.

15       Q.       **Do you remember generally what he**

16   **was saying to you in the explanation?**

17       A.       Just like I said, that he was upset

18   about it.

19       Q.       **But do you remember what he told you**

20   **he was upset about, if there was anything more**

21   **specific?**

22       A.       I don't know.

23       Q.       **At the very top of page 995, there**

24   **is a comment regarding "in public and in news**

25   **today for us, as an education institution, and**

 1    the speed of the response."

 2         Do you recall any discussions about that in

 3    the meeting?

 4         A.      No.

 5         Q.      There are some discussion -- or

 6    notes here regarding things Alan was saying at

 7    the meeting.  And there's the discussion of "20

 8    years ago, okay -- now?"  And then it says, "Two

 9    friends being too amorous when lights went out."

10         Do you recall this part of the meeting at

11    all?

12         A.      No.

13         Q.      And right below that, Curt Dietrich

14    has noted, "Holly, you're trying to take on self

15    and make decision; need to get others involved."

16    And then the next line says -- it's your

17    initials, and it says, "Talked to grade partner."

18         Do you remember this part of the

19    conversation that you were having in the meeting?

20         A.      No, I don't.

21         Q.      Two lines down your initials appear

22    again, and it says, "Snowballed -- police

23    involved and more students."

24         Do you see that?

25         A.      Yes, I see it.

1      Q.      Do you recall this part of the

2  meeting in this discussion?

3      A.      I really don't.  No, I don't.

4      Q.      At the very bottom of page 995,

5  there's a note of Curt Dietrich talking again,

6  and it says, "That's exactly why we need to deal

7  with it."  And it says, "Approp. in the

8  beginning" -- A-P-P-R-O-P, period -- "other thing

9  bad talking to the kids together; the victim is

10 not comfort, zip it, and won't talk."

11     Do you recall this discussion in the

12 meeting?

13     A.      I remember in the meetings I had

14 with Cheryl McHugh -- and I'm sure with Curt

15 Dietrich -- that it was discussed that I should

16 not have pulled the students out together.  I

17 don't specifically remember Curt Dietrich saying

18 that to me in the meeting.

19     Q.      Do you know if you were present for

20 the entire meeting?

21     A.      I would assume that I was.

22     Q.      I don't want you to guess.  But I'm

23 wondering, if you know, in this meeting you kind

24 of gave your discussion with everybody and then

25 left, and they continued to meet, if you know, or

1    if you were part of this total discussion where

2    everybody is kind of talking about things?

3         A.    I don't know.

4               I know that Alan and I left at the

5    same time.

6         Q.    This is on page 996, where I guess

7    Alan was speaking again.  It says, "Concern with

8    PB's form."

9         Do you know what that's referring to; what

10   that means?

11        A.    Bill Bowen.

12        Q.    Concern with Bill Bowen's form?

13        A.    I don't know.

14        Q.    Do you know what that could be

15   referring to?

16        A.    I'm not sure.

17              Maybe the office referral form.

18        Q.    But you're not sure?

19        A.    I'm not sure.

20        Q.    The last thing on page 996, it says,

21   "Perception that Bill doesn't want to be bothered

22   with things."

23        Do you see that?

24        A.    Yes.

25        Q.    At the time did you have a

1    perception about Bill Bowen not wanting to be

2    bothered with things?

3         A.        There were several instances

4    throughout the years that I worked with him where

5    he didn't really handle or deal with situations.

6         Q.        What do you mean by that?

7         A.        A student misbehaving in the

8    classroom, and the principal was called, and he

9    would not respond.  I know of other behavior

10   slips that went to the office and nothing had

11   happened.

12        Q.        Is this just things that you knew

13   about that personally happened to you or -- I

14   guess that's my question -- are these things that

15   personally happened to you?

16        A.        There were some behavioral incidents

17   with students that I would reach out to the

18   office, and they were not handled.  And then also

19   with the teachers that I worked with.  So I had

20   personal, and also within the building.

21        Q.        Okay.  In the incidents where you

22   personally were the one contacting the office and

23   you said "they weren't handled," without

24   identifying who the student was -- unless it

25   happened to be ▓▓▓▓ or ▓▓▓▓ -- can you tell

1     me what you can remember about each of those
2     times; what had happened?
3          A.     I don't remember specific times.
4     Like, I can't give you a specific incident.
5                 I just remember that was the general
6     feeling within the building among the staff.
7          Q.     Did anybody, whether you or you're
8     aware of somebody else, go to somebody to let
9     them know about that being the "general feeling"?
10         A.     Going to?
11         Q.     Whether it was Mr. Bowen himself or
12    anybody else.
13         A.     Not that I can remember, no.
14         Q.     Do you remember there ever being any
15    meetings about the responsiveness or lack thereof
16    of Mr. Bowen to incidents?
17         A.     No.
18         Q.     The incidents that you have
19    mentioned you going to or submitting something to
20    the office, and then it not being handled, do you
21    recall at all the types of behaviors that were at
22    issue in those situations?
23         A.     Like, behavioral disruptions in the
24    classroom.  Yeah, I would say that.
25         Q.     Do you know whether any of them had

1  anything to do with kids touching other kids?

2    A.    No.

3    Q.    No, it didn't; or no, you don't

4  remember?

5    A.    No, it didn't.

6         I mean, I can only speak for the

7  ones that I submitted to the office.  I can't

8  speak for other staff members, what they

9  submitted.  But there were none that I submitted

10  that were of students touching each other.

11   Q.    When you're saying you "submitted it

12  to the office," what type of submission did you

13  make to Mr. Bowen's office?

14   A.    It's the behavior form that we've

15  been talking about.  If it was a major offense,

16  it would go right to the office.  If it was like

17  a fight, that form would go directly to the

18  secretary.

19   Q.    And would you, like, drop it off in

20  the secretary's bin, to be passed along to the

21  principal, or how did that work?

22   A.    Yes.

23   Q.    Do you have an estimate of the

24  number of times that you personally had done that

25  and felt that it wasn't handled?

```
 1       A.      No.  I don't know.

 2       Q.      Was it more than once?

 3       A.      Yes.

 4       Q.      Do you remember if it was more than

 5  five times?

 6       A.      No.

 7       Q.      At this point, in 2015, these

 8  comments are saying that "There is a perception

 9  that Bill didn't want to be bothered with

10  things."

11       So would you agree with me that these

12  incidents that you're talking about would have

13  happened -- at least some of them -- prior to

14  June of 2015, when this meeting is being held?

15                 MS. JORDAN:  Note my objection to

16  the form of the question.

17                 THE WITNESS:  What would have

18  happened prior to June of 2015?

19  BY MS. LAUGHLIN:

20       Q.      The incidents where you had reported

21  it or dropped off the form and it didn't get

22  handled.

23                 MS. JORDAN:  Same objection.

24                 You can answer.

25                 THE WITNESS:  Yes.
```

1    BY MS. LAUGHLIN:

2         Q.        Can you estimate for me when?  Was

3    it this school year or had it been happening

4    since you got there in 2008, you were having

5    issues with that?

6         A.        Bill Bowen was not the principal in

7    2008.  I'm not sure when he started.

8                   But it was the previous year, as

9    well.

10        Q.        I got to talk to Mr. Bowen earlier

11   this week.  And I think he said he started in

12   2013, if that gives you some context.

13        So from 2013 to 2015, there were several

14   incidents where you had reported a behavioral

15   incident, and it was not handled; is that

16   correct?

17        A.        Or the grade level I was working

18   with had reported a situation, and it was not

19   handled.  Correct.

20        Q.        Like, both you're saying?

21        A.        Yes.

22        Q.        In your specific incidents when you

23   were submitting these referral forms and it was

24   not handled, how did you know that it was not

25   handled?

1      A.      Because when a situation was

2  handled, he would fill it out and give it back to

3  the teachers.  So we would never see it again or

4  hear about it again.

5      Q.      Meaning, that he would fill it out,

6  like make comments on your office referral form?

7      A.      Yes.

8      Q.      And then where would it go back to?

9      A.      Sometimes a copy was made.  He would

10  always keep a copy, too.  It would go back to the

11  teacher, to let them know what the consequences

12  were or if the parent was contacted, or if

13  something had happened from the behavior

14  write-up.

15      Q.      Okay.  In the situations where you

16  had submitted that report and nothing had

17  happened, did the behavior of the kids change or

18  was that still something that you were dealing

19  with then?

20      A.      I don't remember a specific student,

21  like a repeat.  I don't remember that.

22      Q.      Is there anything about you

23  reporting specifically and then not having

24  anything happen that you can remember that we

25  didn't already talk about?

1          A.      No.

2          Q.      What about in the other grades that

3     you were working with?  You said other people had

4     other similar complaints.  What do you recall

5     about those?

6                    MS. JORDAN:  Note my objection to

7     the form of the question.

8                    You can answer.

9                    THE WITNESS:  Just like I had said

10    before, it was just kind of the perception that

11    people had based on experiences of them having a

12    situation in the classroom, submitting the form,

13    and then nothing happening from --

14                   (Multiple speakers.)

15                   MS. LAUGHLIN:  Sorry.  Go ahead.

16                   THE WITNESS:  That's okay.  I was

17    finished.

18    BY MS. LAUGHLIN:

19         Q.      Was it only submission of forms or

20    were there, to your knowledge, other

21    conversations they had with Bill and just feeling

22    like he didn't want to be bothered?

23         A.      I can't speak to other peoples'

24    conversations with Bill.

25                   I would say it was just the forms,

1    because that was his method that he wanted us to

2    use.  And there were many of us that just felt

3    things were not followed through.

4        **Q.        Do you know whether you or anybody**

5    **else had spoken to anybody like Ms. Vaszily or**

6    **anybody other than Bill about your frustration**

7    **with the way Mr. Bowen was handling things?**

8              MS. JORDAN:  Note my objection to

9    the form of the question.

10              You can answer.

11              THE WITNESS:  Yes.  The teachers'

12   frustrations were shared with the building

13   guidance counselor.

14   BY MS. LAUGHLIN:

15       **Q.        Was that Ms. Vaszily at the time or**

16   **someone different?**

17       A.        Correct.  Yes, Kristin Vaszily.

18       **Q.        Do you know when you or the other**

19   **teachers had shared the frustrations with her?**

20       A.        Not a specific moment, no.

21       **Q.        What was Ms. Vaszily's reaction?**

22       A.        I can't speak to her reaction.  I

23   don't know.

24              I think it was just -- a building

25   guidance counselor is kind of like everybody's

1    guidance counselor.  And she had a great rapport

2    with all of the staff at Gwynedd Square.  So I

3    think it was just that comfort -- we felt

4    comfortable to be able to vent or even discuss

5    things with her about the building.

6         Q.      Did anything change about the way

7    that Mr. Bowen handled things after your

8    conversations with Ms. Vaszily?

9         A.      No.

10        Q.      I know we kind of talked about that

11   you had described from 2013 to 2015, a bunch of

12   you having this impression of him.  Did that

13   impression of him, that he didn't want to be

14   bothered with things, continue through 2019, when

15   he left Gwynedd?

16        A.      I would say yes.

17        Q.      Were there other instances after

18   2015 that you can recall him not wanting to be

19   bothered with things?

20        A.      Not a specific student.  No, I can't

21   remember a specific situation.  No.

22        Q.      You said when Mr. Bowen came to the

23   school in 2013 that he was the one having

24   implemented this office referral form and

25   utilizing that.  Is that right?

1      A.      Correct.

2      Q.      What was the process before then, if

3 there was an incident or something like that with

4 a student, to document or notify somebody?

5      A.      I think we had an office referral

6 form then, as well, if I remember.  I think it

7 was like the three different colors.  If you

8 wrote on it, it would go through and you could

9 tear it off.  It was a different form, but

10 something along the same lines, something very

11 similar.

12      Q.      Do you know who implemented that

13 prior form?

14      A.      We had a year with a few substitute

15 principals.  But the previous principal before

16 that was Lou Ann Justice.

17      Q.      And that was something Ms. Justice

18 had put in place?

19      A.      Yes.

20              Actually, I can't say that.  I don't

21 know.

22              It was there when I started in 2008.

23      Q.      When Ms. Justice was the principal?

24      A.      Yes.  Correct.

25      Q.      When Mr. Bowen was implementing the

```
 1    office referral form when he started as a
 2    principal in 2013, did he give you, as a teacher,
 3    or any of the other teachers, if you know, any
 4    training or instruction on completing the form?
 5         A.       He shared the form with us at a
 6    faculty meeting and discussed the form.  I don't
 7    remember specifically exactly what he said.  But
 8    he said basically, "This is what we'll be using
 9    now for behavioral issues within the building."
10         Q.       Okay.  So I want to go to the office
11    referral form now, which is page 1023.  And this
12    is an office referral form for
13         You mentioned, though, that you had filled
14    one out for            as well?
15         A.       Yes.
16         Q.       Do you know what happened to that
17    referral form?
18         A.       I do not.
19         Q.       Do you know whether what you put on
20               form was the same as what you were
21    putting on          form?
22         A.       It was exactly the same.
23         Q.       And why did you fill out a form for
24    each of them?
25         A.       I thought at the time that the
```

1   situation involved both of them.  Both of their

2   hands were under the table.  ███████ was touching

3   ███████ hands.

4        Q.        When you say "███████ was touching

5   ███████ hands," were their hands like rubbing

6   each other's hands or were their hands just

7   touching each other?

8                  MS. JORDAN:  Note my objection to

9   the form of the question.

10                  You can answer.

11                  THE WITNESS:  I don't know if they

12  were moving around.  I just remember having both

13  of ███████ hands and both of ███████ hands

14  under the table.

15  BY MS. LAUGHLIN:

16       Q.        You don't recall if their hands were

17  touching, you mean?

18       A.        No.  I meant like moving, if they

19  were just placed there or -- I don't remember

20  them moving, but I know that they were touching

21  each other's hands.

22       Q.        Do you recall where their hands

23  were, whether they were on somebody's leg or just

24  suspended in the air?

25       A.        Correct.  They were on each other's

legs.

**Q. Describe for me whose legs were they on? Whose hands were on whose legs?**

A. I don't know.

**Q. You said, "They were on each other's legs." What did you mean?**

A. [redacted] was sitting on the left, and [redacted] was on right, and both of their hands were underneath the table. So I guess it would have been [redacted] right leg and [redacted] left leg, because their arms were hanging down underneath the table.

**Q. Was [redacted] hand on [redacted] leg, and [redacted] hand on [redacted]s?**

A. Their legs weren't touching. Their hands were touching.

**Q. You said their hands were also touching each other's legs, too.**

**Did I misunderstand that?**

A. Well, I guess it's just the way I'm describing it. [redacted] arm is resting on her leg to touch [redacted] hand.

**Q. Were they touching each other's legs at all?**

A. I don't know.

1      Q.      You don't know whether ▇▇▇ was
2   touching ▇▇▇ leg?
3      A.      I don't know.
4      Q.      Other than ▇▇▇ wearing a
5   sweatshirt, do you remember what she was wearing
6   on her bottoms?
7      A.      No.
8      Q.      This form, you said Mr. Bowen had
9   showed it to you first at a faculty meeting.  Was
10  that when he first became principal?
11     A.      I don't remember exactly when he
12  shared the form with us.
13     Q.      Prior to the 2014-2015 school year,
14  do you recall whether he shared it with you guys
15  more than once?
16     A.      I don't know.
17     Q.      When he's showing you this form, did
18  he give any explanation to you and whoever else
19  was in this faculty meeting about, for example,
20  the difference between "Minor Problem Behavior"
21  and "Major Problem Behavior"?
22     A.      Not specific examples of
23  differences.
24             He told us three minors need to go
25  to the office, and one major needs to come to the

1    office.

2        Q.        Do you remember having any questions

3    about the form and his explanation?

4        A.        No.

5        Q.        Did he explain at all what

6    "Inappropriate Language" meant?

7        A.        I don't recall him going through

8    each behavior and explaining it; no.

9        Q.        So "Physical Contact," he didn't

10   explain to you what would qualify as physical

11   contact?

12       A.        Correct.

13       Q.        Is that something just you, as a

14   teacher, what you thought physical contact was,

15   you could fill out the form based on what your

16   thought was?

17       A.        Yes.  I guess.

18       Q.        When you talked to Mrs. Divver about

19   completing these forms, did you show her the

20   forms that you had completed back in November?

21       A.        I did show her the forms when I

22   completed them, because she filed them.  She kept

23   them in her classroom.

24       Q.        Do you know where in the classroom

25   they were kept?

```
 1        A.       She had, like, a milk crate.  And
 2   each student had their own file, like a file
 3   folder, just throughout the year.  She kept them
 4   in there.
 5        Q.       So one would have been in ████████
 6   milk crate, and one would have been in ████████
 7   milk crate?
 8        A.       Just one milk crate with multiple
 9   file folders.
10        Q.       Okay.
11        A.       A file folder for each student.
12        Q.       I understand.
13        If Mr. Bowen didn't go through what each of
14   the "Minor Problem Behaviors" were, did he also
15   not go over what the "Major Problem Behaviors"
16   were?
17        A.       He did not; no.
18        Q.       At the time what did you believe
19   "Harassment, Bullying" meant on this form?
20        A.       A student harassing another student.
21        Q.       And what did that mean to you, "a
22   student harassing another student"?
23        A.       I guess verbal harassment.
24                 Bullying is something I know we're
25   taught -- bullying is something that continually
```

1 happens.

2     Q.     Was there anything on this form that

3 you are aware of, from your understanding of what

4 the terms meant on the form, that could be

5 checked off for some type of sexual contact?

6     A.     That was never discussed with us.

7     I guess that would have been

8 "Other."

9     Q.     "Other" under what?

10     A.     If I was going to report sexual

11 contact on the office referral form; is that what

12 you're asking?

13     Q.     I'm asking about sexual contact, if

14 you know, if it would have fallen under any of

15 these categories. I think you told me "Other."

16 There's "Other" in Minor Problem Behavior and

17 "Other" in Major Problem Behavior. So I'm asking

18 what you're referring to?

19     A.     I would say that would be a Major

20 Problem Behavior.

21     Q.     At the time what defines "sexual

22 contact"? What was your understanding of that,

23 what sexual contact was?

24     A.     Inappropriate touching.

25     Q.     Did it have to be on a particular

1  part of the body?

2      A.      I don't know.

3      Q.      Would you agree with me, at the

4  time, that a boy putting his hand up a female

5  student's shirt, would that be inappropriate

6  contact at the time, like what you knew at the

7  time?

8              MS. JORDAN:  Note my objection to

9  the form of the question.

10             You can answer.

11             THE WITNESS:  Yes, that is

12  inappropriate contact.

13  BY MS. LAUGHLIN:

14     Q.      Why did you call it "Physical

15  Contact" here as a Minor Problem Behavior on the

16  form?

17     A.      I do feel that I caught it

18  immediately.

19     Q.      What do you mean?

20     A.      Like, he did not get to fully put

21  his hand all the way up her shirt.  It was caught

22  immediately and dealt with.

23             And the fact that ▮▮▮▮ was also

24  touching ▮▮▮▮  And I wrote up an office

25  referral form for ▮▮▮▮ as well.

1    Q.      Meaning, he didn't get to go all the
2  way up her shirt to where her breasts were, you
3  meant?  You caught it before that point?
4    A.      Yes.  Like, his hand didn't even
5  really get up the shirt.  He had just started to
6  do that.  And I caught them and stopped them and
7  pulled them out in the hallway.
8    Q.      When you said "⬛⬛⬛ was touching
9  ⬛⬛⬛ you meant touching his hand?
10    A.      Yes.
11    Q.      Was it the hand that was going up
12  ⬛⬛⬛ shirt that she was touching?
13    A.      Her hands were like over his hands
14  at that point -- over his arms.
15            I don't know how to describe it.  I
16  don't know how to describe this.
17            All four hands were under the table.
18    Q.      Then one of ⬛⬛⬛ hands started
19  to go up ⬛⬛⬛ shirt; right?
20    A.      Yes.
21    Q.      Was ⬛⬛⬛ hand on ⬛⬛⬛ hand
22  at all on that hand that was going up ⬛⬛⬛
23  shirt?  Was she touching that hand?
24    A.      I don't know if it was that specific
25  hand.  But her hands were under the table,

1    touching his arms and hands.  So yes.

2        Q.      I'm saying at the time that his hand

3    was going up her shirt, was ▮▮▮▮ hand on that

4    hand of ▮▮▮▮'s?

5        A.      I don't know.

6                ▮▮▮▮ hand was not going up her

7    own shirt.  So her hand may have been on his arm

8    at that point.

9        Q.      I'm just asking.  If you don't know

10   or you're not sure, I don't want you to guess.  I

11   wasn't there.  So I can't say what I saw.  I can

12   only ask you what you recall.

13       And I'm asking, do you recall whether

14   ▮▮▮▮ -- one of her hands was on ▮▮▮▮ hand

15   that was going up her shirt while it was going up

16   the shirt?

17       A.      I don't recall.

18               I recall all four hands being under

19   the table.  And I recall, like, feeling that I

20   caught it literally the second it was happening,

21   to stop his hand from going up.

22       Q.      When you caught it, when you stood

23   up and pointed to them and were calling them out

24   of the room, could you see ▮▮▮▮ hand that was

25   going up the shirt or was it covered by the

1    sweatshirt at that point?

2        A.      I don't remember.

3        Q.      Is there a certain point in your

4    understanding at the time that something would

5    become sexual contact; meaning, how far up the

6    shirt did he have to go or did a person have to

7    go for it to be defined in your understanding as

8    "sexual contact"?

9                MS. JORDAN:  Note my objection to

10    the form of the question.

11                You can answer.

12                THE WITNESS:  I don't know.

13    BY MS. LAUGHLIN:

14        Q.      Did you have an understanding of

15    whether there was a level of once it got to a

16    certain part of the body, it would be sexual

17    contact?

18        A.      I guess no, not like a specific part

19    of the body that would all of a sudden make it

20    sexual contact.  No.

21        Q.      Why did you select "Physical

22    Contact" on the form?

23        A.      Like I said, they were both touching

24    each other.  That was why I chose that behavior.

25        Q.      I'm going to show you page 985.

 1    This is a letter dated February 1, 2016, from

 2    Charles Herring, from the Pennsylvania State

 3    Education Association, to Kyle Somers, the

 4    District's lawyer, who is here sitting in the

 5    deposition today.

 6         And it mentions in the second line of this

 7    letter that you had "received an evaluation that

 8    requires a Professional Improvement Plan based

 9    upon the incident of last November."

10         Do you recall receiving a Professional

11    Improvement Plan?

12         A.    I did not.  Because it was part of

13    the grievance, and that was taken away.

14         Q.    The evaluation was taken away?

15         A.    No.  It says, "The evaluation

16    requires a Professional Improvement Plan."  I

17    never actually got to the point where I was in a

18    Professional Improvement Plan.

19         Q.    Okay.

20         A.    They removed it.  It was something

21    the district was going to do, but then it was

22    removed.

23         Q.    After the grievance was filed?

24         A.    Correct.

25         Q.    Did you have any discussions with

1    anybody from the district -- not a lawyer, but

2    whether it's Mr. Bowen or anybody else about you

3    going to get a Professional Improvement Plan?

4        A.    No.

5        Q.    Earlier when you were telling me

6    about Professional Improvement Plans, it was, I

7    think, your understanding that you had to have

8    two failings to get a Professional Improvement

9    Plan.  Is that right?

10       A.    Yes.

11       Q.    When you said "two failings," did

12    you mean two separate evaluations or two failings

13    within one evaluation?

14       A.    I'm pretty sure it's two separate

15    evaluations.

16       Q.    And so I think -- go ahead.

17       A.    I think the district was putting me

18    on the Professional Improvement Plan based upon

19    the incident that happened in November.

20       Q.    And based on your testimony

21    previously, you only had one unsatisfactory

22    evaluation or one failing evaluation; right?

23       A.    Correct.

24       Q.    So then you didn't actually have to

25    do a Professional Improvement Plan?

```
 1        A.      Correct.

 2        Q.      There were some notes about the case

 3   going to arbitration; your grievance going to

 4   arbitration.  Did you ever have an arbitration or

 5   did it settle before then?

 6        A.      It settled.

 7        Q.      I'm showing you Bates number 1001,

 8   and it's the Agreement regarding you and the

 9   incident.

10        Have you seen this document before?

11        A.      Yes.

12        Q.      And that's your signature at the end

13   of it?

14        A.      Yes.

15        Q.      By you signing this, did you agree

16   with what was in this form, if you can recall, at

17   the time?

18        A.      I guess I would say yes.  It says,

19   "I have approved this Agreement."

20        Q.      Would you have signed it if you

21   didn't agree with it?

22        A.      I'm sure -- I was under the

23   direction of Sean Devlin at that point, as well.

24   Advice from him.

25        Q.      And he's the Education Association
```

1    president?

2        A.        It had just changed from Alan to

3    Sean in the course of this situation; yes.

4        Q.        But even with his direction, would

5    you have signed this document if you didn't agree

6    with it?

7        A.        If I didn't agree with it, no, I

8    would not have signed it.

9        Q.        Following the November 2014

10   incident, and then when it came to light to the

11   administration in the spring of 2015, did you get

12   any further training from anybody based on the

13   November incident?

14       A.        Nothing in addition to what any

15   other teacher would receive through our

16   professional development.

17       Q.        Okay.  Did Ruth Divver get

18   disciplined at all as a result of the November

19   incident?

20       A.        I'm not sure.

21       Q.        Did you and Ms. Divver have any

22   discussions about the discipline that you were

23   receiving from the incident?

24       A.        She knew I was suspended, because I

25   worked with her and I wasn't going to be there

1    for two days.  And I'm sure she knew about the

2    evaluation at the end of the year, as well.

3        Q.      Do you know whether she had also

4    received a negative evaluation?

5        A.      I don't remember.

6        Q.      I know you said you discussed you

7    getting a negative evaluation.  Do you remember

8    at all the conversations or what she had said

9    about it?

10       A.      I don't remember.

11       Q.      Do you remember whether she agreed

12   with the negative evaluation or the discipline?

13       A.      I don't remember.

14       Q.      Other than the conversations we've

15   talked about, the meetings and the ones that you

16   may have had with Mrs. Divver, do you remember

17   any other conversations you had with anybody

18   surrounding these incidents?

19              MS. JORDAN:  Note my objection to

20   the form of the question.

21              You can answer.

22              THE WITNESS:  Nothing that I haven't

23   shared with you.

24   BY MS. LAUGHLIN:

25       Q.      Did you ever talk to ████ about it

```
 1    other than pulling her and ███████ out in the
 2    hallway?
 3         A.      No.
 4         Q.      Were you her special education
 5    support in the sixth grade, as well?
 6         A.      Yes.
 7         Q.      Did you notice at all a difference
 8    in the way ███████ interacted with you in fifth
 9    grade compared to sixth grade?
10         A.      No.
11         Q.      Did you ever have any issues with
12    ███████ whether it be behavior issues or other
13    issues with her, during the course of ███████
14    fifth grade and sixth grade year?
15         A.      No.
16         Q.      Did you ever talk to ███████
17    parents about the incident?
18         A.      No.
19         Q.      Did you ever talk to ███████
20    parents about the incident?
21         A.      No.
22         Q.      Did you ever exchange any emails
23    about this incident in any way?
24         A.      No.
25         Q.      What about text messages?  Any kind
```

1    of text messages that you exchanged?

2        A.      No.

3        Q.      Did you keep a journal or diary

4    around 2014-2015?

5        A.      No.

6        Q.      Other than the office referral form

7    that we looked at and the handwritten notes that

8    we looked at towards the beginning of the

9    deposition, are there any other notes that you

10   made as a result of this incident?

11       A.      No.

12       Q.      I'm going to show you one other

13   page.  I'm showing you page 983.  And this is

14   your evaluation that you mentioned at the end of

15   the year.

16       Is this something that was kept in your

17   employee file or your teacher file, as far as you

18   know?

19       A.      Yes.  And we're also given a copy of

20   it.

21       Q.      Okay.  Just for you to keep for your

22   own records or to see what was there?

23       A.      Correct.

24       Q.      Do you recall Mr. Bowen -- he

25   described that throughout the year, he would come

1    in to teachers' classrooms to observe them.

2        Do you recall him doing that for you in the

3    2014-2015 school year?

4        A.    I don't remember.

5            Because sometimes I would get

6    observed by the building principal, and sometimes

7    I would get observed by the special education

8    supervisor.

9        Q.    I think Bill, on Monday of this

10   week, had said that he was the one evaluating

11   you.  Maybe it might have just been in this

12   2014-2015 school year.

13       Do you recall any -- sorry, go ahead.

14       A.    The final evaluations are always

15   from the building principal.  But the

16   observations can vary between supervisor or

17   building principal.

18       Q.    Do you recall the principal, Mr.

19   Bowen, coming in and observing you at all during

20   the 2014-2015 school year?

21       A.    Yes.

22       Q.    Can you tell me what you remember

23   about those evaluations -- those observations?

24       A.    I was really struggling at the

25   beginning of the year, because we had just moved

```
 1    to full inclusion and I had three grade levels.
 2    So he actually followed me one day throughout my
 3    schedule, just to see how I had to go up stairs
 4    and down stairs.  And then we met afterwards to
 5    discuss my schedule.
 6         Q.      Do you know about when that was?
 7    You said early on in the year, but do you know
 8    the month?
 9         A.      I don't know exactly.
10                 I would assume September.
11         Q.      Would it have been prior to the
12    incident in November?
13         A.      Yes.
14         Q.      As of November, were you still like
15    struggling or overwhelmed with the inclusion,
16    would you say, at that point, the full inclusion,
17    I mean?
18         A.      No.
19         Q.      When you and Mr. Bowen had the
20    discussion about the schedule and you going up
21    the stairs and down the stairs, can you tell me
22    what you remember about that conversation?
23         A.      I think I ended up he referred me to
24    the special education supervisor.  And we talked
25    about my schedule and how I could make my day a
```

1   little bit easier.

2       Q.      So what ended up happening?

3       A.      We met with a few of the teachers

4   that I worked with and really just talked about

5   how I was responsible for the IEP students, to

6   kind of hone in on when I was in the classroom,

7   what I should be doing and what I should be

8   working on.

9       Q.      Did they change your schedule at

10   that point, too, so you weren't running up and

11   down between classes?

12       A.      No.

13       Q.      So that was still something -- in

14   November, you were still having to run from one

15   floor to the next to observe or help these

16   students?

17       A.      Yes.

18       Q.      Are there other things that weren't

19   changed that you wish were at the time based on

20   the meeting that you had with the special

21   education supervisor and Mr. Bowen?

22       A.      No, not that I can think of.

23       Q.      On page 983, the evaluation that you

24   had, do you recall having a meeting with Mr.

25   Bowen about this evaluation, like going over it?

```
1      A.      Yes.

2      Q.      And what do you recall about that

3  meeting?

4      A.      I had union representation there.

5      Q.      Meaning Alan or what do you mean?

6      A.      No.  It was a building rep.

7      Q.      Okay.  What else?  Do you remember

8  anything about the discussions that were had in

9  the meeting?

10     A.      I remember crying.

11             I don't remember specifically -- I

12  had gotten good evaluations from the previous

13  year.  I don't specifically remember what Mr.

14  Bowen and I discussed; no.

15             I know I was very upset with the

16  failing marks, and I wanted to meet with him,

17  just to clarify why I received the failing marks.

18     Q.      To understand from him why he gave

19  you the failing marks?

20     A.      Yes.

21     Q.      Was that the meeting that you were

22  crying in, when he was explaining it to you?

23             MS. JORDAN:  Note my objection to

24  the form of the question.

25             You can answer.
```

```
 1              THE WITNESS:  Yes.  Yes.
 2   BY MS. LAUGHLIN:
 3        Q.       Why were you crying during the
 4   meeting?
 5        A.       I'm just very emotional, and it was
 6   just a really hard year.  And then I felt like
 7   this was just -- I was just really upset.  I had
 8   never had a failing evaluation before, ever.
 9        Q.       And were you explaining that to him
10   in the meeting?
11        A.       Yes.
12        Q.       Were you explaining to him that you
13   didn't feel like the failing was warranted?
14        A.       And I remember saying, "Just looking
15   at the entire year, I didn't feel that I was
16   failing in those two areas."  Correct.
17        Q.       And then what did he say?  If you
18   were saying "look at the entire year," did he
19   tell you "this incident was so big," or what did
20   he say in response?
21              MS. JORDAN:  Note my objection to
22   the form of the question.
23              You can answer.
24              THE WITNESS:  He was directed to
25   give me the failing in the two areas.
```

 1   BY MS. LAUGHLIN:

 2        Q.      He told you that?

 3        A.      Yes.

 4        Q.      Who was he directed by?

 5        A.      He didn't say.

 6        Q.      Was he telling you that he didn't

 7   think that you needed to be failing in those

 8   areas; like someone told him to do that?  He

 9   didn't believe you were failing?

10                MS. JORDAN:  Note my objection to

11   the form of the question.

12                You can answer.

13                THE WITNESS:  I don't remember.

14   BY MS. LAUGHLIN:

15        Q.      I'm showing you Bates number 1026.

16   It's the Elementary School Code of Conduct.

17        Have you seen this document before?

18        A.      I can't say that I have; no.

19        Q.      Now that it's a little bit bigger on

20   your screen, have you seen this document before?

21        A.      No.

22        Q.      Do you know if you ever received

23   training prior to the 2014-2015 school year on

24   the Elementary School Code Of Conduct?

25        A.      I don't remember.

1              MS. LAUGHLIN:  I think those are all

2    the questions I have for you, Ms. Garrett.  Thank

3    you.

4              MS. JORDAN:  I just have a few

5    questions.

6    EXAMINATION BY MS. JORDAN:

7         Q.      You were the case manager for

8    ▮▮▮▮▮▮  correct?

9         A.      Yes.

10        Q.      And did that start in fourth grade?

11        A.      No.  Fifth grade.

12        Q.      When you had her in fifth grade, it

13   was full --

14        A.      Self-contained.

15        Q.      So she was coming to your classroom?

16        A.      Correct.

17        Q.      Then in sixth grade, that's when it

18   changed to full inclusion, into the regular

19   curriculum?

20        A.      Correct.

21        Q.      And in that first year that you were

22   her case manager, were there other students in

23   the classroom when she came to your classroom?

24        A.      Yes.

25        Q.      Would you ever have one-on-one with

1    her?

2        A.      Yes.

3        Q.      And did that continue in the sixth

4    grade when it was full inclusion?

5        A.      Yes.

6        Q.      How often would you meet with her

7    one-on-one?

8        A.      For IEP progress monitoring, for her

9    goals, I would say every week or every other

10   week.

11       Q.      So you're meeting with her on a

12   regular weekly basis by herself --

13       A.      Yes.

14       Q.      -- during her school year?

15       A.      Yes.

16       Q.      By the time that sixth grade started

17   and you had had a full year with her, did you

18   feel as though you knew ▇▇▇▇ as a student?

19       A.      Yes.

20               MS. LAUGHLIN:  Objection.

21   BY MS. JORDAN:

22       Q.      Did you have conversations with her

23   that were not related to her academics only?

24       A.      I'm sure we did.  I mean, I can't

25   remember a specific conversation.  But my

 1    students like to share about their weekends or if

 2    they were excited about something that was coming

 3    up.

 4         Q.      And when the sixth year started and

 5    it was full inclusion, were you still meeting

 6    with her once a week by herself?

 7         A.      To progress monitor for the IEP

 8    goals, yes.

 9         Q.      Did she have any struggles with the

10    full inclusion in regards to academics?

11         A.      Not that I remember.

12         Q.      Did she have any difficulty with the

13    full inclusion outside of academics that she

14    related to you, to your recollection?

15         A.      No, not that I remember.

16         Q.      After the incident in November with

17    ███████ in the classroom where you called them

18    out, other than discussing the incident with them

19    in the hallway, as you recall, did you have any

20    further conversation with her when you met with

21    her one-on-one?

22         A.      No.

23         Q.      Did you have any further

24    conversation with her regarding that incident in

25    any respect?

```
 1       A.      No.

 2       Q.      Did her behavior change at all after

 3  that incident with you in your one-on-one

 4  meetings and/or in your interaction in the

 5  classroom?

 6       A.      No.

 7       Q.      After the incident occurred, prior

 8  to learning of the November -- I'm sorry -- the

 9  April 2015 incident, did she ever make any

10  statements to you about ▮▮▮▮▮▮

11       A.      Not that I can remember, no.

12       Q.      After learning about the incident

13  involving ▮▮▮▮ with the other girl in the same

14  grade, did you have any conversation with ▮▮▮▮

15  about the incident in November?

16       A.      No.

17       Q.      Did you have any conversation with

18  her at all about her being separated from ▮▮▮▮

19       A.      No.

20       Q.      Did she say anything to you about

21  being separated from ▮▮▮▮

22       A.      Not that I can remember, no.

23       Q.      Did her demeanor change in any way?

24               MS. LAUGHLIN:  Objection.

25               THE WITNESS:  No.
```

1    BY MS. JORDAN:

2        Q.      Did she -- strike that.

3        Are you aware of any information regarding

4        ████ trying to obtain information about ████

5    after they were separated following the April

6    2015 incident?

7        A.      Just at recess.  It just became very

8    apparent at recess that she wanted to get to him,

9    to play with him or ask him for his phone number.

10       Q.      And when ████ -- strike that.

11       When ████ was having recess, would ████

12   also be having recess?

13       A.      The entire grade level, sixth grade,

14   had recess at the same time.

15       Q.      Would you be out on the recess area?

16       A.      Like recess duty?  All of the sixth

17   grade teachers were.

18       Q.      And what, if anything, do you recall

19   observing in that regard?

20       A.      Just, like, her running around,

21   giggly, like running after him.

22       Q.      Was this after they were separated

23   in class?

24       A.      Yes.

25       Q.      And was there any concern when she

```
 1   was seen running after him --
 2        A.        That was the day that Mrs. Divver
 3   wrote up the observations, and then submitted
 4   that to Mr. Bowen.
 5        Q.        And what is your understanding of
 6   what Mrs. Divver wrote up?
 7        A.        Just that        ████    was seeking him
 8   out.
 9        Q.        Did you ever discuss it with her?
10        A.        No.
11        Q.        After      ████     completed the sixth
12   grade, did you have any further contact with
13        ████     in any regard?
14        A.        No.
15        Q.        Did her mother ever contact you
16   after the incident in April where the incident in
17   November was learned?
18        A.        No.
19        Q.        Had you spoken to her mother
20   regarding her academics prior to that time?
21        A.        Prior to April?
22        Q.        Yes.
23        A.        I would have had to, because we have
24   our annual meeting.  So I would have had to
25   schedule an IEP meeting.
```

1          And then the progress report

2     information is shared with the parents at the end

3     of each trimester.

4          **Q.      At the end of the year, would you**

5     **have another meeting with her mother?**

6          A.      No, not necessarily a meeting,

7     unless parents would request a transition

8     meeting.

9               But I don't recall having a

10    transition meeting from elementary to middle

11    school with her parents.

12               MS. JORDAN:  I have no further

13    questions.  Thank you very much.

14               MS. LAUGHLIN:  I just have a couple

15    of follow up.

16    FURTHER EXAMINATION BY MS. LAUGHLIN:

17         **Q.      When you said that "It was apparent**

18    **at recess that ▮▮▮▮▮ was trying to play with**

19    **▮▮▮▮▮▮ I think were your exact words that you**

20    **used, when you said "it was apparent at recess,"**

21    **what do you mean, "it was apparent"?**

22         A.      Just her seeking him out, like

23    running after him, trying to talk to him.

24         **Q.      Was he seeking her out, as well?**

25         A.      No.

1      Q.      Was it just apparent to you or do
2  you know if it was apparent to other people, from
3  your understanding?
4      A.      Other grade level teachers, yes, it
5  was apparent to them, as well.
6      Q.      Like who?
7      A.      Ruth Divver, Rosana D'Elia, Kelli
8  Asman.
9              (Multiple speakers.)
10             (Court reporter clarification.)
11 BY MS. LAUGHLIN:
12     Q.      How do you know that it was apparent
13 to them, as well?
14     A.      Because it was a visual, you could
15 see it.  You could see her running after him, and
16 you could see her trying to go up and talk to
17 him.
18     Q.      Do you know on how many occasions
19 this occurred?
20     A.      I can't say.  I don't know.
21     Q.      Can you estimate?
22     A.      No.
23     Q.      Do you recall when this was?
24     A.      After the safety plan was created,
25 ▇▇▇▇ schedule was changed.  So ▇▇▇ no

1  longer had classes with          And then that is

2  when we started to notice it at recess.

3       Q.      Was it just          that was going up

4  to           Because one of the examples you gave

5  was "running around" or "chasing around" or

6  something.

7                 (Multiple speakers.)

8                 Go ahead.  I'm sorry.

9       A.      From what I remember, it was just

10          chasing after or chasing towards

11      Q.      Was it just the two of them or were

12  there other kids around, as well?

13      A.      No.  I remember the one day,

14  was playing basketball and there were other boys

15  there.

16      Q.      Were there any other students that

17  were like chasing like you described?

18      A.      No, not that I remember.

19      Q.      So were you aware at this point that

20  there was a separation plan in place?

21      A.      Yes.

22      Q.      If you knew that they were supposed

23  to be separated, did you do anything to alert

24  somebody that she was, as you said, "seeking him

25  out"?

1      A.      I knew that Mrs. Divver had written

2  up the observation and submitted it to Mr. Bowen.

3      Q.      **Do you know whether after that was**

4  **submitted whether anything happened as a result**

5  **of that?**

6      A.      I don't know.

7      Q.      **Would that have been something that**

8  **you would have followed up on?**

9      A.      I guess he would have followed up

10  with Mrs. Divver, if she was the one who

11  submitted the form, but I don't -- or the

12  write-up.

13          But I don't remember -- I don't

14  remember any follow up after that.

15      Q.      **Do you know whether something was**

16  **followed up on by Mr. Bowen or whether it was**

17  **another one of those instances where something**

18  **was submitted and then nothing happened from him?**

19          MS. JORDAN:  Note my objection to

20  the form of the question.

21          THE WITNESS:  I don't know.

22  BY MS. LAUGHLIN:

23      Q.      **I know you were ▇▇▇▇ case**

24  **manager in the sixth grade.  That was the entire**

25  **sixth grade, you were her case manager?**

```
 1        A.       Correct.

 2        Q.       Were there other options for special

 3    education caseworkers or case managers to be

 4    assigned to ▓▓▓▓▓▓▓

 5        A.       I guess that was always an option.

 6    We have multiple special education teachers in

 7    the building.

 8        Q.       Do you know whether there was ever

 9    discussion about changing ▓▓▓▓▓▓ to a different

10    case manager from you after what had happened in

11    November?

12        A.       I don't know.

13                 It was never mentioned to me.

14        Q.       Is that something that could be

15    requested, if you know, like a change of case

16    manager?

17        A.       From a parent?

18        Q.       Anyone.

19        A.       Yeah.  I mean yes.  Yes.

20        Q.       Could you as the case manager

21    request it?

22        A.       Yes, I guess I could.  Yes.

23        Q.       And could a student, as well?

24        A.       Yes.

25        Q.       And a parent, a parent of a student?
```

A. Yes.

**Q. And just to make sure I understand your testimony, I think I had asked you about this safety plan being in place. If there was a safety plan in place to separate them at this time, after April, do you know why the two students were allowed to be at recess together?**

A. I can't speak to that.

I mean, I know that each grade level has one time -- like set time for recess.

But I don't know.

**Q. In your experience being at Gwynedd, have you ever seen a time where kids get a different recess time so that kids can be separated?**

A. No.

MS. LAUGHLIN: Those are all the questions I have.

MS. JORDAN: I have nothing further. Thanks, Holly.

MS. LAUGHLIN: Thank you.

(Deposition concluded at 1:40 p.m.)

1              INSTRUCTIONS TO WITNESS.

2

3          Please read your deposition over

4    carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8          After doing so, please sign the

9    errata sheet and date it.  It will be

10   attached to your deposition.

11         It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of

14   receipt of the deposition transcript by

15   you.  If you fail to do so, the

16   deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24

25

1           WITNESS'S CERTIFICATION

2

3           _____

4               HOLLY LYNNE GARRETT

5

6       On _____, 2021 the foregoing

7   deposition was submitted to HOLLY LYNNE GARRETT,

8   the witness, taken on July 28, 2021, for her

9   examination.

10      At which time the deposition was read by the

11  witness and any proposed changes desired were

12  subsequently entered upon the attached errata

13  sheet.

14      Thereafter, the deposition was duly

15  witnessed and signed by:

16

17          _____

18              Notary Public in and for the

19              County of _____

20              State of _____

21

22

23  _____

24  My Commission Expires

25

1        E R R A T A    S H E E T

2

3    WITNESS'S NAME   _____

4    DATE OF DEPOSITION _____

5    CASE NAME _____

6

7    PAGE   LINE   CORRECTION

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1               C E R T I F I C A T E

2               I, DONNA ROSNER, a Certified Court

3    Reporter, License XI001976, and Notary Public of

4    the Commonwealth of Pennsylvania, do hereby

5    certify that prior to the commencement of the

6    examination, HOLLY LYNNE GARRETT was duly

7    remotely sworn by me to testify the truth, the

8    whole truth and nothing but the truth.

9               I DO FURTHER CERTIFY that the foregoing

10   is a true and accurate transcript of the

11   testimony as taken stenographically by and before

12   me at the time, place and on the date

13   hereinbefore set forth.

14              I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney

18   or counsel, and that I am not financially

19   interested in the action.

20

21   _Donna Rosner_

22   _____

23   Notary Public of the Commonwealth of Pennsylvania

24   My Commission expires October 6, 2024

25   Dated:  August 12, 2021.

## 1

**1** 54:13 142:1

**1-0-0-8** 72:21

**1001** 144:7

**10015** 64:13

**1008** 72:20 85:24

**1010** 86:17

**1011** 86:16 87:6

**1013** 99:11 102:14

**1015** 64:11,12, 13,14

**1019** 54:5

**1023** 131:11

**1026** 154:15

**10th** 68:3,5

**112** 4:17

**11:13** 59:17

**11:19** 59:18

**12:18** 104:14

**12:23** 104:15

**14** 13:4 89:17

**15** 13:4 89:17

**16** 99:13

**16th** 86:19 99:19

**17** 34:9,11

**19473** 4:19

**1:40** 166:22

## 2

**2** 54:8

**20** 15:7 118:7

**2001** 17:12 18:17 20:2

**2008** 8:9,11,14 12:1 17:1,12 115:8 125:4,7 130:22

**2012** 19:3

**2013** 19:4 125:12,13 129:11,23 131:2

**2013-2014** 81:15

**2014** 10:14,21 12:4 36:6 50:22 85:19 145:9

**2014-2015** 7:9 11:20 15:5 23:6,14 24:6 25:11 26:9 27:10,14,18 31:11 32:9 33:5 64:5 81:17 92:15 101:6 103:6 108:23 134:13 148:4 149:3, 12,20 154:23

**2015** 7:24 10:14,21 12:4 50:22 68:8 70:14 72:16 85:5 99:13 103:12 110:19 124:7,14,18

125:13 129:11, 18 145:11 158:9 159:6

**2016** 142:1

**2018** 8:17

**2019** 129:14

**25** 15:1,11,12, 17 33:10

**27** 70:14 72:16

## 3

**30** 15:1

## 4

**40** 9:13 12:15

**45** 12:15,19 14:6 15:22

## 6

**60** 9:12

## 9

**9** 20:5 23:3,8,15 103:12

**983** 148:13 151:23

**985** 141:25

**994** 103:11 104:19 112:5 114:2 115:22

**995** 117:23 119:4

**996** 120:6,20

**997** 68:2

## A

**A-P-P-R-O-P** 119:8

**a.m.** 59:17,18

**able** 14:1,2,5 17:20 19:23 41:6 42:4,8 52:15 57:15 64:17 94:14 129:4

**abuse** 24:18 25:3,9,13,16 54:14,17,25 55:8,24 56:15 57:10,19 59:9 61:6,19 62:4, 16,24 64:7 79:4

**abused** 25:20 53:20 54:21 57:20 63:21 64:2

**academic** 55:14 93:20

**academics** 55:7 156:23 157:10,13 160:20

**accept** 82:6

**access** 28:20, 22 96:5,25

**accommodate** 9:1

**account** 109:2

**accurate** 67:1

**across** 41:2 112:9

**act** 116:2,5,14, 21

**action** 4:24 59:3

**actions** 83:24

**actual** 13:22 20:7

**actually** 12:11 16:23 33:8 130:20 142:17 143:24 150:2

**add** 80:20

**addition** 90:8 105:18 145:14

**additional** 9:15, 21 75:3 89:7 90:11

**addressed** 68:3,5

**ADHD** 55:15

**adjustment** 35:3

**administration** 82:24 83:14 145:11

**administrator** 26:21,24 27:8 29:3 56:11,22 57:23 58:13 61:8

**administrators** 74:10 80:7

**adult-to-child** 25:16

**advice** 83:4 144:24

**after** 37:12 43:24 44:7 46:3 47:20 50:16 59:13 60:4 78:4 106:3 113:7 129:7,17 142:23 157:16 158:2,7,12 159:5,21,22 160:1,11,16 161:23 162:15,24 163:10 164:3,14 165:10 166:6

**afterwards** 86:23 150:4

**again** 27:22 46:13,18 47:1,16 50:20 52:9 57:20 61:12,23 76:24 77:6,18,21 78:6 87:7 93:6 96:5 103:12 106:16,18 114:3 118:22 119:5 120:7 126:3,4

**against** 4:24 45:6,11

**age** 75:24 76:2,10,14

**ago** 7:8 8:15 27:3 32:11 44:24 45:20 76:3 98:5 109:9 118:8

**agree** 107:11 124:11 138:3 144:15,21 145:5,7

**agreed** 4:4 146:11

**Agreement** 144:8,19

**ahead** 82:2 84:9 108:6 127:15 143:16 149:13 163:8

**air** 132:24

**Alan** 73:14 103:25 104:2 112:7 113:9 118:6 120:4,7 145:2 152:5

**alert** 163:23

**all** 4:2,6 5:9,25 6:5 7:4 10:12 12:5 13:7,11 14:25 27:23 28:14,17 32:17 33:14 35:18,25 36:13,21 41:12 42:5 46:15 49:17 51:6 65:15,21 71:5 72:15 75:1,8 77:3 83:6,21,24 84:12 85:14 88:4 95:8 99:2 104:9 118:11 122:21 129:2 133:24 135:5 138:21 139:1,17,22 140:18 141:19 145:18 146:8 147:7 149:19 155:1 158:2,18 159:16 166:17

**allowed** 80:17 166:7

**almost** 92:16 105:11

**along** 10:13

99:15 123:20 130:10

**already** 16:1 20:20 66:19,22 67:14 100:8 105:24 107:7,12,13 111:17 126:25

**also** 10:12 13:12 16:15 19:18 20:17 25:14 35:9 37:20 46:10 84:24 97:6 105:10 107:7 121:18,20 133:17 136:14 138:23 146:3 148:19 159:12

**always** 126:10 149:14 165:5

**among** 122:6

**amorous** 118:9

**amount** 11:12 14:1 34:4

**and/or** 158:4

**Andrew** 7:22,25 54:10,17 69:1,13

**Andrew's** 70:6

**Ann** 21:15 130:16

**annual** 160:24

**another** 9:25 11:3 21:16 36:24 42:24 50:6 60:25 68:1 71:8 78:20 92:9 93:9 102:10

136:20,22 161:5 164:17

**answering** 6:9,17 24:7 79:6

**answers** 5:25

**anxieties** 35:8

**anxiety** 55:9,11

**anybody** 32:3 43:7 44:23 66:1 113:15 122:7,12 128:4,5,6 143:1,2 145:12 146:17

**anybody's** 81:8

**anymore** 22:24

**Anyone** 165:18

**anything** 7:11 19:24 26:6 30:9 31:3 37:10 42:13 43:15 44:16 45:3,22 46:16 61:3 66:2,14,18 67:12 70:25 75:4 76:6,11 80:8 81:11 88:21,24 92:3 93:23 95:11,14 100:4,7 102:1 115:20 117:20 123:1 126:22,24 129:6 137:2 152:8 158:20 159:18 163:23 164:4

**anywhere** 28:19 95:20 96:16 102:1

**apologize** 33:20

**apparent** 159:8 161:17,20,21 162:1,2,5,12

**appear** 118:21

**appearance** 4:9

**appearing** 4:3

**applied** 9:19

**Approp** 119:7

**appropriate** 52:2 75:24 108:1,4 117:12

**approve** 82:6

**approved** 144:19

**April** 49:23,25 50:3,5,15 60:9 64:24 65:2 68:8 70:16 71:1 86:19 88:21 89:1 90:3,8 99:12,18 108:20 158:9 159:5 160:16,21 166:6

**arbitration** 144:3,4

**area** 17:2,18,23 38:21,24 68:21 159:15

**areas** 153:16,25 154:8

**arm** 133:21 140:7

**arms** 133:11 139:14 140:1

**around** 7:8 8:17 11:24 15:7 16:3

17:20 25:3 36:21,25 38:17 81:19 100:12 132:12 148:4 159:20 163:5, 12

**arrived** 70:6

**arrow** 114:22

**arts** 12:16,23 13:16 22:5,18, 20 36:18

**Asman** 162:8

**aspects** 55:13

**assault** 49:12, 18 50:13,25 51:8 52:7,11

**assigned** 21:4 39:12,14,25 165:4

**assignment** 16:2 21:19 39:20,22

**assignments** 9:2

**assist** 33:10

**assistance** 13:11 15:18 16:9

**assisting** 55:10

**Association** 142:3 144:25

**assume** 7:4 37:18 46:10 103:24 114:7 119:21 150:10

**assuming** 46:5 65:18 114:12

**attend** 95:5

98:22

**attendees** 73:12 99:14 103:13

**attending** 73:13

**attention** 66:5 87:7

**audio** 113:3,4

**authorities** 75:18

**authority** 75:12,17,19

**average** 15:11 34:13

**avoid** 30:22

**aware** 44:8 53:19 54:10, 17,21,24 56:17,21 57:5 60:21 89:18 90:2,11 111:12 122:8 137:3 159:3 163:19

**away** 142:13,14

---

**B**

**back** 10:3 12:21 17:18,22 21:21 23:11, 14,15 26:16 36:23 37:2,11 38:19,21 39:6 42:1 43:9,12 46:5 49:9,18, 21 50:24 52:11,19,23 59:18 61:24 65:13,14,19

78:11 87:6 88:13,22 101:11,15 104:15,17 111:14 126:2, 8,10 135:20

**backs** 45:6

**bad** 119:9

**based** 109:17 127:11 135:15 142:8 143:18, 20 145:12 151:19

**basically** 131:8

**basis** 108:10 156:12

**basketball** 163:14

**Bates** 54:4 64:11 104:19 144:7 154:15

**Bates-stamp** 72:18

**Bates-stamped** 104:19

**bathroom** 38:7 43:10 104:12

**became** 33:13 134:10 159:7

**become** 5:12 141:5

**before** 4:6 5:5 6:11,13,23 10:24 16:22,25 32:1,3,6 33:21 34:18 37:19 44:7 52:24 53:7 56:15,16 60:9 62:19 63:9 68:11

70:15 74:21 78:3 95:11 107:12 110:21 127:10 130:2, 15 139:3 144:5,10 153:8 154:17,20

**beginning** 34:21 94:7 119:8 148:8 149:25

**behavior** 31:23 37:13 43:20,22 68:20 70:7,11 71:17 75:24 88:19 121:9 123:14 126:13, 17 134:20,21 135:8 137:16, 17,20 138:15 141:24 147:12 158:2

**behavioral** 31:10,15,19 36:16 55:13 58:2 60:14 71:21 72:8 93:23 96:11 121:16 122:23 125:14 131:9

**behaviors** 122:21 136:14, 15

**being** 4:4 9:4 19:23 25:20 28:13,17 34:19 35:19 47:4,8 51:16,19 53:19 57:20 60:17 70:18 74:3,19 75:5 76:2 79:5 82:14 83:13,25 85:13 88:1 95:13 99:14

101:2 114:11 116:13,18 118:9 122:9, 14,20 124:14 140:18 158:18, 21 166:4,12

**believe** 30:25 70:13 73:14 136:18 154:9

**believed** 51:19 103:2

**below** 80:10 85:7 118:13

**benefit** 38:8

**best** 60:13

**better** 12:12

**Betty** 54:6 73:18

**between** 13:13 47:5 57:9 70:11 114:20 134:20 149:16 151:11

**big** 35:3 38:10 153:19

**bigger** 98:11 115:18 154:19

**Bill** 100:13 114:10 120:11, 12,21 121:1 124:9 125:6 127:21,24 128:6 149:9

**bin** 123:20

**bit** 5:8 14:16 32:10 40:16 74:25 104:21 151:1 154:19

**block** 14:3

**board** 27:20
28:5

**board's** 28:8

**bodies** 41:6

**body** 45:3
138:1 141:16,
19

**both** 37:1,5
40:10,19,24
41:10 43:1
44:10 54:9,10
58:7,9 67:5
85:7,17 87:3
105:17 107:2,4
108:7 125:20
132:1,12,13
133:8 141:23

**bothered**
120:21 121:2
124:9 127:22
129:14,19

**bottom** 54:8
85:24 115:23
119:4

**bottoms** 134:6

**Bowen** 27:1
73:17 100:23
110:17 114:10
120:11 121:1
122:11,16
125:6,10 128:7
129:7,22
130:25 134:8
136:13 143:2
148:24 149:19
150:19 151:21,
25 152:14
160:4 164:2,16

**Bowen's**
120:12 123:13

**boy** 47:6 138:4

**boys** 163:14

**brainstorm**
22:11

**break** 5:17
6:21,24 59:15
104:12

**breakdown**
9:10

**breasts** 139:2

**briefly** 4:6

**bring** 91:4,15
93:5

**bringing** 46:14

**broken** 12:3

**brought** 4:24
50:7 52:22
65:14 71:16
76:5 82:24
83:19,21
86:22,23 97:15
114:8

▨ 16:14
131:12

**building** 8:24
9:2,8,25 26:21,
24 29:2,3,9
50:8 56:12
71:19 75:20
91:5 93:15
94:19 97:2,3
115:4 121:20
122:6 128:12,
24 129:5 131:9
149:6,15,17
152:6 165:7

**bullet** 75:22

**bullying**
136:19,24,25

**bunch** 129:11

**C**

**calendar** 98:23,
25

**call** 26:19,22
31:21 36:3
93:6 138:14

**called** 37:6
42:14 43:1,5
52:4 65:8 74:9,
19 93:8 96:2
101:20 121:8
157:17

**calling** 37:14
101:14 140:23

**calls** 56:3 61:12
63:16

**came** 15:22
31:1 65:13
113:22 129:22
145:10 155:23

**can't** 5:16 13:8
15:6 24:8
27:25 30:21
33:24 34:13
47:22 59:11
79:1 83:5
86:15 108:3
109:8 122:4
123:7 127:23
128:22 129:20
130:20 140:11
154:18 156:24
162:20 166:8

**capacity** 17:7

**care** 104:9

**careful** 104:23

**Carlisle** 17:2,21
18:17

**case** 10:7 15:16
33:14 37:21
110:15 144:2
155:7,22
164:23,25
165:3,10,15,20

**caseload** 9:5
16:4,8,15
33:11 37:25

**caseworkers**
165:3

**categories**
137:15

**caught** 52:8
138:17,21
139:3,6
140:20,22

**cause** 68:23
69:4,8 115:16

**caused** 88:13
106:13

**caveat** 7:13

**certain** 11:9,10
15:14,25 78:24
92:2 94:1
141:3,16

**cetera** 114:9

**chairs** 40:24

**change** 7:23
56:6 59:3
62:17 126:17
129:6 151:9
158:2,23
165:15

**changed** 26:17
27:3 55:25
145:2 151:19
155:18 162:25

**changing** 165:9

**Charles** 142:2

**chasing** 163:5,
10,17

**check** 15:25

**checked** 137:5

**Cheryl** 72:16,
17,25 99:16
119:14

**chest** 68:22

**child** 8:25
24:18 25:3,9,
13,20 54:14,
17,24 55:8
56:15 57:3
64:8 79:4
81:18 82:12,17
91:3 92:13,19
93:10,11,12,
16,24 94:21
95:2,7,10,18,
21 96:11
101:4,8,11,12,
14,16,20,22
102:1,6,10

**child-on-child-
type** 25:15

**children** 9:4
13:1 19:19
26:19 27:12,16
59:8 64:1
101:17

**chose** 141:24

**claim** 26:21

**claims** 89:19,
24 90:8,12,20

**clarification**
80:20 162:10

**clarify** 29:18
90:5 152:17

clarifying 81:5

class 12:20
13:16 14:4
15:4,17 16:7
33:9,11,23
34:5,19 36:18
39:24 40:5
66:3 68:23
71:2 159:23

classes 9:16
12:23 20:21
151:11 163:1

classroom 8:25
9:4,6 13:12,17
14:2 15:1,3,13
21:21 22:8,10
32:19 33:1,3
34:16 35:7,10,
25 36:12,21
37:12,22 38:9,
14 43:7,13
45:10 46:6
49:9 52:23
65:11,22 70:17
71:4 81:20
91:7 95:17
100:6 121:8
122:24 127:12
135:23,24
151:6 155:15,
23 157:17
158:5

classrooms
13:20,23
32:18,24 33:7
53:16 91:1
149:1

clear 54:25

clearer 6:4

close 40:15,17

Code 154:16,24

college 17:20,
24

colors 130:7

come 9:20 21:6
32:25 33:1,3
50:11 56:13
60:16 68:12
90:25 108:19
134:25 148:25

comfort 119:10
129:3

comfortable
24:21,23 61:1
129:4

coming 15:2,13
35:6 65:15
66:1 86:24
87:4 95:2
149:19 155:15
157:2

comment
117:24

comments
87:9,21 124:8
126:6

communication
114:19

communication
s 83:16

company 25:24

compared
147:9

comparison
45:7

complaints
127:4

complete 19:17

completed
135:20,22

160:11

completely 4:7

completing
10:12 94:2
131:4 135:19

comprehension
14:20,21

concern 68:24
69:4,9 80:25
120:7,12
159:25

concerned
54:9 70:5

concerns 75:11
93:18,23 112:9
115:19

concluded
70:10 166:22

conclusion
70:7

conduct 79:8
83:13,24 85:4
154:16,24

conducts 78:24

conference
98:14,16

confidentiality
81:1

connection
5:17

consensual
70:8,11 75:23
76:2

consent 27:11,
16 76:11

consequences
110:10 126:11

considered
8:13 9:14 29:7
53:13

consistent
108:10

constituted
52:20

constitutes
28:9

constricted
14:5

contact 37:5
42:2 135:9,11,
14 137:5,11,
13,22,23
138:6,12,15
141:5,8,17,20,
22 160:12,15

contacted
126:12

contacting
121:22

context 70:21
86:13,19
116:13 125:12

continually
136:25

continue
129:14 156:3

continued
47:20 119:25

continuous
59:11

continuously
36:25

conversation
6:2,7 30:24
43:19 44:4
46:1 48:18

52:25 53:1,3,7,
11 67:8,13
76:7,22 85:14
86:14 118:19
150:22 156:25
157:20,24
158:14,17

conversations
11:5 29:17
30:19,20 31:2
68:17 74:5
76:4 80:23
87:2 88:5
103:23 104:24
113:15,23
127:21,24
129:8 146:8,
14,17 156:22

copies 43:19

copy 126:9,10
148:19

core 13:1

corner 73:10

correct 16:11
17:14 18:15
23:1 25:1 31:7
33:12 37:17
39:1 40:13
41:11,14,22
43:14 44:21
50:18 78:10
81:3 84:17,23
87:13 99:8
104:1 108:18,
22 109:4 110:4
111:16,19,25
112:4 114:19
125:16,19
128:17 130:1,
24 132:25
135:12 142:24
143:23 144:1
148:23 153:16

155:8,16,20
165:1

**counsel** 4:8
30:10 32:2

**counselor** 50:9
54:16 56:11,22
58:14 61:8
71:19 87:15,17
91:6 94:19
96:6 97:4
128:13,25
129:1

**couple** 24:1
27:3 161:14

**course** 19:9
59:3 68:22
145:3 147:13

**courses** 19:14,
23

**court** 4:2 5:22
84:11 162:10

**cover** 25:14
43:7

**covered** 24:11
140:25

**crate** 136:1,6,7,
8

**create** 5:23

**created** 162:24

**crime** 112:8,23

**criticized** 83:25
84:16

**cross** 59:22

**crying** 66:13,16
152:10,22
153:3

**currently** 54:19

**curriculum** 9:1
22:5,6 155:19

**cursor** 87:8

**Curt** 68:7 69:5
115:22 118:13
119:5,14,17

---

**D**

**D'AMORE**
29:11,13

**D'ELIA** 162:7

**D'Elia's** 71:4

**danger** 101:23,
24 102:2

**date** 7:15 73:11

**dated** 103:12
142:1

**dates** 96:20

**day** 9:9 12:3
36:15 37:18
39:18 47:19
65:25 79:12,
15,17 87:20
88:17 98:19,21
105:10,17,25
106:25 107:14,
19 111:11,12,
14,15,18
112:2,3 113:20
150:2,25 160:2
163:13

**day-to-day**
12:13

**days** 9:11,13
79:24 91:3,4
105:6 111:21,
24 146:1

**deal** 119:6

121:5

**dealing** 35:7
60:13 126:18

**dealt** 56:7
107:13 138:22

**decided** 106:4

**decision** 11:11
118:15

**Defendant**
4:13,15

**define** 52:12

**defined** 141:7

**defines** 137:21

**definitely** 42:20
56:6 97:17

**definition**
52:17

**degree** 18:6
19:2

**demeanor**
116:25 117:2
158:23

**denied** 37:10
45:22 66:18
100:4 114:14

**deny** 46:22

**depended** 34:6

**depending**
95:15

**depends** 11:12
13:25 14:13
34:14

**deposition** 4:3
5:4,5 29:23
32:3,7 142:5
148:9 166:22

**describe** 8:19
10:4 21:25
38:10 45:6
51:22,24 52:25
133:2 139:15,
16

**described**
38:23 39:5
81:23 129:11
148:25 163:17

**describing**
93:2 133:21

**deserved** 110:3

**desks** 38:17
39:16

**development**
145:16

**developments**
34:23

**Devlin** 144:23

**diagnosed**
55:15

**diagnosis**
55:20

**diary** 148:3

**Dietrich** 68:7,9
69:5 116:3
118:13 119:5,
15,17

**Dietrich's**
115:23

**difference**
56:19 60:22
134:20 147:7

**differences**
134:23

**different** 9:2
14:15,16,17
22:2,3,7,11

31:24 37:16,17
48:1 61:10
63:1,14 67:10
68:25 69:12
73:3 80:21
83:18 99:22
103:25 128:16
130:7,9 165:9
166:14

**differently** 57:9
63:7 88:24
89:6

**difficult** 23:10

**difficulty**
157:12

**dimensions**
38:13

**direct** 66:5 87:7

**directed** 153:24
154:4

**direction**
144:23 145:4

**directly** 12:18
41:9 123:17

**director** 29:7
73:1

**disagree** 54:20,
22 106:21
107:23

**disagreed**
84:20

**disagreeing**
114:18

**discipline**
145:22 146:12

**disciplined**
145:18

**discuss** 67:9
95:2 129:4

150:5 160:9

**discussed** 75:5
91:24 92:2
95:25 105:3
114:11 115:6
119:15 131:6
137:6 146:6
152:14

**discussing**
75:13 83:18
85:20 102:19
113:19 114:24
157:18

**discussion**
76:1,10 101:3
112:6,11
118:5,7 119:2,
11,24 120:1
150:20 165:9

**discussions**
69:2 102:23
118:2 142:25
145:22 152:8

**disruptions**
122:23

**district** 4:25
17:3 20:8,11,
17,23 23:7,18
26:4,8 27:7,22
28:21 42:23
59:8 60:19
63:20 64:4
68:6 69:23
83:2 84:19
97:24 111:11
114:23 115:1
142:21 143:1,
17

**District's** 142:4

**district-wide**
98:11

**dive** 22:4

**diving** 22:18

**Divver** 15:20
16:6 35:24
38:6 43:9,12,
15 44:1,4 46:8
52:25 53:8,12
54:10 67:9,13
71:16 86:22
87:12 88:1,19
94:14 113:19
135:18 145:17,
21 146:16
160:2,6 162:7
164:1,10

**Divver's** 15:2,
13 33:23 36:19
40:5 48:12
49:3

**document**
48:17 53:23,25
74:6 80:11
82:14 86:18
92:7,11 93:25
104:18 130:4
144:10 145:5
154:17,20

**documentation**
31:12 48:10
67:18

**documented**
92:3 95:19
96:15,21

**documents** 5:2
22:13 29:24
30:5 31:8 32:6
90:7 95:24
96:19 111:10

**Doe** 4:11,23

**domain** 85:10

**done** 6:11,13,

17 14:22 25:8
34:18 35:13,18
58:8 59:24
60:12 63:7
88:3 97:22
99:7 103:9
105:24 108:2,9
123:24

**door** 38:14
45:10

**down** 5:22
75:23 87:6
93:5 114:2
118:21 133:11
150:4,21
151:11

**downstairs**
12:8

**drive** 94:8,11
96:24

**drop** 123:19

**dropped**
124:21

**dual** 18:3

**Due** 4:5

**duly** 4:19

**during** 20:3
22:22 50:10
68:22 89:14
91:25 98:18,20
113:8 147:13
149:19 153:3
156:14

**duties** 8:20
10:5

**duty** 159:16

---

**E**

**each** 9:9 41:1,

2,3,17,18
122:1 123:10
131:24 132:6,
7,21,25 133:5,
18,23 135:8
136:2,11,13
141:24 161:3
166:9

**earlier** 32:14
33:9 59:10
76:22 79:2
89:3 100:10
109:2 114:13
125:10 143:5

**early** 150:7

**easier** 5:9
151:1

**education** 8:14,
23 9:14 10:4
11:18,21 16:18
17:5 18:4,13,
14,23 20:13
21:16 29:4,5,8,
10 33:1,3
53:17 73:21
81:9,20 93:13
94:10 97:13
114:7 117:25
142:3 144:25
147:4 149:7
150:24 151:21
165:3,6

**educational**
82:5 96:13

**effect** 100:21

**egregious**
116:2,4,14

**eighth** 17:9

**either** 29:4
45:14

**electronic** 83:6

**elementary** 8:7
17:6 27:12
29:8 97:23
154:16,24
161:10

**email** 26:4,7
27:22 83:16
114:19

**emails** 114:9,
15,16 147:22

**emotional**
55:13 153:5

**employed**
21:23

**employee**
29:25 30:2,6,
15 31:1,4,5
84:4 148:17

**employees**
28:14

**employer** 20:8

**end** 17:15
50:23 51:6,14,
23 52:3 67:16
74:1 81:14
107:8 108:10,
11,13,21,25
109:1 110:18
115:22 116:19,
24 144:12
146:2 148:14
161:2,4

**ended** 39:11
150:23 151:2

**ensure** 4:6

**entailed** 53:2

**entire** 14:3,4
30:2 85:25
86:4 107:16
109:11,18,25

110:1,2 119:20 153:15,18 159:13 164:24

**ESE** 80:6

**especially** 35:5 88:16

**estimate** 7:14, 17 13:7 15:4 33:21 38:20 60:3 123:23 125:2 162:21

**eval** 85:16

**evals** 114:22 115:1

**evaluate** 93:21

**evaluated** 93:1

**evaluating** 149:10

**evaluation** 105:9 106:2 107:8,15,24 108:8,9,12,15, 24 109:6,10 110:3,6,18 111:2,3,6 142:7,14,15 143:13,22 146:2,4,7,12 148:14 151:23, 25 153:8

**evaluations** 109:24 110:13 115:2 143:12, 15 149:14,23 152:12

**even** 10:10 14:17 32:6 66:23 72:8 89:22 92:10 115:10 129:4 139:4 145:4

**every** 9:7 22:3 23:25 108:13 156:9

**everybody** 119:24 120:2

**everybody's** 128:25

**everyone** 35:19 39:23 56:17 57:5

**everything** 5:18,23 18:25 26:5,7 34:19 36:13 38:11 103:20 104:9 114:10

**exact** 7:15 42:17 88:7 105:8,14 106:5 115:11 161:19

**exactly** 7:16 10:5 11:23 12:9 14:12 24:8 26:12 40:21 65:17 79:18 119:6 131:7,22 134:11 150:9

**EXAMINATION** 4:21 155:6 161:16

**examined** 4:20

**example** 15:3 94:9 98:9 108:20 113:18 134:19

**examples** 134:22 163:4

**exchange** 147:22

**exchanged** 148:1

**excited** 157:2

**existence** 92:14

**experience** 52:10 166:12

**experiences** 127:11

**explain** 14:10 69:14,20 74:18 135:5,10

**explaining** 117:11 135:8 152:22 153:9, 12

**explanation** 69:8 70:6,9 117:16 134:18 135:3

**expressions** 44:25

**extent** 84:21

**extra** 112:1

**eye** 37:5 42:2

---

## F

**face** 42:5,8 44:22

**facial** 44:25

**facilitator** 8:16, 21 9:12,17,22, 23 10:2 97:6

**facing** 41:10

**fact** 62:20 83:19 107:6 138:23

**faculty** 131:6 134:9,19

**failing** 110:8,13 111:5 143:22 152:16,17,19 153:8,13,16,25 154:7,9

**failings** 110:16 143:8,11,12

**fair** 109:10

**fallen** 137:14

**familiar** 5:12

**far** 38:20 81:13 84:21 85:4 141:5 148:17

**fast** 42:11

**February** 142:1

**feel** 24:19,21, 23 42:11 52:8 56:20 58:19 61:1 138:17 153:13,15 156:18

**feeling** 122:6,9 127:21 140:19

**feet** 38:22

**felt** 26:22 47:3 62:9 101:22 108:7 109:9 123:25 128:2 129:3 153:6

**female** 68:21 71:8 138:4

**FERPA** 81:9

**few** 5:7 18:19 29:25 59:15 115:5 130:14 151:3 155:4

**Fifteen** 38:22

**fifth** 37:20,21, 23 38:2 55:4 89:20 90:1,19, 21 97:14 147:8,14 155:11,12

**fight** 123:17

**file** 30:1,3,6,15, 18 31:1,4,5 79:13 80:8 84:5 96:13 104:4 106:4,14 136:2,9,11 148:17

**filed** 100:5 103:14 105:13, 22 106:6 107:17 111:9 135:22 142:23

**filing** 104:22 105:5 106:22 107:5

**fill** 53:6 92:20 94:10,14,16 95:22 126:2,5 131:23 135:15

**filled** 92:13 94:21 96:8 131:13

**filling** 103:15

**fills** 96:8

**final** 85:16 149:14

**find** 14:23 70:21

**finding** 88:2

**fine** 59:16 104:13

finish 6:18

finished 127:17

first 4:19 8:3,14
17:19 18:17,20
21:23 32:16,21
33:6 35:2,22
36:11 37:23
38:15 67:24
70:13 74:1
75:1 84:2
86:25 90:15,19
113:21 134:9,
10 155:21

fit 112:8,23

five 9:11
104:12 124:5

five-years-old
54:15

floor 39:15 40:8
151:15

focused 23:13
25:16,18

folder 72:2
136:3,11

folders 136:9

follow 6:3
161:15 164:14

followed 128:3
150:2 164:8,9,
16

following 49:16
50:3 62:1
64:24 81:16
82:13 89:22
99:3 108:16
145:9 159:5

follows 4:20

form 31:17
51:2,10 52:14

56:3,25 57:12,
25 61:12,21
63:3 71:21
77:11,25 78:14
86:8 89:10
92:12,14,20,22
93:3 94:1,5,11,
14,17,20 95:22
96:2,19,22
99:24 109:21
116:7,16
120:8,12,17
123:14,17
124:16,21
126:6 127:7,12
128:9 129:24
130:6,9,13
131:1,4,5,6,11,
12,17,20,21,23
132:9 134:8,
12,17 135:3,15
136:19 137:2,
4,11 138:9,16,
25 141:10,22
144:16 146:20
148:6 152:24
153:22 154:11
164:11,20

format 5:10

forms 58:8
96:25 100:23
125:23 127:19,
25 135:19,20,
21

found 23:12
71:13 87:10
88:5,8,9

four 41:12
139:17 140:18

fourth 10:18
12:7,19,21
89:15,20,25
90:18,21
155:10

Frances 73:18,
19,20 84:24
114:8

friends 47:18,
20,24,25 78:3,
4 118:9

front 36:24
38:15,24 41:6,
8,23 47:7
53:25 65:8

frustration
128:6

frustrations
128:12,19

full 19:10,13
20:19 21:23
32:16,21 33:13
34:15,19,24
36:11 81:15,18
82:12,18,20
83:9,10 150:1,
16 155:13,18
156:4,17
157:5,10,13

full-time 18:20

fully 138:20

further 69:7
76:20 145:12
157:20,23
160:12 161:12,
16 166:19

---

**G**

---

Garner 73:20
84:25 85:3
114:9

Garrett 4:17,22
7:21 59:20
155:2

gave 7:5 22:19
30:7 43:25
46:7 70:10
116:23 117:2
119:24 152:18
163:4

general 8:23
18:4,23 24:11
102:23 122:5,9

generally 76:6
79:5 80:24
81:11 100:20
102:22 116:13
117:15

getting 9:24
20:12 59:12
66:2 74:9
79:15 80:8
81:22 88:18
105:6 146:7

giggly 159:21

girl 50:6 158:13

girl's 47:7

girls 89:19,25
90:9,20

give 5:4 9:7
11:3 14:8
24:11 60:3
69:7 105:2
122:4 126:2
131:2 134:18
153:25

given 5:5 30:11
39:20 43:19
58:4 101:13
106:1 148:19

gives 125:12

giving 14:11

goals 156:9
157:8

goes 5:16
10:12 71:25
72:6

gone 12:14,19,
20 61:7,9 75:7
100:13

good 4:22
19:25 115:2
152:12

Google 92:12,
14,22 93:3,25
94:8,10 96:24

gotten 152:12

GPA 19:25

grad 18:5

grade 9:7 10:9,
10,17,23 11:1,
13,15,19 12:5,
7,14,20,21,23
13:4,8,12,13,
20 16:20,21
17:9 32:15
34:8,10 37:20,
21,23 38:2
47:8 53:15
55:4 65:25
68:22 89:16,
20,25 90:1,9,
15,19,21 97:14
118:17 125:17
147:5,9,14
150:1 155:10,
11,12,17
156:4,16
158:14 159:13,
17 160:12
162:4 164:24,
25 166:9

grader 78:19

grader's 78:20

grades 10:15,

22 11:10 127:2

**graduate** 19:2
20:1

**graduated**
17:19 20:18

**gravely** 54:9

**great** 129:1

**grew** 17:19

**grievance**
103:14,15
104:4,22
105:5,6,13,16,
23 106:4,14,
15,22,25
107:6,17 111:8
142:13,23
144:3

**ground** 5:7

**group** 10:7
13:14 16:1
36:24 97:8

**grouped** 38:17

**groups** 15:23,
24 36:20,21

**guess** 7:11
30:1 31:23
55:17 62:19
78:4 80:1
81:21 83:1,3,
10 88:15 89:2
95:15 99:16
101:22 106:12
107:2,16
109:15 114:3
115:9,15
119:22 120:6
121:14 133:9,
20 135:17
136:23 137:7
140:10 141:18
144:18 164:9

165:5,22

**guidance** 50:8
56:11,21 58:13
61:8 71:19
87:15,16 91:6
94:19 96:6
97:4 128:13,25
129:1

**guide** 14:22

**guided** 14:19

**guys** 134:14

**Gwynedd** 8:7,
11 9:24 11:21
16:25 17:16
20:7,10,13
21:17 26:11
32:16 69:24
98:10,15,16
129:2,15
166:12

---

**H**

**hallway** 37:6
42:14 43:2,6
45:10,12 87:10
88:1 100:3
139:7 147:2
157:19

**hand** 37:3
41:21 42:3
47:7 68:20
78:8 133:13,
14,22 138:4,21
139:4,9,11,21,
22,23,25
140:2,3,4,6,7,
14,21,24

**handful** 19:20

**handle** 121:5

**handled** 56:1
68:25 69:1,12,
13 103:20
121:18,23
122:20 123:25
124:22 125:15,
19,24,25 126:2
129:7

**handling** 128:7

**hands** 37:2
40:10,20,22
41:12,15,16,
17,18 66:24
67:5 78:20
100:2 132:2,3,
5,6,13,16,21,
22 133:3,8,16,
17 139:13,17,
18,25 140:1,
14,18

**handwriting**
64:21

**handwritten**
99:12 112:25
113:5 148:7

**hanging** 133:11

**happen** 46:12,
18 47:1,16
52:9 76:24
77:6,9,18,20
78:6 91:21
95:11 126:24

**happened** 5:3
7:8,15 32:8
36:1 37:10
38:4 42:11
45:17,22,24
46:4 50:12
52:5 55:1
56:14 61:9,10,
18 62:3 66:19
69:15 70:23
71:3,6 74:17

82:9 89:1 90:3
108:16 121:11,
13,15,25 122:2
124:13,18
126:13,17
131:16 143:19
164:4,18
165:10

**happening**
45:14 51:7,25
52:4 57:6
62:25 70:16
74:21 91:1
101:25 113:14
125:3 127:13
140:20 151:2

**happens** 91:24
94:16,18 137:1

**harassing**
136:20,22

**harassment**
23:19 24:13,22
28:7,8,9,10
52:20 136:19,
23

**hard** 153:6

**having** 4:19
14:20 22:10
34:18,25 66:24
74:15 80:7
86:21 101:3,10
113:14 118:19
125:4 126:23
127:11 129:12,
23 132:12
135:2 151:14,
24 159:11,12
161:9

**head** 6:3

**hear** 5:16 126:4

**heard** 4:7 5:18

**hearing** 88:12
90:15,20

**held** 31:12
59:17 94:4
98:13 99:3
104:14 124:14

**help** 8:25 22:12
55:7 77:2
151:15

**helping** 21:20

**helps** 72:14
74:25

**Henderson**
16:13

████████████
97:11

**here** 17:20
30:17 68:19
70:4 76:19
79:12 84:13
85:23 102:13
112:20 113:1
114:11 115:23
118:6 138:15
142:4

**Herring** 142:2

**herself** 156:12
157:6

**high** 97:25

**higher** 75:20

**himself** 122:11

**histories** 62:24

**history** 57:4,10
58:12,25 59:2
61:7,19 62:5,
16,20,22
63:11,13

**holding** 41:18

**Holly** 4:17 7:25 118:14 166:20

**Holly/april** 87:9

**home** 25:21 101:25 111:20, 23

**homeroom** 53:14 72:3 103:8

**hone** 151:6

**Honestly** 40:6 47:10

**hotline** 75:19

**human** 73:1

**hundred** 104:7

**husband** 17:17

**I**

**idea** 31:3 115:10

**identified** 5:1 7:20

**identify** 81:7

**identifying** 121:24

**IEP** 10:11,13 11:13,14 14:8 16:17,19 34:7 54:19 55:2,6, 13 80:11 81:2, 22 82:14 83:5 151:5 156:8 157:7 160:25

**IEPS** 13:4,16, 24 15:15

**immediately** 52:8 138:18,22

**impacts** 64:7

**implement** 98:1

**implemented** 24:3 129:24 130:12

**implementing** 10:11 130:25

**impression** 49:15 116:23 117:3 129:12, 13

**impressions** 106:9

**improvement** 110:8,9,11,14, 21,25 111:3 142:8,11,16,18 143:3,6,8,18, 25

**inappropriate** 116:20 135:6 137:24 138:5, 12

**inappropriately** 50:6 90:10

**incident** 30:16 32:7 36:5,6,7 38:3 49:4,16, 23,25 50:4,5, 17,24 51:15,22 55:23 60:4,9 64:24 65:2 70:16 71:1 74:2 78:3,4 81:24 84:1,14, 25 85:2,19 87:11 88:2,6,8, 13,14,20,25 90:8 99:4 103:3 108:16 109:3,19 110:24 122:4

125:15 130:3 142:9 143:19 144:9 145:10, 13,19,23 147:17,20,23 148:10 150:12 153:19 157:16, 18,24 158:3,7, 9,12,15 159:6 160:16

**incidents** 25:15 90:16 121:16, 21 122:16,18 124:12,20 125:14,22 146:18

**included** 82:18, 19

**includes** 91:5

**inclusion** 8:15, 21,24 9:12,17, 22,23 10:2 32:16,21 33:13 34:16,20,23,24 36:11 81:16,18 82:13,18,20 83:9,10 97:6 150:1,15,16 155:18 156:4 157:5,10,13

**independent** 31:25 32:5,13 36:5 48:17,25 49:2

**info** 75:3

**information** 14:23 22:6 50:8 56:20,23 71:13,18 75:8 89:8 159:3,4 161:2

**informed** 56:10

**informing** 79:7 92:9

**initial** 88:14

**initially** 67:17 92:20

**initials** 85:23 99:22 102:15 114:3 115:23 118:17,21

**initiate** 93:4

**instance** 58:6

**instances** 59:9 121:3 129:17 164:17

**instead** 14:19

**institution** 117:25

**instruction** 7:5 11:3 131:4

**interacted** 147:8

**interacting** 12:11

**interaction** 46:3 49:9 158:4

**interactions** 37:24 68:9

**interview** 75:7

**interviewed** 59:21,25 69:19,25 95:13

**interviewing** 59:22 60:19,23 67:9

**into** 12:5,14 13:15,22 15:2, 16,24 20:17

21:6,13 22:4, 18 32:17,25 33:2,3,9 34:15 37:6,11 42:14 43:1 46:5 52:23 65:19 74:11 82:24 86:18 88:4 97:15 100:3 109:2 155:18

**investigation** 89:23

**invitation** 98:23 99:1

**involve** 80:24 84:24

**involved** 84:22 94:24 118:15, 23 132:1

**involving** 55:5 83:14 84:1 85:3,21 97:10 110:23 158:13

**issue** 19:22 80:11,15 81:19 82:23,25 85:20,21 114:4,12 115:17 122:22

**issued** 82:4,9 84:18

**issues** 85:8,17 91:1 125:5 131:9 147:11, 12,13

**items** 94:2

**J**

**Jane** 4:11,23

job 9:19 10:5 17:20,22 18:18,20

Jordan 4:12 29:19 30:25 31:3 49:19,22 50:14,16 51:1, 9 52:13 54:2 56:2,24 57:11, 24 58:15,23 59:4,16 61:11, 20 62:6,13 63:2,8,15,22 64:13,15,18 72:18,22 77:10,16,24 78:13 80:25 81:5 86:7 89:9 104:11 109:20 116:6,15 124:15,23 127:6 128:8 132:8 138:8 141:9 146:19 152:23 153:21 154:10 155:4,6 156:21 159:1 161:12 164:19 166:19

journal 148:3

judgment 75:11 85:8,18, 21

jump 75:22

June 68:3,5 103:12 110:19 124:14,18

Justice 130:16, 17,23

**K**

keep 96:18

126:10 148:3, 21

Kelli 162:7

kept 28:19 72:1 94:5 135:22,25 136:3 148:16

kids 15:4 35:1 40:1 43:12,17 44:3,10 46:11 47:4,13 48:24 51:16 52:22 60:20,24 62:23 63:20 65:10,13 66:2 67:10 75:3,4,9 76:11, 23 78:25 93:12 119:9 123:1 126:17 163:12 166:13,14

kind 7:17 15:9 17:4 20:12 21:13 34:16,17 35:24 38:9,11, 17 40:7,15 42:22 69:23 88:22 93:3 96:22 119:23 120:2 127:10 128:25 129:10 147:25 151:6

knew 15:21 23:11 32:14 67:5 83:20 91:11 101:12 121:12 138:6 145:24 146:1 156:18 163:22 164:1

knowing 56:20 61:18 62:3

knowledge 5:3 23:13 57:17 101:10 127:20

known 37:19 55:21,22 56:22 57:10 58:11 61:6,19 62:4 89:18

Kristin 87:10, 14,16 128:17

Kutztown 17:25 20:1,3

Kyle 4:14 142:3

**L**

labeled 68:2

lack 122:15

language 12:16,22 13:16 22:5,18,19 36:18 45:3 135:6

lapse 85:8,17, 21

larger 11:14,16

last 5:11 21:22 23:12 97:7 120:20 142:9

later 67:18 87:19 88:17 105:25 114:2

laugh 35:16

Laughlin 4:10, 21,23 49:20,24 50:2,15,18,21 51:5,13 52:18 53:22,24 54:4, 7 56:8 57:7,14 58:3,17 59:1,6, 14,19 61:16,24 62:15 63:5,12, 18 64:3,10,14,

16,20 72:20,23 77:13,19 78:7, 17 80:19 81:4, 6 86:11 89:13 104:13,16 109:22 116:11, 22 124:19 125:1 127:15, 18 128:14 132:15 138:13 141:13 146:24 153:2 154:1,14 155:1 156:20 158:24 161:14, 16 162:11 164:22 166:17, 21

Laura 4:10,23 104:11

lawyer 29:20 30:21 80:22 103:19,23 104:3,5,8,24 105:3 106:18 112:14,17 114:21,25 115:19 142:4 143:1

lawyers 113:15

learn 60:15

learned 89:24 160:17

learning 32:23 33:6 34:18 49:22 50:16 158:8,12

least 110:7 124:13

leave 33:1,2 53:15

leaving 17:15 86:25

left 73:7 119:25 120:4 129:15 133:7,10

left-hand 99:21

leg 132:23 133:10,13,22 134:2

legal 83:4

legs 133:1,2,3, 6,15,18,23

less 34:8 62:24

lesson 12:16 14:14,15,17 16:1,7 68:23

let 5:17 6:17, 18,21 7:2,10, 17 30:8 72:13 90:5 105:3 115:18 122:8 126:11

letter 68:3,5,16 79:13 114:21 142:1,7

letterhead 68:6

level 9:7 10:9 11:13,15 34:8, 10 56:12 97:23 125:17 141:15 159:13 162:4 166:9

levels 10:10,17, 23 11:1,19 12:6,24 13:8 32:15 53:15 150:1

light 108:19 145:10

lights 118:9

like 9:12 12:10,

13 14:6,19
15:7,8,11
16:10 19:24
20:16,22 21:18
22:1,4,7,17
23:21 24:18,19
25:8,10,14,19
20,24 26:17
27:12 28:9,25
29:1 30:14
31:13 32:14
33:8 34:1,6
35:23 38:9
40:4 41:9,18
42:8,11 44:15
45:15,16 47:3
48:18 53:14
55:15 57:3
58:4,19 59:10
60:3 62:19
63:9,24 74:3,
25 75:7,18
76:11 78:6,8
79:2 81:11
83:8,19 84:18
85:9 88:22
92:7,22 93:25
94:13 96:6,16,
17 97:3 98:23
103:3 104:22
105:11 106:16
107:12 108:10
109:9 110:10
112:6,14
116:1,12
117:7,10,17
122:4,23
123:16,19
125:20 126:6,
21 127:9,22
128:5,25
130:3,7 132:5,
18 136:1,2
138:6,20
139:4,13
140:19 141:18,
23 150:14

151:25 153:6,
13 154:8 157:1
159:16,20,21
161:22 162:6
163:17 165:15
166:10

**likely** 62:24

**line** 94:2 101:4,
8,11,13,14,16,
20 102:6,10
115:4,16
118:16 142:6

**lines** 115:24
118:21 130:10

**link** 26:3

**list** 15:16 33:14

**listed** 73:13
99:13,23
103:13

**lists** 73:11

**literally** 140:20

**little** 5:8 14:16
23:10 32:10
40:16 74:25
87:25 104:21
115:18 151:1
154:19

**long** 8:8 17:10
19:7,9 32:10
44:24 45:20
60:4 76:3

**longer** 32:18
33:6 35:10
36:11 163:1

**looked** 12:13
32:6 38:9 42:8,
12 50:23
148:7,8

**looking** 36:25
41:9 44:23

49:21 88:22
109:25 110:2
153:14

**looks** 85:9
112:6

**lot** 24:20 53:16

**Lou** 130:16

**low** 15:9

**lumped** 24:17

**LYNNE** 4:17

---

**M**

**made** 11:11
26:23 37:5
42:2 44:8
54:25 60:11
66:14 126:9
148:10

**maiden** 8:1,4

**major** 18:3
71:25 72:5,6
123:15 134:21,
25 136:15
137:17,19

**make** 5:8 16:3
26:21 56:16
57:4 62:17
101:8,17 112:8
115:18 118:15
123:13 126:6
141:19 150:25
158:9 166:2

**makes** 25:23
63:13

**making** 87:21
112:22

**Malachowski**
103:25

**male** 68:20

**manager** 10:7
37:21 155:7,22
164:24,25
165:10,16,20

**managers**
165:3

**mandated**
26:18

**manner** 68:25
69:1,12,13

**manual** 27:24

**many** 10:15
11:21 13:3,9
15:4,8 33:22
128:2 162:18

**marker** 68:19
73:11

**marks** 100:12
152:16,17,19

**marriage** 8:3

**married** 7:22,
24

**master** 18:14

**master's** 18:6,
11 19:2

**materials** 22:13

**math** 12:23
13:2 22:6 33:4

**matter** 112:2

**Maureen** 4:12
30:7,10

**may** 6:7 11:4
14:15,16,17
16:1 29:17,19,
20 30:10 46:20
53:10 61:1
70:14 72:16

74:2 80:23
84:14 85:4
86:14 92:9
93:20 140:7
146:16

**maybe** 9:1
12:15,19,21
19:8 23:22
24:18 28:13
68:12 83:16
115:7 120:17
149:11

**Mcandrew**
72:24

**Mchugh** 72:16,
25 73:18 99:16
119:14

**mean** 9:9 22:16
24:25 26:12
27:24 31:16
32:20,22 34:8
36:1 40:21
50:5 54:11
59:10 62:21
65:17 76:3
78:9 80:5 84:4
88:15 89:5
91:22,23 95:15
100:18 101:12,
24 104:7
105:24 109:24,
25 117:8 121:6
123:6 132:17
133:6 136:21
138:19 143:12
150:17 152:5
156:24 161:21
165:19 166:9

**meaning** 29:3
103:6 126:5
139:1 141:5
152:5

**means** 75:19

81:2 120:10

**meant** 107:5
132:18 135:6
136:19 137:4
139:3,9

**mechanism**
90:23 92:6

**meet** 68:11,14
91:16 96:1
119:25 152:16
156:6

**meeting** 54:24
70:13 73:25
74:1,12,15,19,
21 75:14
79:14,20 83:17
85:14 86:3,19,
21,23,25 87:3,
4,22 91:20
92:19 93:2,4,6
94:25 95:5,7,
19,20 96:9,11
97:10,15,16,21
99:3,13,15,18,
19 100:17,21,
25 103:13
104:5 112:12,
19 113:21
116:19,24
117:1 118:3,7,
10,19 119:2,
12,18,20,23
124:14 131:6
134:9,19
151:20,24
152:3,9,21
153:4,10
156:11 157:5
160:24,25
161:5,6,8,10

**meetings**
31:12,13 50:11
80:6 92:23,25
94:22 96:16,

20,21 97:8,19
98:4,13 99:20
113:1,7,8,13,
16,19 119:13
122:15 146:15
158:4

**meets** 95:12

**member** 93:19

**members** 94:7
123:8

**memories** 32:5
36:5

**memory** 32:13
53:1 84:14
88:4

**mental** 47:16,
22

**mention** 95:12

**mentioned**
70:19,20 91:17
95:9 122:19
131:13 148:14
165:13

**mentions** 80:10
142:6

**mentor** 20:14,
19,25 21:1,3,
20

**merge** 34:17

**messages**
147:25 148:1

**met** 150:4
151:3 157:20

**method** 128:1

**middle** 17:8
97:25 161:10

**might** 12:14
19:3 22:24

49:11 72:8
105:12 115:10
149:11

**milk** 136:1,6,7,
8

**mind** 56:19
59:14,22 77:14
104:11

**Minor** 134:20
136:14 137:16
138:15

**minors** 71:24
72:5 134:24

**minute** 59:15
104:12

**minutes** 12:15,
19 14:6 15:22

**misbehaving**
121:7

**Mission** 75:3,4,
9

**misunderstand**
133:19

**modified** 16:2

**modify** 9:1

**mom** 83:17

**moment** 88:7
128:20

**Monday** 149:9

**monitor** 157:7

**monitoring**
156:8

**month** 20:22,24
21:22 22:4
23:12 150:8

**months** 18:19
49:16

**more** 9:3 13:15
14:18,19
25:15,18 34:1,
7 57:19 61:17
62:2,10 80:14
117:6,7,20
118:23 124:2,4
134:15

**morning** 4:22
12:17 91:25

**most** 13:2

**mother** 160:15,
19 161:5

**move** 17:18,22

**moved** 17:21
81:21 149:25

**movie** 71:3

**moving** 34:23,
24 81:15
132:12,18,20

**MTSS** 91:3,9
93:7 94:22,25
95:18,20,23
97:2,8,10,19,
21 98:4 99:1,2

**much** 18:24
68:25 69:12
71:5 84:11
93:23 103:20
161:13

**multiple** 13:19
35:11 53:15,16
82:1 84:7
91:22 93:4
96:16,20 108:5
127:14 136:8
162:9 163:7
165:6

**must** 35:17

**mutual** 47:4

75:23 100:5

---

## N

**name** 4:22 7:23
8:2,4 21:12

**nature** 4:5
75:12,17

**near** 15:17
38:19

**necessarily**
92:5 161:6

**necessary**
85:25 86:4

**need** 6:20
14:12 15:14,18
26:5,6 93:20
108:7 115:25
118:15 119:6
134:24

**needed** 13:2,10
14:9,24 26:23
56:21 154:7

**needs** 110:7,9,
11 111:3
134:25

**negative**
109:10 116:20
146:4,7,12

**neighborhood**
54:16

**nerve-racking**
74:8

**nervous** 74:3,7

**never** 74:6
84:6,10 126:3
137:6 142:17
153:8 165:13

new 20:16,17
35:13 82:10

newer 22:12

newly 20:18

news 117:24

next 6:16 36:14
41:1,3 46:4
75:10 89:23
90:6 92:19
94:18 95:25
96:1 100:11
115:4,16
118:16 151:15

night 19:14
98:19

nod 6:2

none 123:9

NOREP 82:4,10
84:18,20
114:14,17

norm 35:21

normal 6:2,7
19:9 35:21

normally 31:20

North 20:8,11,
23 27:19 42:22
54:5 60:18
68:6 69:23
73:4,8 83:1
84:19 114:22
115:1

notation 46:11

note 51:1,9
52:13 56:2,24
57:11,24
58:15,23 59:4
61:11,20 63:2,
8,15,22 77:10,
16,24 78:13

86:7 89:9
109:20 112:20
116:6,15 119:5
124:15 127:6
128:8 132:8
138:8 141:9
146:19 152:23
153:21 154:10
164:19

noted 118:14

notes 31:13
46:9 54:6
72:14,15 99:12
113:1,6,8,12
117:1 118:6
144:2 148:7,9

nothing 45:16,
21 49:2 100:5
121:10 126:16
127:13 145:14
146:22 164:18
166:19

notice 82:5
147:7 163:2

noticed 37:1
40:10,19

notification
94:20

notified 95:3

notify 78:24
102:16,20
103:2 130:4

notifying 103:7

November 36:6
50:12 51:8,15,
22,25 52:5
53:18 54:11
55:23 56:7
57:18 65:2
71:17 74:17
76:16 85:18

87:19 88:14,
17,20,23 89:6
99:4 100:1
103:3 108:17
109:3,19
135:20 142:9
143:19 145:9,
13,18 150:12,
14 151:14
157:16 158:8,
15 160:17
165:11

number 11:17
14:23 48:3
54:4,8,13
64:11 72:19
123:24 144:7
154:15 159:9

numbers 11:17

---

## O

objection 51:1,
9 52:13 56:2,
24 57:11,24
58:15,23 59:4
61:11,20 62:6,
13 63:2,8,15,
22 77:10,16,24
78:13 86:7
89:9 109:20
116:6,15
124:15,23
127:6 128:8
132:8 138:8
141:9 146:19
152:23 153:21
154:10 156:20
158:24 164:19

observation
164:2

observations
149:16,23

160:3

observe 149:1
151:15

observed 62:10
78:5 95:17
149:6,7

observing
149:19 159:19

obtain 159:4

obviously
71:18 117:1

occasion 42:19

occasions
162:18

occupational
93:21

occurred
54:14,15 88:23
95:20 158:7
162:19

off 123:19
124:21 130:9
137:5

offense 123:15

offer 16:9

offered 59:12

office 31:16,23
37:13 43:20
46:7 53:5,6
71:21,24,25
120:17 121:10,
18,22 122:20
123:7,12,13,16
126:6 129:24
130:5 131:1,
10,12 134:25
135:1 137:11
138:24 148:6

office-type 9:3

often 25:8
156:6

once 20:22
94:16 95:1,22
124:2 134:15
141:15 157:6

once-a-month
22:1,15 23:3

one 10:8,19
11:10,16 16:22
20:24 21:5,22
24:22,24,25
25:2,5 28:6
34:10,22 37:14
42:23 48:22
71:24 73:12
90:4 92:23
98:22 99:14
103:3,13
106:22 108:13,
24 111:12,14,
15 112:3
121:22 129:23
131:14 134:25
136:5,6,8
139:18 140:14
143:13,21,22
148:12 149:10
150:2 151:14
163:4,13
164:10,17
166:10

one-on-one
68:14 155:25
156:7 157:21
158:3

ones 26:18
123:7 146:15

online 18:10
19:12,14 23:21

only 7:13 10:8,

21 13:23 14:5 19:16 30:11 38:5 43:10 90:2,4 96:5 105:2 123:6 127:19 140:12 143:21 156:23

**opportunities** 91:23

**option** 165:5

**options** 83:18 165:2

**order** 34:17

**other's** 41:17, 18 132:6,21,25 133:5,18,23

**others** 90:4 118:15

**otherwise** 72:1

**outside** 25:24 30:18,24 31:2 45:9 64:4 113:16 157:13

**over** 5:7,12 68:15 99:24 136:15 139:13, 14 151:25

**overwhelmed** 150:15

**overwhelming** 35:12

**own** 34:25 35:10 36:12 40:2,16 113:11 136:2 140:7 148:22

**P**

**p.m.** 104:14,15

166:22

**paid** 111:15

**Paige** 87:11

**paper** 48:22 77:2

**paperwork** 10:12 22:17, 22,24 48:21 104:9

**paragraph** 66:6 99:23 102:14

**parent** 81:17 82:6,12,17 83:15 94:23,24 114:14,20 126:12 165:17, 25

**parenthesis** 114:5

**parents** 46:12, 15,16,22 47:14 54:9,18 76:21, 24 77:7 78:11, 19,21,24 79:7 83:2,8 84:20 95:3,4 102:16, 20 103:3,7 114:18 147:17, 20 161:2,7,11

**parents'** 115:19

**part** 11:5 16:15, 18 22:14 23:17 49:10 54:12 55:2 76:7,15 85:13 97:6,24 99:24 102:13 107:10 112:5 118:10,18 119:1 120:1 138:1 141:16, 18 142:12

**participants** 95:24

**particular** 34:5 43:17 76:10 80:22 91:15,21 95:12,21 96:25 137:25

**parties** 4:2,7

**partner** 118:17

**partnered** 39:23

**partners** 39:23, 25 40:2

**pass** 19:23

**passed** 123:20

**passing** 68:12

**password** 26:6

**past** 14:7 25:5

**pause** 4:6 30:8

**pay** 79:13,16, 18,25 105:7,25 107:7,14 111:14,24 112:2

███████ 16:14 32:8 37:3,9,14 38:12 39:3 40:12 43:12 44:20 45:15 47:18 48:3,11 49:6 50:5 52:23 57:9 58:7 59:21 65:8,14,19 66:7 70:11,16 71:8 78:2 87:18 88:3,16 89:19,24,25 90:10 97:19 99:3 100:2,4

121:25 131:12 133:7 134:1 138:24 139:9 147:1 157:17 158:10,13,18, 21 159:4,10,11 161:19 163:1, 4,10,13

███████ 41:20 42:3,7 131:21 132:3,5,13 133:10,13,14, 22 136:5 139:18,21 140:4,14,24 147:19 162:25

███████boy 76:16

**PB's** 120:8

**pending** 6:22

**Penn** 20:8,11, 23 27:19 42:22 60:19 68:6 69:23 73:4,8 83:1 84:19 114:22 115:1

**Penn's** 54:5

**Pennsylvania** 4:18 142:2

**people** 33:10 73:12 87:22 91:16 95:9 99:22 127:3,11 162:2

**peoples'** 127:23

**percent** 9:12,13 104:7

**perception** 120:21 121:1 124:8 127:10

**performance** 105:18

**period** 89:15 119:8

**permanent** 107:15,19

**person** 141:6

**personal** 121:20

**personally** 121:13,15,22 123:24

**phone** 26:22 36:3 48:3 159:9

**phrase** 31:19

**physical** 93:22 135:9,10,14 138:14 141:21

**pick** 40:1

**picture** 38:11

**pieces** 48:22

**place** 90:24 92:7 102:15,20 103:2 130:18 163:20 166:4,5

**placed** 11:19 15:24 132:19

**Placement** 82:5

**placements** 83:18

**Plaintiff** 4:11

**plan** 15:20 35:11 91:23 96:1 98:1 110:14,21,25 142:8,11,16,18 143:3,9,18,25

popping 21:13

population 11:14

portion 62:1

position 9:3 18:16

positive 92:16

possibly 52:24

potentially 84:16

practice 60:13

practices 8:24 20:22

pre-history 53:19

prep 91:25

preparation 29:23 32:7

present 8:11 12:1 16:6 86:20 119:19

presently 8:6

president 73:15 99:17 104:2 112:7 145:1

pretty 18:24 39:13 71:5 84:11 93:23 103:20 105:20 106:6 143:14

previous 10:24 38:1 54:24 55:8 58:24 59:2 81:14 114:14,22 115:1,3 125:8 130:15 152:12

planned 12:17

planning 92:1

Plans 143:6

play 47:21 48:2 49:6 159:9 161:18

playground 48:11,13,24 49:4,7

playing 48:24 163:14

point 7:23 39:18 41:5,25 43:9,23 44:5 50:10 52:24 57:18 64:5 65:22 67:6,21 95:1,23 103:6 112:11 114:25 124:7 139:3,14 140:8 141:1,3 142:17 144:23 150:16 151:10 163:19

pointed 37:4 42:1,12 140:23

points 75:22

police 75:18 118:22

policies 27:20, 23 28:3,13,18 29:14

policy 27:24 28:3,5,8,12,25 60:18 69:23 71:22 72:4

poor 75:11 108:8 110:3

previously 26:20 55:1 63:20 64:2 143:21

principal 26:25 29:3,13 46:19 47:2,14,15 50:8 57:23 71:19 72:6 73:17 74:10 75:20 77:8 83:14 91:5 94:20 97:3 99:15 103:8 108:20 114:10 121:8 123:21 125:6 130:15, 23 131:2 134:10 149:6, 15,17,18

principals 130:15

prior 19:8 23:5 24:5 25:10 26:9 27:10,14, 18 37:18 42:19 49:22,24 57:18,19 58:12 59:9 61:6,19 62:4 64:7 68:8 84:1,14 85:4 87:3 89:17 104:4 111:2 124:13,18 130:13 134:13 150:11 154:23 158:7 160:20, 21

privacy 81:9

probably 5:11 29:2 34:3 44:15 53:4 58:1

Problem 134:20,21 136:14,15 137:16,17,20 138:15

procedure 90:23 92:7

process 44:2 84:10 130:2

production 54:5

professional 34:22 110:14, 20,25 142:8, 10,16,18 143:3,6,8,18, 25 145:16

professionalism 85:10

program 16:18 19:5,17,23 20:14,20,25 21:1,6,11,20 22:18,22 93:13

progress 156:8 157:7 161:1

Promise 115:24

proposing 83:2,9

protected 30:21

provided 22:14,17 111:10

PSEA 103:19, 23

psychologist 91:8 95:8 96:7 97:4

public 117:24

pull 44:10 64:11 68:1

pulled 43:8 44:7,13 49:10 66:2 119:16 139:7

pulling 43:11, 16 44:3 147:1

punished 105:12 107:14

punishment 112:8,22

purpose 93:16

purposefully 15:24 104:23

pushing 32:17

put 37:3 86:18 89:2 92:22 96:12 110:13 130:18 131:19 138:20

putting 47:6 78:8,19 102:1 131:21 138:4 143:17

### Q

qualified 32:24

qualify 135:10

question 6:8, 11,14,16,22,23 7:1 11:7 28:24 46:21 50:19 51:2,10 52:14 56:3,25 57:12, 25 61:12,21,22 62:11 63:3

77:11,25 78:14
86:8 89:10
90:6,18 104:25
109:21 116:7,
16 121:14
124:16 127:7
128:9 132:9
138:9 141:10
146:20 152:24
153:22 154:11
164:20

**questioned**
66:23 83:13,25
84:15 85:3

**questions** 11:4
14:21 16:5
23:11,22 24:7,
15 29:14,17,18
66:21 79:6
94:1 99:25
112:16 135:2
155:2,5 161:13
166:18

**quickly** 53:23

**quotation**
100:12

**quote** 7:16

---

**R**

**raising** 117:5

**ran** 21:1,10

**range** 34:11

**rapport** 129:1

**reach** 121:17

**reaching** 68:20

**reaction** 35:17
65:10 79:23
88:10 128:21,
22

**read** 54:11
61:24 62:2

**reading** 13:2
14:17 32:25
33:2 37:8
87:25 91:6
97:5

**realization**
50:12

**realize** 59:24
60:1,11

**realized** 50:24
60:5

**really** 11:6,12
13:25 14:6,13
19:6,11 22:21
23:13 24:16
26:1 27:25
28:23 33:24
34:6,13 44:18,
25 45:19,25
47:22,23 61:15
62:7 63:4 64:9
66:17 75:8
76:4,8 82:8,10
83:5,23 93:18
102:25 108:3
112:13 115:2,
21,25 116:1,4,
13 117:13
119:3 121:5
139:5 149:24
151:4 153:6,7

**reason** 6:20
19:16 30:25
107:5,16

**recall** 13:3
20:4,11 23:2,
18,24 26:9,14
28:7 33:21
36:7 42:21
44:16 65:24
68:17 69:2

70:15 72:10
75:13 76:9,25
79:14,20 82:14
85:19 86:3
88:22 99:18
100:16,20
101:2,10,19
102:19 103:15
112:20 113:11,
14,18,25
114:11,24
117:10 118:2,
10 119:1,11
122:21 127:4
129:18 132:16,
22 134:14
135:7 140:12,
13,17,18,19
142:10 144:16
148:24 149:2,
13,18 151:24
152:2 157:19
159:18 161:9
162:23

**recalled** 38:4

**receive** 59:7
79:8 111:24
145:15

**received** 22:22,
25 23:7,17
24:10 78:23
98:3 101:7
103:5 107:8,23
111:3,5,14
142:7 146:4
152:17 154:22

**receiving** 20:4
23:18 26:10
28:2,7 42:21
72:10 142:10
145:23

**recently** 25:14
26:18

**recess** 47:21
48:2,9 59:17
104:14 159:7,
8,11,12,14,15,
16 161:18,20
163:2 166:7,
10,14

**recollection**
32:1 67:1
72:15 75:1
157:14

**recommended**
82:5 92:23,24
106:17

**recommending**
82:19 114:17

**record** 54:5
59:18 62:2
72:19 86:17
104:15 107:20

**recorded**
113:2,3,5

**records** 7:22
8:1 67:18 80:7
104:20 111:9
148:22

**reduced** 111:11

**REF** 114:3

**references**
81:22

**referral** 31:16
43:20 46:7
53:5,6 71:21
100:5 120:17
125:23 126:6
129:24 130:5
131:1,11,12,17
137:11 138:25
148:6

**referred** 104:3
114:4 150:23

**referring** 40:11
48:12 66:10
71:7 86:13
103:24 120:9,
15 137:18

**reflect** 88:13

**refresh** 72:14
75:1 77:2 88:4
100:7

**regard** 159:19
160:13

**regarding** 65:2
80:11 117:24
118:6 144:8
157:24 159:3
160:20

**regards** 157:10

**regular** 33:1,2
53:17 81:20
155:18 156:12

**related** 156:23
157:14

**remained** 78:3

**remember** 7:10
10:14 13:6
19:1 20:6 21:2,
8,9 22:21 23:9
26:12 27:9,13,
17 28:2 29:15
31:8 32:12
33:25 36:14,
19,22 37:12
39:21 40:3,6
42:6,10,17,25
45:3,23 46:2,
13,14,15,17,23
47:23 48:1,10,
16,25 49:5,6
53:3,9 54:23
55:10,12,18,19
59:12 60:2,6
64:1 65:4,6,9,

17 66:10,12, 13,17,20 67:11,12,22, 23,25 69:5,10, 16,21 70:9,12, 18,22,23,25 71:5,10,15,23 73:9,19,25 74:3,4,20 75:4, 6,8,15 76:1,4, 6,11,13,25 79:1,9,11,19, 21,22 82:10,11 85:1,6,13,15 86:9,15,21,24 87:5,23,24 88:7,11,18 98:6,12 99:10 100:18 101:1, 13 102:23 103:10,17,19 105:8,11,14 106:5 111:13 112:14 113:21, 22 115:5,19 116:3,9,12,18 117:13,15,19 118:18 119:13, 17 122:1,3,5, 13,14 123:4 124:4 126:20, 21,24 129:21 130:6 131:7 132:12,19 134:5,11 135:2 141:2 146:5,7, 10,11,13,16 149:4,22 150:22 152:7, 10,11,13 153:14 154:13, 25 156:25 157:11,15 158:11,22 163:9,13,18 164:13,14

remembered 89:4

remiss 115:25

remote 4:5

remotely 4:3,4, 19

removed 142:20,22

rep 73:14 152:6

repeat 126:21

rephrase 7:3

report 65:1 101:8,17 102:10 107:1 126:16 137:10 161:1

reportable 27:7

reported 102:6 124:20 125:14, 18

reporter 4:2 5:22 162:10

reporters 26:18

reporting 4:5 26:10,14 75:11,16 101:3 126:23

represent 4:23

representation 152:4

reprocessing 88:23

request 99:2 161:7 165:21

requested 165:15

required 26:4 69:24

requirements 25:7 26:15

requires 142:8, 16

resources 73:2

respect 157:25

respond 121:9

response 105:6 118:1 153:20

responsibilities 8:20 10:6

responsible 10:11,15 151:5

responsiveness 122:15

rest 43:6

restate 5:18

resting 133:21

restroom 36:2

result 85:8 111:8 145:18 148:10 164:4

review 29:24 30:2 31:3,5 75:2 85:25 86:4 105:19 106:10

reviewed 30:6 31:9 46:9 48:21,22

right-hand 73:10 99:14

rights 81:9

Road 4:18

role 8:10,15 9:16,22 10:1,3, 6 20:12

room 21:7,13 32:25 33:2,3, 16,17,19 35:19 36:13,19,23,25 37:2 38:5,13, 16,19,21,25 39:6 40:9 42:1 43:10 65:8,9, 15,16,19 72:2 98:14,16 140:24

Rosana 162:7

Rosner 5:21 6:10 61:25

rotate 13:13

rough 35:17

rubbing 132:5

rude 6:5

rug 36:24 38:15,21,24 39:16 40:8 71:5

rules 5:8

run 21:6 43:10 151:14

running 151:10 159:20,21 160:1 161:23 162:15 163:5

Ruth 48:12 86:22 87:3,9, 12,18 88:16,19 113:19 145:17 162:7

Ruth's 48:23

S

Safe 22:23

safety 162:24 166:4,5

said 5:19,23,24 7:16 10:19 19:12 24:13 25:2 30:10 32:14,20 34:6 40:7,9,19 41:25 42:13 43:2 44:13,19 45:13,15,16, 18,21 46:20,23 52:22 53:14 59:10 61:6 62:19 63:9,24 66:11,24 69:17,18,25 74:25 76:25 79:2 83:8 84:18 87:18 88:16 91:9 92:8 96:24 97:3 100:4,10, 19 104:22 106:16 107:12 111:17 112:14, 17 113:25 115:11 116:10 117:14,17 121:23 125:11 127:3,9 129:22 131:7,8 133:5, 17 134:8 139:8 141:23 143:11 146:6,8 149:10 150:7 161:17, 20 163:24

same 8:10 13:12 14:18 35:19 44:11 51:24 53:10

58:8 62:6,13
81:24 90:18
98:1 120:5
124:23 130:10
131:20,22
158:13 159:14

**Santoro** 29:6
54:6,20,23
73:18 99:16

**satisfactory**
109:7 110:6,7

**saw** 24:24
25:14 41:20
46:10 49:8
55:23 67:18
101:4 140:11

**say** 6:3 7:14
11:8,23 13:9
15:2,3,6 16:21,
23 19:3,8
22:23 24:8
31:15 33:24
34:13 35:15
37:9 42:13,16
43:15 44:20
45:14,15,20
47:24 52:2
57:15 62:25
66:7 71:6,7
73:21 85:17
100:24 107:3
108:3 109:8
114:15 117:9
122:24 127:25
129:16 130:20
132:4 137:19
140:11 144:18
150:16 153:17,
20 154:5,18
156:9 158:20
162:20

**saying** 36:10
44:16 46:11,15
48:21 66:2

68:18 69:5
75:2 91:14
100:16,20
102:21 105:11
109:16 112:15
116:3,13,19
117:11,16
118:6 119:17
123:11 124:8
125:20 140:2
153:14,18

**says** 54:9,13
66:7,23 68:19
69:11 70:4
75:10,23 76:15
79:12 85:7,9,
24 87:8,9,18
88:16 100:1,12
102:14,15
103:14 112:6,7
114:3,5,8,9,21
115:4,16,18,24
118:8,16,17,22
119:6,7 120:7,
20 142:15
144:18

**scanning** 36:25
40:9

**scenario** 43:3
58:11

**schedule** 12:6
14:4 94:21
150:3,5,20,25
151:9 160:25
162:25

**scheduling**
83:17

**school** 4:24 7:9
10:15,21 12:4
13:5 17:3,6,8,
13 18:5,18,21
20:8,11,23
23:6 24:6

25:11 26:10,
11,25 27:10,
12,14,18,19
28:5,8,14,19,
24 29:14
31:11,21 32:9
33:5 34:21
42:22 48:7
49:20 50:22,23
51:7,14,23
52:3 54:16
56:10 57:22
58:13 61:7
64:6 68:6,13
69:23 75:25
81:15,17 83:2
84:19 89:17
90:24,25 91:8
96:6 97:4,23,
25 98:18,20
101:6 103:6
106:1 108:23,
24 109:3
114:23 115:1,3
125:3 129:23
134:13 149:3,
12,20 154:16,
23,24 156:14
161:11

**Schwenksville**
4:18

**scope** 22:19

**screen** 5:22
53:23 64:11,17
89:3 154:20

**scroll** 86:17

**scrolling** 87:6

**Sean** 144:23
145:3

**seat** 39:12

**seated** 33:15
36:22

**seats** 39:14

**second** 10:18
12:7,14 30:9
60:9 66:6
70:15 88:2,6,8,
13,25 99:18,23
140:20 142:6

**second-to-last**
102:14

**secretary**
123:18

**secretary's**
123:20

**section** 87:8

**seeking** 83:4
160:7 161:22,
24 163:24

**seems** 57:3

**seen** 27:19
30:15 49:17
74:6 84:4
111:9 144:10
154:17,20
160:1 166:13

**select** 141:21

**self-contained**
32:18 37:22
155:14

**sending** 27:23

**sense** 24:11

**sent** 26:3 27:21
28:13,14,17

**sentence** 70:3
100:11

**separate** 34:18,
25 36:12 58:7
85:2 86:21
87:4 143:12,14
166:5

**separated**
158:18,21
159:5,22
163:23 166:15

**separately**
59:23,25
60:12,20,24
67:10 69:19
70:1

**separation**
163:20

**September**
150:10

**sequence**
22:19

**series** 91:16

**serious** 61:17
62:3,10

**served** 111:17

**sessions** 22:1,
15

**set** 166:10

**settle** 144:5

**settled** 144:6

**settlement**
81:21 82:25
83:11

**seven** 11:24
17:11 19:8,17
109:9

**seventh** 17:9

**several** 7:8
20:21 24:18
89:23 90:9
98:5 121:3
125:13

**sexual** 23:19
24:13,22

49:12,18 50:13,24 51:8
52:7,11,20 55:24 57:10,19
59:9 64:7 75:12,17
137:5,10,13, 21,23 141:5,8,
16,20

**sexually** 53:20 54:21 57:20
63:21

**share** 64:10 157:1

**shared** 58:2 71:18 89:3
94:6 110:17 128:12,19
131:5 134:12, 14 146:23
161:2

**sharing** 53:23

**shirt** 41:21,23 42:4 47:7
68:21 78:9,20 100:2 138:5,21
139:2,5,12,19, 23 140:3,7,15,
16,25 141:6

**shocked** 37:7 43:2

**short** 59:17 104:14

**should** 59:24 60:12 68:23,24
69:3,8,11,14, 19,25 78:21
82:19 100:13, 22 101:20
102:6 107:23 108:2 109:7,
12,17 110:5

119:15 151:7

**show** 53:22 86:16 99:11
103:11 135:19, 21 141:25
148:12

**showed** 104:19 134:9

**showing** 68:2 90:7 134:17
144:7 148:13 154:15

**shown** 28:4

**shred** 83:5

**shredded** 81:23 82:15

**shredding** 80:11 83:7

**sic** 72:24

**side** 41:7 48:18 99:14,21

**sign** 67:19,20, 23

**signature** 144:12

**signed** 67:17 144:20 145:5,8

**significant** 68:23 69:3

**signing** 144:15

**signs** 25:19

**silly** 47:4,8 51:16,19

**similar** 5:15 42:19 87:19
88:17 127:4 130:11

**since** 7:5 8:9, 10 10:25 11:1
46:9 87:3 97:13 106:22
115:8 125:4

**sink** 38:19

**sit** 84:13

**sitting** 15:17 39:15 40:24
41:1,3 71:4 133:7 142:4

**situation** 42:18, 23 44:9 47:20
56:1,7,17 57:4, 8 59:13 60:14
62:10,18 65:18 69:3 74:9,16
75:2 78:5 80:3, 22 83:15 85:25
86:5 89:4,6 90:3 95:16
103:15 106:13 125:18 126:1
127:12 129:21 132:1 145:3

**situations** 48:1 121:5 122:22
126:15

**six** 11:24 19:8, 17

**sixth** 10:18 12:7,20 13:4,
12,13,20 16:19,21 17:8
47:7 55:4 65:25 68:22
78:19,20 90:9, 15 97:14
147:5,9,14 155:17 156:3,
16 157:4 159:13,16
160:11 164:24,

25

**slip** 31:10,16, 20,23 36:16
37:13 53:5,7 58:2 72:8

**slips** 37:16,17 43:20,23,25
46:7 71:17,20, 22 88:19
121:10

**small** 9:5 15:23 36:20

**smaller** 11:17 38:18

**smiling** 18:8

**Snowballed** 118:22

**somebody** 27:4 40:1 75:20
92:7 103:24 122:8 130:4
163:24

**somebody's** 132:23

**someone** 36:2 128:16 154:8

**Somers** 4:14 29:19 142:3

**something** 5:15 6:4 7:10,
15 25:21 26:22 27:24 28:25
29:1 30:14,18 36:3 44:15
45:24 48:16, 19,25 51:15
61:10,17 62:2, 25 73:3 78:6
83:12 87:19 88:3,17 92:8,
10 93:8 94:23

96:7,8,17 97:22,23 99:6
100:21 101:25 102:5,9 105:2
106:18 107:19 108:11 111:13
122:19 126:13, 18 130:3,10,17
135:13 136:24, 25 141:4
142:20 148:16 151:13 157:2
163:6 164:7, 15,17 165:14

**sometimes** 11:18 15:19
19:20 21:7 22:4,5,9 24:19
95:16 126:9 149:5,6

**somewhere** 92:11

**son** 81:20

**sorry** 30:8 54:11 60:7
64:25 68:4 72:25 80:20
82:2 84:8 96:11 108:6
127:15 149:13 158:8 163:8

**sound** 15:8 47:9

**sounds** 15:9

**source** 27:16

**space** 34:25

**speak** 12:10 24:21 27:25
32:2 44:25 46:1 47:22
61:2 62:24 80:17 123:6,8

127:23 128:22
166:8

**speakers** 82:1
84:7 93:4
108:5 127:14
162:9 163:7

**speaking** 4:6
32:2 45:5
120:7

**special** 8:13,22
9:14 10:4
11:18,21 16:18
17:5 18:3,22
20:13 21:16,19
29:4,5,10
73:21 93:13
94:9 97:13
114:7 147:4
149:7 150:24
151:20 165:2,6

**special-ed** 9:21

**specialist** 91:6
97:5

**specific** 14:23
16:8 21:3
26:13 31:22
52:17 55:19
74:4 76:4,14
79:1,7 100:18
101:14 113:12,
23 116:10
117:13,21
122:3,4 125:22
126:20 128:20
129:20,21
134:22 139:24
141:18 156:25

**specifically**
16:13 28:6
45:24 59:12
63:25 66:20
68:13 69:16
71:15 102:21

119:17 126:23
131:7 152:11,
13

**speculate** 56:5
115:8

**speculation**
56:3 61:13,21
63:16

**speculative**
89:11

**speech** 93:20

**speed** 118:1

**spelling** 14:14

**spoke** 29:20
43:24 44:6
100:3

**spoken** 128:5
160:19

**spread** 33:15,
18

**spring** 48:9,23
145:11

**Square** 8:7,12
9:24 32:17
98:10,15,16
129:2

**staff** 90:24
91:15,20 93:19
94:6 122:6
123:8 129:2

**stages** 81:21
82:25 83:11

**stairs** 150:3,4,
21

**stand** 91:10

**standing** 45:11

**start** 6:9,12,16
19:5 41:21

70:3 155:10

**started** 8:11,14
18:17 20:10
24:3 36:4,10
104:18 125:7,
11 130:22
131:1 139:5,18
156:16 157:4
163:2

**starting** 37:3

**state** 4:8 47:16,
23 112:9 142:2

**stated** 53:4

**statement**
48:23 49:4
65:5 66:6
67:16,19,20,24
84:3 89:3

**statements**
158:10

**stay** 111:20,23

**staying** 35:7

**step** 35:24 36:3
92:19

**stepped** 38:6

**steps** 95:25

**stern** 117:7

**still** 9:5,6
51:18,24 65:21
97:25 126:18
150:14 151:13,
14 157:5

**stood** 65:7 66:8
140:22

**stop** 77:23 78:5
140:21

**stop/won't**
76:21

**stopped** 139:6

**story** 14:18

**strike** 159:2,10

**struggles** 22:9
157:9

**struggling** 8:25
149:24 150:15

**student** 38:17
42:23,24 54:19
60:25 61:1
68:20 71:9
79:7 81:8,10
82:19 83:15
88:3 91:15
92:8,9,22
93:14,19 94:17
95:13 96:12,16
97:1 99:1
102:10,11
114:13 121:7,
24 126:20
129:20 130:4
136:2,11,20,22
156:18 165:23,
25

**student's** 68:21
81:1 94:24
96:13 138:5

**students** 9:6
10:8 11:13,15
12:11,18 13:3,
10,16 14:8,11,
25 15:1,12,14,
15,17,23,25
16:3,8 32:24
33:14,17,22
34:5,7,10 35:5,
25 36:13,19,
21,22,24 37:1,
5 38:24 39:8,
14,15,16,17
40:8,10,15,17,
20 43:6,24

47:1 65:21,25
69:19,24,25
71:4 76:20
91:2,4,21,24
92:2 95:16
100:1,3 102:4,
5 118:23
119:16 121:17
123:10 151:5,
16 155:22
157:1 163:16
166:7

**students/kids**
13:24

**study** 18:2 91:3
92:13,19
93:10,11,12,17
95:18 96:11

**stuff** 50:11

**subjects** 13:1

**submission**
123:12 127:19

**submitted**
100:22 123:7,
9,11 126:16
160:3 164:2,4,
11,18

**submitting**
122:19 125:23
127:12

**Subsequent**
110:23

**substitute**
130:14

**substituted**
18:19

**substituting**
18:22,24

**sudden** 141:19

suggestions 22:11

summary 48:13 87:25 100:1

superintendent 68:7

supervisor 9:25 29:4,6 73:21 149:8,16 150:24 151:21

supervisors 29:9

support 8:22 13:2 14:8,11, 19 15:14 32:23 33:7 34:19 55:7,14 147:5

supported 12:15 55:6

supports 54:18 55:3 76:15

supposed 9:11 109:24 163:22

surrounding 36:6 40:14 68:18 102:23 146:18

suspended 79:24 80:8 107:7 132:24 145:24

suspension 79:12,15,18 105:7,10,17,25 106:25 107:14, 19 108:8 111:11,12,18

sweatshirt 37:4 134:5 141:1

switching 9:20 35:9,13

sworn 4:4,19

symptoms 25:19 55:11

system 96:18

**T**

table 37:2 38:18 39:2,3,5, 9,12 40:11,14, 15,20,23 41:13 66:24 67:6 100:2 132:2,14 133:9,12 139:17,25 140:19

tables 39:17

take 6:20,23 9:15,16 10:1 20:12 35:1 59:15 104:12 113:8 118:14

taken 142:13, 14

takes 19:10

taking 5:22 6:10 9:21 19:12 109:2 113:11

talk 22:9 30:17 61:2 81:12 85:18 90:25 104:18 115:12 119:10 125:10 126:25 146:25 147:16,19 161:23 162:16

talked 61:5

66:19 76:22 79:4 100:8 113:23 114:13 118:17 129:10 135:18 146:15 150:24 151:4

talking 7:7 16:12 33:9 48:14 71:20 82:24 92:25 104:21 112:10 114:16 119:5,9 120:2 123:15 124:12

talks 76:19

taught 35:10 113:24 136:25

■ 16:13 32:8 37:10,15, 19,20,24 38:12 39:2 40:11 43:12 45:2,16, 18 47:18,25 48:2,6,11 49:6 52:23 53:19 54:13,21 55:23 57:9 58:7 59:21 65:9,14, 19 66:18 70:11 75:6 78:2 89:16,18 97:10 99:3 100:4 121:25 131:14 132:2,4 133:8 134:4 138:23, 25 139:8 146:25 147:8, 12 155:8 156:18 158:14 159:4,11 160:7,11,13 161:18 162:25 163:3,10 165:4,9

■ 37:4 41:21 42:4,5 58:12 61:6 100:2 131:20 132:13 133:10, 13,14,21 134:2 136:6 139:12, 19,21,22 140:3,6,14 147:13,16 164:23

teacher 8:14 9:8,14,21 10:4 11:16 12:16 17:2,4,5 18:23 20:13 21:5,17, 18 38:5 40:1 53:14 60:17 68:24 72:3 80:9 91:7,25 92:9,20 93:5 94:10,13 95:8 96:8 97:14 98:25 103:8 110:10 126:11 131:2 135:14 145:15 148:17

teacher's 21:12 72:2

teachers 8:23 11:18,21 12:10 13:13 20:16,17 22:12 35:11 53:17 90:24 91:20,22 92:21 121:19 126:3 128:19 131:3 151:3 159:17 162:4 165:6

teachers' 128:11 149:1

teaching 17:22 18:16 20:20

team 91:4,5 95:2,7,11 96:5 97:2,7

tear 130:9

technically 53:13

technology 22:7

telling 46:17,22 47:12 76:13, 19,25 77:6 81:10 85:15 86:3 90:14,19 143:5 154:6

term 31:22

terms 31:24 55:9 60:4 91:19 137:4

testified 4:20

testimony 143:20 166:3

text 147:25 148:1

than 28:12,17 32:1 34:1 51:16 66:21 68:25 69:12 89:6 103:25 113:15 124:2,4 128:6 134:4,15 146:14 147:1 148:6 157:18

their 10:11 14:15,21 37:2 39:12 40:1,10, 20,21 41:6 45:6 46:12,22 65:10 76:2,24 78:19 91:1 132:1,5,6,16, 22 133:8,11,

Holly Lynne Garrett

15,17 136:2 157:1

**therapist** 93:21,22

**thereof** 122:15

**thing** 36:14 47:4 58:8,20, 21 63:10 75:10 108:1 119:8 120:20

**things** 5:8,12 7:8 16:10 20:23 22:7,11 23:12 25:16,18 30:15 35:14 40:5 48:4 68:16 101:19 105:21 118:6 120:2,22 121:2,12,14 124:10 128:3,7 129:5,7,14,19 151:18

**thinking** 49:11, 18 88:24

**thought** 47:6 59:22 105:22 109:8 131:25 135:14,16

**thoughts** 109:5

**three** 8:15 9:11 10:10,17,21, 22,23 11:10,19 13:8 19:18 32:15 34:2 65:15 71:24 72:5 97:7 116:1 130:7 134:24 150:1

**through** 18:7 20:11,14 25:25 26:3 27:22

28:4 55:4,6,7 72:13 74:24 80:9 128:3 129:14 130:8 135:7 136:13 145:15

**throughout** 9:2 33:16,19 54:18 65:25 66:1 121:4 136:3 148:25 150:2

**Tiffany** 29:11

**time** 7:15 9:7,9 10:1,25 11:2 13:15 14:1 17:17 19:7,10, 13 20:24 21:19,22 27:2 29:10,13 32:10,13 37:7, 24 38:3 42:9 43:11,16 44:11 47:3,12,17 48:9 49:8,13 53:10,18 55:21,22 56:1 59:23 67:10 73:2,16,22,24 76:3 77:5,15 78:18 86:14 89:14,15,16,22 90:15,19 91:25 96:1 101:6,21 102:3,8 103:1 104:3 106:8,9 107:22 108:2 109:6 113:13 120:5,25 128:15 131:25 136:18 137:21 138:4,6,7 140:2 141:4 144:17 151:19 156:16 159:14 160:20 166:6,

10,13,14

**timeframe** 11:20 23:14 49:19 50:14,15 68:8

**timeline** 104:8

**times** 35:23 87:4 91:14,25 115:25 122:2,3 123:24 124:5

**timing** 106:5

**title** 20:5 23:3, 7,15 73:23

**today** 5:4,9,24 6:21 16:12 29:24 30:17 32:3 84:13 117:25 142:5

**together** 13:14 15:1,21 33:15 39:19 47:19,21 48:14 59:21 60:24 65:16 90:25 91:20,23 95:2 100:4 113:24 119:9, 16 166:7

**told** 30:12 46:25 48:4 57:22 58:6,12 66:22 67:4,14 74:14 76:23 77:3 79:15,17, 19,21,24 100:8 106:19 117:19 134:24 137:15 154:2,8

**tone** 117:4,7

**took** 8:15 19:7, 16 100:3 104:9

**top** 73:10 86:18 112:5 117:23

**topic** 22:3

**total** 120:1

**touch** 133:22

**touched** 50:6 71:10 89:19,25 90:10,20

**touching** 41:17 42:24 71:8 102:4,10 123:1,10 132:2,4,7,17, 20 133:15,16, 18,23 134:2 137:24 138:24 139:8,9,12,23 140:1 141:23

**tough** 35:2,4,22

**towards** 38:18 148:8 163:10

**track** 96:18

**trained** 26:15, 16 27:11 62:23 64:1 79:5

**training** 9:16 20:3,4,12 23:7, 17,19 24:10,12 26:7,10,13 27:6 28:3,8 34:17 42:22 52:10 59:7,11, 12 63:19 64:5 72:11 78:23 79:1,8 98:3,7, 11 101:7,14 103:5 131:4 145:12 154:23

**trainings** 23:3, 20 24:18 26:5 63:25 79:3

**top** 73:10 86:18

**transcript** 5:24 6:10

**transferred** 9:24

**transition** 161:7,10

**tried** 13:14

**trimester** 161:3

**try** 6:3,12 7:3 11:15 12:22 14:3,7 22:10

**trying** 6:5 30:22 33:10 56:18 103:22 104:23, 25 106:12,19 109:15 118:14 159:4 161:18, 23 162:16

**twice** 105:12

**two** 9:13 10:9, 20 11:1,19 36:22 37:16,17 43:16,24 45:7 46:7,11,25 47:4,5,13 66:2 75:22 79:12, 15,17,24 99:20 105:6,10,17, 21,24 106:25 107:14,19 110:12,16 111:11,18,21 115:23 118:8, 21 143:8,11, 12,14 146:1 153:16,25 163:11 166:6

**type** 39:19 49:11 92:6 110:10 123:12 137:5

Golkow Litigation Services | 877.370.DEPS

**types** 24:20 101:19 122:21

**typical** 11:25 15:11 34:4 40:4

**typically** 9:10 12:3 13:11 14:3 22:3 26:3 33:18 95:4 98:18,20

**U**

**Uh-huh** 6:3

**under** 37:2 40:10,20,23 66:24 67:5 73:11 99:23 132:2,14 137:9,14 139:17,25 140:18 144:22

**undergrad** 17:25 18:9

**underneath** 41:12 68:21 133:9,11

**understand** 5:2 7:3,20 8:5 13:21 56:18 72:16 81:23 106:13 108:19 109:16 136:12 152:18 166:2

**understanding** 12:12 27:15 60:23 62:22 64:6 81:13 101:15,21 102:4 107:18 137:3,22 141:4,7,14

143:7 160:5 162:3

**understood** 7:5 16:4,9 84:22

**unfair** 105:22

**union** 73:14,15 99:17 104:2 112:7 152:4

**University** 18:1,7

**unless** 121:24 161:7

**unsatisfactory** 85:10 105:9,18 106:1,3,10 107:1,8,24 143:21

**unsats** 85:9

**unsure** 107:4

**until** 6:11,13 108:20

**unwarranted** 106:10

**updating** 96:22

**upset** 66:9,11, 15 80:1,2 116:19,24 117:17,20 152:15 153:7

**upsetting** 80:4

**upstairs** 12:8, 19

**use** 22:8 36:2 38:7 96:19 128:2

**used** 31:19 32:23 35:6 46:2 51:22,24

161:20

**useful** 13:15

**using** 14:17,18 51:21 131:8

**usually** 24:17 91:8

**utilizing** 129:25

**V**

**vantage** 41:5

**vary** 149:16

**Vaszily** 87:14, 16 88:1 128:5, 15,17 129:8

**Vaszily's** 128:21

**vent** 129:4

**verbal** 5:25 53:7 136:23

**versus** 9:4

**victim** 54:13 55:24 56:15 57:19 119:9

**video** 23:21 24:14 25:10, 13,23 113:3

**videos** 24:7,20 25:25 26:2 79:5

**view** 51:15 60:23 110:6

**viewed** 57:8

**violate** 81:8

**visit** 9:7 68:13

**visiting** 103:19

**visits** 21:7

**visual** 38:11 162:14

**voice** 117:4,5

**vulnerable** 57:19

**W**

**wait** 6:11,12

**walk** 16:2 38:15

**walked** 65:20

**walking** 15:16

**wall** 45:6,11

**want** 6:9 7:11, 17 19:3 30:9, 12 44:24 45:19,25 57:4 67:20 70:3 73:20 80:9 81:8,18 82:6, 17 83:3,9 87:7 99:24 112:8,16 115:9,14 119:22 120:21 124:9 127:22 129:13 131:10 140:10

**wanted** 10:1 17:18,22 128:1 152:16 159:8

**wanting** 48:2,3 49:6 56:16 81:19 82:12 121:1 129:18

**warranted** 153:13

**Warren** 21:15

**watch** 23:21 24:14 26:2

**watched** 24:24 25:2,10

**watching** 24:6 25:25 71:2 79:5

**way** 28:20,22 35:9,13 40:4 55:25 56:6,9 83:25 92:4,10, 21 96:17 105:1 113:2 128:7 129:6 133:20 138:21 139:2 147:8,23 158:23

**ways** 35:4

**wearing** 134:4, 5

**website** 28:21

**week** 125:11 149:10 156:9, 10 157:6

**weekend** 98:19

**weekends** 157:1

**weekly** 156:12

**weeks** 66:1

**welcome** 64:16

**went** 13:15 18:9 20:14 46:5 65:19 83:10 84:6,10 85:4 87:1 99:20 113:22 118:9 121:10

**whatever** 22:24 37:13 112:3

114:17

**whereupon**
62:1

**whether** 16:14,
17 23:2,5,6
24:5,24 25:10
28:18 29:12
47:14 57:18
65:24 66:1
69:22 75:16,
17,19 76:9
77:3,7 79:14
83:13 88:12
89:15 95:19
96:12,15 97:9,
18,22,24 98:9,
10 102:3,5,8,9
103:1,7 106:24
113:1,2 122:7,
11,25 128:4
131:19 132:23
134:1,14
140:13 141:15
143:2 146:3,11
147:12 164:3,
4,15,16 165:8

**while** 43:8,16
140:15

**whiteboard**
38:16

**whoever**
134:18

**whole** 16:1
65:18 80:3
81:19

**Wilkes** 18:7,12
19:2,22 20:4

**will** 5:8 11:18
76:20

**Wilson** 8:4

**wish** 151:19

**within** 22:8
26:11 121:20
122:6 131:9
143:13

**without** 79:13,
16,18,25 81:10
105:7,25
107:7,14
121:23

**witness** 4:4 5:1
50:1,19 51:4,
12 52:16 54:3
56:5 57:2 58:1,
24 59:5 61:14,
22 62:7,14
63:4,9,17,24
64:19 77:17
78:2,16 80:16
81:3 83:20
86:9 89:12
116:9,18
124:17,25
127:9,16
128:11 132:11
138:11 141:12
146:22 153:1,
24 154:13
158:25 164:21

**wondering**
119:23

**word** 37:9
44:20 45:16
66:7 93:9

**wording** 105:8,
14

**words** 14:15
42:17 45:20
46:2 51:21,24
52:1 69:16
100:19 115:11
116:10,25
117:14 161:19

**work** 8:6 14:3,7

15:18 55:3
73:4 98:24
112:1 123:21

**worked** 8:8
12:1,18,24
16:25 32:15
53:16 54:18
121:4,19
145:25 151:4

**working** 9:24
13:23 15:23
19:13 20:7,10
21:13 36:20,23
39:19,22 40:8
47:19 97:8
125:17 127:3
151:8

**works** 73:5

**write** 43:22
65:5 66:14
87:20 88:18

**write-up** 31:10,
16,20,23 37:9
58:2 64:23
126:14 164:12

**writes** 68:16

**written** 58:9
65:1 72:4,7
164:1

**wrote** 36:15
37:12,14
43:21,25 46:6
58:7 65:5 66:8,
18 67:2,24
100:5 130:8
138:24 160:3,6

---

**Y**

**year** 7:9 10:15,
17,21,22 12:4

13:5 21:23
23:6 24:6 25:6,
11 26:10
27:10,14,18
31:11 32:9,15,
16,21 33:5,6,
23 34:7,14,22
35:2,12,17,22
36:11 48:6,7
49:5,20 50:22,
23 51:7,14,23
52:3 53:17
55:4 64:6
81:14,15,16,17
82:13 89:16,17
94:7 101:7
103:7 106:1
107:9,16
108:10,11,13,
14,16,21,23,
24,25 109:1,3,
7,11,18,25
110:1,2 113:24
114:14 115:3
125:3,8 130:14
134:13 136:3
146:2 147:14
148:15,25
149:3,12,20,25
150:7 152:13
153:6,15,18
154:23 155:21
156:14,17
157:4 161:4

**year-and-a-half**
5:11

**years** 7:8 8:15
10:8,9,10,19,
20,24 11:9,10,
14,25 13:25
17:11 19:8,17
20:21 24:1
27:3 34:7,8,9
35:18 54:19
89:23 97:7
98:5 109:9

115:5 118:8
121:4

**younger** 53:20
55:25

**yourself** 7:21

**Youth** 26:19
101:18

---

**Z**

---

**Zieglerville**
4:18

**zip** 119:10

**Zoom** 5:10,12

EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
NO. 2:20-CV-05142


JANE DOE,                    )    DEPOSITION UPON
                             )
        Plaintiff,           )    ORAL EXAMINATION
                             )
    - vs -                   )          OF
                             )
NORTH PENN SCHOOL            )    ███████  █████
DISTRICT,                    )
                             )
        Defendant.           )
- - - - - - - - - - -        )




            TRANSCRIPT OF DEPOSITION,
taken by and before JAMES J. GALLAGHER, JR.,
Professional Reporter and Notary Public, at
FREIWALD LAW, 1500 Walnut Street, 18th Floor,
Philadelphia, Pennsylvania, on Tuesday,
November 2, 2021, commencing at 3:21 p.m.




            ERSA COURT REPORTERS
              30 South 17th Street
            United Plaza - Suite 1520

              Philadelphia, PA 19103

                (215) 564-1233

```
 1    APPEARANCES:

 2
           FREIWALD LAW
 3         BY:  LAURA E. LAUGHLIN, ESQUIRE
             1500 Walnut Street
 4           18th Floor
             Philadelphia, Pennsylvania 19102
 5               Attorney for the Plaintiff

 6

 7         HENDRZAK & LLOYD
           BY:  MAUREEN A. JORDAN, ESQUIRE
 8           3701 Corporate Parkway
             Suite 100
 9           Center Valley, Pennsylvania 18034
                 Attorney for the Defendant
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    INDEX

 2

 3

 4   WITNESS                        PAGE

 5

 6   ███████ ██████

 7

 8      By: MS. JORDAN              4

 9

10

11

12                  - - -

13

14

15                 EXHIBITS

16

17   NUMBER      DESCRIPTION    MARKED ATTACHED

18          (NO EXHIBITS WERE MARKED.)

19

20                  - - -

21

22

23

24
```

```
 1                    PROCEEDINGS

 2

 3                    (By agreement of counsel,

 4           the signing, sealing, filing, and

 5           certification of the transcript have been

 6           waived; and all objections, except as to

 7           the form of the question, have been

 8           reserved until the time of trial.)

 9

10                    ████████  ██████  after having been

11           duly sworn, was examined and testified as

12           follows:

13

14  BY MS. JORDAN:

15  Q.       Good afternoon,  ██████████   My name is

16  Maureen Jordan and I represent the school district

17  in regard to the lawsuit filed by your sister.  I

18  know that originally you were her friend and filed

19  it for her before she turned 18, correct?

20  A.       Yes.  I was her next friend.

21  Q.       So you're familiar with the claims that

22  she's making in this lawsuit, correct?

23  A.       Yes.

24  Q.       I'm going to be asking you questions about
```

1    what you may know.  Have you ever been deposed

2    before?

3    A.        No.

4    Q.        I'm sure the process was explained to you.

5    The court reporter is taking down everything that's

6    said and a transcript will be made.  So I ask that

7    you wait until I'm finished with my question before

8    you respond and when you do respond your answer has

9    to be verbal; do you understand that?

10   A.        Yes.

11   Q.        If I ask you a question and you don't know

12   the answer to my question or you can't remember the

13   answer to my question, that's fine, I don't want you

14   to guess at anything; do you understand that?

15   A.        Yes.

16   Q.        If I ask you a question and you don't

17   understand my question because of the words I've

18   used, let me know that and I will rephrase my

19   question until you do understand; do you understand

20   that?

21   A.        Yes.

22   Q.        Also, if you need to take a break for any

23   reason, you're more than entitled, but I do not

24   believe that your deposition will be as long as your

1   sister's or your mom's.

2           Are you currently suffering from any illness

3   or infirmity or taking any type of medication that

4   would prevent you from understanding my questions

5   and answering to the best of your ability?

6   A.      No.

7   Q.      Can you state your full name please?

8   A.      ████      Francine ████

9   Q.      How old are you?

10  A.      Twenty-seven.

11  Q.      What's your date of birth?

12  A.      ████.

13  Q.      Where do you currently reside?

14  A.      In Lansdale, on West 3rd Street.

15  Q.      And who do you live with?

16  A.      My son and my partner.

17  Q.      Your son is James, correct?

18  A.      Correct.

19  Q.      How old is he?

20  A.      Eight.

21  Q.      What is your partner's name?

22  A.      Tyler.

23  Q.      What's his last name?

24  A.      Hughes.

1  Q.       Is that H-U-G-H-E-S?

2  A.       Yes.

3  Q.       How long have you lived on 3rd Street in

4  Lansdale?

5  A.       Four years now.

6  Q.       When is the last time you lived in the

7  family home?

8  A.       The last time I lived in the family home

9  was four years ago.

10  Q.       So you moved from -- is it the Garfield

11  Street address to your present address?

12  A.       Garfield Avenue, yes.

13  Q.       Okay.  Are you currently employed?

14  A.       Yes.

15  Q.       Where do you work?

16  A.       Bonucci Masonry.

17  Q.       What is Bonucci Masonry?

18  A.       It is an outdoor living company based in

19  North Wales.

20  Q.       When you say outdoor living, so do they do

21  patios and summer kitchens, those types of things?

22  A.       For Bonucci Masonry, we are part of a

23  family of companies.  We provide motorized louver

24  pergolas, we do landscaping and hardscaping, along

1    with pools, pool houses, any amenities that you can

2    look for for your outdoor entertaining space.  It's

3    a design-build company.

4    Q.        Okay.  How long have you worked there?

5    A.        For a little over a year.

6    Q.        What is your job position there?

7    A.        Administrative support to the president.

8    Q.        Who is the president?

9    A.        Gregg DiSantis of our structure division.

10   Q.        And before you held your current position,

11   did work anywhere else?

12   A.        I was laid off due to the pandemic.

13   Q.        Where did you work before the pandemic?

14   A.        Prior to that, I worked for APA Bucks Mont

15   Pool Association.

16   Q.        What type of business is that?

17   A.        A recreational league for billiards in

18   various locations in Bucks and Montgomery County.

19   Q.        So were you employed by the county?

20   A.        No.  It is a franchise that has a coverage

21   area of the Bucks and Montgomery County area.

22   Q.        And what did you do for them?

23   A.        I was one of two add mins in the office, so

24   the duties varied.

```
 1   Q.        When you were growing up did you attend
 2   North Penn School District schools?
 3   A.        Yes.
 4   Q.        Did you go to Gwynedd Square Elementary?
 5   A.        Yes.
 6   Q.        Did you go to Penndale Middle School?
 7   A.        Yes.
 8   Q.        Did you go to North Penn High School?
 9   A.        Yes.
10   Q.        Did you graduate from North Penn High
11   School?
12   A.        Yes.
13   Q.        What year did you graduate?
14   A.        2012.
15   Q.        So if my math is correct -- I'm not good at
16   math -- you left the family home in approximately
17   2017?
18   A.        Yes.
19   Q.        Do you remember what grade your sister
20   ██████ was in?
21   A.        I do not recall without writing it out.
22   Q.        No problem.  Was she in high school, do you
23   know, or not?
24   A.        I would have to write that out.
```

1    Q.        That's okay.  If you don't know, you don't

2    know.  You can say I don't remember.

3              Were you living in the family home when your

4    sister was in sixth grade at Gwynedd Square

5    Elementary School?

6    A.        Yes.

7    Q.        Did you become aware of an incident that

8    occurred in sixth grade involving  █████

9    A.        Yes.

10   Q.        How did you learn about that incident?

11   A.        We learned about it when my sister had a

12   discussion with my mother in her bedroom when she

13   had an emotional few hours where she was crying and

14   unconsolable and nonverbal until she was able to

15   calm down and -- it was tough for her.

16   Q.        Do you have a recollection as to what

17   timeframe that was; a month or a year?

18   A.        I do not recall the specific timeline.

19   Q.        Do you know whether the school had

20   contacted your mom regarding ██████  █████ before

21   that happened that your sister told you and your mom

22   in the bedroom about it?

23   A.        I do not remember the sequence.

24   Q.        What do you remember your sister stating

1    about the incident in the bedroom when she told you

2    what had happened?

3    A.          She told me that on multiple occasions

4    ███████  had touched her inappropriately in either her

5    chest or her genital region.  She told me that she

6    had talked to one of the employees of the school

7    about it.  She told me that she was ashamed to talk

8    about it and -- I mean she had to keep taking breaks

9    in the middle of telling all of us, just because it

10   was hard for her to discuss.  I mean she was

11   distraught and, like I said, crying and had a very

12   low self-worth from the situation.

13   Q.          When you say tell all of us, was there

14   anyone in the bedroom besides you and your mom?

15   A.          Myself and my mother.

16   Q.          So it was you, your mom and your sister?

17   A.          Yes.

18   Q.          When she told you that she had talked to an

19   employee of the school about it, do you know who she

20   was referring to?

21   A.          I believe she was referring to the aide.  I

22   do not recall her name.

23   Q.          And did she give any more detail other than

24   she had talked to an employee, who you believe was

1   the aide, but you don't know the name, at the school

2   about it?

3   A.       Could you please rephrase?

4   Q.       You told me that your sister relayed to you

5   and your mom that she had talked to an employee of

6   the school, who you believe she referred to as an

7   aide about it, but was she any more specific about

8   that conversation?

9   A.       She was not specific about the

10  conversation.  She was more emotionally focused in

11  talking about the overall situation.

12  Q.       Did she convey to you why she was ashamed

13  to talk about it?

14  A.       When she was explaining her feelings she

15  was ashamed, because this is one of the more well

16  known boys and there were already rumors and there

17  was a social implication within the school itself

18  that put her down in regard to the situation that,

19  you know, puts a lot of pressure on a kid her age.

20  Q.       When she said that there were rumors

21  already, do you know what she was referring to?

22  A.       I did not ask her specifics.

23  Q.       And what's the age difference between you

24  and your sister in regards to years?

1    A.        Nine years.

2    Q.        Would I be correct that when this happened

3    when she was in sixth grade you were older, so you

4    didn't have mutual friends that you could ask her

5    peers what she was referring to?

6    A.        You would be correct.

7    Q.        And when she was in sixth grade, am I

8    correct you were already out of high school?

9    A.        I would have to do the math.  I do not

10   recall.

11   Q.        You graduated in 2012, correct?

12   A.        Yes.

13   Q.        And if she was in sixth grade in 2014 you

14   would have already been graduated?

15   A.        Yes.

16   Q.        When ▆▆▆▆ conveyed this information and

17   these emotions to you and your mom what, if

18   anything, did the two of you do?

19   A.        We just tried to support her.  She had

20   become secluded.  She had withdrawn into herself.

21   She was not the same child that she -- she wasn't

22   the same sister I grew up with.

23   Q.        And how did she manifest that, if you could

24   be more specific?

1    A.        Prior to the incident, ███ was very

2    empathetic, very outgoing, very bubbly, very eager

3    to help, very -- just excited about life.  Shortly

4    before she had talked to -- or had a conversation

5    including me about the incident she had become more

6    quiet and withdrawn and was more likely to isolate

7    herself in her room than to come out with me when

8    she was done her homework.  She was very anxious.

9    She did not like being confined.

10   Q.        When you say she didn't like being

11   confined, what are you referring to?

12   A.        She likes to be in an area where if she

13   needs to remove herself from a situation there is an

14   easily accessible out.

15   Q.        Shortly before she relayed the incident and

16   you noticed these behavior changes, did you try to

17   talk to her about the notices in her behavior?

18   A.        Yes.

19   Q.        And what, if anything, would she say in

20   response?

21   A.        She would shut down.

22   Q.        And when you say shut down, she wouldn't be

23   able to verbalize a response?

24   A.        To clarify, prior to the incident, there

1   was nothing we wouldn't talk about from our opinion

2   of, you know, if dad was being a butt head or, you

3   know, if something fun happened at school, we would

4   always be able to talk about any of that.  She was

5   invested in my personal life, wanted to know what

6   was going on.  When I refer to her being shut down,

7   she was noncommunicative.  She didn't want to talk.

8   She didn't want to be around anyone.  She became

9   more introverted, I believe the word is.

10  Q.      Okay.  And when you tried to talk to her

11  she would not respond; would that be fair from what

12  you're telling me?

13  A.      Correct.

14  Q.      And to your knowledge, did your mother also

15  try to talk to her about her behavior changes before

16  you learned about the incident involving █████

17  A.      Absolutely.

18  Q.      And what, if anything, did she relate to

19  your mother, if you know?

20  A.      I do not know what took place -- let me

21  rephrase.  I do not know the specifics of what

22  █████  talked to mom about.

23  Q.      After she relayed what had occurred and you

24  and your mom tried to emotionally support her and

1    tried to sway her from having these feelings that

2    you relayed to me, did you see any change, did it

3    get worse, did it get better?

4    A.          From when we -- can you --

5    Q.          From originally her explaining what had

6    occurred with ▮▮▮▮▮ and the inappropriate touching,

7    once that was out in the open and you indicated that

8    you tried to support her by, I assume, telling her

9    she shouldn't have these feelings, she shouldn't be

10   ashamed and that type of thing; would I be correct?

11   A.          Along those lines, correct.

12   Q.          After it was out in the open, at any period

13   of time did her behavior get worse, get better, stay

14   the same?

15   A.          I'm just trying to figure out the right way

16   to say this.

17   Q.          Sure.  Take your time.

18   A.          Even after the conversation was had there

19   was no positive changes, though I can't gauge

20   whether it was worse than it already was.

21   Q.          Are you aware that after sixth grade when

22   she was going to seventh grade she didn't go to

23   Penndale, that she went to Pennbrook?

24   A.          I am aware.

1  Q.       And prior to her going to Pennbrook, were

2  you involved in any family discussions of her not

3  going to Penndale specifically to avoid the boy,

4  ██████ ██████

5  A.       I was aware of, but not a part of those

6  conversations.

7  Q.       Once she went to Pennbrook, did you see any

8  change in her demeanor?

9  A.       From the change in location?

10 Q.       Yes.  Because of ██████ ██████ not being at

11 that school, did her isolation improve at all, did

12 her self-confidence improve at all?

13 A.       No.  She became -- it was hard for her to

14 trust new people to make friends.  She felt as if no

15 one would be able to understand her.  She had a hard

16 time with, you know, putting herself out there

17 socially.  I mean she was perpetually anxious, what

18 if I said the wrong thing, what if I do the wrong

19 thing, what if they don't like me.

20 Q.       And did you know those things because you

21 and her discussed it?

22 A.       Yes.

23 Q.       When she would say that she was afraid she

24 would do the wrong thing or they wouldn't think --

1   they wouldn't get her or understand her what, if

2   anything, would you say to her?

3   A.      In conversations where I would try to help

4   her validate her feelings and understand that, you

5   know, she has a lot to offer and that she shouldn't

6   be afraid to be herself.  She shouldn't be afraid to

7   try to build that new support system.

8   Q.      At some point in time, were you aware that

9   your sister got involved in horsing, maintaining a

10  horse?

11  A.      Horseback riding lessons to clarify.

12  Q.      Well, she told me that there was leasing of

13  the horse, so that she had part ownership in it and

14  she would care for the horse in the barn as well as

15  ride it?

16  A.      Yes.  I was aware she was partaking and

17  competing in equestrian events.

18  Q.      I didn't know about her participating in

19  equestrian events; what type of events was she

20  doing, like jumping and that type of thing?

21  A.      I don't have a lot of detail in regards to

22  her horseback riding.  I wasn't that interested.

23  They smell to me.  So I don't really have much input

24  on that.  I know that she was good at what she was

1    doing.

2    Q.        Would I be correct that you never went to

3    the stables with her an observed her interact with

4    the horse, be it riding or caring for the horse?

5    A.        I have gone with her several times.  I just

6    was not an every lesson participant.  I would still

7    go to be there for her and help work the snack stand

8    or help with the cost of leasing the horse.

9    Q.        When she was spending time at the stable

10   did she seem to have a better demeanor?

11   A.        Even when ▆▆▆ was participating in

12   horseback riding she had her good days and she had

13   her bad days.  There was no consistent positive

14   impact on her overall mood or disposition.

15   Q.        When she completed seventh grade and went

16   into eighth grade did her demeanor remain the same?

17   A.        She retained a consistent level of low

18   self-esteem and anxiety for most of her, if not all,

19   of her post elementary school time.

20   Q.        Were you aware in the ninth grade that your

21   sister was going to attend not only Pennbrook, but

22   also North Montco?

23   A.        Yes.

24   Q.        And before she went to North Montco, do you

1    know whether she was excited to do that and to take

2    automotive classes?

3    A.        I believe she was.

4    Q.        After she went to North Montco, did you

5    learn that ██████ █████ was also at North Montco?

6    A.        Yes.

7    Q.        And how did you learn that?

8    A.        Because ██████ came home from school, she

9    would come up to my room on the third floor and she

10   would have very distressed moments of trying to cope

11   and trying to figure out how to deal with this

12   environment.

13   Q.        And when you say she had difficult moments

14   trying to cope and trying to figure out how to deal

15   with her environment, was that an environment where

16   she was going to school where she could run into

17   ██████ █████

18   A.        Yes.

19   Q.        When it was learned that ██████ █████ was

20   also at North Montco, were you aware of your mother

21   going to both North Montco and North Penn School

22   District to try to see if ██████ █████ could not go

23   to that school so that ██████ wouldn't have to deal

24   with that?

1  A.       I am aware that she made contact with the

2  district and also with the tech school.  I was not

3  part of the conversations.  I'm not sure exactly

4  what was said or what plan they were hoping to set.

5  Q.       Were you aware that after learning of

6  ▓▓▓▓▓ ▓▓▓▓ being at North Montco in ninth grade

7  that your mom decided it was best for your sister to

8  attend North Montco on a full-time basis as opposed

9  to also attending Pennbrook?

10                    MS. LAUGHLIN:  Object to the

11             form, but you can answer.

12                    THE WITNESS:  Yes, I was aware.

13  BY MS. JORDAN:

14  Q.       Did that seem to improve ▓▓▓▓▓▓

15  disposition in any way?

16  A.       I don't recall specifically the -- that

17  particular transition.

18  Q.       When she would come up to your room when

19  she would come home from school and would be having

20  a bad day where she was having difficulty coping,

21  would she advise you that she had seen ▓▓▓▓▓ in

22  school or was there nothing in particular that was

23  triggering that interaction where she would relay

24  those feelings?

1   A.        The days where she would come up to me are

2   the days that she had crossed paths.  Those were the

3   days where she had difficulty catching her breath,

4   would go for extended periods of time just crying in

5   my room and trying to, you know, calm down and cope

6   and just that overall she was sad.

7   Q.        Did she ever indicate that she had fear of

8   running into ███████ in school?

9   A.        Yes.

10  Q.        And did she ever tell you what she was

11  afraid of could happen?

12  A.        She was afraid the incidents that had

13  occurred before would happen.  She was afraid of

14  being within arm's reach.

15  Q.        Did there come a point in time when your

16  sister was in tenth grade that you learned that the

17  behavior of ██████ had returned and he was

18  inappropriately touching her again?

19  A.        Yes.

20  Q.        How did you learn that?

21  A.        From when ██████ came to talk to me again.

22  Q.        Do you recall when she came to talk to you

23  in regard to a timeframe?

24  A.        I don't specifically recall timeframes.

1   Q.        And what did she tell you?

2   A.        Once I eventually got her to calm down, she

3   was distraught to the point of throwing up, so we

4   were back and forth between my room and the

5   bathroom.  All she kept saying is that it happened

6   again.

7   Q.        And when she said it happened again did you

8   know what she was referring to?

9   A.        Yes.

10  Q.        And what did you say in response, if

11  anything?

12  A.        I tried to hug her.  I tried to support

13  her.  I tried to be there as best as I could.  I

14  didn't know how to help.

15  Q.        When she told you this, do you know if your

16  mother knew as well that the behavior had happened

17  again?

18  A.        I can't be certain, but I believe so.

19  Q.        Was your sister any more specific in regard

20  to what had occurred?

21  A.        She told me that he stuck his hand down her

22  pants.  She told me that, you know, he was groping

23  her on her chest.  I know it happened more than once

24  from what she told me.  I can't remember specific

1  phrasing, but that was the conversation that was

2  had.

3  Q.       After you learned that it had occurred

4  again, what is your understanding of what then

5  happened in regard to her attendance at school, if

6  you know?

7  A.       Can you restate?

8  Q.       Sure.  When this happened your sister was

9  attending the high school as well as North Montco;

10 would you agree with that, if you know?

11 A.       I don't know.

12 Q.       Okay.  And I was asking after it was

13 learned that the behavior happened again involving

14 ███████  whether you know if her schooling changed in

15 any way?

16 A.       I cannot recall.

17 Q.       What did you observe regarding your sister

18 after you learned that incidents with ███████  ███████

19 had occurred again?

20 A.       Well,  ███████  became more depressed and

21 expressed that she didn't know if she could do it

22 anymore and told me she thought of killing herself

23 and she would have panic attacks where she couldn't

24 breathe.  She would remove herself from even family

1    dinners.  I remember that she was using self-harm as

2    a coping mechanism to try to externalize however she

3    was feeling.

4    Q.        When did you learn that she was

5    self-harming in relation to learning about ▓▓▓▓

6    ▓▓▓▓'s behavior starting again, if you remember?

7    A.        I don't remember.

8    Q.        When you learned that she was self-harming

9    what, if anything, did you do?

10   A.        I know that I talked to mom about it.  I

11   know that there would be nights where she wouldn't

12   be down at dinner and I would go up to check her

13   room to make sure that she didn't have any knives or

14   razors or Tylenol.  We kept all of that above the

15   sink in the kitchen.  We would do a quick sweep so

16   that she wouldn't notice that we were doing it.  We

17   tried to communicate.  We tried to keep that open

18   forum.  That's what I recall right now.

19   Q.        When she told you that she wasn't sure if

20   she could continue to do it and she conveyed to you

21   that she thought about ending her life what, if

22   anything, did you do or say?

23   A.        Again, I know I had talked to my mom.  I

24   tried to reassure her.  I tried to tell her that it

1    gets better.  I tried to tell her that, you know,

2    she was important and valid and that we need her.

3    Q.      During this period of time, do you know if

4    your sister received any professional help, like

5    psychiatrically or through a psychologist?

6    A.      I can't remember.

7                  MS. LAUGHLIN:  Do you want to

8           take a few minutes?

9                  THE WITNESS:  Yeah.

10                 MS. JORDAN:  Take your time.

11                 (At this time, a short break was

12          taken.)

13   BY MS. JORDAN:

14   Q.      Are you aware that your sister did attend

15   school through the 12th grade and that she graduated

16   as scheduled?

17   A.      Yes.

18   Q.      In regard to seeing anyone, are you aware

19   of her seeing a psychologist, Tracy Miller?

20   A.      I don't remember.

21   Q.      Do you recall a point in 2018, in August of

22   2018, which would have been during the summer, that

23   ███████ came and stayed with you to provide a break

24   from her parents?

1   A.      I recall a period where ███████ lived with

2   me, yes.

3   Q.      Do you recall after COVID shutdown that she

4   lived with you for approximately six months, she

5   said; do you agree with that?

6   A.      Yes.

7   Q.      And was that also to get relief from her

8   parents?

9   A.      No.

10  Q.      What is your understanding of why she came

11  to live with you during the shutdown of COVID?

12  A.      My experience with why she had to come stay

13  with me was to get out of the environment for a

14  fresh start.  For her, my house is a calm place.  It

15  is a safe place.  We play.  We do whatever we want.

16  You know, there's more quality time and she gets to

17  hang out with her nephew, which she likes to do, and

18  I needed help just as much as she did.  I needed

19  somebody to keep me company so I wasn't going stir

20  crazy.  It was hard getting laid off thanks to this

21  pandemic and it was nice to have her with me for a

22  while.

23  Q.      Do you recall ███████ through her

24  psychologist, Ms. Miller, indicating that she felt

1   threatened at home by your mom of physical violence

2   and social services were called?

3   A.      I am aware that social services were

4   called.

5   Q.      When that occurred did she come and stay

6   with you for any period of time?

7   A.      I don't remember the sequence.

8   Q.      Do you recall talking to go her about that

9   incident?

10  A.      I do remember talking to her about them

11  being called.

12  Q.      Do you have any recollection as to why she

13  felt threatened?

14  A.      I'm just trying to gather my thoughts.

15  Q.      Oh, sure.  Take your time.

16  A.      I don't remember specifics.  I remember she

17  was frustrated that they were called.

18  Q.      When you say she was frustrated they were

19  called, they you're referring to was social

20  services?

21  A.      Yes.

22  Q.      Do you know if there was any investigation

23  by social services because they were called?

24  A.      I'm not privy.  I'm not sure.

1  Q.       And whether she stayed at your home

2  following that or not, you don't have a recollection

3  of that; would that be accurate?

4  A.       I recall that mom suggested that if ███████

5  wanted to come sleep over with me for a weekend she

6  could.  And I remember from there that ███████ and I

7  had a conversation and it was the summertime, she

8  didn't have obligations and from there it just kind

9  of turned into an extended vacation.  I specifically

10 remember saying maybe some sister time would do her

11 some good, because that's what we call it.

12 Q.       And did you see any improvement following

13 the sister time you just talked about?

14 A.       No.  I wish.  I got to see more of her

15 anxiety, where she could be having a great day and

16 something would bring her to an emotional spot where

17 her anxiety would flare up and she couldn't catch

18 her breath or she would need to step outside for a

19 minute to collect herself and just get some fresh

20 air, even if she was doing something she wanted to

21 do and over a period of time I watched her lose

22 interest in activities that normally she would spend

23 hours doing, playing a particular video game or a

24 change in her routine that wouldn't necessarily be

```
 1   her standard.  She was sleeping less.  She was

 2   eating less.  I don't recall an improvement.

 3   Q.      And did that same behavior continue when

 4   she was staying with you during the pandemic?

 5   A.      Yes.

 6   Q.      How often do you see ███████ currently?

 7   A.      We Facetime and Snapchat all the time.

 8   Q.      Is that every day?

 9   A.      I wouldn't say every day, but at least

10   twice a week.

11   Q.      And not being savvy to how Snapchat works,

12   is it just like using the Facetime?

13   A.      Correct.  However, it's also used to send

14   selfies or still images with fun little stickers and

15   stuff.

16   Q.      And my understanding with Snapchat when

17   you're not Facetiming, you send it and it kind of

18   disappears after a certain period of time?

19   A.      It has that capability, but it doesn't have

20   to remain that setting, correct.

21   Q.      And then when you Facetime through Snapchat

22   you can Facetime as long as you want; would that be

23   correct?

24   A.      Correct.
```

1    Q.        And so you can see each other just like if
2    you were using the Facetime app?
3    A.        Correct.  We used Snapchat because I took a
4    Facebook hiatus and she has an android, so I can't
5    Facetime her.
6    Q.        So because you have two different phones,
7    hers being an android Snapchat allows you to
8    Facetime when she doesn't have an iPhone?
9    A.        Correct.
10   Q.        So if I understand your testimony, you
11   don't believe your sister has improved emotionally
12   at all; would that be accurate?
13   A.        Can you clarify the question?  Is it during
14   a specific period of time or is it --
15   Q.        I mean up until today?
16   A.        Up until today?
17   Q.        Yes.
18   A.        The only change that I have seen with my
19   sister is that she's more open to discussion.
20   Q.        And when did you begin to see that change?
21   A.        Like a month and a half ago.
22   Q.        Was there any triggering event that you
23   believe allowed for her to become more open?
24   A.        No.  I think it was time.  I think she felt

1    comfortable enough in the fact that we weren't here

2    to judge or not.  She knows that, you know, we can

3    relate and we care.  And she finally got to the

4    point where she was able to talk about these

5    situations without having her anxiety attacks.

6    Q.      Your sister told me that she has been

7    dating a guy named Nick since, I believe, ninth

8    grade; do you know Nick?

9    A.      I do know Nick.

10   Q.      And do you believe Nick is good for your

11   sister?

12   A.      Yes.

13   Q.      Do you believe that he helps her not to be

14   anxious?

15   A.      I believe he offers support the best way he

16   can.  I do know that she has difficulty even sitting

17   too close to him sometimes.  She will he be over my

18   house -- and they'll both come over, because Tyler

19   and Nick get along well.  Nick works on cars for a

20   living.  Tyler used to be a mechanic, so -- you

21   know, we enjoy having that time together.  And there

22   will be nights where she can't sit on the same edge

23   of the couch as him or he's not allowed to hug her

24   goodbye.  She won't even let me hug her sometimes,

1 and that sucks.

2 Q.      Do you know why?

3 A.      She doesn't like physical contact.  She

4 used to be very clingy and very lovey dovey and I'd

5 wake up on a Saturday morning to her face in my face

6 at like 6:00 a.m.

7 Q.      When did you see a change in her from being

8 clingy and lovey dovey to not liking physical

9 contact?

10 A.      Back to elementary school.  I don't

11 specifically remember exactly when.  I just remember

12 missing my pain in the butt every Saturday morning.

13 Q.      And do you believe that change in going

14 from a clingy, lovey dovey person to not liking

15 physical contact being directly related to the

16 ███ ███    incident?

17 A.      Yes.

18 Q.      Your sister told me that she works for your

19 stepfather and that she likes her job; did she relay

20 that to you?

21 A.      Correct, yes.

22 Q.      Have you seen any improvement in her since

23 she's working for your stepdad?

24 A.      She has her good and bad days.  I feel that

1    it's easier for her to work with dad, because it's a

2    comfort level.  In previous jobs, like when she was

3    -- I think she was trying to help out more

4    independently at a tea shop and she doesn't do well

5    with authority.  She doesn't -- she would encounter

6    situations with a customer that would be a trigger

7    or they would say something or somebody would sound

8    familiar and she would need to step away from the

9    situation and I know she had a hard time talking to

10   her boss about it, because, you know, no help had

11   come for her before.

12   Q.       Do you believe that your sister would

13   benefit from talking to a counselor of some kind?

14   A.       I think everyone would benefit from talking

15   to a therapist.

16   Q.       And when you say that, do you believe that

17   family therapy or that anyone can be helped by

18   talking to a counselor?

19   A.       I believe anyone can be helped to have more

20   of a self-awareness and learn what coping mechanisms

21   work best for you.

22   Q.       Okay.  I wasn't sure what you meant by your

23   answer.  Thank you.

24   A.       Yes, overall as an opinion.

1    Q.      Do you still have concern that your sister

2    could self-harm again?

3    A.      I don't know.

4    Q.      Have you broached the subject with her?

5    A.      I have not specifically talked about

6    self-harm with her in quite some time, but I do know

7    that even when she didn't want to go to North Penn

8    to graduate.  She wanted to get her diploma in the

9    mail.  She had a hard even envisioning that she had

10   a future, because she didn't see one for herself.

11   She didn't know what she wanted to do when she grew

12   up.  She didn't know if she wanted to go to college

13   anymore.  Even a few months ago I asked her what she

14   wants to do and she doesn't look to the future.

15   Q.      Was there a point in time that she did want

16   to go to college?

17   A.      When she was little.

18   Q.      And do you know what she wanted to study

19   when she went to college?

20   A.      She wanted to be a vet.  She would try to

21   teach the dog how to jump over a broom to work on

22   her animal training skills.

23   Q.      You just said that she didn't want to go to

24   North Penn to graduate, you mean to go to the

1    graduation ceremony?

2    A.        To go on the property, correct.

3    Q.        And I know from her testimony earlier that

4    she did go to graduation?

5    A.        She did.

6    Q.        How did you get her to go to graduation?

7    A.        I know that one incentive was that she was

8    spending the weekend with me following.  Nick and

9    her were coming over to my house.  I was taking her

10   out to Arpeggio for a celebratory dinner.  That's

11   one of her favorite places to go eat.  We were going

12   to have a calm sister weekend and just enjoy being

13   done.

14   Q.        And when you say enjoy being done, enjoy

15   being done with high school?

16   A.        Correct.

17   Q.        Did you attend her high school graduation?

18   A.        I did.

19   Q.        Did she appear to be anxious?

20   A.        She wouldn't make eye contact with us.  She

21   didn't want a lot of pictures.  Even when she was

22   walking in the line she was staring at the ground to

23   file into their seats or to walk up to accept her

24   diploma.  It wasn't very -- she wasn't enthused, if

1    that's the question.

2    Q.        Did she enjoy her sister weekend with you

3    afterwards?

4    A.        She enjoyed not picking up the bill for

5    Arpeggio, yes.

6    Q.        And she did indicate to me that she enjoys

7    spending time with your son?

8    A.        Yes.

9    Q.        So when she has a sister weekend she also

10   gets to spend time with her nephew as well, correct?

11   A.        Yes.  She calls him JJ.  That's my son

12   James.

13   Q.        I have no further questions.  I appreciate

14   your time today.  And I know it was difficult for

15   you to answer my questions.  And on a personal

16   level, I'm sorry if I caused you any distress.

17   A.        Thank you.

18              MS. LAUGHLIN:  I have no

19              questions.  You're all done.

20              Do you need anything from me or

21              do you need me to sign anything?

22              THE COURT REPORTER:  No.  What

23              format would you like?

24              MS. LAUGHLIN:  Electronic is

```
1          fine.

2                    THE COURT REPORTER:   Okay.   Thank

3          you.

4                    (Witness excused.)

5                    (Deposition concluded at

6          4:13 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    CERTIFICATION

2

3

4             I, James J. Gallagher, Jr.,

5        Professional Court Reporter and Notary

6        Public, do hereby certify that the

7        foregoing is a true and accurate transcript

8        of the stenographic notes taken by me in

9        the aforementioned matter.

10

11                   -  -  -

12

13

14

15

16

17

18

19

20        DATE:

21        _____

22        James J. Gallagher, Jr.

23        Court Reporter

24
```

## A

**a.m** 33:6

██████ 1:8 3:6 4:10 6:8

**ability** 6:5

**able** 10:14 14:23 15:4 17:15 32:4

**Absolutely** 15:17

**accept** 36:23

**accessible** 14:14

**accurate** 29:3 31:12 39:7

**activities** 29:22

**add** 8:23

**address** 7:11,11

**Administrative** 8:7

**advise** 21:21

**aforementioned** 39:9

**afraid** 17:23 18:6,6 22:11,12 22:13

**afternoon** 4:15

**age** 12:19,23

**ago** 7:9 31:21 35:13

**agree** 24:10 27:5

**agreement** 4:3

**aide** 11:21 12:1,7

**air** 29:20

**allowed** 31:23 32:23

**allows** 31:7

**amenities** 8:1

**android** 31:4,7

**animal** 35:22

**answer** 5:8,12,13 21:11 34:23 37:15

**answering** 6:5

**anxiety** 19:18 29:15,17 32:5

**anxious** 14:8 17:17 32:14 36:19

**anymore** 24:22 35:13

**APA** 8:14

**app** 31:2

**appear** 36:19

**APPEARANCES** 2:1

**appreciate** 37:13

**approximately** 9:16 27:4

**area** 8:21,21 14:12

**arm's** 22:14

**Arpeggio** 36:10 37:5

**ashamed** 11:7 12:12,15 16:10

**asked** 35:13

**asking** 4:24 24:12

**Association** 8:15

**assume** 16:8

**ATTACHED** 3:17

**attacks** 24:23 32:5

**attend** 9:1 19:21 21:8 26:14 36:17

**attendance** 24:5

**attending** 21:9 24:9

**Attorney** 2:5,9

**August** 26:21

**authority** 34:5

**automotive** 20:2

**Avenue** 7:12

**avoid** 17:3

**aware** 10:7 16:21,24 17:5 18:8,16 19:20 20:20 21:1,5 21:12 26:14,18 28:3

## B

**back** 23:4 33:10

**bad** 19:13 21:20 33:24

**barn** 18:14

**based** 7:18

**basis** 21:8

**bathroom** 23:5

**bedroom** 10:12,22 11:1,14

**behavior** 14:16,17 15:15 16:13 22:17 23:16 24:13 25:6 30:3

**believe** 5:24 11:21,24 12:6 15:9 20:3 23:18 31:11,23 32:7,10,13,15 33:13 34:12 34:16,19

**benefit** 34:13,14

**best** 6:5 21:7 23:13 32:15 34:21

**better** 16:3,13 19:10 26:1

**bill** 37:4

**billiards** 8:17

**birth** 6:11

**Bonucci** 7:16,17,22

**boss** 34:10

**boy** 17:3

**boys** 12:16

**break** 5:22 26:11,23

**breaks** 11:8

**breath** 22:3 29:18

**breathe** 24:24

██████ 1:8 3:6 4:10,15 6:8

**bring** 29:16

**broached** 35:4

**broom** 35:21

██████ 10:8,20 17:4,10 20:5 20:17,19,22 21:6 24:18 33:16

██████ 25:6

**bubbly** 14:2

**Bucks** 8:14,18,21

**build** 18:7

**business** 8:16

**butt** 15:2 33:12

## C

**call** 29:11

**called** 28:2,4,11,17,19,23

**calls** 37:11

**calm** 10:15 22:5 23:2 27:14 36:12

**capability** 30:19

**care** 18:14 32:3

**caring** 19:4

**cars** 32:19

**catch** 29:17

**catching** 22:3

**caused** 37:16

**celebratory** 36:10

**Center** 2:9

**ceremony** 36:1

**certain** 23:18 30:18

**certification** 4:5 39:1

**certify** 39:6

**change** 16:2 17:8,9 29:24 31:18,20 33:7,13

**changed** 24:14

**changes** 14:16 15:15 16:19

**check** 25:12

**chest** 11:5 23:23

**child** 13:21

**claims** 4:21

**clarify** 14:24 18:11 31:13

**classes** 20:2

**clingy** 33:4,8,14

close 32:17
collect 29:19
college 35:12,16,19
come 14:7 20:9 21:18,19 22:1
   22:15 27:12 28:5 29:5
   32:18 34:11
comfort 34:2
comfortable 32:1
coming 36:9
commencing 1:17
communicate 25:17
companies 7:23
company 7:18 8:3 27:19
competing 18:17
completed 19:15
concern 35:1
concluded 38:5
confined 14:9,11
consistent 19:13,17
contact 21:1 33:3,9,15 36:20
contacted 10:20
continue 25:20 30:3
conversation 12:8,10 14:4
   16:18 24:1 29:7
conversations 17:6 18:3 21:3
convey 12:12
conveyed 13:16 25:20
cope 20:10,14 22:5
coping 21:20 25:2 34:20
Corporate 2:8
correct 4:19,22 6:17,18 9:15
   13:2,6,8,11 15:13 16:10,11
   19:2 30:13,20,23,24 31:3,9
   33:21 36:2,16 37:10
cost 19:8
couch 32:23
counsel 4:3
counselor 34:13,18
county 8:18,19,21
court 1:1,21 5:5 37:22 38:2
   39:5,23
coverage 8:20
COVID 27:3,11
crazy 27:20
crossed 22:2
crying 10:13 11:11 22:4
current 8:10

currently 6:2,13 7:13 30:6
customer 34:6

**D**

dad 15:2 34:1
date 6:11 39:20
dating 32:7
day 21:20 29:15 30:8,9
days 19:12,13 22:1,2,3 33:24
deal 20:11,14,23
decided 21:7
Defendant 1:9 2:9
demeanor 17:8 19:10,16
deposed 5:1
deposition 1:5,14 5:24 38:5
depressed 24:20
DESCRIPTION 3:17
design-build 8:3
detail 11:23 18:21
difference 12:23
different 31:6
difficult 20:13 37:14
difficulty 21:20 22:3 32:16
dinner 25:12 36:10
dinners 25:1
diploma 35:8 36:24
directly 33:15
DiSantis 8:9
disappears 30:18
discuss 11:10
discussed 17:21
discussion 10:12 31:19
discussions 17:2
disposition 19:14 21:15
distraught 11:11 23:3
distress 37:16
distressed 20:10
district 1:1,1,8 4:16 9:2 20:22
   21:2
division 8:9
DOE 1:5
dog 35:21
doing 18:20 19:1 25:16 29:20
   29:23
dovey 33:4,8,14
due 8:12
duly 4:11

duties 8:24

**E**

E 2:3
eager 14:2
earlier 36:3
easier 34:1
easily 14:14
EASTERN 1:1
eat 36:11
eating 30:2
edge 32:22
Eight 6:20
eighth 19:16
either 11:4
Electronic 37:24
elementary 9:4 10:5 19:19
   33:10
emotional 10:13 29:16
emotionally 12:10 15:24
   31:11
emotions 13:17
empathetic 14:2
employed 7:13 8:19
employee 11:19,24 12:5
employees 11:6
encounter 34:5
enjoy 32:21 36:12,14,14 37:2
enjoyed 37:4
enjoys 37:6
entertaining 8:2
enthused 36:24
entitled 5:23
environment 20:12,15,15
   27:13
envisioning 35:9
equestrian 18:17,19
ERSA 1:21
ESQUIRE 2:3,7
event 31:22
events 18:17,19,19
eventually 23:2
exactly 21:3 33:11
EXAMINATION 1:6
examined 4:11
excited 14:3 20:1
excused 38:4

**EXHIBITS** 3:15,18
**experience** 27:12
**explained** 5:4
**explaining** 12:14 16:5
**expressed** 24:21
**extended** 22:4 29:9
**externalize** 25:2
**eye** 36:20

**F**

**face** 33:5,5
**Facebook** 31:4
**Facetime** 30:7,12,21,22 31:2
    31:5,8
**Facetiming** 30:17
**fact** 32:1
**fair** 15:11
**familiar** 4:21 34:8
**family** 7:7,8,23 9:16 10:3
    17:2 24:24 34:17
**favorite** 36:11
**fear** 22:7
**feel** 33:24
**feeling** 25:3
**feelings** 12:14 16:1,9 18:4
    21:24
**felt** 17:14 27:24 28:13 31:24
**figure** 16:15 20:11,14
**file** 36:23
**filed** 4:17,18
**filing** 4:4
**finally** 32:3
**fine** 5:13 38:1
**finished** 5:7
**flare** 29:17
**floor** 1:16 2:4 20:9
**focused** 12:10
**following** 29:2,12 36:8
**follows** 4:12
**foregoing** 39:7
**form** 4:7 21:11
**format** 37:23
**forth** 23:4
**forum** 25:18
**four** 7:5,9
**franchise** 8:20
**Francine** 6:8

**FREIWALD** 1:16 2:2
**fresh** 27:14 29:19
**friend** 4:18,20
**friends** 13:4 17:14
**frustrated** 28:17,18
**full** 6:7
**full-time** 21:8
**fun** 15:3 30:14
**further** 37:13
**future** 35:10,14

**G**

**Gallagher** 1:15 39:4,22
**game** 29:23
**Garfield** 7:10,12
**gather** 28:14
**gauge** 16:19
**genital** 11:5
**getting** 27:20
**give** 11:23
**go** 9:4,6,8 16:22 19:7 20:22
    22:4 25:12 28:8 35:7,12,16
    35:23,24 36:2,4,6,11
**going** 4:24 15:6 16:22 17:1,3
    19:21 20:16,21 27:19 33:13
    36:11
**good** 4:15 9:15 18:24 19:12
    29:11 32:10 33:24
**goodbye** 32:24
**grade** 9:19 10:4,8 13:3,7,13
    16:21,22 19:15,16,20 21:6
    22:16 26:15 32:8
**graduate** 9:10,13 35:8,24
**graduated** 13:11,14 26:15
**graduation** 36:1,4,6,17
**great** 29:15
**Gregg** 8:9
**grew** 13:22 35:11
**groping** 23:22
**ground** 36:22
**growing** 9:1
**guess** 5:14
**guy** 32:7
**Gwynedd** 9:4 10:4

**H**

**H-U-G-H-E-S** 7:1

**half** 31:21
**hand** 23:21
**hang** 27:17
**happen** 22:11,13
**happened** 10:21 11:2 13:2
    15:3 23:5,7,16,23 24:5,8,13
**hard** 11:10 17:13,15 27:20
    34:9 35:9
**hardscaping** 7:24
**head** 15:2
**held** 8:10
**help** 14:3 18:3 19:7,8 23:14
    26:4 27:18 34:3,10
**helped** 34:17,19
**helps** 32:13
**HENDRZAK** 2:7
**hiatus** 31:4
**high** 9:8,10,22 13:8 24:9
    36:15,17
**home** 7:7,8 9:16 10:3 20:8
    21:19 28:1 29:1
**homework** 14:8
**hoping** 21:4
**horse** 18:10,13,14 19:4,4,8
**horseback** 18:11,22 19:12
**horsing** 18:9
**hours** 10:13 29:23
**house** 27:14 32:18 36:9
**houses** 8:1
**hug** 23:12 32:23,24
**Hughes** 6:24

**I**

**illness** 6:2
**images** 30:14
**impact** 19:14
**implication** 12:17
**important** 26:2
**improve** 17:11,12 21:14
**improved** 31:11
**improvement** 29:12 30:2
    33:22
**inappropriate** 16:6
**inappropriately** 11:4 22:18
**incentive** 36:7
**incident** 10:7,10 11:1 14:1,5
    14:15,24 15:16 28:9 33:16

**incidents** 22:12 24:18
**including** 14:5
**independently** 34:4
**INDEX** 3:1
**indicate** 22:7 37:6
**indicated** 16:7
**indicating** 27:24
**infirmity** 6:3
**information** 13:16
**input** 18:23
**interact** 19:3
**interaction** 21:23
**interest** 29:22
**interested** 18:22
**introverted** 15:9
**invested** 15:5
**investigation** 28:22
**involved** 17:2 18:9
**involving** 10:8 15:16 24:13
**iPhone** 31:8
**isolate** 14:6
**isolation** 17:11

**J**

**J** 1:15 39:4,22
**James** 1:15 6:17 37:12 39:4
  39:22
**JANE** 1:5
**JJ** 37:11
**job** 8:6 33:19
**jobs** 34:2
**Jordan** 2:7 3:8 4:14,16 21:13
  26:10,13
**Jr** 1:15 39:4,22
**judge** 32:2
**jump** 35:21
**jumping** 18:20

**K**

**keep** 11:8 25:17 27:19
**kept** 23:5 25:14
**kid** 12:19
**killing** 24:22
**kind** 29:8 30:17 34:13
**kitchen** 25:15
**kitchens** 7:21
**knew** 23:16

**knives** 25:13
**know** 4:18 5:1,11,18 9:23
  10:1,2,19 11:19 12:1,19,21
  15:2,3,5,19,20,21 17:16,20
  18:5,18,24 20:1 22:5 23:8
  23:14,15,22,23 24:6,10,11
  24:14,21 25:10,11,23 26:1,3
  27:16 28:22 32:2,8,9,16,21
  33:2 34:9,10 35:3,6,11,12
  35:18 36:3,7 37:14
**knowledge** 15:14
**known** 12:16
**knows** 32:2

**L**

**laid** 8:12 27:20
**landscaping** 7:24
**Lansdale** 6:14 7:4
**LAUGHLIN** 2:3 21:10 26:7
  37:18,24
**LAURA** 2:3
**LAW** 1:16 2:2
**lawsuit** 4:17,22
**league** 8:17
**learn** 10:10 20:5,7 22:20 25:4
  34:20
**learned** 10:11 15:16 20:19
  22:16 24:3,13,18 25:8
**learning** 21:5 25:5
**leasing** 18:12 19:8
**left** 9:16
**lesson** 19:6
**lessons** 18:11
**level** 19:17 34:2 37:16
**life** 14:3 15:5 25:21
**likes** 14:12 27:17 33:19
**liking** 33:8,14
**line** 36:22
**lines** 16:11
**little** 8:5 30:14 35:17
**live** 6:15 27:11
**lived** 7:3,6,8 27:1,4
**living** 7:18,20 10:3 32:20
**LLOYD** 2:7
**location** 17:9
**locations** 8:18
**long** 5:24 7:3 8:4 30:22

**look** 8:2 35:14
**lose** 29:21
**lot** 12:19 18:5,21 36:21
**louver** 7:23
**lovey** 33:4,8,14
**low** 11:12 19:17

**M**

**mail** 35:9
**maintaining** 18:9
**making** 4:22
**manifest** 13:23
**MARKED** 3:17,18
**Masonry** 7:16,17,22
**math** 9:15,16 13:9
**matter** 39:9
**Maureen** 2:7 4:16
**mean** 11:8,10 17:17 31:15
  35:24
**meant** 34:22
**mechanic** 32:20
**mechanism** 25:2
**mechanisms** 34:20
**medication** 6:3
**middle** 9:6 11:9
**Miller** 26:19 27:24
**mins** 8:23
**minute** 29:19
**minutes** 26:8
**missing** 33:12
**mom** 10:20,21 11:14,16 12:5
  13:17 15:22,24 21:7 25:10
  25:23 28:1 29:4
**mom's** 6:1
**moments** 20:10,13
**Mont** 8:14
**Montco** 19:22,24 20:4,5,20
  20:21 21:6,8 24:9
**Montgomery** 8:18,21
**month** 10:17 31:21
**months** 27:4 35:13
**mood** 19:14
**morning** 33:5,12
**mother** 10:12 11:15 15:14,19
  20:20 23:16
**motorized** 7:23
**moved** 7:10

**multiple** 11:3
**mutual** 13:4

**N**

**name** 4:15 6:7,21,23 11:22
  12:1
**named** 32:7
**necessarily** 29:24
**need** 5:22 26:2 29:18 34:8
  37:20,21
**needed** 27:18,18
**needs** 14:13
**nephew** 27:17 37:10
**never** 19:2
**new** 17:14 18:7
**nice** 27:21
**Nick** 32:7,8,9,10,19,19 36:8
**nights** 25:11 32:22
**Nine** 13:1
**ninth** 19:20 21:6 32:7
**noncommunicative** 15:7
**nonverbal** 10:14
**normally** 29:22
**North** 1:8 7:19 9:2,8,10 19:22
  19:24 20:4,5,20,21,21 21:6
  21:8 24:9 35:7,24
**Notary** 1:15 39:5
**notes** 39:8
**notice** 25:16
**noticed** 14:16
**notices** 14:17
**November** 1:17
**NUMBER** 3:17

**O**

**Object** 21:10
**objections** 4:6
**obligations** 29:8
**observe** 24:17
**observed** 19:3
**occasions** 11:3
**occurred** 10:8 15:23 16:6
  22:13 23:20 24:3,19 28:5
**offer** 18:5
**offers** 32:15
**office** 8:23
**Oh** 28:15

**okay** 7:13 8:4 10:1 15:10
  24:12 34:22 38:2
**old** 6:9,19
**older** 13:3
**once** 16:7 17:7 23:2,23
**open** 16:7,12 25:17 31:19,23
**opinion** 15:1 34:24
**opposed** 21:8
**ORAL** 1:6
**originally** 4:18 16:5
**outdoor** 7:18,20 8:2
**outgoing** 14:2
**outside** 29:18
**overall** 12:11 19:14 22:6
  34:24
**ownership** 18:13

**P**

**p.m** 1:17 38:6
**PA** 1:23
**PAGE** 3:4
**pain** 33:12
**pandemic** 8:12,13 27:21 30:4
**panic** 24:23
**pants** 23:22
**parents** 26:24 27:8
**Parkway** 2:8
**part** 7:22 17:5 18:13 21:3
**partaking** 18:16
**participant** 19:6
**participating** 18:18 19:11
**particular** 21:17,22 29:23
**partner** 6:16
**partner's** 6:21
**paths** 22:2
**patios** 7:21
**peers** 13:5
**Penn** 1:8 9:2,8,10 20:21 35:7
  35:24
**Pennbrook** 16:23 17:1,7
  19:21 21:9
**Penndale** 9:6 16:23 17:3
**Pennsylvania** 1:1,16 2:4,9
**people** 17:14
**pergolas** 7:24
**period** 16:12 26:3 27:1 28:6
  29:21 30:18 31:14

**periods** 22:4
**perpetually** 17:17
**person** 33:14
**personal** 15:5 37:15
  ▮▮▮▮ 10:8,20 11:4 15:16
  16:6 17:4,10 20:5,17,19,22
  21:6,21 22:8,17 24:14,18
  25:5 33:16
**Philadelphia** 1:16,23 2:4
**phones** 31:6
**phrasing** 24:1
**physical** 28:1 33:3,8,15
**picking** 37:4
**pictures** 36:21
**place** 15:20 27:14,15
**places** 36:11
**Plaintiff** 1:6 2:5
**plan** 21:4
**play** 27:15
**playing** 29:23
**Plaza** 1:22
**please** 6:7 12:3
**point** 18:8 22:15 23:3 26:21
  32:4 35:15
**pool** 8:1,15
**pools** 8:1
**position** 8:6,10
**positive** 16:19 19:13
**post** 19:19
**present** 7:11
**president** 8:7,8
**pressure** 12:19
**prevent** 6:4
**previous** 34:2
**prior** 8:14 14:1,24 17:1
**privy** 28:24
**problem** 9:22
**PROCEEDINGS** 4:1
**process** 5:4
**professional** 1:15 26:4 39:5
**property** 36:2
**provide** 7:23 26:23
**psychiatrically** 26:5
**psychologist** 26:5,19 27:24
**Public** 1:15 39:6
**put** 12:18
**puts** 12:19

**putting** 17:16

**Q**

**quality** 27:16
**question** 4:7 5:7,11,12,13,16
  5:17,19 31:13 37:1
**questions** 4:24 6:4 37:13,15
  37:19
**quick** 25:15
**quiet** 14:6
**quite** 35:6

**R**

**razors** 25:14
**reach** 22:14
**really** 18:23
**reason** 5:23
**reassure** 25:24
**recall** 9:21 10:18 11:22 13:10
  21:16 22:22,24 24:16 25:18
  26:21 27:1,3,23 28:8 29:4
  30:2
**received** 26:4
**recollection** 10:16 28:12 29:2
**recreational** 8:17
**refer** 15:6
**referred** 12:6
**referring** 11:20,21 12:21
  13:5 14:11 23:8 28:19
**regard** 4:17 12:18 22:23
  23:19 24:5 26:18
**regarding** 10:20 24:17
**regards** 12:24 18:21
**region** 11:5
**relate** 15:18 32:3
**related** 33:15
**relation** 25:5
**relay** 21:23 33:19
**relayed** 12:4 14:15 15:23
  16:2
**relief** 27:7
**remain** 19:16 30:20
**remember** 5:12 9:19 10:2,23
  10:24 23:24 25:1,6,7 26:6
  26:20 28:7,10,16,16 29:6,10
  33:11,11
**remove** 14:13 24:24

**rephrase** 5:18 12:3 15:21
**reporter** 1:15 5:5 37:22 38:2
  39:5,23
**REPORTERS** 1:21
**represent** 4:16
**reserved** 4:8
**reside** 6:13
**respond** 5:8,8 15:11
**response** 14:20,23 23:10
**restate** 24:7
**retained** 19:17
**returned** 22:17
**ride** 18:15
**riding** 18:11,22 19:4,12
**right** 16:15 25:18
**room** 14:7 20:9 21:18 22:5
  23:4 25:13
**routine** 29:24
**rumors** 12:16,20
**run** 20:16
**running** 22:8

**S**

**sad** 22:6
**safe** 27:15
**Saturday** 33:5,12
**savvy** 30:11
**saying** 23:5 29:10
**scheduled** 26:16
**school** 1:8 4:16 9:2,6,8,11,22
  10:5,19 11:6,19 12:1,6,17
  13:8 15:3 17:11 19:19 20:8
  20:16,21,23 21:2,19,22 22:8
  24:5,9 26:15 33:10 36:15,17
**schooling** 24:14
**schools** 9:2
**sealing** 4:4
**seats** 36:23
**secluded** 13:20
**see** 16:2 17:7 20:22 29:12,14
  30:6 31:1,20 33:7 35:10
**seeing** 26:18,19
**seen** 21:21 31:18 33:22
**self-awareness** 34:20
**self-confidence** 17:12
**self-esteem** 19:18
**self-harm** 25:1 35:2,6

**self-harming** 25:5,8
**self-worth** 11:12
**selfies** 30:14
**send** 30:13,17
**sequence** 10:23 28:7
**services** 28:2,3,20,23
**set** 21:4
**setting** 30:20
**seventh** 16:22 19:15
**shop** 34:4
**short** 26:11
**Shortly** 14:3,15
**shut** 14:21,22 15:6
**shutdown** 27:3,11
**sign** 37:21
**signing** 4:4
**sink** 25:15
**sister** 4:17 9:19 10:4,11,21,24
  11:16 12:4,24 13:22 18:9
  19:21 21:7 22:16 23:19
  24:8,17 26:4,14 29:10,13
  31:11,19 32:6,11 33:18
  34:12 35:1 36:12 37:2,9
**sister's** 6:1
**sit** 32:22
**sitting** 32:16
**situation** 11:12 12:11,18
  14:13 34:9
**situations** 32:5 34:6
**six** 27:4
**sixth** 10:4,8 13:3,7,13 16:21
**skills** 35:22
**sleep** 29:5
**sleeping** 30:1
**smell** 18:23
**snack** 19:7
**Snapchat** 30:7,11,16,21 31:3
  31:7
**social** 12:17 28:2,3,19,23
**socially** 17:17
**somebody** 27:19 34:7
**son** 6:16,17 37:7,11
**sorry** 37:16
**sound** 34:7
**South** 1:21
**space** 8:2
**specific** 10:18 12:7,9 13:24

23:19,24 31:14
**specifically** 17:3 21:16 22:24 29:9 33:11 35:5
**specifics** 12:22 15:21 28:16
**spend** 29:22 37:10
**spending** 19:9 36:8 37:7
**spot** 29:16
**Square** 9:4 10:4
**stable** 19:9
**stables** 19:3
**stand** 19:7
**standard** 30:1
**staring** 36:22
**start** 27:14
**starting** 25:6
**state** 6:7
**STATES** 1:1
**stating** 10:24
**stay** 16:13 27:12 28:5
**stayed** 26:23 29:1
**staying** 30:4
**stenographic** 39:8
**step** 29:18 34:8
**stepdad** 33:23
**stepfather** 33:19
**stickers** 30:14
**stir** 27:19
**Street** 1:16,21 2:3 6:14 7:3,11
**structure** 8:9
**stuck** 23:21
**study** 35:18
**stuff** 30:15
**subject** 35:4
**sucks** 33:1
**suffering** 6:2
**suggested** 29:4
**Suite** 1:22 2:8
**summer** 7:21 26:22
**summertime** 29:7
**support** 8:7 13:19 15:24 16:8 18:7 23:12 32:15
**sure** 5:4 16:17 21:3 24:8 25:13,19 28:15,24 34:22
**sway** 16:1
**sweep** 25:15
**sworn** 4:11
**system** 18:7

**T**

**take** 5:22 16:17 20:1 26:8,10 28:15
**taken** 1:15 26:12 39:8
**talk** 11:7 12:13 14:17 15:1,4 15:7,10,15 22:21,22 32:4
**talked** 11:6,18,24 12:5 14:4 15:22 25:10,23 29:13 35:5
**talking** 12:11 28:8,10 34:9,13 34:14,18
███████ 9:20 13:16 14:1 15:22 19:11 20:8,23 22:21 24:20 26:23 27:1,23 29:4,6 30:6
██████ 21:14
**tea** 34:4
**teach** 35:21
**tech** 21:2
**tell** 11:13 22:10 23:1 25:24 26:1
**telling** 11:9 15:12 16:8
**tenth** 22:16
**testified** 4:11
**testimony** 31:10 36:3
**Thank** 34:23 37:17 38:2
**thanks** 27:20
**therapist** 34:15
**therapy** 34:17
**thing** 16:10 17:18,19,24 18:20
**things** 7:21 17:20
**think** 17:24 31:24,24 34:3,14
**third** 20:9
**thought** 24:22 25:21
**thoughts** 28:14
**threatened** 28:1,13
**throwing** 23:3
**time** 4:8 7:6,8 16:13,17 17:16 18:8 19:9,19 22:4,15 26:3 26:10,11 27:16 28:6,15 29:10,13,21 30:7,18 31:14 31:24 32:21 34:9 35:6,15 37:7,10,14
**timeframe** 10:17 22:23
**timeframes** 22:24
**timeline** 10:18
**times** 19:5
**today** 31:15,16 37:14

**told** 10:21 11:1,3,5,7,18 12:4 18:12 23:15,21,22,24 24:22 25:19 32:6 33:18
**touched** 11:4
**touching** 16:6 22:18
**tough** 10:15
**Tracy** 26:19
**training** 35:22
**transcript** 1:14 4:5 5:6 39:7
**transition** 21:17
**trial** 4:8
**tried** 13:19 15:10,24 16:1,8 23:12,12,13 25:17,17,24,24 26:1
**trigger** 34:6
**triggering** 21:23 31:22
**true** 39:7
**trust** 17:14
**try** 14:16 15:15 18:3,7 20:22 25:2 35:20
**trying** 16:15 20:10,11,14,14 22:5 28:14 34:3
**Tuesday** 1:16
**turned** 4:19 29:9
**Twenty-seven** 6:10
**twice** 30:10
**two** 8:23 13:18 31:6
**Tylenol** 25:14
**Tyler** 6:22 32:18,20
**type** 6:3 8:16 16:10 18:19,20
**types** 7:21

**U**

**unconsolable** 10:14
**understand** 5:9,14,17,19,19 17:15 18:1,4 31:10
**understanding** 6:4 24:4 27:10 30:16
**United** 1:1,22

**V**

**vacation** 29:9
**valid** 26:2
**validate** 18:4
**Valley** 2:9
**varied** 8:24
**various** 8:18

verbal 5:9
verbalize 14:23
vet 35:20
video 29:23
violence 28:1
vs 1:7

**W**

wait 5:7
waived 4:6
wake 33:5
Wales 7:19
walk 36:23
walking 36:22
Walnut 1:16 2:3
want 5:13 15:7,8 26:7 27:15
 30:22 35:7,15,23 36:21
wanted 15:5 29:5,20 35:8,11
 35:12,18,20
wants 35:14
wasn't 13:21 18:22 25:19
 27:19 34:22 36:24,24
watched 29:21
way 16:15 21:15 24:15 32:15
week 30:10
weekend 29:5 36:8,12 37:2,9
went 16:23 17:7 19:2,15,24
 20:4 35:19
weren't 32:1
West 6:14
wish 29:14
withdrawn 13:20 14:6
Witness 3:4 21:12 26:9 38:4
word 15:9
words 5:17
work 7:15 8:11,13 19:7 34:1
 34:21 35:21
worked 8:4,14
working 33:23
works 30:11 32:19 33:18
worse 16:3,13,20
wouldn't 14:22 15:1 17:24
 18:1 20:23 25:11,16 29:24
 30:9 36:20
write 9:24
writing 9:21
wrong 17:18,18,24

**X**

**Y**

Yeah 26:9
year 8:5 9:13 10:17
years 7:5,9 12:24 13:1

**Z**

**0**

**1**

100 2:8
12/5/93 6:12
12th 26:15
1500 1:16 2:3
1520 1:22
17th 1:21
18 4:19
18034 2:9
18th 1:16 2:4
19102 2:4
19103 1:23

**2**

2 1:17
2:20-CV-05142 1:2
2012 9:14 13:11
2014 13:13
2017 9:17
2018 26:21,22
2021 1:17
215 1:24

**3**

3:21 1:17
30 1:21
3701 2:8
3rd 6:14 7:3

**4**

4 3:8
4:13 38:6

**5**

564-1233 1:24

**6**

6:00 33:6

# EXHIBIT "F"

1                    UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                  CIVIL ACTION NO. 2:20-CV06142

4

5

6    - - - - - - - - - - - - - - -

7    JANE DOE,                    )

8                    Plaintiff,   )

9        -vs-                     )

10                                )

11   NORTH PENN SCHOOL DISTRICT,  )

12                   Defendant.   )

13    - - - - - - - - - - - - - - -

14

15                      - - -

                  July 26, 2021

16                      - - -

17

           Remote Deposition via Zoom of WILLIAM

18   BOWEN, conducted at the location of the witness,

     taken before Stephanie LaForte, a Professional Court

19   Reporter and Notary Public, on the above date,

     commencing at 10:02 a.m., there being present:

20

21                      - - -

22

23               GOLKOW LITIGATION SERVICES

              877.370.3377 ph/917.591.5672 fax

24                   deps@golkow.com

```
 1   A P P E A R A N C E S:
 2

         FREIWALD LAW, P.C.
 3       BY: LAURA E. LAUGHLIN, ESQUIRE
         1500 Walnut Street, Suite 1801
 4       Philadelphia, Pennsylvania 19102
         (215) 875-8000
 5       CD@freiwaldlaw.com
         Counsel for Plaintiff
 6

 7
         LAW OFFICES OF HENDRZAK &  LLOYD
 8       BY: MAUREEN JORDAN, ESQUIRE
         3701 Corporate Parkway
 9       Center Valley, Pennsylvania 18034
         (610) 709-8744
10       Maureen.Jordan@Zurichna.com
         Counsel for Defendant
11         North Penn School District
12
13       SWEET STEVENS KATZ & WILLIAMS
         BY:  KYLE SOMERS, ESQUIRE
14       331 East Butler Avenue
         New Britain, Pennsylvania 18901
15       (215) 345-9111
         Co-Counsel for Defendant
16         North Penn School District
17
18
19
20
21
22
23
24
```

1                    I N D E X

2

3   WITNESS:                            PAGE

4   WILLIAM BOWEN

5

6

7

8        By:   Ms. Laughlin              6

9

10

11

12                    - - -

13

14                E X H I B I T S

15

16                               PAGE

17   NUMBER        DESCRIPTION        MARKED

18             (NONE)

19

20

21

22

23

24

```
 1                    - - -

 2           DEPOSITION SUPPORT INDEX

 3                    - - -

 4

 5   DIRECTIONS NOT TO ANSWER:

 6   PAGES:  15,202

 7

 8

 9   REQUESTS FOR DOCUMENTS OR INFORMATION:

10   PAGES:  NONE

11

12

13   STIPULATIONS AND/OR STATEMENTS:

14   PAGES:  5

15

16

17   MARKED QUESTIONS:

18   PAGES:  NONE

19

20

21

22

23

24
```

1                          - - -

2                    P R O C E E D I N G S

3                          - - -

4              (It is agreed by and among Counsel for

5        the respective parties that the reading,

6        signing, sealing, filing and certification

7        are hereby waived, and all objections, except

8        as to the form of the question, are reserved

9        until the time of trial.)

10                         - - -

11             WILLIAM BOWEN, after having been

12       first duly sworn, was examined and testified

13       as follows:

14                         - - -

15             THE COURT REPORTER:  All parties to

16       this deposition are appearing remotely and

17       have agreed to the witness being sworn in

18       remotely. Due to the nature of remote

19       reporting, please pause briefly before

20       speaking to ensure all parties are heard

21       completely.

22             Counsel, please state your appearance.

23             MS. LAUGHLIN:  Good morning.  Laura

24       Laughlin, on behalf of the Plaintiff, Jane

1        Doe.

2              MS. JORDAN: Maureen Jordan for the

3        Defendant.

4              MR. SOMERS:  Kyle Somers, also for

5        Defendant.

6                        - - -

7                 E X A M I N A T I O N

8                        - - -

9    BY MS. LAUGHLIN:

10       Q.    Good morning, Mr. Bowen. My name is

11   Laura Laughlin. As I stated before we got on the

12   record, I represent the Plaintiff, Jane Doe in this

13   case, which is a case brought against the North Penn

14   School District.

15            You are here to give a deposition

16   today, so, before we start I am gonna go over some

17   ground rules to make things go a little smoother

18   today, minus the technical difficulties that

19   sometimes goes along with Zoom.

20            Have you given a deposition before?

21       A.    No.

22       Q.    Did you say no?

23       A.    Yes.  I said no.

24       Q.    Okay.  So, I am gonna go over a few

1    rules.  It's a bit different, even though it may

2    feel like a conversation, back and forth, because we

3    have a court reporter here taking down everything

4    that is said, so there's a few rules that we will

5    have to follow to make it go a little easier; okay?

6         A.    Yes.

7         Q.    One of the first things, you are doing

8    great so far, is when I ask a question it may be

9    normal to nod your head or shake your head, but all

10   your answers will have to be verbal so that the

11   court reporter can take that down; okay?

12        A.    Yes.

13        Q.    You may also anticipate or think you

14   know where I am going with my question and start to

15   answer before I am finished, but I would ask that

16   you wait until I am done before you start your

17   answer and I will try to do the same.  If you aren't

18   done answering and I start asking another question,

19   just let me know and I will let you finish.

20        A.    Okay.

21        Q.    If there is any question that I ask

22   that you are not sure what I am asking, just let me

23   know and I will try to rephrase it.

24        A.    Okay.

1        Q.    If you answer the question we are all

2   gonna assume that you understood it since I gave you

3   that instruction.

4        A.    Yes.

5        Q.    If there is any reason today you need

6   to take a break, just let me know and you can do

7   so.  I would just ask that if there is a question

8   pending, that you answer the question before you

9   take your break.

10       A.    Okay.

11       Q.    I am gonna be asking you about some

12  conversations that you had, whether it was to a

13  colleague, teacher, student, family.  If I am asking

14  you about conversations I am not trying to ask you

15  about conversations you may have had with your

16  counsel; okay?

17       A.    Okay.

18       Q.    Let me see. There is one other.  Some

19  of the events we are gonna be talking about happened

20  several years ago, specifically the 2014 to 2015

21  school year, so you may not remember certain things

22  that I ask you. If you don't remember that is fine

23  you can say you don't remember, but I don't want you

24  to guess at anything; all right?

1      A.    Okay.

2      Q.    It is fair if you need to estimate or

3  give me an estimate of something, that's okay to

4  answer in that way.

5      A.    That is fine.

6      Q.    Okay.  So, are you currently the

7  Principal of the Gwynedd Elementary School?

8      A.    No, I am not.

9      Q.    What do you do now for a living?

10      A.    I am the Principal at Gwynedd -- Excuse

11  me.  At General Nash Elementary School.  Still in

12  the North Penn School District.

13      Q.    How long have you held that position?

14      A.    Two years.

15      Q.    Before you held the position -- What

16  was the name of the school again?

17      A.    General Nash Elementary School.

18      Q.    Before you were at General Nash for

19  those two years did you come from being a Principal

20  at Gwynedd Square Elementary?

21      A.    Yes.

22      Q.    Why did you leave to go to General

23  Nash?

24      A.    The district had reorganized and

1  several principals were moved, I was one of them.

2       Q.    Okay.  How does the district, if you

3  know -- I guess one other question I should have

4  asked you. I may ask a question that you don't know

5  the answer to, that is a fine answer if you don't

6  know. I am not sure what you know or don't know, so

7  I have to ask.

8  (Ms. Jordan was dropped from Zoom and has rejoined)

9  BY MS. LAUGHLIN:

10      Q.    Do you happen to know, Mr. Bowen, does

11 the district, like, every so many years do, kind of,

12 a shake up and move people around or what was the

13 reason that you were doing that two years ago?

14      A.    The district has done this on another

15 occasion since I have been here.  So, every few

16 years they move administrators around.  How that

17 occurs, I don't know.

18      Q.    You said before you moved two years ago

19 you had still been the Principal at Gwynedd Square?

20      A.    Correct.

21      Q.    When did you become the Principal at

22 Gwynedd Square?

23      A.    The 2003 school year.  2003-2004.

24      Q.    Did you stay from 2003 to 2004 all the

1   way up through two years ago at Gwynedd Square?

2          A.    Yes.

3          Q.    So, I want to kind of go back and talk

4   a little bit about your education and experience

5   before becoming the Principal at Gwynedd Square.

6          A.    Okay.

7          Q.    Where did you go to college?

8          A.    Undergraduate at Kutztown University

9   Graduate School Lehigh University.

10         Q.    What did you study at Kutztown?

11         A.    Elementary education at Kutztown and

12  educational leadership at Lehigh University.

13         Q.    Was that, like, a Master's degree?

14         A.    Yes, Master's degree at Lehigh.

15         Q.    When did you graduate from Kutztown?

16         A.    Graduated from Kutztown in 1997.

17         Q.    What about from Lehigh?

18         A.    Lehigh, I believe -- Oh, now you are

19  asking me.  I want to say 2000.

20         Q.    Was it a three-year program at Lehigh?

21         A.    It was -- I did it in two years.

22         Q.    Okay.  Did you take a year off after

23  Kutztown before you went to grad school?

24         A.    Yes.

1    Q.    What did you do for that year, that gap

2    year?

3    A.    I was a teacher.  So, if I graduated

4    Kutztown in '97 -- Actually, it would be '92 I

5    graduated from Lehigh.  My apologies.

6    Q.    That is okay.

7    A.    Because it is five years to get

8    Principal in Pennsylvania, you must teach five

9    years, and I taught five years.

10   Q.    So, were you teaching while you were in

11   grad school then?

12   A.    Yes.

13   Q.    I became Principal -- I apologize.  I

14   became Principal in North Penn in 2013.

15   Q.    Oh, okay.  So, from 2013 to, like,

16   2019?

17   A.    Correct.

18   Q.    Does that sound right?

19   A.    Yes.

20   Q.    What kind of teacher were you for those

21   five years?

22   A.    Third and fifth grade.

23   Q.    Was it, like, a couple years in third

24   grade a couple years in fifth grade?

1      A.   It was three years in fifth grade two

2  years in third grade.

3      Q.   Do you remember the name of the school

4  you were at?

5      A.   I was at Stetson Middle School, School

6  District of Philadelphia.  I was at Doyle Elementary

7  in Central Bucks School District and at Springfield

8  Elementary in the Palisades School District.

9      Q.   Were some of these, like, internships

10  for grad school or was it during the day you were a

11  teacher and then you were going to grad school for

12  two years at night?

13      A.   Correct.  I attended classes in the

14  evening.

15      Q.   Why were you at three separate schools

16  in those five years?

17      A.   The first year in Philadelphia I taught

18  in urban district.  I wasn't satisfied with that

19  placement.  The second year I taught in Central

20  Bucks as a long-term sub, and then I went to

21  Palisades as a tenured teacher.  As a contracted

22  tenure teacher.  So, more stability as I moved

23  through the schools.

24      Q.   Okay.  Then you were doing the Lehigh

1  program.  Was it at night or something like that or

2  an online program?

3        A.    It was at night in-person.

4        Q.    Can you just explain for me what is a

5  Master's in educational leadership?  What does that

6  program entail?

7        A.    It entails graduate courses in

8  leadership, in management of school districts and

9  schools in supervision of teachers, it involves an

10  internship that is part of that that I also

11  completed.

12        Q.    Can you tell me a little bit more about

13  the internship?  Where was it and what kind of

14  internship was it?

15        A.    Sure.  The internship was done at

16  elementary school.  I believe it was 180 hours of

17  practical experience, so, doing different activities

18  that are related to the principalship, in addition

19  to my teaching responsibilities.  So, I would use my

20  prep period, evening after hours, things like that

21  to do different tasks that the Principal would

22  assign me.

23        Q.    At this point when you are going

24  through this graduate program did you know that you

1    wanted to be a Principal?

2         A.    Yes.

3         Q.    Do you keep, like, a CV or resume?

4         A.    Yes.

5         Q.    I would ask, I don't think I have a

6    copy of that, I would ask that you provide that to

7    your counsel, Ms. Jordan --

8         A.    Sure.

9         Q.    -- after this deposition?

10        A.    Yep.  Not a problem.

11        Q.    After you graduated in 2002 what did

12   you do between 2002 and 2013, if you can kind of

13   take me through?

14        A.    Sure. I was an elementary assistant

15   school Principal in the Pleasant Valley School

16   District for 1 year, that would have been 2002-2003

17   where I was in a K to 3 elementary school of

18   approximately 1,200 students, and then from 2003

19   until 2013 I was the Principal of Schnecksville

20   Elementary School in the Parkland School District.

21        Q.    Then in 2013 you applied to the

22   Principal position at Gwynedd Square North Penn

23   School District?

24        A.    Correct.

1          Q.    Before you went to college, or during

2    college, did you spend any time in the military?

3          A.    Yes.

4          Q.    Can you tell me a bit about your

5    military career?

6          A.    I entered the military in July of

7    1989.  Completed basic training and military police

8    school, and I was stationed at Fort Carson,

9    Colorado, where I served as a military police

10   officer.

11         Q.    Were you in the Army?

12         A.    Yes, Army.

13         Q.    Honorably discharged?

14         A.    Yes.

15         Q.    While you were working as a Principal

16   for Gwynedd Elementary who was your actual employer?

17         A.    North Penn School District.

18         Q.    In the course of your educational

19   career, what I mean by that is, when you were

20   serving as teacher, assistant Principal, Principal

21   have you ever had any disciplinary issues or

22   actions?

23         A.    No.

24         Q.    In your employment with North Penn

1  School District, I understand that you were the

2  Principal for a number of years at Gwynedd.  Was

3  there a type of hierarchy, if you are Principal of

4  the school, going upward in the school district?

5       A.    Yes, there is.

6       Q.    Can you tell me about that?

7       A.    Sure.  My immediate supervisor is Dr.

8  Betty Santoro. She is the current Director of

9  Elementary Education for four more days until her

10 retirement, and then above her was the Assistant

11 Superintendent, Dr. Diane Holben, who has since

12 retired from the District, and above her, obviously,

13 is the superintendent, Dr. Kirk Dietrich, who is

14 still the superintendent.

15      Q.    What about going downward, if you are

16 the Principal, was there an assistant Principal at

17 Gwynedd?

18      A.    No.

19      Q.    Was there any type of, like, downward,

20 you know, organizational structure when you were,

21 kind of, the leader of that school?

22      A.    I was the leader of the school, just

23 me.

24      Q.    So, it is safe to say as Principal

1   with, kind of, nobody directly under you other than
2   teachers, you know, teaching assistants, things like
3   that, are you responsible for what happens at
4   Gwynedd Square Elementary School as your school?
5       A.    Yes.  I assume since you are using
6   present tense we are just referring to my time at
7   the school, right?
8       Q.    Right?
9       A.    Because I am no longer there.
10      Q.    Yeah.
11      A.    I just wanted to make sure.
12      Q.    Yeah. You are no longer the Principal
13  there so I wouldn't think you are still responsible
14  for what happens now.
15      A.    Yeah. No problem.  I just want to get
16  our tenses correct.
17      Q.    I appreciate you clarifying.
18      A.    No problem.
19      Q.    It is probably good for me to just give
20  another instruction.  The things I am talking about
21  or things we will be talking about in the deposition
22  happened in 2014-2015.  So, when I am asking you
23  about your education, your training, I am really
24  talking about, like, at that time frame, what did

1    you know.  If it is different than today then please

2    let me know so we can distinguish those two things.

3         A.    Sure. No problem.

4         Q.    But I appreciate you asking the

5    clarifying question.

6         A.    Yep.

7         Q.    As part of being Principal at Gwynedd

8    Square can you tell me about your responsibilities

9    and your duties as the Principal?

10        A.    They are very broad, so, I mean, you

11   know, responsible for the supervision and evaluation

12   of all staff; responsible for the discipline of

13   students; responsible for the overview of the

14   delivery of our curriculum, the instruction and the

15   assessment.  So, there is a lot of responsibility

16   with that position.

17        Q.    When you say supervising and evaluating

18   the staff, do you mean the teachers and teachers'

19   assistants working at the school?

20        A.    Yes.

21        Q.    The discipline of the student, meaning

22   if a student were to get in trouble at the school,

23   that would be your responsibility to determine what

24   discipline would be appropriate for the student?

```
1        A.    Correct.

2        Q.    Is that something that as Principal you

3   do on your own or do you need to go up the hierarchy

4   to discipline students?

5        A.    There is a School Code of Conduct that

6   outlines the steps.  We do have some professional, I

7   guess, discretion on, you know, administering any

8   kind of discipline, because there are ranges in

9   there.  If I -- In some cases I do refer to Dr.

10  Santoro in discipline matters.

11       Q.    You are talking about the Student Code

12  of Conduct, kind of, lays out the severity of what

13  the conduct was and then the recommended steps to be

14  taken, who needs to be notified; is that right?

15       A.    Yes.

16       Q.    Like for a weapon or something like

17  that it is an automatic expulsion, I think, for a

18  year or suspension for a year?

19       A.    Yes.

20       Q.    You also mentioned that you are

21  responsible for the curriculum and assessment.  The

22  "curriculum" meaning what teachers are teaching in

23  the classroom?

24       A.    Correct.
```

1    Q.    When you say "assessment", meaning

2    assessing each of the teachers to see if they are

3    living up to the standards that the school would

4    have in place?

5    A.    That would be part of the supervision

6    process.  When I mentioned assessment that was

7    assessment of the students and how they are

8    performing and understanding the academic material.

9    Q.    What about training the teachers, who

10    is responsible for that?

11    A.    Me.  I was responsible for that as

12    well.

13    Q.    Was there certain -- In your time as

14    Principal at Gwynedd Square were there certain

15    scheduled trainings that would happen or how did you

16    do that?

17    A.    The district has a professional

18    development program that outlines our professional

19    development calendar.  So, there are certain

20    district initiatives that we are required to provide

21    to the teachers.  There are then building based

22    professional development opportunities that we

23    develop and deliver to the teachers based upon

24    building need.  So, there are some annual trainings

1    that the district does ask us to deliver for the

2    teachers.

3         Q.    You said those are on an annual basis?

4         A.    Some of them are.

5         Q.    Are there some that are more frequent

6    or less frequent?

7         A.    Yes.

8         Q.    Okay.  Is the training that you are

9    required to implement at your school brought down by

10   the District, do you know, is that kept as a record

11   somewhere?

12        A.    I don't know.  I would imagine our

13   professional -- Our Curriculum and Professional

14   Development Department would have that information

15   if it was kept.

16        Q.    Is there someone that heads that

17   department, if you know?

18        A.    Right now it is currently Dr. Diana

19   Waters. I apologize.  No, it's not.  It's Dr. Pamela

20   Heart who just took over that department a few days

21   ago.  We have had some transition.  Previously Dr.

22    -- At the time of '14-'15 it was Dr. Holben oversaw

23   Curriculum and Development, who was Assistant

24   Superintendent at the time.

1      Q.    H-O-L-B-E-N?

2      A.    Yes, and Director of Curriculum at the

3   time, Dr. Tony Butz, B-U-T-Z.

4      Q.    Do you know whether your teachers at

5   your school were trained on Title IX?

6      A.    I don't recall back at the '14-'15

7   school year what training was developed or -- I

8   can't recall if it was given at the time.

9      Q.    You kind of paused there. Looked like

10  you were kind of racking your brain going backwards.

11           Do you know a point that Title IX

12  training was offered that you can recall?

13     A.    No.  I cannot recall Title IX.  I

14  cannot recall if it was.  I am not saying it wasn't,

15  I just can't recall it being done.

16     Q.    Do you recall in the 2015-'15 school

17  year your school having a Title IX coordinator?

18     A.    At that point, yes, I believe the

19  District Title IX Coordinator at that time --

20           We should have had a Title IX

21  coordinator.  Who it was at that particular point,

22  if it was -- at that point it was either Dr. Fran

23  Carmone (ph) or Dr. Cheryl McCue.  Dr. Carmone was

24  the previous Human Resources Director and then Dr.

1  McCue took over.  I think at that point it was

2  probably Dr. McCue.

3          Q.    You just said Human Resources Director?

4          A.    Yes.

5          Q.    Is that something different than a

6  Title IX Coordinator?

7          A.    No, I believe they were also the Title

8  IX Coordinator.  In our district, until recently, we

9  did not have an Assistant Director of Human

10 Resources.  So, we had, at that point, our Title IX

11 Director was also the Human Resource Director.

12         Q.    Okay.  So, they served both roles?

13         A.    Correct. Yes.

14         Q.    Do you know whether that information

15 was provided to parents at your school of who the

16 Title IX Coordinator was?

17         A.    Not to my knowledge, no.

18         Q.    Not to your knowledge that it was not

19 provided?

20         A.    Correct.  It was not provided.

21         Q.    Do you know why?

22         A.    No.

23         Q.    As Principal, is that something that

24 you had a responsibility to notify students -- the

 1  parents of --

 2          A.    No.

 3          Q.    -- of who the Title IX coordinator was

 4  at that time?

 5          A.    I apologize.  No.  I was not required

 6  to do that.

 7          Q.    Is that something that you were trained

 8  on or where does that come from?

 9          A.    We receive Title IX training from

10  Mr. Somers, who is on the call, during our, usually

11  our administrative retreat in the summer or other

12  professional development meetings we have as

13  administrators in the District.

14          Q.    So, it was during those District

15  trainings that you were advised that you didn't have

16  to tell the students or the parents of who the Title

17  IX Coordinator was?

18          A.    No.  I was never advised that I did not

19  have to tell them.  I was never advised to tell

20  parents.

21          Q.    Okay.  I understand.  So, you have, up

22  to this point, received some Title IX training then

23  from the District; is that right?

24          A.    Correct.

1          Q.    Do you recall about when that started?

2     Do you know whether in 2014-2015 you had Title IX

3     training up to that point?

4          A.    I don't recall.

5          Q.    When do you first recall receiving any

6     kind of Title IX training from the District?

7          A.    I recall a recent training, probably

8     about a -- Less than a year ago, and then a second

9     training, probably about three years before that.

10         Q.    Okay.

11         A.    If there was one given during the

12    '14-'15 school year I do not recall it being given.

13         Q.    Okay.

14         A.    I remember Dr. McCue coming to the

15    buildings and providing Title IX training on one

16    occasion, but I cannot recall during what school

17    year that was.

18         Q.    Do you remember if it was before or

19    after the 2014-2015 school year?

20         A.    I cannot recall.

21         Q.    This incident that you are talking

22    about, Dr. McCue coming and providing specific Title

23    IX training, was it just to Gwynedd Square

24    Elementary?

 1          A.    Yes.  No, it was done to all 13

 2   buildings, but she came to the building and

 3   delivered the training.  It was done in our

 4   library.  Like I said, I remember it being done 1

 5   year.  I cannot recall the year it was done.

 6          Q.    You said she came to 13 buildings.  Is

 7   that, like, all of the elementary, middle school,

 8   high school makes up 13 buildings in the District?

 9          A.    No, there are 13 elementary.  So, my

10   understanding is, she was coming to every elementary

11   and delivering it.  I don't know if she went to high

12   schools and middle schools.

13          Q.    Do you know whether that was in

14   writing, power point or handouts or anything?

15          A.    Knowing Dr. McCue, I am sure there was,

16   but I cannot recall if it was done.

17          Q.    Safe to say if there was handouts or

18   any type of material provided you don't still have

19   those?

20          A.    Not to my knowledge.  I would have to

21   go back and look in files, but I am gonna say

22   probably not.

23          Q.    Do you know what prompted Dr. McCue to

24   come to the schools at this one particular time and

1    train everybody?

2        A.    No.  I don't know.

3        Q.    As part of your education, whether it

4    was at Kutztown or Lehigh or any other education you

5    have received outside the District, did you learn at

6    all about Title IX?

7        A.    Yes.

8        Q.    Can you tell me about where or when or

9    what capacity?

10        A.    Part of that, part of my doctoral --

11    Excuse me.  My Master's program at Lehigh dealt with

12    Title IX training.  Then I know, like I said, North

13    Penn had provided training on a couple of occasions.

14        Q.    Now, when I am asking you these

15    questions, I am kind of asking in the time

16    2014-2015, what you knew at that time.

17        A.    Okay.

18        Q.    What was Title IX at that time?  Did

19    you have an understanding?

20        A.    Any kind of sexual discrimination or

21    anything related to any type of behavior that might

22    have been viewed as sexual in nature.

23        Q.    Okay.  Your role under Title IX as a

24    Principal, did you have a specific role, to your

1  understanding, in terms of Title IX, what you were

2  supposed to do.  What your role was?

3      A.    Any incidents reported to us should be

4  reported to our immediate supervisors, you know, Dr.

5  Santoro.  Obviously Title IX involves discrimination

6  and anything else related to that as well.

7      Q.    Okay.  Do you know why at the time it

8  was required to be reported to Dr. Santoro as

9  opposed to Frank Carmone or -- I'm sorry.  I forgot

10  the other.  Cheryl McCue?

11      A.    Dr. McCue was Human Resources at that

12  time, so at that point she had taken over for Dr.

13  Carmone.  So, you know -- Why was it required?

14  Honestly, I don't think there was any clear

15  direction on who to report it to, so anything along

16  those lines are reported directly to Dr. Santoro.

17      Q.    When you say there wasn't clear, like,

18  lines on who to report it to, meaning there wasn't

19  any written policy in place at that time to report

20  to the Title IX Coordinator?

21      A.    There was nothing delivered to

22  principals as to who directly to report to.

23      Q.    Okay.  Then I would assume since there

24  is no written policy that you are aware of, there

 1  wasn't any training or any, just, policy of going to

 2  them without the writing too; is that true?

 3            MS. JORDAN:  Note my objection to the

 4        form of the question. You can answer.

 5            THE WITNESS:  There is District policy,

 6        there always has been, on Title IX and other

 7        policies.  So, in that policy, you know, it

 8        advises us what process to follow.  As far as

 9        any particular training at that point, I

10        don't recall anything being given.

11            What has been past practice was that we

12        always reported our issues to our direct

13        supervisor, who at the time was Dr. Santoro.

14  BY MS. LAUGHLIN:

15        Q.    Do you know, once it is reported to Dr.

16  Santoro whether there was a policy or practice of

17  who she would report to?  Did she have to report it

18  to anybody else, if you know?

19        A.    I don't know.

20        Q.    Do you know what sexual harassment is

21  under Title IX?

22        A.    Yes.

23        Q.    What is it?  I am asking, you know,

24  back in 2014-2015 what your understanding was?

 1        A.    Any behavior towards an individual that

 2   can be viewed as sexual in nature, that is either

 3   unwarranted or, you know -- that is unwarranted by

 4   that individual.

 5        Q.    Did you say unwarranted or unwanted?

 6        A.    Either one.  Both.  I said unwarranted

 7   but, yeah, it is unwanted as well.

 8        Q.    Would sexual harassment include

 9   something like a student putting their hand up

10   another student's shirt?

11        A.    If it was not consensual, yes.

12        Q.    Based on your training up to that

13   point, and your understanding, is there a certain

14   age where kids can consent?  You mentioned

15   consensual, that is why I am asking.

16        A.    Mm-hmm.  If there is I am not aware of

17   it.

18        Q.    So, is it your understanding that kids,

19   just, say, in sixth grade, that they are able to

20   consent to activity like that or no?

21        A.    Can you rephrase the question for me?

22        Q.    Sure.  I am trying to clarify, and I

23   apologize if my questions are a little bit

24   confusing.

 1              I was asking you, is there a point in

 2    time where kids are able to consent?  Is there a

 3    certain age?  You said you didn't think so; is that

 4    right?

 5         A.    Yes, as far as, is there an age where a

 6    person can allow someone to go up a shirt.  I think

 7    there is a difference between consent and understand

 8    the appropriateness of it.  So, I need you to

 9    rephrase the question so I can fully understand it.

10         Q.    I guess, if you are saying you are

11    distinguishing between consent and understanding the

12    appropriateness of it, what is the difference of

13    those two things?

14         A.    So, we are in a school setting, it is

15    neither inappropriate -- It's not appropriate to do

16    anything of a sexual nature.  If two individuals are

17    doing something, for instance, kissing in the

18    hallway, that would be consensual.  So, they both

19    agreed to allow that to happen.  So, that is where I

20    understand the difference to be.

21         Q.    In terms of consent, do you know

22    whether there is a certain age that kids can consent

23    to sexual behavior, sexual activity?

24         A.    I am not aware of any particular age of

1    that, no.

2         Q.    In terms of kids in your elementary

3    school, is it your understanding that kids in that

4    elementary school can consent in the classroom to

5    sexual behavior?

6         A.    No.  Like I said, it is never

7    appropriate for any type of sexual behavior in a

8    school building.

9         Q.    If sexual harassment is present at

10   Gwynedd when you were the Principal, do you know

11   whether you as the Principal have a duty to

12   investigate?

13        A.    Yes, I do.

14        Q.    What does that entail; your duty to

15   investigate, what do you have to do?

16        A.    I have to look into the allegations,

17   find out if they actually happened.  That could

18   involve interviewing staff of the students and

19   involving parents in that as well.

20        Q.    Are parents always involved when it

21   involves an elementary school student?

22        A.    With what type of behavior?  Sexual?

23        Q.    Sexual harassment.  Mm-hmm.

24        A.    Yes.  Any type of sexual behavior I

1   would involve, I personally would involve parents,

2   yes.

3        Q.   When you say you personally would

4   involve parents, was there any, like, policy of the

5   District to involve the parents at that time or is

6   that just something you did independently?

7        A.   Something I did independently.  So, if

8   -- Yeah.

9        Q.   Did the District at the time not have

10  any kind of policy that you are aware of of

11  informing parents if an elementary school student

12  was involved in some type of sexual harassment

13  issue?

14       A.   I don't recall any kind of policy like

15  that.  Again, that would be something that I would

16  do as a Principal.

17       Q.   Why is it something you would do?

18       A.   Because, again, it is inappropriate

19  behavior in an elementary school.

20       Q.   If you are looking into the allegations

21  and doing the interviews and talking to parents, is

22  that something you would typically undertake as the

23  Principal yourself?

24       A.   That depends. If it was involving a

1  female student sometimes I might involve the

2  guidance counselor in that as well, because at the

3  time at Gwynedd Square, and I currently believe she

4  still is, it is a female guidance counselor, Kristen

5  Badgley.

6      Q.    Meaning Ms. Badgley would be the 1 to

7  interview the female student so it's a more

8  comfortable situation?

9      A.    Either interview or she would be

10 present when I would interview a female student,

11 yes.

12     Q.    At the time, were you familiar with

13 what a hostile education environment was?

14     A.    Formal training, no.

15     Q.    You kind of made that distinction.  So,

16 is there an informal understanding that you had?

17     A.    Sure.  Any environment where someone

18 feels threatened for their personal safety, yes.

19     Q.    Where did you get that informal?

20     A.    Just experience through the position.

21     Q.    At the time had you received any

22 training on mandatory reporting?

23     A.    Yes.

24     Q.    Are there certain times -- Where did

1  you receive that training from?

2        A.    That is District provided.  At some

3  point in there, due to Sandusky at Penn State, it

4  became mandatory on an annual basis.  So, when that

5  whole transition happened I am not sure, but

6  mandated reporting is something we received annual

7  training on.

8        Q.    Back in the 2014-2015 school year and

9  prior, had you been receiving annual training on

10  mandatory reporting from the District?

11       A.    I can't recall if it was annual or not.

12       Q.    Was it some other period of time?

13  Maybe not annually, but do you recall receiving

14  training from the District on that prior to that

15  time?

16       A.    I can't recall if I did receive formal

17  training, so, I am not recalling a specific time or

18  a meeting or anything like that.  I can't recall.  I

19  have received it many, many times throughout, you

20  know, what, 19 years now as a Principal.  So,

21  recalling that exact year, I can't recall it.

22  Sorry.

23       Q.    That is okay.

24             Do you know at the time what your

1  responsibilities were as a mandatory -- I guess let

2  me ask this.

3          Were you a mandatory reporter at that

4  time?

5      A.   Yes.  Always have been.

6      Q.   Okay.  Do you know what your

7  responsibilities were in the 2014-2015 school year

8  as mandatory reporter?

9      A.   I think at that point there were a

10  little -- They weren't as defined as they are now,

11  so at that point mandatory reporting required us to

12  notify authorities of any kind of behavior, whether

13  it be child abuse, sexual in nature, things like

14  that.  Anything we would have on file, reports with

15  authorities.

16      Q.   I want to go into that a little bit

17  deeper.  You said anything child abuse sexual in

18  nature it would have to be reported to authorities;

19  right?

20      A.   Correct.

21      Q.   Are there certain levels, for example,

22  penetration, that would have to be reported to the

23  authorities; right?

24      A.   Depending on who were -- who was the

1  perpetrator.

2         Q.    Can you explain that to me. What do you

3  mean?

4         A.    Obviously if it is an adult, yes.  If

5  it is between two students, not necessarily.

6         Q.    Okay.  I guess I am talking about the

7  elementary school context, because that is where you

8  were.

9         A.    Right.

10        Q.    So, at the time, your understanding of

11 the mandatory reporter responsibilities as Gwynedd

12 Square's Principal is, if there was penetration

13 between two elementary school students you didn't

14 necessarily have to report it to the mandatory

15 reporter line?

16        A.    Correct.  At that time I would not have

17 to make a Child Line referral if there was any kind

18 of penetration or anything along those lines.

19        Q.    What did you have -- What were you

20 required to report at that time?

21        A.    Child abuse.

22        Q.    Can you define that for me?

23        A.    Physical abuse, sexual abuse done by an

24 adult.  As far as anything student to student, I

1  think at that time there was a little discretion

2  that could be -- that mandated reporters had at that

3  time.

4         Q.    So, student to student it was always

5  left up to the discretion of the Principal?

6         A.    Correct.

7         Q.    You are saying at some point that

8  changed, is that what you were referring to with the

9  Sandusky times?

10        A.    Yeah -- I don't know if that's

11  necessarily changed, so if today we had a student

12  that did that, would I be required to call Child

13  Line, I don't think so, you know, but it is

14  something that we are more apt to report nowadays as

15  a result of the changes in the laws from Sandusky.

16        Q.    Did you ever give training or provide

17  training to the staff at Gwynedd Elementary on Title

18  IX?

19        A.    No.  Not that I can recall.

20        Q.    What about in terms of teachers

21  reporting, was that something you ever provided

22  training to your teacher or staff at Gwynedd

23  Elementary?

24        A.    Yes.

1    Q.    Was that prior to the 2014-2015 school

2    year that you provided training on that?

3    A.    I can't recall specifically if I did it

4    prior to that or not.  It was something that was

5    reviewed -- I would say it was something we reviewed

6    annually at our staff meetings when we came back to

7    school every year.  Just a reminder that you are a

8    mandated reporter and there are responsibilities.

9    That was always something that was at least

10   mentioned.

11        I don't know if it always was formal

12   training on that because some years, you know, it

13   was part of our requirement as Principal to do

14   that.  So, I can't recall specifically that school

15   year.

16   Q.    Okay.  You talked about mandated

17   reporting.  I guess I want to separate that from the

18   process, like, internally reporting in your school?

19   A.    Okay.

20   Q.    Did you train on that prior to the

21   2014-2015 school year?

22   A.    Are you asking if I trained teachers on

23   reporting incidents to me?

24   Q.    Yes.

 1        A.     That was done on an annual basis, yes.

 2        Q.     Like when they are coming back to

 3   school?

 4        A.     Correct.

 5        Q.     Was that something that the District

 6   passed down to you or is this something that you are

 7   implementing in your own school as the Principal?

 8        A.     Implementing my own school as the

 9   Principal.

10        Q.     In the 2014-2015 time frame, can you

11   explain for me what the policy was that you

12   instituted in the school?

13        A.     At that point we had an Office Referral

14   Form, so it was a form that teachers would fill out

15   when there was a behavioral incident that occurred.

16        Q.     Okay.  Are these things that the

17   teachers would keep in their classroom or how would

18   they get the form?

19        A.     At that point if you had what was

20   viewed as a minor incident you would document it on

21   the Office Referral Form, and once you had three of

22   them on a particular student in a relatively short

23   time frame then they would be referred to me.  If

24   you had a major incident, that automatically came to

1  me.

2      Q.    When you say "relatively short time

3  frame" is there a time frame that was set?

4      A.    There was not a set time frame.  That

5  was left to the teacher's professional judgment

6  because, you know, if it is something that happened

7  in October, January and May, they are too far apart

8  to be more of a consistent basis, but if it was

9  three times in three weeks then that could be

10  referred to me.

11      Q.    You also mentioned, like, minor

12  incidents versus major incidents, that major

13  incidents would directly go to you.  Minor incidents

14  would be kept by the teacher until there was, you

15  know, several of them or many in a short time

16  period.

17            What is the difference between a minor

18  incident and a major incident?

19      A.    That also is left up to the teacher's

20  professional judgment, because in a building of K to

21  6, what a kindergarten might view as a major or

22  minor could be completely different to what a sixth

23  grade teacher would view as major or minor.  So,

24  there was some professional discretion permitted at

1   that time.

2        Q.    Did you provide any training to those

3   teachers as to what they should filter into the

4   minor or major incident categories?

5        A.    Yes.

6        Q.    Can you explain that for me, what you

7   train or teach them?

8        A.    We talked about different models or

9   different examples of those types of behaviors and

10  we also did those at grade level meetings so that we

11  could talk more specifically about the age level of

12  those students.

13       Q.    Something that was sexual harassment,

14  is that something that was a minor incident or a

15  major incident as you are defining them?

16       A.    Anything with the word sex in it would

17  be viewed as major.

18       Q.    When you say "the word sex" you don't

19  mean, like --

20            I guess, what do you mean?

21       A.    Harassment, sexual contact, sexual --

22  pretty much anything involving anything sexually

23  related at the elementary level, in my view, would

24  be viewed as a major offense.

1     Q.   Is that something that you had -- I

2 know that you said it was kind of left it up to

3 teacher's discretion, you gave some examples, but it

4 is really up to them.  Is that something that you

5 had trained the teachers on, that anything involving

6 sex would be a major incident?

7     A.   I can't recall if I specifically

8 mentioned anything like that.  I think, again,

9 educators, they receive a lot of training not only

10 formally through their education but also through

11 professional development, that they would understand

12 anything of a sexual nature would become a major

13 offense.

14     Q.   Was there a way at your school that you

15 defined something that was sexual in nature versus

16 something that was more platonic or something like

17 that?

18     A.   No.

19     Q.   Are you familiar with Administrative

20 Regulation 4316?

21     A.   By number, no.

22     Q.   4316 is North Penn's School Board

23 Policy For Harassment.  Are you familiar with that?

24 I know you said the number itself is probably a

1   little difficult to remember --

2       A.    Yes.

3       Q.    -- so, I apologize for that.

4       A.    That is okay.

5       Q.    Are you familiar now, that is the

6   Harassment Policy for personnel?

7       A.    Again, I am gonna answer no to

8   specifics about that.  I think I understand what

9   harassment is, but as specifically as it's outlined

10  in the Board Policy, I can't say that I do.

11      Q.    Okay.  When you were the Principal at

12  Gwynedd Square did you keep the North Penn School

13  Board Policies at the school somewhere?

14      A.    I believe at that point they were all

15  online.

16      Q.    Did you have a requirement or a

17  recommendation for your teachers to go online and be

18  familiar with the School Board Policies?

19      A.    I always refer to School Board Policies

20  and the Regulations, so, they were always

21  mentioned.  I think something I have always had said

22  and I continue to say is, never go against School

23  Board Policy.  That's something that I really -- I

24  don't go against School Board Policy.  Knowlingly go

 1  against school Board Policy.  I think there might

 2  have been written copies.  They were written prior

 3  to technology.  I don't recall a written set.  I

 4  think everything was online at that point.

 5        Q.    We talked about teachers reporting and

 6  what that would look like and any training that you

 7  may have provided or information to them about how

 8  to report if they see some type of incident in their

 9  classroom, but what about students reporting as a

10  Principal, did you ever have any assembly training

11  for students to report an incident?

12        A.    No.

13        Q.    Why not?

14        A.    I don't think it is something that we

15  emphasized as much as we do now.  I think students

16  were always encouraged to report anytime, and at

17  that point what our main emphasis was was on

18  bullying.  So, they were asked to report about

19  bullying behaviors.  I think I initially answered

20  your question thinking of sexual, you know.  So, I

21  will rephrase.

22              We train students to report when they

23  were being treated unfairly, more through a bullying

24  lens, because that was our main initiative at that

1    time, was anti-bullying.  We ran a school positive

2    behavior program, so that was a big part of it.  We

3    talked about bystanders and passive involvement in

4    things like that.

5              So, we always encouraged students to

6    report any kind of behavior that they felt that they

7    either witnessed or that they were part of. So, we

8    did encourage students to report it, but we never

9    got in to anything sexual in nature.

10        Q.    When they were told to report these

11   bullying situations if they were being treated

12   unfairly, who were they supposed to report to?

13        A.    Any adult.  We encouraged them to reach

14   out to anyone that they felt comfortable reporting

15   it to.  Many times it would be a guidance counselor

16   or teacher they felt very comfortable with.  On some

17   occasions there are teaching assistants, and some

18   even feel comfortable coming to me.

19        Q.    What about in terms of the parents, did

20   you have any, like, parent-teacher night or things

21   that you gave to parents on if they needed to report

22   an incident who could they report to or how could

23   they handle it?

24        A.    I often would write in my -- I do a

1  Sunday message every Sunday night.  My parents

2  receive an automated call, as well as an email from

3  me.  It is something I have done before the '14-'15

4  school year, and in those messages I often said,

5  anytime, please reach out and contact your child's

6  teacher or me with any issues.

7          So, it wasn't always related to

8  bullying, but there were several times that we

9  recommended that parents reach out if there were

10  issues.

11     Q.   Did you ever give any instruction to

12  parents about Title IX?

13     A.   No.

14     Q.   What about in terms of, like, sexual

15  misconduct or sexual harassment, was there any,

16  like, training or information provided to parents on

17  that back in, like, 2014-2015?

18     A.   No.

19     Q.   Would you agree with me that as

20  Principal it's part of your responsibilities to

21  maintain an education environment that is free from

22  sexual harassment?

23     A.   Yes.

24     Q.   As part of your training up to the

1    2014-2015 school year, did you learn about children

2    who are sexually abused and the impacts that it can

3    have on them?

4          A.    Yes.

5          Q.    Is that something that you received

6    from the District or in some outside capacity?

7          A.    I would say -- I can't recall exactly

8    who because, again, it is mandated between the

9    mandated reporter training and some of my own

10   professional development, I have received that

11   information.  I can't recall specifics though.

12         Q.    Up to that point or prior to the

13   2014-2015 school year, were you aware that children

14   who are sexually abused are more vulnerable to

15   subsequent sexual abuse?  Is that something you knew

16   about?

17         A.    I cannot say that I can recall at that

18   point that that was something I was aware of.

19         Q.    Is that something that you now you are

20   aware of?

21         A.    I think so.

22         Q.    As the Principal starting in 2013, I

23   guess we haven't, I think, specifically talked about

24   the plaintiff in this case, ███████████, but

1    do you remember ███████?

2         A.    Yes, I do.

3         Q.    Do you remember her parents?

4         A.    Her appearance did you say?

5         Q.    Her parents.  P-A-R-E-N-T-S.

6         A.    Yes.  I remember her parents and

7    appearance, so I can say yes to both.

8         Q.    Is there something about her appearance

9    that, like, stands out to you?

10        A.    A red headed child, yep.

11        Q.    Were you aware as the Principal that

12   ████████ had been sexually abused when she was five

13   years old?

14        A.    Prior to the incident that occurred at

15   Gwynedd, I don't recall if I knew that or not.  I

16   definitely was made aware of it at -- in

17   conversations with the parents at that time, but I

18   cannot recall if I knew that before then.

19        Q.    Okay.  As a Principal, is that

20   something you would normally be in the know about if

21   a student had a prior history of sexual abuse?

22        A.    No, not necessarily.  Typically that

23   kind of information would come to the guidance

24   counselor, but there are -- some parents don't even

1  give us that information.  It is really case by case

2  depending on the parents' level of comfort with that

3  information.

4       Q.   You said sometimes that would be

5  something that the school guidance counselor would

6  be aware of.  Do you know why, other than maybe a

7  parent giving too much information, but is there a

8  reason that a guidance counselor would be made aware

9  of something like that to be implemented in the

10 school?

11      A.   I think the guidance counselor is

12 looked at as a resource for mental health, so, if it

13 impacts the child's mental health I think some

14 parents think it is appropriate to go to the

15 guidance counselor and share that mental health

16 information.

17           That is not just sexual in nature.

18 That could be, you know, mental health diagnosis or

19 anything related to a child's mental health.  The

20 guidance counselors are an excellent resource for

21 that.  That is where some parents will go to them.

22      Q.   I just want to jump back for a second.

23 We were talking about the Office Referral Form --

24      A.   Yes.

1    Q.    -- that we spoke about.  If the teacher

2  has it in their file and they don't turn it over to

3  you, is there a certain time period that they hold

4  them for?  How did that work?

5    A.    Usually they are discarded at the end

6  of the school year.

7    Q.    If they do get brought up the chain and

8  given to you, what happens to those office referral

9  forms?

10    A.    Typically I kept a file of them for

11  that school year and that would -- a major would

12  require me to contact a parent and get parental

13  involvement, things like that.  So, typically, I

14  would keep those in a file at that point and, you

15  know, I would refer back to them if I needed to.  At

16  the end of the school year those were thrown away,

17  were shredded as well.

18    Q.    Why were they shredded at the end of

19  the school year?

20    A.    Most of the time they were minor

21  incidences that, you know, we didn't feel needed to

22  be kept necessarily as an educational record.  If

23  they were there would usually then be a different

24  document.  If it led to a suspension or something

1  there would be a letter that we would keep as the

2  educational record for suspension or something like

3  that.

4      Q.    Is that something, the letter, would

5  that be something that would stay in the student's

6  file?

7      A.    Yes.

8      Q.    When I say stay in the student's file,

9  meaning after they left Gwynedd and went on to

10 middle school, is that typically something that

11 would stay in the file with the student?

12     A.    Yes, so that way there would be a

13 record of that behavior or that incident.

14     Q.    When you say letter, is it a letter to

15 the parents --

16     A.    Yes.

17     Q.    -- like, explaining the discipline that

18 the child received?

19     A.    Yes.

20     Q.    Do you know, is that something that the

21 District requires?

22     A.    I would say yes, it is something that

23 is required, you know, that we maintain a record of

24 student discipline, yes.

1      Q.    If a student is in sixth grade at the

2  end of elementary school and they are gonna go in to

3  the middle school, how does the student's file go

4  from the elementary school up to the next level?

5      A.    The cumulative folder is transferred to

6  the middle school. We actually have a process at the

7  end of the year where they are with dates when you

8  are supposed to transfer them and things like that

9  so that things don't get lost.  That was back in the

10  '14-'15 school year.  Now, it is all done

11  electronically.

12      Q.    So, back in 2014-'15 it was like an

13  actual paper file that would then be handed over to

14  --

15      A.    Yes, a folder and many copy boxes of

16  those folders were physically delivered to the

17  buildings and then they were given to, you know, the

18  office there for them to keep on file.

19      Q.    The buildings, meaning, like, whatever

20  middle school the kid was going to?

21      A.    Correct.

22      Q.    Then, your understanding, was it then

23  those boxes would be transferred and moved to the

24  high school?

1          A.    I would assume so.  I don't know.

2          Q.    You don't know?

3          A.    I don't know.

4          Q.    Do you know at what point the district

5    went electronic?  When they stopped keeping these

6    boxes of records?

7          A.    No, I don't know if they still -- I

8    don't know.

9          Q.    When you said -- I think you said we

10   didn't feel that they needed to be kept, the

11   records, I guess past the school year.  When you say

12   "we" who are you talking about?

13         A.    I will rephrase that.

14         Q.    Okay.  So, that's something you didn't

15   feel that records needed to be kept beyond the

16   school year other than what we talked about?

17         A.    Correct.  If it needed to be kept it

18   was put in the students's folder.

19         Q.    When you say something needed to be

20   kept, that would be things like if it was a major

21   report, right; major incident?

22         A.    It could be, yes.

23         Q.    Is there a distinction between major

24   incidents that you wouldn't keep after that year?

```
 1          A.    No, no.  In most cases majors were

 2  kept.  They were put into a folder and kept.

 3          Q.    I am just trying to make a distinction

 4  because I think you are saying most cases, so, that

 5  sounds to me like there are some cases that wouldn't

 6  be.  So, is there a distinction between majors that

 7  were kept and majors that weren't?

 8          A.    Are you referring to the office forms

 9  themselves or are you referring to an actual

10  record?

11          Q.    Is the Office Referral Form -- I guess,

12  what is the difference between an actual record and

13  an Office Referral Form?

14          A.    Office Referral Form was something you

15  used internally that would trigger a document that

16  would be put into a student's cumm folder.

17          Q.    The Office Referral Form, is that

18  something you just used at Gwynedd Square

19  Elementary?

20          A.    Yes.

21          Q.    That is not a District form?

22          A.    Correct.

23          Q.    Then you said if you got the Office

24  Referral Form and then you wanted to make an actual
```

 1   record, what did that entail?

 2        A.    Then that would most likely be a letter

 3   on school letterhead from me to the parents

 4   outlining the behavior and outlining the

 5   consequence.

 6        Q.    Is there any other record that would be

 7   created after an incident other than a letter going

 8   to the parents?

 9        A.    A letter or a phone call, that would be

10   probably it, yes.

11        Q.    Okay.

12        A.    Unless it was something that needed to

13   be referred out to possible law enforcement or

14   anything like that, but there still wouldn't be an

15   actual record of that happening.

16        Q.    Why wouldn't there be a record?

17        A.    I don't know.

18        Q.    So, the District didn't require any

19   kind of record to be kept in those instances then?

20        A.    No.  Not that I am aware of.

21        Q.    Did you feel it was important as the

22   Principal to keep records of major incidents, like,

23   what happened, other than a letter describing the

24   discipline to the student's parents?

1           A.      No.

2           Q.      Why not?

3           A.      I think if it became a major incident

4    that warranted discipline then the letter would be

5    the official document.

6           Q.      In these letters that you would send

7    home to parents, would it be anytime a student

8    received discipline they would get these letters

9    that would go in the file?

10          A.      Depending on the level of discipline,

11   yes.  So, if they were suspended, then, yes, they

12   would.  Maybe missing part of recess or something

13   like that, then it would be a phone call.

14          Q.      As the Principal, why didn't you feel

15   it was important to keep, like, the investigation

16   notes or anything in the file?

17          A.      Hmm. I think what would be, to me would

18   be most the important would be -- To me, that would

19   be record of --

20                  The letter would be the record of what

21   transpired, so that would be my way of keeping the

22   notes, and sometimes I did keep detailed notes on

23   incidences. I wouldn't necessarily put them in the

24   file though.  I think that is your question, why.  I

 1  don't know.  I just, I think I always felt that the

 2  letter was sufficient as to a record of the

 3  incident.

 4       Q.   Okay.  The letters, typically, were

 5  they a form letter that you of kind of plug in,

 6  like, what the suspension was or punishment is and

 7  then like, the incident.  What would, I guess, be in

 8  those letters?

 9       A.   For the most part a description of what

10  happened.  Maybe not to the level of detail -- I

11  should say not in a great level of detail and the

12  consequence. That is typically what it was.

13            Form letter, I guess, that is a loose

14  way of saying it.  I mean, it wasn't the same for

15  every single incident, but I think they definitely

16  -- You could say they were some form, like, in

17  nature.

18       Q.   Okay.  If at the end of each school

19  year these, whatever was in the file regarding an

20  incident were shredded, how were you tracking a

21  student's conduct from one year to the next?

22       A.   If there was some -- The cumm folder.

23  That is the way I would track student behavior, is

24  looking at their cumm folder.

```
 1          Q.    When you say "cumm folder"?

 2          A.    That was the folder that was passed

 3     year to year.  So, a student in elementary would

 4     start a cumulative folder in kindergarten.  It would

 5     have demographic information, academic information,

 6     and behavioral information in it.

 7                So, we would start that in kindergarten

 8     and we would add information all the way through

 9     sixth grade, and then that folder would be sent to

10     the middle school.

11                So, that was the main way of keeping

12     the record.

13          Q.    Okay. I understand at this time it was

14     a literal folder, not something that was electronic?

15          A.    Correct.

16          Q.    But I think you told me that at the end

17     of each school year you would shred, like, incident

18     reports or the --

19          A.    Office Referral Form.

20          Q.    -- Office Referral Forms at the end of

21     each school year.  So, I guess my question is, if

22     you are shredding them at the end of each year how

23     are you tracking from one year to the next a

24     student's behavioral conduct?
```

```
 1        A.    I think that in our particular school,

 2   overwhelmingly they were minor behavior.  We didn't

 3   have many major behaviors at our school.  So,

 4   honestly, if there were major behaviors, I would

 5   remember them.  We had so few that I didn't have a

 6   need to have any kind of system to track major

 7   behaviors.

 8        Q.    Because, you are saying, they are all

 9   in your head?

10        A.    No. Because there were so few of them.

11        Q.    But I think you were saying because you

12   could remember them --

13        A.    Yes.

14        Q.    -- that is why you didn't track them?

15        A.    Yes, because there were so few of them

16   I could remember them, yes.

17        Q.    So, that is why you didn't have to

18   track them on paper, because you remember them?

19        A.    I remember the students, yep.  Yes.

20        Q.    Okay.  So, what happens then when they

21   go from sixth grade to the middle school if they are

22   all things that you remember and it's not papered in

23   a file, how is the next step, as the middle school

24   or high school, supposed to know about a student's
```

1  prior conduct if it is not in the file?

2        A.    Then if it is major it would be in the

3  file, if it's minor it wouldn't be.

4        Q.    So, I guess I am trying to clarify.  I

5  think you told me the only thing that would be in

6  the file would be a letter to the parents; right?

7        A.    Correct.

8        Q.    So, that is the only thing that would

9  go from middle school to high school is a letter if

10 it was sent to the parents?

11       A.    Correct.

12       Q.    Do you think that it would be important

13 for a middle school or a high school, or whoever is

14 gonna get that file to have more information in

15 addition to just the letter that was sent to the

16 parents?

17       A.    Yes.

18       Q.    If you felt that important then why

19 wouldn't you include more information than that?

20       A.    If it was something that needed to be

21 relayed to the middle school it would be.

22       Q.    How would that happen?

23       A.    Typically the middle school would

24 review the folder, however, we did have a transition

```
 1   meeting with the middle school guidance department

 2   at the end of the school year where we could talk

 3   about individual students.

 4            Many cases the guidance counselor and I

 5   would meet with the middle school guidance counselor

 6   to talk about those types of issues or incidences.

 7        Q.   When you say "those types" what do you

 8   mean?

 9        A.   The ones you were referring to.

10   Anything we felt was needed to be passed on to the

11   middle school.

12        Q.   How would you distinguish something

13   that needed to be passed on to the middle school, is

14   that something that you would decide?

15        A.   Yes.

16        Q.   Is that something that the District

17   gave you authority to do?

18        A.   What do you mean?

19        Q.   Like, is that something that you just

20   did on your own or were you allowed to do that, like

21   distinguish what did or didn't get passed along to

22   the middle school?

23        A.   I think we passed along what we felt as

24   professionals was important for middle school to
```

1   know and to have that knowledge in case they needed

2   to act on it in the future.

3        Q.   But I think earlier you said that you

4   have -- You wouldn't knowingly violate school

5   policy; right --

6        A.   Right.

7        Q.   -- school board policy?  In doing that

8   that's something you thought you were permitted to

9   do in terms of your role as Principal at the school;

10  is that right?

11       A.   Can you rephrase it for me?

12       Q.   Sure.  You are saying that you would

13  just relay what needed to be relayed to the middle

14  school, what you felt needed to be relayed; right?

15       A.   Yes.  I would -- We would have that

16  transition meeting where we would provide the middle

17  school information that we, as professionals, felt

18  was important for them to know.  That could

19  include:  Behavioral; academic; or social or

20  emotional information, yes.

21       Q.   That also means the things that you

22  didn't think that they needed to know, you didn't

23  have to tell them, right, in those meetings?

24       A.   Well, if I didn't think they needed to

1  know it I wouldn't relay it to them; correct.

2        Q.    That is something you were allowed to

3  do in your role with the District as a Principal?

4        A.    Well, I think the way you are saying it

5  it is -- It is confusing to me because the way you

6  are saying being allowed, it is almost like I

7  wouldn't do it.  I -- We would do it in what we felt

8  was professional.  We would pass along the

9  information that we felt was important.  That was

10  something that --

11            Did the district come out and say do

12  that or don't do that, no.  They never said that.

13  That was something that we as educators with

14  experience felt that this is something the middle

15  school might want to know.

16            Again, it is not a lot of information

17  because we didn't have -- behaviorally speaking,

18  it's not a lot of information because we didn't

19  really have any behavior incidences, but there is a

20  lot of academic information that might need to be

21  passed along. Students with IEPs or 504 plans or

22  things like that, that kind of information might

23  need to be passed -- that needs to be passed along.

24        Q.    Do you recall whether there was ever a

1  meeting when ███████ ██████ went from elementary to

2  middle school; went to middle school?

3        A.    To be honest, I don't recall that

4  because the incident that we are all here for was

5  towards the end of the school year and I don't

6  remember if that happened before or after our

7  transition meeting.

8        Q.    What is it you don't recall happened

9  before or after?

10        A.    I don't recall if we met with the

11  middle school about -- I don't know if we had our

12  transition meeting before the incident, so that we

13  could relay it, or if it was -- if the -- if the

14  meeting was before the incident then we wouldn't,

15  obviously, be able to relay it.  If the meeting was

16  after then we could have relayed it.

17             I don't recall when that meeting was in

18  relation to the incident to say whether or not we

19  were able to pass that information along.

20        Q.    If the meeting had occurred -- I guess

21  no matter when the meeting had occurred, the

22  incident we are here to talk about today, is that

23  something you would categorize in the need to

24  know --

```
1        A.    Yes.

2        Q.    -- that you would tell--

3        A.    Yes.

4        Q.    Okay. Why do you think that they would

5   need to know about that incident?

6        A.    I think -- You know what, I am gonna

7   rephrase that and say it might not be, as it's

8   germane to the case, because we separated the

9   students, the facts of the case might not need to be

10  relayed.  The behavior of ███████ would have been

11  relayed to the middle school.

12       Q.    So, you are saying because ███████ was

13  going to a separate middle school from ███████ you

14  wouldn't have --

15       A.    Right. We might not have -- I'm sorry.

16  I cut you off.

17       Q.    That's okay. Go ahead.

18       A.    You asked me not to in the beginning.

19       Q.    That is okay.

20       A.    I'm sorry. Because the students were

21  separated I would not feel the need to call the

22  middle school and give them many -- a lot of detail

23  about what happened, because the students are

24  separated.  If I would feel the need, and I can't
```

1  recall if I did, if we did communicate with the

2  middle school, I would communicate the need, that we

3  had an issue that occurred there.

4          I know that the incident was ongoing

5  and I don't recall if it was resolved completely by

6  the end of the school year to relay that information

7  to the middle school.

8      Q.    You said that the incident was

9  "ongoing".  What do you mean?

10     A.    Because there -- Well, the incident

11 occurred, the follow-up that was happening, I don't

12 recall if everything occurred before the end of the

13 school year.

14     Q.    You said that you may not tell them all

15 the details with ███████ because now the students are

16 separated, but you would have told them about the

17 behavior of ███████ right?

18     A.    Correct.

19     Q.    Why was it important to you to tell, if

20 this meeting occurred where your intention would

21 have been to tell the middle school about the

22 behavior of ███████ why is that the case?

23     A.    If I felt that a student was acting

24 inappropriately then I would have relayed that

1   information.

2        Q.    Okay.  In relaying the information,

3   would that have been documented anywhere, these

4   meetings that you had transitioning?

5        A.    No.  The actual information that was

6   relayed would have been just notes the guidance

7   counselors would have kept.

8        Q.    If the guidance counselors were present

9   at any transitional meeting?

10       A.    Correct, and they were.  Those were the

11  individuals that were present for the meetings.

12       Q.    Where are their notes kept.  If you

13  know?

14       A.    I don't know.

15       Q.    Do you know whether it ever makes it

16  into any type of file on the student, whether it's

17  the cumulative file or any other type of thing for

18  transition from one place to the next?

19       A.    No. I don't know.

20       Q.    I guess before we get in to talking

21  about what you reviewed for the deposition today,

22  when you may have met with your counsel.  I am not

23  asking you what you discussed or what may have asked

24  or they told you, but did you review any documents

1    in preparation for the deposition today?

2         A.    Yes.

3         Q.    What documents did you review?

4         A.    I reviewed the Office Referral Form; a

5    copy of my notes.  I think that was about it.

6         Q.    Did you have any conversations --

7    Again, I'm not asking you about conversations with

8    counsel, but did you have any conversations with

9    anybody in preparation for today?

10        A.    Outside of counsel?

11        Q.    Yes.

12        A.    No.

13        Q.    Since the lawsuit has been filed, other

14   than counsel, have you had any conversations with

15   anybody, whether it is teachers, administrators

16   about what happened?

17        A.    No.

18        Q.    Prior to reviewing the documents in

19   preparation for your deposition today, did you have

20   an independent memory of the events in 2014 and

21   2015?

22        A.    Very little.

23        Q.    Tell me what you remember, just

24   outside, like, looking at -- We will look at the

 1    note.  I am just curious what your recollection was

 2    of what happened?

 3         A.     Prior to -- You are asking me prior to

 4    reviewing with Counsel?

 5         Q.     Yeah, and just to clarify again, I'm

 6    not asking you, if they told you certain things, I

 7    am not asking for those communications, just, what

 8    was your memory of what happened?

 9         A.     My memory was that an incident occurred

10    at the school between ████ and ████  What was

11    reported -- It was not initially reported to me when

12    it first occurred, but that I was made aware of it

13    later, and that some other girls had reported some

14    behavior by him.  I couldn't remember what the

15    behavior was, but that something had happened.  That

16    what initially was reported to me seemed to be

17    consensual when it was first reported by the

18    teachers but the teachers did not report that issue

19    to me.

20            They told the students that if it

21    didn't occur again they wouldn't tell their parents,

22    but when it was made aware to me I informed all

23    parents involved and then we -- Then I know that

24    Mission Kids and law enforcement got involved with

 1    it from there.  That is what I recall.

 2          Q.    When you said it was made to be

 3    consensual, is that what you said?

 4          A.    No.  My impression -- The impression

 5    given to me by the teachers was that it was

 6    consensual.

 7          Q.    What do you mean by that?

 8          A.    When the teachers first told me about

 9    the incident they told me they thought it was

10    consensual.

11          Q.    What about it made it consensual?  I am

12    just trying to understand.

13          A.    That's what they told me.

14          Q.    They literally used the words, it was

15    consensual?

16          A.    Yes.  If I recall -- I believe I recall

17    that is what the actual words that were used.

18          Q.    Did you ask any questions, if you can

19    remember, to them as to, like, what does that mean,

20    since they are two elementary school students?

21          A.    That, basically, the students were

22    feeling around in class.

23          Q.    Did they use the words fooling around?

24          A.    I can't recall if they -- Those are my

1  words right now.  I don't recall what the words were

2  at that time.

3        Q.    Do you remember, like, what fooling

4  around in class meant?  Like, what exactly was going

5  on?

6        A.    That ████ had put his hand up her

7  shirt.

8        Q.    I guess just to clarify.  If you know

9  that at the time that ████ had had put his hand up

10 ████'s shirt were you under the impression that

11 that was consensual at the time?

12       A.    Yes.

13       Q.    In comparison to what you told us

14 earlier in the deposition about things being

15 consensual or not consensual, I think you were

16 saying, like, in the school context, one student

17 touching another, that can't be consensual.  It's

18 always inappropriate I think is what you said

19 earlier?

20       MS. JORDAN:  Note my objection to the

21       form of the question.  You can answer.

22       THE WITNESS:  When I was stating the --

23       What I had said was that it could be

24       consensual, but no matter if it's consensual

1          or not it is still inappropriate is what I

2          was referring to earlier.

3     BY MS. LAUGHLIN:

4          Q.    Okay. Is there anything else

5     independently that you remember conversations that

6     you had outside looking at the records?

7          A.    When you say "conversations outside",

8     what do you mean?

9          Q.    Like, with teachers or administrators?

10         A.    I know that I involved Dr. Santoro.

11    She came up to the building.  We met with -- I met

12    with both sets of parents regarding the incident.  I

13    met with Officer Ciaola from Upper Gwynedd Township

14    about the incident.  So, those happened as well.

15         Q.    Now, do you need to take a break at all

16    before we jump in to --

17         A.    No.  Go ahead.

18         Q.    I am gonna pull up some documents on my

19    screen and kind of go through them with you.

20         A.    All right.  If you would like we can

21    take a break while you pull those documents up.

22         Q.    Why don't we take five minutes, because

23    then we are gonna be in another set of questions, so

24    let's take a five-minute break and then come back.

1          A.     Thank you.

2                 (A break was taken)

3     BY MS. LAUGHLIN:

4          Q.     Before I show you a document I just had

5     one follow-up question from what we were just

6     talking about in you recalling what you remember

7     about the'14-'15 incident, and you being notified by

8     the teacher of Gwynedd what had happened.  I think

9     that you said that they had, you know, kind of led

10    you to believe that it was consensual; is that

11    right?

12         A.     Yes.

13         Q.     At some point did you decide otherwise,

14    that you didn't think that it was consensual?

15         A.     I can't recall if I did, you know.

16    What I recall is that that is the only -- in 18

17    years of being a Principal that is the only really

18    sexual issue I have ever really had to deal with, so

19    that is why I remember it so well, but, you know, I

20    don't recall ever having -- I can't recall ever

21    changing it from viewed as more of a consensual act

22    to, you know, non-consensual, which is the only way

23    it can be viewed.

24         Q.     Is there something about it that makes

1  you distinguish it from being consensual versus not

2  consensual?

3        A.    No.  Just that I recall the teachers

4  telling me, kind of, the reason they didn't report

5  it was that they felt that it was more consensual

6  and that is why they told them they wouldn't tell

7  their parents.

8        Q.    Okay.  Them telling them that they

9  wouldn't tell their parents, what was your reaction

10 to that at the time?

11       A.    That they should have told the parents

12 right away.  I mean, what they did was not the

13 correct course of action.

14       Q.    So, I am gonna pull up a document.

15            MR. SOMERS:  These are all documents

16       you have already seen?

17            MS. JORDAN: Yes.

18 BY MS. LAUGHLIN:

19       Q.    Are you able to see that on your

20 screen?

21       A.    Yes.

22       Q.    Is this one of the documents that you

23 reviewed in preparation for today?

24       A.    Yes.

1    Q.    Just for the record, I am not gonna

2  mark this because these are Bates stamped, but I

3  will refer to the Bates number so we can keep track

4  of it with the deposition transcript. It is North

5  Penn's production Bates No. 1016.

6            These are your notes, Mr. Bowen?

7    A.    Yes.

8    Q.    I just want to kind of go through this

9  line by line and ask you some questions along the

10 way, okay?

11   A.    Sure.

12   Q.    It says, On the afternoon of Friday

13 April 10, 2015, I was at the ESC to conduct

14 interviews for teaching positions.

15            What is he ESC?

16   A.    Educational Service Center, that is our

17 district office.

18   Q.    Then it says at 1:31 p.m. I received a

19 text message from Kristen Vaszily, Gwynedd Square

20 guidance counselor asking you to call her for an

21 urgent reason.

22            This text message that you received,

23 was that on a personal cell phone or did you have a

24 District phone to use?

1          A.     Personal.

2          Q.     Now we are in 2021.  Do you still have

3    the cell phone that you were receiving text messages

4    on at that time?

5          A.     No.  No.

6          Q.     It says I called her.  She stated she

7    was contacted by a sixth grade teacher, Mrs. Rosanna

8    D'Elio (ph), to address a situation with a female

9    student identified, then it's blank.

10               Do you see that?

11         A.     Yes.

12         Q.     It says Ms. Vaszily went into the room

13   and met with the teacher.  Ms. D'Elio relayed what

14   the female student said to her.

15         Q.     Now, when you are reading, do you

16   recall having this conversation with Ms. Vaszily?

17         A.     No.  Vividly, no.

18         Q.     It says, Ms. Ruth Divver was present at

19   the time and stated there may have been a similar

20   incident involving the male student that occurred

21   earlier in the year.  I guess just to clarify, Ms.

22   Divver, is she one of the sixth grade teachers at

23   the time?

24         A.     Yes.

1    Q.    Ms. D'Elio, was she a different sixth

2  grade teacher at the time?

3    A.    Yes.  Just for your education and so we

4  keep things moving, Holly Andrew is the co-teacher.

5  She is a specialized teacher assigned to that grade

6  level.

7    Q.    So, is she assigned to the entire grade

8  or she is assigned to Ms. Divver's room?

9    A.    She was assigned to the entire grade to

10  work with the special education students in that

11  grade level.

12    Q.    ███████████████, was she one of the

13  special education students in the sixth grade?

14    A.    I do believe so, yes.

15    Q.    Do you know about how many special

16  education students there were in the sixth grade at

17  the time?

18    A.    No.

19    Q.    From your understanding, was it Ms.

20  Andrews, would she kind of like float from classroom

21  to classroom?  How did she, I guess, keep eyes or

22  assist special education students in the sixth

23  grade?

24    A.    We do what's called -- Typically we do

1    what's called clustering, where we put all the

2    special education students in the same classroom and

3    then we assign the teacher to follow that group

4    around. So, she would go from classroom to classroom

5    with them, because our sixth grade is co-taught. 1

6    teacher teaches math, 1 teaches LA, 1 teaches social

7    studies and science.

8         Q.    So, for Ms. Andrews and Ms. Divver, one

9    of them would teach social studies another one might

10   teach the LA?

11        A.    No. Ms. Divver was the social

12   studies-science teacher. Mrs. Andrew was the special

13   education teacher that would co-teach that class

14   with her.

15        Q.    Do you know, was ■■■■ also a special

16   education student?

17        A.    To my knowledge, no.

18        Q.    So, Ms. Ruth Divver stated that there

19   may have been a similar incident involving the male

20   student that occurred earlier in the year. Is this

21   something, do you know, that Ms. Vaszily was telling

22   you on the phone?

23        A.    Please reread that, because I lost

24   where you were.

1    Q.    Sure.

2    A.    There you go. Ms. Ruth Divver was

3    present at the time and stated there might have been

4    a similar incident involving -- I can't recall if

5    Ms. Vaszily told me that on the phone or in person.

6    Q.    Okay.  After the phone call you went,

7    and I know we are gonna get there, but you went to

8    the school to have an in-person meeting?

9    A.    Yes.

10    Q.    Then it says two lines down, Mrs.

11    Vaszily escorted the female student to her office

12    and spoke with her.  She reported that Wednesday,

13    April 1st 2015, during a movie in social studies

14    class a male student identified as ███████ ███████

15    placed his hand on her neck and lower back.  It

16    says, on Thursday, April 9, 2015, the male student

17    again touched a female on the knee and under her

18    shirt.

19         So, at this point are you present

20    during these interviews that Ms. Vaszily is doing?

21    A.    I can't recall if I was.  I am gonna --

22    I don't think I was, I can't recall though.

23    Q.    So, this is something that you are

24    compiling based on information that you were told

1    by, is it Ms. Vaszily?

2         A.    Yes.

3         Q.    This is obviously typed.  Is it on the

4    school computer that you are typing this on?

5         A.    I would say yes.

6         Q.    Do you recall whether you had made any

7    -- Did you have to send this to anybody before you

8    submitted it to where it was submitted to?

9         A.    No.

10        Q.    Do you recall whether any changes were

11   made to it once you had this up?

12        A.    No.  Not that I recall.

13        Q.    It says that Mrs. Vaszily returned the

14   student to their room and spoke to Ms. Divver and

15   Ms. Holly Andrew, also present, due to the

16   co-teaching classroom.  Mrs. Divver provided Ms.

17   Vaszily with an Office Referral Form from an earlier

18   incident.

19             Do you remember whether you were

20   present when Ms. Vaszily was talking to Ms. Divver

21   and Ms. Andrew?

22        A.    I was not present.

23        Q.    Do you know why you weren't present?

24        A.    I believe this all occurred while I was

 1    at the ESC conducting interviews.

 2         Q.    Before you could get back to the

 3    Gwynedd building?

 4         A.    Correct.

 5         Q.    Then it talks about how Ms. Andrew

 6    provided further information about the November 2014

 7    incident when she witnessed ██████████ and ████████

 8    ████████ sitting together.  At one point she saw

 9    ██████'s hand under ██████'s shirt.

10         Then it mentions that she took both

11    students out in the hallway and the incident did not

12    get reported to the parents or administration but an

13    Office Referral Form was completed and filed with

14    Ms. Divver.

15         Was it typical that the Office Referral

16    Forms would be held by the teacher versus the

17    special education person like Ms. Andrew was?

18         A.    Typically they are housed by the

19    classroom teacher because of the students moving.

20    We needed the homeroom teachers to hold forms

21    because if something happened in art, music and the

22    cafeteria we need a point person to hold all those

23    documents so that we would know when three incidents

24    occur so they became a major.

1    Q.    So, in the sixth grade students would

2    be would have, like, a homeroom and then a normal

3    class teacher, but then they would move to different

4    other teachers for certain subjects?

5    A.    They would have a homeroom and then

6    they would have all three sixth grade teachers for

7    subjects.  So, they went to every teacher,

8    typically.

9    Q.    Did the same group of students move

10   together to each of the teachers?

11   A.    We tried to have students mixed up as

12   much as possible, so I can't recall.  We tried to

13   have them mixed up as much as possible.  So, we

14   tried not to have them always together.

15   Q.    Okay.  So, kind of rotating different

16   students?  Like, you might have social studies

17   together but then in ELA you might be mixed with

18   different groups of people, not everybody in the

19   same class?

20   A.    Correct.

21   Q.    Then I guess you had asked Ms. Vaszily

22   to set up a meeting with the parents of the male

23   student for Monday morning.  After that meeting we

24   would further discuss a course of action.

1       A.      Can you scroll up where that is?

2       Q.      I am sorry.

3       A.      That is okay.  I don't see that written

4   there, that's all.  Okay.  I asked Ms. Vaszily to

5   set up a meeting with the parents for Monday.  Yes.

6   I believe this is -- The information I wrote there,

7   that is what Ms. Vaszily provided to me over the

8   phone when she -- when I called her after I received

9   the text message.

10          So, I said, you know, I won't be back.

11  Probably what I was thinking -- or what I am

12  thinking is, I wasn't back for the rest of the day

13  so I asked her to set up the meeting.

14      Q.      Why was your first course of action to

15  set up a meeting with ███████'s parents?

16      A.      Probably because what's been relayed

17  here is multiple incidences.

18      Q.      So, I guess because there is multiple

19  incidences, you wanted to discuss it with his

20  parents first?

21      A.      Absolutely.

22      Q.      Why is that?

23      A.      Because he is being accused of

24  something, so I wanted to make sure the parents were

 1   aware of the accusations, and what -- you know, that

 2   I would need to further investigate it.

 3        Q.    Then you said you also asked Ms.

 4   Vaszily to provide a written statement of the

 5   November incident?

 6        A.    Yes.

 7        Q.    Why did you have her do that?

 8        A.    Because, again, that was inappropriate

 9   behavior and it should have been documented and

10   brought to my attention immediately.

11        Q.    When you came in Monday Ms. Vaszily

12   gave you the Office Referral Form that had been

13   filled out and Ms. Andew's statement at the time?

14        A.    Correct.

15        Q.    Do you recall over the weekend whether

16   you had had any conversations with anybody, whether

17   it is teachers or parents, about what had happened?

18        A.    No, not that I recall.

19        Q.    At this point did you notify ████'s

20   parents about what had happened?

21        A.    No, I don't believe I contacted her

22   parents yet.

23        Q.    You wanted to talk to Mr. ██████

24   ██████'s parents first?

1      A.    Yes.

2      Q.    Did the district have any requirement

3  or anything upon finding out that there may have

4  been an inappropriate incident with a student that

5  you have to contact -- the time frame you have to

6  contact the students' parents?

7      A.    Are you asking me if there is a time

8  frame that I have to contact parents when I am made

9  aware of an incident?

10      Q.    Yes.

11      A.    No.  As soon as possible would be my

12  answer.

13      Q.    Is there a reason, after finding this

14  out, I assume on Friday or the end of the prior

15  week, that you didn't contact ████'s parents?

16      A.    I contacted them Monday morning, so

17  once I had -- I was able to speak with Ms. Vaszily

18  in person and I was able to gather as much

19  information, then we contacted her parents.

20      Q.    Okay.  Do you know whether you

21  contacted ████'s parents before or after the

22  meeting with ████ ████'s parents?

23      A.    I believe probably after ████'s

24  parents.

1    Q.    Is that something you wanted to find

2  out more information from ███    and his mom about

3  what happened before contacting ███?

4    A.    I can't recall why I did that back

5  then.  You know, I would think that a student's been

6  accused of a, you know, an act that I feel at this

7  point would be serious.  So, I would want to make

8  sure that the parents were involved -- parents were

9  aware of the accusation, and that I would be

10  conducting an investigation into it further.

11    Q.    Here it says, 8:05 we met Mrs. ███

12  and ███  ███    We discussed the incident and

13  ███ admitted that both did occur.

14        Do you see that sentence?

15    A.    Yes.

16    Q.    This is highlighted here.  Do you know

17  whose highlight that is?

18    A.    Nope.

19    Q.    Not something that you highlighted?

20    A.    No.

21    Q.    Can you tell me what you remember about

22  the meeting that you had with ███  and his mother?

23    A.    Gees. Other than ███'s mom being

24  very upset, no.

1        Q.    Did she explain why she was upset?

2        A.    I honestly can't recall.  I can just

3   remember her being upset.

4        Q.    When you say "upset", was she crying or

5   angry; what do you mean?

6        A.    Angry.

7        Q.    Angry at who, or at what?

8        A.    I don't know honestly.  I don't

9   remember if she was angry at us and -- I don't

10  remember.  I don't remember.  I just don't

11  remember.

12             I remember her being angry because I

13  can remember her standing up and being angry with

14  me.  So, I don't remember who she was angry at

15  though.

16       Q.    Do you remember, was she yelling during

17  the meeting?

18       A.    No.  Nope.  She was very calm until the

19  end, then she was very angry.

20       Q.    Do you know what -- what was the end of

21  the meeting?  Do you remember what you were

22  discussing at that point that --

23       A.    No.

24       Q.    Did you ask ▮▮▮▮▮ any questions during

 1    that meeting?

 2          A.    I would think I would, yes, because he

 3    --

 4          Q.    Do you --

 5          A.    -- was present for the meeting.

 6          Q.    Do you remember any --

 7          A.    He had said that --

 8          Q.    -- I apologize.

 9          A.    It's okay. And it says there that he

10    admitted both occurred.  So, he admitted that, you

11    know, he did touch her.

12          Q.    Okay.  Like, touch both of the girls in

13    the different incidents?

14          A.    I don't recall if he's admitted to --

15    that he touched ████████ on multiple occasions or that

16    he touched both girls.  I don't recall.

17          Q.    So, when you are saying that ████████

18    admitted that both did occur, you are not sure what

19    you are referring to?

20          A.    At this point, no.

21          Q.    Do you recall --

22                Was this meeting recorded in any way?

23          A.    No.

24          Q.    Do you recall, like, were you asking

1      ███████ specific questions or do you recall anything

2    about how the conversation went between you and

3      ███████ or you and his mom?

4          A.    No, I don't recall.

5          Q.    Was there anybody else in this meeting

6    other than you, ███████ and his mother?

7          A.    I -- I would think Ms. Vaszily.  I

8    don't recall if Mrs. Vaszily would be present, but

9    she could have been.  I don't recall though.

10         Q.    It says that you informed Ms. ███████

11   that you would need to investigate further and that

12   consequences would be determined after that.  And

13   then you said during the course of Monday you

14   contacted the parents of ███████, who was identified

15   as the girl from the November of 2014 incident.

16              And then it said, I called Dr. Santoro,

17   Director of elementary education to make her aware

18   of the situation, and that ███████'s parents informed

19   me they would be coming to school to further discuss

20   the incident.  I want to kind of break that down.

21              When you called Dr. Santoro, is that

22   after you had -- is this, kind of, your documenting

23   things in the order that you did things?  Like,

24   Friday --

```
 1        A.    Yes.  Yeah, it is chronological.  It is
 2  chronological.
 3        Q.    So, you call Dr. Santoro to make her
 4  aware of the situation.  Why were you doing that?
 5        A.    Because she is my immediate supervisor.
 6        Q.    Is this something -- I think before you
 7  had said that major incidents are the ones that you
 8  would report to the immediate supervisor; is that
 9  right?
10        A.    Correct.
11        Q.    What about this was a major incident?
12        A.    I think, uh, sexual in nature.
13        Q.    Are you talking about both ██████'s
14  incident and the other girl's incident?
15        A.    I am talking about it all.
16        Q.    Okay.
17        A.    Because as you can see, I would need to
18  investigate further.  It is the start of an
19  investigation, so I don't think I have all the
20  facts, and part of that is meeting with the parents.
21        Q.    At this point, since you are starting
22  the investigation, do you know whether this is
23  something that, like, kind of triggers Title IX at
24  this point?
```

1      A.    I don't know because, I think -- I have

2  to recall what ████ admitted to to say that it

3  could, yes.  I don't -- the highlighted area.  We

4  discussed the incident and ████ admitted that both

5  did occur.  I am trying to recall what he had said,

6  but if he admitted to it, yes, this could trigger a

7  Title IX.

8      Q.    Okay.

9      A.    Yep.

10     Q.    Sorry.  I didn't mean to cut you off.

11     A.    That's okay.  I was done.

12     Q.    Now, at this time did you know about

13  Cheryl McCue being the Title IX coordinator?

14     A.    I am gonna say no.  It was not -- We've

15  -- In the training that's occurred since then, it's

16  been -- the process has been made more clear to us.

17  I don't think it was as clear at that time.

18     Q.    So, as far as you were aware, you just

19  contacted your supervisor, which would have been Dr.

20  Santoro?

21     A.    Correct.

22     Q.    With you contacting Dr. Santoro, what

23  was your understanding of how she would get involved

24  at this point?

```
 1       A.    She might not get involved.  You know,
 2  again, it is -- it is -- we want to make our -- We
 3  want to make Dr. Santoro aware of incidences that
 4  could become, you know, serious in nature before
 5  they become serious in nature.
 6       Q.    What do you mean by that; "before they
 7  become serious in nature"?
 8       A.    Because I am doing an investigation so
 9  I want her to know that I am starting an
10  investigation and that this has potential to become
11  a very serious matter.
12       Q.    When you say, "a very serious matter",
13  what are you referring to?
14       A.    That we have a student that's touching
15  students.
16       Q.    Okay.  If that were to continue
17  happening that would be --
18       A.    No.  If my investigation determined if
19  what has been alleged has occurred or that's it's
20  occurred on a grander scale that I am just finding
21  out about, then I want her to be aware of it.
22       Q.    Then it says, when you informed
23  ████████'s parents -- or -- when you talked to
24  ████████'s parents they had informed you that they
```

1  would be coming to the school to further discuss the

2  incident.

3          Do you recall that conversation you had

4  with ████ 's parents?

5          A.    I -- Not really, no.

6          Q.    Do you recall whether you talked to

7  both the parents or whether it was just the mom or

8  the dad?

9          A.    It was definitely both parents.  I

10  recall both parents being in the room.

11          Q.    You recall them both being in the room

12  for the meeting?

13          A.    Yes.

14          Q.    What about the phone call?  Do you

15  recall whether you talked to both or just one?

16          A.    Well,  I think I talked to mom on that

17  case.  I tended to talk to mom more than the father,

18  but I remember both parents coming in.

19          Q.    Then they came in, it says, at 12:30

20  and you met with -- you and Ms. Vaszily met with

21  them for the next hour until 1:30, right?

22          A.    Yes.

23          Q.    Then you had reported back to Dr.

24  Santoro to inform her about the meeting, right?

1       A.    Yes.

2       Q.    When you contacted Dr. Santoro, was

3    that by phone?

4       A.    Yes.

5       Q.    Do you recall whether during the course

6    of this when you are talking to, whether it is Ms.

7    Vaszily or Dr. Santoro or anybody else involved in

8    this investigation, whether you were exchanging

9    emails with anybody?

10      A.    I don't think so.  I think most of this

11   was done by the phone.

12      Q.    My next question was going to be, I

13   know you said it was done by phone, but did you send

14   text messages to anybody, if you know?

15      A.    No, I am not a texter.  Still not a

16   texter.  I am not a text person.

17      Q.    Okay. And then it says --

18      A.    Sorry.  These thumbs are too big to

19   text properly.

20      Q.    It says we then contacted the parents

21   of blank to inform them of our findings.  At this

22   point, did you have, like, findings or conclusions

23   from talking to ████'s parents as well as ████

24   and his mother?

1      A.    I would say that I -- Without having

2  the name there I don't know.  I think just,

3  basically, what I found out so far from meeting with

4  the parents.

5      Q.    Then Dr. Santoro called you to say that

6  she had then met with the ██████████ as well?

7      A.    Right.

8      Q.    Do you know why Dr. Santoro had also

9  met with the ██████████, looks like, right after

10  you and Ms. Vaszily just met with them?

11      A.    I think they -- No, I don't recall.  I

12  would be speculating if I gave you an answer.  I

13  don't recall.

14      Q.    I don't want you to guess so I

15  appreciate that.

16      A.    Yep.

17      Q.    Then it says about 3:00 p.m.  I met

18  with 6th grade teachers to develop a new schedule

19  for ██████  So, this is, like, an action now that

20  you are taking in response to learning this

21  information.

22            Did you talk to anybody else in making

23  this decision to make a new schedule for ██████

24      A.    No, that was a conversation that Dr.

1    Santoro and I had and made that decision.

2         Q.    Can you recall anything about that

3    conversation between you and Dr. Santoro that

4    resulted in that step?

5         A.    Just that we wanted to separate the

6    students, and I recall that we wanted to make sure

7    that the academic level that ██████ was going into

8    was appropriate.  Because I remember the one math

9    class being a little high for him.

10        Q.    So, in addition to different students

11   having, like, math or whatever classes, they were

12   different levels of, like, how difficult the class

13   might be, or?

14        A.    Math was.  There is one class that was

15   accelerated out of the group, and I believe we had

16   to move him in to that math class in order to

17   separate the students --

18        Q.    Okay. And why --

19        A.    -- (inaudible) about doing that with

20   him.

21        Q.    Okay.  And why were you moving ██████

22   as opposed to the other girls, if you know?

23        A.    I don't recall.

24        Q.    Do you know whether there is any

1  requirement, whether it is the District or some,

2  like, Title IX or something like that that -- you

3  are shaking your head no?

4      A.    I am not answering.  You told me not to

5  answer.  Go ahead.

6      Q.    Do you know whether there is any kind

7  of requirement, whether it is the District or Title

8  IX or any other type of requirement that the

9  perpetrator, or the person who committed the act is

10  the 1 that gets impacted?  Or the schedule gets

11  impacted versus the victim?

12      A.    No.  Because ███████ was special ED, if

13  we moved her she would be moved down out of the

14  special ED group, that she would no longer receive

15  the academic support.  So, ██████ was the one that

16  had to be moved.

17      Q.    Do you know whether -- I am not asking

18  the identity of the other girl, but do you know

19  whether she was also special ED?

20      A.    I don't remember the identity or if she

21  was special ED.  No.

22      Q.    Do you know whether generally there is

23  any requirement?  I know you said this particular

24  circumstance the reason that ██████ was moved was

1    because ████ couldn't be moved because she was

2    special ED.

3              Do you know whether there's any

4    requirement or that the person committing the act is

5    the one to get moved versus the victim?

6         A.    Yeah.  Typically you don't -- In any

7    case, you know, bullying or whatever, you don't

8    punish the victim by making them do something.

9    Unless they want to.  You know, until they

10   voluntarily -- you know, they are the ones to say we

11   want out, something like that.

12        Q.    Do you know where that comes from?

13        A.    I mean, plenty of training that I have

14   had with bullying and everything else.  That is a

15   common message, that you don't punish the victim.

16        Q.    From the District?

17        A.    I would say that is probably part of

18   their training, but, you know, in any training I

19   have attended by the District and outside, it's kind

20   of common knowledge you don't punish the victim.

21        Q.    And then it says you asked Ms. Divver

22   to provide a written statement about the November of

23   2014 incident.  And why is that?

24        A.    Ms. Divver and Ms. Andrews were both

1    present at that -- for the November 14th incident.

2            Q.    When you say "both present", meaning

3    they both -- you think they both viewed what was

4    happening, or?

5            A.    I don't know if they both viewed what

6    was happening, but I know they were both in the room

7    and they both talked about it, so I wanted both

8    their statements.

9            Q.    Then it says at about 3:25 p.m. you

10   contacted Ms. ███████ to inform her that her son would

11   receive an out-of-school suspension.

12                 This was by phone?

13           A.    Yes.

14           Q.    Do you recall this conversation at all?

15           A.    No.

16           Q.    Then it says, I guess, 25 minutes later

17   Mr. ███████ contacted you?

18           A.    Yes.

19           Q.    Was that by phone as well?

20           A.    Yes.

21           Q.    It says that he and his wife did not

22   feel the offense warranted this level of discipline

23   and requested to speak to Dr. Santoro?

24           A.    Yes.

1    Q.    Do you recall this conversation with

2    ███████ ███████'s father?

3    A.    Yes, I recall it.  I mean, I recall

4  having it, the content I don't, other than he was

5  pretty -- he was pretty -- he has a very deep voice

6  and he was very, very calm about it, you know, and

7  just said they disagreed with it and, you know,

8  wanted to speak to her about the -- because I wasn't

9  going to overturn my decision.

10    Q.    When he called he was trying to ask you

11  to do something different?

12    A.    He was asking that, you know, he felt,

13  again, as it said, what -- They felt their son

14  didn't warrant this kind of -- this level of

15  discipline and wanted me to reconsider.  Which I

16  said, you know, I am not willing to reconsider and

17  that, you know, if they needed to they could talk to

18  Dr. Santoro about it, and that is what they did.

19    Q.    Did they -- from what -- you said they

20  felt that their son --

21          Did they feel he did something

22  different than what was your understanding, if you

23  know?

24    A.    I think they felt it was more

1  consensual with the girls than what -- you know,

2  than the girls felt it was, and you know, that

3  probably at the time I felt it was.

4      Q.   At the time you said the way that you

5  felt it was.  What did you feel at the time?

6      A.   I think -- I think it was -- I -- I

7  can't give you -- I can't give you a lot of detail

8  about that, other than I felt what he did was wrong

9  or else I wouldn't have suspended him.

10     Q.   When you said that -- You also said

11 that from what the girls said, do you recall

12 something that ███ had -- I'm sorry, that ███

13 had said to you regarding whether it was consensual

14 or she wanted it to happen or anything like that?

15          Do you remember anything?

16     A.   No.  Not necessarily, no.

17     Q.   Okay.  But just your general sense of

18 what you got from them was that it was unwanted?

19     A.   I think -- yes.  I think that whether

20 the first incident was consensual or not, I don't

21 know, but I think that he should not have touched

22 students and he did.  And that is why it warranted

23 that level of discipline.

24     Q.   Do you know whether you or Ms. Vaszily

1  had talked to ███████ about how she felt about the

2  first incident?

3       A.    I imagine we did.  I don't recall what

4  the conversation was.

5       Q.    Okay.  Then it says after you had

6  talked to Dr. ███████ Dr. Santoro called you about

7  5:15 p.m. saying she also spoke with ███████'s

8  parents, or the ███████, and informed you that there

9  would be a meeting at 8:30 on Tuesday.  So, the

10 following day to further discuss the consequences.

11            Do you remember that?

12      A.    Yes.

13      Q.    Do you recall anything about the

14 conversation with Dr. Santoro other than what is

15 mentioned here?

16      A.    No, I don't recall.

17      Q.    So, then, first thing Tuesday morning

18 at 8:00 a.m. you had a meeting with Sergeant Ted

19 Ciaola of the Upper Gweynedd Police Department, as

20 well as -- was it ███████████ as well or just

21 Officer --

22      A.    No. Just Officer Ciaola.

23      Q.    Tell me what you remember about the

24 meeting with the detective.

1    A.    I remember that he came in, said that

2  the parents had made a report, and he was here to

3  discuss what information we had.

4    Q.    Did you discuss that with him?

5    A.    Yes.

6    Q.    Do you recall providing Detective

7  Ciaola with any documentation?

8    A.    I do not believe I provided

9  documentation.

10   Q.    Do you remember what you told him in

11 that meeting?

12   A.    No.  I would have only relayed factual

13 information.

14   Q.    When you say "factual information",

15 meaning what?

16   A.    Any facts from the case I might have.

17   Q.    Like, just, this happened and then this

18 happened or I was told this happened?

19   A.    Yep, correct.

20   Q.    Versus, like, your impressions or

21 something?

22   A.    Correct.  Yep.

23   Q.    Do you recall what, if anything, ended

24 up happening with Dr. Ciaola's (sic) investigation?

1      A.    I don't recall off the top of my head.

2  Yeah, I don't recall.  I know -- No, I don't

3  recall.  I am trying to help.

4      Q.    Do you recall ever having any further

5  conversation or meetings with with Detective Ciaola?

6      A.    About ███████ no, I don't recall.

7      Q.    Then at 8:30, about a half an hour

8  later, Dr. Santoro met with you and Mrs. ███████

9      A.    Yes.

10      Q.    Then it says she also requested Leo

11  McNeil, a social worker from Turning Points be

12  allowed to listen in via her speakerphone?

13      A.    Yes.

14      Q.    Do you know what involvement Turning

15  Points had in this situation?

16      A.    Something makes me think that it was a

17  family member, but I can't recall for sure.

18      Q.    Like, Leo McNeil you thought was a

19  family member of ███████  ███████

20      A.    Yes.  Something makes me think that's

21  what the case was. The parent was a social worker --

22  or the individual was a social worker and was a

23  relative of the ██████.

24      Q.    So, as far as you understood, it's not

1    that ████ was receiving, like, services from

2    Turning Points or something, it was just somebody

3    that the mom wanted to listen in?

4         A.    Right.

5         Q.    Then it says you had this situation

6    discussed, the decision making process for the

7    suspension, and then ultimately determined that

8    ████ would have out of school suspension for

9    Tuesday, April 14th, which was that present day, and

10   an in-school suspension for the following day,

11   Wednesday April 15th, due to an obscene gesture.

12         Before having this meeting with Mrs.

13   ████ and Leo McNeil from Turning Points on the

14   phone, do you recall what the punishment was for

15   ████ I know you said suspension, but do you

16   remember what the punishment was gonna be?

17        A.    No, I don't recall.

18        Q.    Do you recall whether the suspension he

19   got -- or the out-of-school suspension that day and

20   the in-school suspension for the following day,

21   whether that was a reduction or, like, a lesser

22   punishment than what it had been the day prior?

23        A.    No.  Typically if I were to flip-flop

24   back and forth like that, it would be due to child

1   care issue, that maybe both parents had to work and

2   no one would be home, so the child would then be

3   home alone.  And I would rather him in school where

4   we can supervise him as opposed to being being home

5   alone.

6          Being home alone for some kids is not a

7   punishment.  So, whenever I flip on something like

8   this, it was probably because there was no one home

9   to supervise him, not that I would lessen the

10  consequences.

11         Q.   Just so I understand.  The prior

12  discipline would have been two days out of school

13  suspension?

14         A.   Most likely, yes.

15         Q.   Then you switched on the second day

16  being in-school so that he wouldn't have just been

17  home, potentially?

18         A.   Correct.  That is something I have done

19  in the past.  You know, where I might go for an

20  out-of-school and the parent says, well, no one will

21  be home so they're just gonna sit there.  That's not

22  sending a message we want, so I will change to

23  in-school.  So, for me to do something like that it

24  would be because of child care.

1     Q.    That's your pattern and practice?

2     A.    Yes.

3     Q.    Now, it says that this is because of an

4  obscene gesture.  What does that mean?

5     A.    I don't recall.

6     Q.    Is there something in, like, the

7  Student Code of Conduct that, like, these things are

8  obscene gestures?

9     A.    Not that I recall.

10    Q.    Is the touching a female student --

11 Well, let me ask this.

12          This suspension, was it from ████'s

13 incident or the other girl's incident, or just a

14 combination of both?

15    A.    I can't -- I don't remember.

16    Q.    Because I think in both instances he

17 was touching a female student with his hand.

18          Is that an obscene gesture?

19    A.    Um, I -- I don't -- I don't know why it

20 was classified -- I don't know why I wrote obscene

21 gesture.  I don't know if that was what the Code of

22 Conduct was at the time or what.  I don't recall.

23    Q.    So, when I think of an obscene gesture

24 I think of somebody giving somebody the middle

1    finger or something like that.  So, I mean, that's

2    how I would understand.  When I hear obscene gesture

3    that is what I think of.

4             Is that something different, to your

5    understanding, of the obscene gesture, as far as the

6    District is concerned?

7        A.    I don't recall what the obscene gesture

8    was at the time.  I understand your point of view,

9    but I don't recall why I wrote obscene gesture

10   there.

11       Q.    Do you believe that under -- with what

12   happened at the time, that that is an obscene

13   gesture, what he did, or is it something different?

14       A.    I don't recall.  I mean, I don't know.

15       Q.    Was there something at the time that

16   was, whether it's a Student Code of Conduct or just

17   something that you could punish the student for,

18   for, like, sexual harassment or inappropriate

19   touching, was that an option?

20       A.    I don't know at that -- that time.  I

21   don't recall what the Code of Conduct would have

22   said, so, I don't know.  Maybe that is why I used it

23   that level, to raise the level.  I don't know.

24       Q.    So, you are saying obscene gesture you

1  think was a more significant level than --

2      A.    What I am saying is I don't recall why.

3      Q.    Okay.  Would you agree with me that an

4  obscene gesture isn't really, I guess, in actuality

5  what happened to these two girls?

6      A.    I don't recall why I wrote that so I

7  can't say for certain why.

8      Q.    It says, in addition ███████ would have

9  his schedule altered so he would not be in class

10  with either girl and at 10:00 a.m. Mr. ███████

11  contacted me to discuss the outcome of the meeting

12  with his wife and requested ███████ be moved away

13  from the girls.

14          Now, this is already something that was

15  in place at this point, that ███████ was gonna be

16  moved away, right?

17      A.    Yes.

18      Q.    Or is this something different that the

19  father is asking to move additional?

20      A.    No, he is asking for the same thing

21  that is happening.  I think he is going on the

22  record saying he wanted him moved.

23      Q.    So, he is agreeing with your

24  recommendation?

1          A.     Correct.

2          Q.     Now, at this point you are talking with

3    Dr. Santoro to set up the meetings with Ms. Andrew

4    and Ms. Divver; is that right?

5          A.     Correct.

6          Q.     Then it says at about 1:30 Ms. Vaszily

7    and I also made a referral to the Child Line for the

8    April incident.

9                 Do you know why at this point you and

10   Ms. Vaszily were reporting the April incident but

11   not ██████'s November incident?

12         A.     Nope, I don't recall.

13         Q.     At the time, what ██████'s incident,

14   involving ██████ consisted of, do you believe that

15   you should have referred it to Child Line?

16         A.     Rephrase that question.

17         Q.     Knowing what you knew at the time about

18   what ██████'s incident consisted of, do you believe

19   that you had -- that you should have been referring

20   it to Child Line?

21         A.     I think at that time we had the

22   information and it is not our -- we are not the

23   ultimate ones to decide.  We're the mandated

24   reporters so we felt we should at least report it.

1    Q.    But I think at this point it's just for
2    the April incident.  Maybe I am misunderstanding
3    your note.  When I read the April incident I am
4    thinking the 1 with the other girl.
5    A.    I can't recall exactly.  It could have
6    been just the other girl.  I don't recall.
7    Q.    Based on the information you had about
8    ████'s incident, would that have been something
9    reportable to Child Line?
10   A.    Again, I can't recall, you know.
11   Q.    You don't remember what you knew at the
12   time in terms of --
13   A.    Right.  I don't remember the details
14   about what was relayed to us from ████ as well as
15   the other girls, but I think Ms. Vaszily and I
16   thought at the time, based upon the information we
17   have, we should refer it to Child Line for further
18   investigation.
19   Q.    Then it says at 3:30 you contacted both
20   sets of parents to request permission to notify
21   Mission Kids, and both parents declined our
22   assistance.
23         Do you recall the conversation that you
24   had with ████'s parents about this?

1    A.    No, I don't recall the conversation.

2    Q.    Do you recall that you had informed

3 ███████'s parents about reporting it to Mission Kids

4 and that they had said no?

5    A.    What I can recall is that my

6 conversation with Officer Ciaola, that is where we

7 had the initial discussion about involving Mission

8 Kids.  And at one point obviously there we, you

9 know, said, hey, we would like to get Mission Kids

10 involved, to have conversations about what, you

11 know, what had transpired, and it says, both parents

12 declined us notifying Mission Kids.

13    Q.    Do you know whether you needed the

14 parents' permission to notify Mission Kids about a

15 report?

16    A.    I don't recall if we need the parents'

17 permission, but I think in an effort to work with

18 parents, we often reach out to provide resources

19 and, you know, instead of -- with the exception of

20 Children and Youth, we often will call parents

21 before we just refer services to them.  So, I can't

22 recall if we discussed just calling Mission Kids,

23 but most likely we tried to develop that

24 relationship with the parents.

1     Q.    To have the parents be the one, because

2 you said you kind of referred to it as a resource, I

3 think?

4     A.    No.  It says we called the parents to

5 request permission to notify Mission Kids about the

6 incident to see if they wanted to be involved, and

7 both parents said no.

8     Q.    So, at that point when a parent says

9 no, are you not, as far as your understanding, are

10 you not permitted to make a report to Mission Kids

11 on your own?

12     A.    I don't know if we were allowed to or

13 not at that point because we already made the Child

14 Line referral.

15     Q.    At that point you are contacted by Dr.

16 Santoro to discuss details about the Thursday

17 meeting and discuss the incident again.  And then

18 you sent Outlook invitations to the teacher and it

19 says, Ms. Cheryl McCue, North Penn Director of Human

20 Resources, Dr. Santoro, and Alan Malachowski,

21 President of the Teacher's Union.

22     A.    Yes.

23     Q.    Mr. Malachowski, is he somebody that

24 would normally sit in on these meetings?

```
 1        A.    He would sit in on it, yes, with
 2   teachers.  Yes.  He's the President of the Teacher's
 3   Union.
 4        Q.    He would sit in with teachers, meaning
 5   anytime a teacher was in a meeting or anytime a
 6   teacher might be disciplined, he would get invited
 7   to a meeting?
 8        A.    Might be discipline.
 9        Q.    At this point going in to it, what were
10   you thinking in terms of discipline?  What teacher
11   or for what?
12        A.    All I can recall is that I recall the
13   teachers should have notified me of the original
14   incident that occurred back in November, and their
15   failure to do so was the topic of our meeting that
16   was coming up.
17        Q.    Then on Wednesday the following day,
18   this would have been ███████'s day of in-school
19   suspension --
20        A.    Yes.
21        Q.    -- ███████, you wrote, was in Ms.
22   Vaszily's office visibly upset?
23        A.    Mm-hmm.
24        Q.    Do you remember going in and seeing
```

1       ████████   in Ms. Vaszily's office on this day?

2           A.      Yes, I do recall, and she was upset.

3           Q.      Can you describe for me what you saw?

4    What do you mean by "she was upset"?

5           A.      She was crying.

6           Q.      Was it just her in the office or were

7    her parents there, too?

8           A.      No, just Ms. Vaszily and ████████.

9           Q.      Did you talk to ████████ at all, can you

10   remember talking to her about, you know, why she was

11   crying or what was -- I mean, other than just

12   generally being about the incident, do you remember

13   anything specific about why she was crying?

14          A.      No, I don't remember the conversation.

15          Q.      It says that Officer Ciaola contacted

16   you again at 9:30 to tell you that there were

17   potentially other girls involved, and requested that

18   you interview the girls.

19              Do you remember that conversation?

20          A.      No.

21          Q.      Do you remember interviewing other

22   students about the other incident that may have

23   happened, other than the two that we already talked

24   about with ████████

1        A.    I don't recall it, no.

2        Q.    Now, earlier in the deposition you were

3  talking about ▇▇▇▇'s incident and that was the

4  only time that that had happened in the years at the

5  school.

6             Now, would you agree with me that there

7  is now additional incidents that are happening with

8  ▇▇▇▇▇

9        A.    I -- When I mentioned that earlier I

10  was making a generalized statement that it is not

11  ▇▇▇▇, it is the issue with ▇▇▇▇ and all of his

12   -- all of his involvement.

13        Q.    So, you are saying the only issue that

14  you dealt with in your time at North Penn was these

15  series of incidents all involving ▇▇▇▇

16        A.    Everything listed in this document

17  where I am referring to, because if you look at the

18  sequence of dates, one after -- there are a couple

19  of days in a row.  So, I am lumping all of that into

20  that incident.  Yes.

21        Q.    Okay.  I understand.  So, it says Ms.

22  Vaszily met with both of the girls and the third 6th

23  grade girl identified, and it's blank here.  So

24  then, this is showing there was a third 6th grade

1    girl other than ██████ and then the prior we were

2    just speaking of.

3              Do you recall anything about that now

4    that we have read through that sentence?

5         A.    No.

6         Q.    She reported to Ms. Vaszily that ██████

7    touched her in the front and back of the bottom

8    portion of her body.  So, at this point, do you know

9    whether this is something that is, as you described

10   before, like, a minor incident or a major incident?

11        A.    I mean, you are looking at all of this

12   as major.

13        Q.    All of these incidents that we were

14   just talking about?

15        A.    Well, I think because of the -- Yes.

16   Yes.

17        Q.    Then it says at 3:30 we made calls to

18   Child Line for both ██████ and blank.  So, this kind

19   of leads me to believe we talked about the first

20   Child Line call that you made for the April

21   incident.  Then now at 3:30 you are making a call to

22   Child Line for both ██████ and blank.

23              So, would you agree with me by reading

24   this that it appears in the first call you didn't --

1    the call wasn't about ███████s incident, it was

2    about the other girl; is that right?

3         A.    I -- I don't recall.

4         Q.    Okay.

5         A.    I don't recall.  I mean, why would I

6    call -- I don't know.  I don't recall.

7         Q.    Was there anything that you learned at

8    this point that was different, about what you had

9    previously learned about ███████ that made you call

10   the Child Line regarding ███████ at this point?

11        A.    The only thing I can think of is

12   whatever Officer Ciaola called me about.

13        Q.    I'm just gonna go to the next page,

14   which is 1019.  It says notes from Betty Santoro.

15              That's Elizabeth Santoro, right?

16        A.    Correct.

17        Q.    Your supervisor?

18        A.    Correct.

19        Q.    So, I just want to go through this note

20   as well to see if it refreshes any of the things

21   that you remembered about the incident or things

22   that we didn't already talk about.

23              It's talking about at around noon you,

24   Bill Bowen, had informed her of an incident of

1    inappropriate touching of a sixth grade boy, ██████

2    with a sixth grade girl, and then blank, which is

3    the second incident, I assume, we are talking about,

4    since the third 1 didn't come up at this point yet.

5              Is that your understanding?

6         A.    Yes.

7         Q.    And then that was shared with the

8    guidance counselor that Friday and then it says the

9    incident occurred before spring break, but the

10   student reported it to KV.  I assume that is Kristin

11   Vaszily.  Do you know?

12        A.    Yes, it is.

13        Q.    On 4/10, is spring break, is that the

14   first week of April, typically?

15        A.    Somewhere around there.  Whatever

16   Easter would have been around that time of the year.

17        Q.    Then the next part is that you had

18   called the parent on Monday morning to inform them

19   of the incident that was shared by that female

20   student and the parent was informed that the

21   incident would be addressed and the necessary steps

22   would be taken for disciplinary action with the male

23   student.

24              Do you recall at all what your

1    conversation was with that parent, based on reading

2    this?

3         A.    No.

4         Q.    It says the parent informed you that

5    they would not be pursuing police action and were

6    confident the school would handle this matter.

7              Do you recall the conversation you were

8    having with the parent about what is written here?

9         A.    No.

10        Q.    Did you have a pattern or practice at

11   the time when you are having a phone call with a

12   parent of a student involving incidents like this,

13   what you would talk to them about in terms of the

14   case?

15        A.    Can you rephrase the question?  I

16   didn't quite follow it.

17        Q.    I assume you don't remember

18   specifically what you told this parent about talking

19   to the police or making a report to the police; is

20   that right?

21        A.    Yeah, I don't recall the conversation.

22   Yes, I don't recall.

23        Q.    So, did you have a pattern and practice

24   at that point in when you are informing students,

1    whether it's ███████'s parents or this particular

2    student's parents, would you talk to them all about

3    whether to make a report to the police or whether

4    the school was going to do so?

5         A.    Sometimes I would.  Depending on the

6    age, issue --

7         Q.    And what -- I apologize.

8              THE COURT REPORTER:  I'm sorry.

9    Depending on what?

10             THE WITNESS:  Sometimes I would talk to

11             parents about contacting police.  It would

12             depend on the incident.

13   BY MS. LAUGHLIN:

14        Q.    In incidents like these that we are

15   talking about, and these, you know, ████████ and this

16   other girl, did you have in your pattern or practice

17   something that you would have said to them about

18   contacting the police?

19             MS. JORDAN:  Note my objection to the

20             form of the question.  You can answer.

21             THE WITNESS:  Since this is the only

22             incident, I don't have a pattern or practice,

23             so I can't answer that, you know.

24   BY MS. LAUGHLIN:

1      Q.    Right here I want to direct you to this

2  line.  This is kind of talking about your

3  conversations with ████ 's parents and ████ 's

4  incident.  It says he, meaning you, Mr. Bowen,

5  stressed that this personnel matter would be

6  handled.

7           Do you recall whether there was any

8  kind of, like, push back or inquiry in to, like, how

9  you were gonna handle the situation, from the

10 parents?

11     A.    No, there was no push back.  I think

12 they were -- I remember Colin (ph) being upset that

13 it was not reported back in November, and that we

14 told them that they we would handle it as a

15 personnel matter.

16     Q.    Okay.  Did you explain for them what

17 that meant, handling it like a personnel matter?

18     A.    No.  That is pretty much what they were

19 told.

20     Q.    The next thing it says, supports and

21 counseling would be put in place for both female

22 students.

23           Do you recall what supports or

24 counseling, if any, were put in place for ████ ?

 1        A.     What would have been in place is that

 2    they would have had access to the guidance counselor

 3    to talk about it at any point should she need it.

 4        Q.     Do you know whether that was something

 5    that was just discussed with the parents or if

 6    ████     was informed of that?

 7        A.     I don't recall.

 8        Q.     It says at that time the parents did

 9    not want the school to discuss this matter with

10    their daughter, and the ████████ were leaving to

11    file a report with Gwynedd Police Department.

12            Do you recall anything about the

13    conversation that says that the ████████ did not

14    want the school to discuss this matter with their

15    daughter?

16        A.     No, I do not.

17        Q.     Now, it says the next thing from Dr.

18    Santoro's summary is that you met with Mr. and Mrs.

19    ████ to discuss both incidents of inappropriate

20    touching with their son and two fellow female 6th

21    grade students.  It says ████ admitted to the most

22    recent one in April, put his hands up blank, the

23    second's girl shirt.

24            Then it says Mr. Bowen did not address

1  the November incident with ▇ at this point

2  since he was still waiting for the teacher's

3  statement.  Mr. Bowen indicates to the ▇ that

4  he would be moving ▇'s section, with other

5  discipline would occur after gathering more

6  information and he would call the ▇ back at the

7  end of the day.

8          Is that your recollection, that when

9  you talked to ▇ and his mother in that initial

10  meeting that you only talked to them about the

11  second incident and didn't mention ▇'s

12  incident?

13      A.   I don't recall.

14      Q.   We had gone over your summary just a

15  moment ago.

16      A.   Mm-hmm.

17      Q.   Based on your summary, is it your

18  understanding that you would have talked to him

19  about both incidents?

20      A.   Honestly, I don't recall.  I don't know

21  if I would have talked to them both (Sic).

22      Q.   Okay.  It says HR was briefed on the

23  incident, as well as the Superintendent and

24  Assistant Superintendent.  HR, that would have been

1    Cheryl McCue?

2            A.    Yes.

3            Q.    And then who is the Superintendent and

4    Assistant Superintendent who were briefed on this

5    issue, if you know?

6            A.    The Superintendent was Dr. Curt

7    Dietrich and Assistant Superintendent was Diane

8    Holben.

9            Q.    Do you remember whether you were the

10   one informing Dr. Dietrich or whether it was Dr.

11   Santoro?

12           A.    I -- I don't know.  I would assume it

13   was Dr. Santoro.

14           Q.    Okay.  Then it says Mr. and Mrs.

15   ▇▇▇▇▇▇▇▇ came to the ESC, that was the school

16   building you mentioned before, to meet with the

17   Superintendent at, approximately, 2:30.

18                 So, they were meeting with Curt

19   Dietrich; that's your understanding?

20           A.    That is what it says, yes.

21           Q.    Did you have any conversation that you

22   can recall with Dr. Dietrich or Dr. Santoro about

23   these two independent conversations that Mr. and

24   Mrs. ▇▇▇▇▇▇ had with either Dr. Dietrich or Dr.

 1   Santoro?

 2        A.    I do not recall.

 3        Q.    Then it summarizes, the parents express

 4   the following concerns:  One, that is ████████ was the

 5   victim of child abuse that occurred when she was

 6   five years old.  It says the school counselor and

 7   Ms. Andrews were aware of the child abuse and had

 8   worked with the parents on support throughout the

 9   years.

10             Are you familiar with any of the

11   supports that ███████ received from Ms. Vaszily or

12   Ms. Andrew throughout the years --

13        A.    No.

14        Q.    -- based on this?

15        A.    No.  Sorry.

16        Q.    That is okay.  At the bottom of No. 2

17   it talks about Dr. Santoro saying that the

18   ████████████████ are concerned with the moral and

19   ethical attitude of these teachers to disregard

20   addressing this issue.  Meaning the November

21   incident and not reporting it.

22             Do you recall having any conversations

23   with Dr. Santoro about raising, you know, the bigger

24   issue of the moral and ethical attitudes of these

1  teachers with ████'s incident?

2      A.    We had discussions about them not

3  reporting it, yes.

4      Q.    Can you recall for me the discussions

5  that you had?

6      A.    That they failed in their

7  responsibility and that we were going to make sure

8  that on their evaluations we were gonna mark down

9  their performance.

10     Q.    When you say "they" are you talking

11  about Ms. Divver and Ms. Andrew?

12     A.    Yes.

13     Q.    So, here it talks about, this is later

14  on that afternoon.  Dr. Santoro is saying she spoke

15  with you again to share/ fill you in on her

16  conversation with the ████████.  Then you

17  discussed the level of discipline for ██████ based

18  on the information that you had at the time.

19           And then it says, based on the fact

20  that ██████ admitted to putting his hand up blank's

21  shirt, a three-day out-of-school suspension was

22  given, and that you had indicated to Dr. Santoro

23  that you would call the ██████ to let them know

24  about the discipline.

 1              So, at this point does that refresh

 2    your memory at all?  I know we had talked about him

 3    only have a having a two-day suspension.

 4              Do you remember about it being a

 5    three-day suspension prior?

 6         A.    No, I don't recall that.

 7         Q.    Are you surprised?  I mean, you kind of

 8    -- the way -- by the inflection in your voice, are

 9    you surprised by that?

10         A.    No, I just don't recall it.  I did not

11    see -- I have not seen this document so this is the

12    first time I am seeing it as well.  I don't recall

13    ever having a conversation that ▮▮▮▮ had a

14    three-day out-of-school suspension, so.

15         Q.    Then it says around 4:15 Mrs. ▮▮▮▮

16    called and left me a message that she wanted to

17    speak to me about the three-day suspension and then

18    Dr. Santoro talked to her, I guess, at 5:00.

19              And then Dr. Santoro said she was

20    explaining to ▮▮▮▮'s mom that this was a

21    level-three discipline matter and that the

22    discipline warranted out of school.

23              When it says level-three discipline

24    matter, do you know what that means?

       1          A.     That is in our Student Code of Conduct.

       2          Q.     Did you agree at this time that it was

       3   a level-three discipline matter?

       4          A.     I would have to look back at what the

       5   Code of Conduct says to verify that.

       6          Q.     Then it says that she felt, meaning Ms.

       7   ▉▉▉▉ felt she was misinformed that morning in the

       8   principal's office and was under the impression that

       9   no other discipline would occur.  Then she asked if

      10   she could meet with you and Ms. -- sorry Dr. --

      11          A.     Santoro.

      12          Q.     Thank you.  -- Dr. Santoro the

      13   following morning to discuss the matter again for

      14   clarity?

      15          A.     Right.

      16          Q.     Do you recall there being a

      17   miscommunication between ▉▉▉▉'s parent that is

      18   referred here by Dr. Santoro?

      19          A.     Nope, I don't recall that.

      20          Q.     Then the following Monday she recalls

      21   about you and Dr. Santoro meeting with Mrs. ▉▉▉▉

      22   about an hour reviewing the conversation that you

      23   had with Mrs. ▉▉▉▉ the previous day.

      24                 It says that Mrs. ▉▉▉▉ felt her son's

1   behavior deserved consequences, but that this type

2   of behavior is normal for 12-year-old boys.

3          Do you recall this part of the

4   conversation?

5       A.    No, I don't recall it.

6       Q.    At the time, your impression, safe to

7   say, is that this was not normal for 12-year-old

8   boys; is that right?

9       A.    I don't recall.

10          MS. JORDAN:  Note my objection to the

11          form of the question. You can answer.

12   BY MS. LAUGHLIN:

13       Q.    Go ahead.

14       A.    I don't recall the conversation or the

15   facts of it.  So, you know, what is being viewed

16   here, I don't recall what, you know -- I don't

17   recall the details around it, so I can't answer

18   that.

19       Q.    You don't recall the details involving

20   the ██████ and ██████  incident?

21       A.    Right.  What I recall is that the

22   teachers relayed to me they felt it was consensual.

23   I don't remember.  What is stated here is that the

24   ██████  must have felt it was consensual.  I don't

1  remember that being stated.  I don't remember the

2  conversation, but that is obviously what's been

3  stated here.

4        Q.    When you say "it was consensual", do

5  you remember what "it" was?

6        A.    I am assuming ████'s hand up ██████

7  shirt back in November.

8        Q.    So, you do have an understanding,

9  because I think you were just saying, like, you

10 didn't really -- You do not recall what the incident

11 was.  You have an understanding it was him putting

12 his hand up her shirt?

13       A.    I apologize if that's the impression I

14 gave, that I don't understand what happened.  I do

15 understand that that is what happened.  I don't

16 understand -- I don't recall the conversation of Ms.

17 ████ saying that this was normal or anything that

18 is written there.  I don't remember that

19 conversation.  I remember what was the incident that

20 occurred.

21       Q.    At the time then in your, you know,

22 '14-'15 school year, do you believe that it was

23 normal for a boy to be putting his hand up a girl's

24 shirt in the sixth grade?

1          MS. JORDAN:  Note my objection to the

2     form of the question.  You can answer.

3          THE WITNESS:  No, it is not

4     appropriate, as I think it is stated in my

5     written -- in my written notes that it was

6     inappropriate, you know, behavior that

7     occurred.

8  BY MS. LAUGHLIN:

9     Q.    Okay.  Do you recall anything about Ms.

10 ▮▮▮▮  requesting that the girls be punished for

11 this?

12    A.    No, I don't remember that.

13    Q.    Is there anything you recall about this

14 meeting with Mrs. ▮▮▮▮  and Dr. Santoro that we

15 didn't already talk about?

16    A.    No.

17    Q.    This second paragraph here where it

18 says No. 2.

19    A.    Mm-hmm.

20    Q.    Right here it is talking about the

21 incident in April with, like, the second girl we had

22 referred to and --

23    A.    Correct.

24    Q.    -- towards the bottom it talks about

1  Kristin, Ms. Vaszily, indicated that the girl

2  reached out to some friend via social media and they

3  told her to tell someone.

4          Do you recall anything about that?

5      A.   No, I don't recall it.

6      Q.   I am gonna highlight this right here

7  and I want to give a clarifying instruction before I

8  ask you a question.  I am not asking you what

9  Mr. Somers, who is also in the deposition here

10 today, told you or said to you or whatever in this

11 meeting, but I just want to ask.

12         It says Bill, Kristin, and I did a

13 conference call with Kyle Somers, the District

14 attorney, to brief him on the situation.  And Bill

15 is you, Kristin Vaszily, and Dr. Santoro is who they

16 are referring to.

17         Is that typical practice when an

18 incident occurs that you would have a conference

19 call with the District attorney?

20     A.   No.

21     Q.   Was there something different about

22 this incident that --

23         Do you know who was the person who

24 contacted the attorney or did the attorney contact

1  you guys?

2        A.    I don't know.

3        Q.    Are there certain times that the

4  District attorney --

5             Do you know how the District's attorney

6  got involved in this situation?

7        A.    No, I do not.

8        Q.    This part about the email from Ms.

9  ███████████  to Dr. Santoro, um --

10       A.    Yes.

11       Q.    -- do you recall ever seeing that email

12  or discussing that email with anybody?

13       A.    I don't recall.

14       Q.    It says here Mrs. ████████████'s

15  requesting a TOA.  Do you know what specifically

16  that stands for?

17       A.    That is called a transfer of

18  attendance.  That is a request to go to a different

19  building than you are normally assigned to.

20       Q.    Okay.  Normally assigned to meaning,

21  would all of the students from Gwynedd Square be

22  filtered into the same middle school, typically?

23       A.    Typically, yes.

24       Q.    Ms. ██████████ is requesting a

1  transfer from the normal middle school to a

2  different middle school?

3          A.    Yes.

4          Q.    Were you aware of Mrs. ▮▮▮▮▮▮▮

5  requesting that?

6          A.    I was told by Dr. Santoro, yes.

7          Q.    Did Dr. Santoro explain to you how that

8  came about?

9          A.    I believe she told me that Mrs.

10 ▮▮▮▮▮▮▮▮ requested it.

11         Q.    Did you have any conversation with Mrs.

12 ▮▮▮▮▮▮▮▮ or Mr. ▮▮▮▮▮▮▮▮▮▮or ▮▮▮▮▮ about their

13 request to transfer to a different middle school?

14         A.    I don't recall.

15         Q.    Do you remember having any conversation

16 with Dr. Santoro about the ▮▮▮▮▮▮▮▮▮s request

17 that ▮▮▮▮▮ be transferred to another middle school?

18         A.    No, I don't.  Prior to it being done,

19 no.

20         Q.    What about after it had been done, did

21 you have any conversations then?

22         A.    No.  The only conversation I recall

23 having was that Dr. Santoro telling me that she

24 would be going to Penn Brook.

1    Q.    Did you ask any questions?  Like,

2    considering you were saying that normally it is not

3    the victim who is, like, moved or, you know,

4    uprooted, it is the other person, did you raise any

5    issue or question to Dr. Santoro about that?

6    A.    Nope.

7    Q.    Why not?

8    A.    Because, honestly, it's a middle school

9    matter.

10   Q.    So, they are going to a different

11   level.  You are elementary school level.  So, not

12   your --

13   A.    Right.  It's not my decision nor is it

14   is my building, and I don't remember when the

15   decision was made.

16   Q.    I think it was first requested in

17   April.

18   A.    It was requested in April, but I don't

19   know when the final decision was made.

20   Q.    You said the "decision was made",

21   meaning approval from the District?

22   A.    Right.  I don't know --

23   Q.    Is that something --

24   A.    I don't know who approves.  The TOAs at

1    the elementary are approved by Dr. Santoro.  I don't

2    know who approves the TOAs for the middle school

3    level.  So, that is why I don't know.

4         Q.    Now, on that Wednesday, which would

5    have been the day that ███████ is having the

6    in-school suspension, Dr. Santoro is saying that

7    Mrs. ████████████ informed them they talked to ███████

8    about this incident, and this is the highlight of

9    what she got from Mrs. ████████████.

10             ███████ admitted in November that ███████

11   touched her under her clothes, up her skirt, and

12   down her pants.

13             Do you recall this additional

14   information about it also being down ███████'s pants?

15        A.    No.

16        Q.    Do you believe that is something that

17   you would have been informed of at the time?

18        A.    Yes.

19        Q.    If you had been informed of that at the

20   time, is that something that you would have

21   investigated in addition to what you were already

22   investigating with the up-the-shirt touching?

23        A.    Yes.

24        Q.    If this was something that you had been

1   informed of at the time, would that have been

2   something that you would have written about in your

3   summary?

4           A.    Yes.

5                 THE WITNESS:  Can I have a minute to

6           talk to you privately?  Just talk to you.

7                 MS. JORDAN:  You have to answer the --

8                 THE WITNESS:  I did.

9                 MS. JORDAN:  Yes, we can take a

10          five-minute break.  Yeah, it's also, like,

11          12:53 now.  I don't know if you need to eat

12          lunch or what.

13                THE WITNESS:  I prefer to keep going.

14                MS. LAUGHLIN:  Okay.  Is everybody okay

15          with that?

16                MS. JORDAN:  We will just take a

17          five-minute break.

18                MS. LAUGHLIN:  Okay.

19                       - - -

20          (Whereupon, a break was taken.)

21                       - - -

22                MS. LAUGHLIN:  I will just share my

23          screen again.  Can you me see my screen?

24                THE WITNESS:  Yes.  Good.  Are you guys

1      good?

2              MS. JORDAN: Yes.

3    BY MS. LAUGHLIN:

4      Q.    We were just talking about Dr. Santoro,

5    and kind of going through it to see if it has some

6    additional information, compared to your summary we

7    have just gone over, whether that helps to refresh

8    your memory at all as to what was happening at the

9    time.

10             That Wednesday we just talked about how

11   ████████admitted that in November ██████ touched her

12   under her clothes, up her shirt, and down her

13   pants.

14             I think you were saying you don't

15   independently recall the addition of the down her

16   pants being the case?

17     A.    No, I don't recall that.

18     Q.    ████████ had also indicated to Dr.

19   Santoro, according to her notes, that the girls

20   expect this from ████████ and this touching has been

21   going on since fourth grade.

22             Is this something that you were aware

23   of at the time?

24     A.    No.

1    Q.    Do you recall whether you were aware of

2    this at the time?

3    A.    No.

4    Q.    If this was something that you were

5    aware of at the time, that ▓▓▓▓▓ has been touching

6    girls since the fourth grade, is that something that

7    --

8          Would you have done anything different

9    other than what you have done in this investigation?

10   A.    Yes.

11   Q.    What would you have done differently?

12   A.    I would have been much more aggressive

13   in the investigation, as well as the consequences.

14   Q.    So, do you believe that if Dr. Santoro

15   knew this information, that that wasn't communicated

16   to you?

17   A.    Yes.

18   Q.    As far as you know, was ▓▓▓▓▓ an

19   elementary school student at Gwynedd Square in

20   fourth and fifth grade, as well as sixth?

21   A.    I believe he was, yes.

22   Q.    ▓▓▓▓▓ told Dr. Santoro that she

23   witnessed another girl being touched and then she

24   lists the two names of these girls.

```
 1              Do you recall anything about these two
 2   other girls being involved as people being touched
 3   by ███████ at your school?
 4        A.    I do not.
 5        Q.    Do you recall anything about ███████
 6   being afraid of ███████
 7        A.    No.
 8        Q.    Do you recall asking ███████ at all
 9   about whether she was afraid of ███████
10        A.    No, I don't recall.
11        Q.    Would that have been something that you
12   would have done, or you think you would have done at
13   the time?
14        A.    Yes.
15        Q.    Why do you think that, that you would
16   have done that?
17        A.    I just think it's a question I would
18   have asked, obviously, to make sure she was safe in
19   school.
20        Q.    It says at this point that after
21   receiving this additional information that they were
22   gonna -- she was going -- Dr. Santoro was going to
23   talk to Detective Ciaola again so he could inform
24   Mission Kids.
```

 1                Do you recall whether Detective Ciaola

 2   was in touch with Mission Kids at all?

 3        A.    I don't recall.  I would think he would

 4   be, but I don't recall.

 5        Q.    Because I know when we talked about

 6   whether you were going to report, because the

 7   parents declined, you weren't going to?

 8        A.    Correct.  I -- I don't recall.  I would

 9   be guessing.  I would be guessing.

10        Q.    Okay.  It says that Dr. Santoro

11   reported the new event to Dr. Holben and they did a

12   conference call with you.

13                Do you recall this conference call at

14   all?

15        A.    No, I don't.

16        Q.    Do you recall why Dr. Holben was

17   brought into the conversation at this point?

18        A.    No.  She is the assistant

19   superintendent.  Was.  Was.

20        Q.    Okay.  So, at this point it's now,

21   would you agree with me, gone up the chain in terms

22   of the --

23                Well, do you know what the new event

24   was she was referring to?

1           A.    I am assuming what she shared with her

2    on -- you know, in the previous 1 through seven.

3           Q.    That this has been going on?  Like, one

4    of the things is, this has been going on since the

5    fourth grade?

6           A.    Yes, I would assume so.

7           Q.    Would you agree with me at this point,

8    based on these notes, that Dr. Holben is now also

9    aware of what's going on in one through seven?

10          A.    I don't know what was relayed in the

11   conversation.

12          Q.    Because you just don't remember?

13          A.    Well, I wasn't part of that

14   conversation so I don't know what Dr. Holben was

15   told, nor was some of that information told to me.

16          Q.    Okay.  Because it says here we did a

17   conference call to you?

18          A.    Correct.

19          Q.    So, you just don't remember, or are you

20   disagreeing that the conference call took place

21   between --

22          A.    No, I don't remember the conference

23   call taking place.

24          Q.    But you are not disputing that a

1    conference call may have taken place?

2         A.    A conference call may have taken place,

3    sure.  I just don't recall it.

4         Q.    This bullet point here where my cursor

5    is, the third from the bottom, it says, we then

6    called you, Bill Bowen, again, and asked him to call

7    the parents of both girls that have been newly

8    identified, and let them know their names came up in

9    an investigation, and that the counselor would be

10   asking them questions about inappropriate touching.

11         Do you recall having conversations with

12   now these additional two girls or their parents?

13         A.    No, I do not.  I recall calling one

14   parent.  I do not recall the other parent nor do I

15   remember what exactly was said.

16         Q.    When you say you recall calling one

17   parent, I know you are not gonna remember the name

18   of the person anyway, but you were kind of talking

19   about ███████ being first, then there was a second,

20   then there was a third, and now there is two

21   additional girls that have been identified.

22         What call -- What parent do you

23   remember calling?

24         A.    I remember calling Quimby's mom because

1    I remember there were other issues going on in

2    addition to this when I made the phone call.

3         Q.    Quimby was one of the last two students

4    identified?

5         A.    Yes, the note there states it.  Yes.

6         Q.    Do you recall at all the conversation

7    that you had, not in terms of maybe her other

8    issues, but specific to what was going on with

9    ████████

10        A.    Who am I speaking with?  I don't recall

11   your question.

12        Q.    Quimby's mom.

13        A.    I remember this conversation because I

14   remember that there were other issues going on with

15   the young lady and the mom was very dismissal of my

16   phone call.

17              When I told her I would be

18   investigating she, basically, was like, okay.

19   Thanks.  Bye.  Which caused concern for the other

20   issues related to that girl, which, I guess,

21   substantiates some of the concerns.  So, that is why

22   I remember that girl.

23              Like I said, so few that I can remember

24   some of them, but some of the details, you know,

1    it's been seven years almost.

2         Q.    Okay.  Then it says, at 3:00 p.m.  Bill

3    Bowen informed me, meaning Dr. Santoro, that one of

4    the students, blank, did admit to being touched.  It

5    says top, and it's crossed out, front and back and

6    bottom by ████  in fifth grade.  Then it says --

7              So, she is saying that you are the one

8    that informed her about ████  touching somebody in

9    fifth grade?

10        A.    I don't recall that.

11        Q.    I know you don't recall, but do you

12   disagree that that happened or you just can't

13   remember?

14        A.    I can't remember.

15        Q.    Then it says you are following up with

16   the parent of the student and Ted Ciaola.  It says

17   all of this has been reported to Child Line.

18             Do you recall whether you were the one

19   to -- When it says all of this has been reported to

20   Child Line, were you the one who made the calls or

21   did other people; if you know?

22        A.    I believe Kristin Vaszily and I called

23   together.

24        Q.    Do you recall how many phone calls you

1   made to Child Line?

2          A.     I believe it was two separate ones.

3          Q.     Do you recall what the difference was

4   between the two different calls that you made?

5          A.     No, I don't remember.

6          Q.     Do you recall why you had to make two

7   separate calls?

8          A.     I would assume two separate children.

9          Q.     When you are saying two separate

10  children, I mean, we just went over five different

11  children.  It says here in Dr. Santoro notes all of

12  this has been reported to Child Line?

13         A.     I guess I should say separate children,

14  not two.  They were separate children, that is why

15  there would be separate calls.

16         Q.     I think you are saying you recall two

17  calls.  Do you think you made two calls for the five

18  separate children or --

19         A.     I --

20         Q.     Hold on.  Let me finish my question so

21  the court reporter can take it down.

22         A.     I apologize.

23         Q.     Since we have identified five different

24  girls, do you recall whether it would have been five

1  separate calls or do you believe that one of the

2  calls you made you were reporting multiple victims?

3       A.    What I am saying is, in my notes it

4  said ███████ and the name was redacted.  So, that is

5  why I am saying two.  I don't remember how many

6  calls we made.  I am going off what my notes said.

7       Q.    Okay.  Now I am going to show you, I

8  know this isn't your notes, this is Kristin

9  Vaszily's notes from that, I believe it was Tuesday

10 April 14th.  The day ██████ would have had the

11 out-of-school suspension, and this is her, kind of,

12 recounting.

13           Seems like you made a summary.  Ms.

14 Vaszily is making a summary.  You had asked Ms.

15 Andrew to make a summary as well, as Ms. Divver to

16 make a summary.

17           Are those things that you are all

18 asking to be compiled as part of the investigation

19 you are doing?

20      A.    Yes.

21      Q.    Are these things that you had asked

22 reports to be made on?

23      A.    Yes.

24      Q.    Why did you have them do written

1    summaries as opposed to having a meeting about it?

2    I know you had some meetings too, but why did you

3    request a written statement from them?

4         A.    My training as a military police

5    officer, we always got written statements.  That is

6    something I have always done as a Principal.

7         Q.    So, when they are all drafting up these

8    reports and typing these reports to present to you,

9    do you know if anybody had reviewed them or edited

10   them before they made it into your hands?

11        A.    Not to my knowledge.

12        Q.    Once you received them, did you make

13   any edits or suggestions to change any of them?

14        A.    No, I -- I never made or request a

15   change nor did I change anything.

16        Q.    Okay.  So, this is kind of summarizing

17   about the other student, student No. 2 that had been

18   touched by ███████ in April, and then it talks about

19   the same thing right here.  It had described the

20   incident about watching a movie and that ███████ had

21   touched her multiple places and then the girl was

22   very upset.  It says, after I walked her back to

23   class Ms. Divver handed me the Behavioral Referral

24   Form for ███████

1          What is the Behavioral Referral Form?

2     A.    The document you showed -- the Office

3 Referral Form.  That is the document you had, kind

4 of, quickly showed.

5     Q.    We will get back to that.

6     A.    Yep.

7     Q.    So, the Behavioral Referral Form is the

8 same as an Office Referral Form?

9     A.    Yes.  Two terms used interchangeably.

10    Q.    So, this is -- Ms. Divver had a

11 Behavioral Referral Form for this incident.

12          Is that your understanding?

13    A.    I believe that's what it says there,

14 yes.

15    Q.    Let me go to the next.  I am

16 referencing Bates No. 1010 of the North Penn

17 production.  These are notes from a meeting that

18 occurred on April 16, 2015.  It looks like these are

19 your notes.  Have you seen these --

20    A.    They are not --

21    Q.    -- prior to today?

22    A.    They are not my notes.

23    Q.    It says note from Bill Bowen.  These

24 aren't your notes?

```
 1        A.    I don't -- I don't remember seeing
 2  these.
 3        Q.    I just want to kind of scroll so you
 4  can see the only whole thing.  I'm not just showing
 5  you a portion.
 6        A.    Yeah.  Go ahead.
 7        Q.    We will go through it, but just so you
 8  can kind of see what it looks like.
 9             MS. LAUGHLIN:  (Scrolling down).
10  BY MS. LAUGHLIN:
11        Q.    Do you remember the document?
12        A.    I don't -- I don't recall ever seeing
13  this.
14        Q.    You don't think that these are your
15  notes?
16        A.    I don't think they are.  No, because if
17  you notice under Cheryl McCue, I -- I don't know.  I
18  don't know.  I just don't think they are my notes.
19        Q.    You said under Cheryl McCue.  Is there
20  something that makes you think this isn't yours?
21        A.    Yeah, Bill could have followed up.  Why
22  would I write that about myself?
23        Q.    Meaning in first person or that you
24  wouldn't have written that you could have followed
```

 1    up?

 2         A.    Why would I write in first person?  So,

 3    this is -- To me this is Cheryl saying I should have

 4    followed up.  So, I don't remember ever seeing this.

 5         Q.    Okay.  Do you know whose handwriting

 6    this is?

 7         A.    I can't say for certain, no, but to me

 8    this looks like minutes from the Union meeting,

 9    because it says attendees, Ruth, Alan, Betty, Bill,

10    and Cheryl.  So, I don't know -- Yeah, I don't

11    know.

12         Q.    Do you --

13         A.    They are not my notes.

14         Q.    Was this a Union meeting that was

15    scheduled specifically involving this incident or is

16    this just a union meeting that was occurring?

17         A.    This was a meeting scheduled in

18    response to the failure to report from November.

19         Q.    So, I just want to go through these

20    notes with you.

21         A.    Yeah, because I know you are gonna go

22    through them with me, but Holly felt she should have

23    gone to Bill now that she is thinking about it.

24    These are not my notes for sure.

```
 1          Q.    Do you recall that happening?

 2          A.    Oh, yeah, she said that.  Yeah.

 3          Q.    Do you have an independent recollection

 4   of this meeting that occurred then?

 5          A.    I have a recollection of the one union

 6   meeting that I attended.  Yes.

 7          Q.    So, as far as you know, that is this

 8   one?

 9          A.    I would think so, yes.

10          Q.    So, rather than, I think, going through

11   and being like, what do you remember, because it

12   sounds like you don't have an independent -- a good

13   independent memory to be able to say this person

14   said this and then I said that and this wasn't --

15          A.    No, I would not have the memory to say

16   that.

17          Q.    So, I am going to go through these

18   notes with you --

19          A.    Sure.

20          Q.    -- and kind of ask you about it.  Do it

21   that way instead.

22          A.    Okay.

23          Q.    If you don't remember you don't

24   remember, but at the top it starts with Ruth
```

1    Divver.  I am sorry.  At the top where it says

2    attendee, Ruth; that is Ruth Divver?

3         A.    Yes.

4         Q.    Alan, that is --

5         A.    Malachowski.

6         Q.    Yeah, thank you.  The Polish last name,

7    and then Dr. Santoro; correct?

8         A.    Correct.

9         Q.    You and then Cheryl McCue?

10        A.    I am assuming so, yes.  Looks like that

11   is what it says.

12        Q.    Looks like C-M-C?

13        A.    Yes.  That is what I think it says too.

14        Q.    Do you know if this is summarizing what

15   people are saying in the meeting?

16        A.    I think what it says -- Those are what

17   she is saying based upon the notes from me.  That is

18   why there is a separate squiggly line for maybe

19   another meeting.

20        Q.    Okay.  I see what you are saying, or

21   that Ruth isn't present.  Like, Ruth is present for

22   this part of the meeting.  Do you recall that at

23   all, where Ruth was part of the meeting, given her

24   --

 1          A.     Both teachers had a meeting

 2   separately.  That was part of the initial meeting

 3   for both.  That was it.

 4          Q.     That makes sense, because the

 5   attendees, Ruth is listed at first and then the

 6   second part below the squiggly line Holly is listed

 7   in place of Ruth?

 8          A.     Yep.

 9          Q.     I understand.  So, at this point this

10   is Ruth at the meeting explaining what she

11   recalled.  Is that your understanding of what was

12   happening at that meeting?

13          A.     Yes.

14          Q.     It says, this is November of 2014,

15   which would have been ███████s because it was in

16   Ruth's room.  Holly took both students, meaning

17   Holly Andrews?

18          A.     Yes.

19          Q.     Took both students out in the hallway

20   for something that happened at the back table, and,

21   in quotes, Holly took care of it.  Holly filled out

22   the discipline form and trusted Holly was taking

23   care of it.  Ruth didn't know the specifics.

24                 Ruth indicated she knew there was a

1  discipline issue but not the details.  And then

2  Ruth, in quotes, Ruth never pursued the

3  inappropriate behavior.

4           When it is in quotes, do you know who

5  is referring -- Like, who is saying these things?

6      A.    No.

7      Q.    Do you recall, other than what we just

8  went over, Ruth explaining to you what had happened

9  during this?

10     A.    I remember Ruth telling me that she

11 thought Holly took care of the situation.

12     Q.    What did she think Holly did to take

13 care of it?

14     A.    That I don't -- I think she thought

15 Holly reported it to me, but she didn't.

16     Q.    Meaning, like, gave you the Office

17 Referral Form?

18     A.    Correct.

19     Q.    Okay.  When you are given an Office

20 Referral Form from a teacher, can it be, like, a

21 special ED assistant?  Like --

22     A.    Yes, sometimes.

23     Q.    And --

24     A.    Any --

1      Q.     -- it --

2      A.     Any adult can provide it.  Cafeteria

3  assistant, bus driver.  Anybody can do an Office

4  Referral Form.  Sorry.

5      Q.     Is there any -- I know you said if

6  it's, like, a minor incident or something that

7  sometimes the teacher might just keep it.

8             Would you ever know if a teacher ever

9  kept, like, files on a student or Office Referral

10  Forms on a student, like, in their classroom?

11      A.     Teachers would have kept minors and

12  then when they got three minors it would have became

13  a major and would have been reported to me.

14             So, often I would get three minor forms

15  stapled together and then I would address the

16  behavior with the student.

17      Q.     What oversight was there in place by

18  you, if any, to distinguish or make sure that

19  teachers were reporting things appropriately?  Like

20  as a minor --

21             MS. JORDAN:  Note my objection to the

22         form of the question.

23  BY MS. LAUGHLIN:

24      Q.     Sorry.  I assume it got a little funky.

1          What was in place, if anything,

2   oversight wise for you, that would make sure that

3   teachers are distinguishing things appropriately

4   between minor and major, and that things were

5   getting reported to you that needed to be?

6          A.    I would rely on the teacher's

7   professional judgment to do that.

8          Q.    There was no independent review or

9   anything like that to be able to make sure that

10  their independent judgment was appropriate, as far

11  as you were concerned?

12         A.    I can't think of anything in any way a

13  Principal would do that in an elementary school.  We

14  rely -- We are not there, so we rely on the

15  teacher's professional judgment to handle issues or

16  report them.

17         Q.    When you say you are not there, meaning

18  you are not actually in the classroom?

19         A.    Right, when the incident occurs.  Or in

20  the cafeteria, the playground, on the bus,

21  wherever.  So, we have to rely on the professional

22  judgment of our employees to report any incident.

23         Q.    Okay.  When Ruth was saying at this

24  meeting that she didn't know the specifics of what

1   had happened, did you or anybody else in the meeting

2   say anything in response to Ruth about it being her

3   classroom and, you know, her finding out or, you

4   know, why didn't she find out what was going on?

5        A.    I don't recall.

6        Q.    It says here Ruth never pursued the

7   inappropriate behavior.  Do you know what was meant

8   by that?

9        A.    I am assuming Ruth never followed up.

10       Q.    Like, after she gave it to Ms. Andrews,

11  that was the end of it?

12       A.    Right.  Because it says right before

13  that that she did not know the details.  So,

14  obviously, this was said after the incident occurred

15  and probably after the investigation, that she is

16  saying inappropriate behavior.

17       Q.    Do you recall whether this was the only

18  meeting that you were involved in with Ruth or -- I

19  am sorry, with Ms. Divver where you are getting her

20  version of what had happened?

21       A.    No.  I definitely met with her in the

22  building and remember I got written statements from

23  them.  This is, I believe, like I said, the union

24  meetings that occurred.

1     Q.    Okay.  As a result of this, I don't

2  think I have seen anywhere that Ms. Divver was

3  disciplined at all or, like, retrained or anything

4  like that.  Do you know whether she was?

5     A.    No, I don't.

6     Q.    Do you believe at the time, if you can

7  recall, that she should have been or whether this

8  was more of an issue with Ms. Andrews?

9     A.    I don't recall.  The only thing I

10  recall on all of it is I was part of the initial

11  meeting with both teachers, and that there was a

12  determination on discipline for those teachers.  I

13  was not part of any of those conversations, and that

14  there was an appeal by the Union.  I was not part of

15  any of those conversations, and that --

16            I can't recall, but for Holly,

17  something was reduced.  That is all I recall.  I was

18  not part of any of the conversations or anything.

19  So, basically, I know I was here for these two, but

20  anything after that I have no knowledge, nor was I

21  present for anything.

22     Q.    I think you said those teachers were

23  disciplined.  Is that what you said?

24     A.    I believe they both were disciplined.

1    I don't recall.

2         Q.    Okay.  As the Principal, is that within

3    your authority to discipline the teachers?

4         A.    No.

5         Q.    Whose authority is that then?

6         A.    The superintendent and above me, that

7    is all I know.

8         Q.    Do you make any kind of -- As a

9    Principal, kind of being, like, the boots on the

10   ground, as sometimes they say in the military, do

11   you make any kind of recommendation as to what you

12   think should happen in terms of discipline with

13   teachers at your school?

14        A.    I have been involved in other

15   discipline cases.  In those cases, yes.  My

16   involvement in these are my only two in North Penn I

17   am involved in with and I had zero involvement.

18        Q.    Was that because the higher up at the

19   District didn't, like, have you being part of the

20   involvement or what was the difference?

21        A.    I have no clue.  I just was not part of

22   the conversations or anything.  The involvement was

23   in a different school district so I can't speak to

24   that.

1    Q.    Then after that Holly Andrews, it
2  appears, is part of the meeting, and it says that
3  she needs to sign her statement.
4         Do you recall there being an issue with
5  Holly not signing her written statement?
6    A.    No, I don't remember that.
7    Q.    Then it looks like this is a summary of
8  Holly describing in this union meeting what had
9  happened in the incident in November of 2014.
10        That would have been █████ and █████?
11   A.    Correct.
12   Q.    So, I am just gonna go through that to
13 see if that helps you to remember any additional
14 details of the meeting the we didn't already talk
15 about.  It says it was the end of the day and kids
16 (sic) were sitting around working with the
17 students.
18        █████ and █████, their hands were
19 under the table and Holly pointed at █████.  She
20 thought that there was fooling around at the table
21 and -- It says, at this point -- or it says, It was
22 six months ago, you could see █████'s upper body.
23 Caught █████'s hand as it was going up the shirt.
24 She called both out in the hallway.  It says, █████

1    denied.  No hands under the table.

2            Do you know what that means or what she

3    is referring to?

4        A.    No, I don't know.

5        Q.    It says, felt it was mutual.  Do you

6    remember anything about the conversations as to

7    what, assuming she, Holly Andrews, felt was mutual?

8        A.    She felt they were fooling around.

9        Q.    When you say "fooling around", what do

10   you mean?

11       A.    That there was some sexual contact

12   between the both of them.

13       Q.    When you say "between the both of

14   them", I mean, ███████ is the one touching ███████

15   Do you believe there was any indication that it had

16   gone both ways?

17       A.    I think in the notes above that,

18   doesn't it says both hands were under the table?

19   So, that would lead me to believe -- because --

20   hands under the table, Holly pointed to ███████

21   second bullet, I am assuming, based upon that.

22            I recall Holly specifically telling me

23   that she thought they were fooling around and, you

24   know, that's where it says, felt it was mutual.

1    That is what I recall her telling me.

2         Q.    Okay.  It says neither form made it to

3    the office.  When she is saying "neither form", what

4    --

5         A.    The Office Referral Forms I am

6    assuming.

7         Q.    It is saying neither form.  Meaning it

8    almost sounds like more than one form.

9              Do you know what other form she would

10   have been talking about?

11        A.    No.  I am assuming the November one and

12   whatever else.  Maybe later.  I don't know.  Or

13   probably one for each child.  If she felt it was

14   mutual it was probably one for each child.

15        Q.    You mean that you think that she would

16   have filled one out for ███████ and one out for

17   ███████?

18        A.    Right.  Both having inappropriate

19   behavior.  Both being consensual, because she

20   thought it was mutual, and would have written both

21   students up.  That is the way I am reading that.

22        Q.    It says three minor discipline reports

23   go to Bill.  This is, like, three minor incidents

24   and then the fourth discipline, the report goes to

```
 1   Bill?
 2         A.    As it says under, considered it was a
 3   major.  Right.
 4         Q.    It was a minor?
 5         A.    No.  It is saying three minors,
 6   discipline reports go to Bill.  That's correct.  And
 7   then it is considered -- She considered it a minor
 8   is what she felt.  Those are her words, not mine.
 9         Q.    Okay.  Because you already had told us
10   that you thought this was a major, should have been
11   a major?
12         A.    Should have been a major.  Should have
13   been a major right off the bat.  Absolutely.
14         Q.    I see here referral -- Office Referral
15   for both ████████  and ████████
16         A.    Right.
17         Q.    Holly said she didn't see his hand go
18   up the shirt all the way.  She felt she caught it
19   before the entire hand went up her shirt.  Holly
20   felt she should have gone to Bill now that she is
21   thinking about it now.
22               Do you recall Ms. Andrews talking about
23   not seeing a hand go up the shirt all the way or
24   where it stopped or any detail like that?
```

1          A.      No, I don't remember that.

2          Q.      It says, Holly felt she should have

3    gone to Bill now that she is thinking about it.

4                  Do you recall her explaining or what

5    the conversation was to make her say this?

6          A.      After I relayed to her that I was

7    probably unhappy with, that she didn't report it, I

8    am sure she felt now that she's reflected on it, she

9    should have gone to me, which she should have.  But

10   I don't remember her stating that at all.

11         Q.      Do you believe that that occurring was

12   in this meeting or one of the meetings that you had

13   with them previously?

14         A.      She stated it to me, that she should

15   have come to me earlier with the first report.

16   Yeah.

17         Q.      It says, I guess Cheryl McCue talking

18   in the meeting and talking about how ███ isn't

19   going to say anything in front of the perp.

20                 Do you recall that part of the meeting,

21   that conversation?

22         A.      No.

23         Q.      Do you recall having any conversations

24   with Ms. Andrews about her interviewing ███ and

1     ███████   together?

2          A.    Well, I mean, that is usually something

3     you don't do, is interview the two together, but

4     looking at that, she viewed it as a mutual thing, I

5     could see why she interviewed both together.  We

6     never interview -- In the words there, a perp, that

7     is a perpetrator.  That would assume that it was

8     something done to someone else.

9               You never interview the bully and the

10    person bullied together.  You always interview them

11    separately.  That is something we are trained in.

12    So, the fact that she did it together was also

13    something she shouldn't have done.

14         Q.    Did you tell her that, as far as you

15    can remember?

16         A.    Yes.  I don't remember telling her

17    that, but I am sure I did.

18         Q.    Then it says, Bill could have followed

19    up.  Do you know what that is referring to?

20         A.    No, I don't.  I am assuming it is

21    saying ███████ is not going to say anything in front

22    of the perp.  If she interviewed them separately,

23    then I could have followed up.  But I don't know

24    what that means.

1    Q.    Then it is saying, at what point do we

2    have a responsibility.  Could have been a call to

3    Child Line.  Had it been dealt with in November,

4    could have avoided other incidents.

5            Do you know if this had been dealt with

6    in November it could have avoided other incidents?

7    Do you remember what the conversation was at that

8    point?

9    A.    No, that is someone's speculation.  I

10   don't know what that is.

11   Q.    You don't recall a conversation that --

12   A.    No.

13   Q.    -- was around that?

14   A.    No.

15   Q.    Here this is about Holly and it's

16   saying she doesn't remember what was said to Ruth,

17   but they had a conversation about going to you.  Do

18   you recall discussing --

19           Do you recall this part of the

20   conversation in this meeting?

21   A.    No.

22   Q.    Do you recall any discussion with Ms.

23   Andrews or Ms. Divver about having a conversation

24   about going to you and maybe why they didn't, or?

 1          A.    No, I don't recall that conversation.

 2    I am sure it happened, but I don't recall it.

 3          Q.    Here where it says that Holly was asked

 4    in this meeting if she had told the parents, and

 5    Holly, Ms. Andrews, commented it is not her place to

 6    go to the parents.

 7                Do you recall this part of the

 8    conversation?

 9          A.    No.

10          Q.    Do you recall --

11                After these meetings, did you ever have

12    any conversations independently with Ms. Andrews or

13    Ms. Divver about what should change going forward in

14    your school with them?

15          A.    Other than they should report things

16    like this?

17          Q.    Yeah, I mean --

18          A.    I mean, I remember that conversation,

19    but other than that I don't recall anything.  I was

20    clear that they mishandled this and they should have

21    reported this, and they would report it going

22    forward.

23          Q.    Okay.

24          A.    Mm-hmm.

1    Q.    Here they are talking, again, Cheryl

2  McCue is talking about the statement, if you don't

3  do it again I won't go to your parents.  That Ms.

4  Andrews caused another young lady to experience this

5  from the same young man.

6          Do you recall this part of the

7  conversation?

8    A.    (Reading to himself) shared statement

9  from ▓▓▓▓▓  No, I don't remember that.

10   Q.    It says they are referring to that Ms.

11 Andrews not telling -- or telling ▓▓▓▓ or ▓▓▓▓,

12 saying, if you don't do it again I won't go to your

13 parents.  This caused another female to experience

14 this from ▓▓▓▓  do you agree with that?

15         MS. JORDAN:  Note my objection to the

16     form of the question.  You can answer.

17         THE WITNESS:  Can you --

18 BY MS. LAUGHLIN:

19   Q.    Do you agree that, I guess, Ms. McCue

20 is saying in this write up in this note, that Ms.

21 Andrews telling ▓▓▓▓ and ▓▓▓▓ that if it doesn't

22 happen again they won't go to their parents, that

23 that caused another female student to also be

24 touched?

1          MS. JORDAN:  Same objection.  You can

2      answer.

3          THE WITNESS:  I don't know.  I don't

4      know if it caused another young lady to be

5      touched.  Could it have prevented it, maybe.

6      I don't know.  You know, she was wrong, she

7      should have not handled it that way.

8  BY MS. LAUGHLIN:

9      Q.   I am showing you Page 1012 -- Sorry.

10  The next one.  Bates No. -- This is actually 1013.

11      A.   This looks like an of the handwritten

12  notes that were for the bullet points right before

13  it.

14      Q.   They were just typed up.  I

15  understand.

16      A.   Yes.  This is not my writing, but I am

17  looking at the names, it looks exactly the same.

18      Q.   Do you know, now that there is more

19  handwriting, whose notes they are?

20      A.   I want to say Cheryl McCue's but I

21  don't know.  That is who it looks like the

22  handwriting is.

23      Q.   This is page Bates No. 1015.  This is

24  Holly Andrews' statement?

1        A.      Mm-hmm.

2        Q.      Is this the statement that you had

3   asked Ms. Andrews to complete when you asked her to

4   write it up?

5        A.      I am assuming.

6        Q.      Did you ever see the statement after

7   she wrote it?

8        A.      I assume I did.  I can't recall if I

9   did.

10       Q.      Do you know, looking at these

11  handwritten notes on the left-hand side here; do you

12  know whose they are?

13       A.      That looks like Cheryl McCue's

14  handwriting again.  That is my handwriting at the

15  bottom, received from Kristin Vaszily 4/13 '15.  So,

16  I did see this.  I received it from Kristin Vaszily

17  on that date.

18       Q.      Okay.

19       A.      I don't know if -- That is probably

20  Holy's statement given to Kristin and that is why it

21  needed to be signed, because her signature is not on

22  there.

23       Q.      Okay.  At this paragraph where Ms.

24  Andrews is saying ███████ is not -- this is when she

1   pulled them out in the hallway together.  It says

2   ████ did not say a word and just stood there.  I

3   could tell he was upset.

4           Do you recall at all what gave her the

5   impression he was upset?

6       A.   No. I don't know.  This was the

7   interview she did back in November when she pulled

8   them out in the hallway --

9       Q.   Right.

10      A.   -- so, I have no idea.

11      Q.   I am just wondering since, when you got

12  this statement you are having conversations with Ms.

13  Andrews, you know, both before and afterwards

14  whether this ever came up or you ever asked her

15  about that?

16      A.   I can't recall if I did.

17      Q.   Do you recall any further conversation

18  about her asking ████ if they had their hands

19  under the table and she said she didn't.

20      A.   No, I don't recall.

21      Q.   This is Ruth Divver's statement.  Do

22  you recall seeing this?

23      A.   I don't recall, but I am sure I got

24  it.  I think the date at the top looks like my

1    handwriting, the 11/17.  I might have dated that.

2         Q.    Is this date your handwriting too --

3         A.    No.

4         Q.    -- the 4/13?

5         A.    Nope.  That is definitely Ruth's.  It

6    might not even be my handwriting.  I don't -- I

7    don't know.

8         Q.    In the November incident, I want to

9    focus on that one because that is the one involving

10   ███████.

11        A.    Yep.

12        Q.    Ruth says that when I returned to the

13   back room, Ms. Andrews told me she saw ██████ and

14   ██████ having inappropriate contact under the table

15   in the back room.  She called them out in the

16   hallway and spoke with them.  ██████ denied the

17   incident occurred.  ███████ remained silent.

18             She wrote them up on the Incident

19   Report and filed the report in a file folder that I

20   keep the reports in.  She felt she had handled the

21   situation due to the fact that it was denied, and

22   physical contact is a level 1 on the report.

23             That is talking about physical contact

24   being a level 1 on the report.  Is that on the

1    Office --

2          A.    Office Referral Form, yes.

3          Q.    What distinguishes physical contact

4    from sexual contact?  Is there a difference?

5          A.    That would be the discretion of the

6    person viewing the contact.

7          Q.    Prior to this point, do you recall ever

8    having any instruction or training provided to the

9    teachers to talk about, you know, what is sexual

10   contact versus what is just physical contact?

11         A.    No, I did not.  I guess I am gonna

12   amend that by saying, we have had discussions about

13   it because, you know, we talked about hugging

14   students and how that can be misperceived, and other

15   -- We have had those conversations over time.

16   Especially as male teachers, you know, we need to be

17   cautious about how we interact physically, if at

18   all, with students.

19               And those conversations have happened.

20   That is why it is left to the professional judgment

21   of the teachers, you know.  And, you know, in this

22   case, you know, I will continue to go on the record

23   saying that it was poor judgment.

24         Q.    Okay.  Was there something in your view

1  that distinguished what happened in November with

2  the incident with ████ and ████ as it being more

3  than physical contact and more of a sexual contact?

4       A.    Just based again upon what the teacher

5  was saying, that it was mutual and that a hand up

6  the shirt, you know, and it's mutual, it sounds like

7  that they were fooling around.  That was the

8  information I was given.  Again, inappropriate in

9  the school building regardless.

10      Q.    After the Union or whoever handles the

11 discipline for the teacher, and they are coming back

12 to work at Gwynedd Square Elementary after whatever

13 discipline is given, did you think about at all

14 giving additional discipline or training to these

15 teachers to prevent something like this from

16 happening again?

17      A.    I can't give a discipline nor did I

18 consider it.  Again, go over the Office Referral

19 Form every year and talk about how to report it.  I

20 can't recall what level of specifics I went into the

21 following year, but I am sure that, you know, it was

22 reviewed.

23      Q.    Meaning, like, for the next school

24 year?

1      A.     Yes.

2      Q.     The beginning of the school year?

3      A.     Yep.

4      Q.     This appears to be, like, the same date

5  of the meeting of 4/16/2015, and this is when Ms.

6  Divver is in the beginning part of the meeting with

7  the Union rep, as well as Dr. Santoro, you, and Dr.

8  Cheryl McCue.

9              I just want to ask you about this part

10  here, which says, RD, which I assume is Ruth

11  Divver.  It says, question going to Bill, and then

12  it says, trusted.

13             Do you know what that means?

14     A.     No.

15     Q.     Here it says, I'm sorry it turned into

16  this.  Do you remember anything about somebody

17  apologizing about it turning into this?  Like, a

18  meeting?

19     A.     No, I don't recall it.  I am sure it is

20  Ruth saying that she apologized that everything

21  turned into this, but I don't recall if that is

22  specifically what it was, or if that's what it said.

23     Q.     What about this part where it is noted

24  that Dr. Santoro challenged the wording

1  inappropriate touching.

2          Do you remember that conversation?

3      A.    No.

4      Q.    As far as you know, was there ever any

5  issues about teachers not reporting things to you?

6      A.    No.

7      Q.    Do you know whether there was any

8  feeling in the school of teachers not being able to

9  approach you with things like this or otherwise?

10     A.    No.

11     Q.    If you had been made aware of something

12 like that, would you have addressed it?  Was that

13 your general practice; issues came up, you would

14 kind of address them?

15     A.    Absolutely.

16     Q.    This is a meeting that appears to have

17 occurred almost about a month later in May of 2015.

18          Do you recall this separate meeting

19 that you are listed as attending?

20     A.    This would be another Union meeting.

21 Isn't this the same one?

22     Q.    Up here it says 5/27 '15?

23     A.    Right.  And Francis is there and that's

24 the Assistant Director -- at the time Assistant

```
 1   Director of Special Education.  Because Holly is a
 2   special education teacher, that is why she attended
 3   it.
 4         Q.    Okay.  Do you recall this, like, a
 5   separate meeting?
 6         A.    No, I don't recall this.
 7         Q.    I just want to kind of go through this
 8   and see if it helps refresh anything here.  Here
 9   it's talking about CM, for Cheryl McCue.  Additional
10   info for Mission Kids.
11               Do you remember discussing anything
12   about Mission Kids?
13         A.    No.
14         Q.    Here it says -- The note says not
15   mutual or consensual because of age.
16               Do you recall any discussions about
17   that?
18         A.    No.
19         Q.    Here there is an arrow.  It says,
20   supports for ███████ boy in November.
21               Do you recall what that is referring
22   to?
23         A.    No, I don't know.
24         Q.    Do you remember whether ███████ had any
```

1  supports at the time?

2      A.   No.

3      Q.   Like, a --

4      A.   I don't know.

5      Q.   -- one-to-one or anything like that?

6      A.   No.  And that is a no like I don't know

7  of those, not that I don't recall it.  No, he did

8  not have any supports.

9      Q.   This two-day suspension with no pay,

10  letter in file.  As far as you know, that is

11  referring to Ms. Andrews, right?

12      A.   I assume so.  I wasn't part of any

13  discussions regarding discipline.

14      Q.   Okay.

15      A.   Even though my name is on attendance

16  there, I don't recall any conversations about

17  suspension or anything.

18      Q.   Do you believe that you weren't at this

19  other meeting and they put you down in error, or --

20      A.   I don't know.

21      Q.   -- or you just don't know?

22      A.   I don't remember.  I will say that.

23      Q.   There is also some discussion by Ms.

24  McCue about additional concerns about professional

1  judgment in regard to the IEP issue and shredding of

2  the document.

3          Do you remember another incident

4  involving --

5      A.    Um, there was --

6      Q.    -- shredding --

7      A.    -- something with Holly, she shredded a

8  document.  I remember it vaguely.  It was somebody

9  -- It was a student that was going to settlement

10 and she shredded a document.  The parent wanted it

11 and they didn't have it anymore.

12          It was something very vague and that is

13 why Francis was involved, because not only was it

14 the ▓▓▓▓▓ issue, but it was with this issue as

15 well.

16     Q.    When you say the student was going to

17 "settlement", what do you mean?

18     A.    When a -- for special education

19 students, a settlement agreement is something

20 between the District and the parent for services.

21     Q.    Okay.  Other than what you told us, was

22 the IEP issue something that you were dealing with

23 at your school with her?

24     A.    No, I was not dealing with it, Francis

1    was.

2         Q.    Now, going to Page 10005.  This is a

3    North Penn School District Human Resources

4    letterhead.

5         A.    Mm-hmm.

6         Q.    It's to Holly Andrews from Cheryl

7    McCue, the Director of Human Resources, dated June

8    3, 2015.  It says, you, as well as Dr. Santoro, Dr.

9    Gardner, Ms. McCue met with Ms. Andrews as well as

10   the Union rep on May 27th to continue our discussion

11   with the meeting on April 16, 2015 regarding the

12   reported student incident.

13             And then there is a summary that is

14   listed below.  Then at the end, just so I can show

15   you the whole document.  You are CC'd at the end of

16   this letter.

17        A.    Mm-hmm.

18        Q.    Have you seen this letter before?

19        A.    I saw it, yes.  Yep.

20        Q.    Did you see it in preparation for the

21   deposition?

22        A.    No. I saw it when I put it in her

23   file.

24        Q.    So, this is something that went into

1    her file then?

2          A.    I do believe so, yes.  I believe I put

3    it in her file.

4          Q.    While you stayed at Gwynedd Elementary

5    School, did Ms. Andrews continue to work in the same

6    capacity at your school?

7          A.    Yes, she was a special education

8    teacher, changed grade levels, and then she moved

9    into the position called Inclusion Facilitator,

10   which helps -- which works with other special

11   education teachers.

12         Q.    Is that like a lateral move or is this

13   a promotion, or?

14         A.    Lateral.

15         Q.    Was there a reason that, you know, that

16   she moved to the other position?

17         A.    It was open and she requested to move

18   there.

19         Q.    This letter here, and I don't want to

20   go through the whole thing, but this is, basically,

21   summarizing --

22         A.    Right.

23         Q.    -- what had happened?

24         A.    Yep.

1          Q.    That summarizes the second incident in

2    April.  It says, during our April meeting, concern

3    for your judgment in dealing with the situation was

4    shared, as well as the need for continued

5    investigation.  It says that School Board Policy

6    5150, which is the harassment policy, was shared

7    with her.

8               Do you recall when she was being shared

9    this School Board Policy, whether she had ever seen

10   that before --

11         A.    I don't recall.

12         Q.    -- or what her reaction --

13         A.    No.

14         Q.    Okay.  Here it references information

15   from the Mission Kids Report, indicated that both

16   female students were subjected to multiple instances

17   of inappropriate touching from the male throughout

18   the school year.  That that was shared at that May

19   27th meeting that you were part of.

20               Since this is now talking about

21   multiple incidents of inappropriate touching by

22   ███████ do you know why you didn't go back and give

23   him a more serious discipline than what you had

24   done, now that you have this additional information?

 1          A.    The discipline was administered based

 2    upon information we had back in April.  This letter

 3    is dated June 3rd at the end of the school year.

 4    So, no, we didn't revisit an issue from close to two

 5    months ago.

 6          Q.    I mean, at June 3rd was he already out

 7    of the school at that point or was he still a

 8    student?

 9          A.    He was still a student.  I can't recall

10    -- I can't recall how he ended the school year.

11          Q.    You said you wouldn't have gone and

12    revisited an incident from two months prior?

13          A.    Dealing with discipline for that

14    particular incident, you are talking about he was

15    suspended, you know, in April for the inappropriate

16    touching.

17                Even though there was additional

18    information from Mission Kids, I don't -- I don't

19    recall the Mission Kids Report.  I don't know if I

20    ever even got a copy of that report.  So, I can't

21    say I would go back and suspend someone or

22    administer consequences if I don't even know if I

23    saw the report.

24          Q.    Just to be clear.  This is talking

1  about -- They are talking about the report from

2  Mission Kids at the meeting on May 27th, which we

3  just went over that you were present for, and then

4  it is written about in this letter that you were

5  CC'd on.

6          So, at this point you would agree with

7  me that you knew --

8          MS. JORDAN:  Note my objection.

9  BY MS. LAUGHLIN:

10      Q.    -- that there were reports of

11  additional incidents, other than just a single time

12  in November and a single time in April; correct?

13          MS. JORDAN:  Note my objection to the

14          form of the question.

15          THE WITNESS:  I can't recall the report

16          from Mission Kids.  I can't recall most of

17          the details from that May meeting.  I can't

18          say why I would or would not go back and

19          revisit an incident that occurred two months

20          ago and administer additional consequences.

21  BY MS. LAUGHLIN:

22      Q.    Even if it wasn't additional

23  consequences, I mean, would you agree with me, based

24  on the notes we have gone over so far, that you were

```
 1   aware that there were additional incidents than you

 2   did in April?

 3           MS. JORDAN:  Just note my objection to

 4       the form of the question.

 5           THE WITNESS:  So, I can say that, yes,

 6       there were other incidences.  I can't recall

 7       exactly what police involvement might have

 8       been still ongoing or anything else.  So, I

 9       can't speculate as to why I would go back two

10       months after an incident six years ago.

11   BY MS. LAUGHLIN:

12       Q.   I am not asking you that.  Just to be

13   clear, my question was --

14       A.   Okay.  I am misunderstanding you.

15   Sorry.

16       Q.   That is okay.  Let me be clear.

17           My question is specifically, would you

18   agree with me that you had knowledge at this point

19   that it was more than just the two single

20   incidents?

21           (Unknown noise)

22   BY MS. LAUGHLIN:

23       Q.   I am sorry.  Was your answer yes?

24           (Unknown noise)
```

1                    - - -

2              MS. JORDAN:  Note my objection to the

3         form of the question.

4              THE WITNESS:  I didn't say anything

5         yet.  I don't know where that noise was

6         coming from, that is why I sat still.

7              I guess I am still a little confused by

8         your question.  Am I acknowledging that there

9         were multiple incidences?  I can't say for

10        certain, because I don't remember the Mission

11        Kids Report.  I guess that is my answer.

12        Unless you can say your question another

13        way.

14   BY MS. LAUGHLIN:

15        Q.   I guess, based on what we just went

16   over, this summary that you were CC'd on, I guess

17   let me ask you.

18             If there was something inaccurate about

19   this document that you were CC'd on back in June of

20   2015, would you have said something to someone to

21   correct it to make sure that it was accurate?

22             MS. JORDAN:  Note my objection.  You

23        can answer.

24             THE WITNESS:  If there was something in

1           this document that I disagreed with I

2           probably would have asked -- I probably would

3           have made mention of it, yes.

4    BY MS. LAUGHLIN:

5           Q.    So, for example, if it is saying here

6    that the information from Mission Kids indicating

7    that both female students were subject to multiple

8    incidents of inappropriate touching from a male

9    student throughout the school year and it was

10   shared, and you didn't know that, would you have

11   said something to Ms. McCue about, like, you didn't

12   know that, what do you mean?

13          A.    At that point I can't say I would.  I

14   don't know.  It is June 3rd, it is the end of the

15   school year.  It's -- The issue happened a few

16   months ago.  I don't remember if there was still an

17   investigation going on outside of the school.

18          Mission Kids typically is involved in

19   the police.  It's usually not from the school.  So,

20   I don't know.  If there was still police

21   involvement, I don't know if I would have

22   jeopardized anything.  I don't know.  I don't know

23   what I would have done.

24          Q.    If the police were involved, do you

1    know whether that is something that you can -- you

2    said you didn't want to jeopardize police

3    involvement.

4            Can you still do your own independent

5    investigation when there is police involved?

6        A.    Yes.

7        Q.    If you had known at the time that there

8    was more than one incident -- I know we were talking

9    earlier about when a student is now going from your

10   elementary school to the middle school and there is

11   a file that can go with them, but then there is also

12   information that you can relay to them that's

13   important.

14           This information now about multiple

15   incidents of inappropriate touching by ▇▇▇▇ is

16   something that you felt important to have passed

17   along to the middle school he was going to?

18       A.    Yes, it would have been important.  I

19   don't recall if we did or not.

20       Q.    Is there a reason why you wouldn't

21   have if --

22       A.    No.

23       Q.    -- it is important and your practice

24   was to --

1    A.    No, there was no reason I would not

2  have.  I wouldn't have -- I wouldn't hide it.  I

3  wouldn't, you know -- I wouldn't protect the

4  teacher.  There is no reason for me not to pass that

5  along.  It is important for them to know.  I

6  honestly don't recall if we did.

7    Q.    If you had passed that along, do you

8  know whether that would be documented in any way so

9  that it continues along with the student to middle

10 school?

11   A.    I -- It would have to be documented

12 through, like, a guidance counselor's notes or

13 something.

14   Q.    Is there any way that you could make a

15 report?  I know we talked about, typically only the

16 letter to the parents talking about discipline would

17 go into the student's file, but was there something

18 that you independently could have done to have

19 papered the file for this?

20   A.    Hmm.

21        MS. JORDAN:  Objection to the form of

22        the question.  You can answer.

23        THE WITNESS:  I don't know if there

24        is.  I would think that the letter stating

 1          that would be enough, and if the middle

 2          school administration would have seen the

 3          letter and would have asked, then I could

 4          have shared additional information if it was,

 5          you know, relevant.

 6              There is no red flag that I can put on

 7          a kid's folder necessarily, you know, to say

 8          like, hey, look out for this kid.  I can

 9          share information, you know, with the middle

10          school through a transition meeting, and then

11          I can answer questions from the middle school

12          administration.

13  BY MS. LAUGHLIN:

14      Q.    But there is no way that you can, like

15  you said, like, red flag a file in some way for them

16  to, like, preemptively know?

17      A.    No.

18      Q.    Has the District ever had a process for

19  doing so?

20      A.    Not to my knowledge.  Not shared with

21  us.

22      Q.    Now, I am gonna go to that Office

23  Referral Form, which is on Page 1023.

24      A.    Yes.

 1        Q.    I will make it a little smaller so we

 2   can see the whole thing.  This is your handwriting

 3   again at the bottom?

 4        A.    Yes.

 5        Q.    This is the only Office Referral Form

 6   that was produced in this case.  Do you know whether

 7   there was any additional forms that were turned over

 8   to you?

 9        A.    I don't know.

10        Q.    Okay.  This is the form that was filled

11   out by Ms. Andrews.  Did you actually create this

12   form, or where did this form come from?

13        A.    Yes, I created the form.

14        Q.    So, you made this all up from, like,

15   out of a blank sheet?

16        A.    No. This comes from training through

17   the PaTTAN office through the State.  It's called a

18   Positive Behavior Intervention and Support Program.

19   I was trained in Parkland School District and I

20   brought it to North Penn.

21        Q.    Okay.  So, here there is three

22   different categories:  A minor problem behavior; a

23   major problem behavior; and a possible motivation.

24   Here it is listed as a physical contact minor

1  problem behavior.  I think you were saying before

2  that it should have been noted as a major problem

3  behavior; is that right?

4        A.    Yes.

5        Q.    Would that have been harassment and

6  bullying, or would it have been something else?

7        A.    I think based upon the investigation it

8  could have been either one.  Since the information

9  at the time the teacher put down that it was mutual,

10  I would have checked other, and inappropriate

11  contact I would have written down as the other.

12              Now, the possible motivation helps us

13  determine what is the motivation.  It's not a

14  category.  So, the two categories are minor and

15  major.

16        Q.    Okay.  Did you ever go over this form

17  prior to 2014 or 2015 with teachers and how to fill

18  this out, since this is a form you brought in?

19        A.    It is gone over at the start of every

20  school, yes.

21        Q.    Did you define for them, like, what

22  inappropriate language is compared to physical

23  contact, or?

24        A.    No, because at different grade levels

1  this can be done -- You know, inappropriate language

2  for a kindergartner might be completely different

3  than inappropriate language for a sixth grader.

4  This is where the professional judgment comes in.

5      Q.   Here at the bottom it says, has parent

6  signatures.

7      A.   Mm-hmm.

8      Q.   Is it typical that the parent would

9  have to sign one of these forms?

10     A.   If it were a minor -- If it were a

11 major, yes.

12     Q.   So, that would be reported up to you

13 and then you would have the parent --

14     A.   I would send it home so the parent can

15 sign it, yes.  And as you can see at the bottom, all

16 minors are filed with classroom teacher.  Three

17 minors equal a major.

18     Q.   So, just for the record, all minors are

19 filed with the classroom teacher?

20     A.   Correct.  We have talked about that a

21 few times.

22     Q.   Right.  Now I want to go to the -- We

23 talked about the Elementary Code of Conduct.  This

24 is on Page 1026.

```
 1          A.    Right.

 2          Q.    I think earlier we were talking about

 3    the level one, the level three.  I think in one of

 4    the notes you had gone over after these incidents in

 5    either April or May, that it was noted to be a level

 6    three.  What had happened in November?

 7          A.    That was Dr. Santoro's notes and she

 8    mentioned level three, correct.

 9          Q.    Are you able to see it or -- I don't

10    want to make it too small where you can't read it.

11          A.    That is good.  I can see it there.

12          Q.    Do you agree that it was a level three

13    incident?

14                MS. JORDAN:  Objection to the form of

15          the question.  You can answer.

16                THE WITNESS:  Are you -- When am I

17          being asked this question, today or in

18          '14-'15?

19    BY MS. LAUGHLIN:

20          Q.    Back at the time.

21          A.    So, back at the time, knowing what I

22    knew when?

23          Q.    I guess, you know, at the end of the

24    school year, once you had done your investigation
```

1    and --

2         A.    Okay.  So, yes, level three would be

3    appropriate.

4         Q.    I assume you asked for that distinction

5    because when you just got the information from the

6    teacher at first before your investigation was done,

7    they were under the impression it was a level one,

8    so that is what you had thought as well?

9         A.    Correct.  Hence the need for an

10   investigation.

11        Q.    What do you mean "hence the need for an

12   investigation"?

13        A.    If I just assumed it was a level one

14   and stopped there, it wouldn't have been anything,

15   but because I needed to investigate it more, that is

16   why I was able to determine it went to level three.

17        Q.    What was it about this that made you

18   second-guess it was a level 1 and go to the

19   investigation?

20        A.    I never --

21             MS. JORDAN:  Note my objection to the

22        form of the question.

23             THE WITNESS:  I never second-guessed

24        anything.  I am just saying that Holly's form

 1           said it was level one, Dr. Santoro's form

 2           said level three.  I did an investigation to

 3           determine the appropriate level.

 4    BY MS. LAUGHLIN:

 5           Q.    Do you recall ever retraining Ms.

 6    Andrews or Ms. Divver about the different levels and

 7    what they meant according to the form?

 8           A.    No.  Which form?

 9           Q.    The Office Referral Form.

10           A.    Retrain, no.  We did the same training

11    that we do every year at the start of the year.  I

12    think through the conversations they had, and,

13    hopefully, the discipline that was administered,

14    they would see.  It's not necessarily the level that

15    was the issue, it was the fact that they failed to

16    report it.

17           Q.    Do you know whether the District or

18    your school gives any instructions to teachers on

19    this Elementary Code of Conduct to the teachers?

20           A.    It is typically reviewed -- We ask the

21    teachers to review it at the start of the school

22    year.

23           Q.    At the start of each school year?

24           A.    Yeah, it's part of the student Handbook

1    so we ask them to review it on their own.

2         Q.    Would you agree with me, by the end of

3    the 2014-2015 school year, you knew that ▓▓▓▓ had

4    been, like, as we defined sexual harassment at the

5    beginning of your deposition, that she had been

6    sexually harassed --

7              MS. JORDAN:  Note my objection to the

8         form.  You can answer.

9              THE WITNESS:  Can you restate it,

10        please?  Are you gonna object again?  Okay, I

11        will listen better this time. Sorry.

12   BY MS. LAUGHLIN:

13        Q.    It's okay. I was gonna say, at the end

14   of the --

15             MS. LAUGHLIN:  Just -- Maureen, I know

16        you're gonna have an objection to the

17        question and we can note that, but just so

18        it's not cutting back and then it kind of

19        gets -- We can note that if you don't want to

20        interrupt.  You are gonna object to whatever

21        I'm gonna say, so.  Do you understand?

22             THE WITNESS:  Go ahead and say it.

23             MS. JORDAN:  It was trying to avoid the

24        gap in things.

 1  BY MS. LAUGHLIN:

 2      Q.   At the end of the 2014-2015 school

 3  year, would you agree with me that you had

 4  knowledge, actual knowledge that ██████had been

 5  sexually harassed by █████ that year?

 6          MS. JORDAN:  Note my objection to the

 7          question.  It calls for a legal conclusion

 8          and is improper, and I will not have him

 9          answer that question.

10  BY MS. LAUGHLIN:

11      Q.   At the time, would you have considered

12  what happened to █████ sexual harassment?

13          MS. JORDAN:  Not my objection to the

14          form of the question.  You can answer that.

15          THE WITNESS:  I am thinking.

16  BY MS. LAUGHLIN:

17      Q.   That is okay, take your time.

18      A.   It is difficult to say.  I was not

19  there in the room when it occurred.  I didn't

20  witness what happened.  I listened to two sides give

21  their view of the story.  Was there sexual contact?

22  Yes.  Was it harassment, meaning unwarranted or

23  unwelcomed?  I can't definitively say yes or no.

24  Was it inappropriate?  Absolutely.  Whether it was

1    wanted or unwanted.

2        Q.    Okay.  Do you know what impact that

3    incident involving ▮▮▮▮  in November, what impact

4    that had on ▮▮▮▮'s school environment at the

5    elementary school level?

6            Like, were you aware of any --

7        A.    No.  No.  I can't think of anything

8    that negatively -- she didn't seem to have any --

9    She didn't seem to have a negative impact from

10   November through April.

11       Q.    What gave you that impression?

12       A.    I didn't see any change -- major

13   changes in her behavior.  I was unaware of any

14   additional requests for counseling or increase in

15   frequent visits to the guidance counselor.

16           So, there was no change in her behavior

17   in multiple ways for me to feel that there was

18   something that would warrant that.  I think Kristin

19   Vaszily is an excellent guidance counselor and would

20   have communicated to me had she any indication that

21   there was something that impacted her.

22       Q.    Did you ever ask ▮▮▮▮whether it had

23   impacted her?

24       A.    No, more I was unaware of the H5

1    incident at the time.  So, had I known that ahead of

2    time, it could have changed how I handled things or

3    how I had done things, but, you know, the guidance

4    counselor wasn't made aware of it, and I firmly

5    believe in her skills.  Nothing led us to believe

6    that it impacted her negatively.

7        Q.    Other than moving ████ to another,

8    like, room or another class so that he wouldn't be

9    in class with ████ or another one of the victims,

10   were there any other things that you had put in

11   place as the Principal to prevent something like

12   this from occurring again with ████

13       A.    He was under increased supervision

14   informally so we didn't have anyone standing there

15   next to him.  Whenever there were activities where

16   this behavior could have repeated, we made sure to

17   have supervision through the classroom teachers or

18   teaching assistants that worked in the grade level,

19   anyone else that we had. We had playground aides or

20   anyone else that might have been available.

21             We just increased supervision while

22   also maintaining his confidentiality as well, as we

23   are required to do.

24       Q.    How would you increase the supervision

1    with maintaining his confidentiality?

2          A.    We would ask teachers to be more

3    vigilant in their observations.  I would make sure

4    to personally look at ███████ to make sure nothing

5    else was occurring.

6                You know, we are talking about the end

7    of the school year and there is a lot going on.  So,

8    we had to make sure -- Obviously the sixth grade

9    teachers already knew about it so it wasn't that we

10   had to maintain their confidentiality, but cafeteria

11   monitors and things like that, we just asked them to

12   be vigilant in their supervision.

13         Q.    Just in a general sense?

14         A.    For some individuals a general sense

15   because of confidentiality, but for others more

16   direct.

17         Q.    Were there specific meetings that these

18   took place, where you were going to be having the

19   sixth grade teachers keep better --

20         A.    Yes.

21         Q.    -- be more vigilant?

22         A.    When I had the meeting talking about

23   moving his class and things like that, we talked

24   about having, you know, increased supervision

1    involving him.

2         Q.    Did his parents know about that, the

3    increased supervision?

4         A.    I don't know.  I don't think so.  I

5    didn't call them up and tell them.

6         Q.    Would that be something, the increased

7    supervision, that would have been documented in his

8    file at all?

9         A.    No.

10        Q.    Why not?  If you thought there was a

11   need for increased supervision, why wouldn't that

12   have been documented in his file?

13        A.    Because it's not something I would have

14   done.

15        Q.    Do you think that is important for the

16   middle school, like, wherever he is going next to

17   have known about?

18        A.    Yes, I think it is important for them

19   to know about.

20        Q.    But you don't recall whether you had

21   that conversation to tell them?

22        A.    I don't recall, no.

23        Q.    Other than communicating to the middle

24   school, whoever was gonna be, like, I guess the

1  Principal of the middle school, was there ways you

2  could have communicated to the District, generally,

3  for them to be, like, on alert of these things that

4  were put in place that could carry through his

5  education?

6          A.    No.  I think it was done informally

7  through our team at school.

8          Q.    You said team with the school meaning

9  also, like, the team of the middle school or

10 something?

11         A.    No, just our school at Gwynedd.

12         Q.    I am gonna go to page 1009 and just ask

13 you about, this is a note from Ruth Divver to Cheryl

14 McCue dated May 5, 2015.  It just notes about an

15 incident on the playground with ███████ and ███████, a

16 report that ███████ was following her around at

17 recess.

18               Do you remember anything about this

19 incident?

20         A.    Give me a moment just to read through

21 it.

22         Q.    Sure.

23         A.    I don't remember this, to be honest.  I

24 don't.

1    Q.    Okay.  So, you are saying you don't

2  remember, like, the playground incident that's

3  referenced here?

4    A.    No, I don't.

5    Q.    What about the part about ███████

6  telling children on the bus or school about what had

7  happened to her, do you recall anything like that?

8    A.    No, I don't recall.

9    Q.    I know we have gone over several

10  conversations that you have had, whether it's

11  meetings or individual with a teacher or a guidance

12  counselor.

13    A.    Right.  Right.

14    Q.    Any other conversations that we haven't

15  already discussed that you can recall?

16    A.    No.

17    Q.    I know that you said, like, the

18  arbitration procedure and stuff between Ms. Andrews

19  and the district.  You weren't part of any of those

20  conversations or meetings; is that right?

21    A.    No.

22    Q.    Did anybody ever talk to you about what

23  was going on in those meetings?

24    A.    No.

1    Q.    Now, I know that you weren't in this
2   meeting, but I just want to direct your attention to
3   one of the meetings regarding the discipline for Ms.
4   Andrews and ask if you know what they are talking
5   about.
6              Here it notes, and this is on Page 996,
7   it says, perception that Bill doesn't want to be
8   bothered with things.
9              Do you know anything about what they
10  are referring to, or?
11   A.    (Reading note.) Concern from Bill
12  Bowen's form - reiterated again that this was for
13  teacher's use in their personal file.  Bill doesn't
14  want to be bothered.  No, I have no idea.
15   Q.    No one's ever talked to you about your
16  perception at the school or anything like that?
17   A.    No.  No.
18   Q.    Ms. Andrews' suspension being reduced
19  from two days to one, do you know anything about
20  that?
21   A.    No, I don't.
22   Q.    You said as far as you knew that you
23  had believed that Ms. Divver had also been
24  disciplined?

1      A.    I thought so, yeah.

2      Q.    Okay.  Why do you think that?

3      A.    Because they both failed to report the

4  incident.

5      Q.    Okay.  So, in your view, they both

6  should have been disciplined?

7      A.    I think there should have been

8  something, yes.

9      Q.    Is there anything that you could do if

10  a teacher was not disciplined:  Go to the district

11  or your supervisor or somebody to say, hey, I really

12  think we need an additional something here; whether

13  it is discipline or training or whatever?

14      A.    Not that I am aware of, no.  Oh, I

15  could go and say we need additional training or

16  something.  I can make suggestions, but there is no

17  formal process, no.

18      Q.    Would that have been just to your

19  direct supervisor?

20      A.    No.  I can go to Dr. Santoro.  I can go

21  to our professional development people.  I mean, I

22  could go other places, but really a lot of that

23  comes down do what is left at the building level.

24      Q.    So, you handled it at the building

1    level?

2         A.    Yeah, I would have to handle it at the

3    building level.  Yes.

4         Q.    Other than the file you talked about

5    that you would just paper by sending the discipline

6    letter to, like, ███████'s parents for example, was

7    there any other system in place by the District that

8    could allow what happened in sixth grade to, you

9    know, be notified at the middle school level or even

10   the high school level as a student continues through

11   the District?

12        A.    I am sorry.  Say that again.

13        Q.    Yeah. So, we were talking about, like,

14   the incident in sixth grade.  I am wondering the way

15   that that could be tracked through the District

16   school system, and I think you were mentioning that

17   the only --

18        A.    Yes.

19        Q.    -- meaning the track that the middle

20   school would --

21        A.    I --

22        Q.    -- know --

23        A.    I am following you.

24        Q.    Okay.  I think you had mentioned the

1    only real way to document that, would be put in a

2    file, would be the letter to ████s parents

3    informing them of the incident and the discipline.

4              I was wondering if the District had

5    anything in place other than that?  Where you could

6    -- whether it is make a report to the

7    superintendent or, you know, if there was a way you

8    could paper the file in some other way to notify the

9    chain?

10   A.    Back then I'm not sure because now we

11   have an online system which is much more efficient

12   and can be read by the middle school much more

13   easily.  Back at that time I don't know -- Yeah, I

14   don't know any other avenues that we don't already

15   have.

16   Q.    What is the system now that you use?

17   A.    It is called Infinite Campus and it is

18   online system, so the Behavioral Referral Forms are

19   online.  Everything's online and it is kept, you

20   know -- that records are kept and are more

21   accessible by the different levels.

22   Q.    So, it goes with the student then,

23   like, throughout their levels of education?  Like

24   their electronic --

 1       A.    It's, basically, an electronic version

 2  of a paper file.  Yes.

 3       Q.    Okay.  I think in a paper file the only

 4  thing you explained that would really be in there

 5  was the letter that was sent to the parents about

 6  the discipline?

 7       A.    So, an accumulative folder back then

 8  contained the academic information, report cards,

 9  progress reports, and other things like that.  The

10  demographic information.  So, the forms they use

11  when they enroll at the school.  Kindergarten or

12  whatever year they enter.

13             There is also he IEPs in file and 504s

14  and different special education documents, and then

15  there is the behavioral one, where you can put files

16  or, you know, letters for behavior and things like

17  that.  That is all now electronic.  A sixth grader's

18  folder can be a half an inch thick, you know, or

19  more by the end of their elementary career.

20       Q.    Sure. The forms that are available now

21  as far as behavior goes, are there, like, different

22  behavioral forms that can be filled out for students

23  that can then be tracked in the file?

24       A.    I am unaware of what's used at the

 1  middle school or secondary level, but we have a

 2  common behavior form at the elementary level now.

 3  Most schools are now implementing the Positive

 4  Behavior Intervention and Support System and are

 5  using the exact same form that I use at Gwynedd

 6  Square.

 7      Q.   Does that now go into the system

 8  automatically, as opposed to it being, like,

 9  shredded at the end of the year?  Is that something

10  you are now --

11      A.   Yes.

12      Q.   -- putting in?

13      A.   I don't know.  As a matter of fact,

14  July 1st, the new year rolls up.  I don't know if it

15  is carried over or if they are, you know, purged

16  from the system.  I really don't know.

17      Q.   But that is something that you would

18  upload into the system?

19      A.   It is already in the system, so they

20  fill it out online.

21      Q.   Everybody, all the levels have access

22  to that if needed?

23      A.   I don't know what the middle schools

24  and high schools have access to.

1       Q.    Do you only have access to your

2   students at the elementary school?

3       A.    Yes.

4       Q.    I'm gonna go to Page 983 and I am

5   showing you -- Let me just make it a little

6   smaller.  Can you still read what is on the page?

7       A.    Yes.

8       Q.    At the top it says the assigned

9   administrator is you, and it is saved by you and

10  finalized by you.  It looks like this is a classroom

11  teacher rating form for Holly Garrett, (ph).

12              And just for the record, that is the

13  same person as Holly Andrews?

14      A.    Yes. That's her maiden name, Garrett.

15  No, that's her married name Garrett.

16      Q.    Did she get married in this school

17  year?  Do you know?

18      A.    I guess so, yeah.  That must have been

19  the year she got married.

20      Q.    This says evaluation cycle 8/26 '14 to

21  6/30 '15.  Can you just explain for me how these

22  teachers, Mrs. Garrett and Ms. Andrews, is getting

23  evaluated for that school year? How does this work?

24              A.    Let me look at this point.  She was a

1    tenured teacher so she gets this form one time a

2    year, and the form is based upon multiple

3    observations and her performance during the course

4    of the school year.

5         Q.    This says rating date 12/23 '15.

6         A.    Yeah, I don't know why it says that.

7         Q.    Because that would have been the

8    following year, right?

9         A.    Yeah.  I don't know why it says that.

10        Q.    It says date finalized, 6/29 '15.

11        A.    Correct.  Oh.  I don't know when -- and

12   again, this is -- At one point we started using

13   certain metrics in the District, and we wouldn't get

14   the metrics to finalize the teacher's evaluation

15   until the fall.

16             So, we used to not be able to fill

17   these forms out until, like, November/ December.  I

18   don't remember when we started using that system, so

19   that is why it could be dated.  This part of the

20   form --

21             Can you scroll down?  I have a better

22   idea.

23        Q.    Sure.

24        A.    Right there.  Hold on.  The SPP form,

1  we don't get that, because it's based upon the PSA,

2  which they take back in the spring.  Back then we

3  wouldn't get the results until the fall, so we

4  wouldn't be able to finalize this form until

5  November/ December.  So, that is, I think, why the

6  dates up there are so late, but the boxes are done

7  at the end of the school year.

8       Q.    You are saying SPP.  Where do you see

9  that?

10      A.    In the middle item, two, SPP.

11      Q.    Oh, I see.  Okay.

12      A.    So, we don't get that score until late,

13 and we because we get it late we don't finalize

14 these until -- We don't actually finalize them until

15 later in the year.

16      Q.    Okay. And, actually, this bottom part

17 here on Page 984.  --

18      A.    Yep.

19      Q.    -- these parts, I am kind of circling

20 where it says rating professional employee.

21      A.    Mm-hmm.

22      Q.    Performance rating of proficient and

23 final rating of satisfactory.  Who is completing

24 that?

1    A.    That is done through -- So, you look

2    at, at the middle.  All of those scores are

3    calculated and produce that total earned points

4    number.  Right where --

5    Q.    Right here?

6    A.    Nope, down a little.  Yep. Those right

7    there, and then they get -- Right where your cursor

8    is, that is the final rating number, and based upon

9    the table at the top.  So, there's a 1.68, so, she

10    fell just above the proficient -- Oh, you are going

11    too far.  Stop right there.  In middle of the

12    screen, see the scale?  Down.  Down.

13    Q.    Yes.

14    A.    Right there.  Do you see the scale?

15    So, she finished up with a 1.68.  That falls between

16    1.5 and 2.49, which is proficient.  That is why she

17    got that score.

18    Q.    You said at the end of the year she

19    ended up with 1.68?

20    A.    Correct.

21    Q.    Who is giving her this rating?

22    A.    So, the numbers directly above it,

23    those numbers are populated based upon the

24    performance.  So, her observation practice and

1  rating, I do that part.  Those are the numbers up

2  top.  That counts for 50 percent of her evaluation.

3  So, see the boxes at the top?

4       Q.    These ones you're talking about?

5       A.    Yep.  I gave her two failings and two

6  proficients.  So, based upon the calculation of the

7  numerical score for that, she got four out of eight,

8  which is 50 percent.

9             That is why on the first line there is

10  .50.  Then the SPP score and other scores get

11  factored in there and when you add those up, that is

12  where it gets to be 1.68.  That is how it's

13  determined.

14       Q.    Okay.  I understand.  So, the No. 1,

15  the very top of the Page 984, that is based on your

16  observation of her in the classroom, right?

17       A.    Yes.

18       Q.    You gave her, you said, two failings

19  and two proficients; right?

20       A.    Yes.

21       Q.    How many times during the course of the

22  year are you observing her, or is it just one time?

23       A.    It's informal and formal observations.

24  I can note anything that occurs during the school

1  year, in addition to the one formal observation that

2  I have to write up.

3       Q.   You said the one formal observation you

4  have to write up.  Is that, like, a separate report

5  that's put somewhere?

6       A.   A separate form, yep.

7       Q.   Is it called something?

8       A.   Classroom observation form probably.  I

9  don't recall exactly what it is called.

10      Q.   Where is that normally kept?  Is it,

11  like, electronic or filed?

12      A.   The same system that this form is

13  housed in.  It is called Front Line.

14      Q.   That is something whenever that one

15  formal observation occurs, you are documenting what

16  you are seeing --

17      A.   During that particular observation,

18  yes.  But that doesn't automatically translate

19  here.  That's just one small piece.  That would be

20  like me evaluating you on one case through the whole

21  score year; your whole calendar year.

22           If I evaluated you on one legal case

23  that you settle, that would be your end of the

24  year.  So, if you didn't do well in that case, that

1  would mean it would be a bad year.  But I have to

2  look at the accumulative.  I have to look at all the

3  observations, all of your cases, and then I would

4  come up with this form.

5       Q.    Right.  So, this form, this chart with

6  all the boxes that we are looking at on 983, this is

7  out of all those observations you did, this is the

8  conclusion that you putting in?

9       A.    Yes.  Exactly.

10       Q.    So, out of four different grades that

11  you are giving her in the evaluation, two of them

12  are failing; right?

13       A.    Yes.

14       Q.    Is that normal for teachers at your

15  school?

16       A.    No.  These are the only failings I've

17  ever given to a teacher.

18       Q.    Do you remember, was it particular

19  instances or circumstances that were given failing?

20  Is there --

21       A.    It's the reason we are here.

22       Q.    So, that wouldn't be something you

23  actually observed in the classroom; is that right?

24  It's just from --

1   A.   Correct.  That is why I said

2   accumulative.  Everything.  Not just the classroom

3   observation but, you know, turning paperwork in.

4   That is part of a professional responsibility.

5            So, the whole shredding of the document

6   issue, that's why she got the failing there.

7   Failure to properly observe students in the

8   classroom, and the incident with ███████ that got her

9   the failing in the classroom environment.  There are

10  many subcategories that go into each one of those

11  four categories.  We look at it in a global

12  perspective and evaluate and give these scores.

13  Q.   You said these are the only two

14  failings you have ever given to a teacher; correct?

15  A.   I think I -- I have to recall.  I have

16  to say Ruth, I think both her and Ruth have got

17  failings.  I have never given failing for another

18  teacher.  Needs improvements, proficiency, and

19  distinguished, yes.  But a failing to me is a pretty

20  serious incident.

21  Q.   Okay.  When you have this form at the

22  end of the year with a total score and two failings,

23  is there a separate meeting that takes place with

24  the teacher to go over this?

1    A.    We require to meet with any teacher

2  that has a failing on their form.  So, I met with

3  the teachers regarding failing here.

4    Q.    What do you recall about that meeting?

5  This would have been at the end of the school year,

6  right?

7    A.    Yes.  Well, I have to have -- just --

8  We reviewed why they got failing marks.

9    Q.    Is that meeting in writing at all or is

10  it just a verbal meeting?

11    A.    A verbal meeting.

12    Q.    Do you recall what Ms. Andrews or Ms.

13  Divver had said to you in those meetings at the end?

14    A.    I don't recall that, no.

15    Q.    Do you recall whether you had put

16  either one of them on a performance improvement plan

17  after this --

18    A.    I did not put them on a performance

19  improvement plan.

20    Q.    Is that something as a Principal that

21  you are able to do?

22    A.    Yes.  No, I don't believe I did.  No.

23    Q.    Do you know why you didn't put them on

24  a performance improvement plan since they were

1    failing?

2         A.    Usually it would require multiple areas

3    to improve upon.  In this case, with it being a

4    little more isolated, I don't think it needed an

5    improvement plan.  Had I seen other incidences that

6    they failed to report for things like that, then I

7    would have done an improvement plan.

8         Q.    Now, in some of the documents that we

9    have gone over -- Hold on.  Some of the documents we

10   went over today referenced some prior incidences

11   involving ████ with female students in fourth and

12   fifth grade.  I think you said that you didn't

13   recall those incidences as we sit here today?

14        A.    No, I don't.

15        Q.    If there had been prior incidents in

16   school, would that have been something that you

17   would have expected to be documented?

18        A.    Yes.

19        Q.    Like, an Office Referral Form for

20   example?

21        A.    Yes.

22        Q.    I think you told us, unless it was --

23   Well, at the end of the school year those Office

24   Referral Forms would be shredded; correct?

```
 1        A.    Correct.

 2        Q.    So, if something happened in fourth

 3   grade, based on the policy that you had at the

 4   school, at the end of fourth grade any of the Office

 5   Referral Forms, they would have been shredded by

 6   either the teacher or you, right?

 7        A.    Correct.

 8        Q.    If there had been an Office Referral

 9   Form involving ██████ touching female students at

10   school, would that have been something you would

11   have shredded at the end of the school year?

12        A.    Not necessarily.

13        Q.    When you say "not necessarily," what do

14   you mean?

15        A.    Because you are asking me a

16   hypothetical, so I am kind of giving you a

17   hypothetical back.  I haven't had a student that had

18   multiple incidences of touching.  So, I guess you

19   are asking would I have probably kept it?  Yes, I

20   probably would have.

21        Q.    I guess when you are saying, you know,

22   you could have, I just was wondering if there was,

23   like, a distinguishing -- whether in these

24   circumstance you would or these circumstance you
```

 1    wouldn't?

 2         A.    No.

 3         Q.    Did you have the authority or ability

 4    to expel ███████ after --

 5         A.    No.

 6         Q.    -- these -- Sorry.  -- after these

 7    incidences at the end of the year?

 8         A.    Sorry.  No.  Expulsion only comes from

 9    the Superintendent and has to be requested through

10    the School Board.

11         Q.    The School Board has to request it from

12    --

13         A.    The Superintendent recommends it.  It's

14    put on the School Board agenda and voted on by the

15    School Board.

16         Q.    Okay.  What is the most that you can do

17    in terms of discipline for a student as a Principal?

18         A.    When you are saying "most", I guess you

19    are saying most severe?

20         Q.    Correct.

21         A.    Out-of-school suspension is probably

22    the most severe.

23         Q.    Are you able to, as a Principal,

24    recommend that a student like ███████ who has

1    multiple reports of touching female students, can

2    you recommend he receive treatment?

3            MS. JORDAN:  Note my objection to the

4            form of the question.  You can answer.

5            THE WITNESS:  I can, as we did, you

6            know, ask parents for permission to involve

7            Mission Kids or we have other organizations

8            now in our District.  We can ask for parents'

9            permission to enroll them in those programs,

10           but we have to get the parents' permission.

11   BY MS. LAUGHLIN:

12       Q.    I think from the notes we were

13   referring to, my understanding was that the Mission

14   Kids conversation was more for the female parents?

15       A.    In the notes it says we offered both

16   parents to have involvement through Mission Kids.

17   At that time we didn't have many outside agencies.

18   We have many more now, but at the time we didn't

19   have a ton of outside agencies.

20           Sometimes you need to refer through

21   either Children and Youth or Mission Kids to open

22   the door for different services.  So, that is why we

23   also involved Children and Youth.  Not that

24   necessarily it was a criminal act, but sometimes

 1    that's what opens doors for families to get

 2    services.

 3          Q.    Just to clarify.  When you said both

 4    parents were notified about Mission Kids and they

 5    declined, I was understanding that to mean ██████'s

 6    family and the other female victim's family.  But

 7    did you mean ████████ family?

 8          A.    I think my notes, don't they reference

 9    both ██████ and ██████?  I have to see my notes

10    again to say this.

11          Q.    It wasn't by name, it just said both.

12          A.    Right.  I would have to go through the

13    notes, and I still might not recall exactly who we

14    offered it to.

15          Q.    As a Principal, are you able to put

16    information in ████████ IEP at all?

17          A.    I am part of the team that can put

18    information in to her IEP, and then ultimately it

19    must -- if services are to be instituted, we have to

20    have the parents' permission for that.

21          Q.    Okay.  By the end of ██████'s school

22    year, was there any discussion or did you ever

23    consider putting in ██████'s IEP, since she had 1,

24    about keeping ██████ away from her, in terms of

1  their education?

2      A.    No, that wouldn't necessarily be

3  something documented in the IEP.

4      Q.    Why not?  Why do you say it like that?

5      A.    Because it has to be -- That is not

6  necessarily an educational programing decision.

7  That would be something I would want to get -- I

8  would have to get further clarification on, if we

9  were even allowed to do it, from either our Director

10  of Special ED or our legal counsel.

11      Q.    Okay.  Is there anything you know of

12  that you could have done at the elementary school

13  level in terms of ███████'s file to document what had

14  happened so that it would follow her or go to, like,

15  her middle school or something like that so they're

16  aware of it?

17      A.    Honestly --

18          MS. JORDAN:  Note my objection to the

19      form of the question.  You can answer.

20          THE WITNESS:  Honestly, since they were

21      both going to separate middle schools, I

22      don't think we saw the need to document

23      anything like that.

24  BY MS. LAUGHLIN:

1    Q.    What about for high school?  Did you

2  anticipate at the time that they may end up at the

3  same high school at some point after the middle

4  school transfer?

5    A.    Honestly, it's not something we

6  discussed, no.  Not at the elementary level.

7    Q.    Are you aware of the incidents that

8  ▇▇▇▇ had with ▇▇▇▇ again in high school?

9    A.    No.

10    Q.    I just want to show you another

11  document.  The documents I am showing you are

12  documents that have been produced to me by the

13  District as ▇▇▇▇ education file.

14    A.    Okay.

15    Q.    So, these are the documents.  There is

16  this page.  --

17    A.    Mm-hmm.

18    Q.    -- which is an incident at the middle

19  school.  So, this was after you were his -- after he

20  was in your school.  Then the second page I am gonna

21  show you, it's a four-page document.  The top of it

22  has his grades.

23    A.    Right.

24    Q.    And then on Page 4 of 4 there's a

1    Discipline Incident List?

2          A.    Yes.

3          Q.    Have you seen forms that look like this

4    before?

5          A.    This is through, I believe, the old

6    Front Line system.

7          Q.    And that is the electronic record

8    keeping system --

9          A.    Yes.

10         Q.    -- at some point after 2014-2015 the

11   District implemented?

12         A.    Yes.

13         Q.    So, I just want to look at this here,

14   and there is one listed under Gwynedd Square

15   Elementary where it says incident was obscene

16   language and gesture.

17               Do you see that?

18         A.    Yes.

19         Q.    It says the incident date time is

20   4/9/2015?

21         A.    Okay.

22         Q.    Do you know why there is only one

23   incident listed in ▮▮▮▮▮▮ file?

24         A.    Typically that is only when they are

1    suspended does it get listed like that.

2         Q.    So, this Discipline Incident List is

3    usually only when there is a suspension given to a

4    student?

5         A.    Correct.  In our old system.  Yes.

6         Q.    Now, my understanding is this is the

7    entirety of the file for ███████ ███████  I just

8    showed you the five pages and there is no note in

9    this file or letter that was sent to his parents,

10   like you referenced, would be documented in a --

11        A.    That -- Go ahead.  I'm sorry.

12        Q.    -- in a student like this.  Do you know

13   why?

14        A.    That is not his entire file.  So, this

15   is the online Front Line system document that you

16   have.  Anything from elementary school, I don't know

17   what happens to it once it goes to middle school.

18             So, his suspension letter, his DIBELS

19   assessment scores, his report cards, and everything

20   else, they were in paper form and were delivered to

21   Penndale Middle School after the 2015 school year.

22   So, I don't know what happens to them after that.

23        Q.    After the box gets delivered to the

24   actual middle school?

```
 1          A.    Correct.
 2          Q.    So, you would agree with me that as far
 3    as the file you would have kept on him, that is not
 4    in here?
 5               MS. JORDAN:  Note my objection to the
 6          form of the question.  You can answer.
 7               THE WITNESS:  The documents that we
 8          kept on him while he was attending Gwynedd
 9          Middle School are not listed on this form.
10    BY MS. LAUGHLIN:
11          Q.    Okay.  Do you have any idea the ones
12    the District converted to electronic, like the
13    system that you were talking about, what happened to
14    the paper files?  Did they ever tell you that?
15          A.    Nope.  I don't know what happened to
16    them.
17          Q.    I think those are all the questions I
18    have for you, Mr. Bowen.
19          A.    All right.  Pleasure speaking with you
20    today.
21          Q.    You too.
22               MS. LAUGHLIN:  No questions, Maureen,
23          right?
24               MS. JORDAN:  I don't have any
```

```
1        questions, thanks.  We can go off the record.

2        I am getting a copy, email as well as a hard

3        copy.

4                (Whereupon the deposition concluded at

5        2:50 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                C E R T I F I C A T I O N

 2

 3

 4

 5              I, Stephanie A. LaForte, a Court

 6    Reporter, Notary Public, do hereby certify the

 7    foregoing is a true and accurate transcript of the

 8    stenographic notes taken by me in the aforementioned

 9    matter.

10

11

12

13

14

15

16

17

      DATE:

18

19                        Stephanie A. LaForte

                              Court Reporter

20                            Notary Public

21

22

23

24
```

EXHIBIT "G"

1      IN THE UNITED STATES DISTRICT COURT
2  FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                  - - -
4

   JANE DOE,                    :
5        Plaintiff,            :   CIVIL ACTION
                                :   NO. 2:20-CV-
6        v.                    :   05142
                                :
7  NORTH PENN SCHOOL            :
   DISTRICT,                    :
8        Defendant.            :
9                  - - -
10              August 25, 2021
11                  - - -
12
13          Remote oral deposition of
   CHERYL McCUE, taken pursuant to notice,
14  was conducted at the location of the
   witness, beginning at 10:05 a.m., on the
15  above date, before Ben Pieczynski, Jr., a
   Professional Reporter and Notary Public
16  for the Commonwealth of Pennsylvania.
17
18
19
20                  - - -
21
       GOLKOW LITIGATION SERVICES
22     877.370.3377 ph| 917.951.5672
           deps@golkow.com
23
24

```
 1   APPEARANCES:
 2
 3       FREIWALD LAW
         BY:  LAURA E. LAUGHLIN, ESQUIRE
 4       1500 Walnut Street
         Suite 1801
 5       Philadelphia, Pennsylvania 19102
         (215) 875-8000
 6       lel@freiwaldlaw.com
         Representing the Plaintiff
 7       (Via Zoom web conference)
 8
         HENDRZAK & LLOYD
 9       BY:  MAUREEN A. JORDAN, ESQUIRE
         3701 Corporate Center Parkway
10       Suite 100
         Center Valley, Pennsylvania 18034
11       (610) 709-8705
         maureen.jordan@zurichna.com
12       Representing the Defendant
         (Via Zoom web conference)
13
14       WISLER PEARLSTINE, LLP
         BY:  KYLE J. SOMERS, ESQUIRE
15       460 Norristown Road
         Suite 110
16       Blue Bell, Pennsylvania 19422
         (610) 825-8400
17       ksomers@wispearl.com
         Representing the Defendant
18       (Via Zoom web conference)
19
20
21                  -   -   -
22
23
24
```

```
1                    -   -   -

2                  I-N-D-E-X

3                    -   -   -

4    Testimony of:   CHERYL McCUE

5         By Ms. Laughlin              5

6

7

8

9

10                   -   -   -

11            E-X-H-I-B-I-T-S

12                   -   -   -

13   NO.                DESCRIPTION          PAGE

14   Exhibit-A     Curriculum vitae          380

15                   -   -   -

16

17

18

19

20

21

22

23

24
```

1                     −   −   −

2           DEPOSITION SUPPORT INDEX

3                     −   −   −

4

5   DIRECTIONS NOT TO ANSWER:

6   PAGES:  None

7

8   REQUESTS FOR DOCUMENTS OR INFORMATION:

9   PAGES:  None

10

11  STIPULATIONS AND/OR STATEMENTS:

12  PAGES:  None

13

14  MARKED QUESTIONS:

15  PAGES:  None

16

17

18

19

20

21

22

23

24

1              -   -   -

2              CHERYL McCUE, after having

3          been duly sworn, was examined and

4          testified as follows:

5              -   -   -

6              EXAMINATION

7              -   -   -

8    BY MS. LAUGHLIN:

9          Q.    Hi, good morning.

10         A.    Good morning.

11         Q.    Just so I get the, the title

12   right, are you Dr. McCue?  How do you --

13         A.    I am.  You can just refer to

14   me as Cheryl, though, that's fine.  But I

15   do have --

16         Q.    I'll probably --

17         A.    I do have my doctorate.

18         Q.    Okay.  I appreciate that,

19   but I'll probably be a little more

20   formal.

21         A.    Okay.

22         Q.    So I'll --

23         A.    I understand.

24         Q.    -- probably refer to you as

1   Dr. McCue.  I hope that doesn't -- that's
2   okay.
3            Have you ever given a
4   deposition before?
5        A.    I believe so, yes.
6        Q.    About how long ago?
7        A.    Probably years, when I think
8   back, yes.
9        Q.    Was it in, like, the context
10  of your work with the North Penn School
11  District?
12       A.    No.  I think it was prior to
13  that.
14       Q.    Okay.
15       A.    In a different school
16  district.  I've been in mediations and
17  other hearings in situations through my
18  work with North Penn.
19       Q.    Like, as, like, the director
20  of HR?
21       A.    Yes.
22       Q.    So I'm gonna give you some
23  ground rules that will make things
24  hopefully go a little bit easier today,

1  especially since we're all over Zoom and

2  in our own areas, offices and things.

3         Since there's a court

4  reporter that's in the virtual room

5  taking everything down, they're taking

6  down everything that I say, all of my

7  questions, and all of your answers, so

8  everything needs to be verbal, okay?

9         A.    Yes.

10        Q.    It's common, in

11 conversation, to nod your head or say

12 uh-huh or uh-uh, and everybody does it.

13 Just yesterday, I had a deposition, and

14 the witness did it.  So if that happens,

15 I'll try and follow-up and, and catch it,

16 so we can get a clear transcript, but I'm

17 not trying to be rude.  That's what I'm

18 doing, though, okay?

19        A.    Understood.

20        Q.    Since there's a court

21 reporter taking down everything that's

22 said, only one person can speak at a

23 time.  So you may think you know where

24 I'm going with my question, but I would

1    just ask that you allow me to finish
2    before you start your answer, and if I
3    start my next question and you weren't
4    done answering, just let me know, and
5    I'll let you finish, okay?
6         A.    Absolutely.
7         Q.    If there is a question I ask
8    that you're not sure what I meant or it
9    comes out a bit jumbled, just let me
10   know, and I'll try and rephrase it.  If
11   you answer it, though, we're all going to
12   assume that you understood the question,
13   since I gave you that instruction, okay?
14        A.    Yes.
15        Q.    If you need to take a break
16   for any reason today, that's fine, just
17   let us know, and you can do so.  I would
18   just ask, if there's a question pending,
19   that you answer the question before you
20   take your break, okay?
21        A.    Yes.
22        Q.    We're gonna be talking,
23   generally, about your background and
24   things like that over the years and some

1 events that took place in, like, 2014 and
2 2015 and after that as well.  If there's
3 something you don't remember or you don't
4 know, I don't want you to guess, okay?
5          A.    Yes.
6          Q.    But if you're estimating,
7 like you don't know the exact month but
8 you have the general timeframe or things
9 like that, you can give an estimate, just
10 let us know that's what you're doing,
11 okay?
12          A.    I'll clarify as such, yes.
13          Q.    Okay.  And I understand,
14 just before the -- before this
15 deposition, did yo review any documents
16 or anything?
17          A.    Yes.
18          Q.    Okay.  And I just want to
19 give one last instruction before I ask
20 you questions about what you reviewed
21 before your deposition today.
22               I'm gonna be asking you
23 questions about conversations you've had,
24 but I'm not asking you conversations

1   you've had with your counsel in

2   preparation for this deposition today,

3   those are off limits, okay?

4          A.    Yes.

5          Q.    What documents did you

6   review in preparation for today?

7          A.    Some of the notes that I had

8   taken during the course of the

9   investigation.

10          Q.    And are you referring to

11   your handwritten notes from the Gwynedd

12   Square situation?

13          A.    Yes.

14          Q.    Is there anything else that

15   you reviewed before today?

16          A.    Not, not to my knowledge,

17   no.

18          Q.    Okay.  Other than

19   conversations with your lawyer, have you

20   had any other conversations with anybody,

21   whether it's North Penn administration or

22   anybody else, before this deposition

23   today?

24          A.    No.

1        Q.    I understand, just prior to

2 the deposition, I received from your

3 counsel, a copy of your resume?

4        A.    Yes.

5        Q.    Do you have that in front of

6 you?

7        A.    I do.

8        Q.    Okay.  Is it this -- I just

9 did a little thing, but is that the

10 document?

11        A.    It is, yes.

12        Q.    Okay.  I'm going to mark

13 this as Exhibit-A, and I can e-mail it to

14 you, or the court reporter, after the

15 deposition today to be attached to the

16 transcript.  Normally I'd pass it across

17 the table and it gets marked, but we're

18 in a different world these days, so

19 everything's all virtual.

20        So when was the last time

21 that this resume was updated?

22        A.    It would have been in,

23 probably, April or May of 2020, following

24 my new position as director of employer

1    engagement with Lehigh University.

2         Q.    Okay.  And --

3         A.    You see that top part of the

4    professional profile?

5         Q.    Yes, I see that.

6         A.    The experiences relating to

7    my current position, I did not include.

8    It's not included in my resume because

9    this was utilized in conjunction with my

10   transition, my retirement from K to 12 ed

11   and movement into higher ed.

12        Q.    Okay.  You said it's a

13   retirement from K to 12 ed.  I think

14   when -- you know, I normally hear

15   retirement, I think someone is retiring

16   and moving to somewhere with warm weather

17   or something like that.

18             But, I guess, explain for me

19   your transition from -- what you mean by

20   retirement from K through 12 and then

21   going to higher education.

22        A.    I finished a 33-year career

23   in K to 12 and moved into the director of

24   employer engagement with Lehigh

¹ University.

²      Q.    Why did you leave K through

³ 12 education at that time?

⁴      A.    Because it was best for my

⁵ family and my situation at the time.  I

⁶ had an opportunity to return to my alma

⁷ mater to continue that work, and, quite

⁸ honestly, after 33 years in K to 12 ed,

⁹ it was, you know, very much time.  The

¹⁰ commute, the travel, the distance, you

¹¹ know, personal reasons with my family,

¹² that they are more needing of my time

¹³ than, than the -- you know, what I could

¹⁴ otherwise provide them.  So this was an

¹⁵ excellent opportunity and fit our life at

¹⁶ the time.

¹⁷      Q.    Okay.  And did you straight

¹⁸ from your role with North Penn School

¹⁹ District to the job at Lehigh?

²⁰      A.    I did.  I had one week in

²¹ between, to transition, but -- and was

²² still actually maintained as an employee

²³ in the district, due to vacation and --

²⁴ vacation time that I had to expend.  So

1  there was a little bit of overlap,

2  actually, and opportunity for me to

3  support the transition to the new

4  director.

5      Q.    The new director that was

6  taking over at North Penn?

7      A.    Yes.

8      Q.    And were they -- the new

9  director, were they taking over as

10  director of human resources at the

11  district?

12      A.    Yes.

13      Q.    Okay.

14      A.    That's correct.

15      Q.    I want to kind of go through

16  your, your work experience prior to

17  Lehigh, I guess, since, according to your

18  resume, from -- was it 2010 to 2020, you

19  had worked for the North Penn School

20  District?

21      A.    Yes, that's correct.

22      Q.    Okay.  And you started out

23  as the director of elementary education

24  from 2010 to 2014, right?

1    A.    Yes.

2    Q.    Okay.  And it says here,

3  in -- on your resume, on the first page,

4  that the director off elementary

5  education is a cabinet level position.

6  What does that mean, a cabinet position?

7    A.    The superintendant in the

8  school district -- the leadership team,

9  senior leadership, comprise a cabinet of

10  12 members that the superintendant leads

11  and supports in their administrative

12  leadership within the district.  So, the

13  director of elementary was a cabinet

14  level position within the district.

15    Q.    Okay.  And can you just give

16  me a, a general sense, I know it's, you

17  know, here on your resume too, but just

18  from your perspective, what your, like,

19  role and responsibilities were as the

20  director of elementary education for

21  those four years.

22    A.    Sure.

23       It was primarily

24  supervision, oversight support and

1  assistance to the 6,500 students in 13

2  elementary buildings and those leadership

3  teams that existed in the district at the

4  time.  It required, you know, daily

5  conversations with administrators, visits

6  to buildings, oversight of the practices

7  that were occurring, work with parents

8  and community members in regards to

9  supporting those buildings and whatever

10 the initiatives that were happening in

11 regards to the strategic plan that the

12 district had as well as our elementary

13 level goals at the time.

14        Q.    Okay.  So, some of those

15 things seem, like, pretty broad, just in

16 terms of, like, implementation with

17 schools and things like that, especially

18 13 elementary school buildings.  So you

19 were the director of all 13?

20        A.    Yes, that's correct.

21        Q.    Was there anybody below you,

22 like, that's kind of, like, the assistant

23 director of elementary that was, like,

24 more hands-on -- of those 13 schools?

1      A.    No.

2      Q.    Okay.

3      A.    The building principals

4   served as the leaders of their buildings

5   and supervised and oversaw the activities

6   happening in those buildings.  When

7   support was needed, that's where the

8   director came into play.

9      Q.    When you say "support was

10  needed", what kind of situation would you

11  typically get involved in on an

12  elementary school level?

13     A.    If we were reconfiguring a

14  scheduling for the building or for the

15  entire level, some initiative like that,

16  we would be involved in; overseeing and

17  coordinating things that were in common

18  across all 13 buildings; general

19  practices; implementing some new

20  curriculum, would also be supported by

21  the director of elementary and the

22  director of curriculum at the time.  If

23  there were concerns with regard to

24  practices in the building that were

1  unable to be managed or resolved at the

2  building level, they often were escalated

3  to the director of elementary to help

4  facilitate a resolve.  Sometimes those

5  were dealing with parent complaints over

6  practices and procedures in the building.

7  Sometimes they may have been in regard to

8  student behavior, teacher performance,

9  you know, any of those kinds of things

10  that you would associate with the

11  teaching and learning process in a

12  building.

13       Q.    Okay.  One of the things you

14  just mentioned was student behavior.  And

15  just so I make sure I'm understanding

16  your answer, that for student behavior

17  issues, they would be managed by the

18  principal of the school, but if they

19  couldn't handle it for some reason, would

20  they reach out to you, or what does that

21  process look like?

22       A.    Sure.

23            It -- not necessarily that

24  they couldn't handle it, but if it was of

1 such a nature or level that it was
2 required to be elevated based on our
3 policies or a higher level of discipline
4 was required, so for example, if there
5 was something that would have led to an
6 expulsion or hearing status, some of
7 those natures, then the natural
8 progression with regard to policy and
9 procedure was to elevate through my level
10 and then eventually to the assistant
11 superintendant and superintendant.
12            So, you know, if there was a
13 question or a concern, or if there was a
14 situation in which another building had
15 experienced it and there was a need or a
16 desire to communicate across the 13
17 buildings so that we were unified in the
18 way that we chose to address the
19 situation, that would have been another
20 area in which they would have contacted
21 the director.  Sometimes it was a had
22 heads up, if they were dealing with an
23 issue and a parent was not seemingly
24 happy.  It might be a call to say, you

1    know, this parent, you know, calls you or

2    comes over to the ESC, then this is what

3    has happened, this is what's transpired,

4    let me give you the back story so that

5    you're able to appropriately deal with

6    it.

7        Q.    Okay.  I just have a couple

8    follow-up questions on that.

9            When you say that it is

10   consistent across the building, sometimes

11   you would be involved if you wanted to

12   make sure that something was being

13   implemented or done at the school is

14   consistent across buildings, is that

15   something that a principal would have to

16   come to you with, or how would you know

17   if something is being consistently done

18   across school buildings?

19       A.    We would have monthly,

20   monthly meetings of the elementary

21   principals.  So we would discuss strategy

22   and responses to discipline.  We have

23   a -- we had a discipline code at the time

24   that was adhered to, and we would discuss

1  those things.  Now, obviously, the

2  director of elementary is the connecting

3  force among and across all 13 buildings.

4  So that would be the, the connection to

5  informing, you know, the director if, in

6  fact, for example, there was a weapon

7  brought onsite.  There were protocols to

8  take -- to happen and occur, and those

9  principals were very adept at following

10  the protocols, contacting the police,

11  doing the investigation, but then there

12  was always a call to central office.  And

13  in that role, the director of elementary

14  would take the call to hear the concern

15  and see if there was additional support

16  that was needed.

17        Q.    When you say --

18        A.    A case.

19        Q.    Sorry.

20              When you say the principals

21  are very adept at handling, you know,

22  these situations, how is that, like,

23  monitored or assessed?

24        A.    Through supervision of their

1  performance, through professional

2  development and training sessions whereby

3  the director of elementary and the

4  cabinet level members were participating,

5  you know, and updates and responses to

6  emergency situations or behavioral

7  situations that involve students.  So

8  there was a very collaborative spirit in

9  the district in order to make sure that

10  we were referencing and dealing with

11  situations in a similar format across the

12  buildings, essential when you have a

13  district the size of North Penn.

14       Q.    When you say training on

15  updates and things like that, how often

16  was that happening for these building

17  principals?

18       A.    That was -- typically, the

19  district had, at the time -- and I

20  obviously can't speak for now -- but at

21  the time, there was a structure in place

22  where there would be monthly

23  administrative meetings of all 60-plus

24  administrators in the district at a

1  district level, followed by individual

2  break out meetings by department.  So

3  elementary principals would meet,

4  secondary principals would meet, special

5  education supervisors and so on.  And

6  then aside from that or in addition to

7  that, on the second meeting of the month

8  was identified specifically to those

9  individual departments and/or special

10  groups.  So, elementary principals would

11  meet together with the entire

12  administrative team of 60-plus once a

13  month, and they would meet as well with

14  elementary principal, elementary

15  principal group at another point in the

16  month.  They also knew very well to

17  experience a visit from me multiple times

18  during the month to their buildings,

19  where we would do building walks, we

20  would talk about current events in the

21  building, what was happening.  I would

22  attend faculty meetings in the building,

23  home and school, or what you might know

24  as parent association meetings, that

1  happened in the evenings.  There was some

2  discussion and talk sometimes at board

3  meetings, you know, that would have us

4  together, collaborating and sharing what

5  was going on in the buildings.

6          So, those were all the ways

7  that principals were kept informed and

8  had an opportunity to share what was

9  happening in the building so that the

10  communication lines across the district

11  remained open and, and known to everyone.

12          Q.    At these once a month, like,

13  60-plus administrative people getting

14  together at meetings, you said, can you

15  give me, like, a general sense -- I guess

16  let me ask this, was it the same, pretty

17  much, from 2010 to 2020, how those

18  meetings were run and what was happening

19  and things like that, or did it change

20  over the course of the time?

21          A.    It was very, very similar.

22  Players changed, obviously, but the

23  meetings were, were pretty, pretty stable

24  in terms of the structure and the

1  approach.  Additionally, you know, as I'm

2  just thinking about it, we also

3  experienced, as an administrative team,

4  usually three days each summer as an

5  administrative retreat, where the entire

6  team would come together.  And again,

7  that was for strategic planning,

8  projectioning (sic), updating on goals

9  that had been reached, developing goals

10  for the upcoming school year, and that

11  would typically imbed with it some levels

12  of training and professional development

13  opportunities regarding the initiatives

14  and setting principals up -- principals

15  and central office administrators up with

16  what they might need in order to move

17  forward in the new school year with the

18  goals that had been set.

19         Q.    Okay.  And this three-day

20  administrative retreat that would take

21  place each summer, is that just -- like,

22  when you say administration, does that

23  include the principals of the schools or

24  is it higher level?

1    A.    It is the 60-plus

2 administrative team that leads the

3 district, yes.  So it's --

4    Q.    Does --

5    A.    -- the entire leadership

6 team.

7    Q.    Does that include the

8 principals, though?

9    A.    It does, yes.

10    Q.    When you say that part of

11 that three-day retreat involves some

12 level of training, what portion of the

13 three-day retreat is typically spent on

14 training?

15    A.    It really depended on the

16 initiatives at the time and the amount of

17 training, whatever -- you know, what

18 things were new, and coming into the

19 district, we almost always would

20 incorporate an expert in the field or

21 someone that could help facilitate that

22 knowledge-base and those practices.  So

23 it really would be challenging for me to

24 share a percentage of the time, because

1   it was largely dependent on the goals and
2   initiatives that had been created by the
3   cabinet and set in place in the planning
4   for those administrative retreats.
5       Q.   Do you know whether there's
6   somewhere that's kept or documented what
7   the agenda would be on these annual
8   retreats, like what the training was on
9   or who the speaker was or things like
10  that?
11      A.   Yes.  I believe there are
12  agendas that were set in motion for each
13  year.  Whether they were archived, you
14  know, I can't speak to that.  But going
15  into the retreats, we would have agendas
16  in place.
17      Q.   Do you know who would be the
18  person who would be responsible or might
19  know about, like, archiving or whether
20  those things were saved in some capacity?
21      A.   I would venture to say that
22  perhaps the assistant superintendants
23  would be a good starting point.  But
24  again, some of the leadership

1 responsibilities for retreat and

2 discussions within the retreat were

3 shared responsibilities across the

4 administrative team, and, you know, being

5 gone for 18 months or so, I can't tell

6 you where those might be housed at this

7 point.

8            Q.    Mm-hmm.

9                  When you say assistant

10 superintendant, is there someone in

11 particular?  Like, I think Todd Bauer is

12 one of the assistant superintendants.  Do

13 you know who specifically might be -- or,

14 at the time was kind of the go-to person

15 for something like that?

16            A.    Again, the people in those

17 roles have transitioned over time.  So I

18 believe that perhaps the current

19 assistant superintendant, and probably

20 specifically Todd Bauer, with his

21 longevity in the position, might be a

22 good starting point.

23            Q.    Okay.  In terms of the -- do

24 you know -- can you -- sorry, strike

1   that.

2          Were you present for these

3   annual three-day retreats each summer?

4       A.    Yes.

5       Q.    And do you recall whether

6   there was training on Title IX over those

7   years at these retreats?

8       A.    I believe there was training

9   in the context of Title IX as shared

10  through the district solicitor.

11      Q.    Like, the district solicitor

12  would come in and share Title IX

13  knowledge to the group?

14      A.    Yes.  As well as during our

15  monthly administrative meetings, at

16  times, and most often, specific to

17  special education and, you know,

18  components within Title IX.

19      Q.    Okay.  When you say

20  "components within Title IX", what are

21  you referring to?

22      A.    Discrimination with regard

23  to sexual harassment, gender-based, the

24  component that we would know to be

1 present within Title IX.

2      Q.    Okay.  Can you estimate for

3 me, if this retreat is done annually, how

4 often the education would be given on

5 Title IX and sexual harassment?

6      A.    I cannot.  Without the

7 presence of the agendas, I cannot.  I

8 would only be speculating, and I don't

9 recall.

10      Q.    Do you know whether it was

11 every year that you got it, or you can't

12 tell me the amount of years, but it

13 wasn't every year?

14      A.    I don't believe it was every

15 year.  Beyond referencing our policies

16 and procedures of which they cover Title

17 IX.  So if we had updates to policies and

18 procedures, that would be included to

19 inform, you know, our administrators to

20 then turnkey and inform our staff.  But

21 I, you know, again, would be guessing,

22 and I don't want to do that.

23      Q.    No, I appreciate that.  I

24 don't want you to guess either.

1      When you say -- you just

2  mentioned that if there was, like,

3  training, like, updates and stuff like

4  that on Title IX issues, it would be

5  turnkey that the administration would

6  then inform the staff, is that what you

7  said?

8      A.    Yes.  Yes.

9      Q.    How -- sorry -- how would

10  the administration know to inform the

11  staff, is there a process in place for

12  that?

13      A.    There is, and that would be,

14  again, any information that was dealt

15  with either in the administrative

16  retreats, our monthly large-scale

17  administrative meetings or the principal

18  meetings, within those agendas and those

19  topics, the discussion for things that

20  needed to be taken back and implemented

21  at the building level and shared with

22  staff or discussed.  So in leading the

23  elementary principals, coming out of our

24  administrative meetings of cabinet level,

1  I would then formulate my agenda for the
2  elementary principals, sharing with them
3  the policy, procedure updates, things of
4  that nature, and then they would, in
5  turn, take it back and share with their
6  staff at faculty meetings.
7            There were times as well
8  where I, as the director of elementary,
9  would go to a faculty meeting and either
10 co-facilitate, co-share or even present
11 on my own the updates or the changes.  So
12 that, again, relates back to earlier
13 discussion when I shared that I would, I
14 would be at faculty meetings, at times.
15 Sometimes it was to look, listen and
16 learn, other times it was to embark
17 knowledge or share information with staff
18 in the buildings.
19      Q.    Since you're splitting your
20 time over the 13 different elementary
21 school buildings, do you have an estimate
22 of how often you were at the faculty
23 meetings at Gwynedd Square?
24      A.    I -- again, I venture to

¹ guess, I can tell you that I made a

² majority of the faculty meetings across

³ all the buildings.  They were typically

⁴ on specific days of the week, we

⁵ coordinated those, and there was a period

⁶ of time in my tenure as director of

⁷ elementary that the building was without

⁸ a principal and I was also supervising

⁹ that building and in place.  So I was

¹⁰ running faculty meetings and supporting

¹¹ the leadership team in the building.  So,

¹² of that, that staff was absolutely very

¹³ accustomed to seeing me and, and very

¹⁴ comfortable.

¹⁵        Q.    Are you saying at Gwynedd

¹⁶ Square there was a period of time that

¹⁷ there wasn't a principal?

¹⁸        A.    Yes.

¹⁹        Q.    Do you have an estimate as

²⁰ to when that was?

²¹        A.    I believe it was very early

²² on, probably in 2011 or so.  Again, it is

²³ a guess.  We'd have to go back through

²⁴ the HR records.  But we had a retirement,

1  and there was a search.  We wound up, you

2  know, delaying the appointment of the

3  principal and moved through some

4  supervisory issues with, with the interim

5  principal.  So I was unseen a significant

6  amount of time.

7        Q.    Do you have an estimate --

8  and I guess to just clarify a difference

9  between, like, a guess and an estimate,

10  if it's something you have no idea, like

11  you weren't part of that meeting, like, I

12  don't want you to guess at something you

13  have no knowledge of.  But if we're

14  talking about, like, timeframes like this

15  and you don't know the exact timeframe

16  but you know that it was before this or

17  after that, you can estimate on those

18  things.  But if it is something that you

19  really have no knowledge, for whatever

20  reason, and you just flat out don't

21  remember anything like that, just, that's

22  okay.

23        A.    Yeah.  Okay.  Thank you.

24        Q.    The -- do you have an

1  estimate of how long that was the case,

2  when Gwynedd Square didn't have a

3  principal and you were kind of in that

4  role too?

5       A.    Yes.  The -- it was from, I

6  believe, spring break or Easter of the

7  spring semester through the first few

8  weeks of the school year, at the start --

9  in September of the next school year, at

10 which point Mr. Bowen had been hired and

11 was coming on board.  So it was between

12 that interim gap.  And forgive me, I

13 don't recall the years.  I know it was

14 fairly early, probably 2011 or '12,

15 within my tenure as the director of

16 elementary.

17      Q.    Okay.

18      A.    I believe.

19      Q.    Okay.  And I just want to go

20 back for a moment.  When you were talking

21 about this turnkey thing that would be

22 discussed at this administrative level

23 meeting that would then -- the

24 expectation would be that the principals

1 would then go and implement or inform

2 their staff at the actual school itself,

3 safe to say, that was your expectation,

4 that the principals would be taking what

5 they learned at those meetings and then

6 passing that on to the staff at the

7 schools?

8       A.    Yes, absolutely.

9       Q.    And you also mentioned that

10 sometimes you would create an outline for

11 the principals?

12       A.    Well our agendas.  Our

13 meetings had agendas with topics and

14 information to be shared.

15       Q.    Information to be shared at

16 that particular meeting?

17       A.    Yes, the agenda topics.

18       Q.    Okay.  Was there any -- just

19 to make sure I'm understanding, was there

20 any separate that you might create for

21 the principals to then, like, implement

22 or, you know, guidance for them to take

23 back to their staff at the actual schools

24 themselves?

1    A.    Yes.

2    Q.    And can you tell me about

3 that.

4    A.    Very, very generally, very

5 globally, there were times when things

6 would occur in between meetings, and

7 guidance would need to be provided to 13

8 buildings.  So there might have been an

9 e-mail with, you know, background to the

10 issue or the policy or procedure change

11 that would have been disseminated across

12 the elementary buildings, follow-up to

13 meetings that we had.  Specific

14 situation, you know, I obviously can't

15 tell you at this point; but did it

16 happen, absolutely.

17    Q.    And I think it sounds like

18 you're referring to is kind of these

19 things that would pop up typically

20 outside of, like, the general agenda

21 meetings, that you would need to send,

22 like, a separate e-mail of, like, "hey,

23 this happened" or "hey, there's this

24 change" --

1          A.     Yes.

2          Q.     -- is that, is that what

3    you're referring to?

4          A.     Yes.  To coordinate among

5    and across the buildings, yes.

6          Q.     What about in terms of,

7    like, the actual, like, scheduled

8    meetings that take place, was there

9    anything like that that was a separate,

10   like, direction to the principals on what

11   to inform or how to inform their staff at

12   the school?

13         A.     I'm going to have to ask

14   that you clarify the question because I'm

15   not understanding your lead.

16         Q.     Sure.

17                I'm asking if it was

18   something separate, like, that you're

19   directing the principals to take back to

20   school, or was it just the main agenda

21   meeting, like, that would be the

22   principals, it's up to them what they

23   want to implement or what they should

24   implement back to the school?

1          A.     If there was a general

2    protocol created, either within the

3    context of our meetings, it was expected

4    that it be adhered to and implemented in

5    the buildings across the board in the

6    manner in which the decisions were made,

7    whether it happened in the context of our

8    meetings or whether it came as a

9    directive via e-mail from myself or

10   central office administrator outside of

11   the meetings.

12         Q.     But when you say there's a

13   general protocol, is there some type of,

14   like, written policy or what's -- I

15   guess, what's the general protocol?

16         A.     General protocols appeared

17   in our administrative regulations that

18   accompany each of the administrative

19   policies, much like you would find in

20   every school district.

21         Q.     Okay.  So they're really

22   like the policies and procedures of the

23   school district, like harassment policy

24   and things like that, is that what you're

1 referring to?

2        A.    Yes, that's correct.

3        Q.    Okay.  I guess what I'm

4  asking about is, was there any type of

5  policy or procedure in place to guide the

6  principals as to what from those

7  administrative meetings trickle down and

8  get to the staff at each of the

9  elementary schools?

10        A.    The discussion within the

11  meetings themselves.  So, within the

12  agendas were the topics, and then the

13  action steps, outcomes and notes taken

14  would have guided principals as to what

15  they were to go back and share.

16        Q.    And was that on the agenda?

17        A.    There were notes following

18  the meetings, yes.  Notes were taken

19  during the meeting, and those were shared

20  out with action steps for how things were

21  to be communicated and implemented.

22        Q.    Okay.  Do you know whether

23  those were -- were they typed up, the

24  notes at the end of the meeting?

1   A.   In most cases, yes.

2   Q.   And do you know whether they

3 were, like, saved in any capacity, or is

4 that something for, like, an assistant

5 superintendant?

6   A.   They would have resided with

7 the director of elementary and/or the

8 individual principals.  Because at that

9 point, I believe the district was

10 operating off of a SharePoint as opposed

11 to a Google Drive.  So in realtime, notes

12 were being projected on the screen for

13 everyone to see and then stored within

14 the SharePoint.

15   Q.   Okay.  And then, you're

16 saying, at some point the district went

17 from SharePoint to Google Drive?

18   A.   Yes, that's correct.

19   Q.   Okay.

20   MS. LAUGHLIN:  Maureen, I

21   just ask for -- I know I've asked for,

22   like, training and everything like

23   that previously a couple of times, but

24   including in that, the agendas for

1    these meetings and the notes and
2    things like that with these action
3    plans and everything that Dr. McCue
4    just referenced, and I can send you a
5    follow-up for that.  But I'll be
6    requesting those as well.
7  BY MS. LAUGHLIN:
8        Q.    Was there any type of
9  follow-up that you know of through the
10 district to ensure that the information
11 that was at these meetings that the
12 principals are expected to take down to
13 this staff level at each elementary
14 school, that that actually happens or any
15 process in place to, to make sure that
16 was happening?
17       A.    That would happen in the
18 performance of the individuals in
19 reaction to the information that was
20 being shared.  So, you know, for example,
21 you know, if we were implementing a
22 different schedule structure, it would be
23 seen in visits through the building,
24 that, you know, principals and teachers

1  were adhering to new schedule

2  configuration in, you know, in responses

3  to situations as well as, at times, as I

4  indicated before, I would be present in

5  the faculty meeting to know that that

6  information was -- had been disseminated

7  to, to staff and teachers.

8              We were a very hands-on

9  administrative team.  It was an

10  expectation from our superintendant, one

11  that he modeled, that we be out and be

12  visible in buildings.  And so, it wasn't

13  uncommon for us to be in and about

14  buildings, talking with staff, you know,

15  about their practices, visualizing their

16  practices, seeing things being

17  implemented.  So, in response to that, it

18  was done through supervision,

19  observation, sometimes direct

20  responsibility and direct communication

21  with staff and a trust in our

22  administrators that they were doing what

23  they needed to be doing, quite honestly.

24          Q.    Sure.  I mean, you would

1  hope that that would be the case, I'm

2  sure.

3          A.    (Nodding.)

4          Q.    After your role as director

5  of elementary education, I see then you

6  moved into the director of human

7  resources role in 2014?

8          A.    That's correct.

9          Q.    How did you do that, how did

10 you make that transition from those two

11 positions?

12         A.    Can you clarify for me,

13 please, what --

14         Q.    Like, did a job -- did,

15 like, an opening come up in human

16 resources and you decided you wanted to

17 move into that role and apply for it, or

18 how did you transition from being a

19 director of elementary education to then

20 taking on the role of director of human

21 resources?

22         A.    Yes.  We had a retirement

23 from the prior director of human

24 resources that took effect June 30th of

¹ that 2014 year.  Somewhere in early

² spring there was a discussion at the

³ administrative level with the

⁴ superintendant and myself and the school

⁵ board and an appointment then occurred

⁶ with my candidacy -- my being appointed

⁷ to the position.  So it was an

⁸ administrative move within the district.

⁹     Q.    And then did someone fill in

¹⁰ your role as director of elementary

¹¹ education?

¹²     A.    Yes.

¹³     Q.    I'm looking at your resume

¹⁴ now, and one of the things it says is

¹⁵ enforces policies, procedures and

¹⁶ regulations supporting the public school

¹⁷ code and the North Penn School District's

¹⁸ school board.

¹⁹          In terms of this, is that

²⁰ more on the staff level?

²¹     A.    I'm sorry, can you repeat

²² that?

²³     Q.    Sure.

²⁴          I'm referring to the part of

1 your resume that says, enforces policies,

2 procedures, regulations, supporting the

3 public school code and the North Penn

4 School District's school board, it's the

5 second to last bullet point --

6     A.    Yes.

7     Q.    -- on your resume.

8     A.    Yes.

9     Q.    Is that referring to -- in

10 terms of, like, the staff or employees of

11 the school district and school board?

12     A.    It is in terms of the

13 policies that are set forth by the school

14 board to make sure that people are in

15 compliance.  So it could be

16 administrative, it could be leadership,

17 it could be faculty level or staff level

18 within the district.

19     Q.    Okay.  I guess I'm trying to

20 distinguish, it's not, like, student

21 level?

22     A.    Very rarely would I be

23 involved in student level concerns, as a

24 director of human resources, if that

1  helps in answering your question.

2        Q.    Yeah.

3              Would it just be like you

4  had explained before, if a student was

5  facing expulsion or something like that,

6  then it would rise to your level?

7        A.    Not as the director of human

8  resources.  As the director of

9  elementary, it would have.  Director of

10  human resources, unless there was a

11  concern with regard to employee

12  performance, I typically would not get

13  involved in a situation like that.  As

14  director of human resources, I just -- I

15  wouldn't -- typically that would be done

16  by the principals or -- and/or the

17  directors of the level.

18        Q.    Meaning, like, directors of

19  elementary?

20        A.    Director of elementary,

21  director of secondary, director of

22  special education, what have have.

23        Q.    Okay.  So, really, would it

24  be safe to say, in this role, that you

1  are really dealing with employee level

2  stuff?

3        A.    Yes.

4        Q.    Other than being a director

5  of human resources, was there any other

6  job titles that you had during this time?

7        A.    Within the, within the

8  director of human resources job

9  description, the coordinator for Title IX

10 would have been an -- a responsibility.

11       Q.    And how did you know that's

12 one of your responsibilities, the

13 coordinator for Title IX, in this role?

14       A.    As I indicated, in the job

15 description.  And within the policies

16 that were set forth within the district.

17       Q.    Was this the case from 2014

18 all the way through 2020?

19       A.    No, it was not.

20       Q.    When did that change?

21       A.    It would have changed, I

22 believe, in and around 2019, I believe,

23 the later part of 2018, beginning part of

24 2019.  There was a shift for the Title IX

1  coordinator to the assistant director of

2  human resources, directed by the, the

3  board of school directors.

4       Q.   Okay.  So you're saying, in

5  late 2018, early 2019, the role of Title

6  IX coordinator went to the assistant

7  director of human resources at that

8  point?

9       A.   Yes, that's correct.  To the

10  best of my knowledge, in that timeframe.

11       Q.   Do you know why that change

12  was made, then, at that time?

13       A.   I believe it was a result of

14  the school board having additional

15  responsibilities for the director of

16  human resources' role, and movement along

17  those lines would help facilitate

18  involvement and engagement in those

19  priority issues for the board at that

20  time.

21       Q.   From 2014 through the end of

22  2018, or whenever the roles shifted, were

23  you the only coordinator for Title IX

24  through the district?

1      A.    No.  Our organizational
2  structure at the time, or part of that
3  time, provided for point persons within
4  the district to serve in their roles to
5  help facilitate Title IX issues and
6  concerns and communications.  However the
7  director of human resources was the
8  overall coordinator for Title IX within
9  the district.  So there were additional
10  point administrators to help deal with
11  those specific audiences.  And then, as I
12  said, when the transition happened, I can
13  also share that I believe the transition
14  to assistant director of HR happened
15  because it was also the first time in the
16  history of the district that there was an
17  assistant director in human resources.
18  So there wasn't, there wasn't a point of
19  a choice or option prior to that period
20  of time because there wasn't another
21  administrator within the department.
22      Q.    Were you the only person up
23  through when -- at the end of 2018, when
24  they hired this -- made this new role for

1 the director of human resources, were you

2 the only director of human resources for

3 the entire North Penn School District?

4       A.    Yes.  There is one role of

5 director within the district that

6 oversees human resources.

7       Q.    Okay.  And can you, I guess,

8 if there's 13 elementary schools, how

9 many middle schools are there in the

10 district?

11       A.    Three.

12       Q.    And then how many high

13 schools?

14       A.    One.

15       Q.    Can you estimate for me, out

16 of the 13 elementary schools, three

17 middle schools and one high school, how

18 many, like, employees you were in a sense

19 supervising or, like, overseeing for HR?

20       A.    We had approximately 1,900

21 full-time and part-time employees across

22 all sectors of the district with an

23 additional 400 to 500 substitutes that

24 reported through human resources at any

1  given time or had a need to interact with

2  our department.  Thankfully, not everyone

3  every day.

4      Q.    When you say they, they

5  would interact with your department or,

6  like, report through your department,

7  what kind of things would, I guess, you

8  be receiving from those 400 to 500,

9  understanding not every day, but in

10  general?

11      A.    The 400 to 500 substitutes

12  or the total 2,400 employees within the

13  district?

14      Q.    Were you receiving, like,

15  communication from both sets?  For both

16  the 2,400 and the substitutes, was that

17  all coming through your office?

18      A.    Yes.

19      Q.    Okay.  And just to -- sorry,

20  go ahead.

21      A.    We were responsible for all

22  aspects of human resources interactions

23  with personnel for the entire district.

24  It could be posting positions,

1 onboarding, hiring processes,

2 interviewing and the like and then

3 supervision evaluation, the process

4 behind that, managing paperwork and/or

5 computer files, things of that nature.

6        Q.    When you say, like, "we were

7 responsible", was there other people in,

8 like, the department, was there a

9 Department of Human Resources other than

10 you?

11        A.    Yes.  I supervised a team of

12 individuals who had areas of

13 responsibility and expertise in the

14 field.

15        Q.    Okay.  And how many people

16 were you supervising?

17        A.    It varied at times, but

18 anywhere from, I believe our low might

19 have been five and our high might have

20 been six or seven, including myself.

21        Q.    And how were their, like,

22 roles and responsibilities broken up,

23 those, like, five to seven people?

24        A.    Obviously the organizational

1  chart for human resources would give you

2  those specifics, but at any given time we

3  had substitute coordinator, who would

4  deal with the daily operations of

5  providing substitutes for our staff

6  members who required them, also would

7  help assist and support our payroll

8  department within the district in that

9  role.  We had a coordinator of human

10 resources, who was responsible for some

11 of the teacher support hires throughout

12 the district, onboarding, hosting,

13 facilitating the interviewing that was

14 happening across the district by the

15 leadership team and the hiring managers.

16 We had two human resources specialists,

17 who had separate and, and specific roles

18 with regard to tuition reimbursement, you

19 know, onboarding of support staff and

20 then another who was in -- responsible

21 for recruitment efforts and supporting

22 the director with regard to

23 communications out to staff and things of

24 that nature.

1            And then I believe it was
2    the latter part of 2018, beginning part
3    of 2019, that, due to some retirements
4    and some transitions within the
5    department, we were able to create the
6    role of assistant director of human
7    resources and then shift some of the
8    responsibilities among the leadership
9    team at that time.
10            Q.    So from 2014 until, like,
11    2018, the end of 2018, everything you
12    just described, supervising all those
13    five to seven different roles and -- that
14    was all you at that point, because there
15    wasn't an assistant at the time?
16            A.    That's correct.  It fell to
17    the director of human resource role.
18            Q.    Okay.  I see, also, it says
19    participates in planning of delivery of
20    the professional development and
21    improvement activities for all employees.
22    Can you tell me what that means?
23            A.    Yes.  So, during some of
24    those administrative meetings, on a

1  monthly basis, in some of the planning

2  for the administrative retreat, for

3  cabinet level meetings, you know, the

4  director would -- the director of human

5  resources would be responsible to assist

6  and support the planning, implementation

7  any of those areas of responsibility,

8  working, obviously, with other members of

9  the administrative team.

10              We also, during that time,

11 embedded a software platform that would

12 provide professional development based on

13 employee groups.  So, specific content

14 learning related to their positions.  So

15 there might have been, you know,

16 custodial segments that were done for,

17 you know, lifting appropriately and

18 safely, cleaning protocols, there might

19 have been school nutritional services

20 segments on, you know, supervision,

21 evaluation, progressive discipline, you

22 know, any of those topics, whatever

23 needed to be done in terms of employee

24 groups based on their need and

1  performance as well as state and federal

2  mandates at the time.

3       Q.    Did you have any role in

4  actually, like, developing the training

5  or the professional development that

6  staff was going to undergo in the

7  district?

8       A.    At times, yes.  And it would

9  be --

10      Q.    What --

11      A.    -- dependent upon the group

12  of the staff.  So largely, the

13  professional staff, professional

14  development was under the

15  responsibilities of the director of

16  curriculum and the directors of

17  elementary and secondary.

18      Q.    What about in terms of Title

19  IX, did you have any role in deciding

20  what the training was going to be, when

21  or how or anything like that?

22      A.    Again, that was coordinated

23  with my role and some of the other point

24  leaders for Title IX with our district

1  solicitor.

2       Q.    When you say point leaders

3  for Title IX --

4       A.    Mm-hmm.

5       Q.    -- who's that?

6       A.    At one point we had our

7  director of school community relations

8  being a point person for the community

9  and any individuals coming into the

10 district who might have had concerns with

11 Title IX and the way it was being

12 administered or the way they might have

13 experienced a concern.  And then we also

14 had our director of special education

15 being the point person for Title IX

16 issues as they relate to students in the

17 area of special education, and I believe

18 our athletic director held a role and was

19 point person with regard to Title IX's

20 interpretation in athletics.

21       Q.    How is the -- for example,

22 the director of special education being a

23 Title IX point person for issues that

24 arise with special needs students or

1  students in the special education realm,

2  how was that -- is that, like, somewhere

3  on a website, or how is that information

4  disseminated, that they're the point

5  person?

6        A.    I believe it would have been

7  captured in the policy and the

8  regulations at the time.

9        Q.    The district policies and

10  regulations?

11        A.    Yes.

12        Q.    Do you have a specific,

13  like, policy or regulation or, like, the

14  title of one that you might be able to

15  direct me to?

16        A.    I believe it would have been

17  maintained within our harassment and

18  discrimination policy and procedures or

19  regulations.

20        Q.    Okay.  And would that have

21  had, like, who the people are that would

22  be the, the point people or just the

23  titles; do you know?

24        A.    Obviously, in policy and

1 regulations, it's best to always include

2 the title of the position, since the

3 individuals can change.  So it would have

4 been by title.

5       Q.    Okay.

6       A.    And then the HR records

7 would tell you the person responsible at

8 any given period of time within that

9 role.

10      Q.    Did these point people get

11 any, like, separate training on Title IX,

12 that they were taking on these roles?

13      A.    I can't speak to anything

14 that they may have done individually on

15 their own, but they would have been

16 availed the opportunity to be present

17 during the district level trainings

18 through our administrative meetings and

19 our retreats, as I indicated previously.

20      Q.    Like, whatever the general

21 meetings were, like the monthly or the

22 summer meetings, you're talking about?

23      A.    Yes.

24      Q.    What about specific to Title

1  IX, though, if these people are being

2  appointed to -- for example, the director

3  of special education is being appointed

4  as a point person specifically for Title

5  IX, do you know whether they got any,

6  like, separate training?  Like, whoever

7  that person is that is going to take on

8  that role, did they get any specific

9  training on Title IX before doing so?

10       A.    Again, I can't say if they

11  sought training out, but there was

12  training provided to our administrative

13  team in regard to Title IX and the

14  practices, procedures within our policies

15  and regulations through our

16  administrative meetings and retreats, as

17  done by our district solicitor.

18       Q.    And I understand that.  You

19  know, sometimes on an annual meeting or a

20  monthly meeting, there may have been a

21  Title IX part of the agenda, and I know

22  that you don't recall how often or, you

23  know, dates or anything like that more

24  specifically, because you told us that

1  earlier.

2         But I guess I'm asking

3  specifically, not ones that they may have

4  sought out on their own -- I guess, if

5  they did, is that something that the

6  district tracks, like that the teachers

7  would report back and say, hi, I took

8  this outside course on Title IX, is that

9  something the district would be aware of?

10        A.    The district would be if it

11  was a part of their workday and would

12  have been conference or webinar attended

13  as well as if it would have been a

14  reimbursement factor, which the majority

15  of professional development opportunities

16  within the field of education are.  And

17  so, the likelihood of that being

18  referenced would be clear, yes.

19        Q.    Would you agree with me,

20  though, that as far as the district

21  offering training specific in these roles

22  as people are stepping into, you know, a

23  Title IX point person role, the district

24  did not offer, like, separate training

1  for these roles?

2        A.    I will share with you that

3  the administrative meeting and the

4  retreats were the forum in which the

5  district provided global trainings and

6  professional development for all of its

7  administrators present at the time.

8        Q.    Okay.  I understand.

9              Can you recall there ever

10  being, like, a separate training on just

11  Title IX for the district?  I don't mean,

12  like, at these annual things or, like,

13  just a separate, we're going to have a

14  meeting on Title IX, do you recall that

15  ever happening?

16        A.    I don't recall.  Could there

17  have been an entire administrative

18  meeting, two to three-hour time block,

19  devoted to Title IX, yes, absolutely.

20  Were there presentations with regards to

21  Title IX, updates to the law periodically

22  as they occur, how to conduct an

23  investigation from an administrator's

24  lens, what responses should be given and

1 protocols within an investigation, yes,
2 absolutely.
3      Q.    The protocols within the
4 investigation, is that something that
5 would have been documented somewhere,
6 like, what exactly the protocols are?
7      A.    Yes, I believe so.
8      Q.    Do you know where that would
9 have been kept?
10      A.    I believe it would be housed
11 within the administrative retreats and/or
12 monthly administrative meetings as well
13 as with the district solicitor.  Could
14 have been within the director of human
15 resource files as well.
16      Q.    Okay.  Who decided who was
17 going to be, like, the point leaders in
18 Title IX, is that something that you, as
19 the coordinator for Title IX, set out, or
20 was that already in place when you took
21 on that role of -- when you were the
22 director of human resources in 2014?
23      A.    It was a collaborative
24 decision with regard to the

1   administrative team and district

2   solicitor on how to best meet the needs

3   of the district and represent the

4   populations, and the people in those

5   roles came together, and we determined

6   the point people as we were rewriting

7   policy and procedure.

8        Q.    And do you know, do you have

9   an estimate of when that took place?

10        A.    I believe it may have been

11   in the 2015 calendar year.  Again, it is,

12   it is a guess, and the policies and back

13   copies of policies would determine the

14   accuracy of the timeline for those to

15   have occurred.

16        Q.    Was there something -- if it

17   was around the 2015 school year, was

18   there a reason at that time that it was

19   implemented that Title IX would be broken

20   down into these point people?

21        A.    If memory serves me

22   correctly, there were some things

23   occurring within Title IX at the federal

24   level.  A resource guide was provided in

1  2015.  I believe there was also, you

2  know, a letter at that point.  And so the

3  district was taking it under advisement

4  and reviewing its practices and further

5  defining how to respond to the most

6  current guidance coming out at federal

7  level for us.

8       Q.   Was it typically that the

9  solicitor would be giving the guidance

10 to, like, the high administration cabinet

11 level of what the district needed to do

12 in terms of Title IX, is that typically

13 how it would flow down?

14      A.   Yes.  There would be a

15 collaborative discussion on how to

16 interpret any changes and implement those

17 changes, yes.

18      Q.   Okay.  And was that -- this

19 timing we're talking about, when we're

20 deciding, you know, as a group what the

21 district should implement and stuff, the

22 solicitor, was that Kyle Somers, who is

23 on this Zoom call?

24      A.   Yes.  I believe it was.

1  Acting from -- yes, yes, it was.

2       Q.    Okay.  Was there somebody

3  else that held that role prior to him or

4  something that you're trying to figure

5  out a timeframe?

6       A.    Well, I was just trying to

7  align with the firm at the time, who was

8  acting as the solicitor, which would have

9  been Jack Dooley, from Dischell Bartle &

10  Dooley, of which Kyle was a practicing

11  attorney.

12          MR. SOMERS:  (Nodding.)

13  BY MS. LAUGHLIN:

14       Q.    Would you agree with me that

15  on this resume that you provided, which

16  goes from, I guess, around 19 -- the

17  1990s to present, that there's no mention

18  on your resume of being the coordinator,

19  the Title IX coordinator, would you agree

20  with that?

21       A.    Yes, I would.  I would also

22  agree that there's no way to capture

23  every responsibility within the positions

24  on two pages that capture a person's

<sup></sup>¹ 33-year history.  So, this resume was
² created to, to provide a snapshot of my K
³ to 12 experience for the position moving
⁴ into higher ed.  There are -- I have
⁵ previous and past curriculum vitaes, or,
⁶ you know, resumes, that might have
⁷ captured it, but this was the most recent
⁸ one that I had that was utilized for the
⁹ move into higher ed, and again, captures
¹⁰ some of the responsibilities tailored to
¹¹ the position of higher ed, of which Title
¹² IX coordinator is not one.
¹³     Q.    Would you agree with me that
¹⁴ on this resume, Title IX isn't mentioned
¹⁵ at all, like, even the phrase Title IX?
¹⁶     A.    Yes.  I did already indicate
¹⁷ that.
¹⁸     Q.    Okay.  You said that you had
¹⁹ past curriculum vitaes; when was the last
²⁰ time that you had updated the past
²¹ curriculum vitaes?
²² A.    I believe I indicated that
²³ this was updated in April or May, you
²⁴ know, of 2020.

1    Q.    And that's this one we're
2  looking at now that's gonna be --
3    A.    It is.
4    Q.    -- Exhibit-A?
5    A.    It is, yes.
6    Q.    What about before then, can
7  you estimate for me the last time --
8  like, what your resume before this would
9  have been?
10   A.    It would have taken us
11  through the director of elementary
12  position.
13   Q.    Do you have still have that
14  old resume, like when you had updated it
15  to this?
16   A.    I don't believe I do.
17   Q.    Do you know what, what
18  happened to it?
19   A.    It was overwritten with the
20  most recent information.  There's no
21  point in, you know, carrying that prior
22  copy with me.
23   Q.    Do you believe that older
24  resume would have been provided to the

1  school district, like, when you were

2  moving into the director of human

3  resources role?

4        A.    No.  It would not have been.

5        Q.    Do you know anywhere else

6  that that old resume would have -- would

7  be available, like, if you e-mailed it to

8  somebody applying for a job or something

9  like that?

10       A.    It would not have been

11 because I wasn't applying for positions.

12 As I said, I was appointed to the

13 director of human resources position.  It

14 was an internal move administratively

15 within the district.  The only reason why

16 a resume would have been updated in

17 between 2010 and 2020 would have been to

18 capture my responsibilities at the point

19 of which I moved into higher ed.  There

20 was no point to, you know, update it.  I

21 wasn't looking for any positions.  I was

22 quite happy within the district.

23       Q.    Okay.  Other than your work

24 as director of human resources and also

1  this role of Title IX coordinator that
2  you had three point persons under you
3  that were more managing, like, more
4  day-to-day Title IX stuff it sounds like,
5  did you have any other roles or
6  responsibilities during the 2014 to 2020
7  timeframe?
8          A.    I was also an adjunct
9  profession at Del Val University on
10 behalf of the school district for a North
11 Penn cohort of teachers seeking their
12 administrative certifications.  That
13 happened mostly, I believe, in 2019 and
14 on.  That was not a paid position through
15 North Penn, however.
16         Q.    Okay.  But you're saying
17 that role didn't start until 2019?
18         A.    Correct.  It was to meet the
19 needs of a cohort of staff members within
20 the North Penn community.  It wouldn't
21 have -- again, would not have fallen
22 under purview of the school district.  It
23 was just supporting an initiative and an
24 alliance with Del Val that the district

1    had become a part of.

2         Q.    I understand.

3               Any other roles that you

4    held from 2014 to 2020 that we haven't

5    already talked about?

6         A.    No.  I don't believe so.

7         Q.    Okay.  It says that under

8    your director of human resources, all the

9    bullet points, that you also prepare and

10   manage the department budget for the

11   school district?

12        A.    No, for the department.

13        Q.    Okay.  What -- oh, okay --

14   the department budget, the Department of

15   Human Resources?

16        A.    The Department of Human

17   Resources, yes.

18        Q.    So is that, like, employee's

19   salaries and bonuses and things like

20   that?

21        A.    Employee salaries would have

22   been maintained in a separate category

23   through our business office and payroll.

24   The salary component that was

1 accomplished within the human resources
2 budget were merely placeholders for the
3 substitutes that were within the
4 district, which then got parceled out to
5 the appropriate buildings in which they
6 served afterwards.  This was the
7 district -- this was the human resources'
8 budget, of which there were many fields
9 comprised.
10          Q.    When you say "many fields
11 comprised", can you just give me, like,
12 an over -- just to understand what it
13 means, that you're preparing and managing
14 the department budget.
15          A.    Okay.
16          Q.    As a lawyer, I don't know
17 what that means exactly.
18          A.    Yeah.  It means projecting
19 out what the financial responsibilities
20 and needs are of the department with
21 regard to the areas that we supervise and
22 oversee.  So, previously, I mentioned
23 that we, in the department, were
24 responsible for facilitating tuition

¹ reimbursement.  That comes as a line item

² of hundreds of thousands of dollars, to

³ reimburse staff members as they take

⁴ coursework and credits and conference

⁵ attendance and webinars to become

⁶ professionally developed.  So, that's one

⁷ aspect.  The, the increase in salaries as

⁸ a result of moving to the next level from

⁹ the coursework and from the professional

¹⁰ development was also captured in our

¹¹ budget to the tune of hundreds of

¹² thousands of dollars as well.  You know,

¹³ those areas were all encompassing.  Those

¹⁴ are two examples of what might have been

¹⁵ found in the budget.

¹⁶         Q.    So it's a lot of stuff,

¹⁷ conferences.

¹⁸             The budget, then, is that --

¹⁹ without going into all the different

²⁰ categories and all the things that

²¹ day-to-day go into those things --

²² A.    Yes.  You can imagine, the

²³ size of North Penn, would have associated

²⁴ many line items and significant dollars.

1    Q.    Okay.  There's also a

2  mention of, participates in negotiations,

3  interprets and administer the language of

4  the collective bargaining agreement.

5         What does that mean?

6    A.    It means that the district

7  had, at the time, two specific

8  associations, one for the professional

9  staff and one for the support staff as

10 well as our Act 93 agreement with the

11 leadership, and the position of director

12 of human resources was responsible -- was

13 a responsible party to those

14 negotiations, with the district

15 administrator, the school board and the

16 superintendant.  So it what the role of

17 the director of human resources to

18 participate in the negotiations, to help

19 the forward movement of the negotiations,

20 and then once agreed upon and ratified,

21 would be the responsibility to carry out

22 and enforce the components of the

23 collective bargaining agreement.

24    Q.    How often would that, like,

1   review process be happening?

2          A.     Depended on the length and

3   duration of the actual agreement itself,

4   and they varied.  I believe, during my

5   tenure, the least amount of time that an

6   agreement was in place was two years, and

7   it could have gone up as far as four or

8   five years, depending upon what was

9   agreed upon at the table.  I believe

10  there was one year in which there was a

11  continuation of the agreement.  So that

12  would have been extending it by a year.

13         Q.     Okay.  You said Act 93; what

14  is that?

15         A.     That is the agreement under

16  which benefits and parameters for work

17  are stipulated for the administrative

18  team.  Various members of the

19  administrative team, excluding the

20  appointed positions of superintendant,

21  assistant superintendant, and the

22  director of human resources, assistant

23  director of human resources, who were

24  under separate contract.

1      Q.    It also says that, as a
2   director of HR, you conduct investigatory
3   and disciplinary meetings and facilitates
4   employee improvement plans.
5              Are you the point person for
6   all of the -- I think you said 2,400
7   employees in the district, are you the
8   point person for that?
9      A.    Oversee the processes for
10  that, yes.  Was also shared
11  responsibility with the assistant
12  director of human resources, once that
13  position was aligned.  There was a
14  separation of staffing and departments.
15  That position largely supported the
16  support personnel and staff, where the
17  director typically would oversee the
18  administrative team and the professional
19  staff within the district.
20     Q.    Okay.  So before that -- and
21  assistant human resources role didn't
22  come on until 2019.  So before that, that
23  was you, then?
24     A.    It was.

1          Q.     Okay.

2          A.     Again, with support from the

3    immediate area level supervisors.

4          Q.     And what is -- the immediate

5    level area supervisors, meaning, like,

6    the director of elementary education,

7    secondary education --

8          A.     Director of elementary,

9    director of secondary, the building level

10   principals, the school nutrition serves

11   as supervisors and coordinators.  So,

12   obviously within the district, there's an

13   organizational structure that has leaders

14   and supervisors at varying levels in

15   order to, you know, stratify the

16   responsibilities.  But again, if there

17   was a staff member where an investigation

18   was needed or a staff member who was not

19   performing to satisfactory levels or

20   falling short of expectations that

21   required a formal improvement plan or

22   supports for professional development,

23   absolutely, the director of human

24   resources would be made aware of that and

1    sometimes asked to counsel and support

2    the process.

3        Q.    Okay.  It says facilitate --

4    teacher and emergency certification

5    program.  What does that mean?

6        A.    That was an initiative that

7    was created within the district.  Again,

8    North Penn is a district that subscribes

9    to hiring and supporting all of its own

10   employees, which means there is not a

11   department or employee, or wasn't at the

12   time -- again, I can't speak to the

13   current state -- where things, things

14   were being -- where services were being

15   outsourced.  So the guest teacher program

16   was one in which we created the

17   opportunity for people with a bachelor's

18   degree, perhaps in another area, a

19   scientist, a chemist, an attorney, who

20   could come in and seek emergency

21   certification as an educator under the

22   laws of the Commonwealth, and we would

23   train them, provide onboarding, and they

24   would become substitute teachers for us

1 within the district at a daily rate.  It

2 was an initiative that was done when, you

3 know, obviously the, the supply of

4 teachers being graduated from education

5 institutions was, was low.

6         Q.    Do you have an estimate of

7 the time period of when that initiative

8 took place?

9         A.    I do not.

10        Q.    Was it, was it only for,

11 like, a period of time and then the

12 district decided not to do that anymore?

13        A.    I can't speak to now, but

14 through my tenure, it was up and running

15 and happened on a yearly basis.  It was

16 typically done in the fall of every year

17 because we can capitalize on teachers

18 who, teachers who perhaps didn't have a

19 classroom of their own or, as I said,

20 other individuals who were bachelor

21 degreed and looking for a change of

22 career or were not happy within their

23 career, and August/September timeframe,

24 October, was the time in the beginning of

1 the school year that typically worked for

2 us to be able to capitalize on those

3 individuals.  I believe it was a program

4 that was up and running prior to my

5 leaving the district for three to four

6 years, if that's helpful.

7          Q.   Okay.  It also says here in

8 the list of your responsibilities,

9 collaborating with college university

10 partners for replacement of student

11 teachers and dual enrollment program.

12          So are these, like, college

13 students that are in education that need

14 their credits to have student teaching,

15 you're coordinating that, getting those

16 teachers and what they needed to do and

17 where they go and stuff like that?

18          A.   Yes, that's correct.

19          Q.   And then, dual enrollment

20 programming, what is, what is that?

21          A.   Dual enrollment was

22 typically when -- we had created a

23 program within the district whereby some

24 of our students, our seniors, who were

1  thinking about an education degree, if
2  they were affiliated, also, they could be
3  taking their courses at the high school
4  while also attending college; so dual
5  enrollment.
6        Q.    Mm-hmm.
7        A.    And we would support them
8  through observation time, in classroom
9  visiting with teachers, so they could get
10 their observation hours that were a
11 requirement of the college and university
12 that they were attending as well.
13       Q.    Okay.
14       A.    Dual enrollment meant that
15 they were attending North Penn High
16 School but also perhaps one of the
17 ancillary colleges or universities in the
18 area receiving dual credit and being
19 enrolled in both places.
20       Q.    When you took on this role
21 as director of human resources, did you
22 know at the time that part of your
23 responsibilities would also be the Title
24 IX coordinator for the district?

1          A.     Yes.   As I believe I
2    indicated, I believe it was in the job
3    description at the time.   An
4    investigating, harassment and
5    discriminatory practices is a component
6    of human resources.
7          Q.     Well, a part of human
8    resource would be investigating.
9               Is that -- I thought you
10   were saying it's really on the employee
11   level that -- for human resources
12   investigating harassment and things like
13   that?
14         A.     It is, but it also can be as
15   it relates to -- you know, harassment can
16   happen at all levels.   So, if it involved
17   employees, yes, absolutely, I was
18   involved.
19         Q.     What about in terms of
20   student-on-student harassment, is that
21   something you were also involved in?
22         A.     Again, not in -- not
23   typically in the role of human resources,
24   unless it had some level of connection to

1   a staff member or personnel issue.

2        Q.    What about, though, because

3   you're kind of wearing, like, a couple

4   different hats, it seems like, during

5   2014 to 2020, or maybe many hats, based

6   on all the things we just went over.

7             Were you also responsible

8   for investing student-on-student sexual

9   harassment during this period of time,

10  2014 to 2020?

11       A.    I would typically not be

12  involved in direct interactions with

13  students in an investigation.  That would

14  happen through the building

15  administrators and at times the police,

16  if it was appropriate and warranted.

17       Q.    Okay.  How would it be --

18  what was the process for you -- you said

19  typically you would not be involved, and

20  it would really be handled by the

21  building administrators?

22       A.    Right.  There were, there

23  were very few cases where I would go into

24  a building and interview a student.

1          Q.    Were there times -- or, was
2     there, like, a process in place where you
3     would get involved in -- when it involved
4     student-on-student sexual harassment?
5          A.    Not that I can recall.
6     We're talking of -- years ago.  So I
7     don't recall, unfortunately.
8          Q.    You're saying -- sorry, go
9     ahead.
10         A.    No.  I was just saying,
11    unfortunately, I don't recall instances
12    of talking to a student with regard to
13    sexual harassment --
14         Q.    Do --
15         A.    -- in my role as director of
16    human resources.
17         Q.    Okay.  Well what about as
18    your role for Title IX coordinator,
19    because that was part of your -- that was
20    one of your roles as director of human
21    resources, right?
22         A.    Yes.
23         Q.    Were you ever -- go ahead,
24    I'm sorry.

1    A.    I don't recall.  I don't
2 recall.
3    Q.    You don't recall ever being
4 part of a investigation with
5 student-on-student sexual harassment?
6    A.    I don't recall speaking to
7 the students with regard to sexual
8 harassment.  Was I involved in that, in
9 that kind of situation from the lens of
10 Title IX coordinator and director of HR,
11 yes.
12    Q.    And, I guess, tell me your
13 role -- if you're not -- you said,
14 interviewing students, is the example you
15 had given.  What, what is your role or
16 how have you -- how -- what is your role
17 in terms of the investigation, then, for
18 a student-on-student harassment
19 situation?
20    A.    Most, most typically, it
21 would have been to understand if there
22 was any concerns with regard to
23 supervision of those students during the
24 time that -- of the alleged harassment

1  or -- took place, if there was any

2  involvement from a staff member and if

3  the protocols that were set in place had

4  been followed by the administrators at

5  the building level.

6       Q.    What protocols are you

7  referring to, like in terms of properly

8  supervising students?

9       A.    Yes.  And if the

10  investigation under Title IX had

11  occurred, if a formal complaint was

12  lodged and raised, how they investigated

13  it, you know, was it resolved

14  appropriately, were authorities

15  contacted, if appropriate and necessary.

16  So adherence to, you know, our policies

17  as they relate to Title IX.

18       Q.    Meaning, like, the

19  district's policies?

20       A.    Yes.  Where, where Title IX

21  would have been embedded.

22       Q.    When you say "Title IX would

23  have been embedded", what policies are

24  you talking about?

1    A.    Our harassment policy, our
2    harassment policy and the discrimination
3    policy and regulations that clearly speak
4    to Title IX.
5         Q.    Okay.  So I just want to
6    clarify that there's no, like, separate
7    Title IX, like, specific policy, you're
8    saying Title IX policies in the district
9    are embedded in those two policies you
10   just mentioned?
11        A.    Yes, that's correct.
12        Q.    Okay.
13        A.    I believe.
14        Q.    And you were talking about
15   the protocol -- making sure that the
16   protocols are followed.  The first thing
17   you said was that if there was a formal
18   complaint made; is that right?
19        A.    Yes.
20        Q.    What do you, what do you
21   mean by that?
22        A.    Well, within our policies
23   and regulations, with regard to
24   harassment and discrimination, there are

1  also forms and complaints that can be

2  filed within the district to make us

3  aware of concerns, and they're most often

4  filed with the most immediate supervisor

5  or, in cases of Title IX, to go to one of

6  the point people or myself when those

7  occur or happen.

8          Q.    Those three point people you

9  mentioned earlier?

10         A.    Yes.

11         Q.    And the, the, the form

12 you're talking about, is that, like, the

13 sexual harassment form that's, like, a

14 two-page form with, like, questions,

15 people fill in the blanks, is that what

16 you're talking about?

17         A.    Yes.

18         Q.    Is that form something that

19 parents are expected to fill out if

20 they -- if there's a Title IX issue or,

21 like, a sexual harassment issue at the

22 school?

23         A.    I think it can be filled out

24 by whoever is feeling as though they've

1  been violated.  It wouldn't necessarily

2  need to be parents, depending on the

3  level of student.  If it's

4  student-to-student, again, my, my

5  understanding is, most often, those would

6  occur and be reported to the principal or

7  the guidance counselor.  Early ages,

8  students feel more comfortable speaking

9  to those individuals, because they're

10  most known to them, and they -- the

11  principals then would interact and take

12  over, respond appropriately and

13  accordingly to the concerns.

14       Q.    Okay.

15       A.    With the investigation.

16       Q.    And that area you just

17  described wasn't necessarily in a younger

18  child, like an elementary school-aged

19  child.  You're saying they would just

20  maybe go to a guidance counselor or

21  principal and just tell them verbally?

22       A.    Yes.  Sometimes as a

23  teacher.

24       Q.    Is there a difference in the

1    process versus when somebody, like,

2    verbally reports, like, that, like, the

3    scenarios we were just talking about

4    versus if somebody completes that form,

5    makes a formal complaint?

6        A.    I don't believe so.  I

7    believe that our administrators have

8    been, you know, taught to respond to

9    concerns as they're raised as immediately

10   as possible and as thoroughly as

11   possible, following the regulations.

12       Q.    Like, following those two

13   policies we just talked about?

14       A.    Yes.  And the regulations

15   that accompany them.  The policies set

16   forth what the district expects and will

17   accept.  The regulations stipulate the

18   process in addressing the concerns.  You

19   know, so the regulations put the

20   protocols, the step-by-step actions in

21   place for how to respond or potential

22   responses to situations.

23       Q.    Okay.  I guess I'm just --

24   I'm trying to make sure I understand,

1  like, what you're referring to.  I

2  understand the two different policies,

3  the harassment policy and the other

4  policy you talked about, but those

5  regulations you're referring to, where

6  are those kept?  What are you -- like, is

7  there somewhere I can find those, or what

8  are you referring to?

9       A.    There are regulations that

10 accompany some of the school board

11 policies.  The regulations serve as a

12 guide to administrators in interpreting

13 policy and determining the steps that

14 need to be taken in response.  Those, at

15 one point, had been published on the

16 website.  I cannot speak to where, where

17 one might find them now, following a

18 comprehensive policy review.  Regulations

19 don't necessarily need to be posted on --

20 and open to the public but sometimes they

21 are.  I don't know where they would be

22 housed right now, because I've not been

23 in the district, but at the time they

24 were also housed on the district's

1   website.

2          Q.    Okay.  Are there -- you said

3   sometimes the regulations are attached to

4   the policies themselves -- sorry, go

5   ahead.  Is that not what you said?

6          A.    They're not attached, but

7   they correspond to.  So, for example,

8   there would -- you know, whatever the

9   policy number is or title for the policy,

10  so it could be the policy for harassment,

11  and then the administrative regulation in

12  regard or response to policy for

13  harassment would be there.  So, it might

14  be -- it would be listed as a similar

15  reference.

16         Q.    Like, would it be the

17  same -- like, for instance, harassment

18  policy is, I think, 5150.  Do you know if

19  it would be, like, the same number?  How

20  do you know that they correspond?

21         A.    Yes, it would.  It would be

22  the same number and it would also have a

23  reference to.  So on the board policy, at

24  the time, it would have been referenced

1 regulation No. 5150, you know, or in

2 terms of personnel, a different number.

3          Q.   Okay.  I understand what

4 you're saying.

5               And you said that the

6 policies, you know, from your

7 understanding back then, were on the

8 website, but the regulations may not have

9 been because you're not required to post

10 them on the, the public website?

11          A.   Correct.  I don't believe we

12 were.  But again, at the time I was in

13 the district, they were, they had been.

14 Both were published and accessible.

15          Q.   On the website?

16          A.   Mm-hmm.  Yes.

17          Q.   Were there -- other than the

18 website, do you know whether that

19 information, like, the regulations and

20 the policies dealing with harassment and

21 Title IX issues, whether that was, like,

22 sent home to parents in any way?

23          A.   They -- references to our

24 policies and regulations would be found

¹ in the handbooks at each level, which

² were absolutely shared with students and

³ parents.  And in case of the elementary,

⁴ I can speak to, signoff required to

⁵ parents to indicate that they had been

⁶ provided with the information contained

⁷ within the handbook.  So, disciplinary

⁸ practices were contained in the handbook

⁹ and major policies but then, also, a

¹⁰ reference to the district's website,

¹¹ where all policies and regulations could

¹² be found.

¹³        Q.    Okay.

¹⁴        A.    So yes, students and parents

¹⁵ would have been provided that information

¹⁶ via the student rights and

¹⁷ responsibilities, or as we know it, the

¹⁸ student handbooks associated at each

¹⁹ level in the district.

²⁰        Q.    Do you know whether parents

²¹ received any kind of, like, training or,

²² like, education on Title IX and, and

²³ sexual harassment?

²⁴        A.    I do not.

1      Q.   Do you know whose, do you

2  know whose, like, responsibility that

3  would fall under in the district?

4      A.   I do not.  I don't recall.

5      Q.   Okay.  What about in terms

6  of student education on Title IX and

7  sexual harassment, do you know whether

8  students were provided any kind of, like,

9  training or instruction on those topics?

10      A.   I do not.

11      Q.   You don't know?

12      A.   I don't know.  That would

13  have been dealt with through, perhaps the

14  academic side, through, again,

15  principals, guidance counselors, as part

16  of a guidance curriculum.  I do know that

17  that's captured, you know, unwanted

18  touching, things of that nature, you

19  know, are hit upon within our guidance

20  curriculum.  But anything more formally,

21  I can't respond; I don't know.

22      Q.   Okay.  You as the Title IX

23  coordinator, safe to say, like, you

24  didn't provide any training to the

1  students or parents on Title IX issues;

2  is that right?

3          A.    I don't believe so, no.

4          Q.    Okay.  What about any of

5  your, like, point people that you're kind

6  of overseeing, do you know whether they

7  provided any training to students or

8  parents on Title IX?

9          A.    Again, there's a

10 possibility, because of the focus in the

11 district, that through special education

12 and that director of special education,

13 that some of those trainings might have

14 been provided to parent groups that are

15 affiliated with special education.  But

16 again, I, I, I don't know.  I do know

17 that there were trainings internally with

18 staff and administrative team with regard

19 to special education and harassment and

20 discrimination, as I indicated earlier.

21 I don't recall specifically, but I do

22 know that we had active parent

23 organizations, and our director of

24 special education and our assistant

1 director were very involved with parents

2 and may have very well done a -- training

3 with them.

4      Q.    You just -- you don't know,

5 though, like, whether that --

6      A.    I, I don't know for sure.

7      Q.    Okay. As the director of

8 HR, would you, I mean, typically be

9 consulted on something like that, if

10 education is going to be provided, you

11 know, specific to Title IX within the

12 district to -- you know, whether it's

13 parents or students, is that something

14 that you would be involved in, like, in

15 communications, or?

16      A.    I don't recall if I was.

17      Q.    You don't know whether that

18 was part of your responsibilities to do

19 so, then, right?

20      A.    No, that's correct.

21      MS. LAUGHLIN: Off the

22   record for a second.

23         -  -  -

24      (A recess occurred from

1    11:40 a.m. to 11:54 p.m.)

2         -  -  -

3  BY MS. LAUGHLIN:

4    Q.   I guess a quick question or

5  clarification.

6         Were you the only Title IX

7  coordinator for the district between 2014

8  and when you left in 2020?

9    A.   No.

10   Q.   Okay.  Who else or -- who

11  else, I guess, was in that, that role?

12  This is kind of the first time we've been

13  talking about your responsibilities and

14  stuff.  Who else was in that role?

15   A.   Yeah.  As I indicated, the

16  end of 2018, early part of 2019, when the

17  assistant director of human resources was

18  fully integrated into the position, the

19  board had requested that we shift some

20  responsibilities to allow more growth and

21  more oversight of different district

22  initiatives at the time by the director

23  of human resources.  So the role shifted

24  to the director of human resources on or

1 about that time.

2         Q.    Right.  I do recall you

3 saying that to me.

4              But I guess to clarify, do

5 you know who Kathleen Cardamone is?

6         A.    Yes.  She was the previous

7 director of human resources, who retired

8 in June of 2014.

9         Q.    Okay.  So in -- I know that

10 you weren't a part of the district

11 answering, like, interrogatory questions

12 or requests for production of documents

13 or anything, were you involved in any of

14 that?

15         A.    With regard to --

16         Q.    This case.

17         A.    -- a particular issue or

18 this case?

19         Q.    Mm-hmm.

20         A.    No.  I don't believe so.

21         Q.    So in -- it's my

22 understanding Todd Bauer, the assistant

23 superintendant had assisted with that.

24 But in a question asking about who was

¹ the Title IX coordinator from January

² 1st, 2014 to the present, the answer says

³ that Kathleen Cardamone, who, my

⁴ understanding now, is deceased, was the

⁵ Title IX coordinator on January 1st, 2014

⁶ through June 30th, 2021.  Do you know

⁷ whether -- is that not accurate?

⁸        A.    No.  That would not be

⁹ accurate.  She would have been from June

¹⁰ 1st, 2014 through June -- I'm sorry --

¹¹ January 1st, 2014 through June 30, 2014.

¹² And then, July 1st, I assumed the

¹³ responsibilities of director of HR at

¹⁴ that time, thereby also assuming the

¹⁵ Title IX coordinator role.

¹⁶        Q.    Okay.  Was Ms. Cardamone,

¹⁷ was she the prior HR -- director of HR as

¹⁸ well?

¹⁹        A.    Yes.  Dr. Cardamone was the

²⁰ prior director, mm-hmm.

²¹        Q.    Okay.  And then when her

²² role opened up, that's when you stepped

²³ into that role and took over all the

²⁴ responsibilities we already went over,

1  correct?

2      A.    Yes, correct.

3      Q.    Okay.  Thank you for

4  clarifying that.

5            When, when was it that the

6  three people that you mentioned that were

7  appointed as point people for Title IX in

8  the three different areas that you

9  mentioned, when was that established?

10     A.    Again, I believe it was in

11 and around 2015.  Within that academic

12 year, there were some revisions made, as

13 highlighted by changes at the federal

14 level with regard to the guidelines.  And

15 so the district coordinated and worked

16 with the district solicitor to apply

17 those changes and guidance provided and

18 created the three-prong reporting

19 structure, or responsibility structure, I

20 should say.

21     Q.    Okay.  Do you know whether

22 the, the three-prong responsibility

23 structure, whether that's in writing

24 somewhere as to, like, who's -- you know,

1  whether it's, like, the one person, the

2  middle person, the other person, like,

3  who's responsible for what in comparison

4  to what you're responsible for?

5          A.   Yes.  I believe that there

6  would have been a dated rendering of the

7  policies that would indicate specific

8  areas, again, not by name but by title,

9  the director of school and community and

10 then the director of special education

11 and the director of human resources,

12 again, analogues to those populations.

13 If there were community concerns, they

14 would be referenced to the director of

15 school community, special education and

16 student concerns to the director of

17 special ed and then, most often, staffing

18 concerns to myself.

19          Q.   Okay.  Do you know whether

20 the director of special ed, was that

21 Betty Santoro during that time, like,

22 2015 through 2018?

23          A.   It may have been.  Again,

24 there were two people in the role --

1          Q.    Okay.

2          A.    -- that I can recall.

3    During that time, I think most

4    immediately, Dr. Santoro would have

5    followed-up in 2014 and '15, and then Dr.

6    Ruffo would have stepped in, you know,

7    following that, along those lines, I

8    believe.

9          Q.    Okay.  And Dr. Ruffo, what

10   is Dr. Ruffo's first name?

11         A.    Jenna.

12         Q.    Okay.  Did you ever have any

13   conversations with Jenna Ruffo, or Dr.

14   Ruffo, or Dr. Santoro about their

15   responsibilities as point people under

16   this new, like, three-prong approach?

17         A.    Yes.  I believe they would

18   have been involved in the meetings with

19   the attorney, with the district

20   solicitor, at the time, when we developed

21   the three-prong approach.

22         Q.    Other than that initial

23   meeting where this was going to be, like,

24   the new process the district was going to

<sup>1</sup> be following, did you have any other

<sup>2</sup> follow-up meetings with those two

<sup>3</sup> individuals in terms of, like, what their

<sup>4</sup> expectations were or the process they

<sup>5</sup> should be going through or to oversee

<sup>6</sup> them in some way?

<sup>7</sup>          A.     No, I did not.  We

<sup>8</sup> coordinate through joint responsibility

<sup>9</sup> for carrying out the policies and

<sup>10</sup> procedures that we're all made aware of

<sup>11</sup> at the time within the district.  When

<sup>12</sup> issues arose and questions we had, again,

<sup>13</sup> we were collaborating on those issues

<sup>14</sup> alongside our district solicitor, who was

<sup>15</sup> provided by counsel, within our

<sup>16</sup> responses.

<sup>17</sup>          Q.     Do you recall having

<sup>18</sup> meetings with, like, those individuals

<sup>19</sup> or, like, the other point people with the

<sup>20</sup> district solicitor other than the initial

<sup>21</sup> meeting that was creating these roles?

<sup>22</sup>          A.     I think there were several

<sup>23</sup> meetings that took place that created the

<sup>24</sup> roles and discussed the responses and

1  discussed the parameters and procedures

2  in how we would parcel things out.  So

3  there were several meetings surrounding

4  that.

5         Q.    After the creation in 2015,

6  however many meetings it took to, like,

7  create those roles and -- do you recall

8  any meetings, like, later on, from 2015

9  to 2018, where you are meeting with these

10 point people about the expectations of

11 what they had to do or things like that

12 in terms of Title IX?

13        A.    Proactively and individually

14 with them, I cannot recall.  But again, I

15 will defer back to the idea that as an

16 administrative team, review of policies,

17 procedures, changes in them, all happened

18 in the context of our administrative

19 meetings.  So all were present at the

20 time in discussing that.  Most often,

21 that was provided to us by, you know, our

22 district solicitor and legal counsel.

23        Q.    Do you recall any of those

24 point people from this time, from 2015

¹ through, you know 2018, any of them

² coming to you with, like, concerns or

³ questions about situations involving

⁴ Title IX or their role or anything like

⁵ that?

⁶      A.    I'm sure that we

⁷ collaborated on situations because that's

⁸ the nature of our team, we would have

⁹ done that.  So if they had questions,

¹⁰ they would have come to me, our assistant

¹¹ superintendants, we would have called our

¹² district solicitor and dealt with that

¹³ appropriately.  That's just the manner

¹⁴ that we did business.

¹⁵      Q.    So the hierarchy was they

¹⁶ would come to you, and then you would

¹⁷ contact an assistant superintendant, who

¹⁸ would then get the solicitor involved to

¹⁹ have a meeting or discussion?

²⁰      A.    That's one way.  Sometimes

²¹ the assistant superintendant who oversaw

²² the secondary programming might hear

²³ first and then come talk with me, and we

²⁴ would call the district solicitor.  So,

¹ you know, the main point always was to

² get to central office, to, you know,

³ assistant superintendant, to myself, some

⁴ member of our team.  And again, we

⁵ coordinate our efforts and we collaborate

⁶ very closely on all issues.  And so,

⁷ sometimes I was the first to know, other

⁸ times it might have been referenced to me

⁹ by the assistant superintendant, or the

¹⁰ superintendant could have been out in the

¹¹ building when something was occurring,

¹² and he had firsthand knowledge, and he

¹³ would come back and talk about the issue,

¹⁴ and we would take it from there.

¹⁵     Q.    Do you recall specifically

¹⁶ there ever being, like, issues brought up

¹⁷ in terms of Title IX from that timeframe,

¹⁸ 2015 through 2018?

¹⁹     A.    Very few.  Very few.

²⁰     Q.    What, what do you recall --

²¹ like, for instance, was any of these

²² incidents involving ███████  ██████████████

²³ do you recall those ever being part of

²⁴ discussions with the Title IX team or

1   anything like that?

2       A.   Yes.  With the

3   administrators who were responsible for

4   the area in which ███████ was at the time,

5   I believe the elementary program.

6       Q.   Are those the meetings that,

7   you know, you've reviewed the notes for

8   and things like that, is that what you're

9   referring to?

10      A.   Yes.

11      Q.   Okay.  What about, like,

12  other than -- because we're going to go

13  over the notes a little bit later

14  today -- other than, like, those notes

15  and those meetings, are there other

16  meetings -- what I mean by that is with

17  the view of the Title IX point people or

18  the special education Title IX point

19  person specific to, like, Title IX, like,

20  how to do the investigation or issues

21  that have come up with ████████

22  ███████████████

23      A.   Specific to ████████

24  ███████████████

1    Q.    We'll start there, yes.

2    A.    Nothing outside the notes

3  that I believe have been provided.

4    Q.    What about in terms of

5  ███████  ██████  He wasn't a special

6  education student, so I guess more -- not

7  just the special education point people,

8  but generally, Title IX, do you recall

9  there ever been any discussions with you

10  as the director of -- or, sorry -- the

11  coordinator of Title IX and the Title IX

12  point persons?

13    A.    As it relates to that case,

14  again, the notes that you have would be

15  what was discussed.

16    Q.    Okay.  So that was in

17  elementary school --

18    A.    Yes.

19    Q.    -- at Gwynedd Square, right?

20    A.    Correct.

21    Q.    But did you have any

22  separate meetings with, like, the Title

23  IX point people and yourself,

24  administration outside of those meetings

1  with the handwritten notes?

2      A.    Specific to that case?

3      Q.    To anything involving ███████

4  ██████ and Title IX issues.

5      A.    No.  Everything that is

6  captured is captured in either

7  handwritten notes or the formalized

8  letters resulting from the meetings.

9      Q.    The formalized letters,

10 meaning from the teacher, Holly Andrew?

11     A.    Yes.

12     Q.    What about in terms of other

13 issues, do you recall having meetings

14 with the Title IX point people from 2015

15 to 2018 with other Title IX issues with

16 student conduct?

17     A.    I would imagine they

18 occurred, but I would need -- you know,

19 obviously, when we're talking six, seven

20 years ago, you know, jogging my memory

21 with a student name or a situation, I

22 probably could have better recollection.

23 But again, there were very few cases of

24 specific Title IX issues that had come

1 into the district or had been referenced

2 within the district, so.

3     Q.   Okay.  If there was a name

4 that I could -- you know, I don't know of

5 any.  So that's why I'm asking to see if

6 you recall of any.

7     A.   Did we deal with issues of

8 harassment and discrimination, yes.  We

9 dealt with them according to policy and

10 procedure, and we took the appropriate

11 steps that we needed to.

12     Q.   Can you recall, other than

13 the ███████ ████████████ and ████████ ██████████

14 incidents and the other incidents that

15 ██████████ ███████ was involved in, do you

16 recall other situations where you were

17 involved or came to your attention that

18 there were Title IX harassment issues

19 between students?

20     A.   I do not recall at this

21 point.

22     Q.   Okay.  Because you were just

23 saying, like, that it's come up, it's

24 been very few times and that you followed

1   all the procedures and, and policies and

2   things like that, and I'm just trying to

3   find out when those other times were that

4   you're referring to or if there's

5   anything you can remember, or is there

6   just -- you're saying, generally, we

7   would have followed procedures, I can't

8   remember any times other than this case

9   that we dealt with that?

10       A.    Yeah.  I'm speaking in

11  generality, knowing the caliber of our

12  team and the expectations of our team and

13  the high performing levels that we

14  assumed our responsibilities with, that

15  we would have followed all of the

16  protocols and involved our district

17  solicitor and counsel surrounding those

18  decisions that were made.  You know,

19  during the time period, I probably can

20  better recollect situations with staff

21  members and students more so than I can

22  student to student.

23       Q.    Okay.

24       A.    So, that's the best I can do

1   for you right now.

2       Q.   That's okay.  And I

3   appreciate that, you offering that.

4         The teachers to student,

5   what are you referring to?  Was there

6   issues in the district during your tenure

7   of teachers being inappropriate with

8   students?

9       A.   There were cases, yes.

10       Q.   Can you, can you tell me

11   about them or what you remember about

12   them.

13       A.   You know, I don't know how

14   they are pertinent, and with all do

15   respect, my role is one of

16   confidentiality.  And so to be sharing

17   specifics and information about other

18   students and staff that are not germane

19   to, to what I believe have been your

20   questions surrounding ███████  ███████████

21   I'd be reluctant to, to share forward,

22   unless I have authority based on the

23   district solicitor and, and our counsel.

24       Q.   And I appreciate you, you

1  know, raising that.  If your concern is,

2  like, the confidentiality of student,

3  like, victims in these situations, then

4  if it helps to leave out the student

5  names, we can -- I'm okay with doing

6  that.  But I don't think that there's

7  anything -- even though this case is

8  about Jane Doe versus the district, it's

9  not so limited in, you know, I'm only

10  allowed to ask questions about that, and

11  I think, generally -- if you left out the

12  student names, would that help to

13  alleviate your concern about

14  confidentiality?

15      A.    Well I think --

16          MS. JORDAN:  Cheryl, I

17    believe that she's correct.  She's

18    entitled to inquire, but you don't

19    have to give any, any names.  Don't

20    use any names at all.

21          THE WITNESS:  I wouldn't.  I

22    wouldn't.  But again, you know, again,

23    without having specific notes to

24    reference in my files, it's really

1    challenging to be able to go down a

2    line of sharing with you specific

3    situations or instances, because the

4    last thing I want to do is

5    misrepresent anything.

6            But I -- in responding to

7    your question, there were probably two

8    or three to a handful of situations by

9    which staff members and students

10   interacted in a way that caused me to

11   investigate.

12 BY MS. LAUGHLIN:

13       Q.    Okay.

14       A.    During my tenure.

15       Q.    Okay.  And in your tenure,

16 is that from 2014 to 2020?

17       A.    Yes.  Aside from the ones

18 that went to the assistant director of

19 human resources from that 2018 and '19

20 mark on.

21       Q.    Because at that point, did

22 the director of human -- or, assistant

23 director of human resources take on that

24 responsibility as well?

1    A.    Yes, as was apparent in her

2  job description.

3    Q.    Okay.  You said it was two

4  to three or a handful between, we'll just

5  say 2014 to 2018, is that correct, then?

6    A.    I believe so, yes.  I mean,

7  if you're causing me to think about

8  specific situations, there's limitations

9  to my memory, obviously, when we're going

10  back this far.  So, on a scale of the

11  size of the district, I know that we had

12  relatively few complaints and concerns

13  that would fall under these parameters

14  and that I was involved with.

15    Q.    I understand.

16          And so I'm just asking --

17  you know, the questions that I'm asking

18  you, and this goes for the whole

19  deposition is, if there's details you

20  don't remember, you don't remember them.

21    A.    Right.

22    Q.    I don't have documents to be

23  able to show you.  It's not a memory test

24  of --

1    A.    Yeah.

2    Q.    You know, I'm not trying to

3 trick you in any way.

4    A.    No, I understand.  I'm just

5 trying to be as thorough as I can with

6 you to say, yes, there were concerns,

7 absolutely.  You know, the numbers, very

8 few.

9    Q.    Okay.  So let's talk about

10 the ones that you, you do remember.  Do

11 you remember whether they were at a

12 particular level of education, meaning

13 elementary school, middle school, high

14 school, or did that vary?

15    A.    It, it did vary.  The ones

16 that I am thinking about and were

17 enabling me to answer affirmatively that

18 the did exist were primarily at the

19 secondary level.

20    Q.    Is that high school, the

21 secondary level?

22    A.    Yes.  Middle school, high

23 school, yes.

24    Q.    Okay.  So, secondary level

¹ was broken down -- or, includes middle

² school and high school?

³      A.    Yes.

⁴      Q.    Do you recall the schools

⁵ that, that these incidents involve -- or,

⁶ let's -- I mean, off the top of your

⁷ head, how many incidents can you think

⁸ of, like, specific things, so I can kind

⁹ of break them down like that?

¹⁰      A.    Again, you know, probably

¹¹ two, three, maybe four, tops, that, you

¹² know, rose to this level, and they were,

¹³ I believe, high school level.

¹⁴      Q.    Tell me generally, like,

¹⁵ what you remember about each or, like,

¹⁶ what -- like, if you're having separate

¹⁷ memories of, you know, two, three, four

¹⁸ different ones at the high school level,

¹⁹ can you just kind of tell me generally,

²⁰ like, what each involved?

²¹      A.    There were incidents of

²² staff members having inappropriate

²³ physical contact with students through

²⁴ sexual intercourse with a student.  That

1  ran the gamut of the situations we were
2  involved in at the times that they were
3  investigated, and disciplinary actions
4  were taken.
5      Q.   Was this sexual intercourse
6  between a -- when you say staff member,
7  are you talking about a teacher or, like,
8  a administrator, or?
9      A.   Teacher.  Teachers and
10 students.
11     Q.   Okay.  In all of the
12 situations you can remember, was it
13 always involving a teacher having sexual
14 intercourse with a student?
15     A.   It wouldn't necessarily have
16 had to be sexual intercourse.  As I
17 indicated, it could have been
18 inappropriate physical touching, with the
19 most extreme being intercourse.
20     Q.   And when you say
21 inappropriate physical -- sorry, go
22 ahead.
23     A.   I said in one case that I
24 can recall.

1    Q.    Okay.  When you say

2  inappropriate physical touching -- or --

3  is that in a sexual nature, do you mean?

4    A.    Yes, I believe so.

5    Q.    Okay.  Is there, is there

6  another -- I just want to make sure that

7  I'm understand what you're saying -- is

8  there another --

9    A.    Yes.  I think, you know,

10  unwanted physical contact, touching a

11  shoulder, you know, touching a back, is

12  not, you know, one of -- an intimate

13  area, but it's still unwanted and would

14  be deemed inappropriate by a staff

15  member.

16    Q.    Okay.  The allegations or

17  the situations you can remember from the

18  district involving a teacher and a

19  student with this inappropriate contact,

20  were they of, like, the shoulder or the

21  back touching, or were they of, like,

22  more intimate areas?

23    A.    More intimate areas.

24    Q.    Okay.  Would you agree with

1  me that it was, like, a sexual --

2          A.    Sexual.

3          Q.    -- inappropriate touching

4  nature?

5          A.    Yes.

6          Q.    Okay.  So I really just want

7  to kind of break down to understand -- I

8  know you talked about the one incident

9  involved a teacher having intercourse

10 with a student, that's one time you can

11 recall, correct?

12         A.    Yes.

13         Q.    All the times you can

14 remember, were they different teachers

15 involved, or was it the same teacher in

16 each of these incidents, that you can

17 remember?

18         A.    Different teachers.

19         Q.    Okay.  For each incident, it

20 was a different teacher?

21         A.    Yes.

22         Q.    Okay.  Let's start with the

23 one where the teacher was having

24 intercourse with the student.

1          Was that something -- do you
2   know the timeframe about when that
3   happened, like, the year?
4          A.    I don't.
5          Q.    Do you know what -- was it
6   at North Penn High School, then, since
7   that's the only high school?
8          A.    Yes.
9          Q.    How did you -- or, what
10  involvement did you have in, like, the
11  investigation or the situation in the one
12  where the teacher was having intercourse
13  with the student?
14         A.    I believe that was raised
15  through the high school principal to our
16  assistant superintendant and
17  superintendant, by virtue of their
18  oversight of the secondary program and
19  discussion with me, and we guided the
20  investigation, working with our district
21  solicitor, and we followed protocols,
22  involved the police.  It was a situation,
23  if I recall correctly -- again, you know,
24  without the specificity of my notes -- I

¹ believe the sexual interactions took

² place outside of the district.  I don't

³ believe that they happened on property,

⁴ if memory serves me correctly.  And we

⁵ did not -- the staff member was

⁶ immediately suspended, given, you know,

⁷ through -- or, put on administrative

⁸ leave, you know, through the duration of

⁹ the investigation and wound up being

¹⁰ dealt with, you know, through the

¹¹ authorities and resigned position at the

¹² same point in which we were terminating

¹³ employment.

¹⁴         Q.    Did that involve a criminal

¹⁵ prosecution of the teacher?

¹⁶         A.    I do not know.

¹⁷         Q.    Do you know whether, like --

¹⁸         A.    I don't recall.

¹⁹         Q.    Okay.  Do you know whether

²⁰ he was, like, convicted or went to jail

²¹ or anything like that, what the outcome

²² was?

²³         A.    I do not.

²⁴         Q.    Was the teacher that was

¹ involved in that incident, was it the

² student's teacher for one of the high

³ school subjects?

⁴     A.    It was not a -- it was --

⁵ yes, it was a teacher who had direct

⁶ supervision for the student in a

⁷ cocurricular area.

⁸     Q.    Like, an after school

⁹ activity or something like that?

¹⁰     A.    A cocurricular is during the

¹¹ course of the day as well as expanding

¹² beyond the day, for activities.

¹³     Q.    Okay.  So it wasn't, like,

¹⁴ a -- you're saying it wasn't in, like, an

¹⁵ academic class or something, is that what

¹⁶ you're saying?

¹⁷     A.    It was.  It was a teacher

¹⁸ who had responsibility for an academic

¹⁹ area as well as the cocurricular area.

²⁰ So you have departments like, you know,

²¹ music and gym and art, that they have

²² components in the curriculum that also

²³ carry over into after school chorus and,

²⁴ you know, drama and band and that kind of

1  thing.

2       Q.    Okay.  Do you recall what

3  the cocurricular was?

4       A.    I believe it was band.

5       Q.    Do you recall whether Pete

6  Nicholson was the principal of the high

7  school at that time?

8       A.    It may have been.  I

9  don't -- again, I don't recall.

10      Q.    Do you remember -- you said

11 that you were having -- you said you

12 guided the investigation with the

13 district solicitor.  Do you remember who

14 was involved other than you and the

15 district solicitor in that investigation?

16      A.    Yes.  I believe our

17 superintendant, Dr. Dietrich.

18      Q.    Okay.

19      A.    And our now assistant

20 superintendant, Todd Bauer, and -- may

21 have been principal at the time or it may

22 have shifted to Pete Nicholson.  I don't

23 recall, again, you know, the timeframe.

24 I believe it might have been Pete and

1  Todd would have been assistant

2  superintendant, because I think this was

3  more recent than the other situations

4  that I'm recalling.

5      Q.   Okay.  Was Todd Bauer the

6  principal of North Penn before he --

7  North Penn High School before he became

8  super -- assistant superintendant of the

9  district?

10      A.   He was.

11      Q.   Okay.  And then, after Todd

12  Bauer left and went into the assistant

13  superintendant role, that's when Pete

14  Nicholson took over as principal of the

15  high school?

16      A.   That's correct.

17      Q.   Okay.  What -- when you say

18  that you were part of this investigation

19  with this team, what was your role in

20  this investigation involving the, the

21  band teacher intercourse with the

22  student?

23      A.   My role, in terms of HR and

24  Title IX, was, really, helping to

¹ ascertain that the steps in the process

² were followed, working with the attorney

³ and the leadership in terms of

⁴ appropriate courses of action, and then

⁵ once that had been determined, you know,

⁶ obviously the paperwork that accompanies

⁷ the investigation and the disciplinary

⁸ action that was taken.

⁹      Q.    For the teacher?

¹⁰     A.    Yes.

¹¹     Q.    When you say the steps in --

¹² making sure the steps in the process were

¹³ followed, what do you mean, like, what

¹⁴ did, what did -- what is that -- what did

¹⁵ you do?

¹⁶     A.    Well we discussed the

¹⁷ investigation of the student that was

¹⁸ involved, the students, any witnesses,

¹⁹ discussion with the staff member who was

²⁰ alleged to have been involved and moving

²¹ forward, working and cooperating with the

²² police and then determining, again, as I

²³ said, the appropriate course of action

²⁴ with regard to discipline for this staff

1  member.

2      Q.     In terms of the

3  investigation and finding out what

4  happened and kind of before you get to

5  the discipline of the staff member, did

6  you have any, like, hands-on involvement

7  in the investigation, in terms of, like,

8  interviewing or anything like that?

9      A.     No.  I do not believe so.

10      Q.     And who --

11      A.     It was done with the high

12  school administration, the superintendant

13  and I believe the police.  It was a

14  collaborative effort with all involved at

15  that point.

16      Q.     And who was -- not in terms

17  of -- I guess, was the police

18  investigation and the district

19  investigation going on, like,

20  concurrently, at the same time?

21      A.     I believe so.

22      Q.     In your understanding as the

23  Title IX coordinator from 2014 to 2018,

24  do you know whether -- is that the

1  process, that the district investigation

2  goes concurrently with the police

3  investigation, or does, like, one have to

4  wait for the other?

5          A.     I think it depends on the

6  circumstances.  You know, you have to --

7  at times, if parents are informed first,

8  sometimes police are informed first.  And

9  so, you know, we have cooperation with

10  our local municipalities that serve the

11  district, that we will collaborate and

12  work with them.  So, if we're informed

13  first and it's something that is deemed

14  appropriate and necessary for law

15  enforcement to be involved in, we

16  communicate with them and share documents

17  and information, and if it's gone to them

18  first, they will typically report on

19  scene and make us aware of their

20  investigation and provide us with

21  opportunities to investigate as well.

22  There's also community resource of

23  Mission Kids, that we work with, and that

24  they sometimes step in and supercede our

1 ability to talk with a victim first,

2 because they want to have that done by,

3 you know, their investigators. So then

4 we all are waiting to hear back and have

5 that information. At least, at the time,

6 it was. Again, I can't speak to where

7 things have progressed right now. But

8 those were some of the factors that had

9 to be coordinated and worked into our

10 processes at all times.

11      Q. So Mission Kids is really

12 involving the, like, victim in a

13 situation and interviewing, like, a child

14 victim --

15      A. Yes.

16      Q. -- to see whether or not

17 abuse occurred, right?

18      A. Right.

19      Q. What about in terms of,

20 like, any other invest -- or, interviews

21 or things like that that needs to take

22 place, are those things that the district

23 typically continues to do while you're

24 waiting for a Mission Kids interview, if

1  there's going to be one?

2       A.    In terms of what other

3  witnesses on the periphery, yes, yes, we

4  would be doing that.  You know, the

5  essence, obviously, in an investigation

6  is to be as timely as possible so that

7  memories are as clear and crystallized as

8  possible.  And so sometimes things are

9  happening concurrently, sometimes an

10  investigation with a student will provide

11  you with new information to investigate

12  with other students, and sometimes it

13  circles you back around to have to talk

14  to the victim again, you know, multiple

15  times, that kind of thing.  So, an

16  investigation is really a live breathing

17  aspect of, of what we do, depending on

18  what we hear.

19       Q.    Would you agree with me,

20  then, that there's no, like, policy in

21  the district that you have to -- the

22  district has to wait for a police

23  investigation to conclude before the

24  district can start their investigation?

1              MS. JORDAN:  Note my

2      objection to the form of the question.

3              You can answer.

4              THE WITNESS:  I -- can you

5      repeat the question, please?

6              MS. LAUGHLIN:  Yeah.

7   BY MS. LAUGHLIN:

8         Q.    Is there a policy or

9   procedure in the district -- and

10  obviously -- so, I guess, let me clarify.

11  I'm not asking you about things, like,

12  after you left and what it is now,

13  because you're not there anymore and you

14  wouldn't know that step.

15              So during the time that you

16  were there, was there any policy or

17  procedure in the district that the

18  district would wait until a police

19  investigation concluded to do the

20  district's investigation of a harassment

21  situation?

22         A.    I would, I would respond by

23  saying we would not -- our investigation

24  unless we were directed by police

1    authorities or a criminal case was

2    involved that would direct us not to

3    interfere with that situation or that

4    case.  You know, and again, unless we

5    were directed not to, we would continue

6    to do what we needed to do, from the

7    standpoint of our students and our staff.

8          Q.    Okay.  When you say

9    "directed not to", it's from the police

10   department or --

11         A.    From the police.

12         Q.    -- Mission Kids?

13         A.    Yes, absolutely.  And --

14   yes.

15         Q.    Okay.  Do you recall times

16   in your time with North Penn School

17   District where the district was told not

18   to investigate and to wait, by the

19   police?

20         A.    I believe there was one

21   situation that I can recall and probably

22   not when I was director of human

23   resources but when I was director of

24   elementary, that Mission Kids did step

1 in, and we were not able to have access

2 to the students in order to be able to

3 question them.

4     Q.    What about in terms of any

5 other part of the investigation?  I

6 understand, in that, they said don't

7 interview the students yet because

8 Mission Kids wanted to first --

9     A.    Mm-hmm.

10     Q.    -- but what about in any

11 other part of the investigation?

12     A.    No.  I don't believe so.

13     Q.    Do you know whether, in

14 that instance, whether, like, the

15 investigation continued, like gathering

16 documents, talking to employees or

17 something like that?

18     A.    Oh.  Yes, absolutely.  As I

19 indicated, the district would continue to

20 do what we needed to do to follow, you

21 know, procedures and good investigatory

22 practices.

23     Q.    During your time, do you

24 recall -- do you know whether there

1   was -- in order for an investigation to

2   kick off, whether the form, like, a form

3   needed to be completed in order for the

4   district to investigate an incident?

5       A.   The form is best practice

6   and is called for in, you know, our --

7   within the regulation and alluded to in

8   the policy as an expectation.  But if a

9   staff member or an administrator within

10  the district knew of a situation that was

11  concerning or violating another

12  individual, it -- they would -- it could

13  be reported verbally and they would

14  follow-up on.

15      Q.   So it's not like if a

16  parent, for example, would -- or, a

17  student wouldn't have to complete a form,

18  like, the investigation could start

19  independent of any form being filed,

20  right?

21      A.   That's correct.

22      Q.   When you said -- in terms

23  of, like, law enforcement being involved

24  in an investigation involving, like,

1 sexual misconduct in the school, I think

2 the term you said or the phrase was if it

3 was deemed necessary for law enforcement,

4 was there a, like, process in place at

5 the district, or was there a process in

6 place during your time, for when

7 something is deemed necessary to involve

8 law enforcement?

9 　　　　MS. JORDAN:  Note my

10 　objection to the form of the question.

11 　　　　You can answer, Cheryl.

12 　　　　THE WITNESS:  I, I don't, I

13 　don't believe so.  There's nothing

14 　written.  It's a matter of rising to a

15 　level, rising to a level of concern

16 　and, you know, depending on what, what

17 　the allegations are.

18 BY MS. LAUGHLIN:

19 　　　Q.　　Is that, like, based --

20 　　　A.　　And --

21 　　　Q.　　I'm sorry, go ahead.

22 　　　A.　　I was just going to say in

23 compliance with statutes that we know to

24 exist.

1    Q.    What statutes are you

2 referring to?

3    A.    Well, with regards to

4 harassment, discrimination laws that are

5 violated, we would obviously involve the

6 police.

7    Q.    But how -- I guess, are

8 there specific, like, laws or policies

9 you're referring to?

10    A.    Well I think when you're

11 talking about sexual misconduct with a

12 minor, that's certainly reportable and

13 why the police were involved, under child

14 protective services law.

15    Q.    Like, for Pennsylvania; do

16 you mean?

17    A.    Yes.

18    Q.    Okay.  Is there a certain --

19 when you say sexual misconduct with a

20 minor, is there a certain level of,

21 like -- because we talked about, like, if

22 it's a shoulder touch or a back touch

23 versus, like, a touching of the private

24 area.  Is there some type of, like,

1  parameter guidelines that you're aware

2  of, what the district is following in

3  terms of when it's deemed necessary to

4  report to law enforcement?

5            MS. JORDAN:  Note my

6     objection to the form of the question.

7            You can answer.

8            THE WITNESS:  Anything of a

9     sexual nature has been reported to the

10    police.

11 BY MS. LAUGHLIN:

12    Q.    When you say "anything of a

13 sexual nature", what does that mean?

14    A.    If it, if it is deemed to be

15 sexual harassment, sexual abuse, then

16 absolutely, we have reported it.

17    Q.    And how do you -- I guess

18 I'm just -- how do you, like, deem

19 something to be sexual assault or sexual

20 abuse, like, how does -- is there some

21 type of guidance for all district

22 employees that they know to follow on

23 what is or isn't sexual abuse or sexual

24 assault?

1          MS. JORDAN:  Note my

2     objection to the form of the question.

3          You can answer.

4          THE WITNESS:  I think we

5     have reviewed the child abuse

6     statutes, we've reviewed child

7     protection services laws, and we've

8     provided that information to

9     constitute a situation of sexual

10    harassment.

11   BY MS. LAUGHLIN:

12        Q.    So under those laws, like,

13   that's what you're referring to?

14        A.    Yes.  And under our district

15   policies.

16        Q.    Is there a --

17        A.    For harassment.

18        Q.    The harassment policy for

19   the district?

20        A.    Yes, I believe so.

21        Q.    Okay.  Do you know whether

22   the district's harassment policy

23   delineates, like, what constitutes sexual

24   misconduct of a minor that's deemed

¹ necessary to report to law enforcement?

²     A.   Yes.  I believe there are

³ definitions within the policy that

⁴ provide guidelines for what harassment

⁵ constitutes.

⁶     Q.   Okay.  But I guess in terms

⁷ of, like, what's necessary -- so you're

⁸ saying any harassment under that policy

⁹ that's sexual in nature involving a minor

¹⁰ would be reported to the police?

¹¹     A.   Yes.  I believe that's true.

¹²     Q.   How is that communicated --

¹³ because you were saying, like -- how is

¹⁴ that communicated to, to the staff, like

¹⁵ teachers and things like that, at each of

¹⁶ the schools?

¹⁷     A.   That would have been

¹⁸ through, you know, our policy revisions

¹⁹ when principals are discussing protocols

²⁰ in faculty meetings, that would have been

²¹ made aware to them.

²²     Q.   Do you recall there ever

²³ being specific instruction or a meeting

²⁴ about what's deemed necessary to report

1  to law enforcement in terms of sexual

2  misconduct of a minor, or with a minor?

3          A.    I believe that those -- the

4  particular laws that were shared, the

5  child protective services laws and what

6  constitutes sexual misconduct or sexual

7  harassment, were shared with staff during

8  the context of the faculty meetings and,

9  most clearly, our administrative team,

10  who share the responsibility for

11  reporting upwards and outwards to both

12  administrators within the district, the

13  district solicitor, who guides us, as

14  well as to authorities.

15          Q.    Do you recall that

16  specifically, being, like, part of, like,

17  agendas or discussions that you had at

18  the administrative level with the, like,

19  60-plus people that are at these

20  meetings?

21          A.    I believe it would have been

22  found within those agendas in the

23  trainings, yes.

24          Q.    Do you recall specifically,

1  though, or are you just saying, like,

2  generally, I think that they would have

3  been included?

4      A.    I do recall specifically

5  discussions surrounding the policies,

6  actions, case studies.  Can I tell you

7  the date and time, no.

8      Q.    Do you recall how many times

9  that happened, can you estimate for me?

10     A.    I cannot.

11     Q.    Even, like, a, a ballpark.

12 Was it more than once, or?

13     A.    Yes.  I believe it was more

14 than once.

15     Q.    Can you -- is it more than

16 five times?

17     A.    I don't know.

18     Q.    Okay.  I know you said, with

19 the, the band teacher with the student at

20 North Penn High School, that you were

21 involved in the investigation, like, at

22 the ground level, I guess, with, like,

23 students and things like that, correct?

24     A.    No, I did not.  I indicated

1  that I was supportive of the process but

2  that the principal and I believe the

3  superintendant and assistant

4  superintendants, who govern and supervise

5  the secondary program, were involved with

6  the students and talking directly with

7  the students.  It was not common practice

8  for me, as the director of HR, to do

9  that.

10      Q.    What about in terms of your

11  Title IX coordinator role, still not

12  common for you to be involved in that?

13      A.    I was involved in directing

14  and overseeing the process.  We have

15  found and we know, based on research,

16  that people who are most familiar to

17  students will wind up having the best,

18  you know, response from them, they're of

19  greater comfort for them to share when

20  you're talking about these emotional

21  issues.  So, you know, bringing in a

22  stranger doesn't always get the best

23  results, and having confidence in our

24  team and knowledge of the caliber of our

¹ administrators, as I said before, they

² would investigate with the students, take

³ statements, share them with us, you know,

⁴ as appropriate in the investigation with

⁵ me.

⁶         Q.    When you say "take

⁷ statements", is there a process in place

⁸ as to how statements are to be made,

⁹ meaning, like, students writing out their

¹⁰ own statements versus collaborative

¹¹ interviewing, like creating a summary, is

¹² there a process in place as to how that

¹³ should be done in the district?

¹⁴         A.    Obviously, when a student is

¹⁵ of, you know, appropriate age level, they

¹⁶ can write out their own statements, and

¹⁷ depending on their emotional state at the

¹⁸ time, that's always best process and it's

¹⁹ always what we request, and in most cases

²⁰ it's what we're able to ascertain and to

²¹ receive.  In some cases, it is obviously

²² with our -- if it would happen with

²³ younger students and/or the students who

²⁴ are emotionally distressed or special

¹ education students, who may not be

² capable of doing it through the written

³ word, we will scribe for them or we will

⁴ take notes.  Always, whether there's a

⁵ student written statement or not, there

⁶ will be administrative notes regarding

⁷ the investigation with the questions

⁸ asked and the student responses.  So it's

⁹ a, you know, who, what, when where kind

¹⁰ of situation that they've been trained

¹¹ with as well as anyone else that might

¹² have seen it or witnessed it or been a

¹³ party to it, and then stressing,

¹⁴ obviously, the confidentiality of the

¹⁵ situation so that we can be sure that

¹⁶ what is heard and ascertained in the

¹⁷ investigation is, you know, as true as

¹⁸ possible.

¹⁹         Q.    Okay.  When you said that --

²⁰ and I understand in, in -- from what

²¹ you're saying, a preschooler isn't gonna

²² be able to write out a simple statement.

²³         A.    Right.

²⁴         Q.    I have a toddler myself, and

1  that would not be a good task, so I

2  understand.

3             But for instance, in terms

4  of high school, like, unless they have

5  some type of special needs or something

6  like that, those would be students

7  typically that -- what you would expect

8  out of people doing an investigation in

9  the district is that the students would

10  be writing statements and submitting

11  those; is that right?

12        A.    Yes.

13        Q.    And then you said that you

14  would also, I think you said always, have

15  the questions asked and the student

16  responses?

17        A.    Yes.

18        Q.    And what -- is that, like,

19  whoever is interviewing, like, what the

20  question -- how does that look, or what

21  does that --

22        A.    Like, it might start -- an

23  investigation might start with a very

24  open-ended question, you know, much like

1 you started our conversation today, you

2 know, tell me what you recall, tell me

3 what you remember.  And then, from there,

4 the questions become more specific, based

5 on the information that's shared, and,

6 you know, you just evolve and develop.

7 And at times, you know, when I talk about

8 guiding a process, you know, I might

9 discuss it with the administrator, and we

10 might discuss questions that are

11 pertinent and would be important to have

12 answered.

13        Q.    Okay.  Does that -- sorry.

14        A.    That's helping in

15 supporting, you know, them in the

16 investigation.

17        Q.    Is that typically what you

18 do when there's a Title IX investigation,

19 that you tell them what questions are

20 pertinent to ask, or is that generally

21 not your involvement?

22        A.    A part of the involvement,

23 yes.  So it's, you know, make sure that

24 we have this, this and this captured,

1    what are some other thoughts pertaining

2    to the information, and that allows them

3    to also go into the situation with the

4    student equipped with, you know, as much

5    potential to get information as possible.

6         Q.    In these investigations, is

7    there, like, a file created, like a Title

8    IX investigation, is there a district

9    file created with, like, the statements

10   or the documents or whatever evidence in

11   the district investigation?

12        A.    Yes.  There would be a file

13   the investigation created.

14        Q.    Where is that kept?

15        A.    It would typically be kept

16   in human resources.  Again, if it is

17   references a staff member or something

18   that happened, you know, involving a

19   staff member, if it is -- you know,

20   student to student, it might exist first

21   at the building level and then raised up

22   to the appropriate level supervisor, like

23   a director of elementary, director of

24   secondary, that kind of thing.

1          Q.    Student -- I'm sorry.

2          A.    Along with those point

3    people.

4          Q.    Okay.  In terms of the

5    student-on-student Title IX, like, sexual

6    misconduct investigation, you said that

7    they'd be kept at the building level?

8          A.    Well they would originate

9    there.

10         Q.    Oh.

11         A.    And then if there, you know,

12   if there was not involvement from a staff

13   member, I believe they would be

14   maintained there or at the appropriate

15   director's level.  So, you know, if it

16   happened at the secondary, the director

17   of secondary or the assistant

18   superintendant of record for secondary

19   would have knowledge of and probably

20   maintain that file with the student as

21   well as it being at the building level.

22         Q.    When you say they probably

23   maintained, what -- I mean, what --

24         A.    They would be made aware of

1   it.  Whether they would have the physical

2   file or copies of it, that I, I, I can't

3   speak to.  I can't say for sure.

4        Q.    So there's no, like,

5   specific policy that you're aware in the

6   district for a director of special

7   education or somebody higher up at the

8   building level to keep incidents of

9   student-on-student sexual misconduct; is

10  that correct?

11       A.    I don't believe there's

12  policy to that effect.  I can tell you

13  that, in those roles, the people in those

14  roles do have them.  As director of

15  elementary, I had, I had the files, and I

16  kept them.

17       Q.    So, I guess, how would --

18  there's no policy, like, a written policy

19  in place that that's the procedure to be

20  followed.  How do you, like, as director

21  of elementary education or something like

22  that, how do they know to, like, keep a

23  file or how it's maintained or where it's

24  maintained?

¹      A.    It's how we were trained,

²  it's what we do, it's how we supervise

³  and observe and help support the people

⁴  that we interact with.  It's what I would

⁵  have done as a principal, it's what I did

⁶  to support my principals, and it was what

⁷  I needed to do to carry out the

⁸  responsibilities of my job as director of

⁹  elementary.

¹⁰      Q.    I understand you're saying.

¹¹      A.    Yeah.

¹²      Q.    Go ahead.

¹³      A.    It's just a matter of what

¹⁴  we do.  When it -- you know, you discuss

¹⁵  it, you talk about it in our

¹⁶  administrative meetings, as I indicated,

¹⁷  and so, just because it's not written

¹⁸  down in a policy doesn't mean best

¹⁹  practice doesn't happen on a daily basis

²⁰  when it needs to.

²¹      Q.    Well I guess -- so, I know

²²  there's not a written policy, but is

²³  there a practice in -- I understand

²⁴  you're telling me what you would do, it's

1  your experience and I would have done

2  this and -- you know, I --

3        A.    Mm-hmm.

4        Q.     -- understand that's what

5  you're saying.

6        A.    Mm-hmm.

7        Q.    But in terms of a practice

8  in the district, do you know whether

9  that's consistent among, like -- that

10  that's the expectation, that's what they

11  do, that's what we've been trained within

12  the district to do, do you know whether

13  there's something like that?

14        A.    I believe that you would

15  find that in, in the district.  I believe

16  that you would find the director of

17  secondary, the director of elementary,

18  the director of special ed having access

19  to those files, statements, folders

20  information.  Right now, it's more

21  electronic than creating a file folder

22  and handwritten notes.  But yes, I

23  believe that it is common practice and it

24  is understood that when you have a

1 situation of sexual harassment you are

2 also informing your immediate supervisor

3 as one of the director levels.

4       Q.    And I guess I'm talking

5 about the, like, documentation of it, and

6 I -- I'm trying to, I guess --

7       A.    We -- they --

8       Q.    Sorry.  I'm trying to be

9 specific as to whether there's a practice

10 in place for the directors of elementary

11 education or special education or

12 whatever to maintain those files.

13             Is there any kind of

14 practice in the district that, in

15 addition to them being at the building

16 level, that those supervisors also are

17 maintaining those files?

18       A.    Yes.  I believe that that is

19 occurring.  It occurred when I was the

20 director of elementary.  We were --

21 documents were shared, they were

22 forwarded to central office to my

23 attention.  At times, I would even be in

24 the building and bring the physical

¹ copies back to me in that time period.

² In more recent years, there are shared

³ folders that are secure in nature that

⁴ can be shared electronically and/or

⁵ accessed by anyone.  So it's not a matter

⁶ of is there, is there a file maintained

⁷ here for a student and a file maintained

⁸ here, it is a common file where

⁹ investigative documents are housed, and

¹⁰ the pertinent people have secure access

¹¹ to those electric files.

¹²       Q.    Okay.

¹³       A.    Does that help?

¹⁴       Q.    Do you have an estimate of

¹⁵ when it was moved to electronic versus,

¹⁶ like, the paper box file or whatever?

¹⁷       A.    I would say sometime during,

¹⁸ you know, more recent year, like

¹⁹ 2015/2016 on, we moved to paperless in,

²⁰ in many of our functions within the

²¹ district.  And so that's where secured

²² sharing happened, you know, through a

²³ number of platforms that the district

²⁴ has.

1    Q.    Okay.  One of those is,
2  like, the Google Drive, like that we
3  talked about?
4    A.    It is.  Dropbox, Secure
5  Locations was another, and then we also
6  have just secure student software and
7  employee software too.  So CRM systems,
8  things of that nature that are, you know,
9  limited access to.
10    Q.    Student-on-student
11  misconduct, like we've been talking
12  about, where exactly are they housed?
13  Like, is it the student that was accused,
14  in their, like, student file, or what
15  type of category or whatever are those
16  documents kept in?
17    A.    I believe that there are
18  general folders and files.  They're not
19  a -- they're not kept in a student
20  folder.  It's not -- that's not under
21  parameters of, of the way that we would
22  maintain those records.  If discipline
23  was a result of the interaction, there's
24  a separate discipline file for the

 1  student that would house the pertinent
 2  documents.  If there are notes regarding
 3  separation of students because of past
 4  issues and concerns, guidance counselors
 5  and people at the building level who are
 6  responsible for scheduling should be made
 7  aware of that so that they're able to
 8  continue to carry out those requirements.
 9  But as a administrator, there would be
10  some level of a general file.  So that
11  would be kept with -- maintained in the
12  student's folder, comprehensive file,
13  will be maintained separately.
14        Q.    Is there, like -- you said,
15  like, a general folder.  Is there, like,
16  a title to this folder, or is it just so,
17  like, student-on-student misconduct under
18  Title IX folder, or, like, how -- do you
19  have anymore details about how this
20  folder is categorized or maintained?
21        A.    I don't.  I know how I did
22  it.  I can't speak for -- again, it's
23  just a practice that I know
24  administrators have been trained in

1 documenting, maintaining their

2 documentation and referencing

3 documentation for the future.

4     Q.    How do you know they've been

5 trained on that?

6     A.    It's a part of what, what we

7 do.  It happens in Principal 101 through

8 your principal certification program,

9 your supervisor certificate, and it was

10 recurring in our administrative meetings

11 on a monthly and yearly basis, and we

12 talk about doing investigations in any

13 realm, whether it's sexual harassment,

14 Title IX or basic -- discipline.  You

15 know, you make sure you have your

16 documentation, and you maintain it in

17 ways that will help you moving forward.

18     A.    I guess, was there training

19 specifically on how to, like, document,

20 retain and, like, keep student-on-student

21 sexual misconduct incidents.

22     A.    Yes, there was.  There were

23 professional development presentations

24 done on conducting investigations, as

1  they relate to students, as they relate

2  to staff and as they relate to students

3  and staff.  So those parameters were

4  provided to our administrative team, who

5  then, in turn, talked to staff members,

6  faculty at the building level.  Some

7  cases, they even have developed forms

8  that allow for the reporting of incidents

9  that happen in the classroom under the

10  discipline code, to then be shared upward

11  with building principals or directors,

12  whatever the line might be appropriate

13  given the situation.

14       Q.    You said that there's

15  actually documentation on how to, like,

16  conduct the investigations and --

17       A.    I believe we have had

18  presentations with regards to conducting

19  investigations, best practices,

20  documenting, aside from, as I said to

21  you, it's basic in the coursework that

22  administrators have to have when they are

23  seeking certification as an administrator

24  in the Commonwealth of Pennsylvania.

1       Q.    I understand.  And I guess I
2  hear what you're saying, you went through
3  a lot of education to get to where you
4  were and a lot of courses, from undergrad
5  to grad school and all of that, I get
6  that.  But I just want to distinguish
7  specifically in terms of what the
8  district, North Penn School District, has
9  put in place in terms of training on the
10 documentation and where to house things
11 and maintain it and stuff like that.
12             Has there been any specific
13 practices or policies that you're aware
14 of of how to maintain those as far as how
15 the district, you know, directing it be
16 done?
17        A.    Yes.  I believe I responded
18 to that.  I indicated that it happened
19 through our district administrative
20 meetings with presentations outlining the
21 investigation steps, documentation and
22 what to do in specific situations.  I
23 believe those were also done in
24 conjunction with the district solicitor

1    the maintaining records, knowing that

2    they should not be maintained or housed

3    within a student's comprehensive file,

4    just like, you know, they're not

5    maintained in an employee's comprehensive

6    file.  There's separate files for the

7    appropriateness of what it is you're

8    maintaining.

9        Q.    Why shouldn't it be in a

10   student's comprehensive file if a student

11   is, like, accused of misconduct?

12       A.    We operate and house our

13   disciplinary measures in a separate file

14   from students, where students inside the

15   comp files are solely academic records

16   pertaining to the academic levels of a

17   student.

18       Q.    In terms of the

19   disciplinary, though, that's in a --

20   inside a student's folder in, like, a --

21   it sounds like a subfolder --

22       A.    Mm-hmm.

23       Q.    -- type of thing --

24       A.    Right.

1    Q.    -- is that just, like, if
2    they got a suspension or a detention or
3    something like that, is that the
4    disciplinary documentation that you're
5    talking about?
6    A.    Yes.  That can be a part of
7    it, yes.
8    Q.    Are there other things that
9    are a part of that disciplinary file
10   that's kept in the subfolder of the
11   student's folder?
12   A.    It would be, you know, the
13   situations -- excuse me -- any discipline
14   that that student experienced would be
15   kept in that folder.
16   Q.    But, I guess, what -- in
17   terms of the discipline, is it just --
18   because I've seen, like, a printout of,
19   you know, like, when -- the date somebody
20   got suspended and it was a day of
21   in-school suspension and what it was for
22   and things like that.  Are there other
23   things that the district typically, you
24   know, practices to keep other things

¹ other than just that, you know,

² electronic documentation that kind of has

³ it crossing the line of what the

⁴ disciplinary issues with that student

⁵ were?

⁶     A.   Any of the supporting

⁷ documentation that leads up to the

⁸ discipline measures could be found in

⁹ that folder as well.

¹⁰     Q.   When you say "could be", is

¹¹ there a policy that that should be kept

¹² in that folder as well?

¹³     A.   I don't believe there's a

¹⁴ formal policy.

¹⁵     Q.   How would --

¹⁶     A.   It's good, it's good

¹⁷ investigative practice to substantiate

¹⁸ the reasons for the decisions and

¹⁹ discipline that was determined.

²⁰     Q.   When you say it's best

²¹ practice to do so, is that from, like,

²² your own experience or the district had,

²³ like, a best practice that it was

²⁴ informing people of and expecting

1  compliance with?

2      A.    I believe it was components

3  of the presentations done on conducting

4  investigations.

5      Q.    Okay.  These trainings that

6  you're talking about, where it was -- I

7  know you keep saying it's about the

8  investigation and how the investigation

9  should be done and things like that.  But

10  in terms of just documenting and keeping

11  the documentation after an investigation

12  is over, is there -- was there a practice

13  or instruction or training on where that

14  should be kept specifically?

15      A.    I believe that was in the

16  context of the presentations.  The

17  discussions surrounding documentation and

18  maintaining documentation were shared as

19  a practice.  To house it within the comp

20  file that's shared is not something that

21  we did but separate files with student

22  needs associated to -- you know,

23  associated or in conjunction with their

24  files that were maintained, and within

1  that, you would find the formal

2  documentation of letters of discipline,

3  if they were for a detention, a

4  suspension, leading to expulsion as well

5  as the supporting documentation behind

6  that.  I can't answer it any other way.

7  That's what I know.

8       Q.    I understand.

9            Do you know whether this

10  training or this presentations of how to

11  maintain, like, the investigative-type

12  parts, like, you know, statements and

13  what all happened, like, other than just,

14  like, the end result, like, whether they

15  were suspended but all those details of

16  the investigation, of what actually

17  happened, if there were multiple victims,

18  things like that, where specifically is

19  that supposed to be kept, according to

20  the district?

21       A.    I believe it is in a

22  separate file in conjunction with a

23  student -- the student's file.

24       Q.    Like, in that disciplinary

1  subfolder?

2          A.    Yes.

3          Q.    Would everybody have access

4  to that, or who has access to the

5  student, like, folder and subfolders?

6          A.    That's primarily why --

7  that's another reason why it's not housed

8  in a comprehensive folder.  It would

9  be -- discipline typically would be

10  maintained by the principal, guidance

11  counselors, any of the people who have

12  access to that student folder at the, at

13  the time.

14          Q.    In your tenure, was there

15  any process in place to kind of track in

16  a sense, like, student conduct, like, for

17  example, a student who had multiple

18  instances of sexual misconduct over the

19  course of their educational career within

20  the district, is there process in place

21  to be tracking something like that?

22          A.    Typically the principals

23  would manage that through, you know, that

24  folder and their knowledge, and quite

1  honestly, there aren't, there aren't so

2  many that you can't, as a principal, know

3  them, track them and recall them as well.

4  But that's, again, the basis for the

5  folders.  So if they have a discipline

6  folder on a, on a student, then the

7  cumulative effects can be seen through

8  that discipline folder.

9       Q.    Like, if somebody -- like,

10  the next principal picks up that

11  student's folder and looks at it, then

12  they'll be able to see what had happened

13  beforehand?

14       A.    Yes.

15       Q.    Without them doing that

16  independently, is there anything in the

17  district in place -- it's a large

18  district -- to, like, monitor whether a

19  student is having, like, multiple

20  allegations or instances of sexual

21  misconduct with other students?

22       A.    Yes.  There are transition

23  meetings that happen between levels.  So

24  from sixth to seventh grade and then, you

¹ know, moving up to the high school, at

² that level, ninth to tenth, guidance

³ counselors, in particular, are

⁴ responsible for sharing information

⁵ regarding the students that they're

⁶ passing on from one level to the next,

⁷ and when situations like that occur, that

⁸ would be a component of what is shared.

⁹     Q.   It's up to the guidance

¹⁰ counselor when a student is going from,

¹¹ like, you say elementary to middle

¹² school, to communicate that to, like, the

¹³ next school's guidance counselor?

¹⁴     A.   I believe so.  I believe

¹⁵ that if, as the files are being released

¹⁶ when there are nuances of concern with

¹⁷ regard to students, they are raised and

¹⁸ shared from one level to the next.  But

¹⁹ that might also best be addressed by an

²⁰ academic supervisor rather than the

²¹ director -- former director of HR.

²²     Q.   Meaning, that somebody else,

²³ another witness, may know more than you

²⁴ about that situation, is that what you're

1    saying?

2          A.    Yes.

3          Q.    Okay.  And I'll, I'll get to

4    talk to different people, you know, see

5    what they know.

6                 But since you're here today

7    and this is my, you know, one chance to

8    ask you questions as the, you know, both

9    director of HR and, I guess, also, the

10   director of Title IX, would you agree

11   with me that title -- sexual -- sorry --

12   would you agree with me that

13   student-on-student sexual misconduct is a

14   Title IX issue, like, within the

15   district?

16                 MS. JORDAN:  Note my

17      objection to the form of the question.

18                 You can answer.

19                 THE WITNESS:  It depends

20      what your definition of 'issue' is.  I

21      don't believe it's an issue.  Does,

22      does -- would that behavior constitute

23      a concern under Title IX, if it

24      existed, yes.

1  BY MS. LAUGHLIN:

2      Q.    I guess, is it within your

3  role and responsibility, like, your

4  umbrella of all the things that, you

5  know, you're responsible for,

6  student-on-student sexual misconduct, is

7  that within the umbrella of you as the

8  director of Title IX?

9      A.    Yes.

10          MS. JORDAN:  Note my

11      objection to the form of the question.

12          You can answer.

13  BY MS. LAUGHLIN:

14      Q.    Other than --

15      A.    Yes.

16      Q.    Sorry, go ahead.

17      A.    Yes.  I would think I would

18  be made aware of that.

19      Q.    You think you would be made

20  aware of that; what do you mean?

21      A.    I believe I would be made

22  aware of student-to-student sexual

23  misconduct under the role of Title IX

24  coordinator.

1    Q.    Is there a process in place
2  by which -- or a policy, perhaps, at the
3  district that any time there is an
4  allegation of student-on-student sexual
5  misconduct, that whoever the report is
6  made to, that it be communicated to you
7  as well?
8    A.    Yes.  It is in the policy.
9    Q.    And once it's -- when it's
10 communicated to you, is it in the policy
11 or practice of the district that, once
12 the disclosure is made it gets reported
13 to you, or is there a certain point in
14 time that they're supposed to report it
15 to you?
16   A.    I believe, once it is known,
17 once the disclosure has been made, that
18 there is contact, as I said before,
19 upward through central office
20 administration, if not directly to me, to
21 me, at that point.
22   Q.    Okay.
23   A.    So it could come -- as I
24 indicated before, it could come from the

1  principal in the building in which it was
2  reported, they may have talked with their
3  immediate supervisors, the director, and
4  then it comes to me.  But yes, it is
5  reported to the director of human
6  resources, as the Title IX coordinator.
7          Q.    Okay.  And that's even for
8  student-on-student sexual misconduct,
9  right?
10         A.    Yes, I believe so.  Through
11 the window of time that the director was
12 responsible as the Title IX coordinator.
13 Beyond that, it would have been the
14 assistant director of human resources.
15         Q.    After, like, the end of
16 2018?
17         A.    Yes.
18         Q.    I understand.
19         A.    Okay.
20         Q.    Was there a process in place
21 of how they were supposed to inform you,
22 like, phone call, e-mails, was there
23 something in place as to how that would
24 take place?

1    A.    No formality there, no.

2    Q.    If you had been made aware

3  of something like that, as you said, you

4  would expect that every time there was an

5  allegation of student-on-student sexual

6  misconduct, you'd be made aware, what,

7  what were your duties and

8  responsibilities once something like

9  that, you were made aware of?

10    A.    We would share

11  documentation, as you're indicating.  I

12  would have documentation, I would see it,

13  talk through the investigation with them.

14  They would arrive at the discipline with

15  the student.  At some point, we would

16  also more than likely be talking with the

17  district solicitor, making reference to

18  that and checking, you know, our

19  investigation and concluding with the --

20  with appropriate action steps with regard

21  to discipline and/or support for students

22  if they needed any levels of emotional

23  support.

24    Q.    You'd be involved in that

1 for every report of sexual misconduct for

2 student-on-student?

3          A.     I would be made aware of,

4 yes, I believe so.

5          Q.     But I guess there's -- I'm

6 trying to distinguish, I guess, your role

7 and how involved you were in -- you know,

8 I understand you're being made aware of

9 it, but in every case, were you also

10 coming -- you know, working with the

11 principal and whoever was actually

12 interviewing the students, to come up

13 with the questions and what discipline

14 might be appropriate?  Was that, in every

15 case, you were also involved in that as

16 well?

17          A.     Not in every case.  At

18 times, the directors -- like, a director

19 of elementary would come in and discuss

20 disciplinary action.  I would be in the

21 conversation, just in terms of the

22 investigation and making sure everything

23 that needed to be done was done.  And

24 again, I'll remind counsel that there

1  were very few incidences of it.

2          Q.    I --

3          A.    So, it wasn't, it wasn't

4  large and all consuming either.

5          Q.    I understand.

6                Was there any type of, like,

7  practice in place as to what thing you

8  would get more hands-on involved with

9  versus, like, the directors being more

10  involved with the principal or something

11  like that, is there any guidance for

12  that?

13          A.    Yeah.  I mean, obviously, as

14  my -- in the dual role of director of

15  human resources, if staff members were

16  involved, I absolutely would be involved,

17  especially if action needed to be taken

18  with, for or against those staff members.

19  So if it happened to be -- you know, if

20  the, the harassment occurred, you know,

21  in a supervised situation or what should

22  have been a supervised situation, you

23  know, on a -- on the bus, in the

24  cafeteria, those kind of situations, then

1 absolutely, the dual rule of director of

2 human resources will come into play.

3          Q.     Because, then, you had that

4 other hat in terms of, like, employee

5 responsibility that you -- it's now

6 bearing over into that as well, right?

7          A.     Right.  Because there is the

8 potential for discipline action or

9 support, you know, for, for an employee

10 at that point.

11          Q.     I --

12          A.     So yes.

13          Q.     I understand.

14               We talked about the first

15 incident.  I want to go back to the prior

16 incidences that you can remember of

17 teacher-on-student sexual misconduct that

18 you recall from your tenure at the

19 district.  And we talked about the band

20 teacher sexual intercourse incident at

21 North Penn High School, and do you recall

22 what, if anything, was implemented to

23 support the student after this had come

24 to light?

1    A.    I do not recall.

2    Q.    Do you recall whether the

3  student stayed as a student at North Penn

4  School District after this incident?

5    A.    I, I do not recall.  I want

6  to say yes, but I don't recall.

7  Honestly, I don't remember.

8    Q.    Other than the teacher you

9  said, I think -- did the teacher resign,

10  or was he terminated?

11    A.    I believe they kind of

12  happened together.  So we were moving for

13  termination, and I believe the teacher

14  resigned in the midst of that as well,

15  but I'd need to go back and look at my

16  notes.

17    Q.    Okay.  In that circumstance,

18  how is it documented in the person's

19  employee file, if they're, like, going

20  through the process of termination but

21  they resign in the meantime, is it

22  documented that that person resigned in

23  the district's records, like, in the

24  employee file, wherever it's kept?

1    A.    It would have been -- all

2  actions would have been included.  So,

3  information with regard to moving

4  forward, you know, termination as well as

5  capturing the resignation would both be

6  included, depending on how far into the

7  process we were with the termination,

8  obviously, with the charges and things of

9  that nature.

10    Q.    Are teachers -- at that

11  district, are teachers allowed to, like,

12  resign when there is termination

13  proceedings, or, like, once they resign,

14  is that just the end of it, because now

15  they're out of the district at that

16  point, or does the termination proceeding

17  still go forward?

18    A.    I believe we conclude the

19  process with the resignation.

20    Q.    Okay.

21    A.    There have been -- honestly,

22  I can't think of many situations in which

23  I can play out what happened first or

24  where, where we would have continued to

1   go.  I don't recall having gone through
2   termination after resignation was
3   received.
4          Q.    Other than that teaching
5   being disciplined, was there anybody else
6   disciplined as part of that investigation
7   and process?
8          A.    I don't recall.
9          Q.    Like, for example, like, the
10  principal or anybody else that had
11  supervisory roles?
12         A.    I don't believe so, but I,
13  I -- I don't recall.
14         Q.    Okay.
15         A.    I don't believe so.
16         Q.    Okay.  Other than that
17  situation with the band teacher, what
18  other circumstances do you remember about
19  teachers with inappropriate sexual
20  contact with students?
21         A.    We had -- the two others
22  that I can recall, teachers with
23  inappropriate behavior towards students,
24  sexual misconduct.

1      Q.    Okay.  What do you
2  remember -- I guess, if there's two,
3  let's break them down.  Tell me what you
4  remember about the first one.
5      A.    The first one was primarily
6  largely over as a result when I came on
7  board as the director of human resources,
8  but it was a staff member who was accused
9  of touching a student sexually and the
10  student -- and the staff member was put
11  on administrative leave and suspension,
12  during the course of the investigation.
13  I believe the authorities were involved,
14  and eventually the -- that case -- it's
15  going back, you know, seven years, at
16  this point.  I don't recall more of the
17  details for you as to how that staff
18  member eventually left the district,
19  whether it was resignation, you know, or,
20  or termination, but the staff member was
21  no longer, no longer employed in the
22  district.
23      Q.    And that was at North Penn
24  High School as well?

1      A.    It was, yes.

2      Q.    Okay.

3      A.    It was -- yes.

4      Q.    And would that have been

5 under Todd Bauer as the principal during

6 the time, if you can recall?

7      A.    No.  It wouldn't have been.

8 It would have been the prior principal.

9      Q.    Do you remember who that

10 was?

11      A.    Mr. Bert Hines.

12      Q.    Okay.  Was the -- when you

13 say the staff was accused of touching a

14 student sexually, was that a teacher?

15      A.    It was, yes.

16      Q.    Okay.  And was there any

17 finding in the end of whether that

18 actually happened?  You said 'accused',

19 he was accused of touching a student.

20 Was there any finding by the district as

21 to whether or not that did occur?

22      A.    I don't know.  Again, as I

23 said, I was not the director of human

24 resources at the time nor was I

1  affiliated to the high school at the

2  time.  So the details, some of the

3  specificity of details, I, I do not have.

4  The, the overlap between the prior

5  director and myself occurred that summer,

6  and that was the same -- at the same time

7  that the staff member was leaving the

8  district.  There, you know,

9  inappropriate content on the computer,

10  those kind of things, that I think

11  eventually led more of the demise.  But I

12  don't know -- I can't say what the

13  investigation revealed, I don't remember,

14  in terms of the student allegations and

15  the staff member's acknowledgment or

16  denial of it.

17       Q.    Do you recall whether the

18  investigation was completed at the time

19  that you had taken over as the role or

20  whether there was still investigation

21  occurring the following year?

22       A.    I believe the investigation

23  with regard to the student aspect was

24  completed.  I was involved in a small

 1  portion of the inappropriate use of
 2  district technology and accessing sites
 3  that were inappropriate for professional
 4  time that happened in the course of that
 5  summer when the employee still had
 6  district equipment and was in, was in an
 7  inservice, I believe, some type of
 8  training, and was accessing inappropriate
 9  sites.  And at that point, just another
10  component of his employment that wound up
11  moving it forward, and it, it resolved
12  with his leaving the district.
13       Q.    Okay.  So he was using --
14  after this had come to light in the
15  school year and the investigation had
16  taken place in that school year,
17  interviewing the student and whatever
18  interviews may have been made, the
19  teacher was still -- like, had his
20  district computer over the summer?
21       A.    Yes, I believe so.
22       Q.    And was accessing, like,
23  adult material or something --
24       A.    Yes.

1    Q.    -- generally?

2    A.    Yes.

3    Q.    Okay.  And then it was after

4 that point that either he resigned or was

5 terminated or employment ended with him?

6    A.    Yes.  I believe he resigned

7 in the midst of the investigation of

8 that -- of the material.

9    Q.    The second part of things?

10    A.    Yes.

11    Q.    The, the other one you can

12 recall, what -- before we jump to that

13 one, do you recall what subject that

14 teacher taught?

15    A.    I believe he was special

16 education.

17    Q.    Was the, was the student

18 victim, was that a special education

19 student?

20    A.    Yes, I believe so.

21    Q.    Do you recall anything about

22 the level of disability that that student

23 had that had been inappropriately

24 touched?

¹        A.    I don't.  Again, I wasn't

²   involved at that point to know.

³        Q.    When you say the teacher was

⁴   accused of inappropriately touching the

⁵   student, do you remember any other

⁶   details as to, like, where on the body

⁷   the student was touched or how many

⁸   times?

⁹        A.    No.

¹⁰        Q.    Do you recall whether that

¹¹   the allegations or the incidents occurred

¹²   on school property?

¹³        A.    I believe so.  But I --

¹⁴   again, I don't -- I can't say

¹⁵   affirmatively, you know, positively.  But

¹⁶   I believe so.

¹⁷        Q.    Do you know whether -- does

¹⁸   the district have an obligation to

¹⁹   investigate instances of sexual

²⁰   misconduct that occur off school grounds?

²¹           MS. JORDAN:  Note my

²²      objection to the form of the question.

²³           You can answer.

²⁴   BY MS. LAUGHLIN:

1    Q.    Involving students.  Not,
2  like, if something's for, like, unrelated
3  to the district.
4           But involving students, does
5  the district have an obligation to
6  investigate instances of sexual
7  misconduct among students that occur off
8  school grounds?
9           MS. JORDAN:  Again, note my
10    objection to the form of the question.
11           You can answer.
12           THE WITNESS:
13    Student-to-student or
14    staff-to-student?
15  BY MS. LAUGHLIN:
16    Q.    Does it matter?  Is there a
17  distinguish (sic)?
18    A.    Well, I think, in one
19  capacity, the employee of the district
20  hold their role and is held to
21  professional and ethical standards that
22  students would not be.
23    Q.    So what about for
24  student-on-student, does the district

1  have a responsibility to investigate

2  sexual misconduct that occurs off ground

3  but between students?

4            MS. JORDAN:  Note my

5     objection to the form of the question.

6            You can answer.

7            THE WITNESS:  I honestly

8     don't know.  I would tell you I

9     wouldn't think that we could be held

10    responsible for things that are

11    happening off ground and off property.

12    But I do know that if our students

13    need support, we would step in and

14    support and assist in an investigation

15    that, in my opinion, off grounds would

16    happen by virtue of police and, and

17    professional authorities.

18 BY MS. LAUGHLIN:

19    Q.    Okay.  The third incident

20 that you can remember with staff

21 involving a student, tell me what you

22 remember about that.

23    A.    Again, it was a high school

24 teacher with inappropriate actions with a

¹ female student.  As I can recall, more

² verbal harassment of a sexual nature.  I

³ don't, I don't recall if it went into a

⁴ situation of touching but very definitely

⁵ some verbal interactions and what, what

⁶ are obviously inappropriate ethical

⁷ behaviors for a teacher.  Calling out

⁸ characteristics on a female student and

⁹ things of that nature and having private

¹⁰ conversations with a student.  And again,

¹¹ you know, that led, that led to,

¹² obviously, the investigation and the

¹³ staff member -- the removal of the staff

¹⁴ member.

¹⁵       Q.    Were you involved in that

¹⁶ investigation?

¹⁷       A.    Yes, I was.

¹⁸       Q.    Can you estimate for me the

¹⁹ timeframe on when that incident occurred?

²⁰       A.    Might have been 2015 or

²¹ 2016.

²²       Q.    Okay.  Do you recall who the

²³ principal was of the high school at that

²⁴ time?

1    A.    I would venture to say that
2    it might have been Dr. Bauer, given the
3    timeframe.
4    Q.    Do you recall being involved
5    in the -- do you recall what your role
6    was in the investigative process compared
7    to Dr. Bauer's or anybody else that may
8    have been involved administratively in
9    that investigation?
10    A.    Again, you know, overseeing
11    the investigation that was done with the
12    student and the staff member, direct
13    interactions with the staff member with
14    regard to the behaviors demonstrated
15    towards the student and then disciplinary
16    action taken against the, the staff
17    member, meetings with the staff member
18    and the union representation at the time
19    and the superintendant.
20    Q.    Was that teacher terminated;
21    do you know?
22    A.    I, I don't recall if the
23    teacher was terminated or if there was a
24    resignation in that situation.

1        Q.    The teacher in the second

2 instance, with the teacher of special

3 education, do you recall what he did

4 after leaving the school district's

5 employment?

6        A.    I do not.

7        Q.    Like, for instance, do you

8 know whether he became a teacher again?

9        A.    I do not.

10       Q.    Are there any other

11 instances of teacher-on-student sexual

12 misconduct that you can recall from your

13 time at the district?

14       A.    Not that I can recall.  I

15 mean, those -- the three that I shared

16 have stood out.

17       Q.    Other than the incident

18 occurring in 2014/2015 school year that

19 we're here to talk about today, do you

20 recall other instances of student

21 misconduct at -- in the district during

22 your tenure?

23       A.    Not that I can put names to

24 or, you know, that I would have details

1  or information for, no.

2      Q.    Do you recall an incident or

3  incidents at North Penn High School

4  involving a Dropbox of nude images of

5  students?

6      A.    I recall hearing, hearing

7  about it through, you know,

8  administrative discussions, but nothing

9  that was raised to complaint level or, or

10 concern that brought it to me, as Title

11 IX or the director of HR.

12     Q.    What do you recall hearing?

13 Even if it wasn't, like, in a -- you said

14 it wasn't, like, a formal complaint, what

15 do you recall hearing about that

16 situation?

17     A.    Just that the administration

18 at the high school were dealing with that

19 situation.

20     Q.    Do you recall what the

21 situation was?

22     A.    Nothing, nothing more than

23 what you just said; pictures in a

24 Dropbox.

1     Q.    It's my understanding
2  that -- and maybe this will help refresh
3  your recollection a little bit -- it's my
4  understanding that there was a
5  circulation among students of nude
6  student images at the high school that
7  were being circulated among students at
8  North Penn High School through a Dropbox
9  and were being shared of, you know, nude
10 student images compiled that were being
11 passed along of students at the high
12 school.
13          Does that help refresh your
14 memory as to what was going on or what
15 you may have been told about that
16 situation?
17     A.    It does not.  I mean, what
18 you're saying, in the -- yes, I was
19 aware, but that's about the extent of it.
20     Q.    As far as you're aware, do
21 you know who was handling that
22 investigation, if there was an
23 investigation?
24     A.    As I said, I believe the

1 high school administration with the

2 director of secondary or the assistant

3 superintendant, superintendant.

4     Q.    Okay.  Do you know whether a

5 situation like that, whether that's under

6 the umbrella of Title IX for the

7 district?

8     A.    I would guess it would be.

9     Q.    If -- I know, before, you

10 had told me that there was, like, a

11 practice in place or your expectation was

12 that all, like, student-on-student sexual

13 misconduct would be, like, reported to

14 you.  Do you know whether something like

15 this, that I just described, the nude

16 images of students in a Dropbox being

17 shared by students around the high

18 school, whether that's something that you

19 would also expect to be notified of in

20 terms of your rule in Title IX?

21     A.    You know, I would, I would

22 imagine that would be dependant on the

23 times and places that it was shared, were

24 the authorities involved, was it already

1  being dealt with, were there appropriate

2  supports in place.  So, I would imagine

3  that that would predicate whether or not

4  the administration would share that goal

5  with, with me.

6          Q.    Do you know how you became

7  aware of it?

8          A.    I think I just mentioned

9  that I -- in the periphery of

10  conversations with administrators.

11         Q.    Just kind of, like, in

12  passing, or was there a specific meeting

13  to discuss that?

14         A.    It was kind of in passing,

15  if I'm recalling correctly, that it was

16  just something that the high school

17  administrators were doing.  Again, you

18  know, as administrators, there is an

19  element of confidentiality in the

20  district.  Sometimes, you know, that

21  would preclude us from knowing everything

22  that was happening across all levels.

23         Q.    As you as the director of HR

24  and Title IX coordinator, is there some

1  type of level of confidentiality that
2  you're not privy too in terms of Title IX
3  issues?
4         A.    I don't believe so.  I
5  wouldn't think so.  But again, if it was
6  thought that it was being dealt with and
7  the authorities were involved and it was
8  student-to-student, a judgment that it
9  was being taken care of and it wouldn't
10  have needed to be reported might have
11  been what was occurring at the time.
12         Q.    Like, a judgment from the,
13  the principal or something like that at
14  the, the building level?
15         A.    The building level or the
16  director level.
17         Q.    Do you know whether that's
18  what occurred here?
19         A.    I don't.
20         Q.    Okay.
21         A.    I barely remember, you know,
22  what's happening.  Honestly, you're
23  jogging a memory of having heard of
24  things.  But I don't -- I wouldn't, I

1    wouldn't assume to know the

2    decision-making process from someone

3    else.

4            Q.    Okay.

5            MS. LAUGHLIN:  Let's go off

6        the record for one second.

7                   -   -   -

8            (A recess occurred from 1:38

9        p.m. to 2:03 p.m.)

10                  -   -   -

11           THE WITNESS:  I think, in

12       reference to one of the situations, I

13       misspoke and thought it was the band

14       director.  But as I'm thinking about

15       it, it was actually through the ROTC

16       program.  So, still cocurricular in

17       nature, but different area, different,

18       you know, different responsibility in

19       terms of the content and the

20       curriculum.  So I just didn't want

21       that to be on the record as a band

22       director when, actually, it was

23       ROTC -- was in the ROTC program and

24       one of the instructors there.

1  BY MS. LAUGHLIN:

2        Q.    Okay.  And thanks for

3  clarifying that.

4              And just for the record,

5  before we had -- or, right when we had

6  come back from our break, before that

7  part of the record that Dr. McCue had

8  just stated, she had asked if she could

9  make a point of clarification after

10 reflecting on, over the break or

11 whatever, and so that's what that

12 additional information was, and thank you

13 for doing that.

14       A.    Of course.

15       Q.    For clarifying that.

16             Generally, do you know,

17 like, what the definition of sexual

18 harassment is under Title IX?

19       A.    I believe so.  Could I

20 recite it to you, probably not, but --

21       Q.    I'm asking, like, what, what

22 your understanding -- like, what's the

23 definition of sexual misconduct, if

24 you -- you're able to do that.

1      A.     I think it's, you know,

2  unwelcomed (sic) touching or interactions

3  that would violate a person, you know,

4  that creates great discomfort for the

5  individual and, you know, can be from a

6  level of being made to feel, you know,

7  uncomfortable all the way through having,

8  you know, a physical violation and being

9  assaulted.

10      Q.     Okay.  Have you heard the

11  term 'hostile education environment'

12  before?

13      A.     I have.  I have.  So, you

14  know, we look at things through, like,

15  the, the power differential mode as well

16  as, you know, hostile environments or

17  through aspects of retaliation as well.

18      Q.     Do you know what -- sorry, I

19  didn't mean to cut you off.

20      A.     No, go ahead.

21      Q.     Do you know, is there, like,

22  a definition under Title IX, in terms of

23  students, of what a hostile education

24  environment is?

1        A.    I, I don't remember.  It's
2   been a while since I've had to work with,
3   with the statutes and things.  I honestly
4   don't, don't remember.
5        Q.    Do you know whether, when
6   you were in the role in 2014 to 2018,
7   whether you had an understanding of what,
8   like, constitutes a hostile education
9   environment or what the definition was at
10  that time?
11       A.    I'm sure I did.  You know,
12  when you're working with it daily, you
13  know, and it falls within your, your
14  realm, I would imagine I did, yes.
15       Q.    Okay.  Do you know what
16  types of things, like, would constitute a
17  hostile education environment for a
18  student?
19       A.    I think what we're talking
20  about here is, really, having an
21  environment where students can feel
22  comfortable, can feel as they are
23  contributing members of the environment,
24  are able to learn at their best without

1 feeling inhibited or threatened in any

2 way.

3      Q.     And so are you saying, if

4 those things are not present, it can be a

5 hostile education environment?

6      A.     Yes.

7      Q.     Those were all positive

8 things that you were saying.

9      A.     Right.  So the, so the

10 adverse would be -- would constitute an

11 environment of hostility.

12      Q.     Okay.  We talked a bit

13 before the break about documentation and

14 things like that that the district keeps

15 on student misconduct and just a couple

16 follow-up questions to that is, do you

17 know whether the district or whether it's

18 in your role or some other role has a

19 responsibility to look for patterns of

20 misconduct for a student?

21      A.     For an individual student or

22 behaviors across, across the board?

23      Q.     Well I guess -- well, I'll

24 separate them as two separate questions.

1  The first one for an individual student.

2          A.     Yes, I believe so.

3          Q.     And how is that implemented

4  or done?

5          A.     I believe through the

6  recordkeeping at the building level,

7  through constant interactions with

8  guidance counselors, who have a

9  responsibility to all students during

10  the, during the tenure that they're in a

11  building, as well as -- associated with

12  students and might be witnessing or

13  helping the students deal with, you know,

14  behaviors.

15          Q.     So I know you talked about,

16  before, how, like, building to building,

17  there would be, like, meetings when

18  students are going from the elementary

19  school to the middle school level, from

20  the middle school level to the high

21  school level, and it would be -- would

22  you agree with me it's up to, like, the

23  guidance counselors to raise issues on a

24  particular student to inform the next

1  level?

2      A.    Yes.  I believe the guidance
3  counselors are the representing
4  individuals who share the academics and
5  records from students.

6      Q.    Is the guidance counselor --
7  so when I think of guidance counselor, I
8  think of somebody that, like, if a
9  student had a emotional issue or whatever
10  kind of issue, they would go to the
11  guidance counselor, and the guidance
12  counselor would then be familiar with
13  that student.  But is there -- in North
14  Penn School District, are the guidance
15  counselor familiar with, like, all of the
16  students, or how -- I mean, how, I guess,
17  do they know about stuff like that?

18      A.    Yeah.  I think they are, you
19  know, obviously most familiar with the
20  students with whom they deal with a daily
21  basis.  But in our elementary buildings,
22  I think the principals, the guidance
23  counselors, they do get to know all of
24  the students throughout, you know, the

¹ time in the, in the buildings, and then

² they also have the staff members who are

³ liaisons to a student.  So if it's not a

⁴ student who they're seeing on a regular

⁵ basis, but a staff member might have

⁶ concern or issues, the staff member is

⁷ going to talk to the guidance counselor,

⁸ the principal to, you know, to inform the

⁹ guidance counselor that this might be a

¹⁰ student you want to see, and whether it's

¹¹ one interaction or multiple interactions,

¹² I do believe they have a pulse and a

¹³ handle on the students in the building.

¹⁴      Q.    Is that a verbal discussion

¹⁵ between the two levels that would occur,

¹⁶ or is there anything in writing to show

¹⁷ what was discussed?

¹⁸      A.    I believe that it is a

¹⁹ meeting that happens and it might also

²⁰ include teachers from, the building.  So,

²¹ for example, you know, at that, at that

²² transition from sixth to seventh grade,

²³ there were times where sixth grade

²⁴ teachers would meet with the seventh

1  grade transition team and the guidance

2  counselor.  You know, it, it, it all

3  depends on what was available in the --

4  in -- at that time, you know, in the

5  process, who was, who was determining

6  that.  But essentially, it was a meeting

7  where they were talking about case loads

8  and students and academics as they

9  transition the students from one level to

10 the next.  So, it was a verbal meeting.

11 People receiving the students most likely

12 were taking notes about the students, but

13 yet they wouldn't have necessarily known,

14 you know, who their students were at that

15 time, because those meetings typically

16 happened in, you know, at the end of May

17 each year as students are moving up to

18 the next level.

19       Q.    Do you know whether notes

20 are actually taken at those meetings on

21 information they receive on students?

22       A.    I've seen them being taken.

23 I can't say everyone does.  You know,

24 they have a list of students, and they're

1  sharing information, they're sharing

2  files, and if there are nuances of, of

3  things about a student that they need

4  know to better help educate and interact

5  with them, yes, they might be taking

6  notes.

7         Q.    Is there any, like, practice

8  or policy of the district to document

9  those transactions, conversations?

10        A.    I don't believe there's a

11 requirement, but there's a support from

12 the district to make it happen because

13 substitutes are provided in the buildings

14 or release time from responsibilities are

15 provided so that we can make that happen

16 for smooth transitions for students.

17        Q.    Meaning, like, make it

18 happen, the timing for them to be able to

19 meet?

20        A.    Yes.

21        Q.    Okay.

22        A.    Yes.  And I'm -- you know,

23 I'm speaking from sixth to seventh.  I do

24 assume that it does take place again from

1  middle school to high school.

2  Specifically, I know that it happens for

3  our special education students at that

4  secondary level by virtue of their IEPs.

5  I don't know what form of --

6      Q.    Okay.

7      A.    -- again, if it's happening

8  across the board from middle schools to

9  high school.

10     Q.    Okay.  Do you have an

11 estimate of how many -- I know we talked

12 about how many, like, teachers and staff

13 are in the district, but do you have an

14 understanding of how many students, like,

15 just an estimate from, let's say the 13

16 elementary schools, do you know how many

17 students are at that level?

18     A.    Yes.

19     Q.    (Inaudible.)

20     A.    Yeah.  I think I indicated

21 earlier, it was about 6,500 students at

22 the elementary level.

23     Q.    What about middle school?

24     A.    I believe that would fall in

1   around 3,000 to 3,200, maybe a little bit

2   more, depending on, you know, the year,

3   and obviously we're talking about early

4   2020, when I knew, because I don't know

5   the enrollment in the district at this

6   point in time.

7        Q.    Right.  And I can really

8   only ask you about what you --

9        A.    Yup.

10       Q.    -- what you know about from

11   then.

12            Now, that number you just

13   gave me for middle school, is that each

14   middle school or, out of all three,

15   that's the total?

16       A.    All three is the total.

17   There was one larger middle school that

18   was typically around 1,200 students, and

19   then the other two middle schools usually

20   rested around, you know, 800 to 900

21   students, sometimes 1,000.  So that's

22   what I'm saying, it's roughly 6,500 at

23   the elementary, another 3,000, 3,200 at

24   the middle level and then upwards of

1  3,200 or so at the high school level.

2  The sum total, when I was in the

3  district, we rested around 13,000

4  students.

5       Q.    So you were the Title IX for

6  the 13,000 students in the district,

7  then; is that right?

8       A.    That's right.

9       Q.    Okay.

10      A.    Yup.

11      Q.    I know we just talked about

12 these meetings that might occur between

13 teachers and guidance counselors with

14 students moving up to the next level of

15 education, in terms of schooling, what

16 about in terms of recordkeeping at the

17 district level or in any capacity like

18 that, documentation in files, is there a

19 responsibility for the district to look

20 for patterns of student sexual

21 misconduct?

22           MS. JORDAN:  Note my

23    objection to the form of the question.

24           You can answer.

1          THE WITNESS:  I believe that
2     the directors at the appropriate
3     levels, whether it's elementary or
4     secondary or cross-special education,
5     do review and take a look at those
6     kinds of things through the state
7     reporting data that happens for
8     students on a yearly basis with
9     regards to, you know, discipline and
10    interactions of that nature.  So there
11    is a handle and a pulse on the kind of
12    things that are being reported and
13    being dealt with.
14 BY MS. LAUGHLINE:
15      Q.    So you're saying, like, on
16 the annual review for state reporting
17 requirement, that's when the different
18 directors at the different levels would
19 be looking into something like that?
20      A.    I believe so.
21      Q.    Is there any policy or
22 practice that you put into place as
23 director of HR or Title IX coordinator
24 that instructed them to look into these

1  things on a more frequent basis?

2        A.    No.  I don't believe so.

3        Q.    When you say that annually

4  it would be done for state reporting

5  data, what exactly do you mean?

6        A.    There were reports that were

7  required of the district with regard to

8  behavioral infractions and levels of

9  discipline that building level principals

10 were required to report on, and I believe

11 that sparked the conversation about

12 trending data and numbers of suspensions,

13 causes for suspensions and the like.  So

14 that -- at that time -- those times were

15 opportunities for them to review

16 information with regards to students,

17 supports for students, education

18 surrounding students to avoid those kinds

19 of things, positive behavior plans put in

20 place, things of that nature across the

21 district in the different levels to

22 address some of the trends that they were

23 seeing at the time.

24        Q.    Would you agree with me, in

1  order to review that information that
2  might be in the district's system, that
3  the information that's input into that
4  system would have to be accurate?
5          A.    Yes.
6          Q.    You think that's important,
7  for the information to be accurate, to
8  have an understanding of whether there is
9  a pattern of misconduct --
10         A.    Yes.
11         Q.    -- with students in the
12  school?
13         A.    It absolutely does need to
14  be accurate.
15         Q.    The state reporting data,
16  was there a certain period of time that
17  the directors -- the different point
18  people, like the director of education or
19  the elementary level or special
20  education, that they started taking on
21  that role?
22         A.    I don't, I don't know.  I
23  don't recall.
24         Q.    Did you ever have that role

1  at any point, to compile that data?

2        A.    It, it was working -- it was

3  not compiling the data.  It was working

4  through and having discussions with the

5  elementary team in some of our meetings

6  regarding the data that they were

7  reporting to the state.

8        Q.    And what, what do you mean

9  with that?

10       A.    I mean that we were talking

11 about the levels of infractions, the

12 numbers and having discussion in our

13 principal group among the 13 elementary

14 schools.

15       Q.    Why were you doing that?

16       A.    Because it was a practice

17 that was able to create improvement

18 opportunities for us, to know what we

19 were doing, to take a look at the data

20 metrics regarding our student's behavior

21 and take a look at if we needed to adjust

22 things.

23       Q.    Can you estimate for me when

24 this took place?

1    A.    It typically took place in

2 June and July of each school year through

3 our principal meetings, when the reports

4 were being completed.

5    Q.    Was it the principals who

6 are kind of compiling the data from their

7 school and then passing it along to the

8 next level?

9    A.    The principals were

10 compiling the data for the schools and

11 entering it, and then we would have

12 discussion at our level, so yeah.  I can

13 only, again, speak for the elementary.  I

14 would venture to say that there was a

15 similar practice at the secondary because

16 the state report is the state report and

17 was required.

18    Q.    Is the state report

19 something separate from reporting to the

20 Office of Civil Rights?

21    A.    Yes, I believe so.

22    Q.    Okay.  What's -- what is the

23 difference between the two, do you know

24 where, like, the state report goes

1  compared to the Office of Civil Rights'

2  reports?

3         A.    I don't recall.  We did have

4  one of our other administrators who would

5  be responsible for registering the, the

6  disciplinary reports through the

7  Commonwealth or at the state level.  So I

8  don't, I don't recall.

9         Q.    What about in terms of for

10 the Office of Civil Rights, do you know

11 whether there was a point person who was

12 inputting all of that data?

13        A.    I do not.

14        Q.    Do you have any knowledge of

15 how that's compiled through the Office of

16 Civil Rights, reporting and documentation

17 and things like that?

18        A.    I do not.

19        Q.    If the principal's are the

20 one inputting the information in terms of

21 the state reporting requirements, what

22 training or instruction did they get, if

23 you know, about how to categorize and

24 input this data?

1    A.    Much to the point about

2  accuracy, there were discussions and

3  meetings and trainings in terms of how to

4  interpret the discipline policy at the

5  district, how to interpret the levels of

6  infractions, what would constitute

7  through case studies and specific

8  examples, what constitutes something

9  being level -- at a level one, a level

10  two, a level three so that we had

11  consistency, a validity and reliability

12  in the way that people were analyzing

13  situations and, and assigning discipline

14  to them and interpreting them.  So that

15  brought greater consistency to the way

16  the 13 individuals were reporting.

17    Q.    Who did, who did that

18  instruction for the principals?

19    A.    As I recall, when I was in

20  the role of director of elementary, I did

21  it with the principals.

22    Q.    And do you recall any, like,

23  did you have any, like, actual

24  documentation you were giving them in

¹ that training, or can you recall any

² details about the training?

³       A.    Yes.   We -- as I indicated

⁴ to you, we went through case studies.   So

⁵ we took samples from each of the

⁶ buildings, analyzed them, did

⁷ interpretation of the behaviors based on

⁸ the information that was provided in the

⁹ case study and then cross-reference where

¹⁰ we would assign the discipline, what

¹¹ supports would be put in place for the

¹² students who were involved in the

¹³ incidences and then ultimately how we

¹⁴ would register on the scale of discipline

¹⁵ and -- within the behavior code that then

¹⁶ got registered to the state level, so

¹⁷ that a suspension in one building was

¹⁸ looking like a suspension in another

¹⁹ building and in another building, based

²⁰ on the behavior, so that there was

²¹ consistency in the behaviors and students

²² were treated similarly across the board

²³ regardless of what building they were in.

²⁴       Q.    Were you doing that, like,

1    on an annual basis at the end of the

2    year?

3           A.    Yes, we did.

4           Q.    When you say --

5           A.    Because we would have new

6    members joining our team, principals --

7    would leave, and much like English

8    teachers grading a paper and wanting to

9    have consistency upon the grade that they

10   provide across different sections, we

11   always wanted to provide consistent

12   levels of leadership and response to

13   behaviors across the board.  So it would

14   become part of elementary principals

15   meetings.

16          Q.    Okay.  Once you moved up to

17   the director of human resources, were you

18   still involved in that training of

19   principals, like you just described?

20          A.    Specific to discipline, no.

21          Q.    In terms of, like,

22   categorizing and documenting properly and

23   all of that?

24          A.    Beyond what I reference

¹ earlier, in terms of providing support to

² the district solicitor and presentations

³ to the entire administrative team with

⁴ regard to investigations and

⁵ documentation, no, I wasn't involved in

⁶ setting expectations for the elementary

⁷ principals.  That would have gone to the

⁸ new director.

⁹     Q.    Do you recall ever -- the

¹⁰ training that you're talking about, in

¹¹ terms of proper documentation in

¹² categorizing, you know, level one -- I

¹³ think it's one through four, is that

¹⁴ right, does that sound familiar?

¹⁵     A.    It does.

¹⁶     Q.    Do you recall ever training

¹⁷ Bill Bowen, the principal of Gwynedd

¹⁸ Square, on those issues?

¹⁹     A.    I believe Bill would have

²⁰ been present in our meetings.

²¹     Q.    Do you recall, like, whether

²² it was during that timeframe?  I know you

²³ said Bill had come at a later point and

²⁴ there was a gap in the principals and

1  stuff like that.  Do you --

2      A.    Yes.

3      Q.    -- recall whether --

4      A.    Yes.

5      Q.    -- Bill had actually been in

6  part of the training that you were

7  talking about?

8      A.    As we indicated, there were

9  opportunities every year to review the

10 training, to review case studies, to make

11 sure that, you know, what was being

12 appraised was the same.  So, again, as I

13 indicated, I believe Bill was present in

14 those meetings and would have been a part

15 of that process with us, yes.

16     Q.    What you described as kind

17 of, like, providing information to them

18 and going over case studies and things,

19 was there any kind of testing to ensure

20 that the principals were inputting things

21 correctly and documenting and

22 categorizing things correctly?

23     A.    I think, in the training

24 that we provided, there was hands-on

1  appraisal of commonality when they were

2  going through the case studies.  So, you

3  group them by fours and you have them

4  looking at a case study and four of their

5  reactions are the same and they would

6  rate it and level it the same and apply

7  the same level of discipline, view it the

8  same, then you've got consistency.  And

9  then they go back to the building, and

10  you can be assured that they're going to

11  be interpreting and reading things the

12  same way and inputting the data in a

13  similar manner.  So, in terms of

14  assessing, it happened during the

15  training so that everyone was on the same

16  page in understanding how to view things.

17  And then coming back, on a data aspect,

18  when the reports were filed, there were

19  lenses of comparisons in terms of the

20  numbers of cases reported at varying

21  building and constituting those and, you

22  know, students are given a number,

23  because on the report you're not

24  numbering students, but -- so everything

¹ that was chronicled could be validated

² and substantiated, based on what they had

³ done throughout the year.  So from that

⁴ lens, there was consistency and I guess a

⁵ check on what we're doing.  A formal

⁶ assessment, I don't, I don't think that

⁷ that happened.

⁸        Q.    Was there any process in

⁹ place from, like, the district level,

¹⁰ like administration, I guess, kind of the

¹¹ higher-ups, to track student misconduct,

¹² sexual misconduct, for a student?

¹³        A.    Formal process, I don't

¹⁴ know.

¹⁵        Q.    What about, like, an

¹⁶ informal process?  Like, when you were HR

¹⁷ director and director of Title IX, Title

¹⁸ IX coordinator, did you have any process

¹⁹ that you went through to check to see if

²⁰ there was a pattern of sexual misconduct

²¹ for a particular student?

²²        A.    Again, as I shared earlier,

²³ the cases were so few and far between

²⁴ that you knew the students, you knew the

¹ names, just like I, as the director of

² human resources, knew the names of the

³ employees and faculty members that were

⁴ involved in concerning behavior that I

⁵ dealt with.  So, it was never so

⁶ voluminous that separate recordkeeping

⁷ processes were put in place, that I know

⁸ of.

⁹     Q.   What about for, for ███

¹⁰ ███ were you aware -- I know you were

¹¹ involved in the fifth grade incidents --

¹² but were you aware of the incidents, for

¹³ example, of sexual misconduct in middle

¹⁴ school with him?

¹⁵     A.   I was not.

¹⁶     Q.   What about at the high

¹⁷ school level, in tenth grade, were you

¹⁸ aware of sexual misconduct allegations

¹⁹ against him then?

²⁰     A.   No, I was not.

²¹     Q.   Is this the first time that

²² you're hearing of that, middle school and

²³ high school?

²⁴     A.   Yes, in terms of the middle

1    school.   In terms of the high school,

2    what I heard was that there was a

3    scheduling glitch where the two students

4    were mis-scheduled into the same class.

5    But that was the extent of my knowledge

6    of, of what occurred.

7              Q.    Did you -- well, I guess,

8    let me just clarify.   In the tenth grade

9    incident, in addition to them being

10   scheduled in the wrong class, did you

11   hear that -- or, did you -- were you

12   aware that there were incidents where

13   ████████  had allegedly sexually

14   inappropriately touched ██████  in that

15   class?

16             A.    No, I was not.

17             Q.    Now you said that, you know,

18   the way that you track these students

19   that have repeated issues of sexual

20   misconduct is because it doesn't happen

21   very often, so you know who these

22   students are, right?

23             A.    I believe so, yes.

24             Q.    You would agree with me,

1  though, that, that you weren't aware of

2  the incidents after fifth grade and --

3  sixth grade involving ████████ ████████ is

4  that correct?

5      A.    That's correct.

6      Q.    Was there any process in

7  place, other than, like you described,

8  knowing about it, to have tracked that

9  there were allegations in elementary

10  school, middle school and high school

11  level with the same student?

12      A.    I don't know.

13      Q.    Well what about -- I mean,

14  for you, for the HR director, do you know

15  whether there was anything that existed

16  in terms of the district and checking for

17  those things?

18      A.    Again, I don't know.

19      Q.    Okay.  So you weren't aware

20  of any, then; is that right?

21      A.    Not that I was aware or that

22  I knew.

23      Q.    As the director of HR/Title

24  IX coordinator, was that part of your

1  responsibility, to be either implementing

2  things or tracking in some way repeated

3  student sexual misconduct?

4          MS. JORDAN:  Note my

5     objection to the form of the question.

6          You can answer.

7          THE WITNESS:  I don't know.

8  BY MS. LAUGHLIN:

9     Q.    Do you know whether that

10 fell to somebody else, somebody else's

11 responsibility in the district?

12    A.    Responsible for, what?

13    Q.    For tracking student sexual

14 misconduct when you have a repeated

15 student that's, that's sexually

16 inappropriately, like touching students.

17          MS. JORDAN:  Note my

18    objection to the form of the question.

19          You can answer.

20          THE WITNESS:  I would

21    imagine.  I guess, I would think, that

22    it would be within the purview of the

23    administrators dealing with that

24    student, be tracking and dealing with

1    the behavior.

2  BY MS. LAUGHLIN:

3       Q.    When you say administrators

4  dealing with that student, what do you

5  mean?

6       A.    Administrators at the

7  building level.  If it secondary, you're

8  talking about the assistant principals

9  and principals.  You know, perhaps

10 guidance counselors are made aware of it

11 at times.  Elementary, obviously, the

12 principal because they don't function

13 with assistant principals.

14      Q.    So as a student moves

15 through the system and, obviously, then

16 the building principal or assistant

17 principal is going to change as they move

18 up, is there anybody who you know who has

19 the responsibility at the district level

20 to see continuity across, you know, as

21 the student moves up in their educational

22 course, that's keeping track of that?

23      A.    Well, I don't, I don't know

24 that, other than what I've shared with

1  you previously about transition meetings

2  that occur between levels --

3        Q.    Okay.

4        A.    -- with the individuals who

5  are responsible for the students at the

6  time and having access to the folders

7  that should provide cumulative

8  information, as we've discussed.

9        Q.    Okay.  You said that -- I

10 believe you said that as your role, from

11 2014 to 2018, that part of that would be

12 about how to, like, document discipline

13 and things like that in files, is that

14 right, some of the guidance you'd be

15 giving?

16       A.    Guidance in terms of the

17 investigation and how they were

18 proceeding through responses, yes.

19       Q.    What about in terms of after

20 the investigation is concluded and

21 documentation of discipline for a student

22 is going to be put in a student's file,

23 did you have any involvement in, like --

24 or, did you ever train anybody or offer

1  guidance on how it'd actually be

2  documented in a student's disciplinary

3  file?

4      A.    Nope.  Not beyond what was

5  included in the investigation

6  presentation, with having the

7  documentation and maintaining it in a

8  separate file for a student.

9      Q.    For example, I guess let me

10  ask this specifically, in a situation

11  like ███████  ███████  who -- were you aware,

12  I guess, that there were multiple

13  students who had alleged ███████  ███████  had

14  sexually inappropriately touched them at

15  Gwynedd Square Elementary School?

16          MS. JORDAN:  Note my

17      objection to the form of the question.

18          You can answer.

19          THE WITNESS:  I don't

20      recall.

21  BY MS. LAUGHLIN:

22      Q.    In a situation where there

23  is multiple victims in a case like the

24  scenario I just described, do you know

¹ whether principals that are inputting the

² information into student's disciplinary

³ record, whether multiple victims should

⁴ all be lumped together in one incident,

⁵ or is it -- should it be documented

⁶ separately?

⁷     A.   I don't know.

⁸     Q.   Are you familiar with -- I

⁹ know we talked about the four different

¹⁰ levels of misconduct for students.  Do

¹¹ you know whether that's just at the

¹² elementary school level, that it's the

¹³ four levels?

¹⁴     A.   No, I don't.  I've been away

¹⁵ from it for too long; I can't comment.

¹⁶     Q.   Are you familiar with

¹⁷ distinguishing misconduct, misconduct of

¹⁸ students between teachers and minors?

¹⁹     A.   Based on interpretation?

²⁰ I'm not sure I understand the full scope

²¹ of the question.

²²     Q.   Are you familiar at all

²³ with, at the elementary level, discipline

²⁴ of students or the misconduct of students

¹ being referred to, like, major versus

² minor, have you ever heard that

³ terminology before?

⁴        A.    I don't believe so, no.  We

⁵ had, we had the infractions distributed

⁶ across the levels, and we would work on,

⁷ you know, where they fell within, within

⁸ that.

⁹        Q.    Like, for example, in the

¹⁰ deposition of Bill Bowen, the principal

¹¹ of Gwynedd Square, he was talking about

¹² that the teachers were instructed to

¹³ separate things between major incidents

¹⁴ and minor incidents, and three minor

¹⁵ incidents equaled a major incident.  Does

¹⁶ that sound familiar at all?

¹⁷        A.    It might have been a method

¹⁸ that he was using, you know, to scope at

¹⁹ his building, and principals might use

²⁰ that.  I think, where we would typically

²¹ differentiate more minor issues, would be

²² classroom issues with students talking

²³ out.  You know, if they're dealing with

²⁴ something, you know, on occasion with a

1  student in that way, that's absolutely

2  behavior that would be of a level that a

3  teacher could deal with.  It wouldn't be

4  an office referral.  So that might be the

5  context under which people are isolating

6  minor behavior.  But I think best

7  practice is to utilize the misconduct

8  framework, the table that identifies the

9  specific behaviors and associates them to

10  a level, because then you have the

11  consistency across leadership and across

12  for the reporting mechanisms to best do

13  it.  So, I can't speak to what Mr. Bowen

14  might have been doing in his building

15  more recently, as I was the director of

16  HR and didn't have immediate

17  responsibility for him.

18        Q.    But as far as you're aware,

19  because you were -- before that, you were

20  the director of elementary education --

21        A.    Correct.

22        Q.    -- and so you are familiar

23  with that model of, you know, minor --

24  three minors equal a major or anything

1  like that, right?

2          A.     We -- no, would not have had

3  three minors and a major in place,

4  because behaviors could be completely

5  different.  It could be three different

6  minor behaviors that then -- that, that

7  would not equate in my mind to sound

8  practice.  So I, I, I can't speak to what

9  he might have instituted with his staff

10 members, you know, committee framework or

11 whatever that they felt was appropriate

12 in that realm.  Again, it's not something

13 that I'm familiar with.

14         Q.     Did the elementary school

15 principals of the district have the

16 discretion or authority to implement

17 their own misconduct system for students?

18         A.     I believe there was an

19 expectation for them to adhere to the

20 district-approved disciplinary framework.

21         Q.     And that's the one through

22 four?

23         A.     Yes.

24         Q.     Like, the little boxes that

1 go across, right?

2       A.    Yes.  Yes.  Again, you know,

3 interpretation might play into it at

4 different levels, but we tried to

5 mitigate that by having the case studies

6 and some of the interpretation activities

7 that we did.

8       Q.    Did any of the training that

9 you talked about these principals

10 undergoing include specifically

11 classification of how to -- or, like,

12 what to classify certain behaviors by

13 students in disciplinary files?

14       A.    Can you provide me with a

15 little more detail?

16       Q.    Sure.

17             So, like, I guess in the

18 disciplinary files of the students that

19 the district keeps, you know, you -- the

20 teacher or principal, whoever is

21 inputting the data, has to put in, you

22 know, what the misconduct was or, you

23 know, whether it was sexual harassment or

24 obscene gesture or something like that,

1   there's different in the student code of

2   conduct, I guess, different things that a

3   student can do that then they get

4   punished for --

5        A.    Right.

6        Q.    -- is that right?

7        A.    Yes.

8        Q.    Was there any training

9   specifically for the principals on

10  selection of what that student conduct

11  violation would be and how to put that

12  in?

13        A.    That's what happened when we

14  did the case studies.  So, you're

15  looking -- you're hearing about what a

16  student exhibited, the behaviors, what

17  did those behaviors look like, did they

18  look like tussling, pushing and shoving,

19  or did they look like fighting, assault,

20  punching, and that's where some of that

21  alignment of where things would fall on

22  the continuum of options within that four

23  grid framework came into play.  You know,

24  as well as, again, I'll go back and refer

1  to coursework and preparations that lead

2  up to someone having a principal

3  certification.

4        Q.    That's, like, outside the

5  district, they're own education and

6  experience leading up to that point?

7        A.    Required of them to be in

8  the positions they're in, yes.

9        Q.    Okay.  But I guess I'm just

10 trying to distinguish things inside the

11 district that are trained, you know, from

12 the district versus information that

13 they're bringing into that role.

14       A.    Yes.  I mean, the framework

15 that we've referenced is what constitutes

16 the responses from principals.

17       Q.    Okay.  When there is

18 incidents of student sexual misconduct,

19 is there a process in place that can be

20 implemented to make sure that other

21 students that are going to be around,

22 like, the perpetrating student, to make

23 sure that they're safe in the future?

24       A.    Could you repeat that?

 1          Q.     Sure.  I'm asking if there's
 2    any processes in place to make sure that
 3    kids are safe around the student who is
 4    perpetrating sexual misconduct on other
 5    students.
 6               Is there any process in
 7    place to make sure that children,
 8    students are safe from that person in the
 9    future?
10          A.     From my knowledge, I believe
11    that each building administrator with a
12    team of teachers supporting a student,
13    put in place action plans and action
14    steps that are specific to the behaviors
15    being exhibited that help to mitigate
16    them and stop them from happening in the
17    future and keep the rest of the study
18    body safe.
19          Q.     What about in terms of,
20    like, so, you're talking about at that
21    building level, but when a student, for
22    example, goes from the elementary school
23    to the middle school, do you know whether
24    those implementations follow the student

1   in some capacity, or is that just based
2   on the meeting, what the elementary
3   shares with the middle school?
4          A.    Again, it would be my
5   expectation that it would happen in the
6   context of the meeting, here's what
7   worked, here's what we did, as well as
8   documentation within the folders that are
9   also shared from one level to the next.
10  So people responsible for that student
11  would have access to those folders and
12  could be, you know, reading about the
13  history of the student and what practices
14  may or may not have worked.
15         Q.    You were saying before,
16  that's, that's a subfolder you were
17  talking about in the student's file?
18         A.    Yes.
19         Q.    Would that also contain --
20  and I apologize if I asked you this
21  before -- would that also contain, like,
22  the investigation, like, statements,
23  things like that, I think you were saying
24  why a certain discipline was given to a

1  student?

2      A.   Yes.  More than likely, it

3  should contain the formalized letter to

4  the student, if there was a suspension,

5  as well as any of the supporting

6  documents, I believe is what I had

7  mentioned previously.

8      Q.   Okay.  What about if there

9  is a juvenile adjudication, like, in

10 terms of the DA's office, like, an

11 alternate program they go in or something

12 resulting from sexual misconduct at a

13 school, is that something that the

14 district keeps track of with students?

15     A.   I don't know.  I would

16 imagine, if we were made privy to that

17 information, we would utilize it in some

18 way to support that student and the

19 students with whom the student comes in

20 contact with, but I don't know.

21     Q.   Okay.  Do you know, is there

22 somebody at the -- within the district

23 administration that would be kind of

24 responsible or maybe more knowledgeable

1   about that?

2          A.    I don't know.

3          Q.    If there is an investigation

4   for sexual misconduct of a student at,

5   just say the elementary school, is that

6   something -- the fact that there is a

7   criminal adjudication -- juvenile

8   adjudication of that student at a later

9   date, is that something that the district

10  would typically follow-up on, or is it,

11  they are waiting to see whether somebody

12  informs them of, you know, what the

13  outcome may be?

14         A.    I think that we have done

15  both.  We have followed-up, we've -- you

16  know, in our collaborative efforts with

17  law enforcement, we have sought to get

18  the information that was available to us

19  and that they would share.  Beyond that,

20  if they were unwilling or it wasn't

21  appropriate for us to have it, we

22  wouldn't have it.

23         Q.    Do you recall -- sorry.

24         A.    No, go ahead.

1    Q.    Do you recall whether there
2  was a juvenile adjudication -- or, I
3  guess, let me start with -- do you recall
4  whether there was a police investigation
5  involving ██████ █████ at the Gwynedd
6  Square level?
7    A.    I do not know.
8    Q.    Okay.  Do you know whether
9  you knew at the time and just don't
10  recall, or you don't know at all?
11    A.    I believe the authorities
12  were involved, I do recall that, but I
13  don't know the outcome or to what extent
14  they were involved.
15    Q.    In your role as Title IX
16  coordinator and director of HR, was that
17  something that police -- if the police
18  were involved, that you would have
19  followed-up on to find out the outcome of
20  that police investigation?
21    A.    Not necessarily.  That might
22  have fallen to or been the responsibility
23  of the director of the level and/or the
24  principal.

1    Q.    Okay.  Like, the director of
2  elementary education?
3    A.    Yes.
4    Q.    Or the principal of the
5  elementary school?
6    A.    Yes.  Or perhaps even one of
7  our assistant superintendants.
8    Q.    Okay.
9    A.    Dealing with the, dealing
10  with the immediacy of the student, they
11  would have followed-up on that.
12    Q.    You said the immediacy of
13  the student.  What do you mean?
14    A.    Well, it was
15  student-to-student.  If there was a
16  staff, you know, a staff member involved
17  in having violated a student, then it
18  became more of an HR issue, and I would
19  have probably followed it up.  But, you
20  know, our team approach and distribution
21  of responsibilities, I believe they would
22  have followed-up on that.  I don't
23  believe I did.
24    Q.    Okay.  After an

1  investigation is completed, I know we

2  talked about, like, statements and things

3  like that that typically should be

4  included.  Do you know whether there's,

5  like, any type of final report done in

6  the investigation, like, after the

7  investigation concludes, like, a

8  documentation of -- in some type of,

9  like, final form?

10       A.    Yes.  When formal -- yes --

11  when formal reports are filed, part of

12  the policy and procedures are to render,

13  you know, a summary report as to, you

14  know, the outcome of the harassment or

15  the discrimination.

16       Q.    You say "when formal reports

17  are filed".  What do you mean?

18       A.    Well, we talked earlier

19  about the formal forms that are done.  So

20  there is, there is a component in

21  response to that.  But then, obviously,

22  at the conclusion of, you know, any

23  investigation, the, the details

24  surrounding the discipline, the courses

1   of action, the action steps are found and
2   summarized within, you know, that
3   discipline folder, that discipline file
4   so that there's, you know, documentation
5   as to how things were concluded.  You
6   know, parents -- parent notifications,
7   you know, support programs, alternate
8   settings, whatever that might be, those
9   are all captured within the notes from
10  the investigation and from the
11  disciplinary decisions made at the time.
12        Q.    You said there's a summative
13  report, like, a summary report created
14  after the investigation's done that kind
15  of talks about the conclusions, what was
16  done; is that right?
17        A.    In most cases, that would
18  happen.  Again, when there's, you know,
19  that formalized report.  Otherwise, all
20  of those steps that would be found in the
21  summary report are found in the
22  disciplinary actions that the principals
23  have taken or the directors have taken.
24        Q.    I guess, to clarify, if

¹ there's not a formal, like, request for

² an investigation, like that form we

³ talked about that somebody can complete,

⁴ if that doesn't happen, I think you had

⁵ told us before that, like, an

⁶ investigation can still happen --

⁷        A.    Yes.

⁸        Q.    -- and does happen if

⁹ there's a report of sexual misconduct,

¹⁰ right?

¹¹        A.    Yes, mm-hmm.

¹²        Q.    So in those situations where

¹³ there's not a formal report requesting

¹⁴ the investigation, is there still a

¹⁵ summation report that supposed to be

¹⁶ created at the end of the investigation?

¹⁷        A.    Again, you know, the

¹⁸ summation report is capturing and

¹⁹ providing response to the persons who,

²⁰ you know, made the -- who filed the

²¹ report in the, in the first place.  So in

²² the absence of a formalized report,

²³ people who were involved, so they alleged

²⁴ student, the alleged victim, they're a

1 part of the investigation.  They're

2 continued onward talking and they know

3 the outcome.  There is, there is meetings

4 and debriefings.  Whether or not a final

5 report is filed at the building level, I

6 don't know.  I don't know what's

7 contained within those disciplinary

8 folders other than they've captured the

9 steps in the process, and through those

10 steps, that would be the summation of the

11 actions they took and what happened.

12          Q.    But I guess, is there a

13 documentation that is the summation, or

14 it's just only sometimes they do that,

15 like if it's a more formal --

16          A.    Yeah, I don't know.

17          Q.    Okay.  When there is a

18 summation report, do you know whether

19 that has to be given to anybody or

20 provided to anybody or sent somewhere?

21          A.    It is typically shared with

22 the superintendant.

23          Q.    When you say it's typically

24 shared with them, is there --

1          A.    It's shared with the
2    superintendant.
3          Q.    It is shared with the
4    superintendant?
5          A.    It is, yes.
6          Q.    Okay.  And how is, how is
7    that done, or how do people know to do
8    that?
9          A.    In historical days, there
10   was a hard copy that was shared with the
11   superintendant.  In more recent times, it
12   was -- in the folder, is the summation
13   report.  So --
14         Q.    So that would be -- I
15   apologize.  Go ahead.
16         A.    Yeah.  In my role, when I
17   was involved in investigations, there
18   would be information report, and it would
19   be deposited in the folder, and Dr.
20   Dietrich would be made aware the issue
21   had been resolved, and there was a
22   summation report.
23         Q.    Just to clarify, in the ones
24   that you were involved in, the ones that

¹ you had involvement, I guess, from 2014

² to 2018, was there always a summation

³ report?

⁴        A.    If we were dealing with --

⁵ again, if we were dealing with employees

⁶ for whom I had sole responsibility at

⁷ that point, yes, there were.

⁸ Student-to-student, again, because of, of

⁹ shared responsibility, I can't say for

¹⁰ sure that there were always summation

¹¹ reports provided.

¹²        Q.    Okay.  Do you know whether

¹³ there is a policy in place on how long to

¹⁴ keep student disciplinary issues?  Like,

¹⁵ document retention, is there a particular

¹⁶ timeframe?

¹⁷        A.    You know, I could say 99

¹⁸ years, but in all honesty, I don't

¹⁹ recall.  I know there were parameters

²⁰ that we did have in place, but again,

²¹ with responsibility for staff members as

²² well as in, in my past, I can't say that

²³ I recall.

²⁴        Q.    Okay.  Do you have any -- I

1    mean, 99 years, that's a pretty long

2    time.  Do you have an estimate of, like,

3    what -- like, was it, like, for the

4    entire course of someone's career, or do

5    you have, like, a more limited timeframe,

6    if you can remember?

7         A.    No.  Typically, you would

8    keep them through the term of the

9    student's career in the district and then

10   for several years, seven, ten, some, some

11   number of years beyond.  But the reason I

12   said 99 is because, you know, you have

13   archived records that are maintained

14   forever, if there's not a procedure to go

15   through and delete them, and I don't know

16   what happened.  I can't speak to that,

17   for student records.

18        Q.    Okay.  Was the first time

19   you ever had any interaction with ████████

20   ██████ when you got involved in the sixth

21   grade incidents at Gwynedd Square?

22        A.    I believe so, yes.

23        Q.    What about for ████████

24   ██████████████ were you aware of or had any

1 interactions with ███████ ████████████ or

2 her family prior to the sixth grade

3 incidents?

4     A.    I don't think so.  I don't

5 recall any.

6     Q.    Okay.  Do you have a

7 independent recollection of how you

8 became involved in the incidents

9 involving ██████ ██████ at Gwynedd Square?

10     A.    Yes.  I believe it was

11 through the director of elementary and

12 Mr. Bowen, either separately in pretty

13 short order between the two or, you know,

14 collectively on a phone call, that, that

15 described the behavior and then would

16 have triggered the meetings.

17     Q.    Do you know why they were --

18 like, were they -- do you know why they

19 were contacting you, like in terms of

20 your role as HR or in your Title IX role?

21     A.    You know, I think people --

22 in this kind of situation, I think people

23 saw the two roles in a combined function.

24 And so there was outreach because of the

¹ situation and because it involved some

² concern for judgement on behalf of the

³ staff member.

⁴      Q.    The teacher that had

⁵ apparently seen the interaction between

⁶ ▮▮▮▮ and ▮▮▮▮

⁷      A.    Yes.

⁸      Q.    Okay.  Like, Holly Andrew,

⁹ is that who you're referring to?

¹⁰      A.    Yes.

¹¹      Q.    And we'll go through the

¹² notes in detail, because were they your

¹³ handwritten notes, the -- I guess I'll

¹⁴ ask you -- the notes.

¹⁵      Do you recall specifically

¹⁶ what your involvement was in that whole

¹⁷ investigation, whether it was from the

¹⁸ student level or the, the employee level?

¹⁹      A.    I think they were

²⁰ intertwined.  So again, in terms of

²¹ directing the, the questions and the

²² investigation of the student, there was

²³ some collaborative discussion between Dr.

²⁴ Santoro and Mr. Bowen and myself and then

¹ primary responsibility and role in terms

² of the meetings with the staff member and

³ determining levels of concern or issue

⁴ with performance at that point.

⁵         Q.    Okay.  Do you recall any

⁶ discussions about different students

⁷ being interviewed, like, the alleged

⁸ victims in this situation?

⁹         A.    Yes.  That would have been

¹⁰ protocol.

¹¹         Q.    Do you know -- do you recall

¹² whether, whether anybody had actually

¹³ interviewed the student from the, the

¹⁴ district level, like, setting aside

¹⁵ Mission Kids?

¹⁶         A.    I believe Mr. Bowen, as the

¹⁷ building principal, would have interacted

¹⁸ with the students.

¹⁹         Q.    Did you -- do you recall

²⁰ having any conversations with Mr. Bowen,

²¹ asking how that could be accomplished?

²²         A.    I believe there was

²³ discussion about independently meeting

²⁴ with students, which is protocol as well.

1    And Dr. Santoro also had those

2    discussions.  So she primarily served as

3    his guide at that point.  And I believe

4    that some of that was already in

5    progress, at the point of which

6    information was shared with me.

7           Q.    Like, when you --

8           A.    (Inaudible.)

9           Q.    Can you say that last part

10   again.

11          A.    I said, if memory serves me

12   correctly, they had been informed of the

13   situation and had began investigating and

14   once hearing of the concerns, then, you

15   know, got in touch with me.

16          Q.    Do you know how long it was

17   from when any disclosure first came to

18   light from when you were notified?

19          A.    Without my notes, no.  But

20   my notes would tell you very pointedly

21   because everything is dated, you know, in

22   terms of meetings, conversations, phone

23   conversations, it should be -- all my

24   notes should have meeting dates and

1 people in attendance.

2 　　　　Q.　　Okay.　Do you recall having

3 any discussions about, like, actual

4 getting student statements?　We talked

5 before about, like, depending upon the

6 age of the student and whether they can

7 write a statement themselves or somebody,

8 like, actually documenting a statement

9 based on a conversation.　Do you recall

10 having any discussion about how that

11 would be conducted in this investigation?

12 　　　　A.　　I don't.　I don't have that

13 level of specificity at hand.

14 　　　　Q.　　Okay.　Do you know whether

15 there were -- because I can represent to

16 you I haven't seen any student

17 statements, like you described, of, like,

18 what each student said or anything.　Do

19 you know whether those exist?

20 　　　　A.　　I dont.　If I had them, they

21 would have been in, in a file within HR,

22 aligned to the situation to the case.　So

23 if they were obtained and shared with me,

24 we have them.　I don't, I don't recall.

¹ It might have been a situation with

² students were, you know, emotionally

³ concerned or weren't able to provide

⁴ them.  I don't know.  I don't recall.

⁵       Q.    Would you have expected

⁶ individual student's statements to have

⁷ taken place, meaning, like, be created,

⁸ like, the documentation of what each

⁹ student's statement was?

¹⁰      A.    Again, as I, as I shared,

¹¹ best practice and my hope would be that

¹² we could have obtained those for

¹³ students.  But there are a number of

¹⁴ factors that come into play when students

¹⁵ are not able to or in an emotional state

¹⁶ of stability to provide that, at which

¹⁷ point we would take notes of the

¹⁸ interview or the questions of the

¹⁹ meeting, and it would be scribed, it

²⁰ would be shared forward in a a summary

²¹ format of what was indicted from student,

²² and I believe that was ascertained

²³ through the interviews with the students.

²⁴      Q.    About the questions that

1 were asked of them and what their answers

2 are?

3          A.    Yes, what happened.  You

4 know, they're accounting of the situation

5 and how things unfolded.  I believe that

6 Dr. Bowen and/or Dr. Santoro would have

7 had a rendering of what was told to them

8 and what they believed to be true about

9 the situation.

10          Q.    Okay.  But I'm saying,

11 that's -- like, a summary of what they

12 told them if different than, like, an

13 actual student statement of, like, what

14 the student -- is that right?

15          A.    Yes.

16          Q.    Okay.  I want to show you a

17 picture on my screen.  Hold on a second.

18          Are you able to see my

19 screen?

20          A.    Yes.

21          Q.    Okay.  This is -- for the

22 record, it's North Penn bates number 992,

23 and I just want to ask you about your

24 signature line here at the bottom.  This

¹ is from -- an e-mail from June 2019 that

² you had sent -- I'm sorry, June 19th,

³ 2015, that you had sent.  And your

⁴ signature line just says you're the

⁵ director of human resources, right?

⁶          A.    That's correct.

⁷          Q.    Did you have any other type

⁸ of, like, e-mail address or signature

⁹ that would identify you as the Title IX

¹⁰ coordinator for the district?

¹¹          A.    Within our policy, I believe

¹² procedural regulations, there is a e-mail

¹³ that is identified to the Title I

¹⁴ coordinator -- or, Title IX coordinator,

¹⁵ rather, as the director of human

¹⁶ resources.  So, that e-mail was set up

¹⁷ and was sent by technology to be

¹⁸ forwarded to me as the person in the

¹⁹ role.

²⁰          Q.    When you would respond back

²¹ to an e-mail received through the Title

²² IX coordinator e-mail address, would it

²³ come from your e-mail as director of

²⁴ human resources?

1      A.    I can tell you that I don't
2  ever honestly remember receiving an
3  e-mail via that mechanism.
4      Q.    Okay.  Through Title IX
5  directly?
6      A.    There, there were very few
7  incidences that came through, you know,
8  formal documentation of harassment or
9  discrimination during that time.
10     Q.    When you say formal
11 documentation, are you referring to the
12 forms --
13     A.    Yes.  That they would use
14 the forms, especially from a student
15 perspective, and -- and/or that they
16 would use the e-mail.  Most times things
17 were presented through the hierarchy or
18 the organizational structure in the
19 district from the immediate supervisor of
20 the area, whether it was students or
21 employees on up.
22     Q.    Did you have a separate --
23 or, do you recall what the, like, e-mail
24 address was for Title IX?

1    A.    I do not, but it is, it is

2  listed in the then policy.  I can, I can

3  tell you it was, you know, for -- as a

4  director of human resources, serving

5  at -- in that capacity.

6    Q.    Was it, like, Title IX at

7  North Penn School District, or was it,

8  like, your name or something like that?

9    A.    I don't recall.  It was

10  published clearly in the policy and --

11  or, the regulation that, again, was

12  accessible online for people so that it

13  was, it was accessible to anyone and

14  everyone who had concerns.

15    Q.    So that was the harassment

16  policy, is that what you're referring to?

17    A.    Yes.

18    Q.    Okay.  Do you know when that

19  changed, that the e-mail address -- do

20  you know whether that changed, that the

21  e-mail address at some point was removed

22  from the policy?

23    A.    I do not.

24    Q.    I'm showing you what's been

¹ marked as North Penn bates number 1016.

²           Is this your handwriting at

³ the top of this page?

⁴      A.     It is.

⁵      Q.     Okay. And so, do you recall

⁶ receiving this statement from Bill Bowen?

⁷      A.     Yes.

⁸      Q.     And at the top, it says you

⁹ received it April 15th, 2015?

¹⁰      A.     Yes.

¹¹      Q.     Did that give you any

¹² indication -- I know we talked before

¹³ about how long it was since the incident

¹⁴ versus, like, a disclosure was first made

¹⁵ by when you got informed and became

¹⁶ involved. So does this give you any

¹⁷ indication of how long had passed between

¹⁸ when it came to, like, at the school

¹⁹ level versus when you got involved?

²⁰      A.     You know, I can only

²¹ speculate that, based on what is said

²² here, on the 10th, it was a Friday. So

²³ we had the 11th and 12th, which was a

²⁴ weekend. The 13th, they're back in

¹ motion.  This was received on the 15th,

² which would have been a Wednesday.  So at

³ some point probably within a day of me

⁴ knowing that these notes would have,

⁵ would have arrived.  So, either that,

⁶ that Tuesday or Wednesday, perhaps, maybe

⁷ Monday; I don't recall.  I'd have to know

⁸ the comprehensiveness of the file to know

⁹ that if I had any notes in there, you

¹⁰ know, from my perspective of when I was

¹¹ first informed.  This speaks to when I

¹² received the information from Bill Bowen.

¹³         Q.    Okay.  And was this Bill's

¹⁴ statement that he had typed up?

¹⁵         A.    Yes.  I believe it was a

¹⁶ rendering and summary of the information

¹⁷ that he had so far and what was shared

¹⁸ with him and when.

¹⁹         Q.    Okay.  And so, before he

²⁰ gives you this, did you have a discussion

²¹ with him or Dr. Santoro to tell them what

²² you wanted compiled or what you wanted

²³ for this investigation, like, to be

²⁴ provided to you?

1    A.    That would have been

2 standard protocol, yes, to let them know

3 that whatever they've had, whatever

4 they've done, I needed to have copies.

5    Q.    Okay.  And I just want to

6 kind of go through this is little bit.

7    A.    Sure.

8    Q.    It states that, that, I

9 guess, the guidance counselor, Kristen

10 Donnelly, was contacted by a sixth grade

11 teacher, Mrs. Delia, to address a

12 situation with a female student

13 identified as blank, and Mrs. Delia

14 relayed what the student said to her and

15 that Ms. Ruth Diver was present at the

16 time and stated there may have been a

17 similar incident involving the male

18 student that occurred earlier in the

19 year.  And then the report was that, on

20 Wednesday, April 1st, 2015, during a

21 movie in social studies class, a male

22 student identified as ▇▇▇ ▇▇▇ placed

23 his hand on her neck and lower back.

24 Then on Thursday, April 9th, 2015, the

1 male student, again, touched the female

2 on the knee and under her shirt.

3          Do you recall being informed

4 about this student that was being touched

5 inappropriately by ▓▓▓▓ ▓▓▓▓ in April?

6     A.    Yes.  By virtue of this

7 conversation and this notification.

8     Q.    Other than this -- receiving

9 this summary, do you recall either what

10 Bill Bowen or Dr. Santoro had

11 specifically told you about what was

12 happening or what had happened?

13     A.    Word-for-word, I don't.  It

14 would have been similar to what has been

15 captured here in this summary.

16     Q.    Okay.  And then there's a

17 second incident that this summary talks

18 about and that it's in November 2014, Ms.

19 Andrew, the other teacher, witnesses

20 ▓▓▓▓ ▓▓▓▓ and ▓▓▓▓ ▓▓▓▓▓▓

21 sitting together, and at one point she

22 saw ▓▓▓▓ hand under ▓▓▓▓▓ shirt.

23          Do you recall that as well?

24     A.    Do I recall the incident?

1    Q.    Yeah.

2    A.    I recall --

3    Q.    Like, being informed of it

4  and --

5    A.    Yeah.  I recall the incident

6  being reported to us at the same time the

7  incident in April was reported to us.

8    Q.    Okay.

9    A.    There had been nothing prior

10  reported to the building principal, as I

11  recall, or myself or the director of

12  elementary at the time.

13    Q.    Okay.  With the -- do you

14  recall off the top of your head how many

15  students at the end had come forward to

16  disclose that ████ had inappropriately

17  touched them at Gwynedd Square?

18    A.    No, I do not.

19    Q.    On Page 1018, it says, I've

20  contacted -- this is from Bill Bowen --

21  I've contacted the parents of the girls

22  to inform them that Ms. Vasile (pht)

23  would be meeting with them.  Ms. Vasile

24  met with both of the girls and a third

1  sixth grade girl identified as, blank.

2  She reported to Ms. Vasile that ▮▮▮▮

3  touched her in the front and back of the

4  bottom portion of her body and then, at

5  3:30, they made calls to child line for

6  both ▮▮▮▮ and, blank.

7          Do you recall any

8  discussions about the third victim coming

9  forward about what had happened?

10      A.    You know, at this point in

11  time, I don't.  At that point in time and

12  based on these notes, I would have, I

13  would have known and would have dealt

14  with it.  But, you know, again, six years

15  later, I don't recall what happened in

16  that moment.

17      Q.    Do you recall any

18  discussions about making a call to child

19  line?

20      A.    I believe that they had made

21  that determination at the building level

22  with Dr. Santoro's involvement, and by

23  the time I was informed that that was

24  already -- that was occurring, and we

1  knew that would have taken place, I
2  believe.
3       Q.   At this -- sorry -- at this
4  point, you said that you would have been
5  aware that there were three sixth grade
6  girls that had disclosed that ████ had
7  inappropriately touched them.  Do you
8  recall whether there was any discussion
9  or anything put in place about trying to
10 track whether ████ did this again?
11      A.   Again, as I indicated
12 before, based on general protocols, I
13 believe that would have happened at the
14 building level surrounding.  They knew
15 the student, they knew the schedule, they
16 knew, you know, coming back off of
17 whatever discipline was administered to
18 him, what they would need to do to ensure
19 changes in his behavior and safety and
20 security of all of the students at
21 Gwynedd Square.  So, while I don't recall
22 right now or I wasn't -- I don't know
23 that I was privy to it, I'm sure that
24 that was in place because that general

1    protocol would happen at the building

2    level.

3         Q.    Okay.  So as director of HR,

4    did you have any involvement in that,

5    then, or you're saying it's really at the

6    building level, that they would have been

7    the ones to handle anything like that?

8         A.    They would have been the

9    ones to implement and handle it.  I am --

10   I would be surprised if we didn't talk

11   about it as a course of action that would

12   need to happen, a reminder to the

13   building principal, discussion about how

14   to, you know, insulate and secure the

15   rest of the students as well as making

16   sure that ███████ was getting the support

17   and help that, that were needed in order

18   to change the behavior for the future.

19   So it's almost always a part of our

20   conversation, you know, dealing with the

21   behavior, reacting and responding

22   appropriately to the behavior and then

23   also supporting for the future, what can

24   happen, because we're talking about

1 children.

2 　　　Q.　You said you would want to
3 prevent inappropriately -- him from
4 inappropriately touching other students
5 in the future, right?

6 　　　A.　And we would to provide
7 support to him so that he understands the
8 behavior is not appropriate and
9 acceptable and that he's not in a
10 position to be doing that futuristically.
11 So, it's two-fold.  You're providing
12 supports to both the victim and the
13 perpetrator.  You know, they're children.
14 You know, and there's a reason why it's
15 happening.  Part of what we do is support
16 them with, you know, internal resources
17 so that it doesn't happen again.

18 　　　Q.　Do you recall specifically
19 having any conversations about what was
20 going to be put in place, if anything, to
21 prevent ███ from doing this again to
22 other students?

23 　　　A.　I believe I answered that I
24 do not.

1    Q.    Okay.

2    A.    That that would have

3  happened at the building level.

4    Q.    Do you know whether there

5  was any -- whether you would have been

6  involved in any kind of documentation?

7  If a conversation did take place about

8  what would be implemented, is that

9  anything that you would document in any

10  capacity somewhere?

11    A.    Knowing myself, I would

12  think I would have.

13    Q.    And where would you have --

14  sorry.

15    A.    If I was a part of that

16  conversation, it would have appeared in

17  the disposition, in the outcomes.  Just

18  as a --

19    Q.    When you say --

20    A.    Yeah.  Just as a suspension

21  would.  But again, I'll reiterate, the

22  principal and the director of elementary

23  would have been dealing with the

24  discipline and the aspect that occurred

1  by the student.  I dealt with the

2  documentation, summarizing and dealing

3  with the discipline that took place for

4  the staff member involved.

5       Q.    Okay.  I'm going to bates

6  number 1019.  These are labeled as notes

7  from Betty Santoro.

8            Did you also receive these

9  notes as part of your investigation?

10      A.    Yes.

11      Q.    Okay?  And it's dated

12  Monday, April 13th, 2015.  Do you know

13  whether you received these notes on that

14  date or like the other one you had

15  received on the 15th?

16      A.    I honestly can't say.

17      Q.    How would they get these

18  documents to you, would they be e-mailed

19  or, like, hand-presented?

20      A.    At this point, it looks as

21  though they were e-mailed.

22      Q.    Okay.

23      A.    Or it could have been

24  scanned back.  I don't recall.

1      Q.    Okay.

2      A.    Although, there would be a

3  line from the fax machine.  So I would, I

4  would venture to say they were e-mails.

5      Q.    Okay.  I'm gonna scroll

6  down, because this statement goes on for

7  a couple of pages.

8            The bates number 1021,

9  towards the bottom, that states -- this

10  is Wednesday, April 15th, 2015 -- that

11  ██████  indicated that girls expressed

12  this from ██████  and that this touching

13  has been going on since fourth grade.  Do

14  you see that there?

15      A.    I do.

16      Q.    Was this something that you

17  would have been aware of at the time

18  since you received this report from Betty

19  Santoro?

20      A.    Yes.

21      Q.    What, if anything, was done

22  to investigate the touching that ██████

23  ██████████  is saying has been going on

24  from ██████  since the fourth grade?

1    A.    I can't speak to that.  I
2  don't know.  I don't recall.
3    Q.    Do you remember having any
4  conversations with anybody, Bill Bowen or
5  Dr. Santoro, when you're talking about,
6  like, how to guide the investigation
7  about investigating fourth grade
8  incidents?
9    A.    I don't recall.  I can tell
10  you, in the life of a child, you know,
11  that's a pretty long period of time for
12  memories to be accurate, but I don't
13  know.  I don't know what they -- what
14  happened as a result of that.
15    Q.    Meaning, for ████████ memory
16  to be accurate?
17    A.    For any, for any of the
18  students at that point, you know, to
19  be -- it would be, it would be
20  challenging to investigate, but that's
21  not to say that it didn't happen, that
22  they didn't talk to ██████ about what
23  happened through fourth grade.  I don't
24  know.

1    Q.    Do you know whether it was

2  investigated at all?

3    A.    I don't know.

4    Q.    Would that have been

5  something, when you're getting this

6  report and receiving information about

7  you have three girls who are saying they

8  were inappropriately touched by ███████ in

9  the sixth grade and now ███████ talking

10 about girls that would have been touched

11 in the fourth grade as well, do you

12 believe that would have been part of your

13 conversation to do something to find out

14 more about these fourth grade incidents?

15   A.    I hope it would be, yes.

16   Q.    Do you recall whether you

17 did any follow-up to ensure that the

18 fourth grade incidents were looked into?

19   A.    I do not.

20   Q.    Line three says that ███████

21 witnessed another girl being touched,

22 Wendy Slaughton and Daysha Summe,

23 D-A-Y-S-H-A S-U-M-M-E.  Do you recall any

24 of this information about these two other

1 girls being inappropriately touched by

2 ████

3       A.    Obviously, it's in, in this

4 information.  So it would have been

5 referenced at that point.  But beyond

6 Mr. Bowen and Dr. Santoro dealing with

7 the student levels, I do not.

8       Q.    You don't have any

9 independent recollection of that?

10       A.    I do not.

11       Q.    Go to the next page, which

12 is bates number 1022.  The second to last

13 bullet point of Betty Santoro's

14 statement.  It says, at 3:00 p.m., Bill

15 Bowen informed me that one of the

16 students, blank, did admit to being

17 touched front and back bottom by ████

18 in fifth grade.

19          Do you recall discussions

20 about an allegation that ████ had

21 inappropriately touched another student

22 in fifth grade?

23       A.    Based in the context of

24 this, yes, because I believe there was an

1  adjustment made to the notes as they were

2  recorded, top and bottom to front and

3  back.  So it was referenced and --

4      Q.    Is that you're --

5      A.    -- brought into --

6      Q.    Sorry.  Go ahead.

7      A.    Brought into -- yes.

8      Q.    Is that your handwriting,

9  the front and back?

10     A.    It is.

11     Q.    Do you know why you changed

12  it from top and bottom to, I guess, front

13  and back bottom, is that what that's

14  supposed to read now?

15     A.    Yes, I believe so.  Because

16  it was a result of the conversation that

17  had taken place that the touching was on

18  the front and the back and the bottom,

19  not the top, per se.  It was just a

20  greater, a greater level of detail.

21     Q.    When you say the front and

22  the back and the bottom, what are you

23  referring to?

24     A.    What was stated to me at the

1   time.

2          Q.    Is it, like, the private

3   area in the front, like, the vaginal area

4   and the, the bottom, meaning, like, the

5   butt or the -- what exactly do you mean?

6          A.    I would have meant what the

7   person telling me indicated, front and

8   back.

9          Q.    What -- I guess what -- I

10  don't -- these are your -- this is your

11  notes.  So do you remember what you meant

12  by that?

13         A.    It's my note that clarifies

14  top and bottom to be front and back.

15  What area is top and bottom, does that

16  include vaginal area?  So, my

17  clarification was simply that either Dr.

18  Santoro or Mr. Bowen had referenced it as

19  being front and back at some point, and I

20  adjusted the notes, instead of top and

21  bottom, to be front and back.

22         Q.    I mean, did you have an

23  understanding there what the front and

24  back means?  What are you trying to

1  indicate here, what does front and back

2  mean?

3        A.    I'm clarifying what they --

4  what was put in the notes, from top and

5  bottom to front and back.

6        Q.    Did Dr. Santoro or Dr. --

7  or, sorry -- Bill Bowen, did, did they

8  use the words 'front and back'?

9        A.    They would have.  I wouldn't

10  have, I wouldn't have had -- privy to

11  that other than having them share that

12  with me.

13        Q.    Okay.  Do you know whether

14  they were referring to, like, front,

15  meaning the vaginal area, and back,

16  meaning the buttocks?

17        A.    I do not, other than the

18  notes that would have also been contained

19  within these areas, which I believe

20  was  -- there was a reference to

21  underneath her shirt.  So, I don't have

22  anything more specific than what's

23  contained in the notes.  Front and back

24  was stated to me, and I captured it in

1 the notes that way.

2      Q.    Is it important in

3 statements like this to be, like, concise

4 on what exactly is going on?

5      A.    Concise, yes.

6      Q.    Meaning, like, you know,

7 front, like, what that means, like, to

8 have the detail in, in these level of

9 report of what actually happened?

10      A.    I think that there might be

11 some greater levels of detail in the rest

12 of the accompanying documentation.

13      Q.    Okay.

14      A.    And I was simply capturing

15 and repeating in this document what was

16 stated to me, not embellishing, not

17 adding.

18      Q.    Okay.  You would you agree

19 with me, from -- would you agree with me

20 from the documentation we've reviewed so

21 far, that both you as the director of

22 HR/Title IX coordinator for the district,

23 Betty Santoro and -- who's the director

24 of special education; is that right?

1    A.    Elementary education.

2    Q.    Okay.  Elementary education.

3          And Principal Bowen were

4    aware that there was an allegation in

5    fifth grade that ████ had

6    inappropriately touched a girl; is that

7    right?

8    A.    I would base it based on

9    these notes, yes.

10   Q.    That there was at least

11   three allegations in the sixth grade that

12   ████ inappropriately touched them; is

13   that right?

14   A.    Based on these notes, yes.

15   Q.    And that ████ had also

16   reported that there were allegations

17   in -- or, incidents in fourth grade as

18   well with ████ inappropriately touching

19   girls; is that right?

20   A.    As captured in these notes,

21   yes.

22   Q.    Okay.  Did -- in kind of

23   guiding Dr. Santoro and Bill Bowen in

24   this investigation, did you talk about

1 who specifically would be interviewed out

2 of the students and how to go about

3 getting the information for the

4 statements?

5      A.    I don't recall.

6      Q.    In your general practice, is

7 that something you would have done, or

8 with Bill Bowen and Dr. Santoro, you

9 would have let them handle that part?

10      A.    Well, it depends on the

11 comfort level, and when the notes are

12 coming back, if there's anything -- you

13 know, if they're talking about if there;s

14 anything missing, we might talk and

15 collaborate about what they might ask as

16 follow-ups.  In this case, you know,

17 Mr. Bowen, Dr. Santoro and I even believe

18 our assistant superintendant at the time,

19 you know, Dr. Hogan were involved.  So,

20 again, in a collaborative effort, if it

21 wasn't covered, I would have lended

22 advice and guidance, as I've been said

23 before, about what to ask and how to go

24 about the investigation (sic).

1    Q.    Okay.  I'm going to go to

2  Page 1040 -- no, I said the wrong

3  thing -- 1004.

4              There we go.

5              Are these your notes?

6    A.    They are.

7    Q.    Okay.  Is this one of the

8  documents that you reviewed in

9  preparation for the deposition today?

10   A.    Yes.  It might have been, I

11  believe so.

12   Q.    Do you recall this, this

13  meeting or telephone call that's

14  referenced in these notes?

15   A.    Based on the notes, yes.

16   Q.    Do you have independent

17  recollections of the call, or just going

18  to the notes, you remember certain

19  things?

20   A.    I believe the notes are

21  jogging my memory.

22   Q.    Okay.  Let's go through the

23  notes, and I want to -- since they're

24  your handwriting notes, I want to

1  understand, you know, what you meant and

2  what you were writing here.

3        The first part is, like, a

4  little asterisk, and it says, remember

5  anything else/aware of further

6  information that will help, you are

7  directed to report it to Bill.

8        What was this part of the

9  notes that you're documenting?

10        A.   Yeah.  That would have been,

11 you know, to make sure that we were

12 including a statement of that kind of

13 aspect in the meeting with the teachers,

14 when it was in an investigative state.

15 So, you know, oftentimes when they are

16 called to HR and they are processing

17 information, being asked questions, they

18 will reflect on them after the fact, and

19 it might trigger additional memory or

20 additional thoughts involved in the issue

21 at hand.  And so, you know, we wanted to

22 make sure that if they thought of

23 anything, if other things came up, that

24 they would share it with Mr. Bowen

¹ immediately.  So that would help to

² impact his investigation with the

³ students and his response to the behavior

⁴ at the building level.

⁵        Q.    Okay.  And in the next part,

⁶ is says, CPL in November.

⁷              What does, what does CPL

⁸ stand for?

⁹        A.    I think the child protective

¹⁰ services law.

¹¹        Q.    Okay.

¹²        A.    I believe.

¹³        Q.    Sorry, go ahead.

¹⁴        A.    I believe.

¹⁵        Q.    Okay.  Tell me this part,

¹⁶ what, what you're documenting here.

¹⁷        A.    Yeah.  I, I believe that we

¹⁸ were discussing, you know, the need to be

¹⁹ reporting it as a component of the child

²⁰ protection services law and as child

²¹ abuse.  But given the reg, the statute at

²² that time in November, it was

²³ child-to-child, and I don't believe it

²⁴ was covered under the law that it would

1  be perceived as being child abuse.  So we

2  were not required to report it at that

3  time, per the district solicitor's

4  guidance to us.  So there was an

5  indication that we didn't fail to report

6  child abuse.

7        Q.   Okay.  Do you know what the

8  requirements were, based on -- or, when

9  applicable, what the law is, meaning

10 that, is it the law at the time the

11 incident occurred or when a student

12 discloses, do you know what law applies?

13        MS. LAUGHLIN:  You're on

14    mute, Maureen.

15        MS. JORDAN:  Thank you.

16        Note my objection to the

17    form of the question.

18        You can answer.

19        THE WITNESS:  I believe that

20    it would have been -- you know, I'm --

21    I don't know.  I would have asked our

22    attorney at the time, you know, under

23    what governance, and that would have

24    been the end result of this -- those

1    notes.  So, it would have been,

2    perhaps, you know, what are our

3    requirements, what, what should we be

4    doing with regard to this, and I

5    believe it was because the, the

6    interaction, as it occurred in

7    November, was under that governance,

8    so it was not required to be reported

9    at that time.  I would interpret my

10   notes to be that.

11 BY MS. LAUGHLIN:

12        Q.    Just to clarify, was it

13 because it was child-on-child, and that

14 was not reportable?

15        A.    I believe, yes.

16        Q.    Okay.

17        A.    And then, by April, there

18 was a change to the definition, which is

19 the next note right there, and hence why

20 they would have called the child line at

21 that time?

22        Q.    Okay.  And then what --

23 explain for me what you're documenting,

24 right below, it says, April change the

1  definition?

2          A.      I believe that that says the

3  change to definition within the CPL, that

4  child-to-child is not abuse, unless

5  there's specific concerns for sexual

6  penetration in nature and would be

7  indecent assault, and the child under 13

8  had no ability to consent to the

9  behaviors, which was instrumental in what

10  the teacher indicated when she spoke with

11  the students, that she felt that there

12  was mutual consent.  And I believe we

13  took exception to her being able to

14  ascertain that in the way in which she

15  spoke with the students, having spoken

16  with them jointly, not giving them the

17  opportunity to speak separately and

18  without fear of reprisal or threat from

19  the other, other student.  So, that --

20  those were those notes addressing it.

21          Q.      To make sure I understand

22  your notes here, are you writing that a

23  child under 13 does not have the ability

24  to consent?

1        A.      Yes.

2        Q.      Okay.  Was that your

3   understanding of what the, the law or,

4   like, requirements were at that time?

5        A.      Yes.  These would have been

6   the notes taken from discussion with the

7   solicitor at that time.

8        Q.      Okay.  And then the last

9   part here, which has another asterisk,

10  what is that part saying?

11       A.      That was, again, meaning to

12  capture that in a meeting with the

13  teachers, indicates that, you know,

14  because of the lapse of judgment, the

15  gross lapse of judgment in not reporting

16  the incidences at the time they occurred,

17  that incidences of this nature that could

18  be sexual harassment or indecent assault

19  by virtue of the statute, absolutely need

20  to be reported to the building

21  administrator so that the building

22  administrator can take appropriate action

23  in terms of investigating and responding.

24       Q.      Okay.  In terms of --

1          MS. JORDAN:  Can we --

2          MS. LAUGHLIN:  Yeah.

3          MS. JORDAN:  Laura, can we

4    take a five-minute break?  Somebody's

5    ringing my doorbell, and I'm the only

6    one home.

7          MS. LAUGHLIN:  Okay.  Sure.

8    Let's take a five-minute break.

9          MS. JORDAN:  Sorry.

10          MS. LAUGHLIN:  You're okay.

11          MS. JORDAN:  Thank you.

12          MS. LAUGHLIN:  Uh-huh.

13                -  -  -

14          (A recess occurred from 3:35

15      p.m. to 3:41 p.m.)

16                -  -  -

17  BY MS. LAUGHLIN:

18      Q.    I'm just going to share my

19  screen again.  This is bates number 1010,

20  1010, for the record.

21          This is your handwritten

22  notes in the blue ink; is that right?

23      A.    Yes.

24      Q.    This typed up portion, is

1 this your notes as well?

2      A.   No.  They -- as you can see,

3 which is what required the clarity in my

4 handwriting, they were notes taken from

5 Mr. Bowen for the meetings that, I

6 believe, we had had.  So, Mr., Mr. Bowen

7 took these notes and shared them with me,

8 which at times would happen, when you're

9 facilitating a meeting, another

10 administrator in the room would be taking

11 those notes.  And so this is, I believe,

12 Mr. Bowen's rendering of the notes in the

13 meetings with the teachers.

14      Q.   Okay.  And then these are,

15 you said, handwritten notes you wanted to

16 add on for, like, additional detail or

17 clarification?

18      A.   Yes.  To, like, to indicate

19 in -- it looks as though Mr. Bowen had

20 created a running document, but there

21 were separate meetings that took place.

22 So there was a meeting with Ms. Diver,

23 and attending in that meeting were Ruth,

24 Alan, Betty, Bill and myself.  Attending

1  in the Holly Andrews meeting was Holly,

2  Alan, Bill and myself.  So it doesn't

3  look like Betty was present in, in that

4  meeting, in that time of the meeting.

5          Q.    You -- sorry, go ahead.

6          A.    Yeah.  And so that's, that's

7  what that represents.  But this was

8  Mr. Bowen's rendering of notes.  I

9  believe, because these were notes of the

10  meeting, which I was present, there

11  should also be handwritten notes that I

12  was taking while facilitating the meeting

13  as well.

14          Q.    Okay.  So let me go to

15  those, then.  Well, I guess, let me just

16  ask you a couple of questions about your

17  points on these meetings.

18              Do you know whether these

19  two meetings occurred on the same day?

20          A.    They did.  I believe they

21  would have happened back-to-back.

22          Q.    Do you know why Dr. Santoro

23  wasn't in the Holly Andrews meeting but

24  was in the Ruth Diver meeting?

1    A.    I don't recall.  She might

2 have had another meeting or another

3 situation that came up.  I don't recall.

4    Q.    Okay.  This part where

5 it's -- you indicated here and then there

6 are five bullet points afterwards on the

7 bottom of Page 1010, are these things

8 that you were saying in the meeting?

9    A.    Yes.

10    Q.    And what -- can you just

11 explain for me -- I know this is kind of

12 bullet points and Bill's notes -- can you

13 recall what you were saying at the

14 meeting?

15    A.    Yeah.  I think my notes

16 would have been in line order in the way

17 that things were discussed.  I think Bill

18 was capturing summary statements, so that

19 it might be out of context.  But clearly,

20 we were talking about her choice not to

21 have told the administrators at the first

22 point that would -- this had occurred,

23 questioning her judgment in terms of

24 interviewing the two students together,

1  because ███████ as the victim, wasn't

2  going to say anything in front of her

3  perpetrator, in front of the student who,

4  you know, caused the concern, that Bill

5  could have followed-up in a much better

6  way with, with greater protocols in

7  place, obviously, and at what point do we

8  have a responsibility, you know, that,

9  that more than likely was in conjunction

10  to reporting the information to the

11  parents and to the building principal,

12  which she had not done after the first

13  incident, and believing that she had a

14  responsibility to do that could have

15  stopped it from occurring then again in

16  April.

17        Q.    Meaning, that the district

18  thought that she had a responsibility,

19  that Holly Andrews had a responsibility

20  to do that?

21        A.    Yes.  Yes.  And then there

22  was no -- without having informed us,

23  there was no way to know, it could have

24  been a call to child line.  So she took

1  away that opportunity to interpret the
2  situation and make a decision.  Had it
3  been dealt with in November, could have
4  avoided another incident.  So that was my
5  line of responding to what it was she had
6  said in her statement about what
7  happened.
8      Q.    Okay.
9      A.    Best as I can recall and
10 remake the conversation.
11     Q.    When you say Bill could have
12 followed-up with greater protocols in
13 place, what specifically are you
14 referencing?
15     A.    Well I think that, as a
16 building administrator, he would have the
17 opportunity to investigate more fully,
18 separately and individually with the
19 students.  You know, knowing what we
20 know -- knowing what we knew at this
21 point, that, again, other, other students
22 came forward, none of that came out at
23 the earliest possible moment because
24 Holly chose to deal with the situation

1  the way she did and not present it to

2  Bill.  So, there was perhaps, you know, a

3  minimalization (sic) of the behavior that

4  didn't allow the administration to

5  further investigate more comprehensively

6  and to follow the steps that we know

7  exist in comprehensive investigation that

8  could have brought in the audience of

9  witnesses and brought more details to the

10  forefront at an earlier point.  So, you

11  know, from November to April, things

12  could have been avoided, but the

13  principal of the building was not given

14  the opportunity to do that, because he

15  didn't know.

16       Q.    Okay.  I'll jump down --

17  let's see -- this part where it says, mom

18  never confided with Holly about child

19  abuse when ██████ was younger, do you

20  recall that part of the conversation?

21       A.    I do not.  I think there was

22  some point in -- maybe from Dr. Santoro,

23  that there was discussion about ██████

24  having been -- had been a victim at an

¹ earlier point in her life, and there was

² something around the idea that Holly

³ didn't know that, and I might have just

⁴ been reiterating something that Holly

⁵ said that mom hadn't -- she didn't know

⁶ that, that that was, that was important

⁷ to know, because once a victim -- you

⁸ know, it exacerbates and clearly creates

⁹ next levels of emotionality, you know,

¹⁰ for someone who's been a victim to then

¹¹ be victimized again.  So I think that's

¹² what we were talking about at that point.

¹³      Q.    When you say, like, more

¹⁴ severe level of emotionality, meaning

¹⁵ that the impact, like, on a second

¹⁶ assault or a subsequent assault can be

¹⁷ more because of past conduct, past being

¹⁸ a victim, is that what you mean?

¹⁹      A.    I believe so.  I think that

²⁰ it can bring those memories back to the

²¹ forefront as well, and that compounds the

²² situation that we were dealing with, and

²³ I think there needed to be an

²⁴ understanding with the student at that

¹ point.  But I believe Holly was saying

² that, you know, I didn't know, mom never

³ told me, and neither here nor there.

⁴ Whether ███████ had been a prior victim or

⁵ not, the teacher did not respond, you

⁶ know, appropriately in the eyes of the

⁷ district, and so that's why a course of

⁸ action was taken to discipline the

⁹ student -- the teacher.

¹⁰     Q.    Do you recall any discussion

¹¹ about Holly Andrew also writing ███████ up

¹² for the incident in November?

¹³     A.    I don't.

¹⁴     Q.    Under the circumstances that

¹⁵ you were made aware in April, would it

¹⁶ have been appropriate for Holly Andrew to

¹⁷ write up ████████ in that situation along

¹⁸ with ████████

¹⁹     A.    You know, I don't know.  I

²⁰ think, I think she reported what she saw

²¹ or what she thought she saw.  I don't, I

²² don't know if that would have justified

²³ reporting ███████ or what; I don't know.

²⁴     Q.    But based on your

1  understanding of what happened between

2  ███████ and ███████ because they had

3  informed you of what had happened,

4  Holly's version or, you know, statements

5  that were taken and stuff, do you -- as

6  title IX coordinator, do you think it was

7  appropriate to write ███████ up for that

8  incident?

9              MS. JORDAN:  Note my

10     objection to the form of the question.

11             You can answer.

12             THE WITNESS:  I don't know

13     that ███████ was written up.

14  BY MS. LAUGHLIN:

15       Q.    Well, I mean, I can

16  represent to you, from Holly Andrew's

17  deposition, she said she did write both

18  ███████ up and ███████ up.

19       A.    And I don't recall that.

20       Q.    So are you saying that that

21  didn't happen, or?

22       A.    I'm saying I don't recall

23  it.  It may have happened.  I don't know.

24  I don't recall it.

1    Q.    Okay.  Based on your

2  understanding, though, as the title IX

3  coordinator, would it have been

4  appropriate for her to write ███████ up?

5              MS. JORDAN:  Note my

6     objection to the form of the question.

7              You can answer.

8              THE WITNESS:  I don't know.

9  BY MS. LAUGHLIN:

10    Q.    In your experience as the

11 director of Title IX, with your

12 experience, you know, training and

13 everything else with Title IX, is there a

14 protocol about a victim in this situation

15 being written up?

16             MS. JORDAN:  Note my

17    objection to the form of the question.

18             You can answer.

19             THE WITNESS:  I can't

20    recall.  Again, I've not dealt with

21    these situations in, in years.  So, I

22    don't recall.

23 BY MS. LAUGHLIN:

24    Q.    Meaning, since, like, 2018,

1   when you took on the role at Lehigh?

2        A.    Yes.  Well 2021, I took on

3   the role at Lehigh, but yes.

4        Q.    Sorry.  So, last year, I

5   guess, then.

6             You had mentioned you had

7   your own handwritten notes, and I'm

8   showing you bates number page 1012.  Are

9   these the notes from that meeting that

10  were your notes that we were just going

11  over?

12       A.    Yes.  It looks that way.

13       Q.    Okay.  Take me through what

14  you're documenting here.

15       A.    It looks like, in November,

16  Ruth is indicating -- thank you -- is

17  indicating, at the end of the day, she

18  might have been in the bathroom.  In my

19  cryptic notes, I talk about Holly having

20  shared inappropriate behavior, that

21  students were talked to in the hallway.

22  And then probably showed the office

23  referral form that had been written for

24  ████   that I knew of at the time.  And

¹ Ruth she questioned going to Bill, so

² she -- it was indicated that she

³ questioned going to Bill, but she trusted

⁴ that Holly handled the situation -- she

⁵ trusted her, and I believe she filed the

⁶ report or did something with it that was

⁷ shared with her.  She indicated that she

⁸ didn't know the extent of the behavior.

⁹ So I was kind of reviewing, I believe,

¹⁰ her statement that she had given, and

¹¹ that prompted the questions, and those

¹² were her, you know, her responses back to

¹³ me.

¹⁴      Q.    I just want to pause before

¹⁵ we jump to the next part.

¹⁶           You're saying, she didn't

¹⁷ know the extent of the behavior, meaning

¹⁸ Ruth Diver?

¹⁹      A.    Yes.

²⁰      Q.    So when you're saying that

²¹ she questioned going to Bill, meaning

²² that in the conversation with Holly, Ruth

²³ brought up whether they should tell Bill

²⁴ Bowen about what had happened?

1    A.    I believe so.  Because at

2  that point, I think there was a written

3  referral, perhaps, as I indicated in the

4  top line there.  So, based on the

5  referral, should it go to the office,

6  should we refer it to Bill, was, I think,

7  Ruth's question.  Holly, you know, said

8  no.  Because if the notes are correct at

9  that point, if memory serves me, Holly

10  had said to the student something to the

11  effect of, you know, if you don't do this

12  again, I won't either tell your parents

13  or tell Mr. Bowen, something along those

14  lines.  So, for that reason, Holly

15  probably did not want the referral, after

16  she wrote it, to go to Bill.

17    Q.    Because she said that it

18  wouldn't?

19    A.    Yes.  So, she was

20  presenting -- sharing the referral with

21  Ruth, and the very nature of the referral

22  would be to send to the office, but Holly

23  was saying, we're not sending to the

24  office, and Ruth was indicating that she

1   didn't know -- she hadn't witnessed the

2   behavior, she didn't know the extent of

3   the behavior, so she wasn't going to

4   supercede what Holly was saying, that she

5   truster her as a colleague.

6        Q.    So Ruth, like, agreed to do

7   what Holly was saying and not passing the

8   report along to Principal Bowen?

9        A.    I believe so.  Because,

10  again, Ruth was the recipient of the

11  information.  She was not present to have

12  witnessed it or dealt with the students.

13       Q.    Okay.  Was Ruth Diver

14  disciplined at all as a result of this

15  whole sixth grade incident?

16       A.    I believe -- I don't believe

17  there was discipline to the extent that

18  the supervising teacher in the room with

19  the students had at the time.

20       Q.    Wait, I'm sorry.  I don't

21  understand -- I didn't understand your

22  answer.

23       A.    Yeah.  I don't believe that,

24  if action was taken against Ruth, it rose

<sup>1</sup> to the level of the action taken against

<sup>2</sup> Holly.  I'd have to go back and look if

<sup>3</sup> there was a letter placed in her file,

<sup>4</sup> but I do not, I do not believe she

<sup>5</sup> experienced a suspension the way that

<sup>6</sup> Holly did, because Ruth was not involved

<sup>7</sup> to the level that Holly was.

<sup>8</sup>        Q.    I guess my question is, do

<sup>9</sup> you recall whether there was any

<sup>10</sup> disciplinary action against Ruth Diver,

<sup>11</sup> even if it was less than that of Holly

<sup>12</sup> Andrew?

<sup>13</sup>        A.    Again, as I said, I don't

<sup>14</sup> recall a letter in a file was perceived

<sup>15</sup> as discipline, you know, a verbal

<sup>16</sup> reprimand, and there may have been that,

<sup>17</sup> I don't recall.

<sup>18</sup>        Q.    So I can represent to you

<sup>19</sup> that I have not received anything,

<sup>20</sup> whether it's any indication of a verbal

<sup>21</sup> reprimand or a paper in her file.  So I

<sup>22</sup> guess I'm asking, do you know -- do you

<sup>23</sup> recall whether any -- if either of those

<sup>24</sup> things did actually take place?

1    A.    Again, I don't recall.  If
2  you've not been made aware of it, I don't
3  recall.  I would assume that that didn't
4  happen.
5    Q.    Okay.
6    A.    Or there was not cause for
7  that to happen.
8    Q.    Do you recall which it was,
9  like, if it wasn't -- or discussion as to
10  whether or not you disciplined Ruth
11  Diver?
12    A.    I would, I would imagine
13  there was discussion because that's
14  generally what would have happened in a
15  situation, and it was more than likely
16  decided, based on her level of
17  involvement, she didn't witness, she was
18  forthcoming in the investigation, that
19  discipline was not taken.  Again, I
20  don't, I don't recall the complete nature
21  of the decision.
22    Q.    Was that -- as the director
23  of HR, was that your responsibility to --
24  as to whether or not Ruth Diver would

1  receive discipline in this matter, since

2  she was an employee of the district?

3        A.    That would have been done

4  collaboratively with our superintendant

5  and assistant superintendant at that

6  time.  When we would get to that level,

7  they were typically involved.

8        Q.    Okay.  And one of those

9  people would have been Curt Dietrich?

10        A.    That's correct.

11        Q.    Do you know who the other

12  person was?

13        A.    Dr. Holding.

14        Q.    Okay.

15        A.    Diane Holding.

16        Q.    For April, what are these

17  notes saying?

18        A.    So then this was, you know,

19  fast-forwarding to the incident in April.

20  So the first rendering was about content

21  related to November.  This was the

22  content that related to April, in that

23  Ruth indicated that ████ was making eye

24  contact with her -- with me, Ruth -- and

1 she was wondering why she was looking at
2 me when she should be looking at the
3 video.  And then some statement --
4       Q.    Sorry, just to clarify, when
5 you say "she should be looking at the
6 video", are you talking about ████████ or
7 who should be looking at the video?
8       A.    I -- it would be he, sorry.
9       Q.    That's okay.  I just wanted
10 to clarify.
11       A.    Thank you.  I appreciate the
12 enlarged print.
13       Q.    Is it large enough now?
14       A.    Yeah, it's fine.  Thank you.
15             So ██████ was making eye
16 contact with me, being Ruth.  Why you
17 looking at me, should be looking at the
18 video.  So, that was what, you know, her
19 statement was.  Something about the
20 inappropriate touching, and she was sorry
21 that it turned into this.  Reflecting
22 back, perhaps if something would have
23 been made aware in November, it wouldn't
24 have had -- it wouldn't have moved into

1   what we were dealing with in April.

2          Q.    And what you were dealing

3   with in April, meaning the multiple other

4   students that were reporting now at this

5   point?

6          A.    The second occurrence having

7   dealt with ████████

8          Q.    Okay.  And this part about

9   the inappropriate touching, do you know

10  what was being referenced here?

11         A.    I, I think that probably was

12  the -- they were in the video and it was

13  discovered that there was inappropriate

14  touching happening.

15         Q.    Okay.  What about the --

16  sorry, go ahead.

17         A.    No.  I would speculate about

18  that, based on the other notes that we

19  know or shared at the time.

20         Q.    This next one, it says BS,

21  do you know who this person is?

22         A.    That would -- Betty Santoro

23  would have said something about November

24  and inappropriate touching, and she

1  challenged the wording of inappropriate

2  touching, that it would be more along the

3  lines of, you know, sexual harassment or

4  misconduct.

5      Q.    Okay.  Using -- sorry, go

6  ahead.

7      A.    No.  Again, as we said, you

8  know, we, we do not -- we would not have

9  condoned or advised teachers to be

10  touching students in any way.  So

11  inappropriate touching could be grabbing

12  a student by the shoulder or arm to

13  redirect, that's not acceptable, as

14  opposed to, you know, sexually harassing

15  touching, you know, in this -- which we

16  know in this case to happen.  If students

17  push and shove each other, that's

18  inappropriate touching.  Touching someone

19  that makes them feel uncomfortable in an

20  inappropriate area is sexual harassment.

21  So, Betty was just making the

22  distinction, I belive.

23      Q.    That the November incident

24  should have been termed sexual

1  harassment, not inappropriate touching?

2      A.    Yes, I believe so.

3      Q.    Okay.  What about this last

4  part at the bottom here?

5      A.    I directed her to go to Bill

6  if she remembered things after she, you

7  know, had the chance to, you know,

8  reflect after she had left the meeting.

9      Q.    Okay.  These are your notes

10  as well?

11      A.    Yes.

12      Q.    And this is the second

13  meeting, kind of, like, Bill Bowen, you

14  have, like, a little squiggly line to

15  separate the two meetings?

16      A.    I did, yes.

17      Q.    And so this is your second

18  notes from the meeting that day, right?

19      A.    Yes.  And it does look --

20  and just to go back, it does look like

21  Betty was here in my rendering.  It might

22  have just been missed in capturing it on

23  Bill's notes.  But it does look like

24  Betty was there.

1      Q.    Okay.

2      A.    Because I recorded it, and

3 that would have happened in live time.

4      Q.    Okay.  Can you take me

5 through -- when you say "last time", do

6 you know whether Bill Bowen was

7 documenting his after that or whether his

8 was, like, live at the meeting as well?

9      A.    I believe -- he was -- I

10 believe he was typing as the meeting was

11 going, but again, didn't capture who was

12 in the meeting.  So, you know,

13 afterwards, I wrote in, and I might have

14 just missed Betty.

15      Q.    Can you take me through your

16 handwritten notes here and kind of

17 describe for me what you're documenting.

18      A.    Yes.

19            We had, at that point,

20 Holly's statement from her discussion, I

21 believe with Bill and with Betty.  So we

22 had her review the review of the

23 statement and the situation.  She had not

24 signed her statement, so I indicated that

1  a signature would be needed on that.  She

2  walked us through talking about, in

3  November, in the summary with the

4  students at the table, ███████ and his

5  hands were up ███████ shirt, she took

6  the students in the hallway and spoke to

7  them together.  ██████ denied everything,

8  and ██████ said nothing.  There, she's

9  saying mutual -- it was mutual, she wrote

10  a referral and filed it in the classroom.

11  Now that I think of it, should have gone

12  to Bill, in quotes.  So that was a direct

13  quote that she said.  My initials

14  indicate that my responses to --

15      Q.    Let me just stop you right

16  there before we jump to your response,

17  really quick.

18          When she's telling you this,

19  she's actually saying in the meeting, now

20  that I think about it, I should have gone

21  to Bill about the November incident?

22      A.    Yes.

23      Q.    Did she explain why or,

24  like, why she's saying she should have

1  gone to Bill?

2       A.    No.  She -- if she would

3  have gone into greater detail, I probably

4  would have indicated that.

5       Q.    Okay.  And so, go ahead, so

6  now this next part is your response to

7  what Holly had just said in the meeting?

8       A.    Yes.  Indicated, again, that

9  ███████████████ wouldn't say anything or

10 won't say anything in front of the

11 perpetrator.  She shouldn't have

12 questioned them together.  Bill, as the

13 principal, could have investigated more

14 thoroughly.  I questioned whether the

15 parents were notified.  At what point, do

16 we have a responsibility to notify

17 parents and to notify the administration,

18 was what that line meant.  Again, what we

19 just referenced in Bill's notes, the

20 incident could have been a call to child

21 line.  Had we known, we could have

22 determined that.  Had it been dealt with

23 appropriately in November, we could have

24 avoided other incidents, and then asked

1  what was shared with Ruth.  So trying to

2  ascertain Ruth's level of involvement or

3  culpability in, you know, the witnessing

4  of the behavior and responding to the

5  behaviors.

6       Q.    This part about parents

7  notified, like, asking if the parents

8  were notified, do you recall getting an

9  answer from Holly?

10      A.    I don't.

11      Q.    Okay.

12      A.    No.

13      Q.    And then it's, at what point

14 do we have a responsibility, you said, to

15 notify parents and administration of what

16 that line means.

17      A.    Right.

18      Q.    Did you know, at that point,

19 what responsibility, if any, the district

20 has to inform parents of a student's

21 disclosure of sexual misconduct?

22      A.    In terms of did I know what

23 responsibility, my statement was really

24 as a matter of being the responsible

1 party for those students and informing

2 parents when something of this nature had

3 happened, and she took that away by

4 saying to the students, I will not -- you

5 know, I won't tell your parents, I won't

6 tell Mr. Bowen if you promise not to do

7 it again.  So, I wasn't even really

8 thinking about the legal aspect of

9 responsibility.  I was thinking about

10 informing parents.

11          Q.   Taking it outside of, like,

12 the legal, you know, aspect, the

13 responsibility, but in terms of being

14 director of -- or, Title IX coordinator,

15 is -- was there an expectation or

16 responsibility that you're aware of to

17 notify parents in a situation like this?

18          A.   No, I don't know.  I don't

19 know that.

20          Q.   You don't know either one?

21          A.   I don't know, no.

22          Q.   Okay.  And so then, Holly

23 responds to you after you're saying what

24 was shared with Ruth, and go through this

1    for me what you were documenting here.

2           A.     Mm-hmm.

3                  So, Holly indicated that she

4    wasn't sure what was shared with Ruth.

5    Don't remember what was said to Ruth.  We

6    had a conversation about going to Bill

7    but didn't.  Can't really remember.

8    Showed second report for student same

9    date.  Felt it was caught before it went

10   anywhere.

11          Q.     Showed second report for

12   student on same date, do you remember

13   what this was referring to?

14          A.     Unfortunately, I don't.  I

15   don't.

16          Q.     What about when she's

17   saying, thought it was caught before it

18   went anywhere, do you know what she meant

19   by that?

20          A.     That she felt what she was

21   doing, that she had stopped them from

22   going -- from it escalating or the

23   behaviors going further, is what I would

24   interpret.

1    Q.    Meaning, stopped, like, at

2  that moment from it going further in that

3  particular assault?

4    A.    I believe so.

5    Q.    Okay.  And then you said you

6  asked again if parents had been

7  notified --

8    A.    Yes.

9    Q.    -- is that right?

10    A.    Yes.

11    Q.    And then Holly told you,

12  it's not my place to notify the parents?

13    A.    Correct.

14    Q.    Do you recall her saying

15  this in the meeting?

16    A.    Yes.

17    Q.    What was -- when she said

18  that, I mean, what was your reaction?

19    A.    Probably in disbelief.

20  Because if it wasn't her place to notify

21  parents, she also took the vehicle away

22  from the administration to be able to do

23  that by not informing the administration.

24  So, I mean, you can see what was --

1 obviously, not, you know, everything can

2 be captured.  You do the best you can in

3 writing, writing down what's said.

4          Q.     And you responded, how,

5 according to your notes?

6          A.     It says, statement from

7 ██████ parents.  I don't know what that

8 was.  It might have been something that

9 they shared with Dr. Santoro, in their

10 conversation with her, or with Bill.  I

11 don't, I don't know the specifics of that

12 this far afterwards.  And then we

13 fast-forwarded to April.  So --

14          Q.     Okay.

15          A.     -- we talked about November,

16 then let's fast-forward to April.  Holly

17 indicated that she saw Ruth and Kristen

18 in the hallway regarding an incident with

19 Paige, perhaps another student.  Ruth

20 said, ██████ did something similar to

21 November, later that day was asked to

22 write it up.  And then I indicated that,

23 you know, again, not enough investigation

24 occurred in November to appropriately

1  deal with the situation, we'll continue

2  to investigate further, while the

3  investigation continues, please share if

4  you remember anything else.  So this was

5  an information gathering meeting, a first

6  step, you know, in the process.

7       Q.    Okay.  And I want to skip to

8  the next meeting, which is bates number

9  1003.  And this is May 5th, 2015.

10            These are your notes, again?

11       A.    Yes.

12       Q.    And can you take me

13  through -- do you recall this meeting and

14  what the purpose of it was?

15       A.    Yes.  I think that we were

16  discussing, you know, the, the situation

17  and contemplating a course of action in

18  terms of discipline and supports.

19       Q.    Okay.

20       A.    So --

21       Q.    Sorry.

22            When you say, "in terms of

23  discipline and supports", discipline for,

24  who?

1    A.    For -- at this level, for

2 the staff member.

3    Q.    When you say supports, what

4 do you mean?

5    A.    If there's anything that we

6 needed to do in terms of, you know,

7 responding to the staff member, you know,

8 to help stop this from happening in the

9 future, change the, the judgment.

10    Q.    Meaning, like, additional

11 training or something like that?

12    A.    Perhaps.

13    Q.    Are there other things that

14 you were referring to or were part of

15 this meeting or thought process?

16    A.    I don't, I don't recall.

17 I'd say that, you know, we talk about

18 discipline and support because they go

19 hand-in-hand in some cases, and generally

20 that's what we would be doing when we're

21 looking at situations, whether or not

22 supports were deemed necessary in this

23 particular case or whether it was just an

24 aspect of failure to, failure to report

1  and, and respond accordingly.  Those were

2  things that, you know, came up in the

3  conversation, as you can see.

4       Q.    Can you just take me through

5  your notes, explain what you meant by

6  what you wrote here.

7       A.    Sure.

8            So we were talking about the

9  judgement on Holly's part in terms of the

10 act being so egregious.  Her poor

11 judgement not to be reporting the sexual

12 nature of what she witnessed to

13 authority, whether it was Bill or

14 higher-up within the district, the fact

15 that both students, the girl and the guy,

16 were questioned together lended to her

17 poor judgment, and telling the students

18 that it will go no further if they stop,

19 that she wouldn't tell parents, all were,

20 in our mind, a very poor judgement and an

21 egregious act on her part, to not carry

22 out the professional responsibilities

23 that she had and that for her to assume

24 or make an assumption and a judgement

1   that it wasn't consensual, it wasn't

2   appropriate school behavior nor, as we

3   indicated previously, were the students

4   of age to make it consensual as well.

5   So, you know, again, just poor judgement

6   all around and no seeking help from the

7   administration in the building to discern

8   appropriate steps and actions.  And so,

9   at that point, the thought process was

10  that there would be a two-day suspension

11  without pay as well as a letter

12  commemorating that into her file.

13          Q.    Just to clarify your answer,

14  I know that you and the other team

15  members in this meeting are saying that

16  the actions between ███████ and ███████ are

17  not consensual, but Holly Andrew believed

18  that they were consensual, or that was

19  her interpretation or assumption; is that

20  right?

21          A.    That was her statement, yes.

22          Q.    I'm showing you what's been

23  marked as Page 1009 in the bates-numbered

24  records.

1          Do you recall receiving
2    this?
3          A.    Yes.
4          Q.    And it says, Dear Cheryl;
5    that's you?
6          A.    Yup.
7          Q.    I know I've been referring
8    to you as Dr. McCue, but this letter was
9    addressed to you at the time, right?
10         A.    It was, yes.
11         Q.    And it's dated May 5th, 2015
12   and that they -- you said that I should
13   contact you if I think of anything else
14   to add to our discussion, and that's
15   referencing the end of the meeting when
16   you're saying, if there's anything else,
17   tell me?
18         A.    Well, it was actually tell
19   Bill, but yes.
20         Q.    Okay.  Do you know why --
21         A.    To make somewhere aware,
22   yeah.
23         Q.    Do you know why she came to
24   you with this, if you were like, tell

1 Bill, and it's coming directly to you?

2       A.    I don't, other than I was in

3 the meeting, I was facilitating the

4 meeting.  Again, I'll, I'll remind you

5 that we are very hands-on administrative

6 team, and the staff know us from being

7 out in buildings and feel comfortable

8 with us.

9       Q.    Do you know whether Ruth

10 Diver felt more comfortable bringing this

11 to you versus her building principal?

12       A.    I do not know that.

13       Q.    Do you know what at all --

14 sorry.

15       A.    I believe Bill knew this as

16 well.  So I just think it was a matter of

17 her sharing with me in addition.

18       Q.    Were you aware of the

19 relationship at all between the teachers

20 at Gwynedd Square and the -- their

21 relationship with the principal, Bill

22 Bowen?

23       A.    What, what are you

24 referencing in term of relationship?  He

1  was their supervisor.

2      Q.    Right.

3            But, I mean, for example,

4  are you aware of any complaints or issues

5  that the teachers felt with the way that

6  Bill was -- Bill Bowen was handling

7  things at the elementary school?

8      A.    No.  I don't believe so.

9      Q.    As the director of HR, would

10  that be something that reports would

11  typically -- you would expect to come to

12  you --

13      A.    Yes.

14      Q.    -- of that nature?

15      A.    Yes.

16      Q.    Did the teachers know that

17  they were supposed to report that to you?

18  Was there any training given to them or

19  policies or practices that you would

20  inform them of?

21      A.    Reporting, what, to me?

22      Q.    In terms of, like, their

23  feelings towards Bill Bowen and the way

24  that they were handling things, the way

¹ he was handling things at the school?

²      A.    I think there's a chain of

³ command in the organizational structure,

⁴ that if individuals are not comfortable

⁵ with their immediate supervisor, the next

⁶ supervisor in line, in this case the

⁷ director of elementary, if there's

⁸ nothing done specifically to them that

⁹ violates, you know, their employment or,

¹⁰ as we talked about before, that caused a

¹¹ hostile work environment or made them

¹² feel uncomfortable, then absolutely, they

¹³ would come to the director of HR, again,

¹⁴ depending on the nature of it, to share

¹⁵ their concerns.

¹⁶      Q.    In terms of something like

¹⁷ teachers submitting, like, disciplinary

¹⁸ issued to be handled by Principal Bowen

¹⁹ but then not ever hearing anything back,

²⁰ would that be something that would have

²¹ gone to the director of elementary

²² education or would have gone directly to

²³ you?

²⁴           MS. JORDAN:  Note my

1    objection to the form of the question.

2              You can answer.

3              THE WITNESS:  Again, in

4    following with the organizational

5    chain, I would have expected those to

6    go to the director of elementary

7    first.  If it was an ongoing concern

8    that would speak to an individual's

9    performance and their immediate

10   supervisor would need help or there

11   was something that should be taking

12   place in terms of discipline or in

13   regard to an evaluation, then

14   absolutely, I would be involved.  None

15   of that had, to my recollection,

16   occurred at this point in time.

17 BY MS. LAUGHLIN:

18      Q.    I want to get to this note

19 from Ruth Diver to you on Page 1009.

20 It's talking about ███████ and ███████

21 being kept apart at recess and during the

22 day.

23              Do you know how they were

24 kept apart at recess?

1          A.     I do not.

2          Q.     Do you know what, if any,

3    safety-type plans or implementation was

4    put in place to separate ▮▮▮▮ from the

5    victims that had reported in the sixth

6    grade?

7          A.     I do not.

8          Q.     Is that something that you

9    would have been aware of at the time, or

10   was that more at the building level that

11   would have been handing that stuff?

12         A.     Yeah.  I think I responded

13   earlier to this question, that, that if

14   something that would have happened at the

15   building level, we would have talked

16   about ensuring that steps were taken.

17   Obviously, this note indicates that they

18   were and that there was an acknowledgment

19   of the need to separate them.

20   Supervision happened at all of our

21   outside recess times and lunchtime in the

22   cafeteria.  So, I would venture to say

23   that a supervisor plan was put in place

24   that would have the students be

1  separated.

2        Q.    Do you know whether you were

3  actually part of those conversations with

4  this particular case, of what to do, how

5  to separate, things like that?

6        A.    I don't recall.  Principals

7  knew that we could be utilized as a

8  resource, if it was necessary.  But

9  again, in their training and in their

10 leadership, they're certified to do jobs,

11 and they're able to do these jobs, and

12 they do them very well.  And so,

13 oftentimes they're able to put in place

14 these kinds of situation, this kind of

15 action plan and don't need that level of

16 assistance and support, but our structure

17 always provide for it if they do.

18        Q.    Do you recall having any

19 conversations or guidance offered to Bill

20 Bowen about how the information about

21 ████    assaulting multiple girls in sixth

22 grade while at Gwynedd Square was going

23 to be communicated, if at all, to the

24 middle school level?

 1          A.     I do not.

 2          Q.     Would that have been

 3    something that you would have left to the

 4    principal's hands to, to do and

 5    implement?

 6          A.     Yes.  That and as well as

 7    the director of elementary.  So again,

 8    that structure that I indicated earlier,

 9    with transition meetings, my assumption

10    would have been that the -- this would

11    have been indicated as something to

12    share, if, in fact, it was appropriate to

13    be shared.  Because remembering that we

14    have 13 elementary buildings, three

15    middle schools, it was not -- it would

16    not be unlikely that depending on where

17    the -- area and the living residential

18    area is, they may not have been slotted

19    to be going to the same middle school,

20    and thereby the concern for them being

21    together would have been eliminated by

22    virtue of them being in two different

23    middle schools.

24          Q.     What about in a situation

1  where the middle schools then filter back

2  into the same high school, is there any

3  process in place to, like, track that,

4  if, you know, the situation's resolved

5  for the middle school level, but there

6  was a situation that would have been

7  addressed, I mean, is there anything to

8  track that so that when they're both

9  filtered into the same high school, that

10 something can be implemented?

11      A.    I don't know if there's

12 anything in place to track it.  I do

13 know, again, by virtue of the folders

14 that are shared from level to level, that

15 information is contained in there.  But a

16 direct reference to it, I don't know.  I

17 can't speak to that.

18      Q.    Do you know for a fact in

19 this case that that information was

20 contained in �█�█�█�and file?

21      A.    I would expect for it to be,

22 as a matter of protocol, but I have not

23 reviewed his file to know if it was

24 there.

¹      Q.    Okay.  And when you say the

²  information, meaning, like, the summaries

³  of what happened, like, the Dr. Santoro

⁴  summary or the Bill Bowen summary, or --

⁵  are those what you're referring to?

⁶      A.    I'm referring to the notes

⁷  that they would have taken, yes, the

⁸  investigative notes and the outcome with

⁹  regard to action steps for, for the

¹⁰  student.

¹¹      Q.    Like, a final report?

¹²      A.    Mm-hmm.  Final report and/or

¹³  the compilation of papers in the file

¹⁴  that speak to what would be in that final

¹⁵  report, if it existed.

¹⁶      Q.    Okay.  The final reports,

¹⁷  are they kept somewhere separate than in

¹⁸  the student's subfolder?

¹⁹      A.    Again, you know, as I

²⁰  indicated previously, if it were relative

²¹  to a staff member and I had filed a

²²  report, it would be electrically stored

²³  in a folder that was accessible to the

²⁴  superintendant.

1    Q.    What about for students not

2  involving --

3    A.    I don't know.

4    Q.    Okay.  These are your notes,

5  again, on Page 1008, from May 27th, 2015.

6          Can you take me through what

7  you're writing here.

8    A.    Yes.  This would have been a

9  follow-up meeting where we were meeting

10  with Holly to review the situation.  We

11  had additional notes at that time, or

12  additional information from Mission Kids.

13  We talked about two girls.  I'm not sure

14  what any kind movie showing and touching,

15  and it references Paige and ████████ who

16  were the two girls who indicated that

17  they, you know, had experienced this.

18    Q.    You don't know what you

19  meant by that line?

20    A.    I don't know what any time.

21  Two girls anytime movie showing; I'm not

22  sure.  It's abbreviated and summarized to

23  the point that six years later I can't

24  tell you the full context of what that

1  means.

2          Q.    Okay.

3          A.    I shared concerns for poor

4  judgement in not reporting the sexual

5  nature to authority, meaning to the

6  building level principal.  Talked, again,

7  and reiterated the idea of the students

8  being questioned together, and then

9  reiterated from our previous meetings,

10  not -- it was not mutual or consensual

11  because the students were not of age to

12  be able to, to make it consensual, and

13  regardless, it was not appropriate

14  behavior for school.  Followed-up with

15  telling the students that it will go no

16  further if they stopped, that she

17  wouldn't tell the parents.  There's

18  nothing that -- by doing that, she

19  eradicated the opportunity to provide

20  support for ███████ to understand that his

21  behavior was inappropriate and would have

22  stopped and could have stopped the

23  behavior in November and that the

24  district was going to proceed with a

¹ two-day suspension without pay and a

² letter being placed in her file.

³    We had additional concerns

⁴ for her professional judgement in regard

⁵ to -- so yeah, another area, and that was

⁶ still in professional judgment.  There

⁷ was an, an issue for individual education

⁸ plans and programs and her shredding of

⁹ documents, that, for a case that was

¹⁰ still in a settlement stage.  I believe

¹¹ that's why Francis Gardner, who was the

¹² then, I believe, supervisor, it says

¹³ supervisor of special education, assisted

¹⁴ into that building, or perhaps the

¹⁵ assistant director of special education

¹⁶ at the time, was involved in this

¹⁷ meeting.  Both issues, the issue with the

¹⁸ student through sexual harassment as well

¹⁹ as shredding of documents were lapses of

²⁰ judgment, and it could result in

²¹ unsatisfactory performance in the area of

²² professionalism domain two of her

²³ evaluation and in the area of classroom

²⁴ environment.

1  So I was doing that to set
2  her up to know that, within this period
3  of time, those lapses of judgement would
4  substantiate a need for the district to
5  record this on her yearly evaluation,
6  because they were occurring during the
7  year -- at the time of the evaluation.
8    Q.    Do you recall --
9    A.    She --
10   Q.    Sorry.
11   A.    Go ahead.
12   Q.    Was there more with that
13  section?
14   A.    Just that the idea that I
15  able to summarize all of the statements,
16  afforded her the opportunity to ask any
17  questions.  Her last statement was it's
18  not necessary to review the entire
19  situation.  Experience tells me you get
20  some major points in, and that's what I
21  attempted to do.
22   Q.    This IEP issue and her
23  shredding the document, do you remember
24  what that involved?

¹        A.    I do not, other than what I

²    have.  I mean, the action was that she

³    was found to have shedded IEP documents

⁴    of a student on her case load within the

⁵    building, and Dr. Gardner and the special

⁶    education leadership team was dealing

⁷    with that.  Unprofessional, lapse of

⁸    judgment, it became a part of this

⁹    conversation because it was another

¹⁰   aspect of judgment, as I indicated, and

¹¹   was a component of where the district was

¹²   planning to move on her end of the year

¹³   evaluation.

¹⁴        Q.    What about the shredding of

¹⁵   and IEP document was unprofessional?

¹⁶        A.    Those are documents that are

¹⁷   legal documents and should be maintained.

¹⁸   So, it wasn't a draft, it wasn't replaced

¹⁹   by something.  There was no protocol to

²⁰   be shredding it at that time, especially,

²¹   as you can see, the case was in, in a

²²   review point for a settlement.  So, we

²³   wouldn't be discarding documents.

²⁴        Q.    Was there not an electronic

1  version of IEPs kept at this time for

2  students?

3       A.    I believe there, there more

4  than likely was, but I can't speak to

5  that, again, not being the supervisor of

6  that area.

7       Q.    When you say that the case

8  was still in settlement stages, what do

9  you mean?

10      A.    The, the student for whom

11 the IEP was being shredded, there was,

12 there was a pending case occurring at the

13 time.

14      Q.    Like, a lawsuit?

15      A.    I don't know.

16      Q.    Okay.

17      A.    It was a settlement.  I

18 can't recall the levels of those details.

19      Q.    Okay.  Do you recall what

20 the, the case was about or what the, the

21 issue was or the claim made?

22      A.    I do not.

23      Q.    Do you remember --

24      A.    No.  That would have been

1 managed through the director of special

2 education or the solicitor at the time.

3      Q.    Okay.  I'm going to go to

4 bates number 998.  This was a North Penn

5 grievance form that was sent to you from

6 Holly Andrew and Alan Malachowski; is

7 that right?

8      A.    Yes.

9      Q.    And Alan was the president

10 of the teacher's union?

11      A.    Yes.  He was the president

12 of the association, yup.

13      Q.    Would you typically receive

14 any grievance forms from employees, they

15 would -- would they go to you?

16      A.    Yes.

17      Q.    In your role as the director

18 of HR?

19      A.    Yes, that's correct.

20      Q.    And so Holly -- I'm sorry --

21 Ms. Holly Andrew at this point is now

22 filing a grievance after you and the

23 group of people you met with told her she

24 was going to get a two-day suspension

1  without pay and a letter in her file; is

2  that right?

3      A.   Yes.  The president of the

4  association, on behalf of Holly, was

5  filing the grievance in his role as

6  president.

7      Q.   Okay.  And Holly -- I mean,

8  Holly, through, I guess, the union

9  president, Mr. Malachowski, wanted the

10 suspension removed and her salary paid

11 back for those two days; is that right?

12     A.   That's correct.

13     Q.   Do you recall discussions

14 about whether that should happen?

15     A.   In response to the

16 grievance, there were discussions, yes.

17     Q.   Do you recall any of them,

18 independently?

19     A.   I think that we ascertained

20 that our level of discipline was

21 appropriate, and we were not in a

22 position to respond to the grievance in a

23 way that would make her whole.

24     Q.   Okay.  Taking you to bates

1 number 1005, which continues onto 1006,

2 this document here, a Department of Human

3 Resources memorandum, dated June 3rd,

4 2015, is this a document that you create

5 that's kept in the employee's file?

6          A.    Yes.

7          Q.    And is this any time that

8 there's a grievance filed -- or, I guess,

9 some -- a teacher is going to get

10 disciplined, is there something similar

11 to this that's created?

12          A.    Yes.  This would have been a

13 summarization of a performance meeting in

14 which action was taken, to summarize the

15 conversation, the reasons and ultimately

16 the action taken.

17          Q.    Okay.

18          A.    So it wouldn't have been in

19 response to a grievance.  The grievance

20 was in response to this letter.

21          Q.    Oh, okay.

22                I want to take you down to

23 No. 3, I'm on Page 1005.

24          A.    Could I just ask that you

1  make it a hundred percent, if I need to

2  reference it?

3       Q.    Yeah.

4            Is that better?

5       A.    Yes, thank you.

6       Q.    Yeah.

7            So I'm looking at -- and you

8  can see it in that hundred percent?

9       A.    Yes, that's perfect.  Thank

10  you.

11       Q.    In No. 3, it says, school

12  board Policy No. 5150, with regard to

13  harassment and responsibility as an

14  employee to maintain an educational

15  environment free from all forms of

16  unlawful harassment, were shared with

17  you.  It says this is during the April

18  meeting.

19       A.    Yes.

20       Q.    Do you recall whether Ms.

21  Andrew had ever seen that document, the

22  school board Policy 5150?

23       A.    During this -- course of the

24  meeting or prior to the meeting?

1    Q.    Prior to that meeting.

2    A.    Again, all of our policies

3 are on the website, and policies are

4 referenced at faculty meetings at the

5 beginning of the year, and responsibility

6 resides with the staff members to be

7 aware of the policies.  So, I provide

8 them with a copy of the policy at a point

9 which they have violated it.  I would

10 have to assume that she was aware of the

11 policy, based on the ways in which we

12 make it public and accessible to all

13 employees and are made known at the point

14 of their onboarding into the district as

15 well.

16    Q.    So at the point that they're

17 hired into the district, they're told

18 to -- are they told to review the

19 policies online?

20    A.    They are.  And some policies

21 are reviewed with them in the context of

22 the onboarding, as they are appropriate.

23    Q.    Do you know whether this

24 policy 5150 is reviewed with teachers as

1 they're onboarded into the district?

2      A.    I believe there's a

3 reference to the harassment policy as

4 well as the discrimination policy, and

5 it's brought up on the screen, and

6 they're shown where it is and how to

7 access it.

8      Q.    Would it surprise you that

9 Holly Andrew testified that prior to this

10 meeting she had not seen the Policy 5150,

11 regarding harassment, prior to that

12 meeting?

13      A.    I, I can't speak to that.  I

14 mean, I -- you know, Holly was onboarded.

15 It depends on the period when Holly was

16 onboarded and the person responsibile for

17 her hire at that point in time as well

18 as, again, as I said, building principals

19 reviewing policy with staff.

20      Q.    How often were building

21 principals supposed to be reviewing these

22 policies with the staff?

23      A.    They would typically make

24 reference to all of the policies and the

¹ accessibility to them during the opening

² day faculty meetings.  Specific focus was

³ made to policies that may have been

⁴ adjusted, changed or added over the

⁵ course of the summer.  All policies, when

⁶ those occur, are also presented at school

⁷ board meetings in a first read session

⁸ and then ultimately a second read and

⁹ adoption within, you know, a 30-day

¹⁰ period of time.  Those meetings are all

¹¹ broadcasted and accessible to the public

¹² as well as our staff members.  So, you

¹³ know, in this world of technology and

¹⁴ multimedia, staff members are provided

¹⁵ access to the information within the

¹⁶ district.

¹⁷         Q.    Was there any specific

¹⁸ instruction to the principals at the

¹⁹ elementary school level to make sure that

²⁰ their staff was familiar with this

²¹ specific policy, 5150, the policy for

²² harassment?

²³         A.    Again, I would indicate that

²⁴ that would have happened at the point in

1  which the changes were made to the

2  policies, and I can only speak to when I

3  was meeting with the principals as the

4  director of elementary, that was a

5  standard item on our August principal's

6  meeting, to review policies, changes,

7  adjustments, things that needed to be

8  made aware at faculty meetings.  And so,

9  if this policy had undergone changes,

10  which I'm fairly certain it did when we

11  created that three-prong, that would have

12  been there and that would have been

13  discussed with faculty at the time.

14      Q.    And you would have expected

15  that to have gone from the principals

16  down to the teachers at the elementary

17  school?

18      A.    That's correct, yes.

19      Q.    Okay.  How long is

20  documentation like this kept in an

21  employee's file?

22      A.    For as long as the employee

23  is maintained in the district and then

24  it's archived, you know, in our archives

1 at human resources.  So, unless there is

2 a directive from a hearing or a mediation

3 that the records be expunged, it would be

4 maintained in the record.

5 Q.    Okay.  And when you say

6 the -- you -- kept in the record, is it

7 just in the HR end of things in terms of

8 the employee's file, or would it also

9 have been -- because since there's such a

10 summary of what had happened, would it be

11 kept in a capacity involving student

12 files as well?

13 A.    No.  It would not be in

14 student files.

15 Q.    Would it be in any other

16 file other than at HR with the

17 employee-type folder?

18 A.    Well, if you scroll down,

19 you'll see members of the team that also

20 received copies.  So they might have

21 maintained a copy for themselves, as

22 being a part of this situation.

23 Q.    Was there something -- and

24 this is if you know -- that, for

1  instance, Bill Bowen or Dr. Santoro,

2  where, you know, you're saying if they

3  wanted to, they could keep it.  Was there

4  any policy or procedure or practice in

5  place to keep these documents in any

6  other space at these levels?

7       A.    No.  Not to my knowledge.

8       Q.    How was this letter

9  communicated to these four individuals in

10  the CC on Page 1006?

11       A.    It would have been by a

12  personal e-mail attachment.

13       Q.    Okay.  Through the district

14  e-mails?

15       A.    Yes.  I would believe so.

16  Based on the signature line as having

17  come from the HR specialist's at the

18  time, the initials next to my signature.

19       Q.    Okay.  But on Page 994, and

20  this is on June 9th, 2015, these are your

21  notes again, can you just take me through

22  what you're documenting here, could you

23  just explain what you wrote.

24       A.    Yes.

1              So, this was the meeting
2   held with Dr. Dietrich at the request of
3   our grievance process.  So, it looks as
4   though Mr. Malachowski began the meeting.
5   Alan indicated that he was thanking us
6   for the time to meet, filed the grievance
7   at the advice of PSCA.  He -- Holly
8   understands better judgments and
9   decisions to be made, and they want to
10  make sure that the punishment fits the
11  crime across the state concerns.  So I
12  guess, you know, in comparing situations
13  that PSCA advised that they filed a
14  grievance, is what I can recollect and
15  recall at this point.
16         Q.    That the punishment for
17  Holly fit what she actually did?
18         A.    Yes.
19         Q.    And whether that would be
20  appropriate across the state, is that,
21  like, the state of Pennsylvania?
22         A.    I would venture to say
23  that's what he was indicating.
24         Q.    Okay.  And go ahead.

¹      A.      So, Holly indicated that
²  back in November, she believed it to be
³  mutual, because both hands were under the
⁴  table when caught.  She thought they were
⁵  good friends.  Parenthetically, I
⁶  indicated that was never mentioned in any
⁷  of the investigations.  I do type better
⁸  than I write.  Caught it and, something,
⁹  into the hallway.  She, you know, took
¹⁰ them into the hallway and talked to them.
¹¹ She wrote it immediately, and she had a
¹² lapse in judgment by not sending it to
¹³ the principal.
¹⁴      Q.      Okay.
¹⁵      A.      She does not feel that what
¹⁶ she witnessed was sexual harassment or
¹⁷ assault.
¹⁸      Q.      And then, what's next?
¹⁹      A.      Curt asked her if she had
²⁰ other thoughts.  Holly referenced the
²¹ other issue in special education, brought
²² up by Francis Gardner.  She has e-mails
²³ and etc., everything with Bill Bowen, as
²⁴ the principal, the lawyer, the letters,

1 previous e-mails by North Penn. Building

2 for a few years. She didn't cause the

3 issue.

4      Q. I just, I just want to stop

5 you there, just to go back.

6      When you say everything with

7 Bill Bowen, principal, do you know what

8 you were referring to there, what was

9 being discussed?

10      A. I think that the e-mails

11 back and forth regarding the case that

12 came from Bill Bowen and the lawyers,

13 Francis Gardner, she had all of that in

14 support of what she believed she should

15 be doing at the time.

16      Q. Okay.

17      A. She doesn't believe that she

18 caused the issue at hand. Something

19 about copies of parental concerns and,

20 and the parent's lawyer. I can't tell

21 you the context of that at this point.

22 Again, in this meeting, Dr. Dietrich

23 primarily, as the next level up as

24 grievance, was facilitating the meeting.

1  I typically would take notes during the
2  course of that meeting, and that's what I
3  was doing.
4            At this point, I clarified
5  the suspension with issue and question,
6  in terms of -- so, Holly's bringing in
7  the special education issue, into a
8  grievance, meaning that was specific to
9  another issue, and the letter for
10 suspension was specific to her dealings
11 of the students and things.  So I just
12 clarified that that was the reason for,
13 you know, the suspension.  Curt focused
14 on the touching issue, said, you know, it
15 was -- framed it well.  Is, is a two-day
16 suspension appropriate to conduct?  So he
17 was coming back to the essence of the
18 grievance.  Does the two days meet the
19 crime, in their words, you know, in
20 Alan's words at the beginning.  So he was
21 saying is two-day suspension appropriate
22 to conduct.  Well, I promise you I'll
23 think about it, but I need to tell you or
24 I'd be remiss to tell you that, really,

1   it's times three.  So I believe that

2   meant the number -- the students that

3   were involved, it was an egregious act.

4   Or, times three, in my opinion, it was

5   that egregious, something along those

6   lines, just indicating that it did

7   require a level of suspension.

8       Q.     And just to clarify, was it

9   Holly's response to that was really

10  egregious or the conduct by ████ was

11  really, really, really egregious act?

12      A.     Honestly, I think we were

13  referencing both, that Holly was

14  attempting to minimize the act of the

15  students.  We indicated, if you will

16  recall too, what Betty had indicated, in

17  terms of challenging the language of

18  inappropriate behavior as versus sexual

19  harassment.  So that was, in our minds,

20  Holly in a lapse of judgment and

21  downplaying what was witnesses.  It was

22  an egregious act.  You don't, you don't

23  sexual harass and touch another student

24  underneath a shirt, and, and what was

1  witnessed and what was portrayed to have

2  been witnessed.  So that was an egregious

3  act, followed up with the second

4  egregious act, in her lapse of judgement

5  in not reporting it and not getting --

6  not opening up the avenues for a more

7  detailed investigation and appropriate

8  action steps for both the victim and the

9  perpetrator, for both, you know, █████

10  and ██████ and the other girls who were

11  involved at that point.  So, we were

12  looking at it twofold.

13        Q.    Okay.

14        A.    Curt then continued with

15  Alan's comments regarding public and, and

16  what's in the news today for us as an

17  educational institution.  We needed -- we

18  need to have the speed of a response,

19  that we shouldn't be dragging our heels

20  in terms of reacting and responding to

21  the egregious nature of the behavior, and

22  it did warrant, you know, our course of

23  action.  Curt then --

24        Q.    Before you get there, can I

1  just ask a quick follow-up question?

2       A.    Mm-hmm, sure.

3       Q.    When it says "regarding

4  public and in news today", what is that

5  referencing?

6       A.    I believe it was just

7  referencing, you know, situations that

8  you hear of similar to that which

9  occurred in North Penn, that there is

10  harassment going on within the nation and

11  what we're hearing in the news today, and

12  as a public institution, we can't condone

13  it nor can we not react and respond

14  appropriately to stop it.  And that's

15  what would warrant the disciplinary

16  action we took.

17       Q.    Okay.

18       A.    And then, Curt also, then,

19  tried to talk with her and share that

20  there was, you know, a concern for her

21  that she took this on herself when she

22  didn't need to, that she subjected -- as

23  a result of that, as a result of not

24  forwarding the information to the

1  appropriate level within the district,

2  she subjected the kids to more, and

3  nobody should have been made to endure

4  that.  So again, what I had indicated in

5  the initial meetings to Holly and Ruth,

6  that had they taken appropriate action in

7  November, we could -- supports could have

8  been put in place for ████ as well as

9  ████ and disciplinary action could

10  have been taken at that time, wouldn't

11  have progressed to a second incident

12  within the same school year for ████

13  and that no one should need to endure

14  that.  She shouldn't have taken it on

15  herself.  That was huge.  That was a huge

16  miscalculation and lacked, lacked

17  judgment on her part.

18       Q.    Okay.

19       A.    The good thing is that it's

20  really -- it was the first time that she

21  had been called in for that kind of

22  offense.  So she, you know, hadn't had

23  other judgment lapses of that nature

24  before.  If it had been, if it hadn't --

1  if it had been a second time or more, it
2  wouldn't be two days, is what he was
3  essentially telling her, that, you know,
4  there was some consideration for, you
5  know, her as an employee prior to this
6  particular lapse of judgement in this,
7  this incident.
8         And we can see Alan's
9  initials are next.  He spoke about the
10 PSCA legal and make a case to push back,
11 you know, going back and forth, that they
12 could perceive it, instead of sexual
13 harassment, as mutual hanky-panky or
14 fooling around on the part of the
15 students.  20 years ago, that would have
16 been okay.  Now, there's a question as to
17 what we're labeling it and the severity
18 with which we're interpreting it, and
19 he's questioning that.  He further
20 cemented that thought to say that, these
21 are two friends being too amorous when
22 the lights went out.  That's not how we
23 interpreted it nor how it should have
24 been interpreted.

1      Curt indicated, speaking

2  directly to Holly, that, you know, you

3  trying to take this upon yourself and

4  make a decision, you really needed to get

5  others involved, this was significant,

6  and this was not at a level that would

7  have been expected to be dealt with by a

8  teacher.  This isn't a student talking in

9  class while you're trying to teach.  This

10  isn't -- you know, this is more

11  significant and egregious.

12      Holly indicated, at that

13  point, that she talked to her grade

14  partner.  Curt indicated that he

15  clarified with information from the

16  meeting that he would -- that she was

17  never specific regarding the information

18  that she shared with her grade partner,

19  that both Ruth and Holly had indicated

20  they weren't sure.  Ruth indicated she

21  didn't know the detail to which Holly was

22  dealing.  Holly indicated, in her meeting

23  with me, that she wasn't sure, couldn't

24  remember how much she had told Ruth.  So

 1  by her own acknowledgment, we were able
 2  to clarify that talking to your grade
 3  partner is not an appropriate response
 4  for us at this point.  Holly indicated
 5  that it snowballed.  The police were
 6  involved.  More students were involved.
 7  You know, she never anticipated that,
 8  never thought about that.
 9           Curt then responded, that's
10  exactly why we need to deal with it
11  appropriately in the beginning, from the
12  get-go.  The other thing that was bad was
13  her talking to the kids together.  The
14  victim is not comfortable.  You know,
15  they're going to zip it, they're not
16  going to say anything in front of the
17  perpetrator for fear of further
18  retaliation or further issue; they won't
19  talk.  He said, that's really huge, and
20  that's a bad idea and shouldn't have
21  happened.
22           Holly then reaffirmed her
23  belief that she thought it was mutual
24  because they were friends.  Curt said

that -- said she asked for it and seeked

it out, hands up shirt.  That's not okay,

and she didn't.  That's not the

interpretation you want to be giving.  At

this point, he was, you know, that's just

great, want to do that to me, you know,

in this classroom right now, that's -- in

this conference room now, that's not

acceptable.  Boy's hands up her blouse

and attempting to touch her, not

warranted, not wanted.  There's no way

that you're going to spin this as being

mutual and welcomed, was Curt's message

in that.

Alan attempted to jump in,

saying that he appreciated the time in

making your position clear, that was done

in the letter, and sit down with PSCA.

Holly indicated that she had a very --

you know, she was referencing her track

record with North Penn.  Her prior

performance as a teacher was really good.

She's had really good evaluations.  She's

a mother of three.  She would never do

1  anything to harm students.

2            Curt said, you know, all

3  said, it helped it to be two days.  You

4  know, some of the things that she just

5  said, she was a staff member in good

6  standing.  She didn't mean for it to

7  happen that way, lapse of judgment.  It

8  stands at two days.  And he was thankful

9  and appreciative with her demeanor within

10  the meeting and her cooperation.

11            Alan voiced that he was

12  concerned for -- with the form that Bill

13  Bowen was using; so B.B. is Bill Bowen.

14  Reiterated, again, that this was for

15  teacher use in their personnel file.  So,

16  the association was trying to warrant

17  that the form that was completed was

18  never expected to have gone to the

19  office, but yet it was entitled a office

20  referral form, I believe.  So they were

21  trying to mitigate that.  And the

22  perception that Bill doesn't wasn't to be

23  bothered with things is, is what Alan

24  referenced at that point in time.

1          Q.     Okay.

2          A.     And I believe the meeting

3    was concluding at that point.

4          Q.     Just to clarify, this form,

5    that office referral form, that's what

6    Holly had written up for ████ and

7    showed it to Ruth and then Ruth put away,

8    like, filed somewhere, is that what

9    you're referring to?

10         A.     Yes.  I believe Ruth was the

11   team leader and was the regular education

12   for the students, whereas Holly was the

13   special education teacher, and she

14   wasn't -- she wouldn't house the form.

15   It would be kept with Ruth, you know, as

16   the home room teacher.

17         Q.     And were you and Curt

18   Dietrich, in the meeting, kind of

19   saying -- just so I understand what

20   you're telling me about this meeting --

21   that the form actually says 'office

22   referral form', so it should be referred

23   to the office because that's what it's

24   titled.  Was that kind of the response

1  you were giving?

2       A.    Yes.  Yes.  And they were

3  mitigating it by indicating that, you

4  know, the form wasn't used in the way

5  that it was stated and intending to be

6  used.

7       Q.    Meaning that, at that

8  school, they didn't send those forms

9  the office referral, like, to the office?

10      A.    I would venture to say

11 that's what was meant.

12      Q.    Okay.  Next page, this

13 letter here, it's 997, this is Curt

14 Dietrich's response to Holly Andrew's

15 grievance; is that right?

16      A.    Yes.  That would happen

17 following the meeting.

18      Q.    Okay.  And this -- you're

19 CC'ed on this?

20      A.    Yes.

21      Q.    Is this something typically

22 you'd be CC'ed on in this circumstances,

23 when a --

24      A.    It is, yes.  Again, as you

1  indicated previously, the grievances are

2  funneled through the director of HR more

3  so as a result of my -- remember, from my

4  job description or my, my resume --

5  enforcement of the collective bargaining

6  agreements and the grievance processes

7  housed within the collective bargaining

8  agreements and housed within HR.  So this

9  would have been added to the grievance

10  folder that we would have kept

11  surrounding this issue.

12       Q.   Okay.  In Holly's -- Holly

13  Andrew's file?

14       A.   Both in Holly Andrew's file,

15  and then we also maintain, in the

16  district, a grievance file that is issue

17  specific so that if another issue were to

18  come up, this consistency wagered against

19  and across what happened in terms of

20  grievance responses --

21       Q.   Do you --

22       A.   -- in situations.

23       Q.   Sorry.

24            Do you recall writing any of

1  this letter, or was this something that

2  Dr. Dietrich had written?

3      A.   Dr. Dietrich would have

4  written it.

5      Q.   Okay.

6      A.   He may have asked for my

7  notes from the meeting, I would have

8  shared my notes with him, but I would not

9  have been the author of the letter.

10      Q.   I can represent to you, from

11  the notes, Holly Andrew, based on that

12  grievance that she filed, her two-day

13  suspension was reduced to a one-day

14  suspension, and she got paid back for

15  that second day.  Do you recall that?

16      A.   Yes.

17      Q.   And that she was also placed

18  on a performance improvement plan, but

19  then that was removed from her file.  Do

20  you recall that part?

21      A.   Yes.

22      Q.   If it's being removed from

23  her file, how is -- is that documented

24  anywhere, then, that she was given a

1 performance improvement plan related to

2 this incident?

3      A.    It would have, it would have

4 been documented, as you saw back in the

5 notes that I reference to her, in terms

6 of providing her with a less than

7 satisfactory rating within domain two of

8 her evaluation.  As a matter of practice,

9 any staff member who receives an

10 unsatisfactory rating would then be put

11 on a performance improvement plan.  So

12 that would have been the only document --

13 the only documentation to that as well as

14 the -- I believe the settlement or the

15 mediation, the hearing results that would

16 have directed us to remove the

17 performance improvement plan.  So that

18 would have been included in her folder as

19 evidence that that would have been a

20 course of action taken by the, the

21 administration within the school

22 district.

23      Q.    And then it was removed?

24      A.    Yes.

 1        Q.    Okay.  I just want to show
 2   you another -- oops -- another document.
 3   I'm, I'm almost done.  I think, within
 4   the next half hour, I should be done.
 5   I'm trying to go as quickly as possible
 6   to finish up here.
 7        A.    Okay.  Thank you.
 8        Q.    Yeah.
 9              Sorry, my Zoom is acting up.
10              Okay.  Are you able to see
11   my screen?
12        A.    Yes.
13        Q.    Have you ever seen this
14   document before?
15        A.    No.
16        Q.    For the record, this is
17   ██████  ███████  disciplinary file that was
18   provided by the North Penn School
19   District as document production in this
20   case, and it's the three incidents that
21   are listed, and it's Page 4 of 4 of one
22   of the sets of documents that was
23   provided to plaintiffs in this case.
24        A.    Mm-hmm.

1    Q.    The incident the third one

2  listed, at Gwynedd Square Elementary,

3  listed as obscene language and gesture, I

4  can represent to you, at the deposition

5  of Bill Bowen, he said this is what he

6  documented as the incidents that had

7  occurred in sixth grade with ███████  ███████

8  that we've spent the last hour or so

9  going over.

10              Is this appropriately -- or,

11  accurately documented in ███████  file as

12  to what happened?

13       A.    I can't speak to that.

14              MS. JORDAN:  Note my

15    objection to the form of the question.

16              You can answer.

17              THE WITNESS:  I don't know.

18    I'm not responsible for student's

19    discipline file folder in my role as

20    director of human resources.

21  BY MS. LAUGHLIN:

22       Q.    Well, I think, even by your

23  categorization of what had happened to at

24  least ███████ and the other girl that had

1    come forward in sixth grade, that you had

2    classified it as sexual harassment; is

3    that right?

4            MS. JORDAN:  Note my

5        objection to the form of the question.

6            You can answer.

7            THE WITNESS:  That was how

8        the administration did view it, yes.

9    BY MS. LAUGHLIN:

10       Q.    Okay.  Would you agree with

11   me that the administration did not view

12   what happened as an obscene language or

13   gesture by a student?

14       A.    I indicated that we deemed

15   it to be sexual harassment.

16       Q.    Okay.  Are you familiar with

17   what an obscene language or gesture is in

18   terms of student conduct at the district?

19       A.    I think it takes many

20   different examples.  I mean, it can be

21   demonstrated in a variety of different

22   ways.  There isn't one clear cut area of

23   it, but.

24       Q.    Are you aware that ██████

1 according to this, got one day of

2 in-school suspension?

3          A.     I don't, I don't know.

4 Again, I -- you know, that would have

5 been dealt with through the director of

6 elementary and the principal, with the

7 parents as appropriate.  So the two

8 situations were happening parallel.  I'm

9 dealing with the, the staff member and

10 that discipline, they're dealing with the

11 students.

12          Q.     Okay.  Would you agree with

13 me that the incidents that we just went

14 over in sixth grade with ███████ that it

15 wasn't just limited to an incident on

16 April 9th, 2015, would you agree with

17 that?

18          A.     I would, yes.

19          Q.     From your understanding,

20 would the incidents be each of the dates

21 that ██████ touched each of the students?

22          A.     I think what was, what was

23 entered in here and what was reacted to

24 by the administration was the date in

1  April that we knew of it occurring.  To

2  go back and retroactively discipline a

3  student for that which occurred in

4  November but was never reported to us

5  would be very questionable for a student

6  because there wasn't an investigation

7  into those occurrences done.  So I

8  believe what was happening is this was

9  being captured on the incident date that

10  we knew had been reported and had been

11  dealt with for the student at that time.

12       Q.    I guess, just to clarify or

13  make sure I'm understanding, because

14  there was an incident -- I think Paige

15  was the girl's name that had reported in

16  April, but then there were several other

17  students who had reported being

18  inappropriately sexually touched by

19  ████     as well.  Are you referring that

20  this incident would refer to Paige, is

21  that how you're interpreting it?

22       A.    I --

23       MS. JORDAN:  Note my

24  objection to the form of the question.

1          You can answer.

2          THE WITNESS:  I don't know.

3     And again, a one-page summary does not

4     demonstrate or share with us the

5     details of the incident.  So, you

6     know, it only allows one date in the

7     date range for each occurrence.  I

8     don't know if, when you click on that

9     in the live version, it takes you into

10    more detailed notes and information

11    surrounding the event and the issue

12    and the incident.  I don't know.  I've

13    not seen this report, I'm not familiar

14    with it, I don't know the software

15    that the high school is using to, to

16    develop this type of report.  It was

17    not something that I had ever accessed

18    or used.

19 BY MS. LAUGHLIN:

20    Q.   I'll just show you, very

21 briefly, the record that was produced to

22 me for ██████ entire file.  It's the

23 student transcript and then more grades,

24 third page of grades -- oops, sorry --

1  and then the fourth page we just went

2  over with the discipline, and then the

3  second was -- it's a one-page document,

4  which describes the sexual harassment of

5  the two students at the middle school.

6  Based on everything we've

7  talked about so far about ███████

8  involvement in all of the incidents in --

9  at Gwynedd Square and this incident here

10  that's noted at middle school, would you

11  expect, as the director -- or, sorry --

12  the, the HR director/Title IX

13  coordinator, for there to be more

14  documentation of these incidents in

15  ███████ file?

16  MS. JORDAN:  Note my

17  objection to the form of the question.

18  You can answer.

19  THE WITNESS:  I, I do not

20  think that this is a comprehensive

21  review.  I -- the elementary schools

22  were not on an electronically-based

23  discipline reporting system.  So

24  again, I'm going to reference the file

1 system that we used and the actual

2 notes that, that you have surrounding

3 the situation with ████ and with

4 ████ that that would have been the

5 rendering.  There's no way to capture

6 in this situation -- in this summary,

7 when the elementary at the time, back

8 in 2015 when this was occurring, did

9 not have access to an electronic

10 discipline history.  So, I would

11 venture to say that this is a

12 rendering and a capturing of the

13 details related to the incidences at

14 Gwynedd Square within the paper copy

15 of that folder.

16 BY MS. LAUGHLIN:

17     Q.    When the district had

18 switched over to electronic versions and

19 was no longer doing things in paper

20 folders and things like that, do you know

21 what the process was, if any, to make

22 sure that the paper files were converted

23 into electronic versions?

24     A.    I don't.  And I don't even,

1  I don't even know that the elementary are
2  on an electronic version at this point.
3  It can be, you know, a disparity in the
4  way that things are happening across the
5  district.  So the, you know, middle and
6  high schools can have, you know, this
7  electronic entry of reporting and things
8  of that nature.  You saw the form that
9  the elementarys created.  So it was, was
10 not, obviously, in place for the
11 elementary at the time.  I can't speak to
12 what they might be doing now or if and
13 how a transition would have occurred to
14 capture that information.  But obviously
15 you know the information was captured
16 because you have been entering them as,
17 as components of our discussion today.
18 So documentation was maintained for this
19 particular incident.
20     Q.   Well the documentation that
21 we had just gone over.
22     A.   Yes.
23     Q.   Is there other documentation
24 that should have been captured?  Because

the ones that I showed you is the only
documentation that I'm aware of.  Do you
know whether there should be additional
documentation that you're referring to
that should be in this file?

        A.      I don't.  If I was involved,
that's the documentation that's, that's
had.  My point in referencing it was that
we had captured what happened on April
9th, even though it was not in this
electronic version, which only allows
certain points to be referenced in a
summary format.  But there are supporting
documents in a paper way to speak to the
level of detail that -- on the occurrence
of what happened in April.

        Q.      But you're not -- to be
clear, you're not sure where those
documents are housed?  Like, all the
documents that we've been going over, you
don't know exactly where those documents
are, are kept for this particular
incidents?

                MS. JORDAN:  Note my

1     objection to the form of the question.

2              You can answer.

3              THE WITNESS:  At the

4     elementary level, they would have been

5     maintained in the student's discipline

6     folder, as it relates to the student.

7     The documents that we have been

8     dealing with, in terms of discipline

9     for the staff member, were maintained

10    through my office, as the director of

11    human resources, both electronically

12    and in a handwritten format in the

13    folder.

14    BY MS. LAUGHLIN:

15        Q.    So I understand that they're

16    separate, the employee versus the

17    students, but I'm going to ask you about

18    the students to clarify and make sure I'm

19    understanding what you're saying.

20              The documentation of what we

21    had gone over, this statement of Betty

22    Santoro, the summary that Bill Bowen

23    created, your handwritten notes of the

24    grievance procedures and stuff with Holly

1  Andrew, do you -- I mean, when I got the

2  file of ████ ████ none of that was in

3  it.  And so, in your experience as the

4  director of Title IX, should those

5  documents have been in the student's

6  file, since it involved Title IX issues?

7       A.    I don't believe that the

8  investigation of a staff member's

9  performance as it relates to the issue

10 should be in a student's folder.  The

11 student discipline with regard to the

12 suspension and student statements and an

13 investigation at the building level that

14 constituted the suspension should be in a

15 student's discipline folder.

16      Q.    Okay.  Are there any

17 conversation with Dr. Dietrich that you

18 can recall that we didn't already talk

19 about involving ████ or ████ or, you

20 know, ████ generally in the school

21 system?

22      A.    No.  Not that I can recall.

23      Q.    What about any conversations

24 with Dr. Bauer, do you remember any

1 conversations we haven't talked about?

2             Sorry, did you answer?

3       A.    No.  I was pausing to think.

4       Q.    Oh, okay.  Sorry.

5       A.    I don't believe so.  Dr.

6 Bauer would not have been involved in the

7 Gwynedd Square situation, so no.

8       Q.    Because he was the principal

9 at North Penn High School at the time?

10       A.    Yes.

11       Q.    Did you ever talk with

12 ████████ ██████████████ about any of this?

13       A.    No.  I don't believe I had

14 interactions with the students.

15       Q.    Did you ever talk to Mrs.

16 ████████████████ ██████████████ mom, or her father

17 or any other family member of ██████████

18 about this?

19       A.    I don't believe so.  I

20 believe Dr. Santoro was the liaison and

21 the conduit to that.

22       Q.    Do you recall, did you ever

23 have any conversations with ██████████ or

24 ██████████████ parents?

1      A.      Nope.

2      Q.      Was there any -- after the

3  incidents in 2015, were there any changes

4  to any policies or procedures at the

5  district, related to this?

6      A.      I don't recall.

7      Q.      Do you recall whether there

8  was any additional training that was

9  implemented as a result of what had

10  happened at Gwynedd Square and ███████

11      A.      I don't recall.

12      Q.      Was there any -- you talk

13  about you're responsible for the review

14  of district employees and staff -- was

15  there any review of how Dr. -- or,

16  Mr. Bowen had handled the situation at

17  Gwynedd Square?

18      A.      That would have been done by

19  his director supervisor, if it occurred.

20  So that would have been done by Dr.

21  Santoro.  Typically, there is a review

22  of, you know, our practices and what

23  we've done following an incident.  So, I

24  would anticipate that having happened,

1 but I can't, I can't, you know, attest to

2 that.

3      Q.    Would that have been

4 documented in some way, if that did

5 occur?

6      A.    I don't know.

7      Q.    As director of HR, is that

8 something that would be under your

9 responsibility, to document somewhere if

10 things had been reviewed after an

11 incident like this had occurred?

12      A.    If there was a question or a

13 concern with the way in which it had been

14 handled and if there was discipline that

15 would need to have occurred with the

16 individual handling the situation, then I

17 would be made aware of it.  But if not,

18 then it might have been, you know, a

19 question -- or, a conversation, rather,

20 between the supervisor and the

21 administrator.

22      Q.    So you don't know whether

23 that had occurred, either way, in this

24 case --

1      A.     I --

2      Q.     -- with Bill Bowen and Dr.

3  Santoro?

4      A.     I do not.

5      Q.     Just give me one second, I

6  want to review my notes.

7          The job description for the

8  role of director of HR, is that somewhere

9  online, or do you know where that's kept?

10     A.     I believe that the current

11 administration within the human resources

12 department would have that available.  I

13 don't know if the position descriptions

14 are online or not.

15     Q.     Okay.

16          MS. LAUGHLIN:  All right.

17   Those are all the questions I have for

18   you, Dr. McCue.

19          THE WITNESS:  Thank you.

20          MS. JORDAN:  I will take a

21   copy; e-mailed, hard, full-size.

22          (Whereupon, the deposition

23   concluded at 5:16 p.m.)

24          (Whereupon, deposition

1    Exhibit-A was marked for

2    identification.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the

6   witness was duly sworn by me and that the

7   deposition is a true record of the

8   testimony given by the witness.

9

10

11

    BEN PIECZYNSKI, JR., a
12  Professional
    Reporter and Notary Public
13  Dated:  September 24th, 2021

14

15

16

17

18

19          (The foregoing certification

20  of this transcript does not apply to any

21  reproduction of the same by any means,

22  unless under the direct control and/or

23  supervision of the certifying reporter.)

24

# LAWYER'S NOTES

PAGE    LINE

1

2

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____

# EXHIBIT "H"

1     IN THE UNITED STATES DISTRICT COURT
2 FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3               -   -   -
4

JANE DOE,                :
5        Plaintiff,        :
                         :   CIVIL ACTION
6       v.               :   NO. 2:20-CV-
                         :   05142
7 NORTH PENN SCHOOL      :
   DISTRICT,            :
8        Defendant.        :
9               -   -   -
10           August 11, 2021
11              -   -   -
12
13           Remote oral deposition of
   CURTIS DIETRICH, taken pursuant to
14 notice, was conducted at the location of
   the witness, beginning at 10:03 a.m., on
15 the above date, before Ben Pieczynski,
   Jr., a Professional Reporter and Notary
16 Public for the Commonwealth of
   Pennsylvania.
17
18
19
20

              -   -   -
21
22      GOLKOW LITIGATION SERVICES
     877.370.3377 ph| 917.951.5672
23        deps@golkow.com
24

```
 1    APPEARANCES:
 2
 3        FREIWALD LAW
          BY:  LAURA E. LAUGHLIN, ESQUIRE
 4        1500 Walnut Street
          Suite 1801
 5        Philadelphia, Pennsylvania 19102
          (215) 875-8000
 6        lel@freiwaldlaw.com
          Representing the Plaintiff
 7        (Via Zoom web conference)
 8
          HENDRZAK & LLOYD
 9        BY:  MAUREEN A. JORDAN, ESQUIRE
          3701 Corporate Center Parkway
10        Suite 100
          Center Valley, Pennsylvania 18034
11        (610) 709-8705
          maureen.jordan@zurichna.com
12        Representing the Defendant
          (Via Zoom web conference)
13
14        WISLER PEARLSTINE, LLP
          BY:  KYLE J. SOMERS, ESQUIRE
15        460 Norristown Road
          Suite 110
16        Blue Bell, Pennsylvania 19422
          (610) 825-8400
17        ksomers@wispearl.com
          Representing the Defendant
18        (Via Zoom web conference)
19
20
21                 -   -   -
22
23
24
```

```
 1                    -   -   -

 2                 I-N-D-E-X

 3                    -   -   -

 4    Testimony of:  CURTIS DIETRICH

 5         By Ms. Laughlin            5

 6

 7

 8

 9

10                    -   -   -

11              E-X-H-I-B-I-T-S

12                    -   -   -

13    NO.              DESCRIPTION          PAGE

14                (None marked.)

15                    -   -   -

16

17

18

19

20

21

22

23

24
```

```
1                    -   -   -

2          DEPOSITION SUPPORT INDEX

3                    -   -   -

4

5   DIRECTIONS NOT TO ANSWER:

6   PAGES:  None

7

8   REQUESTS FOR DOCUMENTS OR INFORMATION:

9   PAGES:  49, Line 16; 114, Line 15

10

11  STIPULATIONS AND/OR STATEMENTS:

12  PAGES:  5

13

14  MARKED QUESTIONS:

15  PAGES:  None

16

17

18

19

20

21

22

23

24
```

1                    -   -   -

2              CURTIS DIETRICH, after

3           having been duly sworn, was

4           examined and testified as follows:

5                    -   -   -

6                 EXAMINATION

7                    -   -   -

8    BY MS. LAUGHLIN:

9         Q.    Good morning, Dr. Dietrich.

10        A.    Yeah.  I'm going to have to

11   have introductions.  I don't know who

12   Room 44 is, and, Laura, you look familiar

13   to me, but I'm struggling to know why I

14   think you might look familiar, so.

15        Q.    I think I have one of those

16   faces.  I don't think we've ever met

17   before.

18             But it's nice to meet --

19   I'll do the introductions.  My name's

20   Laura Laughlin.  I represent Jane Doe in

21   this case against the school district.

22   Again, I don't think we've met before,

23   but maybe you'll surprise me, and I'll --

24   you can let me know if I'm wrong.  The

1  Golkow Remote Room 44, that's our court
2  reporter, and he's the one that's taking
3  the transcription.
4            Have you ever been in a
5  deposition before today?
6       A.    I have.
7       Q.    Okay.  So, how long ago was
8  that deposition you were in?
9       A.    How long ago, probably five,
10 six years ago.
11      Q.    Okay.  And was it only one
12 prior deposition that you gave?
13      A.    That sounds right, but I'm
14 not positive, Laura.
15      Q.    Okay.  So if it was five to
16 six years ago, it was probably a little
17 bit of a different format than it is
18 today.  As you know, the world's changed
19 a bit since the last few years.  And so,
20 normally the court reporter would be in
21 the room with you, and I would be in the
22 room with you, and so that may be why it
23 looks a little confusing on Zoom.  I'm
24 going to give you some instructions,

1   probably most similar to what you had in

2   your last deposition five to six years

3   ago.

4           But since the court reporter

5   is here taking down everything that is

6   said, all of your answers have to be

7   verbal.  So no nods of the heads or uh-uh

8   or uh-huh, okay?

9       A.    Got it.

10      Q.    And you can just leave

11  yourself off of mute.  I think we have

12  Ms. Jordan and Mr. Somers muting

13  themselves so we don't get that -- the

14  feedback.  But since, I think you'll be

15  doing a lot of talking today, it's

16  probably easier to stay off --

17      A.    Sounds like a plan.

18      Q.    Okay.  Since we have the

19  court reporter taking down everything

20  that's said, you'll probably be able to

21  anticipate where some of my questions are

22  going, but I would just ask that you wait

23  for me to finish my question, and I'll

24  try and wait for you to finish your

1  answer, so we have a clear transcript,

2  okay?

3       A.    Okay.

4       Q.    If I start asking my next

5  question and you weren't done your

6  answer, just let me know so that I can

7  let you finish before I start my next

8  question, all right?  Okay?

9       A.    That's fine.

10       Q.    Okay.  If you have any

11  questions about any of my questions that

12  I ask you today, if you don't understand,

13  or it comes out a little jumbled, just

14  let me know, and I'll try and rephrase

15  it.

16       A.    I'll do that.

17       Q.    If you don't ask me to

18  rephrase and answer the question, we're

19  all going to assume that you understood

20  because I gave you that instruction, all

21  right?

22       A.    Understood.

23       Q.    Since we're on Zoom, there

24  may be times where things may cut out or,

1 you know, you freeze or something like

2 that.  So, if you don't hear a part of my

3 question or you miss something, just let

4 me know, and I'll try and get everything

5 back on track, okay?

6          A.    Okay.

7          Q.    If there is any time today

8 you need a break, just let me know, and

9 we can do so.  The only time I ask that

10 we wait is that if there's a question

11 pending, that you answer the question

12 before we take our break, okay?

13          A.    Understood.

14          Q.    I'm going to be asking you

15 some questions about things that have

16 occurred around, you know, 2014 to the

17 present.  So there may be times that I

18 ask a question that you don't remember

19 the answer.  If that's the truthful

20 answer, it's okay to say you don't

21 remember, okay?

22          A.    Understood.

23          Q.    I don't want you to guess at

24 anything.

1          A.     Understood.

2          Q.     If -- you might not know,

3  like, an exact date or, you know,

4  whatever, that's fine, just let us know

5  that you're estimating.  If it's, like,

6  around this timeframe or something like

7  that, you can give estimations.

8          A.     I'll do that.

9          Q.     My last, my last instruction

10 for you is I'm going to be asking you

11 about conversations you had with

12 different people or what you recall about

13 meetings, things like that.  If there

14 were private conversations with Ms.

15 Jordan or Mr. Somers where they're giving

16 you legal advice, I'm not asking you for

17 those conversations.  Those are off

18 limits, okay?

19         A.     Understood.

20         Q.     All right.  When you gave

21 your deposition, you said five to six

22 years ago, was that as superintendent of

23 the North Penn School District?

24         A.     I've been the superintendent

1 here since 2010, so that would have been.
2 But I have to say, Ms. Laughlin, I don't
3 remember the specifics of the last time I
4 gave a deposition.  So, I'm not positive
5 about it.
6       Q.    You're not sure whether it
7 involved -- the case involved North Penn
8 School District?
9       A.    That's correct.
10      Q.    Do you know whether it was,
11 like, a personal capacity, like a car
12 accident or something like that?
13      A.    No, nothing like that.
14      Q.    Okay.  Was it more involved
15 in your professional capacity?
16      A.    There was a situation in a
17 previous district I had worked where
18 there was a case there, and I needed to
19 return to that district to be helpful.
20 So I think -- that's the one I'm thinking
21 of, so.
22      Q.    And what district was that?
23      A.    Saucon Valley School
24 District.

1      Q.    Were you the superintendent

2 of Saucon Valley?

3      A.    I was not.

4      Q.    What was your role at Saucon

5 Valley?

6      A.    High school principal.

7      Q.    And when did you -- how --

8 from what years did you hold that role?

9      A.    I was the high school

10 principal of Saucon High from 1996 to

11 2006.

12      Q.    And then what did you do

13 from 2006 to 2010, when you became the

14 superintendent of North Penn School

15 District?

16      A.    I was the assistant

17 superintendent of the North Penn School

18 District.

19      Q.    Saucon Valley High School

20 principal, what district is that within?

21      A.    Saucon Valley School

22 District.

23      Q.    Okay.  Can you tell me a bit

24 about your educational background, just

1  kind of summarize from undergrad, where

2  you went to grad school, just kind of lay

3  that out for me.

4         A.    I earned a bachelor of

5  science in dairy science from

6  Pennsylvania State University, or

7  commonly known as Penn State, in 1981.  I

8  earned a master's degree from Lehigh

9  University 1986.  I earned a doctorate in

10  educational administration from Lehigh

11  University in 2001, I believe, was the

12  exact date.

13         Q.    And you said a doctorate in

14  administrative --

15         A.    Educational --

16         Q.    -- what was --

17         A.    Educational administration.

18         Q.    Okay.  You say, an

19  undergrad, you studied dairy science?

20         A.    I did.  I grew up in a dairy

21  farm in Lehigh County, a large operating

22  farm, and it was my full intention to,

23  you know, be a part of that, and I was

24  initially a part of that farm

1 partnership, that business with my father

2 and my brother, but I left that business

3 to pursue education and as a career.

4          Q.    Okay.  Your master's in

5 Lehigh, what was your master's degree

6 focus?

7          A.    Educational administration.

8          Q.    Was the master's at Lehigh

9 in educational administration the first

10 time that your education really focused

11 on education?

12          A.    No.  I had taken some

13 additional coursework at Cedar Creek

14 College, in order to get teacher

15 certification.  I did not earn a teacher

16 certification at Penn State University.

17 Instead, I went to Cedar Crest College to

18 obtain the necessary credits and

19 credentialing to be able to be a biology

20 and chemistry teacher.

21          Q.    And when did you -- do you

22 know the years you did that?

23          A.    That was 1986.  That would

24 have been in 1986.

1          Q.    That's when you went there,
2    or that's when you got your certificate?
3          A.    That's when I got my
4    certificate.  So, I wasn't there long.  I
5    didn't need very many credits.  But I
6    think I answered that the doctorate was
7    '86.  I think -- I'm sorry --
8          Q.    The master's.
9          A.    -- the master's was '86.
10   That master's was probably '88, then.  I
11   think '86 was the Cedar Crest.
12         Q.    Okay.  So you got a
13   certificate from Cedar Crest to be able
14   to teach biology and chemistry; is that
15   right?
16         A.    Well, the way it works is
17   you need to have a sponsor in college or
18   university that has an educational
19   program to be able to recommend a PDE
20   that you should receive a teaching
21   certificate.  So, there was some
22   necessary coursework I needed to complete
23   at Cedar Crest College, for which, then,
24   they were satisfied that I was prepared

1 and ready to be a teacher, and then they
2 signed the application for me to obtain
3 the teacher certification.

4          Q.     Okay.  And then, so --

5          A.     I didn't obtain an actual
6 degree from them.

7          Q.     Okay.  Who -- did you have a
8 teacher certification, then, at some
9 point?

10         A.     Chemistry and biology.

11         Q.     Okay.  Who --

12         A.     Teacher certification.

13         Q.     I apologize, go ahead.

14         A.     Teacher certification in
15 chemistry and biology.

16         Q.     Who is the certification
17 from, though?

18         A.     Pennsylvania Department of
19 Education.

20         Q.     Was there any, like,
21 classroom shadowing or anything like that
22 that was required for that certification?

23         A.     No.  There was no classroom
24 shadowing.

1      Q.    Okay.  Safe to say that you
2  didn't do any, like, classroom shadowing
3  or anything like that to obtain that
4  certification, then; is that right?
5      A.    No.  It wasn't necessary to
6  do classroom shadowing to get that
7  certification, that's correct.
8      Q.    Okay.  In your master's
9  degree in educational administration, was
10  that a two-year program, then?
11      A.    That was 30 credits, if I'm
12  remembering correctly.  So, it was
13  approximately -- I don't remember exactly
14  how many were each year, but I took
15  credits pretty aggressively to be able to
16  complete that master's.
17      Q.    Were you doing that
18  full-time?
19      A.    No.
20      Q.    What, what were you -- were
21  you also dairy farming at the time, or
22  what were your splitting your time
23  between?
24      A.    I was teaching chemistry and

1  biology during that time period.

2        Q.    Where at?

3        A.    Salisbury Township School

4  District.

5        Q.    And so were you a full-time

6  teacher at that point?

7        A.    Initially I was part-time

8  and then, eventually, I was made

9  full-time.

10        Q.    I know you were at Salisbury

11  Township, but did you have a particular

12  school that you were assigned to?

13        A.    The Salisbury Township

14  School District has a high school,

15  Salisbury High School, so I started there

16  part-time.  I had a intern teaching

17  certificate, so I did not need to do

18  student teaching.  They had a program,

19  because there was a shortage of

20  science-certified teachers, where you

21  could get into the teaching program with

22  an intern certificate and not have

23  completed the student teaching program,

24  at that time period.  So I came in under

1  the intern program, and I was teaching

2  from day one with the intern certificate.

3  And then as I completed the necessary

4  coursework simultaneously with -- at

5  Cedar Crest College, then I was

6  recommended for your standard level one

7  of teaching certificate.

8       Q.   Okay.  When did you go to

9  be, like, a full-time teacher; did that

10  happen?

11      A.   It did.  Full-time -- I

12  believe full-time would have been in the

13  '87/'88 school year.

14      Q.   And in the sciences still?

15      A.   Correct.

16           Then I also taught at the

17  middle school level too, in Salisbury

18  Township, because they needed to have

19  some classes covered at the middle

20  school.  So I taught both in the high

21  school and the middle school, Salisbury

22  Middle School and then Salisbury High

23  School.

24           Q.   And were you teaching at the

1 middle school -- or, when you were

2 teaching at the middle school, did you

3 stop teaching at the high school?

4        A.    No.  I was split between the

5 buildings.

6        Q.    How did that work out?

7        A.    If the train didn't come, I

8 was on time.  If the train came through,

9 I would be late to the middle school, and

10 there was nothing I could do about it,

11 and the students would be waiting for me,

12 and when I arrived then, they were

13 well-behaved.  But I think I had it

14 figured out, that there was somebody kind

15 of watching to see when I was rounding

16 the corner, and the rest of the class was

17 told to quickly get quiet because here

18 comes Mr. Dietrich.

19        Q.    So, just so I understand,

20 like, during a Monday, you may have, say,

21 seventh period at the high school and

22 second period at the middle school, is

23 that kind of how it broke out?

24        A.    So the Monday, Tuesday,

1  Wednesday, Thursday, Friday was the same.

2  So, during the time I was split between

3  the two schools, my recollection is that

4  I started at the middle school -- no -- I

5  started at the high school, because I

6  would have to be careful about the train

7  midday at the middle school.  So I

8  started at the high school and then I

9  traveled to the middle school, and I end

10  my day at the middle school.

11        Q.    Okay.  And so you were

12  teaching during the day, and then were

13  you taking the credits for the master's

14  that's in the evenings?

15        A.    Yes, and summers.

16        Q.    Okay.  While you were a

17  teacher at Salisbury Township School

18  District did you undergo any training

19  related to Title IX?

20        A.    I don't recall.

21        Q.    What about in your master's

22  program at Lehigh, do you recall any

23  training on Title IX?

24        A.    So, there were different

¹ classes at Lehigh, and one of those

² classes was school law, for example.  So

³ I completed the school law class.  So,

⁴ they would have covered any relevant kind

⁵ of, you know, coursework that was

⁶ necessary to understand the whole breadth

⁷ of school law.  So, whatever would have

⁸ been included there would have been in --

⁹ I would say, most likely, would have been

¹⁰ in the school law class.

¹¹         Q.    Okay.  Do you recall

¹² actually receiving -- I know school law

¹³ could probably be a pretty broad range of

¹⁴ topics throughout a semester -- do you

¹⁵ recall receiving any instruction on Title

¹⁶ IX?

¹⁷         A.    I can't give you specifics

¹⁸ on the, you know, content of the actual

¹⁹ class.  I certainly remember certain

²⁰ cases, but there's nothing that's Title

²¹ IX that, you know, I can recall from that

²² class.  That's quite a while ago, when I

²³ was there taking school law.  But I had

²⁴ an outstanding professor, so.

1      Q.    That's why -- I mean, I am
2  going to be asking you questions, you
3  know, quite a years back, so that's why I
4  gave you that instruction.  If you don't
5  remember, if that's the truth, that's a
6  fine answer.
7            The -- do you recall, in the
8  education law course, having any
9  discussion or instruction on
10  student-on-student sexual harassment?
11      A.    I don't recall.
12      Q.    Once you completed your
13  master's in Lehigh in 1988, what were you
14  doing then for work?
15      A.    I was teaching science at
16  the, the Salisbury Township School
17  District.
18      Q.    And was that still split
19  between the high school and the middle
20  school there?
21      A.    No.  I was, I believe,
22  entirely at the high school.  There's a
23  gap in there where I was furloughed from
24  teaching, and I worked for the Lehigh

1 Area Vocational Technical School doing

2 industry education coordination work

3 under a Perkins Grant that they had.  So,

4 I think that was roughly the time, then,

5 when I was furloughed.  So, 19 -- the

6 1988/1999 (sic) school year, I spent at

7 the East Penn School District, Emmaus

8 High School, as an assistant principal

9 teaching on assignment.  I didn't have my

10 principal certification yet because you

11 need five years of teaching experience.

12 So I was in as a intern assistant

13 principal in the East Penn School

14 District at Emmaus High School; that was

15 1988/89.

16      Q.    Okay.  Was that assistant

17 principal role, was that your first time

18 working in the administration level at a

19 school?

20      A.    In administration, that's

21 correct.

22      Q.    Do you recall whether you

23 underwent any additional training to be

24 going from a teacher to administrator's

1  role in a school district?

2      A.    In terms of provided by East

3  Penn or through the Lehigh program?  I'm

4  not sure I understand.

5      Q.    I guess, I guess both,

6  either or.

7      A.    Okay.  Well the whole, the

8  whole design of the Lehigh program was to

9  obtain principal certification.  So they

10  have a series of courses that you take,

11  so at the conclusion of the program

12  you're in principal certification.  And

13  then the second part of your question

14  was, at East Penn School District, or

15  what do you mean?

16      Q.    Yeah.  When you were the

17  assistant principal, did you receive any

18  training from that district about taking

19  on that role, administrative role, for

20  the first time?

21      A.    Just the normal, if there

22  were administrative meetings, I would be

23  a part of those.  I was, you know,

24  permitted to and expected to attend, and

1 I did attend, administrative meetings

2 when I was in that role for a year.  It

3 wasn't a -- like, a special program for

4 me or, like, an induction program or

5 anything like that, no.

6          Q.    When you mention the Lehigh

7 program, was, like, get a principal's

8 certification?

9          A.    That's correct.

10          Q.    Are you talking about the

11 master's at Lehigh?

12          A.    Yes.

13          Q.    Okay.  So why -- did I hear

14 you correctly that you said, in 1988,

15 though, you didn't have your principal

16 certification?

17          A.    No.

18          Q.    And that's --

19          A.    So I had gotten laid off or

20 furloughed from teaching at Salisbury and

21 the superintendent of East Penn School

22 District, Bill Leary, had contacted

23 Lehigh University to see if they had

24 anyone in their program who would be able

1 to come and serve as a one-year to take

2 the place of an individual on sabbatical,

3 one-year assistant principal.  They

4 explained that they had a candidate, Curt

5 Dietrich, who doesn't have certification

6 yet, not yet completed certification,

7 because you need a five-year teaching

8 requirement to be met.  But he said, I'm

9 still interested in this candidate, I'd

10 like to meet and interview him; he did

11 that.  He brought me then under intern

12 status to be an assistant principal

13 intern, if you will, for that person on

14 sabbatical.

15     Q.    And then, after 1989, when

16 you were done your assistant principal

17 role, what did you do next?

18     A.    I was industry education

19 coordinator at Lehigh Valley Area

20 Vocational Technical School.

21     Q.    And how long did you do that

22 from?

23     A.    Well, that overlapped then,

24 also.  So initially, initially that was

1  full-time, but then Salisbury Township, I

2  had refault rights.  So I was able to

3  come back and do halftime back at

4  Salisbury Township and continue the

5  industry education coordination job

6  halftime at Lehigh Valley Area Vocational

7  Technical School.  So there was a little

8  overlap in there when, initially, I was

9  full-time at Lehigh Valley Area

10 Vocational Technical School, and I was

11 part-time split between that vo-tech

12 school and Salisbury Township.  So I'd

13 have to go back and look at, you know,

14 the records on my resume to remember

15 exactly what years those were.

16        Q.    The industry coordinator

17 position, can you just give me a summary

18 of what that entailed?

19        A.    Yes.

20              So my job responsibilities

21 were to contact various businesses to see

22 if they had a need for job retraining.

23 So if they had a workforce that could

24 benefit from job retraining or job

1  expansion responsibilities, I would

2  arrange the training provided by the

3  vo-tech teachers in the, either,

4  afternoon or evening hours so that that

5  company could get the latest skills, you

6  know, taught to their workforce.

7       Q.    So, was that role not

8  necessarily like education, like a K

9  through 12 education, but more education

10 provided by this vo-tech school for

11 companies in the area?

12      A.    It was in the Continuing

13 Education Department of the Lehigh County

14 Area Vocational Technical School.  So

15 that was one of the division of Lehigh

16 Valley Area Vocational Technical School,

17 they had a continuing ed program.  So

18 they ran, like, the evening programs

19 where somebody might want to avail

20 themselves to a course in the evening,

21 machining or welding or cake decorating

22 or hydroponics or, you know, some area of

23 what they taught at the vo-tech school

24 during the day.  They had a continuing ed

1  program.

2        Q.    Okay.  What did you do after

3  that?

4        A.    I was recalled then to go

5  back to Salisbury Township School

6  District and taught there until 1993.  In

7  1993, then, I was the assistant principal

8  of the Kutztown Area School District High

9  School, Kutztown Area High School.  That

10 was from 1993 to 1996.

11       Q.    And at this point, did you

12 have your principal certificate?

13       A.    I did.

14       Q.    Was the role at Kutztown

15 Area High School, the role that was open,

16 was that just the assistant principal

17 position?

18       A.    It was the assistant

19 principal position.

20       Q.    If you had a principal

21 certificate, is it common for people

22 with a principal certificate to become

23 assistant principals versus the

24 principal?

1    A.    For middle schools and high
2  schools, yes.  Not necessarily for
3  elementary schools.  Assistant principals
4  are not common at elementary schools.
5  But I have -- I actually know of no one,
6  whoever, went directly from teacher to
7  the building principal at the high school
8  level.
9    Q.    Okay.
10    A.    They go through an assistant
11  principal first, and then they would be
12  promoted to principal.
13    Q.    When you were the assistant
14  principal at Kutztown Area High School,
15  were you responsible at all for providing
16  training to teachers and staff regarding
17  Title IX?
18    A.    I was not.
19    Q.    Was there somebody at the
20  school or district that had that
21  responsibility?
22    A.    I don't recall who that
23  would have been.
24    Q.    Do you recall, maybe not the

1  name, but the, like, position or the

2  level that that person was?

3       A.    I'd be guessing, and I

4  promised you earlier I wouldn't guess.

5       Q.    Okay.  When you were the

6  assistant principal at Kutztown Area High

7  School, do you recall undergoing any kind

8  of training on Title IX?

9       A.    Not specifically.

10      Q.    What about nonspecifically?

11      A.    Well, when you're a

12  principal, you know, there are

13  expectations that you're fully, you know,

14  knowledgeable of all aspects of the law

15  so that you can do your job.  So, I don't

16  recall specifically, you know, the

17  training on that.  But if I was able to,

18  you know, recall all the days of that, I

19  would be -- likely, I could recall, you

20  know, some training on that because that

21  was part of your expectations, you needed

22  to be knowledgeable.  So we would have

23  inservice training and things like that.

24  I just don't recall a specific day when

1   it was -- about Title IX.

2          Q.    You mentioned, in your last

3   answer, that principals are excepted to

4   know all areas of the law; is that

5   correct?

6          A.    Yeah.  I think that's

7   correct, yes.

8          Q.    So would that -- just, I

9   mean, just, I have some clarification

10  questions, I guess because --

11         A.    Sure.

12         Q.    -- Ms. Jordan, Mr. Somers

13  and I, we all practice law.  So that's a

14  broad topic.

15         A.    Yeah.

16         Q.    If you can narrow that down

17  a little bit.

18         A.    We're not expected, as

19  principals, to be the solicitor.  But in

20  order to carry out your job

21  responsibilities, you have to understand,

22  you know, the levels of, you know,

23  various laws and what you need to be able

24  to do and then know when to call the

1 solicitor if it's heading into an area

2 that you need the solicitor's advice.

3        Q.    So solicitor, meaning, like,

4 the lawyer for the district that --

5        A.    Right.

6        Q.    -- can help advice on legal

7 issues; is that correct?

8        A.    That's correct.

9        Q.    When you say, something that

10 would be within the principal's

11 responsibility to know, would that be

12 something, like, what Title IX is?

13        A.    Yes.

14        Q.    And would you agree with me

15 that that also includes, like, what

16 student-on-student sexual harassment is

17 under Title IX?

18        A.    That would be a part of it.

19        Q.    Okay.  What about if a

20 student is sexual harassed under Title

21 IX, what happens next, like what the

22 school's responsibility is, is that

23 something the principal would be expected

24 to know?

1    A.    The principal would be

2 expected to be in contact with the school

3 attorneys, you know, to discuss what the

4 next steps are, you know, and to discuss

5 it, that would be common.

6    Q.    So is that -- I guess, now

7 I'm kind of asking you a more general

8 question, not just about Kutztown Area

9 High School.  But just so I understand,

10 since your role was the superintendent

11 for the North Penn School District in the

12 relevant time period that we're here to

13 talk about today, is it your expectation

14 that the principal, once they recognize

15 something to be student-on-student sexual

16 harassment, to then reach out to the

17 solicitor to --

18    A.    Not --

19    Q.    -- the next steps?

20    A.    Not necessarily directly at

21 that point in time.  You know, if, if the

22 individual believes that, you know, they

23 need to have additional consultation,

24 certainly.  We don't see principals

1  generally, reaching the solicitor

2  directly.  Typically that would work its

3  way through central office, and that

4  would be discussion, perhaps a meeting,

5  that would involve multiple parties.

6         Q.    When you say central office,

7  what do you mean?

8         A.    So, the central office would

9  be positions like superintendent,

10 assistant superintendent, director of

11 elementary education, any other kinds of

12 positions that are, like, in a, in a --

13 if you saw a table of organization, those

14 would be more towards the top of the list

15 on the table of organization.  So, that

16 would be your central office.

17        Q.    What -- I know you said, in

18 a certain situation, they may reach out

19 to the central office, who then may

20 contact the solicitor, but is there

21 certain things, as a superintendent, that

22 you're expecting the principals in a

23 school district to know under Title IX?

24        A.    Like, you're looking for

1 examples or, just, do I expect them to
2 understand the essence of Title IX?  I'm
3 not sure what you're asking me.
4         Q.    Thanks for asking, so I can
5 clarify.
6               I'm not asking, like, do
7 they understand the essence of Title IX,
8 because that could be pretty broad and
9 difficult to define, but, you know,
10 would you expect them to know what
11 student-on-student sexual harassment is,
12 like, the definition of that, what it is?
13         A.    In terms of, like, a cogent
14 definition or to be able to generally
15 describe student-on-student sexual
16 harassment?  I would expect them to
17 understand what student-to-student sexual
18 harassment is.  I'm not sure I would say
19 you need to be able to give me, you know,
20 the answer that would be, you know,
21 specifically worded in a way that's
22 precise.  I think they need to understand
23 what it is.
24         Q.    Okay.  And what about after

1  they recognize student-on-student sexual

2  harassment or something that's been

3  identified as that, would you expect

4  them to know the next steps on what to

5  do after that, like what their

6  responsibility is as a principal?

7       A.   I would expect that they

8  would know what to do next or they would

9  ask for assistance on what to do next.

10      Q.   Okay.  In your experience,

11 do you know what sexual harassment is,

12 student-on-student sexual harassment?

13      A.   Do I know what it is in

14 terms of, like, could I describe sexual

15 harassment or --

16      Q.   Yeah.  Like, under Title IX,

17 do you understand, like, what the

18 definition of student-on-student sexual

19 harassment is?

20      A.   I understand the essence of

21 student-on-student sexual harassment,

22 that students -- you know, Title IX

23 prohibits students from sexually

24 harassing another student or perhaps a

¹ adult to a student or a student to an

² adult.

³        Q.     And what does, what does

⁴ that mean, like, that prevents them from

⁵ sexually harassing another student?

⁶        A.     I'm not sure what you mean

⁷ by the question.  What does that mean?

⁸        Q.     I'm asking, like, what your

⁹ definition is.  You said that it

¹⁰ prohibits student-on-student sexual

¹¹ harassment.  I'm asking, like, what is

¹² sexual harassment, in terms of Title IX?

¹³        A.     So I think there's an

¹⁴ understanding that there are areas that

¹⁵ are inappropriate for students to be

¹⁶ doing, you know, to another student in

¹⁷ the area of, of a sexual arena.  So, if

¹⁸ that is a student saying something that

¹⁹ is unwelcomed (sic) and is, you know,

²⁰ harassing of a student, you know, that

²¹ could be sexual harassment.  I think, you

²² know, physical contact in ways that are

²³ unwelcomed (sic) and not, you know,

²⁴ appropriate for a school situation could

1 be deemed as sexual harassment; those are

2 examples.

3        Q.    What about a boy's hand

4 going up a girl's shirt, is that sexual

5 harassment, in a school setting?

6        A.    We would not condone or

7 permit a boy's going up underneath a

8 girl's shirt in a school setting, that's

9 correct.

10        Q.    So is that sexual

11 harassment, then?

12        A.    I would likely conclude --

13 I'd have to hear all the details, but

14 under your brief description, I would

15 likely conclude that that would be sexual

16 harassment.

17        Q.    What about digital

18 penetration in the classroom in high

19 school, is that under the definition of

20 sexual harassment, in your understanding?

21        A.    Yes.  I would say digital

22 penetration in the classroom would be

23 deemed to be sexual harassment, yes.

24        Q.    When something is suspected

1  to be sexual harassment, what is the
2  responsibility of the -- you said that
3  the high school principal had a
4  responsibility at that point, it's in
5  school --
6       A.    So --
7       Q.    -- responsibility on sexual
8  harassment.
9       A.    The training we've gotten is
10  that you collect what they call the
11  minimal facts, so in other words, what
12  you know and what's been apparent, and
13  that you then turn that over to a group
14  called Mission Kids, so the then district
15  attorney -- when I say then, I mean
16  during, I think, pretty much the time
17  period we're talking about for this
18  particular case -- Risa Ferman made it
19  very clear that we are to gather minimal
20  facts and then turn it to Mission Kids,
21  and we were not to have conversations
22  that got into detail or cross-examining
23  or, you know, asking for a lot of detail.
24  They wanted that opportunity to happen at

1  Mission Kids.  So that was the training

2  we had gotten and that was the

3  expectation set, you know, with our

4  principals.

5        Q.    When you say the expect --

6  or, I'm sorry -- the training you got on

7  that, can you estimate for me or tell me

8  when that training was?

9        A.    So you said estimate but

10  don't guess.

11        Q.    Right.  So if you, you can't

12  even, like, narrow it down and there's no

13  way you can even give me, like, a

14  reasonable estimation, that would be a

15  guess.  But if it's something like, oh,

16  it was around this timeframe, that's,

17  that's an estimation.

18        A.    So, I would estimate that

19  was the mid-2010s; so, roughly that time

20  period.  I don't recall, exactly, Laura,

21  when Risa was the district attorney for

22  Montgomery County.  Risa made a concerted

23  effort to have school districts run

24  things through Mission Kids rather than

1   do the investigations directly

2   themselves.  So I'm going to estimate

3   that was the mid-2010s, which would put

4   it somewhere around the 2012, 2013 to

5   2015 or '16, a range, somewhere in

6   there, probably more likely 2012 or 2013.

7   I'd have to research when Risa was

8   assistant superintendent -- I'm sorry,

9   strike that one, I was -- she wasn't

10  superintendent -- she was district

11  attorney, and it was a big issue that

12  Risa -- have Mission Kids.  They entered

13  into a relationship with Mission Kids,

14  my recollection, and wanted them to do

15  these investigations and not have school

16  personnel, you know, do the

17  investigations.

18        Q.    How did you find out about

19  that, all this stuff about Risa Ferman

20  allegedly putting in this new way of

21  doing things?

22        A.    Risa Ferman, to my

23  recollection, had appeared to us

24  superintendents in a meeting at the

1  intermediate unit to explain to us that

2  she wanted to have Mission Kids be the

3  way that they would handle sexual

4  harassment and sexual matters.  Not just

5  harassment too but just sexual abuse

6  allegations, concerns about sexual abuse,

7  that sort of thing.

8      Q.   Was it your understanding

9  that it was -- once -- because Mission

10  Kids, that's the organization that

11  interviews students or children after

12  there's an allegation of sexual abuse or

13  assault; is that right?

14      A.   Yes.

15      Q.   So was it your understanding

16  that after the Mission Kids had the

17  opportunity to interview the student, the

18  child, then the district can do what they

19  need to do?

20      A.   The district can act on that

21  report that they would get from Mission

22  Kids, yes.

23      Q.   So you said this is a

24  meeting that Risa Ferman called all

1 superintendents into in Montgomery

2 County?

3          A.    Yes.  We have monthly

4 meetings -- well now they're actually

5 more frequent and they're through Zoom --

6 but we would have monthly meetings, all

7 the superintendents of Montgomery County,

8 and different speakers were brought to

9 us.  If there was a timely topic or if

10 there was some other issue that we needed

11 to talk about, the executive director of

12 the intermediate unit would bring that

13 individual to us, and my recollection

14 is that Risa would appear for us to

15 underscore the importance of

16 understanding or desire to have things

17 run through Mission Kids.

18          Q.    Okay.  Did you have an

19 understanding through that meeting about

20 how long it takes for Mission Kids to do

21 what they need to do?

22          A.    Not specifically.  My

23 recollection is that it was explained to

24 us, they would attempt to act on it in a

1  timely manner, but I can't give you,

2  like, you will get an answer within, you

3  know, three days or two weeks or whatever

4  it might be.  I think it was according to

5  their own workload.

6      Q.    Was there -- other than that

7  meeting with Risa Ferman, was there

8  additional training that was done with

9  the district involving --

10      A.    With our principals, for

11  example, or the administration staff?

12      Q.    Yes.

13      A.    Yes.  We had training that

14  was provided through our solicitor's

15  office, that would be the school

16  attorney, who, you know, talks with our,

17  you know, administrative team about

18  school law, about various aspects.  My

19  recollection is we did have training on

20  Title IX to talk about and the matters of

21  Title IX.

22      Q.    Meaning --

23      A.    Those are --

24      Q.    -- the -- I'm sorry, go

1  ahead.

2       A.    Those are meetings that we

3  have -- again, they are monthly meetings

4  that we have with the administrative

5  team, and then we develop, you know, the

6  topics for each month, and part of that

7  is to have updates on school law matters.

8       Q.    And you said that's the

9  administrative team; is that, like,

10  superintendent, assistant superintendent,

11  down to the principal?

12       A.    Also, special education,

13  supervisors, curriculum supervisors,

14  supervisors of other support and

15  ancillary functions, so transportation to

16  service.

17       Q.    Is there any other

18  documentation that's created for each of

19  these meetings, like meeting minute notes

20  or anything like that?

21       A.    Not meeting minute notes,

22  but if there were handouts, that sort of

23  thing, you know, they would have been

24  done, been given out to people.  There

1  would have been -- you know, sometimes

2  things are going through, at that time,

3  PowerPoint or, you know, Google slides,

4  that sort of thing.  So there can be

5  electronic kinds of things that are

6  shared, you know, with individuals in

7  training.

8          Q.    Do you know whether that's

9  maintained in some capacity, like

10  training, PowerPoints, any

11  documentation-type things from these

12  trainings?

13          A.    I don't know that, Laura;

14  I'm not sure.

15          Q.    Would that be something that

16  the district coordinates, like, keeping

17  track of or what's going to be on the

18  agenda?

19          A.    We would have an agenda

20  that, that, you know, would be put out

21  there to the administrators in advance of

22  the meeting.  Typically, you know, three

23  days in advance would be saying, this

24  will be the meeting, this is the agenda.

1  Sometimes there were revisions that are
2  done at the last minute.  But typically
3  the agenda would be circulated, at the
4  minimum, the morning of the trainings or
5  the meetings.
6         Q.    When you say, like, edits
7  and things like that might be done a few
8  days before, is that the district making
9  edits or someone from the solicitor's
10  office?
11         A.    That would be, most likely,
12  the district.  So if there was something
13  that we learned recently since the agenda
14  was published, we would add that in as an
15  additional item.
16         Q.    Okay.  I'll send a letter to
17  your counsel, but I'm gonna ask for any
18  documentation of these trainings
19  regarding Title IX or these school
20  law-type topics, if that's kept in some
21  capacity.  I understand, Dr. Dietrich,
22  you're not aware at this time but a
23  search for those things.
24               When you said this meeting

1  took place with Risa Ferman and the

2  superintendents in Montgomery County, was

3  there any update to that at any point

4  about, that's not the way we're doing

5  things anymore, meaning that you're

6  not -- you don't have to wait for Mission

7  Kids to finish their investigation?

8      A.    I'm not aware of any update

9  that changed that, no.

10      Q.    So, from your understanding,

11  is that still the -- what you're

12  operating under today?

13      A.    It is, yeah.

14      Q.    From the Title IX training

15  that you received from the training that

16  the district provided, that's also

17  consistent, that the school waits to do

18  an investigation until you hear from

19  Mission Kids?

20      A.    Yeah.  It's minimal facts,

21  initially.  So, you know, depending on

22  how you define investigation.  But they

23  did not want us to go down, you know, a

24  more common way if there is a potential

1 disciplinary matter, to have the

2 assistant principal or the principal,

3 depending on what level it's at, you

4 know, to bring in students and to talk to

5 student witnesses and talk to other

6 witnesses and everything like that.  In

7 this case, Risa was very clear; she wants

8 Mission Kids to be able to do that and

9 that they are trained professionals, to

10 ask questions in the right kind of way

11 and ask the right questions to get at

12 what the truth is.

13        Q.    Well if they were -- if

14 that's the policy that the district is

15 operating under, while the Mission Kids

16 is doing their investigation, what's

17 happening at the school level with the

18 students who are involved in, like, a

19 sexual assault or sexual harassment

20 situation?

21        A.    Yeah.  And that, you know,

22 always is a challenge for us because we

23 can't, you know, presume that anyone is

24 guilty.  If necessary, if we believe that

1 we would need to do something with those

2 students in the interim, we could

3 carefully do something. But we have to

4 be, you know, real careful as far as what

5 we might do with students until that, you

6 know, investigation is complete.

7       Q. What do you mean, you have

8 to be real careful with what you might

9 do?

10       A. Well I think that we

11 understand the students have a right to

12 an education. So, we want to be able to

13 continue to provide and meet that, you

14 know, standard of being able to provide

15 an education to the student.

16       Q. So I guess, since you used

17 the frame, like -- or, the phrase, you

18 have to be really careful in what you do,

19 I understand that students have a right

20 to access to education, but what do you

21 mean when you have to be really careful

22 in what you're able to do?

23       A. You don't want to, like,

24 suspend this student and say you're

1  concluding something based off of the

2  minimal facts.  We would wait to hear

3  what Mission Kids and law enforcement was

4  telling us.

5        Q.    In your experience, have

6  there been times where Mission Kids or

7  law enforcement, like, don't bring

8  charges and they close their

9  investigation?

10        A.    I think there are times

11  when, yes, law enforcement and Mission

12  Kids close an investigation and don't

13  bring charges.  They might conclude that

14  something is not founded, or they might

15  conclude that, you know, there was a

16  violation of a school rule, but it wasn't

17  necessarily a violation of a criminal --

18  it wasn't a criminal act, yes.

19        Q.    So what does the school

20  district do with that information, or you

21  as a superintendent, once the Mission

22  Kids part is done or closed, what does

23  the school do?

24        A.    It depends on what they tell

1  us in terms of what they found.

2       Q.    And what, what do you mean

3  by that?

4       A.    I would need more specifics

5  to tell you what we would do, depending

6  on what they told us.

7       Q.    So, for example, if there

8  weren't criminal charges brought -- and

9  is that what you mean, like, if there are

10  criminal charges brought, if there aren't

11  criminal charges brought, if it's

12  unfounded, is that -- like, that would

13  make a school do a certain thing,

14  depending on those outcomes?

15       A.    I think that's a fair

16  description.  That depends if there

17  are -- you know, if something is founded

18  or unfounded or if there are criminal

19  charges brought, that sort of thing, yes,

20  I think the school would clearly take

21  that into account in terms of the

22  school's response to something that

23  happened in school.

24       Q.    What about if there -- for

1  the example that there are not criminal

2  charges brought, what, then, does the

3  district or the school do in that

4  circumstance?

5      A.   So again, it depends.  There

6  could be something where there was -- you

7  know, a law enforcement was involved and

8  we concluded that someone was in

9  violation of school rules, but there

10  wasn't, you know, something there that

11  the district attorney's office and the

12  local law enforcement felt was necessary

13  to have charges brought.  So, it could

14  be -- I don't know -- interaction with

15  students that we ask, you know, law

16  enforcements to help us and intervene

17  with it, but they conclude that, you

18  know, no charges will be filed, that

19  doesn't mean that there still wouldn't be

20  some kind of school discipline; but

21  perhaps there would, perhaps there would

22  not.

23      Q.   But so -- just so I make

24  sure that I'm understanding you clearly,

1  the ending decisions that the district
2  would potentially undertake wouldn't
3  happen until the police investigation and
4  Mission Kids investigation was finalized,
5  right?
6      A.    In terms of a -- in the
7  sexual arena, are you saying now?  I'm
8  getting confused if you mean just
9  generally or containing this sexual
10 arena.
11     Q.    Like, student-on-student
12 sexual harassment.
13     A.    Okay.
14           So in terms of, if there was
15 some sexual involvement and concerns that
16 were brought to us, we would have Mission
17 Kids do that investigation before we
18 would conclude, you know, ours.
19     Q.    When you say "conclude
20 yours", but I think you told me earlier
21 that you, really, just get, like, the
22 very minimal facts --
23     A.    Correct.
24     Q.    -- there's, really, not an

1    investigation that's done or --

2         A.    We do --

3         Q.    Sorry.  Just let me, just

4    let me finish, just to help the court

5    reporter.

6         A.    Okay.

7         Q.    I know it's hard.  It's a

8    little bit different than normal

9    conversation.

10             You -- the district wouldn't

11   start their investigation, they would

12   just get the minimal facts until the

13   Mission Kids gave you a report of what

14   they found and that was concluded; is

15   that right?

16        A.    I think, I think --

17             MS. JORDAN:  Note my

18      objection to the form of the question.

19             You can answer.

20             THE WITNESS:  I think you're

21      struggling to understand, or we're not

22      necessarily understanding one another

23      regarding investigation.

24             So, the minimal facts

1    gathering, if someone wants to call

2    that the initial steps of an

3    investigation, I suppose somebody

4    could, but we would gather minimal

5    facts, hand those over to Mission

6    Kids, to law enforcement, and then we

7    would hear from them in terms of what

8    they learned through, you know, their

9    interactions with the individuals.

10   And then, when we get that back, then

11   we would take, you know, any potential

12   and necessary action thereafter.

13  BY MS. LAUGHLIN:

14       Q.    So, I guess, let's try and

15  get on the same page, so I make sure I'm

16  understanding you and there's not a

17  miscommunication.

18            When you say you try and

19  gather the minimal facts, what does that

20  mean?

21       A.    So minimal facts, the way it

22  was explained to us, is what the student

23  volunteers on their own or when another

24  student reports to us or what an adult

¹ reports to us without us asking what I

² would call investigatory kinds of

³ questions.  So the minimal facts are what

⁴ they volunteer to us directly without

⁵ probing or without asking them to expand,

⁶ without asking them to give us, you know,

⁷ every detail, just, they would come and

⁸ tell us what they experienced or what

⁹ they had heard or what they had seen, and

¹⁰ then we would turn those minimal facts

¹¹ over to Mission Kids and law enforcement.

¹² Q.    Was it the district's

¹³ practice to report to Mission Kids no

¹⁴ matter what the, the student-on-student

¹⁵ contact was?  Like, for example, did it

¹⁶ have to be to a level of penetration, or

¹⁷ was there a certain bar that then made

¹⁸ the report go to Mission Kids?

¹⁹ A.    I don't recall us discussing

²⁰ if there had to be penetration in order

²¹ for something to qualify, if you will, to

²² have Mission Kids' investigation.  I

²³ think there's just -- and it's difficult

²⁴ not to say it any other way, but things

1  can be nuanced.  So I think that, you

2  know, you have to listen carefully as,

3  you know, as a school administrator and

4  determine if this is something that, you

5  know, needs to be presented to Mission

6  Kids or, or does not.

7       Q.    But how do you, how to you

8  define, like, listening carefully to

9  determine whether something does or

10 doesn't have to be reported to Mission

11 Kids?

12      A.    I think there's, you know,

13 an ability that you develop to be able to

14 listen to understand what someone is

15 saying without inferring or without

16 adding to or without subtracting from

17 what it is that they're saying.  So I

18 think that, you know, when you have good

19 listening skills, you're listening

20 carefully to what the, you know, the

21 concern is, and then you arrive at a

22 conclusion whether this should be, you

23 know, pursued in more detail or should

24 not.

1      Q.    Is that, like, a subjective

2 thing, that depending upon who's

3 listening to the information from

4 whoever, whether it's the victim

5 themselves or another student reporting

6 about a fellow student that had something

7 happen to them, that it's a subjective

8 determination as to what gets reported to

9 Mission Kids or doesn't?

10      A.    I think there has to be some

11 level of subjectivity to try to remain as

12 objective as possible and you try not to

13 arrive at any kind of conclusions, but

14 you're listening to understand, and

15 you're forming a judgment whether this

16 should, you know, be moved to another

17 level or whether it's something that

18 should not be.

19      Q.    In your experience, has

20 there been training on that for district

21 administration staff, as to determining

22 what should or shouldn't be reported to

23 Mission Kids?

24      A.    I believe that we had -- and

1 I recall that we had training on Title IX

2 to understand Title IX and to discuss,

3 you know, various cases that involved

4 Title IX, and then, you know, individuals

5 were given an opportunity to ask for

6 clarification on things they maybe

7 weren't understanding or wasn't, or

8 wasn't clear from the presenter.  As a

9 matter -- all the time, I think people

10 try to remain as objective as possible,

11 but it's hard to deny that there's some

12 level of subjectivity when somebody has

13 to make a determination.  So they're

14 reading a lot of things.  They're

15 listening, reading body language.  That's

16 just what people do.

17        Q.    The, the Title IX training

18 you were just referencing, was that just

19 for administration or also for, like,

20 teachers and staff at the district

21 school?

22        A.    What I'm referencing was for

23 administration.

24        Q.    And how does that, then, or

1  does it, then, filter down in some way to
2  the staff level, the training that
3  administration received?
4        A.    So when training is provided
5  that is -- needs to be passed along to
6  other individuals, then the supervisors
7  of those individuals would, you know,
8  pass those along to who they supervise.
9  But not all things that individuals get
10 trained on at the administrative level
11 would necessarily be things that have to
12 get and, you know, explained to
13 individuals for whom it doesn't apply,
14 so.
15       Q.    Does Title IX apply going
16 downward?
17       A.    Title IX applies to anybody
18 within the school system.  A person could
19 be guilty of violating Title IX in any
20 position, you know, within the school
21 system.  So, it's not, like, only -- you
22 pick the position -- can violate Title
23 IX.  It can be anybody that could violate
24 Title IX.

1      Q.     So would you have expected

2   the training that administration received

3   regarding Title IX, that those

4   supervisors, for example, a principal,

5   would then go and pass along the

6   information that they had learned to

7   teachers at the school regarding Title

8   IX?

9      A.     I would say that I would

10   expect that principals would be able to

11   carry the essence of the Title IX and

12   then the specifics that would apply to

13   individuals, back to those whom they

14   supervise.  I would expect that there

15   would be more -- I think there would be,

16   there would be more items of it that

17   would be specific to the principal that,

18   for example, the teacher wouldn't

19   necessarily need to be concerned about or

20   need, you know, time taken to use --

21      Q.     As the superintendent of

22   North Penn School District -- this is

23   going from when you started in 2010 to

24   the present, is -- are you pretty much

1    the head of, like, the administration in

2    the district?

3              A.    I am.

4              Q.    Is there anything that you

5    did after these meetings, regarding Title

6    IX or, as you defined as school law, to

7    ensure that the leaders of schools,

8    whether it's principals, a director of

9    special education, that they're then

10   communicating all the things that you

11   were trained on to the lower level

12   people?

13             A.    Not that I would have done.

14             Q.    Is there somebody else that

15   would have done that or that had that

16   responsibility?

17             A.    Well, we have a system in

18   North Penn, it's like a hierarchy, like I

19   had talked about earlier.  So, if you

20   have a director of elementary education

21   in between principal and assistant

22   superintendent and superintendent, that

23   would be one example.  You know, so

24   principals don't report directly to the

1  superintendent.

2          Q.    Okay.  But if it has to

3  trickle down, would that come from you

4  and then to the director of special

5  education and then to whoever's under

6  them?

7          A.    I'm not sure what you mean

8  by "them".  Can you ask it again?

9          Q.    Sure.

10          So we were talking -- you

11  were talking about the hierarchy and how

12  you're at the top of the hierarchy, but

13  something from a lower level may not go

14  directly to superintendent because

15  there's a, for example, a director of

16  special education that goes in the

17  middle.  Would -- going downward, though,

18  would that be -- like, you're at the top,

19  and you're communicating to the --

20  whoever's the next level, then they would

21  communicate to whoever's the next level,

22  is that typically how it works?

23          A.    If there's something that I

24  would talk about at a cabinet meeting

1  that needed then to go to the next

2  level, you know, below, if you want to

3  use that word, that person would carry

4  that out.  But I wouldn't be putting,

5  as a cabinet meeting agenda item,

6  provide documentation, provide proof

7  that -- whatever the topic was that we

8  discussed -- that, you know, you need to

9  bring back to me that kind of information

10 to prove to me that you did follow

11 through on that, that wouldn't typically

12 be how we do things.

13       Q.    How do building principals,

14 for example, know what to train their

15 teachers and staff on?

16       A.    That would likely come out

17 in discussion when we have the

18 presentations.  So they're sitting there

19 and they're assimilating and they're

20 understanding and they're processing what

21 they're hearing, and they would, you

22 know, be asking qualifying questions in

23 terms of understanding it then and

24 determining what additional steps, you

1 know, were recommended to be taken or

2 whatever it might be.

3     Q.   So, are you talking about

4 the principals in the meeting --

5     A.   Yes.

6     Q.   -- is that what you're

7 referring to?

8     A.   Mm-hmm.

9     Q.   And the -- was there -- I

10 guess, was it just something that --

11 sorry, strike that.

12     Was there direction given to

13 principals on what they should be

14 communicating to their staff, or was it

15 just whatever they feel they should be

16 communicating, that's, really, up to

17 them?

18     MS. JORDAN:  Note my

19   objection to the form of the question.

20     You can answer.

21     THE WITNESS:  So, do we give

22   principal-specific direction on what

23   they should be training their staff

24   on, or do we allow them to make that

1    decision --

2  BY MS. LAUGHLIN:

3          Q.    Yes.

4          A.    -- is that the question?

5          Q.    Yes.

6          A.    And again, I'm saying it's

7  hard to, it's hard to answer that in a

8  general kind of a way.  If, during a

9  discussion, you know, with the presenter,

10  you know, we determine that followthrough

11  time included some specifics that the

12  principal, for example, shall carry back

13  to those whom they supervise, you know,

14  we would talk about that.  But I can't

15  answer that.  In a, in a way, it's just

16  too, too individualized and nuanced.

17          Q.    What about in terms of Title

18  IX, is that something that would have had

19  a carry through plan that you would have

20  expected principals to then be

21  communicating to their staff about what

22  they learned?

23          A.    I don't recall that we had

24  specific statements, you shall talk about

1  these particular items, but I am

2  reasonably certain that, when we had

3  meetings, we talk about these various

4  items and then we talk about, you know,

5  the next steps in terms of additional,

6  you know, followthrough training on that.

7  But I don't recall specifics on Title IX.

8          Q.    And these meetings, how

9  often are -- is the district

10  administrators getting training on Title

11  IX from, like, 2010 to, to, say, 2019,

12  how often was it that the topic would be

13  Title IX --

14          A.    I'd have to --

15          Q.    -- like, defining what it

16  is?

17          A.    I'd have to research that.

18          Q.    Do you have --

19          A.    I don't have an answer.

20          Q.    Do you have an estimate?

21  Was it once a year?  Once a month?

22          A.    Well it definitely wouldn't

23  have been once a month.  And to say it

24  was every year, I, I wouldn't make that

¹ statement either.  I'd have to go back to

² research to see how often we had.

³ Typically, we talk about -- the two ways

⁴ would be good topics on, if we feel like

⁵ there's been a change that's substantive

⁶ to regulations, then that would rise to

⁷ the level of a training topic that we

⁸ include, or if we believe that it's -- a

⁹ time period has gone by as such that we

¹⁰ had new hires or that those that have

¹¹ been with us need a refresher, we would,

¹² then, put it on the agenda as an item.

¹³ We typically would have those

¹⁴ conversations with the school solicitor.

¹⁵         Q.    Earlier, when you said that

¹⁶ Title IX training you recall from the

¹⁷ district involved cases, do you mean,

¹⁸ like, Title IX court cases, or do you

¹⁹ mean specific cases that have come up in

²⁰ the district?

²¹         A.    No, court cases.

²²         Q.    Okay.  And you said that,

²³ sometimes, if there was a change in,

²⁴ like, Title IX or something like that, a

1  regular or whatever, that you would
2  discuss putting it on the agenda.
3  Who's -- who is the one monitoring to see
4  whether there was a change or what the
5  current state of the --
6       A.    That would --
7       Q.    -- new law was?
8       A.    I'm sorry.
9       Q.    Go ahead.
10      A.    I started to jump in.
11            That would be in
12 consultation with the school solicitor
13 and the school solicitor's office.
14      Q.    Is that something, though,
15 that, like, you would be relying on the
16 school solicitor to let you know that you
17 need training on this because something
18 changed, or?
19      A.    I would say it's a
20 combination of input, you know, from the
21 school solicitor's office, and then,
22 also, as administrators, we receive, you
23 know, various trade journals, and there
24 are articles in there and they talk

1  about, you know, things that, you know,

2  might be evolving or changing, whatever

3  it might be.  So there are different ways

4  that, you know, administrators stay, you

5  know, current, if you will.  So I will

6  say it's a combination.

7        Q.    Did you say trade journals?

8        A.    Yes.

9        Q.    Are there particular

10  journals that you as a superintendent,

11  like, subscribe to and read?

12        A.    There are journals that I

13  get unsolicited, and plenty of those, but

14  I don't think I have any specific

15  prescriptions to any journals.  We get

16  them, you know, sent to us.

17        Q.    Are there any that you,

18  like, read and rely on?

19        A.    The school board's

20  associations, both at the Pennsylvania

21  level and the the American School Board

22  Journal level, those publications, I

23  think, are particular helpful school

24  administrator.

1    Q.    And is that something that
2  you read when it comes in?
3    A.    When it comes in, yeah.
4    Q.    Is it -- like, how often do
5  those get sent out; do you know?
6    A.    They're typically monthly.
7  Things are a little different right now
8  with COVID.
9    Q.    Okay.  As superintendent,
10  are you responsible for what happens
11  inside, like, the school buildings, like,
12  at the high school or an elementary
13  school?
14    A.    Could you define responsible
15  for me?
16    Q.    Yeah.  Is that, is that,
17  like, within your authority, to --
18  whether it's implement change or
19  discipline or whatever, are you -- that's
20  what I mean by responsible for what
21  happens in school buildings.
22    A.    Well, there's a hierarchy
23  and there's a chain of command.  So, you
24  know, as CEO of a school district, you

1 know, there's a level of responsibility
2 that you take on as CEO, but I wouldn't
3 be responsible, if you will, for
4 day-to-day operations or those sorts of
5 things.  There's people hired to do that.
6          Q.     Like, curriculum, I mean,
7 you're not obviously teaching the classes
8 or what, what the curriculum would be for
9 that particular day, right?
10          A.     No.  That would not be so.
11 But the curriculum has a -- we have a
12 structure here.  So we have curriculum
13 supervisors, and they report to a
14 director, and the director of curriculum
15 reports to an assistant superintendent,
16 assistant superintendent reports to the
17 superintendent, so.
18          Q.     What about the principals,
19 who are -- you said there's a hierarchy.
20 I guess, can you just explain to me, I
21 guess, who is that hierarchy, who answers
22 to who in that chain.
23          A.     At the elementary level, the
24 elementary principals report to the

1  director of elementary education.  At the
2  secondary level, presently, the
3  principals report to one of our assistant
4  superintendents, and I say presently
5  because that had changed three years ago
6  when we hired two assistant
7  superintendents instead of one, a
8  reorganization of our administrative
9  structure, and we eliminated the position
10 of director of secondary, and we gave
11 those responsibilities to one of the
12 assistant superintendent positions.
13        Q.    What about at the high
14 school level, the high school principal?
15        A.    So the high school principal
16 formally reported to the director of
17 secondary education, and then when we
18 reorganized, we eliminated that position.
19 One of the assistant superintendents took
20 responsibility for supervisor of the
21 secondary principals under -- it turns
22 out it's a male -- under his supervision.
23        Q.    When was that director of
24 secondary education position eliminated?

1       A.      Three years ago.

2       Q.      And I think you said

3  assistant superintendents, plural?

4       A.      We have two.

5       Q.      And how is that divided up?

6       A.      So, one of the assistant

7  superintendents, Dr. Bauer, Dr. Todd

8  Bauer, he is an assistant superintendent

9  that has responsibility for, among other

10  things, the secondary school principals.

11  So he, he would supervise things.

12       Q.      And what about the other

13  assistant superintendent?

14       A.      So, we're in a bit of a --

15  of flux right now in that we just hired

16  another assistant superintendent, or a

17  new assistant superintendent, if you

18  will.  The previous assistant

19  superintendent resigned her position to

20  pursue other interests.  So, that

21  particular individual and the other

22  assistant superintendent, Dr. Bauer, were

23  still in the midst of, you know, totally

24  organizing which responsibilities belong

1  to each individual.  So that person

2  started July 1st.

3       Q.    The elementary director

4  of -- or, the director of elementary

5  education, who do they report up to?

6       A.    The assistant

7  superintendents.

8       Q.    Okay.

9       A.    In the past, it was one of

10  the assistant superintendents; not Dr.

11  Bauer.  It was Dr. Rufo.

12       Q.    Okay.  And then the

13  assistant superintendents, above them is

14  you?

15       A.    Above the assistant

16  superintendents would be me,

17  superintendent, correct.

18       Q.    Does somebody at the

19  district administration, specifically,

20  have the responsibility for training of

21  administration and staff?

22       A.    So that would be a

23  collaborative effort among the director

24  of human resources, the assistant

1 superintendents, the superintendent, and

2 then depending on the topics, the other

3 members of cabinet.  So our

4 superintendent's cabinet would also

5 include the director of elementary

6 education, the director of technology,

7 the director of special education, the

8 communications director, the chief

9 financial officer, the director of

10 facilities and operations, those

11 individuals, director of curriculum, I'm

12 not sure if I mentioned them, they're all

13 members of cabinet.

14          Q.    And the director of HR is

15 that Cheryl McCue?

16          A.    No.  Cheryl McCue is no

17 longer with North Penn School District;

18 that's Dr. Mia Kim.

19          Q.    Prior to Mia Kim, was it

20 Cheryl McCue?

21          A.    It was, yes.

22          Q.    Okay.

23          A.    Mm-hmm.

24          Q.    Can you just give me an

1 understanding of what your

2 responsibilities are as superintendent,

3 as you understand them?

4         A.     Well I have general

5 oversight of the school district, work

6 directly with the school board to advise

7 them and to provide the necessary

8 administrative input for them to make

9 decisions that are within their realm of

10 responsibility.  So, they are policy

11 centers for the school district, for

12 example, and, you know, as they develop

13 district policies, you know, I would have

14 responsible, and my team, to help to

15 advise them on developing district

16 policies.  Also, then, personnel, it's a

17 responsibility of the board to hire and

18 terminate, if necessary, individuals

19 within the school district.  So I would

20 have that responsibility to be able to

21 make recommendations to them regarding

22 personnel items that would rise to that

23 level.  You know, those are -- these are

24 some of the examples.  I have a lot of

1  interaction with the community, as the
2  superintendent of schools to, you know,
3  receive input from them in terms of
4  operations of the school district.
5      Q.   One of the things you
6  mentioned was policy setters within the
7  school board, and you work with your team
8  to come up with the policies, right?
9      A.   With the school solicitor,
10 also.
11     Q.   Okay.  When you say "the
12 team", is that your cabinet, who are you
13 referring to?
14     A.   That would be the cabinet
15 and then, more likely, assistant
16 superintendents and, you know,
17 superintendent.  But other members of
18 cabinet can be drawn into a conversation.
19     Q.   Okay.  So in terms of, like,
20 the district's harassment policy, the
21 5150A, are you familiar with that policy?
22     A.   I know that we have 5150A,
23 but I'd have to have it in front of me to
24 talk about the specifics of it.

1          Q.    Okay.  Is that something,

2    for example, that you would have worked

3    with your team and the school board to

4    come up with?

5          A.    Yes.  All of the policies,

6    we work with the board, to develop and

7    revise, if necessary, our policies.

8          Q.    You talked about hiring and

9    terminating teachers, that's also your

10   responsibility?

11         A.    In terms of recommending to

12   the board for hire.  They actually do the

13   hiring, and then, if necessary, they do

14   termination.

15         Q.    The school board does?

16         A.    Yeah.

17         Q.    Do you --

18         A.    Yes.

19         Q.    Sorry.

20               You as the superintendent

21   recommend to them what they -- what you

22   recommend they should do?

23         A.    Yes.

24         Q.    What about --

1    A.    So we --

2    Q.    Sorry, go ahead.

3    A.    We would carry out, for

4  example, the interview process or -- for

5  hiring, hiring process.  If there was a

6  necessity to discipline an individual,

7  that would be at my level, but if it was

8  a termination, then there are, you know,

9  certain things that have to happen and

10  the board would get involved.

11    Q.    What about in terms of

12  student discipline, is that anything

13  that's within your responsibilities?

14    A.    So, if there would be -- in

15  terms of responsibilities, again, there

16  are individuals that carry out the

17  day-to-day, you know, interaction with

18  the students and disciplining of

19  students.  But if it would mean it would

20  be an expulsion, that would rise to that

21  level, then that would come to me as

22  superintendent and be recommended to the

23  school board.

24    Q.    Like, if a principal or

1 somebody is recommending a kid get

2 expelled from school, then that would be

3 passed along to you, and you'd get

4 involved in that point as to whether or

5 not to recommend to the school board?

6       A.    Yes, eventually.  I mean,

7 there's all the steps that happen through

8 that process, but eventually it will make

9 its way to me.

10       Q.    How is the implementation of

11 disciplinary issues and handling of

12 disciplinary issues, how is that ensured

13 it is consistent among, like, each of the

14 levels of school, if it's elementary

15 school or high school, is there a way

16 that you ensure that there's consistency

17 among those different schools?

18       A.    So, a number of things

19 happen.  We do monitor the number of

20 disciplinary incidents and referrals and

21 action taken.  The state has a system for

22 those that get reported to them for their

23 various infractions.  So we have all of

24 that data, and we would be, you know,

1 reviewing that data.  We also would have

2 discussions at principal's meetings with

3 the supervisor of the principals, whether

4 it be at the elementary with the director

5 of elementary education or at the

6 secondary, either the director of

7 secondary when we had one or with the

8 assistant superintendent who was

9 responsible for secondary education

10 principals, they would have discussions

11 at those meetings in terms of discipline

12 and things that are happening within the

13 schools.

14           Q.    When you say that you're

15 monitoring disciplinary actions that are

16 taken, is that just generally at the

17 school level, like, when it's for

18 elementary school, you're monitoring how

19 many kids were suspended or something

20 like that?

21           A.    Is it just at the elementary

22 school, did you say?

23           Q.    No.  I'm asking, when you

24 say you're monitoring the discipline at

1  the school level -- or, I guess, you're

2  monitoring the discipline because you

3  have to report it, you said, is that just

4  at the school level, like, you know, it's

5  not particular students that you're

6  monitoring but just, in this particular

7  school, how many students were

8  disciplined for particular things?

9          A.    So, the information would be

10  deidentified in the sense of names and

11  that sort of thing.  However, we do

12  collect information that would be useful

13  to us to monitor regarding demographics.

14  So we might look at -- you know, race and

15  ethnicity would be one example.  We might

16  look at gender, we might, you know, look

17  at other kind of characteristics.  I'm

18  trying to remember what they would be,

19  but those would be the biggest ones, I

20  would say, we would look at, in terms of,

21  you know, do we have disproportionality,

22  are there students of -- in a particular

23  race, for example, that are

24  disproportionate in the number of

1 discipline infractions and that sort of

2 thing, you know, we would look at that.

3      Q.   But you're saying -- you

4 said that they would be deidentified,

5 meaning that the actual students that

6 these disciplinary things involve, that's

7 not something that is tracked in this

8 way?

9      A.   I wouldn't oversee a list

10 that said, Laura Laughlin did this,

11 Maureen Jordan did that, Kyle Somers did

12 this, you know, that's not for me.  I'm

13 not, I'm not looking at that kind of

14 information.  But I might look to see,

15 you know, as we review the data, were

16 there -- you know, we do these analyses

17 to see if there's disproportionality to

18 see our sense of a particular race

19 getting suspended less frequently or more

20 frequently, that sort of thing.

21      Q.   So, are student's

22 disciplinary issues tracked in any way by

23 the district, for particular students?

24      A.   Well, they have a cumulative

1  file in terms of -- if that's what you

2  mean, like, they would have that.  So if

3  there is a cumulative file, that would be

4  in that file, and that would make it's

5  way through this system or through the

6  district.  Those files don't come through

7  the district office, but there's a

8  cumulative file that works its way

9  through the district.

10         Q.    And so that would mean any

11  disciplinary issues would have to go into

12  the cumulative file for that to be

13  tracked in a cumulative file, right?

14         A.    Correct.

15         Q.    Like, if something happened

16  and it doesn't get put in the cumulative

17  file, the next person who gets that

18  cumulative file isn't going to know; is

19  that correct?

20         A.    That's correct.

21         Q.    All right.  Is there

22  anything that the district implements to

23  ensure that issues that arise for a

24  particular student in school are put in

1 the cumulative file?

2       A.    Could you rephrase that

3 question?  I'm not quite sure what you

4 mean by that.

5       Q.    How does one decide in the

6 district whether something goes into a

7 student's cumulative file?

8       A.    If there is a disciplinary

9 action, that would go into a student's

10 cumulative file.  If there's some other

11 notation, you know, that is necessary,

12 that would go into that file.  Perhaps

13 it's something having to do with special

14 education, for example.  Those records

15 would be in the student's file.

16       Q.    When you say if there's a

17 disciplinary action, what do you mean?

18       A.    So if -- I believe that if a

19 student got in trouble for something,

20 that there's a notation in the file for

21 that under the discipline area that --

22 and then the succeeding school or anyone

23 else within that individual school could

24 review.  So somebody could look at a

1 student, say, oh, this student has no

2 prior incidents or this student -- the

3 only thing we have on this student prior

4 to this was cutting class, for example.

5 So, there might be times when a student

6 does something very egregious, like gets

7 into a fight, and we might look at the

8 cumulative file to see if there's been a

9 pattern of the student getting into

10 fights to determine whether the student

11 then needs to be, you know, recommended

12 for a more lengthy suspension or for

13 expulsion or temporary expulsion or

14 whatever it might.  That would --

15          Q.    How are -- sorry, go ahead.

16          A.    That would be an example.

17          Q.    How are building

18 principals -- are they instructed at all

19 or trained at all on how to -- like, what

20 to put in the file, how to document

21 something in a cumulative file?

22          A.    That at the elementary

23 level, would be with the director of

24 elementary education and the principals,

1  and then at the secondary level, if

2  there's assistant principals, an

3  assistant principals.  So, the assistant

4  principals would report to the

5  principals.  So the principal would

6  handle that.

7          Q.    But is there any, like,

8  training that those people received on

9  how to -- what to implement and how to

10  put things in the cumulative files, in

11  terms of disciplinary stuff?

12          A.    That would happen at the

13  home office level.  They would call the

14  home offices.  So, at the home office

15  level, when the assistant principal was

16  hired, it would be a discussion at that

17  level in terms of, you know, these are

18  the forms we use and this is, you know,

19  which secretary it would go to, and they

20  would handle that.

21          Q.    When they say -- sorry, go

22  ahead.

23          A.    I'm not real familiar with

24  that.

1    Q.    When you say home office,
2  what do you mean?
3    A.    So, at the middle schools,
4  there's one office.  So if you hear,
5  "you're being sent to the office", that's
6  where the principal and the assistant
7  principal and the secretaries will be.
8  At the high school level, because of the
9  size of our school district and our high
10  school, we have three home offices, one
11  for the class of 2021, one for the class
12  of -- you know, last year, that would be
13  for this coming year, 2022.  So one for
14  the class of '22, one for the class of
15  '23, one for the class of 2024.
16    Q.    When you describe the
17  ability to potentially look over the
18  course of somebody's cumulative file and
19  see if there's anything -- like, a
20  pattern that a student acting in a
21  particular way, is that just, like, up to
22  the discretion of whoever wants to look,
23  or is there somebody in particular that
24  would be responsible for monitoring to

1 see if there's a pattern and practice of

2 a particular student acting in a certain

3 way?

4      A.    So there's a child study

5 process that if individuals have concerns

6 about students at the elementary school.

7 At the middle school, it's more of a

8 teammate kind of approach, where they

9 would look at students and see, you know,

10 is there a pattern of behavior, are their

11 academics suffering, you know, what might

12 be going on, and then, you know,

13 interventions could be taken at that

14 junction.  At the high school, they don't

15 have a true child study process or a --

16 you know, that sort of thing commonly,

17 but there would be discussions among

18 those that are in the special education

19 arena, are thought to be eligible for

20 special education, those kinds of, you

21 know, discussions could be happening at

22 that level, you know, regarding the needs

23 of kids.

24      Q.    And I'm familiar with the

1 child study team, a couple different

2 witnesses have talked about that in their

3 testimony.

4         But it's my understanding

5 that a child study team, someone needs

6 to, like, recommend or, like, fill out a

7 form for, like, a student to have a child

8 study team meeting or whatever, is that

9 your understanding?

10     A.    Yeah.  Somebody has to

11 recommend a student that we have

12 discussed, yes.  They don't appear

13 without somebody putting them on a list.

14     Q.    So is -- would you agree

15 with me that there is no process in place

16 for anybody at the district to be

17 monitoring student's disciplinary files

18 to see if there's a pattern or practice

19 of a certain type?

20     A.    I don't know that I

21 understand what you mean by that.  What

22 do you mean by monitoring?  Like, we

23 don't have a system of demerits, and if

24 you have 12 demerits, you then -- this

1 happens to you or anything -- we don't

2 have anything like that.  But if there

3 are issues that are happening or if

4 somebody has concerns about a child, you

5 know, they could talk about that student

6 in a child study arena and discuss what's

7 going on.  But we don't have, like, a

8 demerits and cumulative points system or

9 anything like that that, you know, is

10 electronically tracked and when you hit

11 so many points it, you know, kicks a

12 student's name up to being put into a

13 child study discussion.

14      Q.    So there's nobody, like, at

15 the administrative level at the district

16 that would say, like, oh, this particular

17 student got in trouble for this in

18 elementary school, oh, and something

19 similar in middle school and something

20 similar in high school, that would --

21 there's no way to, like -- that the

22 district has in place to, like, monitor

23 or track that; is that correct?

24      A.    There's -- we don't have a

1 system where somebody is combing through
2 records and looking and seeing, you know,
3 what's happening.  It's more of, if there
4 are concerns about that person or
5 something recent happened and we wanted
6 to look at the record, we would do it
7 then.
8        Q.    Okay.  Have you heard of the
9 term 'hostile educational environment'?
10       A.    I have.
11       Q.    You have?
12       A.    Yes.
13       Q.    What's -- what does that
14 mean, what's your understanding of what
15 that is?
16       A.    My understanding of that is
17 if somebody feels like they are in a
18 environment where they're being treated
19 in a way that's making it really
20 difficult for them to be able to carry
21 out their job functions, they just feel
22 like they're in a hostile environment
23 because of the way that they've been
24 treated by coworkers or by supervisors.

1    Q.    So, are you talking --
2  you're kind of talking at the employee
3  level, then, because you said jobs and
4  coworkers and stuff like that, right?
5    A.    Yes.
6    Q.    Is there a hostile education
7  environment for students, is that, is
8  that a thing?
9    A.    I'm not familiar with that
10 term being used for students.  I could
11 think about, you know, kind of the
12 coronary to what is -- what we more
13 commonly would talk about would be a
14 hostile work environment for adults.  But
15 I'm not familiar with that term,
16 necessarily, for students.
17    Q.    Okay.  As superintendent, if
18 somebody at the school level or
19 administrative level is doing an
20 investigation into harassment of a
21 student, do you get notified of that
22 investigation once it's completed?
23    A.    If it rises to a level where
24 there's disciplinary action that's

1  necessary, that would be of -- at the
2  student level, it would be, like, an
3  expulsion, then I would be notified of
4  it.  If it's a employee, if that employee
5  would be suspended, you know, without
6  pay, I would be notified of that.
7          Q.    If it involves a
8  student-on-student harassment, so you're
9  saying unless it was going to involve the
10 expulsion of the student, that's
11 something that you wouldn't be notified
12 of --
13         A.    That's correct.
14         Q.    -- as the superintendent?
15         A.    That's correct.
16         Q.    As a superintendent, do you
17 have the authority or ability to
18 implement measures at school for the
19 safety of a particular student?
20         A.    I would say I have the
21 authority to do that.  I don't see it
22 being done unilaterally by the
23 superintendent.  It would be in
24 cooperation, if necessary, with the

1 school principal.  But typically that

2 wouldn't rise to my level.  That would be

3 handled by principals and either the

4 director of elementary or director of

5 secondary or in this case, now, the

6 assistant superintendent that has

7 responsibility.  I wouldn't get involved

8 in that.  But I -- if it was necessary,

9 they came to me and they would like my

10 input, that, that would be, you know, a

11 possibility.  But I wouldn't get involved

12 in those things.

13       Q.    Is it -- I'm sorry, I --

14       A.    That was typically.

15       Q.    Okay.  Sorry.

16             Do you have the ability, as

17 the superintendent, are you able to, if

18 you wanted to put a paper in some

19 student's cumulative file, something you

20 were involved in, is that -- are you able

21 to do that, as the superintendent?

22       A.    Nothing would stop me from

23 doing that, but I would not.  That

24 wouldn't be something I would do.  That's

1 not routinely done by me. I don't put

2 entries into student files. I don't --

3 I'd have to ask where they are and all

4 that. I'm just not involved at that

5 level.

6          Q.    Okay. Your facial

7 expression, when I asked you, you kind of

8 had a bewildered look, a little bit of --

9          A.    I'm trying to think, where

10 would they -- where would I go, where are

11 they. I don't do that.

12          Q.    Okay. Who is, who is the

13 person or the level that would do that or

14 would know to do that?

15          A.    The school principal or

16 assistant principal, depending on the

17 level.

18          Q.    Okay.

19          A.    Or the special education

20 supervisors also would be in consultation

21 with the principal too. So, they're

22 another individual that could be involved

23 in that.

24          Q.    Are those --

1    A.    (Inaudible.)

2    Q.    I apologize.

3          Are those the people that

4    you would be looking to -- if something

5    needed to be documented in a file, that

6    they'd be the ones to do that in a

7    student's file?

8    A.    Yeah.  It would be, like,

9    the supervisor; the special ed

10   supervisor, if a child has an IEP, or the

11   school principal or assistant principal.

12          MS. LAUGHLIN:  Why don't we

13      take, like, a brief five-minute break,

14      if that's okay, before we jump into

15      the next part.

16          MS. JORDAN:  Sure, no

17      problem.

18          MS. LAUGHLIN:  Thanks.

19              -  -  -

20          (A recess occurred from

21      11:36 a.m. to 11:45 a.m.)

22              -  -  -

23   BY MS. LAUGHLIN:

24   Q.    Dr. Dietrich, are you

1 familiar with the Department of Education

2 Office for Civil Rights?

3        A.    Am I familiar -- in terms of

4 what level of familiarity, that it

5 exists, or?

6        Q.    You've heard of it before,

7 right?

8        A.    I've heard of Office of

9 Civil Rights, yes.

10        Q.    Have you ever received any

11 of the guidance put out by the Office of

12 Civil Rights from the Department of

13 Education, whether it's a Dear Colleague

14 letter or a Q&A or anything like that?

15        A.    Yes.  I have received Dear

16 Colleague letters, for example.

17        Q.    Do you -- when you -- how do

18 you receive those?

19        A.    My recollection is they

20 would either e-mail or physically mail.

21 My recollection is, more recently, they

22 get e-mailed to us.

23        Q.    And when you get those, do

24 you read through those documents?

1    A.    I do.

2    Q.    When you read through them,

3  is there anything that you do or

4  implement as a result of reading them?

5    A.    If there's something in

6  there that indicates action, you know,

7  then we would take action. Typically I

8  would review those with the solicitor's

9  office.

10    Q.    Like, in a meeting or

11  something like that?

12    A.    Yes.  In a phone call or a

13  meeting, whatever it might be.

14    Q.    Is that something -- when

15  you say "we would take action", is that

16  something you're relying on the solicitor

17  to let you know whether you need to take

18  action on a particular guidance from the

19  Office of Civil Rights?

20    A.    In terms of relying on the

21  solicitor, I mean, if it was clearly

22  stated in that you shall take action on

23  something that I got, we would, you know,

24  do that.  But we would talk with the

1    solicitor.

2         Q.    And get the advice on what

3    you need to do?

4         A.    Yes.

5         Q.    Okay.  Now you're aware of

6    an incident that occurred between ███████

7    ████████ and ████████ ████████ in the

8    2014/2015 school year; is that right?

9         A.    I'd have to think about the

10   years, but I'm aware of an incident that

11   happened in sixth grade for those

12   students.  So, I think those corresponds

13   to those years.

14        Q.    What did you -- I didn't

15   hear what you said.

16        A.    Sixth grade.

17        Q.    Sixth grade?

18        A.    Yeah.  It was his sixth

19   grade, as I recall.

20        Q.    Yeah.  So just to orient

21   you, ███████ and ████████ sixth grade year

22   was the '14/'15 school year.

23        A.    That sounds right.

24        Q.    So that was -- that --

1  sorry -- so that's the incident you're

2  aware of, an incident occurring between

3  the two of them in sixth grade?

4      A.    Yes.

5      Q.    And how did you become aware

6  that there was an incident between the

7  two of them in sixth grade?

8      A.    My recollection, it was

9  brought to my attention by the director

10  of human resources, Cheryl McCue.  The

11  director of elementary education, Dr.

12  Betty Santoro is also another individual.

13  So I'm not positive to which one told me

14  first or how I learned of it precisely,

15  but those would be the two individuals

16  that, most likely, one of the two would

17  have talked to me first, and then we all

18  talked about it.

19      Q.    Was it in-person?  Or by a

20  phone call?  Or an e-mail?

21      A.    I don't, I don't recall.

22      Q.    What do you recall about

23  what either Dr. Santoro or Ms. McCue had

24  told you?

1    A.    I recall that it came to the
2  attention of the school, Gwynedd Square
3  Elementary School, that a student filed a
4  complaint or, you know, concerns were
5  raised about another student in the class
6  and that, at that juncture, that was in
7  the spring of those student's sixth grade
8  year.  The board came out -- in other
9  words, it came out that there was also an
10  assertion made that something had
11  happened in the -- I want to say fall of
12  the year.  I don't recall exactly when,
13  but if I had to estimate, not guess, it
14  was November-ish, somewhere in there,
15  that something had happened in the fall
16  of the year --
17    Q.    Okay.
18    A.    -- with that male student
19  and in this case a female student, who's
20  the subject of this lawsuit.
21    Q.    Okay.  And the male student,
22  just so we're clear, are you talking
23  about ███████ ████████
24    A.    Yes.

1    Q.    And the female student in

2  the fall, that was ███████ ██████████████

3    A.    That's correct.

4    Q.    And what, what was your

5  understanding at the time of what had

6  happened in -- like, what was the

7  incident in the spring with the sixth

8  grade female student and ████████

9    A.    My recollection is that the

10  female student in the spring reported

11  either to the parent and the parent

12  raised it to the school or the student

13  raised it directly.  I don't know for

14  certain how it came to the attention of

15  school officials.  But that there was

16  contact that was made by the boy that,

17  you know, was unwelcomed (sic),

18  upsetting, it was, you know,

19  inappropriate and that it came out at

20  that point that that same boy had done

21  something to, in this case the subject of

22  the lawsuiter (sic), ██████████ in the fall.

23  That's what I recall being told.

24    Q.    When you say that he had

1 unwelcome, upsetting, inappropriate

2 contact with the girl, can you be more

3 specific than that, of --

4      A.    I --

5      Q.    -- what kind of contact

6 you're referring to?

7      A.    I am not sure.  It was of a

8 sexual nature.  But I don't know anything

9 in terms of the detail of that.  That's

10 all I knew.

11      Q.    But you recall that it was a

12 sexual nature?

13      A.    It was of a sexual nature

14 and, and that it came out that there was

15 also something that happened in the fall,

16 and then it was explained to me that the

17 teacher took the two students, the boy

18 and the girl in the hall and said

19 something to the effect of -- and did it

20 together, which was, you know, really

21 upsetting to me, concerning to me -- but

22 had the boy and girl out there together

23 and said something to the effect of, "you

24 shouldn't be doing that, and if you don't

1  do it again, I won't say anything to your

2  parents".  You know, something to that

3  effect is what I was told the teacher

4  said, and for that the teacher, you know,

5  got in trouble.

6        Q.    Was the incident in the fall

7  involving ███████ and ████████ do you

8  recall what that act was or what was

9  going on there?

10       A.    No, I don't.  All I was told

11  was there was something happening -- the

12  lights had been turned down, they were

13  next to each other, and they were -- I'll

14  use the term 'handsy' with each other.

15  They were touching each other, is what I

16  was told.

17       Q.    And you don't recall who

18  told you that?

19       A.    That would have been either

20  Dr. Santoro or Dr. McCue, but I'm not

21  positive which one.  And there's another

22  possibility that they said, "Curt, we

23  need to see you", and the two of them

24  came to see me together.  I mean, that's

1 a very likely possibility, but I don't

2 remember.

3      Q.    Okay.  Was it your

4 understanding, just like in the incident

5 in the spring, you said that me -- you

6 couldn't remember the specific details,

7 but it was of a sexual nature, was the

8 fall incident, also, from your

9 recollection, of a sexual nature?

10      A.    Yes.

11      Q.    Once you were notified of

12 this information, what did you do?

13      A.    So, we had a discussion

14 about it, and then I think that there was

15 interviewing that was done of the

16 teacher.  My recollection is that would

17 have been done with the director of HR,

18 Cheryl McCue.  I don't remember who else

19 would have been present.  I know our

20 protocols would have indicated that a

21 teacher's association or teacher's union

22 rep would have been there with the

23 teacher, but I don't know that for

24 certain.

1  Q.    In preparation for your
2  deposition today, did you review any
3  documents?
4        A.    I did not.
5        Q.    Do you have anywhere that
6  you keep any documents regarding, like,
7  student issues or even, like, lawsuits
8  that are filed or anything?
9        A.    The HR office keeps files on
10 all, on all individuals.
11       Q.    When you say "keeps them on
12 all individuals", what --
13       A.    All of our employees.
14       Q.    Okay.  Like, employee files
15 or something are kept in HR, is that what
16 you're saying?
17       A.    Yeah.
18       Q.    Okay.
19       A.    Yes.
20       Q.    Is there any documentation
21 or anything that you keep -- like, for
22 example, one of the teachers that I had
23 spoken to recently said that she has a
24 Google drive from the district that she

¹ keeps, like, important documents in -- do

² you as the superintendent have anything

³ like that, any type of, like, file

⁴ keeping on issues?

⁵        A.    I don't.  Now, I wouldn't

⁶ call it a document, but we had e-mails.

⁷ So we have an e-mail system that's

⁸ archived.  In preparation for this, I did

⁹ do a review or a search in my e-mails to

¹⁰ see what was in my e-mails that might

¹¹ help me and jog my memory, but I don't

¹² have a, like, a system of filing for my

¹³ own.  The things would be in the HR

¹⁴ files.

¹⁵        Q.    Did you -- in doing the

¹⁶ e-mail search, did you come up with

¹⁷ anything?

¹⁸        A.    There were some e-mails in

¹⁹ there, more recently, about this case and

²⁰ then --

²¹        Q.    I --

²²        A.    -- there was an e-mail --

²³        Q.    I just want to jump in.  I

²⁴ don't want to ask -- if your lawyers were

1 sending you e-mails, like, about

2 deposition prep or something like that,

3 I'm not asking about that.

4      A.    Okay.

5      Q.    But outside of

6 communications with your counsel, was

7 there anything that you had described to

8 help refresh your recollection or to give

9 you details as to what had happened in

10 the past?

11      A.    There was an e-mail from my

12 then secretary, who is now retired,

13 indicating that she had received a phone

14 call, that Mrs. ████████ wanted to

15 speak to me about her daughter.  There

16 was an e-mail that -- I think it would be

17 the mother -- ████████ had filed

18 indicating that they wanted certain

19 records, and, you know, part of that

20 e-mail, there was communication that was

21 from an attorney with the mother.  And

22 then the rest of it would have been,

23 like, in preparation for this.

24      Q.    Okay.  And so that e-mail

1  that you described, is that something

2  that you still have today?

3         A.    I do, mm-hmm.

4         Q.    And is that -- your

5  secretary was summarizing, like, what the

6  call was about and --

7         A.    Well, no, not summarizing.

8  But it was, "Mrs. ██████████ called you,

9  it's about her daughter who is at

10 Pennbrook, and she believes you know what

11 this is about", you know, that kind of a

12 thing.

13        Q.    Okay.

14        A.    Yeah.  She didn't --

15        Q.    Okay.  I'd ask that you give

16 that e-mail to your counsel --

17        A.    Okay.

18        Q.    -- if you have it, after

19 this deposition so that she can provide

20 it to me.

21              Did that help refresh your

22 memory as to anything?

23        A.    No, it didn't.

24        Q.    Do you recall whether you

1   had talked to Mrs. ███████ after that

2   phone call -- or, after that e-mail that

3   you got?

4        A.    I do recall Mrs. ████████

5   and I had a phone conversation, yeah.

6   But that e-mail didn't help me remember

7   that.  I remember that we had that.

8        Q.    Was that in relation to

9   getting the documents together or a phone

10  call involving something different?

11       A.    That e-mail was back when

12  ██████ was in middle school.  Mrs.

13  █████████ had called me, and ██████ was

14  in middle school.  That's what that

15  e-mail from my secretary was, "Mrs.

16  █████████ called to speak to you about

17  her daughter who was at Pennbrook, she

18  says you know what this would be about",

19  that sort of thing.

20       Q.    Okay.

21       A.    I, I -- but I didn't need

22  that e-mail to remind myself that I had

23  talked with Mrs. ███████

24       Q.    Generally -- just generally,

1    what was -- the telephone call you

2    remember with Mrs. ███████ what was

3    the topic of that?

4         A.    The recollection I have of

5    it was that she wanted her student to be

6    able to attend North Montco Career

7    Technical Center for her daughter's

8    education, and she wanted to be certain

9    that, you know, I understood that the

10   boy, ██████ █████ and ██████ were not to

11   be in the same classes together.  I

12   believe I recall, I'm almost certain of

13   this, but I have to say I don't recall

14   specifics, but I think we talked about

15   the fact that both of them would be at

16   the vocational technical school in, in

17   the same building, but there would be a

18   safety plan that mom was asking to be

19   developed and that they wouldn't be

20   crossing paths and seeing each other,

21   they wouldn't be in the same lab area,

22   you know, the same subject area.

23        Q.    And what -- in response to

24   the mom asking for a safety plan, what

1    did you do, and how did you respond?

2          A.    I spoke with North Montco

3    Technical Career Center representatives,

4    and they developed a safety plan at the

5    North Montco Technical Career Center.

6          Q.    Was -- from your

7    recollection, was this in, like, the

8    ninth -- ██████ ninth grade year, like,

9    from when she was in middle school, going

10   part-time, and then trying to go

11   full-time to North Montco?

12         A.    My recollection is ██████

13   was there in what they called the PYAP

14   program, which is the Pennsylvania Youth

15   Apprenticeship Program.  So, my

16   recollection is that ██████ was in the

17   full-time PYAP program but that the

18   vo-tech school wasn't pleased and didn't

19   think that she could continue there

20   because she wasn't following the safety

21   plan, is what I remember.  That's what I

22   recall.  There was some issue with ██████

23   attending, and the vo-tech saying, "we

24   really don't want to have her back again

1 because she's not being cooperative with

2 us to follow the safety plan".  That's

3 what I remember.

4      Q.    Do you remember -- just to

5 try and put it into context as to when

6 the situation you're describing happened,

7 do you know whether that was before or

8 after ███████ had gone to North Montco

9 High School?

10      A.    My recollection is it was

11 after she had been attending there, and

12 there was talk that they didn't want her

13 to come back, that's what my recollection

14 is.  Like, she attended -- I'm pretty

15 sure that she attended the PYAP program

16 as a ninth grader and that they didn't

17 want her back again because they were --

18 I'm thinking they were certain about

19 that, but they were just frustrated with

20 her and didn't know that it was going to

21 work, to have her continue in that

22 program.

23      Q.    So from your understanding,

24 is that before she had gone to North

1  Montco High School?

2      A.      She was already there.

3      Q.      I'm sorry, I apologize.  I

4  meant to say North Penn High School.

5              Was it before she went to

6  North Penn High School?

7      A.      That would have been before

8  she went to North Penn High School

9  because our middle schools go seven

10 through nine.

11     Q.      Okay.  I'll get back to the

12 conversation that you had on the

13 telephone with Mrs. ███████████  but

14 right now I just want to focus on this

15 incident that -- these incidents that you

16 became aware of at Gwynedd Square

17 Elementary School.

18             Once you had been notified

19 of -- that there was a sexual nature

20 incident in the fall with ██████  and

21 ██████  and then a sexual nature incident

22 that was in the spring with a different

23 female student and ███████  what did you

24 do with that information?

1    A.    So, I don't recall the
2  details of how that was pursued with the
3  HR department, the school principal, very
4  likely the director of education, and the
5  employee, and perhaps an employee's
6  representative, but I remember the
7  conclusion was that the teacher would be
8  suspended without pay, you know, would be
9  suspended, because the way she handled
10 that was not the way North Penn want her
11 to -- she didn't handle it appropriately.
12    Q.    Okay.  Before we get into,
13 like, the -- what happened after that,
14 like, in terms of the employee and stuff
15 like that, as far as the -- just finding
16 out about these two incidents with ██████
17 and these two different girls in sixth
18 grade, was there anything that you
19 directed anybody to do, like an
20 investigation or anything like that, as a
21 result of learning this information?
22    A.    In terms of investigating
23 the actual incident, I didn't have to
24 direct them to do that.  That -- they did

1 that as their, you know, normal protocol

2 to do an investigation. I didn't have to

3 direct them to do the investigation.

4 They did the investigation.

5         Q.    Was that something that you

6 weren't involved with, then?

7         A.    Only to get the summary

8 that -- conclusion that the investigators

9 made, was that the teacher brought the

10 students into the hall together rather

11 than individually and that the teacher

12 made the comment -- I can't remember

13 exactly what it was, but the gist of it

14 was, "if you don't do this -- you are not

15 to be doing this. If you don't do it

16 again, I won't tell your parents". I

17 think the teacher -- and my recollection

18 is the teacher was asserting that she

19 thought that it was a consensual sort of

20 thing and that they didn't understand

21 boundaries, didn't understand boundaries

22 for one another and boundaries regarding

23 school and that it was something they

24 developmentally needed to learn. You

1  don't do this kind of think in a school

2  setting, and you just don't do this kind

3  of thing, generally.  But she believed it

4  was consensual.  That's what I was told,

5  that the teacher explained in terms of

6  her thought process in that fall

7  incident.

8       Q.    When you --

9       A.    But that still was something

10 that we believe wasn't handled.  You

11 don't do it that way.  You don't bring

12 the two students together at the same

13 times in the hallway, and you don't talk

14 about how -- you know, don't do it again,

15 and I wont tell your parents.  Those two

16 things, really, were so far out of bounds

17 that we felt it was necessary to suspend

18 the teacher, you know, as a consequence

19 for her action.

20      Q.    When you say that you don't

21 interview the two students together,

22 that's so out of bounds, what -- why

23 don't you interview the two students

24 together?

1    A.    That's a part of the sexual
2  harassment training, you know, that we've
3  had, as we had talked about earlier on
4  this deposition.  You don't do that, you
5  don't bring, you know, potentially a
6  victim with an aggressor together in the
7  hallway to interview them at the same
8  time, you just don't do that.
9    Q.    When you say "training that
10  we've had", do you mean, like, the
11  administration level training --
12    A.    Yes.
13    Q.    -- that you were talking
14  about earlier?
15    A.    Yeah.
16    Q.    Okay.  But just from your
17  testimony earlier, you don't know whether
18  that training made it down to the, like,
19  staff employee level; is that right?
20    A.    I don't know; I'm not sure.
21    Q.    And you would have been
22  looking to, like, the principal at the
23  school to have done that; is that true?
24    A.    Yeah.

1  Q.    In terms of the

2  investigation or the outcome of the

3  incident of what happened with the two

4  students, not really, like, the HR

5  department, the teacher, but in terms of,

6  like, the student, what ███ was doing

7  or did, did you -- were you informed of

8  an outcome of that investigation?

9  A.    In terms of, like, school

10 consequences or that sort of thing?

11 Q.    Like, did it happen, like,

12 you know, any of that?  Was there a

13 conclusion that you're aware of or were

14 made aware of?

15 A.    No.  I was not made aware of

16 anything like that.  That was handled at

17 the school level.  I don't know what, if

18 any, consequence there were for this

19 student.

20 Q.    Okay.

21 A.    It didn't rise to the level

22 of expulsion, so it didn't come to me.

23 Q.    Okay.  So, to clarify, I

24 think you might have told us this

1 earlier, if it doesn't come to the level
2 of a recommendation of the kid being --
3 the student being expelled, you don't get
4 involved in that?
5      A.    That's correct.
6      Q.    How is there -- is there any
7 oversight over whether discipline of a
8 student is appropriate?
9      A.    So, the principal would, at
10 times, be contacted by the student or the
11 parent or the teacher regarding school
12 discipline and whether the consequence
13 was appropriate or not.  So, somebody can
14 call the principal and say, "I don't
15 think my student should have gotten a
16 detention for that" or "I don't think
17 they should have been suspended", or
18 whatever it might have been, you know,
19 that can happen.  Likewise, the teacher
20 might say to the principal, "I don't
21 understand why you gave, you know, this
22 consequence when I sent the student to
23 the office, I think there should have
24 been a different consequence", or

1 whatever it might be.  Or the student,

2 you know, might come advocate for

3 themselves, to say, "I just don't think

4 that was fair, wasn't the right, you

5 know, thing to do".

6          Q.    Is there anyone in, like, a

7 supervisory role, though, over a

8 principal who would be, like, be able to

9 tell whether a discipline was

10 appropriate?  The examples you gave are

11 kind of, like, a lower level; a teacher,

12 a student, a parent.  What about from a

13 higher level of a principal?

14          A.    I think there's times when

15 parents appeal to the principal, and then

16 there's parents that would appeal for a

17 principal's decision, like they would

18 call the director of elementary, for

19 example, at the elementary level, the

20 director of secondary or assistant

21 superintendent, to say, "I don't think

22 that my child should have gotten what

23 they got" or, conversely, there are times

24 when parents will call and they want to

1  know, "what did that student -- what
2  happened to that student, I want to know,
3  did they get, you know, X, Y or Z".  That
4  is something that we wouldn't be sharing
5  with a parent because that's, you know,
6  an educational record of the -- that
7  student that's not theirs.  So, you know,
8  we wouldn't be talking about the
9  individual consequences of another
10  student.
11       Q.    So, the example that you
12  gave was kind of a parent then calling,
13  like, whether it's an assistant
14  superintendent or a director of something
15  or whatever.
16            Is there -- would you agree
17  with me that there's no independent
18  oversight, though, like a director of
19  special education or a assistant
20  superintendent or a superintendent, that
21  would be seeing whether discipline that
22  principal is giving is appropriate in the
23  circumstances?
24       A.    Like, done independently,

1  reviewing each day's discipline to see

2  if -- what was done that day?

3  　　　　Q.　　Just in any way.　Like, is

4  it independently done, or does the

5  administration wait for, like, a -- if a

6  parent calls or something, or if somebody

7  calls with an issue, then they get

8  involved, but otherwise there's no, like,

9  independent process to be monitoring

10 that?

11 　　　　A.　　No.　I don't know of any

12 independent process to monitor them.

13 　　　　Q.　　Okay.　With your involvement

14 or your, your knowledge about the

15 incidents that occurred at Gwynedd Square

16 involving ██████ ██████ is there anything

17 you remember independently that you

18 didn't already tell me?

19 　　　　A.　　No.　That's all I remember.

20 　　　　Q.　　You were kind of just, once

21 you got the information, other than the

22 employee stuff, you were letting the

23 student stuff be handled by people lower

24 than you, correct?

1    A.    Correct.

2    Q.    I'm gonna --

3    A.    So there --

4    Q.    Go ahead.

5    A.    Yeah.  So, when you say

6  Gwynedd Square, at the end of Gwynedd

7  Square, prior to middle school, then

8  there was the parent request -- my memory

9  says the two students would have been

10  slated to go to the same middle school

11  and the parent didn't want the students

12  to go to the same middle school, and my

13  recollection is that the parent asked for

14  a different middle school, wanted to go

15  to Pennbrook Middle School instead of --

16  I think it would have been Penndale

17  Middle School, from Gwynedd Square.  So,

18  they weren't desirous of having their

19  daughter -- I mean, the mom was not

20  desirous of having ████ attend the same

21  middle school, wanted a different middle

22  school and requested that the child be

23  permitted to attend Pennbrook Middle

24  School.  Now I don't remember if she

1   contacted me about that or if I was told
2   about that.  I don't remember for
3   certain.
4       Q.    Okay.
5       A.    But I remember, I remember
6   believing, understanding, whatever word
7   you wanted to use, that she wanted a
8   different middle school, that I remember,
9   and that would have had to have been at
10  the conclusion of Gwynedd Square, prior
11  to going to middle school.  So I don't
12  know exactly when that would have been,
13  if that would have been, you know, May,
14  June, July or August, but it would have
15  been prior to the start of school in
16  September.
17      Q.    So you were aware of that
18  before the actual transfer was made?
19      A.    I was aware she asked for a
20  transfer of attendance, is what we call
21  them.  But don't remember if she asked me
22  about that.  I don't handle those.  So,
23  I'm not positive about that, if she said,
24  I would like to have it -- to me or if

1  somebody told me she had made that

2  inquiry with them about a different

3  middle school.  But I remember

4  understanding that she wanted a different

5  middle school than the one where ████

6  was going to be going to.

7       Q.     Did you understand why she

8  was making that request?

9       A.     She didn't want them in the

10  same middle school, the two children.

11       Q.     But was it as a result of

12  what had happened in the sixth grade year

13  between the two of them?

14       A.     I think it was a result of

15  that, you know, that interaction that was

16  happening in the, in the elementary

17  school, that she just felt it would be

18  better if they would go to different

19  middle schools, and she wanted to have

20  her child go to Pennbrook.

21       Q.     Okay.

22       A.     Yeah.

23       Q.     Even though -- since you

24  said you weren't readily involved in this

1 transfer of students or transfer of

2 class, do you know why you were brought

3 into the loop on this one?

4      A.   Again, that's what I'm

5 trying to recall, if she asked me and I

6 directed to someone else, or if she asked

7 for a transfer of attendance and I was

8 told about it. That's the part I don't

9 remember.

10      Q.   Okay. Whether it was you

11 or, or somebody else that you were aware

12 of that somebody else was actually

13 handling the transfer, do you know

14 whether there was any discussion with

15 ████ her mother about ████

16 education course being changed versus

17 ████'s?

18      A.   I remember vaguely that the

19 mother -- I'm almost positive, I'm not a

20 hundred percent sure about this -- but

21 the mother thought that ████ shouldn't

22 be permitted to go to the vo-tech school,

23 because ████ wanted to go to the

24 vo-tech school, and I am pretty sure that

1  we discussed that we weren't going to

2  prohibit ▉▉▉▉ from pursuing his, you

3  know, line of education, his access to

4  the particular programs because the

5  vo-tech school has, you know,

6  specialties.  It's different than the

7  middle schools which would offer the same

8  courses.  I am pretty sure that the mom

9  had called me to say, "I don't think that

10  ▉▉▉▉ should be permitted to go to the

11  area vocational technical school because

12  my daughter wants to go there", and we

13  discussed that he would be permitted to

14  pursue his education and that the vo-tech

15  school would develop a safety plan where

16  the two wouldn't, you know, be together

17  in the same course of study, because they

18  weren't interested in pursuing the same

19  course of study, yeah.

20       Q.    Why, why would you tell

21  Mrs. ▉▉▉▉▉▉ that you wouldn't limit

22  ▉▉▉▉ ability to attend the tech

23  school, even though ▉▉▉ was attending

24  the tech school and at this point was the

¹ incident in elementary school and then

² she had transferred to the middle school

³ to separate herself from him?

⁴         A.    Why would we not use that as

⁵ a reason to bar him from pursuing his

⁶ area of interest, is that what your

⁷ question is?

⁸         Q.    Yeah.  Why are you telling

⁹ the parents that you're not going to or

¹⁰ that you -- was it that you weren't going

¹¹ to or you can't prevent him from going to

¹² a tech school?

¹³         A.    Well, it would be a very

¹⁴ high standard to meet to prevent somebody

¹⁵ from pursuing their area of interest and

¹⁶ go to a specialty school like the vo-tech

¹⁷ school when they're other remedies that

¹⁸ are possible for a school safety plan or

¹⁹ individual safety plan.  So, that would

²⁰ have been the discussion, that, you know,

²¹ we believe that he would be permitted to

²² attend the vocational technical school to

²³ pursue his area of interest.  And at

²⁴ that, you know, junction, what we had was

1  the two students reporting to the --

2  explanation was given, when the lights

3  were down, they were -- you know, the

4  teacher believed consensually touching

5  each other, that's what we had at that

6  point in time.

7      Q.   Did you -- you said the

8  teacher believed it was consensually

9  touching -- did you believe it was

10 consensually touching each other?

11     A.   I wasn't there.  I didn't

12 see it; I wasn't there.

13     Q.   But, but you were told the

14 information, correct?

15     A.   I had no reason to believe

16 that it was anything different than what

17 the professional in the classroom

18 observed.  So, that's what I was told.

19     Q.   So are you, are you -- just

20 so I understand your testimony, are you

21 telling me today that you also believed

22 that it was consensual, then, because the

23 teacher -- that's what the teacher told

24 you, and you're going to go with what the

1 teacher said; is that true?

2          MS. JORDAN:  Note my

3      objection to the form of the question.

4          You can answer.

5          THE WITNESS:  So, ask it

6      again -- in a different way, rather.

7          MS. LAUGHLIN:  Sure.

8  BY MS. LAUGHLIN:

9      Q.    The -- we're talking about

10  the sixth grade incident, and I asked you

11  if you thought it was consensual, and you

12  had said, I can't -- I wasn't there", and

13  I said, "I know, but you told me that --

14  or, you were told what happened".

15          So I'm asking, from your

16  understanding, was that consensual?  And

17  I think that your answer was that you had

18  to go by what the teacher who witnessed

19  it told you, and so --

20      A.    Do the investigation myself.

21  I didn't see it, I didn't have

22  discussions with the teacher about the

23  particular act and, you know, what it is

24  that the teacher saw or anything like

1  that.  My interaction with the teacher

2  was that they were not to have taken the

3  two students out together, and they were

4  not to have said, "don't do it again, and

5  I won't call your parents".

6           But in terms of the

7  disposition of that incident, the teacher

8  believed that it was consensual activity

9  between those two students, and that's,

10 you know, what I was told.  So, that --

11 absent any additional information that

12 anyone could have provided, I didn't

13 believe that it raised to the level of

14 barring another student from their course

15 of study.  So, Mrs. ████████ had no

16 other information to provide to me to

17 indicate anything different than what we

18 had.

19      Q.    You told me that it's a very

20 high burden to interrupt a student from

21 their choice of course of study; is that

22 right?

23      A.    That's correct.

24      Q.    When you say "it's a very

1  high burden", what's the burden?

2          A.     I just think it's really

3  difficult to bar a student from a course

4  of study that's not offered.  It's one

5  thing at the middle school, it's another

6  thing to bar them from a particular

7  course of study that's a specialty.  So

8  we do, you know, expel students and

9  they're put on some alternative program

10 or anything like that.  If there's a

11 case -- so if a student makes a bomb

12 threat or, you know, brings a weapon into

13 school, you know, they can be expelled

14 from school, you know, that sort of

15 thing, and then they are able to access

16 their education or we provide them with

17 an education if they can't within the 30

18 days.  But we didn't have, you know,

19 something that rose to an expulsion

20 level, so there wasn't, you know, a need

21 to expel someone or bar them from a

22 school or something like that.

23         Q.     So the, the very high

24 burden, is it more, like, an expulsion

1 level, and that's what would -- something
2 that rises to the level of requiring a
3 student's expulsion to prevent them from
4 doing the course of study that they want
5 to do that's specialized?
6      A.    Well we -- yeah, and we
7 would have to look at, is there a
8 reasonable safety plan that could be put
9 into place, because the mom was concerned
10 that her daughter and this boy were going
11 to be in the same school together.  But
12 in conversation with North Montco, we
13 were reassured as North Penn School
14 District that they weren't choosing the
15 same course of study and that they could
16 put a safety plan together where the two
17 need not, you know, be together in the
18 school at the same time.
19      Q.    I want to go through --
20 since you didn't review them in advance
21 of the deposition today, and I don't --
22 you know, it sounds like the -- we'll go
23 through the documents that we have from
24 that period of time in Gwynedd Square to

1  see if it helps refresh your recollection

2  or go through the notes that you were

3  present for, okay?

4      A.    Sure.

5      Q.    Are you able to see my

6  screen?

7      A.    I am, yeah.

8      Q.    Okay.  And just let me know

9  if you need it any bigger or something

10  like that.

11          But for the record, I'm

12  referring to North Penn production bates

13  number 1003.  These are notes, from my

14  understanding, of Cheryl McCue from

15  meetings that occurred following the

16  Gwynedd Square incidents in sixth grade.

17  At the top right-hand corner, it's dated

18  May 5th, 2015, and there's a list of

19  attendees, and the second one is Curt,

20  which I assume is you, Dr. Dietrich; is

21  that right?

22      A.    I think that's a very good

23  assumption.

24      Q.    Okay.  Is there any other

1  Curt that you're aware of?

2      A.    Not that would have been at

3  a meeting like this.

4      Q.    Okay.

5      A.    That would have been me.

6      Q.    I'm sorry, can you say that

7  again.

8      A.    That would have been me.

9      Q.    Okay.

10     A.    Yeah.  That would have been

11  me.

12     Q.    Okay.  And this is Holly,

13  meaning Holly Andrew.  Does that refresh

14  your memory as to who the teacher was who

15  was involved in the sixth grade incident

16  with ██████ and ████████

17     A.    Yes.

18     Q.    Okay.  And I'll just read

19  through these, these notes to see if it

20  refreshes your recollection.

21          It says, acts so egregious?

22  And then it says, poor judgment not

23  reporting sexual to authority.  Girl and

24  guy questioned together.  Telling

1 students that it will go no further, if
2 they stopped, they won't tell the
3 parents, and then it says, not
4 consensual, not appropriate school
5 behavior today and then letter.
6         Do you see all that?
7     A.    I do.
8     Q.    Do you recall this meeting
9 at all?
10    A.    I don't.
11    Q.    Based on reading this, do
12 you recall any discussion about what was
13 happening being not consensual?
14    A.    I do not.
15    Q.    I'm going to go to a second
16 meeting, that was June 9th, and for the
17 record, it starts on North Penn
18 production 994.
19         Do you recall there being a
20 grievance filed by Holly Andrew?
21    A.    I do.
22    Q.    What do you recall about
23 that?
24    A.    They weren't happy with the

¹ consequences that Holly needed to face
² because of her actions, so they filed a
³ grievance.  And then I recall that
⁴ eventually there was a settlement, like,
⁵ a discussion, and the grievance was
⁶ settled later after it was filed.  But
⁷ that was -- the reason for the grievance
⁸ was they thought we overstepped our
⁹ bounds by suspending her.
¹⁰     Q.   Like, the -- because the
¹¹ records show she had a two-day
¹² suspension.
¹³     A.   Yeah.
¹⁴     Q.   Does -- is that consistent
¹⁵ with your memory?
¹⁶     A.   Yeah, that's consistent.  I
¹⁷ wasn't positive, before you just said two
¹⁸ day -- if it was two or three, but I
¹⁹ remember she was suspended, and they
²⁰ didn't think that that was right.  She
²¹ shouldn't have been suspended, is what I
²² remember.
²³     Q.   Based on your recollection,
²⁴ did you agree that she shouldn't have

1  been suspended, or what did you feel was
2  appropriate at the time?
3        A.    I felt she should be
4  suspended.
5        Q.    And why is that, do you know
6  why you had that feeling of she deserved
7  to be suspended?
8        A.    Because what I stated
9  earlier, that she took the two students
10  out there together and that she made a
11  statement, something to the effect of,
12  you know, don't do it again, if you don't
13  do it again, I won't contact your
14  parents.  And those two things were just
15  really concerning.
16        Q.    Why are they concerning,
17  those two things?
18        A.    That's not the way you
19  handle it.  You don't take two students
20  out in the hallway at the same time.  You
21  don't tell students, "okay, if you don't
22  do this again, I won't tell your
23  parents".  Both of those are wrong.
24        Q.    Why are they wrong, like,

1  what, what can happen, or what's your

2  understanding of why you don't do that?

3          A.    In training on sexual

4  matters, it was explained to us that you

5  don't take the two individuals, one who

6  could be an aggressor, one who could be a

7  victim, together at the same time and

8  interview them together.  That's not how

9  you do that.  You also don't tell

10  students things like "don't do it again,

11  I won't tell your parents".  That's not

12  the standard that we want teachers to,

13  to, you know, carry out.  You just don't

14  do it that way.

15          Q.    Is one of the reasons you

16  don't do it that way because the victim

17  may not feel comfortable to say what was

18  really going on in front of the alleged

19  aggressor?

20          A.    That's a possibility.

21          Q.    Are there other

22  possibilities or other reasons why you

23  don't do it that way or why that's the

24  wrong way to do it?

1   A.   I think you want to be able
2  to hear independent recollections of what
3  happened and not have them together at
4  the same time, you know, telling you what
5  happened.  You want to talk to students
6  individually and tell -- you know, get
7  exactly what happened.
8   Q.   Can it also be that, if
9  you're telling students don't do it
10 again, it won't happen again -- or, if it
11 doesn't happen again, I won't tell your
12 parents, is that something that, just
13 doing that alone, can be difficult to
14 prevent that from happening again?
15          MS. JORDAN:  Note my
16     objection to the form of the question.
17          You can answer.
18          THE WITNESS:  I don't
19     understand that question.
20          MS. LAUGHLIN:  Sure.  That
21     was a bad question.
22 BY MS. LAUGHLIN:
23   Q.   I think what I'm trying to
24 ask is, when it's only talked to with the

¹ students, like, with Ms. Andrew brought

² these two students out in the hallway and

³ talked to them and didn't, you know, tell

⁴ the principal or something like that, is

⁵ it more of a risk that -- or, will

⁶ someone be able to intervene in that, if

⁷ that's the way that it's handled?  When I

⁸ see someone, I mean, like, at

⁹ administrator.

¹⁰        A.    Well administrator wouldn't

¹¹ be able to intervene if the teacher

¹² didn't make administration aware of it or

¹³ apparent or a student made

¹⁴ administration know, they wouldn't know

¹⁵ about it.  So --

¹⁶        Q.    Do you know whether --

¹⁷ sorry, go ahead.

¹⁸        A.    I don't know how else to

¹⁹ answer your question.  I guess I don't

²⁰ understand it clearly enough.

²¹        Q.    Would that have the

²² potential to increase the risk that that

²³ action by that student is going to happen

²⁴ again if administration was not aware of

1  it?

2      A.    Yeah.  I think if

3  administration is not aware of an action,

4  that could increase the odds that that

5  action could happen again.  I -- that's

6  just a general observation, I suppose,

7  that could be made about things, yes.

8      Q.    What about if proper -- the

9  proper response is not taken afterwards,

10  does that increase the risk that, if the

11  proper response wasn't taken to action,

12  that that action can happen again?

13          MS. JORDAN:  Note my

14      objection to the form of the question.

15          You can answer.

16          THE WITNESS:  Yeah.  That is

17      a subjective kind of judgment you're

18      trying to ask me to make about things,

19      generally.  I, I don't really

20      understand what you're trying to say

21      there.  What do you mean?  What do you

22      mean?

23  BY MS. LAUGHLIN:

24      Q.    Whey don't we move on.

1  We'll come back to that.  Let's do Page
2  994 and go over these notes.
3          And since you haven't
4  reviewed this, do you know whether you've
5  ever seen this document?
6      A.    I have not.
7      Q.    Okay.  It's dated June 9th,
8  2015, and again, you're listed at the top
9  as people attending this meeting, and it
10 says that it's you, Cheryl McCue, Holly
11 Andrew and Alan, who, it's my
12 understanding from prior testimony from
13 other witnesses, was the union
14 representative for the teachers.  Is that
15 your understanding?
16     A.    Yes.
17     Q.    Okay.  And then, on the
18 left-hand side, there's initials as to
19 who is speaking in the, the meeting.  Is
20 that your understanding as well?
21     A.    I think that's accurate,
22 yeah.
23     Q.    Okay.  And so let's go
24 through this note kind of line-by-line so

1 we can -- because there's things in here

2 that are attributed to you that we can

3 maybe help refresh your recollection or

4 see if it refreshes your recollection

5 about this meeting.

6          Alan says, TX -- I think

7 thank you -- for the time to meet.  Filed

8 a grievance at the advice of PSCA.  HA,

9 Holly Andrew, understands better

10 judgement/decisions to be made.  Want to

11 make sure punishment fits the crime

12 across the state concerns.  Then Holly

13 describes, back in November/mutual both

14 hands under the table when caught.  Good

15 friends.  And then she says never

16 mentioned caught -- and then it says -- I

17 don't know what the next word is -- but

18 called into hallway.  Wrote immediately

19 in lapse in judgement not sending to

20 principal.  I do not feel that what I

21 witnessed was sexual harassment/assault.

22          Do you recall -- going

23 through this, do you recall being in this

24 meeting and having this discussion?

¹     A.    I recall that there was a

²  grievance and that there was a meeting to

³  deal with the grievance.  These notes are

⁴  helpful, but if you would have said,

⁵  "Curt, you know, give me these kinds of

⁶  details", I would not have been able to

⁷  do that.

⁸     Q.    Okay.  When it says CD, your

⁹  initials, and it says other thoughts, do

¹⁰  you recall, like, what this is about?

¹¹     A.    Yeah.  That would have

¹²  been -- so if you scroll up there

¹³  earlier -- so, Holly and Alan had spoken

¹⁴  to that point, and I asked, "are there

¹⁵  any other thoughts, anything else, you

¹⁶  know, anything else to say", that's what

¹⁷  that would have been.

¹⁸     Q.    Okay.  And then it says that

¹⁹  Holly referred to the other issue brought

²⁰  up by Francis Gardner, an e-mail --

²¹  everything with Bill Bowen, the

²²  principal.  The lawyer letter previous --

²³  by North Penn School District -- a few

²⁴  years.  Didn't cause the issue.  Copies

1  of parental concerns and parent's lawyer.

2          Do you remember that at all,

3  Holly discussing those things?

4      A.   I don't.  I don't know what

5  that's about.

6      Q.   And then Cheryl McCue wrote,

7  clarified suspension with issue and

8  question.

9          Do you recall that

10  discussion?

11      A.   I can't add anything to

12  that, no.

13      Q.   Okay.  And then, this is

14  you again, CD, it says, focus on the

15  touching issues.  Framed it well.  Is

16  two-day suspension appropriate to

17  conduct.  Promise I'll think about it,

18  but I need -- and it says, be remiss to

19  tell you, really, times three, egregious

20  act.

21          Do you recall this part of

22  the conversation?

23      A.   I remember thinking that

24  they were saying there shouldn't have

1 been a two-day suspension, that wasn't

2 appropriate, and I believe we were

3 wrestling between whether it should be

4 two or three, and that's what I said to

5 you earlier. I couldn't remember if we

6 gave her three or if we gave her two, how

7 many days we gave her. And they were

8 arguing that, you know, we overstepped

9 our bounds, if you will, to do a

10 suspension at all, and that's why they

11 were filing a grievance.

12 Q. And when it says "I need to

13 be remiss to tell you, really, like,

14 really, really, really egregious act, do

15 you recall saying that to Holly in this

16 meeting?

17 A. I don't recall those words,

18 but I remember that I was not happy at

19 all that she took two students into the

20 hall together and that she made a

21 statement to those students that, if you

22 don't do it again, I won't tell your

23 parents. That was just -- she was wrong

24 for doing that. You don't do it that

1  way.  You don't take two students
2  together into the hall and do that, like
3  we talked about, and you don't make a
4  statement, "well, if you don't do it
5  again, I won't tell your parents".  That
6  was not good, and she needed to be
7  consequenced (sic) for that.
8        Q.    Was there -- did teachers
9  have any independence in what they did or
10 didn't tell the student's parents in the
11 context of things like this?
12       A.    In the context of things
13 like this; I think --
14       Q.    Like -- yeah, sorry.  Just
15 to be clear, actions of a sexual nature
16 in the sixth grade.
17       A.    So, actions of a sexual
18 nature, I believe that that should have
19 been reported to the principal and that
20 together they would have -- should have
21 contacted the parent to indicate to them
22 what they saw, even if she believed that
23 it was consensual, which I understand
24 that she believed it was consensual.  I

1 still believe that if it rose to the

2 level of taking a student out into the

3 hall, and in this case two students into

4 the hall, to talk to them about it, that

5 that should have been reported to the

6 principal and should have been reported

7 to the parents, and she didn't do that.

8        Q.    Okay.  Is there an

9 understanding that you had about -- using

10 the term consensual, is there a certain

11 age where students can consent to actions

12 of a sexual nature?

13        MS. JORDAN:  Objection to

14    the form of the question.

15        You can answer.

16 BY MS. JORDAN:

17        Q.    If you know, to your

18 understanding.

19        A.    To my understanding, is

20 there an age of consent for something

21 that would be of a sexual nature, I'm not

22 positive about that answer.  So I'm not

23 going to guess.

24        Q.    Okay.  It says, focus on a

1  touching issue.  Framed it well.  Let's

2  see, that was that part.  And then it

3  says, and comment regarding public in the

4  news today for us as an -- as education

5  institution and speed a response.

6           Do you recall this part --

7       A.    Uh-uh.

8       Q.    -- of the discussion?

9       A.    No, I don't.  I could --

10  again, I don't want to guess.  So, I, I

11  don't know.

12      Q.    Okay.  And it says, concern

13  for you to take it on yourself subjected

14  to more and no one should need to endure

15  that, shouldn't have taken it on

16  yourself, huge.

17           Do you recall this

18  discussion and what you were saying to

19  people at the meeting?

20      A.    The general recollection is

21  that she should have taken it to the

22  principal and that they then would have

23  reported it to the parents, and it was

24  not something that she should have

1  unilaterally done, you know, like, taking
2  two kids together in the hallway at the
3  same time and saying what she said, and
4  that's why we suspended her.
5      Q.   The next thing is, good
6  thing first time you have been called in
7  for that kind of offense, second time it
8  wouldn't be two days.
9           Is that you saying, if it
10  happens again, you wouldn't get a two-day
11  suspension; if you recall?
12      A.   I don't recall this
13  conversation, but if somebody did the
14  same thing again, it wouldn't be two
15  days, so.
16      Q.   Meaning, it should be more
17  severe?
18      A.   Yeah.  She should not have
19  taken students together in the hallway,
20  and she should not have made the
21  statement she made regarding, "I won't
22  tell your parents if you don't do it
23  again".
24      Q.   Do you remember anything

1 about Alan, the union representative,

2 saying stuff about, 20 years ago, okay;

3 now, two friends being too amorous when

4 lights went out, do you remember this

5 discussion?

6          A.    No, I do not.

7          Q.    Do you remember Holly

8 talking about going to her grade partner,

9 Ruth Diver, about it?

10         A.    I do.  I remember that she

11 reported that.  It wasn't just her own

12 judgment on how to proceed, that she had

13 talked to Ruth Divers about it.

14         Q.    And what do you remember

15 about her talking to Ruth Diver?

16         A.    Just, basically, that she

17 had said that she had gone to Ruth Divers

18 to tell her about it, and I believe that

19 Ruth Divers had told somebody -- I'm not

20 sure who it would have been, I never

21 talked to Ruth, that I can recall, I

22 don't think I ever did -- that Ruth

23 trusted Holly's interpretation because

24 Ruth didn't see it herself.  That's what

1  I remember.

2        Q.   Did Ruth Diver, as a result

3  of this, since Holly Andrew had

4  communicated what she saw to Ruth Diver

5  and then it still wasn't reported to the

6  building principal, did Ruth Diver get

7  disciplined at all?

8        A.   I don't think Ruth Diver got

9  disciplined in terms of -- I know I

10  didn't suspend her or do anything that

11  would have risen to my level.  I don't

12  know if the principal did anything else

13  with Ruth.  You'd have to ask him.

14        Q.   Since it involves an, you

15  know, an employee of the district, things

16  like discipline and stuff, that is

17  something that falls on you, right --

18        A.   Well --

19        Q.   -- that you're responsible

20  for?

21        A.   The human resources

22  department would do that, but if there's

23  an actual suspension where the person is

24  going to, you know, not receive pay or

1   something like that, then that would come

2   from -- the superintendent would be the

3   one that suspended the person.  That's

4   the way we were operating, you know, with

5   Dr. McCue.

6        Q.   Okay.  Holly Andrew then

7   says, snowballed, police involved with

8   more students.

9             Do you recall this part of

10  the conversation?

11       A.   I don't recall that part of

12  the conversation in this meeting.  I

13  think that the police were -- I think law

14  enforcement was involved, and there was

15  the whole thing about the Mission Kids,

16  and Mission Kids is who does, you know,

17  interviews and everything like that.  But

18  I'm not sure that the parents agreed to

19  Mission Kids interviewing their daughter.

20  So you might have additional

21  documentation on that, but I don't, I

22  don't recall that they agreed to do that.

23       Q.   Meaning, that, like, for the

24  district to notify Mission Kids, or what

1 are you referring to?

2      A.    No.  That the parents agreed

3 to it, to have -- transport their

4 daughter to Mission Kids and have them do

5 the interview.

6      Q.    Are you referring to ████

7 and her parents?

8      A.    Yeah.  Mm-hmm.  Yeah.

9      Q.    If that's the case, does

10 Mission Kids close the -- their

11 investigation, then; if you know?

12      A.    I think, if they don't have

13 a cooperative witness, if you will, in

14 other words, if they don't have somebody

15 that's willing to talk to them, then

16 there's nothing they can do.  You know,

17 so I believe that would be the case, they

18 would close it.

19      Q.    And at that point, because I

20 know earlier in the -- in your testimony,

21 you were saying that the district policy

22 is to wait until the Mission Kids or the

23 police are done with their investigation

24 before they get more than just the

1 minimal facts, I think, was your language

2 that you used, at that point, would it be

3 the district's responsibility, where

4 now -- to complete the investigation and

5 do the interviews and such?

6            MS. JORDAN:  Objection to

7     the form of the question.

8            You can answer.

9            THE WITNESS:  We wouldn't

10     bring a student in and have the

11     student go through everything again

12     with us.  We would trust Mission Kids

13     to have done that thoroughly, and that

14     was part of Risa Ferman's whole, you

15     know, desire to, really, use Mission

16     Kids and use Mission Kids in the way

17     that I had talked about earlier.  We

18     would not subject individuals to our

19     own cross-examination and questioning

20     and everything.  Mission Kids did that

21     or had the opportunity to do that.

22 BY MS. LAUGHLIN:

23     Q.    What about in the example

24 you just gave, where you believe there

1  wasn't a Mission Kids interview, would

2  the district then have any responsibility

3  to do -- to interview the kids?

4            MS. JORDAN:  Note my

5     objection to the form of the question.

6            You can answer.

7            THE WITNESS:  Yeah.  The,

8     the parents aren't going to cooperate

9     with Mission Kids, we would not, you

10    know, push through to insist that the

11    student, you know, get into details

12    beyond what they're comfortable

13    getting into with us.

14 BY MS. LAUGHLIN:

15       Q.    In the district's

16 investigation at that point, the victim's

17 parents wouldn't want to be interviewed?

18            MS. JORDAN:  Note my

19    objection to the form of the question.

20            You can answer.

21            THE WITNESS:  Yeah.  Again,

22    you're making it a little more

23    simplistic, perhaps, than I can,

24    really, answer.

1          So, it's likely, but there

2     might be other reasons that we would

3     have to pursue it, if there are other

4     individuals.  But in terms of, for

5     that individual, we wouldn't insist

6     that they sit and talk with us about

7     details.

8  BY MS. LAUGHLIN:

9          Q.    Have there been times over

10 the course of you being superintendent of

11 the district that you can recall Mission

12 Kids being completed with their interview

13 and then the district does their own

14 investigation?

15         A.    No.  That -- an

16 investigation -- in other words, we

17 wouldn't repeat the work of Mission Kids.

18 So, I can't recall any time that we've

19 ever done that.

20         Q.    Like, interviewing students

21 that were involved or -- not just the

22 victim, but, like, other -- whether it's

23 the aggressor, I think you called the

24 person, or other potential witnesses, is

1  that something you normally would do or

2  recall doing?

3          MS. JORDAN:  Not my

4      objection to the form of the question.

5          You can answer.

6          THE WITNESS:  I don't recall

7      that.

8  BY MS. LAUGHLIN:

9      Q.    Okay.  At the meeting, you

10 also said, that's exactly why we need

11 to deal with it appropriate in the

12 beginning -- appropriately in the

13 beginning.  Other thing bad, talking to

14 the kids together, the victim is not --

15 comfort visit and won't talk.  Really is

16 a bad idea.

17          I know you've already

18 explained to us her pulling the kids out

19 and how wrong that was, but when you say

20 that's exactly why we need to deal with

21 it in the beginning, do you recall what

22 you were discussing then?

23     A.    She needs to talk to the

24 principal and she needs to make, you

1   know, the principal aware, and the

2   principal and, you know, whoever else

3   would contact the parent.

4        Q.    So that it doesn't snowball

5   and more students become involved?

6            MS. JORDAN:  Note my

7        objection to the form of the question.

8            THE WITNESS:  For whatever

9        reason, so that -- you know, it's --

10       it was wrong for her to do that, the

11       way she handled, that's why she was

12       suspended.

13  BY MS. LAUGHLIN:

14       Q.    I understand that.  But, I

15  think, in terms of this meeting, and I

16  know you don't recall, like,

17  independently, specific -- discussed, but

18  I'm trying to -- based on the notes that

19  are here whether one of the reasons you

20  needed to deal with it appropriately in

21  the beginning, would you agree with me,

22  so more students didn't get involved with

23  ▮▮▮▮▮▮▮

24            MS. JORDAN:  Objection.

1  Asked and answered.

2       He said "for whatever

3  reason".

4       MS. LAUGHLIN:  I'm asking if

5  one of those reasons is what I just

6  said.

7       MS. JORDAN:  Note my

8  objection to the form of the question.

9       You can answer.

10      THE WITNESS:  So, you would

11  like to have -- the question answered,

12  what, again?

13  BY MS. LAUGHLIN:

14      Q.   Is one of the reasons that

15  you needed to act -- or, you needed Holly

16  to act properly in the beginning, to deal

17  with it appropriately -- sorry -- is one

18  of the reasons that you needed to deal

19  with it appropriately in the beginning is

20  that so more students didn't get involved

21  in incidents with ███████

22      MS. JORDAN:  Note my

23  objection to the form of the question.

24      You can answer.

1    THE WITNESS:  So, we want to

2  deal with things in the beginning,

3  when they happen, and that's, you

4  know, necessary for us to do, for

5  whatever possibilities -- I don't know

6  what even all those possibilities

7  might be, but we need to deal with

8  things that happen at the time that

9  they happened so that they're dealt

10  with then, and we're not into trying

11  to remember something that happened a

12  long time ago.  We're not into, you

13  know, a situation -- like you said,

14  it's a possibility that somebody does

15  something and then they do it again

16  later.  There are a lot of reasons why

17  you need to do something in a timely

18  kind of a way.

19  BY MS. LAUGHLIN:

20    Q.    And so, just be clear, one

21  of those reasons, like you just said, was

22  that so somebody doesn't do something

23  again?

24    MS. JORDAN:  Note my

1  objection to the form of the question.

2         You can answer.

3         THE WITNESS:  So there was a

4  situation, I gather, in the spring

5  where this student was doing

6  something, and I have to tell you, I

7  don't know what all of those details

8  were, but there was apparently

9  something that happened at the school

10 level in that classroom, and that's

11 when it came out that something had

12 happened in the fall prior, and I

13 think that was in the spring, and

14 Holly Garrett -- or Holly Andrew, I

15 think she was known at the time --

16 Holly should have told us that back in

17 the fall so that we could have dealt

18 with it then.

19 BY MS. LAUGHLIN:

20      Q.    Now that the district or

21 administration was aware of it at this

22 point, after the incident from the

23 spring, do you recall what the district

24 did do to deal with it, other than the,

1 the Holly Andrew administration with the

2 two-day suspension, I mean in terms of

3 the --

4          A.    That would --

5          Q.    -- students?

6          A.    Yes.  That would have been

7 handled at the school level.

8          Q.    Were you aware at all as to

9 what was happening or what happened?

10         A.    I don't know what they did

11 in terms of any -- if any consequences or

12 things regarding the students, you know,

13 that kind of thing.  I don't know.  I'm

14 not sure.  You'd have to ask the

15 principal that.

16         Q.    Was that -- would you agree

17 with me, that wasn't reported to you?

18         A.    In terms of what --

19         Q.    The investigation for the

20 students.

21         A.    -- for the students?

22         Q.    The investigation into the

23 students and the conclusion of that

24 investigation.

1        MS. JORDAN:  Note my

2   objection to the form of the question.

3            You can answer.

4            THE WITNESS:  I don't recall

5   what -- if I was ever even told or

6   whatever.  As I explained earlier in

7   this deposition, the consequences,

8   discipline, whatever it might be,

9   happens at school level unless it

10  rises to the level of an expulsion or

11  they're recommending expulsion.  So

12  that wasn't the case here.

13 BY MS. LAUGHLIN:

14       Q.    On Page 996, there's your

15 initials, again, and it says, that said

16 she asked for it, seeked (sic) it out.

17 Hands up shirt okay?  That's just -- it

18 looks like as if that's -- and want to do

19 that to me in this right now.  Boys hands

20 up her blouse and attempting to touch

21 her, and then it says not wanted.

22       A.    I must have been asking her

23 questions; I don't know.  I don't

24 remember any of this detail.

1    Q.    You don't remember any

2  discussion about ████████ hand being up

3  ████████ shirt?

4    A.    I don't, I don't remember

5  this -- what you are talking about here,

6  in terms of why I was asking those

7  questions.

8    Q.    Okay.  Do you recall any

9  discussion about it being not wanted?

10   A.    No.  I don't recall

11  discussion about that.  Earlier, you had

12  there that she said something about

13  mutual friends, and it looks like I was

14  pursuing questions, like, are you saying

15  that, you know, it was, you know,

16  whatever.  I think that was likely, but I

17  don't remember.

18   Q.    You said "it looked like

19  that you were saying".  Are you saying

20  that --

21   A.    Yeah.  Are you trying to

22  tell me that it was -- you know what I

23  mean, that kind of thing?  But again, I'm

24  just trying to piece together a guess;

1  I'm not sure.

2      Q.    I don't want you to guess,

3  but do you have an -- I know you're not

4  going to get, like, the word-for-word

5  recollection, but do you have a sense of

6  what you were asking her?

7      A.    I don't.  I'm trying to look

8  at that.  I'm not really comfortable that

9  I'm able to tell you with any level of

10  certainty what it was that I was trying

11  to get at here with the teacher.

12      Q.    Okay.  Let's go to the next

13  page, which is 997.

14          And this is a letter

15  authored -- or, signed by you, dated June

16  10th, 2015.  Do you see that?

17      A.    I do.

18      Q.    Have you seen this letter at

19  all, does this look familiar to you?

20      A.     No.  But I see my

21  signature, so I would have signed it.

22      Q.    Okay.  Is this a letter that

23  you would have drafted too, if you're the

24  one signing it?

1    A.    Not necessarily.  That could

2  have been something that we would have --

3  at times, we would consult with the

4  solicitor's office on, you know, how to

5  respond to it or labor counsel, you know,

6  that sort of thing.  At times, they are

7  drafted.  So, I don't know that I wrote

8  this from scratch, so.

9    Q.    Would you have signed the

10  letter if it wasn't accurate or you

11  didn't agree with what the letter said?

12    A.    I would not have signed it

13  if it wasn't accurate or I didn't agree

14  with it.

15    Q.    Okay.  Then, let's go

16  through this letter a little bit so that

17  I can ask you some questions about it.

18         It's dated June 10th, 2015,

19  and the last meeting we were just looking

20  at was I think from June 9th, 2015, just

21  to put things into perspective and

22  timeframe.  And it says, this letter is

23  a step three response to the

24  above-referenced grievance filed by NPEA

1  on May 29th, 2015, alleging that the

2  North Penn School District violated the

3  collective bargaining agreement by

4  issuing a two-day suspension of Ms.

5  Andrew without cause.  And that's what

6  we've been talking about, your

7  recollection that you had given Ms.

8  Andrew a two-day suspension.

9            It looks like -- are you,

10  are you reading the letter now?

11       A.    I am, yeah.

12       Q.    Do you want some time to be

13  able -- I was going to go through it line

14  by line, but do you want a minute to

15  review the letter yourself, you can read

16  through it before I ask you questions

17  about it?

18       A.    Whatever works easiest for

19  you.  I'm fine with however you want to

20  do it.

21       Q.    Well why don't I give you a

22  minute, read through it, it's a short

23  letter, and just let me know when you're

24  finished --

1    A.    Okay.

2    Q.    -- and then we can continue.

3    A.    Sure.

4          Okay.  I read it.

5    Q.    Okay.  Does this help

6  independently refresh your memory at all,

7  reading through this letter that was sent

8  back in June 2015?

9    A.    I mean, yeah, it's helpful

10  to read it, but there's nothing in here

11  that I'm reading that I'm -- I've been

12  consistently explaining that the way she

13  handled the situation was wrong and, you

14  know, saying -- conducting the interview

15  in the way she did it, with two students

16  in the hall at the same time, was not the

17  way you do it and, you know, not telling

18  her principal and the parents was not the

19  way you do it.  So, there's nothing in

20  here that isn't, in my estimation,

21  consistent with what I've been saying

22  consistently to you.

23    Q.    I'm not saying it's not

24  consistent.

1          Do you -- I was just asking
2   if it helped to refresh anything that you
3   couldn't remember previously or didn't
4   have a recollection of previously, but
5   now, you, after reading it, say, "oh,
6   actually, I do remember this or that".
7          A.    No.  I wouldn't say there's
8   anything that meets that.
9          Q.    Since -- you've been clear
10  in this deposition that, in your opinion,
11  Ms. Andrew did things wrong and explained
12  the ways that she did so.  Did you
13  recommend any additional training for Ms.
14  Andrew on the things that she did wrong
15  so that she could understand what she
16  needed to do correctly next time?
17         A.    My recollection is that Ms.
18  Andrew and Mr. Malachowski indicated that
19  she understood what she did was not
20  right.  They disagreed with the magnitude
21  of the consequence, if you will, but that
22  they understand what she did was not the
23  way to go about it.
24         Q.    So you didn't recommend any

1 further training?

2          A.     I did not.

3          Q.     It says, after meeting with

4 you and Ms. Andrew and carefully

5 considering the facts of this case, I

6 conclude that a two-day suspension is

7 appropriate.  And it says, I am very

8 concerned that Ms. Andrew did not report

9 to her building principal, the student's

10 behavior she observed.  And that's what

11 you told us multiple times.  And then it

12 says in the letter, the behavior of a

13 male student reaching his hand underneath

14 a female student's shirt in the area of

15 her chest during the course of a sixth

16 grade class lesson should be very

17 significant cause for concern by the

18 teacher and should have been handled in a

19 much different manner than the manner in

20 which Ms. Andrew handled it.  So I want

21 to stop there and ask you some questions

22 about this.

23          I know -- today, you're

24 saying you don't have a recollection of

1 what you knew back then, is that true,

2 independently?

3          MS. JORDAN:  I object to the

4     form of the question.

5          THE WITNESS:  I don't agree

6     with that.

7          MS. LAUGHLIN:  Sorry.  Let

8     me refresh.

9 BY MS. LAUGHLIN:

10     Q.    I think you were telling us

11 earlier, you didn't remember the specific

12 actions that had happened in October 2014

13 with ███████ and ████████ you couldn't tell

14 me the details of what had happened; is

15 that true?

16          MS. JORDAN:  Note my

17     objection to the form of the question.

18          You can answer.

19          THE WITNESS:  I don't

20     understand what you're trying to say.

21     I explained to you what I was told.

22     So, what are you asking me?

23 BY MS. LAUGHLIN:

24     Q.    Would you agree with me

1 that, based on this letter, that you were

2 aware, in June of 2015, that the behavior

3 between ███ and ███ in that sixth

4 grade class was that ███ reached his

5 hand underneath her shirt in the area of

6 her chest during the sixth grade class

7 lesson?

8          A.     In terms of that level of

9 the detail, is that what you're asking

10 me?

11          Q.     Yes.  Are you aware of that,

12 what I just stated from this letter?

13          A.     Yeah.  And prior to this

14 letter, I didn't remember if it was under

15 her shirt near in the area of her chest

16 or if it was some other, you know, place

17 on her body or what it would have been, I

18 didn't remember that.  So, so this letter

19 is helpful to give that detail, that is

20 accurate.

21          Q.     So, would you agree with me

22 that at the time, in June of 2015, you

23 were aware that ███ had put his hand

24 up ███ shirt in the area of her

1  chest?

2          MS. JORDAN:  Note my

3      objection to the form of the question.

4              You can answer.

5              THE WITNESS:  So, the

6      same -- the behavior of a male student

7      reaching his hand underneath a female

8      student's shirt in the area of her

9      chest during the course of a sixth

10     grade class lesson should be very

11     significant cause for concern by the

12     teacher and should have been handled

13     in a much different manner than the

14     manner in which Ms. Andrew handled it,

15     I think speaks for itself, that that

16     was concerning.  She didn't handle it

17     the way she should have handled it.

18 BY MS. LAUGHLIN:

19     Q.    I understand that.  And my

20 question is, would you agree with me,

21 that as of June 10th, 2015, you were

22 aware of the action between � ▇▇▇▇▇▇

23 putting his hand up ▇▇▇▇▇▇ shirt in the

24 area of her chest, were you aware of that

1 at this time that you wrote the letter,

2 based on what the letter says?

3         A.    I did not see it for myself.

4 The assertion, I think, that we are

5 making as a district is that she didn't

6 handle that situation the way she should

7 have handled situation.  So, I --

8 apparently she reported that it was by

9 putting his hand under this student's

10 shirt in the area of her chest.  I don't

11 recall, if you can go back to Cheryl

12 McCue's notes, if that came out during

13 that interview.  I don't recall that

14 level of detail to know, you know,

15 exactly what it was.  I recall that it

16 was something of a sexual nature and

17 that, you know, it was described to me

18 that they were handsy with each other and

19 that the teacher believed it was a

20 consensual thing, they were doing things

21 to each other, that the lights had been

22 turned down during some lesson or

23 something that was going on in the

24 classroom.  That's what my recollection

1  is.

2       Q.    And I understand all of

3  that.

4            My question is very, like,

5  narrow and specific, though, that, based

6  on this letter, would you agree with me

7  that, at the time, you were aware of --

8  that ███████ had put his hand underneath

9  ███████ shirt?  I know you didn't see

10 it, but were you aware of that fact,

11 based on what's in this letter?

12           MS. JORDAN:  Objection to

13    the form of the question.  He has

14    answered this several times.  I don't

15    know why you keep on asking the same

16    question.  And I'm --

17           MS. LAUGHLIN:  Because I

18    never got an answer.

19           MS. JORDAN:  -- gonna --

20           MS. LAUGHLIN:  Because I

21    never got an answer.

22           MS. JORDAN:  You got an

23    answer.

24           MS. LAUGHLIN:  Were --

1    MS. JORDAN:  He told you he

2    wasn't there; he doesn't know if it's

3    a fact; he knows it's an allegation.

4    You want him to admit it's a fact.

5    That's inappropriate.

6          MS. LAUGHLIN:  Okay.  Well

7    thank you for the clarification.

8          MS. JORDAN:  Let's move on.

9          MS. LAUGHLIN:  Because I

10   understand your objection now.  Thank

11   you for clarifying that.  Let me ask a

12   different question, then, to hopefully

13   get around what the objection is.  I

14   appreciate you for clarifying that,

15   now that I understand.

16   BY MS. LAUGHLIN:

17      Q.    Were you aware of the

18   allegation that ████ had put his hand

19   up ██████ shirt in the course of his

20   sixth grade class at this time, based on

21   this letter?

22      A.    I don't recall what level of

23   detail was shared with me.  I wrote this

24   letter, and apparently it must have been

1  discussed at some point in time, that

2  there was some, you know, reaching of a

3  hand underneath the shirt in the area of

4  the chest, or I wouldn't have put that in

5  there.  But I wasn't there to see it for

6  myself, and I don't know -- the student,

7  as I recall, didn't go through anything

8  where -- you know, a Mission Kids or

9  anybody -- place like that could, you

10  know, work through the process and report

11  back to us.  My recollection is that the

12  mom didn't want to do that.  So I didn't

13  have -- you know, I don't have any of

14  that detail.

15          But, you know, I think what

16  you see here speaks for itself, and I

17  explained to her in this letter that

18  there's behavior of, of a student

19  reaching underneath there like that, that

20  should have been handled in a different

21  manner.  It should have been, you know,

22  dealt with in a different manner.  The

23  way that I would, you know, hope it could

24  be dealt with would be through the

1  process, which is the Mission Kids'

2  interviews, talks about what actually

3  happened.  The student can recount to

4  Mission Kids what happened, and they

5  report back to us.

6          Q.    When you --

7          A.    The way it was handled was

8  not the way it should have been.

9          Q.    I understand.

10         When you said that, that

11 this conduct, the male student reaching

12 his hand underneath a female student's

13 shirt in the area of her chest during the

14 sixth grade lesson should be a very

15 significant cause for concern by the

16 teacher, what do you mean by that?

17         A.    It needs to be reported to a

18 principal, and then the process that we

19 have in place has to occur.  It should

20 not have been handled by the teacher

21 unilaterally -- well I guess there was --

22 she asserts that she had some

23 conversation with Ruth, her grade level

24 partner, but should have been made at

1  that level.  It should have been brought

2  to the principal and then processed

3  through, you know, Mission Kids and

4  everything like that, and she didn't do

5  that.

6          Q.    And that's the next line

7  that you say; it should have been handled

8  in a much different manner.

9                But when you're writing, it

10  should be a very significant cause for

11  concern by the teacher, why should it be

12  a very significant cause for concern by

13  the teacher?

14          A.    Because they need to tell

15  the principal when something that is of a

16  sexual nature is happening in the class

17  room and not have them independently make

18  that decision, to take students in the

19  hall and talk to them together.  You

20  don't -- it's not the way it should be

21  done; she was wrong.

22          Q.    Okay.  And I understand --

23  you would not have put the information

24  about the behavior of a male student

1  reaching his hand under another female
2  student's shirt in the letter if you
3  didn't believe that that allegation --
4  that -- would you have put that in this
5  letter if you didn't believe it was true?
6         A.    I wasn't there to see this
7  for myself.  I have a report from a
8  teacher saying that what she observed,
9  she believed was consensual.  I don't --
10 I was more of the understanding, and I
11 would have -- if you would have said,
12 Curt, please, you know -- well you don't
13 want me to guess -- but can you give a,
14 you know, thought as far as what you -- I
15 thought it was more of, you know, hands
16 under the table-kind of thing, you know,
17 touching the buttocks, whatever it could
18 have -- something other than that.  But
19 nevertheless, it was something that
20 happened there, and she didn't allow the
21 process to, you know, occur, unwind to
22 get at the heart of it so Mission Kids
23 could have told exactly what happened.
24         Q.    I understand, as the

1 superintendent, you're not in the

2 classroom, so those times you're not the

3 one seeing what happened.

4        But here, this was reported

5 to you, correct, the behavior of a male

6 student, that was the report that you

7 received?

8     A.    Yeah.

9     Q.    Okay.  It says, furthermore,

10 I am very concerned about Ms. Andrew's

11 explanation of how and why she arrived at

12 her conclusion that the behavior was

13 consensual.

14        Do you recall any part of

15 that discussion and why you were very

16 concerned about how she concluded it was

17 consensual?

18     A.    She took them out together

19 in the hallway.  She asked them together

20 at the same time.  That is not the way

21 you do the investigation.  I was

22 concerned about that.  I was concerned

23 about it then, I'd be concerned about it

24 again today.

1    Q.    I understand that.  But I'm
2  asking specifically about the conclusion
3  that the behavior was consensual.
4    A.    That's the way she arrived
5  at that when she saw with her eyes what
6  she saw, and then she brought them into
7  the hallway and had a discussion in the
8  hallway together.  I don't know, you'd
9  have to ask her those kinds of questions
10  as far as, you know, the specifics.  But
11  you don't do it by taking them in the
12  hallway together.
13    Q.    I'm just -- I know, because
14  I have asked Ms. Andrew these questions.
15  And so now you're here, and I get to ask
16  you about your thoughts and what you mean
17  when you put in a letter that you signed
18  about that you are very concerned about
19  the conclusion that the behavior was
20  consensual, and I'm asking you --
21    A.    Her explanation of how and
22  why she arrived to that conclusion that
23  it was consensual was based on the fact
24  that she took them in the hall together,

1  interviewed them together, and that's not

2  the way it should have been done.  It

3  should have been reported to the

4  principal and that it should have been

5  turned over to Mission Kids, and Mission

6  Kids would have been able to attempt to

7  do an interview of the, of the student,

8  which I think they did attempt to do, you

9  know, later, I think in spring of 2015 at

10 some point in time when the -- my

11 recollection -- again, I don't have it,

12 you know, for certain, but that's my

13 recollection, that the family had

14 declined to do -- cooperate with Mission

15 Kids and have, you know, the student

16 interviewed by Mission Kids.

17         Q.     I understand all that.  You

18 told me that and about the way that she

19 handled it.  But I'm specifically trying

20 to ask you about what concerned you about

21 how and why she arrived at the conclusion

22 that the behavior between the two

23 students was consensual?

24         A.     I'll answer --

1    MS. JORDAN:  Objection.  He

2    has asked -- he has answered that --

3    THE WITNESS:  I've answered

4    a million times.

5    MS. JORDAN:  -- several

6    times, and he's telling you that the

7    procedure she used to reach her

8    conclusion was faulty, and that's what

9    he's addressing in this letter, I

10   believe.

11   THE WITNESS:  Exactly.  I

12   don't know what else to tell you.  She

13   went about it the wrong way.  You

14   don't do it that way, and she had to

15   be disciplined for that.

16   BY MS. LAUGHLIN:

17   Q.   So you're saying -- just so

18   I understand, you're saying that the way

19   that she concluded that it was consensual

20   was because she brought them both out

21   together, and that was the concern that

22   you had about that?

23   A.   Whatever reasons she used.

24   You'd have to ask her for that.  My

1  understanding of this whole thing was she

2  observed what she observed, she, you

3  know, brought them out there together,

4  she -- at that point in time, the benefit

5  of, whatever, two months, three months, I

6  don't know exactly when it happened, of

7  time observing, you know, them together,

8  and she arrived at a conclusion that it

9  was consensual, and that's not the way

10 you go about it.

11         Q.    The last sentence in this

12 letter in this last paragraph says, as we

13 know, when student behavior, such as the

14 behavior in this case, is not

15 appropriately addressed, the behavior is

16 very likely to be repeated with victims

17 continuing to suffer.

18              Do you see that?

19         A.    Yes, I do.

20         Q.    What did you mean by that?

21         A.    You need to be able to

22 report behavior so that it can be dealt

23 with, it can be verified, it can be, you

24 know, understood what actually happened,

1  and then it can be addressed thereafter.

2  So, she took it upon herself to decide

3  that she would conduct an investigation

4  the way she conducted it and that she

5  would -- she was not to report it, and

6  that was wrong, you don't do it that way.

7       Q.    And that was not a -- would

8  you agree with me, that was not

9  appropriately addressed, then, the

10  behavior?

11       A.    In terms of the -- that

12  student's behavior?

13       Q.    Yes.

14       A.    We want to -- the way it

15  should have happened was she should have

16  told the principal, the principal should

17  have contacted the law enforcement, if

18  they felt that law enforcement would be

19  helpful, particularly then in the spring

20  when the family didn't want to take the

21  child to Mission Kids.  I would have much

22  preferred to have Mission Kids do their

23  investigation and report back to me, come

24  to a conclusion as to what was happening

1 there and that we could take action

2 thereafter, and that didn't happen here.

3        Q.    Would you agree with me that

4 the behavior of ████ at this juncture

5 was not appropriately addressed?

6              MS. JORDAN:  Note my

7    objection to the form of the question.

8              You can answer.

9              THE WITNESS:  I would not

10   agree with that statement in the sense

11   that we couldn't get everybody who was

12   involved to do what they should have

13   done.  The teacher should have

14   reported it, the child should have

15   gone to Mission Kids; it didn't

16   happen.  And then when it comes out

17   here, we have to, you know, deal with

18   it, and she should have not handled it

19   the way she handled it.

20 BY MS. LAUGHLIN:

21        Q.    Do you think that the

22 behavior of ████ was appropriately

23 addressed at this point, then?

24        A.    I'll never know the answer,

1  as they never went to Mission Kids to get

2  all of that detail ascertained by that

3  independent third party.  So I think,

4  given what we knew at that time, that the

5  behavior was appropriately addressed.  I

6  will not say it was not appropriately

7  addressed when we knew what we knew at

8  that junction.  I'm trying to explain to

9  this teacher, and putting it in writing

10 here, that you need to be able to come

11 forward, let the process happen the way

12 the process is supposed to happen.  You

13 can't just circumvent that or decide it

14 on your own or whatever you want to

15 describe it.  You know, you can't

16 unilaterally just make a decision like

17 that.  You need to let it all follow its

18 course and tell the principal, and let

19 the principal then intervene with law

20 enforcement and Mission Kids.

21      Q.    When it says "the behavior

22 is very likely to be repeated", what

23 behavior are you talking about?

24      A.    If a student is, you know,

¹ touching somebody or doing something in a

² way that's not, you know, appropriate,

³ that's what I'm talking about.

⁴     Q.    Okay.  And it says that hat

⁵ behavior is very likely to be repeated

⁶ with victims continuing to suffer.

⁷          What did you mean by "with

⁸ victims continuing to suffer"?

⁹     A.    We were, I believe, talking

¹⁰ about some of the current events at the

¹¹ time.  I think there was a lot of

¹² discussion about -- the Sandusky matter

¹³ was in the news, and I think there was

¹⁴ also, you know, matters in the news with

¹⁵ the catholic church and that sort of

¹⁶ thing, and we were trying to explain that

¹⁷ the individual needs to tell us to be

¹⁸ able to pursue it, and as I said earlier,

¹⁹ and we need the cooperation of the

²⁰ individuals also, then, to follow through

²¹ on it, and if they don't follow through

²² on that, then I need to try to understand

²³ why.  But apparently they chose not to.

²⁴     Q.    When you say "the

1 cooperation", you mean, like, like,

2 ███████ and her family?

3        A.    Yes.

4        Q.    Are you --

5        A.    Go to Mission Kids and be

6 interviewed.  So, my recollection is that

7 they declined that.

8        Q.    Are you saying that part of

9 the reason why it wasn't fully

10 appropriately addressed was because

11 ███████ and her family didn't go to

12 Mission Kids?

13       A.    I don't know.  I don't know

14 what could have happened differently.  I

15 don't know.  They didn't go.  They should

16 have gone.  They chose not to.  I don't

17 know why, but they didn't.

18       Q.    You're saying -- so are you

19 saying ███████ and her family is part to

20 blame for that, then, because they didn't

21 go to Mission Kids?

22       A.    I wish they would have gone

23 to Mission Kids.  That's helpful.  They

24 had reasons.  I don't know all the

1 reasons.  I'm not assigning blame.  I'm
2 saying they chose not to.  So whatever
3 those reasons are.  I don't know why they
4 didn't go.  I'm not assigning blame.  So
5 I don't appreciate trying to be, you
6 know, asserted that I'm trying to assign
7 blame.  I'm not trying to assign blame.
8 I'm saying it didn't happen.
9       Q.    I'm just asking.  I don't
10 know, you know --
11       A.    Okay.
12       Q.    -- that you did or you
13 didn't.
14             One of the things that you
15 had said was that you would try and find
16 out why somebody wouldn't go to Mission
17 Kids, is that right, one of those things
18 you just told me?
19       A.    I don't know why she didn't
20 go to Mission Kids; I don't know.
21       Q.    Well that was going to be my
22 next question.  Did you ask them at all
23 why?
24       A.    I don't recall.

1    Q.    Just to make sure I

2   understood your testimony, this sentence,

3   as we know, when a student behavior, such

4   as the behavior in the case, is not

5   appropriately addressed, that last

6   sentence of this letter, you said that

7   this was around the time of Sandusky and

8   the catholic church, and so you were

9   thinking of that when you were writing

10  this last sentence as well?

11       A.    I was.

12       Q.    All right.

13            MS. LAUGHLIN:  Why don't we

14     take a quick five-minute comfort break

15     and come right back.

16                -  -  -

17            (A recess occurred from 1:22

18       p.m. to 1:44 p.m.)

19                -  -  -

20  BY MS. LAUGHLIN:

21       Q.    I'm just gonna share my

22  screen with you, Mr. Dietrich, again.

23  I'm showing you North Penn's production

24  Pages 1001 and it goes on to 1002, and

1 it's the agreement regarding Holly Andrew

2 Garrett, the sixth grade teacher we were

3 just speaking about before our break.

4         Do you recall -- you had

5 mentioned, like, a settlement and stuff

6 like that regarding the grievance, and is

7 that what this is referring to?

8     A.    I'd have to look at it, but

9 I recall that they grieved it and then

10 there was some attempt to settle it,

11 because of a -- you know, the

12 disagreement.

13     Q.    Okay.  And I can kind of

14 direct you -- so you don't have to read,

15 like, the whole document, I can direct

16 you to the bottom of Page 1001, where

17 it's summarizing the agreement between

18 the district and Ms. Garrett.  Do you see

19 that here?

20     A.    Yes.  Yeah, I got it.

21     Q.    It says, Andrew Garrett's

22 two-day suspension is reduced to a

23 one-day unpaid suspension.  And just to

24 give you context, I'm asking about this

1  document because you're the one that

2  signed on behalf of the North Penn School

3  District.

4      A.    Yes.

5      Q.    Do you recall Ms. Garrett's

6  suspension being reduced from two days to

7  one day?

8      A.    Yeah.  I was thinking that

9  we agreed to a settlement on this, and I

10 think I referenced that earlier in this

11 deposition.  I didn't remember if it was

12 three to two or two to one, but I

13 remember that whole, you know, analysis

14 in terms of attorney's fees and time

15 spent litigating, you know, through a

16 grievance process and that the analysis

17 was that we would agree, then, to cut the

18 suspension from two days to one day, as a

19 part of that settlement.

20     Q.    Are you saying, was that

21 based on, like, looking at the analysis

22 of what it was going to cost to move

23 forward to --

24     A.    Yes.

1    Q.    -- continue with the two-day

2  suspension?

3    A.    That's accurate.

4    Q.    And it was going to be too

5  costly, I guess, is what you're telling

6  me to fight it, and it was better to --

7  easier or whatever to just do the one-day

8  suspension?

9    A.    We did that analysis in

10  terms of the cost and determined that it

11  would be appropriate to agree to this

12  settlement.

13    Q.    Would you agree with me,

14  from our prior discussion, that the

15  discipline that Ms. Garrett you believed

16  should receive was a two-day suspension,

17  not a one-day suspension?

18    A.    Yes.

19    Q.    And then, at No. 3, it says,

20  the district agrees to remove the PIP

21  that was issued to Ms. Andrew -- or, to

22  Andrew Garrett in February of 2016 from

23  her personnel file.

24              Do you remember the

1 performance improvement plan that was

2 discussed for her?

3       A.    I don't remember the details

4 of that.  But I recall that she was not

5 the strongest of employees and that there

6 were concerns -- I believe there were

7 concerns in addition to, you know, this

8 matter that, you know, we've been talking

9 about here that resulted in her being on

10 a performance improvement plan.

11       Q.    There was some notations in

12 the records that were produced by the

13 district that referenced a shredding of

14 an IEP document.  Does that sound

15 familiar to you?

16       A.    Not really.

17       Q.    Okay.  Performance

18 improvement plans, are they typically

19 something that goes in the employee file?

20       A.    Yes.

21       Q.    What's the purpose of that

22 PIP going in the employee file?

23       A.    Because we try to have those

24 employee files be complete, and it would

1   be something that would be impacting upon

2   her employment.

3         Q.   And so the removal of the

4   PIP from her file, what ramifications did

5   that have?

6         A.   That it wouldn't be, you

7   know, in the file any longer.  I don't

8   remember.  Sometimes there are concerns,

9   procedural concerns, you know, that sort

10  of thing, assertions, and I see there, in

11  No. 4, they will not file or commence an

12  unfair labor practice.  So, sometimes

13  there are other issues, you know, that --

14  typically procedural kind of due process

15  issues.  I don't know if that was the

16  case with this one, though.

17        Q.   The fact that the

18  performance improvement plan was going to

19  be removed from Ms. Garrett's -- or,

20  Andrew's personnel file, that would mean

21  that nobody -- like, there's not going to

22  be a record anymore that she was given a

23  performance improvement plan in her file?

24        A.   You'd have to ask the HR

1    director the answer that.  I'm not

2    positive about that.

3         Q.    Okay.  Is there anything

4    about the, the settlement or the

5    agreement that you signed here and that

6    we haven't talked about that you do have

7    a memory of?

8         A.    No.

9         Q.    Okay.  I know we talked a

10   little bit about ████████ request to go

11   to a different middle school to avoid

12   being in the same school as ██████

13   right?

14        A.    I think that was the reason,

15   but again, I'm not positive that that was

16   the only reason.  But I am pretty

17   confident that that was definitely a

18   factor.

19        Q.    Okay.  Do you remember any

20   other factors, as we sit here today, that

21   may have influenced the decision for

22   ██████ to move -- or, request that her

23   middle school be moved?

24        A.    I don't have any specific

1  recollection about this individual and

2  desire to go to that particular middle

3  school.  So I don't know.  I have dealt

4  with other, you know, situations over the

5  years where it's been appealed to me for

6  somebody to change middle schools and for

7  people to go to that particular middle

8  school, but I don't remember, in this

9  case, any other -- I don't know.

10        Q.    Okay.  When there is --

11  like, there's two district students and

12  one requests to transfer schools to avoid

13  the other student, if the students

14  continue on, like, after middle school is

15  going to be the high school, is there any

16  policy or procedure in place to kind of

17  track that that request was made so that

18  it can be followed throughout the

19  student's educational course?

20        A.    If they change middle

21  schools?

22        Q.    Yeah.  Like, for fear.

23  Like, ████ was -- one of the reasons

24  she was trying to transfer the middle

1  school was to be in a different middle

2  school from ▓▓▓▓▓

3       A.    I think that was the case.

4  I'm not, again, certain on that.  But, I

5  mean, the transcript would show a

6  different middle school on it, you know,

7  than the one that she would normally have

8  been in that attendance area for.

9       Q.    But, for example, I mean,

10  once students go through middle school,

11  they eventually, hopefully, go to high

12  school --

13       A.    Right.

14       Q.    -- where the middle schools

15  are filtering back into the same high

16  school --

17       A.    Right.

18       Q.    -- is that how it works at

19  North Penn?

20       A.    It does, yes.

21       Q.    And so, I'm asking, is there

22  any process in place to track something

23  like that so that if a student was

24  specifically trying to avoid another

1  student that now will be filtered into

2  the same school, that that wouldn't

3  happen, any process in place from the

4  district?

5      A.    I don't think there's

6  anything written in place, but there

7  would be conversations that would happen

8  between the director of elementary and

9  the middle school folks or the director

10  of secondary or the director of secondary

11  onward to -- because they're the ones

12  that process those requests.

13          I remember -- you're jumping

14  ahead a little bit now to when she went

15  to high school, but I remember a

16  conversation that I had that they were

17  not to be in the same class and they knew

18  that, like the -- oh, what is her name --

19  she was special ed supervisor at the

20  time.

21      Q.    Kate Small?

22      A.    Kate Small.

23          Kate Small was aware that

24  they weren't supposed to be in the same

1  classroom together.  So, I remember,

2  just, you know, conversation with Kate

3  about, "are you aware of this", "yes, I'm

4  aware of that", that she was ascertaining

5  that they weren't in the same classes and

6  anything.

7        Q.    But I -- so before we go to,

8  like, the specifics, I'm asking,

9  generally, there's not a written policy,

10  but there's a practice -- it sounded like

11  you were saying that, like, supervisor --

12  or, district -- sorry -- the elementary

13  school supervisor of education or the

14  secondary level might have conversations

15  about that when a student requests to be

16  separated from another student?

17        A.    Yeah.  If it would be

18  something like that.  We get, oh, I don't

19  know, probably 75 to maybe 80 or 90,

20  sometimes 100 requests to change schools

21  at the elementary, and then the middle

22  schools, I don't think it's uncommon to

23  have 25 or 30 requests to change middle

24  schools.  We call them TOAs, transfers of

1  attendance.  So, they can be for child

2  care reasons.  That's the most common

3  one.  But we don't have, like, a written

4  'this student was a TOA'.  If there's a

5  concern about students being together,

6  you know, there would be communication

7  happening, but I can't point to a form or

8  anything like that.

9       Q.    When you say there would be

10  communication happening in that

11  circumstance, is there a pattern or

12  practice for what the direct implements

13  other than a written policy for those

14  scenarios?

15       A.    A pattern?  I don't know --

16  pattern --

17       Q.    Like, a practice that the

18  district normally does.

19       A.    What I can describe to you

20  would be that the folks would be involved

21  in talk, you know, so if there's

22  something that's involving that.  You

23  know, now we have something built that

24  they can put a notation in the actual

1  like, electronic record.  So, like, 'no

2  schedule change until the principal is

3  contacted', you know, that kind of thing.

4  But at that point in time, we didn't have

5  any electronic way.  We had -- Kate

6  Small, in this case, is the one that

7  checked to see that they weren't in the

8  same class and -- together, anyway.

9         Q.     When you say that these

10  conversations would happen, is it --

11  like, who would, I guess, like, initiate

12  the conversation, or would it just be a

13  matter of course, that once a student

14  asked to transfer to avoid another

15  student, that the supervisor would know

16  that these conversations had to -- have

17  to take place?

18         A.     It would be the director of

19  elementary who processes the elementary

20  cases and the director of secondary who

21  does the secondary cases and then the

22  special ed supervisor are the other

23  individuals.  Those would be the people.

24         Q.     So for ████████ for example,

1  who was requesting to transfer from

2  elementary to middle school -- for a

3  different middle school, would that be

4  the elementary school director of

5  education, then?

6      A.    Requesting a different

7  middle school?

8      Q.    Yeah.  ███████ requested a

9  different middle school.  So would that

10  have been the person --

11      A.    The director of secondary

12  would have been the one who processed

13  them.  Now, at that time, that was Deb

14  McCay, but Deb McCay is retired now.

15      Q.    Okay.  And Deb McCay, as the

16  director of secondary education, would

17  have had a conversation with, who, in the

18  scenario that you're describing?

19      A.    So the parent that made the

20  request, and then Deb would have reviewed

21  the requests for TOAs and then handle it.

22      Q.    So that's when a request is

23  actually made.  I'm asking, you know,

24  once the time at the middle school is

1 over and now that student is going to go

2 to, whether it's a high school or another

3 school, is, is there any conversation

4 that takes place then to ensure that the

5 students are still separated?

6          A.     I mean, there would be

7 specific about individual cases.  So if

8 there continued to be concern --

9 sometimes there's issues where some kids

10 don't get along with each other, they're

11 bullying each other, whatever, when

12 they're in elementary school and the

13 parents, you know, are asking for a

14 transfer of attendance, either party,

15 we've had situations like that, where

16 people are like, you know what, I think

17 my student would just be better served in

18 a different school because of, like, a

19 situation or something.  But then things

20 move on, parents are like, no, that's,

21 that's no longer a concern.

22          Q.     Are the parents the one that

23 have to contact the district and say,

24 like, "hey, this is no longer a concern",

1  or is it the director of secondary

2  education that's reaching out, saying,

3  "hey, these two students are going to be

4  merging in the same school again, what do

5  you want us to do"?

6         A.    In terms of, like, what

7  would happen if -- are you talking about,

8  like, if a parent didn't ask, like, under

9  that scenario?

10        Q.    I'm trying to understand the

11  process.  And so those were, like, the

12  two choices, like, is it this, or is it

13  that, or is it some other way, how does

14  that come about?

15        A.    So -- and again, I don't

16  deal with this, but I think that they

17  would, you know, have a conversation with

18  the parent if there was, you know,

19  something that they continue to have

20  concerns about or say, "no, we're not

21  really concerned anymore".  But I don't

22  deal with them.

23        Q.    Right.  So, from your -- I

24  know it's not you personally who is

1  dealing with it but somebody like the

2  director of secondary education.

3              Is it your understanding,

4  like, up to them to recognize that these

5  two students are going to be coming back

6  together and is there still an issue that

7  needs to be addressed, or is it they're,

8  they're the ones to be doing that?

9        A.    They would be the ones that

10 would be knowledgeable about that.  So, I

11 would say, you know, most likely, but

12 there could be a parent that, you know,

13 raises a concern or something like that.

14       Q.    Is there any process in

15 place to notify the director of secondary

16 education, like at the end of the school

17 year when students are going to be going

18 onto the next school, of the, the issues

19 that have arisen in the past, like what

20 we're talking about, where a student

21 requests to be separated from another

22 student and now coming to school where

23 they won't be anymore?

24       A.    It would be on an individual

1 case or an individual basis, depending on

2 the magnitude of the concern.  So,

3 there's no form or process that, today

4 we're gonna talk about students and which

5 school they're headed to next and --

6 pattern versus -- to my knowledge, I

7 don't think they do that.  Again, I'm not

8 involved with that.  So I don't, I don't

9 have a great level of intimate knowledge

10 about how they do that.

11          Q.    Okay.  Are you involved at

12 all in -- when students are going to the

13 tech school part-time, like in ninth

14 grade, the ability for students -- middle

15 school students to take some courses at

16 the tech school, are you involved in that

17 at all?

18          A.    I am not, unless, again,

19 something got appealed to me where

20 somebody wasn't happy about a decision or

21 whatever it might be.  But no, I'm not.

22          Q.    Do you know who is the

23 person who's responsible for -- like,

24 it's my understanding, tech school, you

1  have to actually apply to be accepted

2  into that.  Do you know who in the

3  district manages --

4        A.    The guidance counselors and

5  the principals handle that from each of

6  the buildings.  So, we do have ninth

7  grade students who attend a half -- well,

8  not even a half a day.  It's from -- I

9  think it's approximately 10:00 'til

10 11:45, we have that program for ninth

11 graders.  And then there's also the PYAP

12 program, which is the Pennsylvania Youth

13 Apprenticeship Program, and I believe

14 ████  was in the PYAP program, which is

15 a full-time vo-tech program.  So that's

16 what I -- that's what my memory was, that

17 ████  was --

18       Q.    At the elementary school --

19 I want to jump back to the situation

20 between ████ and ████ at the

21 elementary school level.

22            From the prior testimony in

23 this case of the principal, and I think

24 the teacher as well, there was a plan put

1  in place where ▇▇▇▇ was separated from

2  ▇▇▇▇ and the other girl who had

3  reported in the spring of 2015.  Were you

4  aware of that?

5      A.    No, I was not.  That was at

6  the building level.

7      Q.    Okay.  Do you know

8  whether, if there is a plan like that

9  implemented -- is it a safety plan, is

10  that the right word --

11      A.    We often use --

12      Q.    -- for something like that?

13      A.    We often use that term.

14      Q.    Okay.  So if there's -- I

15  just want to make sure I'm using the

16  right terminology -- so if there's a

17  safety plan in place, like ▇▇▇▇ being

18  separated from these two girls, is there

19  any way that that safety plan gets

20  communicated to the next level of

21  schooling once they leave the elementary

22  school?

23      A.    So, the director of

24  elementary or the director of secondary

1 would be the two individuals that would

2 be best able to answer that.  They would

3 communicate that in some way.

4       Q.    Okay.  So you're not sure,

5 like, what that process looks like?

6       A.    I'm not sure.

7       Q.    Okay.  Would you agree with

8 me, then, that you as the superintendent

9 didn't give them any instruction on how

10 to navigate that; is that correct?

11       A.    I'd say quite likely.  I'd

12 have to have my memory jogged on that

13 one, if there is anything, but I don't

14 recall anything.

15       Q.    That's not your experience

16 from what you recall doing?

17       A.    I don't recall doing that.

18       Q.    Okay.  At some point you

19 became aware that ████████ you said, was

20 taking classes in ninth grade at the tech

21 school; is that right?

22       A.    Yes.

23       Q.    And did you also become

24 aware at some point that ████████ was also

1  taking classes in ninth grade at the tech

2  school?

3      A.    I believe the mom called me

4  and was concerned that they didn't want

5  to have ████ continue in that program

6  because they didn't think she was -- I

7  don't know -- working with them to follow

8  the safety plan, that she was leaving

9  class and frequently found in areas of

10  the building that she didn't belong in,

11  that sort of thing.  That's what my

12  recollection is.  They didn't think she

13  was -- it was working well, for her to be

14  at the school, because she just wasn't

15  cooperative with school authorities

16  regarding sticking to the safety plan

17  that was developed.  I don't think she

18  was really bought into that plan.  The

19  mom had agreed to it.  The mom was

20  instrumental with helping to develop it,

21  is my understanding, but I don't think

22  ████ really wanted to have that plan.

23      Q.    How is that your

24  understanding?

1    A.    From communication from

2 North Montco Technical Career Center.

3    Q.    With Dawn LeBlanc?

4    A.    Gina Partavich (pht) was the

5 assistant director.  I think she was

6 finishing assistant director when she got

7 promoted to director.  So I'm almost

8 positive that she was assistant director

9 of the vo-tech school during that time

10 period.

11    Q.    I think --

12    A.    Dawn LeBlanc was the

13 principal.

14    Q.    When you're describing

15 safety plan, when █████ first started at

16 North Montco, there was no safety plan in

17 place.

18    A.    I don't know that for

19 certain.

20    Q.    Okay.  Do you recall having

21 a conversation -- do you remember Mrs.

22 ████████ when you talked to her, do

23 you remember, like, when in the school

24 year that was --

1    A.    I don't.

2    Q.    -- do you recall?

3    A.    No, I don't.

4    Q.    You said that Ms. -- who was

5 the one that you found out from that

6 ████████ and ████████ were at the tech school

7 together, was that Mrs. ████████████ you

8 found that out from?

9    A.    I'm pretty sure that Mrs.

10 ████████████ called me and -- I'm trying

11 to -- she was at one -- I'm pretty sure

12 she was saying, at one point, that she

13 didn't think that they should both be

14 permitted to go to the vo-tech school,

15 that she wanted us to bar the other

16 student, ████████ from going to the

17 vo-tech school and -- but that, you know,

18 wasn't going to happen, then, in that he

19 went.

20    Q.    Can you say that last part

21 again.

22    A.    He went.  He, you know, went

23 to the vo-tech school.  But I'd have to

24 have my memory jogged more.  But that's

1  what I vaguely recommend -- recall, was

2  that Mrs. ███████ had said to me she

3  didn't think that they both should be

4  permitted to go to the vo-tech school,

5  and we had a conversation about that, and

6  the bottom line was that, then, he

7  continued to the tech school, so.

8       Q.    Because you were saying

9  earlier, like, you weren't going to

10 disrupt -- or, stop his ability to take

11 the -- those courses?

12      A.    Those specialized kind of

13 courses that are available there, based

14 off what, you know, we had in front of

15 us.

16      Q.    When you say "what we had in

17 front of us", what do you mean?

18      A.    We had, at that juncture,

19 what I was aware of was that he was in

20 the sixth grade with ██████ at Gwynedd

21 Square, and this was that whole incident

22 that we talked about there.

23      Q.    With his hand going up her

24 shirt, is that what you mean?

1    A.    That's what we talked about

2  earlier, yeah.

3    Q.    Okay.  So based on that, you

4  were saying that there wasn't enough, it

5  didn't rise to the level to stop him from

6  going to the tech school?

7    A.    That's all we had.  She

8  had not -- my memory is that she did not

9  agree to go to Mission Kids, and you

10 might have that somewhere, you know,

11 better than me.  But my memory is she

12 didn't go to Mission Kids to

13 follow-through on that, back there at

14 Gwynedd Square.  And then I'm pretty sure

15 that she called me at some point and was

16 saying, "I don't think that he should go

17 to the school", and we talked about it

18 all, and she didn't provide any

19 additional other information that, you

20 know, persuaded me, if you will, that

21 ▮▮▮▮▮   shouldn't be permitted to pursue

22 that line of training that he wanted at

23 the specialized school.

24    Q.    What about in terms of, we

1 talked about the ███████ and ███████

2 incident in sixth grade, but there was

3 also another incident that we had gone

4 over in the spring, that incident that

5 you said was also involving a sexual

6 nature, I think was your word, was that

7 one of the things that you were

8 considering in whether ██████ should be

9 allowed to continue at the tech school?

10    A.    Well that was knowledge, you

11 know, to me and to us.  So that, you

12 know, again, would have been I'm sure

13 considered as a part of the full

14 equation, but it wasn't at a point where

15 we felt like we couldn't allow him to

16 pursue a particular type of training that

17 he was interested in getting.

18    Q.    When you say it was,

19 knowledge to me, to us, you mean, like,

20 that you were aware of the incident in

21 the spring, is that what you mean?

22    A.    That's how we learned about

23 the incident in the fall, was because

24 there was an incident in the spring.  So

1  then -- yeah.

2      Q.    Do you recall -- other than

3  those two incidents, do you recall there

4  being other females that came forward in

5  Gwynedd Square about ████████

6  inappropriately touching them?

7      A.    I'm not, no.

8      Q.    You don't, you don't recall

9  that?

10     A.    I don't.  I'm not aware of

11 any -- were there others?  I don't know

12 of any.

13     Q.    There's documents that say

14 that there was.  I guess --

15     A.    I'm not --

16     Q.    -- I'm asking --

17     A.    I'm not aware of those.

18     Q.    Okay.  When you had talked

19 with Mrs. ████████████ about this

20 conversation with ██████ and ████████ being

21 at the tech school together, do you

22 recall whether you had anybody else,

23 like, in your office or on the line with

24 you during that call?

1    A.    I don't.

2    Q.    What was the result of

3  that -- the end result of that

4  conversation with Mrs. ██████████ saying

5  that she wanted ██████ removed and you

6  saying, "we're not going to remove him",

7  what was the result of the -- what was

8  the end of the conversation?

9    A.    I think the end of the

10 conversation, I don't recall specifically

11 if it was right at that juncture or if it

12 was, you know, subsequently or, you know,

13 a little time passed, but the end result,

14 if you will, was that both of them

15 attended the vocational school.

16    Q.    Do you recall having any

17 conversations with Dawn LeBlanc about

18 ██████ and ██████ attending the technical

19 school together?

20    A.    Boy, hmm.  It's possible.

21 I'd have to have some more memory jogging

22 on that, but I don't have that --

23    Q.    Do you recall --

24    A.    -- you know, engraved.

1       Q.    Do you recall telling Dawn

2 LeBlanc something along the lines of

3 "thank you for cleaning up my mess"?

4       A.    No.  I don't remember

5 anything like that, no.

6       Q.    Do you remember having any

7 conversations with Dawn LeBlanc about the

8 fact that, like, ███████ and ███████ were

9 supposed to be kept separate and then

10 they both got filtered into the same

11 school, do you remember any conversations

12 like that with her?

13       A.    I don't remember.

14       Q.    Do you remember making sure

15 at all that you had counsel present when

16 you were calling back Mrs. ███████████

17 about ███████ and ███████ being in the tech

18 school together?

19       A.    No.

20       Q.    Do you know why the incident

21 with ███████ and ███████ was not included

22 in ███████ or ██████████ student files?

23       A.    I don't know if it was or if

24 it wasn't.  Are you saying that it was

1  not?

2      Q.    In their file that would

3  have been passed from school to school,

4  it's my understanding that it was not.

5      A.    I'm not aware if it was or

6  if it wasn't; I don't know.

7      Q.    Is that something that, as

8  superintendent, it was within your

9  knowledge or responsibility, or is it

10 somebody else that would be seeing or can

11 answer questions about what is or isn't

12 in a student's file?

13     A.    Yeah.  That wouldn't be me.

14 I don't know what's in student files.  I

15 don't see student files move from

16 building to building or within the

17 building, I don't.

18     Q.    Who would be that person who

19 would be familiar with that; if you know?

20     A.    Building principals would

21 probably be the best people to talk to

22 about that.  Director of elementary,

23 director of secondary might be

24 knowledgeable about it.  But I would say

1 the building principals are most

2 knowledgeable.

3        Q.    Okay.  In the records that

4 were produced from the school district, I

5 think it was -- or, it might have been

6 records that the district provided to the

7 ███████████ when they requested records,

8 there was an indication that there was a

9 phone call between you and Mrs.

10 ███████████ on October 4th, 2017, that

11 was █████ and ███████ ninth grade year,

12 and the conversation, according to Mrs.

13 ███████████ started off that you weren't

14 sure what she was referring to and that

15 she needed to refresh your memory

16 regarding █████ and ███████ Do you

17 recall that?

18        A.    No.  I don't recall that.

19 I'm not sure what she -- what was she

20 calling about?  Did she -- maybe she

21 wasn't clear what she was calling about.

22        Q.    Let me -- I'll try and pull

23 up the, the e-mail and see if it makes it

24 any more clearer.

1     I'm sharing my screen.  It's

2  Page 486 of the -- production, for the

3  record.

4     Are you able to see that

5  here?

6     A.     I see something to DL, I

7  guess that would be Dawn LeBlanc.

8     Q.     Right.

9     A.     DCC Chaz H5 Contracting.

10    Q.     This is an e-mail -- just to

11  put it into context, this is an e-mail

12  from Wendy ██████████  to Dawn LeBlanc,

13  and Chaz is -- the H5 Contracting is

14  ████████  father.  It says, dated

15  10/4/2017, so I just go off the phone

16  with Dietrich.  He started off by,

17  quote-on-quote, not knowing what the

18  situation was and that I needed to

19  refresh his memory.  Not a good start.

20  So I told him exactly what is going on,

21  and I told him that I strongly

22  remember -- sorry -- strongly recommended

23  he remove the boy from tech school.

24     Is that -- is this the

1  conversation you were talking about,

2  where you had it with Mrs. ███████

3  and she wanted you to remove him from the

4  tech school?

5        A.    I'd say it's probably -- it

6  could likely by that one.

7        Q.    Because the next part says,

8  he said he has to be careful because

9  everyone has rights.  I reminded him that

10  he should be worried about ██████

11  rights first and foremost, since it was

12  the district's mistake by not putting

13  safeguards in place.  I explained that

14  you are making accommodations to have

15  ██████ attend tech full-time.  The boy

16  could be in one school, and she could be

17  in another, problem solved.

18            Does that sound familiar in

19  the conversation you described?

20        A.    She didn't want the boy to

21  go to vo-tech.  So he should go to a

22  different school, and ██████ should be

23  the only one that goes to vo-tech.

24  That's what I recall.

1      Q.   Do you recall Mrs.

2 ███████████ -- or, you asking Mrs.

3 ███████████ to have your memory refreshed

4 as to what was going on?

5      A.   Yeah.  And I still don't

6 even know exactly to what she's referring

7 that I started off by not knowing what

8 the situation was.  I don't believe that

9 she's referring to what happened in

10 Gwynedd Square.  I think she's -- wasn't

11 happy about something that happened at

12 the vo-tech school, because I think

13 that -- there was a difference of opinion

14 at the vo-tech school.  So, Dawn LeBlanc

15 was very friendly with the family and

16 was, you know, trying to do what she

17 could in her position as the principal

18 but was -- you know, I believe I

19 understood was, you know, tried to work

20 with the family.  She -- I think Dawn had

21 a -- and I think ███████████ might of

22 had their child go in or something.

23 That's not something I know with

24 certainty.

1          But I think Dawn was trying

2     to work with the ████████ family.  I

3     don't want to get into all the issues

4     that Dawn was having as principal because

5     I don't think that's appropriate.  But I

6     don't know what the situation was, and I

7     still don't know what the situation was.

8     I don't think it was regarding what

9     happened at Gwynedd Square.  I think

10    there must have been something that they

11    weren't happy about at the vo-tech

12    school.  That's what I believe it was.

13         Q.    Well and based on the date

14    of this e-mail, it's October 4th, 2017;

15    so about a month into the school year.

16         A.    I think they, they --

17    somehow or another, they saw each other

18    or something, that the boy and the girl

19    crossed paths at the tech school.

20         Q.    Right.  And that's --

21         A.    I think that's --

22         Q.    -- so I can --

23         A.    Yeah, go ahead.

24         Q.    I can represent to you that

1   that was the incident, that, based on

2   the documentation and conversations

3   that    I've had with Ms. ███████████

4   that once ███████  and ███████  had both been

5   filtered -- gone into the tech school,

6   ███████  ran into ███████  in the hallway and

7   had a panic attack, because she had made

8   the choice to try and transfer away to

9   avoid him and then went to tech school

10  and he was there in the hallway.

11       A.    Okay.

12       Q.    Is that --

13       A.    Yeah.  There was something

14  where they saw each other at the school,

15  but I think they're different versions

16  about how all that happened.

17       Q.    What's the -- what is the

18  other version that --

19       A.    There was some, some folks

20  at the vo-tech school that ███████  was not

21  following various directives and whatever

22  to not cross paths with the student, that

23  they were, you know, doing things that

24  would find themselves together.  That was

1  the belief among some people there;

2  that's my understanding.  Again, I wasn't

3  there.  So I didn't see it for myself.

4  But I think there was something at the

5  vo-tech school where they saw each other

6  and, and ███████ -- and mom talked about

7  that.  They had meetings up there, I

8  never got, you know, like, into the

9  details or whatever, but I know that the

10 school personnel there were having

11 meetings with the ██████████ about her

12 being compliant because there were people

13 that were there that thought she just

14 wasn't cooperating with them in terms of

15 doing her part at the vo-tech school, to

16 be there and not to be out and about.

17       Q.   Do you know, were you

18 involved or were you aware of any

19 discussions about ███████ not having the

20 proper supports with her having ADHD at

21 the tech school?

22       A.   No.  I, I was not told that

23 she didn't have the proper supports.

24       Q.   Do you -- █████████ safety

1  plan, I believe, was not implemented at

2  the start of the school year at North

3  Montco.  Are you aware of when that

4  safety plan went into place?

5       A.    I'm not sure.

6       Q.    Okay.  So you don't know

7  whether, at this point when they run into

8  each other in the hallway, whether there

9  was a safety plan in place at that point?

10       A.    I don't know with enough

11 certainty to say that, you know, I can

12 say whether there was or there wasn't.

13 There could have been, but it might have

14 been changed.  I don't remember exactly

15 how that all was -- I was not there.

16       Q.    Once your memory had been,

17 you know, refreshed where, you know, you

18 had talked to Mrs. ████████ about

19 ████ and ████ being separated, did

20 you do anything with that information?

21            MS. JORDAN:  Note my

22    objection to the form of the question.

23            You can answer.

24            THE WITNESS:  Did I do

1    anything about the vo-tech school?

2  BY MS. LAUGHLIN:

3        Q.    That Mrs. ███████████ was

4  saying that █████ and ██████ should be

5  separated, did you do anything with that

6  information?

7             MS. JORDAN:  Note my

8       objection to the form of the question.

9             You can answer.

10            THE WITNESS:  They weren't

11      separated.  They continued at the same

12      school, and there were assurances that

13      they had a plan, a safety plan, but

14      ██████ had to follow it.  And I

15      recall being told that there were

16      difficulties with getting ██████ to

17      follow the plan that they wanted her

18      to follow at the vo-tech school.

19  BY MS. LAUGHLIN:

20       Q.    Do you recall being part of

21  the decisionmaking for approval for

22  ██████ to attend North Montco full-time

23  that year?

24       A.    No.  I wouldn't have been

1   like, in the -- I don't recall that.

2   Like, to approve who goes to the vo-tech

3   and who doesn't?  I don't get involved in

4   those.  You'd have to have some special

5   kind of situation to jog my memory on

6   that one.  I don't remember that.

7         Q.    Yeah.  I'll show you an

8   e-mail not.  For the record, this is Doe

9   production 1598.  This is an e-mail from

10  Dawn LeBlanc, October 6th, which is,

11  like, right around the same timeframe of

12  the e-mail we just looked at.  It says, I

13  spoke with Dr. Dietrich yesterday, and he

14  gave approval for ▇▇▇▇ to attend North

15  Montco full-time --

16        A.    This is ninth grade?

17        Q.    Right.

18        A.    Okay.  So --

19        Q.    Go ahead.

20        A.    That seems to indicate Dawn

21  must have called or someone contacted me

22  and said, "we'd like to have her be at

23  North Montco full-time", and I said,

24  "sure, fine".

1    Q.    And you said, "sure, fine"?

2    A.    Yeah.

3    Q.    Okay.  But you said normally

4  that's not something that you're involved

5  with?

6    A.    No.  The mom -- so earlier,

7  when -- did that previous -- was that

8  prior to October 6th?

9    Q.    I think it was around the

10  same timeframe.  It was October 4th.  So

11  two days prior to the last e-mail we just

12  looked at.

13    A.    I think ██████ -- ██████ had

14  reasons why she wanted to be at the

15  vo-tech school and be in that PYAP

16  program.  I don't remember what they

17  were.  But I think she must have made

18  some kind of a case for, that would be

19  the best program for her, for her, you

20  know, pursuit of her educational goals,

21  so she could go to the vo-tech school.  I

22  think that ██████ felt more -- I don't

23  know -- comfortable at the vo-tech

24  school.  I think she, you know, felt like

1 Dawn LeBlanc was somebody that, you know,
2 she could see as an ally, that sort of
3 thing.  I think that, I think that
4 Dawn -- I'm not positive about this, but
5 I think that Dawn might have also had
6 something where -- like, besides school.
7 I don't know for certain.  Something
8 tells me that she had a riding -- riding
9 stables or something and ████ had a
10 horse there or went there for riding
11 lessons or -- I don't -- something like
12 that.  I'm not sure.  You can pursue that
13 if you care to.  I think there was
14 something there.  Bottom line is, the
15 reason I'm saying this, I think that
16 ████ felt, like, the school, vo-tech
17 school, was my spot, I feel better about
18 that than, you know, the other options,
19 like Pennbrook.
20          Q.    Do you know why she felt
21 better about tech than the --
22          A.    No.  I just explained why I
23 think that maybe she did.  I don't know
24 for certain.

1    Q.    Okay.  When a student is

2    attending a tech school, are they still,

3    like, the district's responsibility?

4         A.    Yeah -- well, in terms of

5    paying for the cost of that.  But the

6    vo-tech school has a level of

7    independence in terms of how they

8    operate.  We don't dictate to them, but

9    we work cooperatively with them.

10        Q.    Okay.  But are they still,

11   like, a district student if they're

12   attending the tech school?

13        A.    Yeah.  They are still a

14   district student, and they're also a

15   vo-tech school student.

16        Q.    Okay.

17        A.    They're, like, both.

18        Q.    You mentioned about a

19   conversation that you had, I think with

20   Ms. Small, and so I'm gonna ask you

21   about, were you part of any conversations

22   or discussions for ███████ going to North

23   Penn High School in tenth grade?

24        A.    I don't recall what happened

1  there.  I think that the vo-tech didn't

2  want ████ to continue as a full-time

3  PYAP student in their program or a

4  full-time student there.  I don't

5  remember exactly.  But somehow or

6  another, then, it was going to be -- I

7  think she continued halftime at the

8  vo-tech school and halftime at North Penn

9  High School but not full-time at North

10 Montco Vo-Tech.  That's what I think

11 happened.  Again, you'd have to jog my

12 memory if there's something else.

13         Q.    You're right, that in tenth

14 grade -- and I'm not, I'm not trying

15 to -- a memory test here or anything --

16 that in ninth grade -- or, I'm sorry --

17 in tenth grade, ████ was going to be

18 going part-time a day to North Penn High

19 School and part-time a day to North

20 Montco, the vo-tech school.

21            But were you part of any

22 discussions -- because you mentioned that

23 you had a call with Kate Small about

24 needing to check the schedule, and she

1  confirmed to you that she did that.  So I

2  just, I guess, am trying to understand

3  how you became involved in those

4  discussions.

5          A.     Well, we had the discussions

6  about the two of them not crossing paths

7  and not, you know, being together and,

8  you know, not being in the same classes,

9  that -- classes, that sort of thing.

10 That was part of the whole ninth grade

11 discussion part of the -- I think it was

12 part of the reason why she wanted

13 Pennbrook, but I'm not a hundred percent

14 sure there weren't other reasons too.

15 But -- so now it's time for tenth grade,

16 and, you know, it's quite possible that

17 Mrs. ████████ and I discussed in a

18 call sometime -- I'm not sure about that,

19 though -- that, you know, they, you know,

20 would be -- somebody would check to make

21 sure they're not in the same classes, you

22 know, that kind of a thing.

23         Q.     To try and make sure they

24 weren't going to cross paths or be in the

1 same classes together at North Penn High

2 School?

3        A.    Yeah.

4        Q.    Okay.

5        A.    So I would have brought them

6 to Kate and said to Kate -- she -- her

7 office was in the same building as

8 mine -- you know, gone down the hall,

9 probable, and said, make sure, you know,

10 that they're not in the same class.  Yup,

11 I know, I'm aware of it, and, you know,

12 I'm on it.  And she did do that.  It's my

13 understanding she did check, and they

14 were not in the same class.

15        Q.    Okay.  And that was

16 before -- was that before the start of

17 school?

18        A.    That was before the start of

19 school.  And then, it's my understanding

20 that somehow or another, and I don't know

21 how, they got in the same class because

22 when -- the next thing I heard, then,

23 after that was that -- I think �858

24 wasn't successful with her schedule, she

1  needed a schedule change of some kind.  I

2  don't know if it was that social studies

3  class, though.  It could have been

4  another reason, which I think it was, but

5  I'm not positive, that she was struggling

6  in, I want to say, you know, like, a math

7  class, but I don't remember which one,

8  but there was some reason she needed a

9  schedule change, I believe, and that

10  might been by October sometime.  And then

11  when they were trying to tell her you're

12  going to have to have a schedule change,

13  what I was told was she was -- to a

14  schedule change, didn't want a schedule

15  change, and then, ███████ you have to

16  have a schedule change, and she said,

17  well, just so you know, I've been in the

18  same class with, you know, this boy I'm

19  not supposed to be in class with.  And

20  then we had contacted the teacher, I

21  believe it was Tim Borgmann, about that,

22  and then they reported back to me.  I

23  didn't talk to Tim.  But they reported

24  back to me that Tim was quite surprised

 1  by that because he often saw them

 2  volunteering to be together and do that

 3  kind of that.  That's what I was told.

 4        Q.    Who --

 5        A.    She had not said anything to

 6  anybody.  Like, even when she went in the

 7  class, she didn't look around and say,

 8  you know, oh, boy, here is ██████ ████████

 9  and, you know, we're not supposed to be

10  in the same class.  She never said

11  anything to anybody until it was time for

12  a schedule change.  Again, that would

13  have been the second schedule.  In other

14  words, the first schedule, they weren't

15  in the same class.  Then there was a

16  schedule change before school started,

17  and I don't know why, and you'd have to

18  ask, like, Pete Nicholson or Kate Small

19  or one of the assistant principals.  I

20  mean, there's a host of reasons on how it

21  could have happened.  It could have

22  happened at the request of -- they had,

23  like, a drop/add-thing.  So it could have

24  happened during the drop/add.  It could

1  have happened where somebody said, oh, I

2  need to fit Kyle Somers in the class, if

3  I take -- and it's full -- if I take

4  ███████ ███████████ out, she still gets

5  all the classes she wants, and I can

6  solve my problem to get Kyle into the

7  class.  Like, sometimes when assistant

8  principals do that, or whoever does --

9  the guidance counselors do schedule

10 changes, they do that.  So that's

11 another -- I mean, a bevy of reasons

12 could have, you know, explained how.

13          Somehow or another, after

14 Kate checked the schedule, they got in

15 the class together.  We never heard from

16 ████████ or her mom or anybody that they

17 were in the class together, and then it

18 was time to make a schedule change, and I

19 think it was because ████████ -- but I'm

20 not positive -- ████████ was struggling in

21 a different class, and the only way they

22 could -- like, often, it's math where

23 it's, like, this level of math has just

24 proven to be too hard, and they need to

1 take a different level of math, you know,

2 that kind of thing.  I think there was a

3 necessity to meet a different need.  I

4 don't think it was the social studies

5 class she was struggling because I

6 remember being told that the social

7 studies teacher was quite surprised that

8 they were not supposed to be in the same

9 class.

10       Q.    So you didn't think that

11 ███████ was struggling in social studies?

12       A.    I don't know for certain.

13 You'd have to ask others.  I don't know.

14 There was a reason why she needed to have

15 a schedule change, and I was told her

16 initial reaction was she was not in favor

17 of that but that eventually they kept

18 insisting, you know, you're not going to

19 be successful.  So, probably her case

20 manager for -- if she had an IEP or Kate

21 Small or somebody would be better able to

22 answer why she had to have that schedule

23 change at that point.  But she had to

24 have one, and then she disclosed to the

1 group that, do you know, I've been in the

2 same class with this student since

3 September.

4     Q.    Who told you that, that last

5 part of what you're describing to me?

6     A.    That would have been --

7 either, probably, if would have been Kate

8 Small or Pete Nicholson.  I'm pretty sure

9 Pete was principal.  I think he was in

10 his first year of principal at that time.

11     Q.    That's -- I think that's

12 accurate from what --

13     A.    Yeah.  I think that that

14 would have been either Pete or Kate.  I

15 don't know who else it could have been.

16 I would say it's probably one of those

17 two.  I don't remember who, though.

18     Q.    And were they communicating

19 to you that they -- whoever was telling

20 you this believed that she was saying,

21 we're in the same class, because she

22 didn't want her schedule changed?

23     A.    Yeah.  That's what I had

24 been told.  I don't know if it's -- I

1  don't know what's that's based off of.

2       Q.    Okay.

3       A.    So I don't want to present

4  that as fact because I didn't hear it

5  myself.  You know, I don't know.

6       Q.    Okay.  Do you know whether

7  any investigation or interviews took

8  place following ███████ disclosure?

9       A.    Interviews, of?

10      Q.    Any of the students, to find

11 out what had happened or if anything

12 happened.

13      A.    You'd have to ask Pete and

14 perhaps an assistant principal or Kate

15 Small.  People like that would be better

16 able to answer; I don't know.

17      Q.    Okay.  Have you been told

18 anything other than, she didn't want her

19 schedule changed -- or, I'm sorry -- have

20 you been told anything other than that

21 ██████ said, we were in the same class,

22 were weren't supposed to be, were you

23 told anything in addition, like, that he

24 had sexually assaulted her?

1      A.    No.

2      Q.    Have you been told anything

3 about an allegation of digital

4 penetration in the classroom?

5      A.    No.

6      Q.    Any investigation into --

7 after ███████ disclosure of what you

8 described, was that the responsibility of

9 Pete Nicholson?

10      A.    In terms of following

11 through?  I need to know what the

12 allegations or, you know, the concerns

13 were in terms of -- but if there were

14 concerns that were raised, then that

15 would be the high school principal that

16 would be the one that I would expect that

17 would, you know, pursue those concerns.

18 I don't know about that, and I don't know

19 what, if anything, was done.  The only

20 other part I know about that is I was

21 told that Tim Borgmann said that he was

22 quite surprised when he then was told

23 they weren't supposed to be together,

24 that he had said that he was quite

1  surprised by that because they would

2  often volunteer to be partners on

3  projects and things like that.  I was

4  told that, but I didn't see that for

5  myself.  You know, I didn't -- that's

6  just -- again, I didn't talk directly to

7  Tim either.  So that's not directly from

8  Tim.

9       Q.   Who told you that?  Was

10  that, again --

11       A.   I think it was either Pete

12  or Kate.  I don't know who else it could

13  have been; I'm not sure.  I would guess

14  probably either Pete or Kate, but I'm not

15  sure.

16       Q.   Okay.  And how did they tell

17  you these things?  Was it on the

18  telephone?  In writing?

19       A.   No.  It wouldn't -- I

20  seriously doubt that it was in writing.

21  I don't think it was in writing.  I think

22  it would have been on the phone or in

23  conversation together, in-person.

24       Q.   And why were they --

1    sorry -- why were they telling you these

2    things; if you know?

3          A.    In terms of where things

4    stand, like, as much as they, you know,

5    whatever, knew at that juncture.  But I

6    had not heard any of those things you

7    talked about earlier, about -- are you

8    saying that there were allegations of

9    digital penetration and things like that?

10         Q.    Yes.  I mean, that is --

11         A.    Okay.  I'm not aware of

12    that.

13         Q.    Okay.  But my, my question,

14    I think, was, since you're the

15    superintendent, you said you don't

16    normally get involved in, like, student

17    building level things, why were they

18    communicating these things to you?

19         A.    Mrs. ███████████ would call

20    me, had called me over the course of the

21    time period.  So I think they wanted me

22    to know about that.

23         Q.    Because they were aware that

24    Mrs. ███████████ had called you?

1    A.    Mrs. ██████████ had called

2  over time, over the course of the years,

3  you know, concerned about the handling of

4  ██████ and, you know, the class and the

5  boy --

6    Q.    Did you --

7    A.    -- ████████ --

8    Q.    Sorry.

9    A.    No problem.

10    ████████  ████████

11    Q.    Did you ever say to Pete

12  Nicholson or Kate Small, like, keep me in

13  the loop on this or include me -- update

14  me on what's happening?

15    A.    I don't know.  It's

16  possible.  Yeah, I wouldn't be surprised

17  if I said that; I don't know.

18    Q.    I'm just trying to

19  understand, you know, based on what you

20  told us earlier in the deposition of the

21  things you would really get involved in

22  why Pete Nicholson, for example, would be

23  calling you and telling you this

24  information?

1    A.    It would be because Mrs.

2    ███████████ has called me.  So I think

3    that, you know, administrators would let

4    me know stuff and that kind of thing.  So

5    that's -- I mean, you'd have to ask Pete,

6    if it was Pete who did it, and why he did

7    it, but yeah.

8    Q.    Do you know whether, at any

9    point, there was discussion about

10   removing ██████ from North Penn High

11   School?

12   A.    Uh-uh.  I'm not aware of it.

13   Q.    That's something you

14   wouldn't be, like, taking the lead on

15   because of your role as superintendent?

16   A.    Expulsion.

17   Q.    Were you part of any

18   discussion about any discipline for him,

19   for ██████

20   A.    I don't recall any of that.

21   Q.    After ██████ disclosure

22   had come to light, were you part of any

23   conversations about ██████ transferring

24   back full-time to North Montco or

1  anything like that?

2      A.      ████████  disclosure she was

3  in the same class?

4      Q.      Yeah.  Whatever had come of

5  that -- I can represent to you, after

6  there was a disclosure, whatever you're

7  saying was made, there was an

8  investigation, I think by Pete Nicholson.

9      A.      Okay.  So what's your

10 question?

11     Q.      My question was, ████████

12 ended up transferring back full-time

13 to -- away from North Penn High School to

14 the tech school.

15     A.      Okay.

16     Q.      Were you part of any of

17 those discussions or conversations?

18     A.      It's possible that they

19 called me to say, hey, we'd like to take

20 her back or the best solution is she goes

21 back to vo-tech full-time.  That's the

22 part I'm not really clear about, if she

23 was full-time -- I guess she was -- she

24 must have been part-time initially, then

1  she asked to go to full-time and then

2  back to part-time again in the beginning

3  of tenth grade and then back to

4  full-time.  Vo-tech must have said, all

5  right, fine, we'll take her.  I know Dawn

6  felt like she could figure out ways to

7  work with her, but I know there were

8  others at the vo-tech school that didn't

9  really want to see her there full-time.

10 That, that is something I'm, you know,

11 pretty certain about.

12      Q.    Were you part of any of

13 those conversations?  I know you're

14 saying, like, she was part-time and then

15 she was full-time.  Were you part of any

16 of those decision-making?

17      A.    Well you showed me that

18 e-mail that they said that they had

19 talked to me, and they -- Mrs.

20 ███████████  called me many times, but I

21 don't remember, you know, dates or

22 specifics.  So, if you have something

23 else to jog my memory, I'll certainly

24 take a look at that, but I don't

1  remember.

2      Q.    Okay.  Are you familiar with

3  the -- with North Penn's policies on

4  definitions of, like, different

5  disciplinary code violations?

6      A.    In terms of, like, a level

7  one, level two, level three, level four?

8      Q.    No.  Like, when -- like, for

9  example, in terms of what the school

10 district defines harassment as, like,

11 those policies.

12     A.    Well, we have policies, but

13 I'd have to have them in front -- I am

14 familiar that we have policies, but I

15 can't quote to you, you know, chapter and

16 verse.

17     Q.    Do you know what the

18 district defines as an obscene gesture?

19     A.    I'd have to see what's in

20 the policy that defines it.

21     Q.    Okay.  Do you know whether

22 what had happened to the two students at

23 the Gwynedd Square Elementary School,

24 whether those were -- would you define

1  them as obscene gestures?

2       A.    I don't know what you're

3  talking about, obscene gestures.

4       Q.    I'll show you -- give me one

5  second.

6            Are you able to see my

7  screen?

8            MS. JORDAN:  Not yet.

9            THE WITNESS:  Not yet.

10           MS. LAUGHLIN:  Okay.  Sorry.

11  BY MS. LAUGHLIN:

12      Q.    This is ████████

13  disciplinary file, or student file, I

14  think, that was turned over from the

15  district.

16           Have you ever seen this

17  before?

18      A.    I have not.

19      Q.    It -- in Gwynedd Square

20  Elementary School, it says that the

21  incident was an obscene language or

22  gesture.  Do you see that?

23      A.    I see that.

24      Q.    Is what we described and

1  what we talked about earlier with these

2  incidents with the girls in sixth grade,

3  was that, as you understand it, obscene

4  language or gesture?

5       A.    I don't know to what that is

6  referring.  I see a date of April 9th.

7  So I don't know what they categorized, if

8  that was something different or if it was

9  what we were talking about with the

10  springtime interaction with another girl

11  in the classroom, at which time, then,

12  the disclosure that there was something

13  happened in the fall, whatever date that

14  was; I don't know.

15       Q.    I can represent to you, from

16  taking the deposition of the principal of

17  Gwynedd Square Elementary School, that he

18  was saying that this line here was

19  supposed to be all of the incidents that

20  ▮▮▮▮▮▮  had been involved in at Gwynedd

21  Square in the sixth grade year with

22  allegations that he was touching female

23  students.

24              Do you know whether, under

1 the North Penn district policies, whether

2 that should be categorized as an obscene

3 language or gesture, based on the

4 disciplinary -- or, the policies of the

5 district?

6         MS. JORDAN:  Note my

7     objection to the form of the question.

8         You can answer.

9         THE WITNESS:  I don't know

10    enough of the specifics to know what

11    happened there and the way that that

12    should be interpreted, in terms of the

13    offense or the incident description.

14    So I don't know enough about that to

15    describe if that was -- an obscene

16    language was stated during whatever

17    kind of interactions or if there was

18    some kind of gesture that they're

19    interpreting as obscene; I don't know.

20    I don't know enough about what

21    happened.

22 BY MS. LAUGHLIN:

23    Q.    Under the district policy,

24 is an obscene gesture, would that be

1   something like putting his hand up a

2   female student's shirt, or is that not

3   what an obscene gesture is under the

4   policy, from what you understand?

5           MS. JORDAN:  Note my

6       objection to the form of the question.

7           You can answer.

8           THE WITNESS:  Again, it's

9       really difficult to give you a

10      specific description of what falls

11      into the choice that the principal

12      selects for a descriptor of the

13      incident.  So I didn't see the

14      incident, and I don't know what was

15      there, and I wasn't there to be able

16      to pass judgment whether that was, you

17      know, obscene language and obscene

18      gesture/gesture or if there was

19      additional, what it was.  I really

20      don't know.

21  BY MS. LAUGHLIN:

22      Q.    Were you aware at all if

23  ███████ -- the allegations that he

24  sexually harassed two additional girls at

1  the middle school?

2        A.     I'm not aware of them.

3        Q.     Is there a certain point in

4  time where after a student has conduct

5  involving -- or, allegation of conduct

6  involving sexual harassment that you

7  would expect to be made aware as the

8  superintendent?

9        A.     In terms of the student

10  discipline, if it rises to the level of

11  an expulsion, I would be made aware of

12  that, and then we would proceed through

13  the, you know, the procedures that there

14  are for student expulsion.

15        Q.     Is there any guidance to

16  give downward to, like, principals or

17  directors of education about when

18  students should be expelled from school?

19        A.     Again, these are incidents

20  that expulsions aren't, you know, able to

21  be cut and dry and described in specific

22  terms.  There's certain things that, if

23  it falls into that category, if you look

24  at our school discipline code, it would

1  say, you know, expulsion, for example, I

2  believe.  So that would be the best thing

3  I could point you to.

4       Q.    Are you talking about the --

5  sorry.

6       A.    Interpretations that leaders

7  have to make if it rises too.  So I'll

8  give you an example.  There was an

9  interaction that was physical that some

10 people would call a fight, might another

11 person call it a tussle.  You know, so

12 sometimes there are differences of

13 opinion as to whether or not I would call

14 that a fight or a tussle, you know, would

15 I call that assault or -- assault --

16 somebody, you know, gets into it with

17 somebody else or would I not call it a

18 physical assault.  There's all these

19 other things that I know that principals

20 deal with in terms of trying to determine

21 what to call it.  So, yeah.

22      Q.    So something that there is,

23 like, choosing or giving their own

24 interpretation in a sense to decide what

1  they think fits best in that particular

2  scenario?

3          A.      Yeah.  There's a level of

4  that, and we can't divulge -- that.

5  It's -- it would be pages upon pages upon

6  pages to try to describe all the nuances

7  that go into trying to describe whether

8  something is characterized in one way or

9  another way.

10          Q.      As a superintendent, do you

11  set any policies or guidance for schools

12  to follow in terms of document retention

13  in student files?

14          A.      So we have a document

15  retention policy.  So whatever that

16  policy says is what we would do.  So, I,

17  again, don't have that committed to

18  memory.  But there are certain things

19  that, you know, are kept for retention

20  for -- I don't know -- many, many years,

21  I guess, right, other things that are

22  gone when a student graduates, other

23  things that probably never even make it

24  into a file.  You know, so I would best

1   point you to that policy.

2       Q.    Is that a district policy?

3       A.    Yeah.  We have a district

4   policy on retention.

5       Q.    Is --

6       A.    We're in the midst of

7   revising policies.  So, I don't know

8   which one, but I can recall, a few years

9   ago, we had discussion about the

10  retention policy, how many years we

11  should keep certain things.

12      Q.    Does that also include,

13  like, student disciplinary records?

14      A.    I think you have to look in

15  there to see if that's there.  I don't

16  have it committed to memory, but I don't

17  think so.

18      Q.    When you say that you're

19  working on revision of policies, is that

20  the school district is working on that?

21      A.    Yes.  We have a school board

22  policy committee, and we work with school

23  board reps on that committee and school

24  solicitor's office, and then the

1 assistant superintendent, Dr. Bauer, is

2 the lead individual from the

3 administration team on the policy

4 committee.

5          Q.    Why are you reviewing the

6 policies now --

7          A.    Because --

8          Q.    -- is it for a particular --

9 go ahead.

10          A.    Because it's time.  We

11 haven't done them for a long time.  I

12 don't -- some of our policies weren't,

13 you know, updated and reviewed, I want to

14 say 2007, 2008, 2009, I think some might

15 go back that far.  So it's time to go

16 through -- some of them don't change.

17 Others change, you know, they get

18 updated.

19          Q.    Is it all policies, like,

20 every policy in the district is currently

21 going through revision?

22          A.    That's the goal, but we work

23 through methodically.  So we try to go

24 through them one at a time.  Sometimes

1  we're able to accomplish, you know,

2  three, four, five of them in a particular

3  month.  But we're working our way through

4  it.

5        Q.    Prior to -- when did you

6  start revising or going through this

7  policy of revising those policies?

8        A.    I'd have to look to be

9  certain, but I think we're in the second

10 year -- I don't remember if it was a full

11 two years, though, I would say probably

12 not.  I don't think we started, you know,

13 August two years ago, but I have to look

14 it up.

15       Q.    How did that come to be,

16 that there was going to be a decision

17 made to revise all the policies?

18       A.    We just decided it was time.

19 It was a discussion with the school

20 board, who sets policies.  It's their

21 role to set policies.

22       Q.    Okay.

23       A.    And it was time now that we

24 need to embark on revising policies.  I

1 think we started before COVID but not
2 much before COVID hit, and then we still
3 continued to try to work our way through
4 some policies and deal with all the
5 COVID-related decisions that we have to
6 make.
7         Q.    Before making the decision
8 that you're gonna embark on revising all
9 policies, was there any type of frequency
10 in place to do a policy review of what
11 might be needed to be updated?
12         A.    No.  We don't have a policy
13 on -- at least I don't recall that we
14 have a policy on how often we have to
15 review the policies.  Yeah, it's just one
16 of those things where -- it's a
17 time-intensive process, and we felt that
18 it was time to, to really do a
19 comprehensive -- there were other changes
20 in policies since we did the last
21 comprehensive review, but the last time
22 we did a comprehensive review, we
23 actually hired a retired school
24 administrator to assist in working

1 through those policies because it's so
2 time-intensive.
3        Q.    On this round, did you hire
4 someone like that again to help you work
5 through the policies?
6        A.    No.  Not yet, we have not.
7        Q.    Okay.  Yet, I mean, do you
8 guys plan to do so, or is that --
9        A.    What are you doing on the
10 weekend?  I'm joking with you.  I don't
11 know.  We don't -- I don't have any
12 intention, I don't think we have -- you
13 know, it just takes a lot of time.
14        Q.    Okay.
15        A.    And we work with the
16 solicitor's office to do it.
17        Q.    Okay.
18              MS. LAUGHLIN:  I think those
19    are all the questions I have for you.
20              THE WITNESS:  Thank you.
21              MS. JORDAN:  Thank you.
22              I will take a copy of the
23    transcript, a hard full-sized copy.
24              (Whereupon, the deposition

1       concluded at 2:48 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the

6  witness was duly sworn by me and that the

7  deposition is a true record of the

8  testimony given by the witness.

9

10

11  _____

    BEN PIECZYNSKI, JR., a

12  Professional Reporter and Notary

    Public

13  Dated:  September 4th, 2021

14

15

16

17

18

19          (The foregoing certification

20  of this transcript does not apply to any

21  reproduction of the same by any means,

22  unless under the direct control and/or

23  supervision of the certifying reporter.)

24

1

LAWYER'S NOTES

2   PAGE   LINE

3   \_\_\_\_\_   \_\_\_\_\_   _____

4   \_\_\_\_\_   \_\_\_\_\_   _____

5   \_\_\_\_\_   \_\_\_\_\_   _____

6   \_\_\_\_\_   \_\_\_\_\_   _____

7   \_\_\_\_\_   \_\_\_\_\_   _____

8   \_\_\_\_\_   \_\_\_\_\_   _____

9   \_\_\_\_\_   \_\_\_\_\_   _____

10   \_\_\_\_\_   \_\_\_\_\_   _____

11   \_\_\_\_\_   \_\_\_\_\_   _____

12   \_\_\_\_\_   \_\_\_\_\_   _____

13   \_\_\_\_\_   \_\_\_\_\_   _____

14   \_\_\_\_\_   \_\_\_\_\_   _____

15   \_\_\_\_\_   \_\_\_\_\_   _____

16   \_\_\_\_\_   \_\_\_\_\_   _____

17   \_\_\_\_\_   \_\_\_\_\_   _____

18   \_\_\_\_\_   \_\_\_\_\_   _____

19   \_\_\_\_\_   \_\_\_\_\_   _____

20   \_\_\_\_\_   \_\_\_\_\_   _____

21   \_\_\_\_\_   \_\_\_\_\_   _____

22   \_\_\_\_\_   \_\_\_\_\_   _____

23   \_\_\_\_\_   \_\_\_\_\_   _____

24   \_\_\_\_\_   \_\_\_\_\_   _____

# EXHIBIT "I"

**Betsy B. Smith**
**EXPERT OPINION REPORT**
**Pursuant to the Federal Rules of Civil Procedure, Rule 26**

Court:             United States District Court, Eastern District of Pennsylvania
Case Number:       2:20-cv-05142
Case Name:         *Jane Doe v. North Penn School District*

---

I.        <u>Introduction</u>

I, Betsy B. Smith, am over 18 years of age and would be competent to testify if called as a witness in this matter. I have prepared this report on behalf of the Defendant, The North Penn School District, in the matter of *Jane Doe, v. North Penn School District.* I declare under penalty of perjury, that my opinions as outlined in this report are truly my opinions and accurately reflect my review of the matter. My opinions are based on my education, skill, experience and knowledge developed through my career working with K-12 and higher education institutions on the legal aspects of compliance with Title IX and related laws and regulations. My opinions given in this matter are all expressed with a reasonable degree of professional and legal certainty.

I am a licensed practicing attorney in Maryville, Tennessee and currently serve as a Senior Investigator and Consultant with Institutional Compliance Solutions ("ICS"), a legal and consulting company that provides advice and training to colleges, universities, and K-12 districts. I specialize in advising K-12 districts and institutions in Title IX compliance and related laws and regulations. I regularly provide legal advice, conduct external Title IX investigations and conduct trainings of decision-makers, investigators, Title IX Coordinators and other administrators involved in Title IX compliance. Additionally, I perform audits of Title IX processes and procedures. I have been licensed to practice law for twelve and a half (12.5) years and have worked in education specializing in Title IX compliance, for six and a half (6.5) years with my time before that working as an Assistant District Attorney, specializing in domestic violence and sexual abuse matters.

Prior to working at ICS, I served as the Director of Student Conduct and Community Standards and Deputy Title IX Coordinator for Investigations at the University of Tennessee, Knoxville for five (5) years. I was involved in all student reports of misconduct and Title IX.

In addition to service in the industry, I am a thought leader in the industry and have trained and led webinars on Title IX Compliance for the past two and a half (2.5) years for thousands of participants. I regularly present webinars on Title IX compliance and create content for the ICS membership for institutions and K12 districts to assist them with trainings and compliance. Full details of my qualifications and experience entitling me to give an expert opinion, including a list of my speaking, trainings, and publications are contained in <u>Appendix A</u>.

I reserve the right to use any exhibits referenced in my report at trial to explain or summarize my opinions; however, at this time I have not prepared any exhibits for trial, and the only documents I am referencing are those in <u>Appendix B</u>.

     II.     <u>Engagement and Issues to be Addressed</u>

The law firm of Hendrazak & Llyod retained me in January 2022 to review the case on behalf of the Defendant, The North Penn School District (NPSD). In order to draft this report, I reviewed a variety of documents provided by Hendrazak & Lloyd, which assisted me in reaching an opinion in this matter. All of the materials I have reviewed are listed in <u>Appendix B</u>.

The statements made herein are based on my personal knowledge, which is based on a review of the documents listed. Please note that my opinions are based on my review of the items listed in <u>Appendix B</u>, as well as my personal experience in similar cases and my working knowledge of the applicable laws and regulations. If new information should come to light during the discovery process, experts' depositions or trial, it is possible that my opinions may change depending on said information.

Based on the materials reviewed, I was asked to provide my opinion as to the conduct, policies and practices used by NPSD in handling matters before, during and after a November 17, 2014 contact between Doe and P.B.

     III.     <u>Parties</u>

| | |
|---|---|
| Jane Doe ("Doe") | Complainant/Plaintiff |
| P.B. | Male student involved in contact with Doe |
| Mrs. Doe | Mother of Jane Doe |
| Holly Andrew Garrett ("Ms. Garrett")[1] | Special Education Teacher/Inclusion Facilitator Gwynedd Square Elementary School ("Gwynedd") |
| William (Bill) Bowen ("Mr. Bowen") | Principal at Gwynedd |
| Ruth Divver ("Ms. Divver") | Teacher at Gwynedd |
| Rossana D'Elia ("Ms. D'Elia") | Teacher at Gwynedd |
| Kristin Vaszily ("Ms. Vaszily") | Guidance Counselor at Gwynedd |
| Curtis Dietrich ("Dr. Dietrich") | Superintendent at NPSD |
| Dawn LeBlanc ("Dr. LeBlanc") | Principal at North Montco Technical School ("North Montco") |
| Todd Bauer ("Dr. Bauer") | Prior Principal at North Penn High School ("North Penn") and current Assistant Superintendent at NPSD |
| Kyra O'Brien ("Ms. O'Brien") | Guidance Counselor at North Penn |
| Kate Small ("Ms. Small") | Supervisor of Special Education at North Penn |

---

[1] Holly Andrew Garrett married during the 2014-2015 academic year. Her maiden name was Holly Andrew, and her is married name is Holly Garrett. For purposes of this report, she will be referred to as Ms. Garrett.

| Pete Nicholson ("Mr. Nicholson") | Principal at North Penn |
| D'ana Waters ("Ms. Waters") | Assistant Superintendent NPSD |
| Cheryl McCue ("Dr. McCue") | Title IX Coordinator and Director of Human Resources |
| Neil Broxterman ("Dr. Broxterman") | Case Manger while Doe Attended Northbridge Virtual Academy |
| Sargeant Ted Ciaola ("Sgt Ciaola") | Investigator with the Upper Gwynedd Police Department |

IV.      Brief Timeline of Events

| 2007 | Doe was a 5 year old girl and was assaulted by a teenage neighbor |
|---|---|
| 2014-2015 Academic Year | Doe's 6th Grade Year<br>• November 17, 2014 - 6th Grade incident witnessed by Ms. Garrett in which P.B. attempted to place his hand up Doe's sweatshirt and P.B. and Doe were holding hands under the table<br>• Doe alleges that P.B. additional inappropriate touching occurred during this academic year.<br>• April 1, 2015 and April 9, 2015 – P.B. sexually harassed one female student and touches another female student on the leg and under her shirt. These incidents were reported by a teacher who witnessed the behavior, Rossana D'Elia. After learning of these incidents, Ms. Divver reported the November 2014 incident involving P.B. and Doe.<br>• April 13, 2015 – after a meeting with P.B. and his parents in which P.B. admitted to the reported conduct, P.B. received an out-of-school and in-school suspension. |
| 2015-2016 Academic Year | Doe's 7th Grade Year<br>• Doe attended middle school at Pennbrook Middle School |
| 2016-2017 Academic Year | Doe's 8th Grade Year<br>• Doe attended middle school at Pennbrook Middle School |
| January 6, 2016 | While enrolled at a different middle school than Doe, P.B. was given a 3-day out of school suspension for inappropriate physical contact due to touching the thigh of two female students. |
| 2017-2018 Academic Year | Doe's 9th Grade year<br>• Doe was technically still enrolled in Pennbrook Middle School, but was participating as a full-time at North Montco (dual enrollment in their automotive program, with core courses online) |
| 2018-2019 Academic Year | Doe's 10th Grade Year |

| | |
|---|---|
| | • Doe and P.B. were placed in the same social studies class (Doe reported multiple incidents of sexual harassment and by P.B. during this time)<br>• From August 25, 2018-October 11, 2018, Doe was enrolled part-time at North Montco and part-time at North Penn High School<br>• September 2018 – Incident at the Upper Gwynedd Carnival in which Doe reported that P.B. assaulted her<br>• October 11, 2018 – the school discovered Doe and P.B. were in the same social studies class. Doe reported that P.B. was in her class and had sexually harassed her after she was moved from the class due to her poor academic performance<br>• October 15, 2018-end of year, Doe attended North Montco full-time online |
| 2019-2020 Academic Year | Doe's 11th Grade Year<br>• Started in-person at Northbridge School – alternative school and took some classes online<br>• When COVID hit, attended Northbridge online program (home schooled) |
| 2020-2021 Academic Year | Doe's 12th Grade Year<br>• Attended Northbridge online program (home schooled) |

## V. Synopsis of the Case

Doe was a student at North Penn School District ("NPSD") from 2010- 2021. She attended the following schools: Gwynedd Square Elementary ("Gwynedd") 2010-2015, Pennbrook Middle School ("Pennbrook") 2015-2017, North Montco 2018, North Penn High School ("North Penn") 2018, and home schooling through the Northbridge Online Program (2019-2021).

### a. Background Information on Doe

Doe was molested by a teenager who was her neighbor when she was five (5) years old.[2] The teenager pled guilty to a violation of the law.[3]

### b. Elementary School

Doe had an Individualized Education Plan ("IEP") throughout her academic career at NPSD. She was provided accommodations and met regularly to update her education plan. She described that she was diagnosed as having attention deficit disorder as early as age six or seven.[4]

---

[2] Doe depo., p. 41-42.
[3] Mrs. Doe depo., 15.
[4] Doe depo., p. 21.Doe's IEP and related services continued to be updated throughout her career with NPSD.

Doe met P.B. in third or fourth grade because he liked to "hang around" Doe's friend.[5]

Ms. Garrett served as Doe's case manager during her fifth and sixth grade years at Gwynedd.[6] During Doe's fifth grade year, she was in a self-contained classroom taught by Ms. Garrett.[7] In sixth grade, Doe participated in full inclusion classrooms. P.B. was in class with Doe but was not on the IEP caseload with Ms. Garrett.[8] Ms. Garrett attended some full inclusion classes with the students, including Doe, on her caseload during Doe's sixth grade year.[9]  All of the special education students were in the same "cluster" and Ms. Garrett would follow the group of students around to their various classes.[10]

> i.    2014 Sixth Grade Incident

On November 17, 2014, Doe and P.B. were in the same language arts class taught by Ms. Divver. Ms. Garrett was in the classroom that day, providing support for the students on her caseload. The students were participating in a group project.[11] It is unclear how Doe and P.B. were assigned as partners for the project.[12] Doe and P.B. sat at the same table to complete the project.[13]

While working on the project, Ms. Divver left the classroom to use the restroom.[14] Ms. Garrett was sitting at the front the classroom, working with students, when she noticed that Doe and P.B. had their hands under the table and believed they were holding hands.[15] Then, she saw P.B. start to put his hand up the front of Doe's sweatshirt.[16]  Ms. Garrett intervened immediately, thereby stopping P.B. just as he started putting his hand up Doe's shirt.[17]  Ms. Garrett called both students into the hallway and asked what they were doing. P.B. did not say anything and Doe denied that anything happened at all.[18] While Doe stated in her deposition that she felt terrified by P.B., she did not tell Ms. Garrett.[19]  Ms. Garrett believed that Doe and P.B. were friends who were being playful with each other when the incident occurred, and P.B. and Doe continued playing together at recess even after the November 2014 incident.[20]  Ms. Garrett recalls Doe running after P.B. at recess, trying to talk to P.B. and get his number.[21]  These factors, coupled with her belief that Doe and P.B. were holding hands immediately prior to his attempt to put his hand up Doe's shirt and

---

[5] *Id.*
[6] *Id.* p. 27.
[7] Garrett depo., p. 37.
[8]  *Id.* at 16.
[9] Bowen depo., p. 79-80.
[10] *Id.*
[11] Doe depo., p. 31.
[12] *Id.* at 32.
[13] *Id.*
[14] Garrett depo., p. 43.
[15] *Id.* at 41.
[16] *Id.* at 36.
[17] *Id.* at 139.
[18] *Id.* at 37.
[19] Doe depo., p. 36.
[20] Garrett depo., p. 47.
[21] *Id.* at 163-164.

Doe's denial that anything had happened when asked, Ms. Garrett believed the matter was consensual.

When a disciplinary incident occurred in a classroom, Gwynedd school policy involved the teacher creating a write up of the incident on a disciplinary form, and if it was a minor incident, the form would stay in a file with the student's homeroom teacher.[22] If a student had three minor incidents or one major incident, the form would go to the office for a referral with an administrator.[23] Ms. Garrett determined that the November 2014 incident was minor, because she thought the conduct was consensual and because she intervened before P.B.'s hand got far up Doe's shirt and she thought they were holding hands under the table.[24] She wrote up both students for the acts.[25]

Initially, Doe testified that the incident on November 17, 2014 was the first time that P.B. touched her. However, she later testified that she thought it happened a few times before and a few times afterward.[26] Doe stated that P.B. would walk up behind her "really closely so that like no one could see his arm and then he would try to put it under [her] shirt." She stated that she said, "dude stop" but also froze and didn't know what to do.[27] Doe did not tell anyone about these incidents either before or after November 17, 2014 until April 2015.[28]

ii.    2015 Incidents Involving P.B.

In April, 2015, two other students reported that P.B. inappropriately touched them.[29] Ms. Divver informed the administrators, after learning of the new reports that there was a prior incident, earlier in the academic year, with Doe and P.B.[30] An investigation immediately commenced by administrators including written statements from Ms. Divver, Ms. Garrett, and Ms. Kristin Vaszily, the Gwynedd guidance counselor.[31] On Monday, April 13th, the first school day after the reported harassment, Principal Bowen had a meeting with P.B. and his mother, in which P.B. admitted to the reported behaviors.[32]

Administrators informed Doe's mother, Mrs. Doe, about the incidents. [33] Mrs. Doe asked Doe whether P.B. had been touching her due to the fact that she was acting out and showing "anger

---

[22] *Id.* at 71-72.
[23] *Id.*
[24] *Id.* at 139.
[25] *Id.*
[26] Doe depo., p. 36-37.
[27] *Id.* at 37.
[28] *Id.* at 39, 47.
[29] *Id.* at 47.
[30] Bowen depo., p. 78-80.
[31] *Id.* at 150; 04/15/2015 Written Statement from Principal Bowen, Bates DEF NPSD 001016; McCue Depo., p. 299, 309.
[32] 04/15/2015 Written Statement from Principal Bowen, Bates DEF NPSD 001016.
[33] *Id.*

issues" including punching a fourth-grade student.[34] Doe told Mrs. Doe that P.B. touched her inappropriately.[35]

Sargeant Ted Ciaola investigated the matter on behalf of the Upper Gwynedd Police Department, and the faculty and administration provided factual information regarding the incidents to Sgt. Ciaola and other law enforcement personnel to assist in their investigation.[36] Sgt. Ciaola suggested reaching out to Mission Kids, an organization that assists schools with incidents of sexual misconduct, but when the district offered the resource to the family, the Does declined the support.[37] There were no criminal charges as a result of the investigation.

### iii. Gwynedd's Response and Supportive Measures

After the reports were made regarding the 2015 incidents[38] Kristin Vaszily, the guidance counselor at Gwynedd, developed a safety plan, and P.B. and Doe were no longer in the same classes.[39] P.B. was under increased supervision by the teachers and administrators in the classroom and through the use of playground aids. Mr. Bowen and Ms. Vaszily reported behavior by P.B. to the Child Line. It is unclear whether this report to the Child Line included the incidents with Doe or only the other students who reported inappropriate touching.[40]

After a meeting between school administrators, P.B., and his parents, at which P.B. admitted to the conduct, NPSD suspended P.B. from school in April 2015.[41] The discipline included one day of out of school suspension and one day of in school suspension.[42] The discipline was noted in a letter to his parents from the school administrators and remained in his school file.[43]

Although a safety plan was in place, Ms. Garrett, Ms. Divver and other teachers witnessed Doe seek out P.B. at recess.[44] Despite teachers' attempts to keep them apart, the entire sixth grade had recess together, and Doe tried to get P.B.'s number and would "run after" him at recess.[45] Ms. Divver wrote her observations regarding Doe's attempts to make contact with P.B. in a note that she submitted to Mr. Bowen, the Gwynedd Principal.[46]

Doe was offered counseling as a supportive measure that included access to the guidance counselor at any time she should need it.[47]

---

[34] Doe depo., p. 47.
[35] *Id.* at 46.
[36] Bowen depo., p. 104-105.
[37] *Id.* at 114.
[38] Doe depo., p. 58.
[39] Garrett depo., p.161-63.
[40] *Id.* at 102.
[41] Bowen depo., p. 187.
[42] *Id.* at 107. The discipline for P.B. was classified as an "obscene gesture." Mr. Bowen is unsure why it was classified that way but it was, in fact, in response to the events related to Doe and the other individuals who brought forth allegations that P.B. was inappropriately touching them.
[43] *Id.* at 211.
[44] *Id.* at 161-63.
[45] *Id.*
[46] *Id.* This is contrary to Doe's report that she did not see P.B. at all at Gwynedd after the report in April 2015.
[47] *Id.* at 125.

NPSD also disciplined Mrs. Garrett with a one-day suspension without pay for her failure to respond appropriately to the incident with Doe and P.B. in November 2014.[48] As a basis for the discipline, on June 3, 2015, the Title IX Coordinator/Human Resources Director, Cheryl McCue, wrote a memo in which she noted four ways in which Ms. Garrett's treatment of the November 2014 incident between Doe and P.B. was improper: 1) failure to report the incident to someone in authority; 2) improper questioning of the students; 3) assuming that the conduct was consensual; and 4) promising not to report the behavior if it was not repeated.[49] Ms. McCue summarized her memo by indicating that any "future concerns reflecting [Ms. Garrett's] failure to act in a professional manner and within the policies set forth in the school district will result in further disciplinary action up to and including a recommendation for termination."[50]

### c. Middle School

Doe was zoned to attend Penndale Middle School, a NPSD school. Mrs. Doe, however, requested that Doe attend a different middle school, Pennbrook, to prevent her from going to school with P.B.[51] NPSD approved this request and NPSD provided bussing for Doe to attend Pennbrook. During seventh and eighth grades, Doe had no contact with P.B.[52]

### d. High School

Doe wanted to attend NPSD school North Montco Technical School ("North Montco") part time in ninth grade to take automotive classes.[53] According to Doe, she knew that it was a possibility that she would see P.B. at North Montco, though she did not discuss that possibility with anyone.[54]

Doe saw P.B. at North Montco on the first day and was upset.[55] She told her mother, Mrs. Doe who was also upset. Mrs. Doe complained to NPSD and Central Office, and collectively she and Ms. LeBlanc, the principal at North Montco, determined that it would be best for Doe to attend North Montco full time.[56] Doe stated that this was, in part, due to the fact that it would help to keep her from seeing P.B. and also because it was a pilot program for ninth grade students to attend North Montco full time.[57] This full-time experience at North Montco required Doe to complete some of her core courses online.[58] She was provided a space at North Montco to complete her online coursework during the day.[59]

---

[48] Garrett depo., 79-80, 111; Bowen depo., 182.
[49] 06/03/2015 Memorandum from Cheryl A.R. McCue to Holly Andrew (Garrett), Bates NPSD p. 1005.
[50] *Id.* at 1006.
[51] Mrs. Doe depo., p. 24, 27.
[52] Additionally, according to Mr. Bauer, P.B. allegedly touched the thigh of two unrelated individuals during his time at Penndale Middle School. Bauer depo., p. 285. P.B. was suspended from school for three (3) days for this contact in January 2016. This was documented in a letter to P.B. and his parents through a letter from Assistant Principal Jason Bashaw.
[53] Mrs. Doe depo., p. 34.
[54] Doe Depo., p. 76.
[55] *Id.* at 74, 83.
[56] Mrs. Doe depo., p. 42.
[57] Doe depo., p. 82. It appears as though this was not a pilot program, but instead a part of the supportive measures and safety plan for Doe.
[58] *Id.*
[59] *Id.*

In addition, NPSD put a safety plan in place for Doe at North Montco to "help [her] try to avoid him in school."[60] Doe described that she had a security guard wherever she went.[61] The guard was a female who walked with her between classes.[62] Mrs. Doe believed this security guard was best for Doe even though it made Doe anxious to have the security guard.[63] The security guard supported Doe until Doe started "fighting the safety plan" approximately a month after it was put in place.[64]

After her ninth-grade year, NPSD informed Doe that she would have to attend North Penn High School ("North Penn") part time and North Montco part time for her tenth-grade year.[65] Initially, North Montco recommended that Doe attend North Penn full-time and no longer attend North Montco because of both academic and behavioral issues. North Montco recommended withdrawal of Doe from North Montco because of discipline issues, inappropriate behavior, not being where she was supposed to be during the school day, refusal to hand in work, and refusal to do work.[66] Specifically, during her ninth-grade year, Doe had at least eleven disciplinary referrals, more than thirty interventions, and included behaviors such as intruding on the personal space of others and cursing at staff and students.[67] Eventually, Doe was permitted to attend North Montco part-time for tenth grade, but Doe was not permitted to attend North Montco full-time any longer, at least in part because she was not following the safety plan.[68] Mrs. Doe and Doe were assured that North Penn would keep P.B. and Doe out of the same classes and that they would remain separated.[69]

The safety plan that was put in place in ninth grade with a security guard was not in place in tenth grade because Doe "didn't want the safety plan in tenth grade."[70] Regardless, prior to the start of her tenth-grade academic year, Ms. Small, the supervisor of special education at North Penn, checked the schedules of Doe and P.B. to confirm that they were not in any classes together.[71] Doe was assigned to a history/social studies class at North Penn.[72] Doe stated that three days into the class, P.B. became a student in that class and that P.B. and Doe were assigned seats next to each other.[73] It is unclear, from the perspective of NPSD, how this change occurred. From the NPSD viewpoint, it was a change in Doe's schedule that placed Doe and P.B. in the same course.[74] The initial schedules for Doe and P.B. did not have them in the same class but during the drop/add

---

[60] *Id.* at 83.
[61] *Id.* at 84.
[62] *Id.*
[63] Mrs. Doe depo., p. 43.
[64] Doe depo., p. 85.
[65] Mrs. Doe depo., p. 49.
[66] 05/13/2018 Email from Elizabeth Shine to Christine Kelly, Bates Doe 001385.
[67] *Id.,* 08/02/2018 Email from Elizabeth Shine to Juliet Matje, Christine Kelly, and Christina Reffner, Bates DEF NPSD 000636.
[68] Deitrich depo., p. 117.
[69] Mrs. Doe depo., p. 50; Doe depo., p. 97.
[70] *Id.* at 109.
[71] Bauer depo., p. 284.
[72] Doe depo., p. 101.
[73] *Id.* Since 2018, NPSD has added the ability to notate or put an alert on a student file that a student's classes may not be changed without the permission of the principal, counselor, or assistant principal.
[74] Bauer depo., p. 285.

period, P.B.'s schedule was changed, and he was added to this history/social studies course with Doe.[75]

Doe did not tell the history teacher that she was uncomfortable or that she was not supposed to be in the same class as or near P.B.[76] Further, Doe did not tell her counselor, case manager, boyfriend, or family that P.B. was in her class.[77] Doe and P.B. were in a "friend group" of four people, including two others in the history/social studies class.[78]

P.B. and Doe were around each other often at North Penn. P.B. sat with Doe at lunch and they remained in the same friend groups, even outside of the history/social studies class.[79] In October, 2018, Doe was moved from the history/social studies class due to her poor grades in the course.[80] She had a forty-four (44) percent in the course and was being moved to in an attempt to help her be successful with more supports.[81] At that time, approximately two months after the touching reportedly occurred, Doe reported to her guidance counselor, Ms. O'Brien, that P.B. had been touching her inappropriately during the history/social studies class.[82] Doe stated that this inappropriate touching included times when P.B. and Doe were doing group work with other members in the class.[83] Once this was reported to Ms. O'Brien, the police were informed and a criminal investigation commenced, but there were ultimately no criminal charges against P.B. for any incidents in the tenth-grade classroom.[84]

After Mrs. Doe was informed about the allegations related to P.B., she refused to allow Doe to return to the school.[85]

Following Doe's October 2018 report, NPSD investigated the allegations against P.B. Mrs. Doe did not allow Doe to talk to the NPSD employees for the school investigation.[86] The police requested that NPSD hold off on their investigation while the police investigated.[87] NPSD agreed to the request by the police to pause their investigation for multiple reasons. First, NPSD respected the police department requested that NPSD pause their investigation so that the school would not impede with the criminal investigation. Second, Doe was unwilling to share information with NPSD so their investigation would have been futile at that time. Third, the school was unaware of the specifics of the events that Doe was alleging to have occurred due to the lack of participation by Doe. However, once the police informed the district that they could proceed without impeding the criminal investigation, NPSD ultimately continued with interviews of the potential witnesses.[88]

---

[75] Mrs. Doe depo., p. 60.
[76] Doe depo., p. 103.
[77] *Id.* at 104-105.
[78] *Id.* at 107.
[79] *Id.* at 108.
[80] Bauer depo., p. 300.
[81] *Id.* at 301.
[82] Doe depo., p. 110, 117.
[83] *Id.*
[84] *Id.* at 129.
[85] Bauer depo, p. 301.
[86] *Id.* at 261.
[87] *Id.* at 275.
[88] *Id.* at 275-6.

Despite requests by NPSD, neither Doe nor Mrs. Doe filled out the "harassment form" provided by NPSD to include information about the allegations and initiate an investigation.[89] Dr. Bauer talked with Mrs. Doe to encourage her to provide additional details of what happened, stating that NPSD would be "happy to dive deeper."[90] Even with the lack of information shared with the district from Doe or Mrs. Doe, NPSD initiated a limited investigation in an attempt to understand what occurred.

As part of its investigation, NPSD interviewed teachers, other students, and case managers. The students who were interviewed included students who were adjacent to Doe in the seating chart in the history/social studies class where NPSD understood the allegations to have occurred.[91] The students and employees had nothing to provide in the way of information related to the allegations and no information or evidence was able to be gathered.[92] A check of prior office referrals showed that P.B. had no prior office referrals or write ups as a high school student.[93] P.B. was not interviewed by the school in relation to the allegations by Doe due to the fact that Doe did not participate in the investigation and no information was able to be gained by other potential witnesses.[94]

After reporting the matter to Ms. O'Brien, in October 2018, Doe reported that she had no further contact with P.B.[95] Dr. Bauer discussed supportive measures and options moving forward with Mrs. Doe. Options provided included virtual school, another technical school, a school with therapy, and other suggestions Mrs. Doe provided to help Doe feel safe.[96] Ultimately, Doe decided to attend the Northbridge program which was a virtual academy.[97]

Doe transitioned back to North Montco full time to finish tenth grade.[98] The safety plan was updated and enforced.[99] Doe attended Northbridge High School, an alternative school at the beginning of eleventh grade, and states that she loved it and was thriving.[100] During the second semester of her eleventh grade year, after the COVID-19 shut down, Doe transitioned to the Northbridge/ home-schooling program where she finished her high school career.[101]

Doe was evaluated by a therapist provided by NPSD during high school but "was fighting it tooth and nail and chose not to continue meeting with the therapist."[102]

---

[89] *Id.* at 277.
[90] *Id.* at 280.
[91] *Id.* at 275.
[92] *Id.* at 262.
[93] *Id.* at 264-265.
[94] *Id.* at 267. Doe additionally reported in her deposition that P.B. assaulted her on a ride at the Upper Gwynedd Carnival, a non NPSD event, in September of her tenth-grade year.[94] The police were informed of the incident at the carnival but there were no criminal charges against P.B. for the contact at the carnival.
[95] *Id.*
[96] Bauer depo., p. 270-271.
[97] *Id*. at 271.
[98] Mrs. Doe depo., p. 66.
[99] *Id*. at 67.
[100] Doe depo., p. 134-136.
[101] *Id.*
[102] Mrs. Doe depo., p. 64.

During high school, Doe experienced additional struggles outside of and unrelated to the matters related to P.B. She struggled with academics, behavior, and self-harm.[103] Doe lived with her parents some of the time and with her sister for a portion of the time. This transition to living with her sister occurred because her parents were "a little hard to handle."[104] Doe additionally felt threatened by her mother, Mrs. Doe. She asked for social services to be called by her psychologist, and they were ultimately contacted on her behalf.[105]

Administrators at NPSD continued to check in with Doe after she transitioned to Northbridge through Dr. Broxterman, her case manager, when she attended the virtual academy.[106] She reported being quite happy.[107]

## VI. NPSD Sexual Harassment Policies and Training

NPSD implemented various trainings and provided resource materials to faculty, staff, students, and their families.

### a. Employee Training

NPSD provided new employees, including Dr. Bauer, the employee handbook, including policies and procedures related to Title IX and sexual harassment during their new employee orientation.[108] Faculty and staff received training on how to report sexual harassment, how to call security, and where forms were located. While this was not expressly called Title IX training, it included how to address matters related to sexual harassment.[109] Administrators also received legal updates, including matters such as Title IX and sexual harassment at least once per year, and if there were Title IX updates, employees would be trained accordingly.[110] Additionally, employees of NPSD received Act 126 trainings that were online modules with an assessment since at least 2015.[111] The trainings of NPSD employees are tracked through Vector Solutions and administrators maintain records of completed trainings.[112] NPSD faculty and administration also complete Mission Kids Training, which provides professional development to Administrators on how to address incidents of sexual misconduct.[113]

In 2015, soon after Ms. McCue became the Title IX Coordinator, NPSD adopted a three-prong "responsibility structure."[114] This structure was comprised of the director of school and community, the director of special education, and the director of human resources.[115]

---

[103] Doe depo., p. 148.
[104] *Id.* at 155.
[105] *Id.* at 159.
[106] Bauer depo., p. 364-5.
[107] *Id.*
[108] Bauer depo., p. 29.
[109] *Id.* at 34.
[110] *Id.* at 90; McCue depo p. 63.
[111] *Id.* at 192-3.
[112] NPSD Vector Training Log.
[113] McCue depo., p. 376-377.
[114] McCue depo., p. 102.
[115] *Id.*

b. Title IX Coordinator Training and Responsibilities

Ms. McCue was NPSD's Director of Human Resources and the Title IX Coordinator.[116] Both Ms. McCue and the Assistant Director of Human Resources are certified Title IX Coordinators and attended trainings on Title IX.[117] Ms. McCue also received updates from the school district's solicitor via annual trainings, and with legal updates as necessary.[118] Point persons were designated throughout NPSD to support the role of the Title IX Coordinator.[119]

Dr. McCue did not, in her role as Title IX Coordinator, investigate matters of sexual harassment. She instead, oversaw the process to determined how it was investigated, if it resolved appropriately, whether authorities were contacted, and whether students were properly supervised.[120]

As Title IX Coordinator, each month Ms. McCue attended administrative meetings of all administrators in the district, which included breakout sessions by department.[121] Additionally, the Title IX Coordinator visited each school in the district during the month and conducted building walks. During the school visits Dr. McCue discussed current events and any developments related to Title IX.[122] The Title IX Coordinator also attended faculty meetings in each building and attended PTA meetings.[123]

c. Student and Parent/Guardian Information

Students and parents/guardians at NPSD were provided with information about how to report sexual harassment or sexual misconduct in the student handbook, which included Policy 5150.[124] The information went to each student in the "back to school mailing."[125]

d. Policy

The current NPSD sexual harassment policy is Policy 103 which was put in place in 2020.[126] Prior to the implementation of Policy 103, NPSD used Policy 5150 to set forth the procedures for reporting, investigating, interviewing, reaching a disposition related to a complaint of harassment, and the review procedure.[127] Policy 5150 also included a robust definition of harassment and

---

[116] *Id.* at 201.
[117] *Id.* The Title IX Coordinator position transitioned from responsibility of the Director of Human Resources to the Assistant director of Human Resources in 2019.
[118] McCue depo., p. 29.
[119] *Id.* at 60.
[120] *Id.* at 89.
[121] McCue depo., p. 22-23.
[122] *Id.*
[123] *Id.*
[124] *Id.* at 197.
[125] *Id.*
[126] Policy 103 was adopted in November 2020 and updated in April 2021. Policy 103 sets forth the district's policy on the types of incidents to report to the Title IX Coordinator. Policy 103 directs faculty and staff who witness incidents of sexual harassment, gender discrimination, or inappropriate contact to report said conduct. The principal or assistant principal is to receive the initial report, and the principal then reports the incident to the Title IX Coordinator.
[127] NPSD Administrative Regulations, Bates No. DEF NPSD 001044-001051.

prohibited retaliation for reporting harassment.[128] Specifically, the policy defined harassment as: "verbal, written, graphic or physical conduct relating to an individual's race, color, religion, ancestry, sex, national origin/ethnicity, age, and/or disability."[129] According to Policy 5150, conduct rose to the level of harassment when it:

> 1. Is sufficiently severe, persistent, or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening, or abusive educational environment.
> 2. Has the purpose or effect of substantially or unreasonably interfering with an individual's academic performance.
> 3. Otherwise adversely affects an individual's learning opportunities.[130]

Further, the policy highlighted conduct that constitutes sexual harassment in relevant part as:

> unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal, visual, written, graphic, or physical conduct of sexual nature when…[t]he conduct is sufficiently severe, persistent, or pervasive that it has the purpose or effect of substantially interfering with the individual's academic performance, or of creating an intimidating, hostile, or offensive educational environment.[131]

The policy also included extensive examples as to what types of behavior might include sexual harassment.[132] Policy 5150 outlined the procedure for reporting harassment as:

> Any student who feels he/she has been a victim of harassment should immediately report the alleged harassment to a teacher, nurse, counselor, administrator, or the district's compliance officer, in order to commence a complaint in accordance with administrative regulation #5150. Each complaint will be carefully investigated by the compliance officer or designee, and all findings documented in writing. All information obtained will be held in the strictest confidence and will be discussed only on a need-to-know basis to investigate the matter.

> Any action taken as a result of the investigation will depend upon the facts of each case. Disciplinary actions, if applicable, may range from a warning to expulsion for students, and from a warning to termination for employees.[133]

Policy 5150 included a Student Harassment Report Form to be used when harassment was reported by a student.[134] Additionally, Administrative Regulation 4316 set forth the procedures for the district compliance officer to follow in investigating and resolving a complaint of harassment.[135]

---

[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*

Title IX policies and procedures were updated as federal guidance and Dear Colleague letters were published, including in the 2015 school year.[136]

Additionally, forms were created by NPSD to be filled out when there was an allegation of sexual harassment.[137]

VII.    Legal Standard and OCR Guidance

It is undisputed that NPSD is subject to Title IX[138] and therefore prohibited from allowing sexual harassment in its programs or activities.

Title IX is primarily enforced in two ways: (1) through lawsuits against districts alleging a violation of Title IX and (2) by federal agencies that provide funding to districts.

The Office for Civil Rights of the Department of Education ("OCR") is the federal agency that investigates and administratively enforces Title IX as it relates to sexual harassment. In 2001, OCR published in the Federal Register a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties." The revised guidance reaffirmed the compliance standards that OCR applies in investigations and administrative enforcement of Title IX.

OCR subsequently issued guidance documents in the form of Dear Colleague Letters ("DCL") and Q&As. The guidance documents were characterized as "significant" and OCR stated that they were issued to provide recipients with information to assist school in meeting their obligations.[139]

In 2011, OCR issued a DCL ("2011 DCL") that supplemented the 2001 guidance "by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence." This guidance included proactive efforts schools could take to prevent sexual harassment and provided examples of remedies schools should use to "end such conduct, prevent its recurrence, and address its effects."[140]

In 2014, OCR issued Questions and Answers on Title IX and Sexual Violence. The Q&A served as additional guidance to assist schools with their Title IX obligations, including clarifying legal requirements and guidance contained within the 2001 Guidance.[141]

In 2015, OCR issued a DCL on Title IX Coordinators. The DCL served as a reminder that schools must designate at least one employee to coordinate its Title IX efforts (the "Title IX Coordinator") and included information on the roles and responsibilities of a Title IX Coordinator.[142]

---

[136] *Id.* at 65.
[137] *Id.*
[138] Title IX of the Education Amendments of 1972, § 20 U.S.C. 1681 *et seq.*
[139] 2014 DCL, Footnote 1.
[140] OCR Dear Colleague Letter issued April 4, 2011.
[141] OCR Questions and Answers on Title IX and Sexual Violence issued April 29, 2014.
[142] OCR Dear Colleague Letter issued April 24, 2015.

In 2017, OCR rescinded the 2011 and 2014 guidance and issued a new Q&A (2017 Q&A).[143] The 2017 Q&A, 2015 DCL and 2001 guidance were in place at the time of the incidents in this matter.[144] The totality of OCR guidance and resolution letters up to that time informed industry standard for Title IX compliance for districts and were the basis for decision making and industry standard during the time they were in effect.

OCR standards for districts as set forth in its guidance is higher than and distinguishable from the standard set forth by the Courts in a civil lawsuit alleging a violation of Title IX. The leading Supreme Court cases impacting school liability under Title IX are *Gebser v. Logo Vista* and *Davis v. Monroe County*. In order to succeed in a lawsuit alleging a violation of Title IX, a plaintiff must show that the district had actual notice of and was deliberately indifferent to the alleged sexual misconduct.

The Supreme Court's decisions set forth a high threshold for a plaintiff seeking damages against a district based on its response to sexual harassment. In *Gebser*, the court held that "a school can be liable for money damages if a teacher sexually harasses a student, an official who has authority to address the harassment had actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment."[145] In peer to peer cases, for an district to avoid liability for "deliberate indifference," it need not expel the harassers, engage in any particular disciplinary action, or remedy the peer harassment.[146] The district need only respond to known peer harassment in a manner that is not "clearly unreasonable in light of the known circumstances."[147] "This is not a mere 'reasonableness' standard," rather it is a question as to whether the actions were clearly unreasonable. Moreover, the Court in *Davis* emphasized that "courts should refrain from second-guessing the disciplinary decisions made by school administrators [citations omitted]."

Thus, in order to determine if a district's conduct was deliberately indifferent, the question is not whether the process employed by the district was the best possible process, whether the process satisfied OCR's guidance or even whether the district failed to follow its own procedures. The question is whether the district's actions were "clearly unreasonable in light of the circumstances."

VIII.   Opinion

   a.   *NPSD's response to reported incidents between Doe and P.B was not deliberately indifferent or clearly unreasonable in light of the known circumstances, and was compliant with industry standards.*

---

[143] OCR Q&A on Campus Sexual Misconduct issued September of 2017.
[144] As of the date of this report, all of OCR's guidance has been archived due to the new Title IX regulations enacted and effective on August 14, 2020. *See* 34 CFR Part 106.
[145] *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274 (1998), at 280-293.
[146] *Davis v. Monroe County*, 526 U.S. 629 (1999), at 648.
[147] *Id*. at 648-50.

      *i.*      NPSD's Initial Response to the November 2014 incident was not clearly unreasonable in light of the circumstances and was compliant with industry standards.

NPSD's initial response to the November 2014 incident was not clearly unreasonable in light of the circumstances and was compliant with industry standards.

Based on the information provided for my review, the behavior witnessed by Ms. Garrett, including P.B.'s hand partially up Doe's shirt, was initially believed to be consensual. Ms. Garrett immediately addressed and halted the contact between P.B. and Doe. She discussed the events she witnessed with Doe, who denied any contact, and P.B. who did not comment. Ms. Garrett then told Doe and P.B. that the behavior should not occur again, and she wrote both students up in a behavior report, classified as a minor report, and provided the report to Ms. Divver, the regular education teacher.

There was nothing to indicate to Ms. Garrett at the time that the behavior was nonconsensual. Doe did not tell her when she was asked about the contact. Further, Doe did not tell anyone that the act was nonconsensual or report any other behavior by P.B. until the issue was brought up in April 2015. Thus, Ms. Garrett's response to the matter was reasonable at the time.

In retrospect, Ms. Garrett realized, based on the type of contact between Doe and P.B., that she should have referred the matter directly to administrators as a major violation. Ms. Garrett was disciplined for her error, as further discussed in section V.b.iii. Even though she was under the impression that the behavior was consensual and did not believe it to be sexual harassment, she nonetheless took action to eliminate the behavior and address its effects. This action included calling the students into the hallway, drafting a behavior write up, and informing the students not to commit similar behavior moving forward.[148]

The actions by Ms. Garrett with respect to the incident, combined with NPSD's corrective action of Ms. Garrett for her error in reporting, demonstrate that NPSD's response was not clearly unreasonable. Moreover, these actions were consistent with industry standard.

      *ii.*     NPSD's response to reported 2015 incidents and beyond were not clearly unreasonable in light of the circumstances and were compliant with industry standards.[149]

NPSD's response to reported incidents involving P.B., once reported in 2015, were not clearly unreasonable in light of the circumstances and not only complied with, but exceeded industry standards.

---

[148] OCR Dear Colleague Letter issued April 4, 2011 provided guidance that a schools should take immediate action to eliminate the harassment, prevent its recurrence, and address its effect.

[149] The OCR guidance in effect at the time of the 2015 report by Doe included the 2001 Revised Sexual Harassment Guidance, the 2011 Dear Colleague Letter, the 2014 Q & A, and the 2015 Dear Colleague Letter that was effective April 24, 2015.

In April 2015, another student reported that P.B. sexually harassed her. At that time, Ms. Divver reported what she knew of the prior behavior, including the 2014 behavior report, between P.B. and Doe to administrators. An investigation was launched into the 2014 behavior, including interviews and written statements by Ms. Divver and Ms. Garrett. Ms. Doe was contacted by school administrators, and supportive measures and remedies were provided as discussed below. At the time of the incidents and investigation, there were no specific requirements under OCR guidance as to the necessary steps in a sexual harassment investigation. Once the school was on notice of the alleged nonconsensual sexual contact, NPSD conducted a prompt, thorough and impartial investigation.

NPSD appropriately responded to allegations related to P.B. and Doe in 2015 and beyond by providing supportive (interim)[150] measures, remedies, and utilizing a grievance process for investigation and resolution as follows as follows:

Elementary School (sixth-grade)

- NPSD immediately investigated the matter in 2015 once it was aware of potential nonconsensual sexual contact.
- NPSD immediately created a safety plan for Doe which evolved as Doe transitioned through middle and high school.
- P.B. received appropriate student discipline for the matters involving Doe and other students including a day out of school suspension and a day in school suspension.
- NPSD removed P.B. from classes with Doe and other students who alleged sexual harassment at Gwynedd. Doe stated that P.B. was "hidden from them."
- NPSD placed P.B. under increased supervision by teachers and administrators at Gwynedd.
- NPSD administration explained criminal options to Doe and her family, and a report was made to the police and Child Line. The family was provided information about Mission Kids but declined this supportive option.
- NPSD documented Doe's attempted to seek out P.B. at school recess at Gwynedd.
- NPSD disciplined Ms. Garrett with a one-day suspension without pay for her failure to respond appropriately. This served as disciplinary action and a remedy to instruct and remind Ms. Garrett of the way to appropriately respond in the event that a similar situation occurred in the future.

---

[150] The term under the current Title IX regulations implemented in 2020 is supportive measures. Prior to 2020, these supportive actions were called "interim measures" and were required to be provided prior to and during an investigation. Specifically, per the 2015 (and later 2017) guidance, "Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending. Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations."

- NPSD offered Doe counseling services which included access to the guidance counselor at any time at Gwynedd.

Middle School

- NPSD provided Doe with the opportunity to attend Penndale Middle School, a different middle school than the one she was zoned for, in order to prevent her for attending school with P.B. NPSD also provided bus services to Doe so that she could attend Penndale.

High School (ninth-grade)

- NPSD updated Doe's safety plan when Doe and P.B. transitioned to high school.
- As a part of the safety plan, North Montco provided Doe with a security guard to escort her between classes though Doe started "fighting the safety plan" including the services provided by the guard, a month after it was put in place.
- NPSD provided Doe with the opportunity to attend North Montco Technical School full time as a ninth-grade student, though this was not generally an option for ninth graders.
- Even after Doe failed to follow the safety plan, performed poorly in her academics, and had disciplinary issues, NPSD allowed Doe, at her and Mrs. Doe's request, to continue part-time at North Montco for the start of her tenth-grade year. She attended North Penn for the remainder of the day.
- North Montco, in collaboration with NPSD, offered to continue the safety plan in place during Doe's tenth-grade year, but Doe did not want it to remain in place.
- Prior to the start of the 2018-2019 academic year, Doe's tenth-grade year, Ms. Small checked the schedules of both Doe and P.B. to confirm that they did not have overlapping schedules. At the time she checked the schedules, approximately a week prior to the start of school, Doe and P.B. did not have any overlapping classes.[151]

This cumulative response by NPSD was reasonable in light of the circumstances and exceeded industry standard for supportive services to be provided during the time period. In fact, interim measures exceeded the time frame for required support which, at the time, was prior to and during an investigation. In the case of Doe, the interim measures and support continued indefinitely, over the span of Doe's education with the district. Moreover, NPSD continued to interact with Doe and Mrs. Doe, provided every support requested by Doe and Ms. Doe, and also provided additional options for support that were the created by NPSD administrators. All of these actions by NPSD allowed Doe to continue to have access to NPSD's education, program and activities and were beyond that required by industry standard at that time.

---

[151] It was later determined that a change to the schedule of Doe or P.B. created a situation where their schedules overlapped as fully explained in section V.d.

iii. NPSD's response to the 2018 allegations of sexual harassment by Doe against P.B. were not clearly unreasonable in light of the circumstances and were consistent with industry standards.[152]

NPSD's response to reported incidents involving P.B., once reported in 2018, were not clearly unreasonable in light of the circumstances and were consistent with industry standards.

In October 2018, approximately two months after school started, Doe reported to her guidance counselor that P.B. was in her history/social studies class, sat next to her, and sexually harassed her. The report was made after Doe was informed that she was going to be moved from the course due to her poor academic performance, and it was the first time the school was on notice of additional allegations of sexual harassment by P.B. toward Doe. It is unclear from the record exactly what changed with Doe's schedule or P.B.'s schedule to allow them to be placed in the same course since Ms. Small had previously evaluated their schedules to check for overlap; however, Doe did not inform the administrators, teachers, counselors, or even her parents of the overlap. It is clear from the prior and subsequent actions by NPSD that the district would have made immediate change if they had been informed that Doe and P.B. were in the same course. As a result of this matter, NPSD developed a plan to include an alert in the future before changing the schedules of individuals who may not be permitted to attend the same classes.

NPSD immediately notified law enforcement and authorities regarding the reported behavior by P.B. against Doe. Mrs. Doe was contacted by school administrators, and supportive measures and remedies were provided as discussed below. At the time of the incidents and investigation, there were no specific requirements under OCR guidance as to the necessary steps in a sexual harassment investigation. No charges were ultimately pursued by law enforcement for the allegations from within NPSD or the additional allegations of sexual harassment made by Doe against P.B. from the non-school affiliated carnival. Once the school was on notice of nonconsensual sexual contact by P.B. in 2018, the response was prompt, thorough and impartial.

NPSD appropriately responded to allegations related to P.B. and Doe in 2018 and beyond by providing supportive (interim)[153] measures, remedies, and utilizing a grievance process for investigation and resolution as follows as follows:

---

[152] At the time of the 2018 report by Doe, OCR had issued the September 2017 Q & A which rescinded the 2011 and 2015 OCR guidance. Thus, the only guidance remaining was the 2001 Revised Sexual Harassment Guidance and the 2017 Q & A.
[153] The term under the current Title IX regulations implemented in 2020 is supportive measures. Prior to 2020, these supportive actions were called "interim measures" and were required to be provided prior to and during an investigation. Specifically, per the 2015 guidance, "Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending. Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations."

- Immediately, upon being placed on notice of the allegations by Doe, NPSD reported the allegations to law enforcement.
- Even though Mrs. Doe refused to allow Doe to participate in the school investigation or provide specifics of the allegations and failed to sign the harassment forms requesting and agreeing to an investigation as suggested by NPSD policy, NPSD continued an investigation with the limited information it possessed. The investigation was delayed for a limited period of time at the request of law enforcement so as not to interfere with the criminal investigation. Once police informed NPSD that the school investigation would no longer impede the criminal matter, NPSD interviewed students who sat near Doe and P.B. in the social studies/history class, teachers, and counselors in an attempt to gather information for the investigation. These attempts were futile due to NPSD's limited understanding of the allegations and Mrs. Doe's refusal to allow Doe to participate. However, as suggested by OCR guidance, all reasonable steps to investigate and respond to the reported conduct were undertaken by NPSD.
- NPSD transferred Doe back full time to North Montco as a supportive measure.
- NPSD updated and enforced the safety plan in place including enhanced security for Doe, and the requirement that she comply with the plan.
- P.B. and Doe had no further contact.
- NPSD provided Doe with several options for schooling for her eleventh and twelfth grade academic years. She ultimately decided to attend Northbridge and participated in the virtual academy. Doe reported this as a good experience.
- NPSD provided Doe with access to NPSD counselors, though she did not utilize the services.
- Doe's case manager routinely checked in on Doe even after her transition to the Northbridge and virtual learning.

### b. NPSD Substantially Complied with OCR Guidance by Providing Training for the Title IX Coordinator, Employees, Students, and Parents and Publishing a Non-Discrimination Statement and Policies and Procedures

The training for the Title IX Coordinator, employees, students and parents by NPSD substantially complied with OCR Guidance and industry standards during the time period at issue.

#### i. Title IX Coordinator.

As expected in OCR guidance, NPSD identified a Title IX Coordinator, Dr. McCue, who received training from both the solicitor and external sources. The training was consistent with industry standard at the time. NPSD continued to update the requirements of the Title IX Coordinator as OCR guidance was updated including in 2015 and 2020. The training for the Title IX Coordinator was substantially compliant OCR guidance and consistent with industry standards during the time period at issue.

#### ii. Employees.

During the time of the reports related to Doe and the response by NPSD, OCR provided limited information related to how employees should be trained or details as to what was required to be in the training. OCR advised that training should include "how to identify and report sexual harassment" and violence and that it should be "…provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors."[154]

NPSD substantially complied by providing online training modules, in person professional development, and providing copies of the policies and grievance procedures. Additionally, NPSD tracked the completion of the training. This was consistent with industry standards and compliant with OCR guidance during the time period at issue.

   iii.  Students and Parents/Guardians.

As expected in the relevant guidance at the time of the events, NPSD disseminated a notice of non-discrimination. This was provided to students and families through the mailer that was sent to students and families in "back to school mailing" before the start of the academic year. Additionally, this was placed on the school website.

Districts are not required to train parents or students on Title IX or sexual harassment. In fact, while school districts are slowly starting to add this to curriculum for students and parents, it is not required under the current 2020 Title IX Regulations. It was nearly unheard of for schools to train students and parents on sexual harassment and Title IX between 2014 and 2020. The mailer and posting by NPSD substantially complied with OCR guidance and was consistent with industry standards during the time period at issue.

   iv.  Policies and Procedures.

NPSD complied with the requirements and guidance from OCR related to grievance procedures during the 2014-2020 by publishing their grievance process for the prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct in Policy 5150 and Administrative Regulation 4316. Policy 5150 also included a prohibition on retaliation for reporters of sexual harassment.

The NPSD policies and procedures substantially complied with OCR guidance and was consistent with industry standards during the time period at issue.

  IX.  <u>Summary of Opinions and Conclusion</u>

Throughout Doe's time with NPSD, NPSD responded reasonably to the issues brought to its attention related to Doe and P.B. While I acknowledge that the response by NPSD was not perfect, perfection is not the standard. Doe was not denied access to her education, program or activities. In fact, NPSD complied with every request and created safety plans to ensure Doe maintained that access in a safe environment.

---

[154] 2011 OCR Dear Colleague Letter.

Prior to April 2015, NPSD was not on notice of allegations of sexual harassment by P.B. related to Doe. The behavior, to that point, was believed to be consensual acts between two sixth grade students. Doe did not report it otherwise. While I acknowledge that it would have been a more efficient response if Ms. Garrett provided a behavior report for a "major incident," NPSD later disciplined Ms. Garrett for her lack of reporting the concern as a "major incident" and failure to follow district required reporting protocols for inappropriate behavior.  It ultimately remains evident that in November 2014, Ms. Garrett was not aware that the behavior was potentially sexual harassment due to the consensual appearance and responses by Doe and P.B. As soon as NPSD realized that there was potential sexual harassment involved, supportive measures were provided, Doe's parents were contacted, and an investigation was launched. This ultimately resulted in disciplinary sanctions against P.B. and a significant safety plan was put in place for Doe. These interim measures continued far longer than was required by guidance during the time period at issue.

Significant supports and interim measures continued to be provided by NPSD for Doe through middle school and high school. I acknowledge that when Doe was in tenth grade, an error was made that allowed P.B. and Doe to participate in the same social studies/history class. However, it is imperative to note that Doe did not report this overlap and oversight to anyone at the school despite acknowledging she had close relationships with her support professionals. She continued to sit next to P.B. and interact with him both in and outside of the social studies/history class despite her understanding that he was not to be in class with her. It is clear, though, that as soon as NPSD was on notice of the class overlap and alleged sexual harassment, NPSD responded efficiently by notifying law enforcement, investigating, and providing continued support and safety for Doe throughout the remainder of her high school experience.

It is certainly unfortunate that Doe had a negative experience at school with P.B., and that she experienced struggles in her life inside and outside of school. However, my review of the facts and records in this case lead me to the expert opinion that NPSD was not deliberately indifferent in its response to incidents involving Doe before, during, or after the initial November 2014 incident. Further, NPSD substantially complied with OCR guidance and was consistent with industry standards in their response to Doe's allegations.

X.    Additional Items

To date, discovery in this case is not complete.  I reserve the right to supplement this report based on a review of any future discovery.  I also reserve the right to supplement this report with additional exhibits.

Office for Civil Rights guidance relied on in this report are found at:

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf

https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html

Expert Opinion Report/*Doe v. North Penn School District*
Betsy B. Smith

https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf


Betsy B. Smith
March 17, 2022

Appendix A:
Betsy Brockman Smith CV

## Betsy B. Smith – Attorney and Consultant

**Education**
J.D. – The University of
Tennessee College of Law

B.A. The University of Tennessee,
Knoxville

**Certifications**
Licensed to Practice Law,
Tennessee
Trained Title IX Investigator

**Affiliations**
Knoxville Bar Association
Tennessee Bar Association

**Trainings/Experience**
Forensic Interviewing

Ms. Smith has over ten years of experience conducting investigations and training, including five years in a criminal setting and five years in a higher education environment. During her time working for a university, she served as a Deputy Title IX Coordinator for investigations, lead Title IX investigator, and supervisor of campus Title IX investigations and adjudications. While serving as an assistant district attorney she specialized in interpersonal violence cases, including domestic violence, sexual assault, and child abuse matters. She provides a unique understanding of the complexities related to Title IX investigations involving children and young adult as well as compliance expectations on school districts and institutions.

### Relevant Project Experience

**Senior Investigator/Consultant, Institutional Compliance Solutions.** Ms. Smith joined the ICS team in October 2019. Since joining she has taken the lead role for K-12 School District related trainings and consultations. She has created and presented over fifteen distinct trainings for school districts and institutions related to Title IX. She has written policies that are compliant with the new Title IX Regulations. She has served as an external investigator for compliance related matters.

**Director, Student Conduct & Community Standards, Deputy Title IX Coordinator- The University of Tennessee, Knoxville.** As director of Student Conduct & Community Standards, Ms. Smith developed a student focused model that significantly decreased investigation timelines while increasing the thoroughness of investigations and adjudications. She worked with faculty, staff, and students to provide a process based on national best practices. Ms. Smith served on the Campus Threat Assessment Team, Case Management (CARE) Team, Sexual Assault Response Team, and Division of Student Life Leadership Team. She was instrumental in updating a new code of conduct, and Title IX policy for the University. She worked closely with the Office of the General Counsel, local and campus police departments, Title IX Office, and Office of Equity and Diversity to streamline and coordinate prevention and response to reports of serious misconduct including, but not limited to, Title IX and hazing.

**Assistant District Attorney General- Blount County, Tennessee.** In her role as Assistant District Attorney, Ms. Smith was charged with prosecuting all crimes within the jurisdiction. This included a focus on domestic assault and related crimes, as well as sexual assault and child sex crimes. During her time as a prosecutor, she worked closely with law enforcement to ensure that investigations were thorough, timely, fair, and impartial. She advocated

| | for swift and just prosecution when supported by the evidence through jury trials, preliminary hearings, motion hearings, and depositions. |
|---|---|
| | |

## Speaking, Training, and Events

**Virtual Title IX Care and Support Administrator Training (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2022*

**Responding to Dating and Domestic Violence, Title IX (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2021*

**Virtual Title IX Coordinator Training (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *Summer and Fall 2020, 2021, 2022*

**Virtual Title IX Investigator Training Level 1 (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Virtual Title IX Investigator Training Level 2 (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Virtual Title IX Decision-Maker Training Level 1 (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Virtual Title IX Decision-Maker Training Level 2 (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Virtual Title IX Informal Resolution Facilitator Training (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Virtual Title IX Advisor Training (Higher Ed)**
*Institutional Compliance Solutions* │ *Virtual* │ *2020, 2021, 2022*

**Putting Policy into Practice, Title IX (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *2021*

**Breakdown and Implementation of the New Title IX Regulations (Higher Ed and K-12)**
*Institutional Compliance Solutions* │ *Virtual* │ *Summer 2020*

**An Overview of the New Title IX Regulations and Their Implications for Colleges and Universities**
*Institutional Compliance Solutions* │ *Virtual* │ *May 2020*

**An Overview of the New Title IX Regulations and Their Implications for K-12 School Districts**
*Institutional Compliance Solutions* │ *Virtual* │ *May 2020*

**Title IX in a COVID-19 World Part IV** *Institutional Compliance Solutions* │ *Virtual* │ *May 2020*

**Title IX in a COVID-19 World Part III**
*Institutional Compliance Solutions* │ *Virtual* │ *April 2020*

**Title IX in a COVID-19 World Part II**
*Institutional Compliance Solutions* │ *Virtual* │ *April 2020*

**Recognizing and Responding to Stalking**
*Institutional Compliance Solutions* │ *Virtual* │ *April  2020*

**Title IX in a COVID-19 World Part I**

*Institutional Compliance Solutions* │ *Virtual* │ *April 2020*

**Virtual Certified Title IX Investigator Training Level 1**
*Institutional Compliance Solutions* │ *Virtual* │ *April, May 2020*

**Title IX Coordinators**
*Institutional Compliance Solutions* │ *Virtual* │ *April, May 2020*

**Hot Topics in Title IX Conferences**
*Institutional Compliance Solutions* │ *Chattanooga, TN* │ *March 2020*

**Three Tips to Track Title IX Patterns and Trends**
*Institutional Compliance Solutions* │ *Virtual* │ *February 2020*

**Title IX Training- Athletics**
*Institutional Compliance Solutions Webinar* │ *Virtual* │ *October 2019*

**Know Your Role: Title IX Coordinators**
*Institutional Compliance Solutions Webinar* │ *Virtual* │ *October 2019*

**Back to School: When a Student Misbehaves**
*Knoxville Bar Association* │ *Knoxville, TN* │ *August 2019*

**Building a Student Focused Title IX Process**
*Law Enforcement Innovation Center │ Knoxville, Oak Ridge, Chattanooga, TN │ 2018-2019*

**Investigative Report Writing**
*Law Enforcement Innovation Center │ Knoxville, Oak Ridge, Chattanooga, TN │ 2018-2019*

**Title IX- Creating Stability when the Current is Changing**
*Association of Student Conduct Administrators │ Jacksonville, FL │ February 2019*

**Training a Conduct Board for Title IX Cases**
*Title IX Summit │ Knoxville, TN │ April 2018*

**Collaborative Partnerships and Creating Sustainability in Conduct Offices**
*Association of Student Conduct Administrators │ Jacksonville, FL │ February 2018*

**Collaborative Partnerships and Creating Sustainability in Conduct Offices**
*Southern Association for College Student Affairs │ Chattanooga, TN │ October 2017*

**Training a Board, Creating an Academic Course to Train Student Board Members**
*Association of Student Conduct Administrators │ Jacksonville, FL │February 2017*

Appendix B:

Items reviewed by Betsy Smith in preparation of Expert Report

1. Complaint
2. Answer
3. Plaintiff's Discovery Responses and document productions
4. Defendant's Discovery Responses and document productions
5. Medical Records of Plaintiff (North Penn Pediatrics, Sean Homsher, MSEd, NCC, LPC, Tracie Millar LCSW)
6. North Montco Tech Career scholastic records of Plaintiff
7. North Penn School District scholastic records of Plaintiff
8. NPSD school file for █████████████
9. Holly Andrew-Garret suspension file
10. NPSD Administrative Regulations 5150(a)-(e) Student Harassment
11. NPSD School Board Policy 5150(a)-(c) Student Harassment
12. Deposition Transcript of Todd Bauer
13. Deposition Transcript of William Bowen
14. Deposition Transcript of Holly Garrett
15. Deposition Transcript of Kathryn Smith
16. Deposition Transcript of Curtis Dietrich
17. Deposition Transcript of Kira O'Brien
18. Deposition Transcript of Dawn LeBlanc
19. Deposition Transcript of Cheryl McCue
20. Deposition Transcript of ███████████
21. Deposition Transcript of ███████████████
22. Deposition Transcript of ███████████
23. Plaintiff's Expert Report Dr. Charol Shakeshaft
24. Plaintiff's Expert Report Dr. Vernoique Vallerie

# EXHIBIT "J"

1    IN THE UNITED STATES DISTRICT COURT
2  FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                  - - -
4

   JANE DOE,                    :
5        Plaintiff,             :
                                :   CIVIL ACTION
6        v.                     :   NO. 2:20-CV-
                                :   05142
7  NORTH PENN SCHOOL            :
   DISTRICT,                    :
8        Defendant.             :
9                  - - -
10              August 26, 2021
11                  - - -
12
13            Remote videotaped deposition
   of TODD BAUER, taken pursuant to notice,
14 was conducted at the location of the
   witness, beginning at 10:01 a.m., on the
15 above date, before Ben Pieczynski, Jr., a
   Professional Reporter and Notary Public
16 for the Commonwealth of Pennsylvania.
17
18
19

              - - -
20
21      GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.951.5672
22         deps@golkow.com
23
24

```
 1   APPEARANCES:
 2
 3       FREIWALD LAW
         BY:  LAURA E. LAUGHLIN, ESQUIRE
 4       1500 Walnut Street
         Suite 1801
 5       Philadelphia, Pennsylvania 19102
         (215) 875-8000
 6       lel@freiwaldlaw.com
         Representing the Plaintiff
 7       (Via Zoom web conference)
 8
         HENDRZAK & LLOYD
 9       BY:  MAUREEN A. JORDAN, ESQUIRE
         3701 Corporate Center Parkway
10       Suite 100
         Center Valley, Pennsylvania 18034
11       (610) 709-8705
         maureen.jordan@zurichna.com
12       Representing the Defendant
         (Via Zoom web conference)
13
14       WISLER PEARLSTINE, LLP
         BY:  KYLE J. SOMERS, ESQUIRE
15       460 Norristown Road
         Suite 110
16       Blue Bell, Pennsylvania 19422
         (610) 825-8400
17       ksomers@wispearl.com
         Representing the Defendant
18       (Via Zoom web conference)
19
20       VIDEOTAPE TECHNICIAN:
            WILLIAM CHAN
21
22                  -   -   -
23
24
```

1                       -   -   -

2                    I-N-D-E-X

3                       -   -   -

4    Testimony of:  TODD BAUER

5          By Ms. Laughlin            10

6

7

8

9

10                      -   -   -

11             E-X-H-I-B-I-T-S

12                      -   -   -

13   NO.              DESCRIPTION            PAGE

14   Exhibit-A    Notice of Deposition      383

15   Exhibit-B    File document             383

16   Exhibit-C    File document             383

17   Exhibit-D    Letter                    383

18                      -   -   -

19

20

21

22

23

24

```
 1                    -   -   -

 2          DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   DIRECTIONS NOT TO ANSWER:

 6   PAGES:  None

 7

 8   REQUESTS FOR DOCUMENTS OR INFORMATION:

 9   PAGES:  187, Lines 1 and 16; 196, Line 7;

10          274, Line 21

11

12   STIPULATIONS AND/OR STATEMENTS:

13   PAGES:  None

14

15   MARKED QUESTIONS:

16   PAGES:  None

17

18

19

20

21

22

23

24
```

1                    -  -  -

2              MS. JORDAN:  Before we start

3      the 30B6 deposition, I just want to

4      make a general objection to the areas

5      of inquiry that -- the defense objects

6      to the extent that any of the areas of

7      inquiry impose obligations that are

8      inconsistent or in excess of what is

9      required under the Federal Rules of

10     Civil Procedure in that there could be

11     documents or information that is not

12     yet known at this point of the

13     deposition, and we wouldn't want to be

14     precluded at the time of trial from

15     presenting information that is learned

16     at a later date.

17              In addition, in regard to

18     the areas of inquiry, specifically No.

19     5, which indicates other complaints,

20     reports of student-on-student sexual

21     harassment and assault at Gwynedd

22     Square Elementary School, Penndale

23     Middle School, Pennbrook Middle School

24     and North Penn High School, this area

1  of inquiry does not have any date.

2  It's open-ended, which I believe is

3  overly broad and burdensome.

4  Obviously, Dr. Bauer has done due

5  diligence and will respond to that

6  area of inquiry, based on his due

7  diligence.  However, he obviously

8  cannot be responsible to know any

9  complaints for all time that the

10  school district has been in existence.

11           In regard to No. 7, the

12  facts supporting North Penn School

13  District's defenses in this case, the

14  defense objects that it has no duty to

15  advise plaintiff of its defenses.

16  Plaintiff has the burden of proof in

17  regard to the claims being advanced

18  against the school district, and

19  therefore this area of inquiry is

20  inappropriate.

21           Thank you.

22           MS. LAUGHLIN:  Just for the

23  record, this is Laura Laughlin, on

24  behalf of the plaintiff.  The

1    deposition notice for this deposition,

2    the 30B6 deposition, was issued August

3    3rd, and with Attachment A that listed

4    all of the areas of inquiry, 14

5    specifically, for this deposition

6    today.  The deposition was originally

7    scheduled a couple of weeks ago and

8    was asked to be postponed so that

9    Mr. Bauer, who was identified by the

10    district as the corporate designee,

11    could do an investigation into these

12    areas and be prepared to testify today

13    for his deposition, and the deposition

14    was postponed several weeks to

15    accommodate the district's ability to

16    do an inquiry into these areas.

17           This deposition notice in

18    30B6 has been served almost a month

19    ago now, and this is the first time

20    today, the morning of the deposition

21    before the deposition started at

22    10:00, that the district has raised

23    any objection into any of the areas of

24    inquiry that plaintiff had requested

1  in the deposition notice as well as

2  advising that Dr. Bauer, the 30B6

3  corporate designee, may not be

4  prepared to testify on all of the

5  areas in that Attachment A, and the

6  district, for the first time, is

7  saying that they want the opportunity

8  to be able to supplement with

9  additional materials that they may

10  find out later on.

11         Depending upon the

12  information, plaintiff reserves the

13  right to object to that prior to

14  trial, based on notice ahead of time

15  and prejudicial effect in adding in

16  the additional information.  Should

17  the district try to introduce

18  information that was not testified to

19  today, plaintiff reserves the right to

20  re-depose Dr. Bauer in a 30B6 capacity

21  to be able to inquire to those

22  additional areas that may be

23  identified at a later date.

24         Okay.

1          THE VIDEOGRAPHER:  Okay.
2    You ready to proceed?
3          MS. LAUGHLIN:  I think so.
4          MS. JORDAN:  I'm ready.
5    Thank you.
6          THE VIDEOGRAPHER:  Okay.
7    Great.  Please standby for video.
8          Okay.  We are now on the
9    video record.  My name is William
10   Chan.  I am a videographer for Golkow
11   Litigation Services.  Today's date is
12   Thursday, August 26th, 2021.  The time
13   is 10:07 a.m. eastern.
14         This remote video deposition
15   is being held in the matter of Jane
16   Dow versus North Penn School District,
17   which is filed in the United States
18   District Court for the Eastern
19   District of Pennsylvania.  The
20   deponent is Todd Bauer.
21         All parties to this
22   deposition are appearing remotely and
23   have agreed to the witness being sworn
24   in remotely.  Due to the nature of

1    remote reporting, please pause briefly

2    before speaking to ensure all parties

3    are heard completely.

4              Counsel, please identify

5    yourselves for the video record.

6              MS. LAUGHLIN:  Laura

7    Laughlin, on behalf of the plaintiff,

8    Jane Doe.

9              MS. JORDAN:  Maureen Jordan,

10   on behalf of the defendant, School

11   District.

12             MR. SOMERS:  And Kyle

13   Somers, also on behalf of Defendant

14   School District.

15             THE VIDEOGRAPHER:  The court

16   reporter is Ben Pieczynski, who will

17   now swear in the witness.

18                  -   -   -

19             TODD BAUER, after having

20        been duly sworn, was examined and

21        testified as follows:

22                  -   -   -

23             EXAMINATION

24                  -   -   -

BY MS. LAUGHLIN:

Q.    Good morning, Dr. Bauer.

A.    Good morning.

Q.    My name is Laura Laughlin, as I just stated on the record for the video.  I represent the plaintiff, Jane Doe, in this case that's been brought against the North Penn School District.

Have you ever given a deposition before?

A.    I have not.

Q.    So I'm gonna give you a few instructions that will hopefully make things go a little bit smoother today.

I would ask that, since we have both a court reporter taking down everything that's said, even though we have the video too, we'll also be creating a transcript today, I'd ask that all of your answers be verbal, okay?

A.    Sure.

Q.    Being that, in conversation, you may nod the head or say uh-huh, which will come up on the video, but just so

1  the transcript is clear, you'll have to

2  say yes or no, okay?

3       A.    Understood.

4       Q.    In normal conversation you

5  may anticipate where I'm going with my

6  question and start answering, or I may

7  sometimes start asking my question before

8  you're done stating your answer.  I'll

9  try not to do that, but if I do, just let

10  me know that you're not done answering,

11  and I'll let you finish before I start

12  asking my next question, okay?

13       A.    Yes.

14       Q.    I would also ask, just wait

15  until I'm done my question before you

16  start answering, so we can get a clear

17  transcript.

18       A.    Okay.

19       Q.    If there's any question I

20  ask you that you're not sure what I'm

21  asking or you didn't understand, just let

22  me know, and I'll try and rephrase it.

23  If you don't let us know you didn't

24  understand, we're all going to assume

1    that you understood the question, since I

2    gave you that instruction, okay?

3            A.    Yes.

4            Q.    If you need to take a break

5    for any reason today, just let me know,

6    and we can do so.  I would ask, though,

7    if there's a question pending, that you

8    answer the question before you take your

9    break, okay?

10           A.    Yes.

11           Q.    There is -- I'm gonna be

12   asking you some questions generally about

13   the district but also conversations you

14   may have had and things of that sort.  I

15   just want to clarify that when I ask you

16   questions, I'm not asking you for

17   conversations that you've had with your

18   counsel, Ms. Jordan, okay?

19           A.    Yes.

20           Q.    I don't want you to guess at

21   anything today.  If you don't know or,

22   you know, you don't remember, and that's

23   the truth, then that's a fine answer,

24   okay?

1      A.    Yes.

2      Q.    You can estimate, though.

3  So, if you don't know the exact date

4  something happened or, you know, the

5  exact timeframe but you can give me a

6  reasonable estimation, you can do so,

7  just let us know that's what you're

8  doing, all right?

9      A.    Yes.

10      Q.    Do you understand that today

11  you're here as a corporate representative

12  of the North Penn School District?

13      A.    I do.

14      Q.    Do you have an understanding

15  that the answers you give today are

16  binding on behalf of the School District,

17  since you are here as the corporate

18  representative?

19      A.    I do.

20      Q.    Before the deposition today,

21  did you see -- I'm just gonna share my

22  screen.

23          I'm going to mark this as

24  Exhibit-A.  It's the second revised

1  notice of 30B6, the videotaped

2  deposition.  I'll try and make this a

3  little bit smaller so you can actually

4  see it.

5           Did you see this Notice of

6  Deposition before today?

7      A.    I did.

8      Q.    And specifically, on the

9  last two pages in Attachment A, did you

10 see all of those areas of inquiry that

11 you're going to be asked to testify about

12 today?

13     A.    I did.

14     Q.    What did you do -- and

15 again, I'm not asking for meetings or

16 conversations that you've had with your

17 counsel -- but what did you do in

18 preparation before your deposition today

19 to be able to testify in the areas that

20 were listed in Attachment A?

21     A.    I simply reviewed the

22 evidence that was provided.

23     Q.    What do you mean?

24     A.    The records that we provided

¹ as part of this case, I reviewed the

² nearly thousand pages.

³     Q.   Okay.  The ones that were

⁴ stamped at the bottom, like, NPSD and 1

⁵ through 1,000-something, whatever that

⁶ number was?

⁷     A.   Yes.

⁸     Q.   Other than reviewing those

⁹ documents, is there anything else that

¹⁰ you did to prepare for the deposition

¹¹ today?

¹²     A.   I did have conversations

¹³ with my boss, our superintendent, Curt

¹⁴ Dietrich, some of which, of course, will

¹⁵ be unfolded during this deposition, but

¹⁶ some of the events that are referenced

¹⁷ here occurred prior to my time being

¹⁸ employed in the district.  So, I had to

¹⁹ do some research regarding some of those

²⁰ incidents.

²¹     Q.   Okay.  And so to do that,

²² you spoke with Curt Dietrich?

²³     A.   Yes.

²⁴     Q.   Is there anybody else that

1  you spoke with --

2          A.    No.

3          Q.    -- in preparation for the

4  deposition?

5          A.    No.

6          Q.    You said that you had to

7  speak with Curt Dietrich, the

8  superintendent of the district, because

9  some of what occurred in this case

10 happened prior to your time in the

11 district.  When did you first start

12 working for the district?

13         A.    July of 2015.

14         Q.    And what was your role when

15 you started with the district in July

16 2015?

17         A.    I was a high school

18 principal.

19         Q.    At North Penn High School?

20         A.    That's correct.

21         Q.    How long did you serve as

22 the principal at North Penn High School?

23         A.    Three years.

24         Q.    So until July 2018?

1       A.    That's correct.

2       Q.    And then was it Pete

3 Nicholson who took over for the high

4 school after you?

5       A.    Yes.

6       Q.    What did you do in July

7 2018?

8       A.    I transitioned to my current

9 role, which is assistant superintendent.

10      Q.    Is there just one

11 superintendent of the North Penn School

12 District?

13      A.    Yes.

14      Q.    And then there's one

15 superintendent, which is Curt Dietrich;

16 is that right?

17      A.    I believe your last

18 question, you said, is there just one

19 superintendent.  So, if you meant --

20      Q.    Oh.

21      A.    -- assistant, there's two.

22      Q.    Okay.  Sorry, yes.

23      A.    Yup.

24      Q.    The first question I meant

1  to ask, it came out a little wrong, was,

2  is there only one assistant

3  superintendent, but you just told me

4  there's two.

5          So it's you, and who is the

6  other assistant superintendent?

7      A.    At the time, it was Dr.

8  Diana -- or, I'm sorry -- Dr. Jenna Rufo,

9  and currently it is Dr. D'Ana Waters.

10     Q.    Okay.  When did Dr. Waters

11  take on the role of assistant

12  superintendent for the district?

13     A.    July 2021.

14     Q.    Okay.  Do you know how long

15  Dr. Jenna Rufo was the assistant

16  superintendent of the district.

17     A.    I do.  From July 2018 to

18  November 2020.

19     Q.    Do you know who held the

20  roles of assistant superintendent prior

21  to July 2018?

22     A.    I do.  Dr. Diane Holben.

23     Q.    Was it just one assistant

24  superintendent at that point?

1          A.     It was.

2          Q.     And do you know when Dr.

3    Holben had started in that role?

4          A.     My best -- this is an

5    estimate -- I believe she was assistant

6    superintendent for about seven years.

7          Q.     So from about 2011, does

8    that sound about right?

9          A.     It does.

10         Q.     Okay.

11         A.     I believe Dr. Dietrich

12   became superintendent -- again,

13   estimating -- in 2010, maybe '11, and Dr.

14   Holben was soon thereafter.

15         Q.     From about 2010 up through

16   the present, was -- has Dr. Dietrich

17   always been the superintendent?

18         A.     Yes.  Since he was appointed

19   superintendent, he has been -- I believe

20   this is -- might be his thirteenth year.

21   It is his twelfth or thirteenth year.

22         Q.     Okay.  And has there ever

23   been anybody within that time, 2010 to

24   present, that either also served as

1 superintendent or filled in for Dr.

2 Dietrich for a period of time?

3        A.    In an official capacity, no.

4 Certainly, in -- filling in for him at

5 meetings and other meetings and such,

6 yes, I'm sure.

7        Q.    Meaning that, if Dr.

8 Dietrich for some reason had a scheduling

9 conflict, somebody would step into that

10 role for that particular meeting?

11       A.    And preside over the

12 meeting, yes.

13       Q.    Can you tell me, before you

14 became high school principal at North

15 Penn, what did you do before that?

16       A.    I was assistant principal in

17 the Central Bucks School District.

18       Q.    What level of education were

19 you the assistant principal in?

20       A.    High school.

21       Q.    Were you, like, at Central

22 Bucks East or Central Bucks West?

23       A.    South.

24       Q.    Oh.  I didn't know that

1  there was three.

2          Is there four, is there a

3  North too?

4       A.    There is not.  There's

5  three.

6       Q.    Okay.

7       A.    I think.

8       Q.    So I was only one off.

9       A.    Yeah.  It was 2006, I

10  believe, they opened C.B. South.

11       Q.    And about how long did you

12  serve in that role as assistant

13  principal?

14       A.    Three years.

15       Q.    What did you do before that?

16       A.    I was a math teacher at

17  Souderton Area High School, and I was

18  also the head swimming and diving coach

19  of both the boys and the girls.

20       Q.    That was at Souderton?

21       A.    Yes.

22       Q.    Can you tell me a bit about

23  your educational background.

24       A.    Certainly.

 1              My bachelor's degree is in
 2    mathematics from Bucknell University.  I
 3    also have a bachelor's degree in
 4    education.  And my master's degree is
 5    from Wilkes University, in educational
 6    technology.  My principal certification
 7    is from Cabrini College, now Cabrini
 8    University, I believe.  And my doctoral
 9    degree is from Delaware Valley
10    University.
11         Q.    When did you get the
12    doctorate from Delaware Valley?
13         A.    2017.
14         Q.    And what was your doctorate
15    in, did you have a specific course, area
16    of study?
17         A.    Educational leadership.
18         Q.    How long of a program is
19    that to complete?
20         A.    Three years.
21         Q.    Is that part-time, going in
22    the evenings while working during the
23    day?
24         A.    Yes.  So the format, it was

1  a cohort format, and we had class every

2  other weekend.  So, it was Friday night

3  and every other Saturday, every weekend,

4  for three years.  And then after that, of

5  course, a dissertation process.

6       Q.    And did you undertake the

7  doctorate so that you could eventually

8  step into the role as assistant

9  superintendent within the district?

10      A.    I wouldn't say that that is

11  fair to say.  I began my doctorate when I

12  was an assistant principal when I was in

13  Central Bucks, and I simply pursued it

14  because my children were young, and I

15  wanted to have options as my career

16  advanced.  So, I didn't know that I

17  wanted to be an assistant superintendent.

18  Quite frankly, I still don't know that I

19  want to be.  But I just -- I did it

20  because I thought it was best to do it

21  while my children were young.

22      Q.    Why do you say that you --

23  you said, 'frankly, I don't even know

24  that I really want to be assistant

1   superintendent'; why is that?

2        A.    Well, I guess that was

3   tongue in cheek.  Some people say they

4   don't know what they want to be when they

5   grow up.  So I did not aspire to be an

6   assistant superintendent, nor do I aspire

7   to be a superintendent.  I think, when

8   opportunities present themselves for

9   which I believe I'm credentialed and

10  could do a good job and that I can learn

11  a lot, I pursue them.  So, yeah, I didn't

12  get my principal certification because I

13  wanted to be a principal, I just did it

14  to continue my education, and when the

15  right opportunities came up, I pursued

16  them.  But I do not have an end goal.

17       Q.    Did you need a, a doctorate

18  to be an assistant superintendent with

19  the district?

20       A.    You do not.  I believe the

21  job description says doctoral degree

22  preferred.  That said, you do need a

23  superintendent letter of eligibility, and

24  that was part of my doctoral program.

1  So, I, I got that.  Just like a teacher

2  can major in education or in mathematics

3  and they need to have a teaching cert,

4  you can get a doctoral degree in

5  educational leadership, but you still

6  need a certification, which is the letter

7  of eligibility.

8          Q.    The letter of eligibility,

9  is that, like, a letter that's signed by

10  an administrator or something like that,

11  saying that you're, like, qualified or

12  met the criteria or something?

13          A.    Yeah.  I would assume the

14  official document has the secretary of

15  education's signature on it from the

16  Department of Education, that would be my

17  guess.  However, it's coursework,

18  internship hours, and then there's a

19  comprehensive exam at the end.

20          Q.    Okay.  I think I was a

21  little bit confused by when you said

22  letter.

23          Like, that would be

24  something from the general Department of

1  Education, not something, like, Dr.

2  Dietrich saying, I've seen him in action

3  and, you know, support him getting this

4  certification?

5      A.   Yeah.  It's reasonable to

6  call it a certification.  For some reason

7  it is classified as a letter of

8  eligibility.

9      Q.   Did Dr. Dietrich have any

10 involvement in you being able to get your

11 doctorate degree?

12     A.   No.  I began the program

13 prior to ever meeting Dr. Dietrich.

14     Q.   Okay.

15     A.   So he was my mentor when it

16 came to my letter of eligibility, because

17 I had to do 360 hours of intern time.

18 But that's, I guess, separate from my

19 doctorate, and your question was, did he

20 help me in any way get my doctorate; I

21 guess the answer's no.

22     Q.   Well I guess that's what I

23 was kind of starting to allude to, and

24 maybe I'm not asking the right questions

 1  to be able to get that information.

 2          You said that Dr. Dietrich

 3  was helping you because you needed 300

 4  hours of -- and explain for me what

 5  exactly his -- you said he was a mentor

 6  to you.  What exactly is that role?  Is

 7  it, like, an actual title, or is it just

 8  in the term that we all know about

 9  mentor, somebody you look up to and stuff

10  like that?

11          A.    No.  It was a literal term.

12  So similar to -- and you might be more

13  familiar with student teachers, where

14  they have a cooperating teacher that they

15  have do their, their student teaching

16  with, and then that person eventually

17  signs off and does an evaluation on them,

18  in addition to their supervisor from the

19  university.  So, he served in that

20  capacity.  You do need to have a mentor

21  that signs off on your log of the hours

22  that you completed.  He was interviewed

23  by the program director when I was going

24  through my internship to see if I was

1   doing what I was supposed to be doing.

2   So yes, he was officially classified as

3   my mentor.

4          Q.    And was that through Cabrini

5   College --

6          A.    That was --

7          Q.    -- that you --

8          A.    That was Delaware Valley

9   University, for my doctorate.

10         Q.    Okay.  When you were going

11  to take on the role as principal of North

12  Penn High School, did you undergo any

13  additional -- or, any specific training

14  through the district to take on that

15  role, since I guess you were out of the

16  district prior to that?

17         A.    Aside from new employee

18  orientation and trainings that we would

19  do at the beginning of each school year,

20  no.  But --

21         Q.    The new employee

22  orientation, can you give me a sense of

23  what that included, what type of training

24  or instruction?

1    A.    Yeah.  So I recall it quite

2  vividly.  I sat in a conference room here

3  in this very building.  Sat down with

4  certain individuals from different

5  departments.  So they came in, it was

6  like an assembly line.  So someone from

7  the business department came to discuss

8  certain aspects of compensation.  And

9  then somebody from the benefits

10  department came in to talk me through the

11  options and the insurance plans.  Someone

12  from technology gave me my device and my

13  log-ins and how to use e-mail and all the

14  information systems in there.  Of course,

15  someone from human resources sat down

16  with me, handed me a folder.  And I'm

17  trying to think of anyone else -- I did

18  meet with Dr. Holben that day, she came

19  in and sat with me for quite a while, and

20  then Dr. Dietrich also met me.

21          So, that was -- it was a

22  one-on-one program.  I don't believe it

23  was because I was the new high school

24  principal.  I think it's new --

1  onboarding of new employees is usually a
2  fairly intimate setting where it's
3  one-on-one.  But that's what I recall.
4        Q.    So, during that new employee
5  hire, you didn't get any training on,
6  like, North Penn's policies, procedures,
7  how they handle situations; is that
8  correct?
9        A.    That is not correct.  So
10 when I referenced that human resources
11 came in, that folder, I believe, had
12 policies in it and procedures for certain
13 things, such as how to call out, how to
14 report something.  I did -- so, it's not
15 fair to say that I didn't get any
16 training on procedures; I did.  More
17 specific, employee handbooks.  So, I, I
18 recall walking out of here with a stack
19 of literature that was overwhelming at
20 the time.
21       Q.    Just to give you a -- I
22 guess a bunch of manila folders or --
23 of -- you know, or envelopes filled with
24 documents that you were to read on your

1  own to kind of get up to speed; is that

2  right?

3         A.    I would describe it similar

4  to the process of when you have a

5  mortgage and where the -- you sit down at

6  the settlement table, and they say, this

7  document is this and this was what it

8  covers, and then you sign.  So each

9  document itself, we went through, this is

10  what this policy is, this is what -- you

11  know, here's the employee handbook and

12  here it includes this, this and this.

13  So, if you're familiar with that

14  process -- unfortunately, I am far too

15  familiar with the mortgage process --

16  that's kind of what it looked like.

17         Q.    When you say, "how to report

18  something", I think was one of the

19  examples you had used, what are you

20  referring to?

21         A.    I was referring specifically

22  to calling out, taking a vacation day,

23  who to contact in the middle of the night

24  when you have challenges, those types of

1  things, that any employee would hear, not

2  the high school principal.

3      Q.    Okay.  I understand.

4          Do you recall whether HR,

5  whoever, in any of these stacks of

6  materials, had spoken to you about Title

7  IX?

8      A.    I don't recall anyone

9  speaking to me about Title IX --

10      Q.    When you --

11      A.    -- on that day.

12      Q.    Sorry.

13      A.    No, that's okay.

14          I said, "on that day".

15      Q.    It's a little bit difficult,

16  especially over screen sometimes, to

17  anticipate when somebody's done.  So --

18      A.    No problem.

19      Q.    -- I'll try not, try not to

20  do that.

21          In your years with the

22  district, from 2015 to the present, can

23  you tell me how often faculty received

24  training on Title IX?

1    A.    I can't point to faculty
2  explicitly being told, this is Title IX
3  training.  However, I can absolutely
4  testify to the fact that, as a principal
5  of a building, part of beginning of your
6  faculty meeting, which by the way
7  happened yesterday in all 18 of our
8  buildings, we would go over logistics,
9  such as how to write up a student, how to
10  call security, how to report something,
11  where forms are located.  So I cannot, in
12  good conscious, say I or someone else
13  stood in front of them and said, here is
14  your Title IX training, but I can say
15  that we absolutely talked about
16  procedures on emergency situations, how
17  to support students, how to handle
18  discipline scenarios, calling security,
19  things such as that, and that --
20  obviously, that's an annual thing.
21    Q.    What is Title IX?
22    A.    To me, it protects and it is
23  a legislation that prevents
24  discrimination based upon gender.

1    Q.    Okay.  And do you know the
2  sexual harassment part of Title IX?
3    A.    Yes.
4    Q.    What is sexual harassment?
5    A.    Certainly, I -- if someone
6  during day-to-day operation were to ask
7  me what is sexual harassment, I would
8  refer to the policy that I believe was
9  provided.  But to me, sexual harassment,
10  I think the definition includes some
11  perception.  I think when someone feels
12  uncomfortable or that they've been
13  discriminated against because of
14  something related to a protected
15  category, that's sexual harassment.
16    Q.    Have you heard of the term
17  'hostile education environment'?
18    A.    I certainly understand what
19  that term means, just you saying it.
20  Have I ever heard someone say 'hostile
21  education environment', I don't believe
22  so.
23    Q.    Okay.
24    A.    I've heard hostile work

1 environment, yes.

2      Q.    What -- I mean, when you

3 say, when I say the words you understand

4 what I mean, what does, what does that

5 mean to you, then?

6      A.    I would say it essentially

7 means hostile work environment except in

8 an education environment, and it doesn't

9 necessarily just refer to employees, it

10 would refer to anyone in an education

11 system.

12      Q.    But I guess what does that

13 mean, then, hostile education

14 environment?  Are there -- that's my

15 question.

16      A.    I guess I, I would need to

17 defer to the definition of hostile.  And

18 hostile, to me, means it's a contentious

19 environment where people don't feel safe

20 or they feel that there is inappropriate

21 behavior.  I think there's a lot of

22 reasons why someone could say someone or

23 something is hostile.  But based upon

24 that definition of hostile, and again, I

1 think there is perception there.  It's

2 how you feel.  Does it feel safe, do you

3 feel supported, do you feel like someone

4 would help you if you asked.  That's how

5 I would define it.

6        Q.    Like, the perception of the

7 victim, is that what you're referring to

8 when you say perception?

9        A.    I don't necessarily think

10 it's, it's a victim in all cases.  It

11 could be anyone.  They could been an

12 observer, right, it's not just the victim

13 but if they feel that there's a hostile

14 environment, just by watching.  They

15 don't necessarily need to be the victim.

16        Q.    I understand.

17             I want to understand, I know

18 through the district, like, you had the

19 role of principal and then assistant

20 superintendent, there's a superintendent,

21 there's directors of elementary

22 education.  There's a bunch of different

23 titles that people get within the

24 district, and so I want to try and have

1 an understanding of what these roles mean

2 and, you know, what their

3 responsibilities are, generally, within

4 the district.

5            For assistant

6 superintendent, because that's where

7 we're all -- let's start there, what is

8 the assistant superintendent in the North

9 Penn School District?

10      A.    I guess it would be easiest

11 for me to answer that question by

12 defining what I think my role is.

13            I am the conduit to our

14 administrators and employees, in my

15 cases.  I oversee and supervise many

16 cabinet level administrators, which would

17 include your director of facilities and

18 operations, your business manager, I

19 oversee our coordinator of safe, safe

20 schools and emergency management,

21 technology -- our director of technology,

22 all of our secondary schools.  Our other

23 assistant superintendent oversees our

24 director of elementary school and the

1 elementary schools and handle discipline

2 in situations when they rise above the

3 building level.  For example, expulsion,

4 I handle those.  I believe I handle them

5 across the board, just because I'm most

6 familiar.  I'm involved in policies, I'm

7 involved in -- I oversee many of our

8 school board committees.  Our committee

9 structure here at North Penn includes our

10 ECI committee, which is education,

11 curriculum, instruction, we have a

12 facility and operations, a safe school

13 committee, a policy committee.  I

14 oversee -- I'm -- I sit on all of those

15 committees that I just mentioned and help

16 set the agendas for those meetings and

17 work with the board through agenda items

18 or anything that may come up at the

19 meetings.

20            So, I really am a go

21 between -- in between the administrators

22 and, of course, Dr. Dietrich.  It's hard

23 to describe.  It is far easier to explain

24 the superintendent role and the principal

1 role.  I think assistant superintendent

2 is difficult to describe.

3          Q.    And I'll get to the easier

4 ones, because they're on my list too.

5               When you mention the board,

6 who are you referring to, or what is the

7 board?

8          A.    Every school board in

9 Pennsylvania has nine elected community

10 members.  And so, when I say the board,

11 I'm talking about our nine elected school

12 officials.

13          Q.    Okay.  Thanks for clarifying

14 that.

15          A.    My pleasure.

16          Q.    When you say you're the go

17 between the administration and the

18 superintendent, Dr. Dietrich, who -- is

19 this -- the administration made up of?

20          A.    So the easiest was to

21 describe it is school district's have

22 what's called an Act 93 employee group,

23 and that covers anyone who is labeled as

24 an administrator.  In North Penn, I

1  believe we have somewhere around 65

2  administrators.  So, more commonly known

3  are principals and assistant principals.

4  But then you have some of those people I

5  just mentioned, director of facilities,

6  director of technology, director of

7  special education.  We also have some

8  administrators just under those

9  directors.  We have assistant director of

10 business administration, assistant

11 director of technology.  We have a

12 coordinator of communications media,

13 informational technology, benefits

14 coordinator, coordinator of extended

15 school care, which is before and after

16 care, coordinator of school nutrition

17 services.

18          I think that about covers --

19 I didn't go down the curriculum branch.

20 So you have director of curriculum and

21 instruction and then all the supervisors

22 in those content areas.  So, for example,

23 a supervisor of STEM, supervisors of all

24 curricula related to math and science and

1 engineering in the district.  So -- and
2 there's four of them.  And then you have
3 your special education supervisors as
4 well, I believe we have six of them.
5      Q.    And those are all -- all the
6 people that you just mentioned, they're
7 all part of the district administration?
8      A.    Yes.
9      Q.    And is that kind of -- I
10 mean, administration is kind of -- are
11 they, like, the leaders of the district,
12 in a sense?
13      A.    I would describe -- in
14 layman's terms, I would say middle
15 management.  They're leaders within their
16 department, yes.  I would categorize Dr.
17 Dietrich, Dr. Waters and myself, probably
18 most people would say, are the leaders of
19 the district.
20      Q.    Okay.  So the three of you
21 are kind of at the top, and then the next
22 level would be middle management, like
23 you said, the administration -- other
24 administrators of the district; is that

1  right?

2          A.    Yeah.  We use the term

3  operations, I don't know why.  But our

4  operations team includes Dr. Dietrich,

5  myself, Dr. Waters and then our director

6  of human resources, which is Dr. Kim, and

7  our chief financial officer, Mr. Skrocki.

8          Q.    Okay.  And before Dr. Kim,

9  was that Dr. McCue?

10         A.    Yes.

11         Q.    Dr. Cheryl McCue?

12         A.    (Nodding.)

13         Q.    The -- I know you mentioned

14  that Dr. Rufo was also an assistant

15  superintendent.  How do her

16  responsibilities differ from yours, if at

17  all?

18         A.    Just a clarification.  Dr.

19  Rufo is not an assistant superintendent;

20  she was.  But Dr. Rufo -- am I allowed to

21  say everything else?  But she most

22  directly supervised -- I think most

23  people would say that I supervise

24  technology, facilities and operations,

¹ and secondary, that's an

² oversimplification of my

³ responsibilities, but.  And then the

⁴ other assistant superintendent, who is

⁵ currently Dr. Waters, oversees special

⁶ education, curriculum, and elementary.

⁷         Q.    Okay.

⁸         A.    So if you want to try to

⁹ separate the parts of the operation that

¹⁰ people are most familiar with, I would

¹¹ give me those three and her the other

¹² three.

¹³         Q.    Okay.  When you say that the

¹⁴ other superintendent is in charge of

¹⁵ special education, elementary, what do

¹⁶ you mean?

¹⁷         A.    They were mutually

¹⁸ exclusive, those two things; special

¹⁹ education and elementary level.  So,

²⁰ elementary is K to 6 in North Penn, and

²¹ special education is any student with an

²² identified disability.

²³         Q.    So managing all the things

²⁴ that go under those umbrellas; is that

1 correct?

2        A.    Correct.  And the terms

3 might be mutually exclusive, but in

4 actuality they're not, of course.  So

5 there are special education students at

6 the secondary level, and I would be

7 involved in those cases.  But I don't

8 directly supervise our director of

9 special education; Dr. Waters does.

10        Q.    There's, like, some overlap,

11 you're saying, between -- if you have a

12 special education student but they're in

13 the elementary, it would still fall under

14 the other assistant superintendent, but

15 if they're at the high school, then there

16 would be some overlap between the two,

17 right?

18        A.    That's correct.

19        Q.    When you say that you're

20 also, you know, kind of one of your

21 umbrellas, I guess, that you would be

22 responsible for is technology, what, what

23 does that mean?

24        A.    Everything from

1  instructional technology to information

2  systems.  So, I directly supervise our

3  director of technology.  And so,

4  everything from the devices in kid's

5  hands to cell phones in administrator's

6  hands to our core switch to our

7  infrastructure, our backup, the systems

8  involved, we have Canvass as a learning

9  management system, Infinite Campus as a

10  student information system.  So all

11  things related to technology, from

12  projectors, down to the bulbs in those

13  projectors.  So, yeah, devices, hardware,

14  software, communication in general, phone

15  messages when it snows, that kind of

16  thing.

17       Q.    Is the, like, documentation

18  and retention keeping of, like,

19  electronic files, whether they be student

20  files, HR files, are those under your

21  umbrella of responsibilities, or is that

22  kind separate, the, the retention of

23  those -- the organization of those types

24  of files?

1    A.    I would say our technology
2  department provides the platforms for
3  which to do those things, but I wouldn't
4  say that they supervise them, and a lot
5  of our recordkeeping is still paper and
6  pencil.  I would bet -- it's fair to say
7  that in the human resources department, a
8  lot of it is.  So, for example our
9  student information system is Infinite
10 Campus, and I previously mentioned that,
11 and students grades are in there, which
12 means their transcripts are in there.
13 So, I guess, technically, in terms of
14 creating the system and managing the
15 system for which those records are
16 stored, yes.  Creating those records and
17 making sure they're done properly by the
18 individuals who are inputting the data, I
19 wouldn't say that technology has direct
20 oversight of that part.
21    Q.    Who's responsible --
22    A.    That would be --
23    Q.    I'm sorry.
24    A.    That's okay.

¹ Q. What was, what was the last
² thing you just said?
³ A. I don't know, remember. Go
⁴ ahead.
⁵ Q. Okay. Who's responsible for
⁶ that part, when you say, like, inputting
⁷ the data and stuff like that, is there
⁸ someone, like, supervising how that's
⁹ done?
¹⁰ A. I would say that's a
¹¹ building level thing, right? So, the
¹² transcript gets generated based upon
¹³ grades that teachers input in their grade
¹⁴ book, and if teachers aren't putting
¹⁵ grades in their grade book, the
¹⁶ administrators in the building, I think,
¹⁷ would be the person saying, hey,
¹⁸ Mr. Bauer, why didn't you put any grades
¹⁹ in for the third marking period. So I
²⁰ would say the responsibility for the
²¹ input of the data would be all the way
²² down to the teacher level but supervised
²³ by the building administration.
²⁴ Q. What about in terms of

1  retention of or recordkeeping of student
2  misconduct, is that something that falls
3  under your umbrella, or, if not, whose
4  responsibility would that be?
5          A.    I would say same answer
6  because -- at this stage of the game.  In
7  2021, conduct referrals are input into
8  that student information system.  So, the
9  teacher inputs the information into
10  Infinite Campus, and if it's not written
11  up by the teach, again, I would think
12  that the building principal would speak
13  with that teacher.
14          Q.    Was that the same -- like,
15  today, in 2021, was that the same, say,
16  starting in 2014, the same way that that
17  would be documented?
18          A.    I actually believe that that
19  was the tipping point, that year.  As I
20  said way back when we became friends here
21  in this meeting, that I started in 2015,
22  and that was the year we started using
23  electronic system for student discipline
24  at the secondary level.  At the

1  elementary level, it was a few years

2  after.

3       Q.    And secondary level, is that

4  in high school?

5       A.    7 through 12.

6       Q.    Okay.  So in North Penn's

7  district, the middle school and the high

8  school is known as the secondary level?

9       A.    Yeah.  I think that's

10  consistent, at-large.  Secondary is

11  beyond elementary.

12       Q.    Okay.  Infinite --

13       A.    Campus.

14       Q.    -- Campus, yeah, can you

15  describe for me, like, what, what that

16  is?  Is that an app, or?

17       A.    Infinite Campus, so, it's

18  referred to as a SIS, that's an acronym

19  for student information system.  It has

20  everything in there pertaining to student

21  information.  So, medical records,

22  discipline, grades, what bus they're on,

23  if they have an IEP or a 504, you can

24  find those documents in there.  So all --

1  student ID number, birthday, address,

2  emergency contacts, everything -- it is

3  your one stop shopping for all things

4  student information; hence the name.

5       Q.    Is it -- I mean, so I've

6  never seen this Infinite Campus, so I'm

7  just my questions now are gonna kind of

8  be to try and figure out, like, what that

9  looked like and describe it to somebody

10  who had never seen that -- I mean, is it

11  something on a computer that -- like,

12  in -- I know it's SIS -- like, an app

13  that someone can enter and then there's

14  folders that you can go into from there?

15       A.    There are tabs.  So, let's

16  say I put -- Laura Laughlin was a student

17  at our school.  I could type in your name

18  in the search bar.  If I'm a teacher, I

19  can look on my roster, see your name and

20  click on it.  And then there are tabs

21  across the top.  I would see your

22  picture, your demographic information,

23  there are flags for a student, for

24  example, that has an IEP.  And then you

1  can click on the different tabs,

2  transcript, grades, behavior, bus, you

3  know, all those things.  So, it's really

4  just a database and a warehouse for all

5  those things.

6       Q.    When you say that there's a

7  behavior tab, what does that entail?

8  What's on the behavior tab, or what can

9  be on the behavior tab?

10       A.    Any time a student was

11  involved in a infraction that was written

12  up by a teacher or staff member, that

13  would be whether they're the victim or

14  the perpetrator.  I would say even if

15  someone is tagged, and I mean that in a

16  sense that you would tag on social media,

17  so when you write it up, you can add

18  students to the incident itself.  So if

19  you had been written up for seven times

20  over the course of this year, let's say

21  for class cuts, technology use and

22  tardiness, I would be able to open your

23  discipline tab -- or, behavior tab, I'm

24  sorry, and see that you had seven

1    incidents, I can click on each incident
2    and read the details that are provided.
3          Q.    Okay.
4          A.    Only certain people have
5    access to that, of course.
6          Q.    Who has that -- sorry, go
7    ahead.
8          A.    A teacher does not have
9    access.  They have access to write a
10   student up.  They don't have access to
11   look at the historical data of a
12   student's discipline.  So,
13   administrators, counselors, anyone who
14   would need that data to support the
15   student and -- but I would not say -- a
16   teacher cannot click on Laura Laughlin's
17   tab and see, oh, she cut class last year.
18         Q.    Okay.  So when you say
19   administration can, that's including,
20   like, the middle level people?
21         A.    Yeah.
22         Q.    And that -- does that
23   include principals too?
24         A.    Yes.

1    Q.    Is there anything in

2  Infinite Campus that allows you to, like,

3  track certain things?  For example, a

4  student who has multiple similar

5  instances of misconduct, is there

6  anything in that system that allows you

7  to be able to track that in some way?

8    A.    Yes.

9    Q.    Can you tell me about that?

10    A.    Sure.

11          I mean, if you asked me how

12  many times theft occurred in a specific

13  building, I could absolutely pull a

14  report, develop an ad hoc report.  I'll

15  use Gwynedd Square Elementary as an

16  example.  I could pick Gwynedd Square, I

17  could pick which discipline incidents I

18  am interested in looking at, whether it

19  be a snapshot or longitudinally, and I

20  could see what the data indicates.  And

21  of course, I just described what it looks

22  like for a student themselves.  If you go

23  in there, you can look year-by-year of

24  their infractions.

1    Q.    Okay.  So you're saying if

2  you -- if I went into ███████ ███████

3  file, I'd be able to pull, like, a report

4  of, you know, what his infractions were,

5  how many times he was -- gotten in

6  trouble for a particular thing, is that

7  what you're saying?

8    A.    I am.  Assuming those

9  incidents occurred within a timeframe in

10  which we actually documented electrically

11  behavior, yes.  So if I look at a student

12  now, I could see incidents that have

13  happened -- for a high school student,

14  let's say it's a tenth grader, I couldn't

15  probably -- right now, I could go back to

16  20 -- I'm going to say '16/'17.

17    Q.    Is there anything, though,

18  because those are situations that you're

19  saying that an administrator would go in

20  and type in and be able to run that

21  report --

22    A.    Mm-hmm.

23    Q.    -- is there any way to be

24  able to, to, like, keep track of whether

1 somebody is, like, re-offending, you

2 know, doing sexual misconduct on another

3 student, like, is there any way to track

4 that without having to actually go in and

5 run that report?

6          MS. JORDAN:  Note my

7    objection to the form of the question.

8          You can answer.

9          THE WITNESS:  So, I'm going

10    to answer the question from a

11    pragmatic approach, in that if -- when

12    I was a principal, if a student was

13    written up or involved in, let's say a

14    fight, and then I went into the system

15    to assign consequences to that

16    student, organically, when you go in

17    to do so, you see their list of

18    events.  So, I think us and every

19    educational institution on earth has a

20    progressive discipline approach.  So

21    if a kid brings out their cell phone,

22    you may give them a warning, and

23    another warning, and then they get a

24    detention, and it's not stopping.

1    Discipline is -- the intention of

2    discipline is to deter behavior.  So

3    the stakes get higher and higher if

4    the discipline's not working.  So, if

5    you were involved in your third fight,

6    and in during your second fight you

7    got suspended for three days, I would

8    see it when I am going into the system

9    and say, oh, this is Laura's third

10   fight, okay, well here are her

11   consequences.

12            So, is there any way, yes.

13   When you go in and look at that

14   student, you see them.

15   BY MS. LAUGHLIN:

16       Q.   Okay.  I want to get back to

17   the different roles, how you were kind of

18   describing for me who they are.

19            What about for the, the

20   Title IX coordinator, what is their,

21   their role in the district?

22       A.   So, I would say, from a

23   principal's lens, their role is they

24   receive, investigate and eventually make

¹ a determination or ruling on any incident

² that is reported to them.

³     Q.    When you say 'any incident

⁴ reported to them', is there certain

⁵ incidents that, to your understanding,

⁶ the district has setup that the Title IX

⁷ coordinator is receiving?

⁸     A.    Could you ask that question,

⁹ again, please?

¹⁰     Q.    Sure.

¹¹     What types of incidents

¹² are -- is the Title IX coordinator at the

¹³ district supposed to receive?

¹⁴     A.    Yeah.  Specific -- I believe

¹⁵ it's outlined in that policy.  So I can't

¹⁶ cite all of them.  But --

¹⁷     Q.    When you say "that policy",

¹⁸ what are you talking about, what policy?

¹⁹     A.    I think it's Policy 103.

²⁰ Policy 103, discrimination/Title IX, any

²¹ incidents that fit the definition as

²² described in that policy.  But I would

²³ say that any time something is reported

²⁴ to our administrators, I would --

¹ regarding sexual harassment, gender

² discrimination, inappropriate contact, I

³ would expect that they report it to the

⁴ Title IX coordinator.

⁵        Q.    When you say "they", I think

⁶ you were talking about the principals,

⁷ because that's the lens you were

⁸ answering the question in?

⁹        A.    Correct.  So such events

¹⁰ would typically be reported to your

¹¹ principal.

¹²        Q.    Okay.  And the -- you said

¹³ the Title IX coordinator's responsibility

¹⁴ is also to investigate those incidents.

¹⁵ Can you be more specific in that.  Are

¹⁶ they actually the ones doing the

¹⁷ investigation?

¹⁸        A.    Yes.  So I think the, the

¹⁹ principal or the assistant principal.

²⁰ The administrator in the building would

²¹ receive the initial report.  At this

²² stage, we would expect them to report it

²³ to the Title IX coordinator, and Title IX

²⁴ coordinator takes over at that point.

1  So, it is fair to say that the principal

2  might have investigated initially, to get

3  to the point that they categorize the

4  incident as something they shouldn't

5  report.  So, a principal might do a bit

6  of an investigation and then they would

7  head to the Title IX coordinator.  And at

8  that point, they take over.

9         Q.    They would take over from

10  the principal?

11         A.    Yes.

12         Q.    When you say that -- I mean,

13  when a principal receives a report that

14  somebody says, I was, like,

15  inappropriately sexually touched by

16  another student, and that's the

17  disclosure a student makes, is it at

18  that point they should report it to the

19  Title IX coordinator, or is it once a

20  principal -- like, because you kind of

21  talked about, like, does their own

22  investigation and then would report it.

23  Can you help me understand when exactly

24  the report should be made where the Title

1  IX coordinator should be made aware under
2  the district's policies?
3         A.    That's a good question.  I
4  would say that any time something is
5  reported, there is, at least on the
6  periphery, an investigation that takes
7  place, a conversation with someone.  So
8  you might get a report from a tip line or
9  an e-mail where somebody says they saw
10  something.  I would expect that the
11  administrator involved would look into
12  it, and when, at that point, they
13  determine that this could be classified
14  as a Title IX infraction, then it should
15  be reported.
16         Q.    What about if the report
17  from the student, the disclosure from the
18  student is that they were sexually
19  inappropriately touched, I mean, at that
20  point is there enough for that
21  administrator that they're supposed to go
22  to the Title IX or figure that out more
23  before going to Title IX?
24         A.    I think -- I'll get to the

1  direct answer, but I think, in an

2  educational environment where you have

3  kids as young as five all the way up to

4  18, there are lots of things that are

5  reported, and certain things, you know,

6  obviously, you have to triage at times.

7  When you're the principal of a building

8  with 3,000 students in it, there are

9  incidents that occur -- all kinds of

10  incidents that occur in every classroom

11  every day, whether it's a student calling

12  out or driving inappropriately in the

13  parking lot.  So I do think, when

14  something is alleged, that someone

15  touched me inappropriately in this

16  hallway at this time, I would expect our

17  administrators to -- and they believe

18  that to be credible, which I'm sure there

19  will be follow-up question to, they will

20  report it immediately, and I would think

21  that the Title IX coordinator would

22  advise that administrator right away,

23  okay, let me look into this, I'll be in

24  touch about next steps.

1    Q.    Okay.  So just to be clear,
2  if it is something -- because I know you
3  talked about there's, like, minor
4  infractions, like, oh, you know, a five
5  year old pushing another five year old in
6  the playground or something, compared to
7  something a high school student saying,
8  you know, another student sexually
9  inappropriately touched me, in the latter
10 scenario, you would expect that once that
11 report is made that that would
12 immediately be communicated to the Title
13 IX coordinator of the district; is that
14 correct?
15   A.    Yes.  Assuming that the
16 student reported it as you're suggesting,
17 that would absolutely be my expectation.
18   Q.    And you said -- I know you
19 said that the Title IX coordinator in the
20 district, they're the ones that are
21 completing these investigations when it
22 involves, like, an allegation of sexual
23 harassment or assault, right?
24   A.    Yeah, that's correct.

1    Q.    Are they actually the

2  ones -- investigation's kind of a broad

3  term, so I just want to make sure I'm

4  understanding correctly -- are they

5  actually the ones, like, interviewing the

6  witnesses and compiling documents and

7  things of that sort?

8    A.    Yes.  Once it gets to the

9  Title IX coordinator, I do believe that

10  they're the person actually conducting

11  the interviews, sitting down with the

12  families of the students or the

13  employees, yes.

14    Q.    And then you said the

15  third -- you said they receive the

16  report, they investigate the report and

17  then they make a determination; is that

18  right?

19    A.    That's correct.

20    Q.    Can you explain for me what

21  you mean by, after they investigate, they

22  make a determination.

23    A.    Sure.

24        Certainly, depending on the

1   intricacies of the incident, they've done
2   their interviewing and they've drawn a
3   conclusion, then if there were going to
4   be consequences for an offender, supports
5   put in place for a victim or somewhere in
6   between or beyond, that person would
7   identify the next steps.
8           Q.    The -- when they're reaching
9   conclusions and coming up with any
10  supports or discipline, is that all
11  within the responsibility of the Title IX
12  coordinator?
13          A.    Yes.
14          Q.    Like, selecting the
15  discipline that would be given, whether
16  it's to a student or faculty, in those
17  scenarios?
18          A.    It's, it's fairly cumbersome
19  or ambiguous question because it really
20  does depend, I believe, on the
21  conclusions drawn and because of, like I
22  said before, there's progressive
23  discipline.  It depends on the
24  infraction.

1   Q.   Well assuming that -- I

2   guess it's -- let me just clarify the

3   question -- assuming that discipline is

4   going to be implemented, whatever the

5   findings are, that discipline is going to

6   be given, let's say to a student, is that

7   the Title IX coordinator's decision and

8   responsibility as to assigning that or

9   what that's going to be?

10   A.   I think, making a

11   determination and drawing a conclusion, a

12   hundred percent, yes.  They determine the

13   outcome or the conclusion.  I, I think

14   it's reasonable to expect that the

15   discipline for the student could be done

16   in collaboration with the principal due

17   to the progressive nature, as previously

18   discussed.

19   Q.   And just to clarify, when

20   you were discussing what the Title IX

21   coordinator's role is and all the

22   information you just gave me, is that

23   true from the period of 2014 up through

24   the present, or has that changed at all?

1      A.    Could you ask that one more

2 time, please?

3      Q.    Sure.

4          I'm just trying to clarify

5 the descriptions that you gave me about

6 the Title IX coordinator's role for the

7 district, has it been the same from what

8 you described from 2014 through the

9 present?

10      A.    To my knowledge, yes.

11      Q.    When you say that the Title

12 IX coordinator is the one reaching

13 conclusions and kind of sounds like

14 coming up with a summary of everything

15 that's happened, like what the

16 investigation found, what it consisted

17 of, what the conclusion is from that

18 investigation and what the next steps are

19 going to be, is that something that the

20 Title IX coordinator is expected to

21 document in some type of report?

22      A.    Yeah.  So that policy that I

23 reference, 103, there are attachments,

24 and those attachments include the forms

1  to be completed by the accuser, and I

2  believe -- I'd have to reference the

3  policy -- what the output is, what the

4  form looks like.  It could be a narrative

5  and a summary of the investigation and

6  the ultimate conclusions.

7        Q.    Do you -- I guess -- do you

8  know whether there is an actual report,

9  regardless of, like, whether it's in a

10 form that, you know, they're filling out

11 or something that they type up on a

12 document, do you know whether, for a

13 Title IX investigation, once it's

14 concluded, whether, in the district,

15 there's an expectation that a report

16 summarizing the investigation and the

17 findings be made?

18        A.    Yes.  I believe that's the

19 expectation.

20        Q.    And once -- where is that

21 report documented or saved?

22        A.    I think that depends on the

23 type of infraction.  If it's a staff

24 member, I would assume that it's in the

1  personnel file.  If it's a student's

2  infraction, I would assume it goes into

3  the student's cumulative folder.

4          Q.    And is that the folder

5  that's in Infinite Campus?

6          A.    No.  There are documents in

7  Infinite Campus that contain information

8  that is also in a student's cume folder,

9  such as grades, custody notifications,

10 evaluation reports for special education,

11 those types of things.

12         Q.    What is a -- you said a

13 student cumulative folder, sometimes you

14 refer to a student cume folder --

15         A.    Mm-hmm.

16         Q.    -- where is that kept?

17         A.    So if a student matriculates

18 through North Penn and they graduate,

19 that folder is at the high school for a

20 couple of years and then they get stored

21 at a location.  I actually don't know

22 where it is.  I know the company's called

23 Iron Mountain and they do a lot of record

24 storage.  But yeah, so the cume folder --

1 again, as I said, evaluation reports,

2 attendance, transcripts, grades, IEPs,

3 things like that would be in a student's

4 cume folder.  But they're -- now, in

5 2021, things like discipline and such are

6 in the computer.

7       Q.    In the cumulative folder, is

8 it a paper, like, folder?

9       A.    Yes.

10       Q.    Is there any electronic

11 version of that cumulative folder that's

12 kept by the district?

13       A.    No.

14       Q.    Where is the cumulative

15 folder actually kept?  I know you said,

16 at the high school, it would be at the

17 high school until they graduate and then

18 it would go to a couple of years to

19 Iron -- whatever you just said.

20       A.    Yeah.

21       Q.    But where is that kept?

22       A.    At the school,

23       Q.    Where in -- like, for the

24 high school, for example, where is it

1 kept in the school?

2     A.    There's a vault in the main

3 office filled with filing cabinets.  It

4 would be kept in a green filing cabinet

5 in the vault in the main office.

6     Q.    When you say a vault, is it,

7 like, I mean, traditionally you see on

8 the cartoons, with, like, the lock on the

9 end of it and you can't get in there

10 unless you have a key?

11     A.    It a hundred percent looks

12 like a cartoon, as you just described it.

13     Q.    Okay.  So it's, like, this

14 literal log, like, locked away -- in a

15 cumulative folders are in?

16     A.    At North Penn High School,

17 yes.  Yes, it is a huge, heavy door.  It

18 has a, a -- what is commonly referred to

19 as a combination lock, it should be

20 called a permutation lock, on the front

21 of it, and it is -- yes, and there's only

22 a couple people that know the code to

23 that vault.

24     Q.    That was going to be my next

1 question.

2          Who are the people who know

3 the code to the vault where the

4 cumulative folders of students are kept?

5          A.    The principal and the

6 principal's secretary.

7          Q.    Why are the cumulative

8 folders of students kept under such

9 heavy, like, lock and key?

10          A.    I would say for the same

11 reason that you might put your child's

12 birth certificate in a fire box.  It's a

13 high school with a lot of kids and lots

14 of things happen, and just out of concern

15 for the safety of the records and the

16 importance, they are in a vault, a

17 fireproof vault.

18          Q.    Okay.  Are investigations of

19 misconduct, are they kept in the

20 student's cumulative folder?

21          A.    So, I believe, as discipline

22 infractions, in terms of tallies, yes,

23 details are electronic.  But there

24 absolutely is a, a purging of some items

¹ in a student's cumulative folder as they

² move from one level to the next.  The

³ folder can get very think, very thick,

⁴ when you have students in your district

⁵ for 13 years.  So they absolutely purge

⁶ some documents that could be in that

⁷ folder as they transition from elementary

⁸ to middle and middle to high.  But,

⁹ again, in 2021, such things can be found

¹⁰ in Infinite Campus in nearly every

¹¹ circumstance.

¹²        Q.    If they're, I'm sure, input

¹³ into the Infinite Campus SIS --

¹⁴        A.    Correct.

¹⁵        Q.    -- right?

¹⁶        A.    Correct.

¹⁷        Q.    I'm trying to use the right

¹⁸ terminology.

¹⁹        A.    You are.  Great job.

²⁰        Q.    I couldn't tell you exactly

²¹ what it means, but that's okay.  I'm not

²² a tech person.

²³              But is there some type of

²⁴ district, whether it's policy or

1  procedure, on what gets purged as a

2  student moves from level to level?

3          A.    So, in literal sense,

4  policy, I don't believe there is a board

5  policy designating what is purged, no.

6  The practice, I believe -- and, and once

7  you get to high school, typically all you

8  would have in there are grades,

9  attendance and then anything specific to

10 a 504 IEP.

11         Q.    Like, if a student has an

12 IEP --

13         A.    Yeah.

14         Q.    -- that would be in there?

15         A.    You would see, I believe,

16 their IEP, their evaluation reports,

17 things such as that.  Elementary to

18 middle, and I've never been a middle

19 school principal in this district,

20 however -- or at all -- my understanding

21 is that essentially the whole file goes

22 from elementary to middle.

23         Q.    And do you know what is kept

24 in terms of student misconduct in an

1  elementary file as it goes to the meddle

2  school?

3          A.      I believe everything that

4  has been put in the file is kept from

5  elementary to middle.

6          Q.      Is there any, like,

7  instruction or training at the elementary

8  level of what is supposed to go in that

9  file, in terms of student misconduct?

10         A.      That's a good question.

11  I -- yes.  In terms of what should go in

12  the file, I would point back to what I

13  previously mentioned in terms of conduct

14  referrals, how to write them up, etc.,

15  and I believe that those papers and

16  documents would be placed in this file,

17  and this is when it was paper and pencil.

18  Now, no active process needs to exist to

19  train anyone, because they're in Infinite

20  Campus.

21         Q.      Going back to the Title IX

22  coordinator, once -- if a report is

23  created summarizing the investigation,

24  the findings, the next action steps, if

1  there are any, is that report supposed to

2  be sent somewhere; do you know?

3        A.    I believe.

4        Q.    Where does it go?

5        A.    I believe the report is to

6  be provided to the superintendent and

7  then, again, depending on who the, the

8  perpetrator or victim are.  If it's a

9  employee, it would go in the employee's

10 personnel file.  If it was a student, I

11 would expect that it would be in the

12 student's file itself, but the actual

13 discipline write up would be in Infinite

14 Campus.  So -- but in terms of the report

15 of the Title IX coordinator findings, the

16 hard copy, I know it's supposed to go to

17 the superintendent and then --

18       Q.    You said it would go in a

19 student's file; in the cumulative folder

20 for that student?

21       A.    Yes.  If there was a report,

22 I would expect that that's where it would

23 be.

24       Q.    If there was --

1     A.    But I --

2     Q.    Sorry, go ahead.

3     A.    That's okay.

4           I was going to say I am

5  generally not certain that it -- if it

6  would be placed in there, but that would

7  be my expectation.

8     Q.    Do you know if there is any

9  type of, like, practice that the district

10 is supposed to be following as to where

11 that report would be placed?

12    A.    I do not know.

13    Q.    What about in terms of if

14 there's not a final report but there's,

15 like, statements and -- whether it's from

16 students, administrators, principals,

17 teachers, where would that -- if that

18 documentation, if it's about student

19 misconduct, would that be also expected

20 to be kept in the cumulative folder of

21 that student?

22    A.    So I think that's difficult

23 to answer because of the nature of the

24 event that we are speaking about.  I

1 would expect the documents specific to

2 the employees to be in the employee's

3 folder, and any documentation teacher --

4 you know, if a teacher wrote a statement,

5 for example, I would expect it to be in

6 the teacher's file.  If students -- if we

7 had a fight at the high school and we get

8 five students to give a report, we would,

9 we would make copies of those, and it

10 would be connected to the actual security

11 report.  They're scanned in and they're

12 actually -- we have a security software

13 as well.  So it would all be -- and then

14 those things are -- the incident itself

15 and the write up and the determination or

16 the discipline outcome or the consequence

17 is Infinite Campus.  So it's really hard

18 to answer.  Certain components, I would

19 expect -- like you were describing

20 statements -- I would expect that a

21 statement from an employee would be in an

22 employee's file.  A statement from a

23 student would go in a student's file.

24          Q.    In that particular student

1  who gave the statement file?

2        A.    I could see them being

3  bundled altogether, certainly.  So in a

4  case where -- I can think of a recent

5  incident where three kids got in a fight.

6  Each of the students gave a report, and

7  I -- all three reports are in all three

8  student's files.

9        Q.    What about in terms of

10 sexual misconduct, like we're dealing

11 with here, for example, the statements,

12 investigation, stuff like that involving

13 the student who's the alleged

14 perpetrator, would you -- is there a --

15 would you expect that the documents

16 involved in that investigation and things

17 like that would be put in the alleged

18 perpetrator's student's cumulative

19 folder?

20       A.    If the student wrote a

21 statement, yes.  If the teacher wrote a

22 statement, in this case, for example, I

23 would not.  It's just -- yeah, I wouldn't

24 expect that to be in the student's

1  folder, a teacher's account.  But if a
2  student wrote a statement, I would.
3        Q.    What about in terms of --
4  well, I guess, let me ask this -- when
5  there's an investigation done that's
6  being compiled, is there somewhere where
7  the whole investigation, all the parts
8  that go into that is kept in some central
9  location?
10       A.    I would expect that to be
11 all of it, a portfolio of the incident,
12 to be kept with the Title IX coordinator.
13       Q.    With the Title IX
14 coordinator?
15       A.    Yes.
16       Q.    What does, what does that
17 mean?  I mean, they probably don't put it
18 in their briefcase and walk around with
19 it.  So where, where is that, what do you
20 mean by that?
21       A.    I would expect that the
22 Title IX coordinator would have a file of
23 the investigation and each of those parts
24 as you speak.

1      Q.    Is it, like, one file that

2 the Title IX coordinator would keep on

3 all Title IX incidents within the

4 district, or how is that organized or

5 maintained or kept?

6      A.    I can't answer that. I

7 don't look in people's filing cabinets.

8 I could hypothetically tell you how I

9 would do it, but obviously she keeps her

10 own records. I don't know how she stores

11 them. I have not opened that drawer.

12      Q.    Let me ask you this. On

13 behalf of the district, is there any

14 process that is expected on how --

15 because ultimately it's -- you know, the

16 Title IX coordinator works for the

17 district -- it's how the district is

18 keeping documents and categorizing

19 pertaining documents. So is there some

20 type of practice or policy in the

21 district on how those, you know, files of

22 these investigations and statements and

23 findings is, is kept?

24      A.    So, we have had several

1  trainings in my time here in North Penn

2  where Mr. Somers has spoken to the

3  administrative team as a whole and talked

4  about recordkeeping and documenting and

5  the importance of keeping them, and I'm

6  aware of the fact you referenced earlier

7  in this conversation you met with Dr.

8  McCue yesterday, and she was certainly a

9  part of all of those trainings.  So is it

10  the expectation that upon investigation

11  and documentation and then ultimate

12  reporting, if there's discipline of a

13  teacher and so forth, that she would keep

14  all of that, absolutely.  How she

15  specifically does that, my guess would

16  be -- and again, this is me -- this is my

17  expectation -- would be that she has an

18  ultimate finding, she writes a report,

19  and then all the supplemental

20  documentation that led her to that

21  finding is all kept in a folder, and I am

22  sure that she files them somewhere.  But

23  we've had training specific to

24  documentation in special education cases,

1 in discipline cases and the importance of

2 documentation when it comes to student or

3 employee discipline.

4          So yes, there is an

5 expectation, which was your question.

6      Q.    That it's kept and

7 documented in some capacity, right?

8      A.    Yes.

9      Q.    Because you said through the

10 trainings and stuff like that, the

11 trainings have told everybody that it's

12 really important to document and retain

13 information like that; is that correct?

14      A.    Yes.

15      Q.    But to be clear, the

16 district doesn't have a practice or

17 procedure of, this is how those

18 documents, meaning student misconduct

19 involving inappropriate touching, sexual

20 misconduct, sexual harassment, should be

21 kept; is that correct?

22      A.    I don't believe that I said

23 that.  But in a, in a district with -- a

24 large organization, we do not tell people

1  how to keep their records.  Certainly, we
2  stress the importance and provide
3  training on documenting and keeping
4  records, but in a literal sense, how
5  those records should be kept, I don't
6  believe someone has been directed.  But I
7  am sure the Title IX coordinator can tell
8  you how they keep those records.
9       Q.    When you say that there's
10 training on documenting and keeping
11 records, what exactly is the training?
12 Like, what's the instruction?  Is there a
13 PowerPoint, or?
14      A.    So, Mr. Somers has been the
15 district solicitor for quite a while,
16 during the entirety of my time here at
17 North Penn, and I would say two to three
18 times a year he comes and presents to our
19 administrative team and, on occasion,
20 presents in schools.  And I can recall,
21 on many occasions, him explaining to our
22 administrative team, talking through
23 discipline areas and case law and then
24 explaining how to handle and what to do

1 and the importance of documentation

2 throughout and, and giving examples of

3 where there has been some liability as a

4 result of not documenting.

5          So, I cannot, right now,

6 point to a specific training, but I am

7 100 percent certain that we have been

8 told on numerous occasions the importance

9 of documentation and recordkeeping.

10     Q.    When you say that, in these

11 trainings, one of the topics you discuss

12 was liability as a result of not

13 documenting -- is that correct, that you

14 said that?

15     A.    I did.

16     Q.    Are those within the North

17 Penn School District?

18     A.    I'm gonna have to ask you to

19 rephrase the question.

20     Q.    The --

21     A.    I don't know what you're

22 asking.

23     Q.    The situation that you

24 talked about about liability as a result

1  of not documenting, are they cases that

2  involved the North Penn School District

3  that was discussed?

4         A.    No.  So the context in, in

5  my answer was he gives trainings and

6  provides case law of examples of how and

7  why we should and examples of why

8  there's -- or, when there's liability as

9  a result of not.  So, he -- typically I

10  would say they are Supreme Court cases,

11  whether it's state or federal.  So we go

12  over, again, at least annually, in most

13  cases more, recent case law and examples.

14  So, I wasn't speaking specifically to

15  North Penn.

16         Q.    I'm going to ask you, I

17  guess, specifically about North Penn,

18  then.

19              In any of these trainings

20  over the years, has there been discussion

21  of incidences that happened at North Penn

22  and whether that was the right way to do

23  it or wrong way to do it, in terms of,

24  like, documentation, student misconduct

1 and the like?

2      A.    So I believe your question

3 was was there ever any discussions.  I

4 would say there were not discussions led

5 by Mr. Somers.  Being the consummate

6 profession that he is, he would typically

7 say things like, for example, in a

8 district, I experience da da da da da or

9 I worked with an administrator, and then,

10 as you would in any team environment,

11 principals might raise their hand and

12 say, well I dealt with this one time.

13 But I cannot, I cannot recall a time

14 where we pointed -- excuse me -- where

15 Mr. Somers, directly in his training,

16 pointed to something at North Penn.

17      Q.    What about maybe not with

18 training with Mr. Somers.  But generally,

19 at the administrative meetings that

20 you've been part of over the years, have

21 there been times that at that meeting or

22 the, like, a review or discussion about

23 situations that had happened at North

24 Penn?

1    A.    Yeah.  That's fair to say.
2  But I don't believe anything as -- what's
3  the right word -- sensitive.  So for
4  example, when I was high school principal
5  there was a fire at the high school and
6  somebody -- it was an arsonist.  So we
7  absolutely, as a full-fledged
8  administrative team, got together and
9  discussed and learned from and debriefed,
10  and one of our board members uses the
11  term hot-washed.  So we got together and
12  kind of broke it down from start to
13  finish what we could have done better,
14  what worked well, what didn't.  But not
15  something so sensitive as a, a individual
16  student's case.  I would say --
17    Q.    What --
18    A.    -- just larger scale
19  situations.
20    Q.    What about for sexual
21  harassment or sexual misconduct, has that
22  ever been discussed, or is that in the
23  category of, like, as you said, too
24  sensitive that you wouldn't discuss at

1 these meetings?

2      A.    So the original question was

3 about specific incidents, and I don't

4 know that I can recall us discussing a

5 specific incident that occurred in North

6 Penn.  Have we, however, had training

7 related to say, Policy 103, absolutely,

8 yes.

9      Q.    How often is that training

10 done on Policy 103, like you're

11 referencing?

12      A.    I believe -- so Policy 103

13 was just adopted in -- I'm going -- I

14 could be wrong -- I'm going to say

15 November of '19.  Again, that was

16 provided.  Which was obviously a revised

17 policy.  It pertained to a policy that

18 was previously in existence.  But as we

19 were going through the comprehensive

20 policy review process, Mr. Somers has

21 probably come in three or four times to

22 go over pertinent policies, and I would

23 say that Policy 103 has been discussed

24 twice in the last two years.

1  Q.    When you say policy -- well,
2  I guess, are you talking about the times
3  Mr. Somers has come in, you said two to
4  three times, is that over the course of,
5  when?
6  A.    I believe he comes -- we do
7  legal update with our administrative team
8  at least once a year.  Most years, I
9  would say it's twice.
10  Q.    How --
11  A.    And -- go ahead.
12  Q.    No, go ahead.  I'm sorry.
13  A.    So, this policy, in
14  particular, I would say we've discussed
15  twice in the last two years with a full
16  administrative team.
17  Q.    How often are those legal
18  updates, do they include Title IX
19  coordinator and sexual harassment?
20  A.    Aside from twice in the last
21  two years, I can't recall.
22  Q.    Can you estimate for me how
23  many times?
24  A.    In my time here at North

1  Penn, I would say we've spoken about

2  those types of incidents as a full

3  administrative team four times.

4       Q.   Okay.  Since 2015, because

5  that's when you're saying you came to the

6  district?

7       A.   Yes.

8       Q.   When you say --

9       A.   Again, that's an estimate.

10       Q.   I understand.

11            This Policy No. 103, you

12  just said, was implemented in November of

13  2019?

14       A.   Do you mind if I look at the

15  policy?

16       Q.   Sure.

17            And are you looking at, are

18  you looking at a bates number?

19       A.   Yeah, hold on.  It would say

20  at the top when it was adopted and when

21  it was revised.

22       Q.   Okay.  And when you get to

23  that, if you could just let me know the

24  bates number, so I can understand what

1  you're referring to.

2      A.    Of course.

3            If I have it here.  I can

4  certainly find it online and share my

5  screen with you here.

6            So the -- for the old policy

7  versus the new is dramatically different.

8      Q.    Why is that?

9      A.    So the old policy, welfare,

10 harassment procedures, they're a couple

11 policies that relate, I think, but 4316,

12 5150A, I would point to specifically.

13 But --

14     Q.    Is there a bates number that

15 you're referring to, like, at the bottom

16 of the page?

17     A.    Yeah.  So, 1049.  I think

18 there's some pages immediately adjacent

19 to.  Do you mind if I look at the policy

20 online?

21     Q.    No, not at all.

22     A.    Okay.  Shouldn't take long.

23            So, at the top of Policy

24 103, which is publicly available, it was

1   adopted on November 19th, 2020, last

2   revised in April of 2021.

3        Q.   Okay.  And so, just so I'm

4   making sure I understand, where is Policy

5   103, it's on the district's website?

6        A.   Yes.

7        Q.   Okay.  And what is the title

8   of that policy?

9        A.   Discrimination/Title IX

10  sexual harassment affecting students.

11       Q.   Okay.  And are you saying --

12  just to make sure I'm understanding what

13  you're describing -- prior to November

14  2020, because that's when 103 came into

15  play?

16       A.   (Nodding.)

17       Q.   Yes?

18       A.   Mm-hmm.  Sorry, I thought

19  there was more to the question.

20       Q.   No.  That was my question.

21       A.   Yes.

22       Q.   The -- was the -- what's now

23  103, was that 5150 prior to that time?

24       A.   So, yes, 5150A.

1    Q.    Okay.

2    A.    I believe.  So, through the

3 policy review process, our current board

4 began -- I'm going to say we're

5 approaching, embarrassingly, three years

6 ago, it takes an awful long time to get

7 through so many policies, but we switched

8 to PSBA, which is Pennsylvania School

9 Board Association, and they do -- they

10 provide advisement on policies, and they,

11 I'd say, triangulate our policies and

12 practices from handbooks and existing

13 policies and kind of combine them.  So

14 it's hard to say that this policy was

15 exchanged for that policy, because many

16 times it's pulling from multiple to

17 consolidate.  But Policy 5150A, is it my

18 belief, that it most closely aligns with

19 the current Policy 103.

20    Q.    Is -- was 5150A, was that,

21 like, repealed, or is that still

22 currently a district policy that's in

23 effect?

24    A.    I believe it was repealed.

1        Q.    Okay.

2        A.    I can look, but I believe it

3   was repealed.

4        Q.    Is there --

5        A.    Sometimes --

6        Q.    Sorry, go ahead.

7        A.    -- there are little

8   components of policies that need to

9   remain because they're not covered in a

10  newly adopted -- like, we haven't adopted

11  the next policy yet.  So we need to leave

12  it because of this little paragraph out

13  of seven pages.  So -- but I do believe

14  that that policy has been repealed,

15  5150A.

16       Q.    Is -- the rest of the 5150,

17  I think there's, like, a B and C, do you

18  know whether they were repealed as well

19  in this -- do you know if they were

20  repealed as well?

21       A.    I'd have to look.

22       Q.    Where could you -- sorry, go

23  ahead.

24       A.    So, through the policy

1   review process, I have charts of which

2   policies were adopted, which policies

3   were repealed.  They're also reflected in

4   the minutes from our school board

5   meetings.  So it's an action item each

6   month, which policies we're adopting and

7   which ones we're repealing.

8           Q.    Is that readily accessible

9   to you, to find out if that was -- those

10  policies were repealed and, I guess, in a

11  sense, 103 is the relevant policy?

12          A.    Give me a moment to try to

13  answer that.

14              So, I can tell you that when

15  drafting Policy 103, the notes that I

16  have from PSBA, the policies that they

17  referenced in writing Policy 103 was

18  1251, 4316 and 5150.

19          Q.    Okay.

20          A.    Specifically what was

21  repealed, I could -- whether or not that

22  policy was repealed, I can probably get

23  that in a moment or two, if you would

24  like me to try.

1      Q.    Yeah.  I mean, I -- if
2  you're able to.  If it's easily
3  accessible and it will only take a moment
4  or two, I think that would be good to
5  find out.
6      A.    I don't think I'll be much
7  longer, hold on.
8      Q.    Okay.
9      A.    The website --
10     Q.    Take your time.
11     A.    The website does not appear
12  to be cooperating.
13     Q.    Is it the district's website
14  that you're on?
15     A.    Yeah.
16           Oh, you know what, I might
17  know.
18           Okay.  It does appear that
19  5150 is repealed.
20     Q.    What about the other two
21  policies that you had referenced, I think
22  one was 4316, which is administrative
23  regulation, and one more, were they
24  replaced by 103 as well?

1    A.    You -- I'm sorry, you said

2  41 -- I have to --

3    Q.    I thought it was 4316.  The

4  other -- when you had went over 103, you

5  referenced three different policies.

6    A.    Yes.  It doesn't appear that

7  that policy is still in existence.

8          And what was the other?

9    Q.    I forget what the third --

10  I'm not ever sure what it -- what the

11  policy was for, but you referenced three

12  different numbers.

13    A.    I can look.

14          1251.

15    Q.    Do you have 1251 is for,

16  what policy that is (sic)?

17    A.    Nondiscrimination on the

18  basis of disability.

19    Q.    Okay.

20    A.    That one does still exist.

21    Q.    Okay.

22    A.    But again, these were

23  policies that were referenced in drafting

24  Policy 103.

1    Q.    Okay.  And then 103 replaced

2  those three -- well, two of the three

3  policies?

4    A.    Maybe not in their entirety.

5  They -- it has since been repealed, I

6  know that.

7    Q.    Okay.

8    A.    I don't know that it was at

9  the same moment, though.

10    Q.    Do you know when 5150 was

11  repealed?

12    A.    I don't.  Again, I could

13  find it, but it wouldn't be quick.

14    Q.    Okay.

15    A.    I'd have to go back through

16  board minutes and look.

17    Q.    Are the -- the board

18  minutes, where are those kept?

19    A.    On the website.

20    Q.    They're all public?

21    A.    Yes.

22    Q.    What about the discussions

23  in terms of, like, why they're repeating

24  5150 and implementing Section 103, would

1    that be contained in the board minutes as

2    well?

3         A.    Notes, minutes are taken.

4    So if you go to the following month, you

5    can look at the minutes that were

6    approved.  But perhaps, simply, would be

7    all of our meetings are recorded and on

8    the website.  So, you could find our

9    YouTube channel and watch meetings.

10        Q.    Do you know -- happen to

11   know what meetings where 103 or 5150 were

12   discussed?

13        A.    If there was discussion --

14   so, at a typical policy committee

15   meeting, we could have ten policies that

16   go before the committee, and then the

17   committee -- the way the committee

18   structure works is the committee makes a

19   recommendation to the full board.  So, if

20   we discussed it in a policy committee

21   meeting, it would have been two months --

22   at least two months, maybe three, prior

23   to when it was adopted.

24        Q.    Okay.

Todd Bauer

1    A.    So if it was adopted in
2  November 2020, I would expect that we
3  discussed it in August of 2020.
4    Q.    Would you have been at those
5  meetings?
6    A.    Most likely.
7    Q.    Do you recall any discussion
8  about the 5150 or the 4316 being repealed
9  and 103 being implemented or drafted?
10    A.    I am certain that we
11  discussed with counsel.  We review every
12  policy with Mr. Somers and with the chair
13  of that committee behind closed doors.
14  Whether or not we discussed it publicly,
15  I've been to hundreds of school board
16  meetings, I don't recall.
17    Q.    Do you know whether in the
18  discussions about those particular
19  policies, whether any discussion about
20  this case was entered into?
21    A.    I don't.  I don't recall.
22    Q.    Do you know whether those
23  policies and the changing of policies,
24  repealing policies, do you know whether

1  any of that had anything to do with this

2  case?

3        A.    I can't answer that question

4  with confidence.  We were going --

5  reviewing all of our policies to begin

6  with.  Do I think that this case

7  occurred, and we said, oh, let's jump to

8  Policy 103, no, I don't believe we did

9  that as a knee jerk reaction.  I do think

10  they were -- timing-wise, they coincided

11  fairly closely.  In terms of a policy

12  process, which takes years, I think they

13  were in close proximity.  But I don't

14  think it was a knee jerk reaction as a

15  result.

16        Q.    What about in terms --

17  sorry, go ahead.

18        A.    I was just gonna say I

19  thought it -- I think it was part of our

20  comprehensive process.

21        Q.    Okay.  So are you saying

22  that -- you're saying knee jerk reaction,

23  but there can also be a over time

24  reaction, you know, that's not maybe knee

1  jerk and, you know, we have to do

2  something immediately kind of thing.  Do

3  you know whether there was ever, as part

4  of the discussions, a longer process

5  reaction of making sure to implement the

6  issues that came up in this case into

7  those policies?

8        A.    The question is, do I know;

9  I don't, I'm not certain.  I am sure that

10 we have learned from this case, and I am

11 sure that we have had discussions with

12 Mr. Somers about how we can do things

13 better.  I can't specifically point to

14 when it comes to the policy development

15 of Policy 103.

16        Q.    When you say that you're

17 sure that "we", meaning the school

18 district, has learned from this case?

19        A.    Mm-hmm.

20        Q.    Yes?

21        A.    Yes.

22        Q.    Sorry.  All the answers need

23 to be verbal, just because of the, the

24 actual transcript.

1          What -- when you say we,
2    meaning the district, has learned from
3    this case, what did you learn, what do
4    you mean?
5          A.    Just referencing some of the
6    conversations that you and I have had
7    this morning, in terms of documentation,
8    professional development, that every
9    incident that happens in the school
10   district, on a daily basis, we learn
11   from.  So, I believe we have learned.
12   Specifically?  I'm not citing anything
13   specific.  I'm just saying I believe that
14   we have learned, and I, I think out
15   policy -- Policy 103 is stronger than
16   Policy 1250 and Policy 5120 and 4136, I
17   believe were the numbers -- 4316.  I
18   think I switched them there, but.
19         Q.    But what specifically have
20   you learned?  You said, generally,
21   documentation, professional development.
22         A.    I assume your questions will
23   lead us there eventually, but I think
24   there was a specific notification that

1  was referenced in some of these documents

2  and the student's profile screen about

3  her schedule could not change without the

4  permission of.  Those types of things.

5  Our practice and procedure, I think, have

6  changed, and we have learned.

7  Q.  I mean, I, I know what

8  you're talking about, with the alert that

9  was placed on ▆▆▆▆▆▆ schedule.

10  A.  Sure.

11  Q.  What have you learned about

12  that, what do you mean?

13  A.  That was not a tool that was

14  utilized prior to that incident.  So that

15  is an example of something that we have

16  learned.  We actually explored -- as a

17  result of this, we explored with the

18  vendor whether or not something like that

19  is -- the system was capable of it, and

20  we learned that it is.  So now that's a

21  tool that is utilized.

22  Q.  What other documentation?

23  That was one of the examples that you

24  used in terms of what did you learn

1 things from this, this case and

2 documentation, like we've discussed.

3 What do you, what do you mean?

4     A.    I think it's fair to say

5 that as a result of a lot of our

6 trainings, that are principal -- so, I'm

7 speculating that we had a training from

8 Mr. Somers about Policy 103 in -- I'm --

9 February of 2021, if it was adopted in

10 November of 2020.  I could, again, find

11 that answer.  But I believe that our

12 administrators were doing a better job

13 recordkeeping and have received

14 professional development on the forms

15 that have been provided.  So yeah, I

16 think we are better today than we were

17 yesterday or five years ago.

18     Q.    When you say that they could

19 have done a better job recordkeeping,

20 what do you mean?

21     A.    I don't recall saying they

22 could have done.  I said we do a better

23 job now because of the forms and the

24 documents that need to be completed.

1    That's what I mean.

2           Q.    When you say because of the

3    forms and documents that need to be

4    completed, is there, like, different

5    documents or forms that now have been

6    implemented by North Penn?

7           A.    So the forms that were

8    attached to that policy itself have --

9           Q.    To 5150?

10          A.    No, to Policy 103.

11          Q.    Okay.  Those are new forms

12   that were implemented?

13          A.    I believe --

14          Q.    Okay.

15          A.    Yes.

16          Q.    Sorry.

17          A.    Yes, I believe so.  No,

18   that's okay.  That was my fault.

19          Q.    In terms of professional

20   development, when you say we've learned

21   things in terms of professional document,

22   what do you mean?

23          A.    I don't think I have

24   anything additional to add to that.

1  Just, when we receive professional

2  development about these policies in a

3  legal update, we had a workshop provided

4  by Mr. Somers, and at the time I believe

5  it was Dr. Diegue, specific about the

6  process pertaining to Policy 103, among

7  other policies that they were reviewing

8  that day.

9      Q.    Are there other -- other

10 than 103, are there other professional

11 development things that you're saying the

12 district has learned?

13     A.    Professional development

14 things?  I guess --

15     Q.    I think that was your term

16 that you had used.

17     A.    I guess my answer to that

18 would be no.  Nothing comes to mind.

19     Q.    What about in terms of --

20 I'm going back to the defining roles of

21 different people in the district -- for

22 principal, what is their role and

23 responsibility?

24     A.    I would say that the

1  principal's responsibility is to provide

2  a safe educational environment for all

3  students and staff, and the two most

4  important things we always say is taking

5  care of kids and educating them.  So,

6  that's a, a one-liner for the

7  responsibilities of a principal.  They

8  have everything from scheduling, to

9  emergency procedures, to supervising

10  personnel, dealing with parents,

11  community events.  You know, I think

12  every -- one of the things that's unique

13  to the filed of education is that

14  everyone has experience, everyone.  So,

15  all the things that most people know

16  happen in a school, they're responsible

17  for all of those things and more.

18       Q.    In terms of sexual

19  misconduct of a student, what role does

20  the principal have in that, if any?

21       A.    I, I think that was pretty

22  ambiguous, in terms of the role of sexual

23  misconduct.  If, if the question was when

24  something's reported to them, then I

1  would say that they would contact,

2  assuming that it falls under the

3  definition that outlined in the policy,

4  that they would contact the Title IX

5  coordinator.

6      Q.    You say assuming -- because

7  the new policy just started.  So, is

8  there a definition in 5150, you're

9  saying, assuming back then, meaning,

10  like, from 2014 to 2020, if it was a

11  definition in 5150, that it would be

12  reported?

13      A.    I think it's reasonable to

14  expect that if an administrator is aware

15  of misconduct of that nature, that they

16  should report it to the Title IX

17  coordinator or to their immediate

18  supervisor, if they are not sure.  So, I

19  think it is reasonable to expect

20  administrators to report that, if they're

21  aware, yes.

22      Q.    Do principals have any

23  responsibility for investigating Title IX

24  issues?  And when I say Title IX issues,

1  I'm talking about, like, sexual

2  harassment, sexual misconduct.

3        A.    Well, we've, we've already

4  discussed the preliminary investigation

5  to determine whether or not it is

6  something to be reported.  And then once

7  it has been reported, the expectation of

8  the administrator would be under the

9  direction of the Title IX coordinator.

10  So if, for example, Dr. McCue called me

11  when I was a principal and said, hey, I

12  need you to ask this person to write a

13  statement, I would do that.

14        Q.    But that's -- you're saying,

15  like, in that example, that the Title IX

16  coordinator would be directing the

17  principal, interview this person, talk to

18  this teacher or can you pull this

19  document for me; is that right?

20        A.    Yes.

21        Q.    When you say sometimes a

22  principal is going to do, like, a

23  preliminary investigation to see if

24  something falls within the realm of

1 needing to be reported to the Title IX

2 coordinator, how long does that typically

3 take or should it take to determine that?

4        A.    I wouldn't think it would

5 take long at all.  I mean, certainly

6 there are circumstances, right?

7 Something could happen on a Friday and

8 you're unable to make contact with the

9 family over the weekend or something like

10 that.  But I would think that a

11 determination would be very quick, within

12 that day, of that administrators.

13        Q.    Should principals be making

14 credibility determinations?  For example,

15 if somebody reports that they were

16 inappropriately sexually touched, is it

17 up to the principal to determine whether

18 or not that's believable, or should that

19 automatically be reported to Title IX,

20 for the Title IX coordinator to take

21 over?

22        A.    I think any time you're

23 dealing with children, as young as the

24 age of five, there is some discretion in

1 the fact that, so-and-so said he's going

2 to bring in a gun and shoot me in the

3 head.  Is that a reasonable accusation.

4 Were the two kids even in the same room.

5 Where a kid, he did this to me on the

6 bus, do they even ride the same bus.  So

7 do I think there's a level of judgment

8 there, sure.  But in a report that is

9 serious in nature where two students are

10 close by and it is possible, I would say

11 that we should -- we would defer to

12 reporting.

13       Q.    Okay.  I mean, you used a

14 five year old example.  I understand

15 that's a bit different than a high

16 schooler that, you know, isn't a five

17 year old.

18       A.    Right.

19       Q.    In a situation where a high

20 schooler is reporting something that they

21 were inappropriately sexually touched,

22 would you agree with me that's something

23 that a high school principal should not

24 determine credibility of and it should,

1 instead, just be reported to the Title IX

2 coordinator?

3      MS. JORDAN:  Note my

4 objection to the form of the question.

5      You can answer.

6      THE WITNESS:  Yes.  If it

7 was reported to the principal, yes.

8 If the student reported, so-and-so did

9 this to me, I have full confidence

10 that our principal would report it.

11 BY MS. LAUGHLIN:

12    Q.   And that they -- you're

13 saying, like, from the district's

14 perspective, that the -- at that point it

15 shouldn't be a credibility determination

16 for the principal, it should just

17 automatically be reported, if a student

18 in the high school had reported something

19 like that?

20    A.   If the student had reported

21 it, yes.

22    Q.   What about in terms of

23 assistant principal, what is their role?

24    A.   I said these other roles are

1 easier to describe; I'm not sure that's
2 accurate.
3         Assistant principals at
4 North Penn High School, for example,
5 there are two per grade, and I would say,
6 in many aspects, they reason a school
7 within a school.  They are responsible
8 for overseeing certain departments.  For
9 example, you might be in charge of
10 overseeing the science department, the
11 phys ed department and the tech ed
12 department.  You observe all those
13 teachers and can -- their goal meetings,
14 their evaluations, all those things.
15 Then you have a caseload of students
16 you're responsible for.  And their
17 parents and communication and school
18 activities, events like prom and things
19 like that.  So everything from
20 discipline, to teacher evaluation, to
21 student activities, to athletics, to --
22 yeah, so our principals have roughly --
23 assistant principals, I'm sorry, have
24 roughly 500 students that they supervise.

1    Q.    Do they have any

2    responsibilities, assistant principals,

3    for when sexual misconduct is reported,

4    in terms of documenting, investigating,

5    reporting to someone else?

6    A.    The only difference aside

7    from those aforementioned

8    responsibilities of a principal would be,

9    I would expect that the assistant

10   principal went to the principal first.  I

11   think that they would contact the

12   principal, and they would collectively

13   call the coordinator.

14   Q.    Okay.  I want to jump back

15   to principals for a second.

16   A.    Sure.

17   Q.    When there's sexual

18   misconduct reported at their school, I

19   know you said that should be reported to

20   the Title IX coordinator, but upon a

21   finding that sexual misconduct did occur

22   with a student perpetrating on another

23   student, do they have any other

24   responsibilities other than notifying

1  Title IX?  For example, if they're in

2  sixth grade and they're going to seventh

3  school, is there any responsibility for

4  that principal to notify the principal of

5  the middle school?

6        A.    Yeah.  I think, I think

7  that's a reasonable expectation.  If the

8  two students -- so, if I'm the principal

9  of, say, Inglewood Elementary, which is

10  one of our schools, and those students

11  went from sixth grade to seven, go to

12  Penndale Middle School, if two students

13  in that grade are going to the same

14  middle school, do I think conversations

15  occur between the administration and the

16  counselors to best provide supports for

17  that student, for students in general,

18  yes, I do.

19        Q.    What if the perpetrating

20  student is going to the next school, do

21  you still think that the principal has an

22  obligation to notify -- or, an

23  expectation that the principal would

24  notify the principal of the middle school

1  about the perpetrating student and what

2  had happened at the elementary school?

3       A.    Yeah.  That's -- I think

4  it's something that I would do.  I do

5  think it's difficult when you have, say,

6  Penndale Middle School, for example, has

7  400 kids in each grade, so over 1,200

8  students.  Do I think they sit down and

9  go over every infraction for every

10  student, I don't.  But I do think they

11  sit down and discuss students in between

12  years and discuss academic supports,

13  behavioral supports, special education

14  supports, all those things.

15       Q.    Is there any practice or

16  policy that the district puts out, or

17  trainings on, of what things should be

18  communicated from the principal of an

19  elementary school to the principal of a

20  middle school, or even middle school to

21  high school?

22       A.    Could you ask -- I got lost

23  in the details at the end.  Could you ask

24  he initial question, again.

1      Q.    Sure.

2            Is there any practice or

3  policy of the district that certain

4  things, for instance, something as

5  serious as sexual misconduct, that that

6  gets reported from level to level through

7  the principals?

8      A.    I don't know that there is a

9  formalized process --

10     Q.    Is there --

11     A.    -- in terms --

12     Q.    Sorry, go ahead.

13     A.    No.  I don't know that

14 there's a formalized process, that the

15 expectation is that you report,

16 delineated in a document of sorts.  Do I

17 think that there is a practice of

18 principals sitting down each summer, I

19 do.  I know that middle school and high

20 school assistant principals absolutely

21 sit down together, because I was a

22 principal of the high school, and

23 assistant principals would go and meet

24 with the middle school assistant

1  principals during the summer.  But in

2  terms of a formalized practice, written

3  down, I don't know that there is.  I

4  don't believe there is.

5       Q.    What about informal, is

6  there any informal direction on what

7  types of things must get communicated

8  from one level to the next?

9       A.    No.

10      Q.    When you said that -- I

11 asked you about the elementary school

12 communicating sexual misconduct to the

13 middle school, and you said that's

14 something that I would do --

15      A.    Mm-hmm.

16      Q.    -- right?

17           Yes?

18      A.    I did, yes.

19      Q.    Why, why is that something

20 that you would do?

21      A.    Well, I think we answered

22 that question in your last question.  So,

23 I don't know that there's a formal

24 process written down from the elementary

1  to the middle schools.  But I do know

2  that our principals meet to discuss

3  incoming students, and in particular, if

4  there are conflicts with two students who

5  are coming into your school, that they

6  would discuss.

7       Q.    But I think -- I mean, I'm

8  asking specifically about sexual

9  misconduct with students, and I thought

10  that your answer was that that would be

11  something that you would communicate --

12  if you -- to the next level.  I'm asking,

13  why is that, why is that specifically

14  something that you would communicate to

15  the next level?

16       A.    I'm trying to be literal

17  with your question.

18            Because I think I would sit

19  down with the middle school principal, if

20  I was the elementary school principal,

21  and I believed that I would -- as I did

22  as a high school assistant principal -- I

23  would sit down and discuss the needs and

24  concerns with students.  I believe that

1  would be on the list of things that I

2  discussed.

3       Q.    Would it be, in part, to

4  make sure or try and prevent or -- this

5  student from doing something similar at

6  the next level?

7       A.    I think the motivation

8  behind that communication is exactly

9  that.  You sit down to describe the needs

10 and supports for students, to help them.

11 So, yes, I think that's fair to say.

12      Q.    What about in terms of why

13 the other motivation behind what you're

14 saying, I would do that, is to make

15 sure that other students that the

16 perpetrator -- alleged perpetrator may be

17 around would also be kept safe; is that

18 true?

19      A.    I don't, I don't delineate

20 between your last question and this

21 question.  The motivation behind having

22 those conversations is to help support

23 students.  That's, that's the answer to

24 this question as well.

1    Q.   Would it also be, though --

2  because, I mean, to support students, you

3  know, the person who did the misconduct,

4  the sexual misconduct, you're saying they

5  would need support, or they could need

6  supports.  But I'm asking, differently,

7  not that student but the other students

8  that are surrounding that student,

9  further motivation to try to ensure that

10  those students are safe from a situation

11  that had occurred previously?

12           MS. JORDAN:  Objection,

13     asked and answered.

14           You can answer, again.

15           THE WITNESS:  Sure.

16           The motivation behind that

17     conversation that I have described is

18     to help support students and, and to

19     maintain an orderly school

20     environment.  So --

21  BY MS. LAUGHLIN:

22     Q.   When you --

23     A.   -- that's why we would meet.

24     Q.   When you say support

1  students, are you also -- because you

2  talked about, like, supporting the

3  student that was alleged to have

4  committed the conduct -- are you also

5  talking about supporting other students

6  in the school?

7      A.   Yeah.  As a principal, I

8  feel it's my responsibility to support

9  all kids, yes.

10     Q.   And how is you communicating

11 a student's prior misconduct helping to

12 support the other kids in the school?

13          MS. JORDAN:  Objection,

14    asked and answered.

15          Go ahead.

16          THE WITNESS:  I think the

17    more information --

18          MS. LAUGHLIN:  Sorry, just

19    for the record.

20          It wasn't asked and

21    answered.  This is a different

22    question.

23 BY MS. LAUGHLIN:

24     Q.   But you can answer.

1    A.    The think the more
2    information you have about students, the
3    better you can support them, and that's
4    for all kids.  So, I would want to know,
5    as the building principal, anything that
6    I could to help provide a better
7    environment for all of my students.
8    Q.    Would that include keeping
9    them safe?
10    A.    Of course.  I want to keep
11    all kids safe.
12    Q.    What about the
13    superintendent, what's the
14    superintendent's role?
15    A.    The superintendent's role
16    in, what, in particular?
17    Q.    Just, overall, do you have
18    an understanding of -- or are you saying
19    that there's so many things that -- job
20    responsibilities?
21    A.    Yeah.  I mean, so it's the
22    CEO of the organization, right?  So I'm
23    responsible for the budget, for
24    communicating with the school board, for

1  setting agendas for meetings, setting

2  expectations of employees, and that's --

3        Q.    What about in terms of

4  student misconduct, just to cut down to?

5        A.    Most student misconduct

6  infractions are handled at the building

7  level, an overwhelmingly majority of

8  them.  Something that would make its way

9  to my level is usually handled at that

10 point, and if it is egregious, the

11 superintendent would be involved.

12       Q.    Is the superintendent, are

13 they involved at all in, in Title IX

14 student sexual misconduct, sexual

15 harassment?

16       A.    So, such incidents are

17 pretty confidential.  So I don't know

18 about conversations between the

19 superintendent and the Title IX

20 coordinator.  So I can't describe what he

21 knows.  But I can tell you, in, in North

22 Penn, Dr. Dietrich is very involved in

23 many, many things.  So, yeah, I can't, I

24 can't speak to the specificity of the

1 conversation between the Title IX

2 coordinators and -- coordinator and the

3 superintendent.  But I assume he is, he

4 is aware that an investigation is

5 occurring, yes.

6         Q.    Do you know whether the

7 superintendent, just, does he have the

8 authority or the ability to talk to just,

9 say, principals and things and implement

10 things at the, the building level?

11        A.    Sure.

12        Q.    Like, he has the authority

13 to do so?

14        A.    Implement things, yes,

15 certainly.

16        Q.    Well that's pretty broad.

17 So let me be more specific as well, so

18 we're clear.

19              In terms of, like, asking

20 for a safety plan to be put in place, is

21 that something that he would have the

22 authority to do, to go to the building

23 administrator and say, hey, can you put a

24 safety plan in place for this student?

1    A.    Absolutely.

2    Q.    If a safety plan was needed

3  on a student, would you have the

4  expectation -- and the superintendent was

5  aware of that -- would you have the

6  expectation on behalf of the district

7  that the superintendent would communicate

8  that to the principal, whoever, you know,

9  would be actually able on the ground?

10    A.    Can you ask the question one

11  more time?

12    Q.    Yeah.

13         MS. LAUGHLIN:  Are you able

14    to repeat the, the question I just

15    asked?

16         THE WITNESS:  I'm not.  I --

17         MS. LAUGHLIN:  No, sorry.

18    Not you, I meant the court reporter.

19         THE WITNESS:  Oh.

20         MS. LAUGHLIN:  I know that

21    you couldn't.

22         THE COURT REPORTER:  Yeah,

23    one second.

24         MS. LAUGHLIN:  Thank you.

1      THE COURT REPORTER:

2  Question: If a safety plan was needed

3  on a student and the superintendent

4  was aware of that, would you have the

5  expectation on behalf of the district

6  that the superintendent would

7  communicate that to the principal or

8  whoever would be actually on the

9  ground?

10      THE WITNESS:  Okay.  I

11  don't, I don't know that that is

12  practical, in that -- so there's a

13  couple hypotheticals in the question;

14  if this is needed, if they knew about

15  it, would you expect.  I, I don't know

16  that a superintendent, who is involved

17  at the granular level, that this

18  student needs a safety plan.  I would

19  expect that the superintendent asks

20  questions, how are be supporting this

21  student and what do you need from me.

22  But I can't recall a time in my seven

23  years here that Dr. Dietrich has said,

24  Tod, or said principal, I would like

1    you to implement a safety plan.

2    That's something that occurs at the

3    building level, not at the

4    superintendent level.

5  BY MS. LAUGHLIN:

6       Q.    But if the superintendent is

7  the one who knows, just say, for example,

8  and the high school principal maybe

9  doesn't, I mean, does the superintendent

10  have the ability or authority to make

11  sure that that message, if that's needed,

12  gets down to where it can be implemented

13  at the school level?

14            MS. JORDAN:  Note my

15       objection to the form of the question.

16            You can answer.

17            THE WITNESS:  So the -- it

18       is my belief, wholeheartedly, that if

19       Dr. Dietrich, or the superintendent,

20       knew that a safety plan was to be

21       implemented for a student and one was

22       not implemented, I wholeheartedly

23       belief that he would set that

24       expectation and direct it to be done.

¹     But I don't think it is within a

²     normal scope of his job, for -- to

³     direct building teams to setup

⁴     individualized safety plans for kids.

⁵ BY MS. LAUGHLIN:

⁶         Q.    I want to ask you about

⁷ the -- it's my understanding there's a

⁸ director of elementary education,

⁹ director of secondary education and a

¹⁰ director of special education.  Are they

¹¹ all on the same level in terms of

¹² hierarchy?

¹³         A.    Yeah.  So there is not a

¹⁴ director of secondary.

¹⁵         Q.    Okay.

¹⁶         A.    There's a director of

¹⁷ elementary.  If you recall, we described,

¹⁸ back in 2018, that was when we had two

¹⁹ assistant superintendents.  There was a

²⁰ consolidation at that point.  So, the

²¹ director of secondary job no longer

²² existed.  I took on that role.  So there

²³ are two assistant superintendents, a

²⁴ director of elementary and a director of

1 special ed, district of curriculum,

2 director of technology, all of those

3 positions.  Would I say they are all on

4 the same level?  I think, in any

5 organization, there's a hierarchy of

6 sorts, but in general, they're all

7 cabinet level administrators, and I, I

8 would say there's a clear delineation.

9 In the group that I previously

10 referenced, it's the operations team,

11 which would be the superintendent, two

12 assistant superintendents, director of HR

13 and CFO.  They -- excuse me -- they are

14 at the top of the ladder, if you will, in

15 this organization, and then you have the

16 directors, who are all on a parallel

17 plane.

18        Q.    What's the role of the

19 director of elementary education?  And

20 when I'm asking these questions, I'm

21 asking from just, say, 2014 up through

22 the present.  I don't know if it's

23 changed at all, but let me know that,

24 please, if it has.

1    A.    I would say that, to

2  supervise all of the happenings in our

3  elementary schools, collaborating with

4  the curriculum department and special ed

5  department, as it pertains to elementary

6  school, and then the director of

7  elementary, in this district, has other

8  responsibilities as well.  Sometimes

9  those responsibilities can rotate, but

10  here, right now, director of education

11  oversees home school, McKinney-Vento

12  Homelessness, boundary alignment, at

13  times, they have their hands in, if we

14  need to make some shifts because some

15  schools are overpopulated.  So, those are

16  just some examples.  But the workings of

17  our elementary -- 13 elementary school

18  buildings.

19    Q.    Okay.  And there's one

20  director of elementary ed for those 13

21  buildings?

22    A.    Yeah.

23    Q.    And was that Betty -- Dr.

24  Betty Santoro, was that her role?

1    A.    Yes.  Just recently retired.

2    Q.    Does the director of

3  elementary education have the authority

4  to implement things or communicate to

5  people so they could implement things, in

6  terms of student safety and student

7  discipline at the school level?

8    A.    Yes.

9    Q.    What is the difference with

10  the director of special education?

11    A.    The director of special ed,

12  I mean, I think that the answer is in the

13  name.  The director of special education

14  oversees all things related to special

15  education.  So, all students and services

16  with identified disabilities.

17    Q.    So a student that's

18  receiving special education services

19  would also -- kind of like the overlap

20  we talked about earlier in your

21  deposition -- the elementary education

22  director and the special education

23  director would overlap for special

24  education students in elementary?

¹ A. Yeah. There would be some
² overlap, yes.
³ Q. Does the director of special
⁴ education also have the authority to
⁵ implement safety-type things at the
⁶ building level for a student?
⁷ A. I wouldn't say at-large, but
⁸ for students with disabilities, yes. As
⁹ it pertains to students with
¹⁰ disabilities, yes.
¹¹ Q. Okay. And the supervisor of
¹² special education, what's the difference
¹³ between that and the director of special
¹⁴ education?
¹⁵ A. I think you could draw
¹⁶ parallels with the director of elementary
¹⁷ and the principals. It's very similar
¹⁸ with the director of special education
¹⁹ and the special ed supervisors. They're
²⁰ also administrators, and they're direct
²¹ report, it's not the principal of their
²² building, it's the director of special
²³ ed.
²⁴ Q. Okay. So in terms of

1 authority level and what they -- roles

2 are or what they have the authority to do

3 or not do, the supervisor of special

4 education is similar to or in line with

5 the director of special education?

6          A.    That's accurate, yes.

7          Q.    And you said, in terms of

8 the director of elementary education,

9 that is in line with or equal to, in a

10 sense, the authority of the principal of

11 elementary?

12          A.    No.  No.  I didn't say that.

13          Q.    Okay.  I think I

14 misunderstood, then, what you were

15 saying.

16          A.    So, the question was what is

17 a special education supervisor, and I

18 said you could consider kind of the

19 relationship between the director of

20 special ed and the special ed supervisor

21 to be similar to the relationship between

22 director of elementary and the principal.

23 I wouldn't say that the principal and the

24 director of special ed.  Those are, those

1  are two different spots.  These two, the

2  supervisor and the principal, yes,

3  similar playing field, similar salary,

4  similar responsibilities, in terms of

5  significance of their responsibilities.

6  That's fair to say.

7        Q.    Sorry, just to clarify.

8              I thought you were saying

9  the director of elementary education

10  would be on similar --

11        A.    As the director of special

12  ed, yes.

13        Q.    Okay.  And then who would be

14  on a similar level to the principal,

15  then?

16        A.    The supervisor.

17        Q.    Supervisor of special

18  education?

19        A.    Similar, yes.  Not the same,

20  but similar, yes.

21        Q.    Yeah, I -- I mean, one's the

22  principal of the building.  I understand

23  that there are some differences, but I

24  understand what you're saying.  Thank you

1    for clarify that.

2              MS. LAUGHLIN:  Is this a

3    good time to take a break?  Well why

4    don't we go off the record for a

5    minute.

6              THE VIDEOGRAPHER:  We're

7    going off video record, the time is

8    12:19 p.m.

9                   -  -  -

10             (A recess occurred.)

11                  -  -  -

12             THE VIDEOGRAPHER:  We're

13   back on video record.  The time is

14   12:36 p.m.

15             THE WITNESS:  Excuse me.

16   BY MS. LAUGHLIN:

17        Q.    Dr. Bauer, we're just coming

18   back from our break in the afternoon.  I

19   wanted to ask you a follow-up question.

20             Are you familiar with the

21   Title IX coordinator having Title IX

22   point persons?

23        A.    Yes, I am.

24        Q.    What's your understanding of

1  that?

2       A.    I don't -- I'm not familiar

3  with interworkings, but I believe there's

4  one in athletics and just one, in

5  general, related to students.  That's my

6  understanding.

7       Q.    What's the role of the one

8  that is related to students?

9       A.    The actual individual's

10  title?

11       Q.    Well, do you know that they

12  have a title?

13       A.    So the individual is the

14  currently the supervisor of pupil

15  services, I believe.

16       Q.    Supervisor of pupil

17  services?

18       A.    Yes.

19       Q.    Was that a title from 2014

20  to 2018?

21       A.    That title has moved.  So,

22  in 2014, again, that's prior to me being

23  employed by North Penn, but I believe

24  that it was Dr. Jenna Rufo at the time.

1  She was director of special education and

2  pupil services.  Then in -- when Dr. Rufo

3  and I became assistant superintendent,

4  Mr. Jim Galante is our principal of our

5  Northbridge program and supervisor of

6  pupil services.  So it -- when we hired a

7  new director of special ed to replace Dr.

8  Rufo, we moved the pupil services

9  component from that position to

10  Mr. Galante.  That's what I recall.

11        Q.    So in addition to the Title

12  IX coordinator, there's a director of

13  pupil services that also serves as a

14  point person for Title IX?

15        A.    Supervisor of pupil

16  services, yes.  So I -- to my knowledge,

17  the services of that individual, or these

18  individuals in general, has not been

19  necessary.  I think initially the thought

20  was that there was going to be an

21  abundance, just in the nature of a

22  13,000-student district, that there would

23  be many investigations, and it was to

24  provide support.  But to my knowledge,

1  they have not been involved in

2  investigations.

3      Q.    From 2014 to 2018?

4      A.    I can only point to since my

5  time as an assistant superintendent.

6  So --

7      Q.    2015 to 2018?

8      A.    2018 to present.  I don't

9  know that they've been involved in any

10  Title IX cases.

11      Q.    What about -- so that's just

12  2018 to the present.  You're here today

13  as a representative of the school

14  district.  So, I'm asking --

15      A.    I'm aware.

16      Q.    I'm sorry?

17      A.    I just said, "I'm aware."  I

18  understand.

19      Q.    So I'm asking, in that

20  capacity, do you know whether that

21  director of pupil services, whether that

22  person has been involved in any Title IX

23  capacity on behalf of the district?

24      A.    I am not aware of that

1  person being involved, no.

2       Q.    But you're saying, if there

3  was an abundance, I think was the word

4  you used, an abundance of reports or

5  something like that, where it would be

6  more than what the Title IX coordinator

7  would handle, they would be the second in

8  line, is that fair to say?

9       A.    I think they would provide

10  some support, yes.

11       Q.    In situations, though, where

12  there is, like, too many reports --

13       A.    Correct.

14       Q.    -- for the Title IX

15  coordinator?

16       A.    Correct.

17       Q.    The role of the Title IX

18  coordinator that you told us earlier in

19  the deposition, has that -- as far as you

20  know, from 2014 to 2018 -- has that

21  always been the process and the role, or

22  has that changed over time?

23       A.    Over time, of course it has

24  changed.  In my -- in -- since 2014 or

¹ 2015, I do believe that that has been the
² role.
³          Q.    Okay.
⁴          A.    As explained by me earlier
⁵ on, yes.
⁶          Q.    Okay.  Is there certain
⁷ obligations of the district if sexual
⁸ misconduct is substantiated, meaning that
⁹ there is a finding after an investigation
¹⁰ that it did occur?
¹¹          A.    I'm sorry, say that again.
¹²          Q.    Yeah.
¹³                Is there any obligations
¹⁴ of the district or is there something
¹⁵ that the district is supposed to do if
¹⁶ sexual misconduct in a student is
¹⁷ substantiating -- substantiated?
¹⁸          A.    Certainly, yes.
¹⁹          Q.    What would be the next step,
²⁰ what is the obligation of the district at
²¹ that point?
²²          A.    I think it depends on the
²³ severity of the finding.  But certainly,
²⁴ to provide the, the appropriate

1 consequences and the necessary supports

2 for both students.  I think that's

3 reasonable to say.

4     Q.    Okay.  And who determines

5 what those will be?

6     A.    Good question.  I think

7 there would be layers to it.  So, for

8 example, if, if one student was going to

9 go to another school, if we were -- if,

10 if that was an outcome, the student will

11 no longer attend this school, then that,

12 that would be directed by the Title IX

13 coordinator and then implemented by the

14 building teams.  In terms of counseling

15 support for a student, special education

16 supports, that would be the IEP team.  So

17 it kind of depends on what those things

18 were.  I think you could see the Title IX

19 coordinator, the director of special ed,

20 the director of elementary, the assistant

21 superintendent being involved, if

22 necessary, depending on what those things

23 were.  And in the building level, all the

24 way down to the teacher in the classroom

1  and maybe the aide in the classroom, if

2  there is one.  So, it could be anybody

3  that interacts with either child or any

4  of the children to implement those

5  findings -- those -- what's the word --

6  measures, there ya go.

7      Q.    And that could include the

8  principal as well, the building

9  principal?

10     A.    Of course.

11     Q.    Are you familiar with the

12  state's requirements for reporting

13  student sexual harassment?

14     A.    I'm -- yes, I'm familiar --

15  if you're referencing mandated reporters

16  and Act 126 and things related to what,

17  you know, what the look-fors are and our

18  responsibility to report, yes.

19     Q.    Okay.  Can you take me

20  through that, you said what our

21  responsibilities to report are.

22     A.    Yeah.  So my understanding

23  is that if we believe that a student has

24  been abused or harassed, that it should

1 be reported immediately, within -- I

2 forget what the -- I recall, when I

3 initially learned this, maybe back in --

4 whenever the Act 126 came out, I don't

5 know if they used the word practicable,

6 but within reason, it is to be reported,

7 in a reasonable amount of time.  And it

8 did shift right around then from

9 reporting it to your supervisor to

10 reporting it directly to child line.

11        Q.    Do you have -- sorry.

12        A.    No, that's okay.  Go ahead.

13        Q.    Do you have an estimate of

14 when that switched?

15        A.    I'm going to guess 2012 or

16 '13.

17        Q.    Okay.  So prior to, like --

18 I mean, here, we're talking about

19 situations that occurred in the fall,

20 starting in the fall of 2014 --

21        A.    Yup.

22        Q.    -- and onward.  So it was

23 before then?

24        A.    Yes.

1    Q.    And when you say any time a
2  student is being abused or harassed, you
3  report it to child line.  What, what is
4  defined as a student being abused or
5  harassed?
6         A.    I think misconduct -- sexual
7  misconduct is any unwanted, whether it's
8  verbiage or vernacular, teasing, anything
9  physical.  It could even be kids showing
10  another child inappropriate pictures on a
11  phone.  It's, it's difficult to define,
12  of course.  I think a Supreme Court
13  justice said, "I know it when I see it."
14  But that's how I would define sexual
15  abuse or harassment, unwanted touching --
16  without consent -- touching, overtures,
17  vernacular, teasing, so.
18         Q.    When you say without
19  consent, is there an understanding of is
20  there a certain age or -- like, a certain
21  age that, under that, like, you cannot
22  give consent, are you familiar with that?
23         A.    Yeah.  I think the age is, I
24  think the age is 14.

1    Q.    And a student's hand going

2  up the shirt of another student's --

3  sorry -- a student's hand going up the

4  shirt of another student, is that within

5  the definition of abuse and harassment,

6  as you defined it?

7    A.    That's, that's a difficult

8  question to answer.  I think that would

9  be -- I would expect it to be reported,

10  yes.  Does it fit the definition of

11  harassment or abuse, I think it warrants

12  further investigation, regardless.  But I

13  don't know that it does.  If it's

14  something that I perceive to be

15  consensual.  I don't know if it fits the

16  definition of abuse or harassment.

17    Q.    What if it's among kids that

18  are under age 14, or even, say, kids that

19  are around 11?

20    A.    Do I think it's appropriate

21  behavior, no.  Do I think it should be

22  reported, yes.

23    Q.    When you say further

24  investigation should be determined to see

1 whether there was consent, is kind of

2 what you were saying; is that right?

3 　　　A.　　To determine whether or not

4 it, it fits the classification of abuse

5 or harassment, sure.  I think that comes

6 into play of that determination, yes, I

7 do.

8 　　　Q.　　Would, would that still be

9 the case if the students we're talking

10 about misconduct occurring between or at

11 the elementary school level?

12 　　　A.　　I, I -- yes, yes.  Whether

13 or not it's abuse or harassment, yes.  I

14 still -- as I previously stated, I still

15 believe it to be inappropriate and

16 something that should be reported.

17 　　　Q.　　Okay.  When you say, "be

18 reported", you're talking about Child

19 Line, correct?

20 　　　A.　　If nothing else, to your

21 immediate supervisor for support.  I

22 think we work in a, in a business and a

23 world where there's a lot of support for

24 people, and if you didn't know what

1 you're supposed to do, you could ask or

2 seek guidance from many people.  So I --

3 if the individual at the time wasn't sure

4 that they were supposed to report it to

5 Child Line, I believe that the question

6 should have been asked and it should have

7 been reported, yes.

8        Q.    Okay.  And then the building

9 principal or whoever the supervisor would

10 have been, that would have been the

11 expectation, that they would have

12 reported it to Child Line?

13       A.    My expectation would be the

14 same.

15       Q.    Okay.

16       A.    Whether it's reporting to

17 Child Line or reporting to your immediate

18 supervisor because you need support,

19 either way.  I don't believe it's

20 something that you, you don't take

21 further steps.

22       Q.    Are there certain state

23 requirements for reporting of, like,

24 sexual misconduct or sexual harassment or

1  things like that, like a statewide

2  system?

3       A.    I am only aware of indirect

4  reporting.  So, for example, we report to

5  Child Line, they notify the police and

6  if, if they report any specific system.

7  But I am not aware of us filing something

8  in a specific system related to sexual

9  misconduct.

10      Q.    At the end of the, the

11  school year, once a year or something

12  like that, is there any kind of, like,

13  general reporting for Pennsylvania of,

14  like, how many instances of sexual

15  harassment or how many instances of --

16      A.    Yes.

17      Q.    -- whatever, is there

18  something that exists for Pennsylvania

19  like that?

20      A.    There is.

21      Q.    And so, are you familiar

22  with that, then, and, and the reporting?

23      A.    I'm unfamiliar to the extent

24  that the reporting occurs, that it is --

¹ the incidents are reviewed from our

² coordinator of safe schools and emergency

³ management with the principal, and then

⁴ that individual goes and meets with the

⁵ police chief and their respective

⁶ departments, and everyone signs off, and

⁷ then that gets reported.

⁸      Q.    Is that on an annual basis?

⁹      A.    It is.

¹⁰      Q.    When you say the principals,

¹¹ the principals of each school in the

¹² district --

¹³      A.    Yes.

¹⁴      Q.    -- meets with these people?

¹⁵      A.    The coordinator of safe

¹⁶ schools and emergency management meets

¹⁷ with each principal to ensure that they

¹⁸ have all the incidents under given

¹⁹ categories outlined.  Once they settle up

²⁰ the report and they agree that their

²¹ reports match, then that individual meets

²² with, I believe we have seven

²³ jurisdictions within our school district,

²⁴ and he meets with each of the seven to go

1  over the report to make sure that the

2  police reporting and our reporting

3  aligns, and then it's submitted to the

4  state.

5       Q.    The coordinator of safe

6  schools, how long has that been -- like,

7  the -- what you just described to me, the

8  practice, has that been the case since

9  2014?

10      A.    I think there were two

11 questions there.  The position has not

12 been titled coordinator of safe schools

13 and emergency management, but the process

14 for reporting each year has, yes.

15      Q.    Okay.  It was just maybe a

16 different title, but the same role and

17 idea, whatever that title was?

18      A.    Sorry, I just splashed.

19            Yes, that's correct.

20      Q.    Who is that person for the

21 district?

22      A.    His name is Chris Doerr,

23 D-O-E-R-R, Doerr.

24      Q.    And has -- is it Mr. Doerr?

1    A.    It is.

2    Q.    Has Mr. Doerr been in that

3    role for as long as you can recall with

4    the district?

5    A.    He was not.  Prior to him

6    was a gentleman named Mr. Ray Wilson.  I

7    would say that Mr. Doerr went into the

8    position, I think, actually, it was right

9    around when I went into assistant

10   superintendent.  I would guess sometime

11   in 2018.

12   Q.    And then Ray Wilson was the

13   person before that?

14   A.    Yes.

15   Q.    What's Ray Wilson's

16   background, if you --

17   A.    Law enforcement.

18   Q.    And so he actually, like,

19   works for the district, helping to

20   compile --

21   A.    Yeah.  He --

22   Q.    -- these documents?

23   A.    He was the head of security

24   while he was here.

1    Q.    And how long was he head of
2 security at North Penn?
3    A.    When I was new to the
4 district in 2015, he had been there for
5 quite sometime, I believe.  I don't know
6 the -- I would guess ten years or so;
7 that's an estimate.
8    Q.    So Mr. Wilson or Mr. Doerr,
9 they're relying on information the
10 principals provide to them to compile
11 this data; is that correct?
12    A.    Yeah.  That's -- not --
13 what's the word -- is it rectifying,
14 where you kind of -- almost like an
15 audit.  So, our security team takes
16 reports, and we have our incident reports
17 on Infinite Campus, and they make sure
18 that they are aligned.  So, he makes sure
19 that what we have, then aligns with what
20 the police have.  So, both institutions,
21 organizations keep record of police phone
22 calls, number of arrests, citations, all
23 those things.  So that's, that's what
24 they are aligning.

1    Q.    Did you say -- sorry, go

2  ahead.

3    A.    I just don't think the -- I

4  think you framed the question in a way

5  that, is it the responsibility of the

6  principal to give the information.  I

7  think they make sure that the information

8  that Mr. Doerr has and the principal has

9  align, and then they go and check with

10  the police.

11    Q.    Okay.  Who's actually making

12  the report, then, to the state, is it the

13  police, or does the district do that

14  through, like, Mr. Doerr or Mr. Wilson?

15    A.    I believe we file it.

16    Q.    Okay.  When you say he

17  checks for incident reports in Infinite

18  Campus --

19    A.    Mm-hmm.

20    Q.    -- remind me, again, when

21  did Infinite Campus come into existence?

22    A.    This is year two of Infinite

23  Campus.  Yeah, '19/'20 was Infinite

24  Campus' first year.  Prior to that, we

1  used eSchool, and I think the question --

2  I'm seeing a confused look on your

3  face -- the question pertains to when

4  electronic discipline went into place,

5  and I had said to you that was '15/'16,

6  because it started in eSchool.

7          Q.    When you say '15/'16 -- oh,

8  2015/2016.

9          A.    (Nodding.)

10         Q.    Okay.  When you're say

11  '19/'20, you're saying 2019/2020?

12         A.    Yes.

13         Q.    Okay.  And so eSchool was

14  the app or the --

15         A.    SIS.

16         Q.    SIS.

17         A.    I thought you knew the terms

18  by now.

19         Q.    Thank you.  I forgot.  It's

20  been -- I've been talking about many

21  things since then.

22         A.    Yeah.

23         Q.    ESchool was the SIS that the

24  district used before --

1    A.    Yes.

2    Q.    -- Infinite Campus?

3    A.    Yes.

4    Q.    I know earlier you told me
5    that Infinite Campus really didn't deal
6    with, like, the elementary, that was all
7    still kept in paper records?

8    A.    Yes.  So, we did -- we
9    transitioned to electronic discipline at
10   the secondary level when I got to North
11   Penn in 2015, because as the new
12   principal, I didn't appreciate the paper
13   process, I wanted it to be electronic.
14   So secondary moved to it, I believe, in
15   '15/'16 and then elementary thereafter,
16   and this was in eSchool.  And then in
17   '19/'20, we switched student information
18   systems from eSchool to Infinite Campus.

19   Q.    Okay.  Was everything that
20   was in eSchool brought over into Infinite
21   Campus?

22   A.    Not everything.

23   Q.    Student discipline,
24   misconduct, Title IX things, was that

1  brought over?

2      A.    No.  It was warehoused.

3  Student discipline was warehoused, so

4  that it was acceptable.  But it was not

5  transposed or -- into Infinite Campus.

6  IEPs, that was a labor of love, took a

7  long time to get all that information in,

8  medical records, all those things.  But

9  discipline, I believe the two systems

10  didn't talk.  That said, we didn't have

11  electronic discipline until '16/'17.  I

12  could be off by a year, honestly.  It

13  might be '17/'18, for elementary, but I

14  believe it was only one or two years of

15  elementary discipline in eSchool until we

16  transitioned to Infinite Campus.

17      Q.    Okay.  Title IX

18  investigations, things like that, was any

19  of that kept in eSchool?

20      A.    No.

21      Q.    When you said the transition

22  from eSchool to Infinite Campus,

23  discipline files were warehoused,

24  where -- what does that mean, where are

1  they?

2      A.   Just a -- there's an

3  extract.  So we no longer have eSchool.

4  So we had to extract the data, so we have

5  it electrically.  I believe that is

6  actually some of the objects provided in

7  this packet were out of eSchool.  So

8  we're able to access it, but you can't

9  access it from Infinite Campus.  You have

10  to actually open the separate program

11  that we no longer use.

12      Q.   Where is it actually kept,

13  though?  Is it -- like, I know sometimes

14  the district uses, like, Google Drive and

15  stuff like that.

16      A.   I think on our server.  Our

17  technology department has that.

18      Q.   Okay.  And so when was that

19  that you went to Infinite Campus?

20      A.   Infinite Campus was in

21  2019/'20 --

22      Q.   Okay.

23      A.   -- that school year.

24  '20/'21 -- or, I'm sorry -- '15/'16 is

1  when, I believe, we started, and again, I

2  think I might be off by a year.  I'd have

3  to look that up.  But we started one year

4  with secondary electronic discipline and

5  then the following we did elementary.  So

6  it might be '16/'17 for secondary and

7  then '17/'18 for elementary.  It's give

8  or take a year.

9        Q.    Did any of the written files

10  from elementary get input into the

11  electronic version, once you went that

12  route in 2015 or so?

13       A.    I don't think so.  The only

14  things that were electronic were the

15  things that were initially -- in terms of

16  discipline -- were initially put in

17  electrically.

18       Q.    When you say discipline, are

19  you also including, like, student

20  misconduct, and even if a student wasn't,

21  like, disciplined, would that still --

22       A.    Yeah.

23       Q.    -- in that category?

24       A.    If a student was written up,

1  it would be there, yes.

2          Q.    What about if, you know,

3  there were reports of sexual misconduct

4  with a student, is that in that

5  discipline category you're talking about?

6          A.    Since the onset of using

7  electronic discipline, yes, it would be

8  in there.

9          Q.    Sorry.  Did you say, the

10 paper files, they did or did not get

11 input into eSchool?

12         A.    No, they did not.

13         Q.    What happened to the, like,

14 paper documentation or files?

15         A.    So, paper documentation of a

16 student's file would go back to our

17 conversation about the cume file.  So

18 from middle school to high school,

19 typically, you have the documents that I

20 mentioned in there, they do get purged,

21 things -- what can be as thick as several

22 inches does get simplified as all 1,000

23 tenth graders come in, and it's the

24 things that are required when a student

1  applies to college, like attendance,

2  grades, things of that nature.  And then

3  everything from thereon is, of course,

4  everywhere now is entirely electronic.

5          Q.    Would documentation of

6  sexual misconduct of a student, would

7  that be one of the things that would be

8  purged when it's moving file from one

9  school to the next?

10         A.    No.  Because it would be

11  represented in their discipline.

12         Q.    What if the student

13  wasn't -- because the discipline is

14  just saying, like, what the discipline

15  was, it's not, like, all the, the details

16  that would have existed beforehand.

17         A.    I would --

18         Q.    Do -- go ahead.

19         A.    I would expect that to be in

20  the Title IX coordinator's file of the

21  case itself.

22         Q.    Does that get purged in

23  any -- at any level?

24         A.    Not to my knowledge, no.

1    Q.   Do you know how long those

2  documents are obtained?

3    A.   I, I -- in terms of Title IX

4  coordinator's investigations, I would

5  assume in perpetuity.  I think it would

6  be forever.

7    Q.   What if the, the Title IX

8  coordinator wasn't the one to do the, the

9  investigation into sexual misconduct and

10  it was at the principal level, just say

11  the elementary school, where would you

12  expect those documents to be kept?

13    A.   Now, I would certainly

14  expect those documents to be kept with

15  the Title IX coordinator.

16    Q.   Okay.  In terms of -- are

17  you familiar with the Office of Civil

18  Rights reporting?

19    A.   I am.  Not entirely

20  familiar, but I am familiar about the

21  cycle, when we do, who does it here, that

22  kind of thing, but yes.

23    Q.   What's the process for data

24  collection for that, for the, the -- is

1   it annual reporting?

2        A.    It is.

3        Q.    What's the process for data

4   collection for the annual reporting?

5        A.    I believe it's a extract

6   from Infinite Campus.

7        Q.    Since Infinite Campus just

8   started the last two years, what about

9   before then?

10       A.    It would have been from

11  eSchool.  And then prior to that, all I

12  could do is speculate, because I wasn't

13  here prior to that.  But I would assume

14  that there had to be a -- some kind of

15  reporting system.  My -- I guess it would

16  come from security.  I don't know.  I

17  don't know that answer, back to 2014,

18  let's say.  But I'm sure since it's --

19  everything's been electronic, it's been

20  extracted from the electronic systems.

21       Q.    Okay.  But I think we were

22  just talking about how not everything is

23  included in the electronic systems.

24  Like, if somebody wasn't disciplined, for

1  example, it wouldn't be included in the

2  electronic system; is that right?

3       A.   No.  It would be included if

4  it's categorized as a certain type of

5  behavior.  And certainly, the upload, I

6  think that -- the Office of Civil Rights

7  reporting that we have to do each year,

8  it wouldn't include some of the documents

9  you're talking about, it's just numbers.

10  It's an extract of the number of

11  incidents.

12       Q.   But you're saying that it

13  would have to be categorized properly,

14  right, in order to pull that data, right?

15       A.   Right.

16       Q.   Is there any training --

17  sorry, go ahead.

18       A.   No, I was just gonna say, I

19  think that's some of the impetus behind

20  the aligning of our reporting and the

21  police's reporting.  We extract our data,

22  compare it internally, make sure that

23  what we have we believe represents the

24  facts, then we compare it to what the

1  police have, and then it gets -- that

2  data gets sent to TIMS, I believe it is,

3  TIMS or PIMS upload, all the acronyms.

4  But then, in the fall, is when the OCR

5  extract happens.  So the data has already

6  been validated prior to that.

7        Q.    Is there any training or is

8  training that's received by

9  administration, building principals on

10  how to categorize the data that gets put

11  into systems like that so that it can be

12  extrapolated?

13        A.    That's a good question.  I

14  wouldn't say that there is training, but

15  I do believe there are systems in place

16  to ensure consistency.  So, for example,

17  every suspension that occurs at the

18  elementary level, they send their

19  suspension letter to the director of

20  elementary, and she would review -- and,

21  quite frankly, when you're talking about

22  elementary school kids, I don't believe

23  there are many suspensions.  You know,

24  maybe, in a, in a school, maybe, a dozen

1  a year at the elementary level.  And so,

2  the director of elementary is typically

3  aware of those circumstances, why a kid

4  got suspended.  And so the letter comes

5  across her desk, she sees how it's been

6  categorized, and I can recall situations

7  where Dr. Santoro said, "wait a second,

8  it's not this", and they've rectified it.

9  At the secondary level, unfortunately

10 students get suspended more frequently

11 and there's a spreadsheet of suspensions

12 that I oversee.  And so the layer of

13 consistency is there because I'm the one

14 reviewing them.

15          So, training, no, indirectly

16 in terms of a workshop, but when people

17 make mistakes or misstep, I think we fix

18 it, and then we teach them.  So you could

19 refer to that as training or professional

20 development.

21          Q.    In 2015, was Dr. Santoro the

22 one who would have gotten any suspensions

23 of students and reviewed that to ensure

24 its accuracy or -- like you said?

1    A.    Yes, absolutely.

2    Q.    Do you know whether, in this

3  case, Dr. Santoro received or reviewed

4  the categorization for ▓▓▓▓▓

5  suspension in 2015?

6    A.    I don't know for a fact.  I

7  would assume yes, because she was very

8  involved, as indicated by the notes from

9  the meetings with the parents and the

10  principal and such.

11    Q.    Is it the principal's

12  obligation, are they the ones that are

13  sending it to the director of elementary

14  education?

15    A.    Yes.

16    Q.    If there's an allegation of

17  sexual misconduct but maybe doesn't

18  result in discipline or go all the way

19  through that process, is that documented

20  in some way through the district?

21    A.    I -- yes.  So, my

22  understanding of the question is if

23  someone believes there's sexual

24  misconduct and they write it up and

1   report it, then it would be in the

2   system.  And if there were no findings or

3   no consequences, that would be part of

4   that report eventually.

5         Q.    When you say --

6         A.    So it's a routing --

7         Q.    Sorry.

8         A.    The routing goes that a

9   teacher or the observer of the behavior

10  writes it up and then it gets routed to

11  the supervising administrator.  So if I

12  am a tenth grade assistant principal and

13  it's one of my kids, it will come to me

14  automatically, I would review it and then

15  I would complete the report itself.

16        Q.    When --

17        A.    So, if I said that Kyle

18  Somers had no, no findings, Kyle did not

19  do as stated, that would be in the

20  report.

21        Q.    When you say to report it to

22  the teacher, the teacher believes

23  something had happened would be written

24  up, how is it written up?  Is there a

¹ specific form they should be using, or?

²      A.   Yeah.  There's a -- if you

³ recall, we discussed a behavior tab in

⁴ Infinite Campus.  So, if you actually

⁵ click there on that tab, you can click a

⁶ plus sign and create new event.

⁷      Q.   What about before that,

⁸ though, because that just happened in

⁹ 2019, what was the process before

¹⁰ Infinite Campus?

¹¹      A.   It was similar in eSchool.

¹² Prior to that, when it was paper and

¹³ pencil, I believe it was a slip of paper,

¹⁴ student's name, infraction, details, and

¹⁵ submit it to the office.

¹⁶      Q.   The principal's office?

¹⁷      A.   Yes.

¹⁸      Q.   And it was just, like, any

¹⁹ paper, like, take a piece of paper,

²⁰ write --

²¹      A.   No.  I think there's a form.

²²      Q.   Oh, okay.

²³      So a slip of paper you just

²⁴ referred to is an actual form?

1      A.    Yes.

2      Q.    Do you know the name of the

3  form?

4      A.    I thought -- I know, at the

5  secondary level, it was referred to as a

6  conduct referral.  I guess my answer to

7  your question is, no, I don't know the

8  name, but I can find it.

9      Q.    Are you looking through the,

10  the North Penn produced documents?

11      A.    I am.

12      Q.    Okay.

13      A.    I thought there was a form.

14  I could be wrong.

15      Q.    And I can represent to you,

16  I don't believe I saw a form of what

17  you're describing, but I could --

18      A.    So, I would point to 1023,

19  Gwynedd Square Elementary School office

20  referral form.

21      Q.    Oh, okay.

22            And what -- and so it's bate

23  number 1023?

24      A.    Yes.

1    Q.    I see.

2          This -- on that form that

3   you have in front of you, on bates No.

4   1023 from the North Penn production, on

5   there it says minor problem behavior,

6   major problem behavior.  Do you see that

7   there?

8          A.    I do.

9          Q.    Is that something that the

10  district has, that there is to be

11  separation between minor problem behavior

12  and major problem behavior?

13         A.    No.  Since then, Escape, as

14  part of that upload we discussed, has

15  kind of categorized the infractions as

16  they're titled.  So that's not really on

17  the school district, in terms of is this

18  major or is it minor.  It depends how

19  it's coded.  So if you picked, for

20  example, bomb threat, they would --

21  Escape categorizes bomb threat as

22  whatever they categorize it as.  We don't

23  determine if it's minor or major.

24         Q.    When was that, that that new

1  system got implement?

2      A.    I can't answer that with

3  confidence.  I know there were changes to

4  it recently.  I would say 2019 -- 2018 or

5  '19.

6      Q.    Okay.  So around that

7  timeframe?

8      A.    Yeah.  I would assume that

9  that was -- that -- it's possible that

10  the state, in that report that we

11  discussed, when they get the data, was

12  categorizing it.  I'm not aware of them

13  doing so.  I know that they do now.

14      Q.    What about in terms of,

15  like, this form here, for example, the

16  1023 that we're looking at --

17      A.    Mm-hmm.

18      Q.    -- where it says minor

19  problem behavior, major problem behavior,

20  at that time in 2014 or even 2015, was

21  that, like, categorizing minor behavior,

22  major behavior, is that what the district

23  was following, or was there some other

24  way of categorizing behaviors for

1  students?

2      A.    I don't think -- so clearly,

3  this is how they were documenting it at

4  the elementary level at that time.  I

5  would expect that once we moved to the

6  electronic version, you were still

7  picking from a drop-down menu of what was

8  the infraction; lying, cheating, for

9  example, might have been one of the

10 options.  Classifying it as minor or

11 major was not part of that electronic

12 process.

13     Q.    Do you know whether the

14 electronic process dropped-down whether,

15 like, sexual harassment was one of the

16 options available?

17     A.    I don't know that.  I would

18 assume harassment was.  I don't know for

19 certain whether or not sexual harassment

20 was.

21     Q.    What about, like, assault or

22 something like sexual assault, do you

23 know whether that was a category?

24     A.    I would expect that it was.

¹      Q.    Okay.  When you say that

²  minor and major were across the

³  elementary school level, that's the way

⁴  that they were categorizing student

⁵  misconduct, do you know whether that's

⁶  across all 13 elementary schools or

⁷  whether that's just the case for Gwynedd

⁸  Square?

⁹      A.    I'm not certain.  But I

¹⁰  would expect that this isn't a form that

¹¹  was made up by one school.  Again, I

¹²  wasn't here then, but I -- knowing our

¹³  director of elementary, I would assume

¹⁴  the process was fairly uniform.  So I

¹⁵  would assume everybody was using a

¹⁶  similar form.

¹⁷      Q.    Okay.  Because I understand

¹⁸  there's also a elementary level of

¹⁹  student discipline misconduct that has,

²⁰  like, four tiers.  Have you seen that,

²¹  are you familiar with that?

²²      A.    You're talking about the

²³  chart with level one, two, three and

²⁴  four, yes.

1    Q.    Yes.

2          Is that also something that

3    the elementary schools are to be

4    following from the district back in this

5    timeframe?

6          A.    Sure, yeah.  That's the, the

7    student -- that's the code of conduct.

8    And it's in our student handbooks, it's

9    on the website, so yes.

10         Q.    Do you know -- since there's

11   kind of two -- would you agree with me

12   there's two different ways that student

13   misconduct is being categorized, then, in

14   terms of one being a minor/major and the

15   other being the four levels of -- like we

16   just went over in that chart?

17         A.    Yeah.  I would agree with

18   that.

19         Q.    Go ahead.

20         A.    I think it would be there,

21   unfortunately.

22         Q.    Okay.  Like, as to, like,

23   what one to implement or -- is that what

24   you mean?

1      A.    You're talking about in

2  terms of, like, an intervention.  So,

3  like, a consequence.  Based upon how it's

4  categorized, what the consequence would

5  be, is it major, is it minor, is it level

6  one, level two.  Yeah, I mean, I think

7  any time you look at a code of conduct

8  for any school district you're going to

9  see examples of this behavior, could be

10  but not all inclusive, all right?  So,

11  there's definitely some discretion when

12  you're categorizing discipline because

13  stealing could be taking money out of

14  your teacher's purse, or it could be

15  grabbing a cookie from the cafeteria,

16  right?  So, there is definitely some

17  discretion.  But I agree, that it is

18  ambiguous, that this form seems to have

19  minor and major and possible motivation

20  as opposed to a grid that says level one,

21  two, three, four.

22      Q.    You mentioned it being

23  ambiguous in terms of discipline.  What

24  about in terms of, like, categorizing

1    student misconduct, would you agree that

2    it's ambiguous, the two different

3    versions in categorizing student

4    misconduct as well?

5            A.    I don't think in terms of

6    categorizing that it's an electronic

7    violation, for example.  But in terms of

8    categorizing it as minor or major, I

9    think that it is ambiguous, yeah.  I'm

10   certain that that's probably why the

11   process has improved since then, because

12   there's -- it is ambiguous.

13           Q.    When you say the process has

14   improved since then, what do you mean?

15           A.    The electronic version that

16   we've been discussing.  So, now that

17   we're not doing a paper form and now that

18   the electronic version is aligned and

19   that it categorizes in terms of the level

20   all by itself in state reporting.  You

21   pick what the infraction was, and they

22   determine -- the system determines, okay,

23   that is a reportable offense,

24   non-reportable, whether or not police

1    should have been called, those types of
2    things.
3         Q.    Okay.  For the OCR, Office
4    of Civil Rights, reporting, who's
5    responsible for, for that at the
6    district?
7         A.    The individual who does that
8    work for us is -- her name is Sheena
9    Kulp.  Her name -- I think her title
10   is -- I can look -- I believe it's PIMS
11   coordinator.
12        Q.    Is she an employee of the
13   district?
14        A.    She is.
15        Q.    Okay.  And how is she
16   compiling that data?  And I don't mean
17   since, like, the last two years when you
18   have this -- I'm talking about the
19   timeframe from 2014 through 2018.
20        A.    I'm not sure I understand
21   the question compared to questions you've
22   already asked me, in that how do we get
23   that extract.  I thought that -- are you
24   asking something different, or is it the

1  same question?

2      Q.    Well I guess you didn't have

3  the -- in order to have an extract you

4  would need to have a electronic

5  documentation.  It's my understanding

6  that for the elementary level, there was

7  no electronic documentation to extract

8  from back in 2014, 2015, maybe even 2016.

9          Where would -- how would she

10  compile that data back then?

11      A.    I don't know.  I would

12  expect that there was a collection or

13  data kept by the director of elementary

14  because those suspension letters were

15  coming her way.  But I do not know.

16      Q.    Okay.

17      A.    I'm sure that they input it

18  the same way to the state.  But I don't

19  know how they brought all the data

20  together from the 13 elementary schools,

21  I'm not sure.

22      Q.    Are you familiar with the

23  Office of Civil Rights guidance

24  documents?

1    A.    I'd have to be pointed to

2  them directly to answer that question,

3  I'm not sure.

4    Q.    I mean, have you heard of

5  them, like a Dear Colleague letter or --

6    A.    Sure.

7    Q.    -- Q&As?

8    A.    Sure.

9    Q.    What's the process -- does

10  the district have a process of who

11  receives those guidance documents from

12  OCR?

13    A.    I would assume -- and I'm

14  not entirely familiar, but I would assume

15  it goes to Dr. Dietrich and such things

16  are topics of conversation with the

17  district solicitor.

18    Q.    Okay.  Do you know whether

19  there's any, like, downflow of that

20  information in terms of training or

21  making sure that lower levels at the

22  district other than the superintendant

23  gets access to that information?

24    A.    Yes.  I would -- I'm certain

1 that that is part of our legal or

2 legislative update from Mr. Somers.

3      Q.    Have you sat in on -- you're

4 part of these annual meetings with Mr.

5 Somers, right?

6      A.    Of course.

7      Q.    Have you heard -- in the

8 meetings that you've been part of since

9 2015, have you -- do you recall receiving

10 information about these updates in terms

11 of OCR guidance?

12      A.    I'm not sure I've heard them

13 delineated in that way, meaning there's a

14 slide that says, "this is the OCR

15 guidance", but there are usually slides

16 of "things you need to know" and "new

17 expectations", those type of things, but

18 I have not heard them categorized as OCR

19 guidance in these legal updates.

20      Q.    Are they typically a

21 PowerPoint presentation, when Mr. Somers

22 comes to educate the administration of

23 the district?

24      A.    Yes.

¹ Q. Where are those trainings

² kept, the PowerPoints and any materials

³ that are provided?

⁴ A. Typically distributed.

⁵ He'll give a presentation, whether

⁶ they're hard copies or it's e-mailed out.

⁷ Q. Does the direct keep that in

⁸ some way? Is there any documentation

⁹ that the district has on, like, what

¹⁰ training was received this year, what

¹¹ information was received the next year or

¹² the PowerPoints?

¹³ A. Yeah. I think it's only

¹⁴ fair to say, since I've been assistant

¹⁵ superintendant, that each month when we

¹⁶ have a district administrative meeting,

¹⁷ there's an agenda and then related

¹⁸ documents are attached or linked. So, if

¹⁹ I were to go back to, say, February 2020

²⁰ and look at the agenda, Mr. Somers would

²¹ have e-mailed me his presentation, and I

²² would have linked it. That would be

²³ since 2018.

²⁴ Q. Do you know what the process

1  was before then?  Because I understand

2  you were, you were only the assistant

3  superintendant since 2018, but since

4  you're here on behalf of the district as

5  a corporate representative, do you know

6  what the process was or, you know,

7  whether those documents were kept prior

8  to that time on behalf of the district?

9       A.    Yeah.  I believe what I said

10  previously, that they were e-mailed out

11  to us as a group.

12       Q.    But, I mean, who e-mails

13  them, the assistant superintendant?

14       A.    Yes.

15       Q.    Were you a part of -- were

16  you part of compiling the documents in

17  this case from the district?

18       A.    Yes, I believe so.  In terms

19  of, like, me actually getting documents,

20  no; asking people for them, yes.

21       Q.    Did you ask any -- did you

22  ask anybody about any of the trainings

23  that was received on Title IX or any

24  other trainings, like the documents I was

1  just really asking about?

2       A.    I recall asking for the

3  trainings from our human resources

4  department pertaining to safe schools,

5  Act 126, documentation of folks

6  completing those trainings, things such

7  as that.  I don't know that I asked

8  anyone, did you receive an e-mail back in

9  2015 from Mr. Somers, I don't know about

10  that.  But I recall the way that we

11  believe we were fulfilling that request

12  was to get copies of the sexual

13  harassment, the child abuse, all those

14  trainings and who had completed them.

15       Q.    So I can represent to you I

16  didn't receive that list of, who had

17  completed them, what the trainings were,

18  I didn't receive that either.  Did you

19  get that as part of your document

20  compilation?

21       A.    I believe I did.  I'd have

22  to look.  I believe I know who I got it

23  from.  I -- but I can look, if you'd like

24  me to.

1    Q.    You don't have to look right
2  now, but I would just make a request on
3  the record to get those materials, since
4  they were not provided by the, the
5  district.
6          Are you able to, as a
7  superintendant now, not at this moment
8  but after this deposition today, are you
9  able to go back see if you can pull
10 together the trainings that were given,
11 whether it's by the solicitor or by the
12 district, on Title IX, sexual harassment
13 or what those annual trainings or legal
14 updates consisted of?
15    A.    Sure.  I'm able to do that.
16    Q.    Okay.  I would ask for that
17 as well.  These are things that I think
18 have been requested, but since you're
19 telling me that you're actually able to
20 do that, I would request specifically
21 that you do that as well.
22    A.    I think there's -- perhaps
23 I'm mistaken, but I believe you're
24 providing more specificity now that would

1 lead me to those documents, as opposed to
2 what I think I did -- and again, this was
3 a long time ago --
4         Q.    Mm-hmm.
5         A.    -- in pulling all the
6 trainings and the videos that we needed
7 to do as all employees had to complete.
8 That's what I believe.
9         Q.    Okay.  Did you -- you said
10 that you did pull those videos and things
11 like that, though?
12        A.    I believe I pulled the list
13 of trainings.  I asked our HR department
14 too.
15        Q.    Okay.
16        A.    I provided them.  But I
17 could be mistaken; I've made a mistake
18 before.
19        Q.    Okay.  Because I did not
20 receive those.
21        A.    Okay.
22        Q.    So, if you have them, please
23 pass them along to your counsel as well
24 so that they can be passed along to me.

1    A.    I understand.

2    Q.    Okay.  Is there any process

3 in place to ensure that principals are

4 getting the OCR guidance documents and

5 the information contained in them?

6    A.    Not anything outside of what

7 I described.

8    Q.    Okay.  And is that really up

9 for the, the solicitor or the super --

10 who's it up to, something that's going to

11 come into the training for the

12 administration of the district?

13    A.    I think, ultimately, the

14 superintendant would say the district's

15 responsibility.  But it's well-known here

16 in North Penn that we, at least annually

17 or more frequently, have a legal update,

18 and those types of things would come out

19 during our legal update.

20    Q.    The legal update meetings,

21 are they just attended by the

22 administration of the district?

23    A.    Yes.

24    Q.    Does that include

1  principals?

2      A.    Yes.

3      Q.    Is there a process in place

4  to ensure that principals are then

5  communicating that information that they

6  learned to the people -- the employees in

7  their building, like teachers and

8  guidance counselors and the like?

9      A.    Yes.  Typically we, we would

10  outline what needs to be provided or

11  discussed with the folks in their

12  building as a result.

13      Q.    Is there any follow-up to

14  make sure that that actually occurs?

15      A.    That's a good question.  No,

16  I can't say in good conscious that

17  there's a process for asking each

18  building, did you say this to your

19  faculty.  I think when you have highly

20  compensated employees who are

21  credentialed to do the job, when you ask

22  them to do something, your expectation is

23  that they do it.

24      Q.    Is there any process in

1  place to get a sense of the understanding

2  of district employees of their reporting

3  requirements or understanding OCR

4  guidance and things like that?

5      A.    I think I'm answering the

6  question, that there is a process in the

7  trainings that I previously spoke of,

8  there are quizzes.  So there is an

9  accountability measure, and you have

10  certificates, and you have to prove that

11  you completed them.

12      Q.    Okay.  And is that something

13  that the district keeps as well?

14      A.    I think there's a extract

15  from the program where you can see who

16  has completed them.

17      Q.    And is that the case going

18  back to, like, 2014/2015 timeframe up

19  through the present?

20      A.    I would expect, yes.  I'm

21  not certain, but I would expect, yes.

22      Q.    Okay.  Do you recall

23  specifically receiving training from the

24  district in part of these administrative

1 or legal update meetings, Title IX

2 specifically being covered?

3         A.     I was under the impression

4 that you asked this.  Didn't we say --

5 didn't you ask me how many times since

6 2015, and I said four?

7         Q.     Okay.  That may have been

8 the case.

9         A.     Okay.  I want to make sure

10 you're not asking something different.

11         Q.     No, that's okay.  Let me ask

12 you something more specifically.

13               Do you recall receiving

14 training specifically on how to identify

15 sexual harassment at schools with

16 students?

17         A.     I think, sexual misconduct,

18 yes.  Yes, I think it's part of those Act

19 126 trainings and part of the signs of

20 sexual abuse.  Yes, it is in there, I'm

21 certain of it.

22         Q.     Who puts on the Act 126

23 trainings?

24         A.     It is a -- they are

¹ purchased modules, online, asynchronous

² that everyone must complete and then take

³ the assessment.

⁴        Q.    When has that been the case

⁵ since, where it was a purchased module?

⁶        A.    I, I think since Act 126

⁷ came into play, I would expect.  At least

⁸ since 2015.  Most districts that I'm

⁹ aware of, and I've worked in a number of

¹⁰ school districts, have what they call

¹¹ safe school trainings, that you have to

¹² complete every two years, I believe.

¹³        Q.    Does the Act 126 training,

¹⁴ is that every two years that they receive

¹⁵ training on this topic?

¹⁶        A.    That's my understanding,

¹⁷ yes.

¹⁸        Q.    Okay.  Other than the Act

¹⁹ 126 training that -- the modules

²⁰ purchased by the district, are there

²¹ other instances of teachers or

²² administration receiving training on

²³ identifying sexual abuse, sexual

²⁴ harassment?

¹          A.    I wouldn't say at-large, no.

²    That's not to say that individual schools

³    haven't brought in experts, you know,

⁴    brought in -- we work with some outside

⁵    organizations, we've had -- there's

⁶    organization that provides supports for

⁷    women who have been abused, Laurel House,

⁸    I don't know if you're familiar, I don't

⁹    know where you're located, but they've

¹⁰   come in and given presentations, whether

¹¹   they be to the school board or at

¹²   individual schools.  I had them in to

¹³   present to students.  We've worked with

¹⁴   the county for things.  But I can't say

¹⁵   that everyone has.  This is things that I

¹⁶   initiated as a principal.

¹⁷          Q.    At, at the high school?

¹⁸          A.    Yes.

¹⁹          Q.    The reporting of sexual

²⁰   harassment, is that something that's

²¹   covered by the Act 126 trainings?

²²          A.    I believe so, yes --

²³          Q.    Is there any --

²⁴          A.    -- sexual misconduct.  I

1 don't know that it delineates sexual

2 harassment -- I think it does.  I do

3 think it does.  But it might be more

4 defined in the context of colleagues, but

5 it's still in these trainings -- still

6 includes, these are the signs of sexual

7 misconduct, these are the signs of sexual

8 harassment, regardless of whether it's

9 adult-to-adult, student-to-student or

10 some combination.

11        Q.    Does the district still

12 have, like, the module that they

13 purchased for these years on this

14 training?

15        A.    Yeah.  I just completed them

16 a couple weeks ago.  My two years was --

17 yeah -- yes.

18        Q.    Do you have the past ones,

19 though, I guess is what I'm asking?

20        A.    I don't know.  I, I would

21 think that we could access them.  I mean,

22 it's a third-party vendor.  So, could

23 they provide, if we asked, hey, what did

24 the training look like then -- they're

1  very similar.  I mean, I've been doing

2  them since 2013 on at least an every

3  other year basis, and they're very

4  similar.  So I would expect what you saw

5  today to look very similar to what you

6  saw in 2013.

7        Q.    Okay.  I would also ask that

8  if you're able to access, you know, past

9  ones -- because the one from this year,

10  you know, isn't really going to be as

11  relevant -- even if it may be similar to

12  something back in, like, 2015 timeframe

13  or before then or subsequent to them, I

14  would ask to see if you're able to get

15  access to those, and if you are, to

16  produce them to, to your counsel.

17        A.    I might be able to -- if

18  nothing else, an outline of the courses.

19        Q.    Okay.  Yeah, I mean,

20  whatever -- I don't know what you have

21  access to.  It doesn't sound like you do

22  at this point either.  So whatever you're

23  able to access, if you can provide that

24  to your counsel.

1      A.    Okay.

2      Q.    Is there a process in place

3  to inform students of their rights under

4  Title IX from, like, 2014 up to 2018?

5      A.    Yeah.  I believe there is a

6  section in the student handbook that

7  outlines the detail there.

8      Q.    Other than the student

9  handbook, is there any kind of, like,

10  presentation or assembly or anything in

11  the course of a student's education where

12  they've brought about those topics?

13      A.    I don't believe there's a

14  formalized process for that, no.  I

15  think -- back to school mailings every

16  year.

17      Q.    The back to school mailings

18  that go to the student's house or

19  whatever?

20      A.    Yes.

21      Q.    What's included in that

22  mailing?

23      A.    It's a long, long list.  But

24  code of conduct policies, expectations,

1  home and school information, I believe.

2  I believe that packet is something I

3  provided as well.  I think it's pretty

4  detailed.

5        Q.   Is there, like, an enclosure

6  letter -- I mean, is there a way to

7  identify what -- because when I get the

8  documents, for example, I get 1 through a

9  1,000-and-whatever.

10       A.   Yes.

11       Q.   These things aren't, like,

12 this came from this packet that got sent

13 to the student's homes.

14            Is there a way to identify

15 or delineate what is part of that packet

16 that you're saying was provided in these

17 bates numbered records?

18       A.   There is a way, yes.  I can,

19 I can do that.  It'll take me a moment,

20 but I can do it.

21       Q.   Okay.  Well why don't we

22 kind of table that now so we can get

23 through the questions and come back to

24 that.

1          Okay.  What about for Title
2    IX instruction or training in a sense for
3    parents, does the district have that that
4    they offer?
5          A.    No.  Other than the
6    mailings.
7          Q.    Okay.
8          A.    I don't believe there's
9    training for parents on that, Title IX.
10         Q.    If a student makes a report
11   or a parent, you know, received some
12   minor -- makes a report or are informed
13   of a report that their child had made
14   about sexual misconduct at the school, is
15   there an expectation that the student
16   and/or parent gets told by who the Title
17   IX coordinator is and what the process is
18   going to be and stuff?
19         A.    Yes, there is.  I think
20   that's outlined in the policy itself.
21         Q.    Other than it being
22   outlined, do you mean that whoever it's
23   reported to, that that person will notify
24   the parent and/or child that there's a

1   Title IX coordinator and this is who it
2   is and --
3           A.      Yes.
4           Q.      How are Title IX
5   investigations supposed to be conducted
6   through the district?  Is there, like, a
7   procedure in place that this is what
8   you're compiling, this is how you do it
9   and stuff like that?
10          A.      I think the policy itself is
11  really detailed in the forms, and then
12  the training that I suggested, it's very
13  clearly outlined in all of those
14  documents.
15          Q.      Are you referring to the
16  103, Policy No. 103?
17          A.      Yes.
18          Q.      Because that was something
19  that just -- we just talked about just
20  got implemented in the last two years.
21  What about prior to that?
22          A.      Then I would say that I
23  think it's pretty clearly outlined in the
24  policies that have since been repealed.

1    Q.    Those three that we talked

2  about?

3    A.    Yes.

4    Q.    Other than it being clearly

5  delineated in those policies, like you're

6  saying, is there any other kind of

7  training or anything like that that gets

8  put into place on how that gets done and

9  implemented?

10    A.    Our Title IX coordinator

11  needs to attend the training, and I

12  believe that's a requirement.  So, yes,

13  there is a training.  I have never

14  attended that, because I have never

15  served in that role, but I believe our

16  current, our former director of HR both

17  attended, and our director -- assistant

18  director of human resources also

19  attended.

20    Q.    So there's a specific

21  training for -- like, on Title IX for

22  those people?

23    A.    Yes.

24    Q.    Who puts that on, the

1   training?

2       A.    I don't know the answer to

3   that.  I suspect Mr. Somers might know

4   the answer to that, but I do not.

5       Q.    Is it something the district

6   does internally?

7       A.    No.  No, no, no.  They

8   actually have to go.

9       Q.    Okay.  How often is that

10  training done?

11      A.    To my knowledge, to my

12  knowledge it's a one-time thing that they

13  have to go, unless there are changes.

14  They have to get certified, and there's a

15  process for a Title IX coordinator.

16      Q.    To get certified?

17      A.    I believe so.  There's a --

18  I recall, when we had a new assistant

19  director of human resources, that that

20  individual had to go in order to be a

21  Title IX coordinator.

22      Q.    What about prior to that

23  point, like when Cheryl McCue was the

24  Title IX coordinator, do you know if

1  there was a certification back then?

2      A.   I, I don't.  I know that she

3  went, though.  I recall her saying that

4  she had to go to a conference workshop

5  certification somewhere.  I don't know if

6  it was put on through the IU.  Again,

7  that's something I could find out, but I

8  don't know.

9      Q.   What's IU?

10      A.   Independent unit.

11      Q.   Okay.  And what is, what is

12  that, the immediate unit?

13      A.   That's a good question.

14  Each county has an intermediate unit that

15  provides services to the school

16  districts.  So there's an MCIU, which is

17  Montgomery County Intermediate Unit, BCIU

18  and so forth.  In terms of a definition,

19  I don't really know.

20      Q.   When you say it's a one-time

21  thing that you think Dr. McCue had gone

22  to for the Title IX coordinator training,

23  do you know whether that would have been

24  when she stepped into that role as Title

1  IX coordinator or at some other point?

2       A.    I don't know when she

3  attended.  I can't answer that.

4       Q.    These forms that we talked

5  about on Page -- on 1023, with the minor

6  problem behavior and the major problem

7  behavior with the office referral form,

8  do you know what I'm talking about?

9       A.    I do.

10      Q.    Do you know what the

11 rentention of those documents is, what

12 the expectation of the district of how

13 the documents are kept?

14      A.    I would assume that they

15 were placed in the student's files.

16      Q.    Do you know, from

17 year-to-year, whether there's any

18 expectation of the -- like, how the

19 retention of that document would be done?

20      A.    I believe that those files

21 go with the student from elementary to

22 middle and then I would assume that only

23 files -- again, starting in '15/'16, such

24 forms are electronic.  So our current

1 students, over the last six years,

2 everything has been in -- is electronic.

3    Q.    Forms like this, like 1023

4 we were just talking about, is there any

5 reason at the end of the school year they

6 should be shredded?

7    A.    No.  I think, I think it is

8 reasonable that something from a first

9 grader, for example, might not make its

10 way all the way up to the high school

11 because, then, as we described, you know,

12 we have student files that are inches

13 thick.  But I do think from one level to

14 the next they should travel with the

15 student.  So, middle -- elementary to

16 middle, I think they should be there.

17 And then I think you would only have

18 those documents from middle to high.

19 That would be my expectation.  I think

20 that's practical.

21    Q.    Okay.

22    A.    Clearly this document has

23 been kept, though, since 2014, because

24 this is the form we are looking at, but.

1        Q.    Okay.  Do you know where
2   this form came from?  If you're the one
3   kind of pulling documents together, do
4   you know where the 1023 form had come
5   from?
6        A.    I don't.  So like I said, I
7   asked people to collect documents for me;
8   hey, could you get me this, can you get
9   me the trainings, can -- but where
10  specifically it came from, I couldn't
11  tell ya.  Like you said, there's over a
12  thousand pages here.  I don't know where
13  each thing came from.
14       Q.    Okay.  I'm gonna show you
15  for a second.  I'll share my screen in a
16  moment.
17       A.    Okay.
18       Q.    Can you see the document on
19  your screen?
20       A.    I can.
21       Q.    Okay.  At the bottom of the
22  document, on Page 8 of 9, that's your
23  signature verifying that you had reviewed
24  these interrogatory -- the questions to

1  the district; is that true?

2       A.    That's my signature, yes.

3       Q.    Did you actually review

4  these responses before signing it?

5       A.    This document itself?

6       Q.    Yes.

7       A.    Yes, of course.

8       Q.    Okay.  I want to ask you

9  about request No. 10.

10      A.    Would you mind zooming in?

11      Q.    Oh, yeah, sure.

12            Are you able to see that

13  now?

14      A.    Mm-hmm.

15      Q.    Okay.  It says --

16      A.    You went beyond --

17      Q.    I went to far.

18            There we go.

19      A.    Okay.

20      Q.    It says, identify the

21  person, persons on behalf of the

22  Defendant District North Penn Gwynedd --

23  and it says North Montco, but I

24  understand North Montco is separate --

1 knowledgeable about the process for

2 distributing information concerning Title

3 IX policy to students, parents and

4 employees from January 1st, 2014 to the

5 present and describe the substance of

6 each person's knowledge, and the response

7 is Christine Liberaski, director of

8 schools and emergency -- or, I'm sorry --

9 community engagement.

10          How did you find out this

11 information?

12     A.     The information -- that it's

13 Christine Liberaski?

14     Q.     Yes.

15     A.     So, when you asked the

16 question about what is distributed to

17 students and parents, my answer was in

18 our back-to-school mailings, and

19 Christine Liberaski is the director of

20 school and community engagement, and her

21 office handles the back-to-school

22 mailings.  So she is -- directly oversees

23 that process.

24          Q.     Who is it that makes a

1  decision as to what information goes into

2  that packet to students?

3  A.   I think it's -- there's been

4  a longstanding practice of what is

5  included, and then as things change, I

6  often use the phrase, as, as, as the

7  facts change, so does my opinion.  So,

8  for example, there are times when we are

9  discussing policies and Mr. Somers will

10 say, this should probably be included in

11 the back-to-school mailing, and then I

12 will contact Christine's office and say,

13 we need to make sure we add this next

14 year.

15 Q.   Okay.  In No. 12, where the

16 request is identify all training or

17 education completed on sexual misconduct

18 against students -- versus management or

19 compliance with Title IX from January

20 1st, 2014 to the present, and I list

21 several individuals that I'm asking about

22 their particular training.

23       Did you already compile that

24 list of the training that they've been

through?

A. I believe that I did, yes.

Q. Okay. I think that's what I was asking for before. You said you're gonna get that to your counsel so it could be passed along, correct?

A. That was my understanding, yes.

Q. Okay. On the 126 training -- or, Act 126 training, do you know whether that is tested in any way to ensure that the people doing it understood what they were --

A. Yup.

Q. -- doing?

A. I think that's what I was referencing when I answered that. Yes, there's an assessment at the end.

Q. Okay.

A. You need to get an 80 percent or better, I believe.

Q. Okay. In the interrogatory responses there's a note -- I had asked about who the Title IX coordinator was

1  over the course of particular years and

2  there was an answer that Kathleen

3  Cardamone was the Title IX coordinator

4  from January 2014 to June 30th, 2021?

5      A.    That's inaccurate.

6      Q.    Okay.  From talking to Dr.

7  McCue yesterday at her deposition, she

8  had told me that Kathleen Cardamone had

9  filled in maybe a month or two period of

10 time before she took over that role.

11 Does that sound more accurate?

12     A.    It does, yeah.

13     Q.    Why did -- why was Dr. McCue

14 no longer in the role of Title IX

15 coordinator in the fall of 2019?

16     A.    She left the district.

17     Q.    Was it of her own --

18     A.    Yes.

19     Q.    -- decision?

20     A.    Yeah.  She got a job at

21 Lehigh University.

22     Q.    Okay.  Before Dr. McCue took

23 on that role as Title IX coordinator,

24 what was done by the district to ensure

¹ that she understood her responsibilities

² as Title IX coordinator of the district?

³      A.    I don't have anything

⁴ additional to provide other than that she

⁵ went to the required training.

⁶      Q.    You said that outside

⁷ course?

⁸      A.    Yes.

⁹      Q.    But you said that you

¹⁰ weren't sure, you know, whether she did

¹¹ it at the start or at some point later;

¹² is that correct?

¹³      A.    I didn't say that.  I said

¹⁴ I'm not sure when she went, and I

¹⁵ couldn't tell you the dates of when she

¹⁶ went.

¹⁷      Q.    Other than the potential of

¹⁸ taking that course that you mentioned,

¹⁹ was there any other training provided by

²⁰ the district or implementation of her

²¹ getting training in some other way of

²² what the expectation was of the district

²³ of how she was going to handle her duties

²⁴ and responsibilities as it pertained to

1    Title IX?

2                   MS. JORDAN:  Note my

3        objection to the form of the question.

4                   You can answer.

5                   THE WITNESS:  Thank you.

6                   So I would say that any time

7        we, we speak to someone who is more

8        informed regarding a topic than us

9        that is a means of professional

10       development, and in any Title IX case,

11       I would assume that Cheryl -- Dr.

12       McCue, excuse me, collaborated with

13       counsel, Mr. Somers.  So I think it's

14       reasonable to say that his level of

15       expertise is exceptional and she

16       received professional development and

17       training along the way when she worked

18       with counsel.

19   BY MS. LAUGHLIN:

20       Q.    Just in meetings and stuff

21       like that?

22       A.    Sure, yeah.  I think most

23   things that are serious enough that she

24   would be involved, Kyle would be brought

1  into the process.

2      Q.   Okay.  Do you know whether,

3  other than that one training that was

4  outside that you mentioned for Title IX,

5  whether the district provided any other

6  Title IX training to her as the Title IX

7  coordinator?

8      A.   I'm not sure I understand

9  how that question's different than the

10  last one.  Isn't that the same question,

11  didn't you just ask that?

12     Q.   I think I was trying to ask

13  something -- at any point in time, did

14  the district ever provide training on

15  Title IX specifically to Dr. McCue?

16     A.   Other than through

17  Mr. Somers, I don't believe so.

18     Q.   Did Dr. McCue, as the Title

19  IX coordinator, ever provide training to

20  anybody else in the district on what's

21  expected under Title IX?

22     A.   I wouldn't be surprised if

23  over the course of her time in that role

24  that she co-presented with Mr. Somers in

¹ district administrative meetings, and I'm
² sure the records reflect that you asked
³ me to look into those trainings.  But I
⁴ can't recall her doing it by herself.  I
⁵ can recall, certainly Mr. Somers, and he
⁶ has had co-presenters, as recently, I
⁷ think I mentioned, in February, he
⁸ presented with Dr. Diegue, about Policy
⁹ 103 and the expectations.
¹⁰       Q.    When students have an
¹¹ adjudication through the district
¹² attorney's office, is that something --
¹³ based on conduct that had occurred in a
¹⁴ North Penn School District school, is
¹⁵ that tracked in any way by the district
¹⁶ to find out the outcome or what's going
¹⁷ on with the adjudication?
¹⁸       A.    Great question.  I wouldn't
¹⁹ say that there is an active process on
²⁰ our end, where we seek the outcome, but
²¹ we are alerted by the court system.  I
²² can't necessarily tell you how it's
²³ determined what is provided to us and
²⁴ what is not.  The only thing I will say

1  that I am certain of is there are times

2  where you have to put in the student

3  information system whether or not a

4  student was arrested, and there are times

5  where we don't know the answer to that.

6  So we will follow-up, and we will call

7  and say, was the student arrested, were

8  they cited, you know, and what was the

9  offense, was it a misdemeanor, a felony

10 and so forth.  We have done that.  But

11 often, we will get a report from the

12 district attorney's office telling us the

13 outcome, or we'll be notified by juvenile

14 probation, if the student's on probation.

15 You know, there's a gentleman who's a

16 probation officer that we regular use,

17 his name -- or, interact with -- his name

18 is Ken Lawrence.  Ken will send e-mail

19 saying, so-and-so is on my caseload,

20 please contact me if you have any

21 problems with that student.

22           So, those are systems that

23 are in place, but I don't know that it's

24 an active process on our end; they

1  contact us.

2       Q.    Okay.  And if -- for

3  example, do you know whether in this case

4  that the district was contacted about the

5  outcome of an adjudication of ███████

6  ███████ after 2015?

7       A.    I don't know the answer to

8  that, I'm sorry.

9       Q.    That's okay.

10      Have -- in compiling the

11  documents in this case, did you come

12  across anything about the district being

13  aware or documenting the result of the

14  adjudication?

15      A.    I don't recall.  I can

16  recall conversations with Sergeant Kiola

17  in the documentation, and I believe it

18  was the Upper Gwynedd Police Department,

19  but I recall reading things.  I think his

20  name was Ted Kiola.  I read that, but I

21  don't recall what the adjudication was.

22      Q.    Okay.  You said you read,

23  meaning the document that the North Penn

24  School District provided in this case?

1    A.    That's correct.

2    Q.    Okay.  Other than relying on

3  the DA's office or, like, if there's

4  probation involved, that they would

5  notify the district, is there any process

6  in place for the district to follow-up to

7  find out what the outcome was?

8    A.    Aside from us calling when

9  there is an open field when we don't know

10  in the student information system, I

11  can't think of any.

12    Q.    You say the student

13  information system, is that something

14  more recent, like, the last couple of

15  years, you would have that blank?

16    A.    That was the eSchool in

17  '15/'17 and then Infinite Campus

18  beginning in '19/'20.

19    Q.    What about before then, I

20  mean, like, before eSchool there was just

21  paper stuff.  Was there a process in

22  place that the district would call to

23  find that out?

24    A.    I am not aware of anything

1 additional.

2      Q.   Okay.  Is it important to

3 have that information of the results of

4 an adjudication of a student that's going

5 to be continuing in the district?

6      A.   You're asking for my

7 opinion?

8      Q.   Well for -- as the district.

9      A.   I'd like to think that if

10 it's important for us to know, we are

11 told of the outcome.  I do believe that

12 adolescents make mistakes, and in most

13 cases they can be rehabilitated with

14 supports.  So I believe that if we need

15 to know, law enforcement would tell us.

16 We have a very good relationship with

17 them.  I don't know that I believe

18 that -- and the district believes that we

19 need to know every outcome.

20      Q.   Is there anyone monitoring

21 the Title IX investigations to see

22 whether additional training needs to be

23 done or a change in policies and

24 procedures of the way things operate is

1  done on a, on a consistent basis?

2       A.    I would think that those

3  findings would be anecdotal through

4  Mr. Somers workings with the Title IX

5  coordinator.  When we find holes in

6  processes, we try and fix them, right?

7  So, if something were to be uncovered as

8  a result -- for example, wondering if

9  it's possible for an alert to be put up

10 on a student of -- that student's

11 schedule, then we do it.  So in terms of

12 a formalized process, I think it's -- the

13 answer's no.

14      Q.    Okay.

15      A.    But I do believe that there

16 are systems in place where we strive for

17 continuous improvement.

18      Q.    Have there been -- I guess

19 I'll come back to that.  I'm going to

20 show you some of the documents that you

21 reviewed in this case in preparation for

22 the deposition and to go through them

23 with you.  Give me one second.

24           Are you able to see that?

1      A.   I am.

2      Q.   Is it large enough for you?

3      A.   It is.

4      Q.   Okay.  I'm referring to

5  bates No. 1 of the North Penn School

6  District production.

7         Whose, whose notes are

8  these, this typed up document?

9      A.   I believe that was Dr.

10  Ann-Marie Lucas, wrote those.

11         What page are you on, I'm

12  sorry?

13      Q.   10001.

14      A.   Okay.

15      Q.   You have it in front of you

16  as well?

17      A.   I don't, but I'll find it.

18      Q.   I mean, can you see it on

19  the screen?

20      A.   I can, yeah.

21      Q.   Okay.  And I'm just gonna be

22  going through it with you now.

23      A.   Yup.

24      Q.   And who is, who is Ann-Marie

¹ Lucas?

²      A.    At the time of those notes,

³ she was the director of special

⁴ education.

⁵      Q.    Okay.  How -- do you know

⁶ when she took on that role of director of

⁷ special education?

⁸      A.    Yes.  She followed when Dr.

⁹ Rufo got promoted.  So it would have been

¹⁰ 2018.

¹¹      Q.    How did this, this meeting

¹² come about between Mrs. ███████████

¹³ yourself -- is it Dr. Lucas?

¹⁴      A.     It is now; it wasn't then.

¹⁵ I honestly believe that it was a phone

¹⁶ call from me saying I would like to sit

¹⁷ down and talk to her.  I was neutral in

¹⁸ my position at the time, and the

¹⁹ situation was brought to my attention, I

²⁰ supervise the high school, and I reached

²¹ out to her and said, can I sit down with

²² you.  And I think there was some

²³ apprehension initially, and then she

²⁴ called back and said, I'd be willing to

1  meet with you.  So she, Ann-Marie and I

2  all sat down.

3        Q.    How was the situation

4  brought to your attention?

5        A.    I believe Mr. Nicholson

6  reported it to me.

7        Q.    And when -- do you remember

8  when that was?

9        A.    It was certainly in the fall

10  of that year.  I don't know the exact

11  date.  Is there a date at the top of this

12  document.

13        Q.    There's not, no.

14        A.    I'm certain I can find it

15  quickly, because it would be in my

16  calendar, this meeting.  But yeah, I'm

17  going to guess right around October of

18  that year, and he called me to tell me

19  what happened.  I was not aware of this

20  situation prior to, and so he called and

21  shared some details with me, and of

22  course I was upset about it and wanted to

23  get to the bottom of it.  So I called

24  Mrs. ███████████ I believe, myself and

¹ then we met.

²      Q.    Why were you upset about it?

³      A.    Because I was disappointed

⁴ that a student ended up in the same class

⁵ when they should not have been in the

⁶ same class, and obviously the behaviors

⁷ that were alleged, and there was no

⁸ specificity as to what happened, none.  I

⁹ believe the term was sexually assaulted.

¹⁰ And I wanted to meet with the parent.

¹¹      Q.    When you say there was no

¹² specificity as to what happened other

¹³ than using the phrase sexually assaulted,

¹⁴ was that the term that Principal

¹⁵ Nicholson had used to you in that

¹⁶ conversation?

¹⁷      A.    Great question.  I'm not --

¹⁸ I can't say with confidence if he said

¹⁹ that.  My recollection of what he said to

²⁰ me back then was that, look, here's a

²¹ situation, apparently there was some

²² misconduct in elementary school, two

²³ students were to be separated, they went

²⁴ to different middle schools, and when she

1  came to the high school, mom let us know

2  that she should not be in the same

3  classes with this student, and at the IEP

4  meeting, the case manager checked their

5  schedules, they were not in the same

6  class, somehow, I'm not sure how, they

7  ended up in the same social studies

8  class, and mom says that it happened

9  again.

10          That's how it was outlined

11  to me; with no detail.  So that's when I

12  reached out to mom.

13          Q.    When you said that Principal

14  Nicholson said that, mom let us know

15  before ███████ had entered the high

16  school, meaning, like, let Principal

17  Nicholson know of the past conduct that

18  had happened in elementary and then the

19  fact that they were separated?

20          A.    When he was using the term

21  "us", I don't believe it was him.  I

22  don't believe he was initially involved

23  in the first meeting.  So it would have

24  been the case manager, specifically, and

1   the special ed supervisor.  At the time,

2   I believe that was Meg Schoppe and Kate

3   Small.  Juliet Matje was transitioning

4   from special ed supervisor at the high

5   school to the elementary school.  So I

6   think there was a little transition

7   period or overlap with Kate and Juliet.

8        Q.   Do you know specifically

9   whether any of those three individuals

10  had let Pete Nicholson know?

11       A.   Good question.  I don't know

12  that, whether or not they told him that

13  they can't be in the same class.

14       Q.   Okay.  Or of the situation

15  that was going on between them?

16       A.   I don't know that for a

17  fact.

18       Q.   Okay.

19       A.   Yeah.  It is not, it is not

20  uncommon in a high school of 3,000 kids

21  for two students to need to be separated.

22  That is not common -- uncommon, sorry.

23  So, I'm not certain that the special ed

24  supervisor would have said to the

1  principal, hey, Student A and Student B

2  aren't allowed to be near each other.

3          Q.    Is there a process in place

4  at the district -- and this is during

5  this timeframe, the relevant timeframe,

6  you know, 2018 -- was there a process in

7  place -- since you said it's not uncommon

8  for students to need to be separated --

9  that the district would implement as to

10  how that should happen when students need

11  to be separated?

12          A.    Since -- I'm sorry, did you

13  say since then or now -- or, then?

14          Q.    Then.  What was the process

15  then?

16          A.    Yeah.  It was typically word

17  of mouth.  It was typically those

18  meetings that we spent quite a bit of

19  time discussing earlier in this

20  conversation, where the counselors meet,

21  the assistant principals meet.  My honest

22  assessment in this situation, initially,

23  was that the middle -- the two separate

24  middle schools didn't note that these two

1  students need to be separated because
2  they were not both in either school.  So
3  I would assume that the counselor at
4  Pennbrook and the counselor at Penndale
5  did not say anything to the counselors.
6  However, mom did, at the IEP meeting.
7  And it's my belief that the schedules
8  were checked.  I know the individuals
9  involved, and I can't say enough about
10 Kate or Megan, two of our finest, and I
11 believe they did check their schedules,
12 and I also have reason to believe that
13 they were correct, that they -- the two
14 students were not in the same class,
15 because I was able to go back and check
16 their schedules the day of the IEP
17 meeting, and they were not.  So, I think
18 they did as they said.
19       Q.    What's the process that is
20 in place, though, when you're -- or, what
21 are the available processes in place to
22 separate two students at the high school?
23 I know you did talk about schedule
24 checking as one.  But are there other --

1    A.    Yes.

2    Q.    -- avenues that that can be

3 accomplished, to keep two students

4 separate?

5    A.    Yes.  I believe that is

6 referenced in one of these documents

7 here, that Mrs. Schoppe would meet with

8 ██████    Often, we would set routes for

9 two kids.  So let's say you have two kids

10 who got in a fight, and they can't be

11 near each other, when they see each

12 other, they see fire and they fight

13 again-type of thing.  So we would give

14 explicit instructions on which directions

15 students need to walk.  Okay, you are to

16 walk from this class to this class on

17 this floor, use this stairway, and

18 there's a reciprocity, I guess, there

19 with the other student.  Or, we give one

20 student a pass so that they can leave

21 class early so that they are in the

22 hallways when no one else is, and they

23 get a three-minute head start or whatever

24 it is to get to the next class, and then

1    they don't need to interact with the
2    other student.  There's also going as far
3    as families that say, I want to know if
4    so-and-so is going to the dance, because
5    my kid's not going if he or she is there.
6              So there are small measures
7    that we can put in place and, quite
8    frankly, checkpoints for the student,
9    which I also believe happened in this
10   case, where who you can talk to, who you
11   can -- where to go, how to get support,
12   if something happens who you report it
13   to.  So those are just some of the things
14   that we do to try to help mitigate
15   circumstances where two kids can't be
16   together.
17        Q.    Do you believe in this case
18   that a pass or a certain route to take
19   was implemented at the beginning of the
20   school year for █████
21        A.    I do believe that there is
22   documentation here that that was to
23   happen, that Mrs. Schoppe was to meet
24   with ██████ and I also believe that -- I

1  think there are three dates noted where

2  she met with her, but I don't know that

3  there is written confirmation that she

4  gave her a pass or that they discussed

5  it.  I don't know the details of those

6  conversations from -- in 2018.

7      Q.   Okay.  And why did --

8  Principal Nicholson, why was he calling

9  you to bring it to your attention about

10 what had happened?

11     A.   I think Mr. Nicholson has a

12 really high moral compass, and the events

13 as I just described are disappointing.

14 So he called me and said, hey, this

15 happened, and I don't know how it

16 happened, and I'm sorry, but I wanted to

17 let you know.  And that's when I reached

18 out to the mom.

19     Q.   Have you ever had any prior

20 contact with Mrs. ███████████  ██████

21 █████████  before this point?

22     A.   No.  My path did not overlap

23 with ████████  at all.  So I was a high

24 school principal while she was in middle

1  school and then I left the high school

2  before she got there.  I left the summer

3  that she was coming in.  So I had never

4  interacted -- I knew nothing about this

5  case until this point.  So if there seems

6  to be a fluidity to which I'm talking,

7  it's because I was involved at this

8  point.

9       Q.   Okay.  Was -- this was

10 Principal Nicholson's first year as the

11 principal of the high school; is that

12 correct?

13      A.   That's correct.

14      Q.   Was he a district employee

15 prior to this time?

16      A.   He was.

17      Q.   What did he do before then?

18      A.   He was the assistant

19 principal while I was the principal.

20      Q.   Oh, at the high school?

21      A.   Yes.

22      Q.   Okay.  How long was he in

23 that role?

24      A.   I'm going to say five or six

1  years.

2       Q.    Okay.  Was he with the

3  district prior to that time?

4       A.    If you give me 30 seconds, I

5  can tell you.

6       Q.    Okay.

7       A.    No.  I can tell you.

8       Q.    Okay.

9            MS. LAUGHLIN:  Why don't we

10    take a brief -- let's go off the

11    record for a second.

12            THE VIDEOGRAPHER:  Okay.

13    We're going off the video record, the

14    time is 2:12 p.m.

15                -  -  -

16            (A recess occurred.)

17                -  -  -

18            THE VIDEOGRAPHER:  We're

19    back on video record, the time is 2:22

20    p.m.

21  BY MS. LAUGHLIN:

22       Q.    Dr. Bauer, right before the

23  break, I just showed you the document

24  bates No. 1.  I just want to go through

1 this document with you, and were you able

2 to find out when this meeting had

3 occurred?

4      A.     Oh, no.   The -- my task was

5 to determine when Mr. Nicholson started

6 with the district, which was --

7      Q.     Oh, I'm sorry.   Go ahead.

8      A.     10/7/13.

9      Q.     Okay.   Thank you.

10      The -- I want to go through

11 these notes with you and just kind of, if

12 you can, as we go through them, tell me

13 what you're remembering about, about the

14 meeting.

15      A.     Okay.

16      Q.     It says that, mom provided

17 the below background in perspective

18 resulting in current concerns of ▮▮▮▮▮▮

19 education provided to date.

20      Would you agree, that's how

21 the meeting started, that Mrs.

22 ▮▮▮▮▮▮▮▮ was filling you as well as

23 Ann-Marie Lucas in?

24      A.     Yes.   And for the record, I

1  didn't want to let you down; December

2  11th, 2018.  So I was wrong.  The meeting

3  took place on December 11th.

4        Q.    This meeting referenced on

5  Page 1?

6        A.    Yes.  I said October; I was

7  wrong.

8        Q.    Okay.

9        A.    Okay.

10        Q.    And so, I mean, I can

11  represent to you, I believe the record

12  states that it was reported or that, you

13  know, Mr. Nicholson became aware of what

14  had happened in the classroom in late

15  October, according to the records.

16              When did Principal Nicholson

17  inform you of what had happened?

18        A.    I think immediately.  If I

19  recall correctly, there was some --

20  unfortunately, there was some legal

21  minutia that prevented us from meeting in

22  a timely manner.  Initially, we -- I had

23  reached out, and it was kind of, we'll

24  get back to you, and it took weeks, and I

1  think I did say before the break here

2  that she eventually agreed to meet with

3  me.  So, it took some time to get it

4  scheduled.  So I believe that that's the

5  reason why it was on December 11th.

6       Q.    Meaning, that you had

7  reached out to Mrs. ████████ initially

8  when you found out back in October?

9       A.    That's correct.

10      Q.    And you said some legal

11  minutia happened that allowed you to not

12  be able to meet with her until December;

13  is that right?

14      A.    Yeah.  My understanding was

15  that she was under the advice of counsel,

16  and she -- I recall her actually

17  apologizing; sorry this took so long, but

18  I wasn't going to meet with you, then

19  they said I could meet with you-type of

20  thing.

21      Q.    Okay.  Was any legal minutia

22  on the district's end?

23      A.    No.  No, not at all.

24      Q.    Okay.  And so you have this

1  meeting and mom is starting out the

2  meeting explaining what had happened?

3       A.    Yes.

4       Q.    Okay.  And then, can you

5  just kind of, like, if it's helpful to go

6  through this or if you have all of this

7  from memory and you remember what was

8  happening and discussed at the meeting.

9  However it's easiest for you, I just want

10 for you to explain, I guess, what

11 happened at this meeting?

12      A.    Yeah.  I think the meeting

13 was fairly straightforward, in that mom

14 detailed for me -- and again, at that

15 time, other than what I had gathered from

16 Mr. Nicholson, I didn't know Mrs.

17 ▬▬▬▬▬  and I didn't know ▬▬▬▬▬

18 and I didn't know ▬▬▬▬ quite frankly.

19 So we met, and she had told me what had

20 happened.  She told me about the meeting

21 in the summer, the IEP meeting, that her

22 understanding was that the kids were not

23 in the same class, that ▬▬▬ was not

24 performing well in the class, her grades

1   were not good, and the teacher

2   recommended a level change.  When the

3   counselor -- or, the home office, which

4   includes your counselor and your

5   assistant principal, initiated changing

6   her class, because she was failing, they

7   said that she reported, ultimately, I

8   believe to the tech school, that this had

9   happened at the high school, that she had

10  been assaulted again by ▮▮▮▮  So I

11  listened to the story.

12       Q.    Let me just stop you right

13  there.  I have one question to ask you.

14            When you said that ▮▮▮

15  was failing the class --

16       A.    Yes.

17       Q.    -- at the high school and

18  that she was going to be moved and then

19  she reported this to the high school,

20  where did you get that information from?

21       A.    I said to the tech school.

22       Q.    I'm sorry, I apologize.  To

23  the tech school.

24            Where did you get that

1  information from?

2      A.    I -- based upon memory, I'm

3  saying I believe Mr. Nicholson telling me

4  that, but I think it's also in Kate

5  Small's notes that were provided here,

6  that she notified someone at the tech

7  school.

8      Q.    But, I mean, specifically

9  that, you know, that was the progression

10  of what happened, she was failing, she

11  was gonna be moved, then she told

12  somebody at the tech school, that

13  information, was that from Principal

14  Nicholson?

15      A.    That's my understanding of

16  the events, which, I believe, you know, I

17  developed my understanding of the events

18  based upon conversations and notes that

19  I've read.

20      Q.    Was there --

21      A.    Go ahead.

22      Q.    Was there any understanding

23  that you -- that was communicated to you

24  as to the motivation for ▮▮▮▮▮ if any,

1    of, of reporting that she had been

2    assaulted by █████████

3            A.    The motivation --

4                  MS. JORDAN:  Objection to

5       the form of the question.

6                  You can answer, if you

7       understand.

8                  THE WITNESS:  No, I don't.

9       The motivation of why she reported it?

10   BY MS. LAUGHLIN:

11           Q.    Yeah.  I'm asking, did Pete

12   Nicholson communicate to you whether he

13   had believed ████████ disclosure that she

14   had been inappropriately touched by

15   █████████

16           A.    I'm sorry, ask that one more

17   time.

18                 MS. LAUGHLIN:  Can you read

19      it back, Court Reporter, please.

20                 THE COURT REPORTER:  Sure.

21                 Question:  Yeah.  I'm

22      asking, did Pete Nicholson communicate

23      to you whether he had believed

24      ██████████ disclosure that she had been

1    inappropriately touched by ████

2              THE WITNESS:  Okay.  Thank

3    you for that clarification.  That was

4    dramatically different than my

5    understanding the first time.

6              Mr. Nicholson did not, in

7    any way, shape or form, provide a

8    judgment on the allegation.

9    BY MS. LAUGHLIN:

10        Q.    Have you ever been informed

11   or had the impression that ████ had

12   made up the disclosure that she was

13   inappropriately touched by ████

14        A.    No.  Unequivocally, no.

15   That she made it up, no.

16        Q.    Or that it was, like,

17   untrue?

18        A.    No.  I have not heard anyone

19   dispute whether or not.  I'm not sure

20   I've heard anyone pass a judgement one

21   way or the other, whether or not he

22   touched her, no.

23        Q.    Did Pete Nicholson ever

24   communicate to you that the reason that

1    █████  had disclosed at that time was

2    because she didn't want to be removed

3    from the social studies class?

4         A.    No.  He did not tell me that

5    she disclosed that because she didn't

6    want to be removed, absolutely not.

7         Q.    Okay.  When I took the

8    deposition of Curt Dietrich last week, or

9    recently, he had explained -- or, he had

10   testified that somebody had told him, he

11   thought it might have been Pete

12   Nicholson, that the reason that █████

13   had disclosed at that time was because

14   she didn't want to be removed from the

15   class.  Have you heard anybody say that

16   before?

17                MS. JORDAN:  Note my

18      objection to the form of the question.

19                You can answer.

20                THE WITNESS:  Yeah, I have

21      not.  Quite frankly, that makes no

22      sense to me.  Why would she report

23      that as a rationale for not being

24      moved?  I mean, reporting that would

1    absolutely result in her being moved.

2    So, that makes no sense.

3         Now, do I think that the

4    timing is, I guess, subject to

5    consideration, sure, that she was

6    told -- she reported it after she was

7    told she was moving.  But I don't, I

8    don't think that would be a good

9    reason for her to report.  I don't

10   want to move, so I'm going to report

11   that someone assaulted me.  That, that

12   doesn't make any sense to me.  So no,

13   I have never heard that, I have never

14   heard anyone allege that, no.

15   BY MS. LAUGHLIN:

16       Q.    Why is it -- you said the

17   timing would be a consideration; why is

18   that?

19       A.    I think that there were

20   several checkpoints along the way.  My

21   understanding is that ████ was getting

22   counseling on a regular basis, that her

23   case manager checked in with her on

24   multiple occasions since the start of the

1  school year, to check in and see how

2  things were going, and it was never

3  reported.  So, for it to come out the day

4  after that she was told she was going to

5  be moved from level five to level four, I

6  said that I believed that to be worthy of

7  a conversation.  Like, I don't know why

8  she told -- decided to tell someone then

9  as opposed to earlier, but I haven't

10 given any thought as to what the

11 motivation might be.  Yeah, so, I have

12 never heard anyone allege that she said

13 this because she didn't want to switch

14 classes.  That doesn't make sense to me.

15      Q.   You said that the timing

16 would be part of conversation that the

17 day after she told she was -- was told

18 she was moved, then she reported.  What,

19 what correlation do you believe those two

20 things have?

21      A.   I believe I intended to say,

22 at least, that it was worthy of

23 consideration.  Like, I would like to

24 know why.  If this was occurring, I'd be

1   interested in why she reported it then as

2   opposed to the times that her case

3   manager checked in on her and opposed to

4   the times that she met with the

5   counselor.  That would be a question.  I

6   have never spoken to ███████  I have never

7   met her in my life, but I would be

8   interested in that answer.  But that's

9   not me passing judgement in any way,

10  shape or form.  It's just, I don't know

11  why it was reported that day as opposed

12  to two, three -- the first day of school;

13  I don't know.

14       Q.   Did you ever try and find

15  out that answer?

16       A.   Mom had told me her

17  rationale when I met with her, and she

18  just said she didn't trust us, so she

19  didn't report it.  That was kind of the

20  explanation there.  I've never spoken to

21  ███████  again.  So, I still to this

22  day -- and I recognize that I'm jumping

23  ahead -- I still to this day don't know

24  what's alleged to have happened; I don't

1  know.  I read more detail in a newspaper
2  article than I knew about what is said to
3  have happened at North Penn High School.
4          Q.    You said yourself, today,
5  you still question why she reported at
6  that time; is that right?
7          A.    I said I think it's worthy
8  or consideration and I wonder.  Yeah, I
9  don't know why -- it's just sad or
10  unfortunate to me, that when -- you know,
11  assuming that these events did occur,
12  that multiple adults checked in with a
13  student on a regular basis and it was
14  never reported, because, of course, I
15  would like to keep kids safe and, of
16  course, I don't want something like this
17  to happen to a child.  So, yeah, I wish
18  this had -- I wish a lot of things had
19  happened differently, of course.  But I
20  just don't know why then in October as
21  opposed to weeks earlier, when there were
22  check points along the way, that's all,
23  that's what I meant.
24          Q.    Mom, I mean, mom told you in

1  this meeting, right?

2      A.   Mom told me what she thinks,

3  yes, she did.

4      Q.   Do you have some reason to

5  disagree with what mom told you?

6      A.   No, I don't.

7      Q.   But you're still saying,

8  today, that you wish you knew and it's

9  worthy of consideration; is that right?

10      A.   Sure, yeah. I, I said that,

11  yes. I, I wish we had known before,

12  because, of course, we would have stopped

13  it. So, yeah.

14      Q.   No, I meant specifically

15  about this issue, about the timing of

16  █████ reporting. I'm saying, mom told

17  you -- you said what she believed to be

18  the case.

19      A.   Right.

20      Q.   Did you ever try and find

21  out whether there was another reason that

22  exists out there --

23      A.   Nope.

24      Q.   -- you're saying that, I

1  wish I knew today?

2      A.    No, I don't.  I haven't

3  spoken to ████    I, I did answer this

4  question.  I -- no, I have not pursued

5  another rationale.  I know what mom told

6  me she thought, and I have no reason to

7  believe that that's not true.  I just --

8  it's a fact of the case that is

9  disappointing to me, that we didn't know

10 sooner, I wish we had.  Regardless of how

11 it would have happened, that's all.

12     Q.    Okay.  So mom tells you in

13 this meeting that three events occurred

14 over the years to ██████ one happened

15 when she was five and then again in sixth

16 grade, and in the sixth grade year, it

17 was alleged sexual assault occurred with

18 ██████ by a student in her class.

19 Teachers didn't report it.  ██████ is the

20 alleged student.

21          Is there anything about this

22 meeting and mom telling you this that you

23 recall that isn't included in this?

24     A.    No.  Actually, I remember --

1  I have a very good memory.  I have plenty
2  of character and personal flaws, but I do
3  have a good memory, and when I looked
4  this over in preparation today, I was
5  impressed with the notes.  It's -- I
6  think it's very detailed.  So, the one
7  thing that maybe isn't reflected in
8  here -- I don't know if you could please
9  scroll down a bit -- my meeting with mom
10  was actually -- keep going, please.
11      Q.    Oh.  Mm-hmm.
12      A.    And further, please.
13      Q.    Sure.
14      A.    Go all the way to the
15  bottom, please.
16      Q.    Okay.
17          This?
18      A.    Yeah.  There is a part in
19  here where she said -- go up a little bit
20  higher.  It's right at the end here.
21  Right there.  So the second bullet from
22  the bottom.  Mom shared she was happy
23  that we met with her, and it was the most
24  honest and open conversation that she has

1 had and has wanted to have occur.

2          My meeting with mom was

3 rather productive.  Mom was -- she

4 actually used the phrase, which I don't

5 believe is reflected here, "where have

6 you been this whole time", when she was

7 talking to me, because she said she

8 trusts me, she liked me.  I don't recall

9 if it ended in a hug.  Of course, when

10 someone is outlining the details of their

11 daughter, it's an emotional thing, and as

12 a father of a daughter, I, you know, I

13 feel for Mrs. ▓▓▓▓▓▓▓▓  But I did

14 feel that the meeting was positive, and

15 she said to me, "I wish I had met you

16 long ago", because I was just trying to

17 work with her and help her through all of

18 this and -- so, it was, it was positive.

19 I would describe the outcome of the

20 meeting, given the circumstances, as

21 extremely positive, and I think it's

22 reflected in that bullet, but I'm not

23 sure that that bullet does it justice,

24 because she honestly used the phrase

¹ "where you have been all my life" type of

² thing.

³          So, it was a difficult

⁴ meeting, it was a necessary meeting, it

⁵ ended on great terms.  I am understanding

⁶ that she does not like Dr. Dietrich, she

⁷ made that abundantly clear throughout the

⁸ meeting, but I thought she and I, in our

⁹ hour or two together, developed a pretty

¹⁰ good rapport.

¹¹     Q.    Did she explain to you why

¹² she doesn't like -- why she told you or

¹³ you're saying she didn't like Dr.

¹⁴ Dietrich?

¹⁵     A.    Yeah.  She, she blamed him,

¹⁶ and she overtly said that on numerous

¹⁷ occasions, that this is Dietrich's fault,

¹⁸ because he's the superintendant and,

¹⁹ yeah, things can get dropped from

²⁰ elementary to middle and middle to high,

²¹ but he was there -- he knew about this

²² the whole time, and this is his

²³ responsibility.  That's what mom said to

²⁴ me.

1        Q.    That Dr. Dietrich knew this,
2   meaning, like, the assault in sixth
3   grade, what happened in ninth grade at
4   the tech school --
5        A.    Yes.
6        Q.    -- and then, again, you
7   know, going into high school?
8        A.    Yes.  That is what mom said.
9        Q.    Okay.
10       A.    So -- but she was very
11  complimentary of me.  She was -- alluded
12  to, I'm not sure which direction I'm
13  going to go here, I'm so happy that
14  there -- she didn't use this phrasing,
15  but she did use hyperbolic phrases in
16  saying something like, I'm not sure if
17  I'm going to sue you guys for all your
18  worth or if I'm happy with the outcome
19  here, and she actually used that phrased.
20  So --
21       Q.    She used the phrase to you
22  that, "I'm not sure if I'm going to sue
23  you for all your worth."
24       A.    She did.

1    Q.    Okay.

2    A.    She did.  It wasn't pointed

3  at me, but she did say that in the

4  meeting.

5    Q.    Was it in, like, a joking --

6    A.    Yes.

7    Q.    -- response?  And did you

8  laugh when you heard that?

9    A.    I believe.  It was towards

10  the end of the meeting, and it was in the

11  context of, you know, this was really

12  great, thank you, I'm still not sure if

13  I'm going to sue you for all you're worth

14  or if I'll be in touch-type of thing, and

15  it was said with a smile.  So, again, and

16  I think if you spoke with her and asked

17  her about this meeting, she would tell

18  you that it was a positive meeting with

19  me.

20    Q.    Was mom happy throughout

21  this meeting, or were there other

22  emotions, like, her being angry or upset?

23    A.    I did mention that it was

24  emotional as she told the story, which I

1  completely understood as a parent.

2       Q.    Emotional, was she crying in

3  the meeting?

4       A.    Yes.

5       Q.    This part on Page 1 where

6  it's talking about what had happened at

7  the tech school, do you remember mom

8  actually telling you about the incident

9  that had occurred at the tech school?

10      A.    I recall us discussing it,

11  yes.

12      Q.    Tell me what you remember

13  about, about that.

14      A.    I'm trying to see if there's

15  anything additional to what I'm reading

16  here.  I recall -- like, from memory, I

17  recall her saying, you know, they were to

18  be separated, it took a while until she

19  found out that █████ was at the tech

20  school as well, she contacted Dr.

21  Dietrich and wanted █████ kicked out of

22  the tech school, then they worked on a

23  plan to kind of keep the two students

24  separate, in separate programs, safety

1  plan of sorts at the tech school, who the

2  point people were that she was to go to,

3  which security guard she should talk to,

4  who the fall back was going to be if that

5  security guard wasn't present.  I know

6  she had an exceptionally close

7  relationship with Dr. LeBlanc.  That's

8  what I recall the discussion being about

9  the tech school.

10      Q.    When you say exceptionally

11  close relationship with Dr. LeBlanc, what

12  do you mean?

13      A.    Mom was very complimentary

14  of Dr. LeBlanc.  Like, she's her ally,

15  she's the one who looks out for her,

16  she's the best-type of thing, amidst

17  criticism of some others, I believe.

18      Q.    And then after the ninth

19  grade incident at tech school, there's

20  this meeting that occurs at the high

21  school kind of -- the year; is that

22  right?

23      A.    Yeah.

24      Q.    What do you remember about

1  the meeting mom describing what had

2  happened -- high school meeting?

3       A.   Yeah.  I remember that mom

4  said, look, there are -- there's a boy

5  that she's not allowed to be around, I

6  don't want too many people to know about

7  this, it's time for us to move on, but

8  they are to be separated, under no

9  circumstances can they be in the same

10 class, I believe that they can see each

11 other in the hallways or walk past each

12 other, but they cannot be in the same

13 class or the same lunch.  I told her that

14 they were gonna check her schedules --

15 their schedules to make sure that they

16 weren't and -- yeah, that's my

17 understanding of the initial meeting.

18      Q.   Is this from mom, mom

19 telling you this in this meeting?

20      A.   Yes, that's my recollection.

21      Q.   And Kate Small and Megan

22 Schoppe, do they have, like, the ability

23 and the authority to be implementing

24 these separation measures?

1    A.    Yes.  I would say that

2  that -- it's a regular occurrence for a

3  case manager, which was Megan, at the

4  time, to kind of work through plans for

5  how to walk, who to go to, if something

6  happens, how to report it, that kind of a

7  thing and then to have regular check-ins.

8    Q.    Okay.  Is there anything

9  else you can recall up to this point in

10  the meeting with Mrs. ███████ that we

11  didn't already talk about?

12    A.    Up to that point, no, I

13  don't recall anything else.

14    Q.    Okay.  And then the next

15  note here, it says, on October 29th, mom

16  gets a call from ████ and that she was

17  being assaulted again by the same

18  student.

19        Tell me what you recall

20  about mom telling you in this meeting?

21    A.    I don't recall anything

22  additional to what's written here.  I

23  recall her being emotional and kind of

24  just, for lack of better phrasing,

1  incredulous, I can't believe this, this

2  is happening, how could this happen-type

3  of thing.  She did express, you know,

4  just no trust in us.  But yeah,

5  everything that's outlined right here, I

6  recall.

7      Q.   No trust in us, meaning the

8  district?

9      A.   Yes.  She said things like

10  ███████ will never step foot back in that

11  building again.

12      Q.   Did you -- when mom was

13  telling you this, did you explain to her

14  about what her rights were under Title IX

15  as to accommodations, whether it's at the

16  school or what other things the district

17  can implement for ████████

18      A.   Yeah, I did.  And I actually

19  talked to her about filing a report.  I

20  believe these notes reflect that I

21  provided a form.  So we did have that

22  conversation.

23      Q.   Up to this point, had a

24  investigation occurred at all for what

1   had happened in the high school?

2       A.    I would assume, yes, at this

3   point, on December 11th.  I can, you

4   know, I can look here.  There are notes

5   from interviews with other students in

6   the class, there's a -- there are notes

7   here from the teacher that would tell you

8   when the investigation occurred.  I don't

9   recall exactly -- hold on -- I'm seeing

10  that, on November 9th, Megan Schoppe

11  provided a statement.  On November 5th,

12  the teacher sent an e-mail outlining what

13  he saw in the classroom.  So yes, I guess

14  it's fair to say that an investigation

15  had taken place at that point.

16      Q.    Do you know --

17      A.    If --

18      Q.    -- there's -- sorry, go

19  ahead.

20      A.    No.  If there are notes,

21  statements from teachers and students in

22  November and this meeting was in

23  December, then yes, an investigation of

24  some sort took place.

1    Q.    Do you know, there's some
2 student notes about I guess some
3 interviews of students --
4    A.    Yes.
5    Q.    -- at Pages 842 -- or, I'm
6 sorry -- 541, 542.  Do you know when
7 those were taken?
8    A.    I don't.
9    Q.    Do you know whose
10 handwritten that is?
11    A.    That looks like Mr.
12 Nicholson's handwriting.
13    Q.    You refer to a statement by
14 a teacher.  Are you just talking about
15 that e-mail?
16    A.    Yes.  And Megan Schoppe
17 provided one as well, I believe.  It has
18 her signature at the bottom.  I'm talking
19 about 543 and 544.
20    Q.    Do you know who was managing
21 or leading the investigation in the tenth
22 grade?
23    A.    At this point I would assume
24 it was in the hands of Mr. Nicholson.

¹     Q.    Okay.  So when we talked

² earlier today you were saying that Title

³ IX issues of sexual misconduct with

⁴ students would all be handled by a Title

⁵ IX coordinator.  Do you know why Mr.

⁶ Nicholson was the one doing this and not

⁷ the Title IX coordinator?

⁸     A.    My recollection is that this

⁹ was under the advisement of Mr. Somers,

¹⁰ at this point.  At this point in the

¹¹ game, we had been told initially by the

¹² police to stand down and wait while they

¹³ conducted their investigation, and then

¹⁴ they told us that we could proceed with

¹⁵ our investigation, that they were not

¹⁶ pressing any charges, there were no

¹⁷ charges being brought, I believe.  And

¹⁸ then at that point Mr. Nicholson and I

¹⁹ spoke with Mr. Somers, and we still

²⁰ didn't know what was being -- I mean,

²¹ it's important to note here that we did

²² not know what the allegations were.  We

²³ don't -- at no point.  Mrs. ███████

²⁴ did not tell me, ██████ never reported.

1  We don't know what was alleged to have
2  happened, other than she was assaulted
3  again.
4          We provided a form to Mrs.
5  ███████████ to ask, you know, ███████ to
6  write a report.  We offered to interview
7  her.  Mom told me she will not step foot
8  in that building.  Mom did not want us to
9  talk to her.  So we had nothing to work
10  from.  So, at that point, I believe the
11  advice was check with a couple students.
12  You know, we're not gonna interview 28
13  kids, but let's talk to a couple students
14  and see if there's, there's anything here
15  to go off of.  Not whether or not it
16  happened, just if there's evidence to
17  suggest that something happened here.  We
18  interviewed these students.  I don't
19  believe -- I think there was one comment
20  in one of the student's statement that I
21  think you could say, okay, we could
22  unpack that a little bit.  But otherwise,
23  the teacher, the students, the case
24  manager, no one had anything to report.

1    So we really didn't have anything to go

2    by.  So, that's my recollection.

3         Q.    When you said that all you

4    knew was ███████ was assaulted again --

5         A.    Yeah.

6         Q.    -- did you have an

7    understanding of whether it was, like, a

8    sexual-type assault or whether she was

9    punched?

10        A.    I, I did not know that.

11              MS. JORDAN:  Note my

12    objection to the form of the question.

13              You can answer.

14              THE WITNESS:  I don't.  I

15    think I assumed in the moment that it

16    was a similar type of assault.  So I

17    assumed that it was alleged that he

18    touched her inappropriately.  That's

19    what I assume.

20    BY MS. LAUGHLIN:

21        Q.    Like, in a sexual nature; do

22    you mean?

23        A.    Yeah.  And again, I didn't

24    know.  I did not know at that time, and

¹ we were, of course, responding to what

² the police told us we could and couldn't

³ do and then working with Mr. Somers and

⁴ trying to do things as best we could with

⁵ very, very limited information.

⁶      Q.    When you say what -- the

⁷ police told you what you could and

⁸ couldn't do, who did the police

⁹ communicate with specifically?

¹⁰      A.    I think it was Mr.

¹¹ Nicholson.

¹²      Q.    And to your understanding,

¹³ the police told Mr. Nicholson, "do not

¹⁴ investigate, don't talk to anybody"?

¹⁵      A.    Yes.  It is common in

¹⁶ situations such as this and many we're

¹⁷ they're involved in conducting an

¹⁸ investigation, that they don't want us to

¹⁹ tarnish their investigation, to ask kids

²⁰ questions -- I think they're afraid that

²¹ we will impede their investigation.  So,

²² they like to conduct their business, and

²³ typically we would take immediate

²⁴ measures to ensure that everyone was

1  safe, and in this case that was certainly
2  the case, because ███████ was no longer
3  coming to school.  So there wasn't
4  anything we could do immediately, or
5  measures we could take immediately.  So
6  when they asked us not to investigate
7  until they gave us the green light to do
8  so, and we didn't.
9      Q.    When you say take immediate
10 measures to make sure everyone is safe,
11 is there any manner that the district
12 took to ensure that other female students
13 were safe from ███████ who the allegation
14 was against?
15     A.    I, I think the measures
16 we're talking about here, in checking
17 with the teacher, checking with other
18 students in the classroom and what they
19 saw, talking to a case manager.  We're
20 talking about a student that has zero
21 conduct referrals in his time at high
22 school.  So, we didn't have anything,
23 anything reported about this young man
24 aside from something happened and we do

1  not know what.  So I don't know that it

2  would be appropriate to take new measures

3  when we didn't even know what happened,

4  and this is a student who had zero

5  conduct referrals.

6          Q.    For this high school, which,

7  he had been there, like, what, two months

8  or something?

9          A.    Correct.

10         Q.    Okay.  Was ▮▮▮▮▮

11  interviewed at all as part of this

12  process?

13         A.    No.

14         Q.    Why not?

15         A.    That's a good question.  And

16  in hindsight, I think I, I wish we had.

17  At the same time, I understand why not,

18  given the lack of information that we

19  had.  The police -- we did know that the

20  police investigation resulted in them

21  pressing no charges and having no

22  findings, and our questioning of other

23  students resulted in no findings of any

24  sort or any allegations, and ▮▮▮▮▮ and

1    her mom's refusal to let us question or

2    investigate with her, we didn't have

3    anything.  We had nothing to question him

4    about other than to say, I guess, "did

5    you assault", to which I, I -- you know,

6    perhaps it's ignorant of me, but I would

7    assume that he would have said no.  We

8    didn't know what was being alleged,

9    how -- if there was touching, what it

10   was.  So we didn't have anything to ask

11   him, because we didn't know what was --

12   what she was saying, accusing him of.

13        Q.    So there was no questions

14   that could have been asked of ████ at

15   that time, then, that would have helped

16   in an investigation?

17        A.    No.  I didn't say that.  I

18   didn't say there were no questions that

19   we could have asked him.  I said, at that

20   time, we didn't have any information.

21   So, yeah, and I also recognize, in

22   hindsight, maybe we should have.  But we

23   didn't, because we didn't have anything

24   at the time.

1    Q.    Well I think you had told me
2  that you could have asked him, "did you
3  assault this person", is what you could
4  have asked him; is that right?
5    A.    Yeah.  I did say that.
6          MS. JORDAN:  Note my
7    objection to the form of the question.
8          You can answer.
9          THE WITNESS:  I said that.
10 BY MS. LAUGHLIN:
11   Q.    Could have asked him, like,
12 what happened?
13   A.    Yes.
14   Q.    Is that something someone
15 from the district could have done?
16   A.    They could have.
17         MS. JORDAN:  Note my
18   objection to the form of the question.
19         You can answer.
20 BY MS. LAUGHLIN:
21   Q.    Who was directing who gets
22 interviewed and who doesn't?
23   A.    I believe they -- you know
24 what, I haven't cross-referenced this,

1  but I believe -- knowing Mr. Nicholson,

2  my guess is that they looked at the

3  seating chart and they picked students

4  around ███████  I haven't

5  cross-referenced the two lists, who

6  they picked and why.  But I'll bet you

7  that's -- I mean, that's what I would do.

8  I would look at the seating chart and ask

9  the kids who say close by and say, "did

10  you see anything", "what did you notice",

11  "how were the interactions", "anything of

12  note that we should know about."  That's

13  what I would do.  But I don't know that

14  anyone directed Mr. Nicholson which

15  students should be interviewed.

16      Q.    Okay.  Do you know whether

17  there was any instruction from, whether

18  it's Mr. Somers or anybody else, as to

19  what questions should be interviewed --

20  or, asked of these students?

21      A.    I don't know that with

22  confidence.

23      Q.    Okay.  And so ███████ ends up

24  transferring back to the tech school at

1  this time so that she could be away from
2  ████████

3      A.    I don't -- I'd have to look
4  closer.  I don't recall if -- the way my
5  meeting with mom ended was essentially me
6  asking her what her desired outcome was.
7  You know, let's understand -- I
8  understand the circumstances here, I
9  understand why you're upset and why
10 ████████  upset and I understand the
11 situation, what can I do to help, how can
12 we try to make this right at this point.
13 And I remember mom saying, "I'll get back
14 to you".  We talked about options, we
15 talked about other schools, we talked --
16 because mom made a point that she was
17 very unhappy with -- I think her name was
18 Elizabeth Shine -- very unhappy, I don't
19 want her anywhere near my daughter.
20 That's a teacher at the tech school.  She
21 didn't trust people at the tech school
22 either other than Dr. LeBlanc.  So I
23 recall her saying she would ger back to
24 us.  But we talked about other options.

1  We talked about virtual school, we talked

2  about, you know, we could pursue Bucks

3  County Technical Career Center, there

4  were other schools with therapy, there

5  are other -- you know, I'm open to

6  suggestion, you can visit some schools,

7  but happy to try and help and find a way

8  to make ███████ feel safe.

9       Q.    Okay.

10      A.    So, I recall that we -- I

11  believe, pretty soon thereafter, there

12  was a meeting, an IEP meeting, and ██████

13  ended up attending our virtual academy.

14      Q.    Okay.  Meaning, attending

15  school virtually?

16      A.    Yes.  So we have a -- an

17  interesting program here at North Penn,

18  we call it the Northbridge program.  And

19  out of there we run a virtual academy,

20  but we also have a hybrid program, where

21  kids come in a couple days a week to get

22  some reports, some counseling, things

23  like that.  I think, ultimately, ███████

24  was presented with all the options, but

1 ultimately decided to attend virtually.

2 　　　　Q.　　At the top of Page 2, bates

3 No. 2, where is says, shared some

4 documentation which was educational

5 records.  Why don't we have records about

6 the incidents, phone calls, e-mails.  It

7 says transfers of assignments have

8 occurred.  Only filed -- from latest

9 issue handled by Kate Small.

10 　　　　　　What was the conversation at

11 this part?  Did you respond to mom?

12 　　　　A.　　So, the bullet immediately

13 thereafter says, Todd explained --

14 certainly, we don't hold onto every phone

15 call or all the e-mails, and what was in

16 our educational records and files was

17 shared.  Logs of phone calls are not

18 necessarily picked up or shared.

19 Student's actual file.  The TOA was not

20 in her file.  So we had to seek that

21 separately, which we did, and then

22 provided.  That's how I responded in that

23 moment, understood mom's concerns.  That

24 was the extend of it.

1    Q.    Was there any --

2    A.    After that.

3    Q.    Sorry, go ahead.

4    A.    Nope.

5    Q.    Was there anything in

6    ███████ educational file that would have

7    referenced the past history between

8    ███████ and ███████

9    A.    That's hard for me -- I

10   think I'd have to speculate, because I

11   see her file now.  I don't see her file

12   as it was then and -- I don't know.

13   Q.    When you say you see her

14   file now, do you have her whole file now?

15   A.    I have everything that you

16   have.

17   Q.    I mean, do you know what

18   part of the records provided came from

19   ███████ file specifically?

20   A.    Do I know that this second,

21   no.  Could I answer that question, yes, I

22   could, certainly.

23   Q.    Go ahead.

24   A.    I could go get ███████ file

1  now.  I'm sure it's in the vault that we

2  talked about earlier, from the cartoon.

3  I could go check the file.

4        Q.    Okay.  And so, that's the

5  cume file?

6        A.    Yes.

7        Q.    Even after student's

8  graduate, are the cume files still in

9  that vault?

10       A.    Yeah.  For three years, I

11  believe.

12       Q.    Okay.  So ██████ would

13  also be, then, in that vault, correct?

14       A.    I believe so, yes.

15       Q.    Okay.  I would ask,

16  following the deposition today, if

17  you're -- is it at the building you're at

18  now?

19       Q.    Okay.  At the high school?

20       A.    Mm-hmm.

21       Q.    I would ask that you get the

22  cumulative file for both ██████ and

23  ██████ and make a copy of those files, so

24  we can see exactly what is in those

1  cumulative files, okay?

2      A.    Yes.

3      Q.    Where are transfers and the

4  reason for transfers typically documented

5  for a student?

6      A.    And by the way, just, sorry,

7  to go back to a question that you asked,

8  how the students were chosen.  They are

9  the students who are immediately adjacent

10 to ██████ in the seating chart.  I'm

11 looking at the names of the students and

12 looking at the seating chart.  It's all

13 the kids that were directly next, next to

14 her.

15     Q.    Okay.

16     A.    Where -- so transfers of

17 attendance are logged in my office, for

18 secondary, and the director of

19 elementary.  So actually, that's how I

20 got -- I remember when this happened, and

21 I reached out to Dr. Santoro, because the

22 TOA was not in ██████ file.  It was in

23 the file that holds all of the transfers

24 of attendance.  So, when that was brought

1    up, I went to Dr. Santoro and asked her

2    for that transfer of attendance document,

3    and she had it.

4         Q.    Is that something that

5    should be kept in a student's file?

6         A.    That's a good question.  I

7    don't know.  I think it should be kept.

8    Whether or not it needs to be kept in a

9    student's file itself, I'm not sure that

10   that's necessary.

11        Q.    The mom shared in the

12   meeting that you could run your

13   investigation concurrently, according to

14   Title IX, with the police investigation.

15   Do you disagree with that?

16        A.    I don't disagree with that

17   statement.  I don't think it's illegal

18   for us to do so, but I do think it's

19   reasonable that when the police

20   department asks you not to, we would

21   typically not, especially in

22   circumstances where the victim is

23   unwilling to share any detail or talk

24   with us.

1  Q.   You said that Todd, which is
2  you, shared the official bullying
3  harassment form with mom in the meeting,
4  so she can officially request our team to
5  investigate if she and ███ still wants
6  that to happen, as the police
7  investigation has ended.
8          That part of the meeting
9  there, is -- can a school investigate
10  without this form being submitted?
11  A.   Yes.  I'd like to point,
12  again, to the fact that we don't know
13  what was alleged.  Like, it's hard to
14  investigate something when you don't know
15  what happened, in any way, shape or form.
16  There was no official accusation at that
17  point.  We had very little to work from,
18  and, and what we did do, in asking
19  students what they saw, heard, the
20  teacher what they saw, heard, we had
21  nothing.  So, could we have investigated
22  without the harassment form, I guess the
23  answer is clearly yes, because we did,
24  because ███ nor her mom ever filled it

1  out.  So we did.  But we did wait until

2  the police told us that we could.  But

3  I -- two questions ago, you asked do I

4  agree with mom's statement that we can do

5  it concurrently, I do, but again, we try

6  to work collaboratively with the police

7  department.

8         Q.    When you say that you have

9  no idea, like, what this allegation

10  was --

11        A.    Yes.

12        Q.    -- could you have asked mom

13  for any further detail to ascertain a

14  little bit more about what this was

15  about?

16        A.    Of course, I could have.

17  Yes, I could have asked.

18        Q.    But you didn't, right?

19        A.    No.

20        Q.    And as far -- go ahead.

21        A.    I mean, I think it's

22  reasonable to say that me handing her the

23  form and asking her to write down the

24  details is me asking that question.

1  Q.  About what happened?

2  A.  Yeah.

3  Q.  Did you --

4  A.  I think --

5  Q.  -- communicate that to her

6  that I -- in order for me to know what

7  happened, you have to fill out this form?

8  A.  Yes.

9  Q.  Okay.  Because when I'm

10  reading this note here, it's saying,

11  shared the bullying harassment form with

12  mom, so she can officially request our

13  team to investigate.

14           MS. JORDAN:  Is that a

15    question?

16  BY MS. LAUGHLIN:

17  Q.  And then it says mom --

18  okay -- mom took the form with her and

19  will follow-up with us by completing it

20  if she wants that to occur.

21           So what part of the notes

22  here says that mom -- you were telling

23  mom that this form is for me to better

24  understand what happened?

1       MS. JORDAN:  Note my

2  objection to the form of the question.

3       You can answer.

4       THE WITNESS:  I think all of

5  it.  I think the fact that I say that

6  this is the official form and we can

7  officially investigate, and if she and

8  ▇▇▇▇▇ still want that to happen,

9  since the police investigation has

10 ended, she took the form and will

11 follow-up and let me know if she wants

12 that to occur.  I also think that that

13 statement right there, implies that

14 she shared with me some trepidation on

15 us investigating, that she'll complete

16 it if she wants us to investigate.  So

17 clearly, a conversation occurred

18 there, and she said to me, we'll see,

19 I'm not sure, I don't -- you know,

20 again, I'm paraphrasing.  But that

21 statement right there says to me that

22 I talked to about us investigating and

23 if she gives us the details of what

24 happened, we will be happy to dive

1    deeper.

2           Throughout this whole

3    process and the initial meeting, she

4    shared an apprehension to get more

5    people involved and more people to

6    know, as reflected in Kate Small's

7    notes and in my relection (sic) from

8    my meeting.  But yeah, I think that

9    entire bullet there suggests that I

10   had the conversation that you were

11   alluding to.

12   BY MS. LAUGHLIN:

13       Q.    What more would have been

14   done -- this is, like, talking about fill

15   out the formal complaint an official

16   investigation versus the investigation

17   that had been done before.  What more

18   would have or could have been done?

19       A.    Well the more detail someone

20   provides -- I used the phrase earlier,

21   when the facts change, so does my

22   opinion.  So, if, if we were given more

23   detail, this happened, on this date, in

24   this stairwell, over here, we could look

1  at security footage, we could talk to

2  more kids, we could talk to witnesses, we

3  could even check cell phones.  There's a

4  lot that could be done if someone

5  actually gives details of what they

6  allege occurred.  But without that, we're

7  not gonna go accusing students and

8  digging deeper on something we know

9  nothing about.  So yeah, there's -- you'd

10 be surprised at the measures we could

11 take if we had more detail.  The, the

12 building itself has security camera

13 footage everywhere, so.

14      Q.    Did you talk at all to or

15 reach out to the guidance counselor at

16 North Montco who ███████ had disclosed to,

17 to find any any more information?

18      A.    I did not.

19      Q.    Do you know whether anyone

20 else did from the district to find out

21 more detail?

22      A.    It seems as though, in these

23 notes, that Kate Small spoke with the

24 counselor, I believe.

1    Q.    Do you know whether Kate

2    Small had an understanding of what had

3    occurred?

4         A.    I don't believe she did.  So

5    I don't know that it was shared.  But I

6    believe Kate that spoke to the counselor

7    at the tech school.

8         Q.    Okay.  Do you know, do you

9    know anything about that conversation

10   between Kate Small, allegedly, and the

11   counselor at the tech school?

12        A.    No.  I don't know anything

13   other than what you'll see in 479, in

14   Kate's notes.

15        Q.    Did you ever find out how

16   the schedule change occurred, how these

17   two kids ended up in the same class

18   together?

19        A.    No, I didn't.  And there are

20   a couple options.  What I do know is

21   that, on the day of the IEP meeting, when

22   Kate Small said she checked their

23   schedules, we are able to go back into

24   the system and see that their schedules

1  were entirely exclusive.  They had zero

2  classes together, zero lunch together, we

3  could see that.  Then on the day -- on

4  the first day of school, ██████████

5  schedule had changed, not ████████s.  So,

6  quite frankly, if, if you want to talk

7  about -- I believe I've heard the term

8  before deliberate indifference, we --

9  Kate Small deliberately checked their

10 schedules, and they were the same, and we

11 can document the fact that they, they --

12 I'm sorry, not the same -- they were

13 different, they had no classes together,

14 on that date of the IEP meeting, and

15 something changed, and it was with

16 ████████  schedule, and there are a couple

17 of things that could have happened, and

18 this list is not all inclusive.

19           But student's schedules

20 change most regularly due to a student

21 request.  We have a drop/add period where

22 hundreds of kids come in before the start

23 of school and say, "I want to drop this

24 class and add that class", just like

1  college, right, I'm sure you're familiar,

2  a drop/add period.  Is it possible that

3  ▓▓▓▓▓  came into school during our

4  drop/add period before school started and

5  said, "I want this class instead of that

6  class", totally possible.  I don't know

7  that that happened.  But I know that her

8  schedule changed, not his.  Is it

9  possible that she said to someone later,

10  her guidance counsel, "you know, I'd

11  really like to take art instead of

12  Spanish", and then as a result, the

13  social studies -- because there's dominos

14  when you're scheduling a high school of

15  3,000 students and 400 adults.  Okay, I

16  can put you in this section, but then I

17  have to move this section, which moves

18  that section.

19           So, there are a number of

20  reasons.  They could have looked at the

21  master schedule, the load bearing, and

22  say, okay, Maureen and I are both

23  teaching tenth grade history at the 50

24  level, her class has four kids in it, my

1  class has 28 kids in it, we need to move

2  some kids from this class to that class

3  to balance it out, right, that kind of

4  stuff happens.  But what I, I know with a

5  hundred percent certainty and full

6  confidence is that no one deliberately

7  did nothing.  I am a hundred percent

8  certain of that.  They checked their

9  schedules, and they did not have the same

10 classes, but ████████ schedule did change

11 a few days later, for some reason, and I

12 don't know the answer why.

13       Q.    You said that you know the

14 term deliberate indifference?

15       A.    I do.

16       Q.    How do you know that term?

17       A.    Because I have a doctoral

18 degree in education, and we talk about

19 those things.  I've taken quite a bit of

20 school law classes.

21       Q.    And what does that mean,

22 deliberate --

23       A.    To me, it means deliberately

24 doing nothing, making a conscious

1  decision to do nothing.

2      Q.    Okay.

3      A.    And I don't believe, in any

4  step of the processes here, that anybody

5  in North Penn deliberately did nothing,

6  and I also believe that, as I said

7  before, that Kate Small and Meg Schoppe

8  are two of the finest people I've ever

9  met, and mistakes happen, unfortunately.

10 But Kate --

11     Q.    Now --

12     A.    -- Kate left administration

13 as a result of this.  This is how hard

14 she took this circumstance.  I don't

15 think there is any fault on Kate's part.

16 Could she have done things better,

17 perhaps, maybe she could have checked the

18 schedules on the first day of school.

19 But she didn't do it deliberately.

20     Q.    When you said Kate left

21 administration as a result of this --

22     A.    Yes.

23     Q.    -- was that by her own

24 doing?

1    A.    100 percent.

2    Q.    And you said because it hit

3 her so hard?

4    A.    Yes.

5    Q.    How do you know that, or how

6 do you -- where did you get that

7 information?

8    A.    From conversations with

9 Kate.

10    Q.    And what did she tell you?

11    A.    I think she felt

12 responsible, and she just told me that,

13 clearly, she's not cut out for, she was

14 losing sleep, she wasn't eating, and she

15 was just so upset that a, a student had

16 this experience.  Regardless, I, I feel,

17 as I've previously stated, that Kate did

18 not deliberately do nothing.

19    Q.    Did, did Kate tell you why

20 she felt responsible or, like, if there

21 was something that she was saying she

22 should have done that or could have done

23 that, did she tell you any of that?

24    A.    No.  I mean, I think any

1  time something happens with a child that

2  is under your care, you feel responsible,

3  right?  So, I think Kate's position on it

4  was, why didn't I check the schedules on

5  the first day of school, to which I would

6  respond, Kate, there are hundred of kids

7  that you're responsible for, you did

8  check the schedules, and you had no

9  reason to believe that the schedules

10  changed.  Do I wish she had checked on

11  the first day, of course I do, but she

12  didn't.  And -- but I know she didn't do

13  that deliberately.

14      Q.    Okay.  But there was an

15  ability for her to check after this

16  add/drop period, where you said it's

17  common that schedules are changing,

18  things are switching during this period?

19      A.    Yup.

20      Q.    Were there other things,

21  other than just checking the schedule on

22  August 22nd, a week, I guess, before

23  school started, were there other things

24  that the district had the capability to

¹ put in place to prevent these two kids

² from being together?

³       A.    I guess the answer to that

⁴ question, now, is yes, right? So as a

⁵ result of this happening, we discovered

⁶ that we could put an alert on a student's

⁷ file in eSchool to pop up when you open

⁸ their schedule. We did not know that

⁹ prior to this incident. So, prior to

¹⁰ that, I think our process was checking

¹¹ kid's schedules; oh, Johnny and Sally

¹² can't be in class together, let's check

¹³ Johnny and Sally's schedule.

¹⁴ Unfortunately, to my knowledge, this has

¹⁵ never happened before, where two kids

¹⁶ weren't allowed to be together, we check

¹⁷ their schedule, something changed, and

¹⁸ then they ended up being in the same

¹⁹ class. So, we had a system, it wasn't

²⁰ good enough. You'll note one of these

²¹ bullets here, I think it says, Todd said

²² there is a process, but the process

²³ failed. It's true.

²⁴       Q.    That was the process, check

1    the schedule; is that right?

2         A.    Yes.

3         Q.    That note that was put in,

4    the little alert that pops up, that was

5    put in ███████ file, is that right --

6         A.    Correct.

7         Q.    -- afterwards?

8         A.    Yeah, I don't know.  I

9    assume your follow-up question is whether

10   or not it was put on ████████ I don't

11   know the answer to that.  But yes, it was

12   definitely -- when ███████ screen pops

13   up, do not change this student's schedule

14   without speaking to the principal,

15   counselor or assistant principal.

16        Q.    I can tell you from the

17   deposition of Kate Small that it was only

18   placed in ████████ file, not in ██████████

19   So I guess my question is how would that

20   have prevented ██████ and ███████ from

21   being in the same class still?

22        A.    That's a great question.

23   And I don't know that Kate knows that

24   definitively.  That's her understanding,

1    and she's probably right, but I don't

2    know that.  I think that's a pretty clear

3    issue, though, that it should be placed

4    on both students.

5         Q.    Here, at Page 3, where it

6    says, mom shared she was upset that

7    superintendant did not provide more

8    oversight or communication to keep kids

9    apart.  Todd shared it would not be

10   superintendant's job to look at schedules

11   and keep kids apart.  Mom shares she

12   agrees he does not need to be the one to

13   do the schedule checks, but he should

14   have shared the information with others

15   about the incident and keeping them

16   apart.

17              Do you, do you agree with

18   that?

19        A.    Yeah.  But I don't think

20   anything failed here, in that sense,

21   right?  The, the team at -- this didn't

22   happen because people weren't aware.

23   People knew, obviously, as evidence by

24   all the notes, people knew, and people

took steps to prevent it.  So they weren't indifferent.  And Dr. Dietrich, had he been involved, might have said, hey, just heads up, guys, you know, there was a situation back in elementary school, these two students cannot be together, make sure they're not together. And had he said that -- and I don't know that he didn't, I assume he didn't, because he's not usually involved in that level with 13,000 kids -- I think the same thing would have happened, that we would have had an IEP meeting, we would have put her in classes, we would have checked both student's schedules, said, okay, neither kid is -- and mind you, mom said if -- in one of these notes, mom said it's okay if they walk past each other in the hallway.  So, yeah, even if Dr. Dietrich did that, I think the outcome still would have been the same, that Kate would have done what she did, and I don't know that it would have prevented it.

¹      Q.     Meaning, if Dr. Dietrich had

² called and communicated that, that

³ wouldn't have made a difference?

⁴      A.     Right, because they knew.

⁵ It's not, it's not that they didn't know,

⁶ it's not that there was a

⁷ miscommunication, it's that her schedule

⁸ changed by someone -- some process,

⁹ initialed by whom, I don't know. But

¹⁰ people knew. The principal knew. The

¹¹ case manager knew. The special ed

¹² supervisor knew. People knew. So Dr.

¹³ Dietrich didn't need to communicate it;

¹⁴ it was communicated.

¹⁵      Q.     I understand.

¹⁶      The top of Page 3, it says,

¹⁷ the student who touched ▮▮▮▮ did it

¹⁸ twice at Penndale, and there are other

¹⁹ allegations, according to mom. It says

²⁰ Todd may let mom know we are not aware of

²¹ the other allegations or the student's

²² case in general.

²³      Is there more to this part

²⁴ of the conversation or the meeting that

1  you remember in this discussion?

2       A.    Yeah.  So, that was the

3  first that I had heard that something

4  happened at the middle school level, and

5  mind you, ██████ and ██████ did not go to

6  the same middle school.  But mom said in

7  ths meeting, "yeah, he did this to two

8  other girls at the middle school".  At

9  that time, I did not know that.  I have,

10  since, looked into it, I have spoken to

11  the assistant principal at Penndale

12  Middle School, the assistant principal at

13  the time, and he said that his

14  recollection is that he touched two

15  girls' thighs in the cafeteria.

16       Q.    Who was that assistant

17  principal you spoke to?

18       A.    His last name is spelled

19  B -- as in 'bravo' -- A-S-H-A-W, Bashaw;

20  first name is Jason.

21       Q.    When you had found that

22  information out, was ██████ still a

23  student at the high school?

24       A.    No.

1    Q.    Had he -- he had graduated

2 at that point?

3    A.    Yes.

4    Q.    Is this then when you're

5 calling the assistant principal, that was

6 more recently?

7    A.    Yes.  That was in -- part of

8 investigating all of this, pulling

9 records together.

10    Q.    In preparation for your

11 decision today?

12    A.    Not necessarily in

13 preparation for the deposition, but in

14 preparing the documents that I was asked

15 to prepare for -- to provide.

16    Q.    Okay.  Because I think you

17 said that ▮▮▮▮▮ was out of the high

18 school at this point?

19    A.    Mm-hmm.

20    Q.    It's my understanding that

21 ▮▮▮▮▮ just graduated two months ago, in

22 June; is that right?

23    A.    I don't know if it was this

24 year or last.  This year sounds right.

1    Q.    Because I -- the documents

2  that were provided were provided probably

3  in March or April of this year.

4    A.    Okay.  Correct.

5    Q.    So, would you agree with me

6  that -- so when, when did you communicate

7  with the principal?  Was it after ████████

8  left the high school, or was it while he

9  was still there, when these documents

10 were provided?

11   A.    I guess it was more recent.

12 But your question was did I, did I ask

13 the principal in preparation for today.

14 I don't know that it was specifically for

15 today.  It was in preparation for all of

16 this, I guess, yeah.  I mean, it wasn't

17 yesterday, that's fair to say.  But, yes,

18 it was in preparation for the ██████

19 ████████████  case.

20   Q.    I guess I'm just trying to

21 narrow down a little, if we can, the

22 timeframe in which -- was it the last

23 couple of months that you spoke to --

24   A.    Yes.

1    Q.    -- the assistant principal?

2    A.    Yes.

3    Q.    Okay.

4    A.    Yes.

5    Q.    This part on the bottom of

6    Page 3, where it says honest mistake, was

7    that you communicating to mom that you

8    thought Kate checking the schedules on

9    the 22nd and then a week or so goes by

10   before the kids get there, the schedule

11   wasn't checked, again, that's an honest

12   mistake --

13   A.    Yes.

14   Q.    -- is that what you are

15   referring to?

16   A.    That's what I believe I was

17   referring to, yes.

18   Q.    Okay.  Before you had said

19   when ▮▮▮▮▮▮ had reported what had

20   happened in the tenth grade year, that

21   she was assaulted by ▮▮▮▮▮▮ that ▮▮▮▮▮▮

22   was gonna be the one to get moved, like,

23   she was gonna get moved anyway, do you

24   remember saying that?

1    A.    That ▆▆▆▆ was going to get
2    moved anyway?
3    Q.    You were talking about in
4    the context of, you know, why would she
5    report for not wanting to get moved from
6    the, the class, why would that be the
7    reason or the timing of her reporting, do
8    you remember that?
9    A.    I recall you asking a
10   hypothetical question, I believe, and you
11   were referencing Dr. Dietrich saying that
12   he thought he heard from someone that
13   ▆▆▆▆ brought this up because she didn't
14   want to get moved from the class, and I
15   said, I don't, I don't think that would
16   be a good rationale for providing that
17   information, because one, she was
18   moving -- she was going to move levels
19   because she had a 44 percent in the
20   class, and then, two, if you say, there's
21   a kid in this class who I'm not supposed
22   to be in class with, why would we keep
23   her in there if that was the rationale.
24   We would move here, or him, but she was

1  leaving the class anyway, because she had

2  a 44 and she wasn't being successful. So

3  I was responding to that I have never

4  heard that as a rationale, and, quite

5  frankly, that rationale doesn't make

6  sense to me.

7      Q.    My question was going to be,

8  why wouldn't you move him?

9      A.    She was moving because of

10  her grade.  She was not moving because of

11  a report.

12      Q.    Was there any --

13      A.    The move --

14      Q.    Sorry.

15      A.    The move was initiated by

16  the teacher because of her performance in

17  the class.  So, following that, she

18  reported the fact that this had happened.

19  But the reason a student was moving had

20  nothing to do with this, because we were

21  not aware of this.

22      Q.    But once you became aware --

23      A.    Mm-hmm.

24      Q.    -- in that ██████ was

1   failing, this had within going on, as

2   reported by ████████ did the district do

3   anything to try and see if she could stay

4   in that class or to move ██████ out of

5   the class instead to resolve the issue

6   that way?

7           A.      I think an obvious omission

8   here is that when you are speaking of,

9   like, this hypothetical situation, mom

10  was insisting and refusing her daughter

11  was never coming in again.  So, if mom's

12  saying, my child -- she is not stepping

13  foot in that building, why -- yeah, that

14  doesn't make sense to me.  Certainly,

15  would we have entertained, but ██████ was

16  coming out of the class, anyway, that's,

17  that's important.  She had a 44 percent,

18  right; trying to help her be unsuccessful

19  and put her in a classroom that has more

20  supports, like a co-talk class.  Yeah,

21  so, again, at that point she wasn't

22  returning.  When this meeting is

23  happening, she's not returning, this is

24  December 11th.

1      Q.    At the top of Page 4, it

2  says, Todd shared the police would not

3  show us anything about the investigation

4  when mom asked if we had details.

5      A.    Yes.

6      Q.    Did you or somebody else

7  from the district reach out to the police

8  to try and find any details about --

9      A.    I certainly did not, and I

10  can't answer on behalf of Mr. Nicholson.

11  But my experience has been that they are

12  not going to tell us the details of their

13  investigation other than whether or

14  not -- other than publically accessible

15  information, like, were there charges.  I

16  believe what we -- and you would have to

17  ask Mr. Nicholson, who, right now,

18  unfortunately, is in terrible condition,

19  but I think they probably said, we've

20  concluded our investigation, and no

21  charges are being brought.  And that's

22  the extent of it.

23      Q.    As part of your being a

24  corporate representative of the district

¹ today, what did you -- did you do an

² investigation or find out information

³ about the investigation into what

⁴ happened at Gwynedd Square?

⁵          A.    I had -- no.  So, if the

⁶ investigation of what happened at Gwynedd

⁷ Square means interview people, no.  The

⁸ only thing I did was what I just

⁹ mentioned, was ask the assistant

¹⁰ principal what happened in middle school,

¹¹ because I didn't have anything on that.

¹² Everything else here -- I have never in

¹³ my life spoken to Holly or Ruth.  I --

¹⁴ yeah, so other than reading these

¹⁵ documents, speaking with Dr. Dietrich, as

¹⁶ I answered at the top of the hour, and,

¹⁷ of course, counsel, no, I have not done

¹⁸ an investigation on this.

¹⁹          Q.    When you talked with Dr.

²⁰ Dietrich in preparation for your

²¹ deposition today -- excuse me -- what

²² did -- can you summarize for me the

²³ conversation that you had with him?

²⁴          A.    I think you're going to be

1 severely disappointed.  My conversation

2 with Dr. Dietrich in preparation for

3 today was asking, which teacher is the

4 regular ed teacher and which one is

5 special ed, Ruth or Holly.  That was my

6 question for him.  That was all I

7 discussed with him in preparation for

8 today.

9        Q.    Okay.  And so other than

10 that one question that you asked Dr.

11 Dietrich, you reviewed those documents

12 that were produced by the district --

13        A.    I did.

14        Q.    -- in preparation for today?

15        A.    Yes.  In detail and -- yeah,

16 that -- and, of course, went back in my

17 understanding of what happened back in

18 December of 2018, because that's the part

19 that I was involved in.

20        Q.    Meaning, in your own mind,

21 or you read through that report from

22 Pages 1 through 4 that we just went over?

23        A.    Both.

24        Q.    Is there anything that we

1  didn't go over that's not contained

2  within this four-page summary that you

3  recall about that meeting that you

4  haven't already told us?

5        A.    No.  I think I shared the

6  message with you that it was positive,

7  and I did expect to hear from Mrs.

8  ████████████    Ultimately there was an IEP

9  meeting that took place, as referenced

10  here, with Dr. Broxterman, but no.  No, I

11  shared everything.

12        Q.    Okay.  Do you know how the

13  documents, as to the investigation that

14  was done at Gwynedd Square, how those

15  documents were compiled or where they

16  came from?

17        A.    I believe they came from

18  human resources, aside from -- my guess

19  is, aside from the discipline referral,

20  it's possible that that came from Gwynedd

21  Square itself.

22        Q.    Okay.  So in a file for

23  human resources?

24        A.    I would expect, yes.  So

1    these interviews with the teachers, the

2    summary from Dr. Santoro, the meeting

3    with -- I think there was a conversation

4    with Mr. Bowen, now Dr. Bowen, and Dr.

5    Santoro and ██████ parents, Dr.

6    Dietrich meeting with Holly, all those

7    documents, I think they were -- they came

8    from HR.

9         Q.    Okay.  Do you know where in

10   HR they were kept --

11        A.    I don't.

12        Q.    -- if it was electronic or

13   in, like, a vault-type-thing like we

14   talked about before?

15        A.    I would expect the latter.

16   I don't think they were electronic.

17        Q.    Okay.  Is there, like, a

18   separate -- is there, like, a separate

19   vault where HR documents are kept?

20        A.    There's a separate area,

21   sure.  It's not as fun as the cartoon

22   vault, but there is, like, a space in the

23   human resources department where there

24   are personnel folders.

1    Q.    Okay.  From reading those

2   documents, would you agree with me that

3   there was at least three students in

4   sixth grade that were inappropriately

5   touched by ▓▓▓▓▓▓

6    A.    I believe that that behavior

7   in sixth grade is inappropriate in

8   school, yes.

9    Q.    What about in, in fifth

10  grade, that there was an incident where

11  ▓▓▓▓▓  inappropriate -- when I say

12  inappropriate, sexually touched, another

13  female student in fifth grade?

14          MS. JORDAN:  Note my

15     objection to the form of the question.

16          You can answer.

17          THE WITNESS:  I don't recall

18     the fifth grade student.  I'd have to

19     be reminded of the incident.

20  BY MS. LAUGHLIN:

21    Q.    I didn't realize I'm still

22  sharing my screen.  So that makes it

23  easy, I can pull up the page.  Let's see.

24  And this is on Page 1018.

1        A.    Okay.

2        Q.    I may have had the wrong

3   page.  Give me one second.

4              All right.  Sorry, the page

5   is 1022, for the record.

6        A.    I actually have it up.

7        Q.    Can you see that?

8        A.    I can.

9        Q.    Okay.  The second to last

10  bullet point here, it says, 3 p.m., Bill

11  Bowen informed me that one of the

12  students, blank, did admit to being

13  touched front and back bottom by ▮▮▮▮

14  in fifth grade.  Do you see that?

15       A.    I do, yeah.  So I guess I

16  just -- due to the lack of specificity

17  there, it says there would be follow-up,

18  and I didn't read anything about

19  follow-up.  I do recall reading that, now

20  that you've reminded me.  I just don't

21  know any details other than what you read

22  right now.

23       Q.    Okay.  So you were aware

24  that -- or, I'm sorry -- would you agree

1    that at this point, on Page 1022, says

2    that the building principal was aware

3    that there was an incident of a student

4    being touched by ███████ in the fifth

5    grade as well?

6         A.    After, yes.  At this point,

7    when this is written, yes, of course I

8    agree.

9         Q.    Okay.  Do you recall reading

10   that there were incidences of students

11   being touched in fourth grade as well by

12   ███████

13        A.    I don't.

14        Q.    I'm directing your attention

15   to bates number 1021, the No. 2.  It

16   says, ███████ indicated -- from ███████ and

17   that this touching has been going on

18   since fourth grade.  Do you see that?

19        A.    I did, yes.  I -- ███████████

20   mother said that, yes.

21        Q.    In the meeting with you as

22   well?

23        A.    No.  No.

24        Q.    You said ███████████ mother

1  said that.  How do you know that?

2       A.    Because it says, Mrs.

3  ███████████ called me, and then there are

4  notes from the phone conversation.

5       Q.   Okay.  And this -- sorry.  I

6  didn't mean to cut you off.

7       A.    No, that's okay.

8            But this just -- it's

9  nothing -- so I recall -- you're

10  obviously going through each incident --

11  I recall the three in sixth grade, and I

12  recall the incident in middle school.

13  Those are the ones that have detail to

14  them.  Now that you are reminding me that

15  I said ██████████ mom said that he was

16  doing that in fourth grade, I remember

17  reading that.

18       Q.   Okay.  And these are notes

19  from Betty Santoro, who was the director

20  of elementary education; is that right?

21       A.    She was.

22       Q.   Okay.  So, would you agree

23  with me, from these notes from Betty

24  Santoro, the director of elementary

1  education, she was aware of the

2  allegation that students had been touched

3  in fourth grade by ██████

4       A.    I would be willing to state

5  that ███████ mom said that ████████ did

6  that in fourth grade, I'd be willing to

7  say that.

8       Q.    To Dr. Santoro?

9       A.    That ████████ mom said that

10 to Dr. Santoro, yes.

11      Q.    Okay.

12      A.    It was reported not that the

13 principal knew, yes.

14      Q.    In your compiling of

15 information and investigation -- or,

16 documents on behalf of the district, was

17 there any indication to you that a

18 investigation into what happened or the

19 allegation of ██████ touching girls in

20 fourth grade was investigated?

21      A.    I did not come across that,

22 no --

23      Q.    What about --

24      A.    -- that I recall.

1    Q.    I apologize.

2    A.    Go ahead.

3    Q.    What about for the fifth

4  grade incident, was there any indication

5  to you that an investigation into what

6  happened in fifth grade was investigated

7  by the district?

8    A.    I did not come across

9  anything.

10   Q.    In terms of the interviews

11  of the children in sixth grade, do you

12  know whether ▆▆▆▆▆ was interviewed by

13  the district at all?

14   A.    Well it appears that

15  there -- on several occasions Holly said

16  that she asked him, and he said nothing,

17  or maybe it was ▆▆▆▆ said nothing,

18  nothing happened; ▆▆▆▆▆ didn't respond.

19   Q.    You said that happened on

20  several occasions.  Are you referring --

21  I mean, where did you see it happen on

22  several occasions?

23   A.    No.  I said it was noted in

24  several areas of these documents.

1  Holly's statement when Bill interviewed

2  Holly, when Cheryl interviewed Holly,

3  it's repeated multiple times in here.

4       Q.    Okay.  But the instance when

5  Holly had talked to ████████ and ████████

6  are you referring, that's the time when

7  she pulled them out in the hallway?

8       A.    Yes.  And then there's also,

9  clearly, circumstances where the

10 principal met with ████████ whether or

11 not -- I mean, I would assume ████████ was

12 in there, but I don't know that for a

13 fact.

14      Q.    For Title IX investigation,

15 did you see any, like, actual written

16 statements of, like, what the girls had

17 said, if they were asked, in sixth grade?

18      A.    I -- the only notes I saw

19 were that people referred to Mission Kids

20 or Child Line.  In most cases, I think I

21 read that they did not go, they did not

22 want to seek criminal charges and parents

23 were made aware.  I think, a lot of

24 times, when you're dealing with kids so

1  young, and I happen to have children this

2  age, you would -- in such a serious

3  circumstance, you would -- with the

4  parents, right?  And so there's

5  substantial evidence here to suggest that

6  the folks dealt with their parents.

7          Q.    The folks, meaning the

8  district?

9          A.    Yes.

10         Q.    Would you agree with me,

11 then, that any, like, written statements

12 of what was discussed with any of the

13 children, from the district's doing so,

14 is not documented in terms of, like,

15 written statements, so-and-so said this,

16 so-and-so said that?

17         A.    I guess that's not true.

18 There are certain -- instances in here

19 where it says -- from the counselor, Mrs.

20 Vassily (pht), for example, I spoke to

21 her, and she said this.  So there are

22 some.  So it's --

23         Q.    But I guess I'm --

24         A.    -- not --

1    Q.    Sorry.

2    A.    -- it's not clear that they

3 did not, because they did.

4    Q.    Well, so to clarify, I'm

5 asking about separate statements of,

6 like, what was asked.  Not, like, a

7 summary, the gist of what somebody told

8 them.  I'm asking, do you know -- does

9 that exist, like, the actual -- what

10 these kids word-for-word said or what was

11 asked of them?

12    A.    I don't believe that there

13 is a, a record of the dialogue verbatim.

14    Q.    The only, like, dialogue

15 that you're referring to is in these

16 notes that were produced by the district?

17    A.    Yes.

18    Q.    After this -- all of this

19 information comes out and the principal,

20 Dr. Santoro is aware of it, what was done

21 to ensure that kids at the elementary

22 school were going to be kept safe from

23 ███████

24    A.    I think when you're in an

1  elementary classroom where there's, let's

2  say, 24 students, teachers being aware,

3  you, you read a report in here that the

4  staff on the playground kept an eye on

5  him, the teachers are now aware at this

6  point, the next year the two kids go to

7  different schools, there are no

8  infractions at the high school.  So, I do

9  think it seems as though, after this was

10 brought to the attention of the principal

11 and then ultimately Dr. McCue, steps were

12 put in place to try to prevent this, I

13 do.

14      Q.   Other than moving ▬▬▬▬

15 into another class and you said teachers

16 were keeping an eye on the playground, I

17 mean, what else was put in -- was

18 anything else put in place to ensure that

19 the new class ▬▬▬▬ got put in, that he

20 didn't touch another student there?

21      A.   I -- no.  But you seem to be

22 suggesting that that's not enough.  When

23 you're dealing with 11 year olds, quite

24 frankly, asking the adult in the room to

1 keep an eye on things and the teacher

2 understand the history is significant.

3 You know, they are 11 at that time.  So,

4 it seems as though, for the remainder of

5 that year when, when ███████ switched

6 classrooms, that it didn't happen again.

7 So I would argue that the steps they put

8 in place did work from there on out for

9 the remainder of the year.

10        Q.    Do you know that the teacher

11 in the room he was placed in did, in

12 fact -- like, was, in fact, told --

13        A.    I don't know.

14        Q.    -- what the history was?

15        A.    I don't know that.  I don't

16 know that she was or wasn't.

17        Q.    Okay.

18        A.    I would assume, a student

19 comes into your classroom in the spring

20 of sixth grade, I would assume that a

21 conversation occurs.

22        Q.    But you don't know that,

23 right?

24        A.    I don't, no.  But it's been

1  my experience, after 17 years, that a

2  conversation would occur.

3       Q.    After these incidents in

4  sixth grade, did the students get any

5  instruction or training about, like,

6  sexual harassment or harassment?

7       A.    That's, that's a good

8  question.  I know that in sixth grade is

9  when they actually have the

10 conversations, fifth and sixth grade, I

11 believe, in our curriculum, about -- and,

12 and we have a curriculum called Second

13 Step Now, where it's character education.

14 I don't believe -- it's irresponsible of

15 me to, to say that they have lessons on

16 good touch/bad touch in the curriculum.

17 Anything additional, aside from the

18 regular curriculum, in fifth or sixth

19 grade, I can't point to anything.

20      Q.    So after this incident,

21 would you agree with me that you're not

22 aware of anything specifically that was,

23 like, trained or, you know, an assembly

24 or anything like that, based on what, you

1  know, several of these students had gone

2  through in the sixth grade?

3       A.    No.  In a situation like

4  this that is so sensitive, I would think

5  it would be irresponsible to pull the

6  whole grade together to talk to them.

7  Rather, I would expect us to provide

8  supports for the individual students and

9  their families.  And, I mean, you have

10  notes here of the counselor meeting with

11  the students, right?  So, I would assume

12  that that counselor -- I don't know if

13  you've spoken to the counselor, but I

14  would assume that that would be the best

15  source.  When such incidents happen, the

16  counselor in the school, that's part of

17  their job description.

18       Q.    Do you know specifically

19  what was done, if anything, to make the

20  middle school aware of -- since ███████

21  would be moving to the middle school

22  after sixth grade -- of the incidents

23  that occurred with ███████ at the

24  elementary school?

1    A.    I don't.  I don't know

2   whether there was or was not.

3    Q.    Would that have been

4   something that the principal would have

5   had to have communicated or whoever the

6   meeting was between elementary and middle

7   school, that's the why it would have been

8   communicated to the next level?

9    A.    Yes.

10    Q.    Would any of the documents

11   that we're referencing and we just went

12   over with the sixth grade investigation,

13   have gone in any of the student files,

14   cumulative files?

15    A.    Any of the documents in the

16   cumulative file, at some point, yeah.  I

17   think the discipline referral that you're

18   seeing here, from Gwynedd Square, I would

19   expect that to go into a student's file.

20    Q.    The one where Ms. Andrew had

21   written up ████████

22    A.    Yes.

23    Q.    What about other than that,

24   because there's been several documents

1  that, you know, are comprising of this

2  investigation in sixth grade.  Would

3  anything else other than that paper, that

4  one page, be placed in the student's

5  file?

6      A.    I don't believe that this

7  would be in a, a student's cumulative

8  file, no.  I believe these documents -- I

9  mean, the bulk of the investigation here

10  is personnel, in nature.  These documents

11  themselves, I think what would be

12  reflected in a students' would be, as we

13  discussed at length, in electronic

14  format, but just a list of the

15  infractions and consequences, not

16  interviews with staff members and things

17  like that, that wouldn't go in a

18  student's cume folder.

19      Q.    And at this point, there was

20  no electronic way to house these

21  documents, right?

22      A.    The next year, there was,

23  yes.  But no, at that point, there was

24  not.

1    Q.    Okay.  Is there any other
2  way, other than a principal having a
3  conversation with the principal of the
4  middle school in that transitional
5  meeting, that this information that was
6  learned in the sixth grade investigation
7  would have been communicated to the next
8  level?
9    A.    Not that I'm aware of.  I
10 would, I would expect the conversations
11 to take place.
12    Q.    Was there any -- never mind,
13 strike that.
14         What about in terms of the
15 transition from █████ from middle school
16 to high school, since there were two more
17 incidences of sexual harassment according
18 to his disciplinary file at the middle
19 school now going to the high school, is
20 there any kind of process in place that
21 the high school checks or is aware of
22 that type of misconduct before a student
23 gets there?
24    A.    So, in this case, one, you

1  said two incidents.  I'm aware of one

2  that referenced two students.

3        Q.    Okay.

4        A.    But nothing other than what

5  we've already talked about,

6  conversations, and in this case, it's

7  pretty clear that the administration at

8  the high school knew about this, right?

9  So it was communicated.  That's not the

10  issue, whether or not it was

11  communicated.

12        Q.    I guess the way you just

13  answered the question, I wanted to ask a

14  follow-up question, then.

15              When you say you have one

16  incident involving two students --

17        A.    Mm-hmm.

18        Q.    -- in terms of the district

19  classifying incidents, the one with the

20  two separate students that ███████ had

21  touched individually in middle school, is

22  that considered one incident, on behalf

23  of the district?

24        A.    I guess it depends whether

1  there's one infraction -- like, I don't

2  know the details of that incident.  So,

3  did it happen in one sitting at the

4  cafeteria, I don't know.  But if, if

5  there was an infraction on February 1st

6  and then an infraction on February 7th,

7  would there be two, of course.  This was

8  written up in, in one incident.  So, in

9  my understanding of what occurred is that

10 he touched two students' thighs in the

11 cafeteria.  So, to my knowledge, it was

12 one incident, two victims.  That's the

13 way it would be classified.

14       Q.    Do you know whether it

15 occurred, like, at the same time, where

16 he touched the two girls at exactly the

17 same time?

18       A.    I do not.

19       Q.    How would it be

20 distinguished, I guess, since you have

21 two victims, and I understand you said if

22 it was five days later, it would be two

23 separate incidences, but is there a way

24 for the district to distinguish, when

1  there's two different victims, whether

2  there's more than one incident?  Like, is

3  there any, like, policy/procedure on

4  that, on how to categorize how many

5  incidents occurred in a situation like

6  that?

7        A.    Yeah.  I guess there are,

8  there are two options, then.  One, if you

9  write them up separately, right, they're

10 two separate incidents.  So, let's say

11 something happened in second period and

12 something happened in third period, two

13 different teaches write it up, they're

14 two separate incidents.  Another way

15 would be, when you're writing it up, to

16 assign two separate victims and put it in

17 the narrative of the actual event.

18        Q.    Is there any --

19        A.    So --

20        Q.    Sorry.

21        A.    No.  The question was, is

22 there a process; the answer to that is

23 yes, as described.

24        Q.    But in that scenario that

¹ you just described for me, it would be up

² to the principal to decide whether to

³ categorize it as a single incident versus

⁴ two separate incidences, right, based on

⁵ how they input it into the system?

⁶         A.    Yeah.  In that situation, in

⁷ particular, because it was in the

⁸ cafeteria, there's not a teacher, so I

⁹ assume that the principal's the one who

¹⁰ took the report.  So yes, it would be up

¹¹ to the principal at that point, or the

¹² assistant principal in this case.

¹³         Q.    Like, whoever's documenting

¹⁴ what -- like, the report in some way?

¹⁵         A.    Yeah.  I mean, there are

¹⁶ instances where the principal will make

¹⁷ changes to the conduct referral.  She

¹⁸ writes it up, and let's say they say

¹⁹ that, you know, they select a erroneous

²⁰ category or classification, it's the

²¹ responsibility of the administrator to

²² make a change.

²³         Q.    The conduct that occurred,

²⁴ the incidences that occurred in sixth

1  grade that we just went over with ███████
2  ████████  how many instances would that be
3  categorized on behalf of the district?
4          A.    I think the three where we
5  have an identified victim and parents
6  were spoken to would be three separate
7  incidents.
8          Q.    Okay.  So that's how you
9  would except that to be documented?
10         A.    I would, today, yes.
11         Q.    Is it different back then?
12         A.    I don't know.  I'm not sure.
13         Q.    Well I guess, in terms of
14  the district, did it change the way that
15  it was documented?  Because you
16  specifically said today --
17         A.    Yeah.
18         Q.    -- that's what you would
19  expect.
20         A.    Yeah.  I think it's well
21  documented in this deposition here, that
22  the process has changed on how we
23  document; it's electronic now.  So, yes,
24  you can assign -- you know, in 2014 and

1 '15, things were handwritten and there's

2 a report, right, or a conduct referral

3 or -- now, you're actually selecting

4 students and assigning, they're linked.

5 So it is different.

6          Q.    Was there a way back then

7 for three different incidents to be

8 documented to say that they were three

9 separate incidents that occurred?

10          A.    I would assume so, yes.

11          Q.    Even if it was, like, not

12 the same, you know, whatever the SIS that

13 you have now, there was still a method to

14 separate them?

15          A.    There would have to be,

16 right?  So, when they validate the data

17 with the police, as discussed, there

18 would have to be a way to delineate how

19 many incidents, no matter what the

20 infraction is.

21          Q.    Could you agree with me that

22 back then as well, you would expect it

23 would have been delineated as three

24 incidents?

1          A.    I do.

2          Q.    When you had private

3   conversation with the middle school

4   incident at Penndale asking what had

5   happened, did you ask whether there was

6   any documents of what had happened, like,

7   an investigation-type document?

8          A.    I did.

9          Q.    And what was the outcome of

10  that?

11         A.    Keeping in mind it was,

12  what, five years ago, I asked the

13  assistant principal, do you have

14  anything, all I can see in the discipline

15  is that a student was suspended,

16  inappropriate contact -- or, I don't

17  remember exactly how it was coded, I can

18  look.  But he said, if I do, it would be

19  in my notes.  I asked him to check back

20  at the middle school, and there was

21  nothing.  So, I don't believe there was

22  any additional documentation.

23         Q.    Based on our conversations

24  earlier of the expectation of the

1    district, something like this, would you

2    you have expected that to be reported to

3    the Title IX coordinator?

4         A.    I would now, yes.  I would

5    then too, I would expect it, but that's

6    not to say it was.

7         Q.    Okay.  Like, the fact that

8    the principal -- or, the assistant

9    principal -- was it the assistant

10   principal you spoke to?

11        A.    Yes.

12        Q.    The fact that the assistant

13   principal told you, let me check my notes

14   and see if something exists, that's not

15   the way things should be done in the

16   district, correct?

17        A.    No, that's not correct.

18   Because we've discussed that typically

19   there would be a preliminary

20   investigation of some sort.  So I would

21   expect that you would have notes for

22   that.  Yeah, so that's not accurate.

23        Q.    But he did not have notes,

24   correct?

1    A.    I guess I -- it's fair to
2  say, it was five years ago, so if he had
3  his own notes, he no longer has them or
4  didn't procure them.  So, I don't believe
5  he reported it to the Title IX
6  coordinator.  So, Cheryl would not have
7  notes either.
8    Q.    Did you ask if, in fact,
9  there were notes from back then?
10    A.    I told you that I asked him
11  if he had any notes, and he said -- if he
12  had any additional information, he said
13  they would be in my notes, and he looked
14  and didn't have any.
15    Q.    But, I mean, were there --
16  like, did he delete the notes?  Were
17  there no notes period at any time
18  created?
19    A.    Yeah.  I don't believe he
20  was able to tell me that.  It was five
21  years ago, and I don't think he knew.
22  But he, he recalled that it was, as, as I
23  explained, "yeah, I believe he touched
24  two girls on the thigh in the cafeteria",

¹ and I asked him in he had any more

² detail, and he said let me check, and he

³ did not; that was it.

⁴        Q.    Would you agree with me that

⁵ the fact that he couldn't find -- let me

⁶ check my notes, and he couldn't find them

⁷ because it was five years ago, your

⁸ testimony, is that the way that the

⁹ district would expect notes like that to

¹⁰ be handled?

¹¹        MS. JORDAN:  Note my

¹²    objection to the form of the question.

¹³        You can answer.

¹⁴        THE WITNESS:  I don't --

¹⁵    your -- the nature of the question

¹⁶    suggests that he mishandled his notes.

¹⁷    I don't know that there are notes.

¹⁸    So, I can't really -- you're asking,

¹⁹    would I agree that he fell short of my

²⁰    expectations of how he would handle

²¹    his notes.  I don't know that he had

²²    notes.  He didn't have anything.  So,

²³    I don't know.

²⁴ BY MS. LAUGHLIN:

1    Q.    Would you expect that there
2 would be a place that he would check,
3 like, keep the notes that he would know
4 to go to to see whether notes existed?
5    A.    Yeah.
6         MS. JORDAN:  Note my
7    objection to the form of the question.
8         You can answer.
9         THE WITNESS:  I do.  And I
10   believe he went to the place where he
11   would look for them, and that's why he
12   told me he didn't have any.  I don't
13   know that he disposed of them or
14   shredded them or anything like that.
15   I know that he looked to see if there
16   were notes, and there were none.  As
17   we've -- the record says many times,
18   nowadays this would be electronic, and
19   this would not be an issue.
20 BY MS. LAUGHLIN:
21    Q.    Do you know -- did you ask
22 him -- do you know how long he keeps the
23 notes?
24    A.    I didn't ask him that.

1    Q.    Is there an expectation of
2 the district or process or policy in
3 place as to how long notes like that
4 should be kept?
5    A.    I think most people will
6 tell you that the rule of thumb is three
7 years.
8    Q.    Three years?
9    A.    Yes.  In your own personal
10 notes.  I keep mine for three years.
11 I've heard that as a rule of thumb, right
12 or wrong.  But again, if it's put into
13 our information system, they're forever.
14    Q.    When you say, you know, your
15 own person notes, I mean, notes if they
16 existed for this would have been details
17 about incidences of ▮▮▮▮
18 inappropriately touching, would you
19 characterize that as somebody's own
20 personal notes?
21    A.    I just -- it depends where
22 an investigation goes to.  And these
23 questions are all based upon the fact
24 that he had notes; I don't know that he

1  did.  So if I was asking you questions

2  because there was an incident that

3  occurred in the cafeteria, would I write

4  things down on my tablet that I'm

5  holding, I would, and I would consider

6  those my notes.  That's what I mean by

7  personal notes.  Not in the system or

8  something that I am officially

9  submitting.  So, that's what I mean by

10 personal notes, when I'm -- taking notes

11 if I'm talking to someone, not a full

12 formal statement where a student writes

13 something down verbatim question and

14 answer-type of thing.

15      Q.    The personal notes we're

16 talking about, if they exist here, would

17 be about student's alleging -- or,

18 engaging in sexual misconduct; is that

19 right?

20      A.    If, if, if there were notes

21 and if he determined that the misconduct

22 was sexual in nature, then the answer to

23 your question is yes.  I don't know --

24      Q.    What about --

1    A.    I don't know that he had
2  notes.
3    Q.    What about in terms of
4  harassment?  Because, I mean, you
5  reviewed ███████ file in advance of your
6  deposition today, right, the
7  disciplinary -- the three things that are
8  listed?
9    A.    Yeah.  I have seen his
10  discipline, yes.
11    Q.    And the second thing was
12  listed as harassment.  Do you recall
13  seeing that?
14    A.    I think I do.
15    Q.    So, the notes are involving
16  harassment by ███████  Even if they're
17  personal notes, like you had termed them,
18  on behalf of the district, do you think
19  it's appropriate to discard them after
20  three years?
21    A.    No.  I would expect them to
22  be electronic, and I would expect there
23  to be detail in our information system.
24    Q.    Was there a process at that

1  time to make them electronic?

2      A.    What was the date of the

3  incident that you're referencing?

4      Q.    January 6th, 2016.

5      A.    So that's the year in

6  question; I would think so.  I would

7  think, if he had notes, he could type

8  them in in the detail.  You know, the

9  unfortunate circumstance here is that the

10  timeframe we're talking about here is

11  when we transitioned from not only paper

12  and pencil to electronic but then one

13  electronic system to another.  That's

14  unfortunate in gathering some of the

15  details here.  But based upon the fact

16  that there's -- and something input in

17  eSchool at the time, in 2016, I assume,

18  if he had notes, they'd be in there.

19  That's my assumption.

20      Q.    As part of your gathering of

21  documents and things of that sort, would

22  you agree there was no broader

23  investigation, meaning, like, statements,

24  a final report, things like that into the

¹ incidents with ▮▮▮▮ in middle school?

²      A.    I agree with that.

³      MS. JORDAN: Note my

⁴  objection to the form of the question.

⁵      THE WITNESS: I agree.

⁶ BY MS. LAUGHLIN:

⁷      Q.    Did you have the opportunity

⁸ to talk to anybody about the details of

⁹ the tenth grade incidents, other than

¹⁰ what we've already talked about, like

¹¹ Pete Nicholson, anybody, to understand

¹² anything that may have gone on that isn't

¹³ in the documents that district provided?

¹⁴      A.    Did I talk to anyone about

¹⁵ anything that we haven't discussed other

¹⁶ than what's referenced in the documents;

¹⁷ no, not that I recall.

¹⁸      Q.    I'm going to show you a

¹⁹ document that's bates number Doe 668, for

²⁰ the record, and I believe the same letter

²¹ was enclosed in the district's production

²² as well.

²³      Have you seen this letter

²⁴ before?

1      A.    I have.

2      Q.    This letter was put in

3 ███████ -- is it cumulative file, is

4 that where this letter was placed?

5      A.    I believe so, yes.

6      Q.    And this is a letter saying,

7 you know, advising anyone who would open

8 up, I guess, the cumulative file, that

9 ██████ and ███████ should be kept

10 separate?

11     A.    Yes.  I mean, that's what I

12 read here, yes.

13     Q.    Was there an ability for the

14 district to put something like this

15 letter in ███████ file back in Gwynedd

16 Square?

17     A.    Sure.  There was an ability

18 to put a letter in a student's file when

19 she was in Gwynedd Square.

20     Q.    And would that have been

21 something, if it was put into a student's

22 cumulative file, that would have passed

23 through with the student as they went to

24 different schools in the district?

1    A.    I expect that it would, yes.

2    Q.    In ███████ file, could a

3  letter like this, at Gwynedd Square, been

4  placed in his file back at Gwynedd

5  Square?

6    A.    Yes.  I believe it's

7  possible to put letters in any file.

8    Q.    And if it had, would that

9  have been something that would have

10 carried with ██████ as he went to the

11 middle school and high school?

12   A.    Yes.

13   Q.    Is there any other type of

14 documentation or papering of either

15 ███████ or ████████ file that could have

16 notified administration along the way of

17 what had happened at Gwynedd Square?

18   A.    No.  I think we've outlined

19 them pretty well, some of the options.

20 But again, I, I think this, frankly, is

21 irrelevant to this situation because the

22 administration at the high school knew.

23 People knew.  They knew.  I agree that

24 putting a letter in the file could have

1  happened and that could have been

2  helpful.  But they knew.

3       Q.    Even at this point, in 2018,

4  from the documents received from the

5  district, a note was not placed in

6  ██████  file like this; is that correct?

7       A.    Not to my knowledge.

8       Q.    Do you know why a note

9  wasn't placed in his file?

10      A.    I don't.  I mean, we --

11  yeah, I do not.

12      Q.    Do you think it was

13  important to have ██████  file also

14  documented at this point?

15      A.    I think that's an easier

16  question to answer in hindsight.  Sure, I

17  mean, I don't know that it would have

18  hurt to have this in his file, and it

19  could have been helpful, yes.

20      Q.    And for someone to be aware

21  that this letter is in here, would you

22  have to pull the cumulative file of that

23  student?

24      A.    You would.

1 　　　　Q.　　Was there some other method,
2 like, in either of the two SIS's that we
3 talked about for this information to be
4 found on, like, an electronic system?
5 　　　　A.　　No.　That's really the only
6 way, the alert.　The aforementioned alert
7 in the electronic system.　The likelihood
8 of a teacher pulling a student's cume
9 file is low.　It's low.　Them opening the
10 student in the information system and
11 seeing an alert is very high, so.
12 　　　　Q.　　The alert was for
13 scheduling, right, like schedule?
14 　　　　A.　　Yeah.　But it popped up as
15 soon as you pull ███████ up.
16 　　　　Q.　　Even without being in her
17 course and stuff like that?
18 　　　　A.　　Yes.　As soon as you clicked
19 on her name, there was a pop up window.
20 　　　　Q.　　Does the district have a
21 responsibility to investigate incidents,
22 sexual misconduct allegations, between
23 students that occur off school grounds?
24 　　　　A.　　Hmm.　Assuming that the

1 altercation -- all right -- so, Act 126,
2 I believe, says that if you believe that
3 there is some kind of abuse, sexual
4 abuse, you are mandated to report it to
5 a -- so I believe we have a
6 responsibility to report, if we get word
7 that something happened at a party on
8 Saturday night, for example.  In terms of
9 investigating something that happened off
10 school grounds, quite frankly, if it was
11 something egregious, I would expect that
12 we reported it immediately, and the
13 police would take over.  There is a
14 very -- the water is muddied on the
15 authority of the school, things that
16 happen off school ground.  Was it a
17 student activity, that's a different
18 story.  Was it a trip, was it an athletic
19 event, those types of things, different
20 story.  But if it's something that
21 happens off school ground, out of school
22 hours, completely out of the context of
23 school, I -- we have a duty to report,
24 not investigate.

1        Q.    I'm going to show you a

2   document, one second, a North Penn

3   document, it's Page 689.

4              Do you know whose signature

5   it is, the second from the bottom?

6        A.    I can figure it out.

7              My suspicion is that that is

8   Jim Galante.

9        Q.    And Jim Galante was, who, in

10  the 2015 timeframe?

11       A.    The principal, the principal

12  of Pennbrook Middle School.

13       Q.    Okay.  And this last

14  signature here, do you know whose that

15  is?

16       A.    Sean O'Sullivan.

17       Q.    Who's that?

18       A.    He was the principal of

19  Penndale Middle School.

20       Q.    Have you seen -- are you

21  able to see this entire screen --

22       A.    I can.

23       Q.    -- on your screen?

24       A.    I can.

1      Q.    The 'A' that's referenced
2   here, do you know what that means or that
3   stands for?
4      A.    Oh, gosh.  Allergy.
5      Q.    Oh, an allergy?
6      A.    I think so.
7      Q.    Okay.
8      A.    This screen, I believe
9   you're seeing here, is from eSchool --
10  well, no, I guess not.  Hold on a second.
11  If you don't mind, I can look.
12     A.    Sure.
13     Q.    I can probably pull this
14  screen up.
15     Q.    That's great.  And just for
16  the record, this is -- I'm looking at
17  Page 4 of 4 of one of the attachments or
18  productions of ███ ███████ file.
19     A.    Oh no, it's not,
20  interesting.
21     Q.    So right now on your screen,
22  you're pulling up what ███████ file
23  looked like in the most recent?
24     A.    In our system information

1  system, and it's not.  It's not the same

2  picture, it's not -- I wonder if that's

3  from his junior year.  Let me see.

4        Q.    It says grade 11 here.

5        A.    There ya go.  That's why the

6  picture's different.  Okay.

7        Q.    You say -- are you able to,

8  I mean, are you able to share your screen

9  with me of what you're looking at now?

10       A.    I can.

11       Q.    Because you're saying this

12 is ███████ file in the most recent

13 application or SIS?

14       A.    I can, I can share.  I don't

15 know if I -- I'm allowed to ask counsel

16 if I'm allowed to share my screen, of

17 what we see in Infinite Campus, but I'm

18 certainly capable of sharing.

19            MS. LAUGHLIN:  Was there any

20     objection?

21            MS. JORDAN:  I have no

22     objection.

23            MS. LAUGHLIN:  Okay.

24            THE WITNESS:  Well Zoom

 1   does, because it says you cannot share

 2   your screen, so.

 3           MS. LAUGHLIN:  Okay.

 4           MS. JORDAN:  We probably

 5   need to be given rights by somebody.

 6           MS. LAUGHLIN:  Oh.  Oh,

 7   that's -- okay.

 8  BY MS. LAUGHLIN:

 9       Q.    Well, regardless, let me ask

10  you, on the screen, are you able to

11  click --

12           THE COURT REPORTER:  Excuse

13   me --

14           MS. LAUGHLIN:  Oh, sorry.

15           THE COURT REPORTER:  --

16   Laura, it says -- oh, it says one

17   person can share at a time, but I can

18   make it -- okay.

19           MS. LAUGHLIN:  There ya go.

20           THE COURT REPORTER:  Try

21   now, Todd.

22  BY MS. LAUGHLIN:

23       Q.    Dr. Bauer, you should be

24  able to share it now.

1    A.    I'm trying, hold on.

2          What is going on?  Hold on.

3          I swear I'm close.

4          This is what I see.

5          Can you see this?

6    Q.    Yes.

7          I see, this is Infinite

8  Campus?

9    A.    Correct.  And it's a student

10 who graduated.  So he's inactive.  That's

11 why he's red.

12   Q.    Are you able to scroll down

13 where it says person information?

14         Okay.  And is there a --

15 similarly how we were just looking on the

16 last screen, where there was, like,

17 discipline, a discipline screen, is there

18 that on this?

19   A.    Let me see on an active

20 student.  I'm gonna stop sharing for a

21 second --

22   Q.    Okay.

23   A.    -- just because I don't want

24 to share a student's information.

1    Q.    Okay.

2    A.    I don't believe I can pull

3    ███████ up now.

4    Q.    Because he's graduated?

5    A.    Yeah.  Hold on, let me think

6    of a current student.

7          Yeah.  So I am only

8    seeing -- I don't see any discipline for

9    him because he's graduated.

10   Q.    So you can't get access to

11   that tab or something?

12   A.    Yeah, I'm not sure.  I

13   guess, because you can see the records,

14   like, the current year, and then it

15   would -- but he's inactive, because he's

16   a graduate.  So I'm not sure how I

17   could -- hold on -- oh wait.

18         Yeah.  I'm not having any

19   luck, sorry.

20   Q.    Okay.

21   A.    If he was a current student,

22   I could.

23   Q.    Is there a way, do you know,

24   that you can go to, like, the tech people

1  in the district and figure out if that's

2  accessible still, what the discipline

3  folder would say?

4      A.    What's actually written for

5  a particular incident?

6      Q.    Or for this particular

7  student, because you said that the screen

8  I showed you was from the last SIS.

9      A.    Yeah.  Could you pull it up,

10 again?

11     Q.    Sure.

12     A.    Grade 11.  Is there, at the

13 bottom of that page --

14     Q.    Oh, eSchool?  Okay.

15     A.    Yeah.

16     Q.    So this is from eSchool?

17     A.    Right.

18           Could you scroll up, again?

19     Q.    Yes.

20     A.    And that was just --

21     Q.    I'm sorry.

22     A.    That was just printed this

23 summer, that's what it says.  So -- oh,

24 okay.  That makes sense.  So I was

1  confused -- got it.  So this behavior

2  incident, the cutting class, and then the

3  harassment were all before we switched.

4  Because this was -- he graduated in 2021.

5  So this is his sophomore -- those

6  incidents, I guess, were from his

7  sophomore year.  Yeah, that makes sense.

8  May of his sophomore year, the cutting

9  close.

10          Okay.  All right.  I was

11  wondering why that would be in eSchool,

12  when we switched during his junior year,

13  but this was printed -- this report was

14  generated the summer of his sophomore

15  year.  We had not switched to Infinite

16  Campus yet.

17      Q.    Okay.

18      A.    I don't think so.

19      Q.    Okay.  So then, I would just

20  ask to see if you're able to get access

21  to -- I mean, I don't know if this

22  information we're seeing right here on

23  the screen, on Page 4 of 4 of his file,

24  was transferred into the next app.

1    A.    I, I think I tried to pull

2  that, hold on.

3    Q.    I thought you were saying,

4  because he graduates, you can't?

5    A.    Yeah, I know.  But I think I

6  tried to pull it out of eSchool.

7    Q.    Are you going into eSchool

8  now?

9    A.    No.  I thought I asked to

10  see it, maybe not.  I don't think there

11  was as much detail, though.  But I will

12  try.  I'll let you know if I can.

13    Q.    In eSchool, these incidents

14  that are listed on the left, are you able

15  to click on these and get more detail?

16    A.    You could, yes.

17    Q.    So is there -- would you

18  expect, because there's, you know, the

19  way it looks here, that there is more

20  information behind each of these?

21    A.    There could be.

22    Q.    Okay.  I would also ask for

23  you to go -- if you still have access to

24  eSchool -- the summer, to go in and click

1  each of these things that might be

2  available and pull whatever documentation

3  exists behind this screen, okay?

4       A.    I have it.

5       Q.    Oh, you have that now?

6       A.    Yes.  And I believe I've

7  shared this, but I need you to stop

8  sharing.

9             What are you seeing?  Are

10 you seeing my kids?

11      Q.    I'm not seeing anything yet.

12      A.    You don't see anything?

13            THE COURT REPORTER:  It's

14    just black.

15            MS. JORDAN:  It says that

16    you've started to share your screen.

17            THE COURT REPORTER:  There

18    ya go.

19            THE WITNESS:  Okay.

20 BY MS. LAUGHLIN:

21      Q.    What about for the other two

22 that were listed?

23      A.    Those, I did not pull.  But

24 I can.

1          Q.    Oh, okay.

2          A.    This was shared, that

3    incident in particular you reported to.

4          Q.    I understand.  You can, you

5    can stop sharing.

6          A.    Okay.

7          Q.    Okay.  I'm pulling back up

8    that same document we were working from

9    or talking about.

10              This incident at Gwynedd

11    Square that's listed as one incident

12    here, do you agree that this should

13    have -- according to the district and the

14    way that things are expected to be done

15    within the district, that this should

16    have been listed as three separate

17    incidents?

18         A.    I agree with that.

19              MS. JORDAN:  Note my

20       objection to the form of the question.

21    BY MS. LAUGHLIN:

22         Q.    Sorry.  You said you do

23    agree with that?

24         A.    I do.

1    Q.    Are you aware --

2    A.    Hold on.

3    Q.    Sorry.

4    A.    Yeah, I'm sorry.  Real

5 quick.

6          Unless all of the detail is

7 in the report, but I'll see if I can pull

8 that.

9    Q.    Okay.  But based on what

10 we're showing here, you would agree

11 that -- would you agree that this

12 appears, if someone pulled this up and

13 looked at it, that it was just one

14 incident that occurred?

15   A.    I agree with that.

16   Q.    The part where it says

17 obscene language and gesture, do you see

18 that?

19   A.    I do.

20   Q.    Is that a correct

21 categorization of what had occurred at

22 Gwynedd Square in sixth grade?

23   A.    I would not agree with that.

24   Q.    What should it be

1 categorized, on behalf of the district,

2 of what you would expect the incident we

3 went over be categorized as?

4      A.    I'd have to see the list of

5 options.  If nothing else, inappropriate

6 contact or the 338 that you're seeing

7 right above there.  And again, the

8 convention has changed, the coding.  But

9 I don't believe that what is described in

10 the report is obscene language or

11 gesture.  I would say that would be

12 giving someone the middle finger,

13 something like that.

14      Q.    Okay.  So somebody that

15 would -- you would agree, somebody that

16 would view this would -- from seeing

17 obscene language or gesture, that it was

18 somebody would have expected them to

19 think, that it was somebody giving the

20 middle finger?

21      A.    I would expect something of

22 that nature.  However, if you're pulling

23 up a student's discipline to look at it

24 for -- obviously, for a purpose, I would

1 expect them to click on the link and see

2 what happened, right?  So, I'm hopeful

3 that there's a little bit more detail in

4 there, but I'll see if I can find out.

5     Q.    Okay.  For this incident

6 being as one day of ISS, do you know

7 whether that was appropriate on behalf of

8 the district?

9     A.    Well my understanding from

10 reading the documents, he has an OSS and

11 an ISS.  So, it look's like it was coded

12 the consequence was partially correct,

13 not entirely.

14     Q.    Because there's the OSS

15 missing from this report?

16     A.    Yes.

17     Q.    Would you agree with me that

18 it's important to document, in a file

19 like that that we just went over,

20 accurately?

21     A.    I do think it's important to

22 be accurate, yes.

23     Q.    Is part of the reason so

24 that whoever's getting that information

1 would have an accurate understanding of

2 what the history is?

3          A.     Yes.

4          Q.     Is there any kind of

5 training that principals undergo in the

6 district as to how to characterize

7 misconduct like that?

8          A.     I think you asked this

9 question in a different form earlier, and

10 I, I said that Dr. Santoro reviewed --

11 from elementary when she receives the

12 suspension letters.  I receive them for

13 secondary, I have a spreadsheet and a

14 list, and if something was inaccurate, I

15 would provide guidance to the

16 individuals, to the principal.

17          Q.     Would you agree with me,

18 then -- principals on how to document

19 that?

20          A.     I would agree with that.  In

21 terms of how to code something, I would

22 agree with that.

23          Q.     You said that suspension

24 letters would be given.  Here on the

1   document for the screen we just looked at

2   a moment ago, suspension -- since 

3   did receive at least an ISS, one-day

4   in-school suspension, would you have

5   expected that there would have been a

6   suspension letter that went along with

7   that?

8           A.    I would.

9           Q.    Where would that be kept,

10  the suspension letter?

11          A.    In a student's file.

12          Q.    In the cumulative file?

13          A.    Yes.

14          Q.    Is that something that would

15  carry through, like, not be purged when a

16  student moves up to the next year?

17          A.    That would be my

18  expectation, yes.

19          Q.    Okay.  Do you know whether

20  ▮▮▮▮▮▮▮  entire cumulative file was

21  provided in this case?

22          A.    I have no reason to believe

23  that anything was not provided.  Again,

24  unfortunately, there are things that are

1 purged from middle to high school.  But

2 I -- you did ask me, as part of my

3 homework here, to get his file, and I

4 will get it.  I'm headed to the high

5 school after this.

6          Q.    Okay.

7          A.    So I will look.  But I have

8 no reason to believe that his file was

9 not provided.

10          Q.    Okay.  I'm going to share my

11 screen again, just -- and I'm going to

12 mark this as Exhibit-B.

13          A.    This looks like his file.

14          Q.    Okay.  And this is a

15 four-page document.  I'm just gonna

16 scroll through so you can see the four

17 pages.

18               Sorry, are you able to see

19 that?

20          A.    I think -- if you can scroll

21 up a little bit.  It looks like a report

22 card.  Okay, yeah.

23          Q.    Okay.  And then, this page,

24 one-page document, I'll mark as

1  Exhibit-C.

2          These Exhibits-B and C were

3  provided to me that this was ▮▮▮▮▮▮

4  entire file.  Does this appear to you,

5  being familiar with cumulative files of

6  student's, that the five pages would be

7  what is included in ▮▮▮▮▮▮ file?

8          A.    For a student that has zero

9  discipline incidents in high school, I

10 would expect to see his transcript, his

11 most recent report card and a list of his

12 discipline, and I see all of that is

13 provided.  So, yeah, this would represent

14 his -- a high school senior cumulative.

15         Q.    What about in terms of,

16 since we know from Page 4 of Exhibit-B,

17 that he was suspended two separate times

18 where a suspension letter would have been

19 issued, according to you from the

20 district policies and expectations, do

21 you know why there's no suspension

22 letters for the second or third incident

23 here listed on Page 4?

24         A.    The second one, I believe I

1 provided last week.  It was actually as a

2 part of investigating -- or, whenever I

3 provided it -- talking to Mr. Bashaw,

4 provided a letter.

5      Q.    Are you talking about

6 this --

7      A.    No.

8      Q.    -- Exhibit-C?

9      A.    No.

10      Q.    Okay.  I haven't been

11 provided a letter.  Are you saying you

12 provided a letter to your counsel that

13 you received from Mr. Bashaw about the

14 middle school incident?

15      A.    I did.

16      Q.    Is it just a suspension

17 letter, or do you recall what that letter

18 entails?

19      A.    I can show it to you.

20      Q.    Okay.  Let me stop sharing

21 my screen, then.

22      A.    Can you see it?

23      Q.    Oh, yes, I do.

24      Where did this document come

1 from?

2      A.     I -- exactly where it came

3 from, I don't know.  I called over to the

4 middle school and asked if they had --

5 like I said, asked if they had any notes

6 from Mr. Bashaw, and they said, "all we

7 have is a suspension letter".  So where

8 they retrieved this from, I don't know.

9 But here is his suspension letter.

10      Q.     Okay.

11      A.     It doesn't provide anymore

12 detail than what the report you have.  I

13 believe you classified it as Exhibit-C.

14      Q.     Okay.  I'm just gonna -- if

15 there's an ability to send that to your

16 counsel, and we can have this marked as

17 Exhibit-D to the deposition.

18           Would you agree with me that

19 this was not -- Exhibit-D was not in

20 ███████ cumulative file?

21      A.     Yeah, that's correct.  The

22 same level of detail it was, it would be

23 the infraction, what happened, but that,

24 it's -- the letter itself was not.

1    Q.    Should it have been?  Should

2  those letters be kept in a student's

3  cumulative file?

4    A.    I'm not certain.  Quite

5  frankly, the principal of the high school

6  doesn't actually deal with a student's

7  cumulative file all that much.  My gut is

8  that a suspension letter would be.  But a

9  transcript, a report card, behavior, if a

10 suspension -- I earlier said that the

11 suspension letter -- I thought the

12 suspension letter should be in there.  If

13 I am incorrect, I apologize.

14    Q.    Since you talked to Wendy

15 ████████  back in December of 2018, in

16 that meeting, since then, did you ever

17 inquire as to how █████ was doing?

18    A.    Yeah.  On multiple

19 occasions, actually.  I'd say half a

20 dozen.  I worked with her case manager --

21 or, special supervisor, is right down the

22 hall, Dr. Broxterman, on countless

23 occasions -- not countless, but at least

24 half a dozen.  He and I interacted

1   regarding ▇▇▇▇ and he actually seemed

2   to suggest that she was quite happy at

3   the virtual academy.  So yes, that is a

4   hundred percent true, I had checked in.

5       Q.    Through Dr. Broxterman,

6   right?

7       A.    Yeah.  He's the one who --

8       Q.    What about --

9       A.    -- meeting with the family

10  and speaking with mom.

11      Q.    What about directly with

12  Mrs. ▇▇▇▇▇▇ did you ever reach out

13  to her to find out how ▇▇▇ was doing?

14      A.    No.  I wouldn't typically,

15  as assistant superintendant, call and

16  check, as long as I'm apprised by the

17  supervisor.  And, quite frankly, perhaps

18  it was presumptuous of me, I'm not so

19  sure I thought that Mrs. ▇▇▇▇▇

20  wanted to hear from me.  So, I knew Neil

21  had a good relationship with her, and I

22  would check in with him.

23      Q.    Neil Broxterman?

24      A.    That's correct.

1    Q.    You were saying, like, when

2  the meeting ended in December 2nd -- or,

3  I'm saying -- in December of 2018 that

4  Mrs. ████████ really liked you and

5  said all these really nice things.  Why,

6  why would it be presumptuous of you to

7  think that she didn't want to speak to

8  you after that?

9    A.    Because I was aware that we

10 were served some papers after that.  So,

11 the facts changed, so my opinion did too.

12 That day she seemed very happy with me,

13 but she told me she would be back in

14 touch, and she never was, directly.

15   Q.    In terms of the lawsuit in

16 this case, is that what you're talking

17 about, papers were served on you?

18   A.    Yes.  Yes.  So, at the point

19 where she and I met, as I said, it ended

20 with, "I'm not sure which route I'm going

21 to go here, but I'll be in touch".  And

22 it was clear that she went a certain

23 route, and she was never in touch with me

24 directly.  So, again, perhaps

1  presumptuous, but I assume she didn't

2  want to hear from me.

3       Q.   Do you know how long after

4  you last met with Mrs. ████████ before

5  the lawsuit was filed in this case?

6       A.   I don't.

7       Q.   It was October of 2020,

8  that's when the lawsuit was filed in this

9  case.

10      Would you agree with me that

11  from December of 2018, almost two years

12  later, to 2020, you never reached out to

13  Mrs. ████████ to check and see how

14  things were going?

15      A.   Directly to Mrs.

16  ████████ I did not, no.  As I said,

17  she said she would be in touch; she was

18  not.

19      Q.   I think you had said that

20  the difference was her feelings had

21  changed because you got served with the

22  papers, right?

23      A.   I did, yeah.

24      Q.   But that --

1    A.    She said she'd be in touch,
2  she was not.  So, if she wanted to hear
3  from me, I would have been happy to call
4  her, but -- yeah, no, and me not making a
5  personal phone call doesn't mean I didn't
6  check in or didn't care.  So, you're
7  welcome to speak with Dr. Broxterman, I'm
8  sure he would tell you.
9    Q.    Did you ever reach out to
10  try and talk to █████ --
11    A.    No.
12    Q.    -- to see how she was doing?
13    A.    Absolutely not.  That was
14  made pretty clear by mom, that we were
15  not to talk to her.
16    Q.    Do you know whether anybody
17  on behalf of the district had ever --
18  other than Dr. Broxterman had ever
19  inquired to see how █████ was doing?
20    A.    I would assume her teachers
21  and her case manager did.
22    Q.    From the district?
23    A.    Yes.  Yes.  Her teachers
24  were -- teachers at Northbridge.

1      Q.    Okay.  So not --
2 Northbridge, meaning, like, the virtual
3 part of North Penn?
4      A.    Yeah.  But we have live and
5 in the flesh teachers.
6      Q.    From 2014 to the present,
7 are you aware of -- other than the
8 incidents we've talked about today, with
9 ▇▇▇▇ ▇▇▇▇  are you aware of other
10 instances of sexual misconduct with
11 student victims?
12      A.    By ▇▇▇▇
13      Q.    No.  Well, do you know of
14 any of ▇▇▇▇ we haven't talked about?
15      A.    No.
16      Q.    What about outside of
17 ▇▇▇▇  just in the district, generally,
18 since you're here as a representative of
19 the district, are you aware of or do you
20 know of other instances of sexual
21 misconduct of students in the district,
22 since, say, 2010 up through the present?
23      A.    Sure.
24      Q.    Can you tell me how many?

1        A.    I can't.  No, I can't.  I

2   don't know that number off the top of my

3   head.

4        Q.    Can you estimate for me?

5        A.    I can't.  If we would like

6   to take another comfort break, I could do

7   a little research.  I can't responsibly

8   estimate.

9        Q.    Where would you be

10   researching that information?

11        A.    I can -- as previously

12   mentioned, I can pull reports, I can look

13   things up, yes.  I can, I can look at

14   tallies on incidents in a given year, for

15   example.  But I am certainly aware of,

16   with 13,000 kids, over the course of 12

17   years, I think you just put the wind out

18   of instances of sexual misconduct, yes.

19        Q.    I would ask -- I don't want

20   to spend time in a deposition doing so,

21   but if you're able to pull that report,

22   since it's readily available, to figure

23   out sexual misconduct within the

24   district, and that's including both,

1  like, on behalf of students as well as
2  employees and things like that, you'd be
3  able to pull that?
4        A.    I would have to create
5  something, I believe, for staff.  For
6  students, the challenging factor here is
7  two different systems, one system that we
8  no longer have.  I could easily pull,
9  say, a year since Infinite Campus, that
10  would be no problem for me.  I can pull
11  '19/'20, which isn't a great year,
12  because of the pandemic, but I can pull
13  that date for a given year.  In terms of
14  past to eSchool, I would have to see if
15  that's possible.
16        Q.    Okay.  Yeah, I mean, I would
17  ask that, because the allegations in this
18  case, the relevant timeframe in this
19  case, even with the allegations we're
20  talking about were prior to 2014.  So I
21  would ask --
22        A.    What might --
23        Q.    -- that -- sorry.
24        A.    What might be easy to

1  pull -- I'm sorry for interrupting --

2  what might be easy to pull is the data

3  from that report that we submit in PIMS

4  or TIMS.  I actually believe it's

5  publically accessible, you could find it.

6  But I'll see what I can do.

7       Q.    Okay.  Would you agree that

8  in order for the reports that are in PIMS

9  or TIMS, that things would mean -- things

10 would need to be documented correctly or

11 accurately in the district system in

12 order for that to be pulled into the PIMS

13 or the reporting of the, the district?

14      A.    I would agree.

15      Q.    Out of the -- as you sit

16 here today, I know you said you have a

17 good memory, are you able to recall for

18 me instances of sexual misconduct within

19 the district that you can recall?

20      A.    I can.

21      Q.    Can you tell me about them.

22 Or, how many can you recall?

23      A.    I am aware of -- I have

24 intimate knowledge of one, in particular,

1   with a, a student and a faculty member.
2   Yeah, it's, it's irresponsible for me to
3   sit here and say, ah, this one and this
4   one.  I can also recall an incident where
5   students were found doing inappropriate
6   things in areas of the building,
7   consensual things.  Still sexual
8   misconduct, in my mind.  Might not be
9   sexual assault, but it's sexual
10  misconduct in a public setting.  Those
11  are the more frequent types of things you
12  get in a high school.  Yeah, those are
13  the ones that immediately come to mind.
14  I can think of a few of the latter type,
15  where students are misbehaving in areas
16  of the building they shouldn't.
17          Q.    And you're saying those are
18  all consensual, those ones that you can
19  recall?
20          A.    Yeah.  I can't think of one
21  off the top of my head where somebody --
22  relations occurred, in the stairwell, for
23  example, and one said, "I didn't want to
24  partake".

1    Q.    And the instances that

2  you're talking about, the latter, where

3  students were doing inappropriate things

4  consensually, do you have -- those were

5  all at the high school?

6    A.    Yes.  The ones that I'm

7  referencing, yes.

8    Q.    When was the timeframe in

9  which those occurred, the ones that

10  you're referencing?

11    A.    2015 through 2018.

12    Q.    Like, when you were

13  principal?

14    A.    Yes.  Those are the ones

15  that immediately come to mind.

16    Q.    How many occurred during

17  that time, that you can recall?

18    A.    I think a responsible

19  estimate would be ten, over those three

20  years.

21    Q.    Okay.  What about any other

22  instances of misconduct, sexual

23  misconduct, among students during your

24  time as the principal at North Penn High

1  School?

2       A.    Nothing immediately comes to

3  mind, but I'm sure there are other

4  instances to students that occurred.

5  Again, I would have to pull that kind of

6  stuff.

7       Q.    Okay.  When you said there's

8  one incident you have intimate knowledge

9  of involving a teacher and a student, can

10  you tell me -- without giving the

11  student's name, can you tell me about

12  that.

13       A.    It was an instructor in our

14  JROTC program who was having relations

15  with a student, to my knowledge, off

16  school grounds.  He was driving her home,

17  and they engaged in all kinds of sexual

18  activity, whether it be in his car or a

19  hotel room.

20       Q.    Was the student under age,

21  like under age 18?

22       A.    I don't believe the student

23  was, which was a complicating factor.

24       Q.    Do you recall what the

1  outcome of that -- was there an

2  investigation into that?

3        A.    It was fairly limited on our

4  end because the teacher quit in the

5  middle of the night and police were

6  involved immediately.  So in terms of,

7  like, interviewing the individual, none

8  of that occurred with the adult.  With

9  the student, it was extensive.  Yeah, but

10 he -- the day that it was reported to me,

11 he never came back the next day.

12       Q.    You say it was extensive,

13 meaning the district interviewing the

14 student victim?

15       A.    Well -- so it was reported

16 to me by three students.  You know, three

17 nervous kids coming to tell their

18 principal something about one of their

19 friends, and we have been -- you know

20 what, this -- telling this story really

21 refreshed my memory, that we actually had

22 Mission Kids come and provide

23 professional development to our

24 administrators on what to do and not to

1  do in incidents of sexual misconduct.  So

2  we did have a professional development

3  segment where Mission Kids came to the

4  district and gave instruction.

5       Q.   Are you talking about --

6  sorry -- after the one with the

7  instructor -- JROTC instructor?

8       A.   Timeline-wise, I don't --

9  no, I would say it was before that.  So

10 this was a while ago.  There was

11 professional development.  Just telling

12 this story reminded me that Mission Kids

13 came here and presented to us, and as

14 part of that professional development

15 opportunity from Mission Kids, we were

16 advised to not stop a student from

17 talking but don't ask questions at --

18 when -- as soon as you know that there is

19 some kind of potential for there to be a

20 sexual case.  So I recall, as the

21 building principal at the time, kids

22 coming in nervous to tell me this story,

23 and I sat down with them and kind of

24 said, "guys, you're not going to tell me

1  anything I haven't heard before, go

2  ahead".  They were super nervous.  And

3  then they said our friend, Sally, is

4  having sex with Mr. Miller.  And I said,

5  "okay, go on."  And they just talked and

6  talked and talked and talked and talked.

7  I didn't ask any questions.  I took all

8  kinds of notes.  And in the meantime, I

9  had poked my head out and asked the

10 secretary to call the superintendant and

11 to call the police.  And so the police

12 came in and take over -- took over,

13 excuse me.  They interviewed the kids,

14 and in many cases I sat with the kids,

15 because I was in loco parentis.  So

16 extensive Q&A with the students in my

17 presence.  I didn't do the Q&A.

18      Q.    Do you have an estimate of

19 when this Mission Kids professional

20 development training took place, or even

21 in the context of in this case, the

22 timeline, before this, after that?

23      A.    I was hoping you wouldn't

24 ask that, because I don't remember.  But

1  I think I can responsibly figure it out.

2  That occurred -- I'm going to say it was

3  in -- sometime in 20 -- the spring of

4  2016, is my guess.

5        Q.    Was them coming in and doing

6  this professional development training in

7  response to something?

8        A.    No.  Not to my knowledge.

9        Q.    Do you know, like, why then,

10  why in the spring of 2016 did they decide

11  to come in and give this professional

12  development training to the

13  administration?

14        A.    I actually believe there

15  was, like, a circuit, they were going

16  around to school districts.  I don't know

17  what precipitated -- I was not at central

18  office administration at the time.  I

19  don't know what the impetus was.  But I

20  remember it happening.

21        Q.    Are there any other

22  complaints or situations, incidents of

23  sexual harassment within the district

24  that you can recall?

1    A.    I can think of a case that

2  occurred last year at one of our middle

3  schools.

4    Q.    What, what -- do you

5  remember what middle school that was?

6    A.    Penndale.

7    Q.    What do you -- without

8  giving me, like, the details of the

9  student's name, what did that incident

10  involve?

11    A.    Parent reporting that a

12  young man was touching their child

13  inappropriately.  I was alerted to it the

14  first weekend in October last year.  So

15  this would have been, what, 2020.  I was

16  away with my wife.  And we were able to

17  pull security footage of what was alleged

18  to have happened.  There was enough in

19  the security footage that I advised the

20  principal to call the Title IX

21  coordinator -- this is a Saturday, by the

22  way -- call the Title IX coordinator, and

23  then she took it from there.

24    Q.    The Title IX coordinator,

1  that would have been, who?

2      A.    Dr. Diegue.

3      Q.    Was Dr. Diegue also the

4  director of HR?

5      A.    Assistant director of HR.

6      Q.    Okay.

7      A.    Do you mind if I stand?

8      Q.    No, not at all.

9      A.    Okay.

10     Q.    So long as the video, I

11  guess, is -- I'm just -- I'm reviewing my

12  notes.  I may be done, I just want to

13  double check.

14     A.    No problem.

15     Q.    Did you say -- are you able

16  to pull up what was sent home in that

17  packet, are you able to get access to

18  that?

19     A.    Like, this instant, or can I

20  get it?

21     Q.    I guess, you're able to do

22  that separately, right?

23     A.    Yeah.

24     Q.    All right.  I think those

1 are -- if you're able to do that and

2 provide that to your counsel as well, I

3 think those are all the questions that I

4 have for you.

5       A.   Okay.  I will get you the

6 back to school mailing, the Act 126

7 trainings, ████ and ████ files, and

8 I'll find out whether or not I can -- oh,

9 the OCR report uploads and then whether

10 or not I can get further detail on the

11 event of 4/9/15 from eSchool.

12       Q.   Or any of the reports in

13 eSchool, if any of them can -- I know,

14 the middle one, you already provided me

15 what can be clicked on that.

16       A.   I can give you the report on

17 the other one; he cut class.  But I

18 can -- I'll look.

19       Q.   Okay.

20       MS. LAUGHLIN:  All right.

21   Those are all the questions I have.

22   Thank you very much.

23       THE WITNESS:  Thank you.

24       THE VIDEOGRAPHER:  Are there

1    any other questions?

2              MS. JORDAN:  No.

3              THE VIDEOGRAPHER:  All

4    right.  Okay.  Please standby.

5              This concludes the video

6    deposition.  We're going off the video

7    record, the time is 4:57 p.m.

8              MS. JORDAN:  I will take a

9    copy of the transcript.

10             (Whereupon, the deposition

11   concluded at 4:57 p.m.)

12             (Whereupon, deposition

13   Exhibits-A through D were marked for

14   identification.)

15

16

17

18

19

20

21

22

23

24

1

2            CERTIFICATE

3

4

5         I HEREBY CERTIFY that the

6  witness was duly sworn by me and that the

7  deposition is a true record of the

8  testimony given by the witness.

9

10

11  _____

BEN PIECZYNSKI, JR., a
12  Professional
Reporter and Notary Public
13  Dated:  September 29th, 2021

14

15

16

17

18

19         (The foregoing certification

20  of this transcript does not apply to any

21  reproduction of the same by any means,

22  unless under the direct control and/or

23  supervision of the certifying reporter.)

24

LAWYER'S NOTES

PAGE    LINE

1

2

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____

# EXHIBIT "K"

1 　　　UNITED STATES DISTRICT COURT
2 FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3
4 JANE DOE,　　　　　　: CIVIL ACTION NO.
　　　　Plaintiff,　　: 2:20-CV-05142
5 　　　　　　　　　　　　:
　　vs.　　　　　　　　:
6 　　　　　　　　　　　　:
　NORTH PENN SCHOOL　 :
7 DISTRICT,　　　　　　 :
　　　　Defendant.　　 :
8
9
　　　　　　　　　- - -
10
　　　　　August 10, 2021
11
　　　　　　　　　- - -
12
13 　　　Remote videotaped deposition of KATHRYN
14 SMALL, taken pursuant to notice, at the
15 location of the witness, Lansdale,
16 Pennsylvania, commencing on the above date
17 at or about 10:16 a.m., before Eileen P.
18 Barth, C.S.R., N.P.
19
20 　　　　　　　　　- - -
21
22
23 　　　　　GOLKOW LITIGATION SERVICES
　　Phone 877.370.3377　|　Fax 917.591.5672
24 　　　　　　deps@golkow.com

```
 1    APPEARANCES:
 2          FREIWALD LAW
            BY:  LAURA E. LAUGHLIN, ESQUIRE
 3          1500 Walnut Street
            Suite 1801
 4          Philadelphia, PA  19102
            lel@freiwaldlaw.com
 5          Attorneys for the Plaintiff
 6
            HENDRZAK & LLOYD
 7          BY:  MAUREEN A. JORDAN, ESQUIRE
            3701 Corporate Parkway
 8          Center Valley, PA  18034
            maureen.jordan@zurichna.com
 9               and
            WISLER PEARLSTINE, LLP
10          BY:  KYLE SOMERS, ESQUIRE
            460 Norristown Road, Suite 110
11          Blue Bell, PA  19422
            ksomers@wispearl.com
12          Attorneys for the Defendant
13
14
      ALSO PRESENT:  Karen Keebler, Videographer
15
16
17
18
19
20
21
22
23
24
```

1          DEPOSITION SUPPORT INDEX

2

    DIRECTIONS NOT TO ANSWER:

3    PAGES:  None

4    REQUESTS FOR DOCUMENTS OR INFORMATION:

    PAGES:  41

5

    STIPULATIONS AND/OR STATEMENTS:

6    PAGES:  5

7    MARKED QUESTIONS:

    PAGES:  None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    INDEX
 2

     WITNESS                        PAGE
 3

 4   KATHRYN SMALL

 5     By Ms. Laughlin                7

 6

 7

 8                  EXHIBITS

 9   EXHIBIT     DESCRIPTION          PAGE

10
                (No Exhibits Marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1           (It is stipulated by and

2    among counsel for representative

3    parties that the reading, signing,

4    sealing and certification are

5    waived, and that all objections of

6    any nature except as to the form

7    of the question are reserved until

8    the time of trial.)

9           THE VIDEOGRAPHER:  We're now

10    on the record.  My name is Karen

11    Keebler.  I'm a videographer for

12    Golkow Litigation Services.

13    Today's date is Tuesday, August

14    10th, 2021, and the time is 10:16

15    a.m.

16           This remote video deposition

17    is being held in the matter of

18    Jane Doe versus North Penn School

19    District in the United States

20    District Court for the Eastern

21    District of Pennsylvania, Civil

22    Action Number 2:20 CV 05142.  The

23    deponent is Kathryn Marie Small.

24           All parties to this

1    deposition are appearing remotely

2    and have agreed to the witness

3    being sworn in remotely.

4         Due to the nature of remote

5    reporting, please pause briefly

6    before speaking to ensure all

7    parties are heard completely.

8         Will counsel please identify

9    themselves, beginning with

10   Plaintiff's counsel?

11        MS. LAUGHLIN:  Laura

12   Laughlin for the Plaintiff, Jane

13   Doe.

14        MS. JORDAN:  Maureen Jordan

15   for the Defendant, North Penn

16   School District.

17        MR. SOMERS:  And Kyle Somers

18   also for the Defendant, North Penn

19   School District.

20        THE VIDEOGRAPHER:  The court

21   reporter is Eileen Barth, and will

22   now swear in the witness.

23        KATHRYN SMALL, having been

24   duly sworn, was examined and

1          testified as follows:

2     BY MS. LAUGHLIN:

3          Q.    Good morning, Ms. Small.

4          A.    Good morning.

5          Q.    My name is Laura Laughlin,

6     as I just put on the record.  I represent

7     Jane Doe in this lawsuit that's been

8     brought against the North Penn School

9     District.

10              Have you ever given a

11    deposition before?

12         A.    I have not.

13         Q.    I am sure in the last year

14    and a half, almost two years now, you've

15    become pretty familiar with Zoom; is that

16    right?

17         A.    Yes.

18         Q.    So Zoom you're familiar

19    with.  I'll go over some rules for a

20    deposition to make that go a bit

21    smoother, just like the adjustment we all

22    had when we first started using Zoom.

23    I'll give you a few ground rules that

24    will hopefully let things go smoothly

1    today.

2         A.    Great.

3         Q.    If at any time, you know,

4    the audio cuts out or something like that

5    and you can't hear me, just let me know

6    and I'll rephrase the question.  Okay?

7         A.    Yes.

8         Q.    Since we have a court

9    reporter taking down everything that's

10   said, she's going to type up a

11   transcript.  All of your answers need to

12   be verbal.  So we can't say "unh-unh" or

13   nod your head.  Okay?

14        A.    Yes.

15        Q.    You may think you know where

16   I'm going with my question, but I would

17   just ask that you wait until I'm done

18   asking my question before you begin your

19   answer, and I'll try and wait to start my

20   next question before you're -- I'll wait

21   until you're done answering.  Okay?

22        A.    Okay.

23        Q.    If I start asking my next

24   question and you weren't done your

1    answer, just let me know and I'll let you

2    finish.  All right?

3          A.    Okay.

4          Q.    If I ask a question --

5    sometimes I may stumble over my words.

6    If I ask a question that you don't

7    understand or it doesn't make sense, just

8    let me know and I'll try and rephrase it

9    so you do understand.  Okay?

10         A.    Okay.

11         Q.    If you answer the question

12   and don't tell me that you didn't

13   understand it, we're all going to assume

14   that you did understand it since I just

15   gave you that instruction.  All right?

16         A.    Okay.

17         Q.    We're going to be talking

18   about some things that happened a few

19   years ago, around 2018.  So there may be

20   things that you don't remember anymore.

21              If that's the truthful

22   answer, then that's fine to just say you

23   don't remember.  I just don't want you to

24   guess.  All right?

1      A.    Okay.

2      Q.    However, you can give an

3   estimation.  If you don't know the exact

4   date something happened, just let us know

5   that you're estimating.  That's fine to

6   do.

7      A.    Okay.

8      Q.    If you need to take a break

9   for any reason today, just let us know

10  and you can do so.  I would just ask that

11  if there's a question pending, that you

12  answer it before you take a break.

13     A.    Okay.

14     Q.    I think my last question for

15  now -- or my last instruction for now is

16  I may be -- I'm going to be asking you

17  some questions about conversations you

18  may have had.  And I just want to clarify

19  that when I ask you a question like that,

20  I'm not asking you for conversations that

21  you had with your counsel, Ms. Jordan or

22  Mr. Somers; all right?

23     A.    Okay.

24     Q.    Those are off limits.  I'm

1   not trying to ask things like that.

2           If the only answer you can

3   give is based on something you had a

4   conversation with them with, just let me

5   know and then we'll move on.

6       A.    Okay.

7       Q.    Did you review any documents

8   in preparation for the deposition today?

9       A.    I did.

10       Q.    And can you describe for me

11   the documents that you reviewed?

12       A.    I was able to review some

13   notes that I had taken during the IEP

14   meeting that happened in August of 2018,

15   and I was able to review a safety plan

16   that I developed with the principal of

17   North Montco Technical Career Center when

18   ██████ transitioned over to the tech

19   school in October of 2018, and I was able

20   to review some IEP documents.

21       Q.    When you say "the principal

22   of North Montco," is that Donald Wong?

23       A.    Yes.

24       Q.    Those three sets of

1   documents that you reviewed, were they --

2   do you know whether they were, like,

3   stamped at the bottom, or were these

4   things that you had separately kept?

5        A.   I don't know that they were

6   stamped at the bottom, but I do know that

7   the attorneys shared these documents with

8   me when I was meeting with them prior to

9   this.

10        Q.   So this isn't something that

11   you had, like, separate that you had

12   brought; right?

13        A.   No.

14        Q.   Can you tell me a bit about

15   your educational background?

16        A.   Sure.  So I graduated from

17   West Chester University of Pennsylvania

18   in 2011, and I began my teaching career

19   in Alexandria city public schools in

20   Virginia.  I was a special education

21   teacher.

22          I then taught for Mastery

23   Charter Schools in Philadelphia, and I

24   joined North Penn School District in

1 2014, and I then received my master's

2 degree in educational leadership from

3 Arcadia University in 2018.

4   Q. And would that have been,

5 like, in June of 2018?

6   A. I completed the program in

7 May of 2018.

8   Q. When you were an undergrad

9 at West Chester, what was your major?

10   A. I majored in elementary and

11 special education.

12   Q. And then your first job out

13 of college was, you said, in Alexandria,

14 Virginia as a special education teacher;

15 right?

16   A. Yes.

17   Q. During that time, can you

18 describe for me your job

19 responsibilities?

20   A. Sure.  So I was responsible

21 for managing a caseload of approximately

22 20 students, and I provided instruction

23 to them in English and language arts as

24 well as math, and these were second and

1    third grade students, and I also

2    co-taught with their general education

3    teachers.

4         Q.    In that position, other than

5    the responsibilities you just described,

6    did you have any administrative-type

7    responsibilities overall at the school?

8         A.    I did not.

9         Q.    And then you said -- how

10   long did you do that teaching in

11   Alexandria, Virginia?

12        A.    For one year.  So it was the

13   2011-2012 school year.

14        Q.    And then you said you moved

15   to Mastery Charter in Philadelphia?

16        A.    Correct.

17        Q.    And what was your role

18   there?

19        A.    I was a fourth grade general

20   education teacher, and I taught literacy.

21        Q.    And how long did you do that

22   for?

23        A.    I was there for the

24   2012-2013 school year, and then the first

1    half of the 2013-2014 school year.

2         Q.    Why did you leave Mastery

3    Charter midyear?

4         A.    I had an opportunity at

5    North Penn.  I had been a student at the

6    district, so I was definitely looking to

7    try to become a teacher in this district.

8    And the opportunity presented itself, so

9    I interviewed and accepted the position.

10        Q.    And what position did you

11   accept when you started at North Penn

12   midway through -- or I guess in the

13   beginning of 2014?

14        A.    I was a special education

15   teacher at the elementary level.

16        Q.    What school were you at?

17        A.    Oak Park Elementary School.

18        Q.    And you said that you were a

19   student in the North Penn School

20   District?

21        A.    Yes.

22        Q.    Did you go all the way from

23   elementary through high school through

24   this district?

1    A.    I did.

2    Q.    And so did you graduate from

3    North Penn High School as well?

4    A.    I did.

5    Q.    Who was the principal at the

6    time you graduated, if you can remember?

7    A.    Burt Hines.

8    Q.    Do you remember who the

9    superintendent was?

10    A.    I do not.

11    Q.    Do you know whether it was

12    Curt Dietrich?

13    A.    I don't believe so.

14    Q.    In your time as a student in

15    the district, did you know Pete Nicholson

16    at all?

17    A.    I did not.

18    Q.    Same question for Curt

19    Dietrich.  Did you know him?

20    A.    I did not.

21    Q.    What about Todd Bauer?  Did

22    you know him at all during your time as a

23    student in the district?

24    A.    I did not.

1    Q.    So you started as a fourth

2    grade special education -- or sorry --

3    general education teacher, right, at Oak

4    Park Elementary in 2014?

5    A.    I started at Oak Park as a

6    special education teacher.  So I

7    supported multiple grade levels.

8    Q.    Multiple grade levels in the

9    elementary school, though?

10    A.    Yes.

11    Q.    And then how long did you do

12    that for?

13    A.    I was a special education

14    teacher from 2014 through 2018, the end

15    of the 2018 school year.

16    Q.    And that's the same time

17    that you graduated with your master's

18    from Arcadia?

19    A.    Correct.

20    Q.    During 2014 to 2018, did you

21    stay at Oak Park Elementary School?

22    A.    I did.

23    Q.    And so you were just, like

24    you said, supporting different elementary

1  school grades with a case list that you

2  had for kids that were in the special

3  education program?

4        A.    Yes.

5        Q.    At Oak Park, did you have

6  any administrative responsibilities at

7  the school?

8        A.    No.

9        Q.    How many years was the

10  master's in education -- educational

11  leadership at Arcadia?

12        A.    I started the program in the

13  fall of 2015.

14        Q.    Were you going full-time or

15  part-time?

16        A.    I went part-time.  I was

17  still teaching full-time.

18        Q.    So was it something you

19  would do in the evenings?

20        A.    Yes.

21        Q.    Do you know how long the

22  full-time program takes normally to

23  complete?

24        A.    I don't.

1      Q.   Can you describe for me the

2  master's in educational leadership

3  program that you went through?

4      A.   So there were various

5  courses offered in that program around

6  school finance, human resources,

7  educational leadership, supporting

8  curriculum and instruction.  And within

9  that program, I was able to get my

10  certification to be a supervisor of

11  special education.  That required me to

12  complete an internship.

13      Q.   And when did you complete

14  that internship?

15      A.   I completed that internship

16  in the spring of 2018.  Actually, I

17  believe that I started that in the fall

18  of 2018.  I'm sorry.  Fall of 2017.

19      Q.   So you started the

20  internship in the fall of 2017, and you

21  completed it when?

22      A.   In May of 2018 when I

23  graduated.

24      Q.   So the internship was for a

1  full year?

2          A.    Yes.

3          Q.    Where did the internship

4  take place?

5          A.    Within the district.

6          Q.    Was it with your role at Oak

7  Park Elementary?

8          A.    So I was able to maintain my

9  role, and then I would just attend

10  additional meetings with my mentor while

11  I went through that program.

12          Q.    Who was your mentor?

13          A.    Dr. Jenna Rufo.

14          Q.    And she's in the North Penn

15  School District?

16          A.    She was the director of

17  special education at the time of my

18  internship.

19          Q.    And you said, as your

20  internship, you would go with her to

21  meetings?

22          A.    I would attend meetings with

23  her that she felt related to my learning

24  in order to become a supervisor of

1  special education.  I would attend

2  professional development sessions that

3  she recommended, and I would just

4  participate in things that aligned more

5  to special education leadership at her

6  guidance.

7        Q.    How often were you, like,

8  going to these meetings or doing things

9  as part of the internship program?

10       A.    It really depended on what

11  was happening during that time in the

12  school year.  I would have some

13  flexibility during my prep periods as a

14  teacher to kind of pick up some projects

15  that related to my internship that Dr.

16  Rufo would assign to me, but I would say

17  that I likely attended a meeting or a

18  professional development maybe once a

19  week.

20       Q.    And are these meetings just

21  things you would go and kind of observe

22  what was going on?

23       A.    Yes.

24       Q.    When you said that part of

1   the program -- the master's program was

2   on educational leadership, what does that

3   mean?

4        A.   So that was really kind of

5   understanding how to support teachers in

6   being able to deliver effective

7   instruction in their classrooms.

8        Q.   And what about the HR

9   component?  What did that involve?

10        A.   That really just gave you a

11   general overview of how human resources

12   works within a school district.  And I

13   believe as part of that, we reviewed the

14   Pennsylvania School Code as part of our

15   course.

16        Q.   And what do you mean, "the

17   Pennsylvania School Code"?

18        A.   So that is the school code

19   that districts follow in order to make

20   sure that they are, I guess, educating

21   students by the guidance of the State.

22        Q.   So in terms of, like, the

23   actual, like, curriculum and the

24   coursework that students are taking?

1        A.    No.  The school code really

2 just kind of outlines the basic ways that

3 a school district is expected to

4 function.

5        Q.    Does any of that have to do

6 with, like, discipline or issues that may

7 come up with students?

8        A.    I don't remember.

9        Q.    As part of your schooling

10 for the master's that you received and

11 this internship that you did with Ms.

12 Rufo, did any of it cover things like a

13 safety plan for students?

14        A.    No, not that I can remember.

15        Q.    Do you recall whether any of

16 the training you received dealt with --

17 and I mean training before you took on

18 this role, this new role in 2018.  Did

19 any of it deal with Title IX?

20        MS. LAUGHLIN:  I think she

21      might have froze.

22        THE VIDEOGRAPHER:  She did

23      freeze.

24        Would you like to go off the

1    record?

2         MS. LAUGHLIN:  Sure.

3         THE VIDEOGRAPHER:  We're off

4    the record.  The time is 10:34.

5         (Whereupon, a brief recess

6    was held.)

7         THE VIDEOGRAPHER:  We're

8    back on the record.  The time is

9    10:35.

10        (Whereupon, the court

11   reporter read the referred-to

12   question.)

13        THE WITNESS:  I do remember

14   having a former director of human

15   resources come to speak to my

16   class as a whole and shared that

17   she was the Title IX

18   representative for her district.

19   And she just touched on, you know,

20   what her responsibilities were,

21   but I don't remember talking about

22   Title IX significantly.

23   BY MS. LAUGHLIN:

24        Q.   That one time that a Title

1    IX coordinator from a district came and

2    spoke to you, your class, that wasn't a

3    Title IX coordinator for North Penn

4    School District; right?

5         A.   No.

6         Q.   Can you tell me what you

7    remember about her explanation of Title

8    IX or what the responsibilities were that

9    she explained to your class?

10        A.   She explained that in her

11   role, anything that would have fallen

12   under Title IX would have been reported

13   to her and that she would have supported

14   the team at a building level in working

15   through that -- any given --

16             THE COURT REPORTER:  I think

17        she froze again.

18             MS. LAUGHLIN:  Let's go off

19        the record again.

20             THE VIDEOGRAPHER:  We're off

21        the record.  The time is 10:36.

22             (Whereupon, a brief recess

23        was held.)

24             THE VIDEOGRAPHER:  We're

1    back on the record.  The time is

2    10:38.

3  BY MS. LAUGHLIN:

4    Q.    Ms. Small, you were just

5  explaining when a Title IX coordinator

6  from a district outside of North Penn had

7  come to your class in your master's

8  program and explained her role as Title

9  IX.  So I want to follow up with you on

10  that.

11    You said -- I had asked you,

12  you know, what you recall about her

13  explanation to your class, and you told

14  me that Title IX issues would be reported

15  to her and that she would support the

16  team of teachers when something would be

17  reported to her; is that correct?

18    MS. JORDAN:  Note my

19    objection to the form of the

20    question.

21    You can answer.

22    THE WITNESS:  Yes.

23  BY MS. LAUGHLIN:

24    Q.    What else do you recall

1   about what she said?  Because I think

2   your answer got cut off a little bit just

3   due to the connection issue we were

4   having.

5          A.    I really just recall her

6   sharing that she would support a team at

7   a building level with any situation that

8   would have fallen under Title IX.

9          Q.    Did you have an

10  understanding after that training as to

11  whose responsibility it was to comply

12  with Title IX?

13         A.    My understanding was that

14  it's any school employee.

15         Q.    Other than the one night

16  when the woman had come into the class

17  and gave the explanation about Title IX,

18  did you receive any other training or

19  have any conversations about Title IX

20  through your grad program or through your

21  internship with Ms. Rufo?

22         A.    Not that I can remember.

23         Q.    So you would agree with me,

24  then, that in the internship with North

1  Penn School District, you never had any

2  education or conversations surrounding

3  Title IX or responsibilities under Title

4  IX; is that right?

5          MS. JORDAN:  Objection to

6      the form of the question.

7          You can answer.

8          THE WITNESS:  Not that I

9      remember.

10  BY MS. LAUGHLIN:

11      Q.    After the end of 2018 when

12  you ended your role as a special

13  education teacher in Oak Park Elementary,

14  what did you do next?

15      A.    When the school year

16  finished at Oak Park, I interviewed for

17  an interim supervisor of special

18  education position, and I accepted that

19  position.

20      Q.    When did you accept that

21  position?

22      A.    I believe I accepted in June

23  of 2018 with a start date of mid-July

24  2018.

1      Q.    And this was within the

2  North Penn School District; is that

3  right?

4      A.    Yes.

5      Q.    Was it for a particular

6  school?

7      A.    North Penn High School.

8      Q.    Who did you actually accept

9  the job from?  Like, did someone in

10  particular offer you that position?

11      A.    I don't remember.  I think

12  the call came from human resources, but I

13  don't remember who called.

14      Q.    Who were the people, if you

15  can recall, that were, like, involved in

16  the interviewing process?  For example,

17  was it, like, Pete Nicholson, the

18  principal of North Penn, or who were you

19  going through that process with?

20      A.    I don't remember everybody

21  who was there.  I do know that Pete

22  Nicholson was there -- he, I think, had

23  just accepted the principal position for

24  the upcoming school year -- Dr. Rufo was

1  part of the interview; Tiffany D'Amore,

2  who was another supervisor of special

3  education.  Aside from that, I don't

4  remember who else was part of that panel.

5       Q.   So was it just, like, a

6  one-panel interview with several people

7  that you mentioned present?

8       A.   Yes.

9       Q.   Do you know why there was an

10  interim role for supervisor of special

11  education at the high school?

12       A.   I believe that one of the

13  supervisors was out on medical leave and

14  she would have to decide whether she was

15  returning in January of 2019.

16       Q.   So when you were taking on

17  this role, was there any understanding

18  for you as to how long this role was

19  going to last?

20       A.   I did know that a contracted

21  -- or, you know, a formal position would

22  become available in January of 2019.

23       Q.   You did know that one was

24  going to come available?

1    A.    If the current supervisor

2 decided not to return from her medical

3 leave.

4    Q.    And do you know who that

5 supervisor was?

6    A.    Sandy Siemienski was her

7 name.

8    Q.    And so you were offered the

9 role and then accepted the role to start

10 in mid-July of 2018; is that right?

11    A.    Yes.

12    Q.    Now, was this your first --

13 sorry.  Strike that.

14         Is the supervisor of special

15 education position -- was that a more

16 administrative role as compared to what

17 you were doing before?

18    A.    Yes.

19    Q.    Can you describe for me what

20 that position or that role entailed?

21    A.    So I was responsible for

22 supervising a caseload of students at

23 North Penn High School as well as

24 Northbridge, which was our credit

1    recovery building.

2            I worked with teams to

3    discuss special education programming for

4    students, I completed evaluations of

5    special education teachers, and I

6    completed evaluations for

7    paraprofessionals working at the

8    buildings that I supervised.

9        Q.    You mentioned Northbridge

10   was the credit recovery building?

11       A.    Yes.

12       Q.    What does that mean?

13       A.    Students who were not on

14   track to graduate would have the

15   opportunity to attend Northbridge School

16   which offered credit recovery.  So they

17   would do part of their day virtually and

18   then they would be in person for classes

19   for the remainder of their day.

20       Q.    So that program is, like,

21   kind of like an alternative school in a

22   sense, to allow -- go ahead.

23       A.    Yes.

24       Q.    And the purpose of it was to

1   allow students who, whether didn't have

2   enough credits to graduate or weren't on

3   track to graduate, to try and play

4   catch-up so that they could graduate on

5   time?

6       A.   Yes.

7       Q.   Was that school also used

8   for, like, kids who had, like, behavioral

9   issues that, like, would have been, like,

10   at North Penn High School or something

11   like that and then go to, like, an

12   alternative school due to, like, some of

13   the behavioral issues they were having?

14       A.   No.  The way that a student

15   would need to be eligible to attend that

16   school was really strictly based on where

17   they stood with their credits.

18       Q.   Was it something elective

19   that students would go there, or the

20   North Penn High School, for example,

21   would say you're going to spend your days

22   at Northbridge to get caught up?

23       A.   It was typically a

24   conversation that would happen through

1   the child study process.

2       Q.   What's the child study

3   process?

4       A.   That is a team of

5   administrators, teachers, and counselors,

6   school psychiatrists who come together

7   and review student data, and they will

8   make recommendations for a student if

9   they are failing courses or, like we were

10   discussing, don't have enough credits to

11   graduate on time.

12       Q.   Is this child study team

13   process -- is that something -- how does

14   a student, I guess, get put into a study

15   -- child study team process?

16       A.   Typically, that happens

17   through the recommendation of a teacher.

18   There is a form that's completed, and

19   then the child's name would be added to

20   the list to be discussed at child study.

21       Q.   When you accepted this role

22   as the interim supervisor of special

23   education, did you receive any additional

24   training from the district?

1     A.    Given my start date, the
2   first day that I was officially in the
3   position, I did attend North Penn's
4   leadership training that happened for two
5   days.
6     Q.    Can you describe for me what
7   that training entailed?
8     A.    Really, we talked about
9   district goals.  We reviewed data that
10  was available to us, student performance
11  data based on all of the buildings in our
12  district.
13         We did have some legal
14  trainings that took place, and I do know
15  that one of them was a Title IX session.
16    Q.    When you say "legal
17  trainings that took place," what do you
18  mean?
19    A.    I don't remember
20  specifically, but I do know that Kyle
21  Somers was there to present to us.
22    Q.    Did you receive any, like,
23  handouts or documentation at this two-day
24  training?

1      A.    Not that I remember.

2      Q.    Do you recall what you

3 learned from the training on the Title

4 IX?

5      A.    I remember knowing that our

6 Title IX coordinator was Cheryl McHugh,

7 who was the director of human resources.

8      Q.    Other than the Title IX

9 coordinator being identified during the

10 training, is there anything that you

11 remember substantive about what you

12 learned or what was taught?

13      A.    I remember learning a bit

14 more about Title IX and just that it is a

15 law that protects students against

16 discrimination or any staff members

17 against discrimination.

18      Q.    Do you know whether you

19 learned about the responsibilities, like,

20 in your role as a special education

21 supervisor, what it would be in terms of

22 Title IX?

23      A.    I don't remember.

24      Q.    When you say you learned

1    that Title IX prevents discrimination of

2    students, do you recall or did you know

3    at the time whether that also included,

4    like, sexual harassment or sexual

5    assault?

6         A.    Yes.

7         Q.    How did you know that?

8         A.    From the presentation.

9         Q.    When you say a presentation,

10   was it just something where Mr. Somers

11   stood up and talked to you, or was there

12   some kind of PowerPoint or something that

13   you were following along with?

14        A.    I don't remember.

15        Q.    As part of the two-day

16   leadership training that you underwent to

17   take on this new role, did any of the

18   training cover, like, safety plans?

19        A.    I don't remember.

20        Q.    Had you, up to this point,

21   ever participated and/or helped implement

22   a safety plan for a student?

23        A.    No.

24        Q.    This leadership training,

1    who else was present at the training?

2    Like, was it just training for you or was

3    it a larger group of people?

4         A.    It was all of the

5    administration within the district.

6         Q.    So, like, North Penn high

7    school level, the middle schools,

8    elementary schools?

9         A.    Yes.

10        Q.    Was there any kind of

11   testing that was done throughout the two

12   days?

13        A.    No.

14        Q.    Did you take any notes

15   during the two-day leadership training?

16        A.    I don't remember.

17        Q.    Based on your custom and

18   practice at the time, would you typically

19   take notes on a computer or in a

20   notebook?

21        A.    I usually use a notebook and

22   pen, but I also have been known to take

23   notes on the computer, especially as I

24   transitioned into that role because I was

1  working across many -- or two different

2  buildings.  I really kind of switched at

3  that time to using more digital notes.

4        Q.    When you say "digital

5  notes," was it on a personal computer or,

6  like, a district computer that you'd be

7  using?

8        A.    It would have been my work

9  computer.

10        Q.    Do you still have that

11  computer?  Or you said a work computer,

12  meaning the district computer?

13        A.    Yes.

14        Q.    Do you still have access to

15  that?

16        A.    I have a different computer

17  now than I did at that time.

18        Q.    Okay.  Do you know what

19  happened to that computer?

20        A.    I don't.

21        Q.    Was there a particular spot

22  that you would keep your notes when you'd

23  type them up on a district computer?

24        A.    Usually my Google Drive.

1    Q.    Do you still have access to

2  that Google Drive today?

3    A.    I do.

4    Q.    Before the deposition, had

5  you checked at all to see whether you had

6  any notes on there pertaining to, like,

7  this case or ███████ ████████████

8    A.    Yes.  I had seen my notes

9  from the case regarding ███████ but that

10  was all that I really still have access

11  to through my drive.

12    Q.    Okay.  When did you see the

13  notes that were on the drive related to

14  ████████

15    A.    When I met with our

16  attorneys earlier this summer.

17    Q.    When you went on -- are the

18  documents on there still -- still in the

19  drive on your computer?

20    A.    Yes.

21    Q.    And if you can recall, what

22  documents were on there?

23    A.    Notes that I had kept from

24  the IEP meeting that I attended in August

1  of 2018.

2       Q.    Anything else?

3       A.    Not that I remember looking

4  at in preparation for the deposition.

5       Q.    Do you know whether in that

6  Google Drive -- whether there's anything

7  on there with notes regarding training

8  you received before taking on the special

9  education supervisor role?

10      A.    I don't.

11      Q.    You don't know?

12      A.    I don't know.

13      Q.    Okay.  I would ask that

14  following the deposition today, if you

15  could go over that Google Drive and just

16  see if there are any notes that are kept

17  on there pertaining to any training that

18  you received like we just discussed.

19  Okay?

20      A.    Yes.

21      Q.    And if so, you can provide

22  them to Ms. Jordan, your counsel.

23      A.    Okay.

24      Q.    You said that when you took

1  on this role in mid-July of 2018, you

2  were splitting your time between North

3  Penn High School and the Northbridge

4  School.

5           Can you explain for me the

6  breakdown or how you split your time in

7  that role?

8      A.    So once the students

9  returned to school in the end of August,

10  I would typically spend four days at

11  North Penn High School and one day at

12  Northbridge.

13      Q.    And your four days at North

14  Penn High School, what was -- did you

15  have, like, a typical week of what -- I

16  know everything is going to change

17  sometimes, but did you have, like, a

18  typical week of what you'd be doing in

19  those four days at North Penn High

20  School?

21      A.    Most times, I would be

22  visiting classrooms, attending IEP

23  meetings, and participating in our child

24  study team.

1   Q. Would I be correct that it

2 almost seems like you split your time as

3 part doing administrative things in the

4 supervisor of special education, but then

5 also had split your time with, like, a

6 caseload of students to almost like a

7 special educational teacher too?

8    MS. JORDAN:  Note my

9   objection to the form of the

10   question.

11    You can answer.

12    THE WITNESS:  No.  I -- when

13   I say that I had a caseload of

14   students that I was responsible

15   for, I really didn't have any

16   instructional connection to them.

17   I was responsible for overseeing

18   their special education

19   programming, so making sure that

20   they got courses that they needed

21   to be able to address their

22   specific needs.

23 BY MS. LAUGHLIN:

24   Q. Okay.  So then the time you

1    would spend in the classroom, was it more

2    to, like, evaluate the teachers and stuff

3    like that?

4         A.    Yes.

5         Q.    Okay.  I understand.

6               In your Title IX training --

7    sorry.  Let me go back for a second.

8               The Title IX training that

9    you received during the two-day

10   leadership training from Mr. Somers, was

11   that the only Title IX training that you

12   had received from the district up to that

13   point?

14        A.    I don't remember.

15        Q.    Other than looking at

16   documents, do you have an independent

17   recollection of your involvement with

18   ███████ ████████████ in her education at

19   North Penn High School?

20        A.    I do.

21        Q.    Did you have any interaction

22   with ████████ or her family prior to the

23   summer of 2018?

24        A.    No.

1    Q.    Tell me -- can you tell me

2    about the first time that you remember

3    coming into contact or being involved

4    with ███████

5    A.    The first time that I met

6    ███████ was at an IEP meeting that was

7    held on August 22nd of 2018.

8    Q.    And how did that meeting

9    come about, that IEP meeting?

10   A.    I was invited to attend that

11   meeting by Megan Schoppe, who was our

12   special education department chair at the

13   high school.

14   Q.    And explain for me -- you

15   were the supervisor of special education

16   and she was the special education

17   department chair.

18        What's the difference in

19   those roles?

20   A.    So the special education

21   department chair is really kind of just

22   the point person for the special

23   education department at the high school.

24   They do a lot of support for

1  paraprofessionals, kind of problem

2  solving, answers questions for them and

3  -- so they have general overview of many

4  of the students at the high school that

5  have disabilities and receive special

6  education programming.

7       Q.    And how did you -- how was

8  your role in relation to her?  Like, did

9  she answer to you, or how was that

10  relationship?

11       A.    So I would have been the

12  person that was able to make a decision

13  based on programming that needed to be

14  changed or adjusted.  So we would work

15  closely.  She would come to me for ideas

16  for, you know, students and how we could

17  support them, and we would determine, you

18  know, do we have need to have an IEP

19  meeting and discuss all of this with the

20  full team.

21       Q.    Okay.  And in terms of

22  special education, were you kind of the

23  one making the final decisions on things

24  in terms of special education students

1    and what they needed or curriculum that

2    needed to -- like you just described

3    needed to be changed?

4         A.    So I would support in, yes,

5    making a final decision, you know, in

6    conjunction with the team around what

7    programming would be best in order to

8    address their specific needs.

9         Q.    Did you have to get approval

10   from somebody else, like the principal,

11   for example, or was this something that

12   you were able to make decisions on on

13   your own?

14        A.    I was able to make those

15   decisions on my own.

16        Q.    So Ms. Schoppe had asked you

17   to sit in on this August 22nd IEP meeting

18   with ███████ ███████████

19             Did she explain to you why

20   she wanted you included in the meeting?

21        A.    So I knew that she had

22   shared that ████████ would be coming to the

23   high school full-time from North Montco

24   Technical Career Center where she

1  attended full-time the previous school

2  year.  And I did know based on what Megan

3  had shared with me that there was a

4  meeting that happened in the spring that

5  just was not a successful meeting.

6          North Montco made the

7  recommendation that they wanted █████ to

8  attend North Penn High School because

9  they felt that she needed more emotional

10 support programming.  So we were going to

11 be kind of discussing what that program

12 would look like for her.

13      Q.    Emotional support

14 programming.  What do you mean?

15      A.    That would be, typically, a

16 smaller class size where she would have

17 been able to receive some of her major

18 subjects with a cohort of students, that

19 she would be learning the academic

20 skills, but would also be learning

21 self-regulation skills and coping

22 strategies and things that really kind of

23 aligned to her areas of need based on her

24 disability.

1    Q.    Is that -- would that be --

2  would she be grouped in a -- is it a

3  smaller cohort of students?  Like, kids

4  that are in special education kind of

5  would get grouped together to work on

6  academics as well as the emotional

7  component of what they needed?

8    A.    Yes.  So that was the --

9  what the discussion was going to be on

10  August 22nd.

11    Q.    Before this meeting on

12  August 22nd, did you have any knowledge

13  of the prior history with ███████ and

14  ████████ ████████

15    A.    No.

16    Q.    Do you know whether -- just

17  from, like, conversations you may have

18  had, do you know whether anybody else --

19  like Ms. Schoppe or Pete Nicholson or

20  anybody -- was aware prior to the August

21  22nd meeting of the prior history between

22  ████████ and ████████

23    A.    No.

24    Q.    You don't know either way?

1          A.     I don't know.

2          Q.     In addition to Ms. Schoppe

3    and you, was there anybody else that you

4    knew that was supposed to be, like,

5    attending this meeting from the district?

6          A.     Juliet Matje was also in

7    attendance at that meeting, and she is a

8    supervisor of special education.

9          Q.     What's the difference

10   between Ms. Matje's role and your role if

11   you're both supervisors of special

12   education?

13         A.     So we both had the same

14   responsibilities.  However, she had been

15   the previous supervisor at North Penn

16   High School, but she was in the process

17   of transitioning to support some of our

18   elementary buildings.

19         Q.     Okay.  When you say she was

20   in the role previously at North Penn and

21   was transitioning towards elementary, how

22   was her role different than Sandy

23   Siemienski's role that you were coming in

24   for?

1      A.    So, really, the supervisor

2   of special education are district-wide

3   employees, so they support different

4   buildings based on the number of students

5   requiring special education services at

6   those buildings.

7           Since Sandy was out on

8   medical leave, there was some shuffling

9   of supervisors.  Some of them wanted the

10  opportunity to supervise at the

11  elementary level, and that is sort of how

12  the opening at the high school was

13  created.

14      Q.    Were you the only supervisor

15  of special education at North Penn High

16  School?

17      A.    No.

18      Q.    Who else held that role

19  during that time frame, like the 2018

20  school year?

21      A.    Ruth Desiderio.

22      Q.    How did the work get divided

23  between you and Ms. Desiderio?

24      A.    So it was separated by

1  student last names.  So I believe that I

2  supervised all students A through I, and

3  then she had the second half of the

4  alphabet.

5       Q.    Okay.  So that's how you got

6  matched with ████████ ██████████████

7       A.    Correct.

8       Q.    And so anything that ████████

9  needed that would have involved the

10  supervisor of special education role,

11  that would have been your responsibility;

12  right?

13       A.    Yes.

14       Q.    Do you remember the August

15  22nd meeting?

16       A.    Yes, I remember having the

17  meeting.  I don't remember all of the

18  details of the meeting.

19       Q.    Okay.  Tell me what you do

20  remember.

21       A.    So I remember ██████ being

22  present, Mrs. ████████████ myself, Mrs.

23  Schoppe, and Mrs. Matje.  I do remember

24  discussing ████████ return to the high

1  school from North Montco Technical Career

2  Center.  I remember Mrs. ██████████

3  sharing that they would have preferred

4  for her to stay at North Montco, but they

5  understood that the team there felt she

6  needed more emotional support.

7            So we discussed some of the

8  options for the emotional support classes

9  that she would be able to take, and then

10  we talked about, you know, some things

11  that she was interested in.

12            I know -- remember ████████

13  being really excited about -- she shared

14  that she loves riding horses, and we

15  talked about how there was an equestrian

16  club at North Penn, and I know that that

17  was something she shared that she would

18  be interested in.

19            And then Mrs. ██████████████

20  shared that there was an incident that

21  had happened between ██████ and a student

22  by the name of ████████ and that they were

23  not to be in classes together or come in

24  contact with each other.

1          And she shared that ████

2   really has a lot of trust issues with

3   adults and with teachers, and that she

4   preferred that only essential personnel

5   be aware that the two students not come

6   in contact with each other.

7          Q.    Did she explain to you why

8   she said that she only wanted essential

9   personnel to be aware that the two

10  students not come in contact with each

11  other?

12         A.    She had shared that, you

13  know, she felt that ████ had had to

14  make a lot of accommodations due to the

15  incident that she had with this student,

16  and that she wanted her to have, you

17  know, as normal a transition into high

18  school as possible, and that she knew

19  that there was those trust issues between

20  ████ and adults and teachers.

21         Q.    When Mrs. ████████ told

22  you that ████ had to make a lot of

23  accommodations, did she explain to you at

24  the time what she meant by that?

1    A.    I don't remember.

2    Q.    Based on your Title IX

3    training up to that point, had you -- did

4    you have an understanding of, after a

5    Title IX-type incident, who should be

6    making accommodations?

7    A.    I would believe that it

8    would be our Title IX coordinator within

9    the district.

10    Q.    I guess let me clarify my

11    question.

12         When I say who should be

13    making the accommodations, I mean, like,

14    which student.  Like, if it involved two

15    students, like a victim and somebody who

16    had allegedly assaulted somebody, did you

17    have an understanding based on your

18    training and experience at that point who

19    should be the one making the

20    accommodations?

21    A.    No.

22    Q.    As you sit here today, do

23    you have an understanding of that?

24    A.    No.

1    Q.    And I guess I should ask --
2  no.  I'll go back to that later.  Sorry.
3                When Mrs. ████████ was
4  explaining to you the stuff about the
5  prior incident, was ██████ there as well?
6    A.    Yes.
7    Q.    Did █████ say anything to
8  add to anything that Mrs. ████████ was
9  saying?
10    A.    Not that I can remember, no.
11    Q.    Do you remember what the --
12  did Mrs. ████████ explain what the
13  incident involved?
14    A.    I don't remember.  I don't
15  believe that she did.
16    Q.    Did you have an
17  understanding at that time whether the
18  incident involved sexual harassment or
19  sexual assault?
20    A.    No.
21    Q.    You did not have an
22  understanding of that?
23    A.    No.  It was not something
24  that I remember us discussing in that

1    meeting.

2          Q.    What type of incident did

3    you understand had happened between

4    ███████ and ███████

5          A.    I don't know because I don't

6    remember that we discussed that

7    specifically.

8          Q.    Mrs. ███████████ just told

9    you that they couldn't be around each

10   other?

11         A.    She definitely made it clear

12   that they were not to be in the same

13   classes with each other or to come in

14   contact with each other, but that, you

15   know, she really wanted that to be just

16   something that essential personnel was

17   aware of because of the trust issues and,

18   you know, wanting ███████ to have a normal

19   experience in high school.

20         Q.    Did you understand at that

21   meeting why they needed to be separated?

22         A.    No.

23         Q.    Do you recall anybody asking

24   Mrs. ███████████ why these two kids --

1    why she was so adamant that these two

2    kids needed to be kept separate?

3         A.    I don't remember.

4         Q.    Had you ever been in a

5    situation before where a parent had come

6    to you and insisted that their child and

7    another student be kept apart?

8         A.    No.

9         Q.    Do you believe you would

10   have -- I know it's difficult to remember

11   now -- you don't remember specifically --

12   but do you think that you would have

13   asked her why these two students needed

14   to be kept apart?

15        A.    I don't remember.  What I

16   can say is that I remember this being,

17   you know, a short portion of the

18   discussion in our meeting.  I remember

19   most of our conversation being around

20   that specific special education

21   programming in terms of the emotional

22   support courses, but I don't remember

23   talking about this at length.

24        Q.    When you say that Mrs.

1    ███████████ only wanted essential

2    personnel to be aware of the fact that

3    ██████ needed to be kept separate from

4    ██████ or ███████ needed to kept separate

5    from ████████ what did she mean by that?

6         A.    So my understanding was that

7    she felt administrators within the

8    building needed to be aware of that, but

9    that not every teacher that ███████ had

10   needed to be aware.

11        Q.    Is that something she said

12   to you, that not every teacher needed to

13   be aware, or was that something that you

14   interpreted?

15        A.    I believe that's something

16   that we discussed.

17        Q.    When you say "we discussed,"

18   what do you mean?

19        A.    The members that were

20   participating in that meeting.

21        Q.    Do you know who it was that

22   said that not every teacher needed to

23   know?

24        A.    I am pretty certain that

1    Mrs. ███████ shared that.  She wanted

2    to make sure that, you know, ██████

3    didn't feel uncomfortable, like, with

4    teachers knowing information about her.

5         Q.    When you say that

6    administrators needed to know, would that

7    include Pete Nicholson, the principal?

8         A.    Yes.

9         Q.    Who was included in

10   administrators that would have needed to

11   know about that?

12        A.    So when the meeting ended, I

13   contacted Pete Nicholson, who was the

14   principal, the building principal of

15   North Penn High School; and then I also

16   contacted Kyle Hassler, who was the

17   assistant principal assigned to ██████

18   through her home office.

19        Q.    When you say "the assistant

20   principal assigned to ██████ was that

21   broken down by last name as well?

22        A.    It was.

23        Q.    Okay.  And so Kyle Hassler

24   was the assistant principal that was for

1    the H for ████████████

2         A.    Yes.

3         Q.    Okay.  How many assistant

4    principals were there in North Penn High

5    School?

6         A.    I believe six assistant

7    principals.  So there's two per home

8    office, and the home offices are broken

9    down 10th, 11th, and 12th grade students.

10        Q.    Did you have an

11   understanding in the 2018 school year

12   about how many students were in the 10th

13   grade at North Penn High School?

14        A.    No, not a number that I know

15   off the top of my head.

16        Q.    Is it something you can

17   estimate?  Like, was it a hundred or 200?

18        A.    Approximately a thousand

19   students.

20        Q.    Just in the 10th grade?

21        A.    Yes.

22        Q.    And for your role as a

23   special education supervisor, were you

24   just responsible for kids that were in

1   the special education program out of

2   those 10th grade students?

3         A.    Yes.

4         Q.    Do you have an estimate of

5   about how many kids were under your case,

6   because I understand you were just under

7   A through I?

8         A.    In my -- I would say

9   approximately 300 students that were in

10   10th, 11th, and 12th grade.

11         Q.    Are you able to estimate for

12   me how many of those 300 students were in

13   10th grade?

14         A.    I don't know.

15         Q.    Do you know whether it was

16   equal or whether there was a big

17   disparity between the 10th grade, 11th

18   grade, and 12th grade caseload?

19         A.    It's typically relatively

20   equal.

21         Q.    You said after this August

22   22nd meeting -- I guess during that

23   meeting with Mrs. ███████ and Ms.

24   Schoppe and Ms. Matje, did you have any

1  discussion about what would be done to

2  keep ▮▮▮▮ away from ▮▮▮▮

3       A.    We did.  So we shared that

4  we would be able to check her schedule to

5  make sure that they were not scheduled

6  into the same courses.  Mrs. Schoppe

7  shared that she would meet with ▮▮▮▮

8  when the year began to kind of develop a

9  route for her with sort of, like, safe

10 points along the way that if she were to

11 see the student in the hallway, she would

12 have somewhere to go.

13           And then we had discussed

14 that ▮▮▮▮ and ▮▮▮▮ by nature of the

15 programs that they were both enrolled in

16 at North Montco Technical Career Center,

17 would transition from North Penn High

18 School to the North Montco Technical

19 Career Center at the same time during the

20 day.  Students leave from the cafeteria

21 and walk to North Montco Technical Career

22 Center.  And Mrs. Schoppe shared that

23 security is present during that

24 transition or that walk.

1    Q.    Why did she share that

2    security is present during the walk?

3    A.    Just, I think, to make it

4    known that it's, like, students are

5    leaving the building and walking to

6    another building unsupervised.

7    Q.    Was security -- as a result

8    of these conversations you're having on

9    the 22nd of August, was security going to

10   be made aware of the issue between ████

11   and ██████

12   A.    I believe so.

13   Q.    Okay.  And do you have an

14   understanding of what security's role was

15   going to be for that?

16   A.    I think Mrs. ████████  was

17   comfortable with just knowing that there

18   would be somebody there and that the

19   students were not going to be

20   unsupervised.

21   Q.    Okay.  But I mean for the

22   security knowing, what was the security

23   to be told or --

24   A.    We did not discuss that at

1    the meeting.
2         Q.    Was that discussed at a
3    later point of what security was going to
4    be told about the situation?
5         A.    Not that I was involved in.
6         Q.    Okay.  Do you know whether a
7    conversation like that did take place
8    that you found out about later, or just
9    weren't part of that conversation?
10        A.    I don't know.
11        Q.    Is there anything else?  You
12   mentioned check the schedule to make sure
13   they're not in the same courses, Mrs.
14   Schoppe would meet with ███ at the
15   start of school to come up with a route
16   for her, and that security would be
17   notified about the separation between the
18   two of them so when they walked to the
19   tech school, that they'd be aware.
20             Is there anything else?
21        A.    I know that Mrs. Schoppe
22   shared that she would check in with
23   ███ a number of times throughout the
24   first semester.

1    Q.    The suggestion to check the

2  schedule to make sure that they're not in

3  the same courses, whose idea was that?

4  Where did that come from?

5    A.    I think that may have been

6  Megan Schoppe who said that that was

7  something that we could do, and then I

8  was the one that did check the schedules.

9    Q.    Okay.  Had you ever heard of

10  the ability to, like, check schedules and

11  making sure two kids weren't in the same

12  class together?  Had you ever experienced

13  that before?

14    A.    I had not experienced it

15  before, but I had heard of it before.

16    Q.    How did you hear about it

17  before?

18    A.    Just through conversations.

19  I knew how to go into the system and to

20  be able to check a student's schedule.

21    Q.    How?

22    A.    I think --

23    Q.    Sorry.

24    A.    I think that that was

1    something that Ruth Desiderio, who was

2    another supervisor of special education,

3    had showed me how to do once we started

4    participating in IEP meetings.

5        Q.   Okay.  Was it just kind of

6    an on-the-fly thing that Ms. Desiderio

7    had shown you, or did something come up

8    that you had to check schedules for?

9             MS. JORDAN:  Note my

10            objection to the form.

11            You can answer.

12            THE WITNESS:  I think her

13            and I had a number days together

14            where I sort of shadowed her, and

15            I think that was part of the

16            shadowing process is she pulled up

17            our student information system and

18            kind of showed me where the

19            schedules are housed and how to

20            pull up a student's schedule.

21   BY MS. LAUGHLIN:

22        Q.   So she was showing you how

23   to view a student schedule.  Did she

24   explain for you how to, like -- or I

1  guess let me ask this:  Was the

2  crosschecking of schedules, meaning that

3  you were pulling up Student A's schedule

4  and then pulling up Student B's schedule

5  and being able to look at them to see the

6  comparison, is that what you meant?

7       A.    When she really showed me

8  the system, she was just showing me how

9  to pull up one student schedule so that I

10  would know where to locate that if I

11  needed to look a student's schedule or be

12  able to check what their courses were.

13       Q.    Okay.  So when you were

14  talking about you knew how to check the

15  schedules to make sure they were not in

16  the same courses, that's what you meant,

17  like, literally pulling up ████████

18  schedule and then pulling up ████████

19  schedule to take look at the schedules?

20       A.    Yes.

21       Q.    Is there anything that you

22  had ever been trained on regarding, like,

23  crosschecking student schedules, or is

24  that the only thing that you really knew

1   how to do?

2           MS. JORDAN:  Note my

3       objection to the form of the

4       question.

5           You can answer.

6           THE WITNESS:  No, I had not

7       had any other training on that.

8   BY MS. LAUGHLIN:

9       Q.    Okay.  Like, for example,

10  later on, you were able to have a tech

11  person put in an alert in the schedule.

12  Do you know what I'm talking about?

13      A.    Yes.

14      Q.    That was not something --

15  were you aware after the August 22nd

16  meeting that that was even something

17  available to you?

18      A.    I was not.

19      Q.    How did you find out that

20  that's something that could have been

21  done?

22      A.    So after the incident

23  happened in October with ███ and she

24  was transitioning over to the tech school

1    full-time, as a part of that process, I

2    worked closely with our director of

3    special education, and her and I in

4    conversation -- she had mentioned that,

5    you know, in her former district, they

6    were able to put alerts in student

7    profiles, so that we should contact

8    technology to see if that was something

9    that we could do for █████████

10        Q.    And that was Ms. Matje?

11        A.    No.  That was Dr. Ann Marie

12   Lucas, who was our director of special

13   education at that time.

14        Q.    And was she -- Dr. Ann Marie

15   Lucas, was she at North Penn High School,

16   or did she work, like, directly just

17   through the district?

18        A.    She works through the

19   district.

20        Q.    And do you know whether,

21   like, part of her responsibility was

22   also, like, the director of education at

23   North Penn School -- or I'm sorry --

24   North Penn High School as well?

1          A.     As the director, you work

2    closely with the team of supervisors and

3    you ultimately are available to all of

4    the buildings within the district.

5          Q.     From your understanding,

6    afterwards when this had been explained

7    to you by Dr. Lucas and then you talked

8    to the tech at North Penn High School,

9    was the alert something that was

10   available to you at the time of August

11   22nd?

12         A.     No.  So I was a

13   district-level employee versus being

14   somebody that was specific to North Penn

15   High School, so I had very minimal

16   abilities to go into our student

17   information system and make any changes

18   or adjustments on my own.

19              So, for example, I was able

20   to view a student's schedule, but I

21   couldn't change a student's schedule or

22   move them into different courses.  So I

23   really -- I only had the ability to kind

24   of view things in our student information

1    system.

2         Q.    Because of the level that

3    you were at in the administration, you

4    mean?

5         MS. JORDAN:  Note my

6         objection to the form of the

7         question.

8              You can answer.

9         THE WITNESS:  I believe that

10         it was just the building-level

11         administration that would have

12         access to be able to actually go

13         in and make changes.

14    BY MS. LAUGHLIN:

15         Q.    And who is that?  What do

16    you mean by "building-level

17    administration"?

18         A.    Like, the principal and the

19    assistant principals within the

20    buildings.

21         Q.    Okay.  But as far as you

22    knew -- like, for example, the technology

23    of being able to put an alert on

24    somebody's student profile, that wasn't

1    something that, like, they -- like, the

2    tech people had, like, purchased and then

3    implemented?  Like, that was something

4    that if you had the level that you

5    needed, like the principal, it was

6    something that could have been

7    implemented at the time; is that correct?

8              MS. JORDAN:  Note my

9         objection to the form of the

10        question.

11             You can answer.

12             THE WITNESS:  I don't know.

13   BY MS. LAUGHLIN:

14        Q.   Okay.  How did it come to be

15   that you were going to be the one to

16   check the schedules?

17        A.   I believe because I was the

18   LEA in the meeting.  So it just sort of

19   naturally -- in conversation when we sort

20   of talked through what the next steps

21   would be, I had shared that I would check

22   the schedule and communicate to Pete, the

23   principal, and Kyle Hassler, the

24   assistant principal.

1         Q.    You used the phrase "LEA."

2 What does that stand for?

3         A.    I'm blanking right now.

4 Local education -- I can't remember what

5 the "A" is.

6             But in that role, you have

7 the ability to make decisions about

8 district resources and how they can be

9 used.

10         Q.    Okay.  So is that like a

11 role in addition to the supervisor of

12 special education position that you held?

13         A.    No.  Just through being a

14 supervisor of special education, it's --

15 I'm sorry.  It stands for Local Education

16 Agency.

17             So in that meeting, I was

18 acting as a representative for the LEA,

19 and that's just something as an

20 administrator you have the ability to do.

21         Q.    And is the LEA like a

22 representative of the district, then?

23         A.    Yes.

24         Q.    Okay.  You said that after

1　this -- at the end of this meeting, did

2　you or Ms. Schoppe or Ms. Matja make any

3　representation to -- or promises to Mrs.

4　█████████ and ██████

5　　　　　MS. JORDAN:  Note my

6　　　　objection to the form of the

7　　　　question.

8　　　　　You can answer.

9　　　　　THE WITNESS:  What we shared

10　　　was what we kind of discussed at

11　　　the meeting, which would be

12　　　checking the schedule, mapping out

13　　　that route, and then communicating

14　　　to the principal and assistant

15　　　principal.

16　BY MS. LAUGHLIN:

17　　　Q.　Did you or Ms. Schoppe or

18　Ms. Matje tell ██████ and her mother that

19　██████ and ██████ would be kept separate

20　at school?

21　　　A.　I don't remember that that

22　would have been said specifically, but I

23　think that that was the general

24　understanding based on the steps that we

1    had talked about.

2         Q.    And that would have included

3    to not have them in the same classes?

4         A.    Correct.

5         Q.    You said that after the

6    meeting, you contacted Pete Nicholson.

7    How did you do that?

8         A.    I called him on the phone.

9         Q.    Like, the building phone or,

10   like, his cellphone?

11        A.    The building phone.

12        Q.    Okay.  And was it the same

13   day, like, after this meeting that you

14   called him?

15        A.    Yes.  I'm pretty certain

16   that he and I talked within the same

17   school day.

18        Q.    Okay.  Meaning the same

19   school day as this August 22nd meeting?

20        A.    Yes.

21        Q.    Okay.  And you called him on

22   the phone.

23              Can you -- do you remember

24   what the conversation consisted of?

1      A.   I believe that I just kind

2  of summarized the meeting for him and

3  told him that I would check ████████ and

4  ████████ schedules.

5      Q.   So as a result of this phone

6  call with Pete Nicholson, did you tell

7  him that █████████ and ████████ needed to be

8  kept apart?

9      A.   Yes.

10      Q.   Did you tell him that it was

11  for ████████ safety that the two be kept

12  apart?

13      A.   No, I don't think that I

14  said that.

15      Q.   Okay.  Did you give him --

16  did he ask you why the two students

17  needed to be kept apart?

18      A.   I remember sharing with him

19  that her mom had communicated that there

20  was an incident that happened between

21  these two students, and I also remember

22  sharing with him that Mrs. ████████████

23  wanted to make sure that, you know,

24  essential personnel was aware of this

1  situation.

2      Q.    Okay.  And what did

3  Principal Nicholson say in response to

4  you telling him that?

5      A.    I don't remember.

6      Q.    Do you know whether he asked

7  you any questions about the incident that

8  you had described to him?

9      A.    I don't remember.

10      Q.    Did you know -- this

11  incident that occurred between ████  and

12  ████  that Mrs. ████████  told you

13  about, do you know whether that occurred,

14  like, at school previously, or any

15  details into the incident?

16      A.    I don't know that I knew

17  that information at that time.  I'm

18  pretty certain that I did not know that.

19  I've heard since just through reading the

20  lawsuit, that this was something that had

21  happened at school.

22      Q.    Okay.  Reading the lawsuit

23  meaning, like, the complaint that ████

24  filed in this case?

1    A.    Yes.

2    Q.    How did you come to read

3    that?

4    A.    I just saw that it had been

5    -- I guess it became public and was part

6    of a news report.  So that I saw that.  I

7    saw the document that way.

8    Q.    Okay.  How did you -- was it

9    just something you were happening to be

10   scrolling the news, or did somebody send

11   it to you?  How did you get that

12   document?

13   A.    No.  I think I just -- North

14   Penn Now is a news source that I

15   typically look at.  So I had seen that

16   there was a lawsuit that was filed, and

17   then that's when I was able to read the

18   document.

19   Q.    When you read the

20   document -- I mean, it was under Jane

21   Doe.  Did you know at the time you were

22   reading it that it was ████████

23   ████████████████

24   A.    I was able to figure that

1    out when I read the section about, you

2    know, there being a meeting that had

3    happened in August, that I knew my name

4    was in there that I was a part of, yes.

5         Q.    After reading that online,

6    did you have any conversations with

7    anybody about it?

8         A.    I don't believe so.  I know

9    I talked with my husband about it, but I

10   don't remember talking about that with

11   district employees.

12              Actually, I did have a

13   conversation with Dr. Bauer, our

14   assistant superintendent.  I just

15   remember calling him and saying that I

16   had seen this and just asked him if, you

17   know, there was anything that I needed to

18   know.

19        Q.    And what did Dr. Bauer say?

20        A.    He said that, no, that our

21   district attorneys were working through

22   this process, and that if I needed to be

23   involved in that, that they would reach

24   out to me.

1    Q.    Did you have any discussion

2    with Dr. Bauer about, like, the substance

3    of it, about, like, what had happened or

4    anything like that?

5    A.    No, not at that time.

6    Q.    Was there another time that

7    you had a conversation with Dr. Bauer

8    about what had happened?

9    A.    I believe that after ████

10   had come forward to say that she had been

11   assaulted in October of her sophomore

12   year, I spoke with him briefly, and he

13   had just asked me some questions about

14   the schedule.

15   Q.    Okay.  Like, ████'s, like,

16   class schedule?

17   A.    Yes.

18   Q.    Okay.  And we'll get into

19   that a bit later.

20         So you're on the phone with

21   him, with Pete Nicholson, and what was

22   the purpose of you having this call with

23   him?  Like, why did you call him?

24   A.    Because at the meeting, we

1    had, you know, discussed how this would

2    be communicated to essential personnel.

3    So I felt that I needed to share this

4    information with him being the building

5    principal and with Kyle Hassler as the

6    assistant principal of ▬▬▬▬ home

7    office.

8         Q.   Why did you feel that the

9    principal and the assistant principal

10   needed to be the ones to be made aware?

11        A.   I think, to me, that is

12   really kind of, in my mind, who's

13   essential in terms of the inner workings

14   of the building, and I felt like that was

15   definitely information that both of them

16   needed to have.

17        Q.   Okay.  So you explained that

18   an incident happened between ▬▬▬▬ and

19   ▬▬▬▬ and then you told Principal

20   Nicholson that you were going to check

21   the schedules?

22        A.   Yes.

23        Q.   To make sure that ▬▬▬▬ and

24   ▬▬▬▬ weren't in the same class

1    together; right?

2         A.    Correct.

3         Q.    Was there any discussion

4    about how that was going to be done with

5    Mr. Nicholson?

6         A.    Not that I remember, no.

7         Q.    Did you explain to him,

8    like, how you were going to do that?

9         A.    No.

10        Q.    Is there anything you can

11   recall Principal Nicholson saying to you

12   about the information that you had told

13   him?

14        A.    I really do not remember,

15   no.

16        Q.    Is there anything else about

17   that -- did Mr. Nicholson say that he was

18   going to do anything as a result of the

19   information that you gave him?

20        A.    Not that I remember.  I do

21   remember him just confirming that I was

22   going to check the schedules.

23        Q.    Okay.  The conversation you

24   had with Mr. Nicholson on the phone, was

1   that put into writing or summarized in

2   writing at all?

3           A.      No.

4           Q.      The conversation you had

5   with Mr. Hassler, was that also by phone?

6           A.      It was, yes.

7           Q.      What do you remember about

8   that conversation?

9           A.      Very similar.  I remember

10  calling him letting him know that this

11  IEP meeting had happened, that we had two

12  students that were not able to be in the

13  same classes together, and that they were

14  not able to come in contact with one

15  another.  And I shared with him, and I

16  believe that I also shared with Pete who

17  was part of the meeting.  And then I had

18  told Kyle that I would check the student

19  schedules.

20          Q.      So based on your

21  conversation, you would agree with me

22  that Mr. Hassler was also aware of the

23  fact that ███████ and ███████ needed to be

24  kept apart; is that right?

1    A.    Yes.

2    Q.    Following this August 22nd

3    meeting, was there any other

4    conversations that you had with anybody

5    else involving the need for ▮▮▮▮ and

6    ▮▮▮▮ to be kept apart?

7    A.    No.

8    Q.    Were you familiar at this

9    point with who ▮▮▮▮ ▮▮▮▮ was?

10   A.    No.

11   Q.    Do you know whether Ms.

12   Schoppe or Mr. Matje had any familiarity

13   with Mr. ▮▮▮▮?

14   A.    I don't know.

15   Q.    What happened after you had

16   the two telephone calls, one with Mr.

17   Nicholson and one with Mr. Hassler?

18   A.    I know that I had a number

19   of other meetings that day, so I believe

20   that I was just, you know, kind of

21   carrying on with my schedule in terms of

22   meetings that I had on my calendar for

23   that day.

24   Q.    Okay.  After you made those

1  two phone calls and had the meeting with

2  ████  and her mom and the other school

3  district employees, that was the last

4  thing that you did that day regarding

5  ████  is that right?

6      A.    Yes.

7      Q.    Okay.  Did you eventually

8  check the schedules?

9      A.    I did.

10     Q.    When did you do that?

11     A.    I can estimate that -- I'm

12  relatively certain just kind of based on,

13  you know, things that I had plugged into

14  my calendar that I had checked her

15  schedule the following -- or the

16  following day.  So it would have been the

17  day after the schedule change was

18  submitted and the meeting had taken

19  place.

20     Q.    What do you mean, "the

21  schedule change was submitted"?

22     A.    At the meeting, I know that

23  Megan Schoppe took notes on those

24  emotional support classes that we needed

1    ████    to be part of, and she -- there

2    was one course that she was recommending,

3    and that was submitted to the scheduling

4    office.

5            Q.    So is there a specific

6    scheduling office that, I guess,

7    schedules the students in particular

8    courses?

9            A.    Yes.

10           Q.    And is that -- the

11   scheduling office, is that, like, at

12   North Penn High School?

13           A.    Yes.

14           Q.    Are there multiple people

15   that work in the scheduling office?

16           A.    I do not know.

17           Q.    At that time, had you ever

18   received any kind of, like, training or

19   instruction on this scheduling office,

20   like what they do, who it is, where they

21   are, anything like that?

22           A.    No.  I knew where it was

23   located, and I believe I had met the

24   woman who -- at least one of the people

1   that worked in the scheduling office just

2   when I was kind of brought in and toured

3   the building.  I can't remember her name.

4   But I did know where the scheduling

5   office was located.

6          Q.   Okay.  And so -- so based on

7   ████ needing to be in certain, like,

8   emotional support-type classes, she

9   needed a schedule change; right?

10         A.   Yes.

11         Q.   And how did -- it was going

12  to take place, it sounds like, on August

13  23rd, the following day from what you

14  told me.

15             How did that happen?

16         A.   I don't know.  I do believe

17  that August 23rd was the date that I

18  likely checked the schedule, but I don't

19  know the process behind the actual --

20  like, what goes into changing the

21  schedule.

22         Q.   Whose responsibility was it

23  or whose task was it to get ████

24  schedule changed that she had the

1  emotional support classes she needed?

2       A.    After our conversation at

3  the IEP meeting, Megan took her notes to

4  the scheduling office about the course

5  that she would need to be scheduled into.

6       Q.    Okay.  So from your

7  understanding, ██████ was -- that was

8  done -- that change was done on the 22nd?

9       A.    Yes.  That was my

10 understanding.

11      Q.    Okay.  And then on the 23rd,

12 you -- was it at your own desk -- pulled

13 up ██████ schedule and ██████

14 schedule?

15      A.    Yes.  I remember being at

16 the ESC Building which is, you know, our

17 district office, and I have an office

18 space -- had an office space there as

19 well.  And I remember pulling up student

20 schedules.

21           I believe that I printed

22 either one or both of those schedules to

23 crosscheck them.

24      Q.    So you had one, like,

1    printed out and then the other one on

2    your screen so you could look to see if

3    the classes were the same?

4          A.    Yes.

5          Q.    Okay.  Once you did that and

6    you checked them on August 23rd, I assume

7    at that point there was no overlap; is

8    that right?

9          A.    Correct.

10         Q.    Okay.  And so what happened

11   after that, after you crosschecked the

12   schedules, saw there was no overlap?  Did

13   you report to anybody or do anything?

14         A.    So I did share with Megan

15   Schoppe and Kyle Hassler that I had

16   checked the student schedules.

17         Q.    How did you do that?  By

18   phone or by email?

19         A.    I believe that was through

20   email.

21         Q.    And that would have been,

22   like, on the same day?

23         A.    I was actually out -- and I

24   know this, you know, by looking back in

1    my calendar.  I was out on the 24th for a

2    personal day, and I believe that I

3    emailed both of them when I returned that

4    Monday, which the date I -- 27th, I

5    believe.

6         Q.    Was there any other

7    discussion between Mr. Hassler or Ms.

8    Schoppe or Mr. Nicholson about checking

9    the schedules?

10        A.    No, not that I remember.

11        Q.    Was that something that, as

12   far as you know, Principal Nicholson and

13   Mr. Hassler were kind of tasking you --

14   relying on you to do?

15        A.    Yes.  Yeah, I had

16   communicated to them that I would be the

17   one to check the schedules.

18        Q.    Okay.  And they were okay

19   with that?

20        A.    Yes.

21        Q.    Did either of them give you

22   any kind of instruction as to how that

23   could be done or should be done?

24        A.    No.

1    Q.    How did you come up with

2  that being the process, that you would

3  pull up the one schedule and then pull up

4  the other schedule and then look at them

5  both?

6    A.    I knew that I wanted to be

7  able to see both schedules at the same

8  time, and I think that that was sort of

9  the way that I felt most comfortable

10  doing that.

11    Q.    Okay.  Do you know

12  when school started that year, when the

13  students came back?

14    A.    So I believe that the first

15  day of school was either the 28th or the

16  29th.

17    Q.    Okay.  After you checked the

18  schedules on the 24th and nothing had

19  overlapped, what was your plan in between

20  then and when school started to ensure

21  that the schedules didn't change?

22    A.    I did not really think of

23  that.  I knew that I had checked the

24  schedules and that that was, you know,

1   something that I had taken the time to

2   do.

3         Q.    Did you have an

4   understanding at that point that

5   schedules could be changed between the

6   24th and prior to the start of the school

7   year?

8         A.    Yes, I knew that student

9   schedules were changing, but it was not

10  something that I -- that I thought of in

11  relation to ███████   I knew that the

12  schedule change had been submitted, and I

13  thought that that would be, you know, her

14  finalized schedule.

15        Q.    What about in terms of

16  ███████  schedule?  Did you have any --

17  did you consider, like, if his schedule

18  changed before the start of the school

19  year?

20        A.    No.

21        Q.    Was there anything -- did it

22  ever cross your mind to change the

23  schedule -- or sorry -- to check the

24  schedule between the 24th and prior to

1 the start of school?

2  A.  No.

3  Q.  Did anybody else, whether it

4 was Pete Nicholson or Mr. Hassler -- did

5 they discuss with you about checking the

6 schedule prior to the start of the school

7 year after the 24th?

8  A.  No.

9  Q.  When you communicated with

10 Mr. Hassler that you had checked the

11 schedule -- and you said you did that

12 when you returned on the 27th -- did you

13 tell them when you had checked it?

14  A.  No, I don't believe so.

15  Q.  Do you know whether

16 Principal Nicholson was aware that you

17 had checked the schedule, whether that

18 had been communicated to him?

19  A.  I don't -- I don't know.

20  Q.  You weren't the one to

21 communicate that to him; is that right?

22  A.  Correct.

23  Q.  Why did you only go to Mr.

24 Hassler and not to Mr. Nicholson?

1    A.    Because as ███████ home

2    office assistant principal, he really

3    would have been the more direct point of

4    contact for overseeing ███████

5    day-to-day.  So I really kind of

6    continued my communications with Kyle

7    after I had made sure that Pete was aware

8    that these were the steps that we were

9    going to take.

10    Q.    When you talked to Mr.

11    Hassler and Mr. Nicholson about this was

12    your plan to ensure that the two

13    schedules would not overlap, did either

14    of them say anything to you about other

15    measures that could be taken to prevent

16    that from happening?

17    A.    No, not that I remember.

18    Q.    They both agreed with your

19    plan to just check the schedules?

20    A.    I believe so, yes.

21    Q.    Would you agree with me that

22    prior to the start of the school year,

23    like between August 24th and when

24    students are starting the 28th or the

1  29th, it was common for students to

2  sometimes change their schedules?

3             MS. JORDAN:  Note my

4        objection to the form of the

5        question.

6             You can answer.

7             THE WITNESS:  I don't know

8        whether that is a common thing or

9        not.

10 BY MS. LAUGHLIN:

11       Q.    Were you aware of any drop

12 or add period that would take place

13 before the start of a school year?

14       A.    Yes.

15       Q.    How are you aware of that?

16       A.    Just from hearing that that

17 was a process in place at the high

18 school.

19       Q.    Why didn't you -- if you

20 knew that there was a drop/add period

21 where kids could be dropping classes,

22 adding classes, changing classes, why

23 didn't you check the schedule again?

24       A.    I don't think that I

1    realized that there would have been any

2    change beyond when that schedule change

3    was submitted.  It was just something

4    that I knew that I had checked the

5    schedules, and I didn't think to do that

6    again.

7          Q.    But you knew that that was a

8    possibility that schedules could change.

9    That was -- you were aware of that;

10   right?

11              MS. JORDAN:  Note my

12        objection.

13              You can answer.

14              THE WITNESS:  I was aware

15        that there was a drop/add period,

16        yes.

17   BY MS. LAUGHLIN:

18         Q.    And since you were aware

19   that there was a drop/add period, you

20   also would have been aware that ████

21   schedule could have changed during that

22   time; right?

23              MS. JORDAN:  Note my

24        objection to the form of the

1          question.

2                You can answer.

3                THE WITNESS:  I -- I'm not

4          quite sure how to answer that

5          because I think ████████ schedule

6          likely would have changed through

7          an IEP process just given the

8          nature of her special education

9          courses that she was taking.

10   BY MS. LAUGHLIN:

11         Q.    And when you say "changed

12   through an IEP process," what do you

13   mean?

14         A.    So when it comes to a

15   student who's receiving special education

16   services, typically, you know, we have

17   our Penn data that we look at, which is

18   the percentage of their day that they're

19   in special education programming versus

20   general education programming.

21                So in ██████ case, we held

22   the IEP meeting to be able to discuss the

23   courses that she would need because it

24   would change the percentage of the day

1  that she is included in general education

2  versus special education.

3      Q.   Okay.  So even a general

4  education course for ███████ would have

5  had to go through, like, the IEP process

6  to make another change to the schedule?

7      A.   I believe so.  If it was

8  going to impact the percentage within her

9  IEP, then yes.

10     Q.   Okay.  What about for

11  ██████████ schedule?  You were aware that

12  his schedule -- because he wasn't in,

13  like, your special education group --

14  that his schedule could change during the

15  drop/add period; right?

16         MS. JORDAN:  Note my

17     objection to the form of the

18     question.

19         You can answer.

20         THE WITNESS:  Yes, because I

21     was aware of the drop/add period.

22  BY MS. LAUGHLIN:

23     Q.   But you're saying you just

24  didn't think to check again after you had

1    checked on the 24th; is that correct?

2         A.    Correct.

3         Q.    Prior to you checking

4    schedules and being tasked with making

5    sure that the two schedules didn't

6    overlap, had you ever had an experience

7    like that where you had to do something

8    similar before?

9         A.    No.

10        Q.    Did you ever tell anybody

11   when you were tasked with this that,

12   like, hey, this is my first time, you

13   know, doing this?  Did you have that

14   conversation with anybody?

15        A.    I don't believe so.

16        Q.    Did anybody ask you whether

17   you needed any assistance in making sure

18   that, you know, what you said you were

19   going to do with making sure their

20   schedules were separate actually got

21   implemented?

22        A.    I don't believe so.

23        Q.    After you were told by Mrs.

24   ██████████ that there had been a prior

1  incident between ███████ and ███████ did

2  you try and do any kind of investigation

3  as to what may have happened between the

4  two of them in the past?

5       A.   I did not.

6       Q.   Why not?

7            MS. JORDAN:  Note my

8       objection to the form of the

9       question.

10           You can answer.

11           THE WITNESS:  To be honest,

12      I think that it was kind of based

13      on the way that we left things at

14      the IEP meeting.  It sounded like,

15      you know, Mrs. ███████ really

16      wanted essential personnel to be

17      aware that these two students

18      needed to be kept apart.  She

19      wanted to maintain, you know, this

20      normal high school experience for

21      ███████ as much as possible.

22           So based on that

23      conversation and that meeting, at

24      the time, I wasn't thinking that

1      this was something that really

2      required me to look into it any

3      further.

4  BY MS. LAUGHLIN:

5      Q.   That was, like, your own

6  decision to not look into it any further,

7  you mean?

8      A.   Yes.

9           MS. JORDAN:  Note my

10     objection to the form of the

11     question.

12          THE WITNESS:  Yes, just

13     based on how the meeting went.

14  BY MS. LAUGHLIN:

15     Q.   Do you know whether Ms.

16  Matje or Ms. Schoppe had ever looked into

17  further what had been going on between

18  ███████ and ███████ previously?

19     A.   I don't know.

20     Q.   Based on the fact that you

21  did not, like, look into further what had

22  happened between ███████ and ███████ you

23  weren't aware that ███████ had been

24  sexually assaulted by ███████ in 6th

1    grade; is that correct?

2         A.    Correct.

3         Q.    Other than pulling up

4    ██████████  schedule, did you pull up

5    anything else in his file, like his

6    disciplinary history or anything like

7    that?

8         A.    I did not.

9         Q.    Now, you talked about you

10   were responsible for the schedule check,

11   but you also discussed that, at the

12   meeting, Ms. Schoppe was going to work

13   with ██████  to develop a plan for her in

14   terms of her route throughout the school?

15        A.    Correct.

16        Q.    Why was it focused on

17   ██████████  route throughout the school

18   versus the route for the other student,

19   for ██████████

20        A.    I believe that this was

21   because, you know, we were talking about

22   something in order to support and help

23   ██████████  So that's why she was the one

24   that was going to have a route kind of

1    designed for her.

2         Q.    Had you ever had anything

3    prior to this that you had experienced

4    where you're working with a family to

5    develop, like, a route that a student

6    would take in the school?

7         A.    No.

8         Q.    Had you ever heard of

9    anything like this in your training up to

10   this point from the district?

11        A.    No.

12        Q.    What about from your

13   education?

14        A.    Not that I remember.

15        Q.    Other than checking the

16   schedule, is there anything else that you

17   did to try and ensure that they wouldn't

18   end up in the same class together?

19        A.    No.

20        Q.    Did you talk to any of

21   ▇▇▇▇▇▇ teachers about it?

22        A.    I did not.

23        Q.    It's my understanding that

24   ▇▇▇▇▇ had a case supervisor, Lindsey

1  Riggin.

2        A.    Yes.

3        Q.    You were familiar with that?

4        A.    Yes.

5        Q.    Did you know Ms. Riggin

6  prior to this?

7        A.    I did not.

8        Q.    At the start of the 2018

9  school year, did you at some point, like,

10 become familiar with Ms. Riggin as her

11 being ████████ case supervisor?

12       A.    Yes.  I believe that -- I

13 can't remember if that was decided at the

14 August 22nd meeting or very soon after

15 that Lindsey would be her case manager

16 for that school year.

17       Q.    Prior to the start of the

18 school year, Ms. Riggin was assigned as

19 ████████ case manager; right?

20       A.    Yes.

21       Q.    And what was Ms. Riggin's

22 role as case manager, if you know?

23       A.    She would ensure that ██████

24 was getting the accommodations that she

1   would need to be successful in her

2   courses that are outlined in her IEP.

3           Q.    Okay.  Did you tell Mrs.

4   Riggin about the need for ███████ to be

5   kept away from ████████?

6           A.    I did not.

7           Q.    Why didn't you?

8           A.    I knew that Mrs. ████████████

9   had shared that she really wanted

10  essential personnel to be aware of this.

11  She did not feel that all of ████████

12  teachers needed to know this information

13  because she wanted ███████ to be able to

14  kind of build these trusting

15  relationships with adults and she didn't

16  want them to -- there to be a situation,

17  I guess, where ██████ may have felt

18  judged.

19          So I communicated to Pete

20  and to Kyle, and they were the two people

21  that I shared this information with.

22          Q.    Are you the one who decided

23  who the essential personnel would be that

24  would know about this information?

1    A.    In the meeting, I do

2  remember saying that I would share this

3  with Pete and with Kyle, and then I did

4  have those conversations with both of

5  them.  To me, that was who I felt needed

6  to know this.

7    Q.    So that was you who decided

8  who the essential personnel was that

9  needed to be told?

10   A.    In conjunction with the

11  people that were in that meeting with me,

12  yes.  We kind of discussed who would --

13  who we would share this with after the

14  meeting ended.

15   Q.    Did you have a conversation

16  with Mrs. ███████████ or ████████

17  specifically as to who the essential

18  personnel would be or should be?

19   A.    No.

20   Q.    What about with Ms. Schoppe

21  and Ms. Matje?  Did you have a specific

22  conversation with them as to, like, who

23  is defined as "essential personnel"?

24   A.    No.

1    Q.    Okay.  So that was your --

2    like, you communicated that at the

3    meeting, but that was your decision as to

4    who the essential personnel would be that

5    would be told about this?

6    A.    Yes.  Yeah, in conjunction

7    with, you know, our conversation at the

8    meeting and people at the table.  You

9    know, nobody else really shared that

10   anybody else would need to be made aware.

11   Q.    Since you knew that there

12   was a specific scheduling office, did you

13   consider going to the scheduling office

14   to talk to them about what you were

15   trying to accomplish in keeping the

16   schedules separate?

17   A.    No.

18   Q.    You knew at the time that

19   you were checking the schedules before

20   the school year started that there was a

21   scheduling office that was responsible

22   for student schedules, right, at North

23   Penn High School?

24   A.    Yes, I knew that that was

1  where Megan was going to submit the

2  recommended change for ▇▇▇▇▇ schedule.

3     Q.   Did you just not, like,

4  think that that was, like, an added step

5  that could be done at the time?  Like,

6  you didn't think of it, I mean?

7        MS. JORDAN:  Note my

8        objection to the form of the

9        question.

10        You can answer.

11        THE WITNESS:  At that time,

12        I felt confident with the ability

13        to check the student schedules.

14        So, no, I don't think that I

15        thought of that.

16  BY MS. LAUGHLIN:

17     Q.   There was some documentation

18  in the documents that were provided by

19  the district about you writing what had

20  happened at -- sorry -- you wrote on a

21  piece of paper about checking the

22  schedules.  Does that sound familiar to

23  you?

24     A.   I don't remember, or I don't

1    know.

2           Q.    Okay.  You don't remember,

3    like, writing what you did on a piece of

4    paper or anything and then, like, keeping

5    it and not passing it along to somebody

6    else?

7           A.    I don't.

8           MS. LAUGHLIN:  Why don't we

9           take a break?  I don't know.

10          It's, like, lunchtime.  I don't

11          know if we need to take a longer

12          break for lunch.

13          Oh, sorry.  Off the record.

14          Sorry.

15          THE VIDEOGRAPHER:  We're off

16          the record.  The time is 12:03.

17          (Whereupon, a brief recess

18          was held.)

19          THE VIDEOGRAPHER:  We're

20          back on the record.  The time is

21          12:12.

22    BY MS. LAUGHLIN:

23          Q.    Ms. Small, we talked a lot

24    about this meeting that you had on August

1    22nd and then the steps you took

2    afterwards to try to ensure that ████

3    and ████ were not going to be in the

4    same classes together.

5              Is there anything else, any

6    other conversations you had or anything

7    that you did prior to the start of school

8    that we haven't already talked about?

9         A.    I do know that when Kyle

10   Hassler and I spoke, he shared that

11   ████ was a student that he was going to

12   check in with a couple times at the start

13   of the year just to kind of follow up and

14   see how she was transitioning.

15        Q.    The fact that part of the

16   discussion had been that ████ didn't

17   trust teachers or had distrust with

18   teachers, what was the plan to try to

19   lessen that issue that was present?

20        A.    I think that through some of

21   the emotional support courses that she

22   was enrolled in, that's definitely kind

23   of a part of some of what they cover just

24   with kind of coping skills and self

1    regulations and learning about

2    relationships.  And then I -- you know, I

3    do know that Megan Schoppe recommended

4    Lindsey Riggin as her case manager

5    knowing that, you know, she felt she had

6    a personality that █████ would be able

7    to connect with.

8         Q.    Okay.  So for the first part

9    of what you said, that's, like,

10   throughout the course of the school year

11   that they'd be working on?

12        A.    Yes.

13        Q.    Other than specifically

14   selecting Lindsey Riggin as her case

15   manager, do you know whether there was

16   anything else put in place to try and

17   make sure that █████ felt more

18   comfortable or was more trusting of the

19   people that she was to go to if there

20   were any issues?

21        A.    Just the check-ins that

22   Megan Schoppe was going to do with her

23   and that Kyle Hassler was going to have

24   with her.

1         Q.    Were they on any kind of

2 schedule, these check-ins, like how often

3 or how it was going to happen or anything

4 like that?

5         A.    I don't know.

6         Q.    As the supervisor of special

7 education, did you have any

8 responsibility in that, in how that would

9 be implemented?

10         A.    No.

11         Q.    Whose responsibility --

12 like, who was overseeing that?

13         A.    I believe Kyle and Megan

14 both, just through our conversations.

15         Q.    I'm going to share my screen

16 and show you some notes and ask you some

17 questions about them.

18         A.    Okay.

19         Q.    Are you able to see my

20 screen?

21         A.    Yes.

22         Q.    Okay.  And let me know if

23 it's, like, too small or you can't see

24 the text as I go through it.

1          I have on here it's North
2    Penn's production Bates Number 535.
3          And are these the notes that
4    you were talking about seeing on your
5    Google Drive?
6          A.    Yes.
7          Q.    Okay.  And is it just this
8    one page of notes?
9          A.    Yes.
10          Q.    Other than this one page of
11   notes, is there anything else that you
12   were referring to on the Google Drive
13   that you had seen on there?
14          A.    No.
15          Q.    Okay.  This was the only
16   document that you were aware of?
17          A.    Yes.
18          Q.    Okay.  And are these notes
19   -- tell me how these notes came to be.
20   Like, were you typing them up during the
21   meeting, or how did you create these
22   notes?
23          A.    Yes, I was typing as the
24   meeting was happening.

1    Q.    Was there anybody else that

2    was typing as the meeting was ongoing?

3    A.    Yes.  Megan Schoppe and

4    Juliet Matje.

5    Q.    Okay.  Was Juliet Matje --

6    was she actually at the meeting in person

7    from what you can recall?

8    A.    She participated virtually.

9    Q.    How do you know that she

10   was, like, documenting as the meeting was

11   ongoing, then?

12   A.    I believe she had shared her

13   notes document with me, so I had her

14   notes as well once the meeting concluded.

15   Q.    Did you get the ones from

16   Megan Schoppe too?

17   A.    I don't believe that I did.

18   Q.    Why did Ms. Matje send you

19   her notes, if you know?

20   A.    Since she was transitioning

21   to the elementary buildings to support

22   there, she wouldn't be involved with this

23   case moving forward.  So I believe she

24   forwarded them to me just so that I had

1  her notes from the meeting as well.

2          Q.    The notes that you and Ms.

3  Matje and Ms. Schoppe were creating,

4  where did those notes go after you made

5  this document?

6          A.    Just they remained in -- I

7  know my notes remained in my Google

8  Drive.

9          Q.    Who has access to your

10 Google Drive other than you?

11         A.    Just me, unless I were to

12 share a document with somebody.

13         Q.    Is that -- would you

14 normally keep, like, student records like

15 this just in your Google Drive?

16         A.    Yeah.  I would typically

17 have a file for IEP meetings, and I would

18 keep notes in there.

19         Q.    Was it a personal Google

20 Drive or was this, like, the district set

21 up Google Drive for you?

22         A.    The district set up Google

23 Drive.

24         Q.    Okay.  But as far as you

1  knew, you were the only one who had

2  access to the district's Google Drive,

3  like for your Google Drive; right?

4          A.    Yeah.  My personal part of

5  the district Google Drive, yes.

6          Q.    Okay.  How -- if somebody

7  wanted to check the notes on ▇▇▇▇▇ IEP

8  meeting, how would someone go about doing

9  that?

10         A.    I would think that they

11 would likely contact me and ask me to

12 share my notes with them.

13         Q.    Has there ever been any

14 discussion in the training you received

15 or anything about keeping the IEP meeting

16 notes in a place that's accessible to

17 other people on ▇▇▇▇▇ team?

18         A.    The notes specifically, no.

19         Q.    The final IEP, did that get

20 implemented into something that was

21 accessible to all?

22         A.    Yes.

23         Q.    Why weren't the notes kept

24 in the district-accessible area?

1    A.    Likely just because these

2  are, you know, my personal notes that I

3  was taking during the meeting, or same

4  for Megan or for Juliet.  So these

5  wouldn't be notes that necessarily would

6  need to be shared with a building or

7  specific staff.

8    Q.    Did the case manager have

9  access?  Like, Ms. Riggin, did she have

10 access to ▇▇▇▇▇▇ IEP?

11   A.    Yes.

12   Q.    What about ▇▇▇▇▇▇

13 teachers?  Did they also have access to

14 her IEP?

15   A.    Yes.

16   Q.    But neither of those people

17 would have had access to your Google

18 notes; right?

19   A.    Yes.

20   Q.    Or Drive notes?

21   A.    Correct.

22   Q.    Would you agree with me that

23 had ▇▇▇▇▇▇ teachers had access to the

24 Google notes, that they would have been

1  aware that ██████ couldn't be in classes

2  with ██████ ██████ and they needed to have

3  no contact?

4         MS. JORDAN:  Note my

5     objection to the form of the

6     question.

7         You can answer.

8         THE WITNESS:  Yes.

9  BY MS. LAUGHLIN:

10    Q.    Same question for the case

11  supervisor:  Had the case supervisor of

12  ██████ Ms. Riggin, had access to your

13  notes here on Page 535, she would have

14  also been aware that the two students

15  couldn't have any contact?

16        MS. JORDAN:  Note my

17    objection to the form of the

18    question.

19        You can answer.

20        THE WITNESS:  Yes.

21  BY MS. LAUGHLIN:

22    Q.    Did the district have a

23  policy with notes, like things like this,

24  that two students couldn't be in class

1    together, like where that information

2    would be kept?

3           A.    I don't know.

4           Q.    Have you ever received any

5    kind of training on that?

6           A.    No.

7           Q.    When you talked to Mr.

8    Nicholson or Mr. Hassler, did they tell

9    you anything about where that information

10   should be kept?

11          A.    No.

12          Q.    Would you agree with me that

13   the fact that two students need to be

14   kept away from each other -- is that

15   important information?

16          A.    Yes.

17          Q.    Why is it important?

18                MS. JORDAN:  Note my

19          objection to the form of the

20          question.

21                You can answer.

22                THE WITNESS:  To protect the

23          student.

24   BY MS. LAUGHLIN:

1      Q.    Like, to protect ████

2   here?

3      A.    Yes.

4      Q.    At the time, did you see any

5   issue with only communicating this

6   information to essential personnel since

7   it was such important information?

8            MS. JORDAN:  Note my

9            objection to the form of the

10           question.

11           You can answer.

12           THE WITNESS:  I didn't.

13           Based on how our initial meeting

14           went, I felt that those were the

15           two most important people to be

16           made aware of this.

17   BY MS. LAUGHLIN:

18      Q.    Did you at some point later

19   realize that more people should have been

20   made aware of the fact that these two

21   students needed to be kept apart?

22           MS. JORDAN:  Note my

23           objection to the form of the

24           question.

1          You can answer.

2          THE WITNESS:  I would say

3     that that's a very difficult

4     question to answer because I

5     think -- you know, as I've thought

6     about this case, of course now I

7     wish that more people would have

8     known this information.

9          But at the time of that

10    meeting, I felt that checking the

11    schedules and following the steps

12    that we had discussed at the

13    meeting were -- were important to

14    do, and we did that.

15   BY MS. LAUGHLIN:

16        Q.   When you say as you've

17   thought back on this that you think that

18   more people should have known about it at

19   the time, do you think -- I mean, when

20   you say "more people," what other people

21   should have known about it?

22        A.   I would say her teachers.

23        Q.   And what would that have

24   done if the teachers knew about it?

1    A.    I think, you know, had she

2  ended up in the class with this student,

3  it could have been remediated

4  immediately.

5    Q.    Meaning that they could have

6  been separated immediately?

7    A.    Correct.

8    Q.    The top part of your notes

9  are going over the -- is it ███████

10  course schedule that you and ███████ --

11  or you and the other people at the

12  meeting were deciding the classes she'd

13  have for the year, for the semester?

14    A.    Yes.

15    Q.    And then this paragraph

16  here, the third paragraph down, is this

17  the part where you were talking about

18  there was -- Mrs. ███████ had a

19  concern about the students moving from

20  the high school to the tech school?

21    A.    Yes.

22    Q.    It says, Tech school, Mrs.

23  Ahart consulting with the team at -- and

24  it says NMTCC, but North Montco, to

1    implement -- and then it says tier,

2    explanation point, supports.

3              What does that mean?

4         A.    It should say tier 1

5    supports.  One of the -- and this was

6    information from ███████ IEP meeting

7    that had happened in the spring.  The

8    reason that North Montco wanted █████ to

9    return to the high school full-time is

10   that they were having concerns about her

11   behavior.

12             So Mrs. Ahart, who was a

13   behavior specialist, was going to conduct

14   an FBA and to implement tier 1 supports

15   over at North Montco Technical Career

16   Center so that teachers had a better

17   understanding of how to support any of

18   ████████ behaviors.

19        Q.    For the period of the day

20   that she was at the tech school?

21        A.    Yeah.  And that would have

22   really just been done, you know, through

23   consultation on -- from Mrs. Ahart.

24        Q.    And you said that -- you

1    used the term "FBA."  What does that

2    mean?

3            A.    A functional behavioral

4    assessment.

5            Q.    In your understanding, when

6    are functional behavioral assessments

7    used for students?

8            A.    So, typically, if teachers

9    that are working with that student are

10   recognizing that there are behaviors that

11   are impeding their learning, then a

12   functional behavioral assessment would be

13   completed.

14           Q.    Okay.  And then the next

15   part says, Kate, hyphen, reach out to Dr.

16   Hammer to add rating scales to ▮▮▮▮▮▮▮

17   evaluations.

18               Is this something, like,

19   that you're writing that you're going to

20   be doing?

21           A.    Yes.  So I -- Dr. Hammer was

22   the school psychologist that -- again,

23   they were broken up by last names.  So

24   she had the first half of the alphabet,

1  as I did.  So she would have been the

2  school psychologist that was responsible

3  for completing ███████ reevaluation

4  report.

5      Q.   Okay.  And when does the

6  reevaluation report get done, typically?

7      A.   Typically, it would happen

8  every three years.  And I believe in

9  2018, ██████ was up for a reevaluation.

10      So as part of that process,

11  executive functioning skills were going

12  to be included, and I think an FBA would

13  be part of that too.

14      Q.   Okay.  The functional

15  behavioral assessment?

16      A.   Yes.

17      Q.   And it also says, like,

18  Putting in place planning supports for

19  ██████ to be aware of projects and

20  assignments that are coming up in the

21  future.

22      A.   Yes.

23      Q.   Do you recall having that

24  discussion with Dr. Hammer to incorporate

1    those things?

2          A.    Yes.  I believe so, yes.

3          Q.    The next part says, Lots of

4    social anxiety and trust issues with

5    teachers.

6                What do you recall

7    discussing about lots of social anxiety?

8          A.    I think just kind of talking

9    about -- this was part of our

10   conversation about the smaller class

11   sizes.  Mrs. ███████████ had mentioned

12   that ██████ does have anxiety around

13   peers and the trust issues with teachers,

14   and that kind of helped us to talk about

15   those smaller class sizes being more

16   appropriate to meet her needs.

17         Q.    Do you recall any discussion

18   about what the issue was with the social

19   anxiety, what it stemmed from, what it

20   involved, anything like that?

21         A.    I don't.  I don't remember.

22         Q.    And then there was going to

23   be an IEP meeting within the first 30

24   days of school, for the end of September?

1    A.    Yes.

2    Q.    Do you recall, why was there

3    going to be an IEP since you just had one

4    in August, to do one a month later?

5    A.    I think we had talked about,

6    you know, giving █████ some time to

7    transition into the building; and then

8    since this was her first year at North

9    Penn, we would reconvene as a team to

10   kind of talk about how she was doing and

11   if more supports for her were needed.

12   Q.    Okay.  And then like you

13   mentioned before, you talked about the

14   possibility that she could be involved in

15   Knight Riders, the horse -- equestrian

16   club at North Penn High School?

17   A.    Yes.

18   Q.    Was that something that was

19   also available to the students at North

20   Montco, if you know?

21   A.    Yes, because I think if you

22   were a registered North Penn student,

23   then all of those clubs would have been

24   available to you.  Yes.

1          Q.    Meaning if you split your

2     time between North Montco and North Penn

3     High School?

4          A.    Correct.  And even if you

5     were a student that was at North Montco

6     for a full day but you were still a North

7     Penn School District student, you would

8     have had the opportunity to participate

9     in that club.

10         Q.    Okay.  I'm scrolling down to

11    Bates Number Page 536, and this is --

12    Megan Schoppe's notes is how they're

13    identified.

14               Have you seen these notes

15    before today?

16         A.    Yes.  I believe I collected

17    documents when we initially had a records

18    request from mom.  So documents were

19    submitted to me, so I had seen these.

20         Q.    Okay.  And this first page

21    is kind of like in the beginning of your

22    notes where you talk about what ████

23    schedule would actually be?

24         A.    Yes.

1    Q.    This second part where it
2  says, ▬▬▬ ▬▬▬ is not in class or in
3  halls near her, then it says, She is the
4  victim in the situation according to mom,
5  do you see that there?
6    A.    I do, yes.
7    Q.    What do you recall about the
8  conversation about ▬▬▬ being a victim
9  in this situation?
10    A.    I don't remember.  I
11 remember mom sharing, you know, that
12 there was an incident between these two
13 students.  I don't remember her sharing
14 much more than that at the time of that
15 meeting.
16    Q.    Okay.  From your impression
17 of the conversation you had, did you have
18 the impression or was it your
19 understanding that ▬▬▬ was the victim
20 in this situation?
21    A.    I had the impression that
22 ▬▬▬ -- yes, she was the one that was,
23 you know, harmed in what the incident was
24 and that's why, you know, mom wanted to

1  make sure that they didn't come in

2  contact with each other.

3      Q.    When you say ▮▮▮ was

4  harmed, what do you mean by that?

5      A.    It's kind of the word that I

6  use to associate with victim, I guess.

7  The way that mom explained it, I -- I did

8  understand that ▮▮▮ was -- there was

9  an issue between these two students and,

10  you know, ▮▮▮ had a negative

11  experience because of that.  And that's

12  why we wanted to plan to make sure that

13  those two students did not come in

14  contact.

15      Q.    Okay.  So from what you just

16  told me, is it -- am I correct in saying

17  that you had an understanding that ▮▮▮

18  had been harmed in some way by ▮▮▮

19  previously?  Is that right?

20      A.    Yes.

21      Q.    And that ▮▮▮ was the

22  victim in that situation?

23      A.    Again, I don't remember mom

24  using that language specifically, but I

1  do remember understanding that, you know,

2  ███████ was the person that was negatively

3  impacted and we needed to plan to make

4  sure that she was supported coming into

5  the high school.

6        Q.    Did you have any

7  understanding as to whether ███████ had

8  any fault in the prior incident?

9              MS. JORDAN:  Note my

10        objection to the form of the

11        question.

12              You can answer.

13              THE WITNESS:  No.

14  BY MS. LAUGHLIN:

15        Q.    No, you didn't have any

16  understanding either way, or no, she was

17  not at fault?

18        A.    No, I did not have any

19  understanding.

20        Q.    The next part that says --

21  sorry.  The screen keeps going blue

22  instead of white.

23              The next section that says,

24  ███████ needs to have the power back in

1    school setting when near him.

2              Do you see that?

3        A.    I do.

4        Q.    Do you recall that part of

5    the conversation of the meeting?

6        A.    I don't.

7        Q.    What is PBSP needed?  Do you

8    know what that stands for?

9        A.    Yes.  So that stands for

10   positive behavior support plan.  And a

11   functional behavioral assessment would be

12   completed, and then you would use that

13   information from the assessment to

14   develop a positive behavior support plan.

15       Q.    Okay.  And then this here in

16   Ms. Schoppe's note says that that IEP

17   meeting was going to be at the beginning

18   of October?

19       A.    Yes.

20       Q.    Is that your recollection,

21   that there was actually, like, a

22   scheduled meeting for the beginning of

23   October?

24       A.    No.  My recollection is, you

1  know, as we talked as a team, we felt

2  that that would be an appropriate time to

3  come back together just to give ████

4  some time to transition into the building

5  first.

6      Q.    Okay.  So you didn't have a

7  specific date that the meeting was going

8  to take place, but you all were planning

9  for early October to convene again?

10     A.    Yes.

11     Q.    And the next part says, Try

12 not to have Liz Shine attend meetings.

13 Dawn and Keira are go-to for her.

14          Do you recall this part of

15 the meeting?

16     A.    I knew that -- I think I had

17 mentioned earlier that the meeting that

18 had happened at North Montco Technical

19 School in the spring, it was not a very

20 productive meeting.  I think Mrs.

21 ████████    felt that the team was really

22 negative in kind of talking about ██████

23 and Liz Shine who -- I believe she was

24 the special ed point in that building --

1  was very vocal in the meeting and just

2  saying things that weren't really

3  productive to supporting ███████ moving

4  forward.

5          So Mrs. ██████████ did not

6  want her to attend any of the meetings,

7  the IEP meetings that would happen with

8  representation from North Montco.

9      Q.   All the information you just

10  shared with me, is that information that

11  you learned from Mrs. ██████████ or from

12  some other means?

13      A.   Mrs. ██████████ had spoken

14  to that, and then I also knew that from

15  Juliet Matje.  I knew that one of the

16  reasons that she was attending this

17  meeting in August was because she had

18  been at that previous meeting in the

19  spring.

20      Q.   Okay.  I'm going to show you

21  Bates Number 632.  Towards the bottom of

22  the page, there's an email from you to

23  Megan Schoppe, and it's dated August

24  22nd, 2018.  And based on the time at

1    7:59 a.m., I assume this is before you

2    had that meeting that day?

3         A.    Yes.

4         Q.    And it says, FYI, Juliet is

5    going to join us for this meeting.  She

6    said there is some important info from

7    tech that she wants to share.

8              Do you recall, was the --

9    what was the important information that

10   Juliet Matje had shared?

11        A.    She wanted to share that,

12   you know, the meeting in the spring had

13   really not been productive and that --

14   there was just sort of a negative tone to

15   the meeting, so she wanted to be there to

16   kind of share.  She was going to share

17   out a summary of what the tech school had

18   recommended, and that way we could kind

19   of talk through that without having Liz

20   Shine be part of that meeting.

21        Q.    And was this something that

22   Juliet Matje had discussed with you or

23   Megan Schoppe before the meeting with the

24   ██████████  took place?

1      A.    She had called me and said

2  that she wanted to join in on that

3  meeting.  So, yes, she had shared that

4  with me.

5      Q.    Okay.  Like, the background

6  of why she wanted to join in this

7  meeting?

8      A.    Yes.

9      Q.    Was there -- between you,

10  Juliet Matje, and Ms. Schoppe, was there

11  kind of like an agreement between the

12  three of you to, like, try and make this

13  meeting with ███████ and her mom, like, a

14  positive experience after what she had

15  been through in the last IEP meeting?

16          MS. JORDAN:  Note my

17       objection to the form of the

18       question.

19          You can answer.

20          THE WITNESS:  No.  I think

21       we just wanted to make sure that

22       we were able to be focused on

23       making sure that we had the most

24       productive plan for ████████

1  BY MS. LAUGHLIN:

2      Q.    Okay.  I'm going to jump to

3  Page -- North Penn's Bates Number 627.

4  And this is an email that you said you

5  sent August 27th, 2018.

6              And is this the email that

7  you were referring to, that once you got

8  back from your vacation you had sent to

9  Kyle and Megan about checking the

10  schedules?

11      A.    Yes.

12      Q.    You also write in this

13  email, When they return to tech fourth

14  period, they both have lunch.  Megan,

15  should we develop a formalized plan to

16  address this?

17              Do you see that part?

18      A.    Yes.

19      Q.    What happened about a

20  formalized plan?  Did one ever take

21  place?

22      A.    Not that I know of.

23      Q.    Okay.  Did Megan respond to

24  you as far as you can recall?

1    A.    I don't remember.

2    Q.    Why did it -- do you know

3 whether a plan ever got put in place for

4 their return after fourth period?

5    A.    I don't know.

6    Q.    Was this a plan -- based on

7 your email and your understanding of what

8 you were trying to communicate to Megan,

9 was this to make sure that they didn't

10 have lunch together?

11    A.    No.  This was in regards to

12 that transition time that they would be

13 walking from the tech school to North

14 Penn to make sure that, you know, there

15 was a plan there and that they were --

16 you know, we knew that we had supervision

17 for them.

18    Q.    Okay.  Was it from North

19 Penn High School to the tech school and

20 back, or was it just one way you were

21 concerned about?

22    A.    It was both ways.  They

23 would walk there in the morning, I

24 believe, and then they would return in to

1  lunch.

2       Q.    Okay.  At North Penn, were

3  -- was the lunch, like, all in the same

4  cafeteria, or were there separate

5  cafeterias that students would go to to

6  have lunch?

7       A.    It's one big space, but it's

8  sort of divided into maybe almost three,

9  like, areas where you could eat.

10      Q.    Do you know whether there

11 was any safety plan in place for ▇▇▇▇

12 and ▇▇▇▇  to avoid each other at lunch?

13      A.    I don't know.

14      Q.    Would you agree with me

15 that, based on our prior conversation,

16 what you told me about after the August

17 22nd meeting and this email that you sent

18 on August 27th, that it was the school's

19 responsibility to keep ▇▇▇▇  and ▇▇▇▇

20 out of the same classes together?

21      A.    Yes.

22      Q.    I'm going to go to the next

23 page, which is 628.  This is an email the

24 same day, August 27th, at 12:53, and it's

1  from Megan Schoppe to you, and cc'd on

2  here is Lindsey Riggin.

3           It says, Yes, we need to,

4  and I think -- hold on.  Let me -- sorry.

5  I'm trying to make it back into context.

6           Here we go.  So at the very

7  bottom of 627, there's an email sent from

8  you to Lindsey Riggin and Megan Schoppe

9  at 11:58 in the morning.  And it says,

10  Lindsey -- Hi, Lindsey, welcome back.

11  Over the summer, Megan and I met with

12  ███████ ████████████ a student on your

13  caseload, and her mom.  Both ████████ and

14  her mom shared many concerns regarding

15  anxiety and difficulty connecting with

16  teachers.  I just wanted to make sure

17  she's on your radar.  Let me know if you

18  have any questions.

19           And then on the next part,

20  it looks like Megan Schoppe chimes in

21  before Lindsey responds at 12:53 and

22  says, Yes, I think we need to, and I

23  think we need to involve Pete and

24  security as well.

1                  Do you know what Megan

2    Schoppe was referring to about involving

3    Pete and security?

4          A.    I don't.

5          Q.    Okay.  Do you know whether

6    this had to do with the fact that

7    security had to know so that the two

8    students could be monitored as they

9    walked from one place to the next?

10         A.    That's a possibility.

11         Q.    Okay.  Was there anything

12   else that security needed to be a made

13   aware of with ██████ other than what we

14   talked about the security knowing that

15   they weren't supposed to be together,

16   ██████ and ██████

17         A.    No, not from a conversation

18   that I was a part of.

19         Q.    What about involving Pete

20   Nicholson?  Was there anything else other

21   than the fact that ██████ and ██████

22   needed to be kept apart that he needed to

23   be aware of involving ██████

24         A.    No.

1    Q.    Then Lindsey had responded

2    back, I guess, to your email saying,

3    Thank you for filling me in.  I was

4    planning on reaching out to my caseload

5    parents this week.  Is there anything

6    else I need to know regarding █████████

7    Please keep me posted.

8            Did you have a conversation

9    with Ms. Riggin after this, if there's

10   anything that she needed to know?

11   A.    I think I had had a

12   conversation with her just reiterating

13   what I had said in that original email

14   about the anxiety and the trust issues

15   with teachers.

16   Q.    Okay.  But you didn't share

17   with her the involvement of security and

18   the fact that you had to have a

19   conversation with Pete Nicholson?

20   A.    I did not, no.

21   Q.    Do you think that that was

22   something that she should have known at

23   this point?

24            MS. JORDAN:  Note my

1    objection to the form of the

2    question.

3         You can answer.

4         THE WITNESS:  At the time

5    that this all happened, I felt

6    that, you know, we had discussed

7    at the meeting not all of the

8    teachers needing to be aware of

9    this, and I felt that that was

10   something that Mrs. ███████

11   wanted.  So I knew that I had

12   communicated this with Pete and

13   with Kyle, and I didn't think that

14   this was something that I should

15   communicate to Lindsey based on

16   how our conversation went on the

17   22nd.

18   BY MS. LAUGHLIN:

19        Q.    With Mrs. ███████

20        A.    Yes.

21        Q.    Did you talk -- you talked

22   about teachers maybe as part of the

23   conversation of who should or shouldn't

24   know on August 22nd; right?

1    A.    Yes.

2    Q.    Did you discuss, like, that

3 ████ was going to have a specific case

4 manager in special education and whether

5 that person should know about this?

6    A.    We did discuss her having a

7 case manager.  I don't remember that we

8 talked about whether the case manager

9 should know this information.

10    Q.    At what point did you become

11 aware that ████ had been sexually

12 assaulted by ████ in 10th grade?

13    A.    I don't remember the date

14 exactly, but I remember it being a

15 Friday.  And Pete Nicholson called me.

16 It was a day that I was at Northbridge.

17         And he called me and asked

18 if I remembered meeting with a student,

19 ████ ████ and her mom, and I

20 shared that I did.  And he asked me to

21 kind of refresh his memory on what the

22 outcome of that meeting was, and I shared

23 with him about checking the schedules.

24         And he then communicated to

1  me that ███████ had come forward at the

2  tech school, I believe the previous day,

3  and shared that she was sexually

4  assaulted by ████████ and that this had

5  happened in their social studies class,

6  that they were scheduled -- that they

7  were in class together.

8      Q.   And what was your reaction?

9  What did you think when Mr. Nicholson had

10 communicated that to you?

11         MS. JORDAN:  Note my

12         objection to the form of the

13         question.

14         You can answer.

15         THE WITNESS:  Of course

16         immediately I was, you know, very

17         upset to think that this could

18         have happened to a student and

19         that it could have been a result

20         of the schedule changing when I

21         knew that I had checked the

22         schedule.

23         And after ending my

24         conversation with Mr. Nicholson, I

did call Mrs. ▮▮▮▮ to
apologize to her that this had
happened.

BY MS. LAUGHLIN:

Q.   Is that -- the call that you
made to Mrs. ▮▮▮▮ is that
something that you and Mr. Nicholson
discussed would be done?

A.   I told him that I wanted to
call her.

Q.   Why did you tell him that?
Like, what did you say to him?

A.   I think I just said, you
know, I would really -- since I was part
of that meeting on August 22nd, I would
really like to contact her mom and just
to apologize to her.

Q.   Why were you apologizing?

A.   To think that they did end
up in the same class together after I
knew that I had checked the schedule.  I
had called Mrs. ▮▮▮▮ I believe,
the first day that student -- or that
students returned to the building so that

1    ████████ would have been in school.  I

2    called her that day and followed up with

3    her in an email just to check in to see

4    how ██████████ first day went.

5            So I knew that I wanted to

6    reach out to her and just apologize to

7    her that they had ended up in the same

8    class together.

9        Q.    Did you feel responsible for

10   that since you were the one that was

11   checking the schedule?

12       A.    I knew that I had checked

13   the schedule.  So I knew that I had had

14   eyes on that schedule.  I had known that

15   they were not in the same class.  So I

16   definitely felt, you know, was -- I

17   questioned was there something that I

18   missed, but I don't know that I felt

19   solely responsible that they ended up in

20   the same class together.

21       Q.    Who else's responsibility

22   was it, then, if it wasn't totally yours?

23            MS. JORDAN:  Note my

24       objection to the form of the

```
1        question.
2               You can answer.
3               THE WITNESS:  I think, you
4        know, when I think about our
5        student information system that we
6        have and just our ability to kind
7        of safeguard the ability to the
8        students being scheduled into the
9        same class, that was something
10       that I had thought of.
11  BY MS. LAUGHLIN:
12       Q.   But whose responsibility, I
13  guess, is that?  Like, if that's a
14  computer thing, like, is there somebody
15  that, like -- whether they should have
16  told you about that being an option or --
17  what do you mean by that?
18       A.   I think --
19               MS. JORDAN:  Note my
20       objection to the form of the
21       question.
22               You can answer.
23               THE WITNESS:  I think I just
24       mean, you know, maybe if our
```

1    system had the ability to notify

2    you when a specific student's

3    schedule had changed.  If I had a

4    notification like that, then of

5    course I would have gone back in

6    and rechecked the schedules.

7  BY MS. LAUGHLIN:

8         Q.    From what we know later,

9  that was available; right?  You just --

10  that was available; right?

11              MS. JORDAN:  Note my

12         objection to the form of the

13         question.

14              You can answer.

15              THE WITNESS:  I don't know.

16  BY MS. LAUGHLIN:

17         Q.    Later on after this

18  incident, you had communicated or

19  coordinated with someone in the tech

20  department to make that happen; right?

21              MS. JORDAN:  Note my

22         objection to the form of the

23         question.

24              You can answer.

1              THE WITNESS:  What we were

2          able to arrange was a pop-up that

3          would just state that the

4          student's schedule couldn't be

5          changed without consulting

6          administration.  But that doesn't

7          mean that the student's schedule

8          couldn't change without us

9          knowing, if that makes sense.

10              So that would pop up, right,

11          but you could easily have clicked

12          out of that.  So if ███████

13          scheduled happened to change, I

14          wouldn't get any notification on

15          my end that the schedule had

16          changed.

17      BY MS. LAUGHLIN:

18          Q.    Do you know whether

19      something like that even exists or

20      existed at the time of what you're

21      describing?

22          A.    I don't know.

23          Q.    Why -- if you know, why was

24      Pete Nicholson calling you about the

1    assault?

2        A.    I think because he knew that

3    I was the one that had checked the

4    student schedules and he had remembered

5    having that conversation.

6        Q.    Okay.  Because when you said

7    that he called you and said refresh my

8    recollection as to what happened, I mean,

9    what did he know or didn't know as far as

10   your understanding when he called you?

11       A.    I think when he said that,

12   he was just meaning, like, of the

13   conversation that had happened at that

14   IEP meeting since he was not at the IEP

15   meeting.

16       Q.    Okay.  But he did remember

17   at the time that you were checking the

18   schedules to make sure that ██████  and

19   ██████  weren't going to be in the same

20   classes together?

21       A.    Yes.

22       Q.    When Pete Nicholson was

23   explaining to you that ██████  had been

24   sexually assaulted in the social studies

1  class at North Penn High School, did he

2  explain to you exactly what happened in

3  the assault?

4      A.   He did not.

5      Q.   Do you recall, like, how

6  many times it happened or any other

7  details about the sexual assault itself?

8      A.   No, I do not.

9      Q.   When you talked to Mrs.

10  ████████████ when you -- did you call her

11  on the phone immediately after you hung

12  up with Mr. Nicholson?

13      A.   I did, yes.

14      Q.   And what was Ms.

15  ████████████'s reaction to you calling?

16      A.   She was upset.  She was very

17  upset that this had happened and she made

18  that clear.  But we were able to end the

19  conversation.  She said, you know, I

20  appreciate you calling me, but that

21  doesn't change the fact that I'm upset,

22  of course.

23      Q.   When you said that she made

24  it clear that she was upset, what do you

1  mean by that?

2      A.    I think she just kind of

3  reiterated the fact that she was trusting

4  in the school to make sure that ████████

5  did not come in contact with ████████

6      Q.    And what did you say when

7  she told you that?

8      A.    I said, you know, I

9  apologize, and we're absolutely going to

10 be looking into how this happened; I do

11 know that I checked their schedules prior

12 to the first day of school.

13     Q.    Okay.  Is there anything

14 else that you can recall about that

15 conversation with Mrs. ████████████

16     A.    No.

17     Q.    How did you and Pete

18 Nicholson leave the conversation?  You

19 had refreshed his memory as to the exact

20 conversations that took place at the

21 August 22nd meeting and you told him that

22 you were going to be calling Mrs.

23 ████████████████

24          Is there anything else that

1  you guys discussed in that conversation?

2      A.   He did share that law

3  enforcement would be involved with

4  completing a full investigation.  And I

5  just told him to please reach out to me

6  and let me know if there was anything

7  that he needed from me.

8      Q.   When he said law enforcement

9  would be completing a full investigation,

10  what was your understanding of what was

11  happening?

12      A.   My understanding was that

13  the -- you know, ████ report of being

14  sexually assaulted was going to be

15  investigated, and that's really all that

16  I knew at that time.

17      Q.   Do you know whether -- did

18  Mr. Nicholson say anything to you as to

19  whether the school was going to be -- or

20  the district was going to be doing its

21  own investigation?

22      A.   Yes.  I do know that he was

23  going to be interviewing students as

24  well, but I believe that that was going

1  to happen after law enforcement

2  investigated.

3       Q.    Why was that?

4       A.    I think that that was just

5  kind of the order that he had told me.

6       Q.    Okay.  So Pete Nicholson is

7  the one who told you first law

8  enforcement is going to investigate, and

9  then I, meaning Pete Nicholson, is going

10  to investigate what happened?

11       A.    I believe that's how I

12  remember this happening, yes.

13       Q.    Had you had any training

14  prior to this point on investigations

15  involving a sexual assault of a student

16  and how that was supposed to be done?

17       A.    Not that I remember.

18       Q.    Do you know whether a school

19  investigation had to wait until a police

20  investigation could be completed?

21       A.    I don't know.

22       Q.    Is there anything else that

23  you recall about the telephone call with

24  Pete Nicholson?

1      A.    No.

2      Q.    You said that, I think, in

3  your conversation with Mrs. ███████

4  that you were going to try and get to the

5  bottom of what had happened?

6      A.    Yes.

7      Q.    Did you discuss that with

8  Pete Nicholson?

9      A.    I believe that that may have

10  been a topic of our conversation, but I

11  did mention earlier that that was the

12  conversation that I had had with Todd

13  Bauer, who was our assistant

14  superintendent.

15      Q.    Okay.  And so Todd Bauer, I

16  think you were saying before that he had

17  called you, or did you call him?

18      A.    After this happened, I

19  believe that I met with him in his office

20  here at the ESC.

21      Q.    Okay.  Why did you -- how

22  did that come about, you meeting with Dr.

23  Bauer in his office at the ESC?

24      A.    He knew that I was involved

1   with this case and he knew that we would

2   be having an IEP meeting to transition

3   █████ over to North Montco full-time, so

4   he had just wanted to ask me some

5   questions about the scheduling component.

6          Q.    How long after you talked to

7   Pete Nicholson and Ms. █████████ did

8   you have this meeting with Mr. Bauer?

9          A.    This was a Friday, so I

10  would guess that it probably happened

11  early in the next week.

12         Q.    You mentioned that in your

13  meeting with Dr. Bauer that █████ was

14  going to be transitioning full-time to

15  North Montco?

16         A.    Yes.

17         Q.    How did you find that

18  information out?

19         A.    That may have been shared by

20  Pete Nicholson when I spoke with him that

21  Friday when he shared that █████ had

22  come forward and reported that she was

23  sexually assaulted.  She did say that she

24  would not be coming back to North Penn

1    High School and that she would now attend

2    North Montco full-time.

3        Q.    Did you ask Pete Nicholson

4    any questions about, you know, whether

5    there was anything to keep her at North

6    Penn High School or -- was that part of

7    the conversation at all?

8        A.    He had made it clear that

9    Mrs. ███████ wanted her to be at

10   North Montco full-time, that that was

11   going to be the priority.  So I did just

12   mention to him, you know, I will work to

13   schedule an IEP meeting as quickly as

14   possible so that we can make sure we have

15   supports in place for the team at North

16   Montco.

17       Q.    What about when you called

18   Mrs. █████████  Did you discuss that

19   at all with her, about ████████

20   transitioning to North Montco full-time

21   now?

22       A.    I remember her saying that

23   she did not want ██████ returning to the

24   high school.  But aside from that, we did

1    not talk about a transition.

2         Q.    Other than Mrs. ██████

3    telling you that █████ -- that she

4    didn't want ██████ returning to North

5    Penn High School, was there any other

6    discussion about that with Mrs.

7    ██████████

8         A.    No, not in that phone call.

9         Q.    Did you offer any supports

10   or anything to ██████ or, like, for

11   ████████ to Mrs. ████████████ about what

12   you'd be trying to put in place to

13   support ██████ after this assault?

14        A.    Not at that time.  When we

15   did meet for her IEP meeting, we talked

16   at length about those supports that we

17   would make available to her.

18        Q.    Okay.  I know you said that

19   by the end of the conversation, like, it

20   sounded like trying to end the

21   conversation on an okay note I guess I

22   can say, because it probably wasn't a

23   positive note for everything.

24        A.    Right.

1    Q.    Was there a plan as to what
2    was going to happen next when you talked
3    to Mrs. ███████ when you ended that
4    phone call?
5    A.    I believe that I had stated
6    that we would work to schedule an IEP
7    meeting as soon as possible so that we
8    could come together as a team and look at
9    supports for ██████ moving forward.
10   Q.    When -- since ██████ was
11   part of, like, your caseload based on her
12   last name, did you have any
13   responsibility for monitoring her grades
14   at North Penn High School?
15   A.    No.  That would have been
16   the responsibility of her case manager.
17   Q.    Ms. Riggin?
18   A.    Yes.
19   Q.    And then Ms. Riggin would
20   be, like, reporting to you if there were
21   issues; is that right?
22   A.    Yes.
23   Q.    I'm showing you North Penn
24   Bates Number 658.  It's an email from

1   October 3rd, 2018 at 11:57 a.m., and this

2   is from Timothy Borgmann, who is the

3   history teacher at North Penn High

4   School, and it's to Lindsey Riggin.

5           Do you see this?

6      A.   Yes.

7      Q.   Have you ever seen this

8   email before?

9      A.   No.

10     Q.   When you got all the

11  documents -- you said you were the one

12  collecting documents once the district

13  received a request from Mrs. ██████████

14     A.   Yes.

15     Q.   Did you read the documents

16  that you received from that request?

17     A.   No.  I remember seeing some

18  of them just by nature of collecting

19  them, but there were many, many

20  documents.  So, no, I did not read them.

21     Q.   Okay.  So there's an email

22  that Mr. Borgmann had sent to Ms. Riggin

23  October 3rd, 2018 that says, ████████

24  ██████████ has a 16 percent in America

1    in History in Period 6.  I have met her

2    IEP accommodations.  She says her seat is

3    not a problem.  All assignments have had

4    an expected due date and an extended due

5    date.  He talked about the directions

6    that he was giving in the class and that

7    she had extra time on the test.  And does

8    she need to drop down to a 4.0 class is

9    what Mr. Borgmann is asking Ms. Riggin.

10          Since Mr. Borgmann and Ms.

11   Riggin were not notified of the issues

12   with █████ and █████ needing to be kept

13   apart, do you agree with me, at this

14   point when Mr. Borgmann is raising the

15   issue of █████ failing with a 16 percent

16   in the class, they didn't know at this

17   point that there was an issue between

18   █████ and █████ with them needing to be

19   kept apart?  Correct?

20          MS. JORDAN:  Note my

21       objection to the form of the

22       question.

23          You can answer.

24          THE WITNESS:  Not -- not

1            that I communicated to them, so

2            not that I would have made either

3            of them aware of.

4 BY MS. LAUGHLIN:

5       Q.   Do you know whether --

6 outside of you whether they had been made

7 aware of this fact?

8       A.   I don't.  I do not know.

9       Q.   When somebody is failing

10 with a 16 percent in a class and it's

11 communicated to the case manager, Ms.

12 Riggin, would you have expected Ms.

13 Riggin to come to you about one of her

14 case students having a 16 percent in one

15 of the subjects?

16       A.   It depends on, you know,

17 kind of what she felt would be the next

18 best step.

19           So it looks like here

20 they're discussing █████ possibly

21 switching to a 4.0 class.  So that would

22 just be a switch between general

23 education.  She would just be moving down

24 a level.

1          So that's not necessarily

2     something that would need to be

3     communicated to me because it wouldn't be

4     changing her percentage of special

5     education services.  So that's likely why

6     I wasn't aware of this.

7          Q.    Would you agree with me that

8     had Mr. Borgmann or Ms. Riggin been made

9     aware of the fact that █████ and █████

10    needed to be kept separate, that the

11    reason for her failing could have been

12    identified sooner?

13              MS. JORDAN:  Note my

14         objection to the form of the

15         question.  Calls for speculation.

16         She doesn't know why she was

17         failing.

18              You can answer if you have

19         an answer.

20              THE WITNESS:  Yeah, I don't

21         know.

22    BY MS. LAUGHLIN:

23         Q.    When you had found out from

24    Mr. Nicholson that █████ and █████ --

1  or that ▮▮▮▮ had been sexually

2  assaulted by ▮▮▮▮ in the history class,

3  did you ask him how that could have

4  happened?

5         MS. JORDAN:  Note my

6      objection to the form of the

7      question.

8         You can answer.

9         THE WITNESS:  I didn't.  I

10      assumed that that meant that they

11      were in the same course.

12  BY MS. LAUGHLIN:

13      Q.   Did you find out at some

14  point that they were also not only in the

15  same course, but also assigned seats

16  right next to each other?

17      A.   I don't think that Mr.

18  Nicholson shared that detail with me, no.

19      Q.   Other than in that

20  conversation, did you find out at some

21  point that ▮▮▮▮ and ▮▮▮▮ had been

22  assigned seats next to each other in that

23  class?

24      A.   I believe that I only knew

1  that information from reading the

2  complaint.

3        Q.    After the lawsuit was filed?

4        A.    Yes.

5        Q.    Do you know whether it

6  was -- this is just if you know.  If you

7  don't know, obviously you can't answer.

8              But do you know whether it

9  was typical for teachers at North Penn

10 High School to assign seats to the

11 students?

12       A.    I don't know.

13       Q.    I'm sending you -- or I'm

14 showing you North Penn's Bates Number

15 625, and it's an email October 9th, 2018

16 at 1:05 p.m. from you to Pete Nicholson.

17             Do you see that?

18       A.    Yes.

19       Q.    And it says, Hi, Pete.

20 Lindsey Riggin is ███████ case manager.

21 Thanks, Kate.

22             Do you know why this email

23 was sent or what this email involved?

24       A.    I don't.

1        Q.    Do you know whether this was

2    the same day -- based on my records,

3    ███████  had reported the sexual assault on

4    October 9th.  So if that helps to put

5    things in context for you, do you recall

6    having any conversations with Pete

7    Nicholson about who ████████ case manager

8    was when he told you about ███████ being

9    sexually assaulted?

10       A.    I don't.

11       Q.    What is IEP Plus?

12       A.    That is -- was our former

13   system for being able to develop and

14   house all of our IEPs within the

15   district.

16       Q.    Was it in the beginning of

17   the 2018 school year, in the fall of

18   2018?  Was that the program, IEP Plus?

19       A.    Yes.

20       Q.    When did it change to

21   something different?

22       A.    I believe during the 2019

23   school year.

24       Q.    Do you know why it changed

1  from IEP Plus to the other one?

2      A.   I don't.

3      Q.   Other than you physically

4  crosschecking the student schedules, were

5  you aware of anything else that could

6  have been put in place, in a computer or

7  something like that, that could have

8  prevented ███████ and ███████ from being in

9  the same class?

10     A.   No.

11     Q.   At this point, after the

12 meeting on August 22nd, the requirement

13 that ██████ and ██████ be kept separate

14 was not in ████████ IEP; is that right?

15     A.   Correct.

16     Q.   Why wasn't it?

17     A.   I had not experienced before

18 writing another student's name into a

19 child's IEP, but that wasn't something

20 that we had discussed doing at the

21 meeting.  I don't think that that was

22 anything that any us there thought of.

23 We really kind of were focusing on just

24 documenting her academic needs within

1    there and making sure that she had those

2    courses that she needed to be successful.

3         Q.    At some point, ██████ name

4    did go into ██████ IEP, though; is that

5    correct?

6         A.    Yes.

7         Q.    How did that come about to

8    do that and put those requirements in

9    ██████ IEP?

10        A.    So after she had reported

11   that she was sexually assaulted, we met

12   as an IEP team at North Montco.  And in

13   my conversation with our director, Ann

14   Marie Lucas, who also I believe had

15   consulted with Kyle Somers, mom had

16   requested that we then write his name

17   into her IEP.  So I had checked with our

18   director who checked with Kyle to make

19   sure that that was something we could do.

20             So at that meeting at North

21   Montco, we did include, I think in the

22   present levels, a summary that she was

23   not to come in contact with ██████ ██████

24        Q.    Did you need to check to see

1 whether another student's name could be

2 written in the IEP of ▮▮▮▮▮▮

3      A.    For me, that was just

4 something that I hadn't experienced

5 before, and I don't know if our director

6 had experienced that.  So I think when

7 mom made that request, we were just kind

8 of checking that to ensure that we were

9 able to include that.

10      Q.    When including this

11 information in ▮▮▮▮▮▮ IEP, was that so,

12 like, teachers and other people, anyone

13 who had access to ▮▮▮▮▮ IEP, would be

14 aware of the situation?

15      A.    Yes, anybody who would be

16 able to read her IEP would see that.

17      Q.    And as far as -- never mind.

18 Strike that.

19      Did ▮▮▮▮▮ mom explain --

20 did Mrs. ▮▮▮▮▮▮▮ explain why she

21 wanted it in the IEP now?

22      A.    I don't remember that she

23 did.

24      Q.    Do you know who had access

1   to be able to make scheduling changes?  I

2   know you said that that wasn't something

3   on your level that you were able to do as

4   the supervisor of special education.

5               Do you know who did have

6   that ability to make schedule changes for

7   students at North Penn High School?

8          A.    I believe the building

9   principal and the assistant principals of

10  the home office, and I believe the

11  counselors could make scheduling changes

12  as well.

13         Q.    When you say "counselors,"

14  who are you referring to?

15         A.    The guidance counselors that

16  are assigned to a home office.

17         Q.    Did you -- and those are

18  guidance counselors for, like, the whole

19  student body?

20         A.    Yes.

21         Q.    But then I assume because it

22  was a large student body, they'd be

23  separated by, like, last name as well?

24         A.    Yes.  So typically there's

1   two assistant principals per home office

2   and then two counselors, and they're

3   divided in that exact way, by last name.

4        Q.    Okay.  Did you ever find out

5   who was the one who made this schedule

6   change or how the schedule change

7   happened here?

8        A.    I don't know for sure.  I

9   believe that Dr. Bauer was able to

10  confirm the date that the schedule change

11  happened, but I don't remember exactly

12  that date.

13       Q.    Do you recall whether it was

14  during the add/drop period or, like, in

15  context of when other things happened?

16       A.    I believe it was before

17  school started.

18       Q.    But after you had checked

19  the schedules on the --

20       A.    Yes.

21       Q.    How did you find that out?

22       A.    I believe Dr. Bauer shared

23  that with me.  I think when I actually

24  talked with him after the claim was

1  public and printed in the paper.

2        Q.    Okay.  So it wasn't, like,

3  during your in-person meeting with him?

4        A.    No.  At that time, it wasn't

5  known.

6        Q.    Okay.  So when you had that

7  conversation, the call with Dr. Bauer

8  after you had read about the lawsuit that

9  was filed, did he just share that

10  information, like, to you out of the

11  blue, or did you ask him, you know, how

12  did this happen?

13            MS. JORDAN:  Note my

14        objection to the form of the

15        question.

16            You can answer.

17            THE WITNESS:  No.  He

18        just -- he shared that information

19        with me, I think, knowing that

20        that was my part in this larger

21        case, and that was really just the

22        extent of kind of what he shared

23        with me in that phone call.

24  BY MS. LAUGHLIN:

1      Q.    Okay.  Was he -- do you know

2   whether he was able to find out who was

3   the one who made the change?

4      A.    I don't.

5      Q.    What about why the change

6   was made?  Was there any information

7   given to you about that?

8      A.    No.

9      Q.    What about whether it was

10  ██████  schedule or ██████  schedule

11  that had changed?

12     A.    I don't remember him sharing

13  that.

14     Q.    Do you recall exchanging

15  emails with -- regarding this scheduling

16  software to get the alert in ██████

17  profile?

18     A.    Yes.

19     Q.    How did that come about for

20  you to reach out to the -- to ask

21  questions about getting an alert in

22  ██████  profile?

23     A.    After she had reported that

24  she was sexually assaulted and I was

1    talking, kind of conferring with our

2    current director of special education to

3    make sure that we really looked at what

4    additional supports we would put in place

5    for her, that was one of her

6    recommendations, and I believe that

7    required contacting a tech person at the

8    district level rather than building

9    level.

10         Q.    And that was Dr. Lucas you

11   had that conversation with --

12         A.    Yes.

13         Q.    -- that you're referring to?

14               Is there other suggestions

15   that Dr. Lucas made to you other than

16   getting an alert put in ███████ profile?

17         A.    She had advised printing

18   just a note page that could be placed in

19   her cumulative folder that outlined that

20   this is a student that she could not be

21   in contact with.

22         Q.    And when you say her

23   cumulative file, what is a cumulative

24   file for a student?

1    A.    Typically, that's, like, a
2  paper-based file that follows a student
3  through, you know, their start in the
4  district until they graduate, and it
5  houses copies of their IEPs, their report
6  cards.  Really that's the -- any medical
7  information, any legal documents, like,
8  in terms of who their guardian is, that
9  type of information.
10    Q.    And that's kept in a paper
11 file?
12    A.    Yes.
13    Q.    Like, so it's not in, like,
14 a computer system or something like that,
15 then; is that right?
16    A.    I don't know.
17    Q.    Where are the cumulative
18 files kept at North Penn High School?
19    A.    There is an office that has
20 filing cabinets right near the main
21 office where Pete Nicholson's office is,
22 and that is where the cumulative files
23 are kept.
24    Q.    Who has access to the

1  cumulative files at North Penn High

2  School?

3        A.    I don't know.  I do know

4  that teachers can request access, but I

5  believe the door is typically locked or

6  it's secured in some way.

7        Q.    Okay.  Do you know why -- is

8  there a different type of file that's

9  kept electronically on a student?

10        A.    I don't know.  I do know in

11  our student information system, you can

12  find contact information; there's

13  oftentimes medical information; there are

14  alerts on a student's page that will show

15  if they have an IEP or a 504, but I don't

16  know if, like, their report cards are

17  included in there or any other legal

18  documents that pertain to the student.

19        Q.    Why did Dr. Lucas suggest

20  that a note page be put in ████████

21  cumulative file about keeping them

22  separate, ██████ and ████████

23        A.    I believe because, knowing

24  that we had the knowledge that this had

1    been reported, just making sure that it

2    was printed and included with all of her

3    other records.

4         Q.    Meaning that -- when you say

5    because you had the knowledge, what do

6    you mean?

7         A.    That she had reported that

8    she was sexually assaulted in early

9    October.

10         So the purpose of that page

11    was really kind of printing it out.  It

12    was in writing that these students could

13    not come in contact with each other, and

14    that was included in her cumulative

15    folder.

16         Q.    But other than that note

17    being put in the cumulative folder, was

18    anything else to happen with that

19    document?

20         A.    No, not that I remember.

21         Q.    Am I correct in saying that

22    for anybody to know that that note was in

23    the cumulative folder, though, they'd

24    have to get access to the cumulative file

1  and then look through the cumulative file

2  and find that piece of paper in there?

3       A.    Yes.

4       Q.    Did Dr. Lucas explain or did

5  you have an understanding as to how --

6  what the purpose of having that in the

7  cumulative file was if it just stays in a

8  filing cabinet?

9       A.    I believe the reasoning was

10  should ████ ever decide that she wanted

11  to return to North Penn High School, we

12  would at least have that record within

13  her cumulative file.

14      Q.    If she were to return to

15  North Penn High School, would that

16  cumulative file be something that was

17  reviewed upon her coming back, if you

18  know?

19      A.    I don't know.

20      Q.    I know that you discussed

21  putting an alert in for ████ profile

22  or schedule if someone was going to

23  change ████ schedule.  Was it

24  discussed about an alert being put into

1    ███████ profile?

2         A.    It was not.

3         Q.    Do you know why?

4         A.    I don't know.

5         Q.    Would you agree with me that

6    if there was only an alert in ████████

7    file and not in ██████'s, that if

8    ██████████ schedule got changed, no one

9    would still be notified that they weren't

10   supposed to be together?  Is that right?

11        A.    Yes.

12        Q.    Did you -- have you

13   discussed that with anybody, any of the

14   district employees or anything about that

15   possibility?

16        A.    No.

17        Q.    Is this the first time that

18   that's been brought to your attention?

19        A.    It's something that I have

20   thought of since this case has happened,

21   but it's not something that I've actively

22   discussed with anybody in our district.

23        Q.    When you thought of that

24   happening, did you talk to anybody about

1    it or think of going to somebody about

2    it:  Hey, this could be an issue?

3            A.    No.

4            Q.    Why not?

5            A.    I really -- it's honestly

6    something that I thought of more recently

7    in just knowing that I had this

8    deposition coming up and this case has

9    been on my mind and kind of thinking back

10   to the whole scheduling piece.

11            But, no, I have not had an

12   opportunity to talk about that with

13   anybody.

14            Q.    Other than having a

15   conversation with Pete Nicholson, the

16   conversation with Mrs. ███████ and

17   then the meeting you had with Todd Bauer,

18   were you a part of any other parts of the

19   investigation into what happened and --

20   like, other than what you've already told

21   me?

22            A.    No.

23            Q.    I'm going to show you

24   another couple pages and ask you some

1    questions about them.

2             The emails that we were

3    discussing that you had with the district

4    about adding the alert in the high

5    school, you said that that had to go

6    through the -- like, at the district

7    level, not at the North Penn level,

8    meaning North Penn High School level.

9        A.    Yes.

10       Q.    How did you find that out

11   that it had to be at a district level

12   situation, that a high school couldn't do

13   that?

14       A.    I don't know that the high

15   school couldn't do that, but I believe in

16   my conversation with Dr. Lucas, she had

17   shared that either Kimberly Rantz, the

18   person that I sent this email to, would

19   be the person to go to, or she was going

20   to be contacting our director of

21   technology to find out who we would need

22   to work with to make sure that this could

23   happen.

24       Q.    Did Dr. Lucas -- I know that

1   you mentioned that -- I think that you

2   had told me that Dr. Lucas had said that

3   at a different district, she had done

4   something like this, putting an alert in

5   a student's file; is that correct?

6          A.    Yes.  I believe that that's

7   where she had this idea.

8          Q.    Okay.  And do you know

9   whether she had ever done this prior --

10  at North Penn School District prior to

11  doing this for ████    now, meaning in

12  October of 2018?

13         A.    I don't know.

14         Q.    I'm going over the emails

15  that you had had with Ms. Rantz and

16  see -- do you know whether there was any

17  other communications that you had with

18  Ms. Rantz or anybody else involving tech

19  to get something put into ██████

20  profile?

21         A.    I don't remember, but I

22  believe that it was just Ms. Rantz.

23         Q.    Okay.  Do you know -- you

24  had mentioned that with this alert, that

1  if somebody just clicked off this alert,

2  a schedule change could be made anyway.

3  Do you remember telling me that?

4      A.    Yes.

5      Q.    Did you bring that up to

6  anybody about, you know, this -- what

7  could happen if somebody just clicked

8  off?

9      A.    I believe when I spoke with

10 Dr. Lucas, that was something we had

11 discussed, but this seems to be the best

12 option for us to have some type of

13 messaging within that system.

14     Q.    Do you know whether there

15 was an ability to prevent a schedule

16 change for -- sorry.  That's my question.

17     A.    I don't know.

18     Q.    I'm showing you Bates Number

19 658 from the North Penn records.  I'm

20 sorry.  This is actually -- I'm actually

21 jumping over to the records that -- in

22 the Doe production, Page 658.

23          Are these your notes that

24 you had written down?

1    A.    Yes.

2    Q.    Okay.  And the first part is

3    about the apology call that you had made

4    to Mrs. ████████████  right?

5    A.    Yes.

6    Q.    And you told her -- it says

7    in this conversation that you shared, In

8    no way could I understand what their

9    family is going through, and then I

10   apologized greatly that this situation

11   came to be.

12         Do you see that?

13   A.    Yes.

14   Q.    When you say apologize

15   greatly that that situation came to be,

16   what are you referring to?

17   A.    That ████████ reported that

18   she was sexually assaulted and that it

19   was because she was in the same classroom

20   as ██████████

21   Q.    Okay.  When it says right

22   below there, 10/11/18, Spoke with Ann

23   Marie Lucas, director of special

24   education, to ensure that she was aware

1  of this situation, is that the call that

2  you had made to Dr. Lucas?

3      A.    That was to make sure that

4  she was aware that a student had reported

5  that they were sexually assaulted.

6      Q.    Was that your responsibility

7  to call Dr. Lucas about that?

8      A.    No, nobody shared with me

9  that that was my responsibility.  But she

10  was my direct supervisor, so I felt it

11  necessary to contact her.

12      Q.    Okay.  Because you were kind

13  of almost shadowing under her while --

14  before she transitioned to the elementary

15  school role?

16      A.    This is our director of

17  special education, so she was really the

18  point person for all of the special

19  education supervisors.

20      Q.    Okay.  Prior to this call

21  with Dr. Lucas, had you ever had any

22  other conversations with Dr. Lucas about

23  ████████  ███████████████

24      A.    No.

1    Q.    In the next -- or I guess

2  two down, it says that you spoke with

3  Dawn LeBlanc regarding ▓▓▓▓ situation

4  -- or sorry -- transition to full-time

5  PYAP.

6         What does PYAP stand for?

7    A.    I don't recall.  I do know

8  that at North Penn, when you're talking

9  about a student that is at the tech

10  school full-time, they're called PYAP.  I

11  don't remember exactly what those letters

12  stand for.

13    Q.    Okay.  And then you said

14  that you shared ideas for the IEP team to

15  consider regarding counseling support for

16  ▓▓▓▓ while at North Montco.

17         And then it says, Currently,

18  she receives group therapy first period

19  six times per cycle.

20         When it says six times per

21  cycle, what does that mean?

22    A.    So the way that the high

23  school operates is based on letter days,

24  and there are six days within a cycle.

1    So obviously there's five days within a

2    week.  You might have A through E, and

3    then the next day would be an F day, and

4    it continues that rotation.

5              So ████████ was currently

6    enrolled in a group therapy course that

7    met with a counselor each morning during

8    first period, and that happened every day

9    of the cycle.

10        Q.   Okay.  This says, This is

11   something she could continue to receive

12   before going over to the tech school.

13   However, Mrs. ████████████ didn't want

14   ████████ to enter North Penn High School

15   anymore.

16        A.   Right.

17        Q.   And then it says, Ms.

18   LeBlanc -- or Dr. LeBlanc shared that if

19   we were to provide counseling to ████████

20   at North Montco, a room could be made

21   available for this service.

22              Do you recall having that

23   conversation with Dawn LeBlanc?

24        A.   I do.

1    Q.    And what was the outcome of

2  that conversation?  Was there a plan

3  made?

4    A.    So we know that we were

5  coming together as an IEP team.  I can't

6  remember the exact date that we had a

7  meeting scheduled, but I believe it was

8  within that same week.  And we were going

9  to discuss the counseling support further

10 so that we could include Mrs. ███████

11 in that conversation too.

12   Q.    Okay.  Now, at North Penn

13 High School, this was group therapy that

14 ██████ was receiving; right?

15   A.    Correct.

16   Q.    Was she going to be able to

17 receive group therapy at North Montco as

18 well?

19   A.    Her therapy that would have

20 happened at North Montco would have been

21 individual.  If she wanted to participate

22 in the group therapy, that would have

23 been offered during that first period at

24 the high school just given the students

1   that required that type of support.

2           But, you know, I kind of

3   knew that we needed to have a Plan B

4   because I knew that Mrs. ███████ did

5   not want her to return to the high

6   school.

7       Q.    So to be clear, that group

8   therapy was not something that ████ was

9   going to be able to get access to at

10  North Montco; is that correct?

11      A.    Correct.

12      Q.    Is there anything else that

13  you recall about that conversation with

14  Dawn LeBlanc?

15      A.    No.

16      Q.    I'm showing you Doe Bates

17  Number 1007.  These are notes of Todd

18  Bauer.

19          Have you seen these before?

20      A.    No.

21      Q.    I just want to ask you some

22  questions about what he wrote, and we'll

23  go over that.

24          It says, Todd explained --

1    Todd Bauer explained his understanding of

2    how the students might have ended up in

3    the same class after safeguards and

4    measures to check the schedule to keep --

5    it says the apart -- but them apart were

6    put into place.  Given Internet forensic

7    evidence we completed on 8/9, had 0

8    concurrent classes displaying in our

9    systems online.  It says, This would

10   validate that Kate Small did check and

11   they were kept apart when original

12   scheduling occurred.

13           Do you know what the

14   significance was of August 9th?

15      A.   I don't, no.

16      Q.   Do you know when students'

17   scheduling gets, like, set up in the

18   system?

19      A.   I don't.

20      Q.   Do you know what Internet

21   forensic evidence Dr. Bauer is referring

22   to?

23      A.   I don't.

24      Q.   It says, This would validate

1  that Kate Small did check and they were

2  kept apart when original scheduling

3  occurred.  Then on 8/24, the schedules

4  did coincide during a drop/add period.

5          Is that consistent with your

6  understanding after you learned from Mr.

7  Bauer what had happened?

8      A.    Yes.

9      Q.    It says, Students must have

10  requested changes that the scheduler at

11  the time did not know were not to happen.

12          Do you know what that's

13  about?

14      A.    I don't.

15      Q.    It says, "the scheduler at

16  the time."  Do you know whether that's

17  referring to somebody working in the

18  scheduling office at North Penn High

19  School?

20      A.    I believe so.

21      Q.    Did you have any

22  conversations with Dr. Bauer about that?

23      A.    No.

24      Q.    Why do you believe that that

1  is talking about the scheduler being in

2  the scheduling office?

3          A.    I would just guess that that

4  would kind of be the point person for

5  who's doing these schedule changes.

6                But I guess that's not

7  necessarily true.  It could be the

8  assistant principal; it could be somebody

9  else who had the ability -- the building

10 principal, somebody who had the ability

11 to change the schedule.

12         Q.    But would you agree with me

13 that the principal and the assistant

14 principal were aware that they shouldn't

15 be in the same class together?  Is that

16 correct?

17         A.    Yes.

18         Q.    Okay.  Here it says, Todd

19 shared there's a process in place, but it

20 failed ▮▮▮▮▮▮▮

21                Do you know what process was

22 in place?

23         A.    I don't know what he's

24 referring to there.

1    Q.    Do you know whether there

2    was a process in place at the district to

3    keep two students apart from each other?

4    A.    I don't.

5    Q.    That was not something you

6    ever, like, received training on or

7    anybody told you about?

8    A.    No.

9    Q.    On the following page, on

10   1008 -- just give me one second.  I need

11   to find the part on the page.

12        Right here towards the

13   bottom.  I'm sorry.  I'll start here.

14        It says, Kate did look at

15   the schedules, but then a change occurred

16   in the system after.  Someone, not a case

17   manager or principal, made the change.

18   Not an excuse, but I understand it

19   happened in error.  It says, Kate made

20   changes on paper only and communicated to

21   certain team members including principal.

22        Do you know what changes you

23   made on paper only?

24   A.    No.

1    Q.    You're not sure what he's

2  referring to there?

3        A.    No.

4        Q.    Was there anything that you

5  had, like, written down on paper at the

6  time?

7        A.    No.  All of my notes from

8  that meeting were digital on that Google

9  document.  That could be referring to

10  Megan who did take a note and submitted a

11  schedule change to the scheduling office.

12  That might be what that's referring to.

13        Q.    Okay.  But as far as you

14  know, the scheduling change that was

15  made, that was just so ████ could get

16  the emotional supports that were needed;

17  right?

18        A.    Yes.

19        Q.    And the emotional support

20  change that was being made, that was a

21  special education-type class; is that

22  correct?

23        A.    Yes.  It was a special

24  education course.

1        Q.    Okay.  So the general

2 education students would not have been a

3 part of that change; is that correct?

4        A.    Correct.

5        Q.    When you had emailed Pete

6 Nicholson and Kyle Hassler to let them

7 know that an alert had been added into

8 e-school for ███████ why did you notify

9 the two of them?

10        A.    I think because that they

11 were the two people that I had kind of

12 consulted on this from the beginning, so

13 I wanted them to know -- Pete, of course,

14 is the building principal, and Kyle as

15 ███████ direct home office assistant

16 principal -- that if there was a time

17 that there was going to be discussion

18 about her returning to North Penn High

19 School, we did have that alert in the

20 system now.

21        Q.    And what did they say to

22 you, if anything?

23        A.    I don't remember.

24        Q.    Do you recall whether they

1    -- either one of them had responded to

2    you?

3         A.    I don't.

4         Q.    You said that you had been

5    notified that Mrs. ████████ received a

6    request for records, for ██████

7    records?

8         A.    Yes.

9         Q.    How did you find out about

10   that?

11        A.    I believe one of the

12   secretaries from -- one of our special

13   education secretaries emailed me to let

14   me know that that request had been made,

15   I think.  I'm pretty certain.

16        Q.    Okay.  When you got that

17   request, what did you do?

18        A.    I connected again with Ann

19   Marie Lucas about the process that we

20   take to be able to get those records to a

21   parent.

22        Q.    And what do you recall from

23   that discussion with Dr. Lucas?  What did

24   you talk about?

1       A.    I remember her sharing that

2   there's typically a small fee that

3   parents pay to be able to obtain those

4   records, and that I could work with the

5   secretary who supported me and the

6   buildings that I worked in to be able to

7   pull and gather those materials, and then

8   there would also be a thumb drive that

9   those documents would be saved to as

10  well.

11      Q.    Did you have any -- when you

12  received the request that Mrs.

13  ██████████  was requesting  ██████████  whole

14  file, what was your reaction?

15      A.    I wasn't surprised because I

16  knew that she was upset about, of course,

17  you know, the situation that had

18  happened.  So it wasn't surprising to me,

19  and I just kind of went through the

20  motions of what we would need to do to

21  gather those documents for her.

22      Q.    Did you talk to anybody,

23  whether it was Dr. Lucas or anybody else,

24  about your reaction to it, about how you

1    weren't surprised and what this was going

2    to look like in gathering these

3    documents?

4              MS. JORDAN:  Note my

5         objection to the form of the

6         question.

7              You can answer.

8              THE WITNESS:  At this time,

9         I believe we were just in the

10        process of gathering her special

11        education documents from her time

12        at North Penn.

13   BY MS. LAUGHLIN:

14        Q.   And was that something that

15   you were tasked to do?

16        A.   Yes.

17        Q.   And was it just -- what you

18   were in charge of doing, was that just

19   limited to special education documents at

20   North Penn High School?

21        A.   No.  That was her

22   documentation from the time she began

23   receiving special education services.

24        Q.   So all the way from

1  elementary school?

2      A.    Yes.

3      Q.    And that was your

4  responsibility to get those documents

5  from elementary school all the way up

6  through high school as far as the

7  education -- or sorry -- special

8  education file went?

9      A.    That became the secretary's

10 responsibility.  She has access to the

11 system, so she was able to pull all of

12 that and make photocopies and load all of

13 that onto a thumb drive.

14     Q.    What about in terms of

15 emails and stuff that had been exchanged

16 regarding ███████  Was that also part of

17 your responsibility?

18     A.    So that came at a second

19 request which came to our cabinet level

20 administrators, a request from a legal

21 team, I believe, requesting all of

22 ███████  records.  So at that point, we

23 moved through the process of, like, I

24 sent out emails sharing that there was a

1  litigation hold and that any teacher,

2  counselor, administrator that had worked

3  with ███ needed to gather their

4  records and that they would be collected

5  as part of this process.

6      Q.    How did you know that you

7  were the one to do that?

8      A.    Dr. Lucas, I believe, asked

9  me to send out those emails.

10     Q.    So would you agree with me

11 that you were in charge of, like,

12 compiling -- like, sending out the emails

13 letting people know what they needed to

14 compile and then collecting all of the

15 documentation?

16     A.    Yes.

17         MS. JORDAN:  Note my

18         objection to the form of the

19         question.

20 BY MS. LAUGHLIN:

21     Q.    If people had responded to

22 you that, like, things had been deleted,

23 what did you do about that?

24     A.    I don't remember that

1  anybody had responded that, but I was not

2  responsible -- I was responsible for

3  gathering documentation that people had

4  in terms of, like, her school work, you

5  know, anything that would have been

6  related to ███████  There was a separate

7  process for collecting all of the emails.

8  I was not involved in that process.

9          So I really went to the

10  buildings where ███████ had formerly been

11  a student, stopped into the main office,

12  and picked up big file folders of things

13  that people had from over the years.  The

14  technology piece was handled separately.

15      Q.   Okay.  The letter that you

16  had made to -- added to the cumulative

17  file that Dr. Lucas had spoken to you

18  about from October 18th, 2018, do you

19  recall whether any revisions were made to

20  that letter before it became in final

21  form to place into the file?

22      A.   I don't.  I do know that I

23  shared that with Dr. Lucas and with Pete

24  Nicholson as well.  I don't remember if

1 there were revisions that were made.

2      Q.    Okay.   Why did you share it

3 with Mr. Nicholson and Mr. Bauer?

4      A.    It was Mr. Nicholson and Dr.

5 Lucas, and I believe --

6      Q.    I'm sorry.

7      A.    It's okay.

8      I believe that I just shared

9 it with them so that they knew that this

10 was going to be printed and placed in her

11 cumulative folder.

12      Q.    And I'm going to show you

13 the letter to make sure we're talking

14 about the same thing.

15      This is Doe production

16 Number 366.  Is this the letter you're

17 referring to?

18      A.    Yes.

19      Q.    Is this something that you

20 typed up and drafted?

21      A.    Yes.

22      Q.    When you sent it to Pete

23 Nicholson and Dr. Lucas, how did you send

24 that to them?  Was it, like, an email

1  Word document?

2       A.    I don't remember.

3       Q.    And what did -- what did

4  either of them say in return before it

5  was placed in the file?

6       A.    I remember Pete saying this

7  looks good, and it was printed and then

8  placed in her file.

9       Q.    Okay.

10      A.    He may have even seen a

11 paper copy before this was printed and

12 placed in her file.

13      Q.    Was a letter like this also

14 placed in ███████ file?

15      A.    No.

16      Q.    Why not?

17      A.    That was not something that

18 was ever discussed.  I think our concern

19 at this point in time was making sure

20 that we had all of this documented in

21 ███████ records.

22      Q.    Did it ever come up with Dr.

23 Lucas or Mr. Nicholson about putting

24 anything in ███████ file after this

1    incident?

2         A.    No, not that I remember.

3         Q.    I'm going to show you a

4    document from the North Penn production.

5    I'm going to ask you some questions about

6    it.  This is the North Penn Bates Number

7    590.  This is an email from Wendy

8    ████████████ to you and Mr. Nicholson.

9              Do you recall receiving this

10   email?

11        A.    Yes.

12        Q.    And this was dated October

13   -- I'm sorry -- October 17th, 2018.  So

14   this would have been after you had the

15   phone call with Mrs. ████████████ and

16   after --

17        A.    Yes.

18        Q.    -- you were aware that

19   ██████ had been sexually assaulted by

20   ██████ in 10th grade; correct?

21        A.    Yes.

22        Q.    Okay.  I want to go to the

23   third paragraph.  And it says, I

24   appreciate your apologies, offers of

1  support, and assurances that you would

2  get to the bottom of how ████ and

3  ████ ended up in the same class

4  together despite our instructions,

5  meeting with the NPHS staff, and IEP

6  meetings with North Montco.

7       The "offers of support," do

8  you know what she's referring to there?

9       A.   I don't.

10      Q.   Do you know whether -- did

11  Pete Nicholson also have a telephone

12  conversation with Mrs. ████████

13      A.   He did.

14      Q.   Okay.  And as far as you

15  know, that's how he knew to call you to

16  ask you questions about what had

17  happened?

18      A.   Yes.

19      Q.   Do you recall assuring Mrs.

20  ████████ that you would get to the

21  bottom of how ████ and ████ ended up

22  in the same class together?

23      A.    I do know that I shared with

24  her that that was going to be looked

1    into.

2        Q.    Do you know whether Pete

3    Nicholson had also apologized to Mrs.

4    ███████████

5        A.    I do know that he called

6    her, but I don't know what the context of

7    their conversation was.

8        Q.    Now, after the meeting on

9    August 22nd, 2018, you were aware that

10    ██████ and ██████ couldn't be in contact

11    with each other; correct?

12        A.    Yes.

13        Q.    And that's because there was

14    an incident where ██████ was hurt by

15    ██████ in some capacity prior to that

16    time; correct?

17        A.    Yes.

18        Q.    And the purpose of them not

19    being in contact was so ██████ could be

20    kept safe from ██████ correct?

21        A.    Yes.

22        Q.    Pete Nicholson was aware of

23    those things as well; correct?

24        A.    Yes.

1    Q.    You worked with Ms. Matje,

2    Ms. Schoppe, and Mr. Nicholson and the

3    assistant principal, Kyle Hassler, to put

4    a safety plan in place to prevent ████

5    and ████ from being in contact;

6    correct?

7    A.    That -- we did develop a

8    safety plan for her, but that was after

9    the assault had happened in October, and

10   that was to support her at the tech

11   school to ensure that this did not happen

12   again.

13   Q.    Okay.  Let me rephrase,

14   then.

15          You worked with those people

16   I just mentioned to put a plan in place

17   to prevent them from being in contact

18   with each other; correct?

19   A.    Yes.

20   Q.    The thing that you did

21   personally was you checked the schedules

22   around August 23rd or -- I think August

23   23rd; correct?

24   A.    Yes.

1        Q.    And that's the way you

2    described it, by pulling up the one

3    schedule, printing out the other, and

4    checking to see if there were any classes

5    that were the same?

6        A.    Correct.

7        Q.    You didn't tell any of

8    ████████  teachers about what was going

9    on; correct?

10       A.    Correct.

11       Q.    And you didn't tell her case

12   supervisor; is that true too?

13       A.    Correct.

14       Q.    You didn't tell the

15   scheduling office at all about what was

16   going on?

17       A.    Correct.

18       Q.    You would agree with me that

19   ██████  was then put in a social studies

20   class with ███████  right?

21            MS. JORDAN:  Note my

22        objection to the form of the

23        question.

24   BY MS. LAUGHLIN:

1    Q.    They were placed in the same

2  social studies class?

3    A.    Yes.  At some point in time,

4  they were in the same social studies

5  class.  Yes.

6    Q.    At the beginning of the

7  school year; right?

8    A.    I believe so, but I did not

9  become aware of that until after her --

10  she reported the sexual assault in

11  October.

12    Q.    Okay.  And in that social

13  studies class that they were in together,

14  they actually had assigned seats next to

15  each other; right?

16    A.    I only knew that information

17  from reading the lawsuit.

18    Q.    Okay.  Would you agree with

19  me that them being in the same social

20  studies class, that was not agreed to, or

21  something that was not agreed to at that

22  8/22/18 meeting?  Correct?

23        MS. JORDAN:  Note my

24      objection to the form of the

1    question.

2              You can answer.

3              THE WITNESS:  Yes.

4    BY MS. LAUGHLIN:

5         Q.   And then after they were put

6    in the same social studies class at North

7    Penn High School, ████ was then

8    sexually assaulted by ████ in the

9    classroom; is that true?

10             MS. JORDAN:  Note my

11             objection to the form of the

12             question.  You're asking her to

13             speculate.  She has no firsthand

14             knowledge.

15   BY MS. LAUGHLIN:

16        Q.   Well, do you know?  Do you

17   know if she was sexually assaulted by

18   ████ in the classroom?

19             MS. JORDAN:  Note my

20             objection.  It's alleged she was.

21             That's all she knows.

22   BY MS. LAUGHLIN:

23        Q.   Okay.  Were you aware that

24   it was alleged that she was sexually

1  assaulted by ▮▮▮▮ in the classroom?

2       A.    Yes.

3       Q.    And that's what you and the

4  team on 8/22 were trying to prevent; is

5  that right?

6            MS. JORDAN:  Note my

7       objection to the form of the

8       question.

9  BY MS. LAUGHLIN:

10      Q.    Her being sexually assaulted

11 by ▮▮▮▮

12            MS. JORDAN:  Note my

13      objection to the form of the

14      question.

15            You can answer.

16            THE WITNESS:  You know, at

17      that meeting, we were preventing

18      these two students -- attempting

19      to prevent these two students from

20      coming in contact with one

21      another.

22 BY MS. LAUGHLIN:

23      Q.    And that was not prevented;

24 is that right?

1        A.     Correct.

2        Q.     Were you involved at all in

3 the investigation into what happened in

4 Mr. Borgmann's social studies class?

5        A.     No.

6        Q.     Did you have any involvement

7 or discussions with Mr. Nicholson or Mr.

8 Hassler about interviewing students?

9        A.     No.

10        Q.     I'm going to show you Doe

11 production 664 and ask you a question

12 about it.

13        Where it says October 23rd,

14 2018 here, it says, Met with Lindsey

15 Riggin to answer follow-up questions

16 regarding how to enter specific

17 components into ██████ IEP.

18        What did this involve?

19        A.     I believe she had questions

20 regarding how we fill in -- like, now

21 that -- so ██████ was still going to be a

22 North Penn School District student, but

23 she would not be in the building at all,

24 how we would kind of logistically outline

1   that within the IEP.

2          Q.    Was that something that you

3   had dealt with before?

4          A.    No.

5          Q.    You had mentioned earlier

6   about having an IEP meeting after 

7   was going to be transferring to North

8   Montco.  Was that the October 19th, 2018

9   IEP meeting?

10         A.    Yes.

11         Q.    And just for the record, I'm

12  referring to the North Penn production

13  Bates Number 529.

14               Do you know whose notes

15  these are?

16         A.    Kyle Hassler was our note

17  taker at that meeting.

18         Q.    So he's, like, at the

19  meeting typing on a laptop or something

20  like that?

21         A.    Yes.

22         Q.    Did you get to review these

23  notes at all to see if they were accurate

24  or if you agreed with what he's

1    documenting here?

2         A.    I did not.

3         Q.    What do you remember, other

4    than what you've already told us, about

5    this IEP meeting for ███████

6         A.    I remember when we started

7    the meeting, Mrs. ████████████ was there,

8    but ████████ was not present.  Mrs.

9    ████████████ wanted to address the team

10   before ███████ was brought into the

11   conversation.

12            And we opened the meeting by

13   again apologizing that we had to be in

14   this situation.  And I kind of shared

15   with the team that I wanted -- you know,

16   we weren't going to be able to fix what

17   had happened in this meeting, but I

18   wanted to focus our conversation around

19   reviewing supports that we could put in

20   place to ensure that ███████ had a smooth

21   transition to North Montco and that she

22   would have options to have her needs met

23   within that building.

24            Q.    And this is you talking at

1  the meeting when you're describing for me

2  what was just said?

3       A.    Yes.

4       Q.    Okay.  When you said you

5  apologized, what -- do you remember what

6  you said in this meeting to everybody?

7       A.    I remember just apologizing

8  that we had to be in that situation and

9  that ███ was no longer going to be

10  attending North Penn High School.  But it

11  was very brief, and then, you know, I

12  kind of set the stage for us to really

13  talk about the supports that she would

14  need for continued success at North

15  Montco.

16       Q.    Okay.  And other than Kyle

17  taking down notes on his laptop, do you

18  know whether this meeting was recorded at

19  all?

20       A.    I had a paper copy of the

21  IEP that I believe I was just taking

22  handwritten notes right on the document.

23       Q.    Okay.  I mean, was there

24  any, like, audio recording or video

1 recording of what was being said in the
2 room?
3     A.    No.
4     Q.    In any of the other
5 conversations we discussed, whether it
6 was the 8/22 meeting or the conversations
7 you had with Pete Nicholson or anybody
8 else, do you know whether any of those
9 conversations were recorded in any way?
10     A.    No.
11     Q.    Even though ███ at this
12 point was going to be going to North
13 Montco full-time, why is -- why was,
14 like, the North Penn High School -- like,
15 Kyle Hassler, why was he still involved
16 in this meeting?
17     A.    So part of what we wanted to
18 discuss was how we could provide
19 resources to North Montco to be able to
20 support ███ there.  So part of that
21 conversation was providing a counselor
22 who was affiliated with North Penn High
23 School to come to North Montco to provide
24 support for ███ there and therapy at

1  that building.  And we discussed, you

2  know, some other options that we could

3  consider that would require North Penn to

4  provide those resources to North Montco.

5      Q.    Even though ▆▆▆ was now a

6  full-time student at North Montco

7  Technical School, was she still, like,

8  under the supervision of North Penn

9  School District?

10     A.    I believe she was still

11 considered a registered student within

12 the North Penn School District.  So

13 Lindsey Riggin, for example, she attended

14 this meeting as the North Penn School

15 District case manager, and then she also

16 worked very closely with one of the

17 teachers at North Montco to communicate

18 and to keep everybody on the same page

19 regarding ▆▆▆ needs and what was

20 going on.

21     Q.    Okay.  At the bottom of this

22 page, it says, ▆▆▆ sabotaged meeting

23 with investigator because she was afraid

24 she won't get support.

1          Do you recall this part of
2   the IEP meeting?
3          A.    I don't.
4          Q.    Did you know at this time in
5   the meeting who the Title IX coordinator
6   was?
7          A.    Yes.  It was Cheryl McHugh,
8   who was our director of human resources.
9          Q.    And was that the Title IX
10  coordinator for the entire North Penn
11  School District?
12         A.    Yes.
13         Q.    In any of your conversations
14  with Mrs. █████████ did you tell her,
15  like, that Mrs. McHugh was the Title IX
16  coordinator?
17         A.    I don't remember.
18         Q.    Do you remember whether
19  there was ever a discussion with any of
20  the district employees that you had
21  spoken to about talking to Mrs. McHugh
22  about what had happened in 10th grade
23  with █████
24         A.    I don't remember.

1    Q.    As the supervisor of special

2  education, do you know whether you had

3  any responsibility to communicate what

4  had happened with ███████ at North Penn

5  High School to the Title IX coordinator?

6    A.    I heard about this incident

7  through Pete.  And while I don't remember

8  Pete telling me that he contacted Cheryl

9  McHugh, I think that I believed that that

10 was likely part of the internal

11 investigation and really looking into

12 what had happened.  But I don't remember

13 him saying that to me specifically, and I

14 did not contact her directly.

15   Q.    Where did you get that

16 understanding?

17   A.    Just, you know, through my

18 conversation about what the next steps

19 would be in terms of the investigation.

20   Q.    But nobody said anything to

21 you specifically about contacting Ms.

22 McHugh or the Title IX coordinator?

23   A.    Not that I remember, no.

24   Q.    I'm going to go to the North

1   Penn 530 and just ask you, when it's

2   talking about KS, do you know is that

3   you, things that you're saying at the

4   meeting?

5        A.    Yes, I believe so.

6        Q.    Okay.  Here it says, Talked

7   about consultation with counselor

8   strategies for teachers.  If need more

9   academic or behavioral support, come back

10  to table to bring in more supports.

11            Do you recall what was

12  discussed at this point in this meeting?

13       A.    I think that may have been

14  regarding counselor support that could be

15  provided to ███████   So we kind of

16  started the conversation saying that we

17  would be able to provide daily counseling

18  to ███████  and I remember Mrs.

19  ███████████  saying that she felt like

20  that was too much at that moment in time.

21            So I believe we agreed on

22  the counselor coming to see ███████ one

23  time per week and then consulting with

24  all of her teachers.

1       Q.    Okay.  To see how she was

2  doing and what she might need going

3  forward?

4       A.    Yes.

5       Q.    At the very top of the page

6  where it says DL, it says, Is it possible

7  to continue class or contact with RS?

8            Do you know who RS is

9  referring to?

10      A.    I don't, no.

11      Q.    Okay.  Here it says -- right

12  before that, it says, Can we add grade

13  monitoring?  And then your response was,

14  It is in the SDI.  We need to relook at

15  it.

16            What is SDI?

17      A.    Specially designed

18  instruction.

19      Q.    Okay.  What are you saying

20  here?  What was the discussion, if you

21  can recall?

22      A.    I believe that, based on

23  those notes, we wanted to talk about

24  looking at a way to specifically monitor

1    ████████  progress and her courses so that

2    we didn't have a situation again where

3    she was failing a course and might not be

4    able to get that credit.

5         Q.   Okay.  It says, IEP team

6    should outline communications between

7    case managers, will have a meeting.

8              What was -- what

9    communications were they going to be

10   outlining?

11        A.   There was a plan for

12   communication between ████████  point

13   person regarding special education at

14   North Montco and Lindsey Riggin who would

15   continue to be her case manager of record

16   at North Penn High School.

17        Q.   Okay.  Then you recall

18   ████████  had joined the meeting at that

19   point?

20        A.   Yes.

21        Q.   Do you recall what, if

22   anything, ████████  had said or contributed

23   to the meeting once she joined?

24        A.   Yes.  So I remember

1    reviewing all of the specially designed

2    instruction and talking to ███████ and

3    asking her if she felt that there was

4    anything missing from her IEP or that we

5    needed to add additional supports to help

6    her to be successful.  She -- one of her

7    requests was that she wanted to have a

8    water bottle that she was able to carry

9    around with her in the building, so that

10   was an easy SDI to add to the document.

11        Q.    Is there anything else you

12   remember other than what you just told

13   us?

14        A.    I remember her

15   participating.  I remember her, you know,

16   acknowledging when people were speaking

17   with her and I remember her demeanor.

18   Just she was overall, you know, positive

19   and was an active member of the meeting.

20        Q.    I know you had conversations

21   with Mrs. ████████████ about what had

22   happened, but did you ever have any

23   conversations with ████████ about what

24   happened to her in 10th grade?

1    A.    I did not.

2    Q.    Do you know whether anybody

3    from North Penn High School had had

4    conversations with ███████ about what had

5    happened?

6    A.    I don't know.

7    Q.    As part of the meeting, you

8    were then discussing about a safety plan

9    being in place.  Do you recall that?

10    A.    Yes.

11    Q.    What do you remember about

12    the implementation of the coming up with

13    a safety plan for ███████

14    A.    I remember that Dawn LeBlanc

15    and I had worked on that plan together

16    with input from other members at North

17    Montco to make sure that we had some

18    strategies to ensure that ███████ and

19    ███████ would not come in contact with one

20    other at North Montco.

21    Q.    Okay.  And do you know why

22    this was something at North Montco that

23    was focused for ███████ to have a safety

24    plan and not ███████

1    A.    I don't.

2              MS. LAUGHLIN:  Why don't we

3         take another five-minute break?

4              THE WITNESS:  Thank you.

5              THE VIDEOGRAPHER:  We're off

6         the record.  The time is 2:09.

7              (Whereupon, a brief recess

8         was held.)

9              THE VIDEOGRAPHER:  We're

10        back on the record.  The time is

11        2:15.

12   BY MS. LAUGHLIN:

13        Q.    Ms. Small, I'm going to

14   share my screen with you for a second.

15        A.    Sure.

16        Q.    And I'm showing you North

17   Penn's Bates production Number 504, and I

18   see there -- this is the IEP, and there's

19   some -- for █████ and there's some

20   handwriting on there with a star, and it

21   says Revision Meeting 10/19/18.

22              Is that your handwriting?

23        A.    It is, yes.

24        Q.    And throughout the course of

1  this IEP, there's other pages with

2  handwriting.  Is that your handwriting as

3  well?

4       A.    Yes.

5       Q.    Okay.  And are you taking

6  these handwritten notes on the IEP during

7  this 10/19 meeting?

8       A.    Yes.

9       Q.    That will then be

10  incorporated into, like, the printed IEP?

11      A.    Yes.

12      Q.    On the Doe production Page

13  664, it says on October 30th, 2018 that

14  you shared the safety plan with Ann Marie

15  Lucas.

16            Do you see that?

17      A.    Yes.

18      Q.    Why did you share the safety

19  plan with her on that date?

20      A.    Since she was my direct

21  supervisor, I wanted her to have a copy

22  of that safety plan that was developed.

23      Q.    At this point, was Dr. Lucas

24  expecting that you were going to be

1  reporting to her with all the updates

2  from what was happening with ██████

3  situation?

4      A.    Typically, our director of

5  special education would become involved

6  in many of our cases when we know that we

7  need another level of eyes to be a part

8  of this.  So Dr. Lucas would kind of look

9  over things that I would share with her.

10  I don't think it was a requirement that I

11  was sharing with her, but I did this to

12  get feedback from her and to make sure

13  that I was on the right track with

14  planning for ██████

15      Q.    Were you part of any

16  discussions about any discipline for

17  ██████ after the 10th grade incident?

18      A.    No.

19      Q.    Were you a part of any

20  discussion about whether ██████ would be

21  removed from North Penn High School

22  following the incident?

23      A.    No.

24      Q.    Was there any discussions

1    that you were a part of trying to

2    accommodate ▮▮▮▮▮ so she would be able

3    to stay at North Penn High School instead

4    of transferring full-time again to the

5    tech school?

6         A.    I believe that through a

7    conversation with Mrs. ▮▮▮▮▮▮▮ which

8    may have been when I initially called her

9    to apologize, we had briefly discussed

10   her staying at North Penn.  But that was

11   not something that Mrs. ▮▮▮▮▮▮ was

12   interested in, so that was not a

13   discussion moving forward.

14        Q.    When you say that you

15   discussed with her the possibility of her

16   staying at North Penn High School, were

17   there certain things that you had, like,

18   offered to put in place for her, or was

19   it just, like, does she want to stay and

20   Mrs. ▮▮▮▮▮ said no?

21        A.    I believe it was just along

22   the lines of does she want to stay, kind

23   of putting that out there.  And then we

24   heard that the answer to that was no.

1    Q.   Okay.  Are you aware of

2    anything with ▮▮▮▮ and his involvement

3    at the high school, like the types of

4    activities he was involved in or anything

5    like that?

6    A.   No.  I did read in the

7    lawsuit that he was a football player,

8    but I did not know that until having read

9    that in the lawsuit.

10   Q.   Okay.  What is your role

11   currently with North Penn School

12   District?

13   A.   I'm currently an

14   instructional coach.  So I do

15   professional development in the district

16   and I support teams of teachers in

17   working with students with disabilities

18   and inclusive settings.

19   Q.   And is that -- do you have a

20   specific school that you're assigned to?

21   A.   No.

22   Q.   It's, like, anywhere within

23   the district?

24   A.   Yes.

1    Q.    When did you start that
2  role?
3    A.    This past school year.
4    Q.    So the 2020 to 2021 school
5  year?
6    A.    Yes.
7    Q.    It's my understanding that
8  following the incident with ████ in
9  October, you were no longer holding the
10 role of supervisor of special education
11 and have been moved back into the
12 classroom; is that correct?
13   A.    Correct.
14   Q.    And that happened November
15 of 2018; is that right?
16   A.    Correct.
17   Q.    Why did -- why at that point
18 were you moved from the role of
19 supervisor back to the classroom?
20   A.    That was something that I
21 had requested, and that was a
22 conversation that I had started before
23 this incident with ████ had happened in
24 October.  I just felt that the job was

1    not a fit for me, so I wanted to return

2    to a teaching role.

3         Q.    When you said the job wasn't

4    a fit for you, what do you mean?

5         A.    I just missed my ability to

6    work directly with students.

7         Q.    Did you recognize that you

8    were having any kind of issues with the

9    role, like the administration role that

10   you were in?

11        A.    No.

12        Q.    And you said that had

13   started prior to October, you having that

14   conversation.

15             Who were you having the

16   conversation with?

17        A.    Dr. Rufo, who was our

18   assistant superintendent.

19        Q.    When did you first have

20   those conversations with Dr. Rufo?

21        A.    Likely towards the middle or

22   end of September.

23        Q.    Was Dr. -- was Mr. Nicholson

24   aware of you trying to switch out of that

1  role back to the classroom?

2      A.    I don't know that he was

3  aware of that, no.

4      Q.    As far as you know, was

5  anybody else in the district other than

6  Dr. Rufo aware that you were trying to

7  switch out of that role and back into the

8  classroom?

9      A.    Not that I had told, no.

10     Q.    If those conversations

11  started at the end of September, do you

12  know why it was that you weren't

13  transitioned back to the classroom until

14  November?

15     A.    Yes, because they didn't

16  have somebody to fill my position.  So

17  when I had talked with Dr. Rufo, she had

18  said, you know, would you be willing to

19  stay in this role until January, because

20  in January would be the time that our

21  current supervisor would need to decide

22  whether she was returning to the position

23  or if it could be offered as a new

24  position.  So I agreed to that.

1                  And then in the short term,
2    there was another administrator that was
3    looking for a change.  And so he was able
4    to step into that role and I returned to
5    teaching.
6         Q.    Do you know who that
7    administrator was who filled in for that
8    role?
9         A.    Yes, Dr. Broxterman.
10        Q.    That was Neil Broxterman?
11        A.    Yes.
12        Q.    Was there any kind of
13   discipline at all that you received due
14   to what happened with the scheduling
15   issue and stuff like that?
16        A.    No.
17        Q.    Did you receive any
18   additional training following the
19   incident?
20        A.    No.
21        Q.    Are you aware of any new
22   policies or anything put in place after
23   the scheduling issue that happened?
24        A.    I know that we have a new

1 student information system.  But in terms

2 of policy, no.

3         Q.    When you say "student

4 information system," what do you mean?

5         A.    The system that we house all

6 of our current student information.

7         Q.    When was that enacted or

8 implemented?

9         A.    I believe in 2019.

10        Q.    Do you know when in 2019?

11        A.    I don't.

12        Q.    Like, for example, was it,

13 like, the 2018-2019 school year or the

14 following school year?

15        A.    I think it was at the

16 beginning of the 2019-2020 school year.

17        Q.    Do you know whether the

18 decision to change the student

19 information system had anything to do

20 with what happened to ██████ in her 10th

21 grade year?

22        A.    I don't.

23        Q.    Are there any emails that

24 you're aware of being part of or that you

1    sent or received regarding what happened

2    in ███████ 10th grade year that we

3    haven't gone over?

4         A.    No.

5         Q.    Did you send any text

6    massages to anybody involving what had

7    happened at the time or since that time?

8         A.    No.

9         Q.    Are there any other

10   conversations you had with anybody

11   involving ███████ incident that we

12   didn't talk about?

13        A.    No.

14        Q.    Did you keep any kind of,

15   like, journal or diary or anything around

16   this time period?

17        A.    No.

18             MS. LAUGHLIN:  Those are all

19        the questions I have for you.

20             THE WITNESS:  Okay.

21             MS. JORDAN:  Thanks, Kate.

22        You're done.

23             THE WITNESS:  Thank you.

24             THE VIDEOGRAPHER:  That

1       concludes today's deposition.  The

2       time is 2:25.

3               (Whereupon, the deposition

4       was concluded at approximately

5       2:25 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    CERTIFICATION

2

3

4        I, EILEEN P. BARTH, hereby certify that

5    the testimony and proceedings in the

6    foregoing matter are contained fully and

7    accurately in the stenographic notes taken

8    by me and are a true and correct transcript

9    of the same.

10

11

_____

12

                 EILEEN P. BARTH

13               Certified Shorthand

                 Reporter

14

15

16        The foregoing certification of this

17    transcript does not apply to any

18    reproduction of the same by any means unless

19    under the direct control and/or direction of

20    the certifying shorthand reporter.

21

22

23

24

```
 1              _ _ _ _ _ _

 2           LAWYER'S NOTES

 3              _ _ _ _ _ _

 4    PAGE  LINE

 5    _____ _____  _____

 6    _____ _____  _____

 7    _____ _____  _____

 8    _____ _____  _____

 9    _____ _____  _____

10    _____ _____  _____

11    _____ _____  _____

12    _____ _____  _____

13    _____ _____  _____

14    _____ _____  _____

15    _____ _____  _____

16    _____ _____  _____

17    _____ _____  _____

18    _____ _____  _____

19    _____ _____  _____

20    _____ _____  _____

21    _____ _____  _____

22    _____ _____  _____

23    _____ _____  _____

24    _____ _____  _____
```

# EXHIBIT "L"

1          UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                   -   -   -
3    JANE DOE              : CIVIL ACTION NO.
                           : 2:20-CV-05142
4          v.              :
                           :
5    NORTH PENN SCHOOL     :
     DISTRICT              :
6

                    -   -   -
7

              AUGUST 24, 2021
8

                    -   -   -
9

10            REMOTE ZOOM deposition of
11   DAWN LeBLANC, taken pursuant to notice,
12   commencing at 10:00 a.m., on the above
13   date, before LISA MARIE CAPALDO, RPR, a
14   Registered Professional Reporter and
15   Notary Public in and for the Commonwealth
16   of Pennsylvania.
17
18
19
20
21
22        GOLKOW LITIGATION SERVICES
      877.370.3377 ph| 917.591.5672 fax
23           deps@golkow.com
24

1  APPEARANCES:
2

   FREIWALD LAW, P.C.
3  BY:  LAURA E. LAUGHLIN, ESQUIRE
   1500 Walnut Street, 18th Floor
4  Philadelphia, PA  19102
   (215) 875-8000
5  Lel@freiwaldlaw.com
   -- For the Plaintiff
6
7  HENDRZAK & LLOYD
   BY:  SUSAN LLOYD, ESQUIRE
8  3701 Corporate Center Parkway, Suite 100
   Center Valley, PA  18034
9  (610) 709-8705
   Susan.lloyd@zurichna.com
10 -- For the Defendant
11

   WISLER PEARLSTINE, LLP
12 BY:  KYLE J. SOMERS, ESQUIRE
   460 Norristown Road, Suite 110
13 Blue Bell, PA  19422
   (610) 825-8400
14 Ksomers@wispearl.com
   -- For the Defendant
15
16
17
18
19
20
21
22
23
24

1                         –   –   –

2                     I N D E X

3                         –   –   –

4     Testimony of:   DAWN LeBLANC

5

6         By Ms. Laughlin              5
          By Ms. Lloyd                60

7

8                         –   –   –

9                     E X H I B I T S

10                        –   –   –

11

      NO.     DESCRIPTION                    PAGE

12

13         (No exhibits were marked.)

14

15

16

17

18

19

20

21

22

23

24

```
 1                      -   -   -

 2          DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line      Page Line       Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line      Page Line       Page Line

12   None

13

14

15   Stipulations

16   Page Line      Page Line       Page Line

17   5      1

18

19

20   Question Marked

21   Page Line      Page Line       Page Line

22   None

23

24
```

1      (It is hereby stipulated and
2      agreed by and between counsel that
3      sealing, filing and certification
4      are waived; and that all
5      objections, except as to the form
6      of questions, be reserved until
7      the time of trial.)
8                    -   -   -
9      DAWN LeBLANC, after having
10     been duly sworn, was examined and
11     testified as follows:
12                   -   -   -
13                EXAMINATION
14                   -   -   -
15  BY MS. LAUGHLIN:
16     Q.    Good morning, Dr. LeBlanc.
17     A.    Good morning.
18     Q.    My name is Laura Laughlin.
19  I represent Jane Doe which is ████
20  ████████████ in this case.
21          You're here to give a
22  deposition.  I have some questions to ask
23  you about ████████ experience at North
24  Montco and North Penn High School that I

1  understand that you had some

2  conversations and things like that.

3        Do you understand that?

4     A.    Yes, absolutely.

5     Q.    I appreciate you taking the

6  time.  I know it's not great timing.

7        If you need to take a break

8  for any reason today, just let us know

9  and you can do so, okay?

10    A.    Okay.

11    Q.    Have you ever given a

12 deposition before?

13    A.    No, I don't think so, at

14 least not via Zoom.  I've testified in

15 several special needs cases over the

16 years, but I don't think I've done a

17 deposition.

18    Q.    So I'll give you a few

19 ground rules that will hopefully make

20 this go a little bit easier today.

21        Since there's a court

22 reporter, Ms. Capaldo, that's taking down

23 everything that's said, a transcript will

24 be created with my questions and your

1  answers.  Only one person can speak at a
2  time, okay?  Is that yes?
3          A.    Yes.
4          Q.    The second thing is going to
5  be, since she's taking everything down,
6  it's going to be whatever you say is your
7  answer.  So all your answers have to be
8  verbal.
9              So in normal conversation,
10  we say huh-huh and nod our head, but
11  you'll have to say yes or no so that it
12  can actually be recorded on the
13  transcript, okay?
14          A.    I understand.
15          Q.    Everybody does it, though.
16          A.    I'm sure.  It's just part of
17  our language.
18          Q.    I'll try and follow up with
19  you.
20              In normal conversation,
21  sometimes we anticipate where the person
22  is going with their question and we start
23  answering before the question is over, I
24  might start asking my next question.  We

1 really have to wait until one person is

2 finished speaking before the other one

3 starts.

4         So if you're not done saying

5 your answer before I start asking my

6 question, just let me know and I'll let

7 you finish, okay?

8     A.    Okay.

9     Q.    If there's any question I

10 ask that you're not sure what I'm asking

11 or it doesn't make sense, just let me

12 know and I'll try and rephrase it so you

13 do understand.

14     A.    Okay.

15     Q.    I don't want you to guess at

16 anything.

17     A.    Absolutely.  It was a few

18 years ago.  So I'll tell you everything

19 that I remember, but I don't have

20 anything in front of me.

21         It's all my memory and my

22 experience.  Now that I'm retired, I

23 don't have any of that paperwork.

24     Q.    That's completely fine.  The

1  next instruction I was going to say is,

2  since it was a few years ago, if you

3  don't remember the exact date or the time

4  of day, that's okay.

5          But you can estimate.  If

6  you're able to give a reasonable

7  estimation, just let us know that's what

8  you're doing, okay?

9      A.    Okay.

10      Q.    I know you said you are

11  retired now.  Prior to retirement, you

12  were the principal of North Montco

13  Technical School?

14      A.    Yes, I was.

15      Q.    How long did you serve in

16  that role?

17      A.    I started working at North

18  Montco in 1994, five years, and then was

19  the principal until I retired.

20      Q.    What did you teach when you

21  were teaching there?

22      A.    I taught social studies and

23  English.

24      Q.    At some point, did you go

1  and get a principal certification or

2  something like that to become principal?

3       A.    Yes, I did.  I did my

4  educational leadership.  Actually, I got

5  my certification and then my doctorate in

6  educational leadership and also my

7  vocational director certification at the

8  same time.

9       Q.    And I know we're here today

10 to talk about ████  ████████████  and some

11 of the things that occurred back in the

12 2017 to 2019 time frame.

13          Do you remember ███████

14 ████████████

15      A.    Yes, I do.

16      Q.    How did you first meet her

17 or come in contact with her?

18      A.    She came to the office very

19 upset.  She said that she had passed a

20 student in the hallway that she wasn't

21 supposed to be around.  And just seeing

22 him upset her.

23          She was in a different part

24 of the building, but passed him coming to

¹ the office.  And that's kind of where we

² got involved.

³              We weren't familiar with

⁴ anything between her and another student.

⁵ She was in automotive.  He was in

⁶ drafting.

⁷              So at that point in time, we

⁸ kind of came up with a game plan of how

⁹ we could keep her feeling safe in our

¹⁰ building with this other student that was

¹¹ there.

¹²      Q.    When you say this other

¹³ student, are you referring to ███████

¹⁴ ██████?

¹⁵      A.    Yes, I am.

¹⁶      Q.    When you say that she came

¹⁷ to the office very upset because she had

¹⁸ seen this student or passed him in the

¹⁹ hallway, do you recall that conversation

²⁰ when ██████ came in?

²¹      A.    Well, she came in upset.  We

²² didn't know anything about it.  So it was

²³ more asking questions, how do you know

²⁴ this student?  Why did he upset you?

1    She told us she had been --
2  it was in middle school.  So she was not
3  in the same middle school with this
4  student.
5    And then apparently, the
6  middle school sent him to North Montco,
7  that communication of them being
8  separated was never -- for some reason,
9  it was never given to us.
10   Maybe one middle school
11 didn't know the other one was sending
12 him.  There's a lot of different people
13 or groups in sending a kid to the tech
14 school.  So it probably wasn't done
15 purposely, but it was just done -- it
16 just happened that way.
17   Q.    Meaning that somebody from
18 the district didn't communicate to North
19 Montco that these two kids were now going
20 to be at the same school?
21   A.    Yes.
22   Q.    Did ███████ explain to you --
23 I know you just told us about her
24 transferring middle school to avoid

1 ▮▮▮▮▮▮▮

2          But did she tell you why,

3 what the history was between the two of

4 them?

5          A.    Yes.

6          Q.    Can you tell us about that?

7          A.    She said that she had been

8 sexually assaulted by this student

9 several times in elementary school.  And

10 that it was somehow observed by a

11 teacher, but then -- I don't know all the

12 details.

13          Like I said, it was a while

14 ago.  Something about they thought they

15 were going to get in trouble if they told

16 the teacher or something or they would

17 get in trouble if they didn't tell.

18          Then it came out, I guess.

19 I don't know how it came out, that it

20 actually happened, down the road.  That

21 detail is a little foggy.

22          She had explained that.  And

23 then, obviously, with her being upset, I

24 did reach out to her mother and let her

1  know what was going on at school and why
2  ▆▆▆▆▆ was upset.  And she kind of filled
3  in -- the same information that ▆▆▆▆▆
4  had said.
5        Q.    You said that this was news
6  to the district.  I'm sorry.  This was
7  news to North Montco that the district
8  didn't communicate that in advance of
9  ▆▆▆▆▆ and ▆▆▆▆▆ coming to North Montco
10 in ninth grade.  Is that correct?
11       A.    That is correct.
12       Q.    Were you familiar with
13 ▆▆▆▆▆ before this incident where ▆▆▆▆▆
14 had come to your office upset?
15       A.    No, never saw the student.
16 Never heard of the student.
17       Q.    An allegation of sexual
18 assault, like you had said, prior to a
19 student coming to North Montco, is that
20 something typically that the district
21 would make North Montco aware of?
22       A.    I would think so, yeah, of
23 course.  If there's anything out there,
24 they can't be near each other or if

1 there's a situation where a student is

2 feeling uncomfortable around another

3 student, what we generally do is have a

4 plan of safety so that they are not

5 around each other.

6 And without having that

7 information, we couldn't have a plan of

8 safety.  Once we found out, we put that

9 into play.

10 Q.    So to find that information

11 out, do you typically rely on the

12 district that is sending in the student

13 to the tech school?

14 A.    Yes.  Usually, it would come

15 with the application information.  Every

16 guidance counselor has to sign off on the

17 application to go to North Montco.

18 I don't know even if the

19 middle school knew of the situation or

20 not.  That was out of my control.  I

21 don't know where the communication

22 failed, but it failed.

23 Q.    Is it important to be aware

24 of or to be told of allegations of sexual

1  assault against a student that is coming

2  to North Montco?

3      A.    Absolutely.

4            MS. LLOYD:  Objection to

5      form.

6  BY MS. LAUGHLIN:

7      Q.    Why is that important?

8      A.    It's a matter of safety.

9  Whether it's physical safety or emotional

10  safety, it's not fair to keep exposing

11  that student to a student that had

12  assaulted them in any case.

13            We've had situations before

14  where we did have students in similar

15  situations.  And until the court found

16  them guilty, they were still allowed to

17  be in the same building.

18            With that said, we had

19  safety plans for them so that they would

20  not be near each other.

21      Q.    In those situations you just

22  described, is that something where the

23  district would have communicated that to

24  you and then you implement a safety plan?

1          Is that what you are

2    referring to?

3          A.    Yeah.  Yeah.

4          Q.    And just to clarify, for

5    North Montco, is it only North Penn

6    District students that are coming to the

7    tech school?

8          A.    No.  It's five school

9    districts and several private schools.

10   Do you want me to name them?

11         Q.    That's okay.  Are they all

12   kind of surrounding North Penn?

13         A.    Yes, the Northern Montgomery

14   County area.  That's the area that North

15   Montco serves.

16         Q.    About how many students are

17   in -- you said the class is ninth grade,

18   tenth grade, 11th grade, 12th grade.

19         A.    That varies.  I'm not sure

20   where it is now.  When I retired, we had

21   approximately 1,200 students over four

22   grades.  Divide that by four.  Probably

23   less ninth graders.  Some districts don't

24   send ninth grade.

1    So I don't know what the

2  numbers are currently.  The most I've

3  ever seen in our building is about 1,200

4  students over four grades.

5    Q.   Once ████████ had come to you

6  in your office -- you may not know the

7  exact date.

8    Can you estimate for me when

9  in the school year that she came to your

10  office upset?

11    A.   I think it was pretty early,

12  like September of her freshman year,

13  maybe towards the end of September.  I

14  hadn't met her yet.  I know it was close

15  to that time frame.

16    Q.   And after she had come to

17  you, I know you said that you had a

18  conversation with ██████ and then you

19  said you had a conversation with her

20  mother, Mrs. ████████████.

21    Did you talk with anybody

22  from the North Penn School District or

23  the high school or anyone about what had

24  come to light to you?

1    A.    I think we first reached out

2  to the middle school to find out -- they

3  were the ones who sent their applications

4  over.

5              So I think ██████ was at

6  Pennbrook, I think, or she was going to

7  be.  Penndale was where he was.  So they

8  moved her to Pennbrook.

9              So we did reach out to them.

10  I'm not even sure if they were completely

11  aware of the situation.  I think it was

12  lack of communication all the way around.

13              I don't think Penndale

14  really knew.  I don't know where the

15  communication altered or not.  It seemed

16  like nobody was really aware of it until

17  we called the district office.

18    Q.    So do you remember who you

19  spoke to?  Was it the middle school

20  principal?

21    A.    I believe so, yeah, or

22  guidance counselor.  My guidance

23  counselors were working with either one

24  to get the applications.

1          We were kind of working

2 together to find out where this had

3 happened and how can we fix it pretty

4 much.

5          Q.    I just want to ask you a

6 couple of more questions about these

7 middle school conversations before we go

8 to the district office conversations that

9 you had.

10          Do you recall whether you or

11 through the middle school's review what

12 Penndale Middle School had provided to

13 North Montco along with ███████

14 application?

15          A.    It was just his application.

16 There wasn't anything -- on the

17 application, we look for grades,

18 discipline, attendance records, as well

19 as an IEP if that went along with it.

20          There was nothing indicating

21 in his file that they had to be apart or

22 whatever.

23          Q.    When you say it indicates

24 discipline, is there a question on the

1  form that says, has this person had any

2  -- this student had any disciplinary

3  issues or something?

4        A.    Yeah, they would print off

5  the discipline record from the district.

6  All five districts do this.  It's part of

7  the application, that they would print

8  off the discipline record that went with

9  the student.

10       Q.    Can you recall whether

11  ▮▮▮▮▮  had a disciplinary record that was

12  attached to his application?

13       A.    I can't recall.  The fact

14  that he was accepted into a program like

15  drafting where there's usually a list

16  would indicate to me that there really

17  wasn't much on there.  That's usually

18  very competitive.

19             Honestly, I don't remember.

20  I know that the guidance counselor looked

21  at his form, accepted him, and didn't see

22  anything that was out of control or crazy

23  or indicated that he should be separated

24  from ▮▮▮▮▮   There was nothing in there

1  about that.

2      Q.    When you say out-of-control

3  crazy, just to get a sense of what you're

4  talking about, is the right word that it

5  red flags a student at that point?

6      A.    Yes.  If somebody had

7  extensive discipline where they brought a

8  knife to school or assaulted someone and

9  was suspended for fighting five times, we

10 would look at it.  Discuss it with the

11 middle school, usually guidance, maybe

12 start the student on a contract, you

13 know, not saying that they can't come,

14 but, hey, we have a zero tolerance

15 policy, that kind of thing.

16          Maybe have a meeting ahead

17 of time to let the student know that

18 we're going to support them.  We're going

19 to let them come to North Montco, but

20 this behavior can't continue, that type

21 of thing.

22      Q.    I know you're saying you

23 don't recall off the top of your head

24 exactly what, if any, disciplinary file

1  you were given for ██████ ██████ when he

2  applied.

3          But if there was something

4  on there that was harassment, like sexual

5  harassment, would that have been

6  something like a red flag that you would

7  have checked into more?

8      A.    Yes, absolutely.

9      Q.    Do you recall having any

10 conversation with Penndale Middle School

11 about ██████ history of harassment in

12 middle school?

13     A.    No, I never had any

14 conversation at all with Penndale.  I

15 didn't even know who this student was

16 until ██████ pointed him out.

17     Q.    Are there any other

18 conversations that you recall having with

19 Penndale or Pennbrook Middle School about

20 the situation with ██████ and ██████ that

21 we haven't already talked about?

22     A.    No.

23     Q.    You said that you had also

24 called the district office, North Penn

1  School District.  Was it the

2  administration office?

3          A.     Yes.

4          Q.     Do you remember who you

5  spoke to?

6          A.     There was a couple of times

7  I did speak to Dr. Dietrich, but I can't

8  quite remember was it this situation or

9  the second situation that I talked to

10 him.

11         It was always a nice

12 conversation.  I brought it to his

13 attention.  I think he was aware of the

14 previous situation, but he was not aware

15 that both kids were in the middle school

16 at the same time.

17         So I talked to him about

18 having a plan of safety for her.  He was

19 very appreciative and was going to look

20 into what happened so that something like

21 this couldn't happen again.

22         I recommended that maybe

23 ▮▮▮▮▮  changed her school time so that we

24 could really keep an eye on her in that

1  small environment.  She liked being at

2  the tech school.

3              So he seemed to be fine with

4  that and appreciative that we were

5  putting that into place.  And I got

6  permission, because we usually don't take

7  ninth graders full time at North Montco.

8  So I also got permission from my

9  supervisor at the time to allow her to

10  come in at ninth grade because that was a

11  special circumstance.

12              She felt more comfortable in

13  our building.  We had plenty of people to

14  look out for her.  We changed her

15  schedule so that she wouldn't be near

16  ███████    It seemed to be a win, win.

17        Q.    You had said, I think, that

18  Dr. Dietrich -- and that's Curt Dietrich,

19  right?

20        A.    Yes.

21        Q.    He didn't know that ███████

22  and ████████ were going to be in the same

23  middle school at the same time?

24        A.    North Montco at the same

1  time, yes.

2       Q.    You said that Dr. Dietrich

3  was aware of the prior situation.

4            Can you be more specific?

5       A.    I think the assault

6  situation that happened with ███████ and

7  ███████ in elementary school.

8       Q.    And how do you know that he

9  was aware of that when you talked to him?

10      A.    I don't know.  Just through

11 conversation, it just led me to believe

12 that he knew of that situation but that

13 it had been several years earlier.

14           So now that they are in

15 middle school -- at two separate middle

16 schools, it probably didn't cross a lot

17 of people's mind that they would go to

18 the tech school.

19      Q.    Did Dr. Dietrich tell you or

20 did you get the impression that he was

21 aware of the assault in elementary

22 school?

23           Did he tell you, oh, I know

24 what you're talking about?  How did you

1  get that impression from him?

2      A.    Just through conversation.

3  I spoke with a lot of administrators

4  about a lot of different things.  It just

5  seemed like he was aware of the

6  situation.

7              And maybe it got to the

8  middle, and then kind of lost touch with

9  the situation.  And it never crossed

10 anybody's mind that they may end up at

11 the tech school together.

12     Q.    Was Dr. Dietrich glad that

13 you had brought it to his attention?

14     A.    I don't know if he was glad.

15 He seemed very appreciative that we were

16 on top of it and we were going to come up

17 with a safety plan for ██████  and make

18 some changes to her schedule so that she

19 was in a safe environment and we were

20 looking out for her.

21     Q.    Did you believe ██████ when

22 she was telling you this and that she

23 didn't want to be around ██████ and the

24 reasons why?

1    A.    Absolutely.  I think it was

2  pure just fear and maybe some PTSD.  I've

3  done this for a long time and worked with

4  a lot of kids.  It never crossed my mind

5  that it was not truthful.

6    Q.    Can you describe her

7  demeanor or what was it about the

8  situation or ████ coming to you that

9  made you believe her?

10   A.    She was just anxious and

11  just the look on her face and her stance

12  and her just shaking.  She was in fear.

13       I think she didn't expect to

14  see him.  Then she saw him.  And then it

15  was just pure fear.  She froze.  She

16  shook.  There was no reason not to

17  believe her.  She was an upset kid.

18   Q.    And you had also said in one

19  of the earlier questions I asked you that

20  ████ had felt more comfortable in your

21  building and that's why you and the team

22  at North Montco were implementing a

23  safety plan so she could feel safe there.

24       Why did ████ feel more

1 comfortable in your building?

2          A.     She chose to go to North

3 Montco.  Basically, from her

4 conversation, she got sent to Pennbrook

5 to be away from ████████  She felt like

6 she was being punished as the victim

7 because she had to be removed from all of

8 her friends that were at Penndale.

9             So she didn't have any

10 friends at Pennbrook.  So when she got to

11 North Montco, she felt part of the

12 automotive class.  And her teacher really

13 kept an eye on her and made sure that she

14 was feeling safe.

15             It's just a smaller

16 environment.  So we were able to make her

17 schedule so that she never had to go by

18 him.  If there was some type of activity,

19 we gave her the option to attend or not

20 attend and that kind of thing.

21             It's a smaller environment.

22 Kids thrive in different environments.

23 For a lot of kids, they feel very

24 comfortable and at home at the tech

1  school.  And I think ███████ felt that

2  way.

3            We believed her, took

4  action, and came up with a plan right

5  away.  And I think she appreciated that

6  as a kid going through this.

7       Q.    This is for the ninth grade

8  year that you implemented the safety

9  plan, right?

10      A.    Yes.

11      Q.    Did the plan work for North

12  Montco?  Was ███████ able to keep away

13  from ███████

14      A.    Yes.  Yes.  We had a great

15  thing.  We never had any type of

16  altercation or time where she flipped out

17  and was in his presence and we didn't

18  know it.

19            We really stayed on top of

20  it. We were able to look out for her.

21      Q.    I know you said you talked

22  to Curt Dietrich about this.

23            Did you ever talk to the

24  principal at North Montco at this point?

1    A.    At North Montco?

2    Q.    I'm sorry.  At North Penn --

3  I apologize -- Pete Nicholson?

4    A.    Not during this situation

5  because he was at the middle school.

6  When the situation evolved at the high

7  school, when ████ ended up going back

8  to the high school, then I did speak with

9  Pete, yes.

10    Q.    When you say middle school,

11  just to clarify for the record, the

12  middle school in the North Penn School

13  District goes from seventh to ninth

14  grade.  Is that right?

15    A.    Yes.

16    Q.    And then the high school

17  starts at tenth grade and goes through

18  12th grade?

19    A.    Yes.

20    Q.    After the safety plan was

21  implemented and you had your conversation

22  with Curt Dietrich and the different

23  middle schools' administration, is there

24  anything else that is happening in

1    ███████  ninth grade year in terms of

2    ██████  or communications with the North

3  Penn School District?

4        A.    Not that I recall, no.

5        Q.    Was there an IEP meeting at

6  the end of her ninth grade year?

7        A.    Yes, there was.  There was

8  an IEP meeting.  She was doing great, but

9  she wasn't doing well academically in the

10  full-time program.  That was a concern

11  that are we giving her enough support

12  academically.

13            Obviously, she's going

14  through a hard time, but we still needed

15  her to perform and meet the criteria of

16  the full-time program.

17            So as an IEP team, they

18  decided she may be better off back at the

19  high school.  That wasn't always the --

20  not everybody on the IEP team believed

21  that.  But as a team, that was the

22  decision that was made.

23        Q.    You said that you weren't

24  sure if  ██████  had enough support

1  academically at North Montco, right?

2      A.     Yes.

3      Q.     ████████ had a prior history

4  of ADHD, right?

5      A.     Yes.

6      Q.     If you know, what kind of

7  academic supports are there at North

8  Montco compared to the district?

9      A.     Well, I know she -- I know

10 this off of the top of my head.  It was a

11 special needs teacher, Mrs. Dabinski.

12             So ████████ had a support room

13 that she could go to if she was

14 struggling with her academics.  That was

15 Mrs. Dabinski.  She was the special needs

16 teacher.  And ████████ spent a lot of time

17 in there working on her academics.  She

18 felt comfortable in there for sure.

19             Her teacher felt like she

20 used that room too often.  That was one

21 of the concerns they brought up at the

22 IEP meeting.

23     Q.     Were there -- I know you

24 said you had Mrs. Dabinski at North

1  Montco.

2        Do you know whether there

3  were additional supports in the main

4  district school, whether at Pennbrook or

5  North Penn High School?

6        A.    No.  She was at North Montco

7  all the time.  That was the kind of thing

8  that was discussed at the IEP meeting,

9  that she might have additional support if

10 she went back to the high school more

11 than what North Montco could offer.

12       Q.    So at the end of this IEP

13 meeting, it's decided that ███████ is

14 going to go to North Penn High School for

15 tenth grade part time.  Is that right?

16       A.    Yes.

17       Q.    How was ████████ reaction to

18 that?

19       A.    She was very upset by it for

20 sure.  She liked being at North Montco.

21 And it was -- from what I remember, she

22 was upset.  Mom was upset.

23       The team felt like they

24 couldn't support her as much as what she

1 needed.  So maybe with additional

2 academic support and counseling

3 support -- the high school has a lot of

4 resources.

5          I know they -- I think she

6 saw -- in the morning, if I recall,

7 before she came to North Montco.  But I

8 don't remember that completely.

9          I had a lot of kids who saw

10 people before they came for emotional

11 support reasons, but I know the district

12 had a lot of support options for her at

13 the high school.  And I think that was

14 why it was decided that she would go

15 back.

16     Q.    Were you part of any

17 transition-type meetings, getting ███

18 prepared to go from North Montco to North

19 Penn High School?

20     A.    No, I really wasn't a part

21 of -- after the IEP meeting, I'm not

22 quite sure exactly what kind of meeting

23 took place.

24          She was still going to

1 attend North Montco, but I'm not sure if

2 there was any transition meetings or not.

3           I know there was a schedule

4 made for her at the high school and that

5 kind of thing.  Other than that, I wasn't

6 a part of it.

7           Q.    So students that attend

8 North Montco that are technically North

9 Penn School District students, was there

10 any program or online portal that you

11 could input information about North

12 Montco students to the district?

13          A.    Only their grades.  The

14 grades would get sent to the district

15 every marking period.  They really didn't

16 have access to the system, the records

17 and all of that kind of stuff.

18          Q.    For example, this safety

19 plan that you had implemented for 

20 to be kept away and safe from ████████

21 there was nothing the district had that

22 you could have implemented or put into a

23 system that they would have been

24 notified.  Is that right?

1    A.    No.  Not that I know of, no.

2    Q.    Is there anything about

3  ninth grade, any of the conversations

4  we've talked about or meetings about

5  ███████  and  ████████  that we haven't already

6  talked about?

7    A.    I don't think so.  I think

8  that sums it up.  The years kind of blend

9  for me, but I think that pretty much sums

10  up ninth grade.

11    Q.    Then in tenth grade, does

12  ███████  end up going part time to North

13  Penn High School and North Montco?

14    A.    I believe it was tenth or

15  11th grade, yes.  It's not -- I know she

16  was going there part time and then coming

17  to North Montco.

18         That's where she came to me

19  upset again about something going on in

20  the social studies class.

21    Q.    It's not a memory game.

22         I can represent to you from

23  the records that  ███████  tenth grade

24  year is when she had transitioned and was

1  going to be trying out going to North

2  Penn High School part time and North

3  Montco.

4        A.    That's what I thought.

5        Q.    So you said that in tenth

6  grade the next thing you remember is

7  ██████ came to you upset again.  Is that

8  what you said?

9        A.    Yes.

10       Q.    Tell me about that.

11       A.    She said that -- this was

12 like a couple of weeks or so into the

13 school year.  It wasn't right at the

14 beginning.

15             She came upset.  Finally, I

16 got it out of her that ██████ was in her

17 social studies class and sat right next

18 to her and had tried to touch her, even

19 during class.  And she said the teacher

20 wasn't aware and whatnot.

21             So I think that's when I

22 notified Mom and that's when I talked to

23 Pete Nicholson.

24       Q.    Can you tell me about --

1  when you said you notified Pete

2  Nicholson, did you call him on the phone

3  or how did you notify him?

4       A.    Yes, I called him.

5       Q.    Can you tell me what you

6  remember about that conversation with

7  Pete Nicholson?

8       A.    Just what I told you about

9  the history.  There was a history between

10  ███████  and this other student.  And I was

11  under the impression that they shouldn't

12  be near each other.

13            And he was very concerned

14  and said he was going to look into it.  I

15  don't think he was aware of it.  Somehow

16  it got scheduled without anybody knowing

17  that there was that history there.

18       Q.    So as far as you knew at

19  that time -- did Pete tell you -- did

20  Pete Nicholson tell you whether he was

21  aware of any kind of history between

22  ███████  and ███████

23       A.    I don't recall, but I don't

24  believe he was.

1    Q.    Why do you say you don't
2  believe he was?
3    A.    Because he seemed surprised.
4  Not that he wouldn't be concerned anyway.
5  Of course, he would be concerned.
6           But I think somehow the
7  information from the middle school didn't
8  always get to the high school, kind of
9  like it didn't get to North Montco.
10          There's so many cooks in the
11 kitchen.  And sometimes all the
12 information doesn't get where it needs to
13 be.
14    Q.    Are you aware or did you
15 ever hear of any meetings that ▋▋▋▋ and
16 Mrs. ▋▋▋▋▋▋▋ had had with North Penn
17 administration before she started
18 tenth-grade year about the incident
19 between ▋▋▋▋ and ▋▋▋▋▋  Were you
20 aware of any of those meetings?
21    A.    I know they had an IEP
22 meeting at the high school.  I'm not
23 sure.  Obviously, I was aware that they
24 would discuss that, but I wasn't there

1   for that.

2          Q.    When you say that principal

3   Nicholson was very concerned, what gave

4   you that impression?

5                Did he say things?  Was it

6   the way he was saying things?

7          A.    Just the way he was saying

8   things.  In my time -- so in having a

9   conversation, it was almost like, oh, my

10  God.

11               Just hearing about -- the

12  situation seemed like almost bizarre.

13  And we hear a lot of things as

14  administrators, but I think it was like,

15  wow, we got to do something about this

16  right away type of thing.

17               He didn't seem like he had

18  known anything about it ahead of time.

19  He didn't say whether he did or not for

20  sure.

21          Q.    When you're having this

22  conversation with him and he seemed very

23  concerned, did you get the impression

24  from talking to him whether he believed

1  what you were saying about ████████

2  disclosures to you?

3         A.    I would think so.  Yeah, he

4  seemed to believe.  I was one hundred

5  percent -- after knowing what happened

6  before to her, it wasn't shocking that --

7  it was just extremely upsetting to find

8  out that this kid was sitting right next

9  to her in social studies class.

10        Q.    Did ██████ talk to you at

11 all about whether ██████ had, in fact,

12 touched her in the social studies class

13 at North Penn High School?

14        A.    Yes.  She mentioned --

15 again, it was quite a while ago.  I know

16 she mentioned him putting his hand on her

17 leg and whatnot while they were in class

18 working in group.

19             Him putting his hand on her

20 leg while they were just in class working

21 together.

22        Q.    You said ██████ putting his

23 hand on ████████ leg?

24        A.    Yes.

1    Q.    Do you know where on her leg

2  he was putting his hands?

3    A.    Well, I would think like

4  towards her private area because I know

5  it was concerning to her.  That's one of

6  the things she brought up right away, he

7  was touching her inappropriately.  That

8  leads me to assume -- I wasn't there.  I

9  didn't see it.  It was someplace on her

10  body that she felt very uncomfortable.

11    Q.    Other than talking about --

12  let me ask this: Did ██████ ever talk to

13  you specifically about how he was

14  inappropriately touching her in the

15  social studies class?

16    A.    That was pretty much what

17  she indicated to me.  He was touching her

18  leg inappropriately and making her feel

19  uncomfortable.

20    Q.    Did she say anything about

21  him touching her private areas to you?

22    A.    That's what she indicated,

23  yeah.  That's what made her uncomfortable

24  was that he was -- she made it sound like

1  he was assaulting her by touching her

2  inappropriately in those areas while in

3  class.

4      Q.    I'm trying to understand.  I

5  know it's sometimes difficult to talk

6  about, especially when we're talking

7  about private areas and things like that.

8          So I apologize in advance,

9  but the details are important here.  So

10 I'm essentially trying to ask follow-up

11 questions to understand exactly what she

12 told you and where she was touched and

13 the extent -- because you said he touched

14 her leg, but then you were also referring

15 to private areas.

16          Can you describe for me in

17 detail -- I know it's uncomfortable.  I

18 apologize.

19          Can you describe for me in

20 detail where ████ was telling you that

21 ██████ had touched her in the social

22 studies class?

23      A.    She indicated that he

24 touched her on her upper leg near her

1    private area.  She didn't go into detail.

2    I don't know specifically exactly what

3    part he touched her.

4              The fact that -- to me, I

5    interrupted it as that he assaulted her,

6    probably touching close to her vagina

7    area above her jeans but yet still in

8    that area that made her extremely

9    uncomfortable and come to us hysterical

10   about it.

11        Q.    You said she came to you

12   hysterical about it?

13        A.    Yes.

14        Q.    You said it gave you that

15   impression that she was assaulted.

16              Can you describe for me what

17   gave you that impression that she was

18   assaulted?

19        A.    Well, just the way she

20   explained that he touched her above her

21   jeans but in her private area and how

22   upset she was and back to the shaking and

23   crying and just that demeanor.

24              You can't make that up.  You

1 can't make up that emotional response to

2 something like that as far as I'm

3 concerned.  She was genuinely upset.

4      Q.   I guess I'm trying to

5 clarify because you just told me now that

6 she told you that he had touched her in

7 her private area.

8      A.   I don't know if she exactly

9 made that specific comment, but that's

10 what I heard.  He touched her improperly

11 above her jeans.

12           I assume that it was her

13 private area.  She didn't show me.  She

14 didn't like give me a specific body

15 anatomy part.  That's what I assumed.

16      Q.   When you say above her

17 jeans, what do you mean?

18      A.   She had her jeans on.  She

19 was sitting there.  They were in class.

20 So obviously, he couldn't get in her

21 jeans, but he touched her in that spot

22 but on top of her jeans.

23      Q.   When you say in that spot,

24 what are you referring to?

1      A.    Like her private area.

2  Above her leg probably close to her

3  vagina is what I assume.  I don't know.

4  She didn't give me that specific, but

5  that's what I assumed from our

6  conversation.

7      Q.    Did she indicate to you how

8  many times it had happened that he had

9  inappropriately touched her in the social

10  studies class?

11      A.    I don't have a number, but

12  several times, I guess.  When she finally

13  let us know, it was kind of like enough

14  is enough.

15          I think she tried to handle

16  it herself.  I'm in high school.  I'm a

17  big girl.  I can handle this.  But in

18  reality, she couldn't emotionally and

19  whatnot handle it.  That's why she

20  finally came to us.

21      Q.    When you said that she tried

22  to handle it by herself like a big girl

23  in high school, what do you mean?

24      A.    Well, I think she didn't

1  tell anybody about it.  She didn't want
2  to deal with all this stuff again.
3            She would be afraid to be
4  taken out of the environment.  I don't
5  think it was a positive experience.  It's
6  never a positive experience, but I just
7  think that emotionally she didn't want to
8  go through the whole process again.
9       Q.    When you say the whole
10  process, what are you referring to?
11       A.    The investigation, the
12  meetings, probably went along with
13  assault from elementary school.  I'm not
14  quite sure what happened after that, but
15  I know that there was probably a lot
16  going on.
17       Q.    Are those things that ▮▮▮▮
18  talked to you about, that she was
19  concerned about all the other stuff that
20  you just described that would go along
21  with reporting or disclosing?
22       A.    Yeah.  I think that was what
23  -- she didn't want to go through it all
24  again is the impression that I got from

1   her.

2        Q.    Did she say that to you or

3   what was it about her talking to you gave

4   you that impression?

5        A.    I think she probably

6   mentioned that at some point in our

7   conversation.  It was just a lot of --

8   she said it didn't help because then she

9   got taken away from her friends.

10            She felt that all the stuff

11  that happened in respect of helping her,

12  she didn't feel like it was helping her.

13            Everything that was put into

14  place to protect her or help her, I don't

15  think she thought that way.

16       Q.    And she told you that?

17       A.    Yes.

18       Q.    I know you said you talked

19  to Pete Nicholson about this.  And Pete

20  said that he was very concerned and that

21  he was going to look into it?

22       A.    Yes.

23       Q.    Did he explain what that

24  meant, that he was going to look into it

1   or any other detail?

2        A.    I think what he meant was --

3   he didn't tell me specifically, but they

4   have their case manager that does part of

5   their scheduling.

6             I think that was his first

7   thought, to see how she got scheduled in

8   the same class with him and was the IEP

9   team aware of the situation, that kind of

10  thing.

11            He didn't know so he was

12  going to the people who did know, who did

13  the scheduling and whatnot.

14       Q.    Did Pete Nicholson ever

15  report back to you with those answers as

16  to how that happened and how they got put

17  in the same class together?

18       A.    I believe we had a meeting

19  about it.  This is a little fuzzy because

20  there's so many meetings and whatnot.

21            Obviously, it was not

22  intentional how it happened.  I just

23  think it was a mistake.  Honestly,

24  somehow it got scheduled and overlooked.

1  Just to be honest.

2          I don't think that anybody

3  thought, oh, I'm going to put ███ and

4  this kid in the class.  It just happens.

5  There's so many kids.  There's so many

6  schedules.

7          I don't know what kind of

8  communication came up from the district

9  or elementary to the high school

10 administration.  I'm not sure if they

11 were aware of it.

12         So I don't know.  To me, I

13 think it was just a big mistake and he

14 was working to try to fix that.

15     Q.    Pete Nicholson was working

16 to try and fix the mistake.  Is that what

17 you're saying?

18     A.    Yes.

19     Q.    When you say it wasn't

20 intentional, meaning they didn't in a

21 mean way, purposefully put these two kids

22 together; is that what you mean?

23     A.    Yeah, absolutely.  It was an

24 oversight and maybe not attention to

1  detail or information didn't get where it

2  needs to be, that type of thing.

3      Q.   You said that there were

4  meetings that occurred after this had

5  happened and you talked to Pete

6  Nicholson.

7          Do you recall any of those

8  other meetings or who was there or

9  anything like that?

10     A.   I'm pretty sure -- there

11 were some supervisors in some of the

12 meetings and her case manager at the high

13 school.  I'm trying to think back when

14 they decided to have her take some of the

15 online classes.

16         The whole chronology of it

17 is all over the place.  I know they were

18 working to rectify the situation as soon

19 as possible.

20     Q.   When you rectify the

21 situation, what do you mean?

22     A.   Not having the two kids in

23 the same class together.

24     Q.   And after this time, ███████

1 then made the decision, or the decision

2 was made, I should say, for █████ to

3 attend North Montco full time again?

4         A.    Yes.

5         Q.    Do you remember any meetings

6 about that as to why it was going to

7 happen or anything like that?

8         A.    I think even though

9 academically she didn't flourish, I think

10 emotionally she did.  And being at the

11 tech school and that smaller environment

12 made her feel safer.

13             So even though we kind of

14 came up with a hybrid situation for her

15 to come back to North Montco, I think it

16 was just decided that it would be in her

17 best interest emotionally.  She had

18 support in place.  She had a safety plan.

19 So that was decided that she would come

20 back.

21         Q.    You said she had a safety

22 plan in place.  Was that the safety plan

23 she had in ninth grade, was that then

24 implemented still?

1      A.    We had to modify it because

2 they were older.  Yeah, it was a safety

3 plan that we had put in place with our

4 security and our teachers for her in

5 ninth grade.

6      Q.    Did you have any discussion

7 with Dr. Dietrich after the tenth grade

8 assault?

9      A.    I talked to him.  I don't

10 remember if it was after the tenth grade

11 assault or not.  I think I did let him --

12 I think I let him know what we were

13 doing, that we were going to bring █████

14 back to North Montco and re-up her safety

15 plan.

16           She felt emotionally safe

17 there.  Mom was okay with that.  █████

18 was okay with that.  That's probably the

19 second conversation I had with him.

20      Q.    Did you talk to Dr. Dietrich

21 at all in that conversation about what

22 had happened in the social studies class?

23      A.    Well, obviously, I don't

24 think he was aware at all, just like Pete

1  wasn't aware.  I think he was looking

2  into it at the same time.

3          It was probably the same

4  time, within a day I talked to him and I

5  talked to Pete.  And both of them were

6  looking into the whole situation and how

7  it happened and how we can rectify it.

8          I was just trying to be

9  helpful in taking her back because I

10 thought it was in the best interest of

11 her.  They just seemed to support that as

12 well.

13     Q.   Just to clarify, when you

14 said you didn't think that Dr. Dietrich

15 knew, what are you referring to?  He

16 didn't know what had happened in tenth

17 grade yet?

18     A.   Yes.  He was completely

19 unaware of the kids being in the same

20 class and that they shouldn't have been

21 there.

22          It was a scheduling error,

23 and nobody picked it up.  I don't think

24 that they have a type of flagging in

1   their system.  There's so many kids over

2   there.  I'm not sure, but somehow it got

3   through.

4         Q.    Are there any other

5   conversations you recall having with

6   either the North Penn administration or

7   district administration about the

8   assaults in tenth grade?

9         A.    I don't think we had any

10  other specific questions about that, no.

11  I think it was very clear what happened

12  and what we were trying to do to help

13  ███████ to be able to progress in tenth

14  grade and not worry that she's going to

15  have that kind of situation.

16        Q.    I have general questions

17  about North Montco.

18              Does North Montco have proms

19  or school dances?

20        A.    Yes.

21        Q.    Can you tell me a little bit

22  more about that?

23        A.    It's usually supported by

24  the SkillsUSA, which is the student

1 government.  It depends.  Sometimes

2 they'll have a winter dance, like a

3 winter ball.  Sometimes it's hosted at

4 the high school.  Sometimes it's hosted

5 at the Holiday Inn.

6                The kids dress up.

7 Sometimes North Montco kids feel like

8 they are more tied to North Montco than

9 their district, especially if they come

10 full time and they are in the building

11 full time.

12           Q.    So just so I understand you

13 correctly, is there separate proms that

14 North Montco has just for North Montco

15 students or are they proms and dances

16 that are with the high school that they

17 would come from?

18           A.    No, they are just separate.

19 If a student wants to go to their own

20 prom, they are welcome to do that.  They

21 are welcome to do anything at any of

22 their high schools.

23                What North Montco hosts, at

24 least when I was there, was just for our

1    students and their guests.

2         Q.    And is it like a prom for

3    each class year or how does that work?

4         A.    They have one formal dance a

5    year like in the winter.

6         Q.    Like a winter formal?

7         A.    Yeah.

8         Q.    What about in terms of

9    extracurricular clubs and sports and

10   things like that, does North Montco have

11   its own clubs and sports or is that all

12   at the home school for the district?

13        A.    No.  North Montco is just an

14   extension of the home school.  Any sports

15   or clubs that a student would want to

16   participate in, they would go back to

17   district to do that.

18        Q.    I know when I was in high

19   school there were things like spirit day

20   and stuff like that.

21             Does North Montco have

22   anything like that or is that all based

23   at the home school?

24        A.    They'll have a spirit week

1 sometimes or a gym day and this and that.

2 And the end of the week may be a fun day

3 or a fun activity for the kids.  They do

4 participate in that, too.

5      Q.    At North Montco?

6      A.    Yes.

7      Q.    Are there any other

8 differences in terms of like availability

9 of student-type activity, fun-type things

10 that are at the home schools but not at

11 North Montco?

12      A.    They can participate in

13 anything at the home district.  Anything

14 that they would want to, they should be

15 able to whether it's football or be in a

16 play.

17           We're an extension of the

18 high school.  We don't have our own

19 activities like that.

20      Q.    That's what I was trying to

21 clarify.  I understand they can do it at

22 their home school, but at North Montco,

23 North Montco doesn't have its own drama

24 club or anything like that?

1    A.    No.

2         MS. LAUGHLIN:  I think those

3    are all the questions I have for

4    you.  I don't know if Ms. Lloyd

5    has any questions.

6 BY MS. LLOYD:

7    Q.    Thank you.  My name is Susan

8 Lloyd.  I represent the school district

9 in this case.

10        I do have some questions.

11 Did you have a relationship with the

12 ███████████ family outside of school?

13    A.    No.  No, not really.  I did

14 -- I got to know them quite well through

15 this situation.  ████████ one of the

16 things that I was able to get ██████ to

17 talk about and whatnot is horseback

18 riding.  She rides horses.  I have horses

19 and a horse farm.

20        So that's something that we

21 had in common.  Do we hang out and stuff

22 like that outside of school, absolutely

23 not.  She had to come see my horse once

24 with her mom.  That was about it.  My

1  doctor brought her daughter to see my

2  horse, too.  So it's not like -- we're

3  not pals and hang out for sure.  I'm just

4  supportive.  I spent a lot of times

5  talking with her mom on how to help

6  ███████ through this.

7        Q.    So she was at your horse

8  farm once?

9        A.    Yes.

10       Q.    When is the last time you

11 spoke with ███████ ████████

12       A.    Long before she graduated.

13 I really haven't had communication with

14 them for a couple years.

15       Q.    Did she graduate from North

16 Montco?

17       A.    I'm not sure because I

18 wasn't there.

19       Q.    You described yourself as

20 retired.

21             What year did you retire?

22       A.    I retired for health

23 reasons.  I'm on disability retirement

24 right now.

1    Q.    And it was your decision to

2  retire?

3    A.    Yes.

4    Q.    When is the last time you

5  talked to Mrs. ████████  ███████ mom?

6    A.    I'm not sure.  I really

7  don't recall.

8    Q.    Would it have been after her

9  sophomore year?

10    A.    Yeah, I think so.

11    Q.    Did you ever meet with

12  ████████ mom outside of school for any

13  reason?

14    A.    Just at the farm.

15    Q.    And that was the one

16  occasion when ███████ came to see the

17  horse?

18    A.    Yes.

19    Q.    There was a reference in the

20  records to the Night Riders.

21          Is that an equestrian club?

22    A.    I have no idea.

23    Q.    That's fine.  It's not at

24  North Montco then?

1    A.    No.

2    Q.    Do you know if ▓▓▓▓ ever

3 became involved in the equestrian club at

4 the North Penn High School?

5    A.    I do not know.  They may

6 have had one.  I'm not sure, quite

7 honestly.

8    Q.    Did you speak with

9 plaintiff's counsel before today's

10 deposition?

11    A.    No.  About this?

12    Q.    Yes.

13    A.    Just that I was going to

14 have a Zoom deposition.

15    Q.    Nothing specific as to your

16 testimony or what you would be asked?

17    A.    No, just say what I know.

18    Q.    That was a phone

19 conversation?

20    A.    Yes.

21    Q.    How long did that phone

22 conversation last?

23    A.    Just a couple of minutes,

24 five minutes at the maximum.  I was more

1  worried about getting Zoom working.

2       Q.    That is an issue we've all

3  faced over the past year and a half.

4            At any time you were talking

5  to ████ in her sophomore year, did she

6  use the term private area when talking to

7  you about ████ touching her?

8       A.    I can't say one hundred

9  percent, but that's what pops in my mind

10 as soon as I remembered that conversation

11 we had.

12      Q.    And do you recall her

13 telling you how many times that it

14 happened?

15      A.    I don't know a number.  She

16 said several.

17      Q.    And did she bring it to

18 anyone else's attention to your

19 knowledge?

20      A.    No.

21      Q.    Did she indicate to you that

22 anybody at the high school knew about the

23 fact that ████ had touched her?

24      A.    No.  I don't think she told

1  anybody there.  That's why I called as

2  soon as I knew about it.

3       Q.    You indicated that in your

4  conversation with Dr. Dietrich that it

5  never crossed anybody's mind that ▓▓▓▓

6  and ▓▓▓▓▓ might end up at the tech

7  school together.

8            Did somebody say that to

9  you?

10      A.    No.  No.  No.  I just think,

11  as I said, there were too many cooks in

12  the kitchen and nobody just really got it

13  through.  It could happen with everything

14  else going on with enrollment and

15  whatnot.

16      Q.    Is that based on the number

17  of students in the district or something

18  else?

19      A.    I just think they are

20  dealing with central office.  You're

21  dealing with several middle schools.

22  You're dealing with the tech school.

23  That's a lot of involvement with

24  different entities.

1      Q.    Did any of those entities

2  that were involved ever say to you, oh,

3  we have too much to do, we missed this

4  one, or give you any kind of indication

5  that there was a mistake made?

6                MS. LAUGHLIN:  Objection to

7         form.

8                THE WITNESS:  I can't

9         remember an exact phrase for

10        either situation with ▮▮▮▮ being

11        in the same building or with her

12        getting assaulted.  I think that

13        was everybody's mindset was that

14        how did this get missed, you know

15        what I mean?

16                Obviously, it was missed.

17        They were in the same class, same

18        school.  How did that happen and

19        how can that be rectified is what

20        I got out of it.

21  BY MS. LLOYD:

22      Q.    It was rectified essentially

23  by ▮▮▮▮ coming back to the North

24  Montco?

1    A.    Yes.

2         MS. LAUGHLIN:  Objection to

3    form.

4  BY MS. LLOYD:

5    Q.    And did ████ stay at North

6  Montco full time after her sophomore year

7  then or after the beginning of her

8  sophomore year?

9    A.    I believe so, yes.

10        MS. LLOYD:  I have no

11   further questions, ma'am.  Thank

12   you.

13        MS. LAUGHLIN:  I don't have

14   anything else.  Thank you again

15   for participating in this and

16   turning on your video.

17             -  -  -

18        (Whereupon, the deposition

19   concluded at approximately 11:05

20   a.m.)

21             -  -  -

22

23

24

1      CERTIFICATE

2         I, LISA CAPALDO, Registered Court

3   Reporter, do hereby certify that prior to

4   the commencement of the examination, DAWN

5   LeBLANC, was duly remotely sworn by me to

6   testify to the truth, the whole truth,

7   and nothing but the truth.

8         I DO FURTHER CERTIFY that the

9   foregoing is a verbatim transcript of the

10  testimony as taken stenographically by me

11  at the time, place, and on the date

12  hereinbefore set forth, to the best of my

13  ability.

14        I DO FURTHER CERTIFY that I am

15  neither a relative nor employee nor

16  attorney nor counsel of any of the

17  parties to this action, and that I am

18  neither a relative nor employee of such

19  attorney or counsel, and that I am not

20  financially interested in the action.

21

22  _____

    LISA CAPALDO, RPR

23  Notary Public

24

# EXHIBIT "M"

1          IN THE UNITED STATES DISTRICT COURT

2

3        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

4

5   JANE DOE,                    :   CIVIL ACTION
            Plaintiff,           :

6                                :   NO. 2:20-CV-05142
        vs.                      :

7                                :

    NORTH PENN SCHOOL DISTRICT,  :

8            Defendant.          :

9                      -   -   -

10                   August 23, 2021

11                      -   -   -

12

        Remote via Zoom Oral deposition of KIRA

13

    O'BRIEN, conducted at the location of the witness

14

    in Sanatoga, Pennsylvania, before Nancy J.

15

    Taguinot, RPR, CCR(NJ), Registered Professional

16

    Reporter and Notary Public in and for the

17

    Commonwealth of Pennsylvania, commencing at 2:05

18

    p.m.

19

                     -   -   -

20

21

22          GOLKOW LITIGATION SERVICES, INC.

23         887.370.3377 ph/ 917.591.5672 fax

24               deps@golkow.com

```
 1              A P P E A R A N C E S:

 2    FREIWALD LAW, P.C.

 3    BY:   LAURA E. LAUGHLIN, ESQUIRE

 4          1500 Walnut Street, 18th Floor

 5          Philadelphia, Pennsylvania 19102

 6          TEL:  (215)875-8000

 7          EMAIL:  lel@freiwaldlaw.com

 8    Attorneys for the Plaintiff

 9

10    HENDRZAK & LLOYD

11    BY:   REBECCA CANTOR, ESQUIRE

12          3701 Corporate Center Park, Suite 100

13          Center Valley, Pennsylvania 18034

14          TEL:  (610)709-8570

15          EMAIL:  rebecca.cantor@zurichna.com

16    Attorneys for the Defendant

17

18    WISLER PEARLSTINE, LLP

19    BY:   KYLE J. SOMERS, ESQUIRE

20          460 Norristown Road, Suite 110

21          Blue Bell, Pennsylvania 19422

22          TEL:  (610)825-8400

23          EMAIL:  ksomers@wispearl.com

24    Attorneys for the Defendant
```

```
 1                  -  -  -

 2                I N D E X

 3                  -  -  -

 4   WITNESS:  KIRA O'BRIEN

 5   QUESTIONED BY:            PAGE

 6       Ms. Laughlin        6, 72

         Ms. Cantor            67

 7

 8              E X H I B I T S

 9                  -  -  -

                                   MARKED

10   NUMBER         DESCRIPTION        FOR ID

11   (None marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    -  -  -

2              DEPOSITION SUPPORT INDEX

3                    -  -  -

4

5   Direction to Witness Not to Answer

6   PAGE      LINE

7   None.

8

9   Request for Production of Documents

10  PAGE      LINE

11  None.

12

13  Stipulations

14  PAGE      LINE

15      5          2

16

17  Questions Marked

18  PAGE      LINE

19  None.

20

21

22

23

24
```

1                        -  -  -

2              (It is hereby stipulated and agreed by

3        and among counsel for the respective parties

4        that signing, sealing, certification, and

5        filing are waived and that all objections,

6        except as to the form of the question, are

7        reserved until the time of trial.)

8                  -  -  -  -  -  -

9              THE COURT REPORTER:  All parties to

10       this deposition are appearing remotely and have

11       agreed to the witness being sworn in remotely.

12       Due to the nature of remote reporting, please

13       pause briefly before speaking to ensure all

14       parties are heard completely.

15              Counsel, please state your appearances

16       for the record.

17              MS. LAUGHLIN:  I'm Laura Laughlin on

18       behalf of the Plaintiff, Jane Doe.

19              MS. CANTOR:  Rebecca Cantor on behalf

20       of the Defendant, North Penn School District.

21              MR. SOMERS:  And Kyle Somers, also on

22       behalf of the Defendant, North Penn School

23       District.

24              MS. O'BRIEN:  I'm Kira O'Brien.

```
 1                    -  -  -

 2               KIRA O'BRIEN,

 3          having been first duly sworn, was

 4          examined and testified as follows:

 5                    -  -  -

 6               EXAMINATION

 7                    -  -  -

 8  BY MS. LAUGHLIN:

 9      Q.     Good afternoon, Ms. O'Brien.

10      A.     Good afternoon.

11      Q.     I know this is still a little bit weird

12  being over Zoom.  Under normal circumstanced we'd

13  be in a room together and it would be a little less

14  awkward with the, you know, Hollywood Square boxes

15  and things like that.

16               But I appreciate your time today in

17  coming to this deposition to allow me to ask you

18  some questions about ████████ ████████████.

19               Do you understand that's what you are

20  here to do today?

21      A.     Yes.

22      Q.     Have you ever given a deposition

23  before?

24      A.     I did probably about 13 years ago.
```

1    Q.    Was that in your capacity as a guidance

2 counselor with school?

3    A.    Yes.

4    Q.    Did that involve any kind of claim

5 against the North Penn School District, if you can

6 remember?

7    A.    I don't believe so.  It didn't have to

8 do with that.

9    Q.    Okay.  So I'm going to give you --

10 since it's been so many years, and we're probably,

11 you know, online, whereas, the last time you did

12 this you were probably in person, I'm going to give

13 you a few ground rules that will help things go a

14 little bit smoother today.  Okay?

15    A.    Okay.

16    Q.    I don't anticipate being here too long,

17 but if there's any time you need a break for any

18 reason, just let us know and you can take one.

19 Okay?

20    A.    Okay.

21    Q.    You're doing a great job so far, but

22 all of your answers have to be verbal, because we

23 do have a court reporter that's in one of the

24 squares taking down everything that's said today

1    and will create a transcript.  All right?

2         A.    Okay.

3         Q.    If you -- if I ask a question you're

4    not sure of what I meant or it was confusing, just

5    let me know, and I'll try to rephrase it so you do

6    understand.  All right?

7         A.    Okay.

8         Q.    If you answer the question, later on

9    we're all going to assume you understood it, since

10   I gave you that instruction.  Okay?

11        A.    Okay.

12        Q.    I don't want you to guess at anything,

13   but it's okay to give an estimate.  If you don't

14   know an exact date or an exact time, just let us

15   know that you're estimating.  Okay?

16        A.    Sure.

17             THE COURT REPORTER:  Counsel, usual

18        stipulations?

19             MS. LAUGHLIN:  Yes.

20   BY MS. LAUGHLIN:

21        Q.    Is it true that right now you work for

22   the North Montco Technical School?

23        A.    Correct.

24        Q.    And how long have you done that?

 1      A.      So I've been there probably since 2003,

 2  2004.

 3      Q.      And what -- and you've been there

 4  consecutively since that time up through today?

 5      A.      Yes.  My first year, when I was there,

 6  I was considered the SAP counselor and I was

 7  working through an outside agency called the

 8  Lincoln Center, but then I was hired by North

 9  Montco on an emergency permit.

10          I went back to school and got my school

11  counseling certificate so that I could work as a

12  school counselor and get hired as a school

13  counselor there.

14      Q.      Okay.  And you said SAP counselor.  Is

15  that what you said?

16      A.      Yes.  The Student Assistant Program.

17  So I used to work with students in groups and also

18  individually with any of the students that were

19  referred to me.

20      Q.      Okay.  And -- do you recall ████████

21  ██████████████████

22      A.      Absolutely.

23      Q.      Okay.  And was the first time that you

24  ever had any kind of contact or heard about her,

```
 1    was that when she first started at North Montco in
 2    9th grade?
 3         A.     Yes.
 4         Q.     In ████████ 9th grade year, which would
 5    have been like the 2017-2018 school year.  Does
 6    that sound about right to you?
 7         A.     Yes.
 8         Q.     What was your job title at North Montco
 9    at that time?
10         A.     At that time, I was considered a school
11    counselor, but they also at that time, up until
12    this last school year, I was called the crisis
13    counselor.
14              So part of my responsibilities was to
15    work with students who were in crisis or needed
16    extra assistance.  So Joe Paddock was the official
17    school counselor for automotive, but she felt
18    more -- ██████ and her mom felt more comfortable
19    with her seeing me because of her background, but
20    also because I was -- I'm a female.
21              So from as soon as I learned about
22    ██████ she was introduced to me.  And Mr. Paddock
23    also, the school counselor for ██████ he would
24    have interactions here and there with ██████ but
```

1  she mostly felt comfortable coming to me with

2  things.

3       Q.    Okay.  And when you say automotive

4  students would have been with the other gentleman,

5  is that students that came to the tech school on,

6  like, the automotive track?

7       A.    Correct.

8       Q.    And that was ██████  right?     ██████  was

9  studying automotive at tech school?

10      A.    Yes.

11      Q.    Okay.  And when you say that you were

12 going to be assigned to ██████ because of her

13 background, what do you mean?

14      A.    Well, the mom had explained to us --

15 when she reached out to the principal and I at the

16 time, she had explained -- the reason why she

17 reached out to us was she was upset, that she

18 didn't realize that -- am I allowed to say the

19 other student's name?

20      Q.    Yeah.  Do you mean ██████

21      A.    She didn't realize that ██████ ██████

22 was going to be in the same school with ██████

23 and, so when mom discovered this, I guess ██████

24 had mentioned to mom, like, "Hey, I'm passing

1      ████   in school.  I'm seeing him at North Montco."

2            Once Ms. ████████ reached out to the

3      principal and myself, we said, "Hey, just so you

4      know, we're going to do whatever we can to help you

5      with the situation, and I could be a good go-to

6      person if she needs somebody on the North Montco

7      end."

8         Q.     Okay.  And so that was in ████████ 9th

9      grade year?

10        A.     Correct.

11        Q.     Before this point where mom contacts

12     you and the principal -- and is that Dawn LeBlanc?

13        A.     Correct.

14        Q.     Before mom reached out to you and Dawn

15     LeBlanc, had you ever had any interactions or heard

16     of ████ in any way before then?

17        A.     No.

18        Q.     Can you estimate for me when in that

19     school year mom had reached out to you and

20     Principal LeBlanc?

21        A.     I felt like it was towards the

22     beginning of the school year.

23        Q.     And how exactly -- when you say that

24     mom had reached out, how exactly did you start

1   becoming involved?  Like, did you get a phone call

2   or what can you tell me about that time?

3        A.      I knew that Mrs. ██████████ reached

4   out to Dr. LaBlanc with her concern with ████████

5   being in the school and I believe I was brought in

6   right away with the situation.  As soon as

7   Mrs. ██████████ reached out, I also was involved

8   with -- with being there for ████████ as support.

9        Q.      Okay.  And when you say there was

10  concern for ████████ being in the same school as

11  ██████████ what was the concern or what were you aware

12  of was going on at this point?

13       A.      Mom was frustrated because she felt

14  like -- she was saying that ████████ would have to

15  pass ████████ which would make sense, because

16  drafting is on the way to auto.  So she was passing

17  ████████ in the morning before classes and then after

18  classes.  And there were other situations where she

19  was seeing ████████ I believe, she said, like, in

20  the cafeteria and things like that.  So it was, you

21  know, uncomfortable for her.

22              And I believe at that point Mom had

23  said that she was feeling very anxious and was

24  having anxiety attacks because of it.

1    Q.     Did you talk to ███ about, like,
2    that situation at all?

3    A.     Yes.

4    Q.     Can you tell me about that?  Like, what
5    did ███ say to you or what was your impression
6    from ███ perspective what was going on?

7    A.     She -- she really didn't want to see
8    him.  So we came up with a safety plan where she
9    could leave a little early, leave a little later,
10   depending on his schedule, so that they wouldn't
11   have to see each other in the hallways any longer.

12   Q.     Did you have an understanding of why
13   ███ didn't want to see ███

14   A.     Only because that's what the mom had
15   filled Dr. LeBlanc and I in on, the past situation.

16   Q.     And what was that past situation, to
17   your understanding?

18   A.     To my understanding, I believe it was
19   back in 6th grade, there was some inappropriate
20   touching going on between the two of them and a
21   teacher brought them to the side and said, "I'm not
22   going to tell anyone about this, but it needs to
23   stop."

24   Q.     Do you know whether the inappropriate

1  touching, was that ████ touching ████

2       A.    That was -- that's what I was told,

3  correct.

4       Q.    Okay.  Were you aware at all of, like,

5  any investigation or any prior safety plans or

6  anything like that that had been taking place to

7  protect ████ from ████ in the past?

8       A.    When Mom called, one of the frust --

9  one of the things she was frustrated about is

10  because she was saying to us that she thought that

11  this was something that could never happen.  Like,

12  she was surprised that ████ was able to go to

13  North Montco with what had happened in the past.

14            So at that point I wasn't involved with

15  anything, but Mom made it sound like she had had

16  several conversations with or meetings with the

17  people involved to make sure that this sort of

18  thing was never going to happen again.

19       Q.    Meaning that ████ and ████ wouldn't

20  be, like, passing each other in the hallway or

21  things like that?

22       A.    Right.

23       Q.    When you say that Mom had conversations

24  with several people involved, what do you mean?

1    A.    Well, so this was just from -- this is
2  what Mom reported to us when she called Dr. LaBlanc
3  and myself.  She had said, you know, "I don't know
4  how this could have happened, because I've had
5  several conversations or meetings with people in
6  the North Penn School District," meaning, like, the
7  administration, IEP team; and so I can't recall the
8  exact people that she said, but it seemed to me,
9  from what Mrs. ███████ was reporting, that she
10  really thought every stone was unturned, that she
11  felt like she did everything she could to prevent
12  this from happening.
13    Q.    When you -- when Mom was telling -- did
14  she -- did Mrs. ███████ have direct
15  communications with you or was it everything
16  through Principal LaBlanc?
17    A.    Most of the time it was with Dawn and I
18  together, and I believe that day actually
19  Mrs. ███████ met with us in person.  But there
20  are other times where, like -- I know that day that
21  she first called, we were on speakerphone together
22  talking to Mrs. ███████ and she was explaining
23  ███████ past to us and why she was frustrated that
24  ███████ was attending North Montco.

1     Q.    In your experience is, like, past

2 incidents like that, with students now coming to

3 the technical school, is that something that, like,

4 North Penn School District, since they're

5 technically their students, that they would tell

6 North Montco about, if you know?

7     A.    I would say sometimes that's something

8 we hear about and sometimes it's not something we

9 hear about.  It was our understanding that, you

10 know, ██████ had every right to attend North

11 Montco, just like any other student, and there

12 really wasn't anything -- other than coming up with

13 a safety plan and having them not see each other,

14 we really didn't feel like there was anything else

15 that could be done for the situation other than,

16 you know, letting the adults in the situation know

17 what was occurring.

18     Q.    When you say sometimes North Montco

19 would be aware, sometimes they wouldn't, do you

20 know whether there was any kind of, like, policy or

21 practice in place from the district to make sure

22 that district students, if there was prior

23 incidents in the past, like here, that the tech

24 school would be made aware?

 1     A.     Not that I'm aware of.

 2     Q.     Okay.  And you just mentioned that --

 3  from your understanding, that ███ had a right to

 4  go to the tech school.  That part you were just

 5  talking about, where did you get that understanding

 6  or where is that information from?

 7     A.     That was just -- that's what my

 8  understanding was, was that we didn't have -- there

 9  was no -- nothing in writing.  There wasn't

10  anything to say that ███ couldn't come to North

11  Montco.  So we didn't feel like we -- we didn't

12  have any reason to say that he couldn't come to

13  North Montco.

14     Q.     Meaning, like, anything in writing from

15  North Penn School District?

16     A.     Correct.

17     Q.     Is that typically -- for North Montco,

18  is that something, when it's a North Penn

19  student -- or North Penn district students coming

20  to the tech school, is it, in your experience, the

21  North Penn School District that's regulating who

22  can or can't come to the tech school?

23     A.     No.

24     Q.     Then whose responsibility is that or

1  whose decisions is that as to what students can

2  come to the tech school?

3      A.      There's a lot of different factors.  I

4  mean, the school counselor has to fill out the

5  enrollment form -- their portion of the enrollment

6  form, along with the parent, to make sure that that

7  student's eligible to attend North Montco.  And

8  then when it comes to the process of deciding who's

9  going to be accepted, who's not going to be

10 accepted, they look at, you know, discipline,

11 grades, attendance.

12          So there was nothing for us -- we

13 weren't made aware of any situation that ███

14 shouldn't be able to come to North Montco.

15     Q.    Meaning, like, in terms of his

16 disciplinary file up to that point?

17     A.      Correct.

18     Q.    Okay.  Like, North Montco didn't -- do

19 you know whether they had that, ███

20 disciplinary file up to that point?

21     A.      They should have had a discipline file,

22 because we asked for all the discipline records up

23 until that point, but I'm not sure what would have

24 been in there.

        1              If there would have been something that
        2   was concerning or alarming, that's when the school
        3   counselor would probably reach out to the school
        4   counselor to help him fill out the enrollment form
        5   to say, "Hey, you know, what's -- we need to look
        6   deeper into this.  What's going on with this
        7   discipline?"
        8              But nothing was -- nothing was brought
        9   to our attention to have ███████ not accepted at
       10   North Montco.  So we were not made aware that there
       11   was any major issues.
       12      Q.    Okay.  When you say major issues,
       13   would, like, a report of sexual harassment in a
       14   student's file, would that be considered, like, a
       15   major issue that you're talking about they would
       16   look into and find out what was going on?
       17      A.    I would think so.  Absolutely.
       18      Q.    Okay.  I want to go back to this
       19   incident in 9th grade or the incidents where ███████
       20   was passing ██████ in the hallways and you had
       21   mentioned that she was having anxiety and panic
       22   attacks, right?
       23      A.    Correct.
       24      Q.    Did you ever experience or talk with

1   ████ about her having, like, increased anxiety or

2   panic attacks involving ████ being at the school?

3      A.    Yes.  I mean, the times that she was --

4   she was coming to me at the -- when we first

5   learned of ████ she was saying to us that, okay,

6   like, I'm seeing him at -- at these different

7   times.  These are the times I'm hoping to avoid.

8          So she let us know exactly when she was

9   seeing him so that we could try to come up with a

10  plan where she wouldn't have to see him.

11     Q.    Is that something ████ wanted?  She

12  was trying to avoid seeing him?

13     A.    Yes.

14     Q.    In your experience, from being around

15  ████ and, you know, her coming to you, was ████

16  afraid of ████ from your understanding?

17     A.    I never got the feeling that she was

18  afraid of him, but she just -- she didn't want to

19  be around him or see him.  But it -- I never

20  thought of it as a -- I never took it as -- as that

21  she was fearful to be around him.

22     Q.    Did you have an understanding or

23  explore with her the feeling of why she didn't want

24  to be around him?

```
 1      A.      I mean, mostly because of what -- what

 2   occurred back in 6th grade.  And she also, at some

 3   point during the time that she went to school, at

 4   my school at North Montco, she had said that he was

 5   inappropriate with other kids over the years also.

 6          So she just -- she just did not want to

 7   be around him just in case something like that, I

 8   guess, would happen again.

 9      Q.      Like, to her, like, he would try to

10   touch her again or something like that?

11      A.      Exactly.

12      Q.      Okay.  And were those things that she

13   was actually telling you?

14      A.      Yes.

15      Q.      When you say that ███ would be

16   meeting with you -- I think you said, like, often

17   in the 9th grade year after you first came in

18   contact with her, how often -- can you estimate for

19   me, like, how often you were meeting her with her

20   about ███ and her anxiety and the panic attacks?

21      A.      It's hard to say, but I would

22   definitely say I would see her at least once a

23   week, but really I was just available to her

24   whenever -- whenever she needed me.  So sometimes
```

1    it would be once a week, sometimes it might be once

2    every other weeks.  Other times it might be twice a

3    week.  So really depended on what was going on.

4           And she would come to see me not just

5    regarding what had happened with ████ but just

6    her -- everything that was going on in life with

7    her being, you know, new at North Montco and all

8    the things that go along with that.

9       Q.    Like trying to make friends and things

10   like that?

11      A.    Exactly.

12      Q.    You said once ████ and ████ mom

13   had come to you and Dr. LeBlanc about seeing ████

14   in the hallways and trying to prevent that from

15   happening, trying to prevent any further ████

16   trying to touch her inappropriately, you said that

17   you had worked with ████ on a safety plan.

18      A.    Correct.

19      Q.    Can you tell me more about that?

20      A.    It was pretty much just saying that

21   when -- we knew when ████ was going to be

22   arriving to class and when he was going to be

23   leaving class; and so it was permission for ████

24   to get to her class where she wouldn't have to be

1   walking past ▬▬▬▬ and then also being able to

2   leave automotive so that she wouldn't have to see

3   ▬▬▬▬ when she was leaving automotive.

4        Q.    Was there anything implemented with

5   ▬▬▬▬ schedule about, like, when he could arrive

6   or what way he would have to take?

7        A.    I don't believe so.

8        Q.    Okay.  And do you know why that was?

9        A.    I do not.

10       Q.    Now, at this time ▬▬▬▬ was going to

11  North Montco full time, right?

12       A.    Correct.

13       Q.    Was that typical, for a 9th grader to

14  be at North Montco full time?

15       A.    No, not at all.  She was the first 9th

16  grader that had ever been accepted into the

17  full-time program.

18       Q.    And do you know why ▬▬▬▬ was

19  attending North Montco full time?

20       A.    Because of the situation with ▬▬▬▬

21  She -- Dr. LaBlanc had said this could be a way

22  that ▬▬▬▬ would -- would never have to see

23  ▬▬▬▬ and so it would take that factor out of the

24  situation.  So she agreed to allow ▬▬▬▬ to attend

1    North Montco full time.

2        Q.    And that was -- do you mean, like, she

3    would never have -- ████ would never have to see

4    ████ because when they were at North Montco

5    together you had the safety plan in place which

6    would prevent ████ from running into ████

7        A.    That was part of it, but it also was

8    they felt that her being at North Montco full time,

9    she would have even less of a chance of seeing

10   ████

11          Like the way that the schedule worked

12   out, she -- there would be even less likely of

13   chance of her having to see ████

14       Q.    Okay.

15       A.    Not just at North Montco, but also, I

16   believe, at North Penn.

17       Q.    Meaning, like, if she were to go to

18   North Penn?

19       A.    If she would have been a typical

20   student and just stayed at North Penn and attended

21   auto part-time, I guess the fear was that she would

22   be seeing ████ more with her schedule the way it

23   was.

24       Q.    Okay.  And so these were things in the

1    9th grade year you and Dr. LeBlanc implemented for

2    ████  to keep her safe?

3        A.      Yes.  So it was Dr. LaBlanc that came

4    up with the idea of her attending full time.  But

5    I -- I was happy to support ████ with whatever

6    was decided.

7        Q.      Okay.  Was it typical for students to

8    have, like, safety plans in place, like ████ did,

9    at North Montco?

10       A.      No.  I mean, we've definitely -- we

11   have implemented that in the past, but it

12   definitely wasn't a typical thing.  It was very

13   rare.

14       Q.      Do you -- I understand you don't keep

15   any, like, records or anything like that of what

16   ████  discusses in, like, session with you, right?

17       A.      Correct.

18       Q.      Is there a certain, like, length of

19   time that each time ████ would visit that she

20   would spend in your office?

21       A.      No.  It was always different.  There

22   was sometimes where she was just coming by for

23   something easy.  You know, just to get some candy

24   or to get some breakfast, or just to say hi; and

1    then sometimes she would stay for longer, depending

2    on what was going on in life.

3         Q.    In terms of up to this point ▬▬▬

4    talking to you about the past stuff that had

5    happened with ▬▬▬ and running into him before

6    the safety plan was implemented at North Montco,

7    can you recall anything, other than what we've

8    already talked about, about what ▬▬▬ would tell

9    you about those incidents, about how she felt, what

10   had happened, anything like that?

11        A.    No.

12        Q.    Do you keep any documentation of how

13   often or, like, the dates in which ▬▬▬ would

14   come to your office?

15        A.    I had it written down on my agenda book

16   and I hold onto my agenda books, but it doesn't

17   have any comments on what -- what the interaction

18   was about.

19        Q.    Do you still have -- was it a paper

20   agenda book?

21        A.    Yes.

22        Q.    Do you still have that?

23        A.    I should still have that at school

24   locked up in my desk.  But, like I said, it doesn't

1  give any details about what the interactions were

2  about.  It would just say saw █████ or TH.

3       Q.      █████ was struggling academically in

4  9th grade; is that right?

5       A.      Yes.

6       Q.      Do you have any understanding of why?

7  What was going on that █████ wasn't doing well

8  academically in 9th grade?

9       A.      I'm not sure.  I think it was a lot of

10  different factors.  But I think her being the only

11  9th grader doing this virtual plan, I definitely

12  don't think it was an ideal plan, because none of

13  the teachers had -- were used to having a 9th

14  grader come full time.  And some of the times it

15  was █████ with Mrs. Stabinski [ph], who was our

16  IEP case manager, meeting with her and completing

17  assignments.  So it wasn't -- it wasn't an ideal

18  situation.

19       Q.      And when you say the virtual part, was

20  that █████ was taking core classes, like her core

21  education classes, online from North Penn?

22       A.      I don't remember how many classes it

23  was, but there was definitely one or two that she

24  had to take with Ms. Stabinski, in her room, but I

1  wouldn't say that back then it was a virtual

2  situation.  It wasn't a virtual situation, it was

3  just that she was receiving -- she was kind of

4  receiving, like, one-on-one attention -- like,

5  one-on-one classes for some of -- for a couple of

6  her classes.

7      Q.    Okay.  And to your understanding, did

8  ███  have, like, pre-existing ADHD?

9      A.    Yes.

10     Q.    Would you agree that North Montco has

11 less supports for students with special needs, like

12 with ADHD than, like, North Montco [sic] High

13 School does?

14     A.    I would say we definitely have less

15 supports than North Penn High School --

16     Q.    That's what I meant to call it.

17     A.    -- for sure.  But I do feel like we --

18 we did offer -- we offered ███  quite a bit of

19 help and went above and beyond to try to help her

20 be successful.

21     Q.    Yeah, of course.

22         When -- is there anything else that you

23 can remember about ███  9th grade year, whether

24 it's involving ███  or her academics or anything

 1    like that?

 2         A.     I know that at the end of 9th grade

 3    year she was not accepted back into the full-time

 4    program for the upcoming year.  So she was upset by

 5    that and Mrs. █████████ was upset by that.  She

 6    felt like 9th grade year was -- at North Montco was

 7    actually a really good year.  I remember her saying

 8    that.  And going to Mr. Fleck [ph], her auto

 9    teacher and bringing him doughnuts and thanking him

10    for having it be a really great school year.

11              So overall she was feel happy to be at

12    North Montco, but her grades were definitely not

13    where they needed to be.  So that's why they said

14    that she wasn't -- not just with the grades, but

15    also she had been written up quite a few times for

16    discipline referrals also.

17              So they let her know that she could not

18    return to the full-time program.  She could return

19    as a part-time student for auto for 10th grade

20    year.

21         Q.     And did you work through processing

22    that with █████ that she was upset about it?  Was

23    that one of the things you were discussing when she

24    would come to see you?

1        A.      Yes.

2        Q.      Was ███████ -- was there hesitation for

3   her -- the alternative was her having to go to

4   North Penn High School; is that right?

5        A.      Correct.

6        Q.      Did you talk with ██████ at all about

7   her feeling about having to go to North Penn High

8   School, which she was avoiding by going to the tech

9   school?  Did you talk with her about that at all?

10       A.      Yes.

11       Q.      And can you tell me about those

12  conversations that you were having?

13       A.      I just know that she was nervous about

14  how different it was going to be and that the

15  classes were going -- she felt like the classes

16  were going to be bigger, and, you know, North Penn

17  is just bigger all around.

18              So, you know, I think there was --

19  there was definitely a lot of anxieties with

20  starting somewhere new and also about friendships.

21  Like, who was she going to know?  Or was she going

22  to have anybody around that would -- you know,

23  could be there for her.

24       Q.      Was she starting to, like, build some

1  of those relationships at North Montco?

2      A.     Yeah.  I mean, she -- there was

3  definitely times where she was feeling connected

4  and times she was not feeling connected, but for

5  the most part it was a positive experience at North

6  Montco and she was glad that she was there with us.

7      Q.     In terms of ▮▮▮▮ having to transition

8  back to North Penn High School for the 10th grade,

9  did she talk with you at all about any anxiety with

10 ▮▮▮▮ going to be there?

11     A.     I don't recall her saying that to me at

12 that time, but it was -- it was definitely one of

13 those things that she had brought up to me as one

14 of -- one of her things that she was anxious about

15 as a 9th grader, that -- that having to see him.

16     Q.     Okay.  Were you in any meetings at this

17 point, when ▮▮▮▮ was going to be transitioning

18 from 9th grade to 10th grade and going to North

19 Penn High School for the 10th grade year?  Did you

20 talk to any of the district's administration about

21 that transition?

22     A.     I did not, but I know that

23 Mrs. ▮▮▮▮▮▮ set up a meeting with all the

24 people that she thought were necessary to make sure

1  that ███ had a good transition back to taking

2  her academics at North Penn.

3          So I know that -- that Mrs. ████████

4  said that that was something that was happening,

5  that she was setting it up with special ed

6  supervisors and IEP team, but I was not involved in

7  that meeting.

8          I was involved in the meeting at the

9  end of the school year, the IEP meeting where they

10 let ████ and her mom know that she would have to

11 return to North Penn to take her academics and just

12 stay with us part-time.

13     Q.     And that IEP meeting, that was the end

14 of ████ 9th grade year?

15     A.     Correct.

16     Q.     What do you remember about -- you said

17 ████ -- that's when ████ and her mom found out

18 that ████ wasn't going to be able to stay at the

19 tech school full time.  What do you recall about

20 what was being said and what ████ and her mom's

21 reactions were?

22     A.     I just remember that there was a lot of

23 people in that IEP meeting and I felt like it was a

24 lot of -- a lot of people.  And I felt that -- I

1  remember that Mrs. ███████ and ██████ being

2  surprised that she wasn't going to be able to come

3  back full time.

4      Q.    Did ██████ -- other than being

5  surprised, did ██████ seem upset at that meeting?

6      A.    Yes.  I mean, she definitely wanted to

7  stay with us full time and she felt like she had

8  made some good relationships with the teachers and

9  with the students and so -- she -- you know, she

10  would have been happy to stay in the full-time

11  program.  So she was upset that she wasn't going to

12  be able to stay at North Montco's full-time

13  program, that she would have to do her academics at

14  North Penn.

15      Q.    Do you recall whether there were any,

16  like, district -- school district representatives,

17  whether it was, like, superintendents or anybody on

18  behalf of the school district that was at that IEP

19  meeting?

20      A.    There was definitely special ed,

21  teachers from North Penn.  I don't believe there

22  was a superintendent there, but I know for a fact

23  that there were representatives from North Penn,

24  because whenever we have an IEP meeting at North

1    Montco, the representatives from the school,

2    whatever school it may be, in this case it was

3    North Penn, they send their representatives over to

4    North Montco in order to hold the meeting.

5            So there was definitely at least one

6    special ed teacher at the meeting.  I believe there

7    was possibly two.

8        Q.    Do you recall if, like, ███████ or any

9    of those incidents were discussed at that IEP

10   meeting?

11       A.    Not that I recall.

12       Q.    Okay.  And so the decision's made that

13   ██████ is now going to have to go to North Penn

14   part-time for the high school, for 10th grade.  Did

15   you have any involvement with, like, helping ██████

16   transition over to North Penn?  Like, any kind of

17   tours or introductions or anything like that?

18       A.    No.  But I believe, like I said,

19   that -- with Mrs. ███████████ as soon as she found

20   out that ██████ was going to be going back to North

21   Penn for academics, Mrs. ██████████████ said, "Okay.

22   We need to set up these meetings now to make sure

23   this is a good transition."

24           And I believe at that point that's when

1    she was going to have her start meeting with Becca,

2    who is one of the counselors over at North Penn

3    High School, and I just was encouraging █████

4    that, "Hey, you know, people think this counselor's

5    amazing," and, you know, "You'll be in good hands

6    with her."  And just, you know, wanted to get her

7    feeling hopeful and exited about the transition.

8           Like the fact that she -- you know,

9    this wasn't what she wanted, but let's makes the

10   best of this and make it a successful year.

11     Q.     Was ██████ from your understanding and

12   your impression, starting to, like, feel a little

13   bit more hopeful about splitting the day in 10th

14   grade?

15     A.     Yes.  In fact, in 10th grade she

16   even -- she even said to me, the beginning of 10th

17   grade, that she felt like things were going really

18   well.

19     Q.     Did she explain, like, what she meant

20   by that?  Like, what was going really well about

21   North Penn High School?

22     A.     Well, so when she came to me to let me

23   know that █████ was in class with her and was

24   actually sitting right next door to her, she shared

1  that with me hoping that I would not have to share

2  it with anybody else, that I could just keep that

3  to I myself.

4          Because she said, "You know what, like,

5  this has been a school year and everything's going

6  okay and I really -- I don't want this to cause any

7  problems.  I don't want there to be any issues.  If

8  we could just have this be between you and me and

9  not report it, that would be -- that would be

10 ideal."

11         She really just wanted to get through

12 the school year without any -- without any

13 disruptions.  Like, she felt like, "Okay.  If you

14 come forward with what I just told you, then this

15 is really going to throw things off for me."  And

16 she'd rather just ignore it and just, you know,

17 move on with her school year

18    Q.    When you say ignore it, what -- what

19 was she trying to ignore?  What was going on?

20    A.    So when she came to me and let me know

21 that she was in class with ████ and there was

22 inappropriate things going on quite frequently, one

23 of the things, you know, I asked her was why

24 didn't -- you know, why didn't you say something

1    sooner?  And one of the reasons was because she

2    really -- she felt like the year was calm and she

3    felt like things were calm and she had, like -- and

4    it wasn't just academics.  Like, she was always

5    worried about the social piece of things also.

6              Like, she felt like her friend group

7    was good at that point and she felt like some of

8    her friends were friends or acquaintances with

9    ███████  and so she really just didn't want any --

10   any attention to be put on her.  She kind of just

11   wanted to just go through 10th grade without there

12   being any issues.

13             And, unfortunately, I told her, you

14   know, this is something that I can't just keep to

15   myself, it has to be reported.  And she, you know,

16   was upset by that because she was hoping that we

17   could just somehow not report it.

18        Q.   When you said inappropriate things

19   going on, what do you mean?

20        A.   So that's when she told me that ███████

21   was touching her inappropriately sexually during

22   class.

23        Q.   I'm sorry.  I apologize.  So touching

24   her sexually inappropriately during class.  Are

1    those the words that she used?

2        A.      I can't say for sure that she said it

3    exactly that way, but she -- she went into detail

4    about what sort of thing was happening and I

5    explained to her that we needed to call the police.

6        Q.      Now, I know it's uncomfortable and, you

7    know, kind of difficult to talk about, but it's

8    important to understand, you know, what exactly she

9    was saying or, you know, why you thought it was

10   important to call the police.

11           So can you just, as difficult as it may

12   be, you know, say specifically what she was telling

13   you and kind of be more descriptive if you can?

14       A.      She was saying that ██████ purposely

15   had her -- had his desk right next to her desk, and

16   was -- he was going underneath her shorts or her

17   pants and her underwear and using his fingers on

18   her inappropriately.

19       Q.      I apologize for the level of detail,

20   but, like, do you mean in her vagina?

21       A.      Correct.

22       Q.      Or in her -- in her rectum?  Or was it

23   both or just one or the other?

24       A.      I believe it was just her vagina.

```
 1      Q.      And you said this was in the back of
 2  the classroom?
 3      A.      I'm not sure if it was in the back of
 4  the classroom, but I believe when she told me about
 5  it, I pictured it towards the back over to the
 6  side.  I'm kind of surprised that she was able to
 7  have her desk so close to ████████ and that it
 8  wasn't that -- no attention was brought to it.  But
 9  I didn't actually see the layout, so I'm not sure
10  exactly how it was set up.
11      Q.      When you say her desk so close to
12  ██████'s, did she describe for you, like, how close
13  the desks were?
14      A.      She had told me that ██████ pulled up
15  his desk so that -- like, ██████ wanted their desks
16  right next door to each other.
17      Q.      Like where their desks were touching do
18  you mean?
19      A.      Yes.
20      Q.      When you say that ██████ had
21  purposely -- or I think was putting his fingers
22  under her shirts -- or her shorts and her underwear
23  and into her vagina, that you said -- did this
24  happen -- do you know about how many times that had
```

1    happened in the classroom?

2         A.      I know that it definitely happened more

3    than once and it seemed that it had been going on

4    for quite a while, since, like, the beginning of

5    the school year.

6         Q.      And do you know about when it was that

7    ███████  brought this information to you?

8         A.      I believe -- I don't have it in front

9    of me, but I remember -- I believe it was October.

10   Whatever day it was, we called the Towamencin

11   police and they came in on that day to discuss all

12   the details.

13        Q.      Why did you -- I think you said you had

14   to call the police or you wanted to call the

15   police, or something like that.  Why was that?

16        A.      Just the fact that she had told me that

17   somebody touched her sexually inappropriately.

18   That would -- that's the way our school handles a

19   situation like that.  If -- if abuse is reported,

20   then we have to report it.

21        Q.      When you say -- I mean, you just used

22   the term "abuse," when abuse is reported.  How --

23   was there an impression that you got or something

24   that ███████ told you perhaps that made you

1  categorize this as abuse and not something like two

2  kids consensually doing something in the back of

3  the classroom?

4      A.    She made it very clear that this was

5  not something she wanted to happen.  It wasn't

6  something that both of them decided on.  It was --

7  this was something he was doing to her while she

8  was in class.  It wasn't something that she

9  asked -- that she asked to happen or that she went

10  along with.  Like, she made it seem like it was

11  unwanted.  It was unwanted.

12      Q.    And as she's -- are these things that

13  she's actually expressing to you?

14      A.    Yes.

15      Q.    And did you believe her when she was

16  telling you that stuff?

17      A.    Yeah.

18      Q.    When she was telling you all of this,

19  was -- what was her demeanor like?  Was she upset

20  at all or how was she -- when she was telling you

21  all this stuff, how was she?

22      A.    She was very anxious and upset.

23  Because, like I said, like, she -- she was hoping

24  we wouldn't even have to report it.  Like she was

1  kind of like, I have something that I feel like you

2  should know, but, you know, but I'm afraid to tell

3  you.

4          And so that's when I explained to her

5  that, you know, depending on what it was, I would

6  have to report it, depending on what she was about

7  to tell me.

8          And so we had that discussion, but,

9  yeah, she was very anxious about what was this

10  going to mean?  Like, how was this going to disrupt

11  her life, is how she felt like.  And, you know, "Do

12  you have call anybody?  Do you have to call my

13  family?  Do you have to get North Penn involved?"

14          And I'm like, "Yes, I need to do all

15  those things."

16      Q.    And she made a decision to tell you --

17  or she still told you after you explained all of

18  that about I can't keep secrets and I might have to

19  report this depending upon what you say, she still

20  told you all of that?

21      A.    Correct.

22      Q.    Did she explain to you or did you get a

23  sense from her of, like -- I mean, she didn't want

24  things to be disrupted or changed, but what exactly

1  she was afraid of or nervous about by telling you

2  these things?

3       A.     One of the things that would come up

4  quite a bit was the fact that she -- she felt like

5  ████ was very popular and well liked.  I believe

6  he was on the football team and she really felt

7  like -- like that was one of the things that she

8  was worried about, was how was this, you know -- if

9  this were to come out regarding ████ what -- how

10  was that going to affect her?  In all ways.  You

11  know.  Like, she was very anxious about -- about

12  how everything was going to play out, because she

13  really just kind of wanted to just go through 10th

14  grade year and not have to worry about any of this

15  stuff.

16       Q.     When you say not have to worry about

17  any of this stuff, what do you mean?

18       A.     You know, just focus on academics and

19  not have to worry about ████ touching her in

20  class.

21       Q.     Was she worried about, like, her, like,

22  education being disrupted, like, if things were

23  going well for her other than the ████ situation?

24  Like, was she worried about having to leave school?

1  Did she tell you that?

2      A.      I think she was worried about a lot of

3  different things, because there was a lot of

4  transition that had already happened.  And -- and

5  those things were important to her.  Like, who she

6  had as -- you know, she -- she loved her teachers

7  and she loved her classmates and feeling -- you

8  know, feeling like she belonged and was doing well

9  was, you know, important to her, just like it is to

10  every high school student I know.

11      Q.      Was she afraid -- did she talk to you

12  at all about being concerned about, like, bullying

13  or any type of retaliation?

14      A.      Yeah.  That was one of the things that

15  she was definitely concerned about, was how was

16  this going to impact her and was there going to be

17  any retaliation, especially because she felt like

18  ████  was very popular and well liked at the

19  school.  So that was definitely something that she

20  brought up to me for sure.

21      Q.      We talked about the digital penetration

22  that ████ described to you.  Was there any other

23  incidents that ████ told you about about ████

24  inappropriately touching her in any other way?

1          A.      It -- when she let me know what was

2    happening, she made it sound like it wasn't just a

3    one-time deal in social studies.  Like, it was --

4    it was ongoing.  Like, it went on for -- I

5    believe -- like I said, I believe it was October

6    when she told me, and she told me it had been

7    happening the entire school year.

8                  So from the point that I called the

9    police, that's -- she was saying this sort of thing

10   was happening up until then.  And at that time I

11   don't believe she went into too much detail about

12   how often these things were happening.

13                 When I get a report like this, we do

14   our best, like, not to ask too many questions,

15   especially because we knew that, you know, the

16   police were going to be involved.  And so she just

17   gave me kind of like the bare minimum to just let

18   me know that this sort of thing was -- that it had

19   been happening and it had happened at least more

20   than once during that time period.

21        Q.      Did she describe anything about

22   inappropriately touching, like, in the breast area

23   or anything like that, or was it all, like, under

24   the underwear type touching?

1      A.      I believe she might have said that he

2   would -- he touched her in other ways too, but I'm

3   not -- I don't recall.  I don't remember for sure.

4      Q.      Do you recall what other ways you're

5   referring to or what she was referring to?

6      A.      All I know is that it happened more

7   than just once and I forget if -- you know, what

8   was happening when.  You know.  All I know is that

9   this -- there was inappropriate touching going on

10  that she did not want, but I don't remember the

11  details.

12          And to be honest with you, like, she --

13  I didn't want to ask too many details because of

14  the sensitivity of the situation, but she did let

15  me know that fingers -- that ███ did use his

16  fingers underneath her underwear during class.  But

17  I don't know if -- how often that happened, but I

18  know at least one time that happened.

19     Q.      When you say that ███ was upset and,

20  like, very anxious as she's telling you this,

21  what -- was she crying or what was it that gave you

22  the impression that she was upset and very anxious?

23     A.      I'm not sure if she was crying that

24  time, but she would cry.  She would definitely show

1  all the signs of somebody with anxiety, asking lots

2  of questions.  Like I said, she -- she really was,

3  like -- "I don't know if I want to tell you this,

4  because you might have to tell somebody."

5          And I'm like, "Well, these are the

6  reasons why I would have to tell somebody.  And

7  whatever it is, I'd like for you to tell me,

8  obviously."

9          So she definitely showed all the signs

10  of being anxious about -- about letting me know and

11  what was going to happen next.  I can't say for --

12  you know, for sure at this point whether she was

13  crying.  I wouldn't -- I wouldn't doubt it, because

14  she was tearful with me in my office.  She felt

15  comfortable crying in my office if she -- if that

16  was what was going on.  But I just know that she

17  was very worried about how things were going to

18  play out.

19          I remember calling Mom and she was in

20  Philadelphia working and I was very nervous about

21  Mom driving after hearing the news.  So I wanted

22  her to, you know, take it easy and go slow because

23  I knew all of this wasn't going to go over well.

24          So -- so ███████ was very anxious with

1    the magnitude of what she had shared with me and

2    the fact that I did have to get others involved.

3        Q.    I know you said that you reported it to

4    the Towamencin police, right?

5        A.    Correct.

6        Q.    Was that, like, a telephone call or was

7    there some type of written report that you send

8    over?

9        A.    No.  I think it was just a telephone

10   call and then they came and met with ██████ and her

11   mom.  And I wasn't involved with that, that part of

12   the situation.

13       Q.    Do you know why you were not involved?

14       A.    No.

15       Q.    Do you know whether they interviewed

16   ██████ there at the school?

17       A.    I believe so, but I can't say for sure

18   that I -- that that's how it went down.

19       Q.    You also said that you had called

20   Mrs. ██████████ as well.

21       A.    Correct.

22       Q.    And you said that, based on what you

23   told her, you were concerned, like, for her safety

24   about driving to the school for ██████

1    A.    Correct.

2    Q.    What do you remember about that

3 conversation with Mrs. ███████?

4    A.    I just know she was really surprised

5 and really upset.  Like, how could this have

6 happened?

7    Q.    What do you mean she was surprised?

8    A.    She was -- Mrs. ███████ was very

9 upset and she just couldn't believe that ████ was

10 in the same class with her daughter, because she

11 had already met with North Penn and discussed with

12 them how important it was to not have █████ in the

13 same class with █████.

14        So she was shocked that this happened.

15 That they were in class together.  She was

16 surprised by that.  She didn't -- she thought she

17 had already covered all of her bases and that there

18 was no way that something like this would happen.

19    Q.    Other than calling Towamencin police

20 and Mrs. ███████ was there anybody else that

21 you had to, like, inform or did inform about this?

22    A.    We definitely would have informed North

23 Penn, but I can't say for sure if it was me who

24 made that call or Dr. LaBlanc.  Usually the way it

1   goes is Dr. LaBlanc will speak with the

2   administrator that's involved.  And the fact that

3   this was, you know, everything that -- because it

4   was a serious situation, I believe Dr. LaBlanc most

5   like called the administrator involved to let them

6   know what was occurring.

7        Q.    Do you happen to know who that

8   administrator was or who the person from North Penn

9   was?

10       A.    No.  Not at this time.

11       Q.    Okay.  Like, do you know whether it

12  was, like, the principal or whatever?  Even if you

13  don't know the name, like, what title or position

14  that person held?

15       A.    No, because it could have --

16  sometime she would -- a lot of times she would

17  reach out to the assistant principal.  So I don't

18  know if she reached out to the assistant principal

19  or the principal or both people at that time.

20       Q.    After these brief calls were made that

21  day, what -- what happened in terms of meetings or

22  anything afterwards from this report?

23       A.    I believe what I had heard was that

24  ████ -- when it was time for ████ to go to

1  Mission Kids and let her -- and explain what had

2  happened, I believe ███████ decided to not go

3  forward with it, with -- with going forward with

4  the fact that she was being touched inappropriately

5  by ███████

6         Like, I don't think she wanted -- she

7  just didn't want any part of it.  Like, she didn't

8  want to have ███████ get in trouble or have any more

9  issues.  Like, she was very worried about how all

10 of this was going to impact her life.

11     Q.     How do you -- how do you know that?

12     A.     Because these were all things, like,

13 she would share with me.  And also Mrs. ███████████

14 had told us that she -- she decided that she didn't

15 want to go any further with it.  I guess it was the

16 decision about whether to press charges or not.  So

17 that was the -- that's what I had heard.  Like,

18 that she didn't -- she just wanted to be done with

19 it.  She didn't want to go further with it.

20     Q.     In your talking to ███████ -- I assume

21 you met with her after this point or talked with

22 her after this point, right?

23     A.     Yes, but I can't say for sure that we

24 talked about any of this, because it was a very,

1  like, sensitive situation.  We -- she would come to

2  meet with me about all kinds of different things

3  that were going on, not just with this situation

4  with ████

5          So anyway, I can't say for sure that

6  she talked to me about what had gone on after --

7  after that point.

8      Q.      Do you know why she didn't want charges

9  pressed or, if that's your understanding, like,

10  what the motivation was behind that?

11      A.      I was told that she just wanted to --

12  she just wanted to be done with it and she didn't

13  want -- she just wanted to, like I said, move on

14  with her school year.

15          She felt like things were going pretty

16  well and she didn't want to bring any more

17  attention to herself or the situation.  Like,

18  she -- she didn't want to have to -- she didn't

19  want to have to deal with the situation anymore.

20  And she was worried about how it was going to

21  impact her with, you know, ████ being popular and

22  her friends being friends with ████ or

23  acquaintances with him.

24      Q.      Did you notice -- other than, like,

1  actual conversations that you had with ███████ did

2  you notice, like, an impact on her or a change in

3  her after the incidents that happened in 10th

4  grade?

5      A.    I can't say for sure, because she was

6  having a hard time for a lot of different reasons.

7  And I can't say that it was directly because of

8  what she had told me about her being in class with

9  ███████ but that, obviously, had a big impact on

10 her; and I could see that based on how upset she

11 was.

12          But she also would come to me regarding

13 other situations that were going on in life.  So I

14 can't say how much of it was due to what had taken

15 place with ███████ and how much of it had to do with

16 other situations that were going on.

17     Q.    Did you participate in any meetings

18 with the district administration or representative

19 about that, the assault?

20     A.    No.

21     Q.    Did anyone from North Penn School

22 district ever talk to you about, like, ███████

23 disclosure to you or anything like that?

24     A.    No.

1    Q.    Like, not the principal or, like, the

2    Title IX coordinator or anyone?

3    A.    No.  I don't recall having any

4    discussions with anyone.  The only one I would have

5    reached out to, on my end, is the school counselor.

6          Like I said, with most situations, our

7    principal, Dawn LeBlanc, would reach out to her

8    administrative contact and I would reach out to my

9    school counseling contact; but because of the

10   sensitivity of the situation, I definitely would

11   not go into detail about anything.

12         I knew that this was something that

13   needed to be reported and -- and that I was -- you

14   know, that was my part of it, and then I was done

15   with that.

16   Q.    In your experience, was ████ -- like,

17   you said that she, like, didn't want anything

18   else -- that she didn't want to, like, go through

19   with the criminal prosecution and that kind of

20   stuff.

21         In your experience as a guidance

22   counselor for high schoolers, is that typical for

23   students that report abuse like you described?

24   A.    Absolutely.

1    Q.    And in your experience, what -- like

2    why is that common or if you have an understanding?

3    A.    In my experience, what ███ said was

4    what a lot of -- I had a lot of other students say.

5    They're afraid of retaliation.  They're afraid of

6    what will happen if they report what's going on.

7    So, yeah, that's my experience for sure.  That --

8    she was just -- you know, she was afraid.

9    Q.    To your understanding, in speaking with

10   ████ when she was disclosing, did she want the

11   abuse to stop from ████

12   A.    Yes, but she honestly, like, from what

13   she had told me, she did not -- she did not know

14   how to handle the situation.  She felt like, you

15   know what, he's friends or acquaintances with some

16   of my friends and acquaintances, he's very popular,

17   I just -- you know, she wanted it to stop, but she

18   didn't want there to be any backlash from anybody.

19   Q.    Like towards her?

20   A.    Correct.

21   Q.    Do you know what, if any, support the

22   district gave ████ after her disclosure in 10th

23   grade?

24   A.    I know she definitely started meeting

1   with Becca from North Penn.  Becca would come over

2   Wednesday morning and she would meet with ████

3   actually right across from my office.  They would

4   have probably about 45 minutes to an hour every --

5   every week, and I believe it was every Wednesday

6   morning.  And she had a really good rapport with

7   Becca, so I was glad that she had her as a support.

8        Q.    Do you know why ████ -- since you

9   were kind of her support before ████ went to

10  North Penn, why she was meeting with Becca instead

11  of you?

12       A.    Well, Becca is -- I don't know if she

13  still is, but she was through the Lakeside.  Like,

14  she was kind of like what I was when I used to work

15  at North -- my first year working at North Montco.

16  I was hired through an outside agency.  So I was --

17  my purpose was to work with kids that needed that

18  extra support and that's -- that's Becca purpose,

19  was that she was going to give ████ you know,

20  the 45 minutes or hour per week, and they felt that

21  she would have the ability to fit that into her

22  schedule.

23            I think they knew that, because I was a

24  school counselor, that they couldn't count on me

 1  being available for 45 minutes to an hour every

 2  week.

 3       Q.    Okay.  Do you know whether the district

 4  put any other supports in terms of, like,

 5  academics?  Now that ███████ was going to be going

 6  into North Montco again full time in 10th grade,

 7  whether there was any additional implementation to

 8  help ███████ academically?

 9       A.    Not that I'm aware of.

10       Q.    Were you part of the IEP meeting in

11  10th grade with ███████ transitioning back full time

12  to North Montco?

13       A.    I don't believe so.  I know there was

14  an email saying that they did a reevaluation and

15  that she had a new -- at that point they said that

16  she had emotional disturbance and still had the

17  ADHD diagnosis, but I wasn't actually in the IEP

18  meeting for that.  That was just shared with me --

19  actually, Mrs. ███████ shared that email with

20  me.  That, hey, this is -- you know, this is new.

21            Of course, whenever anybody has an IEP

22  meeting, we get a copy of the new IEP.  So that

23  would have definitely happened also.

24       Q.    Do you have an understanding of what

1  the new diagnosis of emotional disturbance, what

2  lead to or why ▬▬▬▬ had that new diagnosis in

3  addition to her prior ADHD?

4      A.    I don't know.

5      Q.    Do you know whether it had anything to

6  do with the incidents with ▬▬▬▬

7      A.    I'm not positive, but I feel like it

8  was after -- after that situation that they had her

9  reevaluated.

10     Q.    When you say "they had her

11  reevaluated," who are you are referring to?

12     A.    Like, Mrs. ▬▬▬▬▬▬ and her IEP

13  team.

14     Q.    Like, through the district?

15     A.    Exactly.

16     Q.    Are there any conversations that you

17  had with Wendy that we haven't already discussed,

18  like, involving the district and ▬▬▬ or anything

19  like that?

20     A.    I don't think so.

21     Q.    And what about for the North Penn

22  administration or, like you said, Becca, the

23  counselor, and about the incidents with ▬▬▬ at

24  the high school?

1     A.    Are you -- are you asking if I had any

2   conversations about -- about what had -- what was

3   reported to me?  Did I have any discussions with

4   Becca?

5     Q.    Or even -- yeah, just kind of more

6   generally about, you know, ███ being supported

7   or what happened, the incidents with ███ that

8   ███ had talked to you about.  Did you have any

9   conversations with Becca about that that we haven't

10  talked about?

11     A.    I definitely stayed in touch with

12  Becca, but most of the time she would check in with

13  me right before she left, and there wasn't anything

14  that she would have to share with me.

15         So most of the time she would just

16  come, meet with ███ and then head out.  So we

17  didn't have that many discussions about what --

18  what they discussed.  And I don't remember having

19  any discussions with Becca at -- at any point

20  regarding what was reported to me.

21     Q.    Okay.  And would Becca just come to

22  North Montco specifically to meet with ███

23     A.    Yes.

24     Q.    Do you recall having any conversations

1   with any North Penn administration or teachers

2   about ▮▮▮▮ and the incidents with ▮▮▮▮

3        A.      No.

4        Q.      What about in terms of ▮▮▮▮, like,

5   emotional disturbance or the emotional

6   psychological impact this was having on her?

7        A.      I know that in 9th grade the teachers

8   were made aware that she was coming to us full time

9   because of confidential information, you know, so.

10  And they knew about the safe -- like, the team knew

11  about the safety plan, but they -- I wouldn't say

12  that anybody knew about what was reported to me in

13  10th grade.  None of that would have been shared

14  with any of the teachers.

15       Q.      Like the North Penn teachers you mean?

16       A.      Right.  Or North Montco teachers.

17       Q.      What about North Penn administration,

18  like the principal?  Do you know whether they were

19  made aware of the incidents with ▮▮▮▮ being

20  abused by ▮▮▮▮ in the classroom?

21       A.      I'm assuming that Dr. LaBlanc, the

22  principal at the time, would have reached out to

23  the North Penn administration.  That was something

24  that would happen every time a situation like that

1  would occur, that would -- that would definitely be

2  something that our administration would share with

3  North Penn's administration.

4      Q.    When you said the team knew about the

5  safety plan that was in place, is this the safety

6  plan in 9th grade that North Montco implemented for

7  ███████

8      A.    Correct.

9      Q.    When you say the team knew about it,

10  are you saying North Penn School District's team?

11     A.    Right.  North Penn was aware that we

12  had set up a safety plan.  So it was shared --

13  definitely shared with the people that needed to

14  know at North Penn and also shared with the people

15  at North Montco that needed to know.

16     Q.    When you said the people that needed to

17  know, would that have included North Penn's high

18  school principal?

19     A.    I would think so.

20     Q.    Like, who are you referring to, I

21  guess, when you're saying that the district knew or

22  they were -- the team knew about the safety plan?

23     A.    I know that it was shared with North

24  Penn and I believe Dr. LaBlanc shared it with her

1    contact over at admin -- at North -- her

2    administrative contact over at North Penn, but I'm

3    not sure which administrator was included on that

4    plan.

5         Q.    Okay.  And when you say North Penn, are

6    you talking about the high school or the district

7    or both?

8         A.    I guess both, because I'm not sure who

9    Dawn LeBlanc was -- like who her point persons

10   were.  I knew there were certain people that she

11   would reach out to, but I'm not sure who her point

12   person was when it came to ▮▮▮▮▮▮

13        Q.    Okay.  But you may not know the answer

14   to this question if you weren't part of the

15   conversation or the decision to do so, but do you

16   know why, since ▮▮▮▮ was full time at the time at

17   North Montco, why North Penn was being notified

18   about the safety plan for ▮▮▮▮▮▮

19        A.    Even when we got kids come to us as

20   full-time students, we know that that student still

21   is technically a student of their sending district.

22   So we definitely still want to keep their district

23   notified of what's going on.  So we try to stay in

24   communication with the counselors and

1  administration as much as possible about any of the

2  students coming to us, even if they are coming to

3  us full time.

4      Q.    Other than we talked about the 6th

5  grade incidents that you were made aware of that --

6  with ███████ in ███████ 9th grade year, and then

7  the 9th grade incidents where she was seeing him in

8  the hallway and having the panic attacks, and then

9  the incidents in 10th grade, was there any other

10  incidences or abuse that ██████ told you about from

11  ██████ in any other situations?

12      A.    Not from ██████

13      Q.    Okay.  Are you referring to, like,

14  something that happened to ██████ when she was like

15  five?

16      A.    Yes.

17      Q.    Okay.  When ███████ came back to North

18  Montco with this emotional disturbance and you said

19  that there was a meeting and new evaluation of

20  ██████ do you recall anything about ████████ name

21  getting put in ███████ IEP?

22      A.    I'm not aware of that.

23      Q.    After ██████ had returned and was now

24  receiving most of her emotional support from Becca,

1    did you have, like, any conversations or any time

2    that you were supporting ██████ after that point?

3         A.     Yes.  Because things would come up, you

4    know, other than that one time.  Like I said, I

5    think it was Wednesday mornings, I'm pretty sure.

6    Usually it was like first thing in the morning.  So

7    she knew she had me as a support for any other time

8    during the school day when she was -- when she was

9    at North Montco.

10             So she definitely still, like, stayed

11   in touch with me and talked to me about things.

12   But she knew that she would have that time with

13   Becca, and that kind of was like her time to

14   discuss whatever she needed to discuss at that

15   time.  But she definitely would still come and see

16   me after Becca was put into place.

17        Q.     Did she ever talk to you about the

18   impact the assault by ██████ had had on her,

19   whether it's in 6th grade or in 10th grade?

20        A.     It was definitely something that

21   impacted her because I know she had a hard time

22   fitting in.  Like, she -- she had a hard time -- I

23   believe she -- she had to go to a different middle

24   school after that situation with ██████  And then,

1  you know, she was coming to us full time in ninth

2  grade.

3            So I know that there was a lot of, you

4  know, anxiety with -- with, like I said, just being

5  a high school student in general, but then throwing

6  this other layer on top of it definitely -- you

7  know, it definitely impacted her life for sure and

8  it was something that she would -- she would share

9  with me is that, you know -- she was very excited

10  when she would make a new friend or be able to hang

11  out with somebody on the weekend, because those

12  things were not coming easy to her.  So when she

13  did have those successes, when she did make a new

14  friend or was feeling like she was accepted, it was

15  definitely a big deal for her.

16      Q.     What about in terms of after the 10th

17  grade abuse incidents?  Anything like that you can

18  add onto like how she was feeling or how it was

19  impacting her?

20      A.     I don't feel like there's anything else

21  to add.

22            MS. LAUGHLIN:  Okay.  I think those are

23      all the questions I have for you, Ms. O'Brien.

24            I don't know if, Ms. Cantor, if you

1      have any questions.

2              MS. CANTOR:  I just have a few

3      follow-up.  Do you need to take a break or

4      anything?  I don't have many.

5              THE WITNESS:  No.  That's okay.

6                      -  -  -

7                   EXAMINATION

8                      -  -  -

9  BY MS. CANTOR:

10      Q.      Okay.  So you testified regarding the

11  safety plan that you had set up in order to make it

12  so that ███████ didn't have to pass ███████ in the

13  hallway, correct?

14      A.      Correct.

15      Q.      Do you recall when that safety plan was

16  instituted?

17      A.      No.

18      Q.      When in the school year, if you need

19  to?

20      A.      No, I don't know exactly.

21      Q.      And was that a safety plan that was set

22  up between you and ███████ or were there other

23  people involved in setting that up?

24      A.      Other people were definitely involved

1 with setting that up.

2    Q.    Who else would have been involved?

3    A.    I know Dr. LaBlanc.  It was -- she was

4 the one who said we're doing this.  And I know

5 security was aware, because they were involved with

6 having her go outside and not have to walk past

7 drafting.

8    Q.    And as far -- once that safety plan was

9 set up, did you hear anything else from ███████ in

10 terms of any concerns she had with ███████ at least

11 during 9th grade?

12    A.    No.

13    Q.    When ███████ came to you in October of

14 10th grade to tell you about the incidents going on

15 with ███████ in class, had she told you at all prior

16 to that that ███████ was in her class?

17    A.    No.

18    Q.    So on the same day that she told you

19 about the incidents occurring with ███████ was also

20 the same date that she told you that ███████ was in

21 her class; is that fair?

22    A.    Correct.

23    Q.    Did ███████ say anything to you at that

24 time that she had told anyone at the North Penn

1   School District that ███ was in her class?

2        A.     No.  It was my understanding, because

3   that was one of the first thing we discussed, like,

4   did you tell anybody else?  And at that point it

5   was my understanding that I was the first person

6   that she was telling that at that time.  Nobody

7   else knew.

8        Q.     And when ███ was in 9th grade, were

9   there any other -- any issues that you were made

10  aware of with regard to any disciplinary issues

11  with ███ while she was in ninth grade at North

12  Montco?

13       A.     She was definitely written up for

14  several different infractions during 9th grade.

15  That was one of the main reasons why they felt that

16  she should not come back to the full-time program.

17  Because that was one of our policies, that you're

18  not supposed to be written up three or more times

19  per school year or be failing -- you can't be

20  failing your lab and also attendance comes into

21  play.

22              I know that she was written up for

23  several different things, but a lot of -- a lot of

24  the things that she was written up for were, like,

1    having her phone out; drinking, like, a Monster

2    beverage during class.  It was definitely like a

3    lot of minor infractions.

4        Q.    Do you know how many times she was

5    written up?

6        A.    I believe it was nine.

7        Q.    Were you aware of an incident where she

8    was drinking alcohol at school?

9        A.    Yes.

10       Q.    When did that occur?

11       A.    I believe that was 10th grade,

12   actually.  The beginning of 10th grade.

13       Q.    And what discipline, if any, was █████

14   subjected to for that?

15       A.    I'm not sure, because I don't handle

16   the discipline, but for something like that, I

17   believe she definitely got an out-of-school

18   suspension.

19       Q.    Have you had any communication with

20   either Attorney Laughlin or anyone from her office

21   outside of the deposition?

22       A.    No.  Just to set this up.

23       Q.    Did ██████ ever tell you anything about

24   the 6th grade incident with ██████

```
 1        A.      Yes.  But I also feel like the reason

 2   why I was even hearing about it is from that phone

 3   call from Mrs. ██████████ reaching out to

 4   Dr. LaBlanc and myself to say, "Hey, this is -- you

 5   know, I'm upset that you have ██████ ██████ at your

 6   school when this happened back in 6th grade."

 7        Q.      And you're referring to a phone call

 8   with regard to ██████ passing ██████ in the

 9   hallway?

10        A.      Yes.

11        Q.      And did ██████ ever tell you anything

12   about the 6th grade incident?

13        A.      I can't say for sure that she told me

14   from her mouth.  I know I found out about it

15   because of Mrs. ██████████ reaching out to us.

16             MS. CANTOR:  That's all the questions I

17        have.

18             Thank you.

19             THE WITNESS:  Okay.

20             MS. LAUGHLIN:  I just have a couple

21        follow-up questions and you'll be out of here

22        shortly.

23                       -  -  -

24                  EXAMINATION
```

1                      -  -  -

2    BY MS. LAUGHLIN:

3       Q.      When -- do you know whether you ever

4    asked ██████ specifically to tell you about what

5    had happened in 6th grade with ██████

6       A.      I highly doubt it.  Because it was --

7    it is such a sensitive situation, it's not

8    something I would bring up.

9       Q.      Okay.  Do you know why -- you had just

10   told Ms. Cantor that you were the first person that

11   ██████ told about the abuse by ██████ in 10th grade

12   and the fact that he was in her class.  Do you know

13   why you were the first person that she told?

14      A.      She felt very comfortable with me, and

15   I think she knew that I had her best interest at

16   heart.  She felt comfortable talking to me about

17   pretty much anything.  So it doesn't surprise me

18   that she came to me with that information.

19      Q.      Did she tell you why she didn't, like,

20   tell the social studies teacher or the principal at

21   North Penn or somebody like that at the high

22   school?

23      A.      She -- she told -- she spoke about that

24   with me because that was one of my first questions.

1 Like, "Oh, my gosh.  How long has this been going

2 on for?"

3          And she was she like, "The entire

4 school year."

5          And I'm like, "Why didn't you say

6 anything?"

7          And she was, you know, very worried

8 about retaliation and how this was going to affect

9 her.

10     Q.     And I know that you don't know the

11 exact time that you worked to institute the safety

12 plan in 9th grade, but was it after ███████ had seen

13 ███████ in the hallway?

14     A.     Absolutely.  That was why -- that's the

15 reason why the safety plan was implemented, so that

16 she wouldn't have to see ███████ anymore.

17     Q.     Was that at the -- if you can estimate

18 for me, was that at the start of ███████ 9th grade

19 year?

20     A.     I really do feel like it was at the

21 very beginning of the school year.  It was after

22 Mrs. ███████████ already reached out to Dawn and I

23 to say, "Hey, this -- you know, ███████ ███████ in

24 your school and my daughter's having anxiety

1  attacks passing him in your school."

2          So that's when the idea of a safety

3  plan to help her avoid ██████ as much as possible,

4  that's when it was set up.

5          MS. LAUGHLIN:  Those are all the

6     questions I have.

7          Any other questions?

8          MS. CANTOR:  Nothing else.

9          MS. LAUGHLIN:  Okay.  You're free to

10     go.

11          Thank you so much for your time, Ms.

12     O'Brien.

13          THE WITNESS:  Okay.  Thank you.

14                    -  -  -

15             (Witness excused.)

16                    -  -  -

17          (Whereupon, the deposition was

18     concluded at 3:38 p.m.)

19                    -  -  -

20

21

22

23

24

1                    C E R T I F I C A T E

2

3            I, Nancy J. Taguinot, RPR, CCR(NJ),

4    Registered Professional Reporter and Notary Public

5    in and for the Commonwealth of Pennsylvania,

6    certify that the foregoing is a true and accurate

7    transcript of the remote deposition of said

8    witness, who was first duly sworn by me on the date

9    and place hereinbefore set forth.

10

11           I further certify that I am neither

12   attorney nor counsel for, nor related to or

13   employed by, any of the parties to the action in

14   which this remote deposition was taken, and

15   further, that I am not a relative or employee of

16   any attorney or counsel employed in this action,

17   nor am I financially interested in this case.

18

19

20           *Nancy J. Taguinot*

21

22           Nancy J. Taguinot, RPR, CCR(NJ)

             Notary Public

23           New Jersey License No. 30XI00100500

24

# EXHIBIT "N"

1        UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

               -   -   -

3   JANE DOE                :NO. 2:20 CV
                            :05142

4          v.               :
                            :

5   NORTH PENN SCHOOL        :
    DISTRICT                 :

6

7               -   -   -

8           November 5, 2021

9               -   -   -

10          Remote Zoom deposition of

11   PETER NICHOLSON, taken pursuant to

12   notice, was held at the location of the

13   witness, commencing at 10:02 a.m., on the

14   above date, before Emily Andreasen, a

15   Court Reporter and Notary Public for the

16   Commonwealth of Pennsylvania.

17

18

19

20

21

22               -   -   -

         GOLKOW LITIGATION SERVICES
23      877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com

24

```
 1   A P P E A R A N C E S:
 2

     FREIWALD LAW
 3   BY:  LAURA E. LAUGHLIN, ESQUIRE
     1500 Walnut Street
 4   18th Floor
     Philadelphia, Pennsylvania 19102
 5   (215) 875.8000
     lel@freiwaldlaw.com
 6      Representing the Plaintiff
 7

 8   HENDRZAK & LLOYD
     BY:  SUSAN LLOYD, ESQUIRE
 9   3701 Corporate Center Parkway
     Suite 100
10   Center Valley, Pennsylvania 18034
     (610) 709-8705
11   susan.lloyd@zurichna.com
        Representing the Defendant
12

13   WISLER PEARLSTINE, LLP
     BY KYLE J. SOMERS, ESQUIRE
14   460 Norristown Road
     Suite 110
15   Blue Bell, Pennsylvania 19422
     (610) 825-8400
16   ksomers@wispearl.com
        Representing the Defendant
17

18

19

20

21

22

23

24
```

1          I N D E X

2               –   –   –

3

4  WITNESS                                    PAGE

5  PETER NICHOLSON

6        By Ms. Laughlin                      4

7

8

9

10          E X H I B T S

11               –   –   –

12  NO.            DESCRIPTION              PAGE

13        (No exhibits were marked.)

14

15

16

17

18

19

20

21

22

23

24

1          (It is hereby stipulated and
2      agreed by and among counsel for
3      the respective parties that
4      reading, signing, sealing,
5      certification, and filing are
6      waived; and that all objections,
7      except as to the form of the
8      question, are reserved until time
9      of the trial.)
10              -  -  -
11          PETER NICHOLSON, after
12      having been duly sworn, was
13      examined and testified as follows:
14              -  -  -
15          EXAMINATION
16              -  -  -
17  BY MS. LAUGHLIN:
18      Q.    Good morning, Mr. Nicholson.
19  My name is Laura Laughlin.  I represent
20  Jane Doe in this lawsuit who, I'm sure,
21  you know as ███████ ██████████   You're
22  here to give a deposition today.
23          Do you understand that?
24      A.    I do.

1    Q.    And I understand that you've

2  been having some health issues, and I'm

3  sorry to hear that.

4           I don't want to go into

5  detail in those health issues, but do the

6  issues that you're going through,

7  health-wise, does that impact your

8  ability to recall information or testify

9  truthfully today?

10   A.    It does not.

11   Q.    Are you on any kind of

12  medications today that would impact your

13  ability to recall information or testify

14  truthfully?

15   A.    I am not.

16   Q.    Have you ever given a

17  deposition before?

18   A.    I have not.

19   Q.    So I'm going to go over a

20  few ground rules that'll, hopefully, make

21  things go a little bit easier today.

22           As you see, we're all on a

23  screen, or at least the court reporter

24  and I are, and, you know, I know that

1  your counsel is in the room with you.

2            If for any reason today, you

3  know, the audio breaks up or something

4  like that, you didn't hear my question,

5  just let me know and I'll try to rephrase

6  it.  You never know what's going to

7  happen with technology.

8        A.    Understood.

9        Q.    Because we have a court

10 reporter in this virtual room, she's

11 taking down everything that's said, and

12 so all of your answers have to be verbal,

13 like a "yes" or "no," you can't say

14 "uh-uh" or nod your head, okay?

15       A.    Yes.

16       Q.    If for any reason you don't

17 understand the question that I asked --

18 it came out jumbled or something, you're

19 not sure what I'm asking -- just let me

20 know and I'll try to rephrase it so you

21 do understand.  Okay?

22       A.    Okay.

23       Q.    If you answer the question,

24 since I gave you that instruction, we're

1 all going to assume you understood what I

2 was asking, okay?

3     A.   Okay.

4     Q.   We're going to be talking

5 about some things that happened several

6 years ago. If you don't remember

7 something, it's okay to say you don't

8 remember, if that's the truth, okay?

9     A.   Yes.

10     Q.   I don't want you to guess at

11 anything today. Understood?

12     A.   Yes.

13     Q.   You can estimate things,

14 though. If you don't know the exact date

15 something happened or a time period or

16 something, if you can estimate, just let

17 us know that that's what you're doing, is

18 giving an estimation, okay?

19     A.   Yes.

20     Q.   If you need to take a break

21 for any reason today, just let us know

22 and you can do so. If there's a question

23 pending, I'd ask that you answer the

24 question before you take your break,

1  okay?

2      A.    Yes.

3      Q.    I understand, from your

4  counsel, Ms. Jordan, who's not here

5  today -- I understand Ms. Lloyd is

6  filling in for her -- that due to your

7  health issues going on, you need to be

8  done the deposition today at 2 o'clock

9  p.m.; is that right?

10      A.    Yes.

11      Q.    And so there's been an

12  agreement, ahead of time today, that if

13  we're not finished today by 2 o'clock,

14  that you would come back on Monday to

15  complete the deposition.

16            Do you understand that?

17      A.    I do.

18      Q.    Are you still the --

19            I understand, during the

20  timeframe in this case, in 2018, you were

21  the principal of North Penn High School.

22            Is that right?

23      A.    That is correct.

24      Q.    And do you still hold that

1 same position today?

2          A.     I do.

3          Q.     When did you become the

4 principal of North Penn High School?

5          A.     In July of 2018.

6          Q.     And the assault we're here

7 to talk about today, that happened in the

8 fall of 2018, would you agree with that?

9          A.     That's when it was brought

10 to my attention, yes.

11          Q.     Okay.  So you started

12 just -- that school year was your first

13 year at North Penn High School as the

14 principal, right?

15          A.     That's correct.

16          Q.     What did you do before you

17 became principal of North Penn High

18 School in July 2018?

19          A.     For five years, I was one of

20 the assistant principals here at North

21 Penn High School.

22          Q.     When you say "one of the

23 assistant principals," how was that

24 broken down?

1        A.      My last couple of years as
2   an assistant principal, there were six
3   assistant principals; prior to that,
4   there had been five for a couple of years
5   as well.  So it depends on the year,
6   exactly, how it was broken down.
7        Q.      Okay.  How did it vary, year
8   to year?
9        A.      My first three years, there
10  were five assistant principals.  We each
11  had a certain portion of the alphabet.
12  Specifically, I had the last names A
13  through C, or the early Ds, in all three
14  grades.
15          And, then, the final two
16  years as assistant principal, we were in
17  charge of certain graduating classes, the
18  first year which would have been the --
19  '16-'17 school year, I had the class of
20  2017, the first half of the alphabet; and
21  the following year, I had the class of
22  2020, the first half of the alphabet,
23  along with another assistant principal.
24        Q.      Okay.  And --

1     A.    I apologize.  We're going to

2  have bells because we're in a school and

3  we're gonna probably have announcements

4  at times, so...

5     Q.    Okay.

6     A.    That was the bell.  We may

7  have announcements, just so you're aware

8  of what's going on if you hear outside

9  noise.

10     Q.    Okay.  Thanks for letting me

11  know.  I mean, I work in the city, so

12  there's always some kind of something

13  going on in the background.  I appreciate

14  you explaining that.

15         How did it come to be that

16  you went from assistant principal to the

17  principal of North Penn High School in

18  July 2018.

19     A.    Our principal up until that

20  point, Dr. Todd Bauer, was named

21  assistant superintendent of North Penn

22  School District.  The hiring process was

23  put out to name and to find the next

24  principal of North Penn High School.  I

1  applied, I interviewed, and was awarded

2  the job.

3        Q.    Did you undergo any

4  additional training to go from being an

5  assistant principal into the principal

6  role at North Penn High School?

7        A.    Not specifically, no.

8        Q.    You said "not specifically."

9              Is there a training that

10 you're thinking of that was not specific

11 that you underwent?

12       A.    No, what I'll say is that

13 the administrators in the district all,

14 pretty much, typically, have the same

15 training schedule and are trained in the

16 same way, so there was nothing specific

17 to the job responsibility that I wasn't

18 already trained in prior to becoming

19 principal.

20       Q.    Okay.  Is there only one

21 principal for the entire North Penn High

22 School?

23       A.    Yes.

24       Q.    Can you give me a summary of

1  how your role changed?

2              I mean, other than,

3  obviously, a title and, I'm sure, more

4  responsibility for principal, how did

5  your role change from going from an

6  assistant principal to the principal?

7      A.    I would say that it becomes

8  more of an oversight of the assistant

9  principals rather than the assistant

10  principal -- monitoring what the

11  assistant principals are doing; working

12  with the fiscal budget is a big change

13  that assistant principals typically don't

14  work with; working with athletics;

15  working with other aspects that,

16  typically, assistant principals are not

17  part of is really the big change that, I

18  would say, is the difference between

19  assistant principal and principal.

20      Q.    I understand, from seeing

21  the documents that were provided by the

22  district in this case, that Kyle Hassler

23  was documented to be the assistant

24  principal during the 2018 school year, as

1  it involved the incident we're here to
2  talk about today.
3          Do you know what Kyle
4  Hassler's role was, at the time, with the
5  assistant principal, meaning did he have
6  certain letters or certain grades at this
7  time?
8          A.    He did, yes.  He would have
9  had that year -- I believe he would have
10  had the sophomore class, the incoming
11  sophomores, and he would have been
12  working, I believe, with the first half
13  of the alphabet, whether that was cut off
14  with the letter K or letter L, I don't
15  recall exactly, but he would have had the
16  first half of the alphabet.
17          Q.    Okay.  When you said he had
18  that year, do you mean the freshmen as
19  well?
20          A.    No.  The sophomore class,
21  the 10th graders.  We do not have
22  freshmen -- we don't have many freshmen,
23  and those that do attend here are only
24  here a couple periods per day.

1    Q.   Right.  Thank you for that.

2   I forgot.  When I went to high school, it

3   was 9 through 12 was high school.

4        I understand North Penn

5   School District, the high school starts

6   at 10th grade.

7        Correct?

8    A.   Correct.  9th grade is on

9   the high school transcript, but it's

10  contained in the middle schools.

11   Q.   I understand.

12        Prior to taking on the role

13  of principal at North Penn High School,

14  had you ever been trained on Title IX?

15   A.   Yes.

16   Q.   Can you describe for me that

17  training, when, where, that kind of

18  stuff?

19   A.   I don't recollect specific

20  times.  I do know that our school

21  solicitor regularly gave training

22  opportunities and updates to our

23  administrative team, as I said before,

24  during district administrative trainings,

1    whether it be during the school year or

2    during the summer.

3         Q.    When you say "the district

4    solicitor," you're talking about Kyle

5    Somers that's in the room with us today?

6         A.    Yes.

7         Q.    To your understanding, back

8    in 2018, what was Title IX?

9         A.    Title IX protects students

10   and staff in a public school setting --

11   specifically, I'll talk about a public

12   school setting -- from any discrimination

13   from race or gender, any protected class.

14        Q.    Do you know whether Title IX

15   also covers sexual harassment?

16        A.    Yes.

17        Q.    Yes, it does cover it?

18        A.    Yes.  Correct.

19        Q.    And in what way?

20              How does sexual harassment

21   have to do with Title IX, to your

22   understanding, back in 2018?

23        A.    To my understanding, in

24   2018, sexual harassment would have been

1 part of the discrimination due to gender

2 or due to sexual orientation, what have

3 you.

4          Q.    As a principal of North Penn

5 High School back in 2018, what

6 involvement, if any, did you have

7 regarding Title IX?

8          A.    At that point, complaints

9 that would have been Title IX, if I

10 recall correctly, would have gone through

11 Title IX compliance officer.  And we

12 would have been directed and worked with

13 any kind of investigation through that

14 process.

15          Q.    When you say would have gone

16 through the Title IX compliance officer,

17 who was that?

18          A.    That would have been our

19 director of HR, to my recollection.  At

20 that point, Dr. Cheryl McCue.

21          Q.    Prior to 2018, I guess you

22 were the assistant principal at that

23 time, but had you ever had any experience

24 with a Title IX complaint and the

1  involvement of Dr. Cheryl McCue?

2        A.    Not to my recollection, no.

3        Q.    Prior to you becoming an

4  assistant principal at North Penn High

5  School, what did you do before that?

6        A.    Prior to becoming an

7  assistant principal at North Penn High

8  School, I was an assistant principal in

9  Allentown School District at Francis D.

10 Raub Middle School for five years; and

11 then prior to that, I was a health and

12 phys ed teacher at Harrison-Morton Middle

13 School in Allentown School District for

14 seven years.

15       Q.    And do you have, like, a

16 resume that you keep?

17       A.    I do.

18       Q.    I would ask to --

19            MS. LAUGHLIN:  If you could

20       provide a copy of that to your

21       counsel.  Your current resume.

22            THE WITNESS:  Sure.  I will

23       do so.

24            MS. LAUGHLIN:  Thank you.

BY MS. LAUGHLIN:

Q.    During your time at North
Penn High School, do you recall there
being any training on Title IX for
students?

A.    Not that I can recall.

Q.    What about for parents?  Do
you recall there being any training for
parents on Title IX, and rights under
Title IX, during your time at North Penn
High School?

A.    Not that I can recall.

Q.    Have you ever heard, at any
point, of North Penn, in the past or
since, doing any kind of training on
Title IX for students or parents?

A.    Not that I can recall.

Q.    To your knowledge, is there
a way that students or parents are
informed about Title IX rights at North
Penn High School?

A.    I believe, but I'm not
certain.  It could be included in our
student-parent handbook, but I'm not

1   100 percent positive on that.

2          Q.    Okay.  Have you ever been

3   part of any discussions, within the

4   district, about informing parents or

5   students about their rights under Title

6   IX since your time in the district?

7          A.    Not that I can specifically

8   recall.

9          Q.    I believe you told me,

10  earlier, that when there is a -- I think

11  you were saying -- Title IX complaint

12  made, it would be taken to the Title IX

13  compliance officer who, at the time, in

14  2018, was Cheryl McCue, and then a plan

15  would be formulated on how to deal with

16  that; is that accurate?

17         A.    Yes, that's correct.

18         Q.    So I want to get into more

19  specifics about that process and how it

20  works.

21               When you say when a report

22  is made or a Title IX complaint is made,

23  what do you mean by that?

24               How does that, typically,

1  happen, in your experience?

2        A.    In my experience, if a

3  complaint is made that is of concern that

4  it would be a violation of Title IX, that

5  would be something that we would run past

6  the compliance officer to verify if it is

7  or is not a potential Title IX violation,

8  and be directed from there.

9        Q.    Okay.  And when you say run

10 it past the compliance officer, how would

11 you do that?  By email, would you call

12 the person?

13       A.    It could, I guess, be

14 either, but I would assume it would

15 involve -- or in past practice, it has

16 involved sharing documentation with the

17 compliance officer.

18       Q.    When you say "sharing" --

19 I'm sorry.  Go ahead.  I didn't mean to

20 cut you off.

21       A.    It could start with a phone

22 call, but at some point, we would share

23 that information electronically or in

24 hardcopy form.

1    Q.    When you say "share that
2  information," are you talking about,
3  like, the initial report by the student
4  or whoever reported it?
5    A.    Yes.
6    Q.    When you say you would
7  submit it, sometimes you would do a phone
8  call, sometimes it would be submitted
9  electronically, would that be through
10  email?
11    A.    If it was electronically,
12  yes.
13    Q.    Prior to 2018, since you, I
14  think, told me you had not been involved
15  in any Title IX issues or reports or
16  anything, is it safe to say that you had
17  not gone through this process prior to
18  that; is that correct?
19    A.    Correct.
20    Q.    How did you know, when you
21  were the principal in the 2018-2019
22  school year, that that was the process,
23  about reporting to the compliance
24  officer?

1    A.    It would have been part of
2  the training we underwent as an
3  administrative team.
4    Q.    And do you have an estimate
5  of when that training took place?
6    A.    No.  As I said, I don't
7  recall specifics of those times or
8  trainings.
9    Q.    Did you get any
10  documentation with that training?
11    A.    Not that I can recall.
12    Q.    Was there any kind of, like,
13  PowerPoint or anything that was shown at
14  this training?
15    A.    Typically, there are.
16  Again, I don't remember specifics.
17    Q.    Do you keep any
18  documentation of any of the training that
19  you undergo through the district?
20    A.    I'll say it depends on the
21  training.  Typically, I take personal
22  notes, but not always.
23    Q.    Have you looked in your
24  files to see whether you have any notes

1   on prior past Title IX trainings that you

2   were saying you recall undergoing?

3           A.     I have not.

4           Q.     I would also ask --

5                  Where do you keep those

6   notes?  Is it in a notebook or in, like,

7   a Word document or something on a

8   computer?

9           A.     I keep some personal notes

10  in handwritten form.  Also some,

11  potentially, electronically in either a

12  Google Doc or my own personal notes.

13                  MS. LAUGHLIN:  I would also

14          ask, following the deposition

15          today, that you do a

16          search through whether it's

17          handwritten notebooks that you

18          keep or Google Docs, or whatever,

19          on a computer -- to see if there

20          are any trainings that you've

21          undergone through the district

22          that you've taken your own

23          personal notes and kept, okay?

24                  THE WITNESS:  Sure.

¹ BY MS. LAUGHLIN:

²      Q.    Once you submit the report

³ to the compliance officer, the Title IX

⁴ compliance officer, who, at the relevant

⁵ time, was Dr. Cheryl McCue, what happens

⁶ next?

⁷      A.    I guess it would depend on

⁸ the specifics of the situation, and we

⁹ would follow the direction of the

¹⁰ compliance officer.

¹¹      Q.    And just to make sure we're

¹² on the same page or I'm understanding

¹³ your testimony correctly:  When you say

¹⁴ that you are reporting it up to the Title

¹⁵ IX compliance officer to, you know, make

¹⁶ sure that this report does fall under

¹⁷ Title IX, to your understanding, would a

¹⁸ report of one student inappropriately

¹⁹ touching another student, sexually, would

²⁰ that fall under Title IX?

²¹      A.    If there was a report made

²² of that nature, yes.

²³      Q.    Do you know, does it matter,

²⁴ for Title IX purposes, whether the

1  assault took place on school grounds or
2  off school grounds?
3       A.    I'm sorry.  Can you repeat
4  the question?
5       Q.    Sure.  I'm asking for your
6  understanding, back in 2018, with Title
7  IX.
8            Does Title IX still apply to
9  assaults between students, both on school
10 grounds and off school grounds?
11      A.    It could, if it would impact
12 the education of the student in question.
13      Q.    Okay.  And so to follow up
14 on that, would the district still have
15 an, I guess, obligation under Title IX to
16 investigate an assault that took place
17 off school grounds as well?
18      A.    If it was reported to us and
19 it was impacting the education, I believe
20 so, yes.
21      Q.    When you say "it was
22 impacting the education," what do you
23 mean?
24      A.    What I mean is the alleged

1  assault or alleged Title IX violation was

2  impacting the ability of one of the

3  students to receive their education at

4  the high school or any school within the

5  district, that would be a Title IX

6  complaint that we would forward to the

7  compliance officer.

8         Q.    And if you have a report

9  that somebody was assaulted off school

10 grounds and that was the information that

11 you had, would you have to do an

12 investigation to determine whether the

13 assault was impacting either student's

14 education at school?

15        A.    I would assume.  I would

16 assume if there was a report made to the

17 school that there was some impact on the

18 student's education.

19        Q.    I guess what I'm -- let me

20 clarify my question, then.

21             Would the report have to

22 include that the assault off grounds was

23 impacting that student's education for

24 the district to investigate or the high

1  school to investigate that assault that

2  occurred off school grounds, then?

3       A.   Well, I don't believe we

4  would be investigating the assault that

5  happened off school grounds.  We would be

6  working to ensure that the student was

7  able to access their education.

8       Q.   And so if a report was made

9  in that instance, when somebody was

10  assaulted off of school grounds by

11  another student, what would the district

12  be doing to determine that?

13       A.   Again, following the

14  direction of the compliance officer, I

15  believe we would be meeting with students

16  to see if there are any measures that

17  need to be put in place to allow students

18  to gainfully access their education.

19       Q.   And if the student --

20            I mean, I guess, how would

21  that be done?  How is that determined?

22       A.   I'm sorry.  How is what

23  determined?

24       Q.   I mean, I guess, is it just,

¹ you know, you asking the student, Is

² there anything that you need, is your

³ education impacted, and hearing what the

⁴ student says?

⁵       A.    To some extent, yes.  I

⁶ believe meetings would have to be held

⁷ and we would have to investigate what

⁸ kind of impact that outside situation has

⁹ made on the student's educational

¹⁰ attainment or access.

¹¹       Q.    And, then, would it be up to

¹² the high school to determine whether or

¹³ not to take steps further, depending upon

¹⁴ what they concluded from what the

¹⁵ students were telling them?

¹⁶       A.    It would be up to the high

¹⁷ school as well as the Title IX officer.

¹⁸       Q.    Okay.  In this case, in

¹⁹ 2018, when there was a report made that

²⁰ ███████  ████████████  was sexually assaulted

²¹ in the classroom at North Penn High

²² School, did you report that to Cheryl

²³ McCue, the Title IX compliance officer?

²⁴       A.    The specifics of this, that

1  I recall, is that the report was made to

2  North Montco.  It was reported to me via

3  the Towamencin Police Department, and we

4  were told not to do any kind of

5  investigation; however, I did share the

6  fact that the investigation was happening

7  with members of the administrative team

8  here at North Penn by including

9  Dr. McCue.

10       Q.    And you included Dr. McCue?

11       A.    I knew she was involved in

12  it, yes.

13       Q.    When you say you know she

14  was involved in it, what do you mean?

15       A.    I know that she -- I know

16  that she was made aware of the pending

17  police investigation and the report that

18  was made at the tech school.

19       Q.    How do you know that she was

20  made aware of those things?

21       A.    Through conversations with

22  other members of the district

23  administrative team that I'd had, after

24  being notified by Towamencin police.

1  Q.    And did they tell you, was

2  there an email that you saw that you were

3  on?  Can you explain to me how you knew

4  that Dr. McCue was aware, at that time,

5  that there was an allegation that ████

6  had been sexually assaulted at school?

7  A.    It would have been a verbal

8  conversation, I believe, with Dr. Bauer,

9  our assistant superintendent.

10  Q.    And so you had a

11  conversation with -- was it just you and

12  Dr. Bauer having this conversation?

13  A.    Yes.  To my recollection.

14  Q.    And was this an in-person

15  conversation, over the telephone?  How

16  did you talk to him?

17  A.    The best of my recollection,

18  it was over the telephone.

19  Q.    Were you the one that was

20  directly notified by Towamencin police?

21  A.    Yes.

22  Q.    And you said that they had

23  told you not to investigate; is that

24  right?

1       A.      Yes, that's correct.

2       Q.      Who was the one who told you

3    that?

4       A.      Going back three years, I

5    believe it was Detective Jusko and

6    Detective Pierre-Louis that were here at

7    North Penn High School to notify me of

8    what was reported.

9       Q.      So these two detectives

10   actually came to the high school and told

11   you this information in person?

12      A.      That's correct.

13      Q.      I want to ask you about that

14   meeting and then we'll get back to the

15   Dr. Bauer phone call.

16              Do you remember when

17   Detective Jusko and Pierre-Louis showed

18   up to North Penn High School?

19      A.      I know it was in October of

20   2018 in the first 10 to 12 days.  I was

21   off campus and my secretary had called

22   me.  I was at a training off campus.  I

23   was called and told that they were here

24   and they need to talk with me about a

1  situation, that I should come back to the

2  high school, which I did.

3            I don't remember the

4  specific date, but I know it was in the

5  early portions of October.

6            Q.    Okay.  And you said you were

7  at a training somewhere?  Is that right?

8            A.    Correct.

9            Q.    Like, district education

10  training, or what kind of training were

11  you at?

12            A.    It was a training on a new

13  student information system that we were

14  starting to implement for the following

15  year, for the 2019-2020 school year.

16            Q.    Okay.  And so, I assume,

17  once you got called that two detectives

18  were at your high school to talk to you,

19  you probably came back immediately; is

20  that right?

21            A.    That's correct.

22            Q.    And so when you got back to

23  the high school -- and was this a normal

24  school day?

1      A.     Yes.

2      Q.     Okay.  So you come back to

3  the high school and -- tell me what you

4  recall happening next.

5      A.     I came back to my office,

6  the detectives were there.  They notified

7  me that there was a report made at North

8  Montco Technical School, that there was a

9  potential assault that occurred at North

10  Penn High School; and that they --

11  believe they were seeking demographic

12  information for the two students that

13  were identified or involved; and that

14  they were going to investigate; and that

15  until they completed their investigation,

16  we should not interfere as per the

17  typical with something of that nature.

18      Q.     "As per the typical with

19  something of that nature," is that what

20  you said?

21      A.     Correct.

22      Q.     What do you mean?  As per

23  the typical with something in that

24  investigation?

1    A.    I mean, in certain
2  situations, the police will tell us not
3  to interfere with an active
4  investigation.  They don't want us doing
5  concurrent investigations that could
6  impede on their own investigation.
7    Q.    Based on the Title IX
8  training that you said you received up to
9  that point, was that consistent with the
10 training that you had received?
11   A.    The training, that I recall,
12 was that it would be reported and then we
13 would follow the direction.  I don't know
14 that that's inconsistent, that we were
15 following direction.
16   Q.    Meaning following direction
17 from the police?
18   A.    Correct.
19   Q.    Had you ever been trained
20 prior to that in Title IX, that a Title
21 IX investigation can run concurrently
22 with a police investigation?
23   A.    Not that I recall.
24             MS. LAUGHLIN:  Can you read

1    back the last question?

2                    -   -   -

3            (At this time, a discussion

4        was held off the record.)

5                    -   -   -

6    BY MS. LAUGHLIN:

7        Q.    You mentioned these two

8    detectives also said they had come to get

9    demographic info about information about

10   the two students that were involved in

11   the report; is that right?

12       A.    Correct.

13       Q.    When you say demographic

14   info about the two students, what do you

15   mean?

16       A.    Student information system

17   information, which would include their

18   name, their date of birth, their address,

19   phone numbers for family contacts, et

20   cetera.

21       Q.    At this point, when the

22   detectives are there, do you know whether

23   the families were contacted?

24       A.    I do not know if they had

1    been contacted at that point.

2         Q.    And just to make sure that

3    we're clear:  The two students that were

4    involved in this report were ███████

5    ████████████  and ████████ ████████  is that

6    right?

7         A.    Yes.  That's correct.

8         Q.    Prior to this report, had

9    you ever had any interactions with ███████

10   ████████████

11        A.    I had not.

12        Q.    Had you been aware of her,

13   the fact that she's a student in your

14   high school or anything about her prior

15   to this?

16        A.    Yes.

17        Q.    And how was that?  How were

18   you aware of her prior to this?

19        A.    I was aware of a meeting

20   that occurred in August, an IEP meeting,

21   or a meeting between she and some of our

22   folks here at the high school regarding

23   her educational needs as she entered 10th

24   grade from -- I believe she was at tech

1   school full time in 9th grade and was

2   coming to the high school for her 10th

3   grade year.

4        Q.    Included in that meeting,

5   did you have an awareness of ████████

6   prior instances with ██████ ███████

7        A.    I was made aware, after the

8   meeting, that there was a concern with

9   the two of them being in the same class

10   together, stemming from something that

11   had happened prior.

12        Q.    When you say "something that

13   had happened prior," what was your

14   understanding of when it happened prior?

15        A.    My understanding was that

16   there was an alleged sexual encounter or

17   assault, something that happened prior

18   to, and I don't recall being told when it

19   was or where it was, but that it had

20   occurred prior to the 2018 school year.

21        Q.    Okay.  And so you were aware

22   of this after the meeting that was held

23   in August, prior to the start of the

24   school year, with high school

1  administration?

2       A.    Correct.

3       Q.    Do you recall who it was

4  that told you about that meeting and the

5  information you just conveyed to me?

6       A.    Kate Small, who is our

7  current special education supervisor,

8  notified me, after the meeting, of some

9  of the information that was shared at the

10  meeting.

11       Q.    How did she notify you?  Was

12  that by email or some other way?

13       A.    I believe she had left me a

14  voicemail to call her and then we had

15  spoken via phone.

16       Q.    After that phone call, was

17  there any type of email or any other

18  documentation, in writing, that was

19  created based on your conversation?

20       A.    Not that I recall, no.

21       Q.    After that conversation you

22  had with Kate Small, did you communicate

23  with anybody else about the information

24  you had learned from her?

1      A.    After I spoke with Kate,

2  because Kate had also mentioned to me

3  that Mrs. ████████ was upset about,

4  again, this somewhat -- or not

5  somewhat -- this undisclosed situation

6  that had occurred previously, that she

7  was upset with our superintendent,

8  Dr. Dietrich.

9          I did have a quick

10  conversation with him because I was

11  headed to our educational services center

12  that afternoon for interviews.  I did see

13  him in person and just mentioned that a

14  meeting was held to see if there was any

15  information that he knew of.

16     Q.    Okay.  And when you say -- I

17  think you used the term "undisclosed

18  situation."

19          At this point, though, you

20  had known that there was an apparent

21  assault that had happened between --

22  like, ██████ assaulting ██████ at that

23  point, right?

24     A.    I knew that there was an

1  alleged assault of some nature.  I didn't

2  know any kind of specifics or necessarily

3  when it happened, where it happened, any

4  of those things.

5       Q.    And, then, you said that you

6  had had a conversation with Dr. Dietrich

7  shortly thereafter because Mrs.

8  ▮▮▮▮▮▮▮▮▮ had mentioned that Dr.

9  Dietrich was aware of, I guess, the

10  circumstances of what had happened in the

11  past; is that right?

12       A.    Correct.

13       Q.    And so this conversation

14  with Dr. Dietrich, that was in person

15  because you had seen him shortly after

16  anyway?

17       A.    Correct.

18       Q.    And tell me what you

19  remember about the conversation with

20  Dr. Dietrich.

21       A.    I recall speaking with

22  Dr. Dietrich, saying that a meeting was

23  held with the ▮▮▮▮▮▮▮ family, that

24  the -- you know, as reported to me, he

1  may have known some -- the facts of the

2  case.  He said that he recalled some of

3  the facts, that he recalled there was a

4  situation.  He did not go into great

5  detail, just based on the setting that we

6  were in, of anything that occurred or

7  anything he recalled from that previous

8  encounter between ████ and ██████

9        Q.    When you say he didn't go

10 into details given the setting he was in,

11 did he give you any details, like what,

12 if anything, did he say, about what had

13 occurred and what he knew?

14       A.    I believe he said it

15 occurred in elementary school, that there

16 was a situation, that he recalls, between

17 █████ and ██████ that occurred in

18 elementary school.  And, again, I don't

19 recall him going into any further detail

20 than that.  Again, there were other folks

21 around, and I don't know that it was an

22 appropriate time to share, based on what

23 I know now.

24       Q.    When you say what you know

1  now, meaning what?

2      A.    That it was an alleged

3  sexual assault that occurred.

4            And, again, there were other

5  folks in the room that were probably not

6  those that you would share something like

7  that in front of.

8      Q.    When you say what you know

9  now, when did you learn that it was

10  sexual assault, is what they were talking

11  about from 6th grade, or elementary

12  school?

13      A.    I don't recall the timeline

14  exactly or where I learned it.  I just

15  recall, at some point, that I was made

16  aware that it was an alleged sexual

17  assault.  I, honestly, couldn't tell you

18  when or along the timeline who even made

19  me aware of that.

20      Q.    Okay.  I know you're saying

21  "alleged sexual assault."

22            Are you aware of the

23  investigation that happened in elementary

24  school within the district?

1    A.    I'm not, no.

2    Q.    Okay.  I guess let me ask a

3 more specific question.

4         Are you aware that Principal

5 Bowen had interviewed, you know, █████████

6 and other students and had found that

7 these assaults did occur, in his opinion?

8 Are you aware of that?

9    A.    I'm not, no.

10    Q.    When you had this

11 conversation with Dr. Dietrich and you

12 said there were other people around, so

13 he couldn't go into that much detail

14 because of the environment you were in,

15 did you have an understanding that the

16 situation involved something of a sexual

17 nature between these two students?

18    A.    I don't recall, at that

19 point, if I knew it was of a sexual

20 nature or not.  As I said, the

21 conversation with Kate Small, prior to my

22 going to the educational services center,

23 was somewhat brief, and I followed up

24 with her later that day, gained more

1  information, potentially, then.  But I

2  didn't have much information to go on

3  other than there had been a meeting and

4  there was some sort of -- for lack of a

5  better term -- encounter between ████

6  and ██████ that they couldn't be

7  together in class.

8        Q.    I know you said that that

9  day, education services center, there was

10  people around so you really couldn't get

11  into detail with Dr. Dietrich other than

12  what you described.

13        Was there another time that

14  you had followed up with Dr. Dietrich to

15  find out the rest of the information that

16  he had had that couldn't be shared in

17  that particular forum where you were?

18        A.    Not that I can specifically

19  recall, no.

20        Q.    Do you recall whether

21  Dr. Dietrich tried to reach back out to

22  you, to follow up on the rest of the

23  conversation that you started having at

24  the education services center?

1    A.    Not that I recall.

2    Q.    You said that later on --

3          Let me ask this:  Was there

4  any time, prior to the assault being

5  reported by ██████ in October 2018, where

6  you had another conversation with

7  Dr. Dietrich about what had happened

8  between ██████ and ██████ prior?

9    A.    To the best of my

10 recollection, no.

11   Q.    Did you talk at all with

12 Todd Bauer, prior to the assaults being

13 reported, about the past assault by

14 ██████ on ████████

15   A.    Again, not that I can

16 recall.

17   Q.    Okay.  Is there anybody

18 else -- we're going to talk about Kate

19 Small in a second.

20         Is there anybody else that

21 you recall speaking with, prior to the

22 assaults being reported by ██████ in 10th

23 grade, about the prior assaults by ██████

24 on ██████

1        A.    I'm sorry.  Can you repeat

2   the question?

3        Q.    Sure.

4              We talked about

5   Dr. Dietrich.  I asked you about Dr. Todd

6   Bauer.  I know we're going to talk about

7   Kate Small.

8              But I was asking:  Is there

9   anybody else you can recall speaking to

10  about the past assaults by ███████ on

11  ███████ prior to ███████ report in 10th

12  grade that she had been assaulted again

13  by ████████

14        A.    No.

15        Q.    You said later that day,

16  meaning, you know, after you had been at

17  the education services building with

18  Dr. Dietrich, you had spoken with -- you

19  followed up with Kate Small again to find

20  out more details; is that right?

21        A.    That's correct.

22        Q.    And was this an in-person

23  conversation with Kate Small?

24        A.    It was.

1    Q.    Tell me what you remember

2    about that conversation with her.

3    A.    We talked about the meeting.

4    We talked about the fact that there had

5    been a -- again, I'm using the word

6    "alleged assault," because I don't have

7    information, necessarily, regarding what

8    had happened.  I believe you said in 6th

9    grade.  I just know that it was

10   elementary school.  That there was

11   conversation at the meeting that ███████

12   and ██████ should not be together in

13   class.

14            Kate told me that she had

15   double checked their schedules to make

16   sure they weren't in classes together,

17   that they were not in classes together,

18   and that Mrs. ██████████ was content

19   with them not being in classes together,

20   was okay with them, potentially, passing

21   in the halls.

22            And through the conversation

23   at the meeting, that as long as they were

24   not in classes together, thought

1  everything would be fine; that ▮▮▮▮ was

2  given some folks to check in with; and

3  that folks would be checking in with

4  ▮▮▮▮ in her transition, in general, as

5  she came to the high school.

6        Q.    When Kate Small had told you

7  that she double checked that, ▮▮▮▮ and

8  ▮▮▮▮ schedules, do you have an

9  understanding of what timeframe this was?

10       Was this still prior to the

11  start of the school year or when was

12  this?

13       A.    This was -- again, in

14  August.  It would have been prior to the

15  start of the school year.  I don't recall

16  it -- you know, you said not to guess.

17  But it was sometime in the early '20s of

18  the dates in August.  So it was prior to

19  the start of the school year.

20       Q.    Okay.  Yeah, if you have no

21  idea, no ability to even estimate, I

22  don't want you to just give me a guess.

23  But if you can estimate, like you did,

24  that's fine to do, and I appreciate you

1  doing so and clarifying it's an

2  estimation.

3           When she had told you that

4  she had double checked the schedules, do

5  you know where the plan came from that

6  she was going to check the schedules?

7       A.    I would be assuming, but

8  based on the fact that the meeting had

9  happened earlier that day, it would be in

10  that meeting that she would have

11  double-checked, or soon thereafter that

12  meeting.

13       Q.    Did you discuss

14  anything with -- or is there anybody

15  else?

16           Like, for instance, Megan

17  Schoppe, I understand, was also in that

18  meeting.

19           Did you ever talk to

20  Ms. Schoppe about what happened at the

21  meeting or the plan to keep ███████ away

22  from ███████

23       A.    I did speak with her about

24  the meeting.

1    Q.    And was that --

2    A.    I'm sorry.

3    Q.    Okay.  That was going to be

4  my next question.

5          Was this also prior to the

6  start of the school year?

7    A.    I believe so, yes.

8    Q.    Okay.  And this was after

9  the conversations that you had with Kate

10  Smalls where she told you she checked the

11  schedules?

12    A.    Correct.

13    Q.    What do you remember about

14  the conversations you had with Ms.

15  Schoppe?

16    A.    I remember the conversation

17  was, roughly, the same as the

18  conversation it was with Kate.  That

19  Megan had shared with me some of the

20  courses that ██████ would be taking and

21  the fact that Megan would be checking in

22  with ██████  She made herself available,

23  as she does to pretty much every student.

24          And at that time, especially

1 as department chair, as a check in and

2 make sure things were going well; and

3 that she would keep me posted if there

4 was anything that I needed to know.

5      Q.    Any other conversations that

6 you had with Ms. Schoppe about this?

7      A.    Not that I can recall, no.

8      Q.    What about Juliette Matje?

9 I believe that's how you pronounce her

10 name.

11           Did I get that right or

12 wrong?

13      A.    I believe it's Matje.

14      Q.    Okay.  I was not even close.

15           But Juliette Matje, do you

16 recall any conversations that you had

17 with her?

18      A.    I don't believe I had any

19 conversations with her.

20      Q.    When Kate Small told you

21 that she double checked the schedules and

22 that the students weren't together, had

23 you ever had a prior instance, in your

24 employment with the district, where you

1  had to make sure that two students were
2  separated and not in classes together?
3      A.    I believe so, but I can't
4  point to the specific situation.
5      Q.    Do you recall whether it was
6  in your time as principal or as assistant
7  principal?
8      A.    It would have been as my
9  time as assistant principal.
10     Q.    Do you recall what, if
11  anything, was put into place to prevent
12  those two students from being in the same
13  class together?
14     A.    At that time, typically, it
15  would have been double-checking schedules
16  to make sure that they were not in there
17  together, and it would have been -- if it
18  were known prior to the school year and
19  an ongoing situation, it would have been
20  something where it was part of what we
21  call our "hand schedule," to make sure
22  that the two students were not placed in
23  the same course by the automatic
24  scheduler in our student information

1 system.

2       Q.    Did you say the "hands

3 schedule"?

4       A.    Correct.

5       Q.    What is that?

6       A.    So in the summer when we

7 schedule students, there's an algorithm

8 that runs in the student information

9 system.  The vast majority of our

10 students get the courses that they need

11 and the courses that they want, and then

12 there are others that need to be hand

13 scheduled.  So the system just won't

14 schedule it, for whatever reason.

15           And part of that process, at

16 that time, would have been making sure

17 that two students that couldn't be

18 together were not scheduled together, and

19 changing a schedule, if need be, prior to

20 the start of the school year.

21       Q.    So would that be somebody --

22 when you're talking about, like, hand

23 schedule, like, somebody is actually, I

24 don't want to say "using their hands"

1  because it's probably on a computer.

2              To actually, like, move

3  classes around to make sure that students

4  aren't in the same classes together; is

5  that right?

6       A.    Correct.  Yes.  It would be

7  manually looking at the two students'

8  schedules, making sure that they're not

9  in a class together; and if they are,

10  moving one of the students out of that

11  course, switching their schedules so

12  they're no longer in a course together.

13       Q.    Okay.  So you're saying,

14  like, you know that you had the

15  capability to do that; that if they

16  were -- for instance, when Kate Smalls

17  had checked and there was a class that

18  was the same with these two students, she

19  could go in and hand change the schedule

20  to make sure that they weren't.

21              Is that what you're talking

22  about?

23       A.    Correct.

24       Q.    Prior to the 2018 school

1  year, were there other ways that the
2  North Penn High School could ensure or
3  prevent two students from being in the
4  same class together, other than doing
5  that schedule check?
6        A.    Not that I recall.
7        Q.    Have you ever received any
8  training on that through the school
9  district or in any other fashion?
10        A.    Not that I recall.
11        Q.    In the other instance that
12  you can recall, I think as assistant
13  principal, where two students could not
14  be in the same class together, did you
15  have somebody check the schedules, like
16  Kate Small did in this case, and then
17  hand change if needed?
18        A.    Yes.
19        Q.    And in that case, did those
20  two students -- were you successful in
21  preventing them from being in the same
22  class together?
23        A.    Yes.
24        Q.    In this case, when Kate

1  Small is checking the schedule, she did
2  this prior to the start of the school
3  year, right?
4          A.      Correct.
5          Q.      And as principal -- or
6  assistant principal, when you were in
7  that role for the five years prior to
8  becoming principal, were you aware that
9  there was an add/drop period for students
10 once the school starts?
11         A.      The 2018 school year was the
12 first year we had an add/drop period.
13         Q.      When did the add/drop period
14 take place, if you can recall, in 2018?
15         A.      I don't know the specific
16 dates, but it would have been the week
17 prior to the first day of school, at
18 least a few days during the week prior to
19 the start of school.
20         Q.      And to your understanding,
21 Kate Small had checked the schedules
22 prior to this add/drop period; is that
23 right?
24         A.      I believe so, yes.

1    Q.   When you say this was the
2   first year that they had done an add/drop
3   period, is it at North Penn High School,
4   the first year they had done that?
5       A.   Correct.
6       Q.   Was there any training to
7   anybody at the high school that this was
8   happening?
9       A.   When you say training to
10  anyone, I'm not sure what you mean.
11      Q.   Yeah.  Was any of the
12  administration at the high school trained
13  that, in 2018, there was going to be this
14  add/drop period for classes that hadn't
15  been done before at North Penn High
16  School?
17      A.   I wouldn't say there was
18  training, but there was notification,
19  yes.
20      Q.   How did that notification
21  happen?
22      A.   Either, verbally, in the
23  administrative meeting or, potentially,
24  via email or electronic means.

1       Q.      Who sent the email or the
2   electronic means to everybody?
3       A.      It would have probably come
4   from either myself or one of my assistant
5   principals that's in charge of
6   scheduling.
7       Q.      Do you recall actually
8   seeing an email that went to
9   administration -- and when I'm talking
10  about "administration," I'm including
11  Kate Small.
12          Do you recall an actual
13  email going out?
14      A.      I don't.
15      Q.      As we sit here today, have
16  you checked your emails for any email on
17  that topic, on the add/drop period being
18  added?
19      A.      I have not.
20      Q.      Have you checked your
21  email --
22          I assume you have a North
23  Penn School District email, right?
24      A.      Correct.

1    Q.    Have you checked your North
2  Penn District email for any emails
3  related to the claims in this case, like,
4  between ▋▋▋ and ▋▋▋ or any of that?
5    A.    I have not.
6    Q.    Do you still have access to
7  your emails from back then?
8    A.    I believe so, yes.
9    MS. LAUGHLIN:  I'd ask for
10       you to also do a search, on your
11       emails, to see if there's any
12       emails involving, you know, this
13       incident between ▋▋▋ and
14       ▋▋▋ whether it's with other
15       district administrators or the
16       family of ▋▋▋ and ▋▋▋
17       regarding this, okay?
18       THE WITNESS:  Okay.
19  BY MS. LAUGHLIN:
20    Q.    Since this was the first
21  year that they're having this add/drop
22  period, which just to be clear:  The
23  add/drop period is an ability for
24  students or administrators to add or drop

1  or switch classes in a schedule for a

2  student?

3        A.    It's the student's ability,

4  in certain circumstances, to change

5  courses.

6        Q.    And how would that be --

7  would the student get notified of their

8  class schedule prior to starting school

9  and then would contact the school if they

10  needed to change something?

11        A.    Correct.  In 2018, they were

12  notified of their schedule and then they,

13  physically, came into North Penn High

14  School to request a schedule change.

15        Q.    And then that would be

16  somebody, like, hand scheduling, to

17  change things at the office?

18        A.    Correct.

19        Q.    Since there was this

20  add/drop period and Kate Small had

21  checked the schedules prior to that, what

22  was put in place to ensure that ████

23  and ██████ didn't get put in the same

24  class following this add/drop period?

1    A.    To my recollection or to my

2 understanding, there was nothing further

3 that was put in place.

4    Q.    Do you know, since there

5 was --

6          You knew and Kate Small, and

7 seems like everybody else -- from what

8 you're telling me -- at the high school

9 was aware that there was going to be this

10 add/drop period.

11          Why wasn't anything put in

12 place to ensure that prior to the start

13 of school, these two students weren't

14 going to be in the same class together?

15    A.    Sorry.  We're getting an

16 announcement.

17          Why was nothing put in

18 place?  I believe it was something

19 because it was new that it was just not

20 thought of.

21    Q.    Did you have any

22 conversations, after the fact, with Kate

23 Small or anybody else?  I'm not asking

24 about conversations you had with your

1    counsel.

2              But did you have any
3    conversations about what could have been
4    done differently to ensure that these two
5    students weren't put in the same class?

6         A.    There were conversations
7    that were had after October, when what
8    was alleged was brought to light, that
9    there was a way to flag things in the
10   system and there were further steps put
11   into place to ensure something like this
12   would not happen again.

13             And when I say "something
14   like this," I mean, students that are not
15   supposed to be in the same class together
16   are not scheduled in the same class
17   together.

18        Q.    Okay.  When you're talking
19   about things that could have been put in
20   place, are you talking about the pop-up
21   box that could show up if a student's
22   schedule was the same as somebody else
23   and they shouldn't have been together, is
24   that what you're talking about?

1     A.     Correct.

2     Q.     How did that come -- I

3  guess, in the start of the 2018 school

4  year, had you known that that was an

5  option?

6     A.     I had not.

7     Q.     How did it come to be that

8  you found out that that was an option?

9     A.     After the situation between

10  ███████ and ███████ were brought to light,

11  there were conversations -- my

12  understanding is there were conversations

13  with technology about what options were

14  available in our student information

15  system based on the scenario of this

16  case.

17     Q.     Okay.  Had the district

18  provided any kind of training or

19  instruction as to what was available for

20  situations in keeping students apart,

21  like, for instance, this pop-up that was

22  available?

23     A.     Not that I recall.

24     Q.     Had you ever received any

1 training from the district on how to

2 prevent two students from being in the

3 same class together?

4      A.     Not that I recall.

5      Q.     So the checking of schedules

6 prior to the start of school, where did

7 that -- is that, like, a process that the

8 school does or was that somebody's idea

9 or where did that come from?

10     A.     When you say checking of

11 student schedules before school, I'm not

12 sure what you mean.

13     Q.     I mean like what Kate Small

14 did, to look at the two schedules and

15 check to see if there new classes.

16     A.     The origination of that, I'm

17 not sure.  I couldn't tell you.

18     Q.     Okay.  You answered one of

19 my questions, a few questions ago, that

20 you had said, "What was alleged had come

21 to light," or something along those

22 lines, I think, was your wording.

23          What was your understanding

24 of what the allegation was by 

1  against ▊▊▊▊

2       A.    My understanding that I had,

3  originally from the police, is that there

4  were some sort of sexual harassment,

5  sexual assault that had occurred in their

6  social studies class together.

7       Q.    Were you given information

8  more specifically than that, like what

9  the sexual assault entailed or whether it

10 was more than once or any details like

11 that?

12      A.    I was not.

13      Q.    At some later point, were

14 you given more information as to what the

15 report entailed?

16      A.    No, not that I can recall.

17      Q.    Sitting here today -- and

18 I'm not asking for conversations you had

19 with your counsel, so if that's what the

20 only information you have, let me know

21 that.  I'm not trying to get into those

22 conversations because they're protected

23 with your lawyers.

24           But do you, today, have any

1  understanding of more details as to the

2  assault that ▮▮▮▮ is saying took place

3  from ▮▮▮▮ in the social studies class?

4        A.    I do not.

5        Q.    Did you ever read the

6  Complaint in this case, the lawsuit?

7        A.    I don't believe I did, no.

8        Q.    Once this lawsuit was filed,

9  did you have any conversations with any

10  of the district employees, administrators

11  about what happened?

12        A.    Not that I can recall, no.

13        Q.    Two detectives had come to

14  your office in October 2018 to tell you

15  about the report that was made by ▮▮▮▮

16  and you said that they had told you that

17  a report was made at North Montco about a

18  potential assault between two North Penn

19  students at North Penn.  They told you it

20  was involving ▮▮▮▮ and ▮▮▮▮   And,

21  then, you said that they told you, Don't

22  do any investigation until our

23  investigation is completed.

24              Is there anything else that

1  the detectives told you in that meeting?

2       A.    No.

3       Q.    Following the meeting, you

4  said that you had called Todd Bauer; is

5  that right?

6       A.    Correct.

7       Q.    What do you recall about

8  that conversation with Todd Bauer, with

9  Dr. Bauer?

10      A.    I recall calling him, as my

11 direct supervisor, to let him know that

12 detectives from Towamencin had been here,

13 that there was a complaint made by one of

14 our students over at the tech school,

15 that Towamencin was going to be

16 investigating it, and just making him

17 aware of the fact that the detectives had

18 been here.

19      Q.    What did Dr. Bauer say to

20 you?

21      A.    I couldn't tell you.  I

22 don't recall.

23      Q.    Did you have any other

24 conversations with Dr. Bauer around that

1   timeframe?

2        A.    I'm sure I did.   As my

3   direct supervisor, I communicate with him

4   probably at least daily, if not more.

5        Q.    What about involving

6   specifically █████ and █████

7        I'm sure you talked about

8   them all the time on different various

9   things, but specifically involving these

10  incidents with █████ and █████ do you

11  recall having any other conversations

12  with Dr. Bauer?

13       A.    Yes.   I remember having

14  conversations throughout the time period

15  in 2018, that the investigation was going

16  on.   I don't recall specifics of many of

17  those conversations, but I know we had

18  talked about it, based on the fact that

19  police investigation was ongoing.

20       Q.    And when you said that you

21  remember having several conversations

22  with Dr. Bauer as the investigation was

23  going on, are you talking about the

24  police investigation?

1    A.    Correct.

2    Q.    What do you remember about

3 the conversations you were having with

4 Dr. Bauer?

5         Why were you having these

6 conversations with him as the

7 investigation was ongoing?

8    A.    I would keep him in the loop

9 on something.

10        For instance, there was a

11 time, not too long after ▮▮▮▮▮ had made

12 the report and the detectives had come to

13 the high school, that the detectives had

14 come back to speak with the social

15 studies teacher.

16        For instance, in that

17 situation, I would have called him to let

18 him know that they were back and spoke to

19 the social studies teacher.

20        He would have, potentially,

21 called me if he had any further

22 information from anyone, just kind of

23 making sure we were on the same page and

24 understanding of, if the police

1  investigation was still ongoing or not.

2        Q.    Okay.  Do you recall any

3  information that Dr. Bauer had shared

4  with you, that he had perhaps learned?

5        A.    I do not.

6        Q.    When you said that the

7  detective came to speak to the social

8  studies teacher, are you talking about

9  Mr. Borgmann?

10       A.    Yes.

11       Q.    And he was the social

12  studies teacher for ███████ and ███████ in

13  10th grade where these -- you know,

14  ███████ had reported being assaulted,

15  correct?

16       A.    Correct.

17       Q.    As far as the police

18  investigation was going, did you ever

19  contact them for any updates as to what

20  was going on?

21       A.    I did not.

22       Q.    During the course of the

23  police investigation, ███████ at this

24  point, had gone back to the tech school

1  full time; is that right?

2       A.    That's correct.

3       Q.    What was going on with

4  ███████ at the high school?

5             Was he still a student?

6       A.    Yes.

7       Q.    Was there anything put in

8  place by the high school during the

9  course of this investigation regarding

10  ██████ or to, potentially, like, protect

11  other female students at the high school

12  from him?

13      A.    No.

14      Q.    Was there any discussion, at

15  any point, with anybody about anything to

16  put in place regarding ██████ at the high

17  school?

18      A.    Not to my recollection.

19      Q.    Do you know whether ████████

20  was aware that there was an

21  investigation, ongoing, into assaults by

22  ██████ or -- assaults of ██████ by him?

23      A.    I do not know for sure, no.

24      Q.    When you say you don't know

1  for sure, is there some type of, like,

2  inkling or rumor or anything like that

3  that would give you that impression?

4        A.    No.  I would have to assume

5  detectives investigating a situation,

6  such as that, would involve contacting,

7  at some point, the -- you know, alleged

8  perpetrator, but that's just my, again,

9  my own assumption.

10       Q.    Okay.  So there's nothing

11 that you were aware, like, from other

12 students or teachers or ███████ family

13 or anything like that, that would give

14 you the impression that they were aware

15 of the investigation, what was going on?

16       A.    Correct.

17       Q.    I believe in addition to

18 speaking with Dr. Bauer after the two

19 detectives had come to the high school

20 and spoke to you in October of 2018, you

21 also spoke to Dr. McCue; is that right?

22       A.    I believe so, yes.

23       Q.    What do you recall about

24 speaking with Dr. McCue?  Was this, like,

1  a telephone call, email, in person?

2        A.    It would have been

3  telephone.

4        Q.    And what do you recall about

5  that conversation with Dr. McCue?

6        A.    Very little.  I believe it

7  just involved the same basic, you know,

8  notification that police are

9  investigating an alleged assault.  And

10 that's about all I can really recall

11 there.

12       Q.    Do you recall Dr. McCue

13 giving you any instruction or information

14 on what to do or what not to do?

15       A.    I do not.

16       Q.    Do you recall Dr. McCue

17 telling you, you know, Don't start any

18 investigation, we're not going to start

19 any investigation?

20             Do you recall any

21 conversation -- any of those types of

22 things being part of the conversation

23 with her?

24             A.    I do not.

1    Q.    Are there any other

2  conversations you can recall having with

3  anybody around this timeframe that we

4  haven't already spoken about?

5    A.    No, not that I can recall.

6    Q.    Do you have an estimate of

7  how long, to your understanding, the

8  police took to investigate this incident?

9  These incidents?

10    A.    My recollection is that they

11 notified me that their investigation had

12 concluded sometime, I want to say, in

13 early November.

14    Q.    So, approximately, a month

15 later?

16    A.    Give or take, yes.  I don't

17 recall specific dates of -- I think as I

18 said before, the report that was made by

19 ▓▓▓▓▓▓ nor do I remember the specific

20 date of the November date, but I believe

21 it was November.

22    Q.    Okay.  And so what did --

23        Who was it that called you

24 or contacted you about the investigation

1  being concluded?

2          A.    I believe it was Detective

3  Pierre-Louis.

4          Q.    And what information -- I

5  mean, obviously, Detective Pierre-Louis

6  told you the investigation was concluded.

7               What other information did

8  the detective provide to you?

9          A.    I don't recall any further

10  information being given to me other than

11  the fact they concluded their

12  investigation.

13          Q.    Did you ask Detective

14  Pierre-Louis what the outcome of the

15  investigation was or what they had found?

16          A.    I did not.

17          Q.    Why didn't you?

18          A.    My experience had told me

19  that that was something that they would

20  not necessarily share.  So I didn't

21  bother asking.

22          Q.    When you said that your

23  experience showed you that that wasn't

24  something that they would necessarily

¹ share, what do you mean?

²      A.    I mean, in other instances,

³ where the police were investigating any

⁴ kind of alleged crime between two of our

⁵ students, when their investigation would

⁶ conclude, they would notify us that it

⁷ had concluded, but not necessarily --

⁸ actually, no.  I shouldn't even say "not

⁹ necessarily."

¹⁰      They would not notify us of

¹¹ the conclusion -- or the decision on any

¹² kind of charges or any pending -- you

¹³ know, whether they were going to make an

¹⁴ arrest, let's say, but they would just

¹⁵ notify us the investigation had

¹⁶ concluded.

¹⁷      Q.    And to your understanding,

¹⁸ when they're notifying you the

¹⁹ investigation had concluded, what, if

²⁰ anything, did you do after that?

²¹      A.    So at that point, I had

²² reached back out to Dr. Bauer again to

²³ notify him that the investigation had

²⁴ concluded.  I believe there was a phone

¹ conversation.  I don't recall everyone

² that was involved in that.  And then

³ pursuant to that, Kyle Hassler and I

⁴ investigated and spoke with a number of

⁵ the students that were in the social

⁶ studies class, to try to get more

⁷ information.

⁸          Q.    Okay.  Before I talk about

⁹ the investigation with you and Kyle

¹⁰ Hassler, you said you called Dr. Bauer on

¹¹ the phone to tell him the investigation

¹² had concluded.  But then I think you

¹³ mentioned there was a phone call with

¹⁴ multiple people; is that right?

¹⁵          A.    I know I spoke with

¹⁶ Dr. Bauer.  I believe, if I recall,

¹⁷ Dr. Dietrich may have been on the phone

¹⁸ call as well.

¹⁹               I don't recall specifically

²⁰ who all was part of that phone call, but

²¹ I believe we kind of talked through the

²² following steps and the investigation

²³ that we would start and conduct here at

²⁴ the high school.

1      Q.    This was a telephone

2  conversation.

3            Do you know, Dr. Bauer,

4  Dr. Dietrich, and you're not sure who

5  else was on this phone call?

6      A.    Correct.

7      Q.    And the purpose of this

8  phone call was to:  One, let them know

9  that the investigation had concluded by

10  the police department, and what steps

11  should you and Kyle Hassler be taking at

12  the high school to start the

13  investigation at North Penn?

14      A.    Correct.

15      Q.    Was Dr. McCue on this

16  telephone call, if you can recall?

17      A.    I don't specifically recall.

18      Q.    Okay.  What did Dr. Bauer or

19  Dr. Dietrich tell you about what the next

20  steps would be, or what do you recall

21  about that conversation?

22      A.    I recall talking about

23  speaking with students that would be

24  potential witnesses within the class,

1  seeing what they would report or what

2  they know about anything that may have

3  occurred in class and -- yeah.

4      Q.    Who came up with the idea,

5  first, that you would be the one speaking

6  with students to see what they recalled

7  or what they know?

8      A.    Whose idea?  I don't recall.

9      Q.    Was there any type of, like,

10 practice or policy in place for how an

11 investigation would be conducted into

12 something like this, like an alleged

13 sexual assault in high school?

14     A.    Without looking at the

15 policies or admin regs that were in place

16 at that time, I can't tell you for sure.

17     Q.    At the time in 2018, were

18 you aware of any policies or procedures

19 as to how -- since we already established

20 this involved Title IX since it was an

21 alleged sexual assault, how a Title IX

22 investigation would take place at the

23 high school?

24     A.    I can't say I was aware of

1 any specific policies, no.

2      Q.      Have you ever received any

3 training from anybody within the district

4 about how a Title IX investigation would

5 commence at the high school?

6      A.      Again, pointing to

7 administrative trainings that were held.

8 Outside of that, I can't speak to a

9 specific training for just myself or --

10 no.

11      Q.      And, I guess, what I'm

12 asking is specifically, do you recall

13 ever receiving training on, like, how to

14 conduct an interview or anything like

15 that in terms of an investigation?

16      A.      I do not.

17      Q.      Prior to this time, had you

18 ever, yourself, conducted an

19 investigation involving, like, Title IX

20 issue?

21      A.      I had not.

22      Q.      Do you know whether Kyle

23 Hassler, because you said he was kind of

24 working with you on the investigation, do

1  you know whether Kyle Hassler had ever

2  had experience conducting a Title IX

3  investigation?

4       A.    I don't know that.

5       Q.    Okay.  Did Dr. Bauer or

6  Dr. Dietrich tell you anything about

7  their experience in conducting a Title IX

8  investigation?

9       A.    Not that I recall.

10      Q.    Did you talk to Dr. McCue at

11 all before beginning your investigation

12 in November of 2018?

13      A.    Again, not that I recall.

14      Q.    Since Dr. McCue is the Title

15 IX -- or was the Title IX coordinator for

16 the district at that time, do you know

17 whether there was, like, an expectation

18 for you to reach back out to her before

19 doing a Title IX investigation?

20      A.    I'll say, based on the phone

21 conversation, based on the conversation I

22 had, there was no direction to reach back

23 out to her at that point.

24      Q.    As the principal of the high

1  school at this point, what was your

2  understanding of Dr. McCue's role as

3  the -- I know you said director of HR,

4  but also, wears the hat of Title IX

5  coordinator, what was her role in Title

6  IX investigations at schools?

7      A.    As far as conducting the

8  actual investigation, I don't believe

9  there was an expectation of her doing so.

10     Q.    Do you know what, if any --

11 like, what your understanding was of her

12 involvement, involving, you know, a Title

13 IX investigation or Title IX anything?

14          Do you know what your --

15 what was your understanding as to what

16 her role was?

17     A.    Again, my understanding was

18 that she was the Title IX compliance

19 officer; that, I believe as I answered

20 before, that -- Title IX complaints would

21 be reported to her, we would take

22 direction from her, but she would not be

23 part of the actual investigation.

24     Q.    I mean, so I guess -- since

1  you would take direction from her as the

2  Title IX compliance officer, did she give

3  you any direction in this case?

4       A.    Not that I can specifically

5  recall.

6       Q.    What was your understanding

7  of what direction she should be giving

8  you as the Title IX compliance officer?

9            MS. LLOYD:  Object to the

10        form.

11            MS. LAUGHLIN:  You can

12        answer.

13            THE WITNESS:  Can you repeat

14        it?  I'm sorry.

15            MS. LAUGHLIN:  Can you read

16        it back.

17                 -  -  -

18            (At this time, the court

19        reporter read back from the record

20        as requested.)

21                 -  -  -

22            THE WITNESS:  I guess my

23        understanding, at the time, was

24        that the investigation would

1       occur, that if there was anything

2       specific that needed to be done or

3       included after the investigation

4       would be run by her.  But that the

5       investigation would be occurring

6       at the building level.

7   BY MS. LAUGHLIN:

8       Q.    Okay.  So is it fair to say

9   that as the Title IX compliance officer,

10  your understanding is that she was more

11  collecting information, like, she would

12  collect the initial report that was made,

13  she would collect, at the end of the

14  investigation, what was found or

15  something like that; is that accurate?

16      A.    Yeah, I think that's

17  accurate.

18      Q.    Okay.  Prior to 2018, did

19  you ever have any conversations with

20  Dr. McCue about her role as Title IX

21  compliance officer?

22      A.    Did I have any conversations

23  with her?  No.

24      Q.    You're using the term "Title

1  IX compliance officer."  And I've used

2  the term "Title IX coordinator."

3          Do you know if there's a

4  difference between the two?

5      A.    I believe we're using them

6  interchangeably.

7      Q.    Okay.  For example, like, to

8  your understanding, there's nothing

9  different between her being a Title IX

10 compliance officer versus a Title IX

11 coordinator?  There's nothing different,

12 to your knowledge, between those two

13 terms; is that right?

14     A.    Correct.  As I said, I think

15 the two of us are using them

16 interchangeably.  It's just my term

17 versus your term.  I don't see a

18 difference between what we're saying.

19     Q.    Okay.

20          THE WITNESS:  Laura, while

21      you pause there, could I take a

22      five-minute comfort break?  Would

23      that be okay?

24          MS. LAUGHLIN:  Yeah, let's

1          take a five-minute break.  We'll

2          come back at 11:30; is that okay?

3                    -  -  -

4          (At this time, a discussion

5          was held off the record.)

6                    -  -  -

7   BY MS. LAUGHLIN:

8          Q.    In this conversation with

9   Dr. Bauer and Dr. Dietrich, we were

10  talking about how the investigation is

11  going to commence, what's going to

12  happen.  I think you said that you and

13  Kyle Hassler were going to be the ones

14  investigating; is that right?

15         A.    Correct.

16         Q.    Was Kyle Hassler on this

17  telephone call too?

18         A.    To my recollection, yes.

19         Q.    Was there any notes taken

20  during this phone call?

21         A.    Not to my recollection.

22         Q.    Other than the fact that, I

23  think you said you were going to be

24  interviewing students, and I think you

1  said potential witnesses, is there

2  anything else that was discussed during

3  that conversation as to what was going to

4  happen in the investigation?

5        A.    Not that I can recall.

6        Q.    Were you the one to actually

7  interview students or potential

8  witnesses?

9        A.    Yes.  Kyle Hassler and I

10  were both in the room.

11        Q.    So you and Kyle Hassler were

12  in the room with each of the students

13  when you asked them questions; is that

14  correct?

15        A.    Correct.

16        Q.    Why were both you and Kyle

17  in the room when asking these students or

18  witnesses questions?

19        A.    I believe we decided that we

20  would be there together if a question

21  came up that either of us would want to

22  follow up.  Because they were 10th grade,

23  he was their assistant principal, so we

24  decided to ask the questions of students

1  together.

2          Q.    Okay.  Who was the one

3  actually asking the questions of

4  students?

5          A.    I believe I asked the vast

6  majority, if not all, of the questions.

7          Q.    How was it determined what

8  students would be interviewed?

9          A.    We received a -- asked for

10 and received a seating chart from the

11 teacher, from the time that ███████ and

12 █████████ were in class together and

13 interviewed the students that sat nearest

14 to them that would have had the ability

15 to interact with them and to see how they

16 interacted together.

17          Q.    Okay.  What was, like, the

18 purpose of the investigation?  I know

19 you're investigating, but what exactly

20 were you trying to figure out or

21 determine?

22          A.    We were trying to determine

23 if there was anything that the students

24 had witnessed, anything that they had

1  seen during the time that ████ and

2  ████ were together in class that would

3  have, I guess -- would have alerted the

4  students to anything inappropriate

5  happening between ████ and ████

6      Q.    Were you also trying to

7  determine whether these assaults

8  actually -- whether they took place?

9      A.    I don't know if we expected

10 to determine if the assault took place,

11 but we wanted to determine if there was

12 any behavior or anything that had

13 occurred that would point us in that

14 direction.

15     Q.    Okay.  So the investigation

16 that --

17          I guess, the investigation

18 that you and Kyle Hassler were doing, was

19 there anything that any of the students

20 saw that would point in the direction of

21 ████ being assaulted by ████    Is

22 that accurate?

23     A.    I'm sorry.  Say that again.

24 I'm not sure if I understood fully what

1  you were asking.

2        Q.    Sure.  I was just trying to

3  summarize your testimony to make sure I

4  understood what you were saying, and that

5  the purpose of your investigation, that

6  you and Kyle Hassler were doing at North

7  Penn High School, was to determine

8  whether there was anything that any

9  students had seen that would --

10             MS. LAUGHLIN:  Emily, are

11        you able to read back the last

12        question that I had asked?  I

13        don't want to say the wrong thing

14        or the different thing now.

15             Can you just read back that

16        last whole question that I had

17        said.

18                   -  -  -

19             (At this time, the court

20        reporter read back from the record

21        as requested.)

22                   -  -  -

23             THE WITNESS:  Yes.  That was

24        the idea behind -- yeah.  That was

1     the idea behind the investigation.
2 BY MS. LAUGHLIN:
3     Q.   How were the questions, that
4 you were asking to the students,
5 determined?  Like what questions to be
6 asked?
7     A.   If I recall, Kyle and I,
8 along with Dr. Bauer, talked a little bit
9 about the questions that would be asked
10 and then subsequent questions were driven
11 based on the answers that students gave.
12     Q.   So the initial questions
13 that were going to be asked, that was
14 determined in the conversation you had on
15 the phone with Dr. Bauer, Dr. Dietrich,
16 and Kyle Hassler?
17     A.   As I recall, an outline --
18 or a general understanding of how we
19 would kind of conduct the investigation,
20 were discussed during that conversation,
21 yes.
22     Q.   Were the questions written
23 down at all, that you were going to be
24 asking the students?

1      A.    I don't recall writing them

2 down, no.

3      Q.    Was there anything in place

4 to ensure that the interviews of each of

5 these students were consistent or done in

6 the same way?

7      A.    Other than the same two

8 individuals being part of the

9 questioning?  No.

10      Q.    Were these interviews, were

11 they during the course of the school day

12 at North Penn High School?

13      A.    They were.

14      Q.    And how did they even take

15 place?  Did you call students out of

16 class?  Did you schedule them ahead of

17 them?

18      How did the three of you get

19 in a room together, the student and you

20 and Kyle Hassler?

21      A.    We called them out of class.

22 We called their class and asked them to

23 come down to my office.

24      Q.    And so these interviews took

1  place in your office with you, the
2  student, and Kyle Hassler present?
3        A.    That's correct.
4        Q.    Were these interviews
5  recorded in any way?
6        A.    They were not.
7        Q.    Why weren't they recorded?
8  Like audio or video or something like
9  that?
10        A.    I can say, in my now,
11  whatever it is, 14 years of being a
12  school administrator, we've never
13  recorded an interview with a student.
14        Q.    Was somebody taking notes
15  during the meeting with the student?
16        A.    Yes, I was.
17        Q.    Okay.  So you're the one --
18  just so I make sure I understand --
19  you're the one asking these students
20  questions and, then, you are documenting,
21  as you're asking questions and they're
22  answering, what they're saying or --
23        A.    Correct.
24        Q.    Do you recall the questions

1   that you had asked these students or how

2   you went into the interview, what

3   questions you started with?

4        A.    Specifically, at this point,

5   I don't.  No.

6        Q.    What questions do you recall

7   Dr. Bauer or Dr. Dietrich telling you?

8   Did they tell you to ask any specific

9   questions or particular questions of

10  these students?

11       A.    My recollection of that is

12  that we would ask students to kind of

13  report back on or to give us their

14  recollection of any kind of interaction

15  that they witnessed between ███████ and

16  ████████ during their time in class, what

17  they may have seen, if there were any

18  kind of -- for lack of a better term, I

19  don't think this was what we used in the

20  phone call -- red flags or any kind of

21  behaviors that were out of the ordinary,

22  anything -- how they interacted with each

23  other, if they were friendly, if they

24  were standoff- -- it was just trying to

1 garner what kind of relationship the two
2 had and if there was anything that stood
3 out to them as concerning or that had
4 been reported to them or told to them by
5 either of the students.
6        Q.    Okay.  By "either of the
7 students," meaning by ████████ or ████████
8        A.    Correct.
9        Q.    Were there any additional
10 questions that you recall asking other
11 than the types of questions that you just
12 described?
13        A.    Specific questions that I
14 recall, no.  I know as students answer
15 questions, there were probably some
16 follow-up questions to gain
17 understanding, gain clarity, just you're
18 asking me.
19           It's all, I believe,
20 documented -- I believe I shared my
21 personal notes from those interviews.  So
22 without seeing them, I couldn't tell you
23 exactly everything that was said by every
24 student or every question that was asked.

1    Q.    We'll go over those
2  handwritten notes, what I think you're
3  describing, anyway, in detail.
4         But what I wanted to know --
5  before looking at them -- was what your
6  independent recollection was.  You know,
7  some people don't remember anything at
8  all.  You obviously have some memory
9  independent from being able to look and
10 read what you had written.
11        Do you recall whether Kyle
12 Hassler had taken any notes of these
13 interviews or investigation?
14    A.    I don't recall if he did or
15 did not.  I was --
16    Q.    Other than interviewing
17 students, like you have described, that
18 were surrounding, on the seating chart,
19 █████  and  ███████  is there anything else
20 that you or Kyle Hassler had done to
21 investigate this?
22    A.    No.
23    Q.    Did you ever interview
24 ██████████

1          A.     We did not.

2          Q.     And why didn't you interview

3     ████████ about what had happened?

4          A.     She was no longer a student

5     here.  We did not have access to speaking

6     with her.

7          Q.     Did you ask, like, her

8     parents or anything about interviewing

9     her even though she was now a student at

10    the tech school?

11         A.     I believe an attempt was

12    made to reach out to Mom.  I don't recall

13    the specifics of that.  And I just recall

14    that we weren't able to speak with her.

15         Q.     When you say you recall an

16    attempt was made, who made the attempt or

17    what are the circumstances that you're

18    remembering about that?

19         A.     I remember there was

20    conversation between, I believe, myself,

21    Dr. Bauer.  I'm not sure if counsel was a

22    part of that, about reaching out.  I

23    don't believe I was the one that reached

24    out to ask if she would be available, but

1  I do remember there was conversation

2  about it.

3        Q.    Do you know for certain

4  whether somebody actually reached out to

5  Mrs. ████████  ████████ mom, to say,

6  specifically, that you wanted to

7  interview her about what had happened in

8  the social studies class?

9        A.    I don't know that for a

10 fact.

11       Q.    For example, in comparison

12 to just leaving a message saying, Hey, we

13 want to talk to you, you don't know which

14 message may have been left with

15 Ms. ████████ correct?

16       A.    Correct.

17       Q.    Did you ever interview

18 ████ ████

19       A.    We did not.

20       Q.    Why didn't you interview

21 ████ ████

22       A.    Based on the responses from

23 the students that we did interview from

24 the social studies class, we did not have

1  any evidence or any understanding from

2  those interviews that would lead us to

3  interview ███████

4        Q.    If the allegation was --

5  which it was -- that ████████ had sexually

6  assaulted ████████ don't you think that

7  ████████ would have had more information

8  about the relationship between him and

9  ████████ in the social studies class?

10             MS. LLOYD:  Object to the

11        form.

12             MS. LAUGHLIN:  He can

13        answer.

14             THE WITNESS:  I wouldn't

15        know.

16  BY MS. LAUGHLIN:

17        Q.    Have you ever -- sorry.

18             Before, I think you had told

19  me that you had never interviewed

20  students in, like, an alleged assault or

21  something like that prior to this, right?

22        A.    Correct.

23        Q.    In any of your conversations

24  with Dr. Bauer or Dr. Dietrich or

1 Kyle Hassler, did anybody, you know,

2 suggest or mention or bring up

3 interviewing ██████ ██████

4     A.    Not to my recollection.

5     Q.    How is it determined that,

6 when you have a situation -- an

7 allegation involving two students, that

8 you start with, like, students

9 surrounding them versus starting with an

10 investigation or interviewing students

11 that were actually involved in the

12 alleged incident?

13        Like how did that come

14 about?

15     A.    In this situation, as I

16 said, ██████ was no longer a student

17 here, so we were not able to start with

18 her, to interview her.

19        Typically, in my experience,

20 when a student is accused of any kind of

21 wrongdoing, they, typically, aren't the

22 first person I go to, to ask because

23 they're not, typically, forthcoming

24 and we like to gather any evidence or any

1  kind of information from those that may

2  have witnessed the situation or look at

3  video cameras, if there's video

4  surveillance in the area where the

5  alleged issue occurred and try -- have an

6  understanding of what happened prior to,

7  you know, home contacting the victim and

8  trying to get them to give us

9  information, when we have no real

10  background or experience with what is

11  being alleged of them.

12      Q.    Well, you knew, at this

13  point, when you're doing the

14  investigation, that the allegation was

15  that ████ was sexually assaulted by

16  ████ -- is that right? -- in the social

17  studies class?

18      A.    That's correct.

19      Q.    Did you have any details --

20  when I say "sexual assault," that's

21  what -- a broad term.  I mean, there's

22  only so much that you can -- you know,

23  quantify as sexual assault.

24          Did you have any

1  understanding or more detail as to, like,

2  what happened in the sexual assault?

3       A.    I believe I answered that

4  earlier.  I did not.

5       Q.    Okay.  Like you didn't know

6  if it was, like, penetration versus

7  touching her breasts or anything like

8  that; is that right?

9       A.    That's correct.  I did not

10 have any knowledge of what the specifics

11 of the allegation were.

12      Q.    Okay.  During the

13 conversation that you had with Dr. Bauer

14 and Dr. Dietrich and Kyle Hassler, did

15 you discuss that you were going to wait

16 to interview ███████ until you got the

17 information and heard what the

18 surrounding students were saying about

19 the incidents?

20      A.    I don't recall specifics of

21 whether we spoke about that or not.

22      Q.    Do you recall whether, at

23 any point during your conversation, there

24 was a plan, at some point, where like,

1 you know, Based on what happened, we

2 might interview ████ --

3          Did he even come up in the

4 conversations about what to do with him?

5          A.   I'm sure based on the

6 specific situation, we spoke about

7 ████    I don't recall the specifics of

8 what the -- you know, what the

9 conversation was or the direction, other

10 than we would start with the potential

11 witnesses.

12          Q.   And as far as your

13 understanding, since you're -- would you

14 agree with me, like, you're leading this

15 investigation at the high school?

16          A.   Correct.

17          Q.   As far as you are concerned,

18 you weren't going to talk to ████ until

19 you had heard what the other surrounding

20 witnesses had said to see if they saw

21 anything out of the ordinary; is that

22 right?

23          A.   Correct.

24          Q.   And if they had not seen

1  anything out of the ordinary, was it your

2  plan to not interview ▮▮▮▮ about what

3  happened?

4       A.    I don't know that it was --

5  a pretty determined plan.  I believe it's

6  what we determined once we spoke with the

7  students surrounding ▮▮▮▮ and ▮▮▮▮

8       Q.    Why did you determine that

9  you weren't going to interview ▮▮▮▮

10  after you spoke to the surrounding

11  students?

12       A.    There was a general lack of,

13  I guess -- for lack of a better term --

14  evidence, or information that came from

15  the surrounding students that would have

16  pointed to something having happened --

17  inappropriate having happened.

18       Q.    That was going to be my next

19  question, what you meant by "something

20  having happened."

21       A.    Yeah.

22       Q.    And when you say

23  "inappropriate," do you mean some type of

24  sexual contact between the two?

1    A.    Correct.

2    Q.    I know you were talking

3    about the timeframe and I know you were

4    estimating for me that when you got the

5    call and were going to start the

6    investigation, it was early November

7    timeframe, right?

8    A.    Yes.

9    Q.    Did you actually start

10   interviewing students in early November?

11   A.    I believe so, yes.  I don't

12   recall -- I'm sorry.

13   Q.    Go ahead.

14   A.    I said I don't recall if I

15   had dates on the sheets.  I believe -- it

16   was certainly in the first 10 to 15 days

17   of November, very soon after the police

18   had notified us that their investigation

19   had concluded.

20   Q.    How long -- if you can

21   recall -- did it take you to complete

22   your investigation at the high school?

23   A.    I believe -- and I'm not

24   certain -- that we completed the

1 investigation, with the students

2 involved, over the course of one, no more

3 than two days.  Again, I don't want to

4 guess.  I tend to remember maybe one of

5 the students was absent on Monday.  We

6 interviewed them on a subsequent day, but

7 I believe it was certainly no more than

8 two days.

9        Q.    Okay.  Do you remember

10 anything else, independently, about each

11 of these investigations -- or

12 interviews -- I'm sorry -- with each of

13 these students?

14        A.    I do not.

15        Q.    When you had called these

16 students -- I assume they were each, one

17 by one, called in; is that right?

18        A.    Correct.

19        Q.    When they were called in,

20 one by one, did any of them have an

21 understanding of why you were calling

22 them in to speak with them?

23        A.    I do not believe they did,

24 no.

1    Q.    Like before starting to ask

2  them questions, did you give any of the

3  students any, like, summary as to, like,

4  why they were here?

5            For a student, for example,

6  it's probably pretty scary to be called

7  into a principal's office at school.

8            Did you give them any speech

9  beforehand before you starting asking

10  them questions?

11    A.    I don't remember specifics.

12  Typically, I would start a conversation

13  like that with a student by telling them

14  they're not in trouble, but something had

15  been reported and I have to ask them some

16  questions about what they may or may not

17  know.  And put them at ease that they're

18  not the subject of any wrongdoing or

19  potential disciplinary action.

20    Q.    And then from there, how did

21  you kick off the specific investigation

22  as to what you were trying to determine

23  from these students?

24    A.    To the best of my

1  recollection, we -- I asked them -- or

2  told them that there had been a report of

3  something inappropriate that had occurred

4  in their social studies class, kind of

5  pointed them in the direction of █████

6  and ███████  Without leading them in any

7  specific direction, asked them if there

8  was anything that they saw, anything that

9  they heard, what kind of relationship --

10  as I spoke to earlier -- what kind of

11  relationship that they witnessed between

12  the two, if there were any kind of

13  situations that occurred during the time

14  the two were in class together that

15  raised any red flags or that was reported

16  to them that anything inappropriate had

17  occurred.

18      Q.    When you said you pointed in

19  the direction of ██████ and ██████ to

20  these students, how did you do that?

21      A.    I don't believe I said their

22  names specifically, but I mentioned the

23  fact that, you know, they sat near a

24  young lady that was no longer in class or

1  -- I forget exactly how I positioned that

2  with students, but I may have used their

3  names.  I don't recall.

4      Q.    And "the young lady who was

5  no longer in class," that was only

6  ███████  right?

7      A.    Right.  Correct.

8      Q.    But so from your

9  communications to these students,

10  regardless you're not sure of the exact

11  words you used, but all of these students

12  understood you were asking them questions

13  specifically about ███████ and ███████ is

14  that right?

15      A.    Correct.

16      Q.    When you said that you were

17  also -- you kind of went over, like, the

18  different types of questions that you

19  were asking each of these students to,

20  obviously, hear what they say and then

21  ask follow-up questions, depending upon

22  what their answers were, you said that

23  one of the other questions you had asked

24  each of these students was if they had

1  seen any situations that had occurred to

2  raise any red flags.

3          Is that what you had asked

4  each of these students?

5      A.    I didn't ask that question,

6  but asked questions to see if there any

7  any behaviors or anything that had

8  occurred, any kind of conflict between

9  the two, any kind of -- just gauging

10 their behavior.  If they were friendly,

11 if they would work together during, you

12 know, independent time or group time

13 during class.

14         Again, if there was any, I

15 guess, conflict between the two, if there

16 was any kind of -- anything reported to

17 any of them, based on anything that

18 happened in class.  I didn't ask if there

19 were any red flags.

20     Q.    The questions that you were

21 asking individual students, were they

22 open ended, or were they more like what

23 you're describing, you know, was there

24 any conflict between them?

1    A.    I would say that the

2    majority of them were more open ended,

3    just trying to get them to open up and

4    speak and talk about what they had

5    witnessed between ███████ and ████████

6    Some of the follow-ups may have been more

7    "yes" or "no," but they're mostly open

8    ended, just trying to get a sense of what

9    they had witnessed.

10    Q.    Okay.  Did you talk to

11    ███████ parents at all, during the

12    course of this or after or before, about

13    what the allegations were and what was

14    going on in the school?

15    A.    I did not.

16    Q.    Did you talk to any of the

17    -- the students you were interviewing,

18    any of their parents at any time?

19    A.    I did not.

20    Q.    Did any parents contact you

21    after the fact, like after these students

22    had been called into your office, did any

23    parents reach out to you about what was

24    happening, what was going on?

1          A.     No.

2          Q.     After you had interviewed

3    these students, did anybody else come up

4    to you about what had happened?

5          A.     No.

6          Q.     As part of your

7    investigation, am I correct that you

8    didn't contact, like, the elementary

9    school principal that was involved in

10   what had happened in elementary school

11   between ███████ and ███████ right?

12         A.     Correct.

13         Q.     Did you ever go into the

14   district's system, for record-keeping or

15   anything, to see what had occurred or

16   whether anything was there involving

17   ██████ or ███████ in the past?

18         A.     I did not.

19         Q.     Did you have the ability to

20   do that, as the principal, to look --

21   whether it was paper files or

22   electronic -- to see what a student's

23   history was?

24         A.     At that time, I had access

1 to their cumulative file, which has no

2 disciplinary record in it, and I don't

3 believe, at that time, there were any

4 disciplinary records from elementary

5 school in our student information system.

6        Q.    Like that made its way from

7 elementary school up through high school?

8        A.    Correct.

9        Q.    Did you have access -- I

10 know you said it wasn't in the cumulative

11 files, the disciplinary issues, did you

12 have access to that in some other fashion

13 on students that were in your high

14 school?

15        A.    No.

16        Q.    If you wanted to know what

17 the disciplinary history was on a

18 student, is there some way you were able

19 to get access to that information through

20 the district?

21        A.    If I were looking for

22 disciplinary information other than

23 calling and speaking with a colleague,

24 calling and speaking with someone else,

1  no.

2         Q.    I mean, I guess, for

3  example, here, to be more specific, with

4  ██████  when you had heard that there's

5  an allegation that he had sexually

6  assaulted ██████ in high school, did you

7  try and get access to any of his

8  disciplinary history to see if he had

9  issues with this type of conduct in the

10 past?

11        A.    I did not.

12        Q.    That is something that you

13 could have done, though -- right? -- to

14 have contacted -- whether somebody or

15 gotten ahold of disciplinary records to

16 check to see if he had done anything like

17 this in the past?

18        A.    I could have.

19        Q.    And you didn't, in either

20 way, call anybody or check the file?

21        A.    I did not.

22        Q.    I know we already talked

23 about you being aware of allegations of

24 assault in elementary school between

1    ████████ and ████████ right?

2         A.    Yes.

3         Q.    But were you aware, at the

4    time, of instances of sexual misconduct

5    involving ████████ at the middle school?

6         A.    I was not.

7         Q.    And specifically, you

8    weren't aware that it was two separate

9    girls in the middle school in the

10   district; is that right?

11        A.    That's correct.

12        Q.    In doing your investigation,

13   since you were leading this investigation

14   into what had occurred in the social

15   studies class in 10th grade, would that

16   have been important information for you

17   to have in leading this investigation as

18   to what other past instances of sexual

19   misconduct this particular student had

20   had?

21            MS. LLOYD:  Object to the

22        form.

23            MS. LAUGHLIN:  You can

24        answer.

1          THE WITNESS:  I guess,

2      potentially.  I don't know what --

3      I don't know.  So I don't know

4      that I can answer that with full

5      confidence.

6  BY MS. LAUGHLIN:

7      Q.    To your understanding, back

8  then, what, potentially, could have been

9  important information in that?

10      A.    I'm --

11          MS. LLOYD:  Object to the

12      form.

13          THE WITNESS:  I'm confused

14      as to what you're asking.  I'm

15      sorry.

16  BY MS. LAUGHLIN:

17      Q.    That's okay, and thank you

18  for telling me.  I'll try and rephrase.

19          You were saying that that

20  information, knowing that there were

21  instances of past sexual misconduct of

22  ██████  could have potentially have

23  been --

24          Was it important

¹ information?  Is that accurate?

²      A.    It could have been.  I don't

³ know that it would have been.  Every

⁴ situation is investigated on its own

⁵ merit.  Because a student was in trouble

⁶ in middle school, doesn't necessarily

⁷ mean that they're conducting the same

⁸ behaviors or there's evidence they're

⁹ doing the same thing in high school.  So

¹⁰ I don't -- I can't answer the

¹¹ hypothetical there.

¹²      Q.    So just to understand your

¹³ mindset:  At the time in 2018 when you're

¹⁴ leading this investigation, am I correct

¹⁵ that you wouldn't be considering -- in

¹⁶ your mind, you wouldn't be considering

¹⁷ things that happened in the past because

¹⁸ you're looking at, specifically in this

¹⁹ instance, what a student did or didn't

²⁰ do; is that accurate?

²¹      A.    Correct.

²²      Q.    In the conversations you had

²³ with Dr. Bauer, Dr. Dietrich, and Kyle

²⁴ Hassler, did any of them mention any past

1  misconduct of ████ when you're going to

2  be kicking off this investigation?

3       A.    No, none that I can

4  specifically remember.

5       Q.    Okay.  Other than

6  interviewing the students, is there

7  anybody else that you interviewed, that

8  you can recall?

9       A.    No.

10      Q.    For example, did you

11  interview Dr. -- Mr. Borgmann, the social

12  studies teacher?

13      A.    I did not interview Mr.

14  Borgmann.  No.

15      Q.    Why didn't you interview Dr.

16  Borgmann, the teacher, where the assaults

17  allegedly took place?

18      A.    If I recall correctly, I'm

19  trying to think -- I believe I was in the

20  room when the police spoke with him, so I

21  had his information.  I didn't take any

22  notes on that, but I was -- I believe --

23  I don't know that I have a date at all,

24  but I believe the police spoke with Mr.

1 Borgmann while here at the high school,

2 and I was in the room for that

3 conversation.

4     Q.   Okay.  When the police spoke

5 to Mr. Borgmann, do you recall -- what do

6 you recall about that conversation?

7     A.   I recall -- and I'm trying

8 to recall what I remember from students

9 and what I remember from Mr. Borgmann.  I

10 remember him stating that, you know, he

11 never witnessed anything, that -- or

12 there was never any behaviors that rose

13 to his attention or anything that

14 happened that would, you know, raise a

15 red flag in his estimation.

16       I remember that the general

17 idea was that ████ and ████ often

18 worked together when there was

19 independent time.  And that when there

20 was group time, if they could work in

21 pairs, the two of them would choose to

22 work together, and that there was really

23 nothing, in their time together in class,

24 that Mr. Borgmann saw as anything

1 concerning between the two.  Nothing that

2 had been reported to him and nothing that

3 was concerning from a behavioral

4 standpoint.

5      Q.    When you say that Dr. -- I

6 keep saying "Dr. Borgmann."  Maybe he is

7 a doctor at this point.

8      A.    He's not, but he would take

9 that as a compliment.

10      Q.    I'm sure.

11           When Mr. Borgmann was saying

12 that when students would pair up in the

13 class that ███████ and ███████ would choose

14 to work together, do you know whether Mr.

15 Borgmann had any -- did he give any

16 further information as to, like, who

17 chose to work with who?

18      A.    No.

19      Q.    As far as you know, do you

20 know, like, whether ███████ had asked to

21 work with ███████ or whether ███████ said

22 to ███████ You're working with me, or

23 anything like that?

24      A.    I don't know that.

1    Q.    Were you present for any
2  other police interviews?
3    A.    I was not.
4    Q.    Were you part of any other
5  interviews other than what we've already
6  talked about?
7    A.    I was not.
8        MS. LAUGHLIN:  I want to
9        show you some of the documents
10       that, I believe, you had turned
11       over -- or the district had turned
12       over, that perhaps you had
13       provided in the investigation.
14       Give me one second while I share
15       my screen.
16  BY MS. LAUGHLIN:
17    Q.    Are you able to see my
18  screen, Mr. Nicholson?
19    A.    Yes, I am.
20    Q.    Okay.  And just for the
21  record, this is page 537 of the North
22  Penn Bates-numbered production in this
23  case.
24        On the screen, there's a

¹ picture of, looks like, the seating chart

² for Mr. Borgmann's class; is that right?

³     A.    Yes.

⁴     Q.    Is this something you had

⁵ asked Mr. Borgmann to provide to you?

⁶     A.    Yes.  Correct.

⁷     Q.    Do you recall whether Mr.

⁸ Borgmann was asked about how these

⁹ students ended up in these particular

¹⁰ seats?

¹¹     A.    I don't recall him being

¹² asked or if he had an answer for that.

¹³     Q.    Did you have an

¹⁴ understanding, back then, as to how these

¹⁵ students got put in these particular

¹⁶ seats?

¹⁷     A.    My understanding is -- and

¹⁸ just from looking at it -- it's

¹⁹ alphabetical:  From front left to back

²⁰ left to -- and then left to right.

²¹          But I don't recall

²² specifically asking that question.  I

²³ believe that's the way it looks, for the

²⁴ most part.

1      Q.    Okay.  Looking at the
2  students' last names, that's what your
3  understanding would be of how they ended
4  up in these particular seats, correct?
5      A.    Correct.
6      Q.    In the right-hand corner
7  where it says Borgmann, Period 6,
8  2018/'19, is that your handwriting?
9      A.    It is not.
10      Q.    Do you know whose
11  handwriting that is?
12      A.    I believe it's Mr. Borgmann.
13      Q.    Do you know ▓▓▓▓▓ face
14  has an X through it on the seating chart?
15      A.    I believe because at the
16  time when this was provided, she was no
17  longer in the class.
18      Q.    Okay.  There's a triangle
19  below ▓▓▓▓▓ name.
20            Do you see that?
21      A.    I do.
22      Q.    I can make it a little
23  larger for you.
24            Can you see it a little

1  better now?

2        A.    A little bit.  Yes.

3        Q.    Are you able to see that?

4        A.    Yes.

5        Q.    Do you know why the triangle

6  is next to some students' names?

7        A.    I'm having trouble seeing

8  exactly which triangle it is.  There's a

9  number of things:  It could be a student

10 with an IEP, it could be a student with a

11 medical issue, it could be a student

12 with, you know, a 504.  For instance, a

13 504 plan.  I can't tell specifically

14 based on that because it's not in color,

15 and it's awfully hard to read what it is.

16 But there are a number of reasons why

17 they would have different flags there.

18       Q.    So there's different

19 triangles that would be different colors

20 for different purposes; is that accurate?

21       A.    Yes.  Different colors and

22 different insignias within the triangle.

23       Q.    Do you know what different

24 colors mean?

1          I know this is in black and
2    white.  But do you have -- like there's
3    three different colors:  Red means this
4    and green means this?
5          A.     Honestly, I don't recall.
6    The 2018-'19 was the last year of that
7    student information system, so I haven't
8    worked in that system in two plus years,
9    three years.  I don't recall the
10   specifics of which was which.
11         Q.     Okay.  When there's a
12   triangle with an M in it, what does that
13   mean?
14         A.     A triangle with an M?  I
15   don't recall.
16         Q.     Like M, as in -- I
17   interpreted it as a medical condition --
18         A.     I believe that was medical.
19         Q.     What about a triangle with
20   an S?
21         A.     I don't recall.
22         Q.     And so this is the chart you
23   were talking about that helped you
24   determine who was actually going to be

1  interviewed; is that right?

2       A.    That's correct.

3       Q.    Is there anything else that

4  this chart of students was used for in

5  your investigation?

6       A.    No.

7       Q.    So I'm going to go to the

8  next page, which has handwritten on,

9  like, a lined page, the first page on

10 page 538, for the record, is Anthony at

11 the top; is that right?

12      A.    Yes.

13      Q.    Are you able to see this

14 okay?

15      A.    Yes.

16      Q.    Okay.  Let me know if you

17 need me to make it a little bit bigger on

18 your screen, I can do so.

19      A.    If you could do that, that

20 would be great.

21      Q.    Is that easier to see?

22      A.    Yes.

23      Q.    Okay.  Is this your

24 handwriting?

1    A.    Yes, it is.

2    Q.    So these are the notes that

3 you were talking about taking as you're

4 interviewing these students; is that

5 right?

6    A.    Correct.

7    Q.    Would you agree with me that

8 this is not, word for word, what these

9 students were telling you?

10    A.    Correct.

11    Q.    This is kind of a summary

12 or -- kind of what -- like the gist of

13 what these students were saying; is that

14 accurate?

15    A.    That's accurate.

16    Q.    Looking at these notes from

17 your conversation with Anthony -- which I

18 know we can correspond with the seating

19 chart and figure out Anthony's full name

20 and stuff.

21         But looking at this, does

22 that refresh your recollection as to what

23 you had asked Anthony and what he had

24 said in return?

1      A.     Yes.

2      Q.     And can you walk me through

3  that, using, you know, your handwritten

4  notes as kind of a guide or an assistance

5  to you to be able to recall exactly what

6  had happened in that interview?

7      A.     Yeah.  So I would have

8  asked -- or I was asking what Anthony

9  does and what the specific student --

10  what he notices, what he saw, anything

11  that occurred in class.  And he obviously

12  said, here to start, that he doesn't pay

13  much attention, just works by himself.

14      Talked a little bit or asked

15  a little about when it says, "most people

16  move desks," I would have asked him, you

17  know, a little bit about the group work

18  and who worked together or those types of

19  things.

20      And then I can assume what

21  some of the follow-up questions may have

22  been from there, based on what is listed

23  here, what I wrote out here.  I don't

24  know the specifics, so I didn't write

1  down.

2         As you said, it's more of a

3  summary.  I didn't write down the

4  specific questions asked.

5       Q.   Okay.  When he's telling

6  you, most people move desks, like during

7  group work they'd move their desks

8  together or in the course of the class,

9  people would move the desks around?

10      A.   Yeah.  During the course of

11 group work or when they were pairing up

12 to do something other than independent

13 work.

14      Q.   Did he talk to you

15 specifically about ██████ desk and

16 ██████ desk and whether they were

17 moved?

18      A.   Based on these notes, he did

19 not.

20      Q.   Would I be safe in

21 assuming -- or am I correct in saying

22 that you didn't ask him specifically

23 about ██████ and ██████ desk, then; is

24 that right?

1        A.      Either that or he didn't

2   have specific information about that,

3   based on his not paying attention to the

4   other kids comment earlier on.

5        Q.      What about the next line,

6   where it starts back middle.

7                Can you explain to me what

8   you were asking and what Anthony was

9   explaining to you?

10       A.      I think I was asking where

11  Anthony sat in the classroom and what

12  his, I guess, for lack -- I don't know

13  that I asked him this way, but what his

14  vantage point was over the relationship

15  between ████ and ██████

16       Q.      And, then, the next part,

17  where it's saying, "TH," is that ██████

18  ███████████

19       A.      Correct.

20       Q.      And when you write "PB,"

21  that's ██████ ███████

22       A.      Correct.

23       Q.      And so can you explain for

24  me based on that same line, the next

1  part, what was going on, what he was

2  telling you, what you were asking.

3       A.    Anthony reported that ███████

4  had told him that -- he didn't witness

5  anything -- but ██████ told him that

6  ██████ was getting touchy; that Anthony

7  didn't see anything inappropriate, and

8  what he saw and that how it was reported

9  to him, in the last line, that ██████ was

10 upset about it, but was just kind of

11 telling him and talking about it; and

12 that what he had witnessed -- that

13 was that they were -- they interacted as

14 close friends; that they would lean on

15 each other when they're closer together;

16 and he didn't see anything that was

17 inappropriate or anything that pointed

18 him in the way that there was anything

19 inappropriate that occurred.

20      Q.    Did you ask Anthony

21 specifically, like, was there anything

22 inappropriate that had occurred between

23 the two of them?

24      A.    In those words?  I don't

1  recall specifics of what I would have

2  used.  It sounds like something I would

3  say.  I don't know if that was the exact

4  wording I would have used.

5          Q.    To go back, I want to --

6  sorry.  Was I cutting you off?

7          A.    No.

8          Q.    I want to go down and break

9  down each of those lines.  There's a lot

10  there.

11          The line that starts with

12  "back middle," it says, TH, ██████ didn't

13  get along with ██████ ██████  I want to

14  ask you specifically about that.

15          Was that in response to you

16  asking Anthony if these two students got

17  along with each other?

18          A.    I don't recall.  I don't

19  want to guess.  I don't recall.

20          Q.    When it says here, "██████

21  didn't get along with ██████ ██████ what

22  does that mean?

23          What was Anthony telling

24  you -- why did you write that down?

1      A.    Again, I don't want to

2   guess.  My recollection is a little foggy

3   on that, but I believe there was some

4   talk about the fact they hadn't

5   previously gotten along.  I don't want to

6   go too far down the track of guessing.

7      Q.    Did Anthony tell you, like,

8   what in the past, why they didn't get

9   along?  Did he have any understanding of

10  that, to your recollection?

11     A.    Not to my knowledge, no.

12     Q.    Did you ask any follow-up

13  questions to Anthony as to why ████  and

14  ████  didn't get along?

15     A.    Not that I recall.

16     Q.    You said that Anthony told

17  you that ████ had told Anthony that

18  ████  ████ was getting touchy with her.

19            What exactly did he tell

20  you?

21            Go ahead.

22     A.    I believe that that is what

23  he told me.

24     Q.    When you wrote the phrase

1    that "███████ was getting touchy," what

2    does that mean?

3              A.    I guess, just what it says,

4    that ██████ was touching ███████

5              The follow-up questions to

6    that were, you know, asking Anthony what

7    he saw and what his recollection and

8    understanding of speaking with ███████

9    about that was.  And if she had reported

10   that to him or said something to him of

11   that nature, that ██████ was getting

12   touchy in a negative connotation or in

13   any way that Anthony saw it as

14   inappropriate or that ██████ had

15   mentioned it being inappropriate.

16         Q.    Did you ask Anthony that

17   specifically?

18         A.    I would assume so, based on

19   what I wrote here, yes.

20         Q.    Did you ask Anthony what he

21   meant when he said "getting touchy"?

22              Was that actually his words

23   that he had used to you?

24         A.    Again, as I recall, those

1 are the words that Anthony said that

2 ▮▮▮▮▮ had said to him. So I was more --

3 sorry.

4         I was more looking at trying

5 to get Anthony's understanding of what

6 ▮▮▮▮▮ meant, not necessarily what

7 Anthony meant because he wasn't privy to

8 the situation.

9      Q. Did Anthony tell you that

10 ▮▮▮▮▮ is the one who used the phrase

11 "getting touchy" to him?

12      A. Anthony said that ▮▮▮▮▮

13 told him that ▮▮▮▮▮ was getting touchy,

14 yes.

15      Q. What did you do to determine

16 what "getting touchy" meant?

17      A. I don't know that there was

18 anything with Anthony I could have done.

19 Anthony did not see it or have knowledge

20 of anything besides what ▮▮▮▮▮ had

21 reported to him.

22      Q. Did you ask Anthony if he

23 knew what ▮▮▮▮▮ meant by "getting

24 touchy," if he had any other details as

 1   to what that meant?

 2         A.    I may have based on what is

 3   listed below that.  I don't recall

 4   specifically.

 5         Q.    It says, "AL saw this."

 6               You're saying Anthony saw

 7   this.  What exactly did Anthony see or

 8   what did he tell you he saw?

 9         A.    I believe, based on my

10   recollection of the conversation, he did

11   not see this as something inappropriate

12   based on how ████████ reported it to him.

13         Q.    When you say -- oh, saw,

14   meaning Anthony saw this, meaning what

15   ████████ is saying to him?

16         A.    Correct.

17         Q.    Not Anthony -- sorry.

18         A.    No.  I'm sorry.  I cut you

19   off.

20               My recollection of this

21   conversation was that it was reported by

22   ████████ that ████████ was getting touchy,

23   but Anthony's estimation of what ████████

24   was saying was not that she was upset

1  about it, in any way, or that it was

2  inappropriate in any way.

3       Q.    How did Anthony get that --

4  how did he come to that conclusion, or

5  how did you understand that was what

6  Anthony was telling you?

7       A.    That if you look at the

8  second to last line, I believe I asked

9  the question about what he witnessed or

10  what he saw and what his estimation of

11  what ███ had said, and that he saw

12  them more leaning on each other, acting

13  as close friends, being -- you know,

14  having an amicable relationship.  I don't

15  think he used that word.  That's my word.

16       Q.    That's a pretty big word for

17  a 10th grader, I would say.

18       A.    Absolutely.

19       Q.    Students leaning on each

20  other, is that something that is

21  appropriate for a social studies class in

22  high school?

23       A.    I wouldn't say it was -- I

24  wouldn't say it's inappropriate.  It

1 happens when students are in close

2 proximity.  I wouldn't say it's something

3 that would be necessarily addressed by a

4 teacher or something that would be out of

5 the ordinary.

6        Q.    When you say "leaning on

7 each other," what exactly does that mean?

8        A.    At this point, I don't know

9 specifically.  Anthony would know better

10 than I do since he witnessed it.  But, I

11 mean, I -- yeah, I don't know.

12        Q.    At the time in 2018, did you

13 have an understanding, or did you try to

14 gain an understanding from Anthony as to

15 what "leaning on each other" meant?

16        A.    I'm sure I did.  I don't

17 recall specifically how that was answered

18 or what the response was.

19        Q.    Okay.  Nothing in your notes

20 here indicates what that meant or

21 anything like that, right?

22        A.    Correct.

23        Q.    And you agree with me, in

24 your notes, there's nothing here that --

1  would you agree "getting touchy" really

2  isn't defined either?

3      A.    Correct.

4      Q.    When it said, Anthony said

5  that ███████ was not upset about this, how

6  did you find that information out?

7          Is that something you asked

8  Anthony specifically, Was ███████ upset

9  about this?  And that was his response,

10  saying, no?

11      A.    Yes.

12      Q.    Is there anything else about

13  this conversation with Anthony that you

14  recall?

15      A.    No.

16      Q.    Based on you having the

17  information about ███████ telling Anthony

18  that ███████ was getting touchy with her,

19  did that raise any level of concern for

20  you in this investigation as to ███████

21  being inappropriately touched by ███████

22  in the class?

23      A.    I will say that when Anthony

24  reported that, there was a level of

1  concern.  As I spoke with Anthony -- as

2  Kyle Hassler and I spoke with him, and

3  then as Kyle and I debriefed afterwards,

4  Anthony's further comments or further

5  answers that are listed below that

6  comment in the -- what he had witnessed,

7  the behavior he witnessed, and the

8  demeanor in which he reported to us that

9  ███████  had made the comment, alleviated

10  many of those concerns.

11        Q.    What was the demeanor?  Was

12  it ███████  demeanor that you're talking

13  about, that Anthony was describing to

14  you?

15        A.    Correct.

16        Q.    What demeanor was that?

17        A.    That she wasn't upset about

18  it.  That there was nothing that she

19  disclosed to him, or nothing that she

20  said that, in any way, made him feel like

21  she was upset about it or, you know, that

22  there was anything that she wasn't

23  comfortable with.

24              And the further Anthony

1  reporting that -- you know, they worked

2  together as close friends and were

3  amicable.  And that led us to believe

4  that there was lower -- that there's not

5  a high level of concern.

6      Q.    What you're just describing

7  there, that was Anthony's impression

8  of --

9      A.    Yeah.

10      Q.    Like, this wasn't ▮▮▮▮▮▮

11  saying to him, Like, I'm not upset about

12  it, that's not what you're describing,

13  right?

14      A.    To my recollection, it was

15  Anthony's understanding.

16      Q.    When you said that Anthony

17  told you about ▮▮▮▮▮▮ demeanor, what

18  specifically did he tell you about her

19  demeanor?

20      A.    I don't remember

21  specifically what words he used or how he

22  described it.  But again, you know, he

23  said that she wasn't upset at all about

24  what she was talking about or upset at

1  all about, you know, any of the

2  interactions between herself and █████

3       Q.   I'm specifically asking --

4  maybe the answer is he didn't or you

5  don't recall, but specifically --

6            Because ██████ not being

7  upset about it, that's, like, a

8  conclusion.

9            Would you agree?

10      A.   That was his conclusion,

11 yes.

12      Q.   But I guess specifically on

13 demeanor, did he tell you anything

14 about -- did Anthony tell you anything

15 about ███████ demeanor, specifically?

16      A.   No.

17      Q.   You said you and Kyle

18 Hassler had a debrief after this meeting

19 with Anthony.

20            Tell me what you remember

21 about that debrief.

22      A.   After every student we spoke

23 with, again, I remember talking with him

24 and talking about what Anthony had said

1  and, you know, the facts -- I believe

2  Anthony was the only one that had a

3  conversation with either ███████ or ████████

4  about anything that happened in class or

5  about anything here.

6              So I remember talking with

7  him and, again, talking about the -- just

8  the general -- again, I'm using the word

9  "demeanor," but Anthony's conclusions

10  that there was nothing inappropriate that

11  ████████ was reporting, that she was just

12  letting him know, or speaking to Anthony

13  as a friend, and talking about ████████

14  with Anthony.

15      Q.    Did you ask Anthony why

16  ████████ was telling him this stuff?

17      A.    Not that I recall.

18      Q.    Did you ask Anthony when

19  ████████ had told him this stuff?

20      A.    Not that I recall.  I was

21  going to say, this would have been -- I

22  mean, no, I did not.

23      Q.    Did you recall how many --

24  did Anthony tell you on how many

1  occasions ███████ had told him about

2  ███████ getting touchy with her in the

3  class?

4        A.    Not that I recall.

5        Q.    Did you ask Anthony

6  specifically if he knew how often or how

7  many times ███████ had gotten touchy with

8  ███████ according to ███████

9        A.    Again, not that I recall.

10       Q.    If you had asked those

11 questions about how often, how many

12 times, the details on the getting touchy,

13 would that have been something you would

14 have included in your notes?

15       A.    I would assume so, yes.

16       Q.    After you and Kyle Hassler

17 had debriefed after talking with Anthony,

18 what, if anything, did you talk about

19 doing as a follow-up to what Anthony had

20 told you?

21       A.    I don't recall.

22       Q.    Do you recall any steps you

23 were going to take about this, you know,

24 getting touchy or ███████ and ███████ not

1  getting along?

2          Was there anything further

3  that you and Kyle had determined to do to

4  find out more details on those two

5  specific things?

6          A.    Not that I recall.  I also

7  don't recall where, in the line of the

8  investigation, this conversation

9  occurred.  If Anthony was first, last, or

10  in between.  The next steps would have

11  been debriefed at the very end of the

12  investigation, not necessarily, you know,

13  This is what we're going to do next.  We

14  would have spoken with all five students.

15  I don't recall exactly what we spoke

16  about after this specific line of

17  questioning with Anthony.

18          Q.    Do you agree with me that

19  after the student conversations, you

20  didn't do anything further to determine

21  any more details about why ██████ didn't

22  get along with ███████ is that correct?

23          A.    Correct.

24          Q.    After -- you know, the five

1 investigations or the investigations of

2 the students -- the interview you had

3 with -- sorry.

4          After the interviews you had

5 with the other students and the interview

6 you had with Anthony, would you agree

7 with me that you didn't do anything

8 further to investigate ██████ telling

9 Anthony that ██████ was getting touchy

10 with her?

11      A.    Correct.

12      Q.    I'm going to go to the next

13 page, which is 539.  This is Sam.

14          Is that a female?  Samantha,

15 I think I saw, on the list?

16      A.    I believe so, yes.

17      Q.    Are these all your

18 handwritings?

19      A.    Yes.

20      Q.    Where did these interview

21 notes come from?

22          Were they in a notebook that

23 you had, or were they implemented in some

24 type of system in the district of this

1   investigation?

2         A.    They were in a notebook that
3   I had.

4         Q.    So after this investigation
5   was completed, did you just keep all of
6   these notes in a notebook in your office
7   or something?

8         A.    Yes.

9         Q.    After you concluded your
10  investigation, was any documentation
11  passed along to anybody else at the
12  district?

13        A.    I mean, obviously at some
14  point, the district has these notes.  I
15  don't recall the specifics of when or
16  how.

17        Q.    I mean, I guess you would
18  have had to have given these notes to
19  somebody, out of the notebook in your
20  office; is that right?

21        A.    Correct.

22        Q.    And that would have been --
23  was that after the litigation had
24  started?

1    A.    Again, I don't recall the
2  timing of when or how these were shared.
3    Q.    Do you recall getting this
4  notebook from your office and providing
5  it to somebody?
6    A.    I do remember scanning it.
7  Scanning the pages of the notebook.
8  Again, I don't remember when or to who.
9    Q.    You don't know who you
10 scanned and sent them to?
11   A.    I don't recall, no.
12   Q.    Do you know whether -- can
13 you estimate how long ago that was, that
14 you were scanning these notes and
15 providing them to somebody?
16   A.    Honestly, no.  I don't
17 recall.
18   Q.    Do you know, after you had
19 completed your investigation, which you
20 said was two days after you started it in
21 November 2018, did you provide any of
22 these notes to anybody throughout, to
23 say, the course of the rest of the school
24 year?

1    A.    Again, I don't recall if it

2  was shared.  At that time, I don't --

3  some point it was shared, obviously.  I

4  don't recall.

5    Q.    To your understanding, had

6  you -- I know you said, like, whenever

7  you did, that we were just talking about,

8  that you had scanned in the notebook, do

9  you recall ever scanning in these

10 notebook pages to anybody prior to that?

11   A.    I'm sorry.  Do I remember

12 scanning the notebook prior to scanning

13 the notebook?

14   Q.    Yes.

15   A.    I don't recall scanning it

16 more than once.  I do recall, at some

17 point, there was a question that, I

18 believe, one of my handwritten notes was

19 missing a back page and there was a bleed

20 through in rescanning something recently,

21 but I don't recall if it was scanned

22 once, twice -- I don't...

23   Q.    After you concluded this

24 investigation, did you compile any

1  summary or report of your conclusions or

2  anything like that?

3        A.    No.

4        Q.    Why not?

5        A.    I will say, in the

6  investigations I've conducted as an

7  administrator, I've never compiled a

8  full -- any kind of report.  That's not

9  typical of an investigation.

10        Q.    In the district?

11        A.    Correct.  Or previous

12  districts.

13        Q.    Okay.  Do you know whether

14  there's any policy or procedure at the

15  district about having, like, a conclusion

16  report at the end of an investigation?

17        A.    Not to my knowledge.

18        Q.    Had you ever received any

19  training on that, about what to do when

20  you conclude the investigation?

21        A.    Not that I recall.

22        Q.    What about from Dr. Bauer or

23  Dr. Dietrich?

24              Did they tell you, you know,

1   what to do after you spoke to these

2   students?

3           A.    Not that I recall.

4           Q.    When you concluded your

5   investigation after a day or two of

6   starting it in November, what did you do

7   with the information that you had

8   learned?

9               I know it's in your

10  notebook, but did you communicate that to

11  anybody?

12              What was the next step?

13          A.    I believe, if I recall,

14  again, there's a conversation between Mr.

15  Hassler and myself, and at least

16  Dr. Bauer, to report back on kind of what

17  had been gleaned from the students we

18  spoke to.  Again, to my recollection,

19  that's what happened.  Once we had

20  concluded the five interviews.

21          Q.    You and Kyle Hassler had

22  reported back to Dr. Bauer?

23          A.    Correct.

24          Q.    Was that a telephone call

1  that you had with him?

2      A.    Yes.  I believe so.

3      Q.    And what did you tell

4  Dr. Bauer?

5      A.    I don't remember specifics,

6  but we would have gone through what the

7  students had said, what I had written

8  down in my notes here, what the

9  conclusion was that we drew from speaking

10  with the students.

11      Q.    And what was the conclusion

12  that you drew from speaking with the

13  students?

14      A.    The conclusion was that

15  there was nothing that pointed us in the

16  direction that we had reasonable

17  suspicion that an assault had occurred in

18  class.

19      Q.    Did you tell Dr. Dietrich,

20  at any point, that you believed that

21  ██████ had made up the assaults?

22      A.    Not that I recall, no.

23      Q.    Is that something that you

24  believed, at the time, that ██████ had

1  made up the assaults?

2       A.    I believe, at the time, we

3  didn't have evidence or corroboration

4  that something had happened.  I don't

5  know if I believed it was up or that we

6  didn't have the evidence.  I didn't

7  believe we had sufficient evidence to

8  move forward with any other

9  investigation.

10      Q.    Did you have any

11 understanding or belief, back in 2018, or

12 shortly thereafter, of any motivation for

13 ███████ for making up an assault?

14      A.    No.

15      Q.    For example, were you part

16 of any conversations about ███████

17 allegedly getting bad grades in the

18 history class, the social studies class?

19      A.    No.

20      Q.    Did you talk to Mr. Borgmann

21 at all about ███████ grades in the

22 social studies class?

23      A.    I don't remember specifics

24 of talking with him about her grades.  I

1 know that there was a teacher-initiated

2 level change, to her out of that class,

3 which is not totally uncommon.

4      Q.   How do you know about that,

5 the teacher initiated level change?

6      A.   At some point in the

7 timeline, I went to check the student

8 schedules, to see if they were in the

9 same class together.  I believe it was

10 the day that the detectives came, saw

11 that they were no longer in the same

12 class, and that she had -- I believe --

13 again, as I recall, on the day that she

14 made the report, that she was dropped out

15 of that class to a lower level social

16 studies class.

17      Q.   Did you find out how that

18 came about, how that had happened or why?

19      A.   Again, I believe it happened

20 that day and I believe it was a teacher

21 initiated level change.

22      Q.   Did you talk to anybody,

23 though, to understand why it was a

24 teacher initiated level change, why the

1 teacher allegedly initiated that?

2        A.     I did not speak to Mr.

3 Borgmann specifically about that, no.

4        Q.     Did you speak to anybody

5 else about that, to see if anyone had any

6 understanding of what had happened or

7 why?

8        A.     I did not.

9        Q.     You said you checked the

10 schedules and learned that they were in

11 the same class together.

12              What did you do about that

13 afterwards?

14              Did you find out how that

15 happened, or what next steps, if any, did

16 you take?

17        A.     I recall going to our

18 student information system and trying to

19 determine how it happened and not being

20 able to figure that out.

21              I don't recall an answer to

22 how that happened.  I believe, at some

23 point, technology was involved.  I don't

24 recall at what level or who initiated the

1 request to technology to find out when

2 and where that change was made between

3 when Kate Smalls double-checked the

4 schedule and when they ended up in the

5 same class together.

6      Q.    After this had happened,

7 when they weren't supposed to be in the

8 same class together, and then they were,

9 was there any, like, training or policy

10 change or discussions that were had about

11 how to prevent this from happening again?

12      A.    Yeah.  I think we mentioned

13 this earlier when I talked about the fact

14 that -- and you mentioned the pop-up flag

15 in the student information system.

16           So that was put into place

17 after this situation.

18      Q.    When you say "put into

19 place," I mean, how was that put into

20 place?

21           For example, did you explain

22 to like your administration or have a

23 training that this was available to them,

24 or how did that get put into place?

1       A.    Correct.  There would have
2  been communication with -- potential
3  training for those who needed to do it,
4  to put the banner in there that needed to
5  be in there, if students should need to
6  be kept separate.
7       Q.    Was there any type of
8  training or memo or something like that
9  to teach the administration about that
10 being available, now that there's a
11 pop-up that can be used?
12      A.    There would be, at the very
13 least, a discussion on it.  I don't know
14 if there was a memo, an email, exactly
15 how that would have been rolled out.
16           It wouldn't have gone to
17 teachers because teachers would not have
18 had access to that component in the
19 system.
20      Q.    Okay.  After you had the
21 telephone call, I think you said with
22 Dr. Bauer that you had concluded the
23 investigation and there wasn't enough
24 evidence or whatever -- there was nothing

1 further going to be done, how did that

2 conversation get left with Dr. Bauer?

3      A.    What do you mean how did

4 that get left?

5      Q.    Were there any next steps

6 discussed, or was it, Okay.  There's

7 nothing else that needs to be done.

8 Thanks for telling me?

9      A.    I don't specifically recall

10 since, I believe, that was the end of the

11 investigation at the high school level.

12           I'm assuming it was left

13 with, That's the end of our involvement

14 at the high school.  I don't know if

15 there was anything else that occurred

16 outside of the high school.

17      Q.    Meaning at the broader

18 district level?

19      A.    Correct.

20      Q.    Did you communicate with

21 Dr. McCue about -- since you said she was

22 notified when there was a report made

23 initially, was she notified about the

24 investigation concluding on behalf of the

1  high school, as far as you were

2  concerned?

3        A.    As far as I know, that was

4  communicated to her, yes, through Dr.

5  Bauer.

6        Q.    Through Dr. Bauer?

7        A.    Yes.

8        Q.    How do you know that

9  Dr. Bauer communicated with Dr. McCue

10  about the investigation being concluded?

11        A.    I don't have a specific way

12  to answer that, other than I know that

13  throughout this, Dr. Bauer, Dr. Dietrich,

14  Dr. McCue, were all being kept in the

15  loop on what was happening.

16              And as I said, as my direct

17  supervisor at that time, I was reporting

18  directly to Dr. Bauer.

19        Q.    How do you know that

20  Dr. McCue is being kept in the loop the

21  whole time?

22        A.    My recollection of

23  conversations with Dr. Bauer throughout

24  the ongoing timeframe.

1    Q.    Did Dr. Bauer tell you that
2  he was -- everything that you were
3  telling him, that he was now
4  communicating that to Dr. McCue?
5    A.    That's my recollection.  I
6  don't remember a specific conversation
7  pointing to that, but that was my
8  understanding, yes.
9    Q.    Okay.  Did Dr. McCue ever
10 contact you, as leading this
11 investigation, as to what happened, how
12 the investigation went, anything like
13 that?
14   A.    I don't recall specifically.
15 I don't recall a specific conversation
16 with her.
17   Q.    Okay.  That was going to be
18 my next question.
19         Do you recall ever speaking
20 with Dr. McCue about the assaults between
21 █████████ and █████████
22   A.    Again, I believe there were
23 a number of conversations where she was
24 on the phone call.  I don't remember a

1 specific one-on-one conversation with

2 her.

3      Q.    I think, before, you had

4 told me you didn't recall whether she was

5 on the phone call with Dr. Bauer,

6 Dr. Dietrich, and Kyle Hassler, and you.

7      A.    On that specific phone call,

8 correct.

9      Q.    Do you recall her being on

10 other phone calls with those men?

11      A.    I do.

12      Q.    What phone calls do you

13 recall Dr. McCue being on the phone for?

14      A.    I couldn't tell you specific

15 phone calls.  I remember her being part

16 of the larger conversation, though, and

17 her being on the phone.  I can't point to

18 a specific conversation or what the

19 conversation was specifically regarding,

20 but I remember her being part of the

21 larger group that discussed the entire

22 situation.

23      Q.    And you said specifically

24 you don't remember, but do you remember,

1  generally, what calls she was on or not

2  on?

3           A.    There were a number of phone

4  calls.  I don't.

5           Q.    Do you recall her ever

6  giving instructions specifically on the

7  investigation or what was to be done or

8  anything involving this situation?

9           A.    I don't recall.

10          Q.    Do you recall her ever

11  sending you any emails or exchanging any

12  emails with Dr. McCue about this

13  situation?

14          A.    Not that I recall.

15          Q.    Do you recall any other

16  emails that were sent about the

17  situation?

18               I know we talked about phone

19  calls, but do you recall ever

20  communicating by email?

21          A.    No.

22          Q.    Did you ever send text

23  messages to anybody, like Dr. Bauer,

24  Dr. Dietrich, Kyle Hassler, anybody like

1  that about this situation?

2       A.    No.

3       Q.    I want to go back to

4  page 539 that's on my screen.  And this

5  is the interview that you had with Sam,

6  one of the other students in the class.

7            Based on your notes, can you

8  tell me what you recall about this

9  interview with Sam?

10           I guess if you could just go

11 through your notes, line by line, what

12 you were asking, what she was saying so I

13 have an understanding of what these notes

14 mean.

15      A.    Again, started with Sam sat

16 in class, back left, as it appears from

17 the teacher, that ████ was seated

18 behind Sam -- directly behind Sam.

19           Asked about some of the

20 goings-on in class, what was happening,

21 what Sam may have seen, or what the

22 general gist of the class is, how the

23 class is set up.

24           Obviously, "typically people

1  doing stuff," which isn't very

2  explanatory.  But lesson, watching

3  videos.  Sam did mention that at times

4  lights would be off during videos --

5          Q.    Let me stop you there before

6  we jump down to the next lines.

7                It says, "People doing

8  stuff."

9                Was that her phrase that she

10 used?

11         A.    Yes.

12         Q.    People were doing stuff?

13         A.    Yes.

14         Q.    And did you ask her what

15 does that mean, "people doing stuff"?

16         A.    If I did, there was nothing

17 specific about how she answered that I

18 would have written down to explain it.

19         Q.    So here, looking at your

20 notes, you don't have an understanding of

21 what "people doing stuff" meant?

22         A.    Correct.

23         Q.    Means?

24                Correct?

1    A.    Correct.

2    Q.    And, then, you said that she

3    told you, the next line, "lights were off

4    during videos"?

5    A.    Mm-hmm.

6    Q.    Yes?

7    A.    Yes.  Sorry.

8    Q.    That's okay.  Everybody does

9    it.

10    The lights off during

11    videos, did she explain to you how often

12    that was happening or more detail about

13    the lights off during videos in the

14    class?

15    A.    No.  I believe that was a

16    follow up when she asked -- when she

17    responded that they would watch videos, I

18    think I asked if the lights were on or

19    off during videos and she responded that

20    lights were off during videos.

21    Q.    Why did you ask if the

22    lights were on or off during the videos?

23    A.    I guess I just wanted to

24    know the lights were on or off during

1  videos based on the investigation and the

2  nature of the investigation.

3        Q.    Did you have any idea at

4  this point -- or an understanding at this

5  point, that the assaults that were

6  occurring, that ████ was talking about,

7  were occurring when the lights were off

8  and they were watching videos?

9        A.    I did not.

10        Q.    Is that news to you?  Is

11  this the first time you're hearing that,

12  then?

13        A.    That is the first time I'm

14  hearing that, yes.

15        Q.    Were there any other

16  questions that you asked her about these

17  lights off during the videos?

18        A.    No.

19        Q.    Did you ask her -- did she

20  tell you or did you ask her about where

21  the desks were positioned when they were

22  watching videos?

23        A.    I did not.

24        Q.    Do you recall asking

1 anybody, any of the students that you

2 interviewed, about where the desks were

3 positioned when they were watching videos

4 when the lights were off?

5      A.    I do not.

6      Q.    The next thing that you

7 wrote here, what does that mean?

8      A.    I believe the question was

9 how often or do they do partner work, do

10 they partner up, do they work together --

11 students -- or do they do more individual

12 work.

13           Sam said that they do

14 partner work pretty often or -- I wrote

15 "always do," and that she, typically --

16 Sam, typically -- goes to the opposite

17 corner of the room to work with a partner

18 on the opposite side of the room.

19      Q.    This next line where it

20 says, "choose partners," what is that

21 referring to, what does that mean?

22      A.    I believe, my recollection

23 is I asked her if partners were

24 predetermined by the teacher or if

1  partners were chosen by the students, if

2  they had student choice in who they

3  worked with.

4          And she would have answered,

5  based on my handwriting here, that they

6  choose their partners.

7      Q.    Okay.  And this last line

8  here, what did you ask, what did she tell

9  you?

10     A.    She, obviously, told me that

11 she hadn't seen anything inappropriate

12 between ███████ and ███████  I assume the

13 question was had she seen anything

14 inappropriate, had there been anything

15 she had witnessed or anything that had

16 been reported to her or anything that,

17 you know, had occurred during class that

18 would have pointed her in the direction

19 that something inappropriate had

20 occurred.

21     Q.    When you're using the term

22 "inappropriate" with these students, did

23 you define for them what you meant by

24 "inappropriate?"

1       A.   No.  I didn't specifically
2  define it.  As I think we've talked
3  about, I had really no knowledge of what
4  I was trying to define.  And I was
5  looking for if there was any kind of --
6  anything they saw that was inappropriate,
7  touching, anything that they saw that was
8  inappropriate behavior or
9  inappropriate -- you know, outbursts or
10 anything that would point to the fact
11 that something that shouldn't be
12 happening in class was happening in
13 class.
14      Q.   Did you break it down to
15 each of these students like that,
16 inappropriate touching, inappropriate
17 outbursts, like you just did?
18      A.   I don't believe I did, no.
19      Q.   Was it more in the line
20 of -- from what you can remember asking
21 these questions -- of, Did you see
22 anything inappropriate between these two?
23      A.   It would have been more
24 along those lines, yes.

1      Q.     When you were asking these

2  students, in these interviews, these

3  questions, when you asked them, Did you

4  see anything inappropriate, did you ask

5  them specific to ██████ and ████████ or

6  was it a more general question, Is there

7  anything inappropriate that you saw in

8  the room?

9      A.     No.  It would have been more

10  specific to ██████ and ████████

11      Q.     Is there anything you can

12  remember, other than what we've already

13  discussed, about the interview with Sam?

14      A.     No.

15      Q.     Did any of these students --

16  when you're asking these questions -- ask

17  you, like, What is this about?  Was

18  something inappropriate?

19             Did they ask any follow-up

20  questions like that?

21      A.     No.  Not that I can recall.

22      Q.     I think this is probably the

23  page that you were talking about having

24  to rescan.

 1      A.    I believe that's the one.

 2      Q.    Okay.

 3            MS. LLOYD:  Can we take two

 4      minutes, five minutes at this

 5      point?

 6            MS. LAUGHLIN:  Sure.

 7            MS. LLOYD:  Thanks.

 8            MS. LAUGHLIN:  Let's take

 9      five minutes.  Come back at 12:58.

10                  -  -  -

11            (At this time, a short break

12      was taken.)

13                  -  -  -

14            MS. LAUGHLIN:  I'm going to

15      share my screen again.

16  BY MS. LAUGHLIN:

17      Q.    Are you able to see that?

18      A.    Yes.

19      Q.    I believe it was page 540

20  that we couldn't see.  I believe this is

21  what has been produced as the cleaner

22  copy that, I think, you recall

23  rescanning.

24            Is that right?

¹ A.    Correct.

² Q.    So I want to go over this

³ one here.

⁴ It says "Kristine" and

⁵ there's kind of a diagonal word.

⁶ Is that her last name?

⁷ A.    Yes.

⁸ Q.    So let's go through this

⁹ note.  And tell me what you recall about

¹⁰ your interview with Kristine.

¹¹ A.    It started with asking about

¹² any kind of behaviors in class, anything

¹³ happening in class that, you know, she

¹⁴ thought needed to be reported.

¹⁵ She said behavior is fine.

¹⁶ No behavior issues to report, that, you

¹⁷ know, everything was fine in her social

¹⁸ studies class.

¹⁹ I asked her where she sat,

²⁰ line 3.

²¹ She said, "Towards the

²² back."  There's an empty desk behind her,

²³ and that there's one person to her right,

²⁴ but that the person behind her moved to a

1   different school, meaning that ████ was

2   the person that was seated behind her.

3   So she was seated directly in front of

4   ████

5       Q.   Okay.  When you say "person

6   behind who moved to a different school,"

7   did Kristine know who ████ was?

8       A.   I don't believe so, no.

9       Q.   Did you ask for any

10  follow-up questions about ████ moving

11  to a different school?

12      A.   I did not.

13      Q.   From what you can recall,

14  did Kristine give you any details as to,

15  like, where she got that understanding or

16  what that meant, that she moved to a

17  different school?

18      A.   She did not.

19      Q.   Through the course of any of

20  the interviews with the students, did you

21  ever ask the students, like, why ████

22  was no longer in school, if they had any

23  understanding about that?

24      A.   I'm sorry.  Say that one

1  more time?

2       Q.    Through your interviews of

3  any of these students, do you recall ever

4  asking if they had any understanding of

5  why ███ was no longer at school?

6       A.    No.

7       Q.    Going on to the next line,

8  what were you asking?  What was Kristine

9  explaining to you?

10      A.    I was asking her about group

11 work and how that looked and what she

12 did.

13            She explained that she --

14 Kristine -- always works by herself in

15 her seat, that she doesn't move, she

16 doesn't work with a partner, chooses to

17 work solo.

18            The next line, I asked more

19 about others, and she said they -- you

20 know, other kids in the class work in

21 groups of two or three.

22            Follow up to that was if

23 it's the student's choice, and she said

24 it's always the student's choice.

1  There's never a time where the teacher

2  makes them work in certain pairs or

3  certain groups or puts the groups

4  together, that it's student choice.

5          She said the worst thing

6  that she had seen, was students get loud

7  during group work and that -- you know,

8  she hasn't been a witness to anything

9  other than that.

10      Q.    Let me stop you there before

11 we go on to the next part.

12         When you said "during group

13 behavior," that that's what she's

14 describing, it that was loud when

15 students are partnering up or working

16 together?

17      A.    Correct.

18      Q.    When she said it's -- "being

19 loud," meaning in the classroom, the

20 classroom is generally loud when students

21 are working together?

22      A.    Correct.

23      Q.    Okay.  Did you ask any more

24 detailed questions about that, the

1 students being loud or the teacher's
2 involvement, if any?
3        A.    No, not to my recollection
4 at least.
5        Q.    Okay.  Is it safe to say,
6 that if they had given you information,
7 you would have put it down in these
8 notes?
9        A.    Absolutely.
10       Q.    Did you ask Kristine or any
11 of the other students about the conduct
12 of Mr. Borgmann or what Mr. Borgmann was
13 doing?
14             For example, here, when
15 students are being loud, what Mr.
16 Borgmann was doing?
17       A.    I did not.
18       Q.    Did you get any information
19 from any of the students as to what Mr.
20 Borgmann was doing or where he was when
21 he would turn the lights off and show
22 videos to the class?
23       A.    I did not.
24       Q.    For example, do you know

1  whether Mr. Borgmann was in the room when

2  he would put on a video and turn the

3  lights off?

4       A.    I mean, for sure, no, but

5  absolutely, the expectation is that

6  teachers are in the room at all times

7  when the students are.

8       Q.    I'm sure.

9             Is there anything else that

10 you can recall discussing with Kristine

11 about the room being loud, students being

12 loud in the class?

13      A.    No.

14      Q.    What's the next thing, the

15 next line?  What is that referring to?

16      A.    She had reported that the

17 girl behind her -- presumably ██████ --

18 had spat coke on her earlier in the

19 school year.

20            As I said, it had been

21 towards the beginning of the school year.

22 That ██████ apologized, and I had asked,

23 at that point, like, what had happened.

24 She said she wasn't sure, that she might

1  have been -- she might have been pushed.

2  She doesn't know who had pushed her or if

3  that's even what had happened, but that

4  the coke was spat.

5            And I followed that up with

6  a question of, What was happening?  Why

7  did that happen or what -- you know, what

8  was going on in class when that happened?

9            She said they were doing

10 work, the lights were on, it was towards

11 the end of the period, earlier in the

12 school year.  So she had had her back to

13 ███████  had no idea what had happened.

14 But that ███████ was, you know, I guess,

15 pleasant, whatever, apologized, helped

16 clean it up.

17            And, then, the following

18 line, I asked her about the teacher and

19 what the teacher knew about that, or did

20 the teacher address it or did it happen?

21            And she said she's not sure

22 if the teacher saw it and that she didn't

23 actually report anything to the teacher

24 because -- you know, she didn't say

1 anything because she did not think that
2 ████ did it on purpose and -- just
3 didn't -- you know, Kristine didn't, I
4 guess, mind too much or didn't really
5 want to get anybody in trouble for
6 something that seemed like an accident.
7      Q.   Okay.  As the principal, and
8 before that, the assistant principal, is
9 there, in your experience, kind of a --
10 is it common for students not to want to
11 tell on other students to get them in
12 trouble?
13           Is that kind of, like, the
14 feeling in the high school amongst
15 students?
16           MS. LLOYD:  Object to the
17      form.
18           Go ahead.
19           THE WITNESS:  I wouldn't say
20      that's the feeling in the high
21      school.  I think the -- when you
22      have 3,000 students in a high
23      school, accidents happen and
24      students will give other students

1         the benefit of the doubt.  I don't

2         think there's a culture of not

3         telling on kids for something that

4         is done in -- you know, on purpose

5         or done to someone out of ill

6         will.

7 BY MS. LAUGHLIN:

8      Q.    Okay.  Did you ask Kristine

9 at all -- and I'm just scrolling down so

10 you can see the full page -- did you ask

11 Kristine at all, or do you recall asking

12 her about ████████ and ████████ specifically

13 and anything that may have gone on

14 between the two of them?

15      A.    I don't remember the

16 specific conversation with Kristine.  As

17 I said, and as you asked, if something

18 would have been told to me, I asked

19 students about the relationship between

20 ████████ and ████████ if there was anything

21 there that she would have reported and I

22 would have written it down here.

23        The only thing she reported,

24 at this point, was the coke incident.  So

1  that's what I captured in the notes.

2        Q.    Okay.  On page 541 of the

3  record, there's a Patricia that you had

4  interviewed.

5            Is that better?  Can you see

6  it?

7        A.    That is better.

8        Q.    Okay.  Tell me what you

9  recall about this interview with

10  Patricia.

11        A.    Patricia, as I recall,

12  really -- if I recall the seating chart

13  and I recall the conversation with

14  Patricia correctly, she was off the

15  beaten track a little bit.  She wasn't

16  one of the closer students and really had

17  nothing to report.

18            She, basically, said she

19  puts her head down and doesn't pay

20  attention to others.

21            The groups that will go

22  off -- I'm not -- the note there doesn't

23  even make sense to myself, but I remember

24  her kind of being -- I don't want to say

1  "standoffish," but she didn't really have

2  anything to report, anything to really

3  say about specifics.  She knew who █████

4  was and she kind of explained to me where

5  people sat and where she sat, in the

6  middle towards the back.

7            Anthony was behind her, and

8  Anthony works with Jack Stubes.  She

9  talked about Chase and Camden on the

10 football team and it was kind of -- there

11 just wasn't much from her at all.  I

12 asked about some behaviors and anything

13 that would rise to -- you know, specific

14 to █████  or to █████

15           She really didn't have

16 anything on that.  She basically went

17 off, kind of on a tangent, about cheating

18 on the first test.  And there just really

19 wasn't much from Patricia in the way of

20 being able to add much to the

21 conversation.

22      Q.    Did you ask Patricia

23 specifically about whether she saw or

24 heard of anything involving █████  and

1    █████  specifically?

2         A.    Yeah.  Again, as I said, I

3    think, a couple times now, I asked

4    specific questions.  And if there was

5    anything that was there, I would have

6    written it down.  So she really had

7    nothing to add to the conversation as far

8    as █████  and █████

9         Q.    I guess, so I'm trying to, I

10   guess, understand.

11             Because in other ones, you

12   had written, No, I didn't see anything

13   inappropriate between █████  and █████

14   And, here, there's nothing written either

15   way.

16             That's why I'm following up

17   and asking:  Why didn't you write that?

18   If the answer was, "No, I didn't see

19   anything inappropriate," why didn't you

20   write that here in these notes?

21        A.    As I said, specific to

22   Patricia, I don't recall her really

23   even -- what's the word I'm looking

24   for -- calling out the fact that she

¹ witnessed anything between them at all.

² Not that she even said, "I didn't see

³ anything."

⁴                 She, I don't believe, even

⁵ knew necessarily -- I reference, at one

⁶ point in here, "the other girl in the

⁷ corner" who was -- it was ███████  She

⁸ didn't even know who she was.

⁹                 So like I said, she was a

¹⁰ little bit more standoffish and really

¹¹ had nothing to add and didn't

¹² specifically answer the question that

¹³ there was anything inappropriate -- there

¹⁴ was nothing that she saw that was

¹⁵ inappropriate.  She just failed to even,

¹⁶ I guess, communicate that she even knew

¹⁷ who ███████ was.  If that makes sense.

¹⁸        Q.    Okay.  Page 542 of the

¹⁹ Bates-numbered records refers to Matt.

²⁰                 And these are all -- this is

²¹ still all your handwriting, right?

²²        A.    Yes.

²³        Q.    And to your recollection, do

²⁴ you recall Kyle Hassler, at all, having a

1   notebook or writing anything down?

2        A.    No.  I believe you asked

3   that before.  I don't recall him taking

4   any notes.

5        Q.   Okay.  Tell me what you

6   recall about, like, going through your

7   notes or conversation with Matt.

8        A.    Yeah.  Again, I'll go kind

9   of line by line.  I'm talking about where

10  Matt sits -- or where Matt sat in class

11  during 6th period social studies, middle

12  of the back row.

13             The desk to the left of him

14  was empty.  I believe that's what it

15  showed on the seating chart as well.

16  Anthony, who we talked about earlier, sat

17  to his right.  So Matt was one person

18  removed from ██████████  two people removed

19  from ██████████

20             He, at times, sat next to an

21  empty desk, which, again, makes sense

22  because the conversation was held long

23  after ██████  left the class.

24             He said there were no

1   behavioral concerns, that there was

2   nothing that he saw -- you know, even

3   when ███████ was in the classroom.  He

4   chooses to work by himself all the time.

5        Q.   Let me just stop you there

6   so I can go back for a second.  I don't

7   mean to interrupt.

8             When you say "no concerns

9   behaviorally," was that just general in

10  the class he was telling you, or was that

11  specific to ████████ or ███████████

12       A.   That was more general to the

13  class.

14       Q.   And then -- sorry -- you

15  said he chose to work by himself all the

16  time and you were about to, I think, go

17  to the next line; is that right?

18       A.   Yeah.

19            He, again, I guess I forget

20  which student it was now that we just

21  talked about -- that, you know, sometimes

22  it gets kind of loud in the class.  I

23  asked, again, more about the group work

24  and what happens there.

1    He says, most of the
2 students get up and move around, most of
3 them go find a partner in a different
4 part of the room.
5    He talked about somebody
6 spilling something one or two -- the
7 first week or two in class, which I liken
8 back to the -- I believe it was Kristine
9 that talked about the coke being spilled
10 or spat or what have you.
11    He said they're allowed to
12 drink water, they're allowed to have
13 drinks in the classroom, which is
14 probably a follow-up at that point.
15    At North Penn High School,
16 they were allowed to have water, they
17 weren't supposed to have soda.  So that
18 was a sidebar based on what the liquid
19 was, but just trying to figure out if it
20 was the same situation.
21    He said he thought the
22 teacher dealt with it and it was the end
23 of class, so it matched up, in my mind,
24 that it was the same situation when,

1  reportedly, ▓▓▓▓ spit soda on the

2  student in front of her.  You know,

3  again, it was an accident and that there

4  was nothing malicious there.

5          I asked about videos --

6      Q.    Let me stop you before there

7  because I think you were going on to the

8  next line.

9          When you wrote "accident"

10  here, you put a question mark.  Why did

11  you put a question mark here in your

12  notes?

13      A.    That would have been based

14  on the student's report that he thought

15  it was an accident but he wasn't sure.

16  You know, can be sure that that she

17  didn't spit on the student in front of

18  her on purpose?  And that -- I think it

19  was an accident.  It was dealt with like

20  it was an accident.  And just put the

21  question mark there to kind of denote the

22  fact that, while not sure, he thought it

23  was an accident.

24      Q.    Okay.  And go ahead.  The

1 next line.

2        A.    Okay.  Again, asked about

3 videos, asked about movies when the

4 lights are off, if there are any issues,

5 anything that he witnessed, anything that

6 happened.

7              He said there were no

8 issues, that students pretty much just

9 sit and a watch the video.  You know, and

10 again, I talked about behavior.  If there

11 was anything that in class, specific to

12 anyone or -- specific to the class or

13 specific to, you know, ███████ and ███████

14              He said, you know,

15 basically, all he reported was the worst

16 behavior is that some of the groups get

17 loud or talkative when they're paired up

18 in nonindependent work.

19        Q.    This "lights off no issues,"

20 was that, like, a more general question

21 you were asking, like is there any issues

22 when the lights go off, and he said no?

23        A.    Correct.

24        Q.    This is probably the fourth

1 student interview we've gone over or so

2 now, and I think most students are

3 writing about the room gets loud.

4           And were you getting, kind

5 of, the sense from this room that it got

6 a little rowdy at times when they would

7 be doing group work?

8           A.    I don't know that I would

9 say "rowdy."  I think it's typical, that

10 it's certainly louder when students are

11 working in groups because they're

12 collaborating, they're talking with each

13 other, they're doing things.

14           It's certainly louder than

15 when you're doing something independent,

16 like taking a quiz or a test or working

17 in your book by yourself or reading.  I

18 did not get the sense that it was rowdy,

19 just that -- if you walk into any class

20 in North Penn High School and there's

21 collaboration going on, it's going to be

22 loud.

23           They didn't point to this as

24 it's so loud that it's out of control,

1  just that -- you know, at times, it's a

2  little bit louder.  And that's to be

3  expected.

4      Q.    Anything else you can recall

5  about this conversation that you had with

6  Matt?

7      A.    No.

8      Q.    Once you had these -- did

9  you ever report to Mr. Borgmann about

10  what any of these students had said about

11  what was going on in the classroom?

12      A.    Not that I recall, no.

13      Q.    Would you agree with me that

14  when you had communicated with -- I think

15  you said it was Dr. Bauer, that you had

16  concluded your investigation and told him

17  your conclusion on the investigation and

18  your finding, would you agree with me

19  that you, at that point, didn't turn over

20  the handwritten notes that we had just

21  gone over, to him?

22      A.    I don't know that I would

23  agree with you.  I think, as I answered

24  before, I don't recall the timeline of

¹ when any of this was scanned or sent.  I

² couldn't tell you -- again, I couldn't

³ tell you if that happened immediately, if

⁴ it happened -- you know, at some time in

⁵ the future from there.  I don't know

⁶ that I can agree or disagree.

⁷          Q.    If you had sent these notes

⁸ at some point to -- whether it was

⁹ Dr. Bauer or even Dr. McCue, there would

¹⁰ be an email -- right -- that would be

¹¹ sent with those attached?  Is that the

¹² way you would have sent it?

¹³          A.    Yes.

¹⁴          Q.    And again, when I ask you to

¹⁵ check your emails involving this case,

¹⁶ I'm asking you to include any email that

¹⁷ you had sent of your investigation notes

¹⁸ or anything like that, okay?

¹⁹          A.    Mm-hmm.  Yes.  Sorry.

²⁰          Q.    It's okay.

²¹          When you were communicating

²² with Dr. Bauer on the phone -- I think

²³ you said when you told the conclusions,

²⁴ he was the one that was on the phone, you

1  couldn't recall anybody else being in

2  that telephone call; is that accurate?

3          A.    I couldn't tell you one way

4  or the other if anyone else was on the

5  call.  I know he was.

6          Q.    In that call where you were

7  reporting your conclusions and what you

8  found, from what you learned from your

9  investigation, did you tell, in that

10 phone call, specifically, that a student

11 had reported that ██████ was getting

12 touchy with ██████

13         A.    As I think I answered

14 before, my recollection of the

15 conversation was running through the five

16 interviews, kind of talking through what

17 the students had said.  I don't

18 specifically recall saying that or

19 sharing that, but it would have been

20 certainly something that I feel I would

21 have shared.

22              Again, I don't recall the

23 specifics.

24         Q.    You're saying that you

1 believe that you would have shared with

2 them, specifically, that a student

3 reported ▇▇▇ telling them that ▇▇▇

4 was getting touchy with her?

5    A.    Sure.

6    Q.    The specific instance of a

7 student reporting that ▇▇▇ and ▇▇▇

8 didn't get along, do you believe that

9 you -- did you communicate that, in the

10 conversation, as part of your conclusion?

11    A.    Again, my recollection is

12 going through my notes, talking through

13 what the students had said, and giving a

14 summary of -- you know, kind of a, not a

15 summary, but giving a somewhat detailed

16 rundown of what each of the students had

17 said and summarizing what the findings

18 were.

19    Q.    On this phone call that

20 we're talking about, you recall

21 specifically that Dr. Bauer was on that

22 phone call; is that accurate?

23    A.    Yes.

24    Q.    When you believe that you

1  told Dr. Bauer, or whoever else was on

2  the phone, about specifically using the

3  phrase "getting touchy," ▮▮▮▮▮ was

4  getting touchy with ▮▮▮▮▮ do you recall

5  anybody asking you any questions about

6  that or following up on that particular

7  statement?

8      A.    I don't recall, no.

9      Q.    When you told them -- or you

10  believe you told them, on the phone call,

11  about you had learned that ▮▮▮▮ and

12  ▮▮▮▮▮ didn't get along, did anybody on

13  the phone call ask you any follow-up

14  questions as to that statement, that

15  ▮▮▮▮ and ▮▮▮▮▮ didn't get along?

16      A.    Not that I recall.

17      Q.    What is your understanding

18  of -- were you familiar with ▮▮▮▮▮

19  throughout his high school career at

20  North Penn High School?

21      A.    I will say I know -- I knew

22  who he was, yes.

23      Q.    Was there any other

24  instances of misconduct throughout his

1  high school career that you were aware

2  of?

3          A.     Certainly, nothing that rose

4  to my level as the high school principal,

5  no.

6          Q.     Is there anything that you

7  had heard about, of any other instances

8  of misconduct?

9          A.     No.  There certainly could

10 have been class cuts or low-level

11 discipline that I would not -- it would

12 not be reported to me, out of the general

13 course of business, but there was nothing

14 that was reported to me at all.

15         Q.     Do you know anything about

16 ███████ being involved in sports at North

17 Penn, what sports he played, anything

18 like that?

19         A.     If I recall correctly, I

20 believe he might have been part of our

21 football team.  I don't know if he played

22 for three years or not.  I believe, at

23 some point, he may have been part of the

24 football team, but I'm not sure.

1    Q.    Do you know, like, whether

2    he was, like, a starting player or

3    anything about, like, how good he was on

4    football or any details like that?

5    A.    Just the fact that I'm not

6    sure if he was on the team for sure or if

7    he was on the team for the whole time.

8    He certainly was not a starter.  He was

9    definitely not a standout athlete, if he

10   was an athlete at all.  If I'm recalling

11   the football participation correctly.

12   Q.    Other than these notes being

13   in your notebook, do you know whether

14   those notes ended up anywhere else in,

15   like, district files?

16   A.    No.  Other than what you

17   have here, I don't know where else they

18   would be.

19   Q.    Are there any other notes or

20   maybe like a Word document or Google Doc

21   that you created involving this

22   investigation?

23   A.    I believe I have a Google

24   Doc of personal notes that has some

1  timeline on it, I believe.

2         Q.    Involving this incident?

3         A.    Yes.

4               MS. LAUGHLIN:  I don't

5         think -- what I showed you, I

6         believe, is what I'm aware of, so

7         I would ask after your deposition,

8         for you to go to that Google Doc

9         and pull out the information that

10        is related to this case, this

11        incident.

12              Are you able to do that?

13              THE WITNESS:  Sure.

14 BY MS. LAUGHLIN:

15        Q.    You said you think it

16 contains a timeline?

17        A.    If I recall correctly, that

18 Google Doc has the exact date that my

19 first conversation with Kate Small

20 happened, the exact date that the

21 detectives showed up, and maybe the exact

22 date that I spoke with the students -- or

23 Kyle Hassler and I spoke with the

24 students.  If I recall, that's kind of

1 what's included there.

2    Q.    Do you know whether you kept

3 any, like, extra notes just so you

4 wouldn't forget what people told you,

5 those types of things?

6    A.    I don't recall having

7 anything other than having the

8 handwritten notes from the student

9 investigation in the Google Doc.

10    Q.    Did you take any notes after

11 you had the conversation with the

12 detectives from the Towamencin police?

13    A.    I did not.

14    Q.    Were you part of any

15 discussions or meetings on changing North

16 Penn School District sexual harassment

17 policy?

18    A.    No, not that I recall.

19    Q.    It's my understanding that

20 the sexual harassment policy that was in

21 place in 2018 was then repealed and

22 replaced by a new policy in, like, the

23 last year or two.

24         Are you aware of that at

1   all?

2          A.    Specific to sexual

3   harassment?  No.  I know we're going

4   through a full board review of -- through

5   PSPA, of all of our school board

6   policies, and they're one by one being

7   repealed and updated.  I have been part

8   of conversations on certain policies.  I

9   don't recall being part of the sexual

10  harassment policy.

11          So it's not -- I don't

12  recall being part of the conversation on

13  that specific policy.  But, yes, I do

14  know that policies are being repealed and

15  replaced.

16          Q.    Do you know when the kind of

17  overview of policies and getting rid of

18  old ones, replacing with new ones, do you

19  know when that kicked off or started?

20          A.    If it didn't start in the

21  '18-'19 school year, it started in the

22  '19-'20 school year.  Not being in the

23  weeds on that, I don't know when that

24  exactly started.  I'm just brought in on

1 certain points in the conversation on

2 pieces that touch the high school.

3      Q.    Okay.  Were you part of any

4 discussions after you concluded your

5 investigation, or even before, in that

6 school year about trying to make

7 accommodations or offer accommodations

8 for ██████ in her education?

9      A.    Beforehand, no.  Afterwards,

10 I was part of an IEP meeting that

11 occurred at North Montco.  I believe that

12 was also sometime in November.  But

13 that's the extent.

14      Q.    And were you actually

15 present, like, physically in the room for

16 that meeting?

17      A.    I was.

18      Q.    What do you recall about

19 that IEP meeting at North Montco in that

20 November?

21      A.    My recollection is that

22 Mrs. ████████████ was in no way, shape, or

23 form interested in allowing ██████ or

24 wanting ██████ to come back to the high

1  school, and that it was very much focused

2  on how tech school would be supporting

3  ▊▊▊▊ the support that North Penn

4  School District, as the home school,

5  would be providing, to support ▊▊▊ at

6  North Montco.  And again, that she would

7  be at North Montco full time.

8         Q.     You said in the meeting, you

9  had the understanding that Mrs.

10  ▊▊▊▊▊▊ in no way, shape, or form

11  wanted ▊▊▊ back at North Penn High

12  School.

13             How do you know that?

14      A.     As I recall, there were

15  statements made by Mrs. ▊▊▊▊▊ that

16  she wasn't returning to the high school,

17  that she wanted her full time at North

18  Montco.  I mean, that --

19      Q.     Sorry.  Were you there for

20  any explanation as to why?

21             Did she explain why she

22  didn't want her daughter back at North

23  Penn High School?

24      A.     I don't specifically

¹ remember if she called out ██████ if she

² called out the details -- she certainly

³ didn't share details, but she made it

⁴ apparent and shared that it was due to

⁵ the report that was made about what

⁶ happened -- or what purportedly happened

⁷ in 6th period social studies class.

⁸          Q.    After you concluded your

⁹ investigation in early November, would

¹⁰ you agree with me in saying that you and

¹¹ the high school weren't going to take --

¹² you were not taking any further steps in

¹³ this investigation or any other things

¹⁴ that you do involving what was reported?

¹⁵          A.    At the high school level, I

¹⁶ would say that was the end of the steps

¹⁷ we had taken.  I can't speak for anyone

¹⁸ outside of the high school.

¹⁹          Q.    Did anybody tell you they

²⁰ were going to take any additional steps

²¹ after they had the phone call or you

²² reported your investigation conclusion?

²³          A.    I can't point to anything

²⁴ specific there that I recall, no.

1     Q.    After that initial meeting

2  with the detectives, did you have any

3  other conversations with, other than,

4  like --

5          I guess, did you have any

6  other conversations with law enforcement

7  about what had happened?

8     A.    I did not.

9     Q.    For example, you did not

10  report to them or provide them with notes

11  or information that you had received; is

12  that right?

13     A.    That's correct.

14     Q.    In 2018, did North Penn High

15  School -- or even before then, when you

16  were the assistant principal there, did

17  they have any type of anonymous student

18  surveys, like, climate surveys for the

19  students?

20     A.    I believe there was a

21  climate survey that was administered in

22  2018, '19.  I don't recall if there were

23  any climate surveys or any surveys, such

24  as that, prior to that during my time as

1  an assistant principal.

2         Q.    Do you recall what time --
3  what part of the school year that climate
4  survey was given?

5         A.    That's a good question.
6               I believe it was given more
7  towards the spring of 2019.

8         Q.    Since that had not been
9  something that you had experienced at
10 North Penn High School before, how did it
11 come about that there was going to be a
12 climate survey done that spring?

13        A.    I was not part of those
14 conversations.  It was not just the high
15 school.  It was district wide.  So I have
16 no idea.

17        Q.    The climate survey, was that
18 something given to you by somebody in the
19 administration of the district?

20        A.    Yes.

21        Q.    Do you recall who gave that
22 to you?

23        A.    I don't recall who shared
24 it.  I know it was a tool developed by

1  Hanover Research.

2       Q.    By who?

3       A.    Hanover Research.

4       Q.    What is that?

5       A.    It's an educational research

6  company.

7       Q.    Is that somebody that, like,

8  North Penn, the district, consults with,

9  or is that just general, all schools know

10 about that stuff?

11      A.    I think it's both.  It would

12 have been a contracted, paid-for tool.

13 It's my understanding -- and I have very

14 limited -- but it's my understanding it's

15 the data-validated survey instrument that

16 schools can use and -- you know, pay for

17 to administer.

18      Q.    Was Hanover -- what was the

19 second word?

20      A.    "Research."

21      Q.    Hanover Research.

22      From as far as you know, is

23 that something where they just administer

24 surveys or is it more of an evaluation of

1 how things are going, how the district is

2 doing?

3          A.     I don't know.

4          Q.     How was the climate survey

5 administered?

6                 Was it something that was,

7 like, passed out to each student to fill

8 out and collect?

9          A.     No.  It was electronic.

10          Q.     Each student would receive

11 an email that they should complete the

12 survey?

13          A.     Correct.

14          Q.     And, then, what happened

15 with the data?  Would it then be

16 transferred back to Hanover?

17          A.     Yes.

18          Q.     And, then, as far as you

19 know, would they report, like, what the

20 conclusions were of the students?

21          A.     Yes.

22          Q.     Do you know whether once

23 they got that data, reported it back to

24 the district, whether Hanover would be

1  making recommendations as to, like, Oh,

2  you should do this, people reported that,

3  do it this way?

4       A.    I don't know if there were

5  recommendations made or data was shared.

6  I'm not sure what that process was.

7             Again, it was at the

8  district level, not at the high school

9  level.

10      Q.    Okay.  Did anybody ever

11  discuss with you -- since you're the

12  principal of the high school -- what the

13  results were of that climate survey?

14      A.    Yes.  The results of the

15  survey were shared with all district

16  admin.

17      Q.    What do you remember about

18  the results of that survey?

19      A.    I don't remember anything

20  specific at this point, it being a couple

21  years ago.  I remember it was shared in

22  the summer of 2019, I believe.  Other

23  than that, I can't point to anything

24  specific.

1    Q.    Do you recall what the
2  climate survey covered, what types of
3  things they were trying to determine
4  based on the climate?
5    A.    If I recall, it covered some
6  academics, it covered some social,
7  emotional aspects of students.  It also
8  went out to parents and to, I believe,
9  community as well.  So there were some
10 data on what the community felt about the
11 school district, what parents felt.
12         Again, it was a few years
13 back, prior to COVID, and I don't recall
14 specifics of exactly what was there.
15   Q.    Do you recall a climate
16 survey happening since that time?
17   A.    I do not, no.  A climate
18 survey, no.
19   Q.    In terms of the climate
20 survey -- I know you don't recall every
21 question that was on there, but do you
22 know whether there were portions of that
23 survey that addressed the climate in,
24 like, reporting, like, assaults or things

1  that are happening?  Do you know whether

2  it was covered by that survey?

3       A.    I don't recall.

4       Q.    Do you still, somewhere,

5  have access to a copy of that climate

6  survey that your students would have

7  received?

8       A.    I do not.

9       Q.    Do you know who would house

10  something like that or who would have

11  that information?

12       A.    I would assume somebody at

13  our educational services center.  One of

14  our district administrators would have

15  access to that or would have a copy of

16  that.  I don't know.

17       Q.    When you were at that

18  meeting in the summer where they talked

19  about the conclusion, you know, that the

20  climate surveys had come to, was there an

21  actual report that was created of what

22  the conclusions were, to your

23  understanding?

24       A.    I know there was data that

1  was shared.  I don't recall if there was

2  a specific report that was shared.

3       Q.   Okay.  I mean, do you know

4  whether the data came from some report?

5       A.   It would have come back from

6  Hanover Research.  I have no idea what

7  form it would have come back in.  If it

8  was raw data or if it was a larger

9  report, I don't know.

10       Q.   Okay.  Did they implement

11  any changes at the high school level

12  based on that report?

13       A.   We use data to inform some

14  of our school goals for that school year.

15  So it was used to implement some change,

16  yes.

17       Q.   Do you know whether any of

18  those changes have anything to do with,

19  like, Title IX, harassment, reporting,

20  anything like that?

21       A.   Not that I recall, no.

22            MS. LAUGHLIN:  Kyle and

23       Susan -- since you're filing in

24       for Maureen -- I'll send a letter

1          afterwards or an email afterwards,

2          but I would also request a copy of

3          the Hanover Research climate

4          survey and any conclusion

5          report-type thing that was done

6          after that.

7     BY MS. LAUGHLIN:

8          Q.    After you had finished your

9     conclusion in November of 2018, did you

10    do anything to -- or do you know whether

11    you could or should offer any type of

12    supports to ███████ who had reported this?

13              MS. LLOYD:  Object to the

14         form.  Go ahead.

15              THE WITNESS:  I'm sorry.

16              Ask that one more time?

17    BY MS. LAUGHLIN:

18         Q.    I guess I'll back up a

19    second.

20              To your understanding as the

21    principal -- and before that, assistant

22    principal -- for this North Penn High

23    School, did you have an understanding,

24    after a conclusion was done, whether

1  students should be offered any type of
2  accommodations?
3       A.    Yes.
4       Q.    I guess, from your
5  understanding, is it only if a report is
6  substantiated then you offer
7  accommodations?  Or what is your
8  understanding of when students are
9  offered accommodations?
10      A.    My understanding is that we
11 would accommodate a student to make them
12 feel comfortable and allow them to access
13 their education in a way that they're not
14 feeling threatened or in fear of any kind
15 of retaliation or any kind of further
16 harassment.
17      Q.    Was          offered any
18 accommodations -- that you know of --
19 after this?
20      A.    Honestly, you would have to
21 ask North Montco.  She was no longer a
22 student here at the high school.
23      Q.    Is it your understanding
24 that once a student is no longer in the

1  North Penn High School building, can they

2  no longer offer accommodations to a

3  student that is attending the tech

4  school?

5  A.    I'm not trying to be

6  difficult here, but I'm not sure what

7  accommodations we could provide at the

8  tech school.

9  The tech school was

10 providing accommodations and we were

11 supporting them from the IEP process.

12 I'm not sure what, as North Penn High

13 School, we would do for a student that's

14 not stepping foot in our building.

15 Q.    Other than the IEP meeting

16 that you were at that you described in

17 November at North Montco, did you ever

18 have any other conversations with Mrs.

19 ████████

20 A.    Not that I recall.

21 Q.    Do you recall ever trying to

22 reach out to ████ or Mrs. ████████

23 to talk about what had happened at the

24 high school?

1    A.    I believe you asked if that

2  was after the IEP meeting.  I know I had

3  a phone conversation with Mrs.

4  ███████████ on at least one occasion

5  prior to the IEP meeting and prior to the

6  conclusion of all this.  I don't recall

7  when that was.

8    Q.    What do you recall about

9  that conversation you had with her?

10    A.    I recall that she was

11  extremely upset by the fact that ███████

12  and ███████ were in the same class; that

13  she was very angry that we allowed them

14  to be in the same class and we allowed

15  her to be subject to the assault that she

16  had reported.

17         And that Mom was adamant --

18  again, similar to when we met at North

19  Montco -- that ███████ would not be

20  returning to North Penn High School.

21    Q.    Did Mrs. ██████████████ give

22  you a sense of how ███████ was doing or

23  how ███████ felt about the whole thing?

24    A.    Not that I can specifically

1  remember, no.

2        Q.    Did you ask Mrs. ███████████

3  about ████████ how █████████ was doing or how

4  she was feeling?

5        A.    If I recall the conversation

6  correctly, I had a difficult time

7  speaking because she was very angry.  And

8  while I believe I asked how █████████ was

9  doing, I don't recall specifically if she

10  answered me or if I was able to get my

11  sentiments across.  Because as I said,

12  she was very heightened, very angry at

13  the time.

14        Q.    Was there any other point in

15  time where you tried to get, like you

16  said, your sentiments across to Mrs.

17  ████████████ as it related to █████████

18        A.    I don't recall.

19        Q.    The sentiments you're

20  talking about, what sentiments are you

21  talking about wanting to get across to

22  Mrs. ████████████ at that time?

23        A.    Well, I mean, I'm a high

24  school principal and a dad.  I care about

1   kids.  I want to know how kids -- as you

2   mentioned, I want to know how kids are

3   doing and how they're managing, how

4   they're feeling, you know?  So that would

5   have been the conversation is -- you

6   know, just the fact that I -- while I

7   didn't know ███████ in her time here, you

8   know, I don't want to see kids hurting

9   and I don't want to see kids upset about

10  a situation and I typically offer to do

11  anything I can to help a student.

12          You know, so that would have

13  been the sentiments, I guess.

14      Q.    I know you said in that

15  conversation you didn't get to really get

16  that opportunity because Mrs. ██████████

17  was so upset; is that right?

18      A.    Correct.

19      Q.    Was there any later point

20  that you had reached out to Mrs.

21  ██████████ to convey those sentiments

22  that you just talked about?

23      A.    Again, not that I recall.

24      Q.    Do you recall receiving an

1 incident report from North Montco about

2 an incident with ███ involving alcohol

3 on November 2, 2018?

4      A.    I don't specifically

5 remember receiving an incident report,

6 but I do recall that there was a

7 suspension that ███ received for

8 either use of and/or possession of

9 alcohol on school property, yes.

10      Q.    Since she wasn't a North

11 Penn -- in the North Penn High School

12 anymore, why did you receive information

13 about a disciplinary issue at the tech

14 school about ███

15      A.    Typically, when a student is

16 at North Montco, whether they're full

17 time at North Montco or just part time at

18 North Montco, if there's a discipline

19 issue, we would be advised, especially

20 when it is a student with an IEP.

21 Because it would, typically, involve

22 their reconvening of the IEP team to talk

23 about the incident and make sure that the

24 student is supported in moving forward, a

1 manifestation meeting, and all those

2 pieces that come into play.

3          Q.    Even though a student is at

4 North Montco full time, the district is

5 still able to, and does, implement like

6 IEPs and things for that student even

7 though they're not technically in the

8 high school building; is that accurate?

9          A.    It depends on the specific

10 student and their needs.  North Montco

11 does have a special education department

12 and case manager, and they're able to

13 implement many of the accommodations,

14 modifications, SCI, that students need.

15 And some cases, students with higher

16 levels of need, they do request -- you

17 know, we do send additional supports from

18 North Penn High School.

19          Q.    Do you know what, if

20 anything -- do you recall discussing the

21 alcohol incident with anybody when you

22 found out about it?

23          A.    I don't recall any

24 discussions specific to that, no.

1    Q.    Other than that incident, do

2    you recall ever receiving any other

3    disciplinary issues that ██████ had

4    during her time at North Montco?

5    A.    I do not.

6    Q.    Is there some type of level

7    of issue or, like, bad thing that has

8    done -- for lack of a better term -- is

9    there any, like, level that, then, the

10   high school gets notified, but more minor

11   infractions they don't?

12   A.    I guess that's a question

13   more for North Montco.

14         Like I said, we would be

15   notified as far as if a manifestation

16   meeting was going to be held, a

17   manifestation hearing, or if an IEP team

18   was going to be reconvened.  In this

19   case, I guess both.

20         We do not typically hear

21   from North Montco when a student has a

22   lower-level disciplinary infraction,

23   cutting class or something -- chewing gum

24   in class.  I don't know.  I'm making that

1 up.

2          But we're not notified of

3 every disciplinary infraction, no.

4      Q.    After you had notified

5 Dr. Bauer, and whoever else in that phone

6 call, that your investigation had

7 concluded, was there anything else that

8 you had done or you were aware of being

9 done involving the incidents, the

10 assaults between ███████ and ███████

11      A.    Again, at the high school,

12 I'm not aware.  I don't know.

13          MS. LAUGHLIN:  Those are all

14      the questions that I have for you.

15      Thank you, Mr. Nicholson.

16          THE WITNESS:  Thank you.  I

17      appreciate it.

18          MS. LLOYD:  I have no

19      questions.

20          MS. LAUGHLIN:  All right.

21      Thank you.

22              -  -  -

23          (Deposition was concluded at

24      1:49 p.m.)

CERTIFICATION

I, Emily Andreasen, certify that the witness was duly sworn by me and that the deposition is a true and accurate record of the testimony given by the witness.

_____

Emily Andreasen

Court Reporter and Notary Public

Dated:

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)