# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:20-cv-5142 |
| | ) | |
| NORTH PENN SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**PLAINTIFF JANE DOE'S OPPOSITION TO DEFENDANT NORTH PENN SCHOOL
DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ..............................................................................................3

SUMMARY JUDGMENT STANDARD .......................................................................13

ARGUMENT.................................................................................................................14

I.     The District is Not Entitled to Summary Judgment on Either of Jane's
       Title IX Claims............................................................................................14

       A.     The District is Not Entitled to Summary Judgment on Jane's
              Pre-Assault Claim ...........................................................................16

       B.     The District is Not Entitled to Summary Judgment on Jane's
              Post-Assault Claim ..........................................................................22

II.    The District is Not Entitled to Summary Judgment on Jane's §1983
       Failure to Train Claim ................................................................................27

       A.     The District Failed to Provide Training on Student-on-Student
              Sexual Harassment. .........................................................................28

       B.     The District Was Deliberately Indifferent Because the Need for
              Sexual Harassment Training was Obvious .......................................31

       C.     The District's Failure to Train Caused Jane's Constitutional Injury ........33

CONCLUSION..............................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,*
  520 U.S. 397 (1997) ...........................................................................................31

*Bostic v. Smyrna Sch. Dist.,*
  418 F.3d 355 (3d Cir. 2005) ...........................................................................14

*C.K. v. Wrye,*
  751 F. App'x 179 (3d Cir. 2018) .....................................................................17

*C.S. v. S. Columbia Sch. Dist.,*
  No. 4:12-cv-1013, 2013 WL 2371413 (M.D. Pa. May 21, 2013).........................23

*City of Canton, Ohio v. Harris,*
  489 U.S. 378 (1989) ...................................................................................30, 32

*Davis v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ................................................................................*passim*

*Dawn L. v. Greater Johnstown Sch. Dist.,*
  586 F. Supp. 2d 332 (W.D. Pa. 2008) ...............................................................23

*Delgado v. Stegall,*
  367 F.3d 668 (7th Cir. 2004) ...........................................................................17

*Doe v. Bd. of Regents of Univ. of Wis.,*
  No. 20-cv-856, 2021 WL 5114371 (W.D. Wis. Nov. 3, 2021) ............................25

*Doe ex rel. Doe v. Coventry Bd. of Educ.,*
  630 F. Supp. 2d 226 (D. Conn. 2009) ...............................................................24

*Doe v. Fairfax Cnty. Sch. Bd.,*
  1 F.4th 257 (4th Cir. 2021) .......................................................................23, 26

*Doe v. Forest Hills Sch. Dist.,*
  No. 1:13-cv-428, 2015 WL 9906260 (W.D. Mich. Mar. 31, 2015).....................32

*Doe v. Hamilton Cnty. Bd. of Educ.,*
  329 F. Supp. 3d 543 (E.D. Tenn. 2018) .......................................................31, 32

*Doe v. Manor Coll.,*
  479 F. Supp. 3d 151 (E.D. Pa. 2020)......................................................15, 23, 24

*Doe v. Pennridge Sch. Dist.*,
413 F. Supp. 3d 393 (E.D. Pa. 2019)......................................................... 19, 23, 31

*Doe v. Sch. Bd. of Broward Cnty. Fla.*,
604 F.3d 1248 (11th Cir. 2010).................................................................. 15, 17, 18

*Doe v. Sch. Dist. No. 1, Denver, Colo.*,
970 F.3d 1300 (10th Cir. 2020)........................................................................ 15, 16

*Doe v. Taylor Indep. Sch. Dist.*,
15 F.3d 443 (5th Cir. 1994) ........................................................................................16

*Does v. Se. Delco Sch. Dist.*,
272 F. Supp. 3d 656 (E.D. Pa. 2017)........................................................ 16, 17, 18

*Ellison v. Brady*,
924 F.2d 872 (9th Cir. 1991) ...................................................................................24

*Escue v. N. Okla. Coll.*,
450 F.3d 1146 (10th Cir. 2006)...............................................................................17

*Farmer v. Kan. State Univ.*,
918 F.3d 1094 (10th Cir. 2019)...............................................................................23

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) ...................................................................................19

*Ferris v. Delta Air Lines, Inc.*,
277 F.3d 128 (2d Cir. 2001) .....................................................................................24

*Fitzgerald v. Barnstable Sch. Comm.*,
504 F.3d 165 (1st Cir. 2007)............................................................................... 15, 26

*Goodwin v. Pennridge Sch. Dist.*,
389 F. Supp. 3d 304 (E.D. Pa. 2019)....................................................... 21, 23, 28

*Hall v. Millersville Univ.*,
22 F.4th 397 (3d Cir. 2022) .......................................................................... 15, 20, 26

*Hernandez v. Baylor Univ.*,
274 F. Supp. 3d 602 (W.D. Tex. 2017) ................................................................25

*Ings-Ray v. Sch. Dist. of Phila.*,
No. Civ.A. 02-CV-3615, 2003 WL 21250556 (E.D. Pa. Apr. 30, 2003)..............27

*Justofin v. Metro. Life Ins. Co.*,
372 F.3d 517 (3d Cir. 2004) .....................................................................................13

*Karasek v. Regents of Univ. of Cal.*,
    956 F.3d 1093 (9th Cir. 2020) ........................................................... 14

*Kelly v. Yale Univ.*,
    No. Civ.A.3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) ...................... 24, 25

*Kinsman v. Fla. State Univ. Bd. of Trs.*,
    No. 4:15CV235, 2015 WL 11110848 (N.D. Fla. Aug. 12, 2015) ........................ 24

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*,
    944 F.3d 613 (6th Cir. 2019) ............................................................ 26

*D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*,
    Nos. Civ. A. 90-3018, 90-3060, 1991 WL 14082 (E.D. Pa. Feb. 1, 1991) ........................... 28

*Lapka v. Chertoff*,
    517 F.3d 974 (7th Cir. 2008) ........................................................... 24

*MDB v. Punxsutawney Christian Sch.*,
    386 F. Supp. 3d 565 (W.D. Pa. 2019) ................................................... 23

*M.J.G. v. School District of Philadelphia*,
    774 F. App'x 736 (3d Cir. 2019) ....................................................... 27

*Murrell v. Sch. Dist. No. 1, Denver, Colo.*,
    186 F.3d 1238 (10th Cir. 1999) ................................................ 19, 27, 28, 33

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ................................................................... 14

*S.B. v. Bd. of Educ. of Harford Cnty.*,
    819 F.3d 69 (4th Cir. 2016) ........................................................... 15

*S.K. v. N. Allegheny Sch. Dist.*,
    168 F. Supp. 3d 786 (W.D. Pa. 2016) ............................................... 15, 16

*Schoonejongen v. Curtiss-Wright Corp.*,
    143 F.3d 120 (3d Cir. 1998) ........................................................... 14

*State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*,
    250 F.R.D. 203 (E.D. Pa. 2008) ....................................................... 26

*Stoneking v. Bradford Area Sch. Dist.*,
    882 F.2d 720 (3d Cir. 1989) ........................................................... 28

*Vaird v. Sch. Dist. of Phila.*,
    No. CIV. A. 99-2727, 2000 WL 576441 (E.D. Pa. May 12, 2000) ...................... 26, 27

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
    231 F.3d 253 (6th Cir. 2000) ........................................................ 15, 21

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
    477 F.3d 1282 (11th Cir. 2007).................................................... 23, 26

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012) ................................................ 16, 21, 25

**Statutes**

20 U.S.C. § 1681 ........................................................................ *passim*

**Other Authorities**

34 C.F.R. § 106.45 (2020) .................................................................32

8A Charles Alan Wright *et al*., Fed. Prac. & Proc. § 2103 (Supp. 2007) ....................................26

Ellie Young *et al*., *Sexual Harassment Among Students With Educational Disabilities*,
    29 Remedial & Special Educ. (2008), https://bit.ly/3kmRZow ...............................30

Fed. R. Civ. P. 56(a)..........................................................................13

Jennifer Ann Drobac, *'Developing Capacity': Adolescent 'Consent' at Work, at Law, and in the Sciences of the Mind*, 10 U.C. Davis J. Juv. L. & Pol'y (2006) ...........................30

Local Rule 5.1.2(12)(b) .......................................................................1

Russlynn Ali, Assistant Sec'y for Civ. Rts., Office for Civ. Rts., U.S. Dep't of Educ.,
    U.S. Dep't of Educ., Dear Colleague Letter (Oct. 26, 2010),
    https://www2.ed.gov/about/offices/list/ocr/ letters/colleague-201010.pdf .....................31, 32

U.S. Const. amend. XIV, § 1 .................................................................27

# INTRODUCTION

North Penn School District's deliberate indifference to student-on-student sexual harassment completely derailed Jane Doe's education. From the end of Jane's sixth-grade school year—when the District admittedly knew that a classmate, MP, had sexually assaulted Jane and other female students at school—to the time she graduated high school, the District placed the onus on Jane to try to obtain an education free from MP's further harassment.[1] Because of the District's failure to respond appropriately to MP's sexual assaults, Jane had to transfer to a different middle school to avoid MP, ask for safety measures, and ultimately change high schools; the District offered nothing and never informed Jane of her right to accommodations and services under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"). And, in tenth grade, the District put Jane directly in harm's way: Despite assuring Jane it would keep MP away from her, the District placed her in the same class with MP, where he repeatedly sexually assaulted her again.

The District claims it took MP's known serial sexual predation seriously and did not act with deliberate indifference. Not so. In fact, the District became a prime facilitator of MP's sexual predation. Even though MP admitted to sexually assaulting Jane and another student in sixth grade—and even though the District had "actual notice" that MP had sexually assaulted three additional students—the District downplayed the seriousness of his sexual misconduct: It gave MP a one-day in-school suspension for "Obscene Lang[uage]/Gesture," effectively concealing his serial sexual harassment.[2] The District's whitewashing of MP's sexual harassment was effective.

---

[1] "MP" is a pseudonym as required by Local Rule 5.1.2(12)(b) for the names of minor children. The same is true for the names of all other individuals referenced in this memorandum of law, who were minors at the time of the underlying events.

[2] Sexual assault is a form of sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999).

It left MP's middle school in the dark about his history of sexually abusing his classmates, enabling MP to continue harassing other students with minimal consequences. In middle school, the District disciplined MP—with another short suspension—for sexually assaulting two other students at school. So, by the time Jane began tenth grade, the District knew of seven sexual assault reports against MP (including Jane's prior report), five of which were substantiated. It is an indisputable fact, not an allegation, that the District knew MP posed a substantial risk of sexually harassing students by the time he and Jane were about to start tenth grade. And the fact that the District nevertheless placed them in a class together, failing to make even the minimal effort to re-check their schedules at the start of the school year to ensure there was no overlap, makes it hard to imagine a school district taking such a substantial risk of harassment less seriously. How does this happen? When school districts, like North Penn, fail to provide their administrators, faculty, and staff with any training on how to recognize, address, and remedy student-on-student sexual harassment.

The District is a case study in deliberate indifference. It acted with deliberate indifference to reports that MP sexually assaulted Jane in sixth grade, causing a hostile educational environment for her after elementary school. It acted with deliberate indifference to MP's known history of sexual harassment, resulting in MP sexually assaulting Jane again in tenth grade. And it acted with deliberate indifference to Jane's right to an education free from sexual harassment when it failed to provide adequate training, causing Jane to suffer repeated sexual harassment. Based on the evidence in this case, a jury will likely agree and should be given the opportunity to do so. The District's summary judgment motion should therefore be denied in its entirety.

# STATEMENT OF FACTS

*MP Sexually Assaults Jane in Sixth Grade*

During the 2014-2015 school year, both Jane Doe and MP were students in Ruth Divver and Holly Garrett's sixth-grade language arts class at Gwynedd Square Elementary School in North Penn School District (the "District"). Dkt. No. 49-3, Def's Statement of Undisputed Material Facts ("Def's SUMF") ¶ 2; Pl's Ex. 2, Jane Doe's Sixth-Grade Report Card; Def's Ex. B, Deposition of Jane Doe at 31:2-14 (Nov. 2, 2021) ("Jane Doe Dep.").[3] One day during class, Jane and MP were paired together for an assignment. Def's SUMF ¶ 3, Def's Ex. D, Deposition of Holly Garrett at 36:18-23 (July 28, 2021) ("Garrett Dep."); Def's Ex. B, Jane Doe Dep. at 32:3-6.

While Ms. Divver briefly stepped out of the classroom, MP sexually assaulted Jane, reaching his hand up her shirt. Def's Ex. B, Jane Doe Dep. at 33:22-34:22; Def's Ex. D, Garrett Dep. at 38:6-7. Jane attempted to stop him by moving her body and shoving him away from her, but it didn't work. Def's Ex. B, Jane Doe Dep. at 34:14-22. MP was still able to reach up his hands up her shirt and touch her breasts. *Id.* Ms. Garrett witnessed the assault. Def's SUMF ¶ 5; Def's Ex. D, Garrett Dep. at 37:6.[4] She then called Jane and MP out into the hall. Def's SUMF ¶ 5. Ms. Garrett wrongly assumed the behavior was consensual and admonished both students. Def's Ex. D, Garrett Dep. at 37:6; Pl's Ex. 5, June 3, 2015 Ltr. to Andrew from Human Resources Dir. Cheryl McCue, NPSD 1005-06 ("June 3, 2015 Ltr. to Andrew"). She also told Jane and MP that if they stopped what they were doing, she would not report the incident to Principal Bowen. Def's SUMF

---

[3] Exhibits attached to the District's Statement of Material Facts at Docket Numbers 49-4 and 49-5 are labeled "Def's Ex." Exhibits attached to Jane's Memorandum of Law in Support of Her Motion for Partial Summary Judgment at Docket Number 47-2 are labeled "Pl's Ex." Supplemental exhibits attached to this filing are labeled "Pl's Supp. Ex."

[4] At the time, Holly Garrett went by the name "Holly Andrew." She has since married and changed her name to Holly Garrett. *See* Def's SUMF ¶ 4 n.1.

¶¶ 6-7; Def's Ex. D, Garrett Dep. at 37:6-12; Pl's Ex. 5, June 3, 2015 Ltr. to Andrew. Garrett then completed "office referral forms" for both Jane and MP, indicating on the form that she had witnessed a minor disciplinary issue involving "physical contact" and had responded by speaking with the students. Pl's Ex. 6, Office Referral Form, NPSD 1023; Def's Ex. D, Garrett Dep. at 37:11-17. Garrett also discussed the incident with the classroom's lead teacher, Ms. Divver, and gave her the forms. Def's Ex. D, Garrett Dep. at 135:21-23. Ms. Divver put the forms in her classroom files, and neither she nor Ms. Garrett took any further action. *Id.*

Over the next several months, MP continued to sexually assault Jane regularly during class and in the hallways between classes. Def's Ex. B, Jane Doe Dep. at 39:14-40:22, 46:4-13; Def's SUMF ¶ 10. In class, he would pull his desk next to Jane's, reach under her shirt, and touch her back and breasts when the teacher wasn't looking. Def's Ex. B, Jane Doe Dep. at 34:1-6. In the hallways, he would walk up behind her and "try to put his hands under [Jane's] shirt" or try to reach into her pants. *Id.* at 37:13-16. Once during sixth grade, he digitally penetrated her vagina. *Id.* at 124:9-14. Afraid of MP, Jane would "tell him to stop" and ask him to "leave [her] alone," but MP "didn't care" and continued sexually assaulting her. *Id.* at 40:20-41:3. Every time Jane walked in the school hallways, she worried that MP would assault her. Pl's Supp. Ex. 1, Expert Report of Dr. Veronique Valliere at 3 (Jan. 6, 2022) ("Valliere Rep."). In total, MP sexually assaulted Jane over twenty times during sixth grade. Def's Ex. B, Jane Doe Dep. at 46:4-13; *see also* Def's SUMF ¶ 10. And, Jane wasn't his only victim: she saw MP sexually assault at least two of her female classmates, too. Pl's Ex. 8, Notes of Director of Elementary Education Betty Santoro, NPSD 1021 ("Santoro Notes").

*Other Students Report Sexual Assaults by MP*

Later that same school year, on April 10, 2015, a female classmate of Jane's, "Sara," reported to her teacher that MP had reached under her shirt and touched her sexually without her consent during class the day before. Def's SUMF ¶ 9; Pl's Ex. 7, Notes of Gwynedd Square Principal Bill Bowen ("Bowen Notes"), NPSD 1016. The teacher shared Sara's sexual assault report with Gwynedd Square guidance counselor Kristen Vaszily, who went to the teacher's classroom to discuss the incident. Pl's Ex. 7, Bowen Notes, NPSD 1016. Ms. Divver happened to be present while Vaszily and the teacher were discussing Sara's report. *Id.* Divver shared that MP had also touched Jane under her shirt during class in November. *Id.* Ms. Vaszily contacted Principal Bowen and reported that MP might have sexually assaulted Sara and Jane. *Id.* Principal Bowen then alerted his supervisor, Director of Elementary Education Betty Santoro, to the reported sexual assaults. *Id.*; Def's SUMF ¶ 12.[5]

Principal Bowen investigated the sexual assault reports. Pl's Ex. 7, Bowen Notes, NPSD 1016-18. As a part of the investigation, Principal Bowen and Director Santoro informed Jane, Sara, and MP's parents about the reports. *Id.* at NPSD 1016-17. Principal Bowen also met with MP and his parents. *Id.* During that meeting, MP admitted he had sexually assaulted Jane and Sara. Def's SUMF ¶ 15.

Jane's mother spoke to Jane about the incident where Ms. Garrett saw MP put his hand up Jane's shirt, and Jane confirmed that she had not wanted MP to touch her. Pl's Ex. 8, Santoro

---

[5] During the investigation, administrators also informed Superintendent Curtis Dietrich and Assistant Superintendent Diane Holben about the reports that MP had sexually assaulted Jane and Sara. Pl's Ex. 8, Santoro Notes, NPSD 1019, 1022.

Notes, NPSD 1021-22.[6] After Jane's mother shared this information with the District, Ms. Vaszily interviewed Jane about MP's sexual assaults. In that interview, Jane told Vaszily that MP had not only sexually assaulted her the one time Ms. Garrett had witnessed, but had repeatedly done so in the classroom and school hallways. Def's SUMF ¶ 10; Def's Ex. B, Jane Doe Dep. at 49:4-7. Vaszily also interviewed two other girls Jane had identified as victims of sexual assault by MP, and a third sixth grade student identified as another possible victim. Pl's Ex. 8, Santoro Notes, NPSD 1021; Pl's Ex. 7, Bowen Notes, NPSD 1018; Def's Ex. J, Deposition of Todd Bauer at 311:1-10 (Aug. 26, 2021) ("Bauer Dep."). One of these students, "Casey," reported to Ms. Vaszily that MP had "touched her in the front and back of the bottom portion of her body." Pl's Ex. 8, Santoro Notes, NPSD 1022. By the end of his investigation, Principal Bowen concluded that MP's touching of Jane, Sara, and Casey was unwanted and sexual in nature. Def's Ex. F, Deposition of Bill Bowen at 92:11-20, 103:17-19 (July 26, 2021) ("Bowen Dep.").

Nonetheless, the District's response was minimal: Principal Bowen moved MP out of Jane, Sara, and Casey's classes and gave MP a one-day in-school suspension. Pl's Supp. Ex. 3, MP's Discipline Incident List; Def's SUMF ¶ 13. The District did not even categorize the reason for MP's suspension as sexual assault or sexual harassment; instead, it categorized the incidents as the less serious offense of "Obscene Lang[uage]/Gesture." Pl's Supp. Ex. 3, MP's Discipline Incident List; Pl's Supp. Ex. 4, Elementary Code of Conduct, NPSD 1026.

The District did not take any other steps to prevent MP from sexually assaulting students going forward. Nor did it provide any information to Jane or her mother about steps it would or could take to protect Jane from future assaults by MP. Fearing for her daughter's safety, Jane's

---

[6] Jane's parents contacted the local police and made a report about MP's sexual assault. Pl's Ex. 7, Bowen Notes, NPSD 1017. Ultimately, the local police department placed MP in a diversion program, the "Youth Aid Panel," as a result of the reported sexual assaults at school. Pl's Supp. Ex. 2, Upper Gwynedd Police Investigation File.

mother requested that the District transfer Jane from her local middle school for the coming academic years so that she would not be forced to attend the same school as MP. Pl's Ex. 14, Application for Transfer of School Attendance, NPSD 689; Pl's Ex. 15, May 5, 2015 Email from Director Santoro to Deborah McKay and Assistant Superintendent Holben, NPSD 690. The District granted the request. Pl's Ex. 14, Application for Transfer of School Attendance, NPSD 689.

Each year, District elementary and middle schools have transition meetings where administrators from the elementary schools share key information about incoming students with middle school administrators. Def's SUMF ¶ 24. But, the District produced no evidence indicating that Gwynedd Square staff shared information about MP's serial sexual assaults of his elementary school classmates with administrators at his assigned middle school. Def's Ex. F, Bowen Dep. at 62:20-63:6, 65:24-66:19. Indeed, Principal Bowen testified that the annual transition meeting may have already occurred by the time he learned of MP's sexual assaults and that he did not take any other steps to share information about MP's sexual assault history with administrators at the middle school MP would be attending. Def's Ex. F, Bowen Dep. at 65:24-66:19. MP's cumulative file, which the District transmitted to the middle school (Def's SUMF ¶ 25), did not contain any record of MP's sexual assaults. *See* Pl's Supp. Ex. 5, MP's Cumulative File. And there is no evidence that the District transmitted MP's "Discipline Incident List," showing a one-day in-school suspension for using obscene language or an obscene gesture, to his middle school. Pl's Supp. Ex. 3, MP's Discipline Incident List.

While MP was in middle school, the District received a report that he had sexually harassed multiple female students at school again. Pl's Ex. 16, Jan 6, 2016 Suspension Ltr.; Def's Ex. J,

Bauer Dep. at 295:2-15. Jason Bashaw, an assistant principal with the District, suspended MP for three days as a result of the harassment. Pl's Ex. 16, Jan 6, 2016 Suspension Ltr.

<center>*MP and Jane Both Attend North Montco*</center>

For her ninth-grade year, Jane was accepted into a part-time automotive program at North Montco Technical Career Center ("North Montco"). Def's Ex. B, Jane Doe Dep. at 73:5-23. North Montco is a specialized technical and career program for students from several private schools and five area school districts, including North Penn. Def's Ex. L, Deposition of Dawn LeBlanc at 17:4-15 (Aug. 24, 2021) ("LeBlanc Dep."). Though Jane did not know it at the time, North Montco had also accepted MP. *Id.* at 75:3-76:13. Typically, if school administrators at North Montco are aware of an allegation of sexual assault by one student against another, the administration creates a safety plan "so that [the students] would not be near each other" at school. *Id.* at 16:8-20. North Montco usually learns about such an allegation because the students' home school district provides it with a student's application. *Id.* at 15:14-17. Here, as North Montco's Principal LeBlanc explained, the District "failed" to provide that crucial information. *Id.* at 15:14-22. Instead, Principal LeBlanc learned about MP's history of sexually abusing Jane from Jane herself, who, soon after seeing MP in the hallway at North Montco, tearfully explained to the principal that she had been "sexually assaulted [by MP] several times in elementary school." *Id.* at 10:16-12:9, 13:6-12; Def's Ex. B, Jane Doe Dep. at 75:3-21.

Once Principal LeBlanc learned of MP's history of sexually assaulting Jane, she took steps to ensure that the two students would not see each other at North Montco. *See, e.g.,* Def's Ex. L, LeBlanc Dep. at 13:6-12, 27:16-20; Pl's Ex. 18, Safety Plan, NPSD 484. North Montco, which is not part of the District, created a safety plan that included providing Jane support from a counselor, alerting Jane's teachers that Jane and MP needed to be separated, shifting Jane's schedule so she

<center>8</center>

would not cross paths with MP, and assigning a special staff member to monitor Jane "from a distance" at school-wide activities to ensure that MP did not harass her. Pl's Ex. 18, Safety Plan, NPSD 484; *see also* Def's SUMF ¶¶ 33-35; Def's Ex. L, LeBlanc Dep. at 54:1-5. Principal LeBlanc also called District Superintendent Curtis Dietrich to discuss MP's history of sexually assaulting Jane, the fact that both students were attending North Montco, and Jane's need for a safety plan. Def's Ex. L, LeBlanc Dep. at 24:6-25:5. Superintendent Dietrich told Principal LeBlanc that he knew MP had sexually assaulted Jane at least once in the past. *Id.* at 24:12-16.

*Jane and MP Enter High School, Where MP Sexually Assaults Jane Again*

The main high school in the District is North Penn High School, which students begin attending in tenth grade. Def's Ex. N, Deposition of Peter Nicholson at 15:4-8 (Nov. 5, 2021) ("Nicholson Dep."). For her tenth-grade year, Jane planned to attend North Penn High School part-time and North Montco part-time. Pl's Ex. 20, August 2018 Meeting Notes, NPSD 1; Def's Ex. M, Deposition of Kira O'Brien at 30:2-4 (Aug. 23, 2021) ("O'Brien Dep."). Before the start of the school year, Jane's mother requested a meeting with North Penn High School administrators to remind them that Jane should not be in classes with MP. Def's Ex. J, Bauer Dep. at 224:19-225:3, 256:3-17; Pl's Ex. 22, Notes of Kate Small (Aug. 22, 2018) ("Small Notes"), NPSD 535; Def's Ex. B, Doe Dep. at 97:9-21. Kate Small and Megan Schoppe, two of the District administrators in the meeting, noted that MP should not be "in class or halls near Jane" and that Jane was "the victim in the situation." Pl's Ex. 23, Notes of Megan Schoppe (Aug. 22, 2018), NPSD 536; Pl's Ex. 22, Small Notes, NPSD 535. Ms. Small told Jane and her mother that the District would "make sure that [Jane and MP] were not scheduled into the same courses." Def's Ex. K, Deposition of Kate Small at 63:3-6 (Aug. 10, 2021) ("Small Dep."). The administrators also told Jane she would have an escort to walk with her between North Montco and North Penn High School, since MP would

also be transitioning between the schools at the same time each day. Def's Ex. B, Jane Doe Dep. at 98:14-23.[7]

The District broke both of these promises. The District placed both Jane and MP in the same social studies class. Def's SUMF ¶ 45. Their teacher—knowing nothing about MP's history of sexually assaulting Jane—assigned them seats next to each other. Pl's Ex. 25, Oct. 15, 2018 Memo from Kate Small, Doe 668; Def's Ex. K, Small Dep. at 210:7-10. The District also did not provide Jane an escort as she walked between schools. Def's Ex. B, Jane Doe Dep. at 109:5-15.

When Jane realized that she and MP were in the same class, she "didn't know what to do." Def's Ex. B, Jane Doe Dep. at 103:2-6. She thought that the District "just blew [her] off." *Id.* She even wondered whether her social studies teacher knew about the sexual assaults and whether the teacher, or another District official, had purposely seated them next to each other. *Id.* at 103:6-9. Jane felt that no one in the District cared enough to protect her from MP. Pl's Supp. Ex. 1, Valliere Rep. at 4. She was frustrated and scared, and "didn't know how to tell" the teacher about MP's past sexual assaults. Def's Ex. B, Jane Doe Dep. at 103:21.

Two or three weeks into the school year, MP began regularly sexually assaulting Jane again. *Id.* at 107:1-4, 110:3-14. He "would move his desk really close to" Jane's so he could reach over and put his hands under her shirt and down her pants. *Id.* at 110:3-14. MP digitally penetrated her vagina multiple times in class. *Id.* at 124:9-125:9. Jane tried to move away or "do whatever she could" to prevent MP from touching her. *Id.* at 126:8-9. She told him to stop but "he never did." *Id.* at 125:8-9. As a result, Jane was terrified every day at school. Pl's Supp. Ex. 1, Valliere Rep. at 12.

---

[7] North Penn High School and North Montco are located on adjacent campuses. Students who attend both schools (including Jane and MP during their tenth-grade year) walk between the two schools. Def's Ex. B, Jane Doe Dep. at 98:2-13.

On October 9, 2018, Jane reported MP's recent string of sexual assaults to her counselor at North Montco, Kira O'Brien. Def's Ex. M, O'Brien Dep. at 37:20-41:5. Jane told Ms. O'Brien that MP's "desk [was] right next to her desk, and" that he had been reaching over and "going underneath her shorts or her pants and her underwear" and digitally penetrating her. *Id.* at 39:14-24. She made clear that "it definitely happened more than once and it … had been going on for quite a while, since…the beginning of the school year." *Id.* at 41:2-5. Ms. O'Brien responded by contacting both local police and Jane's mother to inform them of Jane's sexual assault report. *Id.* at 120:16-23; Def's Ex. B, Jane Doe Dep. at 120:16-23. The police, in turn, contacted the principal of North Penn High School, Pete Nicholson, and informed him of the sexual assault report. Def's Ex. N, Nicholson Dep. at 30:1-3.

After learning about MP's sexual assaults on Jane in tenth grade, the District did not interview MP or take any measures to prevent him from committing future sexual assaults. Def's Ex. J, Bauer Dep. at 265:9-266:13. Instead, it asked Jane to "write a report" about MP's recent sexual assaults. *Id.* at 262:4-6. The District then "check[ed] with a couple students" in Jane and MP's social studies class to see if they had any relevant information and asked the social studies teacher for a written statement. *Id.* at 259:11-13, 262:10-15.

*Jane Leaves North Penn High School*

After Jane reported that MP sexually assaulted her again in tenth grade, she transferred to North Montco full-time for the remainder of the school year. Def's Ex. B, Jane Doe Dep. at 128:18-129:1. While there, she struggled academically. Def's Ex. L, LeBlanc Dep. at 53:8-9. And, as a full-time student at North Montco, Jane did not have access to the full range of extra-curricular activities available at North Penn High School. *Id.* at 58:13-17, 59:7-60:1. For eleventh and twelfth

grades, she transferred to Northbridge, the District's "alternative" high school for students with significant mental health or disciplinary issues. Def's Ex. B, Jane Doe Dep. at 135:3-136:11.[8]

*The District's Lack of Training on Student-on-Student Sexual Harassment*

The District has not produced any evidence that it trained its employees on student-on-student sexual harassment. *See* Pl's Supp. Ex. 6, Expert Report of Dr. Charol Shakeshaft at 66-68 (Jan. 23, 2022) ("Shakeshaft Rep."). Its own liability expert's report confirms this, as does testimony from District employees. *See* Def's Ex. I, Expert Report of Betsy Smith at 12 (Mar. 17, 2022). Principal Bowen, for example, testified that he couldn't recall whether any Title IX training was offered to teachers while he was principal, and that he was not trained on Title IX until approximately 2018, well after Jane left Gwynedd Square Elementary. Def's Ex. F, Bowen Dep. at 23:4-15, 26:5-12. Ms. Garrett, the teacher who wrongly assumed MP's sixth-grade sexual assault of Jane was consensual, testified that she never received training about what conduct constitutes sexual harassment or how to respond to a student who reports harassment. Def's Ex. D, Garrett Dep. at 28:7-11. She admitted that she did not know what Title IX was during Jane's sixth-grade year. *Id.* at 23:5-9, 23:15-16. Ms. Small, too, said that she did not recall receiving any Title IX training from the District. Def's Ex. K, Small Dep. at 27:15-22.

District leadership expected staff to train themselves to address peer harassment. Cheryl McCue, the District's Human Resources Director and Title IX Coordinator, explained that the District "reference[s]" its sexual harassment policies at start-of-school-year staff meetings, and that she "assumes" employees are familiar with these policies because they are available online. Def's Ex. G, Deposition of Cheryl McCue at 341:2-20 (Aug. 25, 2021) ("McCue Dep."). Principal

---

[8] At her deposition, Jane mistakenly referred to the alternative school as "Pennbridge." The correct name for the school is "Northbridge." *See, e.g.,* Def's Ex. J, Bauer Dep. at 368:23-24 (referring to Northbridge as the school Jane attended after leaving North Penn High School).

Bowen, for his part, explained that at Gwynedd Square Elementary, he asked teachers to review the applicable policies "on their own." Def's Ex. F, Bowen Dep. at 200:17-201:1. District Assistant Superintendent Todd Bauer explained that when he became Assistant Superintendent, he received an "overwhelming" "stack of materials" to review in lieu of actual training on student-on-student sexual harassment. Def's Ex. J, Bauer Dep. at 31:4-20.

Based on the District's failure to train its staff on student-on-student sexual harassment, Jane's liability expert concluded that the District's training—which pertained to state law reporting requirements and teacher-on-student sexual harassment—did not have any of the "critical properties" necessary to ensure District employees appropriately responded to student-on-student sexual misconduct. Pl's Supp. Ex. 6, Shakeshaft Rep. at 65, 68. To the extent that the District provided evidence that it did train its employees on student-on-student sexual harassment, that training took place years *after* MP's last assault on Jane. For example, the District produced evidence that it only began training its staff on how to investigate reports of student-on-student sexual harassment in 2020. *See* Pl's Supp. Ex. 7, 2020 NPSD Harassment Presentation at 18-20. Similarly, the District began training employees on what kinds of accommodations they could or should provide to a student who had experienced sexual harassment in February 2021—over two years after MP had sexually assaulted Jane in tenth grade. Pl's Supp. Ex. 8, 2021 NPSD Harassment Presentation at 19-20.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "when its resolution 'might affect the outcome of the suit under the governing law' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Where "reasonable minds may differ" as to the meaning of the evidence, summary judgment is inappropriate. *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998).

## ARGUMENT

**I. The District is Not Entitled to Summary Judgment on Either of Jane's Title IX Claims.**

Jane brings two claims under Title IX: a "post-assault claim" and a "pre-assault claim." *See Karasek v. Regents of Univ. of Cal.,* 956 F.3d 1093, 1099, 1105, 1107-08 (9th Cir. 2020) (describing difference between pre-assault and post-assault claims); *see also Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005) (describing pre-assault substantial danger claim).[9] The post-assault claim (Count I) stems from the District's deliberately indifferent response to reports that MP sexually assaulted Jane in sixth grade, resulting in a hostile educational environment for Jane after elementary school. Compl. 15-18, ECF No. 1. Jane's pre-assault claim (Count II) is based on the District's deliberate indifference to the known substantial danger MP posed to female students, allowing MP to sexually assault Jane again in tenth grade. Compl. 18-19, ECF No. 1.[10]

The District concedes that MP sexually harassed Jane and other students in sixth grade and that it had actual notice of these incidents by the end of the students' sixth-grade year. Def's SUMF

---

[9] In its Memorandum in Support of its Motion for Summary Judgment ("the District's Memorandum"), the District conflated Jane's two Title IX claims. *See generally,* Def's Mem. in Supp. of Mot. for Summ. J. ("Def's Mem.") 12-19, ECF No. 49-2.

[10] The District argues that Jane "seeks to hold the District liable for damages she suffered a [sic] result of her encounters with [MP]." Def's Mem. 1; *see also id.* at 10 (Jane "has now brought this lawsuit as the result of [MP]'s alleged repeated instances of sexual harassment and assault."). This is inaccurate. Jane seeks to hold the District liable for the injuries she experienced as a result of the *District's inadequate response* to the numerous reports of MP's harassment—not for MP's harassment itself. *See, e.g.,* Compl. 15-19, ECF No. 1.

¶¶ 4, 9-10, 15; *see also* Def's Mem. Opp'n Pl's Mot. for Partial Summ. J. 11-12, ECF No. 50. The District's sole argument on summary judgment is that it did not act with deliberate indifference to MP's known sexual harassment. But as demonstrated below, a jury could readily find that the District acted with deliberate indifference both to the substantial danger MP posed to female students and to the reports that MP sexually harassed Jane in sixth grade.

In analyzing deliberate indifference, "[c]ourts look to the totality of the circumstances." *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 162 (E.D. Pa. 2020); *see also Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 180 (1st Cir. 2007), *rev'd on other grounds and remanded*, 555 U.S. 246 (2009). A school district, then, may be liable even if it "took *some* action in response to [the] sexual harassment allegations." *Doe v. Sch. Bd. of Broward Cnty. Fla.*, 604 F.3d 1248, 1259-60 (11th Cir. 2010); *see also, e.g.*, *Hall v. Millersville Univ.,* 22 F.4th 397, 411 (3d Cir. 2022) (rejecting school's argument that it was not deliberately indifferent because "it did not just do 'nothing'"); *S.B. v. Bd. of Educ. of Harford Cnty.,* 819 F.3d 69, 77 (4th Cir. 2016) (acknowledging that not just "any half-hearted investigation or remedial action will suffice to shield a school from liability"). That is, a "school district's mere response to reports of unlawful harassment does not in itself defeat an assertion that it was deliberately indifferent," *S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 801 (W.D. Pa. 2016).

In particular, a school may be deliberately indifferent when it fails to change course after its initial response proves ineffective. *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (upholding jury verdict against school where it had "continued to use the same ineffective methods" to stop the abuse of the plaintiff); *Doe v. Sch. Dist. No. 1, Denver, Colo.*, 970 F.3d 1300, 1314 (10th Cir. 2020) (holding plaintiff pleaded deliberate indifference where "authorities knew that what they had been doing (if anything) had not sufficed" because "[f]ailure

of authorities to try something new can show deliberate indifference"); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (holding school could be deliberately indifferent where "a jury reasonably could have found that the District ignored the many signals that greater, more directed action was needed"); *S.K.*, 168 F. Supp. 3d at 802 (holding a "failure to undertake different or additional measures where it has become apparent that the initial approach has proved to be woefully insufficient supplies a factual basis to permit a finding of deliberate indifference").

Unsurprisingly, then, whether a school acted with deliberate indifference in responding to reported sexual harassment "will often be a fact-laden question." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n.12 (5th Cir. 1994). And "matters of degree"—such as whether a school was clearly unreasonable or merely unreasonable—"are often best left to the jury." *Doe v. Sch. Dist. No. 1*, 970 F.3d at 1311-12. As explained below, a jury could certainly conclude that the District acted with deliberate indifference to MP's known sexual harassment. Summary judgment is therefore inappropriate on both of Jane's Title IX claims.

**A. The District is Not Entitled to Summary Judgment on Jane's Pre-Assault Claim.**

A school district may be liable under Title IX for failing to prevent a student's sexual harassment when "(1) an appropriate person at the school (2) had actual knowledge of facts indicating a substantial danger to students and (3) acted with deliberate indifference to that danger." *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017) (citing *Bostic*, 418 F.3d at 361). The District moves for summary judgment on only the last element, deliberate indifference. Def's Mem. 12-19. A jury, however, could find that the District was deliberately indifferent to the substantial danger MP posed.

The District does not dispute that, before MP sexually assaulted Jane in tenth grade, it had received reports that MP had sexually assaulted Jane and at least six other students. Def's SUMF ¶¶ 9, 12; Pl's Ex. 7 Bowen Notes, NPSD 1018; Pl's Ex. 16, Jan. 6, 2016 Suspension Ltr. Moreover,

the District had substantiated no less than five of these reports by the time MP sexually assaulted Jane again in tenth grade. Pl's Ex. 7, Bowen Notes, NPSD 1016, 1018; Pl's Ex. 16, Jan. 6, 2016 Suspension Letter.[11]

Once the District knew about the risk MP posed to its students, it had an obligation to respond to that risk in a manner that was not deliberately indifferent. *C.K. v. Wrye,* 751 F. App'x 179, 184 (3d Cir. 2018). As explained above, a school is deliberately indifferent if its actions are not reasonably calculated to ameliorate that risk and prevent further harassment. *See supra* pp. 15-16. That will be the case where a school's response is not proportionate to the degree of risk: the more reports it receives about a harasser, the more is expected of the school's response. *See Broward Cnty.,* 604 F.3d at 1261 (holding the "known circumstances" from which to evaluate the reasonableness of the board's response "changed significantly" once a second student had filed a sexual harassment complaint against the same teacher); *Se. Delco Sch. Dist.,* 272 F. Supp. 3d at 689-90 (explaining courts must look to the "apparent gravity of the risk" in determining whether a school's response to the risk was deliberately indifferent). Consequently, when a school receives multiple reports of harassment, even a swift response to the initial report does not foreclose a

---

[11] Based on this evidence, Jane moved for summary judgment on the "actual notice" element of her pre-assault claim. *See* Pl. Jane Doe's Mem. in Supp. of Mot. for Summ. J. ("Pl's Mem.") 17-20, ECF No. 47-1. It is indisputable that the District knew MP posed a substantial danger to students, as required to establish the District's "actual notice." *See C.K. v. Wrye,* 751 F. App'x 179, 184 (3d Cir. 2018) (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 659 (5th Cir. 1997)) (holding that a school has actual knowledge when it knows that an individual "posed a substantial risk of harassing students in general," not one student specifically); *see also* Pl's Ex. 13, June 10, 2015 Ltr. to Andrew from Superintendent Dietrich ("June 10, 2015 Ltr. to Andrew"), NPSD 997. The District was wrong, in its opposition to Jane's motion, to say that it needed knowledge that MP posed a threat to Jane specifically. *C.K.,* 751 F. App'x at 184; *see also Broward Cnty.,* 604 F.3d at 1257 (noting "no circuit has interpreted [Title IX's] actual notice requirement so as to require notice of the prior harassment [by teacher] of the Title IX plaintiff herself" and citing cases); *Escue v. N. Okla. Coll.,* 450 F.3d 1146, 1154 (10th Cir. 2006) (noting schools may have actual notice of teacher's harassment based on "prior complaints by other students"); *Delgado v. Stegall,* 367 F.3d 668, 672 (7th Cir. 2004) (similar), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009); *see also* Def's Mem. Opp'n Pl's Mot. for Partial Summ. J. 12-13, ECF No. 50. But, of course, the District had such specific knowledge, since Jane herself had reported previous assaults by MP.

finding of deliberate indifference. *See Broward Cnty.*, 604 F.3d at 1260-63 (holding a jury could find the board acted with deliberate indifference even though it conducted a thorough investigation in response to the initial report of sexual harassment).

That is the case here. Even if a jury views the District's initial response to the sixth-grade reports as reasonable, it could nevertheless conclude that the District acted with deliberate indifference to the gravity of the risk MP continued to pose to Jane and other female classmates after elementary school—a risk that grew only more obvious as the District received additional student complaints that MP sexually assaulted them. The District knew of five substantiated reports of sexual assault against MP by the time he began high school. But the only step it took at the start of the tenth-grade school year to address the risk MP presented was to check his and Jane's schedules for overlapping classes *once*. Where the "gravity of the risk" of future sexual harassment is readily "apparent," as it was here, it is clearly unreasonable for a school district not to put significant safeguards in place to prevent future abuse. *Se. Delco Sch. Dist.,* 272 F. Supp. 3d at 663, 689-90. Though the District knew that students' schedules changed regularly during the add/drop period, it did not put in place any additional safeguards to prevent Jane from being placed in a class with MP. Def's Ex. J, Bauer Dep. at 284:19-285:18; Def's Ex. K, Small Dep. at 96:11-14; Def's SUMF ¶¶ 44-45. It did not even re-check Jane and MP's respective schedules. Def's Ex. K, Small Dep. at 97:3-6. *See Broward Cnty.,* 604 F.3d at 1260-63 (holding that a reasonable jury could find the school board acted with deliberate indifference even where the school conducted a thorough investigation and placed the harasser on administrative leave). A reasonable jury could find that the District acted with deliberate indifference by taking such minimal action to address the increasingly apparent risk MP presented to female students.

Schools also act with deliberate indifference when they downplay students' reports of sexual harassment, such as by categorizing reported sexual harassment as less serious misconduct. *See, e.g., Doe v. Pennridge Sch. Dist.,* 413 F. Supp. 3d 393, 411 (E.D. Pa. 2019) (stating that a school may not employ "a shadow procedure that fail[s] to accurately categorize student complaints"); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 691 (4th Cir. 2018) (explaining that a school's "downplay[ing]" reports of harassment is evidence of deliberate indifference); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247-48 (10th Cir. 1999) (explaining that school principal's failure to enforce the district's sexual harassment policy is evidence of deliberate indifference).

Here, though the District knew of the danger MP posed as a serial sexual harasser when he was in sixth grade, the evidence shows it took minimal steps to protect students from his abuse after he left Gwynedd Square Elementary School. *See generally* Def's SUMF. From the very start, the District swept MP's abuse under the rug by miscategorizing the multiple sexual assaults in elementary school as a single instance of "obscene lang[uage]/gesture" in his disciplinary record. Pl's Supp. Ex. 3, MP's Discipline Incident List. By misclassifying these offenses and documenting them as a single incident, the District ensured that future administrators and staff at other District schools would be unaware of the danger he presented, thereby making it substantially more likely that MP would be able to continue sexually assaulting his classmates. Pl's Supp. Ex. 6, Shakeshaft Rep. at 72. In addition, despite having a policy of sharing key information about incoming students with administrators, the District produced no evidence that it shared information about MP's history of sexually abusing his classmates with administrators at his middle school. *See* Def's SUMF ¶ 26 (conceding "[i]t is unclear whether information concerning" MP's assaults on Jane at

Gwynedd Square "was given to [MP's middle school].").[12] *See Hall,* 22 F.4th at 411 (treating university's failure to follow its own Title IX policy as evidence of deliberate indifference).

Even as MP continued to harass additional classmates, the District refused to change its ineffective strategy—a clearly unreasonable response to the risk he posed to female students. *See supra* pp. 15-16 (collecting cases explaining that a school's response to known sexual harassment is clearly unreasonable if it continues to apply the same, futile strategy). Here, when the District learned that MP had sexually harassed two additional classmates at this middle school, it merely suspended MP for three days—though it knew that his previous suspension had not changed his behavior. Pl's Ex. 16, Jan. 6, 2016 Suspension Ltr. Unsurprisingly, the second short suspension did nothing to stop MP's pattern of assaulting his classmates either: he went on to sexually assault Jane repeatedly in tenth grade. Def's Ex. B, Jane Doe Dep. at 107:1-4. The fact that the District merely employed the same punishment—one that it already knew had failed—to dissuade MP from sexually assaulting his classmates is further evidence of its deliberate indifference. *See supra* p. 17.

In sum, the District failed in its response to MP's sexual harassment at nearly every turn: it didn't even ask MP about some of his reported sexual assaults in elementary school; it downplayed the seriousness of his assaults in elementary school by misclassifying the reason for his suspension and documenting it as a single incident instead of multiple; it failed to share information about his history of sexually abusing his classmates with his middle school and with staff at North Penn; and it failed to take any meaningful steps to change or stop MP's recurrent

---

[12] The District says it sent MP's "cumulative file" to his middle school, implying that the file would alert administrators at the middle school to MP's history of abusing his classmates. Def's SUMF ¶ 25. But the District's cumulative files do not include students' discipline histories. *See* Def's Ex. G, McCue Dep. at 161:6-17; *see also* Pl's Supp. Ex. 5, MP's Cumulative File (containing no discipline history); Pl's Supp. Ex. 6, Shakeshaft Rep. at 71 (explaining same).

harassing behavior. Taking all of the evidence together a jury could conclude that the District acted with deliberate indifference to the known risk MP posed to other students, and so enabled his additional sexual assaults of Jane in tenth grade.

In asserting that it was not deliberately indifferent to the danger posed by MP, the District suggests that, in assessing its response, the Court should only look to its actions (or lack thereof) in the immediate aftermath of the reports of MP's assaults on Jane in the sixth grade. *See* Def's Mem. 3-4, 14-19. The District cites no authority for this point, and other courts consistently look to a longer time period. *See, e.g., Zeno*, 702 F.3d at 667 (considering school district's response to harassment "over three-and-a-half years"); *Goodwin v. Pennridge Sch. Dist.*, 389 F. Supp. 3d 304, 316-19 (E.D. Pa. 2019) (similar, over two years); *Vance,* 231 F.3d at 256-57, 262 (similar, over three school years). That approach is more consistent with the Supreme Court's directive to look at the totality of the circumstances. *Davis,* 526 U.S. at 648-49.

Next, the District blames Jane herself for not alerting any staff that she and MP were in the same class in tenth grade. *See, e.g.,* Def's SUMF ¶ 46; Def's Mem. 18-19. But Jane had every reason to think the District already knew that: it had access to both students' schedules, and had promised her and her mom it would check those schedules to ensure no overlap. So, when Jane found herself in class with MP, she thought the District "just blew [her] off" and denied her request. Def's Ex. B, Jane Doe Dep. at 103:2-12. She also "didn't know how to tell" her teacher—a strange new adult—about her extensive history of sexual trauma at MP's hands, *id.* at 103:21-24. Any child would struggle to do so; that's why Title IX tasks school administrators, not young students, with coordinating a response to any known risk of sexual harassment.

The District then blames Jane's mother, asserting that it did not tell Jane's teachers that Jane and MP could not be near each other because Jane's mother asked them not to. *See, e.g.,* Def's

Mem. 7, 18; Def's SUMF ¶¶ 41-43. That misses the point. Jane's mother made her request, taking the District at its word that Jane and MP would not be assigned to the same classes. Def's Ex. B, Jane Doe Dep. at 97:9-19. Teachers wouldn't need to know, then, about Jane and MP's history, because there would be no opportunity for them to be in the same classroom. Jane's mom did not want the District to share sensitive information about her daughter without reason. But the District *created* a reason when it broke its promise and assigned Jane and MP to the same class.

A jury, then, could undoubtedly find that the District was deliberately indifferent to the substantial risk MP posed to students, and thus enabled his additional assaults of Jane in tenth grade. Accordingly, the District is not entitled to summary judgment on Jane's pre-assault Title IX claim.

**B. The District is Not Entitled to Summary Judgment on Jane's Post-Assault Claim.**

A school district may be liable under Title IX for failing to respond appropriately to a sexual assault report, when a plaintiff shows that: (1) she was sexually harassed in a district program or activity, (2) the district had actual notice of the harassment, (3) the district was deliberately indifferent to the reported harassment, and (4) the harassment was sufficiently serious to deprive her of access to educational opportunities or benefits. *Davis,* 526 U.S. at 645-50. The District concedes that MP sexually harassed Jane in sixth grade and that it had actual knowledge of those assaults. *See* Def's Mem. Opp'n Pl's Mot. for Partial Summ. J. 11, ECF No. 50. Its sole argument on this motion is that it did not act with deliberate indifference to MP's known sexual harassment. But a jury could find that the District's response to MP's sexual harassment of Jane was clearly unreasonable because it took little action to ensure that Jane could continue her education safely after the assaults, forcing her to transfer schools, subjecting her to a hostile environment, and enabling MP's later assaults.

For a post-assault claim, a court looks not just to whether a school's response was reasonably calculated to prevent reoccurrence of the harassment, but also to its efforts—or lack thereof—to ensure the survivor's continued access to education in the wake of the reported abuse. *See, e.g.*, *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 271-74 (4th Cir. 2021), *petition for cert. filed*, 1 F.4th 257 (Jan. 6, 2022); *Goodwin*, 389 F.Supp.3d at 317-18; *Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d at 404-07; *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 578-80 (W.D. Pa. 2019); *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 370-71 (W.D. Pa. 2008); *C.S. v. S. Columbia Sch. Dist.*, No. 4:12-cv-1013, 2013 WL 2371413, at *9-10 (M.D. Pa. May 21, 2013). If a school's response is clearly insufficient to ensure a victim can safely continue her education, or to ameliorate any post-assault hostile environment, it may be deliberately indifferent. *See, e.g.*, *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1105 (10th Cir. 2019) (holding university was deliberately indifferent where its failure to protect plaintiffs from further assaults forced them to sacrifice educational opportunities to stay safe); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (holding university was deliberately indifferent where its failure to address rape caused plaintiff to leave school); *Goodwin*, 389 F. Supp. 3d at 317-18 (holding jury could find school was deliberately indifferent when it failed to address hostile environment stemming from rape); *Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d at 404-07 (holding school could be deliberately indifferent where its failed response forced student into inferior alternative school); *MDB*, 386 F. Supp. 3d at 578-80 (holding defendant was deliberately indifferent where its failure to address sexual abuse caused plaintiff to transfer out of school); *Dawn L,* 586 F. Supp. 2d at 370 (similar); *C.S.,* 2013 WL 2371413, at *9 (similar).

A jury, then, could find that the District acted with deliberate indifference by failing to make any meaningful effort to ensure that Jane could safely attend school after sixth grade. *Manor*

*Coll.*, 479 F. Supp. 3d at 164-66 (holding a jury could find deliberate indifference when a school failed to provide any safety accommodations after plaintiff reported a sexual assault).Though the District took steps to keep MP away from Jane for the remaining two months of her sixth-grade school year, it offered no plan and implemented no measures to ensure she would be safe after summer break, when she and MP were scheduled to enroll, together, at their local middle school. Pl's Supp. Ex. 9, 2014-2015 NPSD Academic Calendar. Because the District offered no plan to protect Jane from MP in their shared middle school—and because it never informed her of her Title IX rights to protections from further harassment—Jane was forced to transfer to a different middle school. *See* Def's SUMF ¶ 22 (conceding that Jane was only transferred to a different middle school because Jane's mother requested a transfer so that she could stay away from MP); Def's Ex. C, Deposition of Jane's Mother at 70:1-72:9 (Nov. 2, 2021) (explaining that the District never informed Jane's mother about Title IX). That is, because the District had no plan to keep Jane safe, she had to sacrifice her own educational opportunities to avoid MP.

A jury could also find that the District's failure to protect Jane's education beyond sixth grade subjected her to a hostile environment at North Montco. "[A] reasonable jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create" a hostile educational environment. *Kelly v. Yale Univ.*, No. Civ.A.3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003); *see also Kinsman v. Fla. State Univ. Bd. of Trs.*, No. 4:15CV235, 2015 WL 11110848, at *4 (N.D. Fla. Aug. 12, 2015) (similar); *Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D. Conn. 2009) (similar); *cf. Lapka v. Chertoff*, 517 F.3d 974, 984-85 (7th Cir. 2008) (similar, for Title VII); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 137 (2d Cir. 2001) (same); *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) (same). For that reason, courts have found that a school may be deliberately indifferent where it fails to ensure the plaintiff's

ability to move about campus free from fear of encountering her harasser. *Kelly*, 2003 WL 1563424, at \*4-5; *see also Doe v. Bd. of Regents of Univ. of Wis.,* No. 20-cv-856, 2021 WL 5114371, at \*3-4 (W.D. Wis. Nov. 3, 2021) (explaining university was deliberately indifferent when it "forced [her] to attend school with her perpetrator" and collecting cases); *Hernandez v. Baylor Univ.,* 274 F. Supp. 3d 602, 613 (W.D. Tex. 2017) (similar).

Here, the District knew that MP had sexually assaulted Jane repeatedly (Def's SUMF ¶ 10) and that Jane went to the lengths of transferring middle schools to avoid him. *Id.* at ¶ 22. Yet, it sent both Jane and MP to North Montco without even providing North Montco a word of warning. Def's Ex. L, LeBlanc Dep. at 11:3-4. Indeed, the District prevented North Montco from learning about the assaults through MP's student record by misclassifying his repeated sexual assaults as one instance of "obscene lang[uage]/gesture." *See* Pl's Supp. Ex. 3, MP's Discipline Incident List. It is no surprise, then, that Jane encountered MP soon after the start of the school year, creating a hostile educational environment for Jane and causing her significant distress. Def's Ex. L, LeBlanc Dep. at 10:18-22, 11:12-21.

A jury could also find for Jane on her post-assault claim for much the same reasons it could find for Jane on her pre-assault claim: the District's clearly unreasonable response to the obvious risk of further harassment by MP enabled him to further sexually assault Jane. *See supra* Section I.A; *see also Davis,* 526 U.S. at 645 (explaining that schools are deliberately indifferent to sexual harassment when their response "cause[s] students to undergo harassment or make[s] them liable or vulnerable to it" (internal quotation marks omitted)); *Zeno,* 702 F.3d at 670 (explaining that by failing to implement appropriate remedial actions in a timely manner, schools "'effectively

cause[]' further harassment" (quoting *Davis,* 526 U.S. at 642-43)).[13] For the reasons explained at length above, a jury could find that the District caused Jane to experience not only a hostile environment but also additional sexual assaults by placing Jane and MP in the same social studies class—and that it did so despite the District's assurances that it would keep them separate. *See supra* pp. 18-21; *see also* Pl's Ex. 25, Oct. 15, 2018 Memo from Kate Small, Doe 668; Def's Ex. J, Bauer Dep. at 323:6-8.[14]

As previously explained, the District unpersuasively attempts to escape liability for its enormous failures by focusing solely on its conduct during two months of sixth grade, and by trying to shift the blame for the tenth-grade sexual assaults to Jane and her mother. *See supra* pp. 21-22. The District is no more convincing when it tries to take credit for the actions of others to protect Jane from abuse: it wrongly implies that it may have been responsible for the interventions that North Montco put in place to protect Jane (Def's SUMF ¶¶ 34-35) and for contacting the police when MP's assaults on Jane in sixth grade were first reported. Def's Mem. 3.

In arguing that it was not deliberately indifferent to Jane's sexual harassment report in sixth grade, the District relies heavily on three unreported cases that are completely inapposite. Def's Mem. 14-18. In the two cases where the defendant schools substantiated the reported abuse, they employed many more interventions than the District did here in response to much less severe sexual harassment. *See Vaird v. Sch. Dist. of Phila.,* No. CIV. A. 99-2727, 2000 WL 576441 (E.D.

---

[13] Though further harassment supports a finding of deliberate indifference, it is not required for one. *See Fairfax,* 1 F.4th at 274; *Fitzgerald,* 504 F.3d at 172; *Williams,* 477 F.3d at 1295-97; *see also Hall,* 22 F.4th at 409 n.4. *But see Kollaritsch v. Mich. State Univ. Bd. of Trs.,* 944 F.3d 613, 623-24 (6th Cir. 2019), *cert. denied.* 141 S. Ct. 554 (Oct. 13, 2020).

[14] Assistant Superintendent Todd Bauer is the District's Rule 30(b)(6) designee. His testimony is therefore "deemed to be the testimony of the [organization] itself." *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.,* 250 F.R.D. 203, 212 (E.D. Pa. 2008). Though Rule 30(b)(6) testimony "is not a judicial admission absolutely binding on th[e] party," *id.* (quoting 8A Charles Alan Wright *et al.*, Fed. Prac. & Proc. § 2103 (Supp. 2007)), "the party may [not] retract prior testimony with impunity." *Id.*

Pa. May 12, 2000); *Ings-Ray v. Sch. Dist. of Phila.,* No. Civ.A. 02-CV-3615, 2003 WL 21250556 (E.D. Pa. Apr. 30, 2003). In *Vaird*, for example, the defendant initiated a transfer for the harassing student to a new school after receiving a single report. 2000 WL 576441 at *1. In *Ings-Ray*, the school developed a comprehensive intervention plan to protect the victim and rehabilitate the harasser, and even changed its school curriculum to prevent future abuse. 2003 WL 21250556, at *1-2. Rather than help the District, then, these cases only highlight the inadequacy of the District's response to the threat posed by MP.[15]

\*\*\*

For the above-mentioned reasons, the District is not entitled to summary judgment on either Jane's pre- or post-assault Title IX claims.

## II. The District is Not Entitled to Summary Judgment on Jane's §1983 Failure to Train Claim.

The Court should also deny the District's motion for summary judgment on Jane's § 1983 claim because questions of material fact remain as to whether the District deprived Jane of her Fourteenth Amendment right to "equal protection of the laws." U.S. Const. amend. XIV, § 1. The District does not dispute that a school district's refusal to remedy sex discrimination, including sexual harassment, violates a student's equal protection rights. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249-50 & n.7 (10th Cir. 1999) (citing cases). Where, as here, a school district has a custom, policy, or practice of acting with "deliberate indifference" to student-on-

---

[15] In *Ings-Ray,* the sexual harassment involved only two instances of touching, with no penetration. 2003 WL 21250556 at *1. In *Vaird,* a classmate sexually assaulted and then (later the same day) punched the plaintiff. 2000 WL 576441 at *1. And in *M.J.G. v. School District of Philadelphia,* the alleged abuse was not only less severe than MP's but was unsubstantiated. 774 F. App'x 736, 738-39 (3d Cir. 2019).

student sexual harassment, a jury could hold the District liable under § 1983 for violating the Equal Protection Clause. *See id.* at 1249-50.[16]

Specifically, a jury could conclude that the District's failure to train its employees on how to prevent, recognize, and remedy peer sexual harassment constituted deliberate indifference. To defeat summary judgment on her § 1983 failure to train claim, Jane need only show that there is a question of material fact as to whether "there was: (1) an 'identified deficiency' in the training (2) caused by a deliberate indifference to her rights (3) that 'actually caused' the constitutional violation." *Goodwin v. Pennridge Sch. Dist.*, 389 F. Supp. 3d 304, 321 (E.D. Pa. 2019) (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)). A jury could find that Jane has established that District officials had no training on student-on-student sexual harassment; the District's failure to train its staff on student-on-student sexual harassment demonstrated deliberate indifference to students' right to be free from sexual harassment at school; and the failure caused Jane to suffer repeated sexual harassment in violation of her equal protection rights.

### A. The District Failed to Provide Training on Student-on-Student Sexual Harassment.

A jury could find that the District did not train its employees on how to prevent, recognize, or respond to student-on-student sexual harassment. The District's disagreement only underscores that the adequacy of its training is a "contested issue[] of material fact" and therefore "must go to the jury." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

As Dr. Shakeshaft explained, the District produced no evidence that it had trained any staff on identifying, responding to, or remedying student-on-student sexual harassment, despite the obvious need for it—and Jane found plenty of evidence that it didn't. Pl's Supp. Ex. 6, Shakeshaft

---

[16] The District also does not dispute that it is subject to § 1983. Answer to Pls.' Compl. 2, ECF No. 13; *see also D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*, Nos. Civ. A. 90-3018, 90-3060, 1991 WL 14082, at *5 (E.D. Pa. Feb. 1, 1991), *aff'd*, 972 F.2d 1364 (3d Cir. 1992).

Rep. at 63-68. In response to Jane's discovery request, the District did not produce *any* staff training materials addressing Title IX or student-on-student sexual harassment. *Id.* at 63-65. And several of the key District employees involved in this case testified that the District had not trained them on Title IX. *Id.* at 64-65. Indeed, a number of District employees specifically tasked with responding to MP's sexual assaults admitted that they lacked relevant training. For example, Holly Garrett, who witnessed MP sexually assault Jane during the students' sixth-grade, year testified that she did not even know what Title IX was at that time, could not recall any training about Title IX at the District, and did not know what constituted "consent" between children. Def's Ex. D, Garrett Dep. at 24:10-22, 27:10-17. As Dr. Shakeshaft explained: "Holly [Garrett] was remarkably uninformed about student-on-student sexual abuse." Pl's Supp. Ex. 6, Shakeshaft Rep. at 66.

Other District employees testified that they had not received, or could not recall receiving, training on Title IX. Gwynedd Square's principal, Bill Bowen, testified that he could not recall receiving any training about Title IX before or during Jane's sixth-grade year. Def's Ex. F, Bowen Dep. at 23:11-15. Nor did he provide any such training to Gwynedd Square staff. *Id.* at 39:16-19. Even the District's 30(b)(6) designee, Assistant Superintendent Todd Bauer, testified that when he became principal of North Penn High School in 2015, the District did not mention Title IX to him or provide Title IX training at the high school during his three-year tenure there. Def's Ex. J, Bauer Dep. at 33:21-34:20.[17] Based on her review of the record in this case, Dr. Shakeshaft concluded that the District appears not to have trained its staff on *any* of the twenty-nine areas that the United States Department of Education recommends for students, staff, and caregivers to prevent peer-to-peer sexual misconduct. Pl's Supp. Ex. 6, Shakeshaft Rep. at 66-68.

---

[17] Bauer was principal of North Penn High School for three years before he became an Assistant Superintendent in the District. Def's Ex. J, Bauer Dep. at 17:11-18:9.

Though the District claims that its employees received training "relating to harassment and child safety" (Def's Mem. 20), that training did not include information on *student-on-student* sexual harassment or Title IX. Instead, that training focused on school employee sexual misconduct toward students and state child abuse reporting requirements. Pl's Supp. Ex. 6, Shakeshaft Rep. at 65. That training was inadequate to prepare staff to recognize and address student-on-student sexual harassment, and so cannot shield the District from liability here. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 (1989) (noting that, for the purposes of a §1983 failure to train claim, "the focus must be on the adequacy of the training program in relation to the tasks the particular [persons] must perform").

For example, teachers need specific training to identify what conduct between students constitutes sexual harassment so they can intervene and, when necessary, escalate their concerns. *See* Pl's Supp. Ex. 6, Shakeshaft Rep. at 101. While sexual contact between teachers and minor students is always abusive, to identify student-on-student sexual harassment, school staff must be able to differentiate between welcome and unwelcome conduct between peers. *See id.* at 16, 71. And consent looks different in adults versus children. Jennifer Ann Drobac, *'Developing Capacity': Adolescent 'Consent' at Work, at Law, and in the Sciences of the Mind*, 10 U.C. Davis J. Juv. L. & Pol'y 1, 23-30 (2006). Without specific training, then, adults may not able to recognize student-on-student sexual harassment for what it is, instead writing it off as consensual—just as Ms. Garrett did when she witnessed MP reach his hand up Jane's shirt. *See* Ellie Young *et al.*, *Sexual Harassment Among Students With Educational Disabilities,* 29 Remedial & Special Educ. 1, 2 (2008), https://bit.ly/3kmRZow (explaining that adults may struggle to tell the difference between sexual harassment and consensual contact between students); Def's Ex. D, Garrett Dep. at 70:9-12. They might also dismiss it as non-sexual bullying of the type common among children.

*See, e.g.*, Russlynn Ali, Assistant Sec'y for Civ. Rts., Office for Civ. Rts., U.S. Dep't of Educ., Dear Colleague Letter 2-4, 6-7 (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/ letters/colleague-201010.pdf ("2010 Bullying Guidance") (describing "school employees [who] failed to recognize that the 'hazing' [a student faced] constituted sexual harassment"); *see also Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d 393, 400 (E.D. Pa. 2019) (noting staff discretion "to categorize complaints as 'harassment' or 'peer conflict'"). So, to adequately identify and respond to peer sexual harassment among students, school employees must be specifically trained to do so. *See* Pl's Supp. Ex. 6, Shakeshaft Rep. at 66-68; *see also Doe v. Hamilton Cnty. Bd. of Educ.,* 329 F. Supp. 3d 543, 580-81 (E.D. Tenn. 2018) (denying school board's summary judgment motion because "at least some acquaintance with Title IX and student-on-student harassment training seems to be at least minimally necessary" for district employees who work with students). Accordingly, a jury could conclude that the District did not provide its staff necessary training on student-on-student sexual harassment.

> **B. The District Was Deliberately Indifferent Because the Need for Sexual Harassment Training was Obvious.**

A jury could find that the District's failure to train employees on how to handle student-on-student sexual harassment allegations constitutes deliberate indifference, both because of the frequency of such harassment in schools and the patently obvious negative consequences of a failure to train. The District provided no training on peer sexual harassment even though it was extremely likely that this kind of sexual harassment would occur and it was highly predictable that school officials "lacking specific tools to handle that situation w[ould] violate [students'] rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997). Under such circumstances, the "policymakers' decision not to train the officer reflect[s] 'deliberate indifference.'" *Id*. "Because sexual assault claims arise frequently in the public high school

context, it is certainly foreseeable that the failure to train school staff on how to handle such claims would cause disastrous results." *Doe v. Forest Hills Sch. Dist.*, No. 1:13-cv-428, 2015 WL 9906260, at \*17 (W.D. Mich. Mar. 31, 2015). U.S. Department of Education guidance and regulations also require schools to train their employees on responding to student-on-student harassment, including sexual harassment. *See, e.g.*, 2010 Bullying Guidance at 7 (stating that schools "should… train[ their] employees on the type of misconduct that constitutes sexual harassment."); 34 C.F.R. § 106.45 (2020) (requiring that "Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution" receive training on sexual harassment and investigating complaints thereof, among other things).

By failing to provide such training, a jury could find that the District was deliberately indifferent to Jane's constitutional right to be free from sex-based harassment. In *City of Canton*, the Supreme Court explained that the need to train police officers on the constitutional limits of their use of deadly force is so obvious that failure to do so constitutes deliberate indifference. 489 U.S. at 390 n.10. The same is true for the need to train school officials on how to address student-on-student sexual harassment allegations. As one district court explained:

> Just like failing to train a police officer on when to use his or her gun, failing to train a school principal on how to investigate sexual assault allegations constitutes deliberate indifference. It is inevitable that these situations would arise at some point, and the complex Title IX requirements virtually ensure that an investigation done without any formal training would be deficient.

*Forest Hills Sch. Dist.,* 2015 WL 9906260, at \*17; *see also Hamilton Cnty. Bd. of Educ.,* 329 F. Supp. 3d at 580-81. That was exactly the case here: District employees' complete lack of training on the relevant issues resulted in MP sexually harassing Jane and other students—a predictable outcome.

### C. The District's Failure to Train Caused Jane's Constitutional Injury.

Finally, there is a genuine issue of material fact as to whether the District's failure to train caused Jane's constitutional injury. Sex-based discrimination at school, including sexual assault, violates a student's equal protection rights. *Murrell*, 186 F.3d at 1249-50 & n.7; *see also Davis*, 526 U.S. at 649-50 (sexual assault is a form of sex-based discrimination). As a direct result of the District's failure to train its employees, it deprived Jane of her equal protection right to attend school free from sexual harassment.

A jury could find that, had the District appropriately trained its staff on student-on-student sexual harassment, it would not have failed to respond to MP's sexual harassment in so many obvious ways. It would not have failed to accurately note on MP's file that Gwynedd Square suspended him for serial sexual abuse of his classmates. It would not have failed to inform MP's middle school about his history of sexual abuse. It would not have sent Jane and MP to North Montco without warning North Montco staff. It would have ensured MP and Jane did not share any classes in tenth grade. A jury could find, then, that the District's failure to train its employees on Title IX and student-on-student sexual harassment caused Jane to suffer repeated sexual harassment in violation of the Equal Protection Clause.

### CONCLUSION

For the reasons stated above, Plaintiff Jane Doe respectfully requests that the Court deny Defendant North Penn School District's Motion for Summary Judgment in its entirety.

<div style="margin-left:45%">

Respectfully submitted,

</div>

Date:   May 2, 2022

<div style="margin-left:45%">

By: s/ Laura E. Laughlin
Laura E. Laughlin (311896)
Messa & Associates, P.C.
123 S. 22nd Street
Philadelphia, PA 19103
Tel: (215) 568-3500
llaughlin@messalaw.com

</div>

Adele P. Kimmel*
Alexandra Z. Brodsky*
Mollie L. Berkowitz†*
Public Justice, P.C.
1620 L Street, NW
Suite 630
Washington, DC 20036
Tel: (202) 797-8600
akimmel@publicjustice.net
abrodsky@publicjustice.net
mberkowitz@publicjustice.net

*Admitted *Pro Hac Vice*
† Application to the D.C. Bar pending;
Admitted to practice in New York.